**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| IN RE CAPRI HOLDINGS LTD. SECURITIES LITIGATION | Case No. 24-cv-1410-MN |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
Telephone:  (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

MAY 15, 2025

# TABLE OF CONTENTS

                                                                        **Page**

I.      NATURE OF THE ACTION ................................................................... 2

II.     JURISDICTION AND VENUE ............................................................. 5

III.    PARTIES ................................................................................................ 7

        A.      Plaintiffs ................................................................................... 7

        B.      The Capri Defendants ............................................................. 8

        C.      The Tapestry Defendants ........................................................ 8

IV.     FACTUAL BACKGROUND OF DEFENDANTS' FRAUD ............ 9

        A.      Background of the Capri Acquisition and Its Related Antitrust
                Implications—Defendants Hatch their Anticompetitive Scheme ......... 9

        B.      Tapestry and Capri Executives' Internal Communications Reveal that
                Defendants Viewed Michael Kors and Coach as Each Other's Top
                Competitor ................................................................................. 14

                1.      Michael Kors and Coach Compete Head-to-Head on Handbag
                        Marketing ......................................................................... 16

                2.      Michael Kors and Coach Compete Head-to-Head by Tracking and
                        Copying Handbag Design ................................................. 19

                3.      Michael Kors and Coach Compete By Confidentially Monitoring
                        Each Other's Pricing ......................................................... 21

        C.      Confidential Capri and Tapestry Records Reveal Defendants Viewed
                Michael Kors, Coach, and Kate Spade as Close Competitors in an Internally
                Defined Market: the Accessible Luxury Handbag Market ................... 26

                1.      Internal Documents Reveal that Defendants Recognized that
                        Michael Kors, Coach, and Kate Spade Directly Compete in the
                        Accessible Luxury Handbag Market ................................. 27

                2.      Confidential Benchmarking Documents Reveal that Defendants
                        Knew Accessible Luxury Brands Do Not Compete with Luxury or
                        Mass Market Brands ......................................................... 29

        D.      Tapestry Sets Out to Acquire Capri for the Undisclosed Anticompetitive
                Purpose of Reducing Competition in the Accessible Luxury Handbag
                Market ........................................................................................ 34

## TABLE OF CONTENTS

Page

E.  Michael Kors's Declining Performance Motivates Capri to Consider Strategic Alternatives ........................................................................ 41

F.  Tapestry and Capri Executives Continue to Internally Discuss Their Close Competition Throughout the Deal Process and After the Capri Acquisition was Announced on August 10, 2023 .................................... 42

G.  The Cover-Up:  After the FTC Filed Suit, Defendants Attempt to Conceal Their Internal Knowledge of the Competition between Michael Kors, Coach, and Kate Spade in the Accessible Luxury Handbag Market ................. 48

   1.  Defendants Attempt to Conceal Their Knowledge of the Accessible Luxury Handbag Market ........................................................ 49

   2.  Defendants Falsely Claim that Their Accessible Luxury Brands Compete with Luxury and Mass Market Handbag Brands ...................... 54

   3.  Defendants Attempt to Conceal the Fierce Competition Between Michael Kors and Coach ........................................................ 55

   4.  The Tapestry Defendants Attempt to Conceal Their Anticompetitive Rationale for the Capri Acquisition ........................................... 57

V.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD AND THE CAUSALLY RELATED DROPS IN CAPRI STOCK PRICE .......................................... 59

A.  After the Capri Acquisition Announcement on August 10, 2023, Defendants Began Claiming the Capri Acquisition Would Close, Despite Internal Knowledge to the Contrary ..................................................................... 61

   1.  August 10-11, 2023: Capri and Tapestry Announce the Capri Acquisition and Falsely Indicate that the Transaction Would Close ........ 61

   2.  August 17, 2023: Tapestry Falsely Denies Regulatory Hurdles During its Earnings Call Regarding its Q4 2023 Financial Results .......... 67

   3.  August 22, 2023: Tapestry Attends an Investor Conference Hosted by Guggenheim Securities and Falsely Indicates that It Competes in a Fragmented Market .............................................................. 68

B.  Despite the FTC's Second Request on November 3, 2023, Defendants Continued to Issue Misleading Statements ........................................... 70

## TABLE OF CONTENTS

**Page**

    1.    November 6-9, 2023: Capri and Tapestry Disclose the FTC's Second Request and Falsely Reaffirm the Capri Acquisition Close Timeline ......................................................................................................... 70

    2.    February 8, 2024: Tapestry Again Falsely Reaffirms the Capri Acquisition Close Timeline in Public Statements Concerning its Q2 2024 Earnings Results................................................................................. 76

    3.    March 5, 2024: Tapestry Misleadingly Expresses Confidence in the Capri Acquisition Close Timeline at an Investor Conference Hosted by TAG ......................................................................................... 78

C.    Defendants Continued to Misleadingly Claim that the Capri Acquisition Would Close While Disputing Reports in mid-April 2024 that the FTC Would Seek to Block the Deal................................................................. 79

    1.    April 15, 2024: Defendant Crevoiserat Pushes Back on News of FTC Director Henry Liu's Comments ....................................... 79

    2.    April 18, 2024: Defendant Crevoiserat Pushes Back on Reports that the FTC Would Seek to Block the Capri Acquisition............................... 81

D.    Even After the FTC Filed Suit to Block the Capri Acquisition on April 22, 2024, Defendants Falsely Claimed that the Transaction Would Close and Concealed the True Nature of Competition Between Michael Kors and Coach in the Accessible Luxury Handbag Market ............................... 82

    1.    April 22-25, 2024: Defendants Push Back on News that the FTC Has Filed Suit to Block the Capri Acquisition.......................................... 82

    2.    May 9, 2024: Tapestry Falsely and Misleadingly Claims that the Capri Acquisition is "Pro-Competitive" in Public Statements Announcing its Q3 2024 Earnings Results ................................................ 87

    3.    May 22, 2024: Tapestry Falsely Indicates that the Handbag Market is Highly Fragmented at an Investor Conference Hosted by Morgan Stanley.................................................................................................. 89

    4.    May 29, 2024: Capri Falsely Claims that the Capri Acquisition Will Not "Constrain Competition" in a Statement Announcing its Q4 2024 Earnings Results.......................................................................... 91

    5.    August 15, 2024: Tapestry Falsely Claims that the Capri Acquisition is "Pro-Competitive" in a Public Statement Announcing its Q4 2024 Earnings Results........................................................................... 93

**TABLE OF CONTENTS**

**Page**

      6.     September 27, 2024: Tapestry Falsely Claims that the Capri Acquisition is "Pro-Competitive" in its 2024 Annual Proxy Statement........................................................................................... 95

    E.    The Market Finally Learns the Truth: Michael Kors and Coach are Fierce Head-to-Head Competitors in the Accessible Luxury Handbag Market .............. 95

VI.    ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER ................................... 96

VII.    LOSS CAUSATION........................................................................................ 103

VIII.    CLASS ACTION ALLEGATIONS ................................................................... 106

IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ............................................................................................ 108

X.    NO SAFE HARBOR ..................................................................................... 109

COUNT I For Violation of § 10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ................................................................. 110

COUNT II For Violation of §20(a) of the 1934 Act Against All Defendants ........................... 111

XI.    PRAYER FOR RELIEF .................................................................................. 112

XII.    JURY DEMAND .......................................................................................... 112

This is a securities class action on behalf of all persons who purchased Capri Holdings Limited ("Capri") stock or sold Capri puts beginning on August 10, 2023 through and including October 24, 2024 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against Capri, Tapestry, Inc. ("Tapestry"), and certain Capri and Tapestry senior officers and directors.

Lead Plaintiff FNY Partners Fund LP and Plaintiff David R. Hurwitz (each "Plaintiff" and together "Plaintiffs"), on behalf of themselves and all others similarly situated, by Plaintiffs' undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Tapestry and Capri, Tapestry's and Capri's press releases, filings and documents from *Federal Trade Commission v. Tapestry, Inc.*, No. 1:24-cv-03109-JLR (S.D.N.Y. Apr. 23, 2024) (hereinafter "*FTC v. Tapestry*"), documents obtained from the Federal Trade Commission ("FTC") through a Freedom of Information Act ("FOIA") request (including previously confidential and internal Capri and Tapestry emails, text messages, management presentations, and board presentations), analyst reports, media reports, and publicly available reports and information about Tapestry's failed attempted acquisition of all outstanding Capri securities. Plaintiffs believe that substantial additional evidentiary support will result from a reasonable opportunity for discovery.[1]

---

[1]    All internal citations and quotation marks are omitted and all emphasis is added unless otherwise specified. All citations to "Tr." are to the transcripts of the preliminary injunction hearing held in the *FTC v. Tapestry* litigation. Glossaries of key terms, abbreviations, and individuals are attached to the end of this Complaint as Appendix A.

## I.     NATURE OF THE ACTION

1.     Following months of confidential discussions and internal analysis focused on the anticompetitive benefits of merging, on August 10, 2023, Tapestry and Capri announced a transaction whereby Tapestry would purchase all outstanding Capri securities for $57.00 per share (the "Capri Acquisition").  Unbeknownst to investors, the Capri Acquisition was the subject of a fraudulent scheme designed to fool investors, the financial media, consumers, and the FTC into believing that the transaction was beneficial to consumers and shareholders, and not anticompetitive. In furtherance of that scheme, Defendants repeatedly and falsely assured the market that the Capri Acquisition was "pro-consumer," "pro-competition," would "not limit, reduce, or constrain competition," that the relevant market was "fiercely competitive" and "fragmented," and that they expected the transaction to close in 2024.[2]  Analysts parroted these statements when making recommendations that investors buy or hold Capri securities.  However, a multitude of previously confidential—but now exposed—emails, text messages, and corporate presentations make clear that Defendants' principal purpose for the Capri Acquisition was anticompetitive.  This evidence further reveals that Defendants' public statements about Capri securities and the Capri Acquisition were false and misleading, causing economic harm to Plaintiffs and other similarly situated investors.

2.     Tapestry and Capri are fashion firms that sell handbags through well-known subsidiary brands, including Tapestry's Coach and Kate Spade brands and Capri's Michael Kors brand.  Tapestry and Capri had long viewed their respective firms as primary direct competitors in

---

[2]     "Fragmented" markets or industries are characterized by high competition due to, among other things, a large number of firms with low, but relatively equal, market share such that no single firm or group of firms dominate.  In this context, the use of the word "fragmented" when describing two merging companies' product markets indicates that a merger will not reduce competition within the market and thus poses no antitrust enforcement risk.

the "accessible luxury handbag market." Executives of each company closely (and secretly) monitored each other's pricing, discounting, marketing, and designs, reacting in lockstep to any change in strategy in an effort to take market share from one another. Tapestry and Capri internally calculated that they had jointly cornered about four-fifths of the accessible luxury handbag market.

3.     Recognizing that the fierce head-to-head competition between Tapestry and Capri in the accessible luxury handbag market forced the two firms to increasingly rely upon discounting and lower prices, Tapestry executives developed a plan to acquire Capri, thereby absorbing its top competitor. Tapestry internally reasoned that, by joining forces with Capri, it could reduce competition, limit discounts, increase prices, and extract greater profits at the expense of consumers in the accessible luxury handbag market. Capri was similarly motivated; its Michael Kors brand had been in extreme distress, in large part due to its intense competition with Tapestry's Coach and Kate Spade brands.

4.     Following the announcement of the Capri Acquisition, Capri stock began trading predominantly based on the market's expectations as to whether the transaction would close—*i.e.*. whether the transaction would pass antitrust review. As Tapestry and Capri executives well knew, investors, analysts, and the financial media intensely followed and paid close attention to the statements offered by the companies about the status of the Capri Acquisition, including the transaction's expected date of close, competitive and consumer impact, and the scope of the relevant product markets. In sum, the integrity of the market for Capri securities during the pendency of the Capri Acquisition depended primarily on complete and accurate disclosures from each of Tapestry and Capri regarding the true level of antitrust risk inherent in the transaction.

5.     But upon the announcement of the Capri Acquisition and throughout its pendency, in an effort to mislead investors, the financial media, consumers, and the FTC as to the purported

- 3 -

benefits of the deal, the two companies falsely portrayed the transaction as pro-consumer and pro-competition, and the relevant market as highly fragmented.  The market was misled.

6.      As the transaction progressed, despite indications of an intensifying FTC review, Tapestry and Capri continued to forcefully and falsely deny the rapidly increasing risk that the Capri Acquisition would not receive regulatory approval—doubling down on prior misleading statements about the nature of the transaction, the risks attendant to regulatory approval, and the likelihood of closing.

7.      When the FTC filed suit in the United States District Court for the Southern District of New York ("SDNY") to block the transaction, both Capri and Tapestry took the misleading countervailing rhetoric up another notch.  Capri issued a wildly misleading claim that the "market realities … overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition."  Tapestry falsely claimed that "[t]he Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction and is working expeditiously to close the transaction in calendar year 2024."  Both statements flew in the face of Defendants' internal documents—that had by that time been confidentially turned over to the FTC in discovery—documents that clearly told the story of Defendants' anticompetitive scheme.  Because investors and analysts were in the dark as to the full extent of the antitrust implications reflected in Defendants' internal corporate documents, analysts continued to parrot both companies' misleading statements when recommending that investors transact in Capri securities.

8.      Defendants' material misstatements and omissions about Tapestry's pending purchase of all outstanding Capri securities created a misperception in the market as to the true level of antitrust risk and the likelihood of the transaction closing.  While the FTC investigation ramped up, and even after suit had been filed, Defendants continued their concerted effort to

- 4 -

conceal their anticompetitive scheme. Defendants even went so far as to surreptitiously remove all references to the phrase "accessible luxury"—the name of the relevant product market alleged by the FTC in its lawsuit—from their internal documents and public filings following the date the suit was filed.

9.    Following confidential discovery, argument, briefing, and seven days of testimony, on October 24, 2024, the Honorable Jennifer L. Rochon issued a preliminary injunction against the Capri Acquisition. Judge Rochon determined that a "substantial body of compelling evidence" demonstrated that (a) Tapestry and Capri dominate the well-defined "accessible luxury" handbag market and (b) Michael Kors and Coach are head-to-head competitors such that the Capri Acquisition would cause anticompetitive harm. This "substantial body of compelling evidence" existed in stark contrast to Defendants' public statements about the Capri Acquisition. Neither Capri nor Tapestry appealed Judge Rochon's ruling. Instead, Defendants terminated the merger.

10.    Because the preliminary injunction signaled the death of the Capri Acquisition, the price of Capri stock immediately dropped by nearly 50%, causing substantial economic loss to Capri investors. Notably, the parties did not appeal the Court's ruling and instead chose to terminate their deal. This lawsuit seeks compensation for the damages suffered by Plaintiffs and others who invested in Capri stock, or sold put options referencing Capri stock, while the share price was artificially inflated by Defendants' false and misleading statements concerning Capri securities and the Capri Acquisition as well as the concealment of Defendants' anticompetitive scheme and its attendant risks.

## II.    JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5,

promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and § 27 of the 1934 Act.  Defendants transact business in this District and disseminated the statements alleged to be materially false and misleading herein into this District.  Defendants further agreed that the state and federal courts of Delaware, including this Court, are proper forums for adjudicating their claims related to the Capri Acquisition.  In particular, Defendants agreed that their contractual disputes arising out of the Agreement and Plan of Merger, dated August 10, 2023 ("Merger Agreement"), and Termination Agreement ("Merger Termination Agreement"), dated November 13, 2024 would be litigated exclusively in the state and federal courts of Delaware and that both the Merger Agreement and Merger Termination Agreement are governed by Delaware law, stating in pertinent part as follows:

> This [Merger] Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

> *     *     *

> Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Court of Chancery of the State of Delaware, or, if (and only if) such court finds it lacks jurisdiction, *the Federal court of the United States of America sitting in Delaware*, or, if (and only if) such courts find they lack jurisdiction, any state court sitting in Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement.

> *     *     *

> This [Termination] Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

> *     *     *

> Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Court of Chancery of the State of Delaware, or, if (and only if) such court finds it lacks jurisdiction, *the Federal*

***court of the United States of America sitting in Delaware***, or, if (and only if) such courts find they lack jurisdiction, any state court sitting in Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement ….

13.    Moreover, the brand subsidiaries at issue in this action are incorporated in Delaware, including Michael Kors LLC, Michael Kors (USA) Holdings, Inc., Michael Kors (USA) Inc., Coach (US) Partnership, LLC, Kate Spade Holdings LLC, and Kate Spade LLC.  The true business of these Delaware-incorporated entities, including the level of competition between them, is central to the claims in this action.  As a result of the foregoing, a substantial part of the events and omissions giving rise to the claims occurred, and/or a substantial part of the property from which this litigation arises is situated, in this District.

14.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.    Plaintiffs

15.    Lead Plaintiff FNY Partners Fund LP, as set forth in the certification attached hereto and incorporated by reference herein, purchased Capri stock during the Class Period and suffered damages as a result.

16.    Plaintiff David R. Hurwitz, as set forth in the certification attached hereto and incorporated by reference herein, sold Capri puts and purchased Capri stock during the Class Period and suffered damages as a result.

### B.     The Capri Defendants

17.     Defendant Capri is a fashion firm.  Capri stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "CPRI."  Capri owns fashion brands Michael Kors, Jimmy Choo, and Versace.

18.     Defendant John D. Idol served as Chairman, Chief Executive Officer ("CEO"), and director of Capri during the Class Period.

19.     Defendant Thomas J. Edwards, Jr. served as Executive Vice President, Chief Financial Officer ("CFO"), and Chief Operating Officer ("COO") of Capri during the Class Period.

20.     Defendants Edwards and Idol monitored Tapestry's product offerings and pricing and directed their subordinates to do the same and authored or received numerous communications acknowledging the fierce competition with Tapestry.  Edwards and Idol also made, caused to be made, or controlled certain of the false and misleading statements alleged herein.

### C.     The Tapestry Defendants

21.     Defendant Tapestry is a fashion firm.  Tapestry stock is listed on the NYSE under the ticker symbol "TPR."  Tapestry owns fashion brands Coach, Kate Spade, and Stuart Weitzman.

22.     Defendant Joanne C. Crevoiserat served as President, CEO, and director of Tapestry during the Class Period.

23.     Defendant Scott A. Roe served as CFO and COO of Tapestry during the Class Period.

24.     Defendants Crevoiserat and Roe monitored Capri's product offerings and pricing and directed their subordinates to do the same and authored or received numerous communications acknowledging the fierce competition with Capri, and made, caused to be made, or controlled certain of the false and misleading statements alleged herein.

25.    The Defendants referenced in ¶¶ 17-23 are collectively referred to herein as the "Defendants."

26.    The Defendants referenced in ¶¶ 18-19 and 22-23 above are collectively referred to herein as the "Individual Defendants."   The Individual Defendants are liable for the false and misleading statements pled herein because, through their positions as senior executives and/or members of the Board of Directors (the "Board") of Tapestry or Capri, possessed the power and ultimate authority to control the contents of these companies' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions within Capri and Tapestry, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.

## IV.    FACTUAL BACKGROUND OF DEFENDANTS' FRAUD

### A.    Background of the Capri Acquisition and Its Related Antitrust Implications— Defendants Hatch their Anticompetitive Scheme

27.    Confidential, non-public Tapestry documents show that, from the very start of its M&A process in August 2022, the company's internal rationale for the Capri Acquisition was explicitly anticompetitive.  Tapestry zeroed in on Capri as an acquisition target, precisely due to the direct head-to-head competition between Michael Kors (Capri) and Coach (Tapestry). Numerous documents show that Tapestry executives intended to use the Capri Acquisition to leverage the combined entity's market share power—which Tapestry itself estimated to be over

80%—to raise accessible luxury handbag prices, and that Tapestry executives were aware that the Capri Acquisition posed a high risk of anticompetitive effects, including cannibalization within the accessible luxury market.

28.    As a result of that internal analysis, in mid-March 2023, Tapestry CEO Crevoiserat approached Capri CEO Idol to discuss strategic opportunities.  Crevoiserat and Idol held a meeting on April 4, 2023, during which Crevoiserat proposed to acquire Capri in an all-cash transaction priced at $60 per share.  On May 9, 2023, the Capri Board authorized Capri's management to provide Tapestry with due diligence information.  On July 31, 2023, Capri's Board approved an acquisition price of $57.00 per share.

29.    Due diligence on the proposed Merger continued until August 2023.  During this time, executives at both companies continued to discuss the fierce head-to-head competition between Michael Kors, Coach, and Kate Spade.

30.    On August 10, 2023, Capri and Tapestry jointly announced their entry into the Merger Agreement, pursuant to which Tapestry would purchase Capri for $57.00 per share in cash.  On September 20, 2023, Capri filed a Definitive Proxy Statement for the Capri Acquisition (the "Proxy") with the SEC to solicit shareholder approval of the Merger Agreement.  On October 25, 2023, Capri announced that its shareholders had voted to approve adoption of the Merger Agreement.

31.    The Capri Acquisition stood to combine three close competitors: Tapestry's Coach and Kate Spade brands and Capri's Michael Kors brand.  Internal company documents show that Defendants knew their three brands competed in the "accessible luxury" handbag market, a well-defined submarket distinct from the "luxury" and "mass market" handbag submarkets.  Indeed, accessible luxury handbags are the lifeblood of Capri and Tapestry.  Capri derives the majority of

its revenue from sales of accessible luxury handbags.  Capri owns three fashion houses: Michael Kors, Jimmy Choo, and Versace.  Michael Kors offers accessories, footwear, and apparel; Versace sells a wide range of products; and Jimmy Choo's core offering is women's footwear.  Michael Kors makes up the majority of Capri's revenue: in FY 2024, Michael Kors accounted for 68% of Capri's total revenue.  In turn, handbags are a major part of Michael Kors's business: in FY 2023, handbags made up 30% of Michael Kors's revenue.  Almost all of Michael Kors's handbag sales are from its accessible luxury collection MICHAEL Michael Kors ("MMK"): in FY 2023, 98% of handbag sales were from MMK.  By contrast, Versace and Jimmy Choo, which exclusively sell luxury items, together make up only approximately 30% of Capri's annual revenue.  Accordingly, Capri's accessible luxury handbag sales constitute the most significant component of its overall revenue stream.

32.    Like Capri, Tapestry derives almost half of its net sales from sales of accessible luxury handbags—namely, Coach handbags.  Tapestry owns three fashion brands: Coach, Kate Spade, and Stuart Weitzman.  Coach and Kate Spade primarily sell women's handbags, while Stuart Weitzman's core product is women's footwear.  Coach, Kate Spade, and Stuart Weitzman are all accessible luxury brands.  Coach is the largest, accounting for 76% of Tapestry's total net sales in FY 2024.  Kate Spade accounted for 20% of Tapestry's total net sales in FY 2024.  Stuart Weitzman accounts for less than 5% of Tapestry's net sales.  Handbags are the largest part of Coach and Kate Spade's business: handbags accounted for 49% of Coach's net sales and 54% of Kate Spade's net sales in FY 2024.  Coach handbags alone make up over a third of Tapestry's total net sales:  in FY 2024, Coach handbags accounted for 38% of Tapestry's total net sales.

33.    Confidential, non-public records at both companies show that Tapestry and Capri together have cornered over 80% of the accessible luxury handbag market.  Tapestry itself

calculated that Defendants' combined brands would account for 83% of the accessible luxury market. Per Capri's own calculations, Michael Kors comprised 39.5%, Coach comprised 29.4%, and Kate Spade comprised 8.2% of the accessible-luxury-leather-goods market—totaling 77% of the accessible luxury market. Contemporaneous documents at both companies reveal that a primary rationale for the Capri Acquisition was to reduce competition, increase prices, and reduce consumer options within the accessible luxury handbag market—an anticompetitive scheme that Defendants needed to hide from investors, consumers, and the FTC at all costs.

