**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE CAPRI HOLDINGS LTD. SECURITIES LITIGATION | Case No. 1:24-cv-01410-MN<br><br>CLASS ACTION |

**OPENING BRIEF IN SUPPORT OF THE CAPRI DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT FOR
<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

OF COUNSEL:

WACHTELL, LIPTON, ROSEN &
KATZ

Jonathan M. Moses (*pro hac vice*)
Elaine P. Golin (*pro hac vice*)
Adam L. Goodman (*pro hac vice*)
Beatrice R. Pollard (*pro hac vice*)
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1388
EPGolin@wlrk.com
JMMoses@wlrk.com
ALGoodman@wlrk.com
BRPollard@wlrk.com

Dated:  July 14, 2025

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

William M. Lafferty (#2755)
John P. DiTomo (#4850)
Jacob M. Perrone (#7250)
1201 N. Market Street, 16th Floor
Wilmington, DE  19801
Telephone:  (302) 351-9231
wlafferty@morrisnichols.com
jditomo@morrisnichols.com
jperrone@morrisnichols.com

*Counsel for Defendants Capri Holdings
Limited, John D. Idol, and Thomas J.
Edwards, Jr.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

NATURE & STAGE OF PROCEEDINGS........................................................................ 2

SUMMARY OF ARGUMENT ......................................................................................... 3

FACTUAL BACKGROUND ............................................................................................ 3

    A.  Capri Defendants and History of the Transaction........................................... 3

    B.  Efforts to Secure Regulatory Approval........................................................... 4

    C.  FTC Litigation and the SDNY Decision.......................................................... 5

    D.  Capri's Numerous Disclosures about Pending Regulatory Risks.................... 6

    E.  Public Recognition of the Dynamics Underlying the Transaction .................. 9

ARGUMENT.................................................................................................................... 12

I.      PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR
      OMISSIONS ........................................................................................................ 13

    A.  The Statements Are Forward-Looking and Protected by the PSLRA's Safe
        Harbor. ........................................................................................................... 15

    B.  All of the Alleged Misstatements Are Inactionable Opinions. ...................... 18

    C.  Capri Defendants Are Not Liable for Tapestry Statements. .......................... 23

II.     PLAINTIFFS FAIL TO PLEAD SCIENTER ................................................... 24

III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ..................................... 29

IV.    PLAINTIFFS' SECTION 20(a) CLAIM FAILS................................................ 30

CONCLUSION................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Arbitrage Event-Driven Fund* v. *Tribune Media Co.*,
2020 WL 60186 (N.D. Ill. Jan. 6, 2020) ...............................................................................25

*Brown Shoe Co.* v. *United States*,
370 U.S. 294 (1962) ................................................................................................................20

*Chabot* v. *Walgreens Boots All., Inc.*,
2023 WL 2908827 (M.D. Pa. Mar. 31, 2023) ...................................................................16 n.10

*City of Edinburgh Council* v. *Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)..........................................................................3 n.1, 18, 22, 30

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................................................................................................17

*Crutchfield* v. *Match Grp., Inc.*,
529 F. Supp. 3d 570 (N.D. Tex. 2021) ......................................................................13, 21 n.14

*Dang* v. *Amarin Corp. PLC*,
750 F. Supp. 3d 341 (D.N.J. 2024) ................................................................................ *passim*

*Elliott Assocs., L.P.* v. *Covance, Inc.*,
2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000).........................................................................19

*Emps. Ret. Sys. of R.I.* v. *Williams Cos., Inc.*,
889 F.3d 1153 (10th Cir. 2013) ..............................................................................................26

*Fort Worth Emp'rs' Ret. Fund* v. *Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009).....................................................................................29

*Gillis* v. *QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)............................................................................ 22, 26-27

*Gold* v. *Ford Motor Co.*,
577 F. App'x 120 (3d Cir. 2014) ............................................................................................27

*GSC Partners CDO Fund* v. *Washington*,
368 F.3d 228 (3d Cir. 2004)..............................................................................................12, 26

*Hampton* v. *root9B Techs., Inc.*,
897 F.3d 1291 (10th Cir. 2018) ..............................................................................................28

*Hering* v. *Rite Aid Corp.*,
331 F. Supp. 3d 412 (M.D. Pa. 2018)................................................................. 16 & n.10, 19

*Herzog* v. *GT Interactive Software Corp.*,
 1999 WL 1072500 (S.D.N.Y. Nov. 29, 1999)..............................................................27

*Hoey* v. *Insmed Inc.*,
 2018 WL 902266 (D.N.J. Feb. 15, 2018) ...................................................................16

*Ieradi* v. *Mylan Labs, Inc.*,
 230 F.3d 594 (3d Cir. 2000)......................................................................................17

*In re Adolor Sec. Litig.*,
 616 F. Supp. 2d 551 (E.D. Pa. 2009) .......................................................................22

*In re Aetna, Inc. Sec. Litig.*,
 617 F.3d 272 (3d Cir. 2010)......................................................................................15

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014)...........................................................20

*In re Burlington Coat Factory Sec. Litig.*,
 114 F.3d 1410 (3d Cir. 1997)....................................................................................12

*In re Digital Island Sec. Litig.*,
 357 F.3d 322 (3d Cir. 2004)......................................................................................24

*In re Donald J. Trump Casino Sec. Litig.*,
 7 F.3d 357 (3d Cir. 1993)...................................................................................18 n.13

*In re Evolus, Inc. Sec. Litig.*,
 2024 WL 4306786 (S.D.N.Y. Sept. 26, 2024)........................................... 19-20, 21

*In re Focus Fin. Partners Sec. Litig.*,
 2025 WL 961488 (D. Del. Mar. 31, 2025) ...........................................................18, 19

*In re Galena Biopharma, Inc. Sec. Litig.*,
 2019 WL 5957859 (D.N.J. Nov. 12, 2019) ..............................................................17

*In re GeoPharma, Inc. Sec. Litig.*,
 411 F. Supp. 2d 434 (S.D.N.Y. 2006)......................................................................25

*In re GlaxoSmithKline PLC Sec. Litig.*,
 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) .......................................................13, 16

*In re Hertz Glob. Holdings*,
 905 F.3d 106 (3d Cir. 2018)......................................................................................24

*In re Live Concert Antitrust Litig.*,
 863 F. Supp. 2d 966 (C.D. Cal. 2012) ......................................................................20

iii

*In re Merck & Co. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005).................................................................................17 n.12

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015),
  *aff'd sub nom. Tongue* v. *Sanofi*, 816 F.3d 199 (2d Cir. 2016) ...............................26

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006)..............................................................................28

*Institutional Invs. Grp.* v. *Avaya, Inc.*,
  564 F.3d 243 (3d Cir. 2009)...........................................................................24, 27

*Janus Cap. Grp., Inc.* v. *First Derivative Traders*,
  564 U.S. 135 (2011).................................................................................. 23-24

*Lewakowski* v. *Aquestive Therapeutics, Inc.*,
  2023 WL 2496504 (D.N.J. Mar. 14, 2023).............................................................27

*McCabe* v. *Ernst & Young, LLP*,
  494 F.3d 418 (3d Cir. 2007)..............................................................................12

*Monroe Cnty. Emps' Ret. Sys.* v. *YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)....................................................................29

*OFI Asset Mgt.* v. *Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016).............................................................12, 13, 15, 18

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)....................................................................................18, 19

*Ronconi* v. *Larkin*,
  253 F.3d 423 (9th Cir. 2001) .............................................................................24

*Roofer's Pension Fund* v. *Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)..............................................................26

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................................................24

*Tongue* v. *Sanofi*,
  816 F.3d 199 (2d Cir. 2016)..............................................................................22

*United States* v. *E.I. du Pont De Nemours & Co.*,
  351 U.S. 377 (1956)......................................................................................20

*U.S. Healthcare, Inc.* v. *Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993)..........................................................................20, 28

iv

*Water Island Event-Driven Fund, LLC* v. *Tribune Media Co.*,
  39 F.4th 402 (7th Cir. 2022) ........................................................................26

*Williams* v. *Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017).................................................................12, 28

**Statutes and Rules**

15 U.S.C. § 18..........................................................................................5, 11, 19

15 U.S.C. § 45.......................................................................................................5

15 U.S.C. § 53(b).................................................................................................5

15 U.S.C. § 78j(b)...............................................................2, 12, 23, 24, 30

15 U.S.C. § 78t(a) .......................................................................................2, 30

15 U.S.C. § 78u-5(c)........................................................................................15

15 U.S.C. § 78u-5(c)(1)(B) .........................................................................18

Fed. R. Civ. P. 12(b)(6)..............................................................................3, 12

Pub. L. 104-67................................................................2, 3, 12, 13, 15

**Other Authorities**

S. Rep. No. 104-98 (1995), *reprinted* in 1995 U.S.C.C.A.N. 679..................................................13

## PRELIMINARY STATEMENT

On August 10, 2023, Capri Holdings Limited ("Capri"), owner of the Michael Kors, Jimmy Choo and Versace brands, and Tapestry, Inc. ("Tapestry"), owner of Kate Spade, Coach and Stuart Weitzman, (together, the "Parties"), set the fashion world abuzz when they announced an agreement for Tapestry to acquire Capri (the "Merger Agreement"), subject to regulatory review. Plaintiffs purchased stock in Capri after the announcement, knowing full well that the success of their investment would depend on the deal clearing the regulatory process.