34. In furtherance of that scheme, Tapestry and Capri repeatedly stated in public filings and press releases that, because their brands purportedly "face competitive pressures from both lower- and higher-priced products," the Capri Acquisition would not stifle competition, and that they expected to obtain antitrust approval for the Capri Acquisition and for the deal to close in calendar year 2024. In fact, when federal regulators expressed increasing interest in more seriously examining the anticompetitive effects of the Capri Acquisition, Defendants stepped up their public campaign to portray the deal as pro-consumer and to downplay any notion of an actual anticompetitive risk.

35. On November 3, 2023, the FTC issued a Second Request to Capri and Tapestry for information in connection with its antitrust review of the Capri Acquisition, allowing it to obtain a wide array of confidential materials not disclosed to the public.[3] Upon receiving the FTC's Second Request, Defendants knew that it was only a matter of time until the FTC uncovered all of the internal documents and analysis that Defendants generated in support of their anticompetitive

---

[3] In connection with the FTC's review of a pending merger or acquisition, if the FTC has reason to believe the deal will impede competition in a relevant market, it may request more information by way of "Request for Additional Information and Documentary Materials," commonly referred to as a "Second Request."

scheme. Which is exactly what happened. But even as the FTC became privy to these devastating internal documents, Defendants continued to insist to the public that the market was highly fragmented and that the Capri Acquisition was pro-consumer and bore minimal regulatory risk.

36.    Contrary to Defendants' assurances to investors, on April 22, 2024, the FTC filed suit in the SDNY to enjoin the Capri Acquisition. The FTC alleged that, if allowed, the Capri Acquisition would eliminate direct head-to-head competition between Kate Spade, Coach, and Michael Kors, which the FTC claimed all compete within the "accessible luxury handbag market." The FTC alleged that there are three distinct submarkets for handbags: (i) "accessible luxury" (a.k.a., "affordable luxury" or "aspirational luxury"), "crafted predominantly in Asia from high-quality materials and with fine craftsmanship at affordable prices" (*e.g.*, Tory Burch, Marc Jacobs, Longchamp); (ii) "mass market" (a.k.a., "fast fashion" or "opening price point"), "made in bulk in China from lower-quality materials and sold at lower prices" (*e.g.*, Zara, H&M, Steve Madden); and (iii) "true luxury" (a.k.a., "luxury," "pure luxury," "traditional luxury," "European luxury," etc.), "crafted predominantly in Europe that sell at significantly higher prices" (*e.g.*, Versace, Louis Vuitton, Dior, Gucci, Chanel, Prada). The FTC described "accessible luxury" handbags as those that "boast quality leather and craftsmanship (as distinguished from mass-market handbags) at an affordable price (as distinguished from true luxury handbags)." The FTC alleged that Tapestry's acquisition of Michael Kors—which competes against Coach and Kate Spade—would give Tapestry a dominant share of the "'accessible luxury' handbag market," thereby likely creating anticompetitive effects.

37.    On October 24, 2024, the *Tapestry* Court granted the FTC's motion for preliminary injunction and blocked the Capri Acquisition. In its order, the *Tapestry* Court cited hundreds of pages of internal company documents. These documents reveal that Defendants secretly

understood that (i) their three brands (*i.e.*, Kate Spade, Coach, and Michael Kors) compete in the "accessible luxury" handbag market, a well-defined submarket distinct from "luxury" and "mass market" handbag submarkets; (ii) Capri and Tapestry considered Coach and Michael Kors accessible luxury handbags to be direct, head-to-head competitors; (iii) a primary rationale for the Capri Acquisition was to reduce competition within the "accessible luxury" handbag market; and, given these known facts (iv) the risk of adverse action by the FTC was significantly higher than Defendants represented to Capri shareholders during the Class Period. Yet, as detailed below, the true nature of that risk was known only to Defendants as they continuously misled investors regarding those adverse facts and the actual likelihood that the Capri Acquisition would be consummated as structured, if at all.

**B.    Tapestry and Capri Executives' Internal Communications Reveal that Defendants Viewed Michael Kors and Coach as Each Other's Top Competitor**

38.    After the Capri Acquisition was announced, as alleged in greater detail below, Defendants repeatedly told investors that the transaction would not reduce competition because Tapestry and Capri operate in a "highly fragmented" industry and face competitive pressure from "both lower- and higher-priced products" because consumers "have hundreds of handbag choices at every price point."  However, confidential, non-public company documents at both Capri and Tapestry tell a very different story.  These documents reveal that Defendants privately considered Coach and Michael Kors to be head-to-head competitors in the accessible luxury market.  Internal records show, among other things, that executives at Capri and Michael Kors explicitly referred to Coach as "our biggest competitor"; Tapestry and Coach executives presumed that any market share lost by Coach was immediately and directly gained by Michael Kors; and that Capri and Tapestry executives sought to keep pace with each other's marketing campaigns, pricing, and product

designs so closely that a single marketing email from one company advertising new prices could force the other to abandon its entire strategy.

39.     In confidential, internal documents, Capri and Tapestry executives routinely and explicitly identified Michael Kors and Coach as the other brand's key or top competitor.  In a March 17, 2021 email, Capri CEO Idol compared Michael Kors's reselling approach to the approach taken by its "key competitor Coach":  "***Our key competitor Coach*** has an extensive network of resellers in the US and I believe they do approximately $300m in sales through the reseller channel."[4]  Similarly, in a June 4, 2021 email regarding Capri's supplier, Michael Kors President of Accessories & Footwear Newman Chapuis wrote to Capri CFO Tom Edwards, in particular, "they [Capri's supplier] shared that ***our biggest competitor*** is not facing these same dire issues" and, "[a]t some point, John [Idol] is going to want to know why ***our biggest competitor*** is not experiencing the same inventory issues as we are."[5]  Newman Chapuis later confirmed that "biggest competitor" referred to Tapestry.[6]

40.     Internal documents also show that Tapestry and Capri executives believed that gains and losses in their competitor's market share directly cause gains and losses in their own market share.  For example, when a COVID-related shutdown in Vietnam threatened Coach's ability to obtain its planned inventory ahead of the holiday season, Coach CEO Todd Kahn lamented the prospective loss of business to Michael Kors, writing to Coach CFO Vincent Golebiowski and other colleagues in an email in late-2021 that it was "hard to swallow that we ma[y] walk away from over $100 million of [d]emand that is there for our taking.  ***I would hate to see MK pick up***

---

[4]    FTC's Closing Argument Demonstrative at 11 (excerpt of PX2425); *FTC v. Tapestry*, at 486-87; Tr. at 110:4-111:8 (quoting PX2425).

[5]    Tr. at 200:11-201:15 (quoting PX2728); *FTC v. Tapestry*, at 486-87.

[6]    Tr. at 201:7-8, 201:16-18; *FTC v. Tapestry*, at 486-87.

*that volume by default*."[7]  To this end, Defendants closely observe each other's handbag marketing campaigns, product design, and pricing in order to respond in real time.

### 1.    Michael Kors and Coach Compete Head-to-Head on Handbag Marketing

41.    Internal company records also show that Coach and Michael Kors intently tracked and responded to one another's marketing campaigns.  Capri CEO Idol himself monitored Coach marketing emails to ensure that Michael Kors undertakes similar campaigns.  Indeed, the *Tapestry* Court noted that "***Idol monitor[ed] Coach's marketing emails so closely that his subordinates joke that he is 'the most engaged audience that Coach has.'***"[8]  A trove of internal emails indicates that Idol routinely forwarded Coach marketing emails to his subordinates at Capri and Michael Kors and provided direction on what steps executives should take to respond—sometimes on a daily basis.  For example:

- In an April 26, 2021 email regarding Coach's outlet strategy and growth with the subject "FYI, Coach / MK Survey by Cowen," Idol stated "***FYI, Coach's always on outlet marketing is clearly working!***"[9]

- On December 19, 2021, Idol forwarded a promotional email he had received from Coach to then-Michael Kors CEO Schulman, commenting, "***[t]hey [Coach] are winning with the Outlet and promotional strategy in the US***.  It's not just brand heat!"[10]

- On February 2, 2022, Capri CEO Idol emailed then-Michael Kors CEO Schulman regarding Coach promotional emails.[11]  In an email he titled "Re: the emails I got from Coach outlet just today so far," Idol commented, "They [Coach] are clearly sending a massive amount more emails to consumers than we do.  I know you have said that

---

[7]    Excerpt of PX1533 at 1; Tr. at 467:5-469:1 (quoting PX1533); *FTC v. Tapestry*, at 487-88.

[8]    *FTC v. Tapestry*, at 491-92.

[9]    Excerpt of PX2260 at 1; *FTC v. Tapestry*, at 490-92; Tr. at 113:24-114:23 (quoting PX2260)

[10]    Excerpt of PX2114 at 1; Tr. at 117:10-20 (discussing PX2114); *FTC v. Tapestry*, at 491-92.

[11]    Tr. at 118:3-12 (discussing PX2405).

productivity drops when sending more than one email to a customer per day but they seem to be having great success with a different formula."[12]

42.    In fact, Idol forwarded Coach marketing emails to Capri and Michael Kors executives with such frequency that the FTC compiled many of these emails together in its closing argument demonstrative[13]:



43.    Internal documents similarly show that Tapestry executives were keenly aware of how closely Capri monitors and directly competes with Coach.  For example, on April 22, 2021, Coach launched "(Re)Loved," a program through which customers can exchange used Coach items for store credit.  Just over a year later, on or around August 19, 2022, Michael Kors launched its "Pre-Loved" program, an online marketplace on which customers can sell secondhand items in

---

[12]    Tr. at 118:3-12 (discussing PX2405); *FTC v. Tapestry*, at 491-92.

[13]    FTC's Closing Argument Demonstrative at 17.

exchange for a Michael Kors gift card.  Just days after the program's debut, on August 23, 2022, Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris complained to her colleagues that Michael Kors had copied Coach's "(Re)Loved" program, texting Tapestry CFO Roe a screenshot of Michael Kors's "PreLoved" webpage, commenting, "***They say imitation is the sincerest form of flattery***."[14]  Later that same day, Harris shared a link to Michael Kors's "PreLoved" webpage in an email with the subject line "***ankle biters***" with Tapestry Chief Information Officer Ashish Parmar, writing: "***Kors is coming for Coach Reloved!***"[15]  Harris later confirmed that she was "referring to Michael Kors as ankle biters."[16]  Parmar responded: "Oh wow…. ***They do know how to, rinse-repeat and repackage to the next level***."[17]

44.    Internal documents also illustrate how Coach, Michael Kors, and Kate Spade executives and their subordinates directly competed by going so far as physically visiting each other's stores to gather information on marketing campaigns, as well as pricing, discounts, promotions, and product design.  For example, a slide deck emailed on November 21, 2021 to Kate Spade CEO Fraser compared photos of Kate Spade, Coach, Tory Burch, and Michael Kors retail storefronts, promotional offers, and front tables:[18]

---

[14]  Tr. at 386:22-387:16 (quoting PX1448).

[15]  PX1278; Tr. at 387:17-388:24 (quoting PX1278).

[16]  PX1278; Tr. at 387:17-388:24 (discussing PX1278).

[17]  PX1278; FTC's Opening Argument Demonstrative at 25 (excerpt of PX1278).

[18]  PX1127; Tr. at 853:21-855:16 (discussing PX1127).



### 2.    Michael Kors and Coach Compete Head-to-Head by Tracking and Copying Handbag Design

45.     Confidential, non-public company records additionally show that Coach and Michael Kors directly competed by intently tracking and responding to each other's handbag designs.  Capri CEO Idol often went so far as to instruct Michael Kors executives to replicate Coach handbag designs.  In one stand-out example, on August 15, 2021, Capri CEO Idol forwarded Michael Kors President of Accessories & Footwear Newman Chapuis an email he received from Coach regarding the Coach Tabby handbag, writing "Let's discuss the [bag] shape tomorrow if you have a few minutes, thanks."[19]  The next day, Newman Chapuis discussed making changes to the Michael Kors Bradshaw bag based on the design of the Coach Tabby, writing to her subordinates on August 16, 2021: "Maybe we need to evolve our Bradshaw into a larger size?? *Like C[o]ach is doing with their Tabby*… what I like about this version is how soft it seems …

---

[19]    Excerpt of PX2419 at 1; Tr. at 116:2-8, 116:15-21, 186:23-187:12 (quoting PX2419).

not stiff.…"[20] Newman Chapuis went on to say: "[D]id not mean this needed to be Bradshaw exactly… but **more that we know our competitor launched Tabby which is doing very well for them. . . . Design should take a closer look at Tabby as that shape is doing very well for them**."[21] Michael Kors subsequently launched a softer style bag called the Parker.[22]  Capri internal documents further evidence direct competition in that Capri CEO Idol often instructed Capri and Michael Kors executives to purchase Coach handbags so that he could directly examine product design, such as hardware.  For example, on February 11, 2023, Michael Kors President of Accessories & Footwear Newman Chapuis and Michael Kors Senior Vice President of Accessories & Footwear Production Jung Yoon texted about purchasing Coach bags in order to show their hardware to Idol.[23]  Newman Chapuis wrote: "Hey.  Just spoke to John [Idol].  I knew we should have bought those Coach bags for the hardware.  He wants to see them..  Ugh.."[24]  Yoon and Newman Chapuis then discussed the specific Coach bags Yoon would purchase, and Yoon subsequently sent a picture of two shopping bags with "Coach" on them.[25]  The next month, Newman Chapuis and Yoon commissioned an analysis of comparing Coach and Michael Kors hardware costs.[26]

---

[20]  Excerpt of PX2346 at 2; Tr. at 187:13-189:5 (quoting PX2346); FTC's Opening Argument Demonstrative at 20 (excerpt of PX2346).

[21]  Excerpt of PX2346 at 1 (highlight added); Tr. at 187:13-189:5 (quoting PX2346).

[22]  Tr. at 189:3-5; Tr. at 189:7-190:4 (discussing PX2350).

[23]  PX2294; Tr. at 190:5-192:8 (quoting PX2294).

[24]  PX2294 at 1; Tr. at 190:5-192:8 (quoting PX2294); FTC's Closing Argument Demonstrative at 24 (excerpt of PX2294).

[25]  PX2294 at 3-6, 12-18; Tr. at 190:5-192:8 (quoting PX2294).

[26]  PX2183.

### 3. Michael Kors and Coach Compete By Confidentially Monitoring Each Other's Pricing

46. Confidential, non-public documents also reveal that Coach, Michael Kors, and Kate Spade intently, and confidentially, monitored each other's prices, then turned on a dime in order to keep pace with changes. Indeed, internal company records demonstrate that Michael Kors and Coach confidentially viewed the other as its primary constraint on pricing. On the Tapestry side, in an August 2, 2021 email concerning Kate-Spade-collected data on Michael Kors price changes, then-Coach Senior Vice President of North America Retail & Outlet Levine stated, "*FYI, this is interesting. Probably worth doing some compares vs our pricing. I think these are retail styles, but I know they have comparables at outlets, as well*."[27] She later confirmed that "*[t]his is an example of an instance where [I was] suggesting looking at Michael Kors' pricing to see the differences or similarities versus Coach's pricing*."[28] Levine also instructed Coach regional directors to secretly visit Michael Kors stores to collect information on pricing. In a February 25, 2022 email, Levine stated: "*As we used to do a while back there is interest in tracking against pricing for certain styles (namely MK and TB).*"[29] Levine later testified that *she was "asking them to go into the [Michael Kors] stores and check the pricing" and confirmed that this was "an exercise that ha[d] been done in the past*."[30] Levine also confirmed at the hearing that Coach does not send employees to stores other than Michael Kors, Tory Burch, and Kate Spade.[31]

---

[27]  PX1137; Tr. at 782:21-783:21 (discussing PX1137); *FTC v. Tapestry*, at 488-89.

[28]  Tr. at 782:21-783:21 (discussing PX1137).

[29]  Tr. at 786:6-788:25 (quoting PX1547); *FTC v. Tapestry*, at 474-75.

[30]  Tr. at 788:14-25 (discussing PX1547).

[31]  Tr. at 815:3-13; *FTC v. Tapestry*, at 490-91.

47.     The Tapestry Board was kept well-apprised of Coach's efforts to directly compete and keep pace with Michael Kors's handbag prices.  A February 17, 2022 Tapestry presentation on Coach pricing strategy compared pricing for "accessible luxury handbag" brands Coach, Kate Spade, Tory Burch, Michael Kors, and Marc Jacobs.[32]  An April 2022 Coach presentation sent to Todd Kahn compared five years' worth of handbag MSRPs and AURs for five "Acc Lux" brands: Coach, Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs.[33]  A July 21, 2022 slide deck on Coach's quarterly brand update presented to the Tapestry Board, including Crevoiserat and Roe, compared handbag MSRPs and AURs for Coach, Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs.[34]  The *Tapestry* Court found that "Coach presented similarly detailed price comparisons between its handbags and Tory Burch, Michael Kors, and Kate Spade year after year."[35]

48.     Similarly, Capri and Michael Kors executives secretly monitored Coach pricing, discounting, and promotions.  As Capri CEO Idol later testified at the hearing, he "most frequently compare[s] Michael Kors handbag prices to Coach."[36]  For example, on August 17, 2021, Michael Kors President of Accessories & Footwear Newman Chapuis wrote to other Michael Kors executives: **Michael Kors "know[s] from inside intel that Coach is taking prices up" and that**

---

[32]   The deck separately compared prices for "luxury handbag" brands Dior, Gucci, Louis Vuitton, and Prada. Tr. at 454:16-456:1 (discussing PX1542); *FTC v. Tapestry*, at 435 n.19.

[33]   A separate part of the table compared MSRPs and AURs for four "Total Lux" brands: Louis Vuitton, Dior, Prada, and Gucci. Tr. at 453:8-454:8 (discussing PX1537); *FTC v. Tapestry*, at 432-33.

[34]   The deck also compared MSRPs and AURs for "Total Lux" brands Louis Vuitton, Dior, and Gucci and provided averages for "Total Lux" (luxury) and "Total Acc" (accessible luxury).  Tr. at 447:20-453:6 (discussing PX1536); *FTC v. Tapestry*, at 433 n.16.

[35]   *FTC v. Tapestry*, at 488-89.

[36]   Tr. at 101:6-8; *FTC v. Tapestry*, at 490-91.

***Capri CEO "John [Idol] does want us to goal being more expensive than them***.  For now I would

move everything up into the next bucket and then we can see how that compares to their [Coach's]

Fall prices and continue to monitor into Spring."[37]  The myriad of Coach emails Idol forwarded to

his subordinates at Capri and Michael Kors confirm this:

- In an April 7, 2021 email from Coach Outlet with the subject line "Coach promotions," Idol told his colleagues: "You are a hundred percent correct.  ***Let them [Coach] blow their brakes out.  Let's go for the margin[.]***"[38]

- On April 8, 2021, Idol forwarded an email from Coach Outlet advertising "extra 15% off everything," commenting: "***They [Coach] are going low!!!***"[39]

- On February 27, 2022, Idol emailed about the prices listed on the Coach Outlet website: "***Look at these prices!***"[40]

49.    Capri CEO Idol and other Capri and Michael Kors executives frequently updated

the Capri Board on the state of competition by presenting analysis of the differences in pricing

between Michael Kors and Coach.  For example, an August 2021 Capri presentation entitled

"MMK Price Increases Accessories & Footwear Global" ***priced Michael Kors and Coach***

***accessories within mere dollars of one another*** under Michael Kors's "good, better, best" pricing

analysis.[41]  The presentation, circulated among Michael Kors executives in an August 10, 2021

email, compared Coach's average price points and Michael Kors's average price targets for Spring

2022 accessories at three levels of perceived quality.[42]

---

[37]  Excerpt of PX2047 at 1 (highlight added); Tr. at 202:6-9 (discussing PX2047); *FTC v. Tapestry*, at 490-91; FTC's Closing Argument Demonstrative at 27.

[38]  Tr. at 113:5-16, 172:4-16 (quoting PX2396); *FTC v. Tapestry*, at 490-91.

[39]  Excerpt of PX2433 at 1; *FTC v. Tapestry*, at 486-87; Tr. at 112:4-113:1 (quoting PX2433).

[40]  Tr. at 118:25-119:10 (quoting PX2388).

[41]  PX2727; Tr. at 196:6-197:19, 1416:9-16 (discussing PX2727); *FTC v. Tapestry*, at 490-91.

[42]  PX2727 at 3; Tr. at 196:6-197:19, 1416:9-16 (discussing PX2727); *FTC v. Tapestry*, at 490-91.

50.     At times, Michael Kors explicitly changed promotional strategies in light of Coach and Kate Spade discounting in order to "*align with the competition*."  For instance, on April 21, 2023, Michael Kors CEO Wilmotte forwarded an email he had received from Coach Outlet with the subject line "Savings alert: We're unveiling Mom approved gifts plus an extra 15% off" to Capri CEO Idol and then-Michael Kors Senior Vice President of Merchandising, North American Retail Walsh writing: "*we will be offering the same.  Previously we had planned a [different strategy] but we need to ensure we get our share of the consumers' Mother's Day spend so we are going to align with the competition*."[43]

51.     Kate Spade also treated Michael Kors handbag prices as the primary constraint on its own prices.  For example, Kate Spade Chief Merchandiser Michele Parsons shared Kate-Spade-collected data on Michael Kors handbag price changes with Kate Spade team members and Coach and Stuart Weitzman executives in an email on August 2, 2021.[44]  Parsons stated that she was "[s]haring this recap … of the recent price increases that Michael Kors has taken on current prices in the US in Mainline," which she described as "fairly significant."[45]  Parsons then stated that "*[w]e will consider what this means for us as we focus on elevating and MSRP's.*"[46]

52.     As with Coach, the Tapestry Board was kept informed of Kate Spade's efforts to keep pace with Michael Kors's prices.  For example, an August 2021 Kate Spade slide deck analyzed "competitive price positioning by [handbag] silhouette" for Kate Spade, Michael Kors, Coach, and Tory Burch, and noted that "*[l]argest percent increases in shoulders and totes push*

---

[43]  *FTC v. Tapestry*, at 490-91.

[44]  PX1137; Tr. at 856:4-857:11 (discussing PX1495); *FTC v. Tapestry*, at 474-75, 490-91.

[45]  PX1137 at 1.  *See also FTC v. Tapestry*, at 474-75 (quoting PX1495).

[46]  Excerpt of PX1137 at 1.

*pricing to more closely approach [Michael] Kors*."[47]  A February 2022 Kate Spade slide deck compared pricing for "accessible luxury handbag" brands Coach, Kate Spade, Tory Burch, Michael Kors, and Marc Jacobs.[48]  A May 2022 presentation concerning Kate Spade's long-range plan analyzed handbag pricing targets compared to Michael Kors, Coach, and Tory Burch, stating that ***Kate Spade's "target MSRP positioning" was +10% versus Michael Kors, +10% versus Coach, and -25% versus Tory Burch***.[49]  Fraser later confirmed that this presentation was "derived from the presentation to the [Tapestry] board."[50]  In another example, a 2023 Kate Spade slide compared prices as against Michael Kors, Marc Jacobs, Coach, and Tory Burch.[51]  An April 2022 Kate Spade presentation compared handbag pricing of ***"key competitors": Michael Kors, Coach, and Tory Burch***.[52]

53.    In fact, as the *Tapestry* Court noted, Coach, Michael Kors, and Kate Spade "track and respond to each other's pricing activities so closely that Kate Spade and Michael Kors executives accused the other's brand of driving down prices."[53]  At one point, Capri CEO Idol lamented that Coach's price points left Michael Kors with "no choice" but to respond in kind.  On April 16, 2022, Idol forwarded a Coach email with the subject "We dropped prices on our best bags" to Michael Kors executives.[54]  Idol stated: "***They [Coach] are leading with very sharp price***

---

[47]  Tr. at 857:13-858:24 (discussing PX1256); *FTC v. Tapestry*, at 434 n.18.