The disclosed risk of regulatory hurdles soon materialized. On November 3, 2023, the Federal Trade Commission (the "FTC") issued the Parties a request for information about potential anticompetitive effects of the transaction (the "Second Request"). That review culminated in the FTC suing in federal court to block the transaction on April 22, 2024 (the "FTC Litigation"). Despite the Parties' best efforts to defend the deal and defeat the FTC's challenge, including at a seven-day evidentiary hearing before Judge Jennifer Rochon in the Southern District of New York, the court ultimately sided with the FTC and preliminarily enjoined the transaction (the "SDNY Decision").

Now, Plaintiffs, toting little more than that adverse decision, ask this Court to punish Capri and its management for losing litigation that they believed they could win. As Plaintiffs' own pleading shows, the market was well aware of the regulatory risk to the transaction, for the simple reason that Capri repeatedly disclosed it. Nevertheless, Plaintiffs attempt to concoct fraud claims based on Capri's hopeful predictions about the litigation outcome. But while Capri expressed confidence in the merits of its case, it also acknowledged it could lose. Plaintiffs' theory boils down to the idea that Capri had a duty to publicly agree with the FTC's litigation position and sabotage its own case. Yet case after case affirms that litigation optimism is not securities fraud. Plaintiffs' claims also require the Court to credit the absurd idea that Capri signed onto, and spent

1

more than a year defending, a transaction it knew the FTC would successfully block.  Again, case after case rejects this non-plausible inference.

Ultimately, as Plaintiffs plead, the FTC's case turned on a question that is quintessentially a matter of opinion:  whether "accessible luxury" handbags were sufficiently distinct from handbags up and down the price spectrum so as to constitute a relevant ***antitrust*** market.  No one could have known with certainty where Judge Rochon would come out and no one did know — the hearing involved competing views of the relevant antitrust market in a hard-fought "battle of the experts."  Indeed, the same analyst reports and news articles upon which Plaintiffs rely illustrate that investors were well aware of the complexity of the issue and the uncertainty of the litigation outcome.  And stock price movement during the hearing made clear that many observers believed the companies would prevail, even *after* seeing the evidence on which Plaintiffs rely.  That Judge Rochon ultimately agreed with the FTC and its expert does not render the companies' litigation position fraudulent.

With the clarity of hindsight, Plaintiffs may not have chosen to open their purses quite so freely.  But it cannot be said that the market was deceived as to the regulatory risk inherent to the transaction.  At its core, this case is nothing more than buyer's remorse repackaged as claims of securities fraud.  The heightened pleading requirements under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") were enacted to weed out precisely such claims.  This lawsuit should be dismissed.

## NATURE & STAGE OF PROCEEDINGS

On December 23, 2024, an investor in Capri stock filed a putative securities class action against the Parties, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  *In re Capri Holdings Ltd. Sec. Litig.*, 24-cv-01410-MN (D. Del. Dec. 23, 2024), D.I. 1. The Court consolidated that complaint with related complaints, and appointed a lead plaintiff, FNY

2

Partners Fund LP ("FNYP"), on March 7, 2025. *Id.* at D.I. 21. FNYP filed an amended complaint on May 15, 2025, *id*. at D.I. 32 (the "Complaint"). Defendants Capri, John Idol, and Tom Edwards (collectively, the "Capri Defendants") now move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## SUMMARY OF ARGUMENT

Plaintiffs' claims should be dismissed on three independent grounds:

1. Plaintiffs fail to plead falsity because all of the alleged misstatements are protected forward-looking statements and/or nonactionable opinions.

2. Plaintiffs fail to plead scienter because they lack *any* plausible explanation for why Capri would vigorously pursue a transaction it knew was doomed to fail, let alone make allegations supporting the required "strong" and "compelling" inference required to plead scienter under the PSLRA.

3. Plaintiffs fail to plead loss causation because all of the so-called corrections are merely materializations of the regulatory risks that Capri repeatedly disclosed to investors, culminating in the stock drop upon news of the SDNY Decision blocking the deal—the opposite of actual "corrective disclosures."

## FACTUAL BACKGROUND[1]

### A.    Capri Defendants and History of the Transaction[2]

This action names Defendant Capri, as well as two individual defendants, John Idol,

---

[1] This section is based solely on allegations in the Complaint, (D.I. 32), and documents properly before this Court on a motion to dismiss, *i.e.*, documents incorporated into the complaint by reference and U.S. Securities and Exchange Commission ("SEC") filings. *City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 159, 163 n.3, 166 (3d Cir. 2014). Citations to "Ex. __" refer to exhibits appended to the Declaration of Jacob M. Perrone.

[2] Tapestry and its senior executives are also Defendants in this case. This motion addresses the claims against the Capri Defendants for the reasons stated in Section I.C.

Chairman and Chief Executive Officer of Capri, and Tom Edwards, Capri's former Chief Financial Officer and Chief Operating Officer. ¶¶ 17-19.[3]  Capri derives most of its revenue from handbag sales, and Michael Kors is its largest brand.  ¶ 31.  Over the past decade, Michael Kors' brand performance has waned, resulting in a revenue decline of "over 25% since its peak." ¶ 71.  Capri's efforts to avert financial losses and maintain brand relevance fell flat, as "no particular issue seemed to provide a global explanation for the brand's decline."  ¶¶ 71-72.  Failed attempts at brand revitalization led the company to pursue strategic alternatives.  ¶ 72.  In the spring of 2023, the Chief Executive Officer of Tapestry, Joanne Crevoiserat, approached Idol about Tapestry potentially acquiring Capri.  ¶ 73.

On August 10, 2023, after months of diligence and negotiations, the Parties announced a transaction, whereby Tapestry would acquire Capri for $57.00 per share in cash, a more than 50 percent premium to its then trading price, or approximately $8.5 billion.  ¶ 30.  In the press release announcing the transaction, Idol observed that the deal would provide "greater resources and capabilities to accelerate the expansion of [Capri's] . . . brands," subject to the receipt of required regulatory approvals.  Ex. A at Ex. 99.1 at 1 (Aug. 10, 2023, Form 8-K; ¶ 104).  While analysts liked the deal, they also recognized the distinct regulatory risks.  For instance, one analyst projected an "80% chance of the deal closing and a 25-50% chance of a second request." ¶ 114.  On October 25, 2023, Capri shareholders approved the Merger Agreement.  ¶ 30.

B.    Efforts to Secure Regulatory Approval

On August 31, 2023, the Parties filed the required forms with the FTC and Department of Justice ("DOJ") under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act").  Ex. B at 4, 54 (Definitive Proxy Statement; ¶ 30).  On November 3, 2023, the FTC served

---

[3] Citations to "¶ __" refer to the Complaint.

the Parties with the Second Request, which Capri promptly disclosed, alerting the market to the heightened regulatory risk.  Ex. C at 2 (November 6, 2023, Form 8-K; ¶ 118).  Over the ensuing months, Capri cooperated with the FTC's investigation.  While the U.S. investigation was ongoing, the Parties sought and received unconditional regulatory approval from China, Japan, the European Commission, among other jurisdictions requiring antitrust review, leaving the United States as the only remaining regulatory hurdle.  ¶ 145.