[48]  The deck also separately compared prices for "luxury handbag" brands Dior, Gucci, and Prada. Tr. at 832:9-835:16 (discussing PX1404); *FTC v. Tapestry*, at 432-33.

[49]  Tr. at 861:8-863:13 (discussing PX1223); *FTC v. Tapestry*, at 490-91.

[50]  Tr. at 862:9-10 (discussing PX1223).

[51]  *FTC v. Tapestry*, at 490-91 (discussing PX1784).

[52]  Tr. at 567:25-568:22 (discussing PX8036); *FTC v. Tapestry*, at 432-33; Dr. Loren K. Smith Expert Testimony Demonstrative at 20 (excerpt of PX8036).

[53]  *FTC v. Tapestry*, at 490-91.

[54]  PX2075; Tr. at 115:3-6 (discussing PX2075); *FTC v. Tapestry*, at 491-92.

*points which must be driving engagement and conversion. They don't lead with discount*

*therefore preserving margin. We need to develop a strategy to compete with this. I don't love it*

*but we have no choice*. Let's discuss next week."[55]

C.    **Confidential Capri and Tapestry Records Reveal Defendants Viewed Michael Kors, Coach, and Kate Spade as Close Competitors in an Internally Defined Market: the Accessible Luxury Handbag Market**

54.    Contrary to their public statements to investors during the Class Period, Defendants

internally recognized their brands at issue as directly competing in the "accessible luxury handbag"

markets, but not in the mass or the luxury handbag markets. As alleged in greater detail below,

Defendants publicly stated that the Capri Acquisition would not restrain competition because

Tapestry and Capri faced competitive pressure from "both lower- and higher-priced products" as

consumers "have hundreds of handbag choices at every price point." Yet, in stark contradiction

to those misleading public statements, internal company records at both Capri and Tapestry,

including communications between and analyses presented to senior executives, show that

Defendants internally recognized (a) that there are three well-defined submarkets within the

greater market for handbags: the luxury market, the accessible luxury market, and the mass market;

(b) that Coach, Kate Spade, and Michael Kors compete within the accessible luxury market; and

(c) that Coach, Kate Spade, and Michael Kors do not compete with luxury and mass market

handbag brands.

---

[55]    Excerpt of PX2075 at 1; Tr. at 115:3-6 (discussing PX2075); *FTC v. Tapestry*, at 491-92; FTC's Opening Argument Demonstrative at 16 (excerpt of PX2075).

1. **Internal Documents Reveal that Defendants Recognized that Michael Kors, Coach, and Kate Spade Directly Compete in the Accessible Luxury Handbag Market**

55. Internal company records spanning almost a decade—including Board presentations, minutes of Board meetings, and emails between senior executives at Capri and Tapestry—frequently reference "accessible luxury," "affordable luxury," and similar terms. For example:

- A March 2022 presentation to the Tapestry Board concerning Coach's long-range plan for FY2023-FY2025 differentiated between "accessible luxury" and "traditional luxury," stating that "Our global brand positioning" is to "Redefine and Own 'Accessible Luxury'" and that "***Coach enables people to explore their individual take on 'Accessible Luxury.'***"[56]

- A Tapestry slide deck summarizing an ethnography conducted during Q3 FY2022 reported that the study "[c]onfirmed our global brand positioning," going on to state that "Our Position" is that "***Coach enables people to explore their individual take on 'Accessible Luxury.'***"[57]

- A May 2022 presentation on Coach's FY2023 long-range plan sent to then-Coach Senior Vice President of North America Omnichannel Levine on May 11, 2022 listed "***Reclaim 'Accessible Luxury' space*** with elevated AURs and reduction of promotion" as a step to "accelerate retail growth to drive brand aspiration."[58]

56. Capri Board materials and communications between its executives at the highest levels of the company repeatedly make similar references:[59]

- A slide deck prepared for a Capri Board meeting held on January 18, 2018 by Michael Kors President of Accessories & Footwear Newman Chapuis stated that ***Capri's "mission" is "to re-establish Michael Kors as leader in the affordable luxury accessories market***."[60]

---

[56]  Tr. at 267:2-268:13 (quoting PX1431); *FTC v. Tapestry*, at 436-38.

[57]  Tr. at 363:15-364:18 (quoting PX1937); *FTC v. Tapestry*, at 431 n.12.

[58]  Tr. at 813:12-815:24 (quoting PX1230); *FTC v. Tapestry*, at 431.

[59]  PX2439 at 4; Tr. at 734:5-736:4 (quoting PX2439); FTC's Opening Argument Demonstrative at 33 (excerpt of PX2439); *FTC v. Tapestry*, at 436-38.

[60]  PX2166 at 3; Tr. at 184:5 (quoting PX2166); *FTC v. Tapestry*, at 431 n.12.

- A Michael Kors slide deck, including a financial forecast, presented to the Capri Board after Q1 FY2024, which ended in June 2023, referenced the **accessible luxury market**.[61]

- Minutes from a Capri Board meeting held on August 1-2, 2023 reflect that **Michael Kors CEO "Wilmotte next discussed with the Board the U.S. leather goods market and the accessible luxury market**."[62]

- A September 6, 2023 email from Capri Vice President of Investor Relations Davis to Capri CEO Idol, CFO Edwards, Michael Kors CEO Wilmotte, and other Capri executives with the subject line "U.S. Retail Sales Trends Per Credit Card Data in August" referenced the **accessible luxury market**.[63]

- A "final" version of a February 2024 Capri Board presentation sent by Michael Kors Accessories & Footwear executive Devon Ho on February 10, 2024 to President of Accessories & Footwear Newman Chapuis to send to "JI [John Idol] for review" used the phrase "**affordable luxury pricing**."[64]

- A March 2024 Capri strategic-planning slide deck shared with Michael Kors President of Accessories & Footwear Newman Chapuis and others by Michael Kors Vice President of Strategy & Transformation Laura Parsons on March 13, 2024 referenced the **accessible luxury market**.[65]

57.     These repeated references to "accessible luxury" competition in Capri and Tapestry Board materials were not happenstance, but intentional.    Tapestry CEO Crevoiserat later confirmed at the hearing that she "personally had included the term 'accessible luxury' in [her] communications with Tapestry's board."[66]  For example, in her August 2021 letter to the Tapestry Board, Crevoiserat wrote: "***Our performance in FY21 far exceeded our expectations and outperformed our 'close-in' accessible luxury peers***."[67]  She confirmed at the hearing that "'close-

---

[61]   PX2436 at 12; Tr. at 158:23-159:17 (discussing PX2436); *FTC v. Tapestry*, at 431 n.12.

[62]   PX2439 at 4 ; Tr. at 734:5-736:4 (quoting PX2439); FTC's Opening Argument Demonstrative at 33 (excerpt of PX2439); *FTC v. Tapestry*, at 436-38.

[63]   Tr. at 106:17-20 (discussing PX2394); *FTC v. Tapestry*, at 431 n.10.

[64]   PX2034 at 4-7; Tr. at 185:1-23 (discussing PX2034); *FTC v. Tapestry*, at 431 n.12.

[65]   Tr. at 202:16-18 (discussing PX2564); *FTC v. Tapestry*, at 431, 436-37 n.12.

[66]   Tr. at 260:3-261:12, 263:7-13 *FTC v. Tapestry*, at 431 n.12.

[67]   PX1730 at 1; Tr. at 263:17-264:13 (quoting PX1730); *FTC v. Tapestry*, at 431 n.11.

in' accessible luxury peers" refers to "[t]hose of our competitors that have price points in the same vicinity as ours in their range."[68]  Likewise, Capri CFO Thomas Edwards testified that he had instructed his colleagues at Capri to add the term "accessible luxury" to Capri Board materials.[69]

### 2. Confidential Benchmarking Documents Reveal that Defendants Knew Accessible Luxury Brands Do Not Compete with Luxury or Mass Market Brands

58.    Contrary to Defendants' public statements that the Capri Acquisition would not reduce competition because the handbag market is a "highly fragmented global luxury industry" and that "consumers have hundreds of handbag choices at every price point across all channels," confidential, non-public "benchmarking" documents at both Capri and Tapestry show that Defendants in fact did not believe their accessible luxury handbag bands (*i.e.*, Coach, Kate Spade, and Michael Kors) competed with either luxury or mass market handbag brands.  Internal benchmarking documents show that Capri and Tapestry analyzed their subsidiary brands' overall performance by tracking the performance of certain other handbag brands.  As Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris testified at the hearing, Tapestry's Global Strategy & Consumer Insights Group tracks industry trends, including financial performance and sustainability campaigns, for benchmarking purposes to "try to understand how our brands are performing compar[ed] to a basket of industry players, as well as to help inform what our brand should be focused on so they can win with consumers…. The benchmarking is a bit more of a financial exercise to understand relative performance in the industry."[70]  Harris testified that Tapestry tracks "five to ten" brands "to help understand our relative performance with

---

[68]  Tr. at 265:11-14 (quoting PX5019).

[69]  Tr. at 1127:25-1128:2.

[70]  Tr. at 391:23-394:21.

respect to the industry … that tends to be Louis Vuitton, Gucci, Michael Kors, Tory Burch, and I think there are a few others."[71]  Internal Tapestry Board presentations bear this out.  For example, footnote 1 on slide 9 of the May 2023 presentation to the Tapestry Board, entitled "FY 23 Q3 competitor update, May 18th, 2023" and prepared by Harris's team, identified "Louis Vuitton, Gucci, Prada, Tory Burch, Coach, Michael Kors, and Marc Jacobs" as benchmark brands.[72]

59.    The significance of these internal benchmarking documents is two-fold.  First, they evidence Defendants' private knowledge of three, well-defined submarkets within the overall handbag market: (a) "accessible luxury," manufactured predominantly in Asia from higher-quality materials at affordable prices (*e.g.*, Coach, Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs); (b) "mass market," made in China from lower-quality materials and sold at lower prices (*e.g.*, Gap, Calvin Klein, and Tommy Hilfiger); and (c) "luxury," manufactured predominantly in Europe and sold at higher prices (*e.g.*, Gucci, Prada, Chanel, and Louis Vuitton).  A myriad of documents show that Defendants consistently refer to these submarkets, either explicitly by name or implicitly by the brands belonging to a particular submarket, in benchmarking materials shared with executives at the highest levels of Capri and Tapestry.  For example, a February 2019 M&A strategy presentation to the Tapestry Board separately identified benchmark brands for "Acc Lux" and "Lux": "Acc[essible] Lux[ury] Benchmark includes Coach, Kate Spade, Michael Kors, Tory Burch, Longchamp, MCM[,] and Furla … Lux[ury] Benchmark includes Louis Vuitton, Gucci, Fendi, Celine, Dior, Bottega Veneta, Saint Lament, Prada, Burberry, Hermes, Chanel, and Ferragamo."[73]  An August 2023 slide deck presented to the Capri Board at a meeting held on

---

[71]    Tr. at 392:13-25.

[72]    Tr. at 393:16-21 (discussing PX1723).

[73]    Tr. at 367:8-368:6 (discussing PX1175); *FTC v. Tapestry*, at 431-33.

August 1, 2023 listed Coach, Kate Spade, Michael Kors, Tory Burch, Marc Jacobs, and Longchamp as "Affordable Luxury" brands; Yves Saint Laurent, Chanel, Prada, Valentino, Louis Vuitton, Gucci, and Hermès as "Luxury" brands; and Gap, Calvin Klein, Tommy Hilfiger, Abercrombie & Fitch, and Zara as "Mass Market" brands:[74]



60.    Second, the benchmarking and other internal documents reveal that Defendants did not in fact believe Coach, Kate Spade, and Michael Kors compete with luxury or mass market handbag brands.  Rather, Defendants monitor luxury and mass market "benchmark" brands solely to define the bounds of the accessible luxury handbag submarket in terms of price, product design, marketing, and customer demographics.  The Capri Board slide immediately above makes that clear.  Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris similarly confirmed at the hearing that Tapestry does not even include any mass market brands in the "basket

---

[74]    DX885 at 7; *FTC v. Tapestry*, at 431-33 (quoting DX885).

of brands" it tracks for benchmarking purposes.[75]  The *Tapestry* Court found this indicated that

"***Coach, Kate Spade, and Michael Kors do not regard mass-market brands as their peers or primary competitors***."[76]

61.    These internal benchmarking documents stand in stark contrast to the misstatements Defendants made to investors, including that the Capri Acquisition would not constrain competition because consumers "have hundreds of handbag choices at every price point."  Rather, contemporaneous internal Capri and Tapestry records show that senior executives privately believed that Coach, Kate Spade, and Michael Kors were only competitive with other accessible luxury brands on price.  In texts sent on August 3, 2021, Kate Spade CEO Fraser and Coach CEO Kahn explicitly stated that their accessible luxury customers are not interested in luxury price points, and that their respective brands should focus on competing with other accessible luxury competitors Michael Kors and Tory Burch:

> FRASER: "***We may think we're competing with LV [Louis Vuitton] and Gucci, but I can assure you that they are not competing with us***."
>
> KAHN: "Exactly.  In the past we bought market share."
>
> KAHN: "Now we are trying to do it in a healthy way."
>
> FRASER: "This worries me that we'll make bad decisions in order to try to grab the wrong market share."
>
> KAHN: "***Gucci bags at $2000 is just not our customer in NA [North America].***"
>
> KAHN: "You and I won't."
>
> FRASER: "***We should be focused on the correct market share***."
>
> KAHN: "***Take it from MK [Michael Kors], TB [Tory Burch], etc.***"
>
> FRASER: "***Exactly***."

---

[75]  Tr. at 394:15-395:20; *FTC v. Tapestry*, at 433-35.

[76]  *FTC v. Tapestry*, at 433-35.

FRASER: "Even Burberry has pushed up into true luxury."[77]

62.    Fraser expressed similar sentiments in texts to then-Kate Spade CFO Ryan on April 1, 2022: "***Bottom line, saying we're in the same market with true luxury is a joke…. Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?***"[78]  Ryan responded: "And if we believe in luxury, why are we in outlets."[79]  Fraser replied in part by emphasizing Ryan's message.[80]  More specifically, these confidential documents reveal that Defendants privately believed that mass market and luxury handbag prices defined the bounds of accessible luxury prices: Defendants priced their accessible luxury handbags over $100 (the ceiling for mass market handbags) and under $1,000 (the entry point for luxury handbags).  A March 2022 presentation to the Tapestry Board concerning Coach's long-range plan for FY2023-FY2025 noted that the "***traditional luxury entry point [is] $1000+***"; that ***Coach's "product portfolio starts at $100 as [the] point of entry and does not exceed $1000***"; that Coach's prices are "much lower than... $1000+"; and that "[p]roduct focus will be between $150-500 for NA [North America]" as "***luxury owns [the] market" above $1,000***.[81]  Another March 22, 2022 Coach presentation to the Tapestry Board concerning Coach's long-range plan similarly stated that "median prices still are $500 and below globally with the lowest prices in NA" and that "***portfolio starts at $100 as [the] point of entry and does not exceed $1,000 where luxury owns the market***."[82]  Kate Spade CEO Fraser

---

[77]    Tr. at 456:21-459:1, 828:5-829:15 (quoting PX1067); FTC's Opening Argument Demonstrative at 44 (excerpt of PX1067); *FTC v. Tapestry*, at 436-38.

[78]    Tr. at 830:10-832:7 (quoting PX1427); FTC's Opening Argument Demonstrative at 45 (excerpt of PX1427); *FTC v. Tapestry*, at 436-38.

[79]    Tr. at 830:10-832:7 (quoting PX1427).

[80]    Tr. at 830:10-832:7 (quoting PX1427).

[81]    Tr. at 267:2-268:13 (quoting PX1431); *FTC v. Tapestry*, at 423-24, 426-28, 436-38.

[82]    Tr. at 849:22-853:19 (quoting PX1497); *FTC v. Tapestry*, at 476-77.

confirmed that she "would have seen this [information] in a board meeting."[83]  And, as Tapestry Board member Lifford testified: "***My understanding is once you hit a dollar threshold it is driven by a luxury brand.  And so it looks as through [Tapestry's] records show that that's a thousand***."[84]

63.    Defendants specifically tracked price differences between accessible luxury and luxury brands, often referred to in internal records as a "gap," "white space," or "delta," in order to chase the rising ceiling on accessible luxury handbag prices and maximize profits.[85]  Tapestry Board member Lifford testified that the Tapestry Board discussed white space between accessible luxury and true luxury at Board meetings.[86]  For example, a February 17, 2022 Tapestry presentation on Coach pricing strategy compared pricing for "accessible luxury handbag" brands Coach, Kate Spade, Tory Burch, Michael Kors, and Marc Jacobs, and separately compared prices for "luxury handbag" brands Dior, Gucci, Louis Vuitton, and Prada.[87]

**D.    Tapestry Sets Out to Acquire Capri for the Undisclosed Anticompetitive Purpose of Reducing Competition in the Accessible Luxury Handbag Market**

64.    After the Capri Acquisition was announced, as alleged in greater detail below, Defendants repeatedly told the public that there was "no question" that the transaction was "pro-consumer" and "pro-competitive." However, confidential, non-public Tapestry documents show that the company's internal rationale for the Capri Acquisition was explicitly anticompetitive. From the very start of its M&A process in August 2022, Tapestry zeroed in on Capri as an

---

[83]    Tr. at 850:23 (discussing PX1497); *FTC v. Tapestry*, at 476-77.

[84]    *FTC v. Tapestry*, at 426-28 (quoting PX8169).

[85]    *FTC v. Tapestry*, at 428-30.

[86]    *Id*.

[87]    Tr. at 454:16-456:1 (discussing PX1542); *FTC v. Tapestry*, at 435 n.19.

acquisition target, precisely due to the intense head-to-head competition between Michael Kors and Coach described above. Numerous documents show that Tapestry executives secretly intended to use the Capri Acquisition to leverage the post-Merger entity's market share power—which Tapestry itself estimated to be over 80%—to raise accessible luxury handbag prices, and that Tapestry executives were aware that the Capri Acquisition posed a high risk of anticompetitive effects, including cannibalization within the accessible luxury market.

65.    On August 29, 2022, Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris emailed Tapestry CEO Crevoiserat a list of topics for a "touchback" between Harris and Crevoiserat scheduled that day to discuss potential M&A targets.[88] Harris attached a slide deck she had prepared with other members of her team entitled "MK Preliminary Consumer Pulse + M&A Consumer Survey Approach Details," which, as Harris stated in her email, summarized "what we have evaluated for MK [Michael Kors] and our recommendation for a more holistic survey for our short-list targets" based on data from Tapestry's annual Brand Health Tracker:[89]

---

[88]    PX1216 at 1; Tr. at 285:13-288:25, 369:11-372:15 (quoting PX1216).

[89]    PX1216 at 3; Tr. at 285:13-288:25, 369:11-372:15 (quoting PX1216).



tapestry

**MK Preliminary Consumer
Pulse + M&A Consumer
Survey Approach Details**

**August 29, 2022**

Tapestry-FTC-000104517
PX1216-003

66.     Harris and her team only collected data from Michael Kors: "The consumer profile for Michael Kors and Coach are similar and consumers view the brands similarly in terms of image and perception"; "***Both brands are each other's top competition when consumers are considering other brands for purchase***"; and "Coach has been priced an average of $147 above MK for the last 2 years; ***suggesting room to increase MK AUR***."[90]

---

[90]   PX1216 at 4 (highlight added); Tr. at 285:13-288:25, 369:11-372:15 (quoting PX1216); PX1216 at 17; *FTC v. Tapestry*, at 483-84.

## MK Preliminary Consumer Pulse Summary                    tapestry ⎯

- In connection with our M&A ambition, we plan to field a consumer survey across a short list of potential acquisition targets; prior to launching the survey, we pulled together a summary of what we know about Michael Kors through our existing brand tracking, YouGov, EDITED and Google Search tools

- We summarized our initial findings below and throughout the deck, and will share our approach to a more fulsome consumer survey for our short list of M&A targets; we aim to share our learnings at the Nov board meeting

- Michael Kors remains solid on key brand health metrics, however there is downward momentum on the brand's resonance with Gen Z and on re-purchase intent
  - 80% of women 18+ are aware of Michael Kors, 22% of them would consider the brand for purchase, and 8% have a positive purchase intent (conversion results similar to Coach)
  - MK brand momentum remains stable vs. LY with 52% saying the brand is 'on the way up'
  - However, re-purchase intent declined *significantly* in Q4 vs. LY as well as brand resonance ("for me") driven by Gen Z and Older Millennials

- The consumer profile for Michael Kors and Coach are similar and consumers view the brands similarly in terms of image and perception
  - Both brands are considered stylish and high quality, though Coach has a slightly stronger profile and is directionally seen as more classic, high quality, long-lasting, trusted, and timeless

- Both brands are each other's top competition when consumers are considering other brands for purchase
  - For Coach, other brands in consideration lean more towards the luxury spectrum (e.g. 28% of COH buyers considered brands like LV, Gucci, Chanel, Prada vs. 12% for MK buyers)

- Michael Kors has consistently been priced lower than Coach for the last 2 years
  - MK has also offered deeper discount depth and greater discount breadth than Coach for the last 2 years

- Google search demand for Michael Kors has been declining since 2020 while Coach has been rising

**Thought-starters:**
- There is currently space for both brands to exist with consumers. Is there opportunity to further differentiate brand perceptions so each brand can occupy a different place within the portfolio/consideration set? In addition, what is the investment level needed to make a marked shift in perceptions over time?

- As MK has wider distribution in wholesale, is there opportunity to bring more DTC/Digital expertise to accelerate their growth?

- With MK across more categories (e.g. kids, more apparel, etc.), are there existing capabilities that can further enhance TPR brand stretch?

- As MK has broader distribution in Europe, is there opportunity to leverage their network to drive added growth for TPR brands and extend reach into the EU market?

2

Tapestry-FTC-000104517

PX1216-004

67.     Another slide reiterated the last most point: in a section called "Pricing Insights," it featured a chart comparing AURs for Coach, Kate Spade, and Michael Kors, and again stated, "Coach has been priced an average $147 above MK for the last 2 years; *suggesting room to increase MK AUR*."[91]

---

[91]   PX1216 at 17; *FTC v. Tapestry*, at 483-84.



68.    The next slide compared average discount rates for the same three brands, stating: "Over the last 2 years, MK has had an average discount rate of 45% vs. 37% for Coach and 28% for Kate Spade *suggesting opportunity to reduce MK discounting*."[92]

---

[92]    PX1216 at 18; *FTC v. Tapestry*, at 483-84.





Crevoiserat later testified that "this document was meant to convey a process or approach that we may take when we got further into our M&A process."[93]   As the *Tapestry* Court put it, ***this "evidence reflects that Tapestry perceived the acquisition of Michael Kors to be an opportunity to decrease Michael Kors's discounting and increase Michael Kors's prices – a recognized form of anticompetitive effects*."[94]

69.   Underscoring this point, just weeks later, on October 25, 2022, Tapestry's financial advisor, Morgan Stanley, emailed its analysis of Tapestry's potential acquisition targets to Tapestry CEO Crevoiserat and other Tapestry executives.[95]   The analysis explicitly noted that acquiring Capri, and thereby Michael Kors, would pose anticompetitive risks because all three brands compete closely in the accessible luxury market: "***High cross-purchase overlap with***

---

[93]   Tr. at 286:24-288:9 (discussing PX1216); *FTC v. Tapestry*, at 483-84.

[94]   *FTC v. Tapestry*, at 484.

[95]   Tr. at 289:15-290:24 (discussing PX1715); *FTC v. Tapestry*, at 432 n.12.