### C.    FTC Litigation and the SDNY Decision

On April 22, 2024, the FTC announced that it had filed suit in the SDNY seeking to preliminarily enjoin the transaction pursuant to Section 13(b) of the FTC Act.  ¶ 126; *see also* *F.T.C.* v. *Tapestry, Inc.*, 24-cv-03109-JLR (S.D.N.Y. Apr. 23, 2024), D.I. 1 (hereinafter, "*FTC* v. *Tapestry*").  In its public complaint, the FTC alleged that the transaction would result in anticompetitive effects to a purported "accessible-luxury handbag" antitrust market, in violation of Section 7 of the Clayton Act and Section 5 of the FTC Act.  *Id.*

After the completion of expedited discovery, Judge Rochon held a seven-day preliminary injunction hearing from September 9-17, 2024.  ¶¶ 9, 169.  Throughout the hearing, Capri disputed the existence of a distinct "accessible luxury" antitrust submarket for handbags, arguing that while "accessible luxury" was a term it had publicly used to describe the Michael Kors brand, the economic reality was that Michael Kors handbags, with an average retail price of less than $100, also competed with hundreds of other handbag brands up and down the price scale.  Opinion and Order at 21, 87-88, *FTC* v. *Tapestry*, D.I. 339 (the "SDNY Op.").  As is often the case in antitrust litigation, the market definition was fiercely disputed in a "battle of the experts," with economics expert Dr. Fiona Scott Morton, Professor of Economics at the Yale School of Management and the former Chief Economist at the Antitrust Division of DOJ, as well as industry experts Jeff Gennette, former Chairman and Chief Executive Officer of Macy's, and Karen Giberson, President

and Chief Executive Officer of the Accessories Council, testifying for the Parties, and Dr. Loren Smith of Compass Lexecon testifying for the FTC. *Id.* at 6 n.1. The court also heard from almost 20 third-party handbag brands, most of them called by the Parties. *Id.*

The price of Capri stock traded on investors' predictions of the outcome of the hearing (¶ 4) rising from around $36 just before the hearing to $43 after closing arguments, apparently reflecting investors' increased optimism after the public airing of both sides' testimony and evidence. Ex. D at 4-5 (Fischman Certification; ¶ 15). Plaintiffs themselves joined in this post-hearing buying spree. *Id.* at 5-6; Ex. E at 2 (Hurwitz Certification; ¶ 16). On September 30, 2024, the court heard closing arguments (¶ 169) where the FTC presented its summation of the evidence, prominently featuring the very pieces of evidence that Plaintiffs now allege were concealed from the market. *See, e.g.*, ¶ 39 (describing document where Idol compares Michael Kors to its "key competitor Coach"); ¶ 42 (email compilation from the FTC's closing argument demonstrative showing Idol's focus on Coach). Plaintiffs purchased stock even *after* those presentations. Ex. D at 5-6; Ex. E at 2.

On October 24, 2024, Judge Rochon issued a 169-page opinion preliminarily enjoining the transaction, holding that the FTC had shown it was likely to produce anticompetitive effects. ¶ 9. In so doing, she held that the FTC had successfully established a relevant antitrust market of "accessible-luxury" handbags that sell for between $100 and $1,000. SDNY Op. at 36. The Parties promptly appealed to the Second Circuit on October 28, 2024, but withdrew that appeal after mutually agreeing to terminate the Merger Agreement on November 14, 2024, as the outcome of the legal process was uncertain and unlikely to be resolved by the Merger Agreement's outside date of February 10, 2025. *See* Ex. F at Ex. 99.1 (Nov. 14, 2024, Form 8-K).

**D.    Capri's Numerous Disclosures about Pending Regulatory Risks**

From the day the transaction was announced, Capri repeatedly disclosed the uncertainties

6

associated with the transaction, including regulatory risks beyond its control. As noted above, on August 10, 2023, Capri issued a press release, filed with the SEC as an exhibit to a Form 8-K, announcing the transaction. Ex. A at Ex. 99.1. The press release made clear that "the ***outcome of any legal proceedings related to the merger***; the ability of the parties to consummate the proposed transaction on a ***timely basis or at all***; [and] the satisfaction of the conditions precedent to consummation of the proposed transaction, including the ***ability to secure regulatory approvals*** on the terms expected, at all or in a timely manner" could materially impact the fate of the proposed transaction.[4] *Id*. at 4. The press release also categorized statements related to the "anticipated closing date for the proposed transaction" as forward-looking statements. *Id*.

The remainder of the Form 8-K described "Conditions to the Merger," including (1) "the expiration or termination of the applicable waiting period under the [HSR], as amended, and the receipt of certain other regulatory approvals," and (2) "the absence of any injunction or order by a court or other governmental entity . . . preventing, enjoining, prohibiting or making illegal the consummation of the Merger." Ex. A at 2. Capri warned that expectations and projections related to its forward-looking statements depended on risks such as "the ***timing, receipt*** and terms and conditions of ***any required governmental and regulatory approvals*** for the proposed transaction that could delay or result in the termination of the proposed transaction," "the risk that the parties to the Merger Agreement ***may not be able to satisfy the conditions*** to the proposed transaction in a timely manner or at all," "the risk that ***any announcements*** relating to the proposed transaction ***could have adverse effects on the market price of the Ordinary Shares***," and "the risk of ***any litigation*** relating to the proposed transaction." *Id*. at 5. As Appendix A ("App. A") shows, Capri repeated similar warnings in each of the 8-Ks cited by Plaintiffs as containing the alleged

---

[4] Unless otherwise noted, all emphases in case and record citations are added.

misstatements.  Capri also directed readers to refer to Capri's other SEC filings, including its "most recent Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K" for information on other factors that could materially impact its forward-looking statements.  *Id*.[5]

Indeed, on the same day that Capri announced the transaction, it issued its Form 10-Q for that quarter.  The Form 10-Q warned of transaction-related risks under the subheading, "Failure to complete the proposed Merger could adversely affect our business and the market price of our ordinary shares."  Ex. G at 46 (Aug. 10, 2023, Form 10-Q).  The risks disclosed therein included that "[t]here [was] no assurance that the closing of the Merger will occur" and "[Capri] *may be subject to litigation* challenging the Merger, and *an unfavorable judgment or ruling* in any such lawsuits could *prevent or delay* the consummation of the Merger and/or result in substantial costs."  *Id*. at 47.  The 10-Q also stated, "*[l]awsuits related to the Merger may be filed against us, Tapestry*, and our respective affiliates, directors and officers.  If dismissals are not obtained or a settlement is not reached, these *lawsuits could prevent or delay completion of [the] Merger* and/or result in substantial costs to us."  *Id*.

A month later, on September 20, 2023, Capri issued a Definitive Proxy Statement in which it reiterated in a Q&A section that it could not make any guarantees with respect to the closing timeline.  Ex. B at 13 ("Q:  When do you expect the Merger to be completed?  A:  We currently expect the Merger to be completed in calendar year 2024.  However, the *exact timing of completion of the Merger cannot be predicted* because the Merger is subject to the closing conditions specified in the Merger Agreement and summarized in this proxy statement, many of

---

[5] Appendix A contains a chart listing the challenged statements with cross-references to the accompanying cautionary language.  Each cautionary statement incorporates by reference Capri's other SEC filings.  In addition to the disclosures highlighted herein, Capri referred to regulatory risks to the transaction in its Forms 8-K dated November 9, 2023, 10-Q dated February 8, 2024, 8-K dated August 8, 2024, and 10-Q dated November 7, 2024.

which are outside of our control.").  Capri referred to the need for regulatory approval at least 11 times throughout the Proxy Statement, noting, for example, "[we] ***cannot be certain*** that a challenge to the Merger will not be made or that, if a challenge is made, that we will prevail." *Id.* at 54; *see also id.* 4, 15, 28-30, 33-34, 54, 72-74.