***Coach and Kate Spade consumers would present cannibalization risks***, though reinforces the 'affordable luxury' nature of the portfolio and leadership within luxury leather goods."[96]

70.    Internal records like this not only provide insight into Tapestry's M&A strategy but also demonstrate that Tapestry executives knew their brands compete in the accessible luxury handbag market, and do not compete with luxury handbag brands.  Numerous internal documents indicate that Tapestry executives continued to distinguish between the accessible luxury and luxury handbag markets even after the company embarked on its M&A process in full.  For example, a January 2023 presentation demonstrates that Tapestry focused specifically on Capri.[97] The presentation, titled "Comet Competitor Assortment and MSRP Price Positioning," provided a price analysis of Michael Kors and Versace.[98]  Slide 5 of the deck analyzed Versace's handbag MSRP price positioning versus competitors Dior Gucci, Louis Vuitton, and Prada; and slide 16 of the deck analyzed Michael Kors's handbag MSRP price positioning versus other "accessible luxury" competitors Coach, Kate Spade, and Tory Burch.[99]  A February 2023 presentation to the Tapestry Board about the potential acquisition of Capri noted that "Accessible Luxury" brands are Coach, Kate Spade, Michael Kors, Tory Burch, Furla, Longchamp and Marc Jacobs.[100]  The presentation went on to note that the "[p]ricing architecture [for Versace] suggests product is at the entry for European luxury, with average price ~2.5x to ~4.5x accessible luxury brands and ~45% below Gucci, the European luxury brand with next lowest average MSRP."[101]

---

[96]    *FTC v. Tapestry*, at 487-89.

[97]    Tr. at 374:11-376:18 (discussing PX1743 and PX1381) (Harris confirmed that "Comet" was the code name for Capri).

[98]    Tr. at 374:11-376:18 (discussing PX1743 and PX1381).

[99]    Tr. at 374:11-376:18 (discussing PX1743 and PX1381); *FTC v. Tapestry*, at 432-36.

[100]    *FTC v. Tapestry*, at 433 n.16 (quoting PX1393).

[101]    *FTC v. Tapestry*, at 426-28 (quoting PX1393).

E.    **Michael Kors's Declining Performance Motivates Capri to Consider Strategic Alternatives**

71.    Like Tapestry, Capri had a strong, anticompetitive motive to pursue the Capri Acquisition. Over the past decade, Michael Kors had seen a steady decline in brand performance. Michael Kors's revenue declined by over 25% since its peak, dropping from $4.7 billion in FY2016 to $3.5 billion in FY2024. Likewise, Michael Kors's U.S. handbag revenues declined by almost 30% between 2018 and 2023, falling from about $1.65 billion in 2018 to about $1.2 billion in 2023.[102] Uniting Michael Kors and Coach under the same corporate umbrella would eliminate Michael Kors's need to keep pace with its fiercest competitor and alleviate the brand's financial struggles.

72.    Confidential documents indicate that Michael Kors was reaching the end of its rope and was in desperate need of a solution—even one anticompetitive in nature. These documents reveal that Michael Kors executives attempted to come up with various potential explanations for the brand's poor performance, including higher levels of competition, "brand fatigue" caused by the brand becoming "too ubiquitous," an overreliance on discounting, ineffectual marketing, and a general loss of "brand heat" and "brand relevance."[103] Yet no particular issue seemed to provide a global explanation for the brand's decline. As such, efforts to revitalize the brand were largely unsuccessful. For example, Michael Kors launched several new bags—including the Parker, which, as alleged above, was designed to compete with the Coach Tabby—but not one managed

---

[102]  Tr. at 1110:3-11.

[103]  *FTC v. Tapestry*, at 479 (citing Tr. at 134:3-135:1 (Idol); *id.* at 225:23-226:20 (Newman); *id.* at 737:6-8, 753:1-754:13 (Wilmotte); *id.* at 1100:7-13 (Mr. Kors)); DX864 at 1; Tr. at 224:3-226:17 (discussing DX864); DX864 at 1;Tr. at 224:3-226:17(quoting DX864); DX864 at 2-3; Tr. at 224:3-226:17 (quoting DX864); PX2321 at 2; Tr. at 1077:25-1079:8 (quoting PX2321); *FTC v. Tapestry*, at 477-79; DX869; Tr. at 751:20-754:13 (discussing DX869).

to capture the interest of consumers.[104]  In light of these failed efforts, the Capri Board began to consider "strategic alternatives" to keep the company and Michael Kors brand afloat, including a sale of Capri's luxury brands, Versace and Jimmy Choo, in 2023.[105]

     **F.**    **Tapestry and Capri Executives Continue to Internally Discuss Their Close Competition Throughout the Deal Process and After the Capri Acquisition was Announced on August 10, 2023**

73.     In mid-March 2023, Tapestry CEO Crevoiserat approached Capri CEO Idol to discuss strategic opportunities.  Crevoiserat and Idol held a meeting on April 4, 2023, during which Crevoiserat proposed to acquire Capri in an all-cash transaction priced at $60 per share.  Other companies expressed interest in acquiring certain brands owned by Capri, but the Capri Board determined that pursuing a sale of Capri as a whole would be more advantageous.  As such, on May 9, 2023, the Capri board authorized Capri's management to provide Tapestry with due diligence information.

74.     Defendants continued to internally analyze the accessible luxury handbag market and discuss the close competition between Michael Kors, Coach, and Kate Spade in the accessible luxury market after Tapestry and Capri agreed to negotiate.  For example, on the Tapestry side, a May 2023 slide deck titled "FY 23 Q3 competitor update, May 18th, 2023" prepared by Tapestry's Global Strategy & Consumer Insights Group and presented to the Tapestry Board explicitly noted

---

[104] Tr. at 189:3-5; *FTC v. Tapestry*, at 479 (quoting DFOF ¶ 66); Tr. at 189:7-190:4 (discussing PX2350), 222:17-21 (quoting PX2294).

[105] According to minutes of a Capri Board meeting held on May 9, 2023, "representatives of Barclays … discussed with the board various strategic alternatives potentially available to the company, including continuing to execute the standalone business plan, a carve-out of the company's luxury businesses into an independent publicly traded company, a partial or total breakup of the company, and a sale of the company as a whole." PX2440 at 1-2; Tr. at 92:22-93:5, 93:10-94:1 (quoting PX2440). Capri CEO Idol later confirmed that "carve-out of the company's luxury businesses" referred to "a carve-out of Versace and Jimmy Choo." Tr. at 92:22-93:5, 93:10-94:1 (discussing PX2440).

differences in pricing between accessible luxury and luxury.[106]  A slide titled "Luxury brands have increased prices at a higher rate than Accessible Luxury, widening the price gap between the two segments" compared two bar charts reflecting "Luxury Bags MSRP Prices" and "Accessible Luxury Bags MSRP Prices."[107]  In a footnote, the presentation explained that "Luxury reflects LV, Gucci[,] and Prada" while "Accessible Luxury includes Tory, Coach, MK, Marc Jacobs[,] and Kate Spade."[108]  Under the subheading "Key Takeaways," the presentation observed that "[t]he price gap has widened, creating white space for our brands; the pricing gap has grown from ~$1,700 in FY19 to ~$2,550 in FY23-to-date."[109]  Harris later confirmed that "white space," as used in the presentation, "refer[s] to the gap in the MSRP prices between the luxury brands and the accessible luxury brands," and that it "has been widening over time."[110]

75.    In the same vein, Kate Spade continued to fiercely compete with Michael Kors and closely monitor its competitors in the accessible luxury market.  For example, in March 2023, Kate Spade CEO Fraser internally accused Michael Kors of driving prices down: "I'm tired of the race to the bottom."[111]  Additionally, one slide in an August 2023 Tapestry presentation depicted Kate Spade's "Competitive Pricing Update," which analyzed Kate Spade's target MSRPs and AURs for handbags as compared to Michael Kors, Coach, and Tory Burch.[112]  Discussing a similar Kate

---

[106]  Tr. at 268:18-270:2 (quoting PX1723); *FTC v. Tapestry*, at 425-33.

[107]  Tr. at 268:18-270:2 (quoting PX1723); *FTC v. Tapestry*, at 425-33.

[108]  Tr. at 268:18-270:2 (quoting PX1723); FTC's Closing Argument Demonstrative at 16 (excerpt of PX1723); *FTC v. Tapestry*, at 433 n.16.

[109]  FTC's Closing Argument Demonstrative at 16 (excerpt of PX1723); *FTC v. Tapestry*, at 428-30.

[110]  Tr. at 383:12-384:21 (discussing PX1723); *FTC v. Tapestry*, at 428-30.

[111]  Tr. at 869:1-870:8 (quoting PX1321); *FTC v. Tapestry*, at 490-91.

[112]  *FTC v. Tapestry*, at 490-91 (quoting PX1387).

Spade presentation, a former Kate Spade senior executive testified that Kate Spade's "long-term targets" were "for Kate Spade to price 5 percentage above Marc Jacobs, 10 percent above Michael Kors, 10 percent below Coach, and 25 percent below Tory Burch."[113]

76.    Capri executives similarly continued to closely monitor Michael Kors's peers in the accessible luxury market.  For example, on April 19, 2023, Michael Kors President of Accessories & Footwear Newman Chapuis emailed Capri CFO Edwards an analysis comparing Michael Kors and Coach outlet prices as of January 2023.[114]   The presentation, titled "Women's Outlet Accessories, Michael Kors v. Coach pricing comparison, January 2023," provided a detailed overview of Michael Kors's pricing structure as compared to Coach's pricing structure for outlet accessories, including handbags.[115]   The first slide, titled "Key Takeaways—Handbags," compared pricing, assortment, design, and materials between Michael Kors and Coach.[116]

77.    During this time, Capri CEO Idol and Michael Kors executives secretly worked together to collect Coach marketing emails over the course of several weeks to show the Capri Board "what we are up against."[117]   On April 19, 2023, Michael Kors CEO Wilmotte forwarded an email he had received from Coach Outlet with the subject line "We're Offering An Extra 15% Off All These Bags" to Michael Kors Vice President of Strategy & Transformation Laura Parsons, writing: "We did not discuss this but *i would like for you to have a page for now in the BOD presentation with 2 or 3 examples of coach and kate spade racing to the bottom with such*

---

[113]  *FTC v. Tapestry*, at 490-91 (quoting PX5079).

[114]  Tr. at 197:20-199:2 (discussing PX2178), 199:3-200:8 (discussing PX2108); PX2108 at 2-3.

[115]  PX2108; Tr. at 197:20-199:2 (discussing PX2178), 199:3-200:8 (discussing PX2108); *FTC v. Tapestry*, at 490-91.

[116]  PX2108 at 3; Tr. at 197:20-199:2 (quoting PX2178); *FTC v. Tapestry*, at 490-91.

[117]  Tr. at 743:23-745:16 (quoting PX2097); FTC's Opening Argument Demonstrative at 18 (excerpt of PX2097); *FTC v. Tapestry*, at 490-91

*promotions.  I want the board to see what we are up against.*"[118]  These examples were shown to the Capri Board on or around June 15, 2023 as part of a presentation comparing Michael Kors pricing, discounting, and promotional efforts with Coach, Kate Spade, Tory Burch, and Marc Jacobs.[119]  The presentation included a slide, titled "Michael Kors + Coach Location + Shopper Density," which compared the biggest markets for Michael Kors and Coach—and observed that both brands make ~40% of their sales in the United States in the same four states (California, New York, Texas, and Florida).[120]

78.    As before, Capri executives, including Capri CEO Idol, continued to intently monitor Coach marketing emails.  In one such example, on May 20, 2023, Capri CEO Idol forwarded an email he had received from Coach Outlet, writing: "Please speak to me about these email backdrops on Monday.  We never were able to talk about this last week.  *Coach's creativity on these emails (outlet in particular) is killing us*.  Now they even have taken our water and Francesca will show you all the Instagram plane they are using.  *While I find most of their emails offensive they get your attention.  Sorry our background look cheap and uninspiring.  This needs to be corrected quickly*.  Also we need to make our outlet emails feel Jet Set.  They are just bland product photos with no inspiration.  *Help!!! Fast!!!*"[121]

79.    On July 31, 2023, Capri's Board approved an acquisition price of $57.00 per share.  Due diligence continued up to August 7, 2023.  On August 10, 2023, Capri and Tapestry jointly

---

[118]  PX2097; Tr. at 743:23-745:16 (quoting PX2097); FTC's Opening Argument Demonstrative at 18 (excerpt of PX2097); *FTC v. Tapestry*, at 490-91.

[119]  PX2128 at 8, 10; Tr. at 108:9-22, 109:2-25, 746:8-11, 746:19-748:6, 1416:10-23 (discussing PX2128); FTC's Closing Argument Demonstrative at 14 (excerpt of PX2128); *FTC v. Tapestry*, at 428-30, 490-91.

[120]  PX2418 at 7.

[121]  PX2412; FTC's Closing Argument Demonstrative at 16 (excerpt of PX2098); Tr. at 119:12-25 (quoting PX2412); *FTC v. Tapestry*, at 491-92.

announced their entry into the Merger Agreement, pursuant to which Tapestry would purchase Capri for $57.00 per share in cash.  On September 20, 2023, Capri filed the Proxy to solicit shareholder approval of the Capri Acquisition, and on October 25, 2023, Capri announced that its shareholders voted to approve the adoption of the Merger Agreement.  As alleged in greater detail below, both companies issued statements that omitted material facts concerning the intense head-to-head competition between Michael Kors and Coach in the accessible luxury handbag market and misled investors as to the true nature of the antitrust risk inherent in the Capri Acquisition.

80.    Even after announcing the Capri Acquisition, Capri and Tapestry continued to internally discuss their direct competition in the accessible luxury handbag market.  On September 8, 2023, Coach debuted a new version of its Tabby handbag during its runway show at New York Fashion Week.  Texts sent on September 8, 2023 between Michael Kors Accessories & Footwear executives Newman Chapuis, Ho, and Yoon compared the Coach bag to Michael Kors's Tribeca bag.[122]  Ho wrote: "They sent a quilted bag down the runway and you can buy it right away on the site.  ***So Tabby vs. Tribeca***."[123]  Newman Chapuis later texted: "***So now we have two brands in the same group showing the same stuff vying for the same customer***…."[124]  In light of the timing of the texts—about a month after the Capri Acquisition was announced—it is reasonable to infer that "group" referred to the post-Merger entity.  In other words, Michael Kors executives recognized a clear antitrust problem and conceded that the post-Merger entity would have "two brands in the same group showing the same stuff vying for the same customer."[125]

---

[122]  PX2308; Tr. at 193:14-194:16 (discussing PX2308).

[123]  PX2308 at 3; Tr. at 193:14-194:16 (quoting PX2308).

[124]  PX2308 at 8; Tr. at 193:14-194:16 (discussing PX2308); FTC's Closing Argument Demonstrative at 21 (excerpt of PX2308).

[125]  Excerpt of PX2308 at 8.

81. Capri and Michael Kors executives also continued to closely track their peers in the accessible luxury handbag market. For example, on January 17, 2024, Michael Kors Chief Creative Officer Mr. Kors sent an email to Michael Kors executives from his husband's account with the subject line "MMK fall '24 handbags and shoes," writing: "***We would like you to put boards together every season with our suggested pricing for each style in handbags and footwear and comparable pricing from Coach, Tory [Burch], Polo [Ralph Lauren], [Lauren Ralph] Lauren, Kate Spade, Stewart W[eitzman], and Furla … so we can compare [their] price structure …. This is the only way to get clear strategy on our pricing***."[126]

82. Tapestry executives took a similar approach. For example, a January 2024 Kate Spade slide deck concerning long-term strategy compared MSRPs, materials, and styles for Kate Spade, Coach, Marc Jacobs, Michael Kors, and Tory Burch on slides entitled "Mainline Competitive Analysis," "Tote Competitive Pricing," and "Crossbody Competitive Pricing," among others.[127] Kate Spade executives continued to intently monitor and respond to Michael Kors's pricing. On December 6, 2023, Kate Spade President of North America Adrianne Kirszner emailed Kate Spade CEO Fraser and then-Kate Spade CFO Jim Capiola, writing: "***[c]ompetition is fierce. [Michael Kors] changed promotion mid-day yesterday***."[128] That email continued with a list of "actions" to take in response to Michael Kors's switch-up, including "[a]mplifying promotions."[129]

---

[126] Excerpt of PX2522; Tr. at 1076:9-1077:22 (quoting PX2522); *FTC v. Tapestry*, at 434 n.18.

[127] Tr. at 866:24-868:25 (quoting PX1924); *FTC v. Tapestry*, at 434 n.18.

[128] Tr. at 865:4-21 (quoting PX1923); *FTC v. Tapestry*, at 490-91.

[129] *FTC v. Tapestry*, at 490-91.

G.    **The Cover-Up:  After the FTC Filed Suit, Defendants Attempt to Conceal Their Internal Knowledge of the Competition between Michael Kors, Coach, and Kate Spade in the Accessible Luxury Handbag Market**

83.    On April 22, 2024, the FTC brought an action to enjoin the Capri Acquisition in the United States District Court for the Southern District of New York and, after discovery, moved for a preliminary injunction on August 6, 2024.  The FTC alleged that, if allowed, the Capri Acquisition would eliminate direct head-to-head competition between Kate Spade, Coach, and Michael Kors.  The FTC's allegations hinged on its argument that, within the broader market of handbags, there are three distinct submarkets: "mass market," "true luxury," and "accessible luxury."  The FTC alleged that, as Kate Spade, Coach, and Michael Kors all compete within the "accessible luxury handbag market," Tapestry's acquisition of Michael Kors would give it a dominant share of the market.

84.    On October 24, 2024, after an eight-day hearing, the *Tapestry* Court granted the FTC's motion for preliminary injunction and blocked the Capri Acquisition.  In its order, the Court cited to hundreds of pages of internal documents revealing that, as alleged in detail above, Defendants secretly understood that their three brands were close competitors within a well-defined "accessible luxury handbag market" and that the Capri Acquisition would hurt competition (indeed, cornering the accessible luxury handbag market was a key internal rationale for the deal), exposing Capri investors to an acute risk that the Capri Acquisition would be blocked by regulators.  Yet the full extent of that risk was known only to Defendants while they, as detailed below, continuously misled investors regarding those adverse facts and the actual likelihood that the Capri Acquisition would be consummated as structured.

85.    Defendants, as well as other high-level executives at Tapestry and Capri, engaged in a concerted effort to conceal their knowledge of the antitrust risks associated with the Capri Acquisition and their scheme to leverage the full anticompetitive benefits of the combined

business.  Among other things, Defendants surreptitiously removed all references to "accessible luxury" in their internal documents and public filings.  Defendants also worked to conceal evidence: (a) that Coach, Michael Kors, and Kate Spade compete in the accessible luxury handbag market; (b) that Coach, Michael Kors, and Kate Spade do not compete with luxury and mass market handbag brands; (c) that Michael Kors and Coach are each other's top competitors; and (d) that Defendants' actual motive for the Capri Acquisition was anticompetitive in nature.  Tellingly, the *Tapestry* Court determined that Defendants' testimony, consistent with their prior public statements, on those issues was not credible, citing again and again to the trove of internal company documents demonstrating that these witnesses had private views and economic understandings during the Class Period at odds with their misleading public statements and dishonest testimony during the hearing.

### 1.    Defendants Attempt to Conceal Their Knowledge of the Accessible Luxury Handbag Market

86.    During the Class Period, Defendants attempted to conceal their internal knowledge of the well-defined accessible luxury handbag market, based on detailed and extensive analysis. Critically, this knowledge directly contradicted Defendants' public statements to investors that Capri and Tapestry operated in a highly fragmented market and that their products competed with lower- and higher-priced handbags in the mass market and the luxury market.  Defendants' effort was two-part: (a) Defendants concealed their knowledge from the market immediately after the FTC filed suit by removing all references to "accessible luxury" from public filings; and (b) Defendants concealed their knowledge from the public during the preliminary injunction hearing by providing false and/or misleading testimony.

87.    First, after the FTC filed suit, Defendants worked to conceal their knowledge by removing all references to "accessible luxury" in their internal documents and public filings made

after that date.  As the *Tapestry* Court itself noted, ***"Defendants repeatedly used the term*** ***['accessible luxury'] in the months before and after the announcement of the merger—only for*** ***the term to disappear from their lexicon once the FTC filed suit in April 2024***."[130]  To this point, the Court noted that a May 2023 slide deck titled "FY 23 Q3 competitor update, May 18th, 2023" prepared by Tapestry's strategy team and presented to the Tapestry Board;[131] an August 2023 letter from Fraser to the Tapestry Board;[132] an August 2023 slide deck presented to the Tapestry Board on or around August 8, 2023;[133] minutes for a Capri Board meeting held August 1-2, 2023;[134] an October 2023 slide deck presented to the Capri Board;[135] a March 2024 Capri strategic-planning slide deck[136]; Capri's 2024 Third-Quarterly Report (filed in February 2024);[137] and Capri's 2023 Annual Report[138] all made explicit reference to "accessible luxury."  For example, the August 1-2, 2023 Capri Board meeting minutes stated: "Mr. Wilmotte next discussed with the Board the U.S. leather goods market and the accessible luxury market."[139]  Likewise, the May 18, 2023 Tapestry Board presentation explicitly compared "Luxury Bags MSRP Prices" and "Accessible Luxury Bags MSRP Prices" from FY2019 pre-COVID-19-pandemic to FY2023-to-date on a slide

---

[130] *FTC v. Tapestry*, at 436-38.

[131] *Id.* (citing PX1723).

[132] *Id*. (citing PX1250).

[133] *Id.* (citing PX1250).

[134] *Id.* (citing PX2439).

[135] *Id.* (citing PX2430).

[136] *Id.* (citing PX2561).

[137] *Id.* (citing PX7157); Capri Holdings Ltd., 2024 Q3 Report (Form 10-Q) (Feb. 8, 2024).

[138] Capri Holdings Ltd., Annual Report (Form 10-K) (May 31, 2023); *FTC v. Tapestry*, at 436-38.

[139] PX2439 at 4; Tr. at 734:5-736:4 (quoting PX2439); FTC's Opening Argument Demonstrative at 33 (excerpt of PX2439); *FTC v. Tapestry*, at 429, 436-38.

titled "Luxury brands have increased prices at a higher rate than Accessible Luxury, widening the price gap between the two segments."[140]  Yet, as the Court noted, Capri's 2024 Annual Report and Tapestry's 2024 Annual Report—filed one month and two months after the FTC filed suit in April 2024, respectively—omitted the term.[141]

88.    Second, during the hearing, multiple Capri and Tapestry executives engaged in a concerted effort to conceal their knowledge of the accessible luxury market by offering coordinated and dishonest testimony that directly contradicted internal documents.   As the *Tapestry* Court noted, "[d]uring the hearing, some of Defendants' executives and witnesses tried to downplay the significance of the term 'accessible luxury' by suggesting that it is arcane and used mostly in speaking with investors," and highlighted several examples.[142]  For instance, despite his own internal documents to the contrary, Michael Kors CEO Wilmotte testified that "affordable luxury" and "accessible luxury" are "outdated" and "something that is more ... from the past 10 to 15 years ago."[143]  The Court noted that "[s]ome witnesses employed and/or called by Defendants claimed that the term 'accessible luxury' has no commonly understood meaning at all, even within Tapestry and Capri."[144]  For example, Capri CFO Edwards falsely testified that "accessible luxury" and "true luxury" are "broad undefined terms."[145]  Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris falsely testified that "[w]ithin Tapestry internally," there is no "common agreed upon definition of accessible luxury"; accessible luxury

---

[140]  Tr. at 268:18-270:2 (quoting PX1723); *FTC v. Tapestry*, at 425-33.

[141]  *FTC v. Tapestry*, at 436-38 (citing PX7261 and PX7435).

[142]  *FTC v. Tapestry*, at 430.

[143]  Tr. at 765:13-766:3.

[144]  *FTC v. Tapestry*, at 430.