After the FTC filed its suit, Capri continued to apprise the market of the regulatory risks associated with the FTC Litigation.  For instance, in its statement reacting to the lawsuit, it warned of risks related to "any litigation relating to the pending Merger[]" and "the timing, receipt and terms and conditions of any required . . . regulatory approval[s]."  Ex. H at Ex. 99.1 at 2 (Apr. 22, 2024, Form 8-K; ¶ 149).  Capri included further lawsuit-related warnings in the May 29, 2024 press release announcing its annual financial filings.  There, Capri described risks to the transaction, including from "the outcome of the [FTC's] lawsuit attempting to block the pending Merger."  Ex. I at Ex. 99.1 at 4 (May 29, 2024, Form 8-K; ¶ 163).  It reiterated those warnings in its 10-K filing, cautioning the need for U.S. regulatory approval and making several references to the risks from the FTC's lawsuit.  Ex. J at 4, 5, 19-20, 38 (May 29, 2024, Form 10-K).  Capri also provided similar warnings in its August 8, 2024 Form 10-Q, again noting "there can be no assurance as to the outcome of litigation with the FTC or that this condition to the completion of the Merger will be satisfied on a timely basis or at all."  Ex. K at 8, 30 (Aug. 8, 2024, Form 10-Q).

E.    **Public Recognition of the Dynamics Underlying the Transaction**

Throughout the class period, the transaction was the subject of analyst and expert commentary, including those relied on by Plaintiffs.  ¶ 4.  After Capri announced the transaction, analysts generally reacted positively, with one heralding it as an "attractive deal" given Tapestry's "experience in accessible luxury" and "turnaround capabilities," which could add, "brand heat to Michael Kors."  Ex. L at 1 (Aug. 10, 2023, TD Cowen; ¶ 108).  Much like the Capri Defendants, however, analysts tempered this optimism by noting the transaction's regulatory risks.  For

9

example, when the FTC issued its Second Request, Guggenheim identified "the FTC not granting [] regulatory approval" as a "[r]isk[] to the downside." Ex. M at 1 (Nov. 9, 2023, Guggenheim; ¶ 130); *see also* Ex. N at 3 (Apr. 15, 2024, Bloomberg; ¶ 143) (estimating odds of approval at "closer to 40%"). Once the FTC filed its complaint, numerous analysts warned investors of the risks and uncertainty inherent in the litigation process, including the "risk [that] [Tapestry's] attempt to buy [Capri] is blocked by the FTC," which could "drive stock price volatility." Ex. O at 5 (May 9, 2024, UBS; ¶ 159); *see also* Ex. P at 1 (May 10, 2024, TD Cowen; ¶ 159) (noting "risks that the FTC may use the acquisition to try to set precedent around competitors combining"); Ex. Q at 1 (May 23, 2024, TAG; ¶ 162) ("The FTC lawsuit clouds visibility as to the completion of the acquisition, though the announcement was not too surprising. . . ."); Ex. R at 2 (Morgan Stanley, Aug. 15, 2024; ¶ 168) (noting that the September SDNY hearing would provide a better sense of the transaction timeline).

Meanwhile, analysts also offered their own opinions about the competitive landscape for handbags—a market in which virtually all Americans participate. At the time Capri announced the transaction, the concept of "accessible luxury" handbags was well known and obvious to the market, because Capri had openly called Michael Kors an "accessible luxury" line for many years, including in SEC filings from both before and during the class period. *See, e.g.*, Ex. G at 29.[6] And as the analyst reports and news articles that Plaintiffs rely on explicitly discuss, accessible luxury, far from being a secret, was a "category [Tapestry's] Coach arguably created." ¶ 108; *see also* Ex. V at 2 (Aug. 15, 2024, Bank of America; ¶ 168) ("In China, the [Coach] brand's accessible luxury positioning is resonating. . . ."). When reacting to the FTC suit, the BBC described Tapestry brands

---

[6] For example, the 2011 IPO Prospectus for Capri used the term "accessible luxury." *See, e.g.*, Ex. S at 2-3, 5, 34-35, 59, 61, 63-64, 66, F-16 (Prospectus; Dec. 14, 2011); *see also* Ex. T at 32 (Feb. 2, 2022, Form 10-Q); Ex. U at 32 (Feb. 8, 2024, Form 10-Q).

as known for their "accessible luxury" handbags. Ex. W at 2 (Apr. 22, 2024, BBC; ¶ 154). *Forbes* characterized the transaction as "*effectively a merger of equals*" in accessible luxury noting, "Without a doubt, *Tapestry and Capri have been fierce competitors*, but they laid down their swords last August. . . ." Ex. X at 2, 4 (Apr. 18, 2024, *Forbes*; ¶ 146).[7]

What the Capri Defendants disagreed with the FTC about was whether "accessible luxury handbags" was a sufficiently distinct market so as to constitute a relevant *antitrust* market under Section 7 of the Clayton Act. Investors understood this issue: The very same TD Cowen report that credited Coach with inventing accessible luxury also predicted that regulatory approval of the transaction was "likely given *fragmentation* in the market in light of the *current scale of other major luxury* players." ¶ 108. After the Second Request, TD Cowen reiterated that belief, commenting, "*We continue to believe the deal will close* given the competitive and discretionary nature of handbags." ¶ 134. Analysts understood that market definition was the key legal issue and that the transaction faced serious risk if "*you chose to define the outlet market or $300-$500 band only*." *Id*. *Forbes* reported that there was "'essentially *no precedent* for blocked acquisitions within the fashion and accessories sector'" due to "low barriers of entry" and the "'volatile cultural and brand relevance market.'" Ex. X at 3 (¶ 146) (quoting TD Cowen analyst). Another antitrust expert told *Reuters* that "[t]he FTC's decision to sue [was] surprising because there's no shortage of competition for fashion, apparel and accessories," observing that "*[t]he commission has latched onto a marketing term* – 'accessible luxury' – and [is] treat[ing] it like a unique market that exists in a vacuum." Ex. Z at 2 (Apr. 22, 2024, *Reuters*; ¶ 151, 154).

Analysts remained optimistic despite the FTC Litigation noting, for example, "While

---

[7] *See also* Ex. Y at 2 (Apr. 22, 2024, Bloomberg; ¶ 154) ("The proposed acquisition, announced in August, capped a decade or so of rivalry between Coach and Michael Kors to dominate the US handbag market.").

Tapestry and Capri **own meaningful market share in the handbag market**, **the industry is very fragmented** with meaningful price elasticity given the discretionary nature of the product, and with low barriers to entry." ¶ 159.  After Judge Rochon issued her decision, an analyst characterized it as "very surprising news." ¶ 173.  These reports, which Plaintiffs themselves rely on, thus make clear that the market fully understood the Parties' brand positioning as "accessible luxury," and yet, due to the characteristics of the handbag market, shared Capri's tempered optimism about the litigation outcome.

## ARGUMENT

To state a securities fraud claim under Section 10(b), Plaintiffs must plead specific facts demonstrating, among other things, that (1) the Capri Defendants made "a material misrepresentation in connection with the purchase or sale of a security," and (2) the misrepresentation was made with "scienter, *i.e.*, a wrongful state of mind [of] the party making the representation." *OFI Asset Mgt.* v. *Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016).  The claims here are subject to the PSLRA, which imposes "heightened pleading requirements above the normal Rule 12(b)(6) standard." *Williams* v. *Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017).  These requirements are "'rigorously applied,'" and failure to plead such facts makes "dismissal . . . mandatory." *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 236-37 (3d Cir. 2004) (quoting *In re Burlington Coat Factory Sec. Litig*, 114 F.3d 1410, 1417 (3d Cir. 1997)).  Plaintiffs must also plead loss causation, which is the "causal connection between the material misrepresentation and the loss." *McCabe* v. *Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).  The Complaint falls far short of these exacting standards, with each element providing an independent basis for dismissal.

12

## I. PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

Congress enacted the PSLRA to screen out suits based on "nothing more than a company's announcements of bad news, not evidence of fraud."  S. Rep. No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683.  The PSLRA's safeguards are especially important in a case like this one, which arises solely from a failure to prevail in inherently uncertain antitrust litigation.  *Cooper Tire & Rubber*, 834 F.3d at 499 (dismissing claim concerning failed merger as the PSLRA is designed to "prevent disappointed investors from treating every imprecise statement during a transaction as an invitation to file a lawsuit").

District courts regularly dismiss fraud claims based on optimistic statements about ongoing litigation as "clearly routine and aspirational opinions regarding the success of the litigation and not statements of fact," *Crutchfield* v. *Match Grp.*, *Inc.*, 529 F. Supp. 3d 570, 593-94 (N.D. Tex. 2021).  For good reason—if "a legal position taken by a publicly traded company, or an expression of confidence in a legal position, [could] be converted by hindsight into an actionable misrepresentation if the company later los[t] the lawsuit [it] would have a chilling effect on publicly traded companies seeking to defend their interests in litigation."  *In re GlaxoSmithkline PLC Sec. Litig.*, 2006 WL 2871968, at *10 (S.D.N.Y. Oct. 6, 2006) (hereinafter, "*GSK*").  That reasoning—and those policy considerations—squarely apply here.  *See Dang* v. *Amarin Corp. PLC*, 750 F. Supp. 3d 431, 463 (D.N.J. 2024) (finding opinions about litigation prospects actionable would "constitute impermissible 'fraud by hindsight'").