[145]  Tr. at 1128:16-20.

is not "a term that Tapestry uses to identify all the handbag brands that it competes with."[146] Similarly, former Kate Spade CEO Fraser falsely testified that "I'm aware of the term ['accessible luxury'], but it wasn't one that we used at Kate Spade as a matter of course.... It's such a subjective term. Just don't really think about [Kate Spade] that way."[147]

89.    The Court "did not find this testimony credible."[148]   It stated that it based its "credibility findings not only on its firsthand impressions of the witnesses' demeanors while testifying, but also on the substantial body of compelling evidence, including reams of ordinary-course documents, showing that terms like 'accessible luxury' are used frequently and consistently" at both companies, including "emails, internal analyses, [and] internal presentations and slide decks (including many that were presented to companies' boards of directors)."[149]   The Court cited as examples numerous emails between senior executives at Tapestry and Capri, including Tapestry CEO Crevoiserat, Capri CEO Idol, and Capri CFO Edwards, and internal studies shared with the Capri and Tapestry Boards that discussed the accessible luxury market.[150] For example, Crevoiserat stated in a January 29, 2023 email where she provided feedback on a strategy memorandum prepared for the Tapestry Board by Tapestry Chief Supply Chain Officer Charles and others: "Debbie/Peter, specifically, I think we can add a bit to the beginning of our SC [supply chain] section reinforcing that our supply chain innovation over the years effectively

---

[146]  Tr. at 416:20-417:4.

[147]  Tr. at 880:10-22.  Fraser left Kate Spade on September 1, 2024, but it is reasonable to infer that her testimony was prepared in connection with Defendants' defense.

[148]  *FTC v. Tapestry*, at 430-32.

[149]*FTC v. Tapestry*, at 430-32 & nn.10-12.

[150]  *FTC v. Tapestry*, at 430-32 nn.10-11.

created the ***accessible luxury market*** – balancing lower cost with quality well made product."[151]
The final memorandum sent to the Tapestry Board ahead of its February 2023 meeting read, in
part: "Our approach to delivering innovative, high-quality product while optimizing costs created
the ***accessible luxury market***."[152]

90.    In addition, the Court cited as examples 22 slide decks created by executives at
Tapestry and Capri, many of which were reviewed by Tapestry CEO Crevoiserat or Capri CEO
Idol and/or presented to the Tapestry or Capri Boards.[153]  For example, a slide deck prepared for a
Capri Board meeting held on January 18, 2018 stated that ***Capri's "mission" is "to re-establish
Michael Kors as leader in the affordable luxury accessories market***."[154]  The Court pointed out
that Defendants' own testimony at the hearing contradicted their statements, noting that
Crevoiserat testified that she "personally ha[s] included the term 'accessible luxury' in [her]
communications with Tapestry's board"[155] and that Capri CFO Edwards has instructed colleagues
at Capri to add the term "accessible luxury" to Capri Board materials.[156]

91.    Furthermore, Defendants, as the *Tapestry* Court put it, "strained [to] explain[] how
the same accessible-luxury brands are consistently grouped together in Tapestry's ordinary-course
documents."[157]  For example, Tapestry CEO Crevoiserat misleadingly testified—in response to

---

[151] Tr. at 300:4-301:2, 1033:14-1034:11 (quoting PX1704); FTC's Opening Argument
Demonstrative at 40 (excerpt of PX1704); *FTC v. Tapestry*, at 432-34.

[152] Tr. at 298:10-300:3 (quoting PX1731); *FTC v. Tapestry*, at 436-38.; FTC's Opening Argument
Demonstrative at 40 (excerpt of PX1731 *FTC v. Tapestry*, at 419-21; Tr. at 1034:12-1036:15
(quoting PX1811).

[153] *FTC v. Tapestry*, at 431 n.12.

[154] PX2166 at 3; Tr. at 184:5-22 (quoting PX2166); *FTC v. Tapestry*, at 431 n.12.

[155] Tr. at 263:7-14.

[156] Tr. at 1127:25-1128:2.

[157] *FTC v. Tapestry*, at 432-35.

questioning by the Court itself—that the same group of companies (Michael Kors, Coach, Kate Spade, Marc Jacobs, and Tory Burch) are routinely listed in Tapestry's ordinary-course documents because they "report publicly," but later acknowledged that "Tory Burch is not a public company."[158]  Unsurprisingly, the Court stated that it did not find these dishonest explanations "credible or persuasive."[159]

### 2. Defendants Falsely Claim that Their Accessible Luxury Brands Compete with Luxury and Mass Market Handbag Brands

92.    In public statements, deposition testimony, and testimony at the preliminary injunction hearing, Defendants and other executives at Capri and Tapestry repeatedly stated that they believed their brands compete with all handbag brands, including luxury and mass market brands.  Internally, however, Defendants referenced that concept as "a joke."  Unsurprisingly, the Court found that testimony to be "incredible."[160]  For instance, in response to a question by the FTC about whether MMK handbags compete with the Hermes Birkin bag (which retails anywhere from $12,000 to over $100,000), Michael Kors CEO Wilmotte testified: "I believe that Michael Kors compete[s] with anyone who makes handbags at the end of the day, so I'm looking at how the consumer is shopping across the whole spectrum."[161]  The Court ruled:

> *[T]he Court finds incredible the convenient litigation assertions by Defendants that their brands compete with all handbags*.  Commercial realities simply do not support a conclusion that, for example, an MMK handbag competes with an Hermès Birkin bag…. As Kate Spade's former CEO put it – *prior* to litigation – "Nobody says 'should I buy a [Louis Vuitton] bag or a Coach bag?'"… The ordinary-course documents in the record make clear that Coach, Kate Spade, and Michael Kors do not regard brands like Zara and Louis Vuitton as nearly as important to their bottom line as they regard one another, along with other usual suspects like Tory Burch and Marc Jacobs.  The Court finds these documents to be

---

[158]  Tr. at 327:19-25, 333:22-334:6, 351:17-352:2.

[159]  *FTC v. Tapestry*, at 432-35.

[160]  *FTC v. Tapestry*, at 453.

[161]  Tr. at 772:4-8.

more compelling evidence of commercial realities than the platitudes offered by Defendants' executives and experts…. The Court's conclusion is not altered by evidence that Tapestry and Capri executives also look to brands that are not accessible-luxury-handbag brands, such as Louis Vuitton and Gucci, for design inspiration…. Defendants' designs can be inspired by a myriad of things, such as "theatre," "the Ripley television show on Netflix," "art exhibit[s]," "the street," and "people in an airport," as Mr. Kors testified…. Just because Defendants unsurprisingly look externally for design inspiration does not mean that their sources are necessarily included in the relevant market for antitrust purposes.[162]

### 3. Defendants Attempt to Conceal the Fierce Competition Between Michael Kors and Coach

93.    Capri and Tapestry executives also attempted to conceal the truth about their internal knowledge that Michael Kors and Coach are each other's top competitors. Capri CEO Idol dishonestly testified at the hearing that Michael Kors does not have close competitors and instead has "many, many competitors."[163] The Court described this testimony as "self-interested" and found that it contradicted contemporaneous documents, such as Idol's own March 17, 2021 email, in which he described *Coach as "our key competitor*."[164] The Court also highlighted Michael Kors President of Accessories & Footwear Newman Chapuis's June 4, 2021 email to Capri CFO Edwards, in which she described Tapestry as Capri's "*biggest competitor*."[165] These internal documents stand in stark contrast to how Defendants described the supposed pro-consumer and pro-competitive post-Acquisition market.

94.    On the Tapestry side, Coach and Kate Spade executives similarly attempted to conceal their brands' close competition with Michael Kors. Coach President of North America Levine testified at the hearing that "[w]e [Coach] really don't as often … look at Michael Kors'[s]

---

[162]  *FTC v. Tapestry*, at 453 & n.32.

[163]  Tr. at 164:6-11.

[164]  *FTC v. Tapestry*, at 486-87 & n.44; Tr. at 110:4-111:8 (quoting PX2425).

[165]  Tr. at 200:11-201:15 (quoting PX2728); *FTC v. Tapestry*, at 486-87.

offerings" as it did in 2021 and early 2022 because "their business is really struggling, so we wouldn't tend to look at a business that is not doing well."[166]  Similarly, former Kate Spade CEO Fraser testified that "I don't know who our primary competitor would be, but Michael Kors has had a very tough business for a while, so we look at them less and less."[167]  The Court found these statements were "conclusory assertion[s], lacking any corroboration in ordinary-course documents."[168] The Court's findings and the internal documents on which they rely wholly belie the statements Capri and Tapestry made to investors about the competitive nature of the post-acquisition company.

95.    Defendants and their executives also sought to conceal the close competition between their subsidiary brands specifically with regard to pricing.  Tapestry executives repeatedly attempted to conceal evidence that Michael Kors functions as a constraint on Coach and Kate Spade prices by testifying that Tapestry would be unable to increase prices after the Capri Acquisition because consumers control pricing.  Tapestry CEO Crevoiserat testified that Tapestry would have "no ability" to raise the price of Michael Kors handbags if it acquired Capri.[169]  Coach CEO Kahn testified that Michael Kors does not "act[] as a pricing constraint on Coach" because "the consumer decides" pricing.[170]  Coach President of North America Levine testified that "the customer will decide what they want to pay" and "sets the price."[171]  Former Kate Spade CEO Fraser testified that Kate Spade cannot "raise prices without elevating the product and brand

---

[166]  Tr. at 801:8-16.

[167]  Tr. at 895:16-20.

[168]  *FTC v. Tapestry*, at 489 n.48.

[169]  Tr. at 347:22-348:4.

[170]  Tr. at 491:16-23.

[171]  Tr. at 800:15-25.

heat."[172]  Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris testified that it is "[n]ot at all" possible that "Tapestry could successfully raise the price of Michael Kors handbags merely by acquiring Capri" and stated that she "do[es] not agree with" the FTC's position that "if Tapestry is allowed to acquire Capri, it will be able to raise the prices on Michael Kors handbags by as much as 30%."[173]  The *Tapestry* Court described these as "self-interested statements" and determined not to "credit" them.[174]  But most importantly, Defendants internal documents and analyses reveal both Capri and Tapestry had internally concluded prior to the announcement of the Capri Acquisition that they could realize substantial pricing and margin opportunities post-business combination as they would no longer be "racing to the bottom."

### 4. The Tapestry Defendants Attempt to Conceal Their Anticompetitive Rationale for the Capri Acquisition

96.     In another vein, Tapestry executives sought to minimize deal file documents indicating that Tapestry's actual rationale for the Capri Acquisition was to eliminate, rather than promote, competition in the accessible luxury handbag market.  The August 29, 2022, slide deck prepared by Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris and emailed to Tapestry CEO Crevoiserat revealed just that: "The consumer profile for Michael Kors and Coach are similar and consumers view the brands similarly in terms of image and perception"; "***Both brands are each other's top competition when consumers are considering other brands for purchase***"; and "Coach has been priced an average of $147 above MK for the last 2 years; ***suggesting room to increase MK AUR***."[175]  Along the same lines, Harris compared average

---

[172]  Tr. at 890:21-23.

[173]  Tr. at 420:12-16, 424:20-23.

[174]  *FTC v. Tapestry*, at 484-85.

[175]  PX1216 at 18; Tr. at 285:13-288:25, 369:11-372:15 (quoting PX1216).

discount rates for Coach, Michael Kors, and Kate Spade, stating: "Over the last 2 years, MK has had an average discount rate of 45% vs. 37% for Coach and 28% for Kate Spade ***suggesting opportunity to reduce MK discounting***."[176]  This deck featured heavily in the FTC's case, and for good reason: it reveals that the true motivation for Defendants' hidden scheme was anticompetitive from its inception.  As the Court put it, ***the slide deck is "telling" and "reflects that Tapestry perceived the acquisition of Michael Kors to be an opportunity to decrease Michael Kors's discounting and increase Michael Kors's prices – a recognized form of anticompetitive effects***."[177]

97.    At the hearing, Harris absurdly claimed that the slide deck (which sought to justify a multibillion-dollar corporate transaction) was just slapped together in "probably about an hour" by "grab[bing] what already existed from existing reports" and "what was just readily available and off the shelf at the time."[178]  She testified that she did not think the slide deck "would be important or reliant or the focus of any meaningful conversations or analyses."[179]  It is unsurprising then that the Court did "not find it credible that Harris – 'the senior vice president of global strategy and consumer insights' at a multibillion-dollar company – would send a supposedly slipshod slide deck about consumer insights to her CEO that was useless, unimportant, or an improper basis for 'meaningful conversations or analyses.'"[180]

98.    The same is true for Harris's efforts to hide the fact that Tapestry executives explicitly considered the "opportunity to reduce MK discounting" as a reason to pursue the Capri

---

[176]  *Id.*

[177]  *Id.*

[178]  Tr. at 421:17-20, 421:25-422:1.

[179]  Tr. at 413:20-414:1, 422:6-13, 427:16-429:7, 429:8-10.

[180]  *FTC v. Tapestry*, at 448 n.30.

Acquisition.[181]  Harris claimed that "[i]n the context of this slide," the reference to "opportunity" was "just another way to remark on the delta that we see" and "not at all a suggestion that you could actually do that."[182]  The Court found Harris's efforts to obfuscate and recontextualize the slide to be "implausible given that 'the context of this slide' was a presentation to the CEO of Tapestry about the strategic benefits of acquiring Michael Kors."[183]

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD AND THE CAUSALLY RELATED DROPS IN CAPRI STOCK PRICE

99.    Throughout the Class Period, Defendants made materially false and misleading statements and material omissions about the Capri Acquisition in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.[184]  Defendants did so in press releases, on earnings calls with investors, in SEC filings, and during interviews with media outlets. These material misstatements and omissions about Tapestry's anticipated purchase of all outstanding Capri securities had the cause and effect of creating in the market an inaccurate perception as to the level of antitrust risk and the likelihood of completion of the Capri Acquisition. In truth, Defendants knew from the inception of the Capri Acquisition that the transaction presented major antitrust issues due to the intense head-to-head competition between Coach and Michael Kors within the accessible luxury handbag market.  To effect this anticompetitive transaction, Defendants knew that they could not reveal the true purpose and likely impact of the Capri Acquisition.  To that end, Defendants repeatedly concealed this information from the

---

[181]  *Id*. at 483-84.

[182]  Tr. at 423:16-20.

[183]  *FTC v. Tapestry*, at 483-84.

[184]  These materially false and misleading statements are italicized and bolded throughout this section.

securities market when making public statements about the Capri Acquisition and the related likelihood of Tapestry consummating its purchase of all outstanding Capri stock causing Plaintiffs and other similarly situated investors to be damaged.

100.   Both Capri and Tapestry were the makers of each of the misleading statements identified herein, in addition to the relevant Individual Defendants.  Both Capri and Tapestry agreed in the Merger Agreement that "neither the Company [Capri] nor Parent [Tapestry], nor any of their respective Subsidiaries, shall issue or cause the publication of any press release or other public announcement or disclosure with respect to the Merger, the other Transactions or this Agreement without the prior written consent of the other Party," subject to various exceptions not relevant here.  This provided Tapestry ultimate authority over Capri's statements, and vice-versa. The Individual Defendants were also the makers of the statements, as they had ultimate authority over the public statements made by Capri and Tapestry during the Class Period as the companies' most senior executives and Board members.

101.   Although some statements refer to boilerplate warnings that the Capri Acquisition was subject to governmental and regulatory approval, and that (as is true in any large corporate transaction) failure to obtain such approval could result in delay or termination of the transaction, nowhere did Defendants warn that the entire purpose of the Capri Acquisition was to stifle competition, that Tapestry and Capri were each other's top competitors, that they collectively controlled four-fifths of the accessible luxury handbag market, or that all of this put the Capri Acquisition at severe risk of failing to obtain antitrust approval from its inception.

 **A.** **After the Capri Acquisition Announcement on August 10, 2023, Defendants Began Claiming the Capri Acquisition Would Close, Despite Internal Knowledge to the Contrary**

102. The Class Period begins on August 10, 2023.  On that date, Capri and Tapestry announced the Merger Agreement pursuant to which Tapestry would acquire Capri for $57.00 per share in an all-cash transaction valued at approximately $8.5 billion.

 **1.** **August 10-11, 2023: Capri and Tapestry Announce the Capri Acquisition and Falsely Indicate that the Transaction Would Close**

103. In an interview with CNBC reporter Sara Eisen on August 10, 2023, Eisen questioned Defendant Crevoiserat, Tapestry's CEO, regarding potential regulatory concerns with respect to Tapestry's acquisition of all outstanding Capri securities:

> CNBC: In the investor call you said that you expected to close sometime in calendar 2024 which is a bit vague.  Do you have regulatory hurdle concerns around this deal?
>
> Crevoiserat: We expect to go through the normal closing conditions that are required including regulatory and ***we think that the timeline that we've laid out reflects just what we see in the market today and we think that's a realistic timeline to closing***.
>
> CNBC: Are there any antitrust concerns here?  We've seen an administration that's been pretty hostile to industry consolidation.
>
> Crevoiserat: ***We're confident that this deal brings tremendous value to consumers*** as well as to our brand.

104. In a press release announcing the Capri Acquisition, jointly issued by Tapestry and Capri and filed with the SEC on Form 8-K on August 10, 2023, Capri's CEO, Defendant Idol, stated: "Today's announcement marks a major milestone for Capri....  We are confident this combination will deliver immediate value to our shareholders."  The press release further stated, "***The transaction is anticipated to close in calendar year 2024***."

105. Defendant Roe, Tapestry's CFO and COO, stated in an investor conference call held that same day, "The Board of Directors of both Tapestry and Capri have unanimously approved

the transaction, and *we expect the deal to close in calendar year 2024*, subject to customary closing conditions, approval by Capri shareholders and receipt of the required regulatory approvals."

106.   The statements detailed in ¶¶ 103-105 that the "deal brings tremendous value to consumers" and that the Capri Acquisition was "expect[ed] to close in calendar year 2024" were materially false and misleading and omitted material facts when made.  In reality, Defendants negotiated and agreed to the Capri Acquisition in order to reduce the intense head-to-head competition between Michael Kors, Coach, and Kate Spade, reduce discounting, and raise prices in the accessible luxury handbag market.  The true facts which were then known to or recklessly disregarded by Defendants include:

(a)   According to confidential internal communications, Defendants viewed Michael Kors and Coach as one another's top competitor.  Numerous non-public records demonstrate that executives at Capri and Michael Kors and at Tapestry and Coach explicitly referred to one another as "our biggest competitor."  Likewise, Tapestry and Coach executives recognized that any market share lost by Coach was gained by Michael Kors and vice versa.  In fact, Coach and Michael Kors executives sought to compete with one another so intensely that a single marketing email from one brand advertising new prices could force the other to immediately change its entire strategy "to align with the competition."  To this end, executives at both companies closely and secretly monitored each other's handbag marketing campaigns, handbag design, and pricing in order to instantly respond to changes in its competitor's strategy.  Internal documents show that executives at both Tapestry and Capri would often go so far as to instruct subordinates to physically visit stores to gather information about prices and discounts, to learn about marketing campaigns, and to even purchase handbags so that senior executives could examine their design and hardware.  Defendants'

concealment of these facts represented a material omission and rendered the statements in ¶¶ 103-105 materially false and misleading.

(b)     Tapestry's primary rationale for the Capri Acquisition was to eliminate its top competition in the accessible luxury handbag market, reduce discounting, and raise prices.  Internal company records reveal that the Tapestry Defendants intended to leverage the post-Merger entity's market share power—internally estimated by the companies to exceed 75% of the market—to raise the prices of accessible luxury handbags.  An August 2022 Tapestry slide deck analyzing the potential acquisition of Capri noted that the combination would present the opportunity to increase prices and reduce discounting for the Michael Kors brand.  It stated: "Coach has been priced an average of $147 above MK for the last 2 years; suggesting room to increase MK AUR."  Another slide in the deck compared average discount rates for Coach, Kate Spade, and Michael Kors, and stated, "Over the last 2 years, MK has had an average discount rate of 45% vs. 37% for Coach and 28% for Kate Spade suggesting opportunity to reduce MK discounting."  As the *Tapestry* Court put it, this "evidence reflects that Tapestry perceived the acquisition of Michael Kors to be an opportunity to decrease Michael Kors's discounting and increase Michael Kors's prices – a recognized form of anticompetitive effects."  The Tapestry Defendants' failure to disclose that their primary rationale for the Capri Acquisition was to reduce competition and raise prices in the accessible luxury handbag market represented a material omission and rendered the statements in ¶¶ 103-105 materially false and misleading.

107.   Additionally, the statements in ¶¶ 104-105 that calendar year 2024 is "a realistic timeline to closing" were materially false and misleading and omitted material facts when made. In reality, the stated closing timeline of calendar year 2024 was misleading because Defendants

concealed and misrepresented the true likelihood that the Capri Acquisition would face significant scrutiny from antitrust regulators and the attendant heightened risk of the deal failing in light of the intensely and internally-tracked competition between Michael Kors, Coach, and Kate Spade in the accessible luxury handbag market. As discussed in ¶ 106 and ¶ 110, confidential company records reveal that Tapestry and Capri executives viewed Michael Kors and Coach as each other's top competitor and that their primary rationale for the Capri Acquisition was to reduce competition within the accessible luxury handbag market. Defendants' failure to disclose their knowledge of these serious antitrust problems inherent in the Capri Acquisition represented a material omission and rendered the statements in ¶¶ 104-105 materially false and misleading.

108. Defendants' statements upon announcement of the Capri Acquisition fueled a misperception among analysts regarding the level of regulatory risk involved in the transaction. For example, on August 10, 2023, TD Cowen, reporting on both Capri and Tapestry, precisely parroted the very statements Defendants used to conceal their anticompetitive scheme when it noted that *"[w]e believe approval of the deal is likely* given fragmentation in the market in light of the current scale of other major luxury players… We do not anticipate other potential bidders for CPRI given a turnaround needed, combined with TPR's experience in accessible luxury – a category Coach arguably created. European luxury players also generally prefer 100+ heritage brands and no outlet exposure."

109. Following the announcement of the Capri Acquisition, Defendants continued to make materially false and misleading statements and material omissions that concealed the serious antitrust complications inherent in the deal. During an August 11, 2023 interview with Yahoo Finance, Crevoiserat stated: "***We [Tapestry and Capri] play in a resilient $200 billion luxury market*** that includes handbags, footwear, and apparel."

110.   The statement that "[Tapestry and Capri] play in a resilient $200 billion luxury market" was materially misleading and omitted material facts when made.   Specifically, the statement that Tapestry and Capri compete in a $200 billion market is false and misleading because it indicates that the companies competed in a vast market against hundreds of other brands at virtually every price point.  In reality, as alleged in detail herein, Defendants knew that they jointly dominated a clearly-defined accessible luxury handbag submarket.  Yet by indicating that they competed in a far broader market, Defendants fueled the securities market's misperception of Michael Kors's and Coach's respective market shares and thereby concealed the full severity of the antitrust problems inherent in the Capri Acquisition. In this regard, the true facts which were then known to or recklessly disregarded by each of the Defendants include:

(a)   Defendants did not internally believe that the handbag market is fragmented or that Tapestry and Capri faced competitive pressure from both lower- and higher-priced products.   Numerous confidential benchmarking documents reveal that Defendants consistently distinguished between "mass market," "accessible luxury," and "luxury" handbag brands, indicating that Defendants privately recognized that the overall handbag market is divided into three distinct submarkets.  For example, an August 2023 slide deck presented to the Capri Board at a meeting held on August 1, 2023 listed Coach, Kate Spade, Michael Kors, Tory Burch, Marc Jacobs, and Longchamp as "Affordable Luxury" brands; Yves Saint Laurent, Chanel, Prada, Valentino, Louis Vuitton, Gucci, and Hermès as "Luxury" brands; and Gap, Calvin Klein, Tommy Hilfiger, Abercrombie & Fitch, and Zara as "Mass Market" brands.  Defendants' concealment of their knowledge about the true nature of the handbag market represented a material omission and rendered the statements in ¶ 109 materially false and misleading.