Plaintiffs challenge just four statements, all filed on SEC Forms 8-K, that are fairly attributed to Capri Defendants.[8]  Those statements fall into two categories:

*First*, the Complaint singles out two instances where Capri made opinion statements about

---

[8] Capri Defendants are not liable for Tapestry's statements.  *See infra* Section I.C.

the closing timeline for the transaction (the "Timeline Statements"):

- On August 10, 2023, the Parties issued a joint press release announcing the transaction, wherein Idol stated, "Today's announcement marks a major milestone for Capri. . . . We are confident this combination will deliver immediate value to our shareholders." ¶ 104. The Complaint claims that the Parties' statement in that release that, "**The transaction is anticipated to close in calendar year 2024**"[9] was materially misleading. *Id*. Plaintiffs' Complaint omits the second portion of the *same* sentence where the Parties caveated that the anticipated timing was "subject to . . . the receipt of required regulatory approvals, and other customary closing conditions." Ex. A at Ex. 99.1 at 2.

- After the FTC issued its Second Request to the Parties on November 3, 2023, Capri filed a Form 8-K report disclosing that request. Here, Plaintiffs claim as misleading the statement that, "**Capri continues to expect that the [t]ransaction will be completed in calendar year 2024**." ¶ 119.

*Second*, Plaintiffs single out two statements from press releases that reflect advocacy about the nature of the handbag market and Capri's litigation prospects (the "Litigation Statements"):

- First, upon the announcement of the FTC Litigation on April 22, 2024, Capri issued a press release explaining its theory of the case and defending the transaction: "Capri Holdings strongly disagrees with the FTC's decision. **The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition. Tapestry and Capri operate in the fiercely competitive and highly fragmented global luxury industry.**

---

[9] The bold emphasis to these statements appears in the Complaint.

**Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low.** Capri intends to vigorously defend this case in court alongside Tapestry and complete the pending acquisition." ¶ 149.

- Plaintiffs also identify as misleading, fully identical language in Capri's May 29, 2024 press release, which reiterated the above statement regarding Capri's litigation position. ¶ 163.

As set forth below, all of the allegedly misleading statements are forward-looking statements protected by the PSLRA's safe harbor and/or inactionable opinions.

### A.    The Statements Are Forward-Looking and Protected by the PSLRA's Safe Harbor.

The PSLRA provides a "safe harbor" immunizing defendants from liability in actions based on forward-looking statements that are (1) "identified as such, and accompanied by meaningful cautionary statements," or (2) "made without actual knowledge that the statement[s] [were] false or misleading." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278-79 (3d Cir. 2010) (citing 15 U.S.C. § 78u-5(c)).  All of the allegedly misleading statements clearly fall within the safe harbor, and the Complaint should be dismissed for this reason alone.

*The Timeline Statements are, by definition, forward-looking; they concern an expectation of when in the future the transaction would close.* ¶ 104 ("The transaction is *anticipated* to close in calendar year 2024."); ¶ 119 ("Capri continues to *expect* that the [t]ransaction will be completed in calendar year 2024.").  As the Third Circuit has recognized, "'expected,' [is] a term that identifies the statement as forward-looking." *Cooper Tire & Rubber*, 834 F.3d at 501.  Similarly, courts in this Circuit have held that the safe harbor encompasses statements where a defendant "simply attempt[s] to predict a time table for completing [a]

15

transaction." *Hering* v. *Rite Aid Corp.*, 331 F. Supp. 3d 412, 423 (M.D. Pa. 2018);[10] *see also Hoey* v. *Insmed Inc.*, 2018 WL 902266, at *19 (D.N.J. Feb. 15, 2018) (statement expressing the likelihood of FDA approval is forward-looking). Furthermore, Capri expressly classified the statements in question as forward-looking in its SEC filings. *See* App. A.[11]

 *The Litigation Statements are also forward-looking.* *GSK*, 2006 WL 2871968, at *10 is directly on point. In *GSK*, the court concluded that statements expressing predictions about litigation outcomes such as, "We are very confident we can defend our patents" and "[W]e feel that the courts eventually will *recognize the letter of the law* and give us the added protection for [our product]" were "clearly protected" as "classic example[s] of a forward-looking statement." *Id.* at *3, *10. As in *GSK*, Capri's statements reflected its view of "market realities," which, as the context of the statements makes clear, it believed should carry the day in court. Capri's prediction turned out to be wrong, but statements about Capri's "belief and/or hope for how the litigation w[ould] proceed . . . fit comfortably within the forward-looking statement definition," particularly as Capri could not and did not guarantee a litigation outcome and the hearing had not yet occurred. *Amarin*, 750 F. Supp. 3d at 466-67.

 *The allegedly misleading statements are accompanied by relevant and meaningful cautionary language.* With each statement, Capri cautioned investors that the transaction depended on the receipt of regulatory approval and the outcome of litigation relating to the pending merger. *See supra* at pp. 6-9. In so doing, Capri also referred investors to additional warnings

---

[10] The *Rite Aid* court ultimately found certain other timing statements actionable because they alluded to "inside knowledge" about the FTC's review as a basis for downplaying regulatory concerns. *Rite Aid*, 331 F. Supp. 3d at 427; *see also Chabot* v. *Walgreens Boots All., Inc.*, 2023 WL 2908827 (M.D. Pa. Mar. 31, 2023). Nothing of the sort is alleged here.

[11] *See also* Ex. A at Ex. 99.1 at 4 (¶ 104); Ex. C (¶ 118); Ex. H at Ex. 99.1 (¶ 149); Ex. I at Ex. 99.1 (¶ 163).

16

located in other filings, such as its Form 10-K.  For instance, in its year-end financial filings, Capri specifically warned in a detailed "Summary of Risks Affecting Our Business[,]" that "the lawsuit by the U.S. FTC attempting to block the pending Merger, and an unfavorable judgment or ruling in any such lawsuit[] could prevent or delay the consummation of the Merger. . . ."  Ex. J at 5. Noticeably absent from any filing was *any guarantee* of a favorable outcome.  In fact, Capri explicitly cautioned that it "cannot predict with certainty whether and when U.S. regulatory approval will be obtained, and the Court in the FTC Lawsuit may decide to issue an injunction that prevents the Merger from being consummated."  *Id*. at 19.[12]

Plaintiffs cannot claim that Capri had a duty to disclose or caution anything more to obtain the protection of the safe harbor, particularly while the FTC's regulatory challenge was pending. When a company "disclos[es] its involvement in . . . legal proceedings," and explains that those proceedings can lead to adverse consequences, it "complie[s] with its disclosure obligations."  *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  In the context of investigations into wrongdoing, a company is not required to confess to any potential bad facts when disclosing the existence of an investigation.  *See In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *10-11 (D.N.J. Nov. 12, 2019).  The Third Circuit has held the same, finding that a company's disclosure of an FTC investigation was "more than sufficient to put potential investors . . . on notice" that alleged misconduct could "subject the company to [FTC] antitrust action."  *Ieradi* v. *Mylan Labs, Inc.*, 230 F.3d 594, 599 (3d Cir. 2000).  Similar reasoning applies here:  Despite Plaintiffs' claims to the contrary (¶ 107) Capri was not required to undermine

---

[12] As noted above, each of the Forms 8-K containing the allegedly misleading statements incorporated the risk factors identified in the Company's other SEC filings, including its 8-Ks, 10-Ks and 10-Qs, providing additional protection under the safe harbor.  *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005) (cautionary statements need not be in the same document as the forward-looking statements at issue); *see also* App. A.

17

its position by proactively identifying specific vulnerabilities in its legal position or evidence that might ultimately support the FTC's case. *See Amarin*, 750 F. Supp. 3d at 473 (knowledge of vulnerabilities to challenged patents was not a "risk [d]efendants were required to disclose to the investing public").