(b)     Defendants knew that Michael Kors, Coach, and Kate Spade dominated the accessible luxury handbag market.  Countless confidential company records refer to "accessible luxury," "affordable luxury," and similar terms, indicating that Defendants knew they competed in the accessible luxury submarket.  For instance, minutes for a Capri Board meeting held August 1-2, 2023 reflect that Michael Kors CEO "Wilmotte next discussed with the Board the U.S. leather goods market and the accessible luxury market."  Likewise, a March 2022 presentation to the Tapestry Board differentiated between "accessible luxury" and "traditional luxury," stating that "[o]ur global brand positioning" is to "redefine and own 'accessible luxury'" and that "Coach enables people to explore their individual take on 'Accessible Luxury.'"  Further internal documents reveal that Defendants analyzed their own and each other's shares of the accessible luxury market, and that these shares were substantial.  Tapestry calculated that Defendants' combined brands would account for 83% of the accessible luxury market, while Capri calculated that Michael Kors comprised 39.5%, Coach comprised 29.4%, and Kate Spade comprised 8.2% of the accessible-luxury-leather-goods market—totaling 77% of the market.  By contrast, the post-Merger entity's share of the "fragmented," "$200 billion" handbag market would amount to a mere 10%.

(c)     Defendants did not believe that Michael Kors, Coach, and Kate Spade compete against mass market or luxury handbag brands.  According to internal company records, Capri and Tapestry executives recognized that brands in the luxury market were "not competing with" Coach, Kate Spade, and Michael Kors, in part because accessible luxury customers do not purchase handbags at luxury price points.  For example, communications among Kate Spade executives included the following exchange: "Bottom line, saying we're

in the same market with true luxury is a joke…. Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?'" And, in a text message sent to Kate Spade CEO Fraser, Coach CEO Kahn stated that "Gucci bags at $2,000 is just not our customer in [North America]." Defendants' concealment of their knowledge of the true nature of competition within the handbag market represented a material omission and rendered the statements in ¶ 109 materially false and misleading.

### 2. August 17, 2023: Tapestry Falsely Denies Regulatory Hurdles During its Earnings Call Regarding its Q4 2023 Financial Results

111. During an August 17, 2023 Tapestry earnings call in which Defendants Crevoiserat and Roe discussed "the planned acquisition of Capri," Oliver Chen, an analyst with TD Cowen, asked the following question regarding regulatory approval of the Capri Acquisition and the potential overlap between Capri and Tapestry handbag brands:

> [W]ould love [for] you to talk to us a little bit about the approval process or major hurdles or catalysts ahead. And also, how you thought about the differences and the opportunity of the Michael Kors brand [owned by Capri] given that you have so much research – consumer research there. We're looking at cross-product elasticity and diversion ratios, just to understand the relationships between the [two] brands and the big opportunity, financial and strategic?

112. Defendant Crevoiserat responded regarding the Capri Acquisition by stating in pertinent part as follows:

> I'll hit on the regulatory questions and the Michael Kors question briefly because I know we're running over time. But just in short, **we're confident in our ability to complete this transaction**. This is a transaction. It is highly complementary. It expands our portfolio reach and diversification. And ... we fielded a lot of research coming into this transaction. We know that the portfolio at Capri includes – and including Michael Kors, they're strong brands and they're well positioned in attractive markets and market segments.
>
> We're excited about the opportunity that we see working together putting these brands on our platform. They're distinctive and have unique positioning in the market, which is why they're so attractive to us. And that does include the Kors brand, putting that – all of the brands on our platform allows us to take these iconic brands with heritage put them on our consumer engagement platform to drive more

innovation, more connectivity and really more relevance for the consumer which will benefit all of our stakeholders around the world. So we're excited about the opportunities ahead.

113. The statement in ¶ 112 that Tapestry was "confident in [its] ability to complete this transaction" was materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶ 107. In particular, Tapestry and Capri knew that even modest discovery by the FTC would reveal the anticompetitive nature of the Capri Acquisition—and, ultimately, the falsity of the public statements Defendants made to investors. Put another way, Defendants knew or recklessly disregarded the fact that the FTC's review of their confidential, internal documents detailing the truth about the anticompetitive nature of the transaction would almost certainly lead to the end of the Capri Acquisition.

114. Analysts were swayed by Defendants' misleading statements regarding the likelihood of the Capri Acquisition closing. For example, TD Cowen issued two reports immediately following the August 17, 2023 earnings call. Relying on Defendant Crevoiserat's response to Oliver Chen's question about regulatory hurdles, TD Cowen expressed its belief that not only was it highly likely that the Capri Acquisition would close, but that it was unlikely that the FTC would even issue a Second Request. In one report, TD Cowen wrote: "*We believe there is about an 80% chance of the deal closing and a 25-50% chance of a second request* depending how regulators view the market size, diversion ratio, and consumer harm, among other topics." In the other, it stated: "*We calculate the implied probability of the acquisition closing at ~80%* based on CPRI's current stock price and our estimated break price of $33."

### 3. August 22, 2023: Tapestry Attends an Investor Conference Hosted by Guggenheim Securities and Falsely Indicates that It Competes in a Fragmented Market

115. On August 22, 2023, Guggenheim sponsored a dinner with Tapestry senior executives, including Defendant Roe and Tapestry Global Head of Investor Relations Christina

Colone and Director of Investor Relations Kelsey Mueller.  The next day, on August 23, 2023, Guggenheim issued a report that described statements made by the Tapestry senior executives regarding Tapestry's pending acquisition of all outstanding Capri securities: "***Management remains highly confident in its ability to complete the acquisition***. Within its TAM, management noted minimal barriers to entry competitively and the fact that ecommerce has changed the market. ***The companies operate in an attractive, growing, global, highly fragmented market***. While there is much knowledge around Coach/Kors, Jimmy Choo, and Stuart Weitzman, the Versace brand provides TPR [Tapestry] with access to a new vector of growth and deepens access to the luxury segment of the market. We believe these brands do provide optionality and diversification."

116.   The statements in ¶ 115 that Tapestry and Capri compete in a "highly fragmented market" were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶ 110.

117.   Defendants' misleading statements continued to fuel the market's misperception of the likelihood that the Capri Acquisition would close.  For example, on September 7, 2023, UBS noted that a "pivotal question" is *whether "TPR's planned acquisition of CPRI [will] close,"* stating that: "*We think the answer is yes. We see few anti-trust issues given TPR and CPRI operate in a very highly fragmented global market*. Plus unanimous approval by both CPRI and TPR boards gives us additional confidence the deal will close."  These analyst reports parroting Defendants' false public statements stand in sharp contrast to Tapestry and Capri's internal analyses which unquestionably indicate that the companies dominated and sought to reduce competition in the accessible luxury handbag market.

**B.    Despite the FTC's Second Request on November 3, 2023, Defendants
Continued to Issue Misleading Statements**

**1.    November 6-9, 2023: Capri and Tapestry Disclose the FTC's Second
Request and Falsely Reaffirm the Capri Acquisition Close Timeline**

118.    On November 6, 2023, both Capri and Tapestry issued press releases, filed with the

SEC on Form 8-K, disclosing that on November 3, 2023 they had each received a Second Request

from the FTC in connection with its antitrust review of the Capri Acquisition.  The FTC and

Department of Justice typically issue Second Requests in only a small minority of all transactions

that must be reported to the FTC and the DOJ under the Hart-Scott-Rodino Act—just 1.6% in 2022

and 1.9% in 2021.  In cases where a Second Request has been issued, about 70-80% of the

proposed mergers end in an enforcement action, *i.e.*, the FTC or DOJ challenge the merger in

court, the merging parties abandon or restructure the transaction, or the merging parties enter into

a settlement with the FTC or DOJ.  On news of the FTC's Second Request, the price of Capri stock

declined from $50.66 per share on November 6, 2023 to $48.82 per share on November 7, 2023

on abnormally high trading volume.

119.    To prevent their companies' stock prices from falling, Defendants made a series of

positive statements about the Capri Acquisition.  Capri pushed back on news of the FTC's Second

Request and reaffirmed the purported timeline for closing the Capri Acquisition in its November

6, 2023 press release, stating in pertinent part as follows:

> On November 3, 2023, Capri and Tapestry each received a request for additional
> information and documentary materials (the "Second Request") from the Federal
> Trade Commission (the "FTC") in connection with the FTC's review of the
> Transaction.  The effect of the Second Request is to extend the waiting period
> imposed by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as
> amended (the "HSR Act"), until 30 days after Capri and Tapestry have substantially
> complied with the Second Request, unless that period is extended voluntarily by
> Capri and Tapestry or terminated sooner by the FTC.  Both Capri and Tapestry
> expect to promptly respond to the Second Request and to continue to work
> cooperatively with the FTC in its review of the Transaction.  ***Capri continues to
> expect that the Transaction will be completed in calendar year 2024***, subject to

the expiration or termination of the waiting period under the HSR Act and the satisfaction or waiver of the other closing conditions specified in the Merger Agreement.

120.    Likewise, Tapestry reaffirmed the same purported transaction timeline while concealing the full severity of the antitrust problems inherent in the Capri Acquisition in its November 6, 2023 press release, stating in relevant part:

> On November 3, 2023, the Company and Capri each received a request for additional information and documentary materials (the "Second Request") from the Federal Trade Commission (the "FTC") in connection with the FTC's review of the Transaction.  The effect of the Second Request is to extend the waiting period imposed by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), until 30 days after the Company and Capri have substantially complied with the Second Request, unless that period is extended voluntarily by the Company and Capri or terminated sooner by the FTC.  Both the Company and Capri expect to promptly respond to the Second Request and to continue to work cooperatively with the FTC in its review of the Transaction.  **_The Company continues to expect that the Transaction will be completed in calendar year 2024_**, subject to the expiration or termination of the waiting period under the HSR Act and the satisfaction or waiver of the other closing conditions specified in the Merger Agreement.

121.    The Tapestry Defendants continued to express false and misleading confidence in the Capri Acquisition in the days following the revelation of the FTC's Second Request.  On November 9, 2023, Tapestry filed its quarterly report on Form 10-Q with the SEC.  In the section of the quarterly report entitled "Acquisitions," Tapestry reiterated, in relevant part, that the Capri Acquisition "**_is expected to close during calendar year 2024._**"

122.    That same day, Tapestry issued a press release, filed with the SEC on Form 8-K, announcing its financial results for the first quarter of the fiscal year 2024.  In the press release, Tapestry assured investors that it "is working to receive all required regulatory approvals, including responding to [the Second Request]," and that Tapestry "**_remains confident in the ability to complete this transaction, with a close expected in calendar 2024, consistent with prior expectations_**."

123.   During the corresponding earnings call held on November 9, 2023, Defendant Roe discussed "the planned acquisition of Capri," explaining that Tapestry was "making progress towards transaction close."   In discussing the purported progress, Defendant Roe emphasized, among other things, that Tapestry was "working towards receiving all required regulatory approvals, including responding to the FTC's second request. *We remain confident in our ability to complete the transaction with a close anticipated in calendar 2024, consistent with our prior outlook*...."

124.   The statements in ¶¶ 119-123 that the Capri Acquisition was expected to close in "calendar year 2024" were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶ 107.  In this regard, Defendants alone knew the significant risk to closing the Capri Acquisition created by a Second Request.  As described above, a Second Request would allow the FTC to obtain a wide array of confidential materials not disclosed to the public—materials which detailed the true anticompetitive purpose of the Capri Acquisition.

125.   Additionally, the statements in ¶¶ 119-123 that the Capri Acquisition was expected to close in "calendar year 2024" were materially false and misleading and omitted material facts when made given that, during the post-announcement antitrust review process, Defendants likely received confidential feedback directly from the FTC indicating that the Capri Acquisition was anticompetitive and would require a divestiture remedy in order to proceed.   But Defendants concealed that negative feedback while publicly making positive statements about the timing of a close and the related antitrust review process.

126.   In fact, on April 22, 2024, "by a bipartisan 5-0 vote, the [five FTC Commissioners] found reason to believe that the Proposed [Capri Acquisition] may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and

- 72 -

Section 5 of the FTC Act, 15 U.S.C. § 45, or constitutes an unfair method of competition in violation of Section 5 of the FTC Act."[185]  That same day, the FTC filed a complaint seeking to block the Capri Acquisition, alleging that "[t]he Proposed Acquisition will eliminate fierce competition between Coach, Kate Spade, and Michael Kors" and that the "elimination of this multi-faceted competition between the close rivals will harm consumers and employees, likely leading to higher prices, decreased innovation, and reduced wages."[186]

127.   There is no doubt that the FTC disclosed these concerns to Defendants well in advance of its 5-0 Commissioner vote to block the Capri Acquisition.  When a Second Request is issued, as in this case, FTC staff is expected to confidentially identify and "clearly communicate [to the merging parties] the competitive issues raised by the transaction …."[187]  As FTC guidance further explains, "[i]f [FTC] staff determines that anticompetitive effects are likely, it will [confidentially] discuss with the [merging] parties what it has learned and what it believes an acceptable remedy must include to maintain or restore competition in the markets affected by the merger."[188]  During an FTC antitrust review process like this one, "throughout the investigation, [FTC] staff will try to be transparent [to the merging parties] about their concerns … staff may provide feedback – often quite detailed – in order to narrow the issues and provide the basis for an

---

[185] *FTC v. Tapestry*, ECF 1 at ¶16.

[186] *Id.*, ¶¶7, 10.

[187]https://www.ftc.gov/system/files/attachments/merger-review/best_practices_for_merger_investigations_august_2015.pdf

[188]        https://www.ftc.gov/system/files/attachments/negotiating-merger-remedies/merger-remediesstmt.pdf

effective remedy."[189]   In sum, in connection with its Second Request and thereafter, the FTC certainly raised serious concerns and issues directly to Defendants throughout the antitrust review process, indicating that the Capri Acquisition was anticompetitive and that its approval was unlikely without major divestitures.  Defendants' concealment of these facts represented a material omission and rendered the statements in ¶¶ 119-123 materially false and misleading.

128.    During the same November 9, 2023 earnings call, in response to a TD Cowen analyst inquiring about the status of the Capri Acquisition, Defendant Crevoiserat confirmed that Tapestry's "outlook for closing the deal is unchanged," emphasizing that "*[w]e still expect to close the deal in fiscal '24*."   Defendant Crevoiserat further elaborated on Tapestry's purported reasoning for its confidence in closing the deal, stating: "*[W]e operate in a large market, as I talked about, it's the $200 billion market.  It's fragmented.  There are low barriers to entry and the transaction is pro-consumer.  So we remain confident in our ability to complete the transaction, again, closing expected in calendar '24, consistent with our prior expectations*."

129.    The statements in ¶ 128 that the Capri Acquisition would close in 2024; that Tapestry and Capri operate in a "fragmented, "$200 billion market"; and that "the transaction is pro-consumer" were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 106-107, 110, 125-127.

130.    Though the market understood that the FTC's Second Request indicated that antitrust regulators had taken further interest in exploring the potential anticompetitive effects of the Capri Acquisition, the market remained in the dark regarding the full extent of the antitrust

---

[189]    https://www.ftc.gov/sites/default/files/documents/public_statements/significance-consent-orders-federal-trade-commission%E2%80%99s-competition-enforcement-efforts-gcr-live/130917gcrspeech.pdf

complications known only to Defendants.  Following Tapestry's November 9, 2023 earnings call, press release, and Form 10-Q, numerous analysts issued reports the same or the following day repeating and explicitly relying on Tapestry's positive and countervailing misstatements as a basis for their evaluation of whether to buy, sell, or hold Capri stock.  For example:

(a)    On November 9, 2023, reporting on Capri, Guggenheim wrote: "Capri is under an agreement to be acquired by Tapestry, Inc. (TPR) for $57.00 per share, or $8.5 billion, which is ~9x its LTM adjusted EBITDA (at the time of the announcement). *Tapestry expects the transaction to close in 2024. Accordingly, we remain Neutral*."

(b)    On November 9, 2023, reporting on Capri, TD Cowen wrote: "*Per TPR, the transaction remains on track to close in CY24. We raise our target to $57 based on the proposed transaction price with TPR (Outperform, $28.28),* although exact timing for the transaction close is unclear."

(c)    On November 10, 2023, reporting on Tapestry, TAG reported that "*TPR is making progress towards the transaction close… TPR is working closely with the FTC to receive required regulatory approvals… Management still expects the deal to close sometime in FY24*."

(d)    On November 10, 2023, reporting on Tapestry, Bank of America wrote: "*CPRI acquisition on track for C24 close… TPR reaffirmed expectations for the Capri Holdings (CPRI) acquisition to close in C24. The company is making progress towards acquiring all regulatory approvals and integration planning is well underway*."

(e)    On November 10, 2023, reporting on Tapestry, UBS noted that a "pivotal question" is *whether "TPR's planned acquisition of CPRI [will] close,"* stating that "*[w]e think the answer is yes. We see few anti-trust issues given TPR and CPRI operate in a*

*very highly fragmented global market.* Plus unanimous approval by both CPRI and TPR boards gives us additional confidence the deal will close." That same day, UBS issued a report on Capri: "*Our PT is based mainly on the terms of the deal.* A $57 PT represents ~11x our $5.05 FY26 EPS estimate. *We don't believe the Federal Trade Commission's 'Second Request' is a sign that the transaction won't be completed in CY24.*"

> **2.    February 8, 2024: Tapestry Again Falsely Reaffirms the Capri Acquisition Close Timeline in Public Statements Concerning its Q2 2024 Earnings Results**

131.    On February 8, 2024, Tapestry filed its quarterly report on Form 10-Q with the SEC. In the section of the quarterly report entitled "Acquisitions," Tapestry once again stated that the Capri Acquisition "*is expected to close during calendar year 2024.*"

132.    Also on February 8, 2024, Tapestry issued a press release, filed with the SEC on Form 8-K, announcing its financial results for the second quarter of the fiscal year 2024, writing in pertinent part: "***Tapestry remains confident in the ability to complete the transaction, with a close expected in calendar 2024, consistent with prior expectations.***" In the press release, Tapestry continued to reaffirm that the Capri Acquisition "*is expected to close in calendar 2024.*"

133.    During the corresponding earnings call that same day, Defendant Roe touched on the "planned acquisition of Capri" and stated that Tapestry was "continuing to work towards receiving all required regulatory approvals, and as publicly announced by the Chinese regulatory authority, the transaction received clearance in China." Additionally, Defendant Roe assured investors that the Capri Acquisition would close in the previously prescribed timeline, stating, "***[i]n terms of timing, we remain confident in our ability to complete the transaction with a close expected in calendar 2024, consistent with our original expectations.***" For good measure, during the question-and-answer portion of the call, Defendant Crevoiserat further emphasized the 2024

closing timeline, claiming: "***We're making progress as we expected towards the close in this calendar year that's unchanged from our prior outlook***."

134.    Defendants' misstatements concealed from the market the full severity of the antitrust complications inherent to the Capri Acquisition.  Following Defendants' statements in press releases, SEC filings, and on earnings calls on February 8, 2024, numerous analysts issued reports the same or the following day not only repeated Defendants' misstatements but also relied on Defendants' misstatements (including misstatements by the Tapestry Defendants) in their evaluations of whether to buy, sell, or hold Capri stock.  For example:

(a)    On February 8, 2024, reporting on Capri, Guggenheim wrote: "Capri is under an agreement to be acquired by Tapestry, Inc. (TPR) for $57.00 per share, or $8.5 billion, which is ~9x its LTM adjusted EBITDA (at the time of the announcement). *Tapestry expects the transaction to close in 2024. Accordingly, we remain Neutral*."

(b)    TD Cowen on February 8 and 11, 2024 expressed that it did not believe that regulatory approvals would inhibit the deal: "*We continue to believe the deal will close given the competitive and discretionary nature of handbags…  In our view, we do not believe consumers would be harmed with a combination given the competitive nature of the category and varying degrees of cultural relevance.* We acknowledge the combined market share is substantial if you chose to define the outlet market or $300-500 price band only."

(c)    On February 9, 2024, reporting on Capri, UBS wrote: "*we still believe TPR will continue to move forward with its acquisition of CPRI, based on TPR's comments in its earnings report. Thus, we still value CPRI based on its $57 deal price.…*"

(d)    On February 9, 2024, reporting on Tapestry, TAG wrote: "Integration planning is underway for CPRI acquisition; time frame remains FY24. While details were

limited on the earnings call, TPR noted it is doing the necessary planning for the upcoming acquisition of Capri Holdings…TPR is making progress towards the transaction close… *Management still expects the deal to close sometime in FY24.*"

(e)    On February 9, 2024, reporting on Capri and Tapestry, Wells Fargo noted: "*We are Equal Weight post TPR's announced acquisition of CPRI for $57/share on Aug. 10th. The transaction is expected to close in CY24. Target Price Valuation for CPRI: $57.00 from NC. Our $57 price target is based on the announced acquisition price…*"

(f)    BNP on February 9, 2024, reporting on Capri, wrote: "*Regarding the Tapestry deal, Chairman John Idol said 'We look forward to the successful completion of the merger transaction with Tapestry in calendar year 2024.'… Both companies reiterated their confidence on deal completion in calendar 2024.*"

135.    But in reality, Defendants could not have had a good faith belief that their statements regarding their confidence the deal would be completed in 2024 were true.  The extreme risk to regulatory approval created by Defendants' internal documents detailing the truth behind the Capri Acquisition makes clear Defendants fully understood, or at best recklessly disregarded, those risks and the falsity of any statement touting the likelihood the transaction would close.

### 3.    March 5, 2024: Tapestry Misleadingly Expresses Confidence in the Capri Acquisition Close Timeline at an Investor Conference Hosted by TAG

136.    On March 5, 2024, the Telsey Advisory Group ("TAG") hosted a meeting with investors and Tapestry's senior management, including Defendants Crevoiserat and Roe and Tapestry Global Head of Investor Relations Christina Colone and Senior Manager of Investor Relations Maddison Miller at Tapestry's New York headquarters.  In its report issued the following day, on March 6, 2024, TAG noted that, during the conference, "management reiterated its confidence in completing the CPRI acquisition."  The report paraphrased the executives'

comments: "***The company remains confident in completing the CPRI acquisition, and the process remains on the expected timeline to close in calendar 2024*** … ***Management reiterated that it remains confident in closing the deal***, and that it is exactly where it thought it would be at this point, noting that it expected a somewhat drawn out process as reflected in ***the expected closing timeline of calendar 2024*** …"

137.    Defendants' statements in ¶ 136 expressing confidence in closing the Capri Acquisition were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 107, 125-127.

### C.    Defendants Continued to Misleadingly Claim that the Capri Acquisition Would Close While Disputing Reports in mid-April 2024 that the FTC Would Seek to Block the Deal

#### 1.    April 15, 2024: Defendant Crevoiserat Pushes Back on News of FTC Director Henry Liu's Comments

138.    The FTC Bureau of Competition Director Henry Liu made comments about the agency's focus on Guideline 2 of the then-new 2023 Merger Guidelines and, in particular, the importance of direct indicators of competition in merger review at the 2024 American Bar Association Antitrust Spring Meeting in Washington, D.C. on April 11, 2024.  Liu argued that while antitrust enforcement has historically focused on market definition as the primary indicator of anticompetitive effects, there are some circumstances in which direct evidence of head-to-head competition proves to be a more effective litmus test.  Liu stated that "[t]his is a scenario we see time and again in merger review": "[t]he ordinary course evidence suggest that the merging parties view each other as key competitors, but we nonetheless hear arguments about how our proposed market is incorrectly defined."  Liu then stated that "evidence of competition between the merging parties can be grounds to declare a merger illegal—regardless of market shares and market concentration figures."

139.   In light of these statements by Director Liu, Defendants unquestionably knew that their internal documents analyzing the accessible luxury handbag market and detailing the intense head-to-head competition between Coach, Michael Kors, and Kate Spade would fail pass muster under the FTC's review.