Nothing more is needed to dismiss this suit: The challenged statements are forward-looking and accompanied by meaningful cautionary language. This would suffice even if Plaintiffs had pled actual knowledge of falsity, which they have not (*infra* pp. 22-23, Section II.). As the Third Circuit has held, actual knowledge of a forward-looking statement's falsity is legally "irrelevant" to the safe harbor analysis when it is accompanied by meaningful cautionary disclosures, as here. *Cooper Tire & Rubber*, 834 F.3d at 502.[13]  Moreover, the failure to plead actual knowledge of falsity is a separate basis for dismissal under the safe harbor. 15 U.S.C. § 78u-5(c)(1)(B).

### B.    All of the Alleged Misstatements Are Inactionable Opinions.

The statements are also inactionable opinions. *See Omnicare, Inc*. v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). As the Third Circuit has made clear, opinion statements are only actionable when they are "not honestly believed and lack a reasonable basis." *Pfizer*, 754 F.3d at 170. The Complaint does not plead with particularity any facts that show Capri Defendants' beliefs were insincere or lacking a reasonable basis, meaning they cannot support a securities fraud claim. *See In re Focus Fin. Partners Sec. Litig.*, 2025 WL 961488, at *4-5 (D. Del. Mar. 31, 2025) ("Nowhere. . . do [p]laintiffs allege that [d]efendants' belief in the strength of [their] offer was insincerely-held.").

 The Timeline Statements projecting the "anticipated time table for closing the deal" were

---

[13] And, because Capri's statements are sufficient in describing the risks, the "bespeaks caution" doctrine renders them immaterial as a matter of law and is another basis for dismissal. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993).

plainly opinions. *Rite Aid*, 331 F. Supp. 3d at 426; *see also Elliott Assocs., L.P.* v. *Covance, Inc.*, 2000 WL 1752848, at *2, *9 (S.D.N.Y. Nov. 28, 2000) (rejecting securities fraud claim based on failed merger where "remain[ing] on track to close" statements were "merely opinions" about the future); *In re Focus*, 2025 WL 961488, at *6 ("'[B]elief' about the likelihood of a transaction . . . is an *Omnicare* opinion statement."). Indeed, even when plaintiffs allege that defendants "knew of the FTC's" concerns, courts have deemed statements about merger timelines to be inactionable opinions. *Rite Aid*, 331 F. Supp. 3d at 426-27. This makes sense, especially "[g]iven the usual level of uncertainty as to whether any proposed merger will actually be completed." *Covance*, 2000 WL 1752848, at *9.

Similarly, the Litigation Statements are opinions about the handbag market, which Capri believed had characteristics that undermined the viability of the FTC's legal claims. Capri stated that it "strongly disagree[d]" with the FTC's decision to file suit and that the FTC ignored "market realties" that demonstrated the "transaction [would] not limit, reduce, or constrain competition." ¶¶ 149, 163 (emphasis omitted). These assertions are clearly opinions about the relevant legal analysis under Section 7 of the Clayton Act. *Id.* (noting fragmented nature of handbag segment, hundreds of handbag choices for consumers, and low barriers to entry). Indeed, analysts made similar comments, *supra* at pp. 9-12, and the FTC acknowledged the same. SDNY Op. at 69 (referring to over 200 handbag brands in the FTC's "candidate accessible-luxury-handbags market"); *see also* Closing Argument, *FTC* v. *Tapestry*, D.I. 347 at 1495 ("We don't dispute . . . there's competition among lots of brands even brands outside the accessible luxury market."). When a statement expresses an "inherently subjective . . . assessment[]," that is enough to render it one "of pure opinion." *Omnicare*, 575 U.S. at 186. And as other courts have explained, forecasting the outcome of a litigation involving complex analysis is extraordinarily difficult. *In*

19

*re Evolus, Inc. Sec. Litig.*, 2024 WL 4306786, at *31 (S.D.N.Y. Sept. 26, 2024).  In *In re Evolus*, the court declined to credit arguments that the defendant had "no reasonable basis to believe" it would succeed in litigation before the International Trade Commission (ITC), reasoning that the issues decided by the ITC were "extremely complex," "scientific in nature," and "involved matters about which reasonable minds could differ." *Id.* at *13, *16, *18-20 (underlying litigation turned on complex analysis of competing expert testimony and voluminous confidential records).  As such, the statements at issue in *Evolus* concerning litigation prospects were inactionable opinions, just as here.  *Id.* at *20 (statements such as "We believe in the merits of our case" and "[W]e are not really worried about the outcome here" are inactionable opinions).

The issues in antitrust litigation (*e.g.*, defining a relevant antitrust market) are similarly complex and depend on technical econometric analysis, about which "reasonable experts may differ"—and did differ here.  *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014) (citation omitted).  Indeed, "[t]here is no subject in antitrust law more confusing than market definition," which is "deliberately an attempt to oversimplify . . . very complex economic interactions."  *U.S. Healthcare, Inc.* v. *Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993) (citing *United States* v. *E.I. du Pont De Nemours & Co.*, 351 U.S. 377 (1956)).  Statistical models used in antitrust litigation rely on complex "judgment and art as well as the reasoned manipulation of numbers" that are not "the real world," *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *8, yet are a major factor in the "gray area" of product market definition, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 996 (C.D. Cal. 2012).

At issue here was whether the court, applying *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 325 (1962), would accept the FTC's proposed "accessible luxury handbag market."  Judge Rochon recognized the complexities of establishing a relevant "accessible luxury" market

20

definition, dedicating 43 pages to weighing qualitative factors and an additional 23 pages to discussing expert analysis. SDNY Op. at 21-64; 64-87; *see also id*. at 87-94 (counterbalancing the anticompetitive effects). Capri had its own views on these complex subjects, based, among other things, on the Parties' economic analyses and expert witnesses, and thus its statements about "market realities" are directly analogous to those found inactionable in *In re Evolus*.

Courts routinely treat advocacy regarding the merits of pending litigation as inactionable opinions because they concern defendants' "belief[s] about the strength" of their legal claims. *Amarin*, 750 F. Supp. 3d at 461-62.[14] In *Amarin*, the court found inactionable statements that "Amarin was 'vigorously' litigating its claims," "that[] [its] arguments were 'persuasive,'" and that Amarin had "a reasonable shot at winning," because the statements "put forward Amarin's belief about the strength of their patents, rather than asserting positive knowledge of what the outcome of the litigation would be." *Id*. at 462. Capri's litigation advocacy statements similarly put forward its belief about the strength of its arguments, without ever guaranteeing an outcome.

Capri had many reasonable bases for believing it would prevail—the market definition, the proliferation of alternative brands, the relevance of low barriers to entry, and potential offsetting procompetitive effects were all factors that the court would consider and on which reasonable minds could and did differ. Furthermore, at no point prior to Judge Rochon's ruling was Capri alone in its view that the handbag market was fragmented and that the transaction was not anticompetitive, supporting the reasonableness of such an opinion. *See, e.g.*, *supra* at pp. 9-12. The fact that the court ultimately reached a different market definition than that proposed by Capri does not render its advocacy fraudulent. *Amarin*, 750 F. Supp. 3d at 482-83 (rejecting arguments

---

[14] *Accord, e.g.*, *Match Grp.*, 529 F. Supp. 3d at 594 (dismissing claims based on statements that "the FTC's legal claims . . . were 'without merit'" as "aspirational opinions regarding the success of the litigation and not statements of fact").

that defendants should have weighed the evidence differently from the outset).  Indeed, courts routinely dismiss fraud claims premised on the fact that a regulator ultimately disagreed with an issuer's subjective interpretations of data or evidence.  *See, e.g.*, *Pfizer*, 754 F.3d at 170 (finding subjective interpretations of complex clinical data inactionable opinions); *In re Adolor Sec. Litig.*, 616 F. Supp. 2d 551, 567 (E.D. Pa. 2009) (dismissing securities fraud claim based on defendants' interpretation of study results); *Gillis* v. *QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 598 (S.D.N.Y. 2016) ("That [regulatory agencies] ultimately disagreed with defendants' interpretation of the data does not render their subjective assessments false or misleading."); *Tongue* v. *Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) ("At bottom, [p]laintiffs' allegations regarding [d]efendants' stated opinion about the [clinical] trial results are little more than a dispute about the proper interpretation of data . . . which this [c]ourt rejected as a basis for liability.").