140.   Multiple news outlets and analysts reported that Liu was referencing the Capri Acquisition as a potential enforcement target through his comments.  On this news, the price of Capri stock declined from $42.87 per share on April 11, 2024 to $39.31 per share on April 12, 2024 on abnormally high trading volume.

141.   Yet, even though Liu was indirectly referencing the Capri Acquisition, investors remained in the dark as to the full severity of the antitrust risks inherent in the Capri Acquisition. And Defendants' repeated false statements expressing confidence in regulatory approval and the closing of the merger in calendar 2024 only served to further obscure the truth from investors, tempering the market's reaction to the news of Liu's comments.

142.   Defendants pushed back on reports connecting Liu's comments to the Capri Acquisition and continued to misrepresent the market dynamic between Capri and Tapestry, and thus the level of antitrust risk inherent in Tapestry's pending acquisition of all outstanding Capri securities.  On April 15, 2024, Defendant Crevoiserat reiterated that she still expected the Capri Acquisition to close in calendar year 2024 in an interview with *Women's Wear Daily*.  The article, entitled "Tapestry CEO Joanne Crevoiserat Signals Confidence in Capri Deal," quoted Defendant Crevoiserat, who stated that "[t]he FTC is still reviewing it, and we continue to work collaboratively with the FTC in that effort .... ***But we continue to be confident because we know that this is a transaction that is pro-consumer***."  Defendant Crevoiserat continued to explain that Tapestry "expected that the regulatory process particularly would be a long one, just understanding

the environment and the landscape we're operating in," and as a result, Tapestry gave itself a "pretty wide window" and had not "been specific" for the exact time the Capri Acquisition would close. Despite understanding that the Capri Acquisition was facing intense regulatory scrutiny, Defendant Crevoiserat again doubled down on the Capri Acquisition closing in 2024, stating, "*We had set a calendar 2024 expectation, and we're still confident that we can complete the deal.*"

143.    The same day, Defendant Crevoiserat, speaking with *Bloomberg*, continued to mislead investors about the regulatory hurdles the Capri Acquisition was facing, stating, "We know that given the landscape, it just takes time to work through the issues." Moreover, Defendant Crevoiserat added that Tapestry had no intention of divesting brands to complete the Capri Acquisition, claiming, "*We don't think that it's necessary.*"

144.    The statements in ¶¶ 142-143 that the "transaction… is pro-consumer"; that the deal would be "complete[d]" in "calendar 2024"; and that Tapestry would not need to divest brands to complete the Capri Acquisition were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 106-107, 110, 125-127.

### 2.    April 18, 2024: Defendant Crevoiserat Pushes Back on Reports that the FTC Would Seek to Block the Capri Acquisition

145.    On April 17, 2024, *The New York Times* reported that the FTC was preparing to sue to block the Capri Acquisition, according to "two people with knowledge of the matter… who were not authorized to discuss the deliberations." On this news, the price of Capri stock declined from $38.93 per share on April 16, 2024 to $37.87 per share on April 17, 2024 on abnormally high trading volume. Despite this partial revelation of the truth, Defendants' various misstatements kept investors in the dark and prevented the stock price from dropping further. For example, on April 17, 2024, reporting on Tapestry, Wells Fargo reacted to the reporting by *The New York Times*: "*Multiple news sources (including the NYT), have now indicated that the FTC is set to file*

*an antitrust lawsuit to block the TPR/CPRI deal. That said, a final decision has not been made and the FTC is expected to meet this week with a vote on the deal likely to follow. Recall, TPR announced yesterday that EU and Japan regulators issued approval (China regulators also approved in Jan. '24), with US regulators the last hurdle for the deal… However, mgmt. has remained confident the deal will be approved.*"

146.    The day after *The New York Times* article was published, Defendant Tapestry denied that the Capri Acquisition inherently faced severe antitrust issues. On April 18, 2024, *Forbes* reported that Tapestry claimed to "'***strongly believe this is a deal that deserves to clear as it is pro-consumer and pro-competitive***'" and that "'[w]e have full confidence in the merits of this transaction and in our legal arguments, should we need to make them.'"

147.    The statement in ¶ 146 that the Capri Acquisition was "pro-consumer" and "pro-competitive" was materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶ 106.

**D.      Even After the FTC Filed Suit to Block the Capri Acquisition on April 22, 2024, Defendants Falsely Claimed that the Transaction Would Close and Concealed the True Nature of Competition Between Michael Kors and Coach in the Accessible Luxury Handbag Market**

**1.      April 22-25, 2024: Defendants Push Back on News that the FTC Has Filed Suit to Block the Capri Acquisition**

148.    On April 22, 2024, in a heavily redacted filing, the FTC filed suit in the United States District Court for the Southern District of New York to enjoin the Capri Acquisition. The complaint alleged that, if allowed, the Capri Acquisition would eliminate direct head-to-head competition between Kate Spade, Coach, and Michael Kors, which the FTC claimed all compete within the "accessible luxury handbag market." On this news, the price of Capri stock declined from $37.96 per share on April 22, 2024 to $34.81 per share on April 25, 2024 on abnormally high

trading volume.   Despite this partial revelation of the truth, Defendants' countervailing misstatements about the Capri Acquisition kept Capri's stock price from dropping further.

149.   On April 22, 2024, Capri issued a statement, filed with the SEC on Form 8-K, claiming that the FTC had misrepresented the "market realities" undergirding the Capri Acquisition, stating in pertinent part as follows:

> Capri Holdings strongly disagrees with the FTC's decision. ***The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition. Tapestry and Capri operate in the fiercely competitive and highly fragmented global luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low.*** Capri intends to vigorously defend this case in court alongside Tapestry and complete the pending acquisition. The U.S. FTC is the only regulator that did not approve this transaction, which received required approvals from all other jurisdictions. We remain confident in this combination and the value it will bring to all stakeholders.

150.   That same day, Tapestry issued a similar statement "in response to the [FTC's] attempt to block its proposed acquisition of Capri," stating in pertinent part as follows:

> ***There is no question that this is a pro-competitive, pro-consumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop. Tapestry and Capri operate in an intensely competitive and highly fragmented industry alongside hundreds of rival brands, including both established players and new entrants.***
>
> ***We also compete for consumers who are cross-shopping a wide range of channels and brands along a vast pricing spectrum when considering what to purchase. The reality is that consumers have a host of choices when shopping for luxury handbags and accessories, footwear, and apparel, and they are exercising them.***
>
> ***The bottom line is that Tapestry and Capri face competitive pressures from both lower- and higher-priced products. In bringing this case, the FTC has chosen to ignore the reality of today's dynamic and expanding $200 billion global luxury industry.***
>
> This transaction will unite six brands that offer products across a wide range of categories. With Capri, Tapestry will gain access to a broader set of global luxury consumers and geographies and will drive sustainable, healthy growth for Capri's iconic brands, building desire and engagement with consumers globally. Tapestry has a strong record of not only innovating for consumers but also providing

industry-leading wages and benefits for our employees.  The combined company will continue to set the bar for both consumer and employee experiences.

***We have full confidence in the merits and pro-competitive nature of this transaction.***  It will bring significant benefits to the combined company's customers, employees, partners, and shareholders in the U.S. and around the world.  We have strong legal arguments in defense of this transaction and look forward to presenting them in court and working expeditiously to close the transaction in calendar year 2024.

151.   On April 22, 2024, Defendant Crevoiserat gave an interview to *Reuters*, wherein she stated: "***We see the FTC as fundamentally misunderstanding the marketplace and the way consumers shop today*** as well as the impact of this deal on employees and workers in our industry."

152.   On or around April 25, 2024, Defendant Crevoiserat spoke to CNBC reporter Sara Eisen.  Eisen then shared Crevoiserat's statements on *Squawk on the Street* on April 25, 2024: "she told me she is 'disappointed but ***quite surprised with the way the FTC is thinking about the market***.'  She said: '***They fundamentally misunderstand the market and the way consumers shop***.'  She said: '***We spend time in the market and we have data and it is intensely competitive***.'  Crevoiserat following up by saying '***duopoly?***   Because we mentioned this idea that the FTC referred to as Kors-Coach duopoly.  She said: '***I wish our job was that easy, I wish we had to worry about one competitor***.'"

153.   Defendants' statements in ¶¶ 140-152 were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 106-107, 110. The internal documents stand in sharp contrast to the misleading and countervailing statements made in the Capri and Tapestry Form 8-K filings and related public statements.

154.   The financial press and analysts widely reported on Defendants' misleading and countervailing statements regarding the Capri Acquisition, further obscuring the truth from investors:

(a)    On April 22, 2024, *Bloomberg* reported that, "Tapestry said: '*There is no question that this is a pro-competitive, pro-consumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop.*' The company said that *both Tapestry and Capri 'operate in an intensely competitive and highly fragmented industry alongside hundreds of rival brands,'* adding that it will work to close the transaction this calendar year. Capri said *the government is ignoring 'market realities,'* which '*overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition.*' In a statement, Capri said it will 'vigorously defend this case in court alongside Tapestry and complete the pending acquisition.'"

(b)    On April 22, 2024, the BBC reported that "Tapestry said in a statement that '*in bringing this case, the FTC has chosen to ignore the reality of today's dynamic and expanding $200 billion global luxury industry.*' Capri, which also owns Versace and Jimmy Choo, said, '*this transaction will not limit, reduce, or constrain competition*' as the two firms '*operate in the fiercely competitive and highly fragmented global luxury industry.*'"

(c)    On April 22, 2024, CBS MoneyWatch reported that "Tapestry rejected the FTC's stance, saying *the agency understands neither the marketplace nor how people shop. 'The bottom line is that Tapestry and Capri face competitive pressures from both lower- and higher-priced products. In bringing this case, the FTC has chosen to ignore the reality of today's dynamic and expanding $200 billion global luxury industry,*' the company said in a statement."

(d)    On April 22, 2024, CNBC wrote: "Tapestry argued the federal agency '*fundamentally misunderstands both the marketplace and the way in which consumers shop*.' In a statement, the company said it must win the business of consumers who increasingly shop

across brands, channels and price points. '*The bottom line is that Tapestry and Capri face competitive pressures from both lower- and higher-priced products*,' it said. '*In bringing this case, the FTC has chosen to ignore the reality of today's dynamic and expanding $200 billion global luxury industry*.' Capri echoed that argument in its own statement, saying *consumers 'have hundreds of handbag choices at every price point across all channels, and barriers to entry are low.'* Tapestry and Capri both said they will fight for the transaction in court, with Tapestry saying it will work 'expeditiously to close the transaction in calendar year 2024.'"

> (e)    *The Associated Press* on April 22, 2024 reported that "Both Capri and Tapestry said they strongly disagreed with the FTC's decision. '*The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition*,' Capri said in a statement on its website. '*Tapestry and Capri operate in the fiercely competitive and highly fragmented global luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low*.' Capri said it intends to 'vigorously defend this case in court alongside Tapestry and complete the pending acquisition.' It said the U.S. FTC is the only regulator that hasn't approved the transaction. Tapestry said that '*there is no question that this is a pro-competitive, pro-consumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop*.' '*Tapestry and Capri operate in an intensely competitive and highly fragmented industry alongside hundreds of rival brands, including both established players and new entrants*,' Tapestry said in a statement."

> (f)    On April 22, 2024, *Reuters* wrote: "'Capri Holdings strongly disagrees with the FTC's decision,' the company said in a statement. '*The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not*

*limit, reduce, or constrain competition*.' Tapestry, in a statement, also said '*there is no question that this is a pro-competitive, pro-consumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop*.'"

(g)     TAG on April 23, 2024, reporting on Capri, reiterated Capri and Tapestry management's confidence in the deal: "Immediately following the announcement of the FTC lawsuit, *both TPR and CPRI issued press releases reaffirming their commitment to the merger and the strength of their case against the FTC's suit*. Tapestry's management noted that it has 'full confidence' in the merits of its case and the transaction, arguing that it would benefit the combined company's customers, employees, partners, and shareholders around the world. TPR management noted that it believes it has strong legal arguments supporting the transaction and will work to close the deal in calendar 2024. *CPRI's management noted that it 'strongly disagrees' with the FTC's decision, and both statements pointed to the highly competitive and fragmented global luxury industry as evidence that the deal would not erode competition. CPRI management further noted that consumers have 'hundreds of handbag choices at every price point across all channels' with low barriers to entry and competitive pressure across both lower and higher price points.*"

**2.     May 9, 2024: Tapestry Falsely and Misleadingly Claims that the Capri Acquisition is "Pro-Competitive" in Public Statements Announcing its Q3 2024 Earnings Results**

155.    On May 9, 2024, Tapestry filed its quarterly report on Form 10-Q with the SEC.  In the section of the quarterly report entitled "Acquisitions," Tapestry stated that the Capri Acquisition "*is expected to close during calendar year 2024*."

156.    That same day, Tapestry issued a press release and filed a related Form 8-K announcing its financial results for the third quarter of fiscal year 2024.  In the press release, Tapestry touched on the status of the Capri Acquisition, falsely stating, "Importantly, this

transaction will bring significant benefits to the combined Company's customers, employees, partners, and shareholders around the world...."  Later in the press release, Tapestry discussed the FTC's action to block the Capri Acquisition, falsely stating that Tapestry is "***confident in the merits and pro-competitive, pro-consumer nature of this transaction*** and looks forward to presenting its strong legal arguments in court, working expeditiously to close the transaction in calendar year 2024."

157.   During the corresponding earnings call that same day, Defendant Crevoiserat again falsely asserted that the Capri Acquisition "will bring significant benefits to customers, employees, partners and shareholders around the world" and stated that Tapestry remains "***confident in the merits and pro-competitive, pro-consumer nature of this transaction*** and look[s] forward to presenting our strong legal arguments in court."  Defendant Crevoiserat further explained to investors that the Capri Acquisition's closing timeline "always contemplated the potential for litigation, and we continue to expeditiously work to close the transaction in calendar year 2024."

158.   Defendants' statements in ¶¶ 155-157 were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 106-107.

159.   Analysts continued to be swayed by Defendants' misleading statements regarding the Capri Acquisition.  For example, following Tapestry's press release, Form 10-Q, and earnings call on May 9, 2024, numerous analysts issued reports the same or the following day highlighting Defendants' misstatements:

(a)      In two reports dated May 9, 2024, BMO Capital Markets wrote that "Management is 'confident in the merits and pro-competitive, pro-consumer nature of this transaction and looks forward to presenting its strong legal arguments in court, working expeditiously to close the transaction in calendar year 2024.'"

(b)    On May 9, 2024, UBS wrote: "TPR's press release suggests it remains intent on acquiring CPRI: Our conversations with investors indicate some wondering if TPR will change its mind about the acquisition. TPR said, 'On April 22, 2024, the Federal Trade Commission (FTC) filed a lawsuit in an attempt to block the proposed acquisition. The Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction and looks forward to presenting its strong legal arguments in court, working expeditiously to close the transaction in calendar year 2024.'"

(c)    On May 9 and on May 10, 2024, TAG wrote that Tapestry "management remains confident in the merits of its FTC lawsuit regarding the CPRI acquisition."

(d)    On May 10, 2024, Morgan Stanley wrote that "TPR re-affirmed its commitment to the deal."

(e)    On May 10, 2024, TD Cowen stated that "*[w]e believe management is determined to complete the CPRI transaction… While Tapestry and Capri own meaningful market share in the handbag market, the industry is very fragmented with meaningful price elasticity given the discretionary nature of the product, and with low barriers to entry.*"

### 3.    May 22, 2024: Tapestry Falsely Indicates that the Handbag Market is Highly Fragmented at an Investor Conference Hosted by Morgan Stanley

160.    On May 22, 2024, Morgan Stanley hosted an investor meeting in Paris at its Luxury Conference with Defendants Crevoiserat and Roe and Tapestry Global Head of Investor Relations Colone. In its report issued on May 23, 2024, Morgan Stanley described statements made by the Tapestry senior executives at these meetings: "***[t]ransaction commitment permeated mgmt. responses throughout conference meetings***, in-line with positioning on TPR's 3Q24 earnings call. Consistent with TPR's messaging at the time of the initial transaction announcement & since,

mgmt. continued to highlight the compelling nature of the CPRI acquisition… In our conference meetings, this ongoing commitment to the deal was clear, with mgmt. 1) reiterating confidence in the strong legal arguments planned for its September hearing on the FTC transaction block, 2) conducting ongoing work to understand brand positioning, recent trend, & future opportunities for improvement at the CPRI business,… &/or 3) working to help the FTC understand *key industry dynamics (such as high fragmentation & low barriers to entry, among others).*"

161.    The statements in ¶ 160 expressing Defendants' commitment to the Capri Transaction and indicating that the handbag market is "highly fragment[ed]" were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 107, 110.

162.    Other analysts were similarly swayed by Defendants' misleading statements regarding the Capri Acquisition.  For example, TAG on May 23, 2024, reporting on Capri, reiterated Capri and Tapestry management's confidence in the deal: "Immediately following the announcement of the FTC lawsuit, *both TPR and CPRI issued press releases reaffirming their commitment to the merger and the strength of their case against the FTC's suit*. Tapestry's management noted that it has 'full confidence' in the merits of its case and the transaction, arguing that it would benefit the combined company's customers, employees, partners, and shareholders around the world. TPR management noted that it believes it has strong legal arguments supporting the transaction and will work to close the deal in calendar 2024. *CPRI's management noted that it 'strongly disagrees' with the FTC's decision, and both statements pointed to the highly competitive and fragmented global luxury industry as evidence that the deal would not erode competition. CPRI management further noted that consumers have 'hundreds of handbag choices at every price*

- 90 -

*point across all channels' with low barriers to entry and competitive pressure across both lower and higher price points.*"

      **4.**      **May 29, 2024: Capri Falsely Claims that the Capri Acquisition Will Not "Constrain Competition" in a Statement Announcing its Q4 2024 Earnings Results**

163.    On May 29, 2024, Capri issued a press release, filed on Form 8-K with the SEC, announcing its financial results for the fourth quarter of the fiscal year 2024. In the press release, Defendant Idol rejected the FTC's characterization of the Capri Acquisition as anticompetitive, while claiming that Capri "looks forward to the successful completion" of the Capri Acquisition, stating in relevant part as follows:

> Last August Capri Holdings announced that we entered into a definitive agreement to be acquired by Tapestry. In April, the FTC filed an unprecedented lawsuit to block the proposed transaction. We strongly disagree with the FTC's decision and firmly believe in the merits of this acquisition. ***The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition. Tapestry and Capri operate in the fiercely competitive and highly fragmented global fashion luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low.*** As we previously stated, Capri intends to vigorously defend this case in court alongside Tapestry and we look forward to the successful completion of the pending acquisition….

164.    The statements in ¶ 163 were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 106-107, 110.

165.    Analysts and the media again repeated the statements at issue when making recommendations regarding, and reporting on, Capri securities. For example:

        (a)    On May 29, 2024, Guggenheim, reporting on Capri, wrote that: "Capri is under an agreement to be acquired by Tapestry, Inc. (TPR) for $57.00 per share, or $8.5 billion, which is ~9x its LTM adjusted EBITDA (at the time of the announcement). *Tapestry expects the transaction to close in 2024. Accordingly, we remain Neutral rated. CPRI shares closed at 8.0x our new FY26 EPS estimate of $4.25.*"

(b)    On May 30, 2024, *Vogue Business* wrote: "Idol addressed the FTC's suit claiming that Tapestry's acquisition of Capri would eliminate competition in the accessible luxury handbag space. '*We strongly disagree with the FTC's decision and firmly believe in the merits of this acquisition. The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition. Tapestry and Capri operate in the fiercely competitive and highly fragmented global fashion luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low*.'  Idol said that Capri plans to 'vigorously defend' the case alongside Tapestry, and looks forward to the successful completion of the acquisition."

(c)    On August 5, 2024, Guggenheim, reporting on Tapestry, stated: "*In regard to the lawsuit filed by FTC, Tapestry continues to believe in the merits and pro-competitive nature of the Capri transaction and is actively preparing to present its case in court on September 9th (still aiming to complete the transaction in CY24)*."

(d)    On August 9, 2024, TAG, reporting on Tapestry, stated: "*TPR remains excited about and committed to the CPRI acquisition. Immediately following the announcement of the FTC lawsuit, recall that both TPR and CPRI issued press releases reiterating their commitment to the merger and the strength of their case against the FTC's suit. The company believes the acquisition will bring significant benefits to customers, employees, and partners, in addition to shareholders.* TPR plans to increase investment in CPRI's brands and bring more innovation to customers. Moreover, the larger company is expected to become an 'incubator for talent' *as it focuses on capturing share across the $200B-plus global luxury market*. Following the FTC's suit to block the acquisition, TPR is

looking forward to presenting its legal arguments in court. *TPR is still working to close the transaction in CY24 as its original timeline contemplated potential litigation*."

(e)    On August 9, 2024, Guggenheim, reporting on Capri, stated: "Capri is under an agreement to be acquired by Tapestry, Inc. (TPR) for $57.00 per share, or $8.5 billion, which is ~9x its LTM adjusted EBITDA (at the time of the announcement). *Tapestry expects the transaction to close in 2024. Accordingly, we remain Neutral rated.* CPRI shares closed at 10.7x our new FY26 EPS estimate of $3.00."

### 5.    August 15, 2024: Tapestry Falsely Claims that the Capri Acquisition is "Pro-Competitive" in a Public Statement Announcing its Q4 2024 Earnings Results

166.    On August 15, 2024, Tapestry issued a press release, filed with the SEC on Form 8-K, announcing its financial results for the fourth quarter and full year of fiscal 2024.  Within the press release, Tapestry again cited the FTC's action to block the Capri Acquisition, stating, "***The Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction*** and looks forward to presenting its strong legal arguments in court, working expeditiously to close the transaction in calendar year 2024."

167.    The statement in ¶ 166 that the Capri Acquisition was "pro-competitive" and "pro-consumer" was materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶ 106.

168.    Analysts again reported on the statements at issue when making recommendations regarding Capri securities.  For example:

(a)    On August 15, 2024, TAG, reporting on Tapestry, wrote: "In addition, *management remains confident in the merits of its FTC lawsuit regarding the CPRI acquisition*… Therefore, given what we see as management's strong execution in an attractive, high margin category, we maintain our Outperform rating."

(b)     On August 15, 2024, TD Cowen, reporting on Tapestry, wrote: "Management Committed to CPRI Deal; CPRI Stock Trades at 45% Discount to Bid. *Management reiterated their commitment to completing the CPRI acquisition* which is scheduled to begin trial in early September as the FTC is suing to block the deal."

(c)     On August 15, 2024, Morgan Stanley, reporting on Tapestry, wrote: "Transaction Update: *Mgmt. again reiterated its commitment to the CPRI acquisition*."

(d)     On August 15, 2024, Guggenheim, reporting on Tapestry, wrote: "*In regard to the lawsuit filed by FTC, Tapestry continues to believe in the merits and pro-competitive nature of the Capri (CPRI) transaction and is actively preparing to present its case in court in September*."

(e)     In two reports dated August 15, 2024, BMO Capital Markets, reporting on Tapestry, restated Tapestry management's belief that the Capri Acquisition would close in 2024.  In the first, it wrote: "'CPRI. *Management reiterated its prior deal commentary noting they are 'confident in the merits and pro-competitive, pro-consumer nature of this transaction and looks forward to presenting its strong legal arguments in court, working expeditiously to close the transaction in calendar year 2024.*'"  In the second, it wrote: "*TPR Still Excited About Deal*; Accretion Starting Point Potentially Altered. Management believes CPRI is still an excellent strategic fit with value creation opportunity."

(f)     On August 15, 2024, Bank of America, reporting on Tapestry, wrote: "Mgmt cited growing conviction in synergy opportunities related to the CPRI acquisition and *is working to close the deal in C24*."

(g)     On August 16, 2024, Jefferies, reporting on Tapestry, wrote: "*TPR remains committed to the deal* and still sees value creation oppty over time."