Nor can Plaintiffs show that Capri's opinion statements were insincerely-held.  Although Plaintiffs attempt to allege that Capri's predictions about closing were inconsistent with the information it actually possessed, those allegations are entirely speculative and conclusory. Plaintiffs baldly claim that Capri knew its position was ill-founded because the FTC staff "certainly raised serious concerns and issues directly to Defendants throughout the antitrust process," (¶ 127), but that is mere speculation.  Plaintiffs make no specific allegations about what information was supposedly provided, let alone that it was information sufficient to undermine the Capri Defendants' belief in their litigation position.  Such conclusory assertions cannot support a securities fraud claim.

Plaintiffs try to cure their deficient pleadings with snippets from cherry-picked documents from the FTC Litigation, some of which contain the term "accessible luxury," or refer to Coach as

22

Michael Kors' "key or top" competitor. *See, e.g.*, ¶¶ 38-39, 55-56.[15]   However, to undermine Capri's litigation opinions, Plaintiffs must "point to a contradiction between the company's internal and public statements." *Amarin*, 750 F. Supp. 3d at 464-65.   Plaintiffs plead no facts supporting such a contradiction, only conjecture.   Capri's public position (that the availability of hundreds of alternative brands had more legal significance than evidence of head-to-head competition between the Parties (SDNY Op. at 21, 162-63)) was not inconsistent with the internal documents plaintiffs cite.   To the contrary, as set forth above, Capri made no secret of the concept of accessible luxury, which it had referred to for years in its filings.   *Supra* at pp. 9-12.   On top of that, its competitive positioning was well known to the market, because analysts and popular press discussed it.   *Id*.   Equally important, all the analysts cited by Plaintiffs acknowledged these circumstances while believing that the transaction should succeed.   *Id*.   Thus, Plaintiffs fail to show that Capri's opinion statements are actionable.

### C.    Capri Defendants Are Not Liable for Tapestry Statements.

Plaintiffs also allege that Capri Defendants are liable for statements attributed to Tapestry, and its executives.   ¶¶ 26, 100.   That claim fails under *Janus*, which held that only the "maker" of a statement can face Section 10(b) liability.   *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564

---

[15] While ultimately irrelevant to this motion, Plaintiffs frequently pluck evidence from the FTC Litigation record while ignoring countervailing evidence on which the Parties relied.   Still, even Plaintiffs' cherry-picked documents show that the Capri Defendants believed that Capri competed broadly.   For instance, Plaintiffs highlight two FY24 Q1 board decks to show Capri's embrace of the term "accessible luxury," but both documents show Capri believed it faced fierce competition beyond that segment.   *See, e.g.*, Ex. AA at 7 (PX-2436; ¶ 56) (noting as a risk factor "increased competitive activity" from "luxury competition"); Ex. BB at 6 (DX-885; ¶¶ 59-60) (noting "intensified competition" and "[a]ccessible luxury squeezed from the top and bottom" as threats to the business).   Similarly, in attempting to show Capri executives focused only on Coach, Kate Spade, and Tory Burch, Ex. CC at 2-3 (PX-2395; ¶ 181), Plaintiffs omit pages from the same document showing Michael Kors grouped in the same category as so-called luxury brands like Gucci, Louis Vuitton, and Dior.   The federal securities laws are not a vehicle for trials about trials.

U.S. 135, 142 (2011) ("[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). Plaintiffs rely on a provision in the Merger Agreement requiring the Parties to provide written consent for the publication of the other's merger-related disclosures. Ex. A at Ex. 2.1 at 51. But that provision standing alone does not show that Capri (the target here) possessed "ultimate authority" over what Tapestry actually disclosed, especially disclosures made in unscripted settings, which many of the Tapestry statements are. Moreover, those statements are all inactionable for the reasons set forth in the Tapestry Defendants' Brief, which the Capri Defendants join.

## II.    PLAINTIFFS FAIL TO PLEAD SCIENTER.

To state a claim under Section 10(b), Plaintiffs must meet the high bar of pleading scienter, which includes pleading facts with particularity that give rise to a "strong" inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[M]erely 'reasonable' or 'permissible'" inferences do not suffice. *Id.* For these reasons, "[i]n few other areas are motions to dismiss . . . so powerful." *Ronconi* v. *Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

The Third Circuit has described the requisite state of mind as one "embracing [an] intent to deceive, manipulate, or defraud, either knowingly or recklessly." *In re Hertz Glob. Holdings*, 905 F.3d 106, 114 (3d Cir. 2018) (quoting *Institutional Invs. Grp.* v. *Avaya, Inc.*, 564 F.3d 243, 252 (3d Cir. 2009)). Under this standard, conduct is reckless only when it constitutes "an extreme departure from the standards of ordinary care [and] presents a danger of misleading buyers or sellers that is either known to defendant or is *so obvious that the actor must have been aware of it*." *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004) (emphasis added) (citation omitted). Plaintiffs' Complaint fails to meet this demanding test.

Plaintiffs' theory of scienter asserts that Capri entered into a transaction that it knew would

24

be blocked (¶¶ 84-88, 113, 174-177, 185), relying on the same cherry-picked documents they use to unsuccessfully claim that Capri Defendants' opinions had no reasonable basis.  *Supra* at pp. 22-23.  Plaintiffs' theory is based on the following illogical inferences:  (1) Capri Defendants "knew or recklessly disregarded" the fact that the FTC's review of their internal documents regarding the supposed "truth" about the transaction's anticompetitive effects would "***almost certainly*** lead to the end of the Capri Acquisition," ¶ 113; (2) despite this virtual certainty, the Capri Defendants provided the FTC with "materials which [they knew] detailed the anticompetitive purpose" of the transaction, and would be soon revealed, ¶ 124; and (3) the Capri Defendants sought to conceal that Michael Kors "secretly" competed with Kate Spade and Coach in the "accessible luxury" handbag market, even while knowing all would be revealed at trial.  ¶¶ 84, 172, 177.  In addition to the fact that the information Plaintiffs claim Capri Defendants concealed was well known, Plaintiffs fail to explain why Capri Defendants would have engaged in this doomed short-term scheme that could not economically benefit them.

Numerous cases make clear that Plaintiffs' storyline does not support a cogent and compelling inference of fraud.  "Courts often refuse to infer scienter . . . when confronted with illogical allegations"—especially those asserting that defendants acted against their own economic self-interests.  *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006).  The far more logical inference is that Capri entered and defended the transaction because it believed it could and should obtain approval, under the relevant legal framework and based on the complete evidentiary record.  Plaintiffs cannot explain why Capri would enter a transaction it knew was destined to failure.  *Arbitrage Event-Driven Fund* v. *Tribune Media Co.* is instructive.  There, the court held that access to knowledge of regulatory concerns was insufficient to plead scienter.  2020 WL 60186, at *10 (N.D. Ill. Jan. 6, 2020).  The court credited the company's participation

in the regulatory process as evidence that "cut[] against the inference of scienter and weigh[ed] in favor of their good faith belief that the merger would be approved." *Id.* at *11. On appeal, the Seventh Circuit affirmed dismissal, holding that "no [defendant] had anything to gain by [the deal's] failure, which would diminish [the stock price] as surely as it would injure outside investors." *Water Island Event-Driven Fund, LLC* v. *Tribune Media Co.*, 39 F.4th 402, 407 (7th Cir. 2022). That reasoning readily applies here. Furthermore, the absence of any confidential witness support—that is, the absence of anyone at Capri claiming the company acted other than in good faith—also cuts against an inference of scienter. *Roofer's Pension Fund* v. *Papa*, 2018 WL 3601229, at *19 (D.N.J. July 27, 2018).

The far more compelling inference is that Capri "sincerely held [its] optimistic views" and believed it would prevail. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 544-46 (S.D.N.Y. 2015), *aff'd sub nom. Sanofi*, 816 F.3d at 199 (finding scienter not adequately pleaded where FDA ultimately disagreed with company's view). Throughout, Capri conveyed its litigation position openly and consistently, making clear that in spite of the Parties' size, depth of experience in "accessible luxury," and history of competition, the Capri Defendants sincerely believed that Judge Rochon would find that the breadth of the handbag market, low barriers to entry, and pro-competitive factors defeated the FTC's construct. SDNY Op. at 107-47 (analyzing the Parties' rebuttal case). Capri ultimately lost, but that does not make its litigation advocacy unreasonable, much less support the required "strong" inference of scienter, especially considering the complexity of the issues involved. "Indeed, if [Capri Defendants] thought there was a substantial likelihood that the [Capri-Tapestry] merger would not go through, what would be its motive to press forward on the transaction?" *Emps. Ret. Sys. of R.I.* v. *Williams Cos., Inc.*, 889 F.3d 1153, 1173 (10th Cir. 2013); *see also QRX Pharma Ltd.*, 197 F. Supp. 3d at 600 ("[T]he facts pled do

not reveal any incentive to inflate QRX's stock price by pretending, during the period of FDA review, that approval . . . was likely.").