### 6. September 27, 2024: Tapestry Falsely Claims that the Capri Acquisition is "Pro-Competitive" in its 2024 Annual Proxy Statement

169.    The hearing on the FTC's motion for preliminary injunction filed in *FTC v. Tapestry* was held in the Southern District of New York over the course of seven days, beginning September 9, 2024.  Opening arguments were heard on September 9, 2024; testimony and evidence was presented from September 9 through September 17, 2024; and closing arguments were heard on September 30, 2024.

170.    On September 27, 2024, Tapestry issued its definitive annual proxy statement, filed with the SEC on Form DEF 14A, in which Tapestry repeated similar misstatements regarding the Capri Acquisition:

> On April 22, 2024, the Federal Trade Commission ("FTC") filed a lawsuit in an attempt to block the proposed acquisition and a trial was conducted in September 2024, the results of which are pending.  ***The Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction and is working expeditiously to close the transaction in calendar year 2024***.

171.    The statements in ¶ 170 were materially false and misleading and omitted material facts when made for the same reasons set forth above in ¶¶ 106-107.

### E. The Market Finally Learns the Truth: Michael Kors and Coach are Fierce Head-to-Head Competitors in the Accessible Luxury Handbag Market

172.    After a seven-day hearing, on October 24, 2024, Judge Jennifer L. Rochon of the United States District Court for the Southern District of New York granted the FTC's motion to preliminarily enjoin the Capri Acquisition.  In its order, the *Tapestry* Court cited to hundreds of pages of internal documents revealing that Defendants secretly understood that (i) Kate Spade, Coach, and Michael Kors compete in the "accessible luxury" handbag market; (ii) Capri and Tapestry considered Coach and Michael Kors accessible luxury handbags to be head-to-head competitors; (iii) a primary rationale for the Capri Acquisition was to reduce competition within the "accessible luxury" handbag market; and, given these known facts; (iv) the risk of adverse

action by the FTC was significantly higher than Defendants represented to Capri shareholders during the Class Period.

173.    As a result of this news, the price of Capri stock dropped from $41.60 per share on October 24, 2024 to $21.26 per share on October 25, 2024, a nearly 50% decline on abnormally high trading volume.  For example, on October 24, 2024, reporting on Capri and Tapestry, Wells Fargo wrote: "In very surprising news, AMC Judge Rochon blocked the TPR/CPRI deal that was announced last Aug.  Ramifications for both stocks are material: CPRI shares are down > 50% after-market…"  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Capri securities, Plaintiffs and other Class members have suffered significant losses and economic damages under the federal securities laws.

## VI.    ADDITIONAL ALLEGATIONS IN SUPPORT OF SCIENTER

174.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Capri and Tapestry, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding the Capri Acquisition, and the related full extent to which Tapestry and Capri brands competed in the accessible luxury market, and their control over and/or receipt and/or modification of Tapestry and/or Capri's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

175.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge

and complicity of, or at least the reckless disregard by, personnel at the highest levels of Capri and Tapestry, including the Individual Defendants.

176.    The Individual Defendants, because of their respective positions with Capri and Tapestry, controlled the contents of Capri's and Tapestry's respective public statements during the Class Period.  The Individual Defendants were each provided with or had access to the respective information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  Indeed, the specific undisclosed issues involved critical information for investors that the Individual Defendants held themselves out as the persons most knowledgeable about.  As a result, each of the Individual Defendants was responsible for the accuracy of Capri's and Tapestry's respective corporate statements during the Class Period and was, therefore, responsible and liable for the related representations contained therein and knowingly, or at the very least recklessly, disseminated the material misrepresentations detailed herein.

177.    In addition, internal Capri and Tapestry company records, testimony, and other evidence obtained from FOIA requests and the *FTC v. Tapestry* litigation, confirm that Defendants were aware of, or at the very least recklessly disregarded, the adverse facts detailed herein that rendered their Class Period statements materially misleading.  These confidential, non-public documents and testimony collectively demonstrate that Capri, Tapestry, and their respective senior management, including the Individual Defendants: (i) secretly knew that Kate Spade, Coach, and Michael Kors compete in the "accessible luxury" handbag market, a well-defined submarket

distinct from "luxury" and "mass market" handbag submarkets; (ii) internally considered Coach and Michael Kors accessible luxury handbags to be direct, head-to-head competitors; (iii) were motivated to negotiate and enter into the Capri Acquisition to reduce competition within the "accessible luxury" handbag market; and (iv) knew that the risk of adverse action by the FTC was significantly higher than Defendants represented to Capri securityholders and the market for Capri securities during the Class Period.

178.    <u>Defendant Idol</u>:  As alleged in detail above, contemporaneous Capri records reveal that Defendant Idol, Capri's Chairman, CEO, and member of the Capri Board, not only consistently identified Coach as Michael Kors's top competitor in the accessible luxury handbag market, but also personally directed Michael Kors's efforts to outpace Coach.  Idol himself explicitly referred to Coach as "our [Michael Kors's] key competitor" and testified at the *Tapestry* preliminary injunction hearing that he "most frequently compare[s] Michael Kors handbag prices to Coach."[190]  As the *Tapestry* Court noted, "Idol monitor[ed] Coach's marketing emails so closely that his subordinates joke that he is 'the most engaged audience that Coach has.'"[191]  Idol personally directed Michael Kors executives to emulate Coach marketing campaigns, chase Coach prices and discounts, and replicate Coach handbag designs.  Idol even requested that Michael Kors executives purchase Coach bags so that he could gather information about Coach's latest designs. Indeed, Idol has attended to Michael Kors's competition with Coach so closely that, on November 26, 2024, he appointed himself CEO of the brand.

179.    As Chairman, CEO, and member of the Capri Board, Idol was routinely presented with materials identifying Coach as Michael Kors's top competitor in the "accessible luxury"

---

[190]  Tr. at 101:6-8; *FTC v. Tapestry*, at 490-91.

[191]  *FTC v. Tapestry*, at 486-87, 491-92 & n.44; Tr. at 110:4-111:8 (quoting PX2425).

handbag market.  For instance, an August 2021 presentation to the Capri Board entitled "MMK Price Increases Accessories & Footwear Global" priced Michael Kors and Coach accessories within mere dollars of one another under Michael Kors's pricing analysis.[192]  As CEO, Idol himself helped create Capri Board materials.  For example, Idol participated in efforts to gather examples of "coach and kate spade racing to the bottom [with] such promotions," commenting in May 2023 on a Coach email he forwarded to Michael Kors executives:  "A good one for the BOD deck."[193]

180.  <u>Defendant Edwards</u>:  As alleged in detail above, Defendant Edwards, as Capri's Executive Vice President, CFO, and COO, received countless materials identifying Coach as Michael Kors's top competitor in the accessible luxury handbag market.  For example, Michael Kors President of Accessories & Footwear Newman Chapuis wrote to Edwards on June 4, 2021 regarding Capri's supplier: "In particular, they [Capri's supplier] shared that our biggest competitor is not facing these same dire issues" and, "[a]t some point, John [Idol] is going to want to know why our biggest competitor is not experiencing the same inventory issues as we are."[194] Edwards was personally involved in Michael Kors's efforts to compete with Coach.

181.  Edwards was also routinely presented materials referencing the "accessible luxury" handbag market and distinguishing between "accessible luxury" and "luxury" handbag brands.  In fact, Edwards testified at the *Tapestry* preliminary injunction hearing that he instructed his colleagues to add the term "accessible luxury" to Capri Board materials.[195]  Edwards also received weekly updates from Capri Vice President of Investor Relations Davis on credit card spending trends for Michael Kors and its accessible luxury competitors Coach, Kate Spade, and Tory Burch,

---

[192]  PX2727; Tr. at 196:6-197:19, 1416:9-16 (discussing PX2727); *FTC v. Tapestry*, at 490-91.

[193]  *FTC v. Tapestry*, at 490-91 (quoting PX2331).

[194]  Tr. at 200:11-201:17 (quoting PX2728); *FTC v. Tapestry*, at 486-87.

[195]  Tr. at 1127:25-1128:2.

including on July 6, 2021; April 17, 2023; and September 6, 2023.[196]  Furthermore, as a member

of Capri senior management, it is reasonably inferable that Edwards regularly attended Capri

Board meetings and developed and/or received many of the same materials shared with Idol and

the Capri Board.  For example, both Idol and Edwards attended the August 1-2, 2023 Capri Board

meeting at which Michael Kors CEO Wilmotte "discussed with the Board the U.S. leather goods

market and the accessible luxury market."[197]

182.    Defendant Crevoiserat:   As alleged in detail above, Defendant Crevoiserat, as

President, CEO, and a member of the Tapestry Board, received Tapestry Board and executive team

materials showing that Michael Kors was Coach's top competitor in the accessible luxury handbag

market.[198]  Numerous documents indicate that Crevoiserat herself closely monitored gains and

losses in market share between Coach and Michael Kors.  For example, in a March 15, 2021 email

regarding Capri's stock performance, Crevoiserat wrote: "Looking at the CPRI [Capri] note – *do

we know where MK is closing stores?  Feels like an opportunity to grab share* if we can adjust

marketing and if we have a presence in these areas."[199]  In another example, in an April 26, 2021

email, a member of Tapestry's strategy team reported recent data on handbag sale trends for Coach,

Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs.[200]  Crevoiserat commented on Michael

Kors's market share growth, but not on Tory Burch's or Marc Jacobs's commensurate growth:

---

[196]  Tr. at 106:17-20 (discussing PX2394); *FTC v. Tapestry*, at 431 n.10; Excerpt of PX2515 at 1;
Tr. at 101:9-12, 101:20-102:3, 102:10-24 (discussing PX2515); PX2395; Tr. at 105:10-13, 105:18-
106:13 (discussing PX2395); *FTC v. Tapestry*, at 436 n.22.

[197]  PX2439 at 4; Tr. at 734:5-736:14 (quoting PX2439); FTC's Opening Argument Demonstrative
at 33 (excerpt of PX2439); *FTC v. Tapestry*, at 436-38.

[198]  Tr. at 447:20-453:6 (discussing PX1536); Tr. at 469:23-470:9 (discussing PX1783); *FTC v.
Tapestry*, at 433 n.16, 488-89.

[199]  Excerpt of PX1703 at 2; *FTC v. Tapestry*, at 487-88; Tr. at 278:1-280:16 (quoting PX1703).

[200]  PX1306 at 3; Tr. at 282:5-283:17 (discussing PX1306); *FTC v. Tapestry*, at 487-88.

"***Have we really lost that much share to [Michael Kors]*** ... (their business +26% to [Coach] -18% and KS -41%)?"[201]    Additionally, Crevoiserat testified at the *Tapestry* preliminary injunction hearing that she "personally ha[s] included the term 'accessible luxury' in [her] communications with Tapestry's board."[202]

183.    As also alleged in detail above, a multitude of internal records created during Tapestry's M&A process show that Crevoiserat received materials explicitly indicating that the Capri Acquisition would reduce competition between Michael Kors and Coach in the accessible luxury handbag market—and which demonstrate that this was Crevoiserat's motivation for pursuing the transaction in the first place.    As the *Tapestry* Court put it, this "evidence reflects that Tapestry," including Crevoiserat, "perceived the acquisition of Michael Kors to be an opportunity to decrease Michael Kors's discounting and increase Michael Kors's prices – a recognized form of anticompetitive effects."[203]

184.    <u>Defendant Roe</u>:    As alleged in detail above, Defendant Roe, as CFO and COO of Tapestry, likewise received Tapestry executive team and other internal materials showing that Michael Kors directly competed with Tapestry brands Coach and Kate Spade.[204]    On August 23, 2022, Tapestry Senior Vice President of Global Strategy & Consumer Insights Harris texted Roe to complain that Michael Kors had copied Coach's "(Re)Loved" program.    She sent him a screenshot of Michael Kors's "Preloved" webpage, commenting, "They say imitation is the

---

[201]    PX1306 at 1-2; Tr. at 284:18-20 (quoting PX1306); *FTC v. Tapestry*, at 487-88.

[202]    Tr. at 260:3-261:13, 263:7-14; *FTC v. Tapestry*, at 431 n.12.

[203]    *FTC v. Tapestry*, at 484.

[204]    Tr. at 447:20-453:6 (discussing PX1536); Tr. at 469:23-470:9 (discussing PX1783); *FTC v. Tapestry*, at 433 n.16, 488-89.

sincerest form of flattery."[205]  Furthermore, as a member of Tapestry senior management, it is reasonably inferable that Roe regularly attended Tapestry Board meetings and participated in the development of and received many of the same materials shared with Crevoiserat and the Tapestry Board.  For instance, a July 21, 2022 slide deck on Coach's quarterly brand update presented to the Tapestry Board, including Crevoiserat and Roe, compared handbag MSRPs and AURs for Coach, Kate Spade, Michael Kors, Tory Burch, and Marc Jacobs.[206]  Similarly, a January 2023 Coach presentation entitled "January 2023 Coach Brand Review," sent to Tapestry executives including Roe, detailed Coach's monthly average handbag MSRPs and AURs compared to Michael Kors, Kate Spade, and Tory Burch.[207]

185.   Defendants Capri and Tapestry, through directors, officers, and employees, and as evidenced in both companies' internal formal records and informal electronic communications detailed above, knew that their respective brands competed closely in the accessible luxury market and that, as a result, the anticompetitive nature of the Capri Acquisition would draw regulatory scrutiny, threatening its consummation.  Furthermore, this conclusion was demonstrated by the concerted efforts of Capri and Tapestry executives, including the Individual Defendants, to conceal their knowledge of the true nature of competition in the handbag market and, in particular, the accessible luxury handbag market by (a) ceasing to refer to the accessible luxury market in public filings with the SEC after the FTC filed suit and (b) downplaying the fierce competition between Michael Kors and Coach in the accessible luxury handbag market in testimony before Judge

---

[205]  Tr. at 386:22-387:16 (quoting PX1448).

[206]  The deck also compared MSRPs and AURs for Total Lux" brands Louis Vuitton, Dior, and Gucci and provided averages for "Total Lux" (luxury) and "Total Acc" (accessible luxury).  Tr. at 447:20-453:6 (discussing PX1536); *FTC v. Tapestry*, at 433 n.16.

[207]  Tr. at 469:23-470:9 (discussing PX1783); *FTC v. Tapestry*, at 488-89.

Rochon during the *Tapestry* preliminary injunction hearing—testimony, particularly from the Defendants here, that the Court found to be not "credible or persuasive."[208]

## VII. LOSS CAUSATION

186.   During the Class Period, as detailed herein, Defendants deceived the market for Capri securities by falsely describing the extent to which Capri and Tapestry competed in a limited and clearly-defined market, falsely characterizing the Capri Acquisition as pro-consumer, misleadingly failing to disclose material facts while touting the likelihood of approval of the Capri Acquisition, and misleading investors regarding the true level of risk involved in the consummation of Tapestry's acquisition of all outstanding Capri securities.

187.   Defendants' deceptive course of conduct artificially inflated the price of Capri stock during the Class Period, increasing the price at which Plaintiffs and the Class purchased Capri stock and decreasing the price at which they sold put options referencing Capri stock.

188.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Capri stock declined significantly as the prior artificial inflation came out of the price of such securities.

189.   As a result of their transactions in Capri securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements regarding Capri securities caused Capri stock to trade at artificially inflated prices throughout the Class Period, with Capri stock often trading close to the $57.00 per share price inherent in the Capri Acquisition, and caused Capri put options to trade at deflated prices.

---

[208] *FTC v. Tapestry*, at 430-32, 432-35, 453 & n. 32, and 486-87 & n.44; Tr. at 110:4-111:8.

190.    Because the price of put options is inversely related to the price of the referenced stock, Capri investors who sold put options during the Class period did so at prices that were artificially low (because the stock prices were artificially high) as a result of Defendants' false and misleading statements.

191.    Negative news about the Capri Acquisition entered the market before the full truth was finally revealed upon the issuance of the October 24, 2024 preliminary injunction enjoining the Capri Acquisition.  For example:

(a)    As detailed in ¶ 118, following the November 6, 2023 disclosure that the FTC had issued a Second Request, the price of Capri stock declined from $50.66 per share on November 6, 2023 to $48.82 per share on November 7, 2023 on abnormally high trading volume;

(b)    As detailed in ¶¶ 138-140, following the comments by FTC Director Liu at the 2024 American Bar Association Antitrust Spring Meeting in Washington, D.C. on April 11, 2024 and the associated news reports identifying the Capri Acquisition as the enforcement target of Director Liu's comments, the price of Capri stock declined from $42.87 per share on April 11, 2024 to $39.31 per share on April 12, 2024 on abnormally high trading volume.

(c)    As detailed in ¶ 145, following the April 17, 2024 *New York Times* report that the FTC was preparing to sue to block the Capri Acquisition, the price of Capri stock declined from $38.93 per share on April 16, 2024 to $37.87 per share on April 17, 2024 on abnormally high trading volume.

(d)    As detailed in ¶ 148, following the April 22, 2024 filing of the FTC's suit to block the Merger, the price of Capri stock declined from $37.96 per share on April 22, 2024 to $34.81 per share on April 25, 2024 on abnormally high trading volume.

192.    However, at or about the same time as each of these events, Defendants made false and misleading statements that internal documents now reveal Defendants knew to be false when made. Those countervailing statements muted the price impact of the negative news on each of the above dates. Nevertheless, the negative news about the Capri Acquisition on each of these dates caused a portion of the artificial inflation in Capri's share price caused by Defendants' prior false and misleading statements to be removed, causing economic harm to investors who purchased Capri stock during the Class Period.

193.    The full truth about the anticompetitive nature of the Capri Acquisition was revealed to the market when the *Tapestry* Court issued a preliminary injunction blocking it on October 24, 2024. The price of Capri stock fell significantly, to a low of $21.26 per share the next day, October 25, 2024, as the remaining artificial inflation was removed therefrom, and causing further economic loss to investors who had purchased Capri stock during the Class Period.

194.    The declines in the price of Capri stock after the corrective disclosures alleged herein were a direct result of the nature and extent of Defendants' fraudulent misrepresentations about Capri securities being revealed to investors and the market. The timing and magnitude of the price declines in Capri securities negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Defendants' fraudulent conduct.

195.    The chart below shows the historical price data for Capri stock from June 1, 2023 through November 29, 2024:



196.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to downplay and conceal the anticompetitive nature of the Capri Acquisition and its true level of regulatory risk, artificially inflating the price of Capri securities, and the subsequent significant declines in the value of Capri securities when the truth was revealed.

## VIII.   CLASS ACTION ALLEGATIONS

197.    Plaintiffs bring this action as a class action on behalf of a class consisting of all persons who purchased Capri stock or sold Capri puts during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal

representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

198.    *Numerosity*.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Capri stock was actively traded on the NYSE and there was a robust market for other Capri securities.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Capri or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

199.    *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

200.    *Adequacy of Representation*.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

201.    *Commonality*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' statements during the Class Period were materially false and misleading;

(b)    whether Defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

202.    *Superiority*.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

203.    At all relevant times, the market for Capri securities was an efficient market for the following reasons, among others:

(a)    Capri common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, Capri filed periodic public reports with the SEC;

(c)    Capri regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Capri was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain

customers of their respective brokerage firms, and were publicly available and entered the public marketplace; and

(e)      unexpected material news about Capri was rapidly reflected in and incorporated into the price of Capri securities during the Class Period.

204.  As a result of the foregoing, the market for Capri securities promptly digested current information regarding Capri from all publicly available sources and reflected such information in the price of Capri securities.  Under these circumstances, all purchasers of Capri securities during the Class Period suffered similar injury through their purchases of Capri securities at artificially inflated prices, and a presumption of reliance applies.

## X.      NO SAFE HARBOR

205.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Capri and/or Tapestry who knew that those statements were false when made.

**COUNT I**

**For Violation of § 10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

206.  Plaintiffs incorporate ¶¶ 1-205 above.

207.  During the Class Period, Defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208.  The Defendants named herein violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Capri securities during the Class Period.

209.  Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Capri securities.  Plaintiffs and the Class would not have purchased Capri stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements. Plaintiffs and the Class would not have sold put options referencing Capri stock during the Class period at the prices they received, or at all, if they had been aware that the market price for puts had been artificially and falsely deflated by Defendants' misleading statements.

210.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Capri securities during the Class Period.

## COUNT II
### For Violation of §20(a) of the 1934 Act
### Against All Defendants

211.   Plaintiffs incorporate ¶¶ 1-205 above.

212.   The Individual Defendants respectively acted as controlling persons of Capri and Tapestry within the meaning of §20(a) of the 1934 Act.  By virtue of their respective positions as officers and/or directors of Capri or Tapestry, participation in and/or awareness of Capri's or Tapestry's operations, intimate knowledge of the respective false and misleading statements made during the Class Period, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Capri or Tapestry, including the content and dissemination of the false and misleading statements alleged herein.

213.   Defendants were provided with or had unlimited access to copies of the respective statements alleged to be misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of those statements or cause those statements to be corrected.

214.   As set forth above, Defendants had the ability to exercise control over, and did control, a person or persons who have each violated §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder, by their acts and omissions in connection with the false and materially misleading Class Period statements as alleged herein.

215.   By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## XII.    JURY DEMAND

Plaintiffs hereby demand a trial by jury.


DATED: May 15, 2025                    Respectfully submitted,

                    **FARNAN LLP**

                    By: /s/ Brian E. Farnan
                    Brian E. Farnan (Bar No. 4089)
                    Michael J. Farnan (Bar No. 5165)
                    919 North Market Street, 12th Floor
                    Wilmington, DE 19801
                    Telephone: (302) 777-0300
                    Facsimile: (302) 777-0301
                    Emails:   bfarnan@farnanlaw.com
                              mfarnan@farnanlaw.com

                    *Liaison Counsel for the Class*

Vincent R. Cappucci (*pro hac vice forthcoming*)
Robert N. Cappucci (*pro hac vice forthcoming*)
Jonathan H. Beemer (*pro hac vice forthcoming*)
Brendan B. Brodeur (*pro hac vice forthcoming*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com
bbrodeur@entwistle-law.com

– and –

Andrew J. Entwistle (*pro hac vice forthcoming*)
Callie D. Crispin (*pro hac vice forthcoming*)

**ENTWISTLE & CAPPUCCI LLP**
500 W. 2nd Street, Suite 1900-16
Austin, Texas  78701
Telephone:  (512) 710-5960
aentwistle@entwistle-law.com
ccrispin@entwistle-law.com

*Counsel for Lead Plaintiff FNY Partners Fund LP,*
*Lead Counsel for the Class and Chair of Executive*
*Committee for the Class*


Christopher H. Lyons (#5493)
Tayler D. Bolton (#6640)
**ROBBINS GELLER RUDMAN**
 **& DOWD LLP**
1521 Concord Pike, Suite 301
Wilmington, DE  19803
Telephone:  (302) 467-2660
Email:  clyons@rgrdlaw.com
          tbolton@rgrdlaw.com

David A. Knotts (*pro hac vice forthcoming*)
Michaela Park (*pro hac vice forthcoming*)
Jake Kalphat-Losego (*pro hac vice forthcoming*)
**ROBBINS GELLER RUDMAN**
 **& DOWD LLP**

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
dknotts@rgrdlaw.com
mpark@rgrdlaw.com
jlosego@rgrdlaw.com

*Executive Committee Member for the Class and
Counsel for David R. Hurwitz*


**SAXENA WHITE P.A.**
David J. Schwartz (*pro hac vice forthcoming*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
dschwartz@saxenawhite.com
mduenas@saxenawhite.com

Thomas Curry (#5877)
**SAXENA WHITE P.A**.
824 North Market Street, Suite 1003
Wilmington, DE 19801
Telephone: (302) 484-0480
tcurry@saxenawhite.com

Adam Warden (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
awarden@saxenawhite.com

*Executive Committee Member for the Class*