Plaintiffs cannot cure their deficient scienter allegations with motive allegations, because it is well established that motive allegations alone cannot independently establish scienter in the Third Circuit. *Avaya, Inc.*, 564 F.3d at 277; *Gold* v. *Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014). More to the point, Plaintiffs plead no rational motive to explain why Capri Defendants would mislead their shareholders into voting for a transaction they believed would fail. They do not assert *any* scenario in which the Capri Defendants would benefit from the alleged fraud (*e.g.*, no disproportionate or personal benefit obtained by Capri Defendants in the event that the transaction failed to close). Nor do they plead allegations of insider trading by the Individual Capri Defendants, a fact that "consistently" weighs "against an inference of scienter." *Lewakowski* v. *Aquestive Therapeutics, Inc.*, 2023 WL 2496504, at *12 (D.N.J. Mar. 14, 2023).

The motive Plaintiffs do plead—that the Parties "were motivated to negotiate and enter into the Capri Acquisition to reduce competition in the 'accessible luxury' handbag market" (¶ 177)—makes no sense as to Capri, as the target in an all-cash merger. There is no allegation that Defendants Idol or Edwards had any expectation of a go-forward role in the merged entity. Even so, motives that are "generally possessed by most corporate directors and officers" cannot create a strong inference of scienter. *Washington*, 368 F.3d at 237 (citation omitted); *see also Herzog* v. *GT Interactive Software Corp.*, 1999 WL 1072500, at *9 (S.D.N.Y. Nov. 29, 1999) (holding a desire to consummate a transaction cannot constitute a motive for securities fraud).[16] Nor can Plaintiffs simply point to the position or roles of Defendants Idol or Edwards as a basis

---

[16] Plaintiffs also plead nothing to support the notion that the Capri Defendants had any knowledge of Tapestry's internal documents or motivations. In any event, Plaintiffs' scienter allegations tied to the Tapestry Defendants also fail for the reasons stated in Tapestry's motion.

27

for scienter. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) (rejecting assertions of knowledge based on defendants' positions within the company).

Plaintiffs tack on additional allegations related to (1) the removal of the term "accessible luxury" from Capri's SEC filings and (2) an alleged "concerted effort[]" to provide dishonest testimony to Judge Rochon. ¶ 185. Neither can support an inference that is strong, "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Globus Med. Inc.*, 869 F.3d at 245. Most pertinently, the Capri Defendants never denied using the phrase "accessible luxury;" rather, they disputed the phrase accurately captured the prevailing competitive landscape for handbags. SDNY Op. at 21. Courts have rejected efforts to read nefarious intent into decisions to amend public filings. *Hampton* v. *root9B Techs., Inc.*, 897 F.3d 1291, 1300-01 (10th Cir. 2018) (rejecting argument that the company made misstatements when it removed language in response to unfavorable press coverage). The Capri Defendants' actions here should be similarly read as an effort to clarify misconceptions in light of the FTC's belief that the term "accessible luxury" described a distinct ***antitrust*** market—after all, there was nothing secret about Capri's go-forward changes to its public filings; its earlier filings remained available for all investors to consider.

Plaintiffs' allegations about Judge Rochon's credibility findings likewise miss the point. Judge Rochon's decision took issue with Capri Defendants' explanations for some of the documents, but that does not render Capri's litigation position fraudulent. When judges engage in antitrust analysis, they impose "nuances and . . . antitrust policy goals" in the process. *Healthsource Inc.*, 986 F.2d at 598. Judge Rochon never found Capri's litigation position unreasonable or in bad faith, but rather defined the relevant antitrust market differently than the Capri Defendants did. In the end, she credited "all counsel in [the] case" for "an excellent job in presenting their materials and representing their clients," a far cry from charging Defendants with

28

an attempt to win the case based on false testimony.  Preliminary Injunction Hearing Transcript at 1400:18-1401:3, *FTC* v. *Tapestry*.

### III.     PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION.

To support its loss causation theory, Plaintiffs string together five purported "corrective disclosures" related to the FTC's investigation and lawsuit against Capri, media reports related to the FTC's enforcement activity, and Judge Rochon's ultimate decision to side with the FTC and preliminarily enjoin the transaction.  ¶ 191.  But all are materializations of publicly known risks, meaning they cannot support loss causation.  *Monroe Cnty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014) ("[M]aterialization of a known risk, rather than the disclosure of a concealed one," cannot establish loss causation.).  Plaintiffs, just like the rest of the public, were well aware of the risk of regulatory enforcement because Capri repeatedly disclosed it.  *Supra* at pp. 6-9.  In fact, Plaintiffs themselves concede that "70-80% of proposed mergers that receive a Second Request end in an enforcement action," which undoubtedly put them on notice of any heightened scrutiny.  ¶ 118.

The October 24, 2024 drop in stock price, which also happens to be the largest, is the most salient example of this pleading defect.  There is no question that investors knew there was a risk the deal could be blocked once the FTC filed suit.  Indeed, Plaintiffs highlight the FTC's closing argument as containing proof of the alleged falsity of Defendants' statements.  *See supra* at p. 6. Still, the stock did not drop during trial, but rather later when, after hard-fought litigation, the FTC prevailed.  *Fort Worth Emp'rs' Ret. Fund* v. *Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (price decline caused by FDA denial of approval, not by any disclosure of some prior untruth).  Nor did the SDNY Decision "correct" any prior misstatements; it was simply the point at which the market learned about *Judge Rochon's reaction* to information to which the market already had access.  To illustrate the point, the court's opinion could have been a minute order

announcing the preliminary injunction, with no discussion of any testimony or documents, and the market would almost certainly have reacted just the same. By the same token, if Judge Rochon had issued an opinion with substantially similar market findings but concluded that the deal nevertheless did not warrant a preliminary injunction (*e.g.*, due to low barriers of entry), the stock price would have likely soared toward the merger price. This dynamic is fatal to any contention that the value of Capri's securities declined due to the alleged misrepresentations.

## IV.    PLAINTIFFS' SECTION 20(a) CLAIM FAILS.

Because Plaintiffs fail to state any primary violation of Section 10(b), they have "failed to adequately plead a predicate Section 10(b) violation [and] their Section 20(a) claim must be dismissed." *Pfizer*, 754 F.3d at 177.

## CONCLUSION

Capri Defendants respectfully request that the claims against them be dismissed with prejudice.

Respectfully submitted,

|                                                          | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP** |
|----------------------------------------------------------|------------------------------------------|
| OF COUNSEL:                                              |                                          |
| **WACHTELL, LIPTON, ROSEN & KATZ**                      | /s/ John P. DiTomo                       |
|                                                          | William M. Lafferty (#2755)              |
| Jonathan M. Moses (*pro hac vice*)                      | John P. DiTomo (#4850)                   |
| Elaine P. Golin (*pro hac vice*)                        | Jacob M. Perrone (#7250)                 |
| Adam L. Goodman (*pro hac vice*)                        | 1201 N. Market Street, 16th Floor        |
| Beatrice R. Pollard (*pro hac vice*)                    | Wilmington, DE  19801                    |
| 51 West 52nd Street                                      | Telephone: (302) 351-9231                |
| New York, NY  10019                                      | wlafferty@morrisnichols.com              |
| Telephone: (212) 403-1388                                | jditomo@morrisnichols.com                |
| EPGolin@wlrk.com                                         | jperrone@morrisnichols.com               |
| JMMoses@wlrk.com                                         |                                          |
| ALGoodman@wlrk.com                                       | *Counsel for Defendants Capri Holdings*  |
| BRPollard@wlrk.com                                       | *Limited, John D. Idol, and Thomas J.*   |
|                                                          | *Edwards, Jr.*                           |

Dated:  July 14, 2025

31