# Exhibit 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

_____

**FORM 10-K**

_____

☑   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended July 1, 2023**
**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 1-16153**

_____

# Tapestry, Inc.

(Exact name of registrant as specified in its charter)

_____

| **Maryland** | **52-2242751** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**10 Hudson Yards, New York, NY 10001**

(Address of principal executive offices); (Zip Code)
**(212) 946-8400**
(Registrant's telephone number, including area code)

_____

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on which Registered |
|---|---|---|
| Common Stock, par value $.01 per share | TPR | New York Stock Exchange |

**Securities Registered Pursuant to Section 12(g) of the Act: None**

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☑ | Accelerated filer | ☐ | Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
|---|---|---|---|---|---|---|---|
| Emerging growth company | ☐ | | | | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell Company (as defined in Rule 12b-2 of the Act).Yes ☐ No ☑

The aggregate market value of Tapestry, Inc. common stock held by non-affiliates as of December 30, 2022 (the last business day of the most recently completed second fiscal quarter) was approximately $9.0 billion. For purposes of determining this amount only, the registrant has excluded shares of common stock held by directors and executive officers. Exclusion of shares held by any person should not be construed to indicate that such person possesses the power, direct or indirect, to cause the direction of the management or policies of the registrant, or that such person is controlled by or under common control with the registrant.

On August 4, 2023, the Registrant had 227,439,225 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

| Documents | Form 10-K Reference |
|---|---|
| Proxy Statement for the 2023 Annual Meeting of Stockholders | Part III, Items 10 - 14 |

**TAPESTRY, INC.**

**TABLE OF CONTENTS**

|  |  | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 16 |
| Item 1B. | Unresolved Staff Comments | 30 |
| Item 2. | Properties | 30 |
| Item 3. | Legal Proceedings | 30 |
| Item 4. | Mine Safety Disclosures | 30 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 31 |
| Item 6. | Reserved | 32 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 49 |
| Item 8. | Financial Statements and Supplementary Data | 50 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 50 |
| Item 9A. | Controls and Procedures | 50 |
| Item 9B. | Other Information | 51 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 51 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 52 |
| Item 11. | Executive Compensation | 52 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 52 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 52 |
| Item 14. | Principal Accounting Fees and Services | 52 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 53 |
| Item 16. | Form 10-K Summary | 57 |
| Signatures | | 58 |

i

**SPECIAL NOTE ON FORWARD-LOOKING INFORMATION**

This document, and the documents incorporated by reference in this document, our press releases and oral statements made from time to time by us or on our behalf, may contain certain "forward-looking statements" within the meaning of the federal securities laws, including Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and are based on management's current expectations, that involve risks and uncertainties that could cause our actual results to differ materially from our current expectations. In this context, forward-looking statements often address expected future business and financial performance and financial condition, and often contain words such as "may," "can," "continue," "project," "should," "expect," "confidence," "goals," "trends," "anticipate," "intend," "estimate," "on track," "future," "well positioned to," "plan," "potential," "position," "believe," "seek," "see," "will," "would," "target," similar expressions, and variations or negatives of these words. Forward-looking statements by their nature address matters that are, to different degrees, uncertain. Such statements involve risks, uncertainties and assumptions. If such risks or uncertainties materialize or such assumptions prove incorrect, the results of Tapestry, Inc. and its consolidated subsidiaries could differ materially from those expressed or implied by such forward-looking statements and assumptions. All statements other than statements of historical fact are statements that could be deemed forward-looking statements. Tapestry, Inc. assumes no obligation to revise or update any such forward-looking statements for any reason, except as required by law.

Tapestry, Inc.'s actual results could differ materially from the results contemplated by these forward-looking statements and are subject to a number of risks, uncertainties, estimates and assumptions that may cause actual results to differ materially from current expectations due to a number of factors, including those discussed in the sections of this Form 10-K filing entitled "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations." These factors include, but are not limited to: (i) the impact of economic conditions, recession and inflationary measures; (ii) the impact of the coronavirus ("Covid-19") pandemic; (iii) our exposure to international risks, including currency fluctuations and changes in economic or political conditions in the markets where we sell or source our products; (iv) our ability to retain the value of our brands and to respond to changing fashion and retail trends in a timely manner, including our ability to execute on our e-commerce and digital strategies; (v) our ability to successfully implement the initiatives under our 2025 growth strategy; (vi) the effect of existing and new competition in the marketplace; (vii) our ability to control costs; (viii) the effect of seasonal and quarterly fluctuations on our sales or operating results; (ix) the risk of cyber security threats and privacy or data security breaches; (x) our ability to protect against infringement of our trademarks and other proprietary rights; (xi) the impact of tax and other legislation; (xii) the risks associated with potential changes to international trade agreements and the imposition of additional duties on importing our products; (xiii) our ability to achieve intended benefits, cost savings and synergies from acquisitions, including our proposed acquisition of Capri Holdings Limited ("Capri"); (xiv) risks related to the availability of funding for our bridge loan facility associated with our proposed acquisition of Capri; (xv) the impact of pending and potential future legal proceedings; and (xvi) the risks associated with climate change and other corporate responsibility issues. These factors are not necessarily all of the factors that could cause actual results to differ materially from those expressed in any of our forward-looking statements.

*In this Form 10-K, references to "we," "our," "us," "Tapestry" and the "Company" refer to Tapestry, Inc., including consolidated subsidiaries as of July 1, 2023 ("fiscal 2023"). References to "Coach," "Kate Spade," "kate spade new york" or "Stuart Weitzman" refer only to the referenced brand. Fiscal 2023 was a 52-week period, July 2, 2022 ("fiscal 2022") was a 52-week period, and July 3, 2021 ("fiscal 2021") was a 53-week period.*

**PART I**

### ITEM 1. BUSINESS

Founded in 1941, Coach, Inc., the predecessor to Tapestry, Inc. (the "Company"), was incorporated in the state of Maryland in 2000. During fiscal 2015, the Company acquired Stuart Weitzman Holdings LLC, a luxury women's footwear company. During fiscal 2018, the Company acquired Kate Spade & Company, a lifestyle accessories and ready-to-wear company. Later in fiscal 2018, the Company changed its name to Tapestry, Inc.

Tapestry, Inc. (the "Company") is a leading New York-based house of iconic accessories and lifestyle brands. Our global house of brands unites the magic of Coach, kate spade new york and Stuart Weitzman. Each of our brands are unique and independent, while sharing a commitment to innovation and authenticity defined by distinctive products and differentiated customer experiences across channels and geographies. We use our collective strengths to move our customers and empower our communities, to make the fashion industry more sustainable, and to build a company that's equitable, inclusive, and diverse. Individually, our brands are iconic. Together, we can stretch what's possible.

### OUR STRATEGY

Building on the success of the strategic growth plan from fiscal 2020 through fiscal 2022 (the "Acceleration Program"), in the first quarter of fiscal 2023, the Company introduced the 2025 growth strategy ("*future*speed"), designed to amplify and extend the competitive advantages of its brands, with a focus on four strategic priorities:

- Building Lasting Customer Relationships: The Company aims to leverage Tapestry's transformed business model to drive customer lifetime value through a combination of increased customer acquisition, retention and reactivation.

- Fueling Fashion Innovation & Product Excellence: The Company aims to drive sustained growth in core handbags and small leathergoods, while accelerating gains in footwear and lifestyle products.

- Delivering Compelling Omni-Channel Experiences: The Company aims to extend its omni-channel leadership to meet the customer wherever they shop, delivering growth online and in stores.

- Powering Global Growth: The Company aims to support balanced growth across regions, prioritizing North America and China, its largest markets, while capitalizing on opportunities in under-penetrated geographies such as Southeast Asia and Europe.

#### *Covid-19 Impact*

The Covid-19 pandemic has resulted in varying degrees of business disruption for the Company since it began in fiscal 2020 and has impacted all regions around the world, resulting in restrictions and shutdowns implemented by national, state, and local authorities. Such disruptions continued during the first half of fiscal 2023, and the Company's results in Greater China (mainland China, Hong Kong SAR, Macao SAR, and Taiwan) were adversely impacted as a result of the Covid-19 pandemic. Starting in December 2022, certain government restrictions were lifted in the region and business trends have improved. The Company continues to monitor the latest developments regarding the Covid-19 pandemic and potential impacts on our business, operating results and outlook.

### OUR BRANDS

The Company has three reportable segments:

- *Coach* - Includes global sales primarily of Coach brand products to customers through Coach operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers and through independent third-party distributors. This segment represented 74.5% of total net sales in fiscal 2023.

- *Kate Spade* - Includes global sales primarily of kate spade new york brand products to customers through Kate Spade operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers and through independent third-party distributors. This segment represented 21.3% of total net sales in fiscal 2023.

- *Stuart Weitzman* - Includes global sales of Stuart Weitzman brand products primarily through Stuart Weitzman operated stores, sales to wholesale customers, through e-commerce sites and through independent third-party distributors. This segment represented 4.2% of total net sales in fiscal 2023.

Corporate, which is not a reportable segment, represents certain costs that are not directly attributable to a brand. These costs primarily include administrative and information systems expense.

**Coach**

Coach is a global fashion house of accessories and lifestyle collections, founded in New York in 1941. Inspired by the vision of Expressive Luxury and the inclusive and courageous spirit of its hometown, the brand makes beautiful things, crafted to last - for you to be yourself in. Coach has built a legacy of craft and a community that champions the courage to be real.

*Stores* - Coach operates freestanding retail stores, including flagships, and outlet stores as well as concession shop-in-shop locations. These stores are located in regional shopping centers, metropolitan areas throughout the world and established outlet centers.

Retail stores carry an assortment of products depending on their size, location and customer preferences. Coach operates a limited number of flagship stores that offer the fullest expression of the Coach brand and are located in tourist-heavy, densely populated cities globally. Coach outlet stores serve as an efficient means to sell manufactured-for-outlet product and discontinued retail inventory outside the retail channel. The outlet store design, visual presentations and customer service levels support and reinforce the brand's image. Through these outlet stores, we target value-oriented customers in established outlet centers that are close to major markets.

3

The following table shows the number of Coach directly operated locations and their total and average square footage:

| | Coach | | |
| | North America | International | Total |
|---|---|---|---|
| **Store Count** | | | |
| **Fiscal 2023** | **330** | **609** | **939** |
| **Net change vs. prior year** | **(13)** | **7** | **(6)** |
| **% change vs. prior year** | **(3.8)%** | **1.2 %** | **(0.6)%** |
| | | | |
| Fiscal 2022 | 343 | 602 | 945 |
| Net change vs. prior year | (11) | 17 | 6 |
| % change vs. prior year | (3.1) % | 2.9 % | 0.6 % |
| | | | |
| Fiscal 2021 | 354 | 585 | 939 |
| Net change vs. prior year | (21) | 2 | (19) |
| % change vs. prior year | (5.6) % | 0.3 % | (2.0) % |
| | | | |
| **Square Footage** | | | |
| **Fiscal 2023** | **1,618,310** | **1,396,898** | **3,015,208** |
| **Net change vs. prior year** | **(41,503)** | **37,917** | **(3,586)** |
| **% change vs. prior year** | **(2.5)%** | **2.8 %** | **(0.1)%** |
| | | | |
| Fiscal 2022 | 1,659,813 | 1,358,981 | 3,018,794 |
| Net change vs. prior year | (34,903) | 62,978 | 28,075 |
| % change vs. prior year | (2.1) % | 4.9 % | 0.9 % |
| | | | |
| Fiscal 2021 | 1,694,716 | 1,296,003 | 2,990,719 |
| Net change vs. prior year | (63,952) | 10,674 | (53,278) |
| % change vs. prior year | (3.6) % | 0.8 % | (1.8) % |
| | | | |
| **Average Square Footage** | | | |
| **Fiscal 2023** | **4,904** | **2,294** | **3,211** |
| Fiscal 2022 | 4,839 | 2,257 | 3,194 |
| Fiscal 2021 | 4,787 | 2,215 | 3,185 |

In fiscal 2024, we expect minimal change in overall store count with a reduction in store count primarily in Japan and North America, partially offset by an increase in store count in Greater China.

*Digital* - We view our digital platforms as instruments to deliver Coach products to customers directly, with the benefit of added accessibility, so that consumers can purchase Coach products wherever they choose. For Coach, we have e-commerce sites in the U.S., Canada, Japan, Greater China, several throughout Europe, Australia and several throughout the rest of Asia. Additionally, we continue to leverage various third-party digital platforms to sell our products to customers.

*Wholesale* - We work closely with our wholesale partners to ensure a clear and consistent product presentation. We enhance our presentation with proprietary Coach brand fixtures within the department store environment in select locations. We custom tailor our assortments through wholesale product planning and allocation processes to match the attributes of our department store consumers in each local market. We continue to closely monitor inventories held by our wholesale customers in an effort to optimize inventory levels across wholesale doors. The wholesale business for Coach comprised approximately 10% of total segment net sales for fiscal 2023. As of July 1, 2023 and July 2, 2022, Coach did not have any customers who individually accounted for more than 10% of the segment's total net sales.

**Kate Spade**

Since its launch in 1993 with a collection of six essential handbags, kate spade new york has always been colorful, bold and optimistic. Today, it is a global lifestyle brand that designs extraordinary things for the everyday, delivering seasonal collections of handbags, ready-to-wear, jewelry, footwear, gifts, home décor and more. Known for its rich heritage and unique brand DNA, kate spade new york offers a distinctive point of view, and celebrates communities of women around the globe who live their perfectly imperfect lifestyles.

*Stores* - Kate Spade operates freestanding retail stores, including flagships, and outlet stores as well as concession shop-in-shops. These stores are located in regional shopping centers and metropolitan areas throughout the world as well as established outlet centers.

Kate Spade retail stores carry an assortment of products depending on their size, location and customer preferences. Kate Spade operates a limited number of flagship locations which offer the fullest expression of the Kate Spade brand and are located in key strategic markets including tourist-heavy, densely populated cities globally. Kate Spade outlet stores serve as an efficient means to sell manufactured-for-outlet product and discontinued retail inventory outside the retail channel. Through these outlet stores, we target value-oriented customers in established outlet centers that are close to major markets.

The following table shows the number of Kate Spade directly operated locations and their total and average square footage:

| | Kate Spade | | |
| --- | --- | --- | --- |
| | **North America** | **International** | **Total** |
| **Store Count** | | | |
| **Fiscal 2023** | **205** | **192** | **397** |
| **Net change vs. prior year** | **(2)** | **1** | **(1)** |
| **% change vs. prior year** | **(1.0)%** | **0.5 %** | **(0.3)%** |
| | | | |
| Fiscal 2022 | 207 | 191 | 398 |
| Net change vs. prior year | (3) | (6) | (9) |
| % change vs. prior year | (1.4) % | (3.0) % | (2.2) % |
| | | | |
| Fiscal 2021 | 210 | 197 | 407 |
| Net change vs. prior year | (3) | (10) | (13) |
| % change vs. prior year | (1.4) % | (4.8) % | (3.1) % |
| | | | |
| **Square Footage** | | | |
| **Fiscal 2023** | **589,561** | **277,710** | **867,271** |
| **Net change vs. prior year** | **(3,088)** | **2,423** | **(665)** |
| **% change vs. prior year** | **(0.5)%** | **0.9 %** | **(0.1)%** |
| | | | |
| Fiscal 2022 | 592,649 | 275,287 | 867,936 |
| Net change vs. prior year | (4,537) | (6,692) | (11,229) |
| % change vs. prior year | (0.8) % | (2.4) % | (1.3) % |
| | | | |
| Fiscal 2021 | 597,186 | 281,979 | 879,165 |
| Net change vs. prior year | (6,301) | (9,343) | (15,644) |
| % change vs. prior year | (1.0) % | (3.2) % | (1.7) % |
| | | | |
| **Average Square Footage** | | | |
| **Fiscal 2023** | **2,876** | **1,446** | **2,185** |
| Fiscal 2022 | 2,863 | 1,441 | 2,181 |
| Fiscal 2021 | 2,844 | 1,431 | 2,160 |

In fiscal 2024, we expect minimal change in overall store count with an increase in store count in Greater China, partially offset by a reduction in store count in Japan and North America.

5

*Digital* - We view our digital platforms as instruments to deliver Kate Spade products to customers directly with the benefit of added accessibility as consumers can purchase Kate Spade products wherever they choose. For Kate Spade, we have e-commerce sites in the U.S., Canada, Greater China, Japan and several throughout Europe. Additionally, we continue to leverage various third-party digital platforms to sell our products to customers.

*Wholesale* - The wholesale business for Kate Spade comprised approximately 11% of total segment net sales for fiscal 2023. Kate Spade has developed relationships with a select group of distributors who sell Kate Spade products through travel retail locations and in certain international countries where Kate Spade does not have directly operated retail locations. As of July 1, 2023 and July 2, 2022, Kate Spade did not have any customers who individually accounted for more than 10% of the segment's total net sales.

**Stuart Weitzman**

Founded in 1986, Stuart Weitzman has been inspired by women who are confident, sexy, bold - and, above all, strong. By combining its artisanal Spanish craftsmanship and precisely engineered fit, the New York City based global luxury footwear brand creates shoes that empower women to stand strong.

*Stores* - Stuart Weitzman products are primarily sold in retail and outlet stores. Retail stores carry an assortment of products depending on their size, location and customer preferences. Through outlet stores, we target value-oriented customers in established outlet centers that are close to major markets.

6

The following table shows the number of Stuart Weitzman directly operated locations and their total and average square footage:

| | Stuart Weitzman | | |
| | North America | International | Total |
| --- | ---: | ---: | ---: |
| **Store Count** | | | |
| **Fiscal 2023** | **36** | **57** | **93** |
| Unit change vs. prior year | (3) | (4) | (7) |
| % change vs. prior year | (7.7%) | (6.6%) | (7.0%) |
| | | | |
| Fiscal 2022 | 39 | 61 | 100 |
| Unit change vs. prior year | (9) | 5 | (4) |
| % change vs. prior year | (18.8%) | 8.9% | (3.8%) |
| | | | |
| Fiscal 2021[1] | 48 | 56 | 104 |
| Unit change vs. prior year | (10) | (17) | (27) |
| % change vs. prior year | (17.2%) | (23.3%) | (20.6%) |
| | | | |
| **Square Footage** | | | |
| **Fiscal 2023** | **68,592** | **78,171** | **146,763** |
| Unit change vs. prior year | (6,244) | (5,899) | (12,143) |
| % change vs. prior year | (8.3%) | (7.0%) | (7.6%) |
| | | | |
| Fiscal 2022 | 74,836 | 84,070 | 158,906 |
| Unit change vs. prior year | (13,558) | 3,620 | (9,938) |
| % change vs. prior year | (15.3%) | 4.5% | (5.9%) |
| | | | |
| Fiscal 2021[1] | 88,394 | 80,450 | 168,844 |
| Unit change vs. prior year | (14,390) | (8,732) | (23,122) |
| % change vs. prior year | (14.0%) | (9.8%) | (12.0%) |
| | | | |
| **Average Square Footage** | | | |
| **Fiscal 2023** | **1,905** | **1,371** | **1,578** |
| Fiscal 2022 | 1,919 | 1,378 | 1,589 |
| Fiscal 2021[1] | 1,842 | 1,437 | 1,624 |

_____

[1] During fiscal 2021, we exited certain regions previously operated in to optimize our fleet under the Acceleration Program.

In fiscal 2024, we expect minimal change in overall store count with a modest reduction in store count in North America and a modest increase in store count in Greater China.

*Digital* - We view our digital platform as an instrument to deliver Stuart Weitzman products to customers directly with the benefit of added accessibility as consumers can purchase Stuart Weitzman brand products wherever they choose. For Stuart Weitzman, we have e-commerce sites in the U.S, Canada and Greater China. Additionally, we continue to leverage a third-party digital platform to sell our products to customers.

*Wholesale* - The wholesale business for Stuart Weitzman comprised approximately 34% of total segment net sales for fiscal 2023. We continue to closely monitor inventories held by our wholesale customers in an effort to optimize inventory levels across wholesale doors. Stuart Weitzman has developed relationships with a select group of distributors who sell Stuart Weitzman products through travel retail locations and in certain international countries where Stuart Weitzman does not have directly operated retail locations. As of July 1, 2023 and July 2, 2022, Stuart Weitzman did not have any customers who individually accounted for more than 10% of the segment's total net sales.

Refer to Note 17, "Segment Information," for further information about the Company's segments.

**LICENSING**

Our brands take an active role in the design process and control the marketing and distribution of products in our worldwide licensing relationships. Our key licensing relationships and their fiscal year expirations as of July 1, 2023 are as follows:

| Brand | Category | Partner | Fiscal Year Expiration |
|-------|----------|---------|------------------------|
| Coach | Jewelry and Soft Accessories | Centric | 2024 |
| Coach | Watches | Movado | 2025 |
| Coach | Eyewear | Luxottica | 2026 |
| Coach | Fragrance | Interparfums | 2026 |
| Kate Spade | Tableware and Housewares | Lenox | 2024 |
| Kate Spade | Fashion Bedding | Himatsingka | 2024 |
| Kate Spade | Watches | Fossil | 2025 |
| Kate Spade | Sleepwear | Komar | 2025 |
| Kate Spade | Stationery and Gift | Lifeguard Press | 2026 |
| Kate Spade | Fragrance | Interparfums | 2030 |
| Kate Spade | Eyewear | Safilo | 2031 |

Products made under license are, in most cases, sold through stores and wholesale channels and, with the Company's approval, the licensees have the right to distribute products selectively through other venues, which provide additional, yet controlled, exposure of our brands. Our licensing partners generally pay royalties on their net sales of our branded products. Such royalties currently comprise approximately 1% of Tapestry's total net sales. The licensing agreements generally give our brands the right to terminate the license if specified sales targets are not achieved.

**PRODUCTS**

The following table shows net sales for each of our product categories by segment:

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | July 1, 2023 | | July 2, 2022 | | July 3, 2021 | |
| | (millions) | | | | | |
| | Amount | % of total net sales | Amount | % of total net sales | Amount | % of total net sales |
| Coach | | | | | | |
| Women's Handbags | $ 2,450.7 | 36.8 % | $ 2,574.8 | 38.5% | $ 2,302.3 | 40.1% |
| Women's Accessories | 1,024.8 | 15.4 | 942.5 | 14.1 | 776.7 | 13.5 |
| Men's | 947.1 | 14.2 | 904.8 | 13.5 | 769.3 | 13.4 |
| Other Products | 537.8 | 8.1 | 499.2 | 7.5 | 404.8 | 7.0 |
| Total Coach | $ 4,960.4 | 74.5 % | $ 4,921.3 | 73.6% | $ 4,253.1 | 74.0% |
| Kate Spade | | | | | | |
| Women's Handbags | $ 779.6 | 11.7 % | $ 819.5 | 12.2% | $ 681.5 | 11.9% |
| Other Products | 332.4 | 5.0 | 319.0 | 4.8 | 269.3 | 4.7 |
| Women's Accessories | 306.9 | 4.6 | 307.0 | 4.6 | 259.2 | 4.5 |
| Total Kate Spade | $ 1,418.9 | 21.3 % | $ 1,445.5 | 21.6% | $ 1,210.0 | 21.1% |
| Stuart Weitzman[1] | $ 281.6 | 4.2 % | $ 317.7 | 4.8% | $ 283.2 | 4.9% |
| Total Net sales | $ 6,660.9 | 100.0 % | $ 6,684.5 | 100.0% | $ 5,746.3 | 100.0% |

[1] The significant majority of sales for Stuart Weitzman is attributable to women's footwear.

8

***Women's Handbags*** - Women's handbag collections feature classically inspired as well as fashion designs. These collections are designed to meet the fashion and functional requirements of our broad and diverse consumer base.

***Women's Accessories*** - Women's accessories include small leather goods which includes mini and micro handbags, money pieces, wristlets, pouches and cosmetic cases. Also included in this category are novelty accessories (including address books, time management accessories, travel accessories, sketchbooks and portfolios), belts, key rings and charms.

***Men's*** - Men's includes bag collections (including business cases, computer bags, messenger-style bags, backpacks and totes), small leather goods (including wallets, card cases, travel organizers and belts), footwear, watches, fragrances, sunglasses, novelty accessories and ready-to-wear items.

***Other Products*** - These products primarily include women's footwear, eyewear (such as sunglasses), jewelry (including bracelets, necklaces, rings and earrings), women's fragrances, watches, certain women's seasonal lifestyle apparel collections, including outerwear, ready-to-wear and cold weather accessories, such as gloves, scarves and hats. In addition, Kate Spade brand kids items, housewares and home accessories, such as fashion bedding and tableware, and stationery and gifts are included in this category.

## DESIGN AND MERCHANDISING

Our creative leaders are responsible for conceptualizing and implementing the design direction for our brands across the consumer touchpoints of product, stores and marketing. At Tapestry, each brand has a dedicated design and merchandising team; this ensures that Coach, Kate Spade and Stuart Weitzman speak to their customers with a voice and positioning unique to their brand. Designers have access to the brands' extensive archives of product designs, which are a valuable resource for new product concepts. Our designers collaborate with strong merchandising teams that analyze sales, market trends and consumer preferences to identify market opportunities that help guide each season's design process and create a globally relevant product assortment. Leveraging our strategic investments in data and analytics tools across Tapestry's platform, merchandisers are able to gain a deeper understanding of customer behavior that empowers our teams to respond to changes in consumer preferences and demand as well as scale opportunities across brands with greater speed and efficiency. Our merchandising teams are committed to managing the product life cycle to maximize sales and profitability across all channels. The product category teams, each comprised of design, merchandising, product development and sourcing specialists help each brand execute design concepts that are consistent with the brand's strategic direction.

Our design and merchandising teams also work in close collaboration with all of our licensing partners to ensure that the licensed products are conceptualized and designed to address the intended market opportunity and convey the distinctive perspective and lifestyle associated with our brands.

## MARKETING

We use a 360-degree approach to marketing for each of our brands, synchronizing our efforts across all channels to ensure consistency at every touchpoint. Our global marketing strategy is to deliver a consistent, relevant and multi-layered message every time the consumer comes in contact with our brands through our communications and visual merchandising. Each brand's distinctive positioning is communicated by our creative marketing, visual merchandising and public relations teams, as well as outside creative agencies. We also have a sophisticated consumer and market research capability, which helps us assess consumer attitudes and trends.

We engage in several consumer communication initiatives globally, including direct marketing activities at a national, regional and local level. Total expenses attributable to the Company's marketing-related activities in fiscal 2023 were $570.7 million, or approximately 9% of net sales, compared to $551.6 million in fiscal 2022, or approximately 8% of net sales.

Our wide range of marketing activities utilize a variety of media, including digital, social, print and out-of-home. Our respective brand websites serve as effective communication vehicles by providing an immersive brand experience, showcasing the fullest expression across all product categories.

As part of our direct marketing strategy, we use databases of consumers to generate personalized communications in direct channels such as email and text messages to drive engagement and build awareness. Email contacts are an important part of our communication and are sent to selected consumers to stimulate consumer purchases and build brand awareness. Visitors to our e-commerce sites provide an opportunity to increase the size of these consumer databases, in addition to serving as a point of transactions globally, except where restricted.

The Company has several regional informational websites for locations where we have not established an e-commerce presence. The Company utilizes and continues to explore digital technologies such as social media websites as a cost effective consumer communication opportunity to increase on-line and store sales, acquire new customers and build brand awareness.

9

## MANUFACTURING

Tapestry carefully balances its commitments to a limited number of "better brand" partners that have demonstrated integrity, quality and reliable delivery. The Company continues to evaluate new manufacturing sources and geographies to deliver high quality products at competitive costs and to mitigate the impact of manufacturing in inflationary markets.

Our raw material suppliers, independent manufacturers and licensing partners must achieve and maintain high quality standards, which are an integral part of our brands' identity. Before directly partnering with a new manufacturing vendor for finished goods, the Company evaluates each facility by conducting a quality, business practice standards and social compliance review. We expect finished good manufacturers to undergo a social compliance audit before being approved as a Tapestry supplier. Manufacturers working with our licensed partners must have had an acceptable social compliance audit conducted within the prior six months of their onboarding date. Suppliers that fail to meet our standards are not approved until an acceptable report is provided. We also conduct periodic evaluations of existing, previously approved finished good suppliers. We believe that our manufacturing partners are in material compliance with the Company's integrity standards.

These independent manufacturers each or in aggregate support a broad mix of product types, materials and a seasonal influx of new, fashion-oriented styles, which allows us to meet shifts in marketplace demand and changes in consumer preferences.

We have longstanding relationships with purveyors of fine leathers and hardware. Although our products are manufactured by independent manufacturers, we maintain a strong level of oversight in the selection of key raw materials and compliance with quality control standards is monitored through on-site quality inspections at independent manufacturing facilities.

We maintain strong oversight of the supply chain process for each of our brands from design through manufacturing. We are able to do this by maintaining sourcing management offices in Vietnam, mainland China, the Philippines, Cambodia and Spain that work closely with our independent manufacturers. This broad-based, global manufacturing strategy is designed to optimize the mix of cost, lead times and construction capabilities.

During fiscal 2023, manufacturers of Coach products were primarily located in Vietnam, Cambodia, and the Philippines and no individual vendor provided 10% or more of the brand's total purchases. During fiscal 2023, Kate Spade products were manufactured primarily in Vietnam, Cambodia, the Philippines and mainland China. Kate Spade had one vendor, located in Vietnam, who individually provided approximately 10% of the brand's total purchases. Stuart Weitzman products were primarily manufactured in Spain. During fiscal 2023, Stuart Weitzman had three vendors, all located in Spain, who individually provided over 10% of the brand's total units (approximately 37% across the three, in the aggregate).

## FULFILLMENT

The Company's distribution network is designed to support the movement of each brand's products from our manufacturers to fulfillment centers around the world. These fulfillment centers are either directly operated by the Company or by independent third parties, with some supporting multiple brands. Our facilities use bar code scanning warehouse management systems, where our fulfillment center employees use handheld scanners to read product bar codes. This allows for accurate storage and order processing and allows us to provide excellent service to our customers. These facilities are also integrated into our Enterprise Resource Planning ("ERP") system, ensuring accurate inventory reporting. Our products are primarily shipped to retail stores, wholesale customers and e-commerce customers.

In North America we maintain fulfillment centers in Jacksonville, Florida, and West Chester, Ohio, operated by Tapestry. In addition, in fiscal 2023, the Company opened a new multi-brand fulfillment center located in Las Vegas, Nevada that increase capacity and continue to enhance fulfillment capabilities in North America. The Company also has two third-party facilities in Toronto, Canada and Tijuana, Mexico. Globally, we utilize regional fulfillment centers in mainland China, the Netherlands, the United Kingdom, and Spain, owned and operated by third parties, that support multiple countries. We also utilize local fulfillment centers, through third-parties in Japan, parts of Greater China, South Korea, Singapore, Malaysia, Spain, the U.K., Canada, and Australia.

## INFORMATION SYSTEMS

The Company's information systems are integral in supporting the Company's long-term strategies. Our information technology platform is a key capability used to support digital growth and drive consumer centricity and data-driven decision making. We are continually enhancing our digital technology platforms to elevate our e-commerce capabilities direct-to-consumer functionalities, and overall omni-channel experience, by utilizing cloud-based technology infrastructure. For example, we will continue to enhance certain of our machine learning models to improve our customer capture and segmentation capabilities.

In fiscal 2021, the Company began implementing a cloud-based digital platform to enhance our omnichannel capabilities, across all brands in North America, Europe and Japan. This shared enterprise digital strategy affords the Company more productive and efficient capabilities for digital and in-store selling and engagement. This implementation was substantially completed in fiscal 2023.

The Company maintains global information security and privacy compliance programs, comprised of risk management policies and procedures surrounding the Company's information systems, cybersecurity practices and protection of consumer and employee personal data and confidential information. The Board of Directors (the "Board") has ultimate oversight of the Company's risk management policies and procedures, and has delegated primary responsibility for monitoring the risks and programs in this area to the Audit Committee, which receives quarterly updates on information security and privacy risk and compliance. The Board receives periodic updates on these topics as well. As part of the Company's compliance programs, all global employees are required to take annual training on information security, including cybersecurity, and global data privacy requirements and compliance measures. We also conduct periodic internal and third-party assessments to test our cybersecurity controls, perform cyber simulations and annual tabletop exercises, and continually evaluate our privacy notices, policies and procedures surrounding our handling and control of personal data and the systems we have in place to help protect us from cybersecurity or personal data breaches. Additionally, we maintain network security and cyber liability insurance in order to provide a level of financial protection in the event of certain covered cyber losses and data breaches.

### INTELLECTUAL PROPERTY

Tapestry owns COACH, KATE SPADE and STUART WEITZMAN, as well as all of the material trademark, design and patent-rights related to the production, marketing, distribution and sale of our products in the United States and other countries in which our products are principally sold. In addition, it licenses trademarks and copyrights used in connection with the production, marketing and distribution of certain categories of goods and limited edition collaborations. Tapestry also owns and maintains registrations in countries around the world for trademarks in relevant classes of products. Major trademarks include TAPESTRY, COACH, STUART WEITZMAN, KATE SPADE and KATE SPADE NEW YORK. It also owns brand-specific trademarks such as COACH and Horse & Carriage Design, COACH and Story Patch Design, COACH and Lozenge Design, COACH and Tag Design, Signature C Design and COACHTOPIA for the COACH brand; kate spade new york and Spade Design, and spade flower monogram for the kate spade new york brand; and NUDIST and 5050 for the Stuart Weitzman brand. Tapestry is not dependent on any one particular trademark or design patent although Tapestry believes that the Coach, Stuart Weitzman and Kate Spade New York trademarks are important for its business. In addition, Tapestry owns a number of copyrights, design patents and utility patents for its brands' product designs. Tapestry aggressively polices its intellectual property, and pursues infringers both domestically and internationally. It pursues counterfeiters through leads generated internally, as well as through its network of investigators, law enforcement and customs officials, the respective online reporting form for each brand, the Tapestry hotline and business partners around the world.

### SEASONALITY

The Company's results are typically affected by seasonal trends. During the first fiscal quarter, we typically build inventory for the winter and holiday season. In the second fiscal quarter, working capital requirements are reduced substantially as we generate higher net sales and operating income, especially during the holiday season.

Fluctuations in net sales, operating income and operating cash flows of the Company in any fiscal quarter may be affected by the timing of wholesale shipments and other events affecting retail sales, including weather and macroeconomic events, and pandemics such as Covid-19.

### GOVERNMENT REGULATION

Most of the Company's imported products are subject to duties, indirect taxes, quotas and non-tariff trade barriers that may limit the quantity of products that we may import into the U.S. and other countries or may impact the cost of such products. The Company is not materially restricted by quotas or other government restrictions in the operation of its business, however customs duties do represent a component of total product cost. To maximize opportunities, the Company operates complex supply chains through foreign trade zones, bonded logistic parks and other strategic initiatives such as free trade agreements. For example, we have historically received benefits from duty-free imports on certain products from certain countries pursuant to the U.S. General System of Preferences ("GSP") program. The GSP program expired in the third quarter of fiscal 2021, resulting in additional duties that have negatively impacted gross margin. Additionally, the Company operates a direct import business in many countries worldwide. As a result, the Company is subject to stringent government regulations and restrictions with respect to its cross-border activity either by the various customs and border protection agencies or by other government agencies which control the quality and safety of the Company's products. The Company maintains an internal global trade, customs and product compliance organization to help manage its import/export and regulatory affairs activity.

**COMPETITION**

The product categories in which we operate are highly competitive. The Company competes primarily with European and American luxury and accessible luxury brands as well as private label retailers. In varying degrees, depending on the product category involved, we compete on the basis of style, price, customer service, quality, brand prestige and recognition, among others. Over the last decade, these luxury and accessible luxury brands have grown and are expected to continue to grow, encouraging the entry of new competitors as well as increasing the competition from existing competitors. This increased competition drives interest in these brand loyal categories. We believe, however, that we have significant competitive advantages because of the recognition of our brands and the acceptance of our brands by consumers.

**CORPORATE RESPONSIBILITY**

As a people-centered and purpose led Company, Tapestry believes that a better-made future is one that is both beautiful and responsible. Our Environmental, Social and Corporate Governance ("ESG") strategy, the *Fabric of Change*, aims to unite teams across the Company's business to work to meet our Corporate Responsibility Goals ("ESG Goals") and a shared objective: to create the accessible luxury company of the future that balances true fashion authority with meaningful, positive change. The *Fabric of Change* focuses on three pillars: Our People, Our Planet and Our Communities.

- Our People:

  ◦ We aim to foster inclusivity and diversity through four interconnected principles: talent, culture, community, and marketplace. Our equity, inclusion and diversity ("EI&D") goals focus on attracting and retaining talent and building a compelling and fulfilling employee experience.

  ◦ We have set goals focused on building diversity in our leadership team, reducing differences in our employee survey results based on gender and ethnicity, focusing on progression and establishing core wellness standards to enable our employees to manage their work and personal lives.

  ◦ We tie 10% of leadership annual incentive compensation to EI&D goals on a global basis level.

- Our Planet:

  ◦ We aim to sustain and restore our planet through continuous innovation in solutions that improve biodiversity and reduce our impact on climate change with a focus on renewable energy, increased use of environmentally preferred materials and production methods, and circular business models that design out waste and pollution, keep products in use, and restore natural systems.

  ◦ We have set ESG goals focused on utilizing 100% renewable energy in our own operations; tracing and mapping our raw materials, environmentally responsible sourcing of leather, increasing the recycled content of our packaging, reducing waste in our corporate and distribution centers and water across our company and supply chain. We have also set new science-based emissions reduction targets in line with Science Based Targets initiative ("SBTi's") criteria and 1.5ºC.

- Our Communities:

  ◦ We aim to support and empower the communities where our employees live and work, and provide the resources and investment needed to strengthen the regions where we operate, through volunteer efforts, philanthropic initiatives, product donations, and social impact programming.

  ◦ We have set goals focused on volunteerism programs, philanthropic initiatives and supply chain empowerment programs.

The Company's ESG and Corporate Responsibility Strategy, including oversight, management and identification of risks, is ultimately governed by the Board of Directors and overseen by an ESG Steering Committee, which is comprised of members of our executive leadership team, and driven by an ESG Task Force, which is comprised of senior leaders and cross-functional members from major business functions. The Board approves long-term sustainability goals, strategic moves or major plans of action and receives updates at least annually. Tapestry's Governance and Nominations Committee of the Board receives quarterly updates on sustainability strategy, including climate-related topics, progress towards the ESG goals and other ESG related initiatives.

Additional information on the *Fabric of Change* and Corporate Responsibility Goals can be found at www.tapestry.com/responsibility. The content on this website and the content in our Corporate Responsibility Reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

12

**HUMAN CAPITAL**

At Tapestry, being true to yourself is core to who we are. When each of us brings our individuality to our collective ambition, our creativity is unleashed. This global house of brands was built by unconventional entrepreneurs and unexpected solutions, so when we say we believe in dreams, we mean we believe in making them happen.

Where differences intersect, new thinking emerges. So we cultivate a place for people who are both warm and rigorous, work that is both challenging and fun, a culture led by both head and heart. Most of all, we bring together the unique spirits of our people and our brands and give them a place to move their work and our industry forward. We believe that difference sparks brilliance, so we welcome people and ideas from everywhere to join us in stretching what's possible.

### Governance and Oversight

Our Board of Directors and its committees provide governance and oversight of the Company's strategy, including over issues of human capital management. The Board has designated the Human Resources Committee of the Board of Directors (the "HR Committee") as the primary committee responsible for the Company's human capital strategy, overseeing executive compensation programs, performance and talent development, succession planning, engagement and regular review of employee benefits and well-being strategies. Together with the Board, the HR Committee also provides oversight of the Company's EI&D strategies. The full Board of Directors and the HR Committee receive at least quarterly updates on the Company's talent development strategies and other applicable areas of human capital management.

Unlocking the power of our people is a key strategic focus area for the Company, supported by significant engagement from the Company's senior leadership on talent development and human capital management, as reflected in the key programs and focus areas described below.

### Employees

As of July 1, 2023, the Company employed approximately 18,500 employees globally. Of these employees, approximately 14,700 employees worked in retail locations, of which 5,900 were part-time employees. This total excludes seasonal and temporary employees that the Company employs, particularly during the second quarter due to the holiday season. The Company believes that its relations with its employees are good, and has never encountered a strike or work stoppage.

### Equity, Inclusion and Diversity

Our company name Tapestry, represents the diversity of our brands and the diversity of our people. We know that having a diverse range of perspectives, backgrounds and experiences makes us more innovative and successful and it brings us closer to our consumer. Our goal is to create a culture that is equitable, inclusive and diverse - where all of our employees, customers and stakeholders thrive.

Our EI&D strategy is grounded in our purpose and values and is a core element to unlocking the power of our people. To support these actions, we are guided by four interconnected principles:

- *Talent:* Attracting, retaining and growing top talent - making us an employer of choice in a rapidly evolving talent marketplace.

- *Culture:* Fostering a culture of inclusion, where people and ideas from everywhere are welcomed.

- *Community:* Nurturing the vibrancy of the communities in which we live and work to advance equity, opportunity and dignity for all.

- *Marketplace:* Embracing our responsibility in the marketplace as a global fashion company. We are committed to affecting positive change for our industry and deliver on our value proposition to stakeholders - consumers, investors and future talent.

Our global EI&D Champion Network supports and engages our professional community by creating an environment where all are welcomed. This network includes our five employee business resource groups ("EBRGs"), two task forces and regional inclusion councils to support and engage our employees.

Additionally, we believe educating our employees is crucial in achieving our EI&D goals. We have established a global multi-year EI&D learning road map, including bespoke skill-building programs to accommodate our dynamic employee population. Furthermore, the Company has focused on providing employees with resources to foster continuing education and conversation on EI&D through 'Tapestry UNSCRIPTED', which is an internal speaker series for our employees designed to bring our values to life. We feel hosting bold conversations about our values provides an opportunity for us to be inspired, discover ideas, and ignite personal passions.

13

Tapestry is committed to the support of historically underrepresented and marginalized groups through our corporate efforts. We are a member of the CEO Action for Diversity and Inclusion, the largest business coalition committed to advancing Diversity and Inclusion. Our focus on fostering an equitable work environment has led to continued recognition from Forbes on the list of "Best Employers for Diversity" and Human Rights Campaign's list of "Best Place to Work for LGBTQ Equality". In 2023, we were recognized by Civic 50 as one of the 50 Most Community-Minded Companies. Additionally, we have been certified as a "Great Place to Work" for 2023. The Company is dedicated to building a workforce with leadership teams better reflecting our general corporate population in North America. The Company monitors the representation of women and ethnic minorities at different levels throughout the company, and discloses this information in our website at www.tapestry.com/responsibility/our-people.

### *Total Rewards*

Tapestry is dedicated to being a place where our employees love to work, where they feel recognized and rewarded for all that they do. Maintaining a competitive program helps us attract, motivate and retain the key talent we need to achieve outstanding business and financial results. To accomplish this goal, we strive to appropriately align our total compensation with the pay, benefits and rewards offered by companies that compete with us for talent in the marketplace.

Our Total Compensation Program includes cash pay, annual and long term incentives, benefits and other special programs that our employees value. We strive to pay each employee fairly and competitively across our brands. Tapestry's primary compensation principle is to "pay for performance." Tapestry's practice is to pay a competitive base salary and to provide corporate employees with the opportunity to earn an annual bonus tied to Tapestry's and its brands' financial performance, and store employees with the opportunity to earn sales incentives. Approximately 2,500 of our employees, including nearly all of our store managers, received an annual long-term equity award in 2023, which align employee interests with those of our stockholders, rewards employees for enhancing stock holder value and supports retention of key employees.

Our benefits package is designed to be competitive and comprehensive, which varies by location and jurisdiction. Our benefits, along with competitive pay, includes medical benefits and paid wellness days and parental leave, in accordance with local policies and regulations, for directly hired full-time and part-time employees. The Company also offers retirement benefits for its employees, which are managed in accordance with local jurisdictions. To support employees in achieving their career and financial goals, the Company also provides access to learning opportunities on personal finances as well as physical and mental wellness through various platforms based on the location of the employee.

### *Talent Acquisition and Development*

Hiring talented employees is critically important to us, as we consider our employees around the world to be our greatest asset. Our recruitment and sourcing strategy focuses on tapping diverse sources to attract the best talent to our organization and then retaining them through our continued investments in resources that provide our employees with the tools for career advancement. Our internal opportunity program encourages employees to stretch themselves in their career development, aligning their capabilities with career interests and goals. We strive to provide a working environment where our people can grow and progress their careers within the Company.

We are committed to helping our employees develop the knowledge, skills and abilities needed for continued success, and encourage employee development at all levels and every career stage. Our development programs enable individual and team success through targeted initiatives and resources, offering a wide-ranging curriculum focused on professional and leadership development for leaders, managers, and individual contributors, including through our Common Thread people management program, Emerging Leaders High-Potential Program, Leader Transition Acceleration Program, and third-party learning platforms in addition to other trainings and education facilitated through the Company for all employees.

As a company, performance management is critical to our ability to reach our goals and foster a culture of success. By having a dynamic, performance-driven culture, we can achieve greater results, maximize employee, manager and team performance and offer exciting development and career opportunities. As our focus extends beyond the performance of our employees to the performance of our Company as a whole, we have mechanisms in place to facilitate comprehensive upward feedback through robust cross-functional feedback tools and a cadence of regular pulse surveys that inform on how we can continue to strive for excellence in our work culture.

### *Well-being and Safety*

At Tapestry, we are committed to providing a safe working environment for our people, as well as supporting our people in achieving and maintaining their health and well-being goals. Work-life integration is top of mind, and we provide resources and benefits to help achieve this balance. We provide our employees with supplemental resources to achieve wellness such as access to our Employee Assistance Program, regular employee programming and subscriptions to Headspace, a smartphone application dedicated to meditation and mindfulness. The Company announced the establishment of an Associate Relief Fund, beginning in fiscal year 2024, which will provide emergency assistance for events considered a disaster or hardship.

14

At Tapestry, we believe in encouraging and empowering our employees to take part in building a welcoming and inclusive community. We provide all employees with supplemental time-off to perform community service through nonprofits of their personal choice and through team and Company sponsored volunteering events. In our commitment to supporting our communities, we have three foundations which provide monetary support to nonprofit organizations across communities that we are a part of. Additionally, on an annual basis, our foundations match up to $10,000 in donations to eligible non-profits per employee in North America.

**FINANCIAL INFORMATION ABOUT GEOGRAPHIC AREAS**

Refer to Note 4, "Revenue," and Note 17, "Segment Information," presented in the Notes to the Consolidated Financial Statements for geographic information.

**AVAILABLE INFORMATION**

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 are available free of charge on our investor website, located at www.tapestry.com/investors under the caption "SEC Filings," as soon as reasonably practicable after they are filed with or furnished to the Securities and Exchange Commission. These reports are also available on the Securities and Exchange Commission's website at www.sec.gov. No information contained on any of our websites is intended to be included as part of, or incorporated by reference into, this Annual Report on Form 10-K.

The Company has included the Chief Executive Officer ("CEO") and Chief Financial Officer certifications regarding its public disclosure required by Section 302 of the Sarbanes-Oxley Act of 2002 as Exhibits 31.1 and 31.2, respectively to this Form 10-K.

15

## ITEM 1A. RISK FACTORS

*You should consider carefully all of the information set forth or incorporated by reference in this document and, in particular, the following risk factors associated with the business of the Company and forward-looking information in this document. Please also see "Special Note on Forward-Looking Information" at the beginning of this report. The risks described below are not the only ones we face. Additional risks not presently known to us or that we currently deem immaterial may also have an adverse effect on us. If any of the risks below actually occur, our business, results of operations, cash flows or financial condition could suffer.*

### Risks Related to Macroeconomic Conditions

***Economic conditions, such as an economic recession, downturn, periods of inflation or uncertainty, could materially adversely affect our financial condition, results of operations and consumer purchases of luxury items.***

Our results can be impacted by a number of macroeconomic factors, including but not limited to: consumer confidence and spending levels, tax rates, levels of unemployment, consumer credit availability, pandemics, natural disasters, raw material costs, fuel and energy costs (including oil prices), bank failures, market volatility, global factory production, supply chain operations, commercial real estate market conditions, credit market conditions and the level of customer traffic in malls, shopping centers and online.

Many of our products may be considered discretionary items for consumers. Demand for our products, and consumer spending in the premium handbag, footwear and accessories categories generally, is or may be significantly impacted by trends in consumer confidence, general economic and business conditions, high levels of unemployment, periods of inflation, health pandemics, interest rates, foreign currency exchange rates, the availability of consumer credit, and taxation. Consumer purchases of discretionary luxury items, such as the Company's products, tend to decline during recessionary periods or periods of sustained high unemployment, when disposable income is lower.

Unfavorable economic conditions may also reduce consumers' willingness and ability to travel to major cities and vacation destinations in which our stores are located. Our sensitivity to economic cycles and any related fluctuation in consumer demand may have a material adverse effect on our financial condition.

***The Covid-19 pandemic and resulting adverse economic conditions may continue to adversely affect our business, financial condition, results of operations and cash flows.***

The Covid-19 pandemic has had, and may continue to have, a significant impact on our operations, cash flow and liquidity. The virus has impacted all regions that we operate in around the world, resulting in restrictions and shutdowns implemented by national, state, and local authorities. These requirements resulted in temporary closures of the majority of the Company's directly operated stores globally for some period of time to help reduce the spread of Covid-19 during fiscal 2020. Throughout fiscal years 2021 through 2023, the vast majority of the Company's stores were opened and have continued to operate, however, some store locations have experienced temporary re-closures or operated under tighter restrictions in compliance with local government regulations. During the first half of fiscal 2023, the Company's results in Greater China were adversely impacted as a result of the Covid-19 pandemic. Starting in December 2022, certain government restrictions were lifted and business trends have improved in the region.

Although the impact of the Covid-19 pandemic during fiscal 2023 has generally been less significant than those experienced in fiscal years 2021 and 2022, we cannot predict for how long and to what extent the Covid-19 pandemic may continue to impact our business, financial condition, and results of operations. We continue to monitor the latest developments regarding the Covid-19 pandemic and potential impacts on our business, operating results and outlook.

The impact of regulations imposed in the future in response to the Covid-19 pandemic or other public health crises, could, among other things, require that we close our stores or distribution centers or otherwise make it difficult or impossible to operate our business.

### Risks Related to our Business and our Industry

***We face risks associated with operating in international markets.***

We operate on a global basis, with approximately 39.3% of our net sales coming from operations outside of United States for fiscal year 2023. While geographic diversity helps to reduce the Company's exposure to risks in any one country, we are subject to risks associated with international operations, including, but not limited to:

- political or economic instability or changing macroeconomic conditions in our major markets, including the potential impact of (1) new policies that may be implemented by the U.S. or other jurisdictions, particularly with respect to tax and trade policies or (2) sanctions and related activities by the United States, European Union ("E.U.") and others;

- public health crises, such as pandemics and epidemic diseases;

16

- changes to the U.S.'s participation in, withdrawal out of, renegotiation of certain international trade agreements or other major trade related issues including the non-renewal of expiring favorable tariffs granted to developing countries, tariff quotas, and retaliatory tariffs, trade sanctions, new or onerous trade restrictions, embargoes and other stringent government controls;

- changes in exchange rates for foreign currencies, which may adversely affect the retail prices of our products, result in decreased international consumer demand, or increase our supply costs in those markets, with a corresponding negative impact on our gross margin rates;

- compliance with laws relating to foreign operations, including the Foreign Corrupt Practices Act ("FCPA") and the U.K. Bribery Act, and other global anti-corruption laws, which in general concern the bribery of foreign public officials, and other regulations and requirements;

- changes in tourist shopping patterns, particularly that of the Chinese consumer;

- geopolitical instability (such as the uncertainty in U.S.-China relations);

- natural and other disasters;

- political, civil and social unrest; and

- changes in legal and regulatory requirements, including, but not limited to safeguard measures, anti-dumping duties, cargo restrictions to prevent terrorism, restrictions on the transfer of currency, climate change and other environmental legislation, product safety regulations or other charges or restrictions.

***Our business is subject to the risks inherent in global sourcing activities.***

As a Company engaged in sourcing on a global scale, we are subject to the risks inherent in such activities, including, but not limited to:

- continued disruptions or delays in shipments whether due to port congestion, logistics carrier disruption (including as a result of labor disputes), other shipping capacity constraints or other factors, which has and may continue to result in significantly increased inbound freight costs and increased in-transit times;

- loss or disruption of key manufacturing or fulfillment sites or extended closure of such sites due to the Covid-19 pandemic or other unexpected factors;

- imposition of additional duties, taxes and other charges or restrictions on imports or exports;

- unavailability, or significant fluctuations in the cost, of raw materials;

- compliance by us and our independent manufacturers and suppliers with labor laws and other foreign governmental regulations;

- increases in the cost of labor, fuel (including volatility in the price of oil), travel and transportation;

- compliance with our Global Business Integrity Program;

- compliance by our independent manufacturers and suppliers with our Supplier Code of Conduct, social auditing procedures and requirements and other applicable compliance policies;

- compliance with applicable laws and regulations, including U.S. laws regarding the identification and reporting on the use of "conflict minerals" sourced from the Democratic Republic of the Congo in the Company's products, other laws and regulations regarding the sourcing of materials in the Company's products, the FCPA, U.K. Bribery Act and other global anti-corruption laws, as applicable, and other U.S. and international regulations and requirements;

- regulation or prohibition of the transaction of business with specific individuals or entities and their affiliates or goods manufactured in certain regions by any government or regulatory authority in the jurisdictions where we conduct business, such as the listing of a person or entity as a Specially Designated National or Blocked Person by the U.S. Department of the Treasury's Office of Foreign Assets Control and the issuance of Withhold Release Orders or other detentions of product by the U.S. Customs and Border Patrol;

- inability to engage new independent manufacturers that meet the Company's cost-effective sourcing model;

- product quality issues;

- political unrest, protests and other civil disruption;

- public health crises, such as pandemic and epidemic diseases, and other unforeseen outbreaks;

- natural disasters or other extreme weather events, whether as a result of climate change or otherwise; and

- acts of war or terrorism and other external factors over which we have no control.

17

We are subject to labor laws governing relationships with employees, including minimum wage requirements, overtime, working conditions, and citizenship requirements. Compliance with these laws may lead to increased costs and operational complexity and may increase our exposure to governmental investigations or litigation.

In addition, we require our independent manufacturers and suppliers to operate in compliance with applicable laws and regulations, as well as our Supplier Code of Conduct and other compliance policies under our Global Business Integrity Program; however, we do not control these manufacturers or suppliers or their labor, environmental or other business practices. Copies of our Global Business Integrity Program documents, including our Global Operating Principles, Anti-Corruption Policy and Supplier Code of Conduct are available through our website, www.tapestry.com. The violation of labor, environmental or other laws by an independent manufacturer or supplier, or divergence of an independent manufacturer's or supplier's labor practices from those generally accepted as ethical or appropriate in the U.S., could interrupt or otherwise disrupt the shipment of our products, harm our trademarks or damage our reputation. In addition, if there is negative publicity regarding the production methods of any of our suppliers or manufacturers, even if unfounded or not specific to our supply chain, our reputation and sales could be adversely affected, we could be subject to legal liability, or could cause us to contract with alternative suppliers or manufacturing sources. The occurrence of any of these events could materially adversely affect our business, financial condition and results of operations.

### *A decline in the volume of traffic to our stores could have a negative impact on our net sales.*

The success of our retail stores located within malls and shopping centers may be impacted by (i) changes in consumer shopping behavior, closures, operating restrictions and store capacity restrictions; (ii) reduced travel resulting from economic conditions (including a recession or inflationary pressures); (iii) the location of the store within the mall or shopping center; (iv) surrounding tenants or vacancies; (v) increased competition in areas where malls or shopping centers are located; (vi) the amount spent on advertising and promotion to attract consumers to the mall; and (vii) a shift towards online shopping resulting in a decrease in mall traffic. Declines in consumer traffic could have a negative impact on our net sales and could materially adversely affect our financial condition and results of operations. Furthermore, declines in traffic could result in store impairment charges if expected future cash flows of the related asset group do not exceed the carrying value.

### *The growth of our business depends on the successful execution of our growth strategies, including our global omni-channel expansion efforts and our ability to execute our digital and e-commerce priorities.*

Our growth depends on the continued success of existing products, as well as the successful design, introduction of new products and maintaining an appropriate rationalization of our assortment. Our ability to create new products and to sustain existing products is affected by whether we can successfully anticipate and respond to consumer preferences and fashion trends. See *"The success of our business depends on our ability to retain the value of our brands and to respond to changing fashion and retail trends in a timely manner."* The failure to develop and launch successful new products or to rationalize our assortment appropriately could hinder the growth of our business. Also, any delay in the development or launch of a new product could result in our company not being the first to bring product to market, which could compromise our competitive position.

Our success and growth also depends on the continued development of our omni-channel presence for each of our brands globally, leaning into global digital opportunities for each brand, along with continued bricks and mortar expansion in select international regions, notably Greater China. With respect to international expansion, our brands may not be well-established or widely sold in some of these markets, and we may have limited experience operating directly or working with our partners there. In addition, some of these markets, either through bricks and mortar stores or digital channels, have different operational characteristics, including but not limited to employment and labor, privacy, transportation, logistics, real estate, environmental regulations and local reporting or legal requirements.

Furthermore, consumer demand and behavior, as well as tastes and purchasing trends may differ in these countries, and as a result, sales of our product may not be successful, or the margins on those sales may not be in line with those we currently anticipate. Further, expanding in certain markets may have upfront investment costs that may not be accompanied by sufficient revenues to achieve typical or expected operational and financial performance and therefore may be dilutive to our brands in the short-term. We may also have to compete for talent in international regions as we expand our omni-channel presence.

Consequently, if our global omni-channel expansion plans are unsuccessful, or we are unable to retain and/or attract key personnel, our business, financial condition and results of operation could be materially adversely affected.

18

We aim to provide a seamless omni-channel experience to our customers regardless of whether they are shopping in stores or engaging with our brands through digital technology, such as computers, mobile phones, tablets or other devices. This requires investment in new technologies and reliance on third-party digital partners, over which we may have limited control. Additionally, our digital business is subject to numerous risks that could adversely impact our results, including (i) a diversion of sales from our brand stores or wholesale customers, (ii) difficulty in recreating the in-store experience through digital channels, (iii) liability for online content, (iv) changing dynamics within the digital marketing environment and our ability to effectively market to consumers, (v) intense competition from online retailers, and (vi) the ability to provide timely delivery of e-commerce purchases, which is dependent on the capacity and operations of our owned and third-party operated fulfillment facilities. See "*Our business is subject to the risks inherent in global sourcing activities*" for additional risks related to our fulfillment networks. If we are unable to effectively execute our e-commerce and digital strategies and provide reliable experiences for our customers across all channels, our reputation and ability to compete with other brands could suffer, which could adversely impact our business, results of operations and financial condition.

***The successful implementation of the Company's 2025 growth strategy, future*speed*, is key to the long-term success of our business.***

Building on the success of the Company's strategic growth plan from fiscal 2020 through fiscal 2022, the Company introduced its 2025 growth strategy, *future*speed, in the first quarter of fiscal 2023, which is designed to amplify and extend the competitive advantages of the brands, with a focus on four strategic priorities: (i) Building Lasting Customer Relationships; (ii) Fueling Fashion Innovation & Product Excellence; (iii) Delivering Compelling Omni-Channel Experiences; and (iv) Powering Global Growth.

The Company believes that its intentional focus positions Tapestry to drive sustainable, profitable growth to create value for its stakeholders over time. However, there is no assurance that we will be able to sustain such efforts in accordance with our plans, that such efforts will result in the intended or otherwise desirable outcomes or that such efforts, even if successfully sustained, will be effective in achieving long-term growth or increased profitability. Refer to Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" for further information regarding *future*speed.

If our incorporation of the initiatives under *future*speed falls short, our business, financial condition and results of operation could be materially adversely affected.

***Significant competition in our industry could adversely affect our business.***

We face intense competition in the product lines and markets in which we operate. Our competitors are European and American luxury brands, as well as private label retailers, including some of the Company's wholesale customers. Competition is based on a number of factors, including, without limitation, the following:

- our competitors may develop new products or product categories that are more popular with our customers;

- anticipating and responding in a timely fashion to changing consumer demands and shopping preferences, including the ever-increasing shift to digital brand engagement, social media communications, and online and cross-channel shopping;

- maintaining strong brand recognition, loyalty, and a reputation for quality, including through digital brand engagement and online and social media presence;

- recruiting and retaining key talent;

- developing and producing innovative, high-quality products in sizes, colors, and styles that appeal to consumers of varying age group;

- competitively pricing our products and creating an acceptable value proposition for consumers, including price increases to mitigate inflationary pressures while simultaneously balancing the risk of lower consumer demand in response to any such price increases;

- providing strong and effective marketing support in several diverse demographic markets, including through digital and social media platforms in order to stay better connected to consumers;

- providing attractive, reliable, secure, and user-friendly digital commerce sites;

- sourcing sustainable raw materials at cost-effective prices;

- ensuring product availability and optimizing supply chain efficiencies with third-party suppliers and retailers;

- protecting our trademarks and design patents;

- adapting to changes in technology, including the successful utilization of data analytics, artificial intelligence, and machine learning; and

- the ability to withstand prolonged periods of adverse economic conditions or business disruptions.

19

A failure to compete effectively or to keep pace with rapidly changing consumer preferences and technology and product trends could adversely affect our growth and profitability.

***The success of our business depends on our ability to retain the value of our brands and to respond to changing fashion and retail trends in a timely manner.***

Tapestry, Inc. is a New York-based house of iconic accessories and lifestyle brands. Our global house of brands unites the magic of Coach, kate spade new york and Stuart Weitzman. Each of our brands are unique and independent, while sharing a commitment to innovation and authenticity defined by distinctive products and differentiated customer experiences across channels and geographies. Any misstep in product quality or design, executive leadership, customer service, marketing, unfavorable publicity or excessive product discounting could negatively affect the image of our brands with our customers. Furthermore, the product lines we have historically marketed and those that we plan to market in the future are becoming increasingly subject to rapidly changing fashion trends and consumer preferences, including the increasing shift to digital brand engagement and social media communication. If we do not anticipate and respond promptly to changing customer preferences and fashion trends in the design, production, and styling of our products, as well as create compelling marketing campaigns that appeal to our customers, our sales and results of operations may be negatively impacted.

The shift towards digital engagement has become increasingly important, with increased use of social media platforms by our brand representatives, influencers and our employees. Actions taken by our partners on social media that do not show our brands in a manner consistent with our desired image or that are damaging to such partner's reputation, whether or not through our brand social media platforms, could harm our brand reputation and materially impact our business.

Our success also depends in part on our and our executive leadership team's ability to execute on our plans and strategies. Even if our products, marketing campaigns and retail environments do meet changing customer preferences and/or stay ahead of changing fashion trends, our brand image could become tarnished or undesirable in the minds of our customers or target markets, which could materially adversely impact our business, financial condition, and results of operations.

***Our success depends, in part, on attracting, developing and retaining qualified employees, including key personnel.***

Our business and future success depends heavily on attracting, developing and retaining qualified employees, including our senior management team. Competition in our industry to attract and retain these employees is intense and is influenced by our ability to offer competitive compensation and benefits, employee morale, our reputation, recruitment by other employers, perceived internal opportunities, non-competition and non-solicitation agreements and macro unemployment rates.

We depend on the guidance of our senior management team and other key employees who have significant experience and expertise in our industry and our operations. There can be no assurance that these individuals will remain with us or that we will be able to identify and attract suitable successors for these individuals. The loss of one or more of our key personnel or the direct or indirect consequences of results thereof, or any negative public perception with respect to these individuals or the loss of these individuals, could have a material adverse effect on our business, results of operations and financial condition. We do not maintain key-person or similar life insurance policies on any of senior management team or other key personnel.

We must also attract, motivate and retain a sufficient number of qualified retail and fulfillment center employees. Historically, competition for talent in these positions has been intense and turnover is generally high, both of which were exacerbated by the Covid-19 pandemic. If we are unable to attract and retain such employees with the necessary skills and experience, we may not achieve our objectives and our results of operations could be adversely impacted.

Additionally, changes to our office environments, the adoption of new work models, and our requirements and/or expectations about when or how often certain employees work on-site or remotely may not meet the expectations of our employees. As businesses increasingly operate remotely, traditional geographic competition for talent may change in ways that we cannot presently predict. If our employment proposition is not perceived as favorable compared to other companies, it could negatively impact our ability to attract and retain our employees.

***Our business may be materially impacted if our fulfillment centers face significant interruptions and operations.***

We are dependent on a limited number of fulfillment centers. Our ability to meet the needs of our customers and our retail stores and e-commerce sites depends on the proper operation of these centers. If any of these centers were to shut down or otherwise become inoperable or inaccessible for any reason, we could suffer a substantial loss of inventory and/or disruptions of deliveries to our retail and wholesale customers. Depending on the duration of these closures, our results may be materially impacted. While we have business continuity and contingency plans for our sourcing and fulfillment center sites, significant disruption of manufacturing or fulfillment for any of the above reasons could interrupt product supply, result in a substantial loss of inventory, increase our costs, disrupt deliveries to our customers and our retail stores, and, if not remedied in a timely manner, could have a material adverse impact on our business.

Because our fulfillment centers include automated and computer-controlled equipment, they are susceptible to risks including power interruptions, hardware and system failures, software viruses, and security breaches. In North America we maintain fulfillment centers in Jacksonville, Florida, Westchester, Ohio and Las Vegas, Nevada, operated by Tapestry. Our multi-brand Las Vegas, Nevada fulfillment center began operations during fiscal 2023 and is expected to become fully operational during fiscal 2024. This opening involves configuration and implementation of a cloud-based warehouse management system, training on this and other new technology and automation and integration with existing systems. Any failure to execute our operational plans for this fulfillment center could result in the Company not being able to meet customer demand for its products and could materially adversely affect our business and operations.

Globally we utilize fulfillment centers in mainland China, the Netherlands, the U.K. and Spain, owned and operated by third parties, allowing us to better manage the logistics in these regions while reducing costs. We also utilize local fulfillment centers, through third-parties, in Japan, parts of Greater China, South Korea, Singapore, Malaysia, Spain, the U.K., Canada, Australia, and, starting during fiscal 2023, in Mexico. The warehousing of the Company's merchandise, store replenishment and processing direct-to-customer orders is handled by these centers and a prolonged disruption in any center's operation could materially adversely affect our business and operations.

In addition, if our fulfillment centers are not sized to meet the optimal capacity for our products or are not adequately staffed, utilized or operated, our profitability may be negatively impacted.

***Our business may be subject to increased costs due to excess inventories and a decline in profitability as a result of increasing pressure on margins if we misjudge the demand for our products.***

Our industry is subject to significant pricing pressure caused by many factors, including intense competition and a highly promotional environment, fragmentation in the retail industry, pressure from retailers to reduce the costs of products, and changes in consumer spending patterns. If we misjudge the market for our products or demand for our products are impacted by other factors, such as inflationary pressures, political instability or effects of the Covid-19 pandemic, we may be faced with significant excess inventories for some products and missed opportunities for other products. We have in the past been, and may in the future be, forced to rely on donation, markdowns, promotional sales or other write-offs, to dispose of excess, slow-moving inventory, which may negatively impact our gross margin, overall profitability and efficacy of our brands.

Increases in our costs, such as raw materials, labor or freight could negatively impact our gross margin. Our costs for raw materials are affected by, among other things, weather, customer demand, speculation on the commodities market, the relative valuations and fluctuations of the currencies of producer versus customer countries and other factors that are generally unpredictable and beyond our control. Any of these factors may be exacerbated by global climate change. In addition, the remaining impacts of the pandemic, political instability, trade relations, sanctions, price inflationary pressure, or other geopolitical or economic conditions could cause raw material costs to increase and have an adverse effect on our future margins. Labor costs at many of our manufacturers have been increasing significantly and, as the middle class in developing countries continues to grow, it is unlikely that such cost pressure will abate. Furthermore, the cost of transportation has fluctuated and may continue to fluctuate significantly if oil prices continue to rise. We may not be able to offset such increases in raw materials, labor or transportation costs through pricing measures or other means.

***As we outsource functions, we will become more dependent on the third parties performing these functions.***

As part of our long-term strategy, we look for opportunities to cost effectively enhance capability of business services. While we believe we conduct appropriate due diligence before entering into agreements with these third parties, the failure of any of these third parties to provide the expected services, provide them on a timely basis or to provide them at the prices we expect could disrupt or harm our business. We also cannot guarantee that these third parties will not experience a personal data or security breach in the future, which could have a material impact on our operations. Any significant interruption in the operations of these service providers, including as a result of changes in social, political, and economic conditions, including those resulting from military conflicts or other hostilities, that could result in the disruption of trade from the countries in which our manufacturers or suppliers are located, over which we have no control, could also have an adverse effect on our business. Furthermore, we may be unable to provide these services or implement substitute arrangements on a timely and cost-effective basis on terms favorable to us.

***Our wholesale business could suffer as a result of consolidations, liquidations, restructurings and other ownership changes in the wholesale industry.***

Our wholesale business comprised approximately 11% of total net sales for fiscal 2023. The retail industry, including wholesale customers, has experienced financial difficulty leading to consolidations, reorganizations, restructuring, bankruptcies and ownership changes. Our wholesale customers have also experienced significant business disruptions as a result of the Covid-19 pandemic, including reduced operations or the closure, temporarily or permanently, of many of our wholesale partners. This may continue and could further decrease the number of, or concentrate the ownership of, wholesale stores that carry our or our licensees' products. Furthermore, a decision by the controlling owner of a group of stores or any other significant customer, whether motivated by competitive conditions, financial difficulties or otherwise, to decrease or eliminate the amount of merchandise purchased from us or our licensing partners could result in an adverse effect on the sales and profitability within this channel.

Additionally, certain of our wholesale customers, particularly those located in the U.S., have in the past been highly promotional and have aggressively marked down their merchandise and may do so again in the future, which could negatively impact our brands or could affect our business, results of operations, and financial condition.

***Mergers, acquisitions and other strategic investments may not be successful in achieving intended benefits, cost savings and synergies and may disrupt current operations.***

One component of our historical growth strategy has been acquisitions, and, consistent with our longer-term capital allocation priorities, our management team expects to maintain M&A flexibility and may from time to time evaluate and consider acquisitions or other strategic investments. These involve various inherent risks and as a result, the expected benefits, cost savings and synergies may not be realized.

The integration process of any newly acquired company, such as our proposed acquisition of Capri Holdings Limited ("Capri"), may be complex, costly and time-consuming. The potential difficulties of integrating the operations of an acquired business and realizing our expectations for an acquisition, including the benefits that may be realized, include, among other things:

- failure of the business to perform as planned following the acquisition or achieve anticipated revenue or profitability targets;

- delays, unexpected costs or difficulties in completing the integration of acquired companies or assets;

- higher than expected costs, lower than expected cost savings or synergies and/or a need to allocate resources to manage unexpected operating difficulties;

- difficulties assimilating the operations and personnel of acquired companies into our operations;

- diversion of the attention and resources of management or other disruptions to current operations;

- the impact on our or an acquired business' internal controls and compliance with the requirements under the Sarbanes-Oxley Act of 2002;

- changes in applicable laws and regulations or the application of new laws and regulations;

- changes in the combined business due to potential divestitures or other requirements imposed by antitrust regulators;

- retaining key customers, suppliers and employees;

- retaining and obtaining required regulatory approvals, licenses and permits;

- operating risks inherent in the acquired business and our business;

- lower than anticipated demand for product offerings by us or our licensees;

- assumption of liabilities not identified in due diligence; and

- other unanticipated issues, expenses and liabilities.

Our failure to successfully complete the integration of any acquired business and any adverse consequences associated with future acquisition activities, could have an adverse effect on our business, financial condition and operating results.

Completed acquisitions may result in additional goodwill and/or an increase in other intangible assets on our Consolidated Balance Sheets. We are required annually, or as facts and circumstances exist, to assess goodwill and other intangible assets to determine if impairment has occurred. If the testing performed indicates that impairment has occurred, we are required to record a non-cash impairment charge for the difference between the carrying value of the goodwill or other intangible assets and the implied fair value of the goodwill or the fair value of other intangible assets in the period the determination is made. We cannot accurately predict the amount and timing of any potential future impairment of assets. Should the value of goodwill or other intangible assets become impaired, there could be a material adverse effect on our financial condition and results of operations.

***We may not complete our acquisition of Capri within the time frame we anticipate or at all.***

The completion of our acquisition of Capri is subject to a number of conditions, including, among others, receipt of Capri shareholder approval, receipt of certain global anti-trust clearances, including expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and receipt of certain other regulatory approvals.

The failure to satisfy the required conditions could delay the completion of the acquisition for a significant period of time or prevent it from occurring at all. For example, under certain limited conditions, we and/or Capri may elect to terminate the merger agreement, which could materially and adversely affect our business and reputation. A delay in completing the acquisition could cause us to realize some or all of the benefits later than we otherwise expect to realize them if the acquisition is successfully completed within the anticipated time frame, which could result in additional transaction costs or in other negative effects associated with uncertainty about the completion of the acquisition.

***We may fail to realize all of the anticipated benefits of the Capri acquisition, and the merger or those benefits may take longer to realize than expected.***

We believe that there are significant benefits and synergies that may be realized through our acquisition of Capri. However, the efforts to realize these benefits and synergies will be a complex process and may cost more than we anticipate. Further, our efforts to realize these benefits and synergies may disrupt both companies' existing operations if not implemented in a timely and efficient manner. The full benefits of the acquisition, including the anticipated sales or growth opportunities, may not be realized as expected or may not be achieved within the anticipated time frame, or at all. Failure to achieve the anticipated benefits of the acquisition could adversely affect our results of operations or cash flows, cause dilution to our earnings per share, decrease or delay any accretive effect of the acquisition and negatively impact the price of our common stock.

In addition, we will be required post-closing to devote significant attention and resources to successfully align our business practices and operations. This process may disrupt the businesses and, if ineffective, would limit the anticipated benefits of the acquisition.

***We may be subject to litigation challenging the Capri acquisition, and an unfavorable judgment or ruling in any such lawsuits could prevent or delay the consummation of our acquisition of Capri and/or result in substantial costs.***

Lawsuits related to our acquisition of Capri may be filed against us, Capri, and our respective affiliates, directors and officers. If dismissals are not obtained or a settlement is not reached, these lawsuits could prevent or delay completion of the acquisition and/or result in substantial costs to us.

***Our operating results are subject to seasonal and quarterly fluctuations, which could adversely affect the market price of the Company's common stock.***

The Company's results are typically affected by seasonal trends. We have historically realized, and expect to continue to realize, higher sales and operating income in the second quarter of our fiscal year. Business underperformance in the Company's second fiscal quarter would have a material adverse effect on its full year operating results and result in higher inventories. In addition, fluctuations in net sales, operating income and operating cash flows of the Company in any fiscal quarter may be affected by the timing of wholesale shipments and other events affecting retail sales, including adverse weather conditions or other macroeconomic events, including the impact of the Covid-19 pandemic.

***We rely on our licensing partners to preserve the value of our licenses and the failure to maintain such partners could harm our business.***

Our brands currently have multi-year agreements with licensing partners for certain products. In the future, we may enter into additional licensing arrangements. The risks associated with our own products also apply to our licensed products, as do unique risks stemming from problems that our licensing partners may experience, including risks associated with each licensing partner's ability to obtain capital, manage its labor relations, maintain relationships with its suppliers, manage its credit and bankruptcy risks, and maintain customer relationships. While we maintain significant control over the products produced for us by our licensing partners, any of the foregoing risks, or the inability of any of our licensing partners to execute on the expected design and quality of the licensed products or otherwise exercise operational and financial control over its business, may result in loss of revenue and competitive harm to our operations in the licensed product categories. Further, while we believe that we could replace our existing licensing partners if required, any delay in doing so could adversely affect our revenues and harm our business.

We also may decide not to renew our agreements with our licensing partners and bring certain categories in-house. We may face unexpected difficulties or costs in connection with any action to bring currently licensed categories in-house.

***We are subject to risks associated with leasing retail space subject to non-cancelable leases. We may be unable to renew leases at the end of their terms. If we close a leased retail space, we remain obligated under the applicable lease.***

We do not own any of our retail store locations. The majority of our stores are under non-cancelable, multi-year leases, often with renewal options. We believe that the majority of the leases we enter into in the future will likely be non-cancelable. Generally, our leases are "net" leases, which require us to pay our proportionate share of the cost of insurance, taxes, maintenance and utilities. We generally cannot cancel these leases at our option. In certain cases, as we have done in the past, we may determine that it is no longer economical to operate a retail store subject to a lease or we may seek to generally downsize, consolidate, reposition, relocate or close some of our real estate locations. In such cases, we may be required to negotiate a lease exit with the applicable landlord or remain obligated under the applicable lease for, among other things, payment of the base rent for the balance of the lease term. In some instances, we may be unable to close an underperforming retail store due to continuous operation clauses in our lease agreements. In addition, as each of our leases expire, we may be unable to negotiate renewals, either on commercially acceptable terms or at all, which could cause us to close retail stores in desirable locations. Our inability to secure desirable retail space or favorable lease terms could impact our ability to grow. Likewise, our obligation to continue making lease payments in respect of leases for closed retail spaces could have a material adverse effect on our business, financial condition and results of operations.

23

Additionally, due to the uncertain economic environment, it may be difficult to determine the fair market value of real estate properties when we are deciding whether to enter into leases or renew expiring leases. This may impact our ability to manage the profitability of our store locations, or cause impairments of our lease right of use assets if market values decline, any of which could have a material adverse effect on our financial condition or results of operations.

**Risks Related to Information Security and Technology**

*Computer system disruption and cyber security threats, including a personal data or security breach, could damage our relationships with our customers, harm our reputation, expose us to litigation and adversely affect our business.*

We depend on digital technologies for the successful operation of our business, including corporate email communications to and from employees, customers, stores and vendors, the design, manufacture and distribution of our finished goods, digital and local marketing and clienteling efforts, data analytics, collection, use and retention of customer data, employee, vendor and partner information, the processing of credit card transactions, online e-commerce activities and our interaction with the public in the social media space. Due to persistent Covid-19 risks, our company implemented a hybrid working model. Many of our corporate employees and independent contractors returned to offices several days a week but continued to work remotely the other days. Continued remote working has increased our dependence on digital technology. The possibility of a successful cyber-attack on any one or all of these systems is a serious threat. The retail industry, in particular, has been the target of many cyber-attacks. As part of our business model, we collect, retain, and transmit confidential information and personal data over public networks. In addition to our own databases, we use third-party service providers to store, process and transmit this information on our behalf. Although we contractually require these service providers to implement and use reasonable and adequate security measures and data protection, we cannot control third parties and cannot guarantee that a personal data or security breach will not occur in the future either at their location or within their systems. We also store all designs, goods specifications, projected sales and distribution plans for our finished products digitally. We have enterprise class and industry comparable security measures in place to protect both our physical facilities and digital systems from attacks. Despite these efforts, however, we may be vulnerable to targeted or random cyber-attacks, personal data or security breaches, acts of vandalism, computer malware, misplaced or lost data, programming and/or human errors, or other similar events. Further, like other companies in the retail industry, during the ordinary course of business, we and our vendors have in the past experienced, and we expect to continue to experience, cyber-attacks of varying degrees and types, including phishing, and other attempts to breach, or gain unauthorized access to, our systems. To date, these attacks have not had a material impact on our operations, but we cannot provide assurance that cyber-attacks will not have a material impact in the future.

Awareness and sensitivity to personal data breaches and cyber security threats by consumers, employees and lawmakers is at an all-time high. Any misappropriation of confidential or personal information gathered, stored or used by us, be it intentional or accidental, could have a material impact on the operation of our business, including severely damaging our reputation and our relationships with our customers, employees, vendors and investors. We have been incurring and expect that we will continue to incur significant costs implementing additional security measures to protect against new or enhanced data security or privacy threats, or to comply with current and new international, federal and state laws governing the unauthorized disclosure or exfiltration of confidential and personal information which are continuously being enacted and proposed such as the General Data Protection Regulation ("GDPR") in the E.U. the UK GDPR, the American Data Privacy and Protection Act, the California Consumer Privacy Act ("CCPA") as amended by the California Privacy Rights Act ("CPRA"), the Virginia Consumer Data Protection Act ("VCDPA"), the Colorado Privacy Act ("CPA"), the Utah Consumer Privacy Act ("UCPA"), the Connecticut Data Privacy Act ("CTDPA"), the Montana Consumer Data Privacy Act ("MCDPA"), the Washington My Health My Data Act ("WMHMDA"), the Florida Digital Bill of Rights ("FDBR"), the Texas Data Privacy and Security Act ("TDPSA") in the U.S.A., as well as increased cyber security and privacy protection costs such as organizational changes, deploying additional personnel and protection technologies, training employees and contractors, engaging outside counsel, third-party experts and consultants. We may also experience loss of revenues resulting from unauthorized use of proprietary information including our intellectual property. Lastly, we could face sizable fines, significant breach containment and notification costs to supervisory authorities and the affected data subjects, and increased litigation and customer claims, as a result of cyber security or personal data breaches. While we carry cyber liability insurance, such insurance may not cover us with respect to any or all claims or costs associated with such a breach.

In addition, we have e-commerce sites in certain countries throughout the world, including the U.S., Canada, Japan, Greater China, several throughout Europe, Australia and several throughout the rest of Asia and have plans for additional e-commerce sites in other parts of the world. Additionally, Tapestry has informational websites in various countries. Given the robust nature of our e-commerce presence and digital strategy, it is imperative that we and our e-commerce partners maintain uninterrupted operation of our: (i) computer hardware, (ii) software systems, (iii) customer databases, and (iv) ability to email or otherwise keep in contact with our current and potential customers. Despite our preventative efforts, our systems are vulnerable from time-to-time to damage, disruption or interruption from, among other things, physical damage, natural disasters, inadequate system capacity, system issues, security and personal data breaches, email blocking lists, computer malware or power outages. Any material disruptions in our e-commerce presence or information technology systems and applications could have a material adverse effect on our business, financial condition and results of operations.

*A delay, disruption in, failure of, or inability to upgrade our information technology systems precisely and efficiently could materially adversely affect our business, financial condition or results of operations and cash flow.*

We rely heavily on various information and other business systems, including data analytics and machine learning, to manage our operations, including management of our supply chain, point-of-sale processing in our brands' stores, our online businesses associated with each brand and various other processes and metrics. We are continually evaluating and implementing upgrades and changes to our systems. In addition, from time to time, we implement new systems.

Implementing new systems and upgrading existing systems and data analytics models carries substantial risk, including failure to operate as designed, failure to properly integrate with other systems, failure to accurately capture or report data or metrics, potential loss of confidential and personal information, cost overruns, implementation delays and disruption of operations. Furthermore, failure of our computer systems due to inadequate system capacity, computer viruses, human error, changes in programming, security and personal data breaches, system upgrades or migration of these services, as well as employee, vendor and consumer privacy concerns and new privacy and security laws and global government regulations, individually or in accumulation, could have a material effect on our business, financial condition or results of operations and cash flow.

**Risks Related to Environmental, Social, and Governance Issues**

*The risks associated with climate change and other environmental impacts and increased focus by stakeholders on climate change, could negatively affect our business and operations.*

Our business is susceptible to risks associated with climate change, including through disruption to our supply chain, potentially impacting the production and distribution of our products including availability and pricing of raw materials, as well as shipping disruptions and/or higher freight costs. Climate change can lead to physical and transition risks impacting our business. The physical risks result from climatic events, such as wildfires, storms, and floods, whereas transition risks result from policy action taken to transition the economy off of fossil fuels. Increased frequency and/or intensity of extreme weather events (such as storms and floods) due to climate change could also lead to more frequent store and fulfillment center closures, adversely impacting retail traffic and/or consumer's disposable income levels or spending habits on discretionary items, or otherwise disrupt business operations in the communities in which we operate, any of which could result in lost sales or higher costs.

There is also increased focus from our stakeholders, including consumers, employees and investors, on climate change issues. Many countries in which we and our suppliers operate have begun to enact new legislation and regulations in an attempt to mitigate the potential impacts of climate change, which could result in higher sourcing, operational, and compliance-related costs for the Company. Such proposed measures include expanded disclosure requirements regarding greenhouse gas emissions and other climate-related information, as well as independent auditors providing some level of attestation to the accuracy of such disclosures. Inconsistency of legislation and regulations among jurisdictions may also affect our compliance costs with such laws and regulations. An assessment of the potential impact of future climate change legislation, regulations or industry standards, as well as any international treaties and accords, will be fraught with uncertainty given the wide scope of potential regulatory change in the countries in which we operate. Any failure on our part to comply with such climate change-related regulations could lead to adverse consumer actions and/or investment decisions by investors, as well as expose us to legal risk.

25

***Increased scrutiny from investors and others regarding our environmental, social and governance ("ESG") initiatives, including matters of significance relating to sustainability, could result in additional costs or risks and adversely impact our reputation.***

Stakeholders, including consumers, employees and investors, have increasingly focused on corporate responsibility practices of companies. Although we have announced our ESG strategy and related goals, there can be no assurance that our stakeholders will agree with our strategy or that we will be successful in achieving our goals. Failure to implement our strategy or achieve our goals on a timely basis, or at all, could damage our reputation, causing our investors or consumers to lose confidence in our Company and brands, and negatively impact our operations. In addition, our brand is susceptible to risks associated with changing consumer attitudes regarding social and political issues and consumer perceptions of our position on these issues.

Any ESG report that we publish or other sustainability disclosure we make may include our policies and practices on a variety of social and ethical matters, including corporate governance, environmental compliance, employee health and safety practices, human capital management, product quality, supply chain management and workforce inclusion and diversity. It is possible that stakeholders may not be satisfied with our ESG practices or the speed of our adoption of these practices. We could also incur additional costs and require additional resources to monitor, report and comply with various ESG practices and various legal, legislative and regulatory requirements. Also, our failure, or perceived failure, to meet the standards included in any sustainability disclosure could negatively impact our reputation, employee retention and the willingness of our customers and suppliers to do business with us.

In addition, many of the countries where we and our suppliers operate continue to enact legislation and regulatory rules that address climate change and other sustainability issues, including expanded disclosure requirements on greenhouse gas emissions and other climate related information. Consumers, trade associations, interested non-governmental organizations and other stakeholders have increased focus and emphasis on sustainable features of products and other sustainability topics, including traceability and transparency, sustainability claims and product labeling requirements, responsible sourcing and deforestation, the use of energy and water, and the recyclability or recoverability of packaging, product, and materials. The rules and regulations and governmental oversight continue to rapidly evolve with varying degrees of complexity and scope, many that include penalties for non-compliance. Any failure on our part to comply with sustainability related legislation, regulations and frameworks could lead to adverse consumer action, government enforcement action and private litigation. Our ability to comply with the evolution of consumer expectations, regulations and governmental standards and legal landscape can lead to increased risk, operational costs and management time and effort.

**Risks Related to Global Economic Conditions and Legal and Regulatory Matters**

***We face risks associated with potential changes to international trade agreements and the imposition of additional duties on importing our products.***

Most of our imported products are subject to duties, indirect taxes, quotas and non-tariff trade barriers that may limit the quantity of products that we may import into the U.S. and other countries or may impact the cost of such products. To maximize opportunities, we rely on free trade agreements and other supply chain initiatives and, as a result, we are subject to government regulations and restrictions with respect to our cross-border activity. For example, we have historically received benefits from duty-free imports on certain products from certain countries pursuant to the U.S. Generalized System of Preferences ("GSP") program. The GSP program expired on December 31, 2020, resulting in additional duties that have negatively impacting gross margin. Additionally, we are subject to government regulations relating to importation activities, including related to U.S. Customs and Border Protection ("CBP") enforcement actions. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements, and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. Since fiscal 2019, the U.S. and China have both imposed tariffs on the importation of certain product categories into the respective country, with limited progress in negotiations to reduce or remove the tariffs. However, while the U.S. has participated in multi-national negotiations on trade agreements and duty rates, there continues to be a possibility of increases in tariffs on goods imported into the U.S. from other countries, which could in turn adversely affect the profitability for these products and have an adverse effect on our business, financial conditions and results of operations as a result.

***Fluctuations in our tax obligations and effective tax rate may result in volatility of our financial results and stock price.***

We are subject to income taxes in many jurisdictions. We record tax expense based on our estimates of taxable income and required reserves for uncertain tax positions in multiple tax jurisdictions. At any one time, multiple tax years are subject to audit by various taxing jurisdictions. The results of these audits and negotiations with taxing authorities may result in a settlement which differs from our original estimate. As a result, we expect that throughout the year there could be ongoing variability in our quarterly effective tax rates as events occur and exposures are evaluated. In addition, our effective tax rate in a given financial statement period may be materially impacted by changes in the mix and level of earnings. Further, proposed tax changes that may be enacted in the future could impact our current or future tax structure and effective tax rates.

26

Over the past year, there has been significant discussion with regards to tax legislation by both the Biden Administration and the Organization for Economic Cooperation and Development ("OECD"). On August 16, 2022, the Inflation Reduction Act of 2022 was signed into law by the Biden Administration, with tax provisions primarily focused on implementing a 15% corporate alternative minimum tax on global adjusted financial statement income ("CAMT") and a 1% excise tax on share repurchases. On December 12, 2022, the European Union member states also reached agreement to implement the OECD's reform of international taxation known as Pillar Two Global Anti-Base Erosion ("GloBE") Rules, which broadly mirror the Inflation Reduction Act by imposing a 15% global minimum tax on multinational companies. The CAMT and GloBE are anticipated to be effective beginning in fiscal 2024 and fiscal 2025, respectively. The US Treasury and the OECD continue to seek input and release guidance on the CAMT and GloBE legislation and how the two will interact, so it is unclear at this time what, if any, impact either will have on the Company's tax rate and financial results. We will continue to evaluate their impact as further information becomes available. With respect to the 1% excise tax on net share repurchases, this provision of the Inflation Reduction Act was effective on January 1, 2023 and did not have a material impact on our financial statements.

***Our business is exposed to foreign currency exchange rate fluctuations.***

We monitor our global foreign currency exposure. In order to minimize the impact on earnings related to foreign currency rate movements, we hedge certain cross currency intercompany inventory transactions and foreign currency balance sheet exposures, as well as the Company's cross currency intercompany loan portfolio. We cannot ensure, however, that these hedges will fully offset the impact of foreign currency rate movements. Additionally, our international subsidiaries primarily use local currencies as the functional currency and translate their financial results from the local currency to U.S. dollars. If the U.S. dollar strengthens against these subsidiaries' foreign currencies, the translation of their foreign currency denominated transactions may decrease consolidated net sales and profitability. Our continued international expansion will increase our exposure to foreign currency fluctuations. The majority of the Company's purchases and sales involving international parties, excluding international consumer sales, are denominated in U.S. dollars.

***We may be unable to protect our intellectual property and curb the sale of counterfeit merchandise, which can cause harm to our reputation and business.***

We believe our trademarks, copyrights, patents, and other intellectual property rights are extremely important to our success and our competitive position. We devote significant resources to the registration and protection of our trademarks and to anti-counterfeiting efforts worldwide. We pursue entities involved in the trafficking and sale of counterfeit merchandise through legal action or other appropriate measures. We cannot guarantee that the actions we have taken to curb counterfeiting and protect our intellectual property will be adequate to protect the brand and prevent counterfeiting in the future. Despite our efforts, our brands are still susceptible to counterfeiting. Such counterfeiting dilutes our brands and can cause harm to our reputation and business. Our efforts to enforce our intellectual property rights are often met with defenses and counterclaims attacking the validity and enforceability of our intellectual property rights. In the ordinary course of business, we become involved in trademark oppositions and cancellation actions. Our trademark applications may face objections from the trademark offices we seek to register them in and may not mature into registrations. Other parties may seek to invalidate our trademarks or assert violations of their trademarks or other intellectual property and seek to block our sales of certain products. Unplanned increases in legal and investigative fees and other costs associated with defending our intellectual property rights could result in higher operating expenses. Finally, many countries' laws do not protect intellectual property rights to the same degree as U.S. laws.

**Risks Related to our Indebtedness**

***We have incurred a substantial amount of indebtedness, which could restrict our ability to engage in additional transactions or incur additional indebtedness.***

As of July 1, 2023, our consolidated indebtedness was approximately $1.67 billion. In connection with the pending acquisition of Capri, we expect to incur up to $8.0 billion of additional indebtedness through a combination of senior notes and term loans. If we cannot raise the senior notes and term loans by the closing of the Capri acquisition, we will incur bridge loans that will raise our borrowing costs if they remain outstanding and cannot be refinanced. This substantial level of indebtedness could have important consequences to our business including making it more difficult to satisfy our debt obligations, increasing our vulnerability to general adverse economic and industry conditions, limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate and restricting us from pursuing certain business opportunities. In addition, the terms of our $1.25 Billion Revolving Credit Facility contain affirmative and negative covenants, including a maximum net leverage ratio of 4.0 to 1.0, as well as limitations on our ability to incur debt, grant liens, engage in mergers and dispose of assets. Refer to Note 12, "Debt", for a summary of these terms and additional information on the terms of our $1.25 Billion Revolving Credit Facility, Term Loan and outstanding Senior Notes.

27

The consequences and limitations under our $1.25 Billion Revolving Credit Facility and our other outstanding indebtedness could impede our ability to engage in future business opportunities or strategic acquisitions. In addition, a prolonged disruption in our business may impact our ability to satisfy the leverage ratio covenant under our $1.25 Billion Revolving Credit Facility. Non-compliance with these terms would constitute an event of default under our $1.25 Billion Revolving Credit Facility, which may result in acceleration of payment to the lenders. In the event of an acceleration of payment to the lenders, this would result in a cross default of the Company's Senior Notes, causing the Company's outstanding borrowings to also become due and payable on demand.

Our ability to make payments on and to refinance our debt obligations and to fund planned capital expenditures depends on our ability to generate cash from our operations. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. We cannot guarantee that our business will generate sufficient cash flow from our operations or that future borrowings will be available to us in an amount sufficient to enable us to make payments of our debt, fund other liquidity needs and make planned capital expenditures. In addition, our ability to access the credit and capital markets in the future as a source of funding, and the borrowing costs associated with such financing, is dependent upon market conditions and our credit rating and outlook.

As a result of having operations outside of the U.S., we are also exposed to market risk from fluctuations in foreign currency exchange rates. Substantial changes in foreign currency exchange rates could cause our sales and profitability to be negatively impacted.

**Risks Related to Ownership of our Common Stock**

***If we are unable to pay quarterly dividends or conduct stock repurchases at intended levels, our reputation and stock price may be negatively impacted.***

In fiscal 2023, the Company returned capital to its shareholders through (i) a quarterly cash dividend of $0.30 per common share, for an annual dividend rate of $1.20 per share, or approximately $280 million and (ii) the repurchase of 17.8 million shares of common stock for $700 million (the "Shareholder Return Programs"). The dividend program and the stock repurchase program each require the use of a significant portion of our cash flow. Our ability to pay dividends and conduct stock repurchases will depend on our ability to generate sufficient cash flows from operations in the future. This ability may be subject to certain economic, financial, competitive and other factors that are beyond our control. Our Board may, at its discretion, decrease or entirely discontinue these Shareholder Return Programs at any time. Any failure to pay dividends or conduct stock repurchases, or conduct either program at expected levels, after we have announced our intention to do so may negatively impact our reputation, investor confidence in us and negatively impact our stock price.

***Our stock price may periodically fluctuate based on the accuracy of our earnings guidance or other forward-looking statements regarding our financial performance, including our ability to return value to investors.***

Our business and long-range planning process is designed to maximize our long-term strength, growth, and profitability, and not to achieve an earnings target in any particular fiscal quarter. We believe that this longer-term focus is in the best interests of the Company and our stockholders. At the same time, however, we recognize that, when possible, it is helpful to provide investors with guidance as to our forecast of net sales, operating income, net interest expense, tax rate, earnings per diluted share and other financial metrics or projections. While we generally expect to provide updates to our financial guidance when we report our results each fiscal quarter, we do not have any responsibility to provide guidance going forward or to update any of our forward-looking statements at such times or otherwise. In addition, any longer-term guidance that we provide is based on goals that we believe, at the time guidance is given, are reasonably attainable for growth and performance over a number of years. However, such long-range targets are more difficult to predict than our current quarter and fiscal year expectations. If, or when, we announce actual results that differ from those that have been predicted by us, outside investment analysts, or others, our stock price could be adversely affected. Investors who rely on these predictions when making investment decisions with respect to our securities do so at their own risk. We take no responsibility for any losses suffered as a result of such changes in our stock price.

We periodically return value to investors through payment of quarterly dividends and common stock repurchases. The market price of our securities could be adversely affected if our cash dividend rate or common stock repurchase activity differs from investors' expectations. Refer to "*If we are unable to pay quarterly dividends or conduct stock repurchases at intended levels, our reputation and stock price may be negatively impacted.*" for additional discussion of our quarterly dividend.

***Certain provisions of the Company's charter, bylaws and Maryland law may delay or prevent an acquisition of the Company by a third-party.***

The Company's charter, bylaws and Maryland law contain provisions that could make it more difficult for a third-party to acquire the Company without the consent of our Board. The Company's charter permits a majority of its entire Board, without stockholder approval, to amend the charter to increase or decrease the aggregate number of shares of stock or the number of shares of stock of any class or series that the Company has the authority to issue. In addition, the Company's Board may classify or reclassify any unissued shares of common stock or preferred stock and may set the preferences, rights and other terms of the classified or reclassified shares without stockholder approval. Although the Company's Board has no intention to do so at the present time, it could establish a class or series of preferred stock that could have the effect of delaying, deferring or preventing a transaction or a change in control that might involve a premium price for the Company's common stock or otherwise be in the best interest of the Company's stockholders.

The Company's bylaws provide that nominations of persons for election to the Company's Board and the proposal of business to be considered at an annual meeting of stockholders may be made only in the notice of the meeting, by the Company's Board, by a stockholder who is a stockholder of record as of the record date set by the Company's Board for purposes of determining stockholders entitled to vote at the meeting, at the time of the giving of the notice by the stockholder pursuant to the Company's bylaws and at the time of the meeting, who is entitled to vote at the meeting in the election of each individual so nominated or on any such other business and has complied with the advance notice procedures of the Company's bylaws or by qualifying stockholders that satisfy the proxy access provisions of the Company's bylaws.

Under Maryland law, business combinations, including mergers, consolidations, share exchanges, or, in circumstances specified in the statute, asset transfers or issuances or reclassifications of equity securities, between the Company and any interested stockholder, generally defined as any person who beneficially owns, directly or indirectly, 10% or more of the Company's common stock, or any affiliate of an interested stockholder are prohibited for a five-year period, beginning on the most recent date such person became an interested stockholder. After this period, a business combination must be approved by two super-majority stockholder votes, unless common stockholders receive a minimum price, as defined under Maryland law, for their shares in the form of cash or other consideration in the same form as previously paid by the interested stockholder for its shares. The statute permits various exemptions from its provisions, including business combinations that are exempted by our Board prior to the time that the interested stockholder becomes an interested stockholder.

The Company's charter provides that, except as may be provided by our Board in setting the terms of any class or series of preferred stock, any vacancy on our Board may be filled only by a majority of the remaining directors, even if the remaining directors do not constitute a quorum. The Company's charter further provides that a director may be removed only by the affirmative vote of at least two-thirds of the votes entitled to be cast generally in the election of directors. This provision, when coupled with the exclusive power of our Board to fill vacant directorships, may preclude stockholders from removing incumbent directors except by a substantial affirmative vote and filling the vacancies created by such removal with their own nominees.

***Our bylaws designate the Circuit Court for Baltimore City, Maryland as the sole and exclusive forum for certain actions, including derivative actions, which could limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company and its directors, officers, other employees, or the Company's stockholders and may discourage lawsuits with respect to such claims.***

Unless we consent in writing to the selection of an alternative forum, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Company, (b) any action asserting a claim of breach of any duty owed by any director or officer or other employee of the Company to the Company or to the stockholders of the Company, (c) any action asserting a claim against the Company or any director or officer or other employee of the Company arising pursuant to any provision of the Maryland General Corporation Law, the charter or the bylaws of the Company, or (d) any action asserting a claim against the Company or any director or officer or other employee of the Company that is governed by the internal affairs doctrine, shall, to the fullest extent permitted by law, be the Circuit Court for Baltimore City, Maryland (or, if that Court does not have jurisdiction, the United States District court for the District of Maryland, Baltimore Division). This exclusive forum provision is intended to apply to claims arising under Maryland state law and would not apply to claims brought pursuant to the Securities Exchange Act of 1934, as amended, or the Securities Act of 1933, as amended, or any other claim for which the federal courts have exclusive jurisdiction.

Although we believe the exclusive forum provision benefits us by providing increased consistency in the application of Maryland law for the specified types of actions and proceedings, this provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company and its directors, officers, or other employees and may discourage lawsuits with respect to such claims.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2. PROPERTIES**

The following table sets forth the location, use and size of the Company's key fulfillment, corporate and product development facilities as of July 1, 2023. All of the properties are leased, with the leases expiring at various times through fiscal 2037, subject to renewal options.

| Location | Use | Approximate Square Footage |
|---|---|---|
| Jacksonville, Florida | Coach North America fulfillment and customer service | 1,050,000 |
| Las Vegas, Nevada | Coach North America fulfillment | 789,000 |
| Westchester, Ohio | Kate Spade and Stuart Weitzman North America fulfillment | 601,000 |
| New York, New York | Corporate global headquarters | 546,000 |
| Chiba, Japan | Coach and Kate Spade Japan regional fulfillment | 278,000 |
| Shanghai, China | Coach Asia regional fulfillment | 179,000 |
| New York, New York | Kate Spade corporate management | 135,000 |
| North Bergen, New Jersey | Corporate office and customer service | 106,000 |
| Taiwan, China | Coach Taiwan regional fulfillment | 36,100 |
| Tokyo, Japan | Corporate regional management | 24,900 |
| Shanghai, China | Coach Greater China regional management | 21,200 |
| Shanghai, China | Corporate regional management | 21,200 |
| Elda, Spain | Stuart Weitzman regional management, sourcing and quality control | 19,000 |
| Dongguan, China | Corporate sourcing, quality control and product development | 17,000 |
| London, England | Corporate regional management | 16,500 |
| Ho Chi Minh City, Vietnam | Coach sourcing and quality control | 12,600 |
| Seoul, South Korea | Corporate regional management | 11,400 |
| Singapore | Coach Singapore regional management, sourcing and quality control | 8,700 |
| Hong Kong SAR, China | Corporate sourcing and quality control | 8,500 |

In addition to the above properties, the Company occupies leased retail and outlet store locations located in North America and internationally for each of our brands. These leases expire at various times through fiscal 2034. The Company considers these properties to be in generally good condition, and believes that its facilities are adequate for its operations and provide sufficient capacity to meet its anticipated requirements. Refer to Item 1. "Business," for further information.

**ITEM 3. LEGAL PROCEEDINGS**

The Company is involved in various routine legal proceedings as both plaintiff and defendant incident to the ordinary course of its business, such as to protect Tapestry, Inc.'s intellectual property rights, litigation instituted by persons alleged to have been injured by advertising claims or upon premises within the Company's control, contract disputes, insurance claims and litigation, including wage and hour litigation, with present or former employees.

Although the Company's litigation can result in large monetary awards, such as when a civil jury is allowed to determine compensatory and/or punitive damages, the Company believes that the outcome of all pending legal proceedings in the aggregate will not have a material effect on the Company's business or consolidated financial statements.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market and Dividend Information**

Tapestry, Inc.'s common stock is listed on the New York Stock Exchange and is traded under the symbol "TPR."

As of August 4, 2023, there were 1,899 holders of record of Tapestry's common stock.

Any future determination to pay cash dividends will be at the discretion of Tapestry's Board and will be dependent upon Tapestry's financial condition, operating results, capital requirements and such other factors as the Board deems relevant.

**Performance Graph**

The following graph compares the cumulative total stockholder return (assuming reinvestment of dividends) of the Company's common stock with the cumulative total return of the Standard & Poor's ("S&P") 500 Stock Index and the S&P 1500 Apparel, Accessories & Luxury Goods Index over the five-fiscal-year period ending July 1, 2023, the last day of Tapestry's most recent fiscal year. The graph assumes that $100 was invested on June 30, 2018 at the per share closing price in each of Tapestry's common stock, the S&P 500 Stock Index and the S&P 1500 Apparel, Accessories & Luxury Goods Index, and that all dividends were reinvested. The stock performance shown in the graph is not intended to forecast or be indicative of future performance.

During fiscal 2023, the Company moved to using the S&P 1500 Apparel, Accessories & Luxury Goods Index from the S&P 500 Apparel, Accessories & Luxury Groups Index.

Tapestry management selected the S&P 1500 Apparel, Accessories & Luxury Goods Index on an industry/line-of-business basis and believes this updated index represents good faith comparables based on their history, size, and business models in relation to Tapestry, Inc.



|  | Fiscal 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Fiscal 2022 | Fiscal 2023 |
|---|---|---|---|---|---|---|
| **TPR** | $100.00 | $70.48 | $29.10 | $98.91 | $73.31 | $105.00 |
| **S&P 500 Apparel, Accessories & Luxury Goods** | $100.00 | $88.35 | $48.75 | $93.49 | $54.47 | $48.10 |
| **S&P 1500 Apparel, Accessories & Luxury Goods** | $100.00 | $86.78 | $49.34 | $98.73 | $60.46 | $56.95 |
| **S&P 500** | $100.00 | $110.42 | $115.19 | $169.29 | $150.97 | $178.66 |

**Stock Repurchase Program**

The Company's share repurchases during the fourth quarter of fiscal 2023 were as follows:

| Fiscal Period | Total Number of Shares Repurchased | Average Price per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[1] | Approximate Dollar Value of Shares that May Yet be Purchased Under the Plans or Programs[1] |
|---|---|---|---|---|
| | | (in millions, except share data and per share data) | | |
| April 2, 2023 - May 6, 2023 | - | $ - | - | $ 1,000 |
| May 7, 2023 - June 3, 2023 | 2,092,052 | 41.78 | 2,092,052 | 913.0 |
| June 4, 2023 - July 1, 2023 | 2,614,466 | 43.03 | 2,614,466 | 800.0 |
| Total | 4,706,518 | | 4,706,518 | |

[1] On May 12, 2022, the Company announced that its Board of Directors authorized a common stock repurchase program to repurchase up to $1.50 billion of its outstanding common stock (the "2022 Share Repurchase Program"). Purchases of the Company's common stock were executed through open market purchases, including through purchase agreements under Rule 10b5-1. The authorized value of shares available to be repurchased under this program excludes the cost of commissions and excise taxes.

**ITEM 6. RESERVED**

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion of the Company's financial condition and results of operations should be read together with the Company's consolidated financial statements and notes to those financial statements included elsewhere in this document. When used herein, the terms "the Company," "Tapestry," "we," "us" and "our" refer to Tapestry, Inc., including consolidated subsidiaries. References to "Coach," "Stuart Weitzman," "Kate Spade" or "kate spade new york" refer only to the referenced brand.

**INTRODUCTION**

Management's discussion and analysis of financial condition and results of operations ("MD&A") is provided as a supplement to the accompanying consolidated financial statements and notes thereto to help provide an understanding of our results of operations, financial condition, and liquidity. MD&A is organized as follows:

- *Overview.* This section provides a general description of the business and brands as well as the Company's growth strategy.

- *Global Economic Conditions and Industry Trends.* This section includes a discussion on global economic conditions and industry trends that affect comparability that are important in understanding results of operations and financial conditions, and in anticipating future trends.

- *Results of operations.* An analysis of our results of operations in fiscal 2023 compared to fiscal 2022.

- *Non-GAAP measures.* This section includes non-GAAP measures that are useful to investors and others in evaluating the Company's ongoing operating and financial results in a manner that is consistent with management's evaluation of business performance and understanding how such results compare with the Company's historical performance.

- *Financial Condition.* This section includes a discussion on liquidity and capital resources including an analysis of changes in cash flow as well as working capital and capital expenditures.

- *Critical Accounting policies and estimates.* This section includes any critical accounting policies or estimates that impact the Company.

**OVERVIEW**

The fiscal year ended July 1, 2023 was a 52-week period, July 2, 2022 was a 52-week period, and July 3, 2021 was a 53-week period.

Tapestry, Inc. (the "Company") is a leading New York-based house of iconic accessories and lifestyle brands. Our global house of brands unites the magic of Coach, kate spade new york and Stuart Weitzman. Each of our brands are unique and independent, while sharing a commitment to innovation and authenticity defined by distinctive products and differentiated customer experiences across channels and geographies. We use our collective strengths to move our customers and empower our communities, to make the fashion industry more sustainable, and to build a company that's equitable, inclusive, and diverse. Individually, our brands are iconic. Together, we can stretch what's possible.

The Company has three reportable segments:

- *Coach* - Includes global sales of primarily Coach brand products to customers through Coach operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers and through independent third-party distributors.

- *Kate Spade* - Includes global sales primarily of kate spade new york brand products to customers through Kate Spade operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers and through independent third-party distributors.

- *Stuart Weitzman* - Includes global sales of Stuart Weitzman brand products primarily through Stuart Weitzman operated stores, sales to wholesale customers, through e-commerce sites and through independent third-party distributors.

Each of our brands is unique and independent, while sharing a commitment to innovation and authenticity defined by distinctive products and differentiated customer experiences across channels and geographies. Our success does not depend solely on the performance of a single channel, geographic area or brand.

33

**2025 Growth Strategy**

Building on the success of the strategic growth plan from fiscal 2020 through fiscal 2022 (the "Acceleration Program"), in the first quarter of fiscal 2023, the Company introduced the 2025 growth strategy ("*future*speed"), designed to amplify and extend the competitive advantages of its brands, with a focus on four strategic priorities:

- Building Lasting Customer Relationships: The Company's brands aim to leverage Tapestry's transformed business model to drive customer lifetime value through a combination of increased customer acquisition, retention and reactivation.

- Fueling Fashion Innovation & Product Excellence: The Company aims to drive sustained growth in core handbags and small leathergoods, while accelerating gains in footwear and lifestyle products.

- Delivering Compelling Omni-Channel Experiences: The Company aims to extend its omni-channel leadership to meet the customer wherever they shop, delivering growth online and in stores.

- Powering Global Growth: The Company aims to support balanced growth across regions, prioritizing North America and China, its largest markets, while capitalizing on opportunities in under-penetrated geographies such as Southeast Asia and Europe.

## GLOBAL ECONOMIC CONDITIONS AND INDUSTRY TRENDS

The environment in which we operate is subject to a number of different factors driving global consumer spending. Consumer preferences, macroeconomic conditions, foreign currency fluctuations and geopolitical events continue to impact overall levels of consumer travel and spending on discretionary items, with inconsistent patterns across channels and geographies.

We will continue to monitor the below trends and evaluate and adjust our operating strategies and cost management opportunities to mitigate the related impact on our results of operations, while remaining focused on the long-term growth of our business and protecting the value of our brands.

Furthermore, refer to Part I, Item 1 - "Business" for additional discussion on our expected store openings and closures within each of our segments. For a detailed discussion of significant risk factors that have the potential to cause our actual results to differ materially from our expectations, see Part I, Item 1A. "Risk Factors".

### *Current Macroeconomic Conditions and Outlook*

During fiscal 2023, the macroeconomic environment remained challenging and volatile. Several organizations that monitor the world's economy, including the International Monetary Fund, continue to forecast growth in the global economy. Some of these organizations have recently revised the forecast slightly upwards since the third quarter of fiscal 2023. Nevertheless, the updated forecast is still below the historical average, which is reflective of the current volatile environment, including higher than anticipated inflation, tighter monetary and fiscal policies aiming to lower inflation, financial market volatility, and the negative economic impacts due to the crisis in Ukraine. The World Health Organization ("WHO") announced in May 2023 that it no longer considered Covid-19 to be a global health emergency. Supply chains have largely recovered, and shipping costs and delivery times are back to pre-pandemic levels.

In fiscal 2023, the U.S. Dollar has appreciated as compared to foreign currencies in regions where we conduct our business. During fiscal 2023, this trend has resulted in adverse impacts to our business as compared to prior year, including, but not limited to, decreased Net sales of $217.5 million, negative impact to gross margin of approximately 90 basis points, and negative impact to operating margin of approximately 120 basis point.

Currency volatility, political instability and potential changes to trade agreements or duty rates may also contribute to a worsening of the macroeconomic environment or adversely impact our business. Since fiscal 2019, the U.S. and China have both imposed tariffs on the importation of certain product categories into the respective country, with limited progress in negotiations to reduce or remove the tariffs.

In response to the current environment, the Company continues to take strategic actions considering near-term exigencies and remains committed to maintaining the health of the brands and business.

*Covid-19 Pandemic*

The Covid-19 pandemic has resulted in varying degrees of business disruption for the Company since it began in fiscal 2020 and has impacted all regions around the world, resulting in restrictions and shutdowns implemented by national, state, and local authorities. Such disruptions continued during the first half of fiscal 2023, and the Company's results in Greater China were adversely impacted as a result of the Covid-19 pandemic. Starting in December 2022, certain government restrictions were lifted in the region and business trends have improved. Although the impact of the Covid-19 pandemic during fiscal 2023 has generally been less significant than those experienced in fiscal years 2021 and 2022, we cannot predict for how long and to what extent the Covid-19 pandemic may continue to impact our business, financial condition, and results of operations. We continue to monitor the latest developments regarding the Covid-19 pandemic and potential impacts on our business, operating results and outlook. Refer to Part I, Item 1A. "Risk Factors" for additional discussion regarding risks to our business associated with the Covid-19 pandemic.

*Supply Chain and Logistics Challenges*

Covid-19 has and may cause disruptions in the Company's supply chain within our third-party manufacturers and logistics providers. During fiscal 2022, certain of the Company's third-party manufacturers, primarily located in Vietnam, experienced ongoing and longer-than-expected government mandated restrictions, which resulted in a significant decrease in production capacity for these third-party manufacturers. In response, the Company took deliberate actions such as shifting production to other countries, adjusting its merchandising strategies, where possible, and increasing the use of air freight to expedite delivery. Based on these actions and improved production levels, the Company has and expects that it will continue to be able to meet anticipated levels of demand. The Company has experienced other global logistical challenges, such as delays as a result of port congestion, vessel availability, container shortages for imported products and rising freight costs.

During fiscal 2023, freight costs on inbound shipments have started to moderate and the Company has significantly reduced the use of air freight when compared to fiscal 2022. As a result, during fiscal 2023, the Company incurred lower freight expense of $84.8 million when compared to the prior year, positively impacting gross margin by approximately 140 basis points.

*Generalized System of Preferences ("GSP") program*

The Company has historically benefited from duty-free imports on certain products from certain countries pursuant to the U.S. Generalized System of Preferences ("GSP") program. The GSP program expired in the third quarter of fiscal 2021, resulting in additional duties and negatively impacting gross profit.

*Crisis in Ukraine*

In the third quarter of fiscal 2022, a humanitarian crisis unfolded in Ukraine, which has created significant economic uncertainty in the region. The Company does not have directly operated stores in Russia or Ukraine and has a minimal distributor and wholesale business which was less than 0.1% of the Company's total Net sales for fiscal 2023 and fiscal 2022. Starting in the third quarter of fiscal 2022 the Company paused all wholesale shipments to Russia. The Company's total business in Europe represented less than 5% of fiscal 2023 and fiscal 2022 total Net sales.

*Tax Legislation*

Over the past year, there has been significant discussion with regards to tax legislation by both the Biden Administration and the Organization for Economic Cooperation and Development ("OECD"). On August 16, 2022, the Inflation Reduction Act of 2022 was signed into law by the Biden Administration, with tax provisions primarily focused on implementing a 15% corporate alternative minimum tax on global adjusted financial statement income ("CAMT") and a 1% excise tax on share repurchases. On December 12, 2022, the European Union member states also reached agreement to implement the OECD's reform of international taxation known as Pillar Two Global Anti-Base Erosion ("GloBE") Rules, which broadly mirror the Inflation Reduction Act by imposing a 15% global minimum tax on multinational companies. The CAMT and GloBE are anticipated to be effective beginning in fiscal 2024 and fiscal 2025, respectively. The US Treasury and the OECD continue to seek input and release guidance on the CAMT and GloBE legislation and how the two will interact, so it is unclear at this time what, if any, impact either will have on the Company's tax rate and financial results. We will continue to evaluate their impact as further information becomes available. With respect to the 1% excise tax on net share repurchases, this provision of the Inflation Reduction Act was effective on January 1, 2023 and did not have a material impact on our financial statements. This excise tax is recorded in Retained earnings as part of Stockholders' Equity.

**RESULTS OF OPERATIONS**

**FISCAL 2023 COMPARED TO FISCAL 2022**

The following table summarizes results of operations for fiscal 2023 compared to fiscal 2022. All percentages shown in the tables below and the related discussion that follows have been calculated using unrounded numbers.

| | | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|---|
| | July 1, 2023 | | July 2, 2022 | | Variance | |
| | | | (millions, except per share data) | | | |
| | Amount | % of net sales | Amount | % of net sales | Amount | % |
| Net sales | $ 6,660.9 | 100.0 % | $ 6,684.5 | 100.0% | $ (23.6) | (0.4)% |
| Gross profit | 4,714.9 | 70.8 | 4,650.4 | 69.6 | 64.5 | 1.4 |
| SG&A expenses | 3,542.5 | 53.1 | 3,474.6 | 52.0 | 67.9 | 2.0 |
| Operating income (loss) | 1,172.4 | 17.6 | 1,175.8 | 17.6 | (3.4) | (0.3) |
| Loss on extinguishment of debt | - | - | 53.7 | 0.8 | (53.7) | NM |
| Interest expense, net | 27.6 | 0.4 | 58.7 | 0.9 | (31.1) | (53.0) |
| Other expense (income) | 1.7 | - | 16.4 | 0.2 | (14.7) | (89.5) |
| Income (Loss) before provision for income taxes | 1,143.1 | 17.2 | 1,047.0 | 15.7 | 96.1 | 9.2 |
| Provision for income taxes | 207.1 | 3.1 | 190.7 | 2.9 | 16.4 | 8.6 |
| Net income (loss) | 936.0 | 14.1 | 856.3 | 12.8 | 79.7 | 9.3 |
| Net income (loss) per share: | | | | | | |
| Basic | $ 3.96 | | $ 3.24 | | $ 0.72 | 22.2 |
| Diluted | $ 3.88 | | $ 3.17 | | $ 0.71 | 22.3 |

NM - Not meaningful

**GAAP to Non-GAAP Reconciliation**

The Company's reported results are presented in accordance with accounting principles generally accepted in the United States of America ("GAAP"). There were no charges affecting comparability during fiscal 2023. The reported results during fiscal 2022 reflect certain items which affect the comparability of our results, as noted in the following tables. Refer to "Non-GAAP Measures" herein for further discussion on the Non-GAAP measures.

36

Fiscal 2022 Items

| | | | GAAP Basis (As Reported) | Acceleration Program | Debt Extinguishment | Non-GAAP Basis (Excluding Items) |
|---|---|---|---|---|---|---|
| | | | **Fiscal Year Ended July 2, 2022** | | | |
| | | | | Items affecting comparability | | |
| | | | (millions, except per share data) | | | |
| Coach | | | 3,553.8 | - | - | 3,553.8 |
| Kate Spade | | | 912.0 | - | - | 912.0 |
| Stuart Weitzman | | | 184.6 | - | - | 184.6 |
| Gross profit | | $ | 4,650.4 $ | - $ | - $ | 4,650.4 |
| | | | | | | |
| Coach | | | 2,079.9 | 6.7 | - | 2,073.2 |
| Kate Spade | | | 754.6 | 5.9 | - | 748.7 |
| Stuart Weitzman | | | 182.8 | 3.6 | - | 179.2 |
| Corporate | | | 457.3 | 26.6 | - | 430.7 |
| SG&A expenses | | $ | 3,474.6 $ | 42.8 $ | - $ | 3,431.8 |
| | | | | | | |
| Coach | | | 1,473.9 | (6.7) | - | 1,480.6 |
| Kate Spade | | | 157.4 | (5.9) | - | 163.3 |
| Stuart Weitzman | | | 1.8 | (3.6) | - | 5.4 |
| Corporate | | | (457.3) | (26.6) | - | (430.7) |
| Operating income (loss) | | $ | 1,175.8 $ | (42.8) $ | - $ | 1,218.6 |
| | | | | | | |
| Loss on extinguishment of debt | | | 53.7 | - | 53.7 | - |
| Provision for income taxes | | | 190.7 | (3.4) | (12.9) | 207.0 |
| Net income (loss) | | $ | 856.3 $ | (39.4) $ | (40.8) $ | 936.5 |
| Net income (loss) per diluted common share | | $ | 3.17 $ | (0.15) $ | (0.15) $ | 3.47 |

In fiscal 2022 the Company incurred adjustments as follows:

- *Debt Extinguishment* - Debt extinguishment charges relate to the premiums, amortization and fees associated with the $500 million cash tender of the Company's 2027 Senior Notes and 2025 Senior Notes in the second quarter of fiscal 2022. Refer to Note 12, "Debt," for further information.

- *Acceleration Program* - Total charges incurred under the Acceleration Program are primarily share-based compensation and professional fees incurred as a result of the development and execution of the Company's comprehensive strategic initiative. Refer to the "Executive Overview" herein and Note 5, "Restructuring Activities," for further information.

These actions taken together increased the Company's SG&A expenses by $42.8 million, increased Loss on extinguishment of debt by $53.7 million and decreased Provision for income taxes by 16.3 million, negatively impacting net income by 80.2 million, or 0.30 per diluted share.

**Tapestry, Inc. Summary - Fiscal 2023**

**Currency Fluctuation Effects**

The change in net sales and gross margin in fiscal 2023 compared to fiscal 2022 has been presented both including and excluding currency fluctuation effects. All percentages shown in the tables below and the discussion that follows have been calculated using unrounded numbers.

**Net Sales**

| | Fiscal Year Ended | | | Variance | | Constant Currency Change |
|---|---|---|---|---|---|---|
| | July 1, 2023 | July 2, 2022 | Amount | % | |
| | | | (millions) | | | |
| Coach | $ 4,960.4 | $ 4,921.3 | $ 39.1 | 0.8% | 4.5% |
| Kate Spade | 1,418.9 | 1,445.5 | (26.6) | (1.8) | 0.2 |
| Stuart Weitzman | 281.6 | 317.7 | (36.1) | (11.4) | (9.1) |
| Total Tapestry | $ 6,660.9 | $ 6,684.5 | $ (23.6) | (0.4) | 2.9 |

Net sales in fiscal 2023 decreased 0.4% or $23.6 million to $6.66 billion. Excluding the impact of foreign currency, net sales increased by 2.9% or $193.9 million.

- *Coach Net Sales* increased 0.8% or $39.1 million to $4.96 billion in fiscal 2023. Excluding the impact of foreign currency, net sales increased 4.5% or $219.9 million. This increase in net sales was primarily due to an increase of $161.3 million in net retail sales driven by an increase of store sales globally, partially offset by a decrease in e-commerce sales. The increase in net sales was also attributed to a $30.5 million increase in wholesale sales.

- *Kate Spade Net Sales* decreased 1.8% or $26.6 million to $1.42 billion in fiscal 2023. Excluding the impact of foreign currency, net sales increased 0.2% or $3.0 million. This increase in net sales was primarily due to an increase of $2.4 million in net retail sales driven by higher store sales globally, partially offset by a decrease in e-commerce sales.

- *Stuart Weitzman Net Sales* decreased by 11.4% or $36.1 million to $281.6 million in fiscal 2023. Excluding the impact of foreign currency, net sales decreased 9.1% or $29.0 million. This decrease in net sales was primarily due to a decrease of $15.3 million in net retail sales driven by a decrease in stores globally, partially offset by a increase in e-commerce sales. This decrease in net sales was also attributed to a $13.7 million decrease in wholesale sales.

**Gross Profit**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | July 1, 2023 | | July 2, 2022 | | Variance | |
| | | | (millions) | | | |
| | Amount | % of Net Sales | Amount | % of Net Sales | Amount | % |
| Coach | $ 3,647.1 | 73.5 % | $ 3,553.8 | 72.2% | $ 93.3 | 2.6% |
| Kate Spade | 900.1 | 63.4 | 912.0 | 63.1 | (11.9) | (1.3) |
| Stuart Weitzman | 167.7 | 59.6 | 184.6 | 58.1 | (16.9) | (9.1) |
| Tapestry | $ 4,714.9 | 70.8 | $ 4,650.4 | 69.6 | $ 64.5 | 1.4 |

Gross profit increased 1.4% or $64.5 million to $4.71 billion in fiscal 2023 from $4.65 billion in fiscal 2022. Gross margin increased 120 basis points to 70.8% in fiscal 2023 from 69.6% in fiscal 2022. This increase in Gross margin was primarily attributed to lower freight costs, net pricing improvements and favorable geography mix, partially offset by unfavorable currency translation. Refer to "Current Macroeconomic Conditions and Outlook" and "Supply Chain and Logistics Challenges" herein, for further information.

The Company includes inbound product-related transportation costs from our service providers within Cost of sales. The Company, similar to some companies, includes certain transportation-related costs due to our distribution network in SG&A expenses rather than in Cost of sales; for this reason, our gross margins may not be comparable to that of entities that include all costs related to their distribution network in Cost of sales.

**Selling, General and Administrative Expenses**

| | Fiscal Year Ended | | | | | |
| | July 1, 2023 | | July 2, 2022 | | Variance | |
| | (millions) | | | | | |
| | Amount | % of Net Sales | Amount | % of Net Sales | Amount | % |
|---|---|---|---|---|---|---|
| Coach[1] | $ 2,117.2 | 42.7 % | $ 2,079.9 | 42.3% | $ 37.3 | 1.8% |
| Kate Spade[1] | 785.1 | 55.3 | 754.6 | 52.2 | 30.5 | 4.0 |
| Stuart Weitzman[1] | 174.4 | 62.0 | 182.8 | 57.5 | (8.4) | (4.6) |
| Corporate[1][2] | 465.8 | NA | 457.3 | NA | 8.5 | 1.9 |
| Tapestry | $ 3,542.5 | 53.1 | $ 3,474.6 | 52.0 | $ 67.9 | 2.0 |

   SG&A expenses increased 2.0% or $67.9 million to $3.54 billion in fiscal 2023 as compared to $3.47 billion in fiscal 2022. As a percentage of net sales, SG&A expenses increased to 53.1% during fiscal 2023 as compared to 52.0% during fiscal 2022. Excluding items affecting comparability of $42.8 million in fiscal 2022, SG&A expenses increased 3.2% or $110.7 million to $3.54 billion from $3.43 billion in fiscal 2022. SG&A as a percentage of net sales increased 180 basis points to 53.1% compared to 51.3% in fiscal 2022. This increase in SG&A as a percentage of net sales was primarily due to higher information technology costs, increased occupancy costs, and higher marketing spend.

[1] In fiscal 2022, Coach, Kate Spade, Stuart Weitzman and Corporate incurred charges affecting comparability of $6.7 million, $5.9 million, $3.6 million and $26.6 million respectively. Excluding those items affecting comparability:
   - Coach: SG&A expenses increased 2.1% or $44.0 million to $2.12 billion from $2.07 billion in fiscal 2022; and SG&A expenses as a percentage of net sales increased to 42.7% in fiscal 2023 from 42.1% in fiscal 2022.
   - Kate Spade: SG&A expenses increased 4.9% or $36.4 million to $785.1 million from $748.7 million in fiscal 2022; and SG&A expenses as a percentage of net sales increased to 55.3% in fiscal 2023 from 51.8% in fiscal 2022.
   - Stuart Weitzman: SG&A expenses decreased 2.7% or $4.8 million to $174.4 million from $179.2 million in fiscal 2022; and SG&A expenses as a percentage of net sales increased to 62.0% in fiscal 2023 from 56.4% in fiscal 2022.
   - Corporate: SG&A expenses increased 8.2% or $35.1 million to $465.8 in fiscal 2023 as compared to $430.7 million in fiscal 2022.

[2] Corporate expenses, which are included within SG&A expenses discussed above but are not directly attributable to a reportable segment.

**Operating Income (Loss)**

| | Fiscal Year Ended | | | | | |
| | July 1, 2023 | | July 2, 2022 | | Variance | |
| | (millions) | | | | | |
| | Amount | % of Net Sales | Amount | % of Net Sales | Amount | % |
|---|---|---|---|---|---|---|
| Coach | $ 1,529.9 | 30.8 % | $ 1,473.9 | 29.9 % | $ 56.0 | 3.8 % |
| Kate Spade | 115.0 | 8.1 | 157.4 | 10.9 | (42.4) | (27.0) |
| Stuart Weitzman | (6.7) | (2.4) | 1.8 | 0.6 | (8.5) | NM |
| Corporate | (465.8) | - | (457.3) | NA | (8.5) | (1.9) |
| Tapestry | $ 1,172.4 | 17.6 | $ 1,175.8 | 17.6 | $ (3.4) | (0.3) |

   Operating income decreased $3.4 million to $1.17 billion during fiscal 2023 as compared to $1.18 billion in fiscal 2022. Operating margin remained even at 17.6% in fiscal 2023 as compared to 17.6% in fiscal 2022. Excluding items affecting comparability of $42.8 million in fiscal 2022, operating income decreased $46.2 million to $1.17 billion from $1.22 billion in fiscal 2022; and operating margin decreased 60 basis points to 17.6% in fiscal 2023 as compared to 18.2% in fiscal 2022. This decrease in operating margin was primarily attributed to a increase of 180 basis points in SG&A as a percentage of sales partially offset by a 120 basis points increase in gross margin.

- *Coach Operating Income* increased $56.0 million to $1.53 billion in fiscal 2023, resulting in an operating margin increase of 90 basis points to 30.8%, as compared to $1.47 billion and 29.9%, respectively in fiscal 2022. Excluding items affecting comparability, Coach operating income increased $49.3 million to $1.53 billion from $1.48 billion in fiscal 2022; and operating margin increased 70 basis points to 30.8% in fiscal 2023 as compared to 30.1% in fiscal 2022. This increase in operating margin was primarily attributed to a 130 basis points increase in gross margin, mainly due to lower freight costs and net pricing improvements, partially offset by unfavorable currency translation, and a 60 basis point increase in SG&A expenses as a percentage of net sales, mainly due to higher information technology costs and higher marketing spend, partially offset by a decrease in selling costs.

- *Kate Spade Operating Income* decreased $42.4 million to $115.0 million in fiscal 2023, resulting in an operating margin decrease of 280 basis points to 8.1%, as compared to 157.4 million and 10.9%, respectively in fiscal 2022. Excluding items affecting comparability, Kate Spade operating income decreased $48.3 million to $115.0 million from $163.3 million in fiscal 2022; and operating margin decreased 320 basis points to 8.1% in fiscal 2023 as compared to 11.3% in fiscal 2022. This decrease in operating margin was primarily attributed to a 350 basis points increase in SG&A expenses as a percentage of net sales, partially due to deleverage of expenses on lower net sales. This increase in SG&A expenses as a percentage of net sales was mainly due to an increase in selling and distribution costs, higher information technology costs and increased occupancy costs, partially offset by a 30 basis points increase in gross margin, mainly due to lower freight costs and favorable geography mix, partially offset by unfavorable currency translation, increased promotional activity and unfavorable channel mix.

- *Stuart Weitzman Operating Loss* increased $8.5 million to a loss of $6.7 million in fiscal 2023, resulting in an operating margin decrease of 300 basis points to (2.4)%, as compared to operating income of $1.8 million in fiscal 2022 and operating margin of 0.6%. Excluding items affecting comparability, Stuart Weitzman operating loss increased $12.1 million to an operating loss of $6.7 million from operating income of $5.4 million in fiscal 2022; and operating margin decreased 410 basis points to (2.4)% in fiscal 2023 as compared to 1.7% in fiscal 2022. This decrease in operating margin was primarily attributable to a 560 basis point increase in SG&A expenses as a percentage of net sales, partially due to deleverage of expenses on lower net sales. This increase in SG&A expenses as a percentage of net sales was mainly due to higher marketing spend, increased compensation costs, higher information technology costs and higher depreciation, partially offset by a 150 basis points increase in gross margin, primarily attributed to net pricing improvements and lower freight costs, partially offset by unfavorable currency translation.

- *Corporate Operating Loss* increased (1.9)% or $8.5 million to $465.8 million in fiscal 2023. Excluding items affecting comparability, Corporate operating loss increased $35.1 million to $465.8 million from $430.7 million in fiscal 2022. This increase in operating loss was attributed to an increase in SG&A expenses primarily due to higher information technology costs, higher professional fees, increased compensation costs and increased occupancy costs.

**Loss on Extinguishment of Debt**

There was no loss on extinguishment of debt in fiscal 2023 as compared to $53.7 million in fiscal 2022. This was primarily related to the premiums, amortization and fees associated with the partial tender of the company's 2027 senior notes and 2025 senior notes.

**Interest Expense, net**

Net interest expense decreased 53.0% or $31.1 million to $27.6 million in fiscal 2023 as compared to $58.7 million in fiscal 2022. This decrease in Interest expense, net was mainly due to the favorable impact of the net investment hedges, lower bond interest expense on senior notes, as well as higher interest income offset by higher interest on the term loan.

**Other Expense (Income)**

Other expense decreased $14.7 million to $1.7 million in fiscal 2023 as compared to an expense of $16.4 million in fiscal 2022. This decrease in other expense was related to a decrease in foreign exchange losses.

**Provision for Income Taxes**

The effective tax rate was 18.1% in fiscal 2023 as compared to 18.2% in fiscal 2022. Excluding items affecting comparability, the effective tax rate was 18.1% in fiscal 2022.

**Net Income (Loss)**

Net income increased $79.7 million to a net income of $936.0 million in fiscal 2023 as compared to a net income of $856.3 million in fiscal 2022. Excluding items affecting comparability, net income decreased $0.5 million to $936.0 million in fiscal 2023 from $936.5 million in fiscal 2022.

**Net Income (Loss) per Share**

Net income per diluted share was $3.88 in fiscal 2023 as compared to net income per diluted share of $3.17 in fiscal 2022. Excluding items affecting comparability, net income per diluted share increased $0.41 to $3.88 in fiscal 2023 from $3.47 in fiscal 2022, primarily due to higher net income and a decrease in shares outstanding.

**FISCAL 2022 COMPARED TO FISCAL 2021**

The comparison of fiscal 2022 to 2021 has been omitted from this Form 10-K, but can be referenced in our Form 10-K for the fiscal year ended July 2, 2022, filed on August 18, 2022 within Part II. Item 7. "Management's Discussion and Analysis of Financial Conditions and Results of Operations".

**NON-GAAP MEASURES**

The Company's reported results are presented in accordance with GAAP. There were no items affecting comparability during fiscal 2023. The reported SG&A expenses, operating income, loss on extinguishment of debt, provision for income taxes, net income and earnings per diluted share in fiscal 2022 reflect certain items, including Acceleration Program costs and debt extinguishment costs. As a supplement to the Company's reported results, these metrics are also reported on a non-GAAP basis to exclude the impact of these items along with a reconciliation to the most directly comparable GAAP measures.

The Company has historically reported comparable store sales, which reflects sales performance at stores that have been open for at least 12 months, and includes sales from e-commerce sites. The Company excludes new stores, including newly acquired locations, from the comparable store base for the first twelve months of operation. The Company excludes closed stores from the calculation. Comparable store sales are not adjusted for store expansions. Due to extensive temporary store closures resulting from the impact of the Covid-19 pandemic, comparable store sales are not reported for the fiscal year ended July 1, 2023 as the Company does not believe this metric is currently meaningful to the readers of its financial statements for this period.

These non-GAAP performance measures were used by management to conduct and evaluate its business during its regular review of operating results for the periods affected. Management and the Company's Board utilized these non-GAAP measures to make decisions about the uses of Company resources, analyze performance between periods, develop internal projections and measure management performance. The Company's internal management reporting excluded these items. In addition, the human resources committee of the Company's Board uses these non-GAAP measures when setting and assessing achievement of incentive compensation goals.

The Company operates on a global basis and reports financial results in U.S. dollars in accordance with GAAP. Fluctuations in foreign currency exchange rates can affect the amounts reported by the Company in U.S. dollars with respect to its foreign revenues and profit. Accordingly, certain material increases and decreases in operating results for the Company and its segments have been presented both including and excluding currency fluctuation effects. These effects occur from translating foreign-denominated amounts into U.S. dollars and comparing to the same period in the prior fiscal year. Constant currency information compares results between periods as if exchange rates had remained constant period-over-period. The Company calculates constant currency revenue results by translating current period revenue in local currency using the prior year period's currency conversion rate.

We believe these non-GAAP measures are useful to investors and others in evaluating the Company's ongoing operating and financial results in a manner that is consistent with management's evaluation of business performance and understanding how such results compare with the Company's historical performance. Additionally, we believe presenting certain increases and decreases in constant currency provides a framework for assessing the performance of the Company's business outside the United States and helps investors and analysts understand the effect of significant year-over-year currency fluctuations. We believe excluding these items assists investors and others in developing expectations of future performance.

By providing the non-GAAP measures, as a supplement to GAAP information, we believe we are enhancing investors' understanding of our business and our results of operations. The non-GAAP financial measures are limited in their usefulness and should be considered in addition to, and not in lieu of, GAAP financial measures. Further, these non-GAAP measures may be unique to the Company, as they may be different from non-GAAP measures used by other companies.

For a detailed discussion on these non-GAAP measures, see Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**FINANCIAL CONDITION**

**Cash Flows - Fiscal 2023 Compared to Fiscal 2022**

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | July 1, 2023 | July 2, 2022 | Change |
| | (millions) | | |
| Net cash provided by (used in) operating activities | $ 975.2 | $ 853.2 | $ 122.0 |
| Net cash provided by (used in) investing activities | 5.7 | (253.6) | 259.3 |
| Net cash provided by (used in) financing activities | (1,035.9) | (1,778.1) | 742.2 |
| Effect of exchange rate changes on cash and cash equivalents | (8.7) | (39.4) | 30.7 |
| Net increase (decrease) in cash and cash equivalents | $ (63.7) | $ (1,217.9) | $ 1,154.2 |

The Company's cash and cash equivalents decreased by $63.7 million in fiscal 2023 compared to a decrease of $1.22 billion in fiscal 2022, as discussed below.

**Net cash provided by (used in) operating activities**

Net cash provided by operating activities increased $122.0 million primarily due to changes in operating assets and liabilities of $149.9 million and higher net income of $79.7 million, partially offset by lower impact of non-cash adjustments of $107.6 million.

The $149.9 million change in our operating asset and liability balances was primarily driven by:

- Inventories were a source of cash of $49.9 million in fiscal 2023 as compared to a use of cash of $311.7 million in fiscal 2022, primarily driven by lower in-transits and receipts due to the strategic decision to pull back on receipts as well as normalization of lead times.

- Trade accounts receivable were a source of cash of $44.1 million in fiscal 2023 as compared to a use of cash of $96.0 million in fiscal 2022, primarily driven by higher wholesale sales in fiscal 2022 compared to fiscal 2021.

- Accounts payable were a use of cash of $98.1 million in fiscal 2023 as compared to a source of cash of $86.4 million in fiscal 2022, primarily driven by lower in-transit inventory and receipts compared to prior year due to the strategic decision to pull back on receipts.

- Accrued liabilities were a use of cash of $93.0 million in fiscal 2023 as compared to a use of cash of $16.1 million in fiscal 2022, primarily driven by a decrease in accruals for the Annual Incentive Plan, a decrease in accrued freight and duty, partially offset by an increase in accrued interest due to the net investment hedge and the timing of income tax payments.

- Other liabilities were a use of cash of $61.1 million in fiscal 2023 as compared to a use of cash of $9.2 million in fiscal 2022, primarily driven by lower long-term transition tax due to timing of payment schedule.

**Net cash provided by (used in) investing activities**

Net cash provided by investing activities was $5.7 million in fiscal 2023 compared to a use of cash of $253.6 million in fiscal 2022, resulting in a $259.3 million increase in net cash provided by investing activities.

The $5.7 million source of cash in fiscal 2023 is primarily due to proceeds from maturities and sales of investments of $148.0 million, settlement of net investment hedge of $41.9 million, partially offset by capital expenditures of $184.2 million.

The $253.6 million use of cash in fiscal 2022 is primarily due to purchases of investments of $540.4 million and capital expenditures of $93.9 million, partially offset by proceeds from maturities and sales of investments of $380.7 million.

**Net cash provided by (used in) financing activities**

Net cash used in financing activities was $1.04 billion in fiscal 2023 as compared to a use of cash of $1.78 billion in fiscal 2022, resulting in a $742.2 million decrease in net cash used in financing activities.

The $1.04 billion use of cash in fiscal 2023 was primarily due to repurchase of common stock of $703.5 million, dividend payments of $283.3 million as well as taxes paid to net settle share-based awards of $55.6 million.

The $1.78 billion use of cash in fiscal 2022 was primarily due to repurchase of common stock of $1.60 billion, repayment of debt of $900.0 million, payment of dividends of $264.4 million and the payment of debt extinguishment costs of $50.7 million, partially offset by proceeds from debt, net of discount of $998.5 million.

42

**Cash Flows - Fiscal 2022 Compared to Fiscal 2021**

The comparison of fiscal 2022 to 2021 has been omitted from this Form 10-K, but can be referenced in our Form 10-K for the fiscal year ended July 2, 2022, filed on August 18, 2022 within Part II. Item 7. "Management's Discussion and Analysis of Financial Conditions and Results of Operations".

**Working Capital and Capital Expenditures**

As of July 1, 2023, in addition to our cash flows from operations, our sources of liquidity and capital resources were comprised of the following:

| | Sources of Liquidity | | Outstanding Indebtedness | | Total Available Liquidity[1] | |
|---|---|---|---|---|---|---|
| | | | (millions) | | | |
| Cash and cash equivalents[1] | $ | 726.1 | $ | - | $ | 726.1 |
| Short-term investments[1] | | 15.4 | | - | | 15.4 |
| Revolving Credit Facility[2] | | 1,250.0 | | - | | 1,250.0 |
| Term Loan[2] | | 468.8 | | 468.8 | | - |
| 3.050% Senior Notes due 2032[3] | | 500.0 | | 500.0 | | - |
| 4.125% Senior Notes due 2027[3] | | 396.6 | | 396.6 | | - |
| 4.250% Senior Notes due 2025[3] | | 303.4 | | 303.4 | | - |
| Total | $ | 3,660.3 | $ | 1,668.8 | $ | 1,991.5 |

---

[1] As of July 1, 2023, approximately 47.0% of our Cash and cash equivalents and Short-term investments were held outside the United States.

[2] On May 11, 2022, the Company entered into a definitive agreement whereby Bank of America, N.A., as administrative agent, other agents party thereto, and a syndicate of banks and financial institutions have made available to the Company a $1.25 billion revolving credit facility (the "$1.25 Billion Revolving Credit Facility") and an unsecured $500.0 Million Term Loan (the "Term Loan"). Both the $1.25 Billion Revolving Credit Facility and Term Loan (collectively, the "Credit Facilities") will mature on May 11, 2027. The Company and its subsidiaries must comply on a quarterly basis with a maximum 4.0 to 1.0 ratio of (a) consolidated debt minus unrestricted cash and cash equivalents in excess of $300 million to (b) consolidated EBITDAR.

Borrowings under the $1.25 Billion Revolving Credit Facility bear interest at a rate per annum equal to, at the Company's option, (i) for borrowings in U.S. Dollars, either (a) an alternate base rate or (b) a term secured overnight financing rate, (ii) for borrowings in Euros, the Euro Interbank Offered Rate, (iii) for borrowings in Pounds Sterling, the Sterling Overnight Index Average Reference Rate and (iv) for borrowings in Japanese Yen, the Tokyo Interbank Offer Rate, plus, in each case, an applicable margin. The applicable margin will be adjusted by reference to a grid (the "Pricing Grid") based on the ratio of (a) consolidated debt to (b) consolidated EBITDAR (the "Gross Leverage Ratio"). Additionally, the Company will pay facility fees, calculated at a rate per annum determined in accordance with the Pricing Grid, on the full amount of the $1.25 Billion Revolving Credit Facility, payable quarterly in arrears, and certain fees with respect to letters of credit that are issued. The $1.25 Billion Revolving Credit Facility may be used to finance the working capital needs, capital expenditures, permitted investments, share purchases, dividends and other general corporate purposes of the Company and its subsidiaries (which may include commercial paper backup). There were no outstanding borrowings on the $1.25 Billion Revolving Credit Facility as of July 1, 2023.

The Term Loan includes a two-month delayed draw period from the closing date. On June 14, 2022 the Company drew down on the Term Loan to satisfy the Company's remaining obligations under the 3.000% senior unsecured notes due 2022 and for general corporate purposes. The Term Loan amortizes in an amount equal to 5.00% per annum, with payments made quarterly. As of July 1, 2023, $25.0 million of the Term Loan is included in Current debt on the Consolidated Balance Sheets. Borrowings under the Term Loan bear interest at a rate per annum equal to, at the Company's option, either (i) an alternate base rate or (ii) a term secured overnight financing rate plus, in each case, an applicable margin. The applicable margin will be adjusted by reference to a pricing grid based on the Gross Leverage Ratio. Additionally, the Company will pay a ticking fee on the undrawn amount of the Term Loan. Refer to Note 12, "Debt," for further information on our existing debt instruments.

[3] In December 2021, the Company issued $500.0 million aggregate principal amount of 3.050% senior unsecured notes due March 15, 2032 at 99.705% of par (the "2032 Senior Notes") and completed cash tender offers for $203.4 million and $296.6 million of the outstanding aggregate principal amount under its 2027 Senior Notes and 2025 Senior Notes, respectively. In June 2017, the Company issued $600.0 million aggregate principal amount of 2027 Senior Notes. In March 2015, the Company issued $600.0 million aggregate principal amount of 2025 Senior Notes. Furthermore, the indentures for the 2032 Senior Notes, 2027 Senior Notes, and 2025 Senior Notes contain certain covenants limiting the Company's ability to: (i) create certain liens, (ii) enter into certain sale and leaseback transactions and (iii) merge, or consolidate or transfer, sell or lease all or substantially all of the Company's assets. As of July 1, 2023, no known events of default have occurred. Refer to Note 12, "Debt," for further information on our existing debt instruments.

We believe that our Revolving Credit Facility is adequately diversified with no undue concentrations in any one financial institution. As of July 1, 2023, there were 14 financial institutions participating in the Revolving Credit Facility and Term Loans, with no one participant maintaining a combined maximum commitment percentage in excess of 14%. We have no reason to believe at this time that the participating institutions will be unable to fulfill their obligations to provide financing in accordance with the terms of the facility in the event we elect to draw funds in the foreseeable future.

We have the ability to draw on our credit facilities or access other sources of financing options available to us in the credit and capital markets for, among other things, acquisition or integration-related costs, our restructuring initiatives, settlement of a material contingency, or a material adverse business or macroeconomic development, as well as for other general corporate business purposes.

Management believes that cash flows from operations, access to the credit and capital markets and our credit lines, on-hand cash and cash equivalents and our investments will provide adequate funds to support our operating, capital, and debt service requirements for fiscal 2023 and beyond. There can be no assurance that any such capital will be available to the Company on acceptable terms or at all. Our ability to fund working capital needs, planned capital expenditures, and scheduled debt payments, as well as to comply with all of the financial covenants under our debt agreements, depends on future operating performance and cash flow. This future operating performance and cash flow are subject to prevailing economic conditions, and to financial, business and other factors, some of which are beyond the Company's control.

To improve our working capital efficiency, we make available to certain suppliers a voluntary supply chain finance ("SCF") program that enables our suppliers to sell their receivables from the Company to a global financial institution on a non-recourse basis at a rate that leverages our credit rating. We do not have the ability to refinance or modify payment terms to the global financial institution through the SCF program. No guarantees are provided by the Company or any of our subsidiaries under the SCF program.

Total capital expenditures and cloud computing implementation costs were $260.8 million in fiscal 2023 as the Company continues to prioritize investing in digital capabilities. Certain cloud computing implementation costs are recognized within Prepaid expenses and Other assets on the Consolidated Balance Sheets.

### *Seasonality*

The Company's results are typically affected by seasonal trends. During the first fiscal quarter, we typically build inventory for the winter and holiday season. In the second fiscal quarter, working capital requirements are reduced substantially as we generate higher net sales and operating income, especially during the holiday season.

Fluctuations in net sales, operating income and operating cash flows of the Company in any fiscal quarter may be affected by the timing of wholesale shipments and other events affecting retail sales, including weather and macroeconomic events, and pandemics such as Covid-19.

### *Stock Repurchase Plan*

On May 12, 2022, the Company announced the Board of Directors authorized the additional repurchase of up to $1.50 billion of its common stock (the "2022 Share Repurchase Program"). Pursuant to this program, purchases of the Company's common stock will be made subject to market conditions and at prevailing market prices, through open market purchases. Repurchased shares of common stock will become authorized but unissued shares. These shares may be issued in the future for general corporate and other purposes. In addition, the Company may terminate or limit the stock repurchase program at any time. As of July 1, 2023 the Company had $800 million of additional shares available to be repurchased as authorized under the 2022 Share Repurchase Program. Refer to Part II, Item 5. "Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities," for further information. During fiscal 2023, the Company repurchased $700 million worth of shares.

44

**Contractual and Other Obligations**

*Firm Commitments*

As of July 1, 2023, the Company's contractual obligations are as follows:

| | Total | Fiscal 2024 | Fiscal 2025 - 2026 | Fiscal 2027 - 2028 | Fiscal 2029 and Beyond |
|---|---|---|---|---|---|
| | | | (millions) | | |
| Capital expenditure & cloud computing implementation commitments | $ 20.4 | $ 16.9 | $ 3.5 | $ - | $ - |
| Inventory purchase obligations | 352.6 | 352.6 | - | - | - |
| Operating lease obligations | 1,947.6 | 376.7 | 536.1 | 348.3 | 686.5 |
| Finance lease obligations | 2.7 | 1.4 | 1.3 | - | - |
| Debt repayment | 1,668.8 | 25.0 | 353.4 | 790.4 | 500.0 |
| Interest on outstanding debt[1] | 345.8 | 74.0 | 130.8 | 80.0 | 61.0 |
| Mandatory transition tax payments[2] | 68.3 | 24.8 | 43.5 | - | - |
| Other | 187.5 | 102.9 | 81.7 | 2.9 | - |
| Total | $ 4,593.7 | $ 974.3 | $ 1,150.3 | $ 1,221.6 | $ 1,247.5 |

[1] Interest on outstanding debt includes fixed interest expenses for unsecured notes and variable interest expenses for the term loan. The estimated interest expenses associated with our term loan is based on the current interest rate as of July 1, 2023. Refer to Note 12, "Debt," for further information.

[2] Mandatory transition tax payments represent our tax obligation incurred in connection with the deemed repatriation of previously deferred foreign earnings pursuant to the Tax Legislation. Refer to Note 15, "Income Taxes," for further information.

We expect to fund these firm commitments with operating cash flows generated in the normal course of business and, if necessary, through availability under our credit facilities or other accessible sources of financing. Excluded from the above contractual obligations table is the non-current liability for unrecognized tax benefits of $100.6 million as of July 1, 2023, as we cannot make a reliable estimate of the period in which the liability will be settled, if ever. Besides the firm commitments noted above, the above table excludes other amounts included in current liabilities in the Consolidated Balance Sheets at July 1, 2023 as these items will be paid within one year and certain long-term liabilities not requiring cash payments.

*Capri Holdings Limited Acquisition*

On August 10, 2023, the Company entered into an Agreement and Plan of Merger by and among the Company, Sunrise Merger Sub, Inc., a direct wholly owned subsidiary of Tapestry, and Capri Holdings Limited. Refer to Note 21, "Subsequent Event," herein for further information.

The Company intends to fund the acquisition through a combination of senior notes, term loans and excess Tapestry cash. Furthermore, on August 10, 2023, the Company entered into a bridge facility commitment letter pursuant to which Bank of America, N.A., BofA Securities, Inc. and Morgan Stanley Senior Funding, Inc. committed to provide up to $8.0 billion under a 364-day senior unsecured bridge loan facility to finance the acquisition.

*Off-Balance Sheet Arrangements*

In addition to the commitments included in the table above, we have outstanding letters of credit, surety bonds and bank guarantees of $37.1 million as of July 1, 2023, primarily serving to collateralize our obligation to third parties for duty, leases, insurance claims and materials used in product manufacturing. These letters of credit expire at various dates through calendar 2028.

We do not maintain any other off-balance sheet arrangements, transactions, obligations, or other relationships with unconsolidated entities that would be expected to have a material current or future effect on our consolidated financial statements. Refer to Note 13, "Commitments and Contingencies," for further information.

**CRITICAL ACCOUNTING POLICIES AND ESTIMATES**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect our results of operations, financial condition and cash flows as well as the disclosure of contingent assets and liabilities as of the date of the Company's financial statements. Actual results could differ from estimates in amounts that may be material to the financial statements. Predicting future events is inherently an imprecise activity and, as such, requires the use of judgment. Actual results could differ from estimates in amounts that may be material to the financial statements. The development and selection of the Company's critical accounting policies and estimates are periodically reviewed with the Audit Committee of the Board.

The accounting policies discussed below are considered critical because changes to certain judgments and assumptions inherent in these policies could affect the financial statements. For more information on the Company's accounting policies, please refer to the Notes to Consolidated Financial Statements.

**Revenue Recognition**

Revenue is recognized when the Company satisfies its performance obligations by transferring control of promised products or services to its customers, which may be at a point of time or over time. Control is transferred when the customer obtains the ability to direct the use of and obtain substantially all of the remaining benefits from the products or services. The amount of revenue recognized is the amount of consideration to which the Company expects to be entitled, including estimation of sale terms that may create variability in the consideration. Revenue subject to variability is constrained to an amount which will not result in a significant reversal in future periods when the contingency that creates variability is resolved.

Retail store and concession shop-in-shop revenues are recognized at the point-of-sale, when the customer obtains physical possession of the products. Digital revenue from sales of products ordered through the Company's e-commerce sites is recognized upon delivery and receipt of the shipment by its customers and includes shipping and handling charges paid by customers. Retail and digital revenues are recorded net of estimated returns, which are estimated by developing an expected value based on historical experience. Payment is due at the point of sale.

The Company recognizes revenue within the wholesale channel at the time title passes and risk of loss is transferred to customers, which is generally at the point of shipment of products but may occur upon receipt of the shipment by the customer in certain cases. Wholesale revenue is recorded net of estimates for returns, discounts, end-of-season markdowns, cooperative advertising allowances and other consideration provided to the customer. The Company's historical estimates of these variable amounts have not differed materially from actual results.

The Company recognizes licensing revenue over time during the contract period in which licensees are granted access to the Company's trademarks. These arrangements require licensees to pay a sales-based royalty and may include a contractually guaranteed minimum royalty amount. Revenue for contractually guaranteed minimum royalty amounts is recognized ratably over the license year and any excess sales-based royalties are recognized as earned once the minimum royalty threshold is achieved.

At July 1, 2023, a 10% change in the allowances for estimated uncollectible accounts, markdowns and returns would not have resulted in a material change in the Company's reserves and net sales.

**Inventories**

The Company holds inventory that is sold through retail and wholesale distribution channels, including e-commerce sites. Substantially all of the Company's inventories are comprised of finished goods, and are reported at the lower of cost or net realizable value. Inventory costs include material, conversion costs, freight and duties and are primarily determined on a weighted-average cost basis. The Company reserves for inventory, including slow-moving and aged inventory, based on current product demand, expected future demand and historical experience. A decrease in product demand due to changing customer tastes, buying patterns or increased competition could impact the Company's evaluation of its inventory and additional reserves might be required. Estimates may differ from actual results due to the quantity, quality and mix of products in inventory, consumer and retailer preferences and market conditions. At July 1, 2023, a 10% change in the inventory reserve, would not have resulted in material change in inventory and cost of sales.

46

**Goodwill and Other Intangible Assets**

Upon acquisition, the Company estimates and records the fair value of purchased intangible assets, which primarily consists of brands, customer relationships, right-of-use assets and order backlog. Goodwill and certain other intangible assets deemed to have indefinite useful lives, including brand intangible assets, are not amortized, but are assessed for impairment at least annually. Finite-lived intangible assets are amortized over their respective estimated useful lives and, along with other long-lived assets as noted above, are evaluated for impairment periodically whenever events or changes in circumstances indicate that their related carrying values may not be fully recoverable. Estimates of fair value for finite-lived and indefinite-lived intangible assets are primarily determined using discounted cash flows and the multi-period excess earnings method, respectively, with consideration of market comparisons as appropriate. This approach uses significant estimates and assumptions, including projected future cash flows, discount rates and growth rates.

The Company generally performs its annual goodwill and indefinite-lived intangible assets impairment analysis using a quantitative approach. The quantitative goodwill impairment test identifies the existence of potential impairment by comparing the fair value of each reporting unit with its carrying value, including goodwill. If the fair value of a reporting unit exceeds its carrying value, the reporting unit's goodwill is considered not to be impaired. If the carrying value of a reporting unit exceeds its fair value, an impairment charge is recognized in an amount equal to that excess. The impairment charge recognized is limited to the amount of goodwill allocated to that reporting unit.

Determination of the fair value of a reporting unit and intangible asset is based on management's assessment, considering independent third-party appraisals when necessary. Furthermore, this determination is judgmental in nature and often involves the use of significant estimates and assumptions, which may include projected future cash flows, discount rates, growth rates, and determination of appropriate market comparables and recent transactions. These estimates and assumptions could have a significant impact on whether or not an impairment charge is recognized and the amount of any such charge.

The Company performs its annual impairment assessment of goodwill as well as brand intangibles at the beginning of the fourth quarter of each fiscal year. The Company determined that there was no impairment in fiscal 2023, fiscal 2022 and fiscal 2021.

Based on the annual assessment in fiscal 2023, the fair values of our Coach brand reporting units significantly exceeded their respective carrying values. The fair values of the Kate Spade brand reporting unit and indefinite-lived brand as of the fiscal 2023 testing date exceeded their carrying values by approximately 20% and 40%, respectively. Several factors could impact the Kate Spade brand's ability to achieve expected future cash flows, including the optimization of the store fleet productivity, the success of international expansion strategies, the impact of promotional activity, continued economic volatility and potential operational challenges related to the macroeconomic factors, the reception of new collections in all channels, and other initiatives aimed at increasing profitability of the business. Given the relatively small excess of fair value over carrying value as noted above, if profitability trends decline during fiscal 2024 from those that are expected, it is possible that an interim test, or our annual impairment test, could result in an impairment of these assets.

**Valuation of Long-Lived Assets**

Long-lived assets, such as property and equipment, are evaluated for impairment whenever events or circumstances indicate that the carrying value of the assets may not be recoverable. In evaluating long-lived assets for recoverability, the Company uses its best estimate of future cash flows expected to result from the use of the related asset group and its eventual disposition. To the extent that estimated future undiscounted net cash flows attributable to the asset are less than its carrying value, an impairment loss is recognized equal to the difference between the carrying value of such asset and its fair value, considering external market participant assumptions.

In determining future cash flows, the Company takes various factors into account, including the effects of macroeconomic trends such as consumer spending, in-store capital investments, promotional cadence, the level of advertising and changes in merchandising strategy. Since the determination of future cash flows is an estimate of future performance, there may be future impairments in the event that future cash flows do not meet expectations.

**Share-Based Compensation**

The Company recognizes the cost of equity awards to employees and the non-employee Directors based on the grant-date fair value of those awards. The grant-date fair values of share unit awards are based on the fair value of the Company's common stock on the date of grant. The grant-date fair value of stock option awards is determined using the Black-Scholes option pricing model and involves several assumptions, including the expected term of the option, expected volatility and dividend yield. The expected term of options represents the period of time that the options granted are expected to be outstanding and is based on historical experience. Expected volatility is based on historical volatility of the Company's stock as well as the implied volatility from publicly traded options on the Company's stock. Dividend yield is based on the current expected annual dividend per share and the Company's stock price. Changes in the assumptions used to determine the Black-Scholes value could result in significant changes in the Black-Scholes value.

For stock options and share unit awards, the Company recognizes share-based compensation net of estimated forfeitures and revises the estimates in subsequent periods if actual forfeitures differ from the estimates. The Company estimates the forfeiture rate based on historical experience as well as expected future behavior.

The Company grants performance-based share awards to key executives, the vesting of which is subject to the executive's continuing employment and the Company's or individual's achievement of certain performance goals. On a quarterly basis, the Company assesses actual performance versus the predetermined performance goals, and adjusts the share-based compensation expense to reflect the relative performance achievement. Actual distributed shares are calculated upon conclusion of the service and performance periods, and include dividend equivalent shares. If the performance-based award incorporates a market condition, the grant-date fair value of such award is determined using a pricing model, such as a Monte Carlo Simulation.

A hypothetical 10% change in our stock-based compensation expense would not have a material impact to our fiscal 2023 net income.

**Income Taxes**

The Company's effective tax rate is based on pre-tax income, statutory tax rates, tax laws and regulations, and tax planning strategies available in the various jurisdictions in which the Company operates. The Company classifies interest and penalties on uncertain tax positions in the Provision for income taxes. The Company records net deferred tax assets to the extent it believes that it is more likely than not that these assets will be realized. In making such determination, the Company considers all available evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent and expected future results of operation. The Company reduces deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some amount of deferred tax assets is not expected to be realized. The Company is not permanently reinvested with respect to earnings of a limited number of foreign entities and has recorded the tax consequences of remitting earnings from these entities. The Company is permanently reinvested with respect to all other earnings.

The Company recognizes the impact of tax positions in the financial statements if those positions will more likely than not be sustained on audit, based on the technical merits of the position. Although the Company believes that the estimates and assumptions used are reasonable and legally supportable, the final determination of tax audits could be different than that which is reflected in historical tax provisions and recorded assets and liabilities. Tax authorities periodically audit the Company's income tax returns and the tax authorities may take a contrary position that could result in a significant impact on the Company's results of operations. Significant management judgment is required in determining the effective tax rate, in evaluating tax positions and in determining the net realizable value of deferred tax assets.

Refer to Note 15, "Income Taxes," for further information.

**Recent Accounting Pronouncements**

Refer to Note 3, "Significant Accounting Policies," to the accompanying audited consolidated financial statements for a description of certain recently adopted, issued or proposed accounting standards which may impact our consolidated financial statements in future reporting periods.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

### Market Risk

The market risk inherent in our financial instruments represents the potential loss in fair value, earnings or cash flows, arising from adverse changes in foreign currency exchange rates or interest rates. The Company manages these exposures through operating and financing activities and, when appropriate, through the use of derivative financial instruments. The use of derivative financial instruments is in accordance with the Company's risk management policies, and we do not enter into derivative transactions for speculative or trading purposes.

The quantitative disclosures in the following discussion are based on quoted market prices obtained through independent pricing sources for the same or similar types of financial instruments, taking into consideration the underlying terms and maturities and theoretical pricing models. These quantitative disclosures do not represent the maximum possible loss or any expected loss that may occur, since actual results may differ from those estimates.

### Foreign Currency Exchange Rate Risk

Foreign currency exposures arise from transactions, including firm commitments and anticipated contracts, denominated in a currency other than the entity's functional currency, and from foreign-denominated revenues and expenses translated into U.S. dollars. The majority of the Company's purchases and sales involving international parties, excluding international consumer sales, are denominated in U.S. dollars and, therefore, our foreign currency exchange risk is limited. The Company is exposed to risk from foreign currency exchange rate fluctuations resulting from its operating subsidiaries' transactions denominated in foreign currencies. To mitigate such risk, certain subsidiaries enter into forward currency contracts. As of July 1, 2023 and July 2, 2022, forward currency contracts designated as cash flow hedges with a notional amount of $842.3 million and $41.5 million, respectively, were outstanding. As a result of the use of derivative instruments, we are exposed to the risk that counterparties to the derivative instruments will fail to meet their contractual obligations. To mitigate the counterparty credit risk, we only enter into derivative contracts with carefully selected financial institutions. The Company also reviews the creditworthiness of our counterparties on a regular basis. As a result of the above considerations, we do not believe that we are exposed to any undue concentration of counterparty credit risk associated with our derivative contracts as of July 1, 2023.

The Company is also exposed to transaction risk from foreign currency exchange rate fluctuations with respect to various cross-currency intercompany loans, payables and receivables. This primarily includes exposure to exchange rate fluctuations in the Chinese Renminbi, the British Pound Sterling and the Japanese Yen. To manage the exchange rate risk related to these balances, the Company enters into forward currency contracts. As of July 1, 2023 and July 2, 2022, the total notional values of outstanding forward foreign currency contracts related to these loans, payables and receivables were $272.3 million and $274.1 million, respectively.

We perform a sensitivity analysis to determine the effects that market risk exposures may have on the fair values of our forward foreign currency exchange and cross-currency swap contracts. Under the terms of our cross-currency swaps, we will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 2.4% to 2.7% in Euros and 0.1% to (0.3)% in Japanese Yen. We assess the risk of loss in the fair values of these contracts that would result from hypothetical changes in foreign currency exchange rates. This analysis assumes a like movement by the foreign currencies in our hedge portfolio against the U.S. Dollar. As of July 1, 2023, a 10% appreciation or depreciation of the U.S. Dollar against the foreign currencies under contract would result in a net increase or decrease, respectively, in the fair value of our derivative portfolio of approximately $185 million. This hypothetical net change in fair value should ultimately be largely offset by the net change in the related underlying hedged items. Refer to Note 10, "Derivative Investments and Hedging Activities," for additional information.

### Interest Rate Risk

The Company is exposed to interest rate risk in relation to its $1.25 Billion Revolving Credit Facility and $500.0 Million Term Loan entered into under the credit agreement dated May 11, 2022, the Term Loan, the 2032 Senior Notes, 2027 Senior Notes, and 2025 Senior Notes (collectively the "Senior Notes") and investments.

Our exposure to changes in interest rates is primarily attributable to debt outstanding under the $1.25 Billion Revolving Credit Facility and $500.0 Million Term Loan (collectively, the "Credit Facilities"). Borrowings under the $1.25 Billion Revolving Credit Facility bear interest at a rate per annum equal to, at the Company's option, (i) for borrowings in U.S. Dollars, either (a) an alternate base rate or (b) a term secured overnight financing rate, (ii) for borrowings in Euros, the Euro Interbank Offered Rate, (iii) for borrowings in Pounds Sterling, the Sterling Overnight Index Average Reference Rate and (iv) for borrowings in Japanese Yen, the Tokyo Interbank Offer Rate, plus, in each case, an applicable margin. The applicable margin will be adjusted by reference to a grid (the "Pricing Grid") based on the ratio of (a) consolidated debt to (b) consolidated EBITDAR (the "Gross Leverage Ratio"). Borrowings under the Term Loan bear interest at a rate per annum equal to, at the Company's option, either (i) an alternate base rate or (ii) a term secured overnight financing rate plus, in each case, an applicable margin. The applicable margin will be adjusted by reference to a pricing grid based on the Gross Leverage Ratio. Borrowings under the Credit Facilities are subject to interest rate risk due to changes in SOFR. A hypothetical 10% change in the Credit Facilities' interest rates would have resulted in an immaterial change in interest expense in fiscal 2023.

The Company is exposed to changes in interest rates related to the fair value of the Senior Notes. At July 1, 2023, the fair value of the 2032 Senior Notes, 2027 Senior Notes and 2025 Senior Notes was approximately $399 million, $372 million and $295 million, respectively. At July 2, 2022, the fair value of the 2032 Senior Notes, 2027 Senior Notes and 2025 Senior Notes was approximately $409 million, $383 million and $304 million, respectively. These fair values are based on external pricing data, including available quoted market prices of these instruments, and consideration of comparable debt instruments with similar interest rates and trading frequency, among other factors, and are classified as Level 2 measurements within the fair value hierarchy. The interest rate payable on the 2027 Senior Notes will be subject to adjustments from time to time if either Moody's or S&P or a substitute rating agency (as defined in the Prospectus Supplement furnished with the SEC on June 7, 2017) downgrades (or downgrades and subsequently upgrades) the credit rating assigned to the respective Senior Notes of such series.

The Company's investment portfolio is maintained in accordance with the Company's investment policy, which defines our investment principles including credit quality standards and limits the credit exposure of any single issuer. The primary objective of our investment activities is the preservation of principal while maximizing interest income and minimizing risk. We do not hold any investments for trading purposes.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Refer to "Index to Financial Statements," appearing at the end of this Annual Report on Form 10-K.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

We have evaluated, under the supervision and with the participation of management, including our principal executive and principal financial officers, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the fiscal year covered by this annual report. Based on that evaluation, our principal executive and principal financial officers have concluded that the Company's disclosure controls and procedures were effective at the reasonable assurance level as of the fiscal year-end covered by this Annual Report on Form 10-K.

### Management's Report on Internal Control over Financial Reporting

The Company's management is responsible for establishing and maintaining adequate internal controls over financial reporting as defined in Rule 13a-15(f). The Company's internal control system was designed to provide reasonable assurance to the Company's management and Board regarding the preparation and fair presentation of published financial statements. Management evaluated the effectiveness of the Company's internal control over financial reporting using the criteria set forth by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission in Internal Control - Integrated Framework in 2013. Management, under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of the Company's internal control over financial reporting as of July 1, 2023 and concluded that it was effective at the reasonable assurance level.

The Company's independent auditors have issued an audit report on the Company's internal control over financial reporting as of July 1, 2023 as included elsewhere herein.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Company's internal control over financial reporting during the fourth quarter of 2023 that were identified in connection with management's evaluation required by paragraph (d) of Rules 13a-15 and 15d-15 under the Securities Exchange Act of 1934, as amended, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B. OTHER INFORMATION**

There was no adoption, modification or termination of any Rule 10b5-1 plan or other trading arrangements by our directors and officers during the quarter ended July 1, 2023.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

None.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required to be included by Item 10 of Form 10-K will be included in the Proxy Statement for the 2023 Annual Meeting of Stockholders (the "2023 Proxy Statement") and such information is incorporated by reference herein. The 2023 Proxy Statement will be filed with the Commission within 120 days after the end of the fiscal year covered by this Form 10-K pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended.

**ITEM 11. EXECUTIVE COMPENSATION**

The information required by this Item will be included in the 2023 Proxy Statement and is incorporated herein by reference.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information under the headings "Securities Authorized for Issuance Under Equity Compensation Plans" and "Tapestry Stock Ownership by Certain Beneficial Owners and Management" in the Company's Proxy Statement for the 2023 Annual Meeting of Stockholders is incorporated herein by reference.

There are no arrangements known to the registrant that may at a subsequent date result in a change in control of the registrant.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this Item will be included in the 2023 Proxy Statement, and is incorporated herein by reference.

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by this Item will be included in the 2023 Proxy Statement, and is incorporated herein by reference.

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)    The following documents are filed as part of this report:

(1) Financial Statements. For a list of financial statements filed as part of this report refer to "Index to Consolidated Financial Statements and Supplementary Information" which appears following the signature page below.

(2) Financial Statement Schedules:

Schedule II - Valuation and Qualifying Accounts

All other financial statement schedules are omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto included in this Form 10-K.

(3) Exhibits:

In reviewing agreements included as exhibits to this report, please remember they are included to provide you with information regarding their terms and are not intended to provide any other factual or disclosure information about the Company or the other parties to the agreements. The agreements contain representations, warranties, covenants and conditions by or of each of the parties to the applicable agreement. These representations, warranties, covenants and conditions have been made solely for the benefit of the other parties to the applicable agreement and:

(i) should not in all instances be treated as categorical statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate;

(ii) may have been qualified by disclosures that were made to the other party in connection with the negotiation of the applicable agreement, which disclosures are not necessarily reflected in the agreement;

(iii) may apply standards of materiality in a way that is different from what may be viewed as material to you or other investors, or under federal securities law; and

(iv) were made only as of the date of the applicable agreement or such other date or dates as may be specified in the agreement and are subject to more recent developments.

Accordingly, these representations and warranties may not describe the actual state of affairs as of the date they were made or at any other time. Additional information about the Company may be found elsewhere in this report and the Company's other public filings, which are available without charge through the SEC's website at http://www.sec.gov.

| Exhibit | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of August 10, 2023, by and among Tapestry, Inc., Sunrise Merger Sub, Inc. and Capri Holdings Limited, incorporated by reference to Exhibit 2.1 to the Company's Form 8-K filed with the SEC on August 10, 2023 (File No. 001-16153) |
| 3.1 | Articles of Incorporation, dated June 1, 2000, which is incorporated herein by reference from Exhibit 3.1 of to the Registrant's Registration Statement on Form S-1 filed on June 16, 2000 |
| 3.2 | Articles Supplementary of Coach, Inc., dated May 3, 2001, which is incorporated herein by reference from Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed on May 9, 2001 |
| 3.3 | Articles of Amendment of Coach, Inc., dated May 3, 2001, which is incorporated herein by reference from Exhibit 3.3 to the Registrant's Current Report on Form 8-K filed on May 9, 2001 |
| 3.4 | Articles of Amendment of Coach, Inc., dated May 3, 2002, which is incorporated by reference from Exhibit 3.4 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2002 |
| 3.5 | Articles of Amendment of Coach, Inc., dated February 1, 2005, which is incorporated by reference from Exhibit 99.1 to the Registrant's Current Report on Form 8-K filed on February 2, 2005 |
| 3.6 | Articles of Amendment to Charter of Tapestry, Inc., effective as of October 31, 2017, which is incorporated by reference from Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on October 31, 2017 |
| 3.7 | Amended and Restated Bylaws of Tapestry, Inc., effective as of October 31, 2017, which is incorporated herein by reference from Exhibit 3.2 to the Registrant's Current Report on Form 8-K filed on October 31, 2017 |
| 3.8 | Bylaws of Tapestry, Inc., effective as of April 12, 2023, which is incorporated herein by reference from Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on April 13, 2023 |
| 4.1 | Specimen Certificate for Common Stock of Tapestry, Inc. which is incorporated by reference from Exhibit 4.1 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 30, 2018, filed on August 16, 2018 |

| Exhibit | Description |
|---|---|
| 4.2 | Indenture, dated as of March 2, 2015, between Coach, Inc. and U.S. Bank National Association, as trustee, which is incorporated herein by reference from Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed on March 2, 2015 |
| 4.3 | First Supplemental Indenture, dated as of March 2, 2015, relating to the 4.250% senior unsecured notes due 2025, between Coach, Inc. and U.S. Bank National Association, as trustee, which is incorporated herein by reference from Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed on March 2, 2015 |
| 4.4 | Form of 4.250% senior unsecured notes due 2025 (included in the First Supplemental Indenture), which is incorporated herein by reference from Exhibit 4.3 to the Registrant's Current Report on Form 8-K filed on March 2, 2015 |
| 4.5 | Second Supplemental Indenture, dated as of June 20, 2017, relating to the 3.000% senior unsecured notes due 2022, between Coach, Inc. and U.S. Bank National Association, as trustee, which is incorporated by reference from Exhibit 4.1 to the Registrant's Current Report on Form 8-K, filed on June 20, 2017 |
| 4.6 | Third Supplemental Indenture, dated as of June 20, 2017, relating to the 4.125% senior unsecured notes due 2027, between Coach, Inc. and U.S. Bank National Association, as trustee, which is incorporated by reference from Exhibit 4.2 to the Registrant's Current Report on Form 8-K, filed on June 20, 2017 |
| 4.7 | Form of 3.000% senior unsecured notes due 2022 (included in the Second Supplemental Indenture), which is incorporated by reference from Exhibit 4.3 to the Registrant's Current Report on Form 8-K, filed on June 20, 2017 |
| 4.8 | Form of 4.125% senior unsecured notes due 2027 (included in the Third Supplemental Indenture), which is incorporated by reference from Exhibit 4.4 to the Registrant's Current Report on Form 8-K, filed on June 20, 2017 |
| 4.9 | Indenture, dated as of December 1, 2021, between the Company and U.S. Bank National Association, as trustee, which is incorporated herein by reference from Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed on December 1, 2021 |
| 4.10 | First Supplemental Indenture, dated as of December 1, 2021, relating to the 3.050% senior unsecured notes due 2032, between the Company and U.S. Bank National Association, as trustee, which is incorporated by reference from Exhibit 4.2 to the Registrant's Current Report on Form 8-K filed on December 1, 2021 |
| 4.11 | Form of 3.050% senior unsecured notes due 2032 (included in the First Supplemental Indenture), which is incorporated by reference from Exhibit 4.3 to the Registrant's Current Report on Form 8-K, filed on December 1, 2021 |
| 4.12 | Description of Securities, which is incorporated by reference from Exhibit 4.9 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 27, 2020 |
| 10.1† | Coach, Inc. Non-Qualified Deferred Compensation Plan for Outside Directors, which is incorporated by reference from Exhibit 10.14 to The Registrant's Annual Report on Form 10-K for the fiscal year ended June 28, 2003 |
| 10.2† | Amended and Restated Tapestry, Inc. 2001 Employee Stock Purchase Plan, which is incorporated by reference to Appendix C to the Registrant's Definitive Proxy Statement for the 2016 Annual Meeting of Stockholders filed on September 30, 2016 |
| 10.3† | Coach, Inc. 2004 Stock Incentive Plan, which is incorporated by reference from Appendix A to the Registrant's Definitive Proxy Statement for the 2004 Annual Meeting of Stockholders, filed on September 29, 2004 |
| 10.4† | Coach, Inc. 2010 Stock Incentive Plan, which is incorporated by reference from Appendix A to the Registrant's Definitive Proxy Statement for the 2010 Annual Meeting of Stockholders, filed on September 24, 2010 |
| 10.5† | Amendment to the Coach, Inc. 2010 Stock Incentive Plan, which is incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on September 22, 2014 |
| 10.6† | Coach, Inc. Amended and Restated 2010 Stock Incentive Plan, which is incorporated herein by reference from Appendix B to the Registrant's Definitive Proxy Statement for the 2014 Annual Meeting of Stockholders, filed on September 26, 2014 |
| 10.7† | Coach, Inc. Amended and Restated 2010 Stock Incentive Plan (Amended and Restated as of September 18, 2015), which is incorporated herein by reference from Appendix B to the Registrant's Definitive Proxy Statement for the 2015 Annual Meeting of Stockholders, filed on September 25, 2015 |
| 10.8† | Coach Inc. Executive Deferred Compensation Plan, effective as of January 1, 2016, which is incorporated herein by reference from Exhibit 10.10 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2019 |
| 10.9† | Coach, Inc. Amended and Restated 2010 Stock Incentive Plan (Amended and Restated as of September 23, 2016), which is incorporated herein by reference from Appendix B to the Registrant's Definitive Proxy Statement for the 2016 Annual Meeting of the Stockholders, filed on September 30, 2016 |

54

| Exhibit | Description |
|---|---|
| 10.10† | Coach, Inc. Amended and Restated 2010 Stock Incentive Plan (Amended and Restated as of September 20, 2017), which is incorporated herein by reference from Appendix B to the Registrant's Definitive Proxy Statement for the 2017 Annual Meeting of the Stockholders, filed on September 29, 2017 |
| 10.11† | Tapestry Inc. 2018 Stock Incentive Plan, which is incorporated herein by reference from Appendix B to the Registrant's Definitive Proxy Statement for the 2018 Annual Meeting of Stockholders, filed on September 28, 2018 |
| 10.12† | Form of Stock Option Grant Notice and Agreement under the Tapestry, Inc. 2018 Stock Incentive Plan, which is incorporated herein by reference from Exhibit 10.14 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2019 |
| 10.13† | Form of Restricted Stock Unit Award Grant Notice and Agreement under the Tapestry, Inc. 2018 Stock Incentive Plan, which is incorporated herein by reference from Exhibit 10.15 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2019 |
| 10.14† | Form of Performance Restricted Stock Unit Agreement Grant Notice and Agreement under the Tapestry, Inc. 2018 Stock Incentive Plan, which is incorporated herein by reference from Exhibit 10.16 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2019 |
| 10.15† | Form of Stock Option Grant Notice and Agreement for Outside Directors under the Tapestry, Inc. 2018 Stock Incentive Plan, which is incorporated by reference from Exhibit 10.3 to the Registrant's Quarterly Report on Form-Q for the period ended December 29, 2018 |
| 10.16† | Form of Restricted Stock Unit Grant Notice and Agreement for Outside Directors under the Tapestry, Inc. 2018 Stock Incentive Plan, which is incorporated by reference from Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the period ended December 29, 2018 |
| 10.17† | Tapestry, Inc. 2018 Performance-Based Annual Incentive Plan, which is incorporated herein by reference from Exhibit 10.1 to the Registrant's Current Report on Form 8-K, filed on August 10, 2018 |
| 10.18† | Letter Agreement, dated June 22, 2015, between Coach, Inc. and Todd Kahn, which is incorporated by reference from Exhibit 10.2 to the Registrant's Current Report on Form 8-K, filed on June 22, 2015 |
| 10.19† | Letter Agreement, dated August 11, 2016, between Coach Inc. and Todd Kahn, which is incorporated herein by reference from Exhibit 10.20 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 27, 2020 |
| 10.20 | Redemption Agreement and Amendment to Limited Liability Company Agreement, dated as of August 1, 2016, by and between Legacy Yards LLC, Coach Legacy Yards LLC and Podium Fund Tower C SPV LLC, which is incorporated by reference from Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the period ended October 1, 2016 |
| 10.21 | Lease Agreement, dated as of August 1, 2016, by and between Coach, Inc. and Legacy Yards Tenant LP, which is incorporated by reference from Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the period ended October 1, 2016 |
| 10.22 | Amended and Restated Development Agreement, dated as of August 1, 2016, by and between ERY Developer LLC and Coach Legacy Yards LLC, which is incorporated by reference from Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q for the period ended October 1, 2016 |
| 10.23 | Termination and Release of the Coach Guaranty, dated as of August 1, 2016, by and between Podium Fund Tower C SPV LLC and ERY Developer LLC, which is incorporated by reference from Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the period ended October 1, 2016 |
| 10.24 | Sublease, dated as of September 13, 2017 between Coach, Inc. and The Guardian Life Insurance Company of America, a New York mutual insurance company, which is incorporated by reference from Exhibit 10.1 to the Registrant's Current Report on Form 8-K, filed on September 14, 2017. |
| 10.25† | Letter Agreement, dated May 8, 2019 between the Registrant and Thomas Glaser, which is incorporated herein by reference from Exhibit 10.37 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2019 |
| 10.26† | Tapestry, Inc. Severance Pay Plan for Vice Presidents and Above, Amended and Restated effective May 9, 2019, which is incorporated herein by reference from Exhibit 10.38 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2019 |
| 10.27† | Tapestry, Inc. Special Severance Plan, effective August 12, 2019, which is incorporated herein by reference from Exhibit 10.40 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 29, 2019 |
| 10.28† | Amended & Restated Tapestry Inc. 2018 Stock Incentive Plan, which is incorporated herein by reference from Appendix B to the Registrant's Definitive Proxy Statement for the 2019 Annual Meeting of Stockholders, filed on September 27, 2019 |
| 10.29 | Credit Agreement, dated as of October 24, 2019, by and among Tapestry, Inc., Bank of America, N.A. as Administrative Agent, JPMorgan Chase Bank, N.A. and HSBC Bank USA, N.A., as Co-Syndication Agents, and the other lenders party thereto, incorporated by reference from Exhibit 10.4 to Tapestry's Quarterly Report on Form 10-Q filed on November 7, 2019 |

| Exhibit | Description |
|---|---|
| 10.30† | Letter Agreement, dated January 28, 2020, between the Registrant and Liz Fraser, which is incorporated herein by reference from Exhibit 10.33 to the Registrant's Annual Report on Form 10-K for the fiscal year ended July 3, 2021. |
| 10.31 | Amendment No. 1, dated May 19, 2020, to the Credit Agreement, dated as of October 24, 2019 by and among Tapestry, Inc., Bank of America, N.A. as Administrative Agent, JPMorgan Chase Bank, N.A. and HSBC Bank USA, N.A., as Co-Syndication Agents, and the other lenders party thereto, which is incorporated herein by reference from Exhibit 10.37 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 27, 2020 |
| 10.32† | Letter Agreement, dated July 20, 2020 between the Registrant and Todd Kahn, which is incorporated herein by reference from Exhibit 10.40 to the Registrant's Annual Report on Form 10-K for the fiscal year ended June 27, 2020 |
| 10.33† | Second Amended and Restated Tapestry Inc. 2018 Stock Incentive Plan, which is incorporated by reference from Appendix B to the Registrant's Definitive Proxy Statement for the 2020 Annual Meeting of Stockholders, filed on September 25, 2020 |
| 10.34† | Letter Agreement, dated October 24, 2020 between the Registrant and Joanne Crevoiserat, incorporated by reference from Exhibit 10.5 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended September 26, 2020 |
| 10.35 | First Amendment to Lease, dated as of March 12, 2021, between Legacy Yards Tenant LP, a Delaware limited partnership and Tapestry, Inc., incorporated by reference from Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q |
| 10.36† | Letter Agreement, dated April 12, 2021, between the Registrant and Todd Kahn, incorporated by reference from Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q |
| 10.37† | Letter Agreement, dated April 26, 2021, between the Registrant and Scott Roe, incorporated by reference from Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q |
| 10.38 | Waiver, dated August 11, 2021, to the Credit Agreement, dated as of October 24, 2019 by and among Tapestry, Inc., Bank of America, N.A. as Administrative Agent, JPMorgan Chase Bank, N.A. and HSBC Bank USA, N.A., as Co-Syndication Agents, and the other lenders party thereto, which is incorporated herein by reference from Exhibit 10.44 to the Registrant's Annual Report on Form 10-K for the fiscal year ended July 3, 2021 |
| 10.39 | Credit Agreement dated as of May 11, 2022, among Tapestry, Inc., the foreign subsidiary borrowers from time to time party thereto, the lenders from time to time party thereto, and Bank of America, N.A. as administrative agent, incorporated by reference from Exhibit 1.1 to the Registrant's Current Report on Form 8-K filed on May 12, 2022 |
| 10.40† | Letter Agreement, dated August 4, 2022, between the Registrant and Scott Roe, incorporated by reference from Exhibit 10.1 to the Registrant's Current Report on Form 8-K, filed on August 4, 2022 |
| 21.1* | List of Subsidiaries of Tapestry, Inc. |
| 23.1* | Consent of Deloitte & Touche LLP |
| 31.1* | Rule 13(a)-14(a)/15(d)-14(a) Certification of the Company's Chief Executive Officer |
| 31.2* | Rule 13(a)-14(a)/15(d)-14(a) Certification of the Company's Chief Financial Officer |
| 32.1* | Section 1350 Certification of the Company's Chief Executive Officer |
| 32.2* | Section 1350 Certification of the Company's Chief Financial Officer |
| 101.INS* | Inline XBRL Instance Document |
| | Note: the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

---

\* Filed herewith

† Management contract or compensatory plan or arrangement.

**ITEM 16. FORM 10-K SUMMARY**

None.

57

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TAPESTRY, INC.

Date: August 17, 2023    By: /s/ Joanne C. Crevoiserat

Name: Joanne C. Crevoiserat
Title: Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated below on August 17, 2023.

| Signature | Title |
| --- | --- |
| /s/ Joanne C. Crevoiserat<br>Joanne C. Crevoiserat | Chief Executive Officer<br>(Principal Executive Officer) |
| /s/ Scott A. Roe<br>Scott A. Roe | Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Manesh B. Dadlani<br>Manesh B. Dadlani | Corporate Controller<br>(Principal Accounting Officer) |
| /s/ Anne Gates<br>Anne Gates | Independent Chair, Board of Directors |
| /s/ John P. Bilbrey<br>John P. Bilbrey | Director |
| /s/ Darrell Cavens<br>Darrell Cavens | Director |
| /s/ David Denton<br>David Denton | Director |
| /s/ Johanna W. Faber<br>Johanna W. Faber | Director |
| /s/ Thomas R. Greco<br>Thomas R. Greco | Director |
| /s/ Alan Lau<br>Alan Lau | Director |
| /s/ Pam Lifford<br>Pam Lifford | Director |
| /s/ Annabelle Yu Long<br>Annabelle Yu Long | Director |

**TAPESTRY, INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY INFORMATION**

|  | Page Number |
|---|---|
| Reports of Independent Registered Public Accounting Firm (PCAOB ID No. 34) | 60 |
| Consolidated Financial Statements: |  |
| Consolidated Balance Sheets | 63 |
| Consolidated Statements of Operations | 64 |
| Consolidated Statements of Comprehensive Income | 65 |
| Consolidated Statements of Stockholders' Equity | 66 |
| Consolidated Statements of Cash Flows | 67 |
| Notes to Consolidated Financial Statements | 68 |
| Financial Statement Schedules: |  |
| Schedule II - Valuation and Qualifying Accounts | 103 |

All other schedules are omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of Tapestry, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Tapestry, Inc. and subsidiaries (the "Company") as of July 1, 2023 and July 2, 2022, the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows, for each of the three years in the period ended July 1, 2023, and the related notes and the financial statement Schedule II listed in the Index to the Consolidated Financial Statements (collectively referred to as the "financial statements").
In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of July 1, 2023 and July 2, 2022, and the results of its operations and its cash flows for each of the three years in the period ended July 1, 2023, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of July 1, 2023, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated August 17, 2023
,
expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

**Goodwill and Other Intangible Assets - Kate Spade - Refer to Notes 3 and 14 to the financial statements**

**Critical Audit Matter Description**

The Company's evaluation of goodwill and indefinite-lived brand intangible assets for impairment involves the comparison of carrying value to their respective fair values. The determination of the fair values requires management to make significant estimates and assumptions related to forecasts of future cash flows and growth rates, as well as discount rates. Changes in these assumptions could have a significant impact on either the fair values, the amount of any impairment charge, or both.

The fair values of the Kate Spade brand reporting unit and indefinite-lived brand, which are included in the Company's goodwill and intangible asset balances, respectively, as of the fiscal 2023 testing date exceeded their respective carrying values by approximately 20% and 40%, respectively. Several factors could impact the Kate Spade brand's ability to achieve expected future cash flows, including the optimization of the store fleet productivity, the success of international expansion strategies, the impact of promotional activity, continued economic volatility and potential operational challenges related to the macroeconomic factors, the reception of new collections in all channels, and other initiatives aimed at increasing profitability of the business.

60

Given the significant judgments made by management to estimate the fair value of the Kate Spade operations used in both the goodwill and Kate Spade indefinite-lived brand intangible fair value analyses and the difference between their fair values and carrying values, performing auditing procedures to evaluate the reasonableness of management's judgments regarding the business and valuation assumptions utilized in the valuation model, particularly the forecasts of future cash flows and growth rates and the selection of the discount rate, required a high degree of auditor judgment and an increased extent of effort, including the need to involve our fair value specialists.

**How the Critical Audit Matter Was Addressed in the Audit**

Our audit procedures related to the projected future cash flows and growth rates and discount rates included the following:

- We tested the effectiveness of management's controls over its Kate Spade goodwill and indefinite-lived brand intangible asset impairment evaluations, including controls over the forecasts of future Kate Spade revenue and profit margin, and the selection of the discount rate.

- We evaluated management's ability to accurately forecast by comparing Kate Spade actual revenue and profit margin results to historical projections.

- We evaluated management's Kate Spade revenue and profit margin projections over the projection period by comparing them with (1) internal communications to management and the Board of Directors, (2) peer companies, and (3) industry and market conditions.

- With the assistance of our fair value specialists, we evaluated the Kate Spade market approach, including evaluating the reasonableness of the selected guideline public companies and the resulting market multiples calculations, as well as benchmarking the selected multiples against these guideline public companies.

- We used the assistance of our fair value specialists to assess the acceptability of the weighting applied to value indications from different valuation techniques for Kate Spade.

- We used the assistance of our fair value specialists to assess the acceptability of the implied equity premium for Kate Spade. With respect to the market value of equity, we tested the calculations used in developing the respective market value of equity.

- We used the assistance of our fair value specialists in evaluating the Kate Spade fair value methodology and the discount rate, including testing the underlying source information and the mathematical accuracy of the calculations. Specific to the discount rate, we considered the inputs and calculations, and we developed a range of independent estimates and compared those to the respective discount rates selected by management.

/s/ DELOITTE & TOUCHE LLP

New York, New York
August 17, 2023

We have served as the Company's auditor since 2002.

61

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of Tapestry, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Tapestry, Inc. and subsidiaries (the "Company") as of July 1, 2023 based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").
In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of July 1, 2023, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated financial statements and financial statement schedule as of and for the year ended July 1, 2023, of the Company and our report dated August 17, 2023, expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ DELOITTE & TOUCHE LLP

New York, New York
August 17, 2023

62

**TAPESTRY, INC.**
**CONSOLIDATED BALANCE SHEETS**

|  | July 1, 2023 | July 2, 2022 |
|---|---|---|
|  | (millions) | |
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 726.1 | $ 789.8 |
| Short-term investments | 15.4 | 163.4 |
| Trade accounts receivable, less allowances for credit losses of $5.8 and $3.7, respectively | 211.5 | 252.3 |
| Inventories | 919.5 | 994.2 |
| Income tax receivable | 231.1 | 217.2 |
| Prepaid expenses | 126.3 | 105.2 |
| Other current assets | 133.6 | 51.7 |
| **Total current assets** | 2,363.5 | 2,573.8 |
| Property and equipment, net | 564.5 | 544.4 |
| Operating lease right-of-use assets | 1,378.7 | 1,281.6 |
| Goodwill | 1,227.5 | 1,241.5 |
| Intangible assets | 1,360.1 | 1,366.6 |
| Deferred income taxes | 40.4 | 47.9 |
| Other assets | 182.1 | 209.5 |
| **Total assets** | $ 7,116.8 | $ 7,265.3 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current Liabilities:** | | |
| Accounts payable | $ 416.9 | $ 520.7 |
| Accrued liabilities | 547.1 | 628.2 |
| Current portion of operating lease liabilities | 297.5 | 288.7 |
| Current debt | 25.0 | 31.2 |
| **Total current liabilities** | 1,286.5 | 1,468.8 |
| Long-term debt | 1,635.8 | 1,659.2 |
| Long-term operating lease liabilities | 1,333.7 | 1,282.3 |
| Deferred income taxes | 240.0 | 221.7 |
| Long-term income taxes payable | 43.5 | 95.3 |
| Other liabilities | 299.5 | 252.5 |
| **Total liabilities** | 4,839.0 | 4,979.8 |

See Note 13 on commitments and contingencies

| **Stockholders' Equity:** | | |
|---|---|---|
| Preferred stock: (authorized 25.0 million shares; $0.01 par value) none issued | - | - |
| Common stock: (authorized 1.0 billion shares; $0.01 par value) issued and outstanding - 227.4 million and 241.2 million shares, respectively | 2.3 | 2.4 |
| Additional paid-in-capital | 3,682.2 | 3,620.2 |
| Retained earnings (accumulated deficit) | (1,216.8) | (1,166.2) |
| Accumulated other comprehensive income (loss) | (189.9) | (170.9) |
| **Total stockholders' equity** | 2,277.8 | 2,285.5 |
| **Total liabilities and stockholders' equity** | $ 7,116.8 | $ 7,265.3 |

*See accompanying Notes.*

63

**TAPESTRY, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | | Fiscal Year Ended | |
| --- | --- | --- | --- |
| | July 1, 2023 | July 2, 2022 | July 3, 2021 |
| | (millions, except per share data) | | |
| Net sales | $ 6,660.9 | $ 6,684.5 | $ 5,746.3 |
| Cost of sales | 1,946.0 | 2,034.1 | 1,664.4 |
| Gross profit | 4,714.9 | 4,650.4 | 4,081.9 |
| Selling, general and administrative expenses | 3,542.5 | 3,474.6 | 3,113.9 |
| Operating income (loss) | 1,172.4 | 1,175.8 | 968.0 |
| Loss on extinguishment of debt | - | 53.7 | - |
| Interest expense, net | 27.6 | 58.7 | 71.4 |
| Other expense (income) | 1.7 | 16.4 | (0.7) |
| Income (loss) before provision for income taxes | 1,143.1 | 1,047.0 | 897.3 |
| Provision for income taxes | 207.1 | 190.7 | 63.1 |
| Net income (loss) | $ 936.0 | $ 856.3 | $ 834.2 |
| Net income (loss) per share: | | | |
| Basic | $ 3.96 | $ 3.24 | $ 3.00 |
| Diluted | $ 3.88 | $ 3.17 | $ 2.95 |
| Shares used in computing net income (loss) per share: | | | |
| Basic | 236.4 | 264.3 | 277.9 |
| Diluted | 241.3 | 270.1 | 283.0 |

*See accompanying Notes.*

64

**TAPESTRY, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

|  | Fiscal Year Ended | | |
|---|---|---|---|
|  | July 1, 2023 | July 2, 2022 | July 3, 2021 |
|  | (millions) | | |
| Net income (loss) | $ 936.0 | $ 856.3 | $ 834.2 |
| Other comprehensive income (loss), net of tax: | | | |
| Unrealized gains (losses) on cash flow hedging derivatives, net | 37.2 | (1.6) | (1.8) |
| Unrealized gains (losses) on available-for-sale investments, net | 0.5 | (0.5) | - |
| Foreign currency translation adjustments | (56.7) | (96.8) | 22.0 |
| Other comprehensive income (loss), net of tax | (19.0) | (98.9) | 20.2 |
| Comprehensive income (loss) | $ 917.0 | $ 757.4 | $ 854.4 |

*See accompanying Notes.*

65

**TAPESTRY, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Shares of Common Stock | Common Stock | Additional Paid-in-Capital | Retained Earnings / (Accumulated Deficit) | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | | | (millions, except per share data) | | | |
| **Balance at June 27, 2020** | 276.2 $ | 2.8 $ | 3,358.5 $ | (992.7) $ | (92.2) $ | 2,276.4 |
| Net income (loss) | - | - | - | 834.2 | - | 834.2 |
| Other comprehensive income (loss) | - | - | - | - | 20.2 | 20.2 |
| Shares issued, pursuant to stock-based compensation arrangements, net of shares withheld for taxes | 3.3 | - | 53.6 | - | - | 53.6 |
| Share-based compensation | - | - | 74.9 | - | - | 74.9 |
| **Balance at July 3, 2021** | 279.5 | 2.8 | 3,487.0 | (158.5) | (72.0) | 3,259.3 |
| Net income (loss) | - | - | - | 856.3 | - | 856.3 |
| Other comprehensive income (loss) | - | - | - | - | (98.9) | (98.9) |
| Shares issued, pursuant to stock-based compensation arrangements, net of shares withheld for taxes | 3.7 | - | 43.8 | - | - | 43.8 |
| Share-based compensation | - | - | 89.4 | - | - | 89.4 |
| Repurchase of common stock | (42.0) | (0.4) | - | (1,599.6) | - | (1,600.0) |
| Dividends declared ($1.00 per share) | - | - | - | (264.4) | - | (264.4) |
| **Balance at July 2, 2022** | **241.2** | **2.4** | **3,620.2** | **(1,166.2)** | **(170.9)** | **2,285.5** |
| Net income (loss) | - | - | - | 936.0 | - | 936.0 |
| Other comprehensive income (loss) | - | - | - | - | (19.0) | (19.0) |
| Shares issued, pursuant to stock-based compensation arrangements, net of shares withheld for taxes | 4.0 | 0.1 | (16.8) | - | - | (16.7) |
| Share-based compensation | - | - | 78.8 | - | - | 78.8 |
| Repurchase of common stock, including excise tax | (17.8) | (0.2) | - | (703.3) | - | (703.5) |
| Dividends declared ($1.20 per share) | - | - | - | (283.3) | - | (283.3) |
| **Balance at July 1, 2023** | **227.4** $ | **2.3** $ | **3,682.2** $ | **(1,216.8)** $ | **(189.9)** $ | **2,277.8** |

*See accompanying Notes.*

66

**TAPESTRY, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Fiscal Year Ended | | |
|---|---|---|---|---|
| | | July 1, 2023 | July 2, 2022 | July 3, 2021 |
| | | (millions) | | |
| **CASH FLOWS PROVIDED BY (USED IN) OPERATING ACTIVITIES** | | | | |
| Net income (loss) | $ | 936.0 | $ 856.3 | $ 834.2 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | |
| Depreciation and amortization | | 182.2 | 195.3 | 218.7 |
| Covid-19 related impairment charges | | - | - | 45.8 |
| Provision for bad debt | | 5.7 | 19.9 | 2.8 |
| Loss on extinguishment of debt | | - | 53.7 | - |
| Share-based compensation | | 78.8 | 72.2 | 64.1 |
| Acceleration program charges | | - | 14.8 | 5.1 |
| Deferred income taxes | | 41.2 | 29.9 | 52.6 |
| Changes to lease related balances, net | | (36.0) | (53.4) | (125.6) |
| Gain on sale of building | | - | - | (13.2) |
| Gain on deferred purchase price | | - | - | (12.5) |
| Other non-cash charges, net | | (15.8) | 31.3 | 21.4 |
| Changes in operating assets and liabilities: | | | | |
| Trade accounts receivable | | 44.1 | (96.0) | (9.6) |
| Inventories | | 49.9 | (311.7) | 32.2 |
| Other liabilities | | (61.1) | (9.2) | (16.8) |
| Accounts payable | | (98.1) | 86.4 | 307.3 |
| Accrued liabilities | | (93.0) | (16.1) | 140.3 |
| Other assets | | (58.7) | (20.2) | (223.1) |
| **Net cash provided by (used in) operating activities** | | 975.2 | 853.2 | 1,323.7 |
| **CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES** | | | | |
| Purchases of property and equipment | | (184.2) | (93.9) | (116.0) |
| Purchases of investments | | (6.7) | (540.4) | (0.7) |
| Proceeds from maturities and sales of investments | | 154.7 | 380.7 | 1.8 |
| Proceeds from sale of building | | - | - | 23.9 |
| Settlement of net investment hedge | | 41.9 | - | - |
| **Net cash provided by (used in) investing activities** | | 5.7 | (253.6) | (91.0) |
| **CASH FLOWS PROVIDED BY (USED IN) FINANCING ACTIVITIES** | | | | |
| Payment of dividends | | (283.3) | (264.4) | - |
| Repurchase of common stock | | (703.5) | (1,600.0) | - |
| Proceeds from issuance of debt, net of discount | | - | 998.5 | - |
| Payment of initial debt costs | | - | (4.6) | - |
| Payment of debt extinguishment costs | | - | (50.7) | - |
| Repayment of debt | | (31.2) | (900.0) | (11.5) |
| Proceeds from share-based awards | | 38.8 | 74.7 | 61.2 |
| Repayment of revolving credit facility | | - | - | (700.0) |
| Taxes paid to net settle share-based awards | | (55.6) | (30.6) | (7.5) |
| Other financing activity | | (1.1) | (1.0) | (8.2) |
| **Net cash provided by (used in) financing activities** | | (1,035.9) | (1,778.1) | (666.0) |
| Effect of exchange rate changes on cash and cash equivalents | | (8.7) | (39.4) | 14.7 |
| **Net (decrease) increase in cash and cash equivalents** | | (63.7) | (1,217.9) | 581.4 |
| **Cash and cash equivalents at beginning of year** | | 789.8 | 2,007.7 | 1,426.3 |
| **Cash and cash equivalents at end of year** | $ | 726.1 | $ 789.8 | $ 2,007.7 |
| **Supplemental information:** | | | | |
| Cash paid for income taxes, net | $ | 231.9 | $ 179.7 | $ 251.8 |
| Cash paid for interest | $ | 82.6 | $ 67.8 | $ 69.7 |
| Non-cash investing activity - property and equipment obligations | $ | 11.0 | $ 6.7 | $ 14.4 |

*See accompanying Notes.*

67

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements**

## 1. NATURE OF OPERATIONS

Tapestry, Inc. (the "Company") is a leading New York-based house of iconic accessories and lifestyle brands. Our global house of brands unites the magic of Coach, kate spade new york and Stuart Weitzman. Each of our brands are unique and independent, while sharing a commitment to innovation and authenticity defined by distinctive products and differentiated customer experiences across channels and geographies. We use our collective strengths to move our customers and empower our communities, to make the fashion industry more sustainable, and to build a company that's equitable, inclusive, and diverse. Individually, our brands are iconic. Together, we can stretch what's possible.

The Coach segment includes global sales of primarily Coach brand products to customers through Coach operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers and through independent third-party distributors.

The Kate Spade segment includes global sales primarily of kate spade new york brand products to customers through Kate Spade operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers and through independent third-party distributors.

The Stuart Weitzman segment includes global sales of Stuart Weitzman brand products primarily through Stuart Weitzman operated stores, sales to wholesale customers, through e-commerce sites and through independent third-party distributors.

## 2. BASIS OF PRESENTATION AND ORGANIZATION

### Fiscal Year

The Company's fiscal year ends on the Saturday closest to June 30. Unless otherwise stated, references to years in the financial statements relate to fiscal years. The fiscal year ended July 1, 2023 ("fiscal 2023") was a 52-week period. The fiscal year ended July 2, 2022 ("fiscal 2022") was a 52-week period and the fiscal year ended July 3, 2021 ("fiscal 2021") was a 53-week period. The fiscal year ending June 29, 2024 ("fiscal 2024") will be a 52-week period.

### Covid-19 Pandemic

The Covid-19 pandemic has resulted in varying degrees of business disruption for the Company since it began in fiscal 2020 and has impacted all regions around the world, resulting in restrictions and shutdowns implemented by national, state, and local authorities. Such disruptions continued during the first half of fiscal 2023, and the Company's results in Greater China were adversely impacted as a result of the Covid-19 pandemic. Starting in December 2022, certain government restrictions were lifted in the region and business trends have improved. The Company continues to monitor the latest developments regarding the Covid-19 pandemic and potential impacts on our business, operating results and outlook.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and footnotes thereto. Actual results could differ from estimates in amounts that may be material to the financial statements.

Significant estimates inherent in the preparation of the consolidated financial statements include reserves for the realizability of inventory; asset retirement obligations; customer returns, end-of-season markdowns and operational chargebacks; useful lives and impairments of long-lived tangible and intangible assets; accounting for income taxes and related uncertain tax positions; accounting for business combinations; the valuation of stock-based compensation awards and related expected forfeiture rates; reserves for restructuring; and reserves for litigation and other contingencies, amongst others.

### Principles of Consolidation

The consolidated financial statements include the accounts of the Company and all 100% owned and controlled subsidiaries. All intercompany transactions and balances are eliminated in consolidation.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Share Repurchases*

The Company accounts for stock repurchases by allocating the repurchase price to common stock and retained earnings. Under Maryland law, the Company's state of incorporation, there are no treasury shares. All repurchased shares are authorized but unissued shares and these shares may be issued in the future for general corporate and other purposes. The Company may terminate or limit the stock repurchase program at any time. The Company accrues for the shares purchased under the share repurchase plan based on the trade date. Purchases of the Company's common stock are executed through open market purchases, including through purchase agreements under Rule 10b5-1. Effective January 1, 2023, the Company is subject to a 1% excise tax on net share repurchases as part of the Inflation Reduction Act of 2022, which is recorded in Retained earnings as part of Stockholders' Equity.

## 3. SIGNIFICANT ACCOUNTING POLICIES

*Cash and Cash Equivalents*

Cash and cash equivalents consist of cash balances and highly liquid investments with a maturity of three months or less at the date of purchase.

*Investments*

Short-term investments consist primarily of high-credit quality U.S. and non-U.S. issued corporate debt securities, and U.S. Treasuries and government agency securities with original maturities greater than three months and with maturities within one year of balance sheet date, classified as available-for-sale. Long-term investments typically consist of high-credit quality U.S. and non-U.S. issued corporate debt securities, U.S. Treasuries and government agency securities, classified as available-for-sale, and recorded at fair value, with unrealized gains and losses recorded in other comprehensive income. Dividend and interest income are recognized when earned.

Additionally, GAAP requires the consolidation of all entities for which a Company has a controlling voting interest and all variable interest entities ("VIEs") for which a Company is deemed to be the primary beneficiary. An entity is generally a VIE if it meets any of the following criteria: (i) the entity has insufficient equity to finance its activities without additional subordinated financial support from other parties, (ii) the equity investors cannot make significant decisions about the entity's operations or (iii) the voting rights of some investors are not proportional to their obligations to absorb the expected losses of the entity or receive the expected returns of the entity and substantially all of the entity's activities involve or are conducted on behalf of the investor with disproportionately few voting rights.

*Concentration of Credit Risk*

Financial instruments that potentially expose the Company to concentration of credit risk consist primarily of Cash and cash equivalents, investments and accounts receivable. The Company places its cash investments with high-credit quality financial institutions and generally invests primarily in corporate debt securities, money market instruments, U.S. government and agency debt securities, commercial paper and bank deposits placed with major banks and financial institutions. Accounts receivable is generally diversified due to the number of entities comprising the Company's customer base and their dispersion across many geographical regions. The Company believes no significant concentration of credit risk exists with respect to these investments and accounts receivable.

*Inventories*

The Company holds inventory that is sold through retail, including e-commerce, and wholesale distribution channels. Substantially all of the Company's inventories are comprised of finished goods, and are reported at the lower of cost or net realizable value. Inventory costs include material, conversion costs, freight and duties and are primarily determined on a weighted-average cost basis. The Company reserves for inventory, including slow-moving and aged inventory, based on current product demand, expected future demand and historical experience. A decrease in product demand due to changing customer tastes, buying patterns or increased competition could impact the Company's evaluation of its inventory and additional reserves might be required.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Property and Equipment, Net*

Property and equipment, net is stated at cost less accumulated depreciation including the impact of long-lived asset impairment and disposals. Depreciation is calculated on a straight-line basis over the estimated useful lives of the assets. Buildings are depreciated over 40 years and building improvements are depreciated over ten to 40 years. Machinery and equipment are depreciated over lives of five to seven years, furniture and fixtures are depreciated over lives of three to ten years, and software and computer equipment is generally depreciated over lives of three to seven years. Implementation costs eligible for capitalization related to cloud computing arrangements that are a service contract are recorded within Prepaid expenses and Other assets in the Consolidated Balance Sheets and amortized as Selling, general and administrative ("SG&A") expense in the Consolidated Statement of Operations over the term of the associated hosting arrangement. Leasehold improvements are amortized over the shorter of their estimated useful lives or the related lease terms. Maintenance and repair costs are charged to earnings as incurred while expenditures for major renewals and improvements are capitalized.

*Valuation of Long-Lived Assets*

Long-lived assets, such as Property and equipment and Operating lease right-of-use ("ROU") assets are evaluated for impairment whenever events or circumstances indicate that the carrying value of the assets may not be recoverable. In evaluating long-lived assets for recoverability, the Company uses its best estimate of future cash flows expected to result from the use of the related asset group and its eventual disposition. To the extent that estimated future undiscounted net cash flows attributable to the asset are less than its carrying value, an impairment loss is recognized equal to the difference between the carrying value of such asset and its fair value, considering external market participant assumptions. The Company recorded $7.2 million and $4.0 million of impairment charges in fiscal 2023 and fiscal 2022, respectively.

In determining future cash flows, the Company takes various factors into account, including the effects of macroeconomic trends such as consumer spending, in-store capital investments, promotional cadence, the level of advertising and changes in merchandising strategy. Since the determination of future cash flows is an estimate of future performance, there may be future impairments in the event that future cash flows do not meet expectations.

*Goodwill and Other Intangible Assets*

Upon acquisition, the Company estimates and records the fair value of purchased intangible assets, which primarily consists of brands, customer relationships, right-of-use assets and order backlog. Goodwill and certain other intangible assets deemed to have indefinite useful lives, including brand intangible assets, are not amortized, but are assessed for impairment at least annually. Finite-lived intangible assets are amortized over their respective estimated useful lives and, along with other long-lived assets as noted above, are evaluated for impairment periodically whenever events or changes in circumstances indicate that their related carrying values may not be fully recoverable. Estimates of fair value for finite-lived and indefinite-lived intangible assets are primarily determined using discounted cash flows and the multi-period excess earnings method, respectively, with consideration of market comparisons when appropriate. This approach uses significant estimates and assumptions, including projected future cash flows, discount rates and growth rates.

The Company generally performs its annual goodwill and indefinite-lived intangible assets impairment analysis using a quantitative approach. The quantitative goodwill impairment test identifies the existence of potential impairment by comparing the fair value of each reporting unit with its carrying value, including goodwill. If the fair value of a reporting unit exceeds its carrying value, the reporting unit's goodwill is considered not to be impaired. If the carrying value of a reporting unit exceeds its fair value, an impairment charge is recognized in an amount equal to that excess. The impairment charge recognized is limited to the amount of goodwill allocated to that reporting unit.

Determination of the fair value of a reporting unit and intangible asset is based on management's assessment, considering independent third-party appraisals when necessary. Furthermore, this determination is judgmental in nature and often involves the use of significant estimates and assumptions, which may include projected future cash flows, discount rates, growth rates, and determination of appropriate market comparables and recent transactions. These estimates and assumptions could have a significant impact on whether or not an impairment charge is recognized and the amount of any such charge.

The Company performs its annual impairment assessment of goodwill as well as brand intangibles during the fourth quarter of each fiscal year or if an event occurs that would more likely than not reduce the fair value below its carrying amount. The Company determined that there was no impairment in fiscal 2023 or fiscal 2022.

70

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Operating Leases*

The Company leases retail space, office space, warehouse facilities, fulfillment centers, storage space, machinery, equipment and certain other items under operating leases. These leases may also include rent escalation clauses or lease incentives in the form of construction allowances and rent reduction. In determining the lease term used in the lease right-of-use ("ROU") asset and lease liability calculations, the Company considers various factors such as market conditions and the terms of any renewal or termination options that may exist. When deemed reasonably certain, the renewal and termination options are included in the determination of the lease term and calculation of the lease ROU asset and lease liability. The Company is typically required to make fixed minimum rent payments, variable rent payments primarily based on performance (i.e., percentage-of-sales-based payments), or a combination thereof, directly related to its ROU asset. The Company is also often required, by the lease, to pay for certain other costs including real estate taxes, insurance, common area maintenance fees, and/or certain other costs, which may be fixed or variable, depending upon the terms of the respective lease agreement. To the extent these payments are fixed, the Company has included them in calculating the lease ROU assets and lease liabilities.

The Company calculates lease ROU assets and lease liabilities as the present value of fixed lease payments over the reasonably certain lease term beginning at the commencement date. Per the guidance, the use of the implicit rate to determine the present value of lease payments is required. As the rate implicit in the Company's leases is not readily determinable, the Company uses its incremental borrowing rate based on the information available at the lease commencement date, including the Company's credit rating, credit spread and adjustments for the impact of collateral, lease tenors, economic environment and currency.

For operating leases, fixed lease payments are recognized as operating lease cost on a straight-line basis over the lease term. For finance leases and impaired operating leases, the ROU asset is depreciated on a straight-line basis over the remaining lease term, along with recognition of interest expense associated with accretion of the lease liability. For leases with a lease term of 12 months or less ("short-term lease"), any fixed lease payments are recognized on a straight-line basis over such term, and are not recognized on the Consolidated Balance Sheets. Variable lease cost for both operating and finance leases, if any, is recognized as incurred.

Asset retirement obligations represent legal obligations associated with the retirement of a tangible long-lived asset. The Company's asset retirement obligations are primarily associated with leasehold improvements in which the Company is contractually obligated to remove at the end of a lease to comply with the lease agreement. When such an obligation exists, the Company recognizes an asset retirement obligation at the inception of a lease at its estimated fair value. The asset retirement obligation is recorded in current liabilities or non-current liabilities (based on the expected timing of payment of the related costs) and is subsequently adjusted for any changes in estimates. The associated estimated asset retirement costs are capitalized as part of the carrying amount of the long-lived asset and depreciated over its useful life. As of the end of fiscal 2023 and fiscal 2022, the Company had asset retirement obligations of $53.7 million and $48.8 million, respectively, primarily classified within Other non-current liabilities in the Company's Consolidated Balance Sheets.

*Revenue Recognition*

Revenue is recognized when the Company satisfies its performance obligations by transferring control of promised products or services to its customers, which may be at a point of time or over time. Control is transferred when the customer obtains the ability to direct the use of and obtain substantially all of the remaining benefits from the products or services. The amount of revenue recognized is the amount of consideration to which the Company expects to be entitled, including estimation of sale terms that may create variability in the consideration. Revenue subject to variability is constrained to an amount which will not result in a significant reversal in future periods when the contingency that creates variability is resolved.

Retail store and concession shop-in-shop revenues are recognized at the point-of-sale, when the customer obtains physical possession of the products. Digital revenue from sales of products ordered through the Company's e-commerce sites is recognized upon delivery and receipt of the shipment by its customers and includes shipping and handling charges paid by customers. Retail and digital revenues are recorded net of estimated returns, which are estimated by developing an expected value based on historical experience. Payment is due at the point of sale.

The Company recognizes revenue within the wholesale channel at the time title passes and risk of loss is transferred to customers, which is generally at the point of shipment of products but may occur upon receipt of the shipment by the customer in certain cases. Wholesale revenue is recorded net of estimates for returns, discounts, end-of-season markdowns, cooperative advertising allowances and other consideration provided to the customer. The Company's historical estimates of these variable amounts have not differed materially from actual results.

71

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The Company recognizes licensing revenue over time during the contract period in which licensees are granted access to the Company's trademarks. These arrangements require licensees to pay a sales-based royalty and may include a contractually guaranteed minimum royalty amount. Revenue for contractually guaranteed minimum royalty amounts is recognized ratably over the license year and any excess sales-based royalties are recognized as earned once the minimum royalty threshold is achieved.

Gift cards issued by the Company are recorded as a liability until they are redeemed, at which point revenue is recognized. The Company also uses historical information to estimate the amount of gift card balances that will never be redeemed and recognizes that amount as revenue over time in proportion to actual customer redemptions if the Company does not have a legal obligation to remit unredeemed gift cards to any jurisdiction as unclaimed property.

The Company accounts for sales taxes and other related taxes on a net basis, excluding such taxes from revenue.

Refer to Note 4, "Revenue," for additional information.

### Cost of Sales

Cost of sales consists of inventory costs and other related costs such as reserves for inventory realizability and shrinkage, damages and replacements.

### Selling, General and Administrative ("SG&A") Expenses

Selling expenses include store employee compensation, occupancy costs, depreciation, supply costs, wholesale and retail account administration compensation globally. These expenses are affected by the number of stores open during any fiscal period and store performance, as compensation and rent expenses can vary with sales. Advertising, marketing and design expenses include employee compensation, media space and production, advertising agency fees, new product design costs, public relations and market research expenses. Distribution and customer service expenses include warehousing, order fulfillment, shipping and handling, customer service, employee compensation and bag repair costs. SG&A expenses also include compensation costs for corporate functions including: executive, finance, human resources, legal and information systems departments, as well as corporate headquarters occupancy costs, consulting fees and software expenses.

### Shipping and Handling

Shipping and handling costs for delivery of products to consumers were $217.0 million, $230.8 million and $178.6 million in fiscal 2023, fiscal 2022 and fiscal 2021, respectively, and are included in SG&A expenses. The Company includes inbound product-related transportation costs from manufacturers within Cost of sales. The balance of the Company's transportation-related costs related to its distribution network is included in SG&A expenses rather than in Cost of sales.

### Advertising

Advertising costs include expenses related to direct marketing activities, such as digital and other media and production costs. In fiscal 2023, fiscal 2022 and fiscal 2021, advertising expenses for the Company totaled $570.7 million, $551.6 million and $395.2 million, respectively, and are included in SG&A expenses. Advertising costs are generally expensed when the advertising first appears.

### Share-Based Compensation

The Company recognizes the cost of equity awards to employees and the non-employee Directors based on the grant-date fair value of those awards. The grant-date fair values of share unit awards are based on the fair value of the Company's common stock on the date of grant. The grant-date fair value of stock option awards is determined using the Black-Scholes option pricing model and involves several assumptions, including the expected term of the option, expected volatility and dividend yield. The expected term of options represents the period of time that the options granted are expected to be outstanding and is based on historical experience. Expected volatility is based on historical volatility of the Company's stock as well as the implied volatility from publicly traded options on the Company's stock. Dividend yield is based on the current expected annual dividend per share and the Company's stock price. Changes in the assumptions used to determine the Black-Scholes value could result in significant changes in the Black-Scholes value.

The Company recognizes share-based compensation net of estimated forfeitures and revises the estimates in subsequent periods if actual forfeitures differ from the estimates. The Company estimates the forfeiture rate based on historical experience as well as expected future behavior.

72

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The Company grants performance-based share awards to key executives, the vesting of which is subject to the executive's continuing employment and the Company's or individual's achievement of certain performance goals. On a quarterly basis, the Company assesses actual performance versus the predetermined performance goals, and adjusts the share-based compensation expense to reflect the relative performance achievement. Actual distributed shares are calculated upon conclusion of the service and performance periods, and include dividend equivalent shares. If the performance-based award incorporates a market condition, the grant-date fair value of such award is determined using a pricing model, such as a Monte Carlo Simulation.

***Income Taxes***

The Company's effective tax rate is based on pre-tax income, statutory tax rates, tax laws and regulations, and tax planning strategies available in the various jurisdictions in which the Company operates. The Company classifies interest and penalties on uncertain tax positions in the Provision for income taxes. The Company records net deferred tax assets to the extent it believes that it is more likely than not that these assets will be realized. In making such determination, the Company considers all available evidence, including scheduled reversals of deferred tax liabilities, projected future taxable income, tax planning strategies and recent and expected future results of operation. The Company reduces deferred tax assets by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some amount of deferred tax assets is not expected to be realized. The Company is not permanently reinvested with respect to earnings of a limited number of foreign entities and has recorded the tax consequences of remitting earnings from these entities. The Company is permanently reinvested with respect to all other earnings.

The Company recognizes the impact of tax positions in the financial statements if those positions will more likely than not be sustained on audit, based on the technical merits of the position. Although the Company believes that the estimates and assumptions used are reasonable and legally supportable, the final determination of tax audits could be different than that which is reflected in historical tax provisions and recorded assets and liabilities. Tax authorities periodically audit the Company's income tax returns and the tax authorities may take a contrary position that could result in a significant impact on the Company's results of operations. Significant management judgment is required in determining the effective tax rate, in evaluating tax positions and in determining the net realizable value of deferred tax assets.

Refer to Note 15, "Income Taxes," herein for further discussion on the Company's income taxes.

***Derivative Instruments***

The majority of the Company's purchases of finished goods are denominated in U.S. dollars, which limits the Company's exposure to the transactional effects of foreign currency exchange rate fluctuations. However, the Company is exposed to foreign currency exchange risk related to its sale of U.S. dollar inventory to foreign operating subsidiaries in local currency, as well as risk related to various cross-currency intercompany loans and payables, and translation risk. The Company is also exposed to foreign currency risk related to changes in the U.S. dollar value of its net investment in foreign subsidiaries. The Company uses derivative financial instruments to manage these risks. These derivative transactions are in accordance with the Company's risk management policies. The Company does not enter into derivative transactions for speculative or trading purposes.

The Company records all derivative contracts at fair value on the Consolidated Balance Sheets. The fair values of foreign currency derivatives are based on the forward curves of the specific indices upon which settlement is based and include an adjustment for the Company's credit risk. Judgment is required of management in developing estimates of fair value. The use of different market assumptions or methodologies could affect the estimated fair value.

For derivative instruments that qualify for hedge accounting, the changes in the fair value of these instruments are either (i) offset against the changes in fair value of the hedged assets or liabilities through earnings or (ii) recognized as a component of Accumulated other comprehensive income (loss) ("AOCI") until the hedged item is recognized in earnings, depending on whether the derivative is being used to hedge changes in fair value or cash flows. For derivative instruments that are designated as a net investment hedge, the changes in the fair value of the instruments are recognized as a component of AOCI, and upon discontinuation of the hedge remain in AOCI until the net investment is sold or liquidated.

Each derivative instrument entered into by the Company that qualifies for hedge accounting is expected to be highly effective at reducing the risk associated with the exposure being hedged. For each derivative that is designated as a hedge, the Company documents the related risk management objective and strategy, including identification of the hedging instrument, the hedged item and the risk exposure, as well as how hedge effectiveness will be assessed over the term of the instrument. The extent to which a hedging instrument has been and is expected to remain highly effective in achieving offsetting changes in fair value or cash flows is assessed and documented by the Company on at least a quarterly basis.

73

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

If it is determined that a derivative instrument has not been highly effective, and will continue not to be highly effective in hedging the designated exposure, hedge accounting is discontinued and further gains (losses) are recognized in earnings within foreign currency gains (losses). Upon discontinuance of hedge accounting, the cumulative change in fair value of cash flow derivatives previously recorded in AOCI is recognized in earnings when the related hedged item affects earnings, consistent with the original hedging strategy, unless the forecasted transaction is no longer probable of occurring, in which case the accumulated amount is immediately recognized in earnings within foreign currency gains (losses).

As a result of the use of derivative instruments, the Company may be exposed to the risk that the counterparties to such contacts will fail to meet their contractual obligations. To mitigate this counterparty credit risk, the Company has a policy of only entering into contracts with carefully selected financial institutions based upon an evaluation of their credit ratings, among other factors.

The fair values of the Company's derivative instruments are recorded on its Consolidated Balance Sheets on a gross basis. For cash flow reporting purposes, the Company classifies proceeds received or amounts paid upon the settlement of a derivative instrument in the same manner as the related item being hedged, primarily within cash from operating activities.

*Hedging Portfolio*

The Company enters into forward currency contracts primarily to reduce its risks related to exchange rate fluctuations on foreign currency denominated inventory transactions, as well as various cross-currency intercompany loans and payables. To the extent its derivative contracts designated as cash flow hedges are highly effective in offsetting changes in the value of the hedged items, the related gains (losses) are initially deferred in AOCI and subsequently recognized in the Consolidated Statements of Operations as part of the cost of the inventory purchases being hedged within Cost of sales, when the related inventory is sold to a third-party. Current maturity dates range from July 2023 to March 2025. Forward foreign currency exchange contracts designated as fair value hedges and associated with intercompany and other contractual obligations are recognized within foreign currency gains (losses) generally in the period in which the related balances being hedged are revalued. The maturity date of most instruments held as of July 1, 2023 are in August 2023, and such contracts are typically renewed upon maturity if the related balance has not been settled. The Company also enters into cross-currency swaps to reduce its risks related to exchange rate fluctuations on net investments in foreign subsidiaries. The related gains (losses) are deferred in AOCI until the net investment is sold or liquidated, and current maturity dates range from April 2025 to March 2032.

**Foreign Currency**

The functional currency of the Company's foreign operations is generally the applicable local currency. Assets and liabilities are translated into U.S. dollars using the current exchange rates in effect at the balance sheet date, while revenues and expenses are translated at the weighted-average exchange rates for the period. The resulting translation adjustments are included in the Consolidated Statements of Comprehensive Income as a component of Other comprehensive income (loss) ("OCI") and in the Consolidated Statements of Equity within AOCI.

The Company recognizes gains and losses on transactions that are denominated in a currency other than the respective entity's functional currency in earnings. Foreign currency transaction gains and losses also include amounts realized on the settlement of certain intercompany loans with foreign subsidiaries.

**Recent Accounting Pronouncements**

*Recently Adopted Accounting Pronouncements*

In September 2022, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2022-04, "Liabilities-Supplier Finance Programs (Subtopic 405-50)", which is intended to enhance the transparency of supplier finance programs. The ASU requires the buyer in a supplier finance program to disclose sufficient information about the program in order to allow a user of financial statements to understand the program's nature, activity during the period, changes from period to period, and potential magnitude. The requirements of the new standard will be effective for annual reporting periods beginning after December 15, 2022, and interim periods within those annual periods, which for the Company is the first quarter of fiscal 2024. Early adoption is permitted. The Company does not expect that the adoption of ASU 2022-04 will have a material impact on its consolidated financial statements.

*Recently Issued Accounting Pronouncements Not Yet Adopted*

The Company has considered all new accounting pronouncements and has concluded that there are no new pronouncements that may have a material impact on our results of operations, financial condition or cash flows based on current information.

74

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

**4. REVENUE**

The Company recognizes revenue primarily from sales of the products of its brands through retail and wholesale channels, including e-commerce sites. The Company also generates revenue from royalties related to licensing its trademarks, as well as sales in ancillary channels. In all cases, revenue is recognized upon the transfer of control of the promised products or services to the customer, which may be at a point in time or over time. Control is transferred when the customer obtains the ability to direct the use of and obtain substantially all of the remaining benefits from the products or services. The amount of revenue recognized is the amount of consideration to which the Company expects to be entitled, including estimation of sale terms that may create variability in the consideration. Revenue subject to variability is constrained to an amount which will not result in a significant reversal in future periods when the contingency that creates variability is resolved.

The Company recognizes revenue in its retail stores, including concession shop-in-shops, at the point-of-sale when the customer obtains physical possession of the products. Digital revenue from sales of products ordered through the Company's e-commerce sites is recognized upon delivery and receipt of the shipment by its customers and includes shipping and handling charges paid by customers. Retail and digital revenues are recorded net of estimated returns, which are estimated by developing an expected value based on historical experience. Payment is due at the point of sale.

Gift cards issued by the Company are recorded as a liability until redeemed by the customer, at which point revenue is recognized. The Company also uses historical information to estimate the amount of gift card balances that will never be redeemed and recognizes that amount as revenue over time in proportion to actual customer redemptions if the Company does not have a legal obligation to remit unredeemed gift cards to any jurisdiction as unclaimed property.

Certain of the Company's retail operations use sales incentive programs, such as customer loyalty programs and the issuance of coupons. Loyalty programs provide the customer a material right to acquire additional products and give rise to the Company having a separate performance obligation. Additionally, certain products sold by the Company include an assurance warranty that is not considered a separate performance obligation. These programs are immaterial individually and in the aggregate.

The Company recognizes revenue within the wholesale channel at the time title passes and risk of loss is transferred to customers, which is generally at the point of shipment of products but may occur upon receipt of the shipment by the customer in certain cases. Payment is generally due 30 to 90 days after shipment. Wholesale revenue is recorded net of estimates for returns, discounts, end-of-season markdowns, cooperative advertising allowances and other consideration provided to the customer. Discounts are based on contract terms with the customer, while cooperative advertising allowances and other consideration may be based on contract terms or negotiated on a case by case basis. Returns and markdowns generally require approval from the Company and are estimated based on historical trends, current season results and inventory positions at the wholesale locations, current market and economic conditions as well as, in select cases, contractual terms. The Company's historical estimates of these variable amounts have not differed materially from actual results.

The Company recognizes licensing revenue over time during the contract period in which licensees are granted access to the Company's trademarks. These arrangements require licensees to pay a sales-based royalty and may include a contractually guaranteed minimum royalty amount. Revenue for contractually guaranteed minimum royalty amounts is recognized ratably over the license year and any excess sales-based royalties are recognized as earned once the minimum royalty threshold is achieved. Payments from the customer are generally due quarterly in an amount based on the licensee's sales of goods bearing the licensed trademarks during the period, which may differ from the amount of revenue recorded during the period thereby generating a contract asset or liability. Contract assets and liabilities and contract costs related to the licensing arrangements are immaterial as the licensing business represents approximately 1% of total net sales in the fiscal year ended July 1, 2023.

The Company has elected a practical expedient not to disclose the remaining performance obligations that are unsatisfied as of the end of the period related to contracts with an original duration of one year or less or variable consideration related to sales-based royalty arrangements. There are no other contracts with transaction price allocated to remaining performance obligations other than future minimum royalties as discussed above, which are not material.

Other practical expedients elected by the Company include (i) assuming no significant financing component exists for any contract with a duration of one year or less, (ii) accounting for shipping and handling as a fulfillment activity within SG&A expense regardless of the timing of the shipment in relation to the transfer of control and (iii) excluding sales and value added tax from the transaction price.

75

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Disaggregated Net Sales*

The following table disaggregates the Company's net sales into geographies that depict how economic factors may impact the revenues and cash flows for the periods presented. Each geography presented includes net sales related to the Company's directly operated channels, global travel retail business and to wholesale customers, including distributors, in locations within the specified geographic area.

| | North America | | Greater China[1] | | Other Asia[2] | | Other[3] | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (millions) | | | | | |
| **Fiscal 2023** | | | | | | | | | | |
| **Coach** | $ | 3,037.5 | $ | 896.7 | $ | 752.9 | $ | 273.3 | $ | 4,960.4 |
| **Kate Spade** | | 1,142.8 | | 47.9 | | 140.4 | | 87.8 | | 1,418.9 |
| **Stuart Weitzman** | | 180.0 | | 71.2 | | 1.8 | | 28.6 | | 281.6 |
| **Total** | $ | 4,360.3 | $ | 1,015.8 | $ | 895.1 | $ | 389.7 | $ | 6,660.9 |
| | | | | | | | | | | |
| Fiscal 2022 | | | | | | | | | | |
| Coach | $ | 3,102.8 | $ | 892.2 | $ | 691.3 | $ | 235.0 | $ | 4,921.3 |
| Kate Spade | | 1,156.7 | | 41.7 | | 139.0 | | 108.1 | | 1,445.5 |
| Stuart Weitzman | | 189.9 | | 92.7 | | 0.4 | | 34.7 | | 317.7 |
| Total | $ | 4,449.4 | $ | 1,026.6 | $ | 830.7 | $ | 377.8 | $ | 6,684.5 |
| | | | | | | | | | | |
| Fiscal 2021 | | | | | | | | | | |
| Coach | $ | 2,466.3 | $ | 930.6 | $ | 666.3 | $ | 189.9 | $ | 4,253.1 |
| Kate Spade | | 936.7 | | 55.2 | | 134.7 | | 83.4 | | 1,210.0 |
| Stuart Weitzman | | 139.4 | | 108.3 | | 4.0 | | 31.5 | | 283.2 |
| Total | $ | 3,542.4 | $ | 1,094.1 | $ | 805.0 | $ | 304.8 | $ | 5,746.3 |

[1] Greater China includes mainland China, Taiwan, Hong Kong SAR and Macao SAR.

[2] Other Asia includes Japan, Malaysia, Australia, New Zealand, Singapore, South Korea, and other countries within Asia.

[3] Other sales primarily represents sales in Europe, the Middle East and royalties earned from the Company's licensing partners.

*Deferred Revenue*

Deferred revenue results from cash payments received or receivable from customers prior to the transfer of the promised goods or services, and is primarily related to unredeemed gift cards, net of breakage which has been recognized. Additional deferred revenue may result from sales-based royalty payments received or receivable which exceed the revenue recognized during the contractual period. The balance of such amounts as of July 1, 2023 and July 2, 2022 was $43.0 million and $41.5 million, respectively, which were primarily recorded within Accrued liabilities on the Company's Consolidated Balance Sheets and are generally expected to be recognized as revenue within a year. For the fiscal year ended July 1, 2023, net sales of $23.5 million were recognized from amounts recorded as deferred revenue as of July 2, 2022. For the fiscal year ended July 2, 2022, net sales of $16.8 million were recognized from amounts recorded as deferred revenue as of July 3, 2021.

76

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

## 5. RESTRUCTURING ACTIVITIES

### Acceleration Program

During fiscal 2020, the Company embarked on a strategic growth plan after undergoing a review of its business under its multi-year growth agenda. This multi-faceted, multi-year strategic growth plan (the "Acceleration Program") reflects: (i) actions to streamline the Company's organization; (ii) select store closures as the Company optimizes its fleet (including store closure costs incurred as the Company exits certain regions in which it currently operates); and (iii) professional fees and share-based compensation costs incurred as a result of the development and execution of the Company's comprehensive strategic initiatives aimed at increasing profitability. Since inception in fiscal 2020 until the completion of the program in fiscal 2022, the Company incurred total pre-tax charges of $219.4 million. The Company did not incur any charges related to the Acceleration Program in fiscal 2023.

During the fiscal year ended July 2, 2022, the Company incurred charges of $42.8 million, all of which was recorded within SG&A expenses. Of the $42.8 million recorded within SG&A, $26.6 million was recorded within Corporate, $6.7 million was recorded within the Coach segment, $5.9 million was recorded within the Kate Spade segment and $3.6 million was recorded within the Stuart Weitzman segment.

During the fiscal year ended July 3, 2021, the Company incurred charges of $89.6 million, all of which was recorded within SG&A expenses. Of the $89.6 million recorded within SG&A, $65.8 million was recorded within Corporate, $21.9 million was recorded within the Coach segment, $4.4 million was recorded within the Kate Spade segment and a reduction of expense of $2.5 million was recorded within the Stuart Weitzman segment.

During the fiscal year ended June 27, 2020, the Company incurred charges of $87.0 million, of which $8.4 million was recorded within Cost of sales and $78.6 million was recorded within SG&A expenses. Of the $8.4 million recorded within Cost of sales, $8.4 million was recorded within the Stuart Weitzman segment. Of the $78.6 million recorded within SG&A expenses, $28.9 million was recorded within Corporate, $18.5 million was recorded within the Coach segment, $17.6 million was recorded within the Stuart Weitzman segment and $13.6 million was recorded within the Kate Spade segment.

A summary of charges and related liabilities under the Acceleration Program is as follows:

| | Organization-Related[1] | | Store Closure[2] | | Other[3] | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | | (millions) | | | |
| Fiscal 2020 charges | $ | 44.7 | $ | 32.3 | $ | 10.0 | $ | 87.0 |
| Cash payments | | (15.8) | | (11.0) | | (7.1) | | (33.9) |
| Non-cash charges | | (4.0) | | (20.8) | | - | | (24.8) |
| Liability balance as of June 27, 2020 | $ | 24.9 | $ | 0.5 | $ | 2.9 | $ | 28.3 |
| Fiscal 2021 charges | $ | 16.6 | $ | 5.9 | $ | 67.1 | $ | 89.6 |
| Cash payments | | (38.2) | | (11.9) | | (36.6) | | (86.7) |
| Non-cash charges | | - | | 5.8 | | (10.9) | | (5.1) |
| Liability balance as of July 3, 2021 | $ | 3.3 | $ | 0.3 | $ | 22.5 | $ | 26.1 |
| Fiscal 2022 charges | $ | 0.5 | $ | 3.9 | $ | 38.4 | $ | 42.8 |
| Cash payments | | (2.7) | | (6.4) | | (38.2) | | (47.3) |
| Non-cash charges | | - | | 2.4 | | (17.2) | | (14.8) |
| Liability balance as of July 2, 2022 | $ | 1.1 | $ | 0.2 | $ | 5.5 | $ | 6.8 |
| **Fiscal 2023 charges** | $ | - | $ | - | $ | - | $ | - |
| **Cash payments** | | (1.1) | | (0.2) | | (5.5) | | (6.8) |
| **Non-cash charges** | | - | | - | | - | | - |
| **Liability balance as of July 1, 2023** | $ | - | $ | - | $ | - | $ | - |

[1] Organization-related charges, recorded within SG&A expenses, primarily relates to severance and other related costs.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

(2) Store closure charges represent lease termination penalties, removal or modification of lease assets and liabilities, establishing inventory reserves, accelerated depreciation and severance.

(3) Other charges, recorded within SG&A, primarily relates to share-based compensation and professional fees.

## 6. ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS)

The components of Accumulated other comprehensive income (loss), as of the dates indicated, are as follows:

| | Unrealized Gains (Losses) on Cash Flow Hedging Derivatives[1] | Unrealized Gains (Losses) on Available-for-Sale Investments | Cumulative Translation Adjustment[2] | Total |
|---|---|---|---|---|
| | (millions) | | | |
| Balances at July 3, 2021 | $ (0.7) | $ - | $ (71.3) | $ (72.0) |
| Other comprehensive income (loss) before reclassifications | (4.2) | (0.5) | (96.8) | (101.5) |
| Less: amounts reclassified from accumulated other comprehensive income (loss) | (2.6) | - | - | (2.6) |
| Net current-period other comprehensive income (loss) | (1.6) | (0.5) | (96.8) | (98.9) |
| Balances at July 2, 2022 | $ (2.3) | $ (0.5) | $ (168.1) | $ (170.9) |
| **Other comprehensive income (loss) before reclassifications** | **32.0** | **0.5** | **(56.7)** | **(24.2)** |
| **Less: amounts reclassified from accumulated other comprehensive income (loss)** | **(5.2)** | **-** | **-** | **(5.2)** |
| **Net current-period other comprehensive income (loss)** | **37.2** | **0.5** | **(56.7)** | **(19.0)** |
| **Balances at July 1, 2023** | **$ 34.9** | **$ -** | **$ (224.8)** | **$ (189.9)** |

(1) The ending balances of AOCI related to cash flow hedges are net of tax of $(2.9) million and $0.9 million as of July 1, 2023 and July 2, 2022, respectively. The amounts reclassified from AOCI are net of tax of $1.1 million and $0.8 million as of July 1, 2023 and July 2, 2022, respectively.

(2) The ending balances of AOCI related to foreign currency translation adjustments includes a loss of $55.7 million and $7.6 million, net of tax of $(0.8) million and $(11.4) million, as of July 1, 2023 and July 2, 2022, respectively, related to changes in the fair values of instruments designated as hedges of the Company's net investment in certain foreign

## 7. SHARE-BASED COMPENSATION

The Company maintains several share-based compensation plans which are more fully described below. The following table shows the total compensation cost charged against income for these plans and the related tax benefits recognized in the Consolidated Statements of Operations:

| | July 1, 2023 | July 2, 2022 | July 3, 2021 |
|---|---|---|---|
| | (millions) | | |
| Share-based compensation expense[1] | $ 78.8 | $ 89.4 | $ 74.9 |
| Income tax benefit related to share-based compensation expense | 12.9 | 15.2 | 12.9 |

(1) There was no share-based compensation expense under the Acceleration program during fiscal year ended July 1, 2023. During the fiscal year ended July 2, 2022, the Company incurred $17.2 million of share-based compensation expense related to Acceleration Program. During the fiscal year ended July 3, 2021, the Company incurred $10.8 million of share-based compensation expense related to its Acceleration Program. Refer to Note 5, "Restructuring Activities," for further information.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Stock-Based Plans*

The Company maintains the Amended and Restated Tapestry, Inc. 2018 Stock Incentive Plan to award stock options and shares to certain members of management and the outside members of its Board of Directors ("Board"). The Company maintains the 2010 Stock Incentive Plan for awards granted prior to the establishment of the 2018 Stock Incentive Plan. These plans were approved by the Company's stockholders. The exercise price of each stock option equals 100% of the market price of the Company's stock on the date of grant and generally has a maximum term of 10 years. Stock options and service based share awards that are granted as part of the annual compensation process generally vest ratably over four years. Stock option and share awards are subject to forfeiture until completion of the vesting period, which ranges from one to four years. The Company issues new shares upon the exercise of stock options or vesting of share awards.

*Stock Options*

A summary of stock option activity during the fiscal year ended July 1, 2023 is as follows:

| | Number of Options Outstanding | Weighted- Average Exercise Price per Option | Weighted- Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | (millions) | | | (millions) |
| Outstanding at July 2, 2022 | 10.0 | $ 34.52 | | |
| Granted | 1.1 | 35.42 | | |
| Exercised | (1.4) | 26.18 | | |
| Forfeited or expired | (1.0) | 50.17 | | |
| Outstanding at July 1, 2023 | 8.7 | 34.02 | 5.3 | $ 90.4 |
| Vested and expected to vest at July 1, 2023 | 8.6 | 34.08 | 5.3 | 89.1 |
| Exercisable at July 1, 2023 | 5.8 | 36.52 | 4.1 | 49.3 |

The fair value of each option grant is estimated on the date of grant using the Black-Scholes option pricing model and the following weighted-average assumptions:

| | July 1, 2023 | July 2, 2022 | July 3, 2021 |
|---|---|---|---|
| Expected term (years) | 4.9 | 5.0 | 5.1 |
| Expected volatility | 48.6 % | 46.9 % | 48.8 % |
| Risk-free interest rate | 3.3 % | 0.8 % | 0.3 % |
| Dividend yield | 3.4 % | 2.4 % | - % |

The expected term of options represents the period of time that the options granted are expected to be outstanding and is based on historical experience. Expected volatility is based on historical volatility of the Company's stock as well as the implied volatility from publicly traded options on the Company's stock. The risk free interest rate is based on the zero-coupon U.S. Treasury issue as of the date of the grant. Dividend yield is based on the expected annual dividend per share and the Company's stock price as of the grant date.

The weighted-average grant-date fair value of options granted during fiscal 2023, fiscal 2022 and fiscal 2021 was $12.04, $13.94 and $7.54, respectively. The total intrinsic value of options exercised during fiscal 2023, fiscal 2022 and fiscal 2021 was $19.5 million, $17.5 million and $17.0 million, respectively. The total cash received from option exercises was $34.9 million, $71.3 million and $58.1 million in fiscal 2023, fiscal 2022 and fiscal 2021, respectively, and the cash tax benefit realized for the tax deductions from these option exercises was $3.9 million, $3.7 million and $3.7 million, respectively.

At July 1, 2023, $17.7 million of total unrecognized compensation cost related to non-vested stock option awards is expected to be recognized over a weighted-average period of 1.4 years.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

### *Service-based Restricted Stock Unit Awards ("RSUs")*

A summary of service-based RSU activity during the year ended July 1, 2023 is as follows:

|  | Number of Non-vested RSUs | Weighted-Average Grant-Date Fair Value per RSU |
|---|---|---|
|  | (millions) |  |
| Non-vested at July 2, 2022 | 6.4 | $ 25.15 |
| Granted | 2.5 | 35.53 |
| Vested | (2.4) | 25.61 |
| Forfeited | (0.6) | 28.17 |
| Non-vested at July 1, 2023 | 5.9 | 28.69 |

At July 1, 2023, $95.7 million of total unrecognized compensation cost related to non-vested share awards is expected to be recognized over a weighted-average period of 1.3 years.

The weighted-average grant-date fair value of share awards granted during fiscal 2023, fiscal 2022 and fiscal 2021 was $35.53, $41.70 and $16.40, respectively. The total fair value of shares vested during fiscal 2023, fiscal 2022 and fiscal 2021 was $88.0 million, $92.5 million and $26.3 million, respectively.

### *Performance-based Restricted Stock Unit Awards ("PRSU")*

The Company grants PRSUs to key executives, the vesting of which is subject to the executive's continuing employment and the Company's achievement of certain performance goals. A summary of PRSU activity during the fiscal year ended July 1, 2023 is as follows:

|  | Number of Non-vested PRSUs | Weighted-Average Grant-Date Fair Value per PRSU |
|---|---|---|
|  | (millions) |  |
| Non-vested at July 2, 2022 | 1.2 | $ 23.52 |
| Granted | 0.4 | 35.46 |
| Change due to performance condition achievement | 0.8 | 17.35 |
| Vested | (1.7) | 17.09 |
| Forfeited | - | - |
| Non-vested at July 1, 2023 | 0.7 | $ 38.27 |

At July 1, 2023, $16.0 million of total unrecognized compensation cost related to non-vested share awards is expected to be recognized over a weighted-average period of 1.0 years.

The weighted-average grant-date fair value per share of PRSU awards granted during fiscal 2023, fiscal 2022 and fiscal 2021 was $35.46, $41.86 and $16.83, respectively. The total fair value of awards that vested during fiscal 2023, fiscal 2022 and fiscal 2021 was $60.4 million, $0.0 million and $3.7 million, respectively.

PRSUs are subject to a two-year and three-year cliff vesting contingent on the employee's continuing employment and the Company's achievement of the performance goals established at the beginning of the performance period. The fair value of the PRSU's is based on the price of the Company's common stock on the date of grant.

In fiscal 2023, fiscal 2022 and fiscal 2021, the cash tax benefit realized for the tax deductions from all RSUs (service and performance-based) was $29.5 million, $17.4 million and $6.2 million, respectively.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Employee Stock Purchase Plan*

Under the 2001 Employee Stock Purchase Plan, eligible employees are permitted to purchase a limited number of Company common shares at 85% of market value. Under this plan, the Company sold 0.1 million, 0.1 million and 0.2 million shares to employees in fiscal 2023, fiscal 2022 and fiscal 2021, respectively. Compensation expense is calculated for the fair value of employees' purchase rights using the Black-Scholes model and the following weighted-average assumptions:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | July 1, 2023 | July 2, 2022 | July 3, 2021 |
| Expected term (years) | 0.5 | 0.5 | 0.5 |
| Expected volatility | 38.2 % | 38.2 % | 81.6 % |
| Risk-free interest rate | 3.3 % | 0.1 % | 0.1 % |
| Dividend yield | 3.1 % | 1.5 % | - % |

The weighted-average fair value of the purchase rights granted during fiscal 2023, fiscal 2022 and fiscal 2021 was $9.30, $10.71 and $7.39, respectively. The Company issues new shares for employee stock purchases.

## 8. INVESTMENTS

The following table summarizes the Company's primarily U.S. dollar-denominated investments, recorded within the Consolidated Balance Sheets as of July 1, 2023 and July 2, 2022:

| | July 1, 2023 | | | July 2, 2022 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Short-term | Long-term[3] | Total | Short-term | Long-term[3] | Total |
| | (millions) | | | | | |
| **Available-for-sale investments:** | | | | | | |
| Commercial paper[1] | $ - | $ - | $ - | $ 59.6 | $ - | $ 59.6 |
| Government securities - U.S.[2] | - | - | - | 39.4 | - | 39.4 |
| Corporate debt securities - U.S.[2] | - | - | - | 55.2 | - | 55.2 |
| **Total Available-for-sale investments** | $ - | $ - | $ - | $ 154.2 | $ - | $ 154.2 |
| **Other:** | | | | | | |
| Time deposits[1] | 0.6 | - | 0.6 | 0.6 | - | 0.6 |
| Other | 14.8 | 1.3 | 16.1 | 8.6 | 0.1 | 8.7 |
| **Total Investments** | $ 15.4 | $ 1.3 | $ 16.7 | $ 163.4 | $ 0.1 | $ 163.5 |

---

[1] These securities have original maturities greater than three months and are recorded at fair value.

[2] These securities as of period end have maturity dates during their respective following fiscal years and are recorded at fair value.

[3] Long-term investments are presented within Other assets on the Consolidated Balance Sheets.

There were no material gross realized and unrealized gains or losses on available-for-sale investments as of the periods ended July 1, 2023 and July 2, 2022.

81

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

## 9. LEASES

The Company leases retail space, office space, warehouse facilities, fulfillment centers, storage space, machinery, equipment and certain other items under operating leases. The Company's leases have initial terms ranging from 1 to 20 years and may have renewal or early termination options ranging from 1 to 10 years. These leases may also include rent escalation clauses or lease incentives. In determining the lease term used in the lease ROU asset and lease liability calculations, the Company considers various factors such as market conditions and the terms of any renewal or termination options that may exist. When deemed reasonably certain, the renewal and termination options are included in the determination of the lease term and calculation of the lease ROU asset and lease liability. The Company is typically required to make fixed minimum rent payments, variable rent payments primarily based on performance (i.e., percentage-of-sales-based payments), or a combination thereof, directly related to its ROU asset. The Company is also often required, by the lease, to pay for certain other costs including real estate taxes, insurance, common area maintenance fees, and/or certain other costs, which may be fixed or variable, depending upon the terms of the respective lease agreement. To the extent these payments are fixed, the Company has included them in calculating the lease ROU assets and lease liabilities.

The Company calculates lease ROU assets and lease liabilities as the present value of fixed lease payments over the reasonably certain lease term beginning at the commencement date. The Company is required to use the implicit rate to determine the present value of lease payments. As the rate implicit in the Company's leases is not readily determinable, the Company uses its incremental borrowing rate based on the information available at the lease commencement date, including the Company's credit rating, credit spread and adjustments for the impact of collateral, lease tenors, economic environment and currency.

For operating leases, fixed lease payments are recognized as operating lease cost on a straight-line basis over the lease term. For finance leases and impaired operating leases, the ROU asset is depreciated on a straight-line basis over the remaining lease term, along with recognition of interest expense associated with accretion of the lease liability. For leases with a lease term of 12 months or less ("short-term lease"), any fixed lease payments are recognized on a straight-line basis over such term, and are not recognized on the Consolidated Balance Sheets. Variable lease cost for both operating and finance leases, if any, is recognized as incurred.

The Company acts as sublessor in certain leasing arrangements, primarily related to a sublease of a portion of the Company's leased headquarters space as well as certain retail locations. Fixed sublease payments received are recognized on a straight-line basis over the sublease term.

ROU assets, along with any other related long-lived assets, are periodically evaluated for impairment.

82

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The following table summarizes the ROU assets and lease liabilities recorded on the Company's Consolidated Balance Sheets as of July 1, 2023 and July 2, 2022:

| | | July 1, 2023 | | July 2, 2022 | Location Recorded on the Consolidated Balance Sheets |
|---|---|---|---|---|---|
| | | (millions) | | | |
| **Assets:** | | | | | |
| Operating leases | $ | 1,378.7 | $ | 1,281.6 | Operating lease right-of-use assets |
| Finance leases | | 1.2 | | 1.9 | Property and equipment, net |
| Total lease assets | $ | 1,379.9 | $ | 1,283.5 | |
| **Liabilities:** | | | | | |
| Operating leases: | | | | | |
| Current lease liabilities | $ | 297.5 | $ | 288.7 | Current portion of operating lease liabilities |
| Long-term lease liabilities | | 1,333.7 | | 1,282.3 | Long-term operating lease liabilities |
| Total operating lease liabilities | $ | 1,631.2 | $ | 1,571.0 | |
| Finance leases: | | | | | |
| Current lease liabilities | $ | 1.2 | $ | 1.1 | Accrued liabilities |
| Long-term lease liabilities | | 1.2 | | 2.4 | Other liabilities |
| Total finance lease liabilities | $ | 2.4 | $ | 3.5 | |
| Total lease liabilities | $ | 1,633.6 | $ | 1,574.5 | |

The following table summarizes the composition of net lease costs, primarily recorded within SG&A expenses on the Company's Consolidated Statement of Operations for the fiscal year ended July 1, 2023 and July 2, 2022:

| | | Fiscal Year Ended | | |
|---|---|---|---|---|
| | | July 1, 2023 | | July 2, 2022 |
| | | (millions) | | |
| Finance lease cost: | | | | |
| Amortization of right-of-use assets | $ | 1.1 | $ | 0.9 |
| Interest on lease liabilities[1] | | 0.3 | | 0.5 |
| Total finance lease cost | | 1.4 | | 1.4 |
| Operating lease cost | | 323.1 | | 331.9 |
| Short-term lease cost | | 29.8 | | 23.5 |
| Variable lease cost[2] | | 209.6 | | 203.0 |
| Operating lease right-of-use impairment | | 1.3 | | 0.9 |
| Less: sublease income | | (18.1) | | (19.7) |
| **Total net lease cost** | $ | 547.1 | $ | 541.0 |

[1] Interest on lease liabilities is recorded within Interest expense, net on the Company's Consolidated Statement of Operations.

[2] Rent concessions negotiated related to Covid-19 are recorded in variable lease cost.

83

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The following table summarizes certain cash flow information related to the Company's leases for the fiscal year ended July 1, 2023 and July 2, 2022:

| | Fiscal Year Ended | |
| --- | --- | --- |
| | July 1, 2023 | July 2, 2022 |
| | (millions) | |
| **Cash paid for amounts included in the measurement of lease liabilities:** | | |
| Operating cash flows from operating leases | $ 387.8 | $ 418.3 |
| Operating cash flows from finance leases | 0.3 | 0.5 |
| Financing cash flows from finance leases | 1.1 | 0.9 |
| **Non-cash transactions:** | | |
| Right-of-use assets obtained in exchange for operating lease liabilities | 390.7 | 111.7 |
| Right-of-use assets obtained in exchange for finance lease liabilities | - | - |

The following table provides a maturity analysis of the Company's lease liabilities recorded on the Consolidated Balance Sheets as of July 1, 2023:

| | July 1, 2023 | | |
| --- | --- | --- | --- |
| | Operating Leases | Finance Leases | Total |
| | (millions) | | |
| Fiscal 2024 | $ 365.7 | $ 1.4 | $ 367.1 |
| Fiscal 2025 | 296.4 | 1.3 | 297.7 |
| Fiscal 2026 | 239.7 | - | 239.7 |
| Fiscal 2027 | 201.8 | - | 201.8 |
| Fiscal 2028 | 146.5 | - | 146.5 |
| Fiscal 2029 and thereafter | 686.5 | - | 686.5 |
| Total lease payments | 1,936.6 | 2.7 | 1,939.3 |
| Less: imputed interest | (305.4) | (0.3) | (305.7) |
| Total lease liabilities | $ 1,631.2 | $ 2.4 | $ 1,633.6 |

The future minimum fixed sublease receipts under non-cancelable operating lease agreements as of July 1, 2023 are as follows:

| | July 1, 2023 |
| --- | --- |
| | (millions) |
| Fiscal 2024 | $ 17.7 |
| Fiscal 2025 | 17.3 |
| Fiscal 2026 | 14.8 |
| Fiscal 2027 | 14.8 |
| Fiscal 2028 | 14.8 |
| Fiscal 2029 and thereafter | 127.5 |
| Total sublease income | $ 206.9 |

84

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The following table summarizes the weighted-average remaining lease terms and weighted-average discount rates related to the Company's operating leases and finance leases recorded on the Consolidated Balance Sheets as of July 1, 2023 and July 2, 2022:

|  | July 1, 2023 | July 2, 2022 |
|---|---|---|
| Weighted average remaining lease term (years): | | |
| Operating leases | 8.3 | 8.0 |
| Finance leases | 1.9 | 2.9 |
| Weighted average discount rate: | | |
| Operating leases | 4.2 % | 3.9 % |
| Finance leases | 11.3 % | 11.3 % |

Additionally, the Company had approximately $11.0 million of future payment obligations related to executed lease agreements for which the related lease had not yet commenced as of July 1, 2023.

## 10. DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES

The following tables provide information related to the Company's derivative instruments recorded on the Company's Consolidated Balance Sheets as of July 1, 2023 and July 2, 2022:

| Designated Derivative Hedging Instruments | Notional Value | | Derivative Assets | | | Derivative Liabilities | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Fair Value | | | Fair Value | |
| | July 1, 2023 | July 2, 2022 | Classification on the Consolidated Balance Sheets | July 1, 2023 | July 2, 2022 | Classification on the Consolidated Balance Sheets | July 1, 2023 | July 2, 2022 |
| | | | | (millions) | | | | |
| FC - Inventory purchases[1] | $ 842.3 | $ 41.5 | Other Current Assets | $ 38.6 | $ - | Accrued Liabilities | $ 0.1 | $ 2.7 |
| FC - Intercompany liabilities and loans[2] | 272.3 | 274.1 | Other Current Assets | 0.4 | 0.4 | Accrued Liabilities | 0.2 | 0.5 |
| CCS - Net investment hedges[3] | 1,200.0 | 1,200.0 | Other Assets | 13.1 | 47.8 | Other Liabilities | 90.5 | 44.0 |
| Total Hedges | $ 2,314.6 | $ 1,515.6 | | $ 52.1 | $ 48.2 | | $ 90.8 | $ 47.2 |

[1] Represents forward foreign currency exchange contracts ("FC") designated as derivative instruments in cash flow hedging relationships.

[2] Represents forward foreign currency exchange contracts ("FC") designated as derivative instruments in fair value hedging relationships.

[3] Represents cross currency swap contracts ("CCS") designated as derivative instruments in net investment hedging relationships.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The following tables provides the pretax impact of gains and losses from the Company's designated derivative instruments on its Consolidated Financial Statements for the fiscal years ended July 1, 2023, July 2, 2022 and July 3, 2021:

| | Amount of Gain (Loss) Recognized in OCI on Derivatives | | |
| --- | --- | --- | --- |
| | Fiscal Year Ended | | |
| | July 1, 2023 | July 2, 2022 | July 3, 2021 |
| | (millions) | | |
| **Cash flow hedges:** | | | |
| Inventory purchases[1] | $ 34.7 | $ (5.6) | $ (7.2) |
| **Total cash flow hedges** | $ 34.7 | $ (5.6) | $ (7.2) |
| **Other:** | | | |
| Net investment hedges | (58.7) | 3.8 | 0.0 |
| **Total other** | $ (58.7) | $ 3.8 | $ 0.0 |
| **Total hedges** | $ (24.0) | $ (1.8) | $ (7.2) |

| | | Amount of Gain (Loss) Reclassified from Accumulated OCI into Income | | |
| --- | --- | --- | --- | --- |
| | Statement of Operations Classification | Fiscal Year Ended | | |
| | | July 1, 2023 | July 2, 2022 | July 3, 2021 |
| | | (millions) | | |
| **Cash flow hedges:** | | | | |
| Inventory purchases[1] | Cost of Sales | $ (6.3) | $ (3.4) | $ (4.9) |
| **Total hedges** | | $ (6.3) | $ (3.4) | $ (4.9) |

[1] Represents forward foreign currency exchange contracts ("FC") designated as derivative instruments in cash flow hedging relationships.

For forward foreign currency exchange contracts that are designated as fair value hedges, both the gain (loss) on the derivative as well as the offsetting gain (loss) on the hedged item attributable to the hedged risk are recorded within Other expense (income) on the Company's Consolidated Statement of Operations.

The Company expects that $25.5 million of net derivative gains included in Accumulated other comprehensive income at July 1, 2023 will be reclassified into earnings within the next 12 months. This amount will vary due to fluctuations in foreign currency exchange rates.

The Company assesses the cross-currency swaps used as a net investment hedges under the spot method. This results in the cross-currency basis spread being excluded from the assessment of hedge effectiveness, and recorded as incurred as a reduction in interest expense in the Company's consolidated statements of operations. Accordingly, the Company recorded net interest income of $28.5 million and $2.2 million during fiscal 2023 and fiscal 2022, respectively.

**11. FAIR VALUE MEASUREMENTS**

The Company categorizes its assets and liabilities, based on the priority of the inputs to the valuation technique, into a three-level fair value hierarchy as set forth below. The three levels of the hierarchy are defined as follows:

Level 1 - Unadjusted quoted prices in active markets for identical assets or liabilities.

Level 2 - Observable inputs other than quoted prices included in Level 1. Level 2 inputs include quoted prices for identical assets or liabilities in non-active markets, quoted prices for similar assets or liabilities in active markets, and inputs other than quoted prices that are observable for substantially the full term of the asset or liability.

Level 3 - Unobservable inputs reflecting management's own assumptions about the input used in pricing the asset or liability. The Company does not have any Level 3 investments.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The following table shows the fair value measurements of the Company's financial assets and liabilities at July 1, 2023 and July 2, 2022:

| | Level 1 | | Level 2 | |
| | July 1, 2023 | July 2, 2022 | July 1, 2023 | July 2, 2022 |
|---|---|---|---|---|
| | (millions) | | | |
| **Assets:** | | | | |
| Cash equivalents[1] | $ 155.7 | $ 99.1 | $ 11.9 | $ 10.9 |
| Short-term investments: | | | | |
| Time deposits[2] | - | - | 0.6 | 0.6 |
| Commercial paper[2] | - | - | - | 59.6 |
| Government securities - U.S.[2] | - | 39.4 | - | - |
| Corporate debt securities - U.S.[2] | - | - | - | 55.2 |
| Other | - | - | 14.8 | 8.6 |
| Long-term investments: | | | | |
| **Other** | - | - | 1.3 | 0.1 |
| Derivative Assets: | | | | |
| Inventory-related instruments[3] | - | - | 38.6 | - |
| Net investment hedges[3] | - | - | 13.1 | 47.8 |
| Intercompany loans and payables[3] | - | - | 0.4 | 0.4 |
| **Liabilities:** | | | | |
| Derivative liabilities: | | | | |
| Inventory-related instruments[3] | $ - | $ - | $ 0.1 | $ 2.7 |
| Net investment hedges[3] | - | - | 90.5 | 44.0 |
| Intercompany loans and payables[3] | - | - | 0.2 | 0.5 |

[1] Cash equivalents consist of money market funds and time deposits with maturities of three months or less at the date of purchase. Due to their short term maturity, management believes that their carrying value approximates fair value.

[2] Short-term investments are recorded at fair value, which approximates their carrying value, and are primarily based upon quoted vendor or broker priced securities in active markets.

[3] The fair value of these hedges is primarily based on the forward curves of the specific indices upon which settlement is based and includes an adjustment for the counterparty's or Company's credit risk.

Refer to Note 12, "Debt," for the fair value of the Company's outstanding debt instruments.

***Non-Financial Assets and Liabilities***

The Company's non-financial instruments, which primarily consist of goodwill, intangible assets, right-of-use assets and property and equipment, are not required to be measured at fair value on a recurring basis and are reported at carrying value. However, on a periodic basis whenever events or changes in circumstances indicate that their carrying value may not be fully recoverable (and at least annually for goodwill and indefinite-lived intangible assets), non-financial instruments are assessed for impairment and, if applicable, written-down to and recorded at fair value, considering market participant assumptions.

During the fiscal year ended July 1, 2023, the Company recorded $5.9 million of impairment charges to reduce the carrying amount of certain store assets within property and equipment, net to their estimated fair values. During the fiscal year ended July 2, 2022, the Company recorded $3.1 million of impairment charges to reduce the carrying amount of certain store assets within property and equipment, net to their estimated fair values.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

During the fiscal year ended July 1, 2023, the Company recorded $1.3 million of impairment charges to reduce the carrying amount of certain operating lease right-of-use assets to their estimated fair values. During the fiscal year ended July 2, 2022, the Company recorded $0.9 million of impairment charges to reduce the carrying amount of certain operating lease right-of-use assets to their estimated fair values.

The fair value of store assets were determined based on Level 3 measurements. Inputs to these fair value measurements included estimates of the amounts and the timing of the stores' net future discounted cash flows based on historical experience, current trends and market conditions.

## 12. DEBT

The following table summarizes the components of the Company's outstanding debt:

|  | July 1, 2023 | | July 2, 2022 |
|---|---|---|---|
|  | (millions) | | |
| **Current Debt:** | | | |
| Term Loan | $ 25.0 | $ | 31.2 |
| **Total Current Debt** | $ 25.0 | $ | 31.2 |
|  | | | |
| **Long-Term Debt:** | | | |
| Term Loan | $ 443.8 | $ | 468.8 |
| 3.050% Senior Notes due 2032 | 500.0 | | 500.0 |
| 4.125% Senior Notes due 2027 | 396.6 | | 396.6 |
| 4.250% Senior Notes due 2025 | 303.4 | | 303.4 |
| **Total Long-Term Debt** | 1,643.8 | | 1,668.8 |
| Less: Unamortized Discount and Debt Issuance Costs on Senior Notes | (8.0) | | (9.6) |
| **Total Long-Term Debt, net** | $ 1,635.8 | $ | 1,659.2 |

During fiscal 2023, 2022 and 2021 the Company recognized interest expense related to the outstanding debt of $72.8 million, $68.8 million and $73.5 million, respectively.

### *$1.25 Billion Revolving Credit Facility and $500.0 Million Term Loan*

On May 11, 2022, the Company entered into a definitive credit agreement whereby Bank of America, N.A., as administrative agent, the other agents party thereto, and a syndicate of banks and financial institutions have made available to the Company a $1.25 billion revolving credit facility (the "$1.25 Billion Revolving Credit Facility") and an unsecured $500.0 million Term Loan (the "Term Loan"). Both the $1.25 Billion Revolving Credit Facility and Term Loan (collectively, the "Credit Facilities") will mature on May 11, 2027. The Company and its subsidiaries must comply on a quarterly basis with a maximum 4.0 to 1.0 ratio of (a) consolidated debt minus unrestricted cash and cash equivalents in excess of $300 million to (b) consolidated EBITDAR.

Borrowings under the $1.25 Billion Revolving Credit Facility bear interest at a rate per annum equal to, at the Company's option, (i) for borrowings in U.S. Dollars, either (a) an alternate base rate or (b) a term secured overnight financing rate, (ii) for borrowings in Euros, the Euro Interbank Offered Rate, (iii) for borrowings in Pounds Sterling, the Sterling Overnight Index Average Reference Rate and (iv) for borrowings in Japanese Yen, the Tokyo Interbank Offer Rate, plus, in each case, an applicable margin. The applicable margin will be adjusted by reference to a grid (the "Pricing Grid") based on the ratio of (a) consolidated debt to (b) consolidated EBITDAR (the "Gross Leverage Ratio"). Additionally, the Company will pay facility fees, calculated at a rate per annum determined in accordance with the Pricing Grid, on the full amount of the $1.25 Billion Revolving Credit Facility, payable quarterly in arrears, and certain fees with respect to letters of credit that are issued. The $1.25 Billion Revolving Credit Facility may be used to finance the working capital needs, capital expenditures, permitted investments, share purchases, dividends and other general corporate purposes of the Company and its subsidiaries (which may include commercial paper backup). There were no outstanding borrowings on the $1.25 Billion Revolving Credit Facility as of July 1, 2023.

88

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The Term Loan includes up to a two-month delayed draw period from the closing date. In the fourth quarter of fiscal 2022 the Company drew down on the Term Loan to satisfy the Company's remaining obligations under the 3.000% senior unsecured notes due 2022 and for general corporate purposes. The Term Loan amortizes in an amount equal to 5.00% per annum, with payments made quarterly. Borrowings under the Term Loan bear interest at a rate per annum equal to, at the Company's option, either (i) an alternate base rate or (ii) a term secured overnight financing rate plus, in each case, an applicable margin. The applicable margin will be adjusted by reference to a pricing grid based on the Gross Leverage Ratio. Additionally, the Company will pay a ticking fee on the undrawn amount of the Term Loan.

### 3.050% Senior Notes due 2032

On December 1, 2021, the Company issued $500.0 million aggregate principal amount of 3.050% senior unsecured notes due March 15, 2032 at 99.705% of par (the "2032 Senior Notes"). Interest is payable semi-annually on March 15 and September 15 beginning March 15, 2022. Prior to December 15, 2031 (the date that is three months prior to the scheduled maturity date), the Company may redeem the 2032 Senior Notes in whole or in part, at its option at any time or from time to time, at a redemption price equal to the greater of (1) 100% of the principal amount of the 2032 Senior Notes to be redeemed or (2) as determined by a Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon that would have been payable in respect of the 2032 Senior Notes calculated as if the maturity date of the 2032 Senior Notes was December 15, 2031 (not including any portion of payments of interest accrued to the date of redemption), discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate (as defined in the Prospectus Supplement) plus 25 basis points, plus, in the case of each of (1) and (2), accrued and unpaid interest to the redemption date.

### Cash Tender Offer

On December 1, 2021, the proceeds from the 2032 Senior Notes were utilized to complete a cash tender offer of $203.4 million and $296.6 million of the outstanding aggregate principal amount of the Company's 2027 Senior Notes (defined below under "4.125% Senior Notes due 2027") and 2025 Senior Notes (defined below under "4.250% Senior Notes due 2025"), respectively. As a result of these cash tender offers completed prior to their scheduled maturities, the transactions were subject to a premium of $22.4 million and $26.8 million for the 2027 Senior Notes and 2025 Senior Notes, respectively. Additionally, the Company recognized $4.5 million of debt issuance costs, tender fees, and unamortized original discount in connection with the transaction. These premiums and costs, which totaled $53.7 million, were recorded as a pre-tax debt extinguishment charge during the second quarter of fiscal 2022. Refer to the fiscal 2022, "GAAP to Non-GAAP Reconciliation," in Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" for additional information.

### 4.125% Senior Notes due 2027

On June 20, 2017, the Company issued $600.0 million aggregate principal amount of 4.125% senior unsecured notes due July 15, 2027 at 99.858% of par (the "2027 Senior Notes"). Interest is payable semi-annually on January 15 and July 15 beginning January 15, 2018. Prior to April 15, 2027 (the date that is three month prior to the scheduled maturity date), the Company may redeem the 2027 Senior Notes in whole or in part, at its option at any time or from time to time, at a redemption price equal to the greater of (1) 100% of the principal amount of the 2027 Senior Notes to be redeemed or (2) as determined by a Quotation Agent, the sum of the present values of the remaining scheduled payments of principal and interest thereon that would have been payable in respect of the 2027 Senior Notes calculated as if the maturity date of the 2027 Senior Notes was April 15, 2027 (not including any portion of payments of interest accrued to the date of redemption), discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Adjusted Treasury Rate (as defined in the Prospectus Supplement) plus 30 basis points, plus, in the case of each of (1) and (2), accrued and unpaid interest to the redemption date. On December 1, 2021, the Company completed a cash tender offer for $203.4 million of the outstanding aggregate principal amount of its 2027 Senior Notes.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

### 4.250% Senior Notes due 2025

On March 2, 2015, the Company issued $600.0 million aggregate principal amount of 4.250% senior unsecured notes due April 1, 2025 at 99.445% of par (the "2025 Senior Notes"). Interest is payable semi-annually on April 1 and October 1 beginning October 1, 2015. Prior to January 1, 2025 (90 days prior to the scheduled maturity date), the Company may redeem the 2025 Senior Notes in whole or in part, at its option at any time or from time to time, at a redemption price equal to the greater of (1) 100% of the principal amount of the 2025 Senior Notes to be redeemed or (2) the sum of the present values of the remaining scheduled payments of principal and interest thereon that would have been payable in respect of the 2025 Senior Notes calculated as if the maturity date of the 2025 Senior Notes was January 1, 2025 (not including any portion of payments of interest accrued to the date of redemption), discounted to the redemption date on a semi-annual basis at the Adjusted Treasury Rate (as defined in the indenture for the 2025 Senior Notes) plus 35 basis points, plus, in the case of each of (1) and (2), accrued and unpaid interest to the redemption date. On and after January 1, 2025 (90 days prior to the scheduled maturity date), the Company may redeem the 2025 Senior Notes in whole or in part, at its option at any time or from time to time, at a redemption price equal to 100% of the principal amount of the 2025 Senior Notes to be redeemed, plus accrued and unpaid interest to the redemption date. On December 1, 2021, the Company completed a cash tender offer for $296.6 million of the outstanding aggregate principal amount of its 2025 Senior Notes.

At July 1, 2023, the fair value of the 2032, 2027, and 2025 Senior Notes was approximately $399.5 million, $371.7 million, and $295.1 million, respectively, based on external pricing data, including available quoted market prices of these instruments, and consideration of comparable debt instruments with similar interest rates and trading frequency, among other factors, and is classified as Level 2 measurements within the fair value hierarchy. At July 2, 2022, the fair value of the 2032, 2027 and 2025 Senior Notes was approximately $409.0 million, $383.0 million and $304.1 million, respectively.

### Capri Holdings Limited Acquisition

Subsequent to the fiscal 2023 year end, on August 10, 2023, the Company entered into an Agreement and Plan of Merger by and among the Company, Sunrise Merger Sub Inc., a direct wholly owned subsidiary of Tapestry, and Capri Holdings Limited. In addition, on August 10, 2023 the

Company entered into a bridge facility commitment letter pursuant to which Bank of America, N.A., BofA Securities, Inc. and Morgan Stanley Senior Funding, Inc. committed to provide a $8.0 billion 364-day senior unsecured bridge loan facility to finance the acquisition. The commitment thereunder is subject to customary conditions.

Refer to Note 21, "Subsequent Event", for further information.

***Debt Maturities***

As of July 1, 2023 the debt maturities for the next five fiscal years and thereafter are as follows:

|  | Principal (millions) |
| --- | --- |
| 2024 | $ 25.0 |
| 2025 | 328.4 |
| 2026 | 25.0 |
| 2027 | 393.8 |
| 2028 | 396.6 |
| Thereafter | 500.0 |
| **Total** | $ 1,668.8 |

## 13. COMMITMENTS AND CONTINGENCIES

### *Letters of Credit*

The Company had standby letters of credit, surety bonds and bank guarantees totaling $37.1 million and $37.8 million outstanding at July 1, 2023 and July 2, 2022, respectively. The agreements, which expire at various dates through calendar 2028, primarily collateralize the Company's obligation to third parties for duty, leases, insurance claims and materials used in product manufacturing. The Company pays certain fees with respect to letters of credit that are issued.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Tax Legislation*

The Tax Legislation requires the Company to pay a one-time tax, or Transition Tax, on previously unremitted earnings of certain non-U.S. subsidiaries. The Company expects to pay approximately $68.3 million related to the remaining obligation on the Transition Tax. Refer to Note 15, "Income Taxes," for more information related to the impact of the Tax Legislation.

*Other*

The Company had other contractual cash obligations as of July 1, 2023, including $352.6 million related to inventory purchase obligations, $20.4 million related to capital expenditure and cloud computing implementation commitments, $187.5 million of other purchase obligations, $1.7 billion of debt repayments, $2.7 million of finance lease obligations and $345.8 million of interest payments on the outstanding debt. Refer to Note 9, "Leases," for a summary of the Company's future minimum rental payments under non-cancelable leases.

The Company is involved in various routine legal proceedings as both plaintiff and defendant incident to the ordinary course of its business, such as to protect Tapestry, Inc.'s intellectual property rights, litigation instituted by persons alleged to have been injured by advertising claims or upon premises within the Company's control, contract disputes, insurance claims and litigation, including wage and hour litigation, with present or former employees.

Although the Company's litigation can result in large monetary awards, such as when a civil jury is allowed to determine compensatory and/or punitive damages, the Company believes that the outcome of all pending legal proceedings in the aggregate will not have a material effect on the Company's business or consolidated financial statements.

*Capri Holdings Limited Acquisition*

Subsequent to the fiscal 2023 year end, on August 10, 2023, the Company entered into an Agreement and Plan of Merger by and among the Company, Sunrise Merger Sub Inc., a direct wholly owned subsidiary of Tapestry, and Capri Holdings Limited. Refer to Note 21, "Subsequent Event", for further information.

## 14. GOODWILL AND OTHER INTANGIBLE ASSETS

The Company performs its annual impairment assessment of goodwill as well as brand intangibles at the beginning of the fourth quarter of each fiscal year or if an event occurs that would more likely than not reduce the fair value below its carrying amount.

The estimated fair value of the Company's reporting units are based on a weighted average of the income and market approaches. The income approach is based on estimated discounted future cash flows, while the market approach is based on earnings multiples of selected guideline companies. The approach, which qualifies as Level 3 in the fair value hierarchy, incorporated a number of significant assumptions and judgments, including, but not limited to, estimated future cash flows, discount rates, income tax rates, terminal growth rates and valuation multiples derived from comparable publicly traded companies. The Company determined there was no impairment in fiscal 2023 and fiscal 2022 based on the annual assessment and no events occurring that would more likely than not reduce the fair value below its carrying amount.

*Goodwill*

The change in the carrying amount of the Company's Goodwill by segment is as follows:

| | Coach | | Kate Spade | | Stuart Weitzman [1] | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | (millions) | | | | |
| Balance at July 3, 2021 | $ | 656.3 | $ | 641.0 | $ | - | $ | 1,297.3 |
| Foreign exchange impact | | (47.2) | | (8.6) | | - | | (55.8) |
| Balance at July 2, 2022 | | 609.1 | | 632.4 | | - | | 1,241.5 |
| **Foreign exchange impact** | | **(11.6)** | | **(2.4)** | | **-** | | **(14.0)** |
| **Balance at July 1, 2023** | $ | **597.5** | $ | **630.0** | $ | **-** | $ | **1,227.5** |

[1] Amount is net of accumulated goodwill impairment charges of $210.7 million as of July 1, 2023, July 2, 2022 and July 3, 2021.

91

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Intangible Assets*

Intangible assets consist of the following:

| | Fiscal Year Ended | | | | | |
| | July 1, 2023 | | | July 2, 2022 | | |
| | Gross Carrying Amount | Accum. Amort. | Net | Gross Carrying Amount | Accum. Amort. | Net |
| | (millions) | | | | | |
|---|---|---|---|---|---|---|
| Intangible assets subject to amortization: | | | | | | |
| Customer relationships | $ 100.3 | $ (50.0) | $ 50.3 | $ 100.3 | $ (43.5) | $ 56.8 |
| Total intangible assets subject to amortization | 100.3 | (50.0) | 50.3 | 100.3 | (43.5) | 56.8 |
| Intangible assets not subject to amortization: | | | | | | |
| Trademarks and trade names | 1,309.8 | - | 1,309.8 | 1,309.8 | - | 1,309.8 |
| Total intangible assets | $ 1,410.1 | $ (50.0) | $ 1,360.1 | $ 1,410.1 | $ (43.5) | $ 1,366.6 |

Amortization expense for the Company's definite-lived intangible assets was $6.5 million and $6.6 million for fiscal 2023 and fiscal 2022, respectively.

As of July 1, 2023, the expected amortization expense for intangible assets is as follows:

| | Amortization Expense |
| | (millions) |
|---|---|
| Fiscal 2024 | $ 6.5 |
| Fiscal 2025 | 6.5 |
| Fiscal 2026 | 6.5 |
| Fiscal 2027 | 6.5 |
| Fiscal 2028 | 6.5 |
| Thereafter | 17.8 |
| Total | $ 50.3 |

The expected future amortization expense above reflects remaining useful lives ranging from approximately 6.8 to 9.0 for customer relationships.

92

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

**15. INCOME TAXES**

The provisions for income taxes, computed by applying the U.S. statutory rate to income before taxes, as reconciled to the actual provisions were:

| | | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|
| | July 1, 2023 | | July 2, 2022 | | July 3, 2021 | |
| | Amount | Percentage | Amount | Percentage | Amount | Percentage |
| | | | (millions) | | | |
| Income before provision for income taxes: | | | | | | | |
| United States[1] | $ 421.5 | 36.9 % | $ 392.0 | 37.4 % | $ 341.0 | 38.0 % |
| Foreign | 721.6 | 63.1 | 655.0 | 62.6 | 556.3 | 62.0 |
| Total income before provision for income taxes | $ 1,143.1 | 100.0 % | $ 1,047.0 | 100.0 % | $ 897.3 | 100.0 % |
| | | | | | | |
| Tax expense at U.S. statutory rate | $ 240.0 | 21.0 % | $ 219.9 | 21.0 % | $ 188.4 | 21.0 % |
| State taxes, net of federal benefit | 23.2 | 2.0 | 15.8 | 1.5 | 18.0 | 2.0 |
| Effects of foreign operations[2] | 4.3 | 0.4 | (3.5) | (0.3) | 6.5 | 0.7 |
| Effects of tax credits and reorganization[3] | (61.3) | (5.4) | (49.8) | (4.8) | (94.5) | (10.5) |
| Change in state valuation allowance | - | - | - | - | 11.5 | 1.3 |
| Impact of net operating loss carryback | - | - | - | - | (65.4) | (7.3) |
| Other, net | 0.9 | 0.1 | 8.3 | 0.8 | (1.4) | (0.2) |
| Taxes at effective worldwide rates | $ 207.1 | 18.1 % | $ 190.7 | 18.2 % | $ 63.1 | 7.0 % |

[1]   The United States jurisdiction includes foreign pre-tax earnings allocated to the Company from its interest in a foreign partnership.

[2]   This includes the tax related to the Global Intangible Low-Taxed Income ("GILTI"). The Company has elected to account for the tax associated with GILTI as a period cost, and accordingly, the Company has not recorded deferred taxes associated with GILTI.

[3] Fiscal 2021 is comprised primarily of $60.9 million of U.S. federal foreign tax credits generated in fiscal 2021.

Current and deferred tax provision (benefit) was:

| | | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|---|
| | July 1, 2023 | | July 2, 2022 | | July 3, 2021 | |
| | Current | Deferred | Current | Deferred | Current | Deferred |
| | | | (millions) | | | |
| Federal | $ 111.6 | $ 24.7 | $ 104.0 | $ 13.9 | $ (80.0) | $ 57.3 |
| Foreign | 48.0 | 3.6 | 46.6 | 11.2 | 63.8 | (9.4) |
| State | 6.3 | 12.9 | 10.7 | 4.3 | 26.7 | 4.7 |
| Total current and deferred tax provision (benefit) | $ 165.9 | $ 41.2 | $ 161.3 | $ 29.4 | $ 10.5 | $ 52.6 |

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The components of deferred tax assets and liabilities were:

| | July 1, 2023 | | July 2, 2022 |
|---|---|---|---|
| | (millions) | | |
| Share-based compensation | $ 21.8 | $ | 26.1 |
| Reserves not deductible until paid | 45.9 | | 51.1 |
| Employee benefits | 23.1 | | 36.7 |
| Net operating loss | 47.7 | | 74.7 |
| Other | 67.2 | | 19.6 |
| Inventory | 23.4 | | 28.8 |
| Lease liability | 348.6 | | 335.3 |
| **Gross deferred tax assets** | 577.7 | | 572.3 |
| Valuation allowance | 34.3 | | 51.6 |
| **Deferred tax assets after valuation allowance** | $ 543.4 | $ | 520.7 |
| | | | |
| Goodwill | 64.4 | | 69.1 |
| Other intangibles | 306.0 | | 309.6 |
| Property and equipment | 24.8 | | 11.3 |
| Foreign investments | 44.8 | | 23.5 |
| Right-of-use | 302.1 | | 280.4 |
| Prepaid expenses | 0.9 | | 0.6 |
| **Gross deferred tax liabilities** | 743.0 | | 694.5 |
| **Net deferred tax (liabilities) assets** | $ (199.6) | $ | (173.8) |
| | | | |
| **Consolidated Balance Sheets Classification** | | | |
| Deferred income taxes - non-current asset | 40.4 | | 47.9 |
| Deferred income taxes - non-current liability | (240.0) | | (221.7) |
| **Net deferred tax (liabilities) assets** | $ (199.6) | $ | (173.8) |

Significant judgment is required in determining the worldwide provision for income taxes, and there are many transactions for which the ultimate tax outcome is uncertain. It is the Company's policy to establish provisions for taxes that may become payable in future years, including those due to an examination by tax authorities. The Company establishes the provisions based upon management's assessment of exposure associated with uncertain tax positions. The provisions are analyzed at least quarterly and adjusted as appropriate based on new information or circumstances in accordance with the requirements of ASC 740.

94

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

A reconciliation of the beginning and ending gross amount of unrecognized tax benefits is as follows:

|  | July 1, 2023 | | July 2, 2022 | | July 3, 2021 |
|---|---|---|---|---|---|
|  | | | (millions) | | |
| **Balance at beginning of fiscal year** | $ | **96.1** | $ | 111.4 | $ | 88.5 |
| Gross increase due to tax positions related to prior periods | | **4.3** | | 1.6 | | 38.3 |
| Gross decrease due to tax positions related to prior periods | | **(7.7)** | | (11.7) | | (9.4) |
| Gross increase due to tax positions related to current period | | **5.2** | | 7.4 | | 6.8 |
| Decrease due to lapse of statutes of limitations | | **(6.1)** | | (10.9) | | (12.0) |
| Decrease due to settlements with taxing authorities | | **-** | | (1.7) | | (0.8) |
| **Balance at end of fiscal year** | $ | **91.8** | $ | 96.1 | $ | 111.4 |

Of the $91.8 million ending gross unrecognized tax benefit balance as of July 1, 2023, $87.1 million relates to items which, if recognized, would impact the effective tax rate. Of the $96.1 million ending gross unrecognized tax benefit balance as of July 2, 2022, $88.3 million relates to items which, if recognized, would impact the effective tax rate. As of July 1, 2023 and July 2, 2022, gross interest and penalties payable was $10.3 million and $8.2 million, respectively, which are included in Other liabilities. During fiscal 2023, fiscal 2022 and fiscal 2021, the Company recognized gross interest and penalty expense of $2.3 million, gross interest and penalty income of $1.5 million and gross interest and penalty expense of $0.8 million, respectively.

The Company files income tax returns in the U.S. federal jurisdiction, as well as various state and foreign jurisdictions. Tax examinations are currently in progress in select foreign and state jurisdictions that are extending the years open under the statutes of limitation. Fiscal years 2018 to present are open to examination in the U.S. federal jurisdiction, fiscal 2016 to present in select state jurisdictions and fiscal 2016 to present in select foreign jurisdictions. The Company is currently under U.S. federal audit for fiscal 2018 to 2020. The IRS is examining carryback claims to fiscal 2014 through fiscal 2019 as part of Joint Committee procedures for tax refund claims. The Company anticipates that one or more of these audits may be finalized and certain statutes of limitation may expire in the foreseeable future. However, based on the status of these examinations, and the average time typically incurred in finalizing audits with the relevant tax authorities, the Company cannot reasonably estimate the impact these audits may have in the next 12 months, if any, to previously recorded uncertain tax positions. The Company accrues for certain known and reasonably anticipated income tax obligations after assessing the likely outcome based on the weight of available evidence. Although the Company believes that the estimates and assumptions used are reasonable and legally supportable, the final determination of tax audits could be different than that which is reflected in historical income tax provisions and recorded assets and liabilities. With respect to all jurisdictions, the Company has made adequate provision for all income tax uncertainties.

As of July 1, 2023, the Company had the following tax loss carryforwards available: U.S. state tax loss carryforwards of $547.2 million and tax loss carryforwards of various foreign jurisdictions of $80.6 million. As of July 2, 2022, the Company had the following tax loss carryforwards available: U.S. state tax loss carryforwards of $706 million and tax loss carryforwards of various foreign jurisdictions of $123.9 million. The state net operating loss carryforwards generally start to expire in fiscal 2024. The majority of the foreign net operating loss can be carried forward indefinitely. Deferred tax assets, including the deferred tax assets recognized on these net operating losses, have been reduced by a valuation allowance of $34.3 million as of July 1, 2023 and $51.6 million as of July 2, 2022.

The Company is not permanently reinvested with respect to the earnings of a limited number of foreign entities and has recorded the tax consequences of remitting earnings from these entities. The Company is permanently reinvested with respect to all other earnings. The total estimated amount of unremitted earnings of foreign subsidiaries as of July 1, 2023 and July 2, 2022 was $835.1 million and $747.6 million, respectively. The Company intends to distribute $708.1 million of earnings that were previously subject to U.S. Federal Tax and has recorded a deferred tax liability of $2.4 million during fiscal 2023 for U.S. state taxes and foreign withholding taxes related to the future distribution. Based on the Company's current analysis, there is further unrecognized deferred tax liability of approximately $2 million to $4 million on the remaining unremitted earnings.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Transition Tax*

The Company is required to pay a one-time Transition Tax on previously unremitted earnings of certain non-U.S. subsidiaries. The Company has elected to pay the Transition Tax in installments. As shown in the table below, the remaining Transition Tax payable is $68.3 million and is payable between fiscal 2024 and fiscal 2025.

|  | Transition Tax Payments |
| --- | --- |
|  | (millions) |
| Fiscal 2024 | $ 24.8 |
| Fiscal 2025 | 43.5 |
| **Total** | **$ 68.3** |

## 16. DEFINED CONTRIBUTION PLAN

The Company maintains the Tapestry, Inc. 401(k) Savings Plan, which is a defined contribution plan. Employees who meet certain eligibility requirements and are not part of a collective bargaining agreement may participate in this program. The annual expense incurred by the Company for this defined contribution plan was $13.4 million, $11.8 million and $10.6 million in fiscal 2023, fiscal 2022 and fiscal 2021, respectively.

## 17. SEGMENT INFORMATION

The Company has three reportable segments:

- *Coach* - Includes global sales primarily of Coach products to customers through Coach operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers and through independent third-party distributors.

- *Kate Spade* - Includes global sales primarily of kate spade new york brand products to customers through Kate Spade operated stores, including e-commerce sites and concession shop-in-shops, sales to wholesale customers, and through independent third-party distributors.

- *Stuart Weitzman* - Includes global sales of Stuart Weitzman brand products primarily through Stuart Weitzman operated stores, sales to wholesale customers, through e-commerce sites and through independent third-party distributors.

In deciding how to allocate resources and assess performance, the Company's chief operating decision maker regularly evaluates operating profit of these segments. Segment operating profit is the gross profit of the segment less direct expenses of the segment. Total expenditures for additions to long-lived assets are not disclosed as this information is not regularly provided to the chief operating decision maker at the segment level.

The following table summarizes net sales of each of the company's segments for fiscal 2023, fiscal 2022, and fiscal 2021:

|  | Fiscal Year Ended | | |
| --- | --- | --- | --- |
|  | July 1, 2023 | July 2, 2022 | July 3, 2021 |
| **Segment net sales:** |  |  |  |
| Coach | $ 4,960.4 | $ 4,921.3 | $ 4,253.1 |
| Kate Spade | 1,418.9 | 1,445.5 | 1,210.0 |
| Stuart Weitzman | 281.6 | 317.7 | 283.2 |
| Total Net sales: | $ 6,660.9 | $ 6,684.5 | $ 5,746.3 |

96

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The following table summarizes segment operating profit of each of the company's segments and reconciliation to Income (loss) before provision for income taxes for fiscal 2023, fiscal 2022, and fiscal 2021:

| | | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|---|
| | | July 1, 2023 | | July 2, 2022 | | July 3, 2021 |
| **Segment operating profit (loss):** | | | | | | |
| Coach | $ | 1,529.9 | $ | 1,473.9 | $ | 1,312.1 |
| Kate Spade | | 115.0 | | 157.4 | | 108.5 |
| Stuart Weitzman | | (6.7) | | 1.8 | | (8.6) |
| Total segment operating profit (loss): | $ | 1,638.2 | $ | 1,633.1 | $ | 1,412.0 |
| Unallocated corporate expenses[1] | | 465.8 | | 457.3 | | 444.0 |
| Loss on extinguishment of debt | | - | | 53.7 | | - |
| Unallocated other charges, net[2] | | 29.3 | | 75.1 | | 70.7 |
| Income (loss) before provision for income taxes | $ | 1,143.1 | $ | 1,047.0 | $ | 897.3 |

The following table summarizes depreciation and amortization expense of each of the company's segments for fiscal 2023, fiscal 2022, and fiscal 2021:

| | | Fiscal Year Ended | | | | |
|---|---|---|---|---|---|---|
| | | July 1, 2023 | | July 2, 2022 | | July 3, 2021 |
| **Depreciation and amortization expense[3]:** | | | | | | |
| Coach | $ | 94.7 | $ | 110.1 | $ | 102.2 |
| Kate Spade | | 44.2 | | 48.5 | | 46.8 |
| Stuart Weitzman | | 10.5 | | 10.3 | | 13.3 |
| Unallocated corporate[1] | | 32.8 | | 26.4 | | 58.2 |
| Total Depreciation and amortization expense: | $ | 182.2 | $ | 195.3 | $ | 220.5 |

[1] Corporate, which is not a reportable segment, represents certain costs that are not directly attributable to a segment. These costs primarily include administration and certain costs for information systems.

[2] Includes Interest expense, net and Other expense (income).

[3] Depreciation and amortization expense for the segments includes an allocation of expense related to assets which support multiple segments. For the fiscal year ended July 3, 2021, depreciation and amortization expense includes $1.8 million of Acceleration Program costs.

97

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

The following table summarizes total assets of each of the company's segments for fiscal 2023, fiscal 2022, and fiscal 2021:

| | | Fiscal Year Ended | | | |
| --- | --- | --- | --- | --- | --- |
| | | July 1, 2023 | | July 2, 2022 | July 3, 2021 |
| **Segment total assets:** | | | | | |
| Coach | $ | 2,272.3 | $ | 2,392.2 $ | 2,513.5 |
| Kate Spade | | 2,597.3 | | 2,641.3 | 2,707.3 |
| Stuart Weitzman | | 235.8 | | 269.3 | 298.6 |
| Corporate | | 2,011.4 | | 1,962.5 | 2,863.0 |
| Total Assets: | $ | 7,116.8 | $ | 7,265.3 $ | 8,382.4 |

The following table shows net sales for each product category represented:

| | | | Fiscal Year Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | July 1, 2023 | | | July 2, 2022 | | July 3, 2021 | |
| | | Amount | % of total net sales | | Amount | % of total net sales | Amount | % of total net sales |
| | | | (millions) | | | | | |
| **Coach** | | | | | | | | |
| Women's Handbags | $ | 2,450.7 | 36.8 % | $ | 2,574.8 | 38.5 % $ | 2,302.3 | 40.1 % |
| Women's Accessories | | 1,024.8 | 15.4 | | 942.5 | 14.1 | 776.7 | 13.5 |
| Men's | | 947.1 | 14.2 | | 904.8 | 13.5 | 769.3 | 13.4 |
| Other Products | | 537.8 | 8.1 | | 499.2 | 7.5 | 404.8 | 7.0 |
| Total Coach | $ | 4,960.4 | 74.5 % | $ | 4,921.3 | 73.6 % $ | 4,253.1 | 74.0 % |
| **Kate Spade** | | | | | | | | |
| Women's Handbags | $ | 779.6 | 11.7 % | $ | 819.5 | 12.2 % $ | 681.5 | 11.9 % |
| Other Products | | 332.4 | 5.0 | | 319.0 | 4.8 | 269.3 | 4.7 |
| Women's Accessories | | 306.9 | 4.6 | | 307.0 | 4.6 | 259.2 | 4.5 |
| Total Kate Spade | $ | 1,418.9 | 21.3 % | $ | 1,445.5 | 21.6 % $ | 1,210.0 | 21.1 % |
| Stuart Weitzman[1] | $ | 281.6 | 4.2 % | $ | 317.7 | 4.8 % $ | 283.2 | 4.9 % |
| Total Net sales | $ | 6,660.9 | 100.0 % | $ | 6,684.5 | 100.0 % $ | 5,746.3 | 100.0 % |

---

[1]  The significant majority of sales for the Stuart Weitzman brand is attributable to women's footwear.

98

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

*Geographic Area Information*

Geographic revenue information is based on the location of our customer sale. Geographic long-lived asset information is based on the physical location of the assets at the end of each fiscal year and includes property and equipment, net, right of use assets and other assets.

| | United States | Greater China[2] | Japan | Other[3] | Total |
|---|---|---|---|---|---|
| | | | (millions) | | |
| **Fiscal 2023** | | | | | |
| Net sales[1] | $ 4,040.2 | $ 1,015.8 | $ 569.0 | $ 1,035.9 | $ 6,660.9 |
| Long-lived assets | 1,662.5 | 160.3 | 87.7 | 213.5 | 2,124.0 |
| **Fiscal 2022** | | | | | |
| Net sales[1] | $ 4,174.3 | $ 1,026.6 | $ 578.8 | $ 904.8 | $ 6,684.5 |
| Long-lived assets | 1,578.9 | 131.0 | 94.0 | 231.6 | 2,035.5 |
| **Fiscal 2021** | | | | | |
| Net sales[1] | $ 3,365.9 | $ 1,094.1 | $ 598.9 | $ 687.4 | $ 5,746.3 |
| Long-lived assets | 1,722.2 | 125.7 | 132.0 | 290.8 | 2,270.7 |

[1] Includes net sales from our global travel retail business in locations within the specified geographic area.

[2] Greater China includes sales in mainland China, Taiwan, Hong Kong SAR and Macao SAR.

[3] Other includes sales in Canada, Europe, Malaysia, Australia and New Zealand, Singapore, South Korea, other countries in Asia, and royalties earned from the Company's licensing partners.

99

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

## 18. EARNINGS PER SHARE

Basic net income per share is calculated by dividing net income by the weighted-average number of shares outstanding during the period. Diluted net income per share is calculated similarly but includes potential dilution from the exercise of stock options and restricted stock units and any other potentially dilutive instruments, only in the periods in which such effects are dilutive under the treasury stock method.

The following is a reconciliation of the weighted-average shares outstanding and calculation of basic and diluted earnings per share:

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | July 1, 2023 | July 2, 2022 | July 3, 2021 |
| | (millions, except per share data) | | |
| **Net income (loss)** | $ 936.0 | $ 856.3 | $ 834.2 |
| **Weighted-average basic shares** | 236.4 | 264.3 | 277.9 |
| Dilutive securities: | | | |
| Effect of dilutive securities | 4.9 | 5.8 | 5.1 |
| **Weighted-average diluted shares** | 241.3 | 270.1 | 283.0 |
| **Net income (loss) per share:** | | | |
| Basic | $ 3.96 | $ 3.24 | $ 3.00 |
| Diluted | $ 3.88 | $ 3.17 | $ 2.95 |

At July 1, 2023, options to purchase 2.1 million shares of common stock were outstanding but not included in the computation of diluted earnings per share, as these options' exercise prices, ranging from $41.65 to $56.39, were greater than the average market price of the common shares.

At July 2, 2022, options to purchase 5.4 million shares of common stock were outstanding but not included in the computation of diluted earnings per share, as these options' exercise prices, ranging from $33.46 to $58.54, were greater than the average market price of the common shares.

At July 3, 2021, options to purchase 3.7 million shares of common stock were outstanding but not included in the computation of diluted earnings per share, as these options' exercise prices, ranging from $44.97 to $78.46, were greater than the average market price of the common shares.

Earnings per share amounts have been calculated based on unrounded numbers. Options to purchase shares of the Company's common stock at an exercise price greater than the average market price of the common stock during the reporting period are anti-dilutive and therefore not included in the computation of diluted net income (loss) per common share. In addition, the Company has outstanding restricted stock unit awards that are issuable only upon the achievement of certain performance goals. Performance-based restricted stock unit awards are included in the computation of diluted shares only to the extent that the underlying performance conditions (and any applicable market condition modifiers) (i) are satisfied as of the end of the reporting period or (ii) would be considered satisfied if the end of the reporting period were the end of the related contingency period and the result would be dilutive under the treasury stock method. As of July 1, 2023, July 2, 2022 and July 3, 2021, there were approximately 2.7 million, 6.9 million, and 5.0 million, respectively, of shares issuable upon exercise of anti-dilutive options and contingent vesting of performance-based restricted stock unit awards, which were excluded from the diluted share calculations.

## 19. RELATED PARTIES

The Stuart Weitzman brand owns approximately 50% of a factory located in Spain, which is involved in the production of Stuart Weitzman inventory. Payments to this factory represented $15.2 million and $15.6 million in fiscal 2023 and fiscal 2022, respectively. Amounts payable to this factory were not material at July 1, 2023 or July 2, 2022.

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

**20. SUPPLEMENTAL BALANCE SHEET INFORMATION**

The components of certain balance sheet accounts are as follows:

| | July 1, 2023 | | July 2, 2022 | |
|---|---|---|---|---|
| | | (millions) | | |
| **Property and equipment** | | | | |
| Land and building | $ | 8.0 | $ | 8.0 |
| Machinery and equipment | | 67.2 | | 50.1 |
| Software and computer equipment | | 627.6 | | 584.7 |
| Furniture and fixtures | | 306.5 | | 310.7 |
| Leasehold improvements | | 778.5 | | 738.2 |
| Construction in progress | | 14.3 | | 40.4 |
| Less: accumulated depreciation | | (1,237.6) | | (1,187.7) |
| Total property and equipment, net | $ | 564.5 | $ | 544.4 |
| **Accrued liabilities** | | | | |
| Payroll and employee benefits | $ | 131.9 | $ | 212.4 |
| Accrued rent | | 18.4 | | 18.9 |
| Accrued income taxes | | 41.8 | | 35.8 |
| Accrued freight | | 52.1 | | 80.4 |
| Operating expenses | | 302.9 | | 280.7 |
| Total accrued liabilities | $ | 547.1 | $ | 628.2 |
| **Other liabilities** | | | | |
| Deferred lease obligation | $ | 40.2 | $ | 46.0 |
| Gross unrecognized tax benefit | | 91.8 | | 96.1 |
| Other | | 167.5 | | 110.4 |
| Total other liabilities | $ | 299.5 | $ | 252.5 |

101

**TAPESTRY, INC.**

**Notes to Consolidated Financial Statements (Continued)**

## 21. SUBSEQUENT EVENTS

### Merger Agreement

On August 10, 2023, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") by and among the Company, Sunrise Merger Sub, Inc., a direct wholly owned subsidiary of Tapestry, and Capri Holdings Limited ("Capri"). Under the terms of the Merger Agreement, Tapestry has agreed to acquire any and all of Capri's ordinary shares (other than (a) Capri's ordinary Shares that are issued and outstanding immediately prior to the consummation of the acquisition that are owned or held in treasury by the Company or by Capri or any of its direct or indirect subsidiaries and (b) Capri's ordinary shares that are issued and outstanding immediately prior to the consummation of the acquisition that are held by holders who have properly exercised dissenters' rights in accordance with, and who have complied with, Section 179 of the BVI Business Companies Act, 2004 (as amended) of the British Virgin Islands) in cash at a purchase price of $57.00 per share, without interest, subject to any required tax withholding as provided in the Merger Agreement. The purchase price is expected to be approximately $8.5 billion and the transaction is expected to close during calendar year 2024.

### Commitment Letter

On August 10, 2023, the Company entered into a bridge facility commitment letter pursuant to which Bank of America, N.A., BofA Securities, Inc. and Morgan Stanley Senior Funding, Inc. committed to provide a $8.0 billion 364-day senior unsecured bridge loan facility to finance the acquisition. The commitment thereunder is subject to customary conditions.

102

**TAPESTRY, INC.**

**Schedule II - Valuation and Qualifying Accounts**
**For the Fiscal Years Ended July 1, 2023, July 2, 2022 and July 3, 2021**

| | Balance at Beginning of Year | Additions Charged to Costs and Expenses | Write-offs/ Allowances Taken | Balance at End of Year |
|---|---|---|---|---|
| | (millions) | | | |
| **Fiscal 2023** | | | | |
| Allowance for credit losses | $ 3.7 | $ 5.7 | $ (3.6) | $ 5.8 |
| Allowance for returns | 11.2 | 14.2 | (10.1) | 15.3 |
| Allowance for markdowns | 11.6 | 17.6 | (17.9) | 11.3 |
| Valuation allowance | 51.6 | - | (17.3) | 34.3 |
| Total | $ 78.1 | $ 37.5 | $ (48.9) | $ 66.7 |
| **Fiscal 2022** | | | | |
| Allowance for credit losses | $ 4.2 | $ 19.9 | $ (20.4) | $ 3.7 |
| Allowance for returns | 18.7 | 8.8 | (16.3) | 11.2 |
| Allowance for markdowns | 11.4 | 13.6 | (13.4) | 11.6 |
| Valuation allowance | 65.9 | - | (14.3) | 51.6 |
| Total | $ 100.2 | $ 42.3 | $ (64.4) | $ 78.1 |
| **Fiscal 2021** | | | | |
| Allowance for credit losses | $ 15.9 | $ 2.8 | $ (14.5) | $ 4.2 |
| Allowance for returns | 19.3 | 18.6 | (19.2) | 18.7 |
| Allowance for markdowns | 9.7 | 16.6 | (14.9) | 11.4 |
| Valuation allowance | 39.6 | 27.7 | (1.4) | 65.9 |
| Total | $ 84.5 | $ 65.7 | $ (50.0) | $ 100.2 |

103

# Exhibit 2

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended April 1, 2023**

or

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from __ to __

**Commission file number 001-35368**

**CAPRI**

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **British Virgin Islands** | **N/A** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**90 Whitfield Street**
**2nd Floor**
**London, United Kingdom**
**W1T 4EZ**
(Address of Principal Executive Offices)
**Registrant's telephone number, including area code: 44 207 632 8600**
**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on which Registered |
|---|---|---|
| Ordinary Shares, no par value | CPRI | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒ Yes ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange ☒ Yes No Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to ☒ Yes No Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer | Accelerated filer |
| Non-accelerated filer | Smaller reporting company |
| | Emerging growth company |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes No

Table of Contents

The aggregate market value of the registrant's voting and non-voting ordinary shares held by non-affiliates of the registrant was $4,869,769,555 as of September 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter based on the closing price of the ordinary shares on the New York Stock Exchange.

As of May 24, 2023, Capri Holdings Limited had 117,377,367 ordinary shares outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this report, to the extent not set forth herein, is incorporated by reference from the Registrant's definitive Proxy Statement, which will be filed in June 2023, for the 2023 Annual Meeting of the Shareholders.

Table of Contents

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 7 |
| Item 1A | Risk Factors | 19 |
| Item 1B | Unresolved Staff Comments | 34 |
| Item 2 | Properties | 35 |
| Item 3 | Legal Proceedings | 35 |
| Item 4 | Mine Safety Disclosures | 35 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 36 |
| Item 6 | [Reserved] | 37 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8 | Financial Statements and Supplementary Data | 60 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 60 |
| Item 9A | Controls and Procedures | 61 |
| Item 9B | Other Information | 61 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 62 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 63 |
| Item 11 | Executive Compensation | 63 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 63 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 63 |
| Item 14 | Principal Accounting Fees and Services | 63 |
| **PART IV** | | |
| Item 15 | Exhibits and Financial Statement Schedules | 64 |

3

Table of Contents

**NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K, including documents incorporated herein by reference, contains statements which are, or may be deemed to be, "forward-looking statements." Forward-looking statements are prospective in nature and are not based on historical facts, but rather on current expectations and projections of the management of Capri Holdings Limited (the "Company") about future events. All statements other than statements of historical facts included in this Annual Report on Form 10-K, including documents incorporated herein by reference, may be forward-looking statements. Forward-looking statements include information concerning the Company's goals, future plans and strategies, including with respect to environmental, social and governance ("ESG") goals, initiatives and ambitions as well as the Company's possible or assumed future results of operations, including descriptions of its business strategy. Without limitation, any statements preceded or followed by or that include the words "plans", "believes", "expects", "intends", "will", "should", "could", "would", "may", "anticipates", "might" or similar words or phrases, are forward-looking statements. These forward-looking statements are not guarantees of future financial performance. Such forward-looking statements involve known and unknown risks and uncertainties that could significantly affect expected results and are based on certain key assumptions, which could cause actual results to differ materially from those projected or implied in any forward-looking statements. These risks, uncertainties and other factors include changes in consumer traffic and retail trends; high consumer debt levels, recession and inflationary pressures; loss of market share and industry competition; the impact of the COVID-19 pandemic, levels of cash flow and future availability of credit, compliance with restrictive covenants under the Company's credit agreement, the Company's ability to integrate successfully and to achieve anticipated benefits of any acquisition and to successfully execute our growth strategies; the risk of disruptions to the Company's businesses; risks associated with operating in international markets and our global sourcing activities, including disruptions or delays in manufacturing or shipments; the risk of cybersecurity threats and data security breaches; the negative effects of events on the market price of the Company's ordinary shares and its operating results; significant transaction costs; unknown liabilities; the risk of litigation and/or regulatory actions related to the Company's businesses; fluctuations in demand for the Company's products; levels of indebtedness (including the indebtedness incurred in connection with acquisitions); the timing and scope of future share buybacks, which may be made in open market or privately negotiated transactions, and are subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors, and which share repurchases may be suspended or discontinued at any time, the level of other investing activities and uses of cash; fluctuations in the capital markets; fluctuations in interest and exchange rates; the occurrence of unforeseen epidemics and pandemics, disasters or catastrophes; extreme weather conditions and natural disasters; political or economic instability in principal markets; adverse outcomes in litigation; and general, local and global economic, political, business and market conditions including acts of war and other geopolitical conflicts; as well as those risks set forth in the Company's filings with the U.S. Securities and Exchange Commission (the "SEC"), including in this Annual Report on Form 10-K, particularly under "Item 1A. Risk Factors" and in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations." The Company disclaims any obligation to update or revise any forward-looking statements contained herein other than in accordance with legal and regulatory obligations.

**SUMMARY OF RISKS AFFECTING OUR BUSINESS**

Our business is subject to numerous risks. The following summary highlights some of the risks you should consider with respect to our business and prospects. This summary is not complete and the risks summarized below are not the only risks we face. You should review and consider carefully the risks and uncertainties described in more detail in this "Risk Factors" section of this Annual Report on Form 10-K which includes a more complete discussion of the risks summarized below as well as a discussion of other risks related to our business and an investment in our ordinary shares. Risks are listed in the categories where they primarily apply, but other categories may also apply.

Risks Related to Macroeconomic Conditions

- the accessories, footwear and apparel industries are heavily influenced by general macroeconomic cycles that affect consumer spending and a prolonged period of depressed consumer spending could have a material adverse effect on our business, results of operations and financial condition; and
- the COVID-19 pandemic may continue to adversely affect our business and results of operations.

Risks Related to Our Business

- we may not be able to respond to changing fashion and retail trends in a timely manner, which could have a material adverse effect on our brands, business, results of operations and financial condition;
- the markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline;
- our business could suffer as a result of reductions in our wholesale channel and/or consolidations, liquidations, restructurings and other ownership changes of our wholesale partners;
- we face risks associated with operating globally;

4

Table of Contents

- our retail stores are heavily dependent on the ability and desire of consumers to travel and shop, and a decline in consumer traffic could have a negative effect on our comparable store sales and store profitability resulting in impairment charges, which could have a material adverse effect on our business, results of operations and financial condition;
- if we are unable to effectively execute our e-commerce business and provide a reliable digital experience for our customers, our reputation and operating results may be harmed;
- the departure of key employees or our failure to attract and retain qualified personnel could have a material adverse effect on our business;
- our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments;
- our business may be subject to increased costs and a decline in profitability as a result of increasing pressure on margins if we misjudge the demand for our products;
- the long-term growth of our business depends on the successful execution of our strategic initiatives;
- our current and future licensing and joint venture arrangements may not be successful and may make us susceptible to the actions of third-parties over whom we have limited control;
- acquisitions may not achieve intended benefits and may not be successfully integrated;
- we are subject to risks associated with leasing retail space subject to long-term and non-cancelable leases. We may be unable to renew leases at the end of their terms. If we close a leased retail space, we remain obligated under the applicable lease;
- we are dependent on a limited number of distribution facilities. If one or more of our distribution facilities experiences operational difficulties or becomes inoperable, it could have a material adverse effect on our business, results of operations and financial condition;
- we are dependent on third-parties to perform certain outsourced functions;
- increases in the cost of raw materials could increase our production costs and cause our operating results and financial condition to suffer;
- we primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods; and
- our business is exposed to foreign currency exchange rate fluctuations.

Risks Related to Information Technology and Data Security
- privacy breaches and other cyber security risks related to our business could negatively affect our reputation, credibility and business; and
- a material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.

Risks Related to Environmental, Social and Governance Issues
- increased scrutiny from investors and others regarding our corporate social responsibility initiatives, including environmental, social and other matters of significance relating to sustainability, and changing regulatory requirements around ESG could result in additional costs or risks and adversely impact our reputation; and
- our business is susceptible to the risks associated with climate change and other environmental impacts which could negatively affect our business and operations.

Risks Related to Tax, Legal and Regulatory Matters
- our business is subject to risks associated with importing products, and the imposition of additional duties, tariffs or trade restrictions could have a material adverse effect on our business, results of operations and financial condition;
- fluctuations in our tax obligations and changes in tax laws, treaties and regulations may have a material adverse impact on our future effective tax rates and results of operations;
- if we fail to comply with labor laws or collective bargaining agreements, or if our independent manufacturing contractors fail to use acceptable, ethical business practices, our business and reputation could suffer;
- we may be unable to protect our trademarks, copyrights and other intellectual property rights, and others may allege that we infringe upon their intellectual property rights;
- we self-insure certain risks and may be impacted by unfavorable claims experience; and
- we are subject to various proceedings, lawsuits, disputes, and claims in the ordinary course of business which could have an adverse impact on our business, financial condition, and results of operations;

5

Table of Contents

Risks Related to Our Debt

- we have incurred a substantial amount of indebtedness, which could adversely affect our financial condition and restrict our ability to incur additional indebtedness or engage in additional transactions;
- we may be unable to meet financial covenants in our indebtedness agreements which could result in an event of default and restrictive covenants in such agreements may restrict our ability to pursue our business strategies; and
- if one or more of our counterparty financial institutions default on their obligations to us, we may incur significant losses or our financial liquidity could be adversely impacted.

Risks Related to Our Ordinary Shares

- our share price may periodically fluctuate based on the accuracy of our earnings guidance or other forward-looking statements regarding our financial performance;
- if we are unable to conduct share repurchases at expected levels, our share price could be adversely affected;
- failure to maintain adequate financial and management processes and controls could lead to errors in our financial reporting, which could harm our business and cause a decline in the price of our ordinary shares;
- provisions in our organizational documents may delay or prevent our acquisition by a third-party;
- rights of shareholders under British Virgin Islands law differ from those under United States law, and, accordingly, our shareholders may have fewer protections;
- the laws of the British Virgin Islands provide limited protection for minority shareholders, so minority shareholders will have limited or no recourse if they are dissatisfied with the conduct of our affairs;
- it may be difficult to enforce judgments against us or our executive officers and directors in jurisdictions outside the United States; and
- British Virgin Islands companies may not be able to initiate shareholder derivative actions, thereby depriving shareholders of one avenue to protect their interests.

6

Table of Contents

## PART I

*Unless the context requires otherwise, references in this Annual Report on Form 10-K to "Capri", "we", "us", "our", "the Company", "our Company" and "our business" refer to Capri Holdings Limited and its consolidated subsidiaries. References to our stores, retail stores and retail segment include all of our full-price retail stores (including concessions), our e-commerce websites and outlet stores. The Company utilizes a 52 to 53 week fiscal year and the term "Fiscal Year" or "Fiscal" refers to that 52-week or 53-week period. The fiscal years ending on April 1, 2023 and March 27, 2021 ("Fiscal 2023" and "Fiscal 2021", respectively) contain 52 weeks and the fiscal year ending on April 2, 2022 ("Fiscal 2022") contains 53 weeks. The Company's Fiscal 2024 is a 52-week period ending March 30, 2024. Some differences in the numbers in the tables and text throughout this annual report may exist due to rounding.*

### Item 1. Business

### Our Company

Capri Holdings Limited ("Capri") is a global fashion luxury group consisting of iconic, founder-led brands Versace, Jimmy Choo and Michael Kors. Our commitment to glamorous style and craftsmanship is at the heart of each of our luxury brands. We have built our reputation on designing exceptional, innovative products that cover the full spectrum of fashion luxury categories. Our strength lies in the unique DNA and heritage of each of our brands, the diversity and passion of our people and our dedication to the clients and communities we serve.
.

### Our Brands

#### Versace

Our Versace brand has long been recognized as one of the world's leading international fashion design houses and is synonymous with Italian glamour and style. Founded in 1978 in Milan, Versace is known for its iconic and unmistakable style and unparalleled craftsmanship. Over the past several decades, the House of Versace has grown globally from its roots in haute couture, expanding into the design, manufacturing, distribution and retailing of accessories, ready-to-wear, footwear, eyewear, watches, jewelry, fragrance and home furnishings businesses. Versace's design team is led by Donatella Versace, who has been the brand's Artistic Director for over 20 years. Versace distributes its products through a worldwide distribution network, which includes boutiques in some of the world's most glamorous cities, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

#### Jimmy Choo

Our Jimmy Choo brand offers a distinctive, glamorous and fashion-forward product range, enabling it to develop into a leading global luxury accessories brand, whose core product offering is women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as men's luxury shoes and accessories business. In addition, certain categories, such as fragrance and eyewear, are produced under licensing agreements. Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the brand since its inception in 1996. Jimmy Choo products are unique, instinctively seductive and chic. The brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo is represented through its global store network, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

#### Michael Kors

Our Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, whose vision has taken the Company from its beginnings as an American luxury sportswear house to a global accessories, footwear and ready-to-wear company with a global distribution network that has presence in over 100 countries through Company-operated retail stores and e-commerce sites, leading department stores, specialty stores and select licensing partners. Michael Kors is a highly recognized luxury fashion brand in the Americas and Europe with growing brand awareness in other international markets. Michael Kors features distinctive designs, materials and craftsmanship with a jet-set aesthetic that combines stylish elegance and a sporty attitude. Michael Kors offers three primary collections: the Michael Kors Collection luxury line, the MICHAEL Michael Kors accessible luxury line and the Michael Kors Mens line. The Michael Kors Collection establishes the aesthetic authority of the entire brand and is carried by select retail stores, our e-commerce sites, as well as in the finest luxury department stores in the world. MICHAEL Michael Kors has a strong focus on accessories, in addition to offering footwear and

7

Table of Contents

ready-to-wear, and addresses the significant demand opportunity in accessible luxury goods. We have also been developing our men's business in recognition of the significant opportunity afforded by the Michael Kors brand's established fashion authority and the expanding men's market. Taken together, our Michael Kors collections target a broad customer base while retaining our premium luxury image.

**Our Segments**

We operate in three reportable segments as follows:

- Versace - accounted for approximately 20% of our total revenue in Fiscal 2023 and includes worldwide sales of Versace products through 223 retail stores (including concessions) and e-commerce sites, through 744 wholesale doors (including multi-brand stores), as well as through product and geographic licensing arrangements.

- Jimmy Choo - accounted for approximately 11% of our total revenue in Fiscal 2023 and includes worldwide sales of Jimmy Choo products through 237 retail stores (including concessions) and e-commerce sites, through 527 wholesale doors (including multi-brand stores), as well as through product and geographic licensing arrangements.

- Michael Kors - accounted for approximately 69% of our total revenue in Fiscal 2023 and includes worldwide sales of Michael Kors products through 812 retail stores (including concessions) and e-commerce sites, through 2,843 wholesale doors, as well as through product and geographic licensing arrangements.

In addition to these reportable segments, we have certain corporate costs that are not directly attributable to our brands and, therefore, are not allocated to segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including Enterprise Resource Planning ("ERP") system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges and COVID-19 related charges. The segment structure is consistent with how our chief operating decision maker plans and allocates resources, manages the business and assesses performance. All intercompany revenues are eliminated in consolidation and are not reviewed when evaluating segment performance. For additional financial information regarding our segments and corporate unallocated expenses, see Note 19 to the accompanying consolidated financial statements for additional information.

**Industry**

We operate in the global personal luxury goods industry. Through 2019, the personal luxury goods market grew at a mid-single digit rate over the past 20 years, with more recent growth driven by stronger Chinese demand from both international and local consumers and demographic and socioeconomic shifts resulting in younger consumers purchasing more luxury goods. Then, in 2020, due to the impact of the COVID-19 crisis, the personal luxury goods market declined 22%. According to *Bain\**, the personal luxury goods market returned to 2019 levels in 2021, and grew 15% in constant exchange rates in 2022. The market is predicted to increase at a 5-7% compound annual growth rate between 2022 and 2030. Future growth will be driven by e-commerce, Chinese consumers and younger generations. By 2030, Bain studies estimate that over 30% of personal luxury goods sales will occur online, Chinese consumers will represent approximately 40% of total global personal luxury goods sales and Gen Z and Alpha combined will make up at least one-third of the market. As the personal luxury goods market continues to evolve, Capri is committed to designing exceptional, innovative products that cover the full spectrum of fashion luxury categories. In our view, increased customer engagement and tailoring merchandise to customer shopping and communication preferences are key to growing market share. We believe that our innovative and luxurious product offerings and customer engagement initiatives across all three brands position us to capitalize on the continued growth of the global personal luxury goods industry.

* Bain - Altagamma Luxury Goods Worldwide Market Study, Fall 2022 (November 15, 2022). These studies were prepared by Bain & Company and Altagamma and can be obtained free of charge or at a nominal cost by contacting Bain & Company's media contacts. While we believe that each of these studies and publications is reliable, we have not independently verified market and industry data from third-party sources.

**Geographic Information**

We generate revenue globally through our three reportable segments, as described above. We sell our Versace, Jimmy Choo and Michael Kors products through retail and wholesale channels in three principal geographic markets: the Americas (United States, Canada and Latin America), EMEA (Europe, Middle East and Africa) and Asia (Asia and Oceania). We also have wholesale arrangements pursuant to which we sell products to geographic licensees. In addition, we have licensing

8

Table of Contents

agreements through which we license to third-parties the use of our Versace, Jimmy Choo and Michael Kors brand names and trademarks, certain production rights and sales and/or distribution rights with respect to our brands.

The following table details our revenue by segment and geographic location (in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Versace revenue - the Americas | $ 408 | $ 408 | $ 201 |
| Versace revenue - EMEA | 468 | 425 | 276 |
| Versace revenue - Asia | 230 | 255 | 241 |
| **Total Versace revenue** | **1,106** | **1,088** | **718** |
| Jimmy Choo revenue - the Americas | 196 | 175 | 102 |
| Jimmy Choo revenue - EMEA | 255 | 229 | 146 |
| Jimmy Choo revenue - Asia | 182 | 209 | 170 |
| **Total Jimmy Choo revenue** | **633** | **613** | **418** |
| Michael Kors revenue - the Americas | 2,616 | 2,627 | 1,869 |
| Michael Kors revenue - EMEA | 819 | 835 | 607 |
| Michael Kors revenue - Asia | 445 | 491 | 448 |
| **Total Michael Kors revenue** | **3,880** | **3,953** | **2,924** |
| | | | |
| Total revenue - the Americas | 3,220 | 3,210 | 2,172 |
| Total revenue - EMEA | 1,542 | 1,489 | 1,029 |
| Total revenue - Asia | 857 | 955 | 859 |
| **Total revenue** | **$ 5,619** | **$ 5,654** | **$ 4,060** |

**Competitive Strengths**

We believe that the following strengths differentiate us from our competitors:

**Global Fashion Luxury Group Led by a World-Class Management Team and Renowned Designers**. We are a global fashion luxury group, consisting of three iconic brands defined by fashion luxury products with a reputation for world-class design and innovation. The design leadership of our founder-designers Donatella Versace, Sandra Choi and Michael Kors is a unique advantage that we possess. Our founder-led design teams are supported by our senior management team with extensive experience across a broad range of disciplines in the retail industry, including design, sales, marketing, public relations, merchandising, real estate, supply chain and finance. With an average of 26 years of experience in the retail industry, including at a number of public companies, and an average of 19 years of experience with our brands, our senior management team has strong creative and operational experience and a successful track record.

For over 20 years, Donatella Versace has been the Artistic Director, molding Versace's iconic style. A true visionary with an intuition for how to blend fashion, design and culture, Donatella continues to honor the rich and storied Versace heritage founded in 1978, while constantly evolving and adapting the luxury house to ensure the brand's continued relevance. Donatella's most recent collections for Versace are a testament to her bold and fearless design vision that celebrate Versace's Italian heritage and unapologetic glamour. Versace designs have been worn by the world's most famous celebrities and most sought-after super models.

Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the Jimmy Choo brand since its inception in 1996. Jimmy Choo products are glamourous and daring. The Jimmy Choo brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo's products have a strong red carpet presence and are often worn by global celebrities.

The Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, who is responsible for conceptualizing and directing the design of our Michael Kors brand products. We believe that the Michael Kors

9

Table of Contents

brand name has become synonymous with luxurious fashion that is timeless and elegant, expressed through the brand's sophisticated accessories and ready-to-wear collections. Each of our Michael Kors brand collections exemplifies the jet-set lifestyle and features high quality designs, materials and craftsmanship. Michael Kors has received a number of awards, which recognize the contribution he and his team have made to the fashion industry and our Company. Some of the most widely recognized global trendsetters and celebrities wear our Michael Kors brand collections.

**Expertise in the Accessories Category.** We have strong group expertise in accessories. The strength of our Michael Kors luxury collection and our accessible luxury MICHAEL Michael Kors line have allowed us to expand our brand awareness and position Michael Kors as one of the leading global luxury brands in the accessories product categories. Capitalizing on the success of our accessories product category, we continue to further develop the accessories businesses for Jimmy Choo and Versace, bringing our accessories expertise, including our product category knowledge, our merchandising best practices and our substantial group buying power to these brands. Our goal is to increase Versace's women's and men's accessories penetration from 20% of revenues in Fiscal 2023 to 50% of Versace's revenues over time and to increase Jimmy Choo's women's accessories penetration from approximately 20% of revenues in Fiscal 2023 to 30% of Jimmy Choo's revenues over the next few years and to 50% over time.

**Exceptional Retail Store Footprint.** Versace operates in three primary retail formats: boutiques, outlet and e-commerce. We operated 223 Versace retail stores as of April 1, 2023 in some of the most fashionable cities and the most sought-after shopping destinations around the world. During Fiscal 2022, we completed renovations at approximately 50% of our Versace retail stores to incorporate our new store design and have continued with these renovations in Fiscal 2023. Versace's products are distributed worldwide through a global network of highly specialized stores, which average approximately 2,900 gross square feet. In addition, we operate Versace e-commerce sites in the United States, Europe and China (covering 90 countries worldwide).

We operated 237 Jimmy Choo retail stores as of April 1, 2023, in some of the most premier locations worldwide. Jimmy Choo retail stores, comprised of full-price stores and outlets, average approximately 1,400 gross square feet. In addition, we operate Jimmy Choo e-commerce sites in the United States, certain parts of Europe, Japan, China, Australia and Korea.

We operated 812 Michael Kors stores as of April 1, 2023 with four primary retail store formats: collection stores, lifestyle stores, outlet stores and e-commerce sites. Michael Kors collection stores are located in some of the world's most prestigious shopping areas and average approximately 2,900 gross square feet in size. The Michael Kors lifestyle stores are located in some of the world's most frequented metropolitan shopping locations and leading regional shopping centers, and average approximately 2,800 gross square feet in size. We also extend our reach to additional consumer groups through our outlet stores, which average approximately 4,500 gross square feet in size. In addition, we also operate Michael Kors e-commerce sites in North America, China, Japan, South Korea, certain parts of Europe, the Middle East, Africa, Asia Pacific and Oceania.

**World-class Omni and CRM Capabilities.** We have omni-channel capabilities from best-in-class digital platforms to state-of-the-art distribution facilities globally, which we leverage across businesses. As part of our plan to continue to implement omni-channel capabilities throughout our businesses, we have begun leveraging our distribution centers globally to serve multiple brands.

**Strong Relationships with Premier Department Stores**. We partner with leading wholesale customers, such as Macy's, Saks Fifth Avenue, Bloomingdale's and Holt Renfrew in North America, as well as Harrods, Harvey Nichols, Printemps, Selfridges and Galeries Lafayette in Europe. These relationships enable us to access large numbers of our key consumers in a targeted manner. Our "shop-in-shops" have specially trained staff, as well as customized fixtures, wall casings, decorative items, flooring and provide department store consumers with a more personalized shopping experience than traditional retail department store configurations. We have engaged with our wholesale customers on various initiatives and have continued to enter into supply chain partnerships designed to increase the speed at which our luxury fashion products reach the ultimate consumer. We plan to increase Versace's and Jimmy Choo's presence in certain luxury department stores, and for Michael Kors, we continue to optimize deliveries with the intent to drive more full-price sell-through in the wholesale channel.

**Business Strategy**

Our goal is to continue to create long-term shareholder value by increasing our revenue and profits and strengthening our global brands. We also believe that sound environmental and social policies are both ethically correct and fiscally responsible. To that end, we are committed to improving the way we work in order to better the world in which we live. We plan to achieve our business strategy by focusing on the following strategic initiatives:

Table of Contents

**Leverage group expertise and capabilities.** We will continue to leverage our group expertise in accessories and footwear to fuel growth across our portfolio of brands, implementing the best practices from our Michael Kors core accessories business to our Versace and Jimmy Choo brands. We will also continue to prioritize the development of our e-commerce platforms and omni-channel capabilities for our brands, leveraging our broad expertise and capabilities in this area. We see a number of opportunities to create long-term operational synergies as we combine our global competencies and footprint. These synergies will be primarily focused on opportunities in our supply chain, information systems, back office support and manufacturing.

**Continue to increase our presence in Asia.** We plan to continue to diversify our group's global footprint with an emphasis on the Asia market, where we believe each of our three brands continue to have the potential to significantly grow market share in the region.

**Continue to execute our strategies to grow Versace.** We plan to grow the Versace business to at least $2 billion in revenues over time. To achieve this goal, we plan to build on Versace's iconic brand codes - Virtus, La Medusa and La Greca. Additionally, we will capitalize on Versace's high brand awareness through bold and engaging consumer communication. We also plan to expand and elevate Versace's distribution by accelerating e-commerce and omni-channel capabilities, increasing our global retail footprint to 300 retail stores and continuing to renovate the remainder of the store fleet. Finally, we plan to leverage our group's expertise to expand Versace's women's and men's accessories to 50% of the brand's revenues over time, while maintaining Versace's authoritative presence in women's and men's ready-to-wear.

**Continue to execute on our strategies to grow Jimmy Choo.** We plan to continue to implement our growth strategies for Jimmy Choo with a goal of reaching $1 billion in revenues over time. Our overarching strategy is rooted in reinforcing the brand's glamorous DNA through consumer experience and communications, as well as through product - from formal to casual, across accessories and footwear. Additionally, we plan to expand Jimmy Choo's distribution by accelerating e-commerce and omni-channel developments and increasing our global retail footprint to 300 retail stores in the most fashionable shopping destinations around the world. We also have a significant opportunity to increase women's accessories to approximately 50% of Jimmy Choo's revenue over time by expanding the breadth of new collections. At the same time, we plan to continue to grow footwear sales by capitalizing on the success of glamour while expanding our fashion active and casual offerings.

**Continue to leverage the strength of Michael Kors, which remains the foundation for our fashion luxury group.** Our goal is to continue to elevate Michael Kors to become a stronger and more profitable brand. We are capitalizing on high brand awareness and consumer engagement by embracing Michael Kors jet set heritage through a modern lens. Reinforcing our highly recognizable brand codes including the MK Signature pattern and MK hardware across all product categories remains a core growth strategy. In accessories, we continue to refresh and celebrate brand icons while evolving styles with newness. Additionally, we plan to grow our men's business by leading with accessories and maximizing our brand codes. Our strategy to enhance customer experience by expanding our omni-channel capabilities also remains a key priority. Finally, we plan to double Michael Kors revenue in Asia over time.

**Execute on our corporate social responsibility strategy.** We strive to foster a future where both people and the planet are cared for, and we believe that ethical business practices and giving back are critical to our success. Our corporate social responsibility (CSR) strategy focuses on four foundational pillars - Our Governance, Our World, Our Community and Our Philanthropy. We continue to take steps to advance our CSR strategy and to support the United Nations Sustainable Development Goals. Our key sustainability goals, our plans for getting there, and an update on the progress we have made can be found in our annual CSR report located at www.capriholdings.com/responsibility. The content on this website and the content in our CSR reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

Table of Contents

**Collections and Products**

Our total revenue by major product category is as follows (in millions):

|  | Fiscal Years Ended | | | | | |
|  | April 1, 2023 | % of Total | April 2, 2022 | % of Total | March 27, 2021 | % of Total |
|---|---|---|---|---|---|---|
| Accessories | $ 2,826 | 50.3% | $ 2,901 | 51.3% | $ 2,158 | 53.2% |
| Footwear | 1,217 | 21.7% | 1,208 | 21.4% | 796 | 19.6% |
| Apparel | 1,107 | 19.7% | 1,027 | 18.2% | 720 | 17.7% |
| Licensed product | 222 | 4.0% | 241 | 4.3% | 185 | 4.6% |
| Licensing revenue | 211 | 3.8% | 212 | 3.7% | 155 | 3.8% |
| Other | 36 | 0.5% | 65 | 1.1% | 46 | 1.1% |
| **Total revenue** | $ 5,619 | | $ 5,654 | | $ 4,060 | |

**Versace**

Versace is one of the leading international fashion design houses, representing the brand's creative vision through a wide range of products. From haute-couture to ready-to-wear, footwear, accessories and home decor, Versace delivers a unique lifestyle that welcomes customers in its elegant yet glamorous universe. Generally, Versace's haute couture retails up to $250,000, ready-to-wear retails from $400 to $23,000, accessories retail from $100 to $6,100 and footwear retail from $400 to $3,300.

Certain product categories, such as Versace Jeans Couture, eyewear, fragrances, jewelry, watches and home furnishings, are produced under product licensing agreements. Swinger SA is the exclusive licensee for Versace Jeans Couture, Luxottica is the exclusive licensee for Versace eyewear, EuroItalia is the exclusive licensee for Versace fragrances, Vertime is the exclusive licensee for Versace watches and Poltrona Frau is the exclusive licensee for Versace home furnishings. Generally, Versace Jeans Couture retail from $45 to $1,500, Versace eyewear retails from $110 to $500, Versace fragrances retail from $38 to $400, Versace watches retail from $420 to $4,000 and Versace home furnishings, which include a variety of products, generally retail from $850 to $100,000.

**Jimmy Choo**

Jimmy Choo is a leading global luxury accessories brand and offers a distinctive, glamorous and fashion-forward product range, whose core product offerings are women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as a men's luxury shoes and accessories business. Generally, Jimmy Choo women's and men's luxury shoes retail from $500 to $5,000 and accessories retail from $200 to $4,500.

Certain product categories, such as Jimmy Choo fragrance and eyewear, are produced under product licensing agreements. Interparfums SA is the exclusive licensee for Jimmy Choo fragrances and makeup and Safilo SpA is the exclusive licensee for Jimmy Choo eyewear. Generally, Jimmy Choo eyewear retail from $250 to $500 and Jimmy Choo fragrances and beauty retail from $50 to $220.

**Michael Kors**

Michael Kors has three primary collections that offer accessories, footwear and apparel: Michael Kors Collection, MICHAEL Michael Kors and Michael Kors Mens. The three primary collections and licensed products are offered through our own Michael Kors retail stores and e-commerce businesses, in department stores around the world and by our exclusive licensees to wholesale customers, in addition to select retailers. The Michael Kors Collection is a sophisticated designer collection for women based on a philosophy of essential luxury and pragmatic glamour and includes accessories, primarily handbags and small leather goods, ready-to-wear and footwear. Generally, the Michael Kors Collection women's handbags and small leather goods retail from $300 to $4,000, footwear retails from $300 to $1,500 and ready-to-wear retails from $400 to $9,000. MICHAEL Michael Kors is the accessible luxury collection and offers women's accessories, primarily handbags and small leather goods, as well as footwear and apparel and is carried in all of the Michael Kors lifestyle stores and leading department stores around the world. MICHAEL Michael Kors offers handbags designed to meet the fashion and functional requirements of our broad and diverse consumer base. Generally, MICHAEL Michael Kors handbags retail from $200 to $750, small leather goods retail from $50 to $250, footwear retails from $50 to $300 and apparel retails from $75 to $700. Michael Kors Mens is an innovative collection of men's ready-to-wear, accessories and footwear with a modern American style.

12

Table of Contents

Michael Kors Mens apparel generally retails from $50 to $1,000, men's accessories generally retail from $50 to $800 and men's footwear generally retails from $150 to $400.

Certain product categories, including watches, jewelry, eyewear and fragrance, are produced under product licensing agreements. Fossil is our exclusive licensee for Michael Kors watches and jewelry, including our Michael Kors ACCESS smartwatches and our fine jewelry line. Luxottica is our exclusive licensee for Michael Kors distinctive eyewear inspired by our collections. The Company transitioned its fragrance business to EuroItalia during Fiscal 2023. Generally, Michael Kors fashion watches retail from $200 to $600, Michael Kors ACCESS smartwatches retail from $250 to $450, Michael Kors jewelry retails from $50 to $500, Michael Kors eyewear retails from $100 to $350 and Michael Kors fragrance and related products generally retail from $30 to $150.

**Advertising and Marketing**

Our marketing and advertising programs are designed to build brand awareness for each of our luxury houses as well as highlight our product offerings. We use a 360-degree marketing strategy for each of our brands to deliver a consistent message across each brand's advertising communications, social media, celebrity dressing, special events and direct marketing activities at a national, regional and local level. Our campaigns are increasingly being executed through digital and social media platforms to drive further engagement with younger consumers.

Our brands introduce their new collections annually with fashion shows and other fashion events. These fashion events, in addition to celebrity red carpet dressing moments, generate extensive domestic and international media and social media coverage. The Versace and Michael Kors semi-annual runway shows and Jimmy Choo celebrity placements generate extensive media coverage. Jimmy Choo is also the leading brand in editorial coverage for women's luxury shoes globally.

We believe our renowned brand founders, as well as our high-profile brand ambassadors and well-known social media influencers across our marketing programs help expand brand awareness and drive cultural relevance.

In Fiscal 2023, we recognized approximately $374 million in advertising and marketing expenses globally. We engage in a wide range of integrated marketing programs across various marketing channels, including but not limited to email marketing, print advertising, outdoor advertising, digital marketing, social media, public relations outreach, visual merchandising and partnership marketing, in an effort to engage our existing and potential customer base and ultimately stimulate sales in a consumer-preferred shopping venue.

Our growing e-commerce businesses provide us with an opportunity to increase the size of our customer database and to communicate with our consumers to increase online and physical store sales, as well as to continue to build global brand awareness for our brands. We are continuously improving the functionalities and features on our e-commerce sites to create innovative ways to keep our brands at the forefront of consumers' minds by offering a broad selection of products, including accessories, apparel and footwear. Since e-commerce growth is critical to our overall growth strategy, we plan to accelerate Versace's and Jimmy Choo's e-commerce and omni-channel development and we are also in the process of re-platforming our brands' e-commerce sites to expand our global capabilities. See Item 1A. "Risk Factors" - "If we are unable to effectively execute our e-commerce business and provide a reliable digital experience for our customers, our reputation and operating results may be harmed."

**Manufacturing and Sourcing**

We generally contract for the purchase of finished goods principally with independent third-party manufacturing contractors, whereby the manufacturing contractor is generally responsible for the entire manufacturing process, including the purchase of piece goods and trim for our Jimmy Choo and Michael Kors brands. For the Versace brand, some of the piece goods and trim are separately purchased by Versace and provided to the manufacturers, and some are sourced directly by the manufacturers, as further described below.

Versace has a centrally managed production model for the majority of its products, and buys raw materials and components for these products. All raw materials arrive in a central warehouse in Novara, Italy and are distributed to independent third-party manufacturing contractors after the quality control process is complete. The vast majority of Versace's production is located in Italy. The remaining production occurs elsewhere in Europe and a small portion is produced in Asia or North Africa.

Jimmy Choo products are manufactured by independent third-party manufacturing contractors and our Italian atelier and shoe manufacturer. Most of Jimmy Choo's products are produced by specialists in Italy, supported by other factories across

13

Table of Contents

Europe, with a small portion produced in Asia. Jimmy Choo has a product development facility in Florence. In addition to purchasing finished goods, Jimmy Choo also purchases raw materials for both product development and manufacturing purposes.

Michael Kors contracts for the purchase of finished goods principally with independent third-party manufacturing contractors that are generally responsible for the entire manufacturing process, including the purchase of piece goods and trim. Product manufacturing for the Michael Kors brand is allocated among third-party manufacturing contractors based on their capabilities, the availability of production capacity, pricing and delivery. For certain product categories, Michael Kors also has relationships with various agents who source finished goods with numerous manufacturing contractors on its behalf. This multi-supplier strategy provides specialized skills, scalability, flexibility and speed to market, as well as diversifies risk. In Fiscal 2023 and Fiscal 2022, one third-party buying agent sourced approximately 15% and 14%, respectively, of Michael Kors finished goods purchases, based on dollar volume. Michael Kors' largest manufacturing contractor, who produces its products in Asia and who Michael Kors has worked with for approximately 20 years, accounted for the production of approximately 15% of its finished products, based on dollar volume in Fiscal 2023. Nearly all of our Michael Kors products were produced in Asia in Fiscal 2023.

The manufacturing contractors for our brands operate under the close supervision of our global manufacturing divisions and buying agents located in North America, Europe and Asia. All products are produced according to our specifications. Production staff monitors manufacturing at supplier facilities in order to correct problems prior to shipment of the final product. Quality assurance is focused on as early as possible in the production process, allowing merchandise to be received at the distribution facilities and shipped to customers with minimal interruption. See "Import Restrictions and Other Governmental Regulations" and Item 1A. "Risk Factors" - "We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods, which poses legal, regulatory, political and economic risks to our business operations."

Our future manufacturing and sourcing strategy includes purchasing luxury manufacturing facilities in Italy to support all of our brands, pursuing manufacturing synergies across brands and securing capacity and improving our expertise in development and delivery. While the fashion design process will remain independently managed by each of our brands, we believe that in-sourcing luxury manufacturing capacity will create synergies and support expansion for our global fashion luxury group.

**Distribution**

Versace owns a central warehouse in Novara, Italy, managed by a third-party, which acts as a global hub for Versace's primary operations. Versace also has a leased warehouse near Novara operated by the same third-party, which serves as a distribution point for other Versace lines. From these warehouses, products are shipped to regional warehouses that are operated by third-parties in New Jersey, Hong Kong, Mainland China and Japan, and supports the Versace retail and e-commerce businesses. E-commerce distribution for the United States market is conducted through third-party providers in New Jersey. Versace's wholesale business is mainly serviced from three central warehouses located in Italy, the United States and Japan.

Jimmy Choo's primary distribution facility is our Company-owned and operated distribution facility in the Netherlands. From there, products are shipped to regional warehouses in the United States, Canada, Mainland China, Hong Kong, South Korea, Japan and United Arab Emirates, largely supporting the Jimmy Choo retail and e-commerce businesses. Shipments to wholesale customers globally are made from the Netherlands and the United States, with some further local fulfillment. All of the distribution facilities utilized by Jimmy Choo are operated by third-parties and are shared with other unaffiliated businesses with the exception of our distribution facility in the Netherlands. This flexible method reinforces the speed and efficiency of the supply chain and allows the business to deliver Jimmy Choo product and collections to market rapidly and in line with the industry's fashion calendar.

Michael Kors' primary distribution facility in the United States is a leased facility in Whittier, California, which is directly operated and services our Michael Kors retail stores, e-commerce site and wholesale operations in the United States. We also engage in omni-channel order fulfillment by filling online orders through our Michael Kors retail stores and through our click-and-collect service offerings. Our primary Michael Kors distribution facility in Europe is our Company-owned and operated distribution facility in the Netherlands, which supports our European operations for our Michael Kors brand, including our European e-commerce sites. We also have a regional Michael Kors distribution center in Canada, which is leased, as well as regional Michael Kors distribution centers in New Jersey, Mainland China, Hong Kong, Japan, South Korea and Taiwan, which are operated by third-parties.

14

Table of Contents

**Intellectual Property**

We own VERSACE, JIMMY CHOO and MICHAEL KORS trademarks, as well as other material trademarks, copyrights, design and patent rights related to the production, marketing and distribution of our products, both in the United States and in other countries in which our products are principally sold. We also have applications pending for a variety of related trademarks, copyrights, designs and patents in various countries throughout the world. As the worldwide usage of our material trademarks, copyrights, designs and patents continue to expand, we continue to strategically apply to register them in key countries where they are used. We expect that our material intellectual property will remain in full force and effect for as long as we continue to use and renew them.

We aggressively police our intellectual property and pursue infringers both domestically and internationally. In addition, we pursue counterfeiters in the United States, Europe, the Middle East, Asia and elsewhere in the world in both online and offline channels, working with our network of customs authorities, law enforcement, legal representatives and brand specialists around the world as well as involvement with industry associations and anti-counterfeiting organizations.

**Information Systems**

Each of our three brands currently operate using certain legacy systems for finance and accounting, supply chain, inventory control, point-of-sale transactions, store replenishment and other functions. Our long-term strategy includes consolidating certain systems across our brands over time to create operational efficiencies. During Fiscal 2020, we embarked on a multi-year ERP implementation to conform various processes onto one global system that would support certain finance, accounting and operational functions. The implementation of the ERP requires a significant investment in human and financial resources. As a result of COVID-19 and our need to significantly reduce our capital expenditures, we temporarily suspended our ERP project. Certain phases of the project have resumed as of the fourth quarter of Fiscal 2021 and portions of our global ERP system are live in Fiscal 2023. See Item 1A. "Risk Factors" - "A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition."

**Human Capital Management**

At Capri Holdings, we strive to create workplaces where our employees and the workers across our supply chain thrive. Through our benefits and compensation packages, learning and development programs, focus on diversity and inclusion, employee engagement, wellness and safety programs and supply chain empowerment initiatives, we continue to make significant investments in our Capri community.

**Governance and Oversight.** Our Board of Directors has delegated oversight of matters relating to human capital management, including compensation, learning and development and diversity and inclusion to our Compensation and Talent Committee. Our Compensation and Talent Committee receives regular updates on our talent development strategies and other applicable areas of human capital management.

**Employee Profile.** At the end of Fiscal 2023, 2022 and 2021, we had approximately 15,500, 14,600 and 13,800 total employees, respectively. As of April 1, 2023, we had approximately 10,400 full-time employees and approximately 5,100 part-time employees. Approximately 11,500 of our employees were engaged in retail selling and administrative positions and our remaining employees were engaged in other aspects of our business as of April 1, 2023. As of April 1, 2023, we have approximately 2,900 employees covered by collective bargaining agreements in certain European countries. We consider our relations with both our union and non-union employees to be good.

**Benefits and Compensation.** We maintain comprehensive benefits and compensation packages to attract, retain and recognize our employees. Our health and welfare benefit program is designed to provide a wide range of benefits to meet the health care, financial, work/life and mental wellbeing needs of eligible employees. Benefits include, among others, medical, dental and vision plans, life insurance, short and long-term disability coverage, retirement plans (with matching contributions where applicable), paid parental leave for all parents, gender reassignment coverage and fertility support benefits in the United States, and a wellness program focused on mental wellbeing, including several digital therapeutic programs to assist with therapy, anxiety and worry and sleep. We also offer employees paid time off, including to volunteer with select charitable organization. Employees are also entitled to discounts on our merchandise.

**Learning and Development.** We honor our employees through our dedication to development and believe that enabling opportunity means ensuring our teams have the skills they need to build fulfilling careers with us. We promote employee performance with personalized development plans and by providing individualized feedback at regular intervals throughout the

15

Table of Contents

year, and all employees participate in a formal performance review process annually. We continue to refresh our learning and development programming by offering targeted skill-building for employees at all stages of their career. During Fiscal 2023, we launched our first learning management system, Capri FLEX, and we continue to offer quality training touchpoints to employees throughout our global organization, including programs around compliance, ethics and integrity, promoting respect in the workplace, global cybersecurity practices, and supply chain transparency as well as a mandatory three-party diversity and inclusion ("D&I") curriculum. We also deployed a new leadership development program focused on building and understanding emotional intelligence in our leaders.

**Diversity and Inclusion.** Diversity and inclusion are embedded in our DNA. We foster an inclusive environment where employees, vendors and customers of diverse backgrounds are respected, valued and celebrated. We are proud of our commitment to diversity, equality and inclusion, and will continue to advance these principles through meaningful short and long term actions across the globe.

Our commitment to diversity and inclusion is supported by three pillars:

*Capri Culture* - Our commitment to diversity extends beyond representation. We aim to build an inclusive space where all employees have the opportunity to realize their full potential and excel, while contributing to our success in a meaningful way.
*Capri Talent* - Differences in ideas and experiences allow our Company to thrive. We are attracting, advancing and advocating for a workforce that reflects the diversity of the world around us.

*Capri Community* - Through diversity and inclusion comes understanding and strength. Our responsibility to promote equality is not just to those who work with us, but to our industry, the customers we serve and the communities around us.

We have a Global Diversity & Inclusion Council comprised of diverse leaders across all brands and regions. The Global D&I Council works closely with senior leadership to ensure alignment of short-and long-term diversity and inclusion goals with Capri's overall business strategy, provides governance and oversight on diversity and inclusion efforts across our brands, and promotes company-wide communication on progress. We have a number of employee resource groups ("ERGs") to provide support for those employees who self-identify with a particular group, including Pride@Capri, BOLD@Capri", Black Organizers, Leaders and Doers, an Asian and Pacific Islander ERG and a women's network ERG, and we utilize global D&I listening sessions, regular D&I newsletters and communications and keynote speakers to further embed inclusion in our workplace. We are committed to recruiting, developing and retaining passionate, skilled and diverse talent. We launched a new mentorship program during the fiscal year and we educate recruiters and hiring managers to mitigate the impact of unconscious bias during the interview process. We are also a proud partner with a wide array of organizations and pledges in furtherance of driving equality and have a received a number of awards and accolades in the area of D&I.

Through The Capri Holdings Foundation for the Advancement in Diversity in Fashion, we are also driving diversity, inclusion and equality throughout the fashion industry by working collaboratively with colleges and high schools to create meaningful opportunities in fashion for underrepresented communities through scholarship programs in partnership with the Fashion Institute of Technology (FIT), Howard University, PENSOLE Academy and Central Saint Martins - University of the Arts London. Over the next few years, the Foundation will fund scholarships for nearly 100 students from historically underrepresented communities pursuing degrees in fashion and merchandising across these four educational institutions.

**Employee Engagement, Well-being and Safety**. Enhancing our employee experience has always been an integral part of our strategy and checking in with one another is a key part of our employee engagement program. We believe two-way communication, feedback and continuous improvement drive progress within our group and our brands. In Fiscal 2023, we expanded our employee listening approach and surveyed all global employees to better understand our company's strengths and opportunities, and to ensure that the Capri employee experience is both highly engaging and inclusive. We are proud to have been certified in the U.S. as a Great Place to Work® in 2022 - an accolade that we believe is a testament to our culture of empowerment, inclusion and growth. Michael Kors was also recently certified as a Great Place to Work® in the U.K.

Everyone working on behalf of our Company is entitled to work in a safe environment while maintaining their health and well-being. Capri's global safe workplace program, which includes employee traveler and emergency response alerts, raises awareness and provides safety resources tailored for workers in different work environments - from our distribution centers to our retail stores. Throughout the fiscal year, we continued to assess evolving health and safety guidance related to COVID-19 and tailored our practices and protocols for different workplaces. We also provided a range of resources and benefits to our employees throughout the pandemic, from remote and flexible workplace arrangements to grocery deliveries during lock-down and expanded mental health benefits through our *Thrive* global wellness program, designed to inspire employees to improve

16

Table of Contents

their physical, emotional and financial well-being. While we have welcomed employees back to work, we continue to explore flexible work options and have implemented a hybrid working environment.

**Supply Chain Empowerment.** Our community extends beyond our direct employees and our corporate social responsibility program drives us toward greater engagement with our suppliers. We are dedicated to conducting our operations throughout the world on principles of ethical business practice and recognition of the dignity of workers. Through our Code of Conduct for Business Partners and Factory Social Compliance Program, we partner with our suppliers on important human rights, health and safety, environmental and compliance issues. Our goal is to establish and implement supply chain empowerment programs for key supply chain partners in line with the UN Framework for Corporate Action on Workplace Women's Health and Empowerment by 2025. We are also signatory to the UN Women's Empowerment Principles, we partnered with the Fashion Makes Change campaign to support the empowerment and education of women in the fashion supply chain, and we recently joined Empower@Work, a platform that serves to catalyze collective action at scale for the benefit of the women workers and gender equality in global supply chains. Beginning in 2023, we are committed to implementing workplace trainings at strategic partner facilities and leveraging the organization's industry-wide and data-driven solutions to positively impact a greater number of women workers within our value chain.

## Competition

We face intense competition in the product lines and markets in which we operate from both existing and new competitors. Our products compete with other branded products within their product category. In varying degrees, depending on the product category involved, we compete on the basis of style, price, customer service, quality, brand prestige and recognition, among others. In our wholesale business, we compete with numerous manufacturers, importers and distributors of products like ours for the limited space available for product display. Moreover, the general availability of manufacturing contractors allows new entrants easy access to the markets in which we compete, which may increase the number of our competitors and adversely affect our competitive position and our business. We believe, however, that we have significant competitive advantages because of the recognition of our brands and the acceptance of our brands by consumers. See Item 1A. "Risk Factors" - "The markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline."

## Seasonality

We experience certain effects of seasonality with respect to our business. We generally experience greater sales during our third fiscal quarter, primarily driven by holiday season sales, and the lowest sales during our first fiscal quarter.

## Import Restrictions and Other Governmental Regulations

Virtually all of our imported products are subject to duties which may impact the costs of such products. In addition, countries to which we ship our products may impose safeguard quotas to limit the quantity of products that may be imported. We utilize free trade agreements and other supply chain initiatives in order to maximize efficiencies and cost savings relating to product importation. For example, we have historically received benefits from duty-free imports on certain products from certain countries pursuant to the United States. Generalized System of Preferences ("GSP") program. The GSP program expired on December 31, 2020. If the GSP program is not renewed or otherwise made retroactive, we will continue to experience significant additional duties and our gross margin will continue to be negatively impacted. Additionally, we are subject to government regulations relating to importation activities, including the United States. Customs and Border Protection ("CBP") withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our results of operations and financial condition. Additionally, we are subject to government regulations relating to product labeling, testing and safety. We maintain a global customs and product compliance organization to help manage our import and related regulatory activity.

## Corporate Social Responsibility ("CSR")

Our CSR strategy focuses on four foundational pillars:

- **Our Governance -** We believe responsible business practices start from the top, and we recognize the increasing importance of ESG matters to our business and our stakeholders. Our sustainability governance model ensures our

17

Table of Contents

Board of Directors, executive team and brands are aligned on the most important sustainability risks and opportunities for Capri.

- **Our World** - We believe that the success of our Company is directly linked to the sustainability of the world around us. Our brands strive to create the highest quality luxury products with longevity and sustainability in mind. We endeavor to operate responsibly in order to lower our impact on the planet and to promote industry-wide environmental change.

- **Our Community** - We believe we have a responsibility to those who work with us. Our Company strives to create inclusive workplaces where all of our employees are empowered and respected. We are committed to creating meaningful opportunities for our diverse Capri community to grow.

- **Our Philanthropy** - Giving back is embedded in Capri's culture. We remain steadfast in our commitment to support our philanthropic partners and to drive positive change in the communities where we live and work.

Within each of our four foundational pillars are key CSR focus areas that guide our work in support of the United Nations Sustainable Development Goals (SDGs).

We believe responsible business practices start from the top. Our sustainability governance model includes a multi-level structure to ensure our Board of Directors, executive management team and business leaders across our brands are aligned on the most important environmental, social and governance ("ESG") risks and opportunities for Capri. The Board has delegated oversight of ESG activities to the Governance, Nominating and CSR Committee (the "Governance Committee"). On at least an annual basis, our sustainability goals and action plans are presented to the Governance Committee for review and approval, along with CSR progress updates which are generally presented quarterly. The full Board of Directors regularly receives ESG updates from the Governance Committee and reviews our annual CSR reporting. The Board's Audit Committee also assesses ESG risks as part of its overall enterprise risk management review, and the Board's Compensation and Talent Committee considers performance against individualized ESG goals in making executive compensation decisions.

In fiscal 2023, we conducted our latest materiality assessment with the goal of identifying and prioritizing the most relevant ESG topics to our business and our stakeholders. The results of this materiality assessment helped to reinforce our CSR strategy and inform our reporting. We are committed to regular public reporting of our ESG risks and opportunities and the progress we are making toward our CSR goals.

Additional information can be found at www.capriholdings.com/responsibility. The content on this website and the content in our CSR reports are not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC.

**Available Information**

Our investor website can be accessed at www.capriholdings.com. The content of our website is not incorporated by reference into this Annual Report on Form 10-K. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K filed with or furnished to the SEC pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge on our website under the caption "Financials" and then "SEC Filings" promptly after we electronically file such materials with, or furnish such materials to, the SEC. No information contained on our website is intended to be included as part of, or incorporated by reference into, this Annual Report on Form 10-K. Information relating to corporate governance at our Company, including our Corporate Governance Guidelines, our Code of Business Conduct and Ethics for all directors, officers, and employees, and information concerning our directors, Committees of the Board, including Committee charters, and transactions in Company securities by directors and executive officers, is available at our website under the captions "Governance" and "Financials" and then "SEC Filings." Paper copies of these filings and corporate governance documents are available to shareholders free of charge by written request to Investor Relations, Capri Holdings Limited, 90 Whitfield Street, 2nd Floor, London, United Kingdom, W1T 4EZ. Documents filed with the SEC are also available on the SEC's website at www.sec.gov.

18

Table of Contents

**Item 1A. Risk Factors**

You should carefully read this entire report, including, without limitation, the following risk factors and the section of this annual report entitled "Note Regarding Forward-Looking Statements." Any of the following factors could materially adversely affect our business, results of operations and financial condition. Additional risks and uncertainties not currently known to us or that we currently view as immaterial may also materially adversely affect our business, results of operations and financial condition. Risks are listed in the categories where they primarily apply, but other categories may also apply.

**Risks Related to Macroeconomic Conditions**

*The accessories, footwear and apparel industries are heavily influenced by general macroeconomic cycles that affect consumer spending and a prolonged period of depressed consumer spending could have a material adverse effect on our business, results of operations and financial condition.*

Global economic conditions and the related impact on levels of consumer spending worldwide have impacted, and are likely to continue to impact, our business and the accessories, footwear and apparel industry overall. Inflation, rising interest rates, higher fuel and energy costs and commodity prices, reductions in net worth based on market declines and uncertainty, home prices, credit availability and consumer debt levels, concerns of a global banking crisis, political instability due to war or other geopolitical factors and other macroeconomic pressures and general uncertainty regarding the overall future economic environment have led to recession fears and are creating a challenging retail environment. Purchases of discretionary luxury items, such as the accessories, footwear and apparel that we produce, tend to decline when disposable income is lower or when there are recessions, inflationary pressures or other economic uncertainty. Other factors that could depress consumer spending include extreme weather conditions and natural disasters, pandemics (like COVID-19), high levels of unemployment, fluctuating foreign currency rates and increased taxation. Reduced consumer confidence and adversely impacted consumer spending patterns in any of the regions in which we operate could adversely affect our business, results of operations and financial condition.

*The COVID-19 pandemic may continue to adversely affect our business and results of operations.*

The COVID-19 pandemic caused significant disruption to the global economy, consumer spending and behavior, tourism and to financial markets and negatively impacted our business. While the overall COVID-19 situation appears to be improving, our business and operating results may be negatively impacted by COVID-19 again in the future if the virus worsens or if regions or countries where we operate reinstate extended lock-downs and/or implement travel restrictions. Long term store closure requirements and/or other operational restrictions placed on our business or the business of our wholesale customers or supply chain partners as a result of COVID-19 could materially impact or disrupt our business and limit our ability to fully operate in the ordinary course, which could materially impact our financial results.

**Risks Related to Our Business**

*We may not be able to respond to changing fashion and retail trends in a timely manner, which could have a material adverse effect on our brands, business, results of operations and financial condition.*

The accessories, footwear and apparel industries have historically been subject to rapidly changing fashion trends and consumer preferences. We believe that our success is largely dependent on the images of our brands and ability to anticipate and respond promptly to changing consumer demands and fashion trends in the design, styling, sustainability production, merchandising and pricing of products. Any misstep in product quality or design, executive leadership, customer services, unfavorable publicity or excessive product discounting could negatively affect the image or our brands with our customers. If we do not correctly gauge consumer needs and fashion trends and respond appropriately, consumers may not purchase our products and our brand names and the images of our brands may be impaired. Even if we react appropriately to changes in fashion trends and consumer preferences, consumers may consider our brands to be outdated or associate our brands with styles that are no longer popular or trend-setting. We have also increased the price of our products. There can be no guarantee that consumers will accept these price increases. Any of these outcomes could have a material adverse effect on our brands, business, results of operations and financial condition.

19

Table of Contents

***The markets in which we operate are highly competitive, both within North America and internationally, and increased competition based on a number of factors could cause our profitability and/or gross margins to decline.***

Our brands face intense competition from other accessories, footwear and apparel producers and retailers, including, primarily European and American international luxury brands. In addition, we face competition through third-party distribution channels that sell our merchandise, such as e-commerce, department stores and specialty stores. Competition is based on a number of factors, including, without limitation, the following:

- anticipating and responding to changing consumer demands in a timely manner;
- establishing and maintaining favorable brand name recognition;
- determining and maintaining product quality;
- retaining key employees;
- maintaining and growing market share;
- developing quality and differentiated products that appeal to consumers;
- establishing and maintaining acceptable relationships with retail customers;
- pricing products appropriately;
- providing appropriate service and support to retailers;
- optimizing retail and supply chain capabilities;
- determining size and location of retail and department store selling space; and
- protecting intellectual property.

In addition, some of our competitors may be significantly larger and more diversified than us and may have significantly greater financial, technological, manufacturing, sales, marketing and distribution resources than we do. Their capabilities in these areas may enable them to better withstand periodic downturns in the accessories, footwear and apparel industries (including as a result of recent inflationary pressures and other macroeconomic factors), compete more effectively on the basis of price and production and more quickly develop new products. The general availability of manufacturing contractors and agents also allows new entrants easy access to the markets in which we compete, which may increase the number of our competitors and adversely affect our competitive position and our business. Any increased competition, or our failure to adequately address any of these competitive factors, could result in reduced revenues, which could adversely affect our business, results of operations and financial condition.

Competition, along with other factors such as consolidation, changes in consumer spending patterns and a highly promotional retail selling environment, could also result in significant pricing pressure. These factors may cause us to reduce our sales prices to our wholesale customers and retail consumers, which could cause our gross margins to decline if we are unable to appropriately manage inventory levels and/or otherwise offset price reductions with comparable reductions in our operating costs. If our sales prices decline and we fail to sufficiently reduce our product costs or operating expenses, our profitability may decline, which could have a material adverse effect on our business, results of operations and financial condition.

***Our business could suffer as a result of reductions in our wholesale channel and/or consolidations, liquidations, restructurings and other ownership changes by our wholesale partners.***

We have experienced and may continue to experience a decline in sales in our wholesale channel. Reductions in the amount of merchandise purchased from us by our wholesale partners or an increase in order cancellations by our wholesale partners could further reduce our revenues and have a material adverse effect on our profitability. In addition, many of our wholesale customers have experienced, and may continue to experience, liquidity constraints or other financial difficulties. These challenges could lead to the need to extend payment terms, larger outstanding accounts receivable balances, delays in collection of accounts receivable, increased expenses associated with collection efforts, increases in excess inventory, increases in credit losses and reduced cash flows.

The retail industry has also experienced a great deal of consolidation and other ownership changes over the past several years and a number of wholesale accounts were forced to file bankruptcy or undergo restructurings. We expect that the risk of consolidation, bankruptcy, restructurings or reorganizations by department stores and other retailers will continue to exist for the foreseeable future. This could result in store closings by our wholesale customers, which would decrease the number of stores carrying our products, while the remaining stores may purchase a smaller amount of our products and/or may reduce the retail floor space designated for our brands. In addition, such consolidation, bankruptcy or other changes with respect to our

20

Table of Contents

wholesale customers could decrease our opportunities in the market, increase our reliance on a smaller number of large wholesale customers and decrease our negotiating strength with our wholesale customers, which could have a material adverse effect on our business, results of operations and financial condition.

Additionally, certain of our wholesale customers, particularly those located in the United States, have become highly promotional and have aggressively marked down their merchandise. We expect that such markdowns may continue to be exacerbated because of the current macroeconomic environment. Such promotional activity could negatively impact our business.

***We face risks associated with operating globally.***

We operate on a global basis, with approximately 47% of our total revenue from operations outside of the United States during Fiscal 2023. As a result, we are subject to the risks of doing business internationally, including:

- political or civil unrest, including protests and other civil disruption;
- unforeseen public health crises, such as pandemic and epidemic diseases, including COVID-19 and any variants thereof;
- economic instability and unsettled regional and global conflicts (such as the current war in Ukraine), which may negatively affect consumer spending by foreign tourists and local consumers in the various regions where we operate;
- laws, regulations and policies of foreign governments (including sanctions and retaliatory actions by the United States, European Union and others);
- potential negative consequences from changes in taxation policies;
- natural disasters or other extreme weather events, including those attributed to climate change; and
- acts of terrorism, military actions or other conditions over which we have no control.

In addition, we pursue selective international expansion in a number of countries around the world and through a number of channels. If our international expansion plans are unsuccessful, it could have a material adverse effect on our business, results of operations and financial condition. There are also some countries where we do not yet have significant operating experience, and in most of these countries we face established competitors with significantly more operating experience in those locations.

We also sell our products at varying retail price points based on geographic location that yield different gross profit margins and we achieve different operating profit margins, depending on geographic region, due to a variety of factors including product mix, store size, occupancy costs, labor costs and retail pricing. Changes in any one or more of these factors could result in lower revenues, increased costs, and negatively impact our business, results of operations and financial condition. Furthermore, consumer demand and behavior, as well as tastes and purchasing trends may differ in these countries and, as a result, sales of our product may not be successful, or the gross margins on those sales may not be in line with those we currently anticipate.

There can be no assurance that any or all of these events will not have a material adverse effect on our business, results of operations and financial condition.

***Our retail stores are heavily dependent on the ability and desire of consumers to travel and shop and a decline in consumer traffic could have a negative effect on our comparable store sales and store profitability resulting in impairment charges, which could have a material adverse effect on our business, results of operations and financial condition.***

Reduced travel resulting from economic conditions (including a recession or inflationary pressures), fuel shortages, increased fuel prices, travel restrictions, travel concerns and other circumstances, including adverse weather conditions, disease pandemics (including COVID-19), epidemics and other health-related concerns, war, terrorist attacks or the perceived threat of war or terrorist attacks, or unsettled regional and global conflicts (such as the current war in Ukraine) could have a material adverse effect on us, particularly if such events impact our customers' desire to travel to our retail stores.

In addition, other factors that could impact consumer traffic at our retail stores include: (i) the location of the mall or the location of a particular store within the mall; (ii) the other tenants occupying space at the mall; (iii) vacancies or extended store closures within the mall; (iv) increased competition in areas where the malls are located; (v) the amount of advertising and promotional dollars spent on attracting consumers to the malls; and (vi) a shift toward online shopping. A decline in consumer

21

Table of Contents

traffic could have a negative effect on our comparable store sales and/or average sales per square foot and store profitability. If our retail stores underperform due to declining consumer traffic or otherwise and our expected future cash flows of the related underlying retail store asset do not exceed such asset's carrying value, we may incur store impairment charges. A decline in future comparable store sales and/or store profitability or failure to meet market expectations or the occurrence of impairment charges relating to our retail store fleet could have a material adverse effect on our business, results of operations and financial condition.

***If we are unable to effectively execute our e-commerce business strategy and provide a reliable digital experience for our customers, our reputation and operating results may be harmed.***

E-commerce represents approximately 18% of our net revenues and has been our fastest growing business over the last several years. The success of our e-commerce business depends, in part, on third-parties and factors over which we have limited control, including changing consumer preferences and buying trends relating to e-commerce usage, both domestically and abroad, and promotional or other advertising initiatives employed by our wholesale customers or other third-parties on their e-commerce sites. Any failure on our part, or on the part of our third-party digital partners, to provide attractive, reliable, secure, efficient and user-friendly e-commerce platforms could negatively impact our consumers' shopping experience, resulting in reduced website traffic, reduced conversion, diminished loyalty to our brands and lost sales. In addition, if there is a change in consumer behavior such that customers shift to utilizing e-commerce more than, or even instead, of traditional brick-and-mortar stores, and we or our wholesale partners are unable to attract consumers who previously made in-store purchases to our digital commerce channels, our financial and operating results may be negatively affected.

The success of our business also depends on our ability to continue to develop and maintain a reliable digital experience for our customers. We strive to give our customers a seamless omni-channel experience both in stores and through digital technologies, such as computers, mobile phones, tablets and other devices. We also use social media to interact with our customers and enhance their shopping experience. Our inability to develop and continuously improve our digital brand engagement could negatively affect our ability to compete with other brands, which could adversely impact our business, results of operations and financial condition.

In addition, we must keep current with competitive technology trends, including the use of new or improved technology and services, creative user interfaces and other e-commerce marketing tools such as paid search and mobile applications, among others. Since e-commerce growth is critical to our overall growth strategy, we plan to accelerate our e-commerce and omni-channel development and we are also in the process of re-platforming our brands' e-commerce sites to expand our global capabilities. Implementing new or improved digital systems, services or technologies, such as new or improved e-commerce platforms, may increase our costs, cause delays in or hinder our ability to continually deliver a reliable or seamless digital experience for our customers, or cause us not to succeed in increasing sales or attracting consumers. Our failure to successfully respond to these risks and uncertainties might adversely affect the sales in our e-commerce business, as well as damage our reputation and brands.

Additionally, the success of our e-commerce business and the satisfaction of our consumers depend on their timely receipt of our products. The efficient flow of our products requires that our company-operated and third-party operated distribution facilities have adequate capacity to support the current level of e-commerce operations as well as any anticipated increased levels that may follow from the growth of our e-commerce business. Transportation shortages, labor shortages and port congestion as well as disruptions in factory production in certain countries where we source our products may delay inventory orders and impact product availability in our channels, including our e-commerce sites, which could result in customer dissatisfaction, and have an adverse effect on our business and harm our reputation.

***The departure of key employees or our failure to attract and retain qualified personnel could have a material adverse effect on our business.***

We depend on the services and management experience of executive officers who have substantial experience and expertise in our business as well as key employees involved in our design and marketing operations, including our creative officers for each of our brands, Ms. Donatella Versace, Ms. Sandra Choi and Mr. Michael Kors. Although we have entered into employment agreements with our executive officers and other key employees, we may not be able to retain the services of such individuals in the future, which may be disruptive to, or cause uncertainty in, our business and future strategic direction, particularly if we fail to ensure a smooth transition and effective transfer of knowledge. Any such disruption or uncertainty could generate a negative public perception and/or have a material adverse impact on our results of operations, financial condition, and the market price of our ordinary shares.

22

Table of Contents

Competition for qualified personnel in the fashion industry is intense and turnover in the industry for retail associates is generally high. Competitors may use aggressive tactics to recruit our employees. Our ability to attract, develop, motivate and retain employees is influenced by our ability to offer competitive compensation and benefits, employee morale, our reputation, recruitment by other employers, perceived internal opportunities, non-competition and non-solicitation agreements and macro unemployment rates. Additionally, our ability to meet our labor needs while also controlling costs is subject to external factors such as unemployment levels, prevailing wage rates, minimum wage legislation and overtime regulations. If we are unable to attract, develop, motivate and retain talented employees with the necessary skills and experience, or if changes to our organizational structure, operating results or business model adversely affect morale, hiring and/or retention, we may not achieve our objectives and our results of operations could be adversely impacted.

***Our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments.***

As a company engaged in sourcing on a global scale, we are subject to the risks inherent in such activities, including, but not limited to:

- disease pandemics, epidemics and health-related concerns, including related to COVID-19 or variants thereof;
- political or labor instability, labor shortages (stemming from labor disputes or otherwise), or increases in costs of labor or production in countries where manufacturing contractors and suppliers are located;
- labor disputes or strikes at the location of the source of our goods and/or at ports of entry;
- disruptions, delays or reductions in shipments, including port delays and congestion, and/or capacity constraints on transportation of goods or at our factories due to COVID-19 or otherwise;
- significant increase in freight, shipping and other logistics costs, including as a result of disruptions at ports of entry;
- political or military conflict (such as the current war in Ukraine);
- heightened terrorism security concerns;
- a significant decrease in availability or an increase in the cost of raw materials, including sustainable materials, or other limitations on our ability to use raw materials or goods produced in a country that is a major provider due to political, human rights, labor, environmental or other concerns;
- the migration and development of manufacturing contractors;
- product quality issues;
- imposition of regulations, quotas and safeguards relating to imports and our ability to adjust in a timely manner to changes in trade regulations;
- increases in the costs of fuel (including volatility in the price of oil), travel and transportation (including vessel and freight);
- imposition of duties, taxes and other charges on imports;
- significant fluctuation of the value of the United States dollar against foreign currencies;
- restrictions on transfers of funds out of countries where our foreign licensees are located;
- compliance by our independent manufacturers and suppliers with our Supplier Code of Conduct and other applicable compliance policies;
- compliance with United States laws regarding the identification and reporting on the use of "conflict minerals" sourced from the Democratic Republic of the Congo in the Company's products and the United States Foreign Corrupt Practices Act, U.K. Bribery Act and other global anti-corruption laws, as applicable; and
- regulation or prohibition of the transaction of business with specific individuals or entities and their affiliates or goods manufactured in certain regions, such as the listing of a person or entity as a SDN (Specially Designated Nationals and Blocked Persons) by the United States Department of the Treasury's Office of Foreign Assets Control and the issuance of withhold release orders by CBP.

Any of the foregoing could materially and adversely affect our ability to produce or deliver our products and, as a result, have a material adverse effect on our business, financial condition and results of operations.

23

Table of Contents

***Our business may be subject to increased costs and a decline in profitability as a result of increasing pressure on margins if we misjudge the demand for our products.***

Our industry is subject to significant pricing pressure caused by many factors, including intense competition and a highly promotional environment, fragmentation in the retail industry, pressure from retailers to reduce the costs of products, and changes in consumer spending patterns. If we misjudge the market for our products or demand for our products is impacted by other factors, such as inflationary pressures, political instability or COVID-19, we may be faced with significant excess inventories for some products and missed opportunities for other products. We have in the past been, and may in the future be, forced to rely on donation, markdowns, promotional sales or other write-offs, to dispose of excess, slow-moving inventory, which may negatively impact our gross margin, overall profitability and efficacy of our brands. In addition, increases in our costs, such as raw materials, labor or freight, could negatively impact our gross margin, and we may not be able to offset such cost increases through pricing measures or other means.

***The long-term growth of our business depends on the successful execution of our strategic initiatives.***

As part of our long-term strategy, we intend to grow our market share and revenue through the following initiatives:

- trendsetting and innovative product offerings;
- increased brand engagement;
- optimizing customer experience;
- investing in technology; and
- expanding our global presence.

We also intend to support the growth of Versace and Jimmy Choo sales through retail store openings and further developing each brand's e-commerce and omni-channel presence, as well as expanding into the luxury accessories market. We cannot guarantee that we will be able to successfully execute on these strategic initiatives.

If we are unable to execute on our strategic initiatives, our business, results of operations and financial condition could be materially adversely affected.

***Our current and future licensing and joint venture arrangements may not be successful and may make us susceptible to the actions of third-parties over whom we have limited control.***

We have entered into a select number of product licensing agreements with companies that produce and sell, under our trademarks, products requiring specialized expertise. We have also entered into a number of select licensing agreements pursuant to which we have granted third-parties certain rights to distribute and sell our products in certain geographical areas and have a number of joint ventures. In the future, we may enter into additional licensing and/or joint venture arrangements. Although we take steps to carefully select our partners, such arrangements may not be successful. Our partners may fail to fulfill their obligations under these agreements or have interests that differ from or conflict with our own, such as the timing of new store openings, the pricing of our products and the offering of competitive products. In addition, the risks applicable to the business of our partners may be different than the risks applicable to our business, including risks associated with each such partner's ability to:

- obtain capital;
- exercise operational and financial control over its business;
- manage its labor relations;
- maintain relationships with suppliers;
- manage its credit and bankruptcy risks; and
- maintain customer relationships.

In addition, the geographic areas subject to our licensing agreements could be impacted by geopolitical risks. Any of the foregoing risks, or the inability of any of our partners to successfully market our products or otherwise conduct its business, may result in loss of revenue and competitive harm to our operations in regions or product categories where we have entered into such licensing arrangements.

24

Table of Contents

We rely on our partners to preserve the value of our brands. Although we attempt to protect our brands through, among other things, approval rights over store location and design, product design, production quality, packaging, merchandising, distribution, advertising and promotion of our stores and products, we may not be able to control the use by our partners of our brand. The misuse of our brand by a licensing or joint venture partner could have a material adverse effect on our business, results of operations and financial condition.

***Acquisitions may not achieve intended benefits and may not be successfully integrated.***

One component of our growth strategy has historically been acquisitions. Acquisitions are not currently contemplated in the Company's capital allocation priorities, however, we may in the future evaluate and consider other strategic investments or acquisitions. Acquisitions involve various inherent risks and the benefits, cost savings and synergies sought may not be realized. The potential difficulties that we may face that could cause the results of our acquisitions to not be in line with our expectations include, among others:

- failure to implement our business plan for the combined business or to achieve anticipated revenue or profitability targets;
- delays or difficulties in completing the integration of acquired companies or assets;
- higher than expected costs, lower than expected cost savings and/or a need to allocate resources to manage unexpected operating difficulties;
- unanticipated issues in integrating logistics, information and other systems;
- unanticipated changes in applicable laws and regulations;
- retaining key customers, suppliers and employees;
- operating risks inherent in the acquired business and our business;
- diversion of the attention and resources of management and resource constraints;
- retaining and obtaining required regulatory approvals, licenses and permits;
- unanticipated changes in the combined business due to potential divestitures or other requirements imposed by antitrust regulators;
- assumption of liabilities not identified in due diligence or other unanticipated issues, expenses and liabilities; and
- the impact on our internal controls and compliance with the requirements under the Sarbanes-Oxley Act of 2002.

We are required to test goodwill and indefinite-lived intangible assets acquired as a result of acquisitions for impairment at least annually. For Fiscal 2023, the carrying value of certain Jimmy Choo reporting units and brand indefinite-lived intangible assets exceeded its respective fair values requiring us to record impairment charges of $106 million. Please refer to Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for additional information.

***We are subject to risks associated with leasing retail space subject to long-term and non-cancelable leases. We may be unable to renew leases at the end of their terms. If we close a leased retail space, we remain obligated under the applicable lease.***

We do not own any of our retail store facilities, but instead lease all of our stores under operating leases. Our leases generally have terms of up to 10 years, generally require a fixed annual base rent and some require the payment of additional percentage rent if store sales exceed a negotiated amount. Certain of our European stores also require initial investments in the form of key money to secure prime locations, which may be paid to landlords or existing lessees. Generally, our leases are "net" leases, which require us to pay all of the costs of insurance, taxes, maintenance and utilities. We generally cannot cancel these leases or withhold payments at our option, and payments under these operating leases account for a significant portion of our operating costs. For example, as of April 1, 2023, we were party to operating leases associated with our retail stores that we operate directly throughout the globe, as well as other global corporate facilities, requiring future minimum lease payments aggregating to $1.5 billion through Fiscal 2028 and approximately $427 million thereafter through Fiscal 2044. Our substantial operating lease obligations could have a material adverse effect on our business, results of operations and financial condition.

In certain cases, as we have done in the past, we may determine that it is no longer economical to operate a retail store subject to a lease or we may seek to generally downsize, consolidate, reposition, relocate or close some of our real estate locations. In such cases, we may be required to negotiate a lease exit with the applicable landlord or remain obligated under the applicable lease for, among other things, payment of the base rent for the balance of the lease term. In some instances, we may be unable to close an underperforming retail store due to continuous operation clauses in our lease agreements. In addition, as

25

Table of Contents

each of our leases expire, we may be unable to negotiate renewals, either on commercially acceptable terms or at all, which could cause us to close retail stores in desirable locations. Our inability to secure desirable retail space or favorable lease terms could impact our ability to grow. Likewise, our obligation to continue making lease payments with respect to leases for closed retail spaces could have a material adverse effect on our business, financial condition and results of operations.

Additionally, due to the volatile economic environment, it may be difficult to determine the fair market value of real estate properties when we are deciding whether to enter into leases or renew expiring leases. This may impact our ability to manage the profitability of our store locations, or cause impairments of our lease right-of-use assets if market values decline, any of which could have a material adverse effect on our financial condition or results of operations.

***We are dependent on a limited number of distribution facilities. If one or more of our distribution facilities experience operational difficulties or becomes inoperable, it could have a material adverse effect on our business, results of operations and financial condition.***

We operate a limited number of distribution facilities. Our ability to meet the needs of our own retail stores and e-commerce sites, as well as our wholesale customers, depends on the proper and uninterrupted operation of these distribution facilities. If any of these distribution facilities were to shut down or otherwise become inoperable or inaccessible for any reason (including due to COVID-19), we could suffer a substantial loss of inventory and/or disruptions of deliveries to our customers. In addition, we could incur significantly higher costs and longer lead times associated with the distribution of our products during the time it takes to reopen or replace the damaged, inoperable or otherwise inaccessible facility. Any of the foregoing factors could result in decreased sales and have a material adverse effect on our business, results of operations and financial condition.

To support the growth of our business, we also use third-party logistics centers that are responsible for distribution, warehousing and fulfillment services on our behalf. Significant disruptions at these facilities could have a material adverse impact on our business. Because our direct and third-party fulfillment centers include automated and computer-controlled equipment, they are susceptible to risks including power interruptions, hardware and system failures, software viruses, security breaches and other technological and operational disruptions and of which could cause shipping delays or otherwise adversely affect our business.

***We are dependent on third-parties to perform certain outsourced functions.***

We are increasingly looking for opportunities to cost effectively enhance capability of business services, which includes outsourcing certain functions. While we believe we conduct appropriate due diligence before entering into agreements with these third-party service providers, the failure of any of these third-parties to provide the expected services, provide them on a timely basis or to provide them at the prices we expect could disrupt or harm our business. Any significant interruption in the operations of these outsource service providers, including as a result of changes in social, political, and economic conditions, and those resulting from military conflicts or other hostilities, that result in the disruptions of business where these outsource providers are located, could also have an adverse effect on our business. Furthermore, we may be unable to provide these services ourselves in the future or implement substitute arrangements on a timely and cost-effective basis on terms favorable to us.

***Increases in the cost of raw materials could increase our production costs and cause our operating results and financial condition to suffer.***

Our business is subject to volatility of costs related to certain raw materials used in the manufacturing of our products, including inflationary pressure. The costs of raw materials used in our products are affected by, among other things, weather, consumer demand, speculation on the commodities market, the relative valuations and fluctuations of the currencies of producer versus consumer countries and other factors that are generally unpredictable and beyond our control. We are not always successful in our efforts to protect our business from the volatility of the market price of raw materials and our business can be materially affected by dramatic movements in prices of raw materials which have resulted, and are expected to continue to result, in increased pricing pressures and pressure on our margins. We may not be able to implement price increases that fully mitigate the impact of these higher costs and/or any such price increases could have an adverse impact on consumer demand for our products. In addition, our costs may be impacted by sanction tariffs and customs trade orders which could also impact sourcing and availability of raw materials used by our suppliers in the manufacturing of certain of our products. Manufacturing labor costs are also subject to volatility based on local and global economic conditions. Increases in commodity prices, tariffs, sanctions, customs trade orders and/or manufacturing labor costs could increase our production costs and negatively impact our revenues, results of operations and financial condition.

26

Table of Contents

***We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods.***

Our products are primarily produced by, and purchased or procured from, independent manufacturing contractors, and in some cases third-party sourcing agents, located mainly in Asia and Europe. A manufacturing contractor's failure to ship products to us in a timely manner or to meet the required quality standards could cause us to miss the delivery date requirements of our customers for those items. The failure to make timely deliveries may cause customers to cancel orders, refuse to accept deliveries or demand reduced prices, any of which could have a material adverse effect on us.

We do not have long-term agreements with any of our third-party manufacturing contractors or third-party sourcing agents. As a result, any single manufacturing contractor or sourcing agent could unilaterally terminate its relationship with us at any time. Our inability to promptly replace manufacturing contractors or third-party sourcing agents that terminate their relationships with us or cease to provide high quality products in a timely and cost-efficient manner could have a material adverse effect on our business, results of operations and financial condition and impact the cost and availability of our goods.

***Our business is exposed to foreign currency exchange rate fluctuations.***

Our results of operations for our international subsidiaries are exposed to foreign exchange rate fluctuations as the financial results of the applicable subsidiaries are translated from the local currency into United States dollar during financial statement consolidation. If the United States dollar strengthens against foreign currencies, the translation of these foreign currency denominated transactions could impact our consolidated results of operations. In addition, we have intercompany notes amongst certain of our non-United States subsidiaries, which may be denominated in a currency other than the functional currency of a particular reporting entity. As a result of using a currency other than the functional currency of the related subsidiary, results of these operations may be adversely affected during times of significant fluctuation between the functional currency of that subsidiary and the denomination currency of the note. We continuously monitor our foreign currency exposure and hedge a portion of our foreign subsidiaries' foreign currency-denominated inventory purchases to minimize the impact of changes in foreign currency exchange rates. However, we cannot fully anticipate all of our foreign currency exposures and cannot ensure that these hedges will fully offset the impact of foreign currency exchange rate fluctuations. We use forward foreign exchange contracts and cross-currency swap contracts to hedge material exposure to adverse changes in foreign currency exchange rates. However, no hedging strategy can completely insulate us from foreign exchange risk.

In addition, because we operate retail stores and concessions in various countries outside of the United States, we are also exposed to market risk from fluctuations in foreign currency exchange rates, primarily the Euro, the British Pound, the Chinese Renminbi, the Japanese Yen, the Korean Won and the Canadian dollar, among others. A substantial weakening of foreign currencies against the United States dollar could require us to raise our retail prices or reduce our profit margins in various locations outside of the United States. In addition, our sales and profitability could be negatively impacted if consumers in those markets were unwilling to purchase our products at increased prices.

**Risks Related to Information Technology and Data Security**

***Privacy breaches and other cyber security risks related to our business could negatively affect our reputation, credibility and business.***

We are dependent on information technology ("IT") systems and networks for a significant portion of our direct-to-consumer sales, including our e-commerce sites and retail business credit card transaction authorization and processing. We are responsible for storing data relating to our customers and employees and also rely on third-party vendors for the storage, processing and transmission of personal and Company information. Consumers, lawmakers and consumer advocates alike are increasingly concerned over the security of personal information transmitted over the Internet, consumer identity theft and privacy and the retail industry, in particular, has been the target of many recent cyber-attacks. In addition to taking the necessary precautions ourselves, we generally require that third-party service providers implement reasonable security measures to protect our employees' and customers' identity and privacy. We do not, however, control these third-party service providers and cannot guarantee the elimination of electronic or physical computer break-ins or security breaches in the future. Cyber security breaches, including physical or electronic break-ins, security breaches due to employee error or misconduct, attacks by "hackers," phishing scams, malicious software programs such as viruses and malware, and other breaches outside of our control, could result in unauthorized access or damage to our IT systems and the IT systems of our third-party service providers. Despite our efforts and the efforts of our third-party service providers to secure our and their IT systems, attacks on these systems do occur from time to time. As the techniques used to obtain unauthorized access to IT systems become more varied and sophisticated (as cybercriminals are finding new ways to launch their attacks) and if the occurrence of such security breaches becomes more frequent, we and our third-party service providers may be unable to adequately anticipate these

27

Table of Contents

techniques and implement appropriate preventative measures. While we maintain cyber risk insurance to provide some coverage for certain risks associated with cyber security incidents, there is no assurance that such insurance would cover all or a significant portion of the costs or consequences associated with a cyber security incident. A significant breach of customer, employee or Company data could damage our reputation, our relationship with customers and our brands, and could result in lost sales, sizable fines, significant breach-notifications and other costs and lawsuits, as well as adversely affect our results of operations.

Additionally, we may incur increased costs and experience a significant strain on our resources to account for implementation of additional required security measures and technologies to protect personal data and confidential information or to comply with current and new state, federal and international laws governing the unauthorized disclosure of confidential information which are continuously being enacted and proposed, such as the General Data Protection Regulation in the EU, various consumer privacy and data privacy and protection acts in the United States, including, but not limited to, the American Data Privacy and Protection Act, the California Consumer Privacy Act and the California Privacy Rights Act, the Virginia Consumer Data Protection Act, the Colorado Privacy Act, the Utah Consumer Privacy Act, the Connecticut Data Privacy Act and the Iowa Consumer Data Protection Act, and the Personal Information Protection Law in China.

Lastly, increased scrutiny by federal regulators (such as the FTC) and state attorney generals focused on the retail industry may lead to increased privacy and cyber security costs such as organizational changes, deploying additional personnel, acquiring and implementing enhanced privacy and security technologies on e-commerce sites, mandatory employee training for those handling customer and employee personal data, and engaging third-party experts and consultants, and the unauthorized use of proprietary information may lead to lost revenues.

*A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.*

We rely extensively on our IT systems to track inventory, manage our supply chain, record and process transactions, manage customer communications, summarize results and manage our business. The failure of our IT systems to operate properly or effectively, problems with transitioning to upgraded or replacement systems, or difficulty in or failure to implement new systems, could adversely affect our business. We also operate a number of e-commerce websites throughout the world. Our IT systems and e-commerce websites may be subject to damage and/or interruption from power outages, computer, network and telecommunications failures, malicious software, such as viruses and malware, attacks by "hackers", security breaches, usage errors or misconduct by our employees and bad acts by our customers and website visitors which could materially adversely affect our business.

We are undergoing a multi-year Enterprise Resource Planning ("ERP") implementation. The implementation of the ERP will require a significant investment in human and financial resources. Implementing new systems also carries substantial risk, including failure to operate as designed, failure to properly integrate with other systems, potential loss of data or information, cost overruns, implementation delays and disruption of operations. Third-party vendors are also relied upon to design, program, maintain and service our ERP implementation program. Any failures of these vendors to properly deliver their services could similarly have a material adverse effect on our business. In addition, any disruptions or malfunctions affecting our ERP implementation plan could cause critical information upon which we rely to be delayed, defective, corrupted, inadequate, inaccessible or lost or otherwise cause delays or disruptions to our operations, and we may have to make significant investments to fix or replace impacted systems.

## Risks Related to Environmental, Social and Governance Issues

*Increased scrutiny from investors and others regarding our corporate social responsibility initiatives, including environmental, social and other matters of significance relating to sustainability, and changing regulatory requirements around ESG could result in additional costs or risks and adversely impact our reputation.*

Investor advocacy groups, certain institutional investors, investment funds, other market participants, shareholders, customers, employees and regulators have increasingly focused on ESG or "sustainability" practices of companies. We have a publicly announced global strategy to achieve significant, measurable goals across a range of important environmental and social sustainability issues, including, renewable energy, responsible material sourcing, water use and chemical management and waste reduction. We have also set science-based targets around greenhouse gas emissions (GHG) reductions. We rely on our supply chain partners to meet certain of our targets, including our GHG emissions reduction goals; however, our supply chain is complex and comprised of parties not within our control. It is possible that stakeholders may not be satisfied with our

28

Table of Contents

ESG targets, practices or the speed of adoption or that we may not be successful in achieving our goals on the timelines set or at all, which could negatively impact our brands, our reputation, and customer and employee retention.

In addition, many countries in which we and our suppliers operate have begun enacting new ESG and climate legislation and regulations. Such proposed regulations include expanded disclosure requirements regarding GHG emissions and other climate-related information, including independent auditors providing some level of attestation to the accuracy of such disclosures. Our ability to comply with any such new ESG and/or climate laws and regulations may lead to increased costs and operational complexity and/or we may be required to divert costs and resources in order to comply with ESG frameworks, and legal, legislative and regulatory requirements. Any failure on our part to comply with such ESG-related regulations could lead to adverse consumer actions and/or investment decisions by investors, as well as expose us to government enforcement action and/or private litigation.

***Our business is susceptible to the risks associated with climate change and other environmental impacts which could negatively affect our business and operations.***

Our business, including our retail, distribution and manufacturing operations, is susceptible to the risks associated with climate change and other environmental impacts. For example, the physical effects of climate change, such as severe weather events, natural disasters and/or significant changes in climate patterns may (i) cause potential disruptions to our retail stores, distribution centers and corporate facilities or those facilities of our wholesale customers, licensees or suppliers, (ii) adversely impact global supply chains, including the availability and cost of raw materials, (iii) negatively affect the ability of our manufacturers to fulfill our orders timely and/or to our specifications, (iv) cause shipping disruptions and/or (v) lead to higher freight costs. An increase in extreme weather conditions could also result in more frequent damage and/or closures of our stores and distribution centers (or facilities of our wholesale customers, licensees or suppliers), adversely impact retail traffic, consumer's disposable income levels or spending habits on discretionary items, or otherwise disrupt business operations in the communities in which we or our partners operate, any of which could result in lost sales or higher costs. In addition, concern over climate change may result in transitional risks such as new or additional legal, legislative and regulatory requirements to reduce or mitigate the effects of climate change on the environment which may result in increased operational and administrative compliance costs. These physical and transitional risks relating to climate could negatively affect our business and operations.

### Risks Related to Tax, Legal and Regulatory Matters

***Our business is subject to risks associated with importing products, and the imposition of additional duties, tariffs or trade restrictions could have a material adverse effect on our business, results of operations and financial condition.***

There are risks inherent to importing our products. Virtually all of our imported products are subject to duties which may impact the cost of such products. In addition, countries to which we ship our products may impose safeguard quotas to limit the quantity of products that may be imported. We rely on free trade agreements and other supply chain initiatives in order to maximize efficiencies relating to product importation. Additionally, we are subject to government regulations relating to importation activities, including related to CBP withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements, and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our business.

***Fluctuations in our tax obligations and changes in tax laws, treaties and regulations may have a material adverse impact on our future effective tax rates and results of operations.***

The Company and our subsidiaries are subject to taxation in the United States and various foreign jurisdictions, with the applicable tax rates varying by jurisdiction. As a result, our overall effective tax rate is affected by the proportion of earnings from the various tax jurisdictions. We record tax expense based on our estimates of taxable income and required reserves for uncertain tax positions in multiple tax jurisdictions. At any time, there are multiple tax years that are subject to examinations by various taxing authorities. The ultimate resolution of these audits and negotiations with taxing authorities may result in a settlement amount that differs from our original estimate. Any proposed or future changes in tax laws, treaties and regulations or interpretations where we operate could have a material adverse effect on our effective tax rates, results of operations and financial condition.

Table of Contents

We and our subsidiaries are also engaged in a number of intercompany transactions. Although we believe that these transactions reflect arm's-length terms and that proper transfer pricing documentation is in place, the transfer prices and conditions may be scrutinized by local tax authorities which could result in additional tax liabilities.

On October 5, 2015, the Organization for Economic Co-operation and Development ("OECD"), an international association of 34 countries, including the United States and United Kingdom, released the final reports from its Base Erosion and Profit Shifting ("BEPS") Action Plans. The BEPS recommendations covered a number of issues, including country-by-country reporting, permanent establishment rules, transfer pricing rules and tax treaties. Future tax reform resulting from this development may result in changes to long-standing tax principles, which could adversely affect our effective tax rate and/or result in higher cash tax liabilities. The Organization for Economic Cooperation and Development, the European Union and other countries (including countries in which we operate) have committed to enacting substantial changes to numerous long-standing tax principles impacting how large multinational enterprises are taxed in an effort to limit perceived base erosion and profit shifting incentives. In particular, the OECD's Pillar Two initiative introduces a 15% global minimum tax applied on a country-by-country basis, for which many jurisdictions have now committed to an effective enactment date starting January 1, 2024. If these proposals are implemented in any jurisdictions in which we operate, they could negatively impact our effective tax rate as well as increase the tax compliance and reporting costs related to such requirements.

***If we fail to comply with labor laws or collective bargaining agreements, or if our independent manufacturing contractors fail to use acceptable, ethical business practices, our business and reputation could suffer.***

We are subject to labor laws governing relationships with employees, including minimum wage requirements, overtime, working conditions and citizenship requirements. We are also subject to collective bargaining agreements with respect to employees in certain European countries. Compliance with these laws and regulations, as well as collective bargaining agreements, may lead to increased costs and operational complexity and may increase our exposure to governmental investigations or litigation.

We require our independent manufacturing contractors to operate in compliance with applicable laws, rules and regulations regarding working conditions, employment practices and environmental compliance, as well as our Supplier Code of Conduct and other compliance policies under our Factory Social and Environmental Compliance Program. Our staff and third-parties we retain for such purposes periodically visit and monitor the operations of our independent manufacturing contractors to determine compliance. However, we generally do not control these manufacturing contractors or suppliers or their labor, environmental or other business practices. The violation of labor, environmental or other laws by an independent manufacturer or supplier, or divergence of an independent manufacturer's or supplier's labor practices from those generally accepted as ethical or appropriate or that violate our Supplier Code of Conduct, could interrupt or otherwise disrupt the shipment of our products, harm our trademarks or damage our reputation. Further, we could be prohibited from importing goods by governmental authorities. The occurrence of any of these events could materially adversely affect our business, financial condition and results of operations.

***We may be unable to protect our trademarks, copyrights and other intellectual property rights, and others may allege that we infringe upon their intellectual property rights.***

Our VERSACE, JIMMY CHOO and MICHAEL KORS trademarks, as well as other material trademarks, copyrights and design and patent rights related to the production, marketing and distribution of our products, are important to our success and our competitive position. We are susceptible to others imitating our products and infringing on our intellectual property rights in the Americas, EMEA, Asia and elsewhere in the world in both online and offline channels. Our brands enjoy significant worldwide consumer recognition and the generally higher pricing of our products creates additional incentive for counterfeiters to infringe on our brands. We work with customs authorities, law enforcement, legal representatives and brand specialists globally in an effort to prevent the sale of counterfeit products, but we cannot guarantee the extent to which our efforts to prevent counterfeiting of our brands and other intellectual property infringement will be successful. Such counterfeiting and other intellectual property infringement could dilute our brands and otherwise harm our reputation and business.

Our trademark and other intellectual property applications may fail to result in registered trademarks or other intellectual property or to provide the scope of coverage sought, and others may seek to invalidate our trademarks, copyrights or other intellectual property or block sales of our products as an alleged violation of their trademarks and/or intellectual property rights. In addition, others may assert rights in, or ownership of, trademarks, copyrights and/or other intellectual property rights of ours or in trademarks, copyrights or other intellectual property that are similar to ours or that we license, and we may not be able to successfully resolve these types of conflicts to our satisfaction. In some cases, other intellectual property owners may have prior rights to our trademarks or similar trademarks or intellectual property. Furthermore, the laws of certain foreign countries may

30

Table of Contents

not protect trademarks, copyrights and/or other intellectual property rights to the same extent as the laws of the United States or the European Union.

From time to time, in the ordinary course of our business, we become involved in opposition and cancellation proceedings with respect to trademarks or other intellectual property similar to some of our brands. Any litigation or dispute involving the scope or enforceability of our intellectual property rights or any allegation that we infringe upon the intellectual property rights of others could be costly and time-consuming and, if determined adversely to us, could result in harm to our competitive position.

***We self-insure certain risks and may be impacted by unfavorable claims experience.***

We use a combination of insurance and self-insurance programs, including a wholly-owned captive insurance entity, to provide for the potential liabilities for certain risks including, employee health-care benefits, workers' compensation, employer liability, general liability, marine transport and inventory, property damage, cyber risk and business interruption. Claims are difficult to predict and may be volatile. Any adverse claims experience could have a material adverse effect on our results of operations, financial condition and cash flows.

***We are subject to various proceedings, lawsuits, disputes and claims in the ordinary course of business which could have an adverse impact on our business, financial condition and results of operations.***

We are a global company and are subject to various proceedings, lawsuits, disputes and claims throughout the world in the ordinary course of business. These claims could include commercial, intellectual property, employment, customer and data privacy claims, as well as class action lawsuits. Typically, these claims raise complex factual and legal issues and are subject to uncertainties. Plaintiffs may seek unspecified damages and/or injunctive or other equitable relief. Our potential liability may be covered in part by our insurance policies, but we may not always have adequate insurance to defend all claims. An unfavorable outcome in any proceeding, lawsuit, dispute or claim may have an adverse impact on our business, financial condition and results of operations.

## Risks Related to Our Debt

***We have incurred a substantial amount of indebtedness, which could adversely affect our financial condition and restrict our ability to incur additional indebtedness or engage in additional transactions.***

As of April 1, 2023, our consolidated indebtedness was approximately $1.8 billion. Our total borrowings as of April 1, 2023 primarily relate to our revolving credit facility of $874 million, Versace term loan of $488 million and senior notes of $450 million. Our ability to make payments on and refinance our debt obligations and to fund planned capital expenditures depends on our ability to generate cash from our operations. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Our substantial level of indebtedness could have negative consequences to our business and we cannot guarantee that our business will generate sufficient cash flow from our operations or that future borrowings will be available to us in an amount sufficient to enable us to make payments of our debt, fund other liquidity needs, make necessary capital expenditures or pursue certain business opportunities. Our financial results, our substantial indebtedness and our credit ratings could adversely affect the availability and terms of our financing and negatively impact our ability to enter into new financing arrangements in the future.

In addition, our ability to access credit and capital markets in the future as a source of funding, and the borrowing costs associated with such financing, is dependent upon market conditions and our credit rating and outlook. We are currently rated investment grade by two of the Company's three credit rating agencies. If our investment rating is downgraded in the future, it could result in reduced access to the credit and capital markets, more restrictive covenants in future financial documents and higher interest costs and potentially increased lease or hedging costs.

***We may be unable to meet financial covenants in our indebtedness agreements which could result in an event of default and restrictive covenants in such agreements may restrict our ability to pursue our business strategies.***

The terms of our indebtedness contain affirmative and negative covenants that impose operating and financial restrictions on us and may restrict our ability to engage in future business opportunities or pursue our strategies. The Company's 2022 Credit Facility and the 2022 Versace Credit Facility (of which the Company provides a parent guarantee) requires us to maintain a quarterly maximum permitted net leverage ratio of no greater than 4.0 to 1.0. The 2022 Credit Facility, the 2022

31

Table of Contents

Versace Credit Facility and the Indenture governing our senior notes also contain certain restrictive covenants, including restrictions on our and certain of our subsidiaries ability to:

- incur additional indebtedness and guarantee indebtedness;
- pay dividends or make other distributions or repurchase or redeem capital stock;
- make loans and investments, including acquisitions;
- sell assets;
- incur liens;
- enter into transactions with affiliates; and
- consolidate, merge or sell all or substantially all of our assets

which collectively may limit our ability to engage in acts that may be in our long-term best interest.

A breach of the covenants or restrictions under the documents that govern our indebtedness could result in an event of default under the applicable indebtedness. Such a default may allow creditors to accelerate the related debt and may result in the acceleration of any other debt to which a cross-acceleration or cross-default provision applies. In addition, an event of default under the credit agreement governing our 2022 Credit Facility or the Versace 2022 Credit Facility would permit the lenders under our those credit facilities to terminate all commitments to extend further credit under such facility. In the event our lenders or noteholders accelerate the repayment of our borrowings, we and our subsidiaries may not have sufficient assets to repay that indebtedness. As a result of these restrictions, we may be:

- limited in how we conduct our business;
- unable to raise additional debt or equity financing to operate during general economic or business downturns, including during a recessions or other times of economic uncertainty; or
- unable to compete effectively or to take advantage of new business opportunities.

***If one or more of our counterparty financial institutions default on their obligations to us, we may incur significant losses or our financial liquidity could be adversely impacted.***

As part of our hedging activities, we enter into transactions involving derivative financial instruments, including fixed-to-fixed cross-currency swaps to hedge our net investments in foreign operations against future volatility in the exchange rates between the United States dollar and foreign currencies, with various financial institutions. In addition, we have significant amounts of cash, cash equivalents and other investments on deposit or in accounts with banks or other financial institutions in the United States and abroad. We also rely on borrowings under our revolving credit facilities, under which we had $694 million of borrowing capacity as of April 1, 2023. We rely on that borrowing capacity to fund our operations. As a result, we are exposed to the risk of default by, or failure of, counterparty financial institutions to meet their contractual obligations to us. This risk may be heightened during economic downturns and periods of uncertainty in the financial markets. If one of our counterparties were to become insolvent or file for bankruptcy, our ability to borrow funds or recover losses incurred as a result of a default or our assets that are deposited or held in accounts with such counterparty may be limited by the counterparty's liquidity or the applicable laws governing the insolvency or bankruptcy proceedings. In the event of default or failure of one or more of our counterparties, we could incur significant losses or our financial liquidity could be adversely impacted, which could negatively impact our results of operations and financial condition.

**Risks Related to Our Ordinary Shares**

***Our share price may periodically fluctuate based on the accuracy of our earnings guidance or other forward-looking statements regarding our financial performance.***

Our business and long-range planning process is designed to maximize our long-term growth and profitability and not to achieve an earnings target in any particular fiscal quarter. We believe that this longer-term focus is in the best interests of our Company and our shareholders. At the same time, however, we recognize that it is helpful to provide investors with guidance as to our forecast of total revenue, earnings per share and other financial metrics or projections. While we generally expect to provide updates to our financial guidance when we report our results each fiscal quarter, we do not have any responsibility to update any of our forward-looking statements at such times or otherwise. In addition, any longer-term guidance that we provide is based on goals that we believe, at the time guidance is given, are reasonably attainable for growth and performance over a number of years. However, such long-range targets are more difficult to predict than our current quarter and fiscal year

Table of Contents

expectations. If, or when, we announce actual results that differ from those that have been predicted by us, outside investment analysts, or others, our share price could be adversely affected. Investors who rely on these predictions when making investment decisions with respect to our securities do so at their own risk. We take no responsibility for any losses suffered as a result of such changes in our share price.

***If we are unable to conduct share repurchases at expected levels, our share price could be adversely affected.***

We periodically return value to shareholders through our share repurchase program. On November 9, 2022, the Company announced that its Board of Directors approved the Existing Share Repurchase Plan which permits the Company to repurchase up to $1 billion of its outstanding ordinary shares over two years in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time. Our ability to conduct share repurchases depends on our ability to generate sufficient cash flows from operations in the future which may be limited by economic, financial, competitive and other factors that are beyond our control. The Existing Share Repurchase Plan may also be suspended or discontinued at any time. Investors may have an expectation that we will repurchase all shares available under our Existing Share Repurchase Plan. The market price of our ordinary shares could be adversely affected if our share repurchase activity differs from investors' expectations or if our share repurchase activity were to terminate.

***Failure to maintain adequate financial and management processes and controls could lead to errors in our financial reporting, which could harm our business and cause a decline in the price of our ordinary shares.***

As an SEC registrant, we are required to document and test our internal controls over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. If our management is unable to certify the effectiveness of our internal controls or if our independent registered public accounting firm cannot render an opinion on the effectiveness of our internal control over financial reporting, or if material weaknesses in our internal controls are identified, we could be subject to regulatory scrutiny and a loss of public confidence, which could have an adverse effect on our business and cause a decline in the price of our ordinary shares.

***Provisions in our organizational documents may delay or prevent our acquisition by a third-party.***

Our Memorandum and Articles of Association (together, as amended from time to time, our "Memorandum and Articles") contain several provisions that may make it more difficult or expensive for a third-party to acquire control of us without the approval of our board of directors. These provisions may delay, prevent or deter a merger, acquisition, tender offer, proxy contest or other transaction that might otherwise result in our shareholders receiving a premium over the market price for their ordinary shares. These provisions include, among others:

- our board of directors' ability to amend the Memorandum and Articles to create and issue, from time to time, one or more classes of preference shares and, with respect to each such class, to fix the terms thereof by resolution;
- provisions relating to the multiple classes and three-year terms of directors, the manner of election of directors, removal of directors and the appointment of directors upon an increase in the number of directors or vacancy on our board of directors;
- restrictions on the ability of shareholders to call meetings and bring proposals before meetings;
- elimination of the ability of shareholders to act by written consent; and
- the requirement of the affirmative vote of 75% of the shares entitled to vote to amend certain provisions of our Memorandum and Articles.

These provisions of our Memorandum and Articles could discourage potential takeover attempts and reduce the price that investors might be willing to pay for our ordinary shares in the future, which could reduce the market price of our ordinary shares.

***Rights of shareholders under British Virgin Islands law differ from those under United States law, and, accordingly, our shareholders may have fewer protections.***

Our corporate affairs are governed by our Memorandum and Articles, the BVI Business Companies Act (Revised Edition 2020) (as amended) (the "BVI Act") and the common law of the British Virgin Islands. The rights of shareholders to take legal action against our directors, actions by minority shareholders and the fiduciary responsibilities of our directors under British

33

Table of Contents

Virgin Islands law are to a large extent governed by the common law of the British Virgin Islands and by the BVI Act. The common law of the British Virgin Islands is derived in part from comparatively limited judicial precedent in the British Virgin Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the British Virgin Islands. The rights of our shareholders and the fiduciary responsibilities of our directors under British Virgin Islands law are not as clearly established as they would be under statutes or judicial precedents in some jurisdictions in the United States. In particular, the British Virgin Islands has a less developed body of securities laws as compared to the United States, and some states (such as Delaware) have more fully developed and judicially interpreted bodies of corporate law. As a result of the foregoing, holders of our ordinary shares may have more difficulty in protecting their interests through actions against our management, directors or major shareholders than they would as shareholders of a United States company.

***The laws of the British Virgin Islands provide limited protection for minority shareholders, so minority shareholders will have limited or no recourse if they are dissatisfied with the conduct of our affairs.***

Under the laws of the British Virgin Islands, there is limited statutory law for the protection of minority shareholders other than the provisions of the BVI Act dealing with shareholder remedies. The principal protection under statutory law is that shareholders may bring an action to enforce the constituent documents of a British Virgin Islands company and are entitled to have the affairs of the Company conducted in accordance with the BVI Act and the memorandum and articles of association of the Company. As such, if those who control the Company have persistently disregarded the requirements of the BVI Act or the provisions of the Company's memorandum and articles of association, then the courts will likely grant relief. Generally, the areas in which the courts will intervene are the following: (i) an act complained of which is outside the scope of the authorized business or is illegal or not capable of ratification by the majority; (ii) acts that constitute fraud on the minority where the wrongdoers control the Company; (iii) acts that infringe on the personal rights of the shareholders, such as the right to vote; and (iv) acts where the Company has not complied with provisions requiring approval of a special or extraordinary majority of shareholders, which are more limited than the rights afforded to minority shareholders under the laws of many states in the United States.

***It may be difficult to enforce judgments against us or our executive officers and directors in jurisdictions outside the United States.***

Under our Memorandum and Articles, we may indemnify and hold our directors harmless against all claims and suits brought against them, subject to limited exceptions. Furthermore, to the extent allowed by law, the rights and obligations among or between us, any of our current or former directors, officers and employees and any current or former shareholder will be governed exclusively by the laws of the British Virgin Islands and subject to the jurisdiction of the British Virgin Islands courts, unless those rights or obligations do not relate to or arise out of their capacities as such. Although there is doubt as to whether United States' courts would enforce these provisions in an action brought in the United States under United States securities laws, these provisions could make judgments obtained outside of the British Virgin Islands more difficult to enforce against our assets in the British Virgin Islands or jurisdictions that would apply British Virgin Islands law.

***British Virgin Islands companies may not be able to initiate shareholder derivative actions, thereby depriving shareholders of one avenue to protect their interests.***

British Virgin Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States. The circumstances in which any such action may be brought, and the procedures and defenses that may be available in respect of any such action, may result in the rights of shareholders of a British Virgin Islands' company being more limited than those of shareholders of a company organized in the United States. Accordingly, shareholders may have fewer alternatives available to them if they believe that corporate wrongdoing has occurred. The British Virgin Islands courts are also unlikely to recognize or enforce judgments of courts in the United States based on certain liability provisions of United States securities law or to impose liabilities, in original actions brought in the British Virgin Islands, based on certain liability provisions of the United States securities laws that are penal in nature. There is no statutory recognition in the British Virgin Islands of judgments obtained in the United States, although the courts of the British Virgin Islands will generally recognize and enforce the non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. This means that even if shareholders were to sue us successfully, they may not be able to recover anything to make up for the losses suffered.

**Item 1B. Unresolved Staff Comments**

None.

34

Table of Contents

## Item 2. Properties

The following table sets forth the location, use and size of our significant distribution and corporate facilities as of April 1, 2023, all of which are leased with the exception of our distribution center in the Netherlands, our central warehouse in Italy and luxury shoe factory in Italy, which are owned. The leases expire at various times through Fiscal 2044, subject to renewal options.

| Location | Use | Approximate Square Footage |
|---|---|---|
| Whittier, CA | Michael Kors United States Distribution Center | 1,181,000 |
| Venlo, Netherlands | Michael Kors and Jimmy Choo European Distribution Center | 1,096,000 |
| New York, NY | Michael Kors, Versace and Jimmy Choo United States Corporate Offices | 211,000 |
| Montreal, Quebec | Michael Kors and Jimmy Choo Canada Corporate Offices and Distribution Center | 150,000 |
| Novara, Italy | Versace European Distribution Center | 109,000 |
| Milan, Italy | Versace Corporate Offices | 90,000 |
| Milan, Italy | Versace Showroom | 54,000 |
| Novara, Italy | Versace Manufacturing and Distribution Center | 46,000 |
| Pistoia, Italy | Capri Luxury Shoe Factory | 41,000 |
| East Rutherford, NJ | Michael Kors United States Corporate Offices | 31,000 |
| Milan, Italy | Michael Kors Regional Corporate Office and Showroom | 25,000 |
| Shanghai, China | Michael Kors, Versace and Jimmy Choo Regional Corporate Offices | 25,000 |
| London, England | Jimmy Choo Corporate Offices | 24,000 |
| London, England | Capri Corporate Headquarters and Michael Kors Regional Corporate Office | 19,000 |
| Manno, Switzerland | Michael Kors European Corporate Offices | 18,000 |

As of April 1, 2023, we also occupied 1,272 leased retail stores worldwide (including concessions). We consider our properties to be in good condition and believe that our facilities are adequate for our operations and provide sufficient capacity to meet our anticipated requirements.

Other than the land and building for our Michael Kors and Jimmy Choo European distribution center in the Netherlands, our Versace central warehouse in Italy and our Capri luxury shoe factory in Italy, property and equipment related to our stores (e.g. leasehold improvements, fixtures, etc.) and computer equipment, we did not own any material property as of April 1, 2023.

## Item 3. Legal Proceedings

We are involved in various routine legal proceedings incident to the ordinary course of our business. We believe that the outcome of all pending legal proceedings, in the aggregate, will not have a material adverse effect on our business, results of operations and financial condition.

## Item 4. Mine Safety Disclosures

None.

Table of Contents

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our ordinary shares trade on the NYSE under the symbol "CPRI". At April 1, 2023, there were 117,347,045 ordinary shares outstanding, and the closing price of our ordinary shares was $47.00. Also as of that date, we had approximately 133 ordinary shareholders of record.

**Share Performance Graph**

The line graph below compares the cumulative total shareholder return on our ordinary shares with the Standard & Poor's ("S&P") 500 Stock Index and the S&P 500 Apparel, Accessories & Luxury Goods Index for the five-year period from March 29, 2018 through March 31, 2023, the last business day of our fiscal year. The graph below assumes an investment of $100 made at the close of trading on March 29, 2018, in our ordinary shares and each of the indices presented. All values assume reinvestment of the full amount of all dividends, if any, into additional shares of the same class of equity securities at the frequency with which dividends are paid on such securities during the applicable time period.



**Issuer Purchases of Equity Securities**

On June 1, 2022, the Board of Directors terminated our Fiscal 2022 Plan, with $500 million of availability remaining, and authorized a new share repurchase program pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within period of two years from the effective date of the program.

On November 9, 2022, the Company announced that its Board of Directors approved a new share repurchase program of up to $1 billion of its outstanding ordinary shares, providing additional capacity to return cash to shareholders over the longer term. This new two-year program replaced the Company's existing $1 billion share repurchase program which had $250 million of availability remaining.

Share repurchases may be made in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

Table of Contents

The following table provides information regarding our ordinary share repurchases during the three months ended April 1, 2023:

| | Total Number of Shares | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs | Remaining Dollar Value of Shares That May Be Purchased Under the Programs (in millions) |
|---|---|---|---|---|
| January 1, 2023 - January 28, 2023 | 604 | $ 64.64 | - | $ 800 |
| January 29, 2023 - February 25, 2023 | 3,288,564 | $ 50.17 | 3,288,564 | $ 635 |
| February 26, 2023 - April 1, 2023 | 5,146,526 | $ 45.66 | 5,146,526 | $ 400 |
| | 8,435,694 | | 8,435,090 | |

**Item 6. [Reserved]**

37

Table of Contents

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

*Our Business*

Capri Holdings Limited is a global fashion luxury group consisting of iconic, founder-led brands Versace, Jimmy Choo and Michael Kors. Our commitment to glamorous style and craftsmanship is at the heart of each of our luxury brands. We have built our reputation on designing exceptional, innovative products that cover the full spectrum of fashion luxury categories. Our strength lies in the unique DNA and heritage of each of our brands, the diversity and passion of our people and our dedication to the clients and communities we serve.

Our Versace brand has long been recognized as one of the world's leading international fashion design houses and is synonymous with Italian glamour and style. Founded in 1978 in Milan, Versace is known for its iconic and unmistakable style and unparalleled craftsmanship. Over the past several decades, the House of Versace has grown globally from its roots in haute couture, expanding into the design, manufacturing, distribution and retailing of accessories, ready-to-wear, footwear, eyewear, watches, jewelry, fragrance and home furnishings. Versace's design team is led by Donatella Versace, who has been the brand's Artistic Director for over 20 years. Versace distributes its products through a worldwide distribution network, which includes boutiques in some of the world's most glamorous cities, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

Our Jimmy Choo brand offers a distinctive, glamorous and fashion-forward product range, enabling it to develop into a leading global luxury accessory brand, whose core product offering is women's luxury shoes, complemented by accessories, including handbags, small leather goods, jewelry, scarves and belts, as well as a growing men's luxury shoe and accessory business. In addition, certain categories, such as fragrances and eyewear are produced under licensing agreements. Jimmy Choo's design team is led by Sandra Choi, who has been the Creative Director for the brand since its inception in 1996. Jimmy Choo products are unique, instinctively seductive and chic. The brand offers classic and timeless luxury products, as well as innovative products that are intended to set and lead fashion trends. Jimmy Choo is represented through its global store network, its e-commerce sites, as well as through the most prestigious department and specialty stores worldwide.

Our Michael Kors brand was launched over 40 years ago by Michael Kors, a world-renowned designer, whose vision has taken the Company from its beginnings as an American luxury sportswear house to a global accessories, footwear and ready-to-wear company with a global distribution network that has presence in over 100 countries through Company-operated retail stores and e-commerce sites, leading department stores, specialty stores and select licensing partners. Michael Kors is a highly recognized luxury fashion brand in the Americas and Europe with growing brand awareness in other international markets. Michael Kors features distinctive designs, materials and craftsmanship with a jet-set aesthetic that combines stylish elegance and a sporty attitude. Michael Kors offers three primary collections: the Michael Kors Collection luxury line, the MICHAEL Michael Kors accessible luxury line and the Michael Kors Mens line. The Michael Kors Collection establishes the aesthetic authority of the entire brand and is carried by select retail stores, our e-commerce sites, as well as in the finest luxury department stores in the world. MICHAEL Michael Kors has a strong focus on accessories, in addition to offering footwear and ready-to-wear, and addresses the significant demand opportunity in accessible luxury goods. We have also been developing our men's business in recognition of the significant opportunity afforded by the Michael Kors brand's established fashion authority and the expanding men's market. Taken together, our Michael Kors collections target a broad customer base while retaining our premium luxury image.

38

Table of Contents

***Certain Factors Affecting Financial Condition and Results of Operations***

*Macroeconomic conditions and inflationary pressures.* Global economic conditions and the related impact on levels of consumer spending worldwide impacted our business in Fiscal 2023, and are likely to continue to impact our business and the accessories, footwear and apparel industry overall for the foreseeable future. Inflation, rising interest rates, higher fuel and energy costs and commodity prices, reductions in net worth based on market declines and uncertainty, home prices, credit availability and consumer debt levels, concerns of a global banking crisis, political instability due to war or other geopolitical factors and other macroeconomic pressures and general uncertainty regarding the overall future economic environment have led to recession fears and created a challenging retail environment, particularly in the second half of Fiscal 2023, which is expected to continue in the near term. Purchases of discretionary luxury items, such as the accessories, footwear and apparel that we produce, tend to decline when disposable income is lower or when there are recessions, inflationary pressures or other economic uncertainty which could negatively affect our financial condition and results of operations.

*COVID-19 pandemic.* The Company's performance during Fiscal 2023 was adversely impacted due to lockdowns in certain regions, most notably in Greater China, as a result of an increase in infections due to variants of COVID-19. These lockdowns resulted in store closures and an overall decline in demand in the region. While the situation seems to be improving, infection rates and government restrictions may continue to persist in Greater China or elsewhere.

*Luxury goods trends and demand for our accessories and related merchandise.* Our performance is affected by trends in the luxury goods industry, global consumer spending, macroeconomic factors, overall levels of consumer travel and spending on discretionary items as well as shifts in demographics and changes in lifestyle preferences. Through 2019, the personal luxury goods market grew at a mid-single digit rate over the past 20 years, with more recent growth driven by stronger Chinese demand from both international and local consumers and demographic and socioeconomic shifts resulting in younger consumers purchasing more luxury goods. However, in 2020, due to the impact of the COVID-19 crisis, the personal luxury goods market declined 23%. Market studies indicate that the personal luxury goods market returned to 2019 levels in 2021, and the market is predicted to increase at a 10% compound annual growth rate between 2020 and 2025. Future growth is expected to be driven by e-commerce, Chinese consumers and younger generations; however, growth may be limited by concerns over inflation, the possibility of a global recession, foreign currency volatility or worsening economic conditions.

*Foreign currency fluctuation.* Our consolidated operations are impacted by the relationships between our reporting currency, the United States dollar, and those of our non-United States subsidiaries whose functional/local currency is other than the United States dollar, primarily the Euro, the British Pound, the Chinese Renminbi, the Japanese Yen, the Korean Won and the Canadian dollar, among others. We continue to expect volatility in the global foreign currency exchange rates, which may have a negative impact on the reported results of certain of our non-United States subsidiaries in the future, when translated to the United States dollar.

*Disruptions or delays in shipping and distribution and other supply chain constraints.* Any disruptions in our shipping and distribution network, including port congestion, vessel availability, container shortages and temporary factory closures, could have a negative impact on our results of operations. See Item 1A. "Risk Factors" - "We primarily use foreign manufacturing contractors and independent third-party agents to source our finished goods" and "Our business is subject to risks inherent in global sourcing activities, including disruptions or delays in manufacturing or shipments" for additional discussion.

*Costs of manufacturing, tariffs and import regulations.* Our industry is subject to volatility in costs related to certain raw materials used in the manufacturing of our products. This volatility applies primarily to costs driven by commodity prices, which can increase or decrease dramatically over a short period of time. In addition, our costs may be impacted by sanction tariffs imposed on our products due to changes in trade terms. We rely on free trade agreements and other supply chain initiatives in order to maximize efficiencies relating to product importation. We are also subject to government import regulations, including CBP withhold release orders. The imposition of taxes, duties and quotas, the withdrawal from or material modification to trade agreements and/or if CBP detains shipments of our goods pursuant to a withhold release order could have a material adverse effect on our business, results of operations and financial condition. If additional tariffs or trade restrictions are implemented by the United States or other countries, the cost of our products could increase which could adversely affect our business. In addition, commodity prices and tariffs may have an impact on our revenues, results of operations and cash flows. We use commercially reasonable efforts to mitigate these effects by sourcing our products as efficiently as possible and diversifying the countries where we produce. In addition, manufacturing labor costs are also subject to degrees of volatility based on local and global economic conditions. We use commercially reasonable efforts to source from localities that suit our manufacturing standards and result in more favorable labor driven costs of our product.

Table of Contents

*Segment Information*

We operate in three reportable segments, which are as follows:

*Versace*

We generate revenue through the sale of Versace luxury accessories, ready-to-wear and footwear through directly operated Versace boutiques throughout North America (United States and Canada), certain parts of EMEA (Europe, Middle East and Africa) and certain parts of Asia (Asia and Oceania), as well as through Versace outlet stores and e-commerce sites. In addition, revenue is generated through wholesale sales to distribution partners (including geographic licensing arrangements), multi-brand department stores and specialty stores worldwide, as well as through product license agreements in connection with the manufacturing and sale of products, including jeans, fragrances, watches, jewelry, eyewear and home furnishings.

*Jimmy Choo*

We generate revenue through the sale of Jimmy Choo luxury goods through directly operated Jimmy Choo retail and outlet stores throughout the Americas (United States, Canada and Latin America), certain parts of EMEA and certain parts of Asia, through our e-commerce sites, as well as through wholesale sales of luxury goods to distribution partners (including geographic licensing arrangements that allow third-parties to use the Jimmy Choo tradename in connection with retail and/or wholesale sales of Jimmy Choo branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide. In addition, revenue is generated through product licensing agreements, which allow third-parties to use the Jimmy Choo brand name and trademarks in connection with the manufacturing and sale of products, including fragrances and eyewear.

*Michael Kors*

We generate revenue through the sale of Michael Kors products through four primary Michael Kors retail store formats: "Collection" stores, "Lifestyle" stores (including concessions), outlet stores and e-commerce, through which we sell our products, as well as licensed products bearing our name, directly to consumers throughout the Americas, certain parts of EMEA and certain parts of Asia. Our Michael Kors e-commerce business includes e-commerce sites in the United States, Canada, EMEA and Asia. We also sell Michael Kors products directly to department stores, primarily located across the Americas and EMEA, to specialty stores and travel retail shops in the Americas, Europe and Asia, and to our geographic licensees in certain parts of EMEA, Asia and Brazil. In addition, revenue is generated through product and geographic licensing arrangements, which allow third-parties to use the Michael Kors brand name and trademarks in connection with the manufacturing and sale of products, including watches, jewelry, fragrances and eyewear, as well as through geographic licensing arrangements, which allow third-parties to use the Michael Kors tradename in connection with the retail and/or wholesale sales of our Michael Kors branded products in specific geographic regions.

*Unallocated Corporate Expenses*

In addition to the reportable segments discussed above, we have certain corporate costs that are not directly attributable to our brands and, therefore, are not allocated to segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges, impairment costs, COVID-19 related charges and the war in Ukraine. The segment structure is consistent with how our chief operating decision maker plans and allocates resources, manages the business and assesses performance. The following table presents our total revenue and income (loss) from operations by segment for Fiscal 2023, Fiscal 2022 and Fiscal 2021 (in millions):

40

Table of Contents

|  | | Fiscal Years Ended | | | | |
|---|---|---|---|---|---|---|
|  | | April 1, 2023 | | April 2, 2022 | | March 27, 2021 |
| **Total revenue:** | | | | | | |
| Versace | $ | 1,106 | $ | 1,088 | $ | 718 |
| Jimmy Choo | | 633 | | 613 | | 418 |
| Michael Kors | | 3,880 | | 3,953 | | 2,924 |
| **Total revenue** | $ | 5,619 | $ | 5,654 | $ | 4,060 |
| | | | | | | |
| **Income (loss) from operations:** | | | | | | |
| Versace | $ | 152 | $ | 185 | $ | 21 |
| Jimmy Choo | | 38 | | 13 | | (55) |
| Michael Kors | | 868 | | 1,005 | | 595 |
| Total segment income from operations | | 1,058 | | 1,203 | | 561 |
| **Less:** Corporate expenses | | (233) | | (190) | | (152) |
| Impairment of assets [1] | | (142) | | (73) | | (316) |
| COVID-19 related charges [2] | | 9 | | 14 | | (42) |
| Impact of war in Ukraine [3] | | 3 | | (9) | | - |
| Restructuring and other charges | | (16) | | (42) | | (32) |
| **Total income from operations** | $ | 679 | $ | 903 | $ | 19 |

[1] Impairment of assets during Fiscal 2023 includes $110 million, $30 million, and $2 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively. Impairment of assets during Fiscal 2022 includes $50 million, $19 million and $4 million of impairment charges related to the Michael Kors, Versace and Jimmy Choo reportable segments, respectively. Impairment of assets during Fiscal 2021 includes $191 million, $91 million and $34 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively.

[2] COVID-19 related charges during Fiscal 2023, primarily include net inventory credits of $9 million. COVID-19 related charges during Fiscal 2022, primarily include net inventory credits and severance expense of $16 million and $2 million, respectively. COVID-19 related charges during Fiscal 2021, primarily include net inventory reserves and severance expense of $10 million and $24 million, respectively. Inventory related costs are recorded within costs of goods sold and severance expense and credit losses are recorded within selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

[3] These charges primarily relate to incremental credit losses and inventory reserves which are a direct impact of the war in Ukraine. Credit losses are recorded within selling, general and administrative expenses and inventory related costs are recorded within costs of goods sold in the consolidated statements of operations and comprehensive income (loss).

41

Table of Contents

The following table presents our global network of retail stores and wholesale doors:

| | As of | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Number of full price retail stores (including concessions): | | | |
| Versace | 160 | 149 | 153 |
| Jimmy Choo | 182 | 181 | 176 |
| Michael Kors | 508 | 524 | 529 |
| | 850 | 854 | 858 |
| Number of outlet stores: | | | |
| Versace | 63 | 60 | 57 |
| Jimmy Choo | 55 | 56 | 51 |
| Michael Kors | 304 | 301 | 291 |
| | 422 | 417 | 399 |
| Total number of retail stores | 1,272 | 1,271 | 1,257 |
| Total number of wholesale doors: | | | |
| Versace | 744 | 803 | 868 |
| Jimmy Choo | 527 | 446 | 450 |
| Michael Kors | 2,843 | 2,742 | 2,852 |
| | 4,114 | 3,991 | 4,170 |

The following table presents our retail stores by geographic location:

| | As of April 1, 2023 | | | As of April 2, 2022 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Versace | Jimmy Choo | Michael Kors | Versace | Jimmy Choo | Michael Kors |
| Store count by region: | | | | | | |
| The Americas | 42 | 43 | 319 | 39 | 45 | 334 |
| EMEA | 58 | 70 | 173 | 55 | 73 | 176 |
| Asia | 123 | 124 | 320 | 115 | 119 | 315 |
| | 223 | 237 | 812 | 209 | 237 | 825 |

Table of Contents

***Key Performance Indicators and Statistics***

We use a number of key indicators of operating results to evaluate our performance, including the following (dollars in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Total revenue | $ 5,619 | $ 5,654 | $ 4,060 |
| Gross profit as a percent of total revenue | 66.3% | 66.2% | 64.0% |
| Income from operations | $ 679 | $ 903 | $ 19 |
| Income from operations as a percent of total revenue | 12.1% | 16.0% | 0.5% |

**Critical Accounting Policies and Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported amounts of revenue and expenses during the reporting period. Critical accounting policies are those that are the most important to the portrayal of our results of operations and financial condition and that require our most difficult, subjective and complex judgments to make estimates about the effect of matters that are inherently uncertain. In applying such policies, we must use certain assumptions that are based on our informed judgments, assessments of probability and best estimates. Estimates, by their nature, are subjective and are based on analysis of available information, including current and historical factors and the experience and judgment of management. We evaluate our assumptions and estimates on an ongoing basis. While our significant accounting policies are detailed in Note 2 to the accompanying financial statements, our critical accounting policies are discussed below and include revenue recognition, inventories, long-lived assets, goodwill and other indefinite-lived intangible assets, share-based compensation, derivatives and income taxes.

***Revenue Recognition***

Revenue is recognized when control of the promised goods or services is transferred to our customers in an amount that reflects the consideration we expect to be entitled to in exchange for goods or services. We recognize retail store revenue when control of the product is transferred at the point of sale at our owned stores, including concessions. Revenue from sales through our e-commerce sites is recognized at the time of delivery to the customer, reduced by an estimate of returns. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, after merchandise is shipped and control of the underlying product is transferred to our wholesale customers. To arrive at net sales for retail, gross sales are reduced by actual customer returns, as well as by a provision for estimated future customer returns, which is based on management's review of historical and current customer returns. The amounts reserved for retail sales returns were $22 million, $22 million and $20 million at April 1, 2023, April 2, 2022 and March 27, 2021, respectively. Net sales for wholesale equals gross sales, reduced by provisions for estimated future returns based on current expectations, as well as trade discounts, markdowns, allowances, operational chargebacks, and certain cooperative selling expenses. Total sales reserves for wholesale were $73 million, $70 million and $78 million at April 1, 2023, April 2, 2022 and March 27, 2021, respectively. These estimates are based on such factors as historical trends, actual and forecasted performance and market conditions, which are reviewed by management on a quarterly basis. Our historical estimates of these costs were not materially different from actual results.

Royalty revenue generated from product licenses, which includes contributions for advertising, is based on reported sales of licensed products bearing our tradenames at rates specified in the license agreements. These agreements are also subject to contractual minimum levels. Royalty revenue generated by geographic licensing agreements is recognized as it is earned under the licensing agreements based on reported sales of licensees applicable to specified periods, as outlined in the agreements. These agreements allow for the use of our tradenames to sell our branded products in specific geographic regions.

***Inventories***

Our inventory costs include amounts paid to independent manufacturers, plus duties and freight to bring the goods to the Company's warehouses, as well as shipments to stores. The combined total of raw materials and work in process recorded on our consolidated balance sheets as of April 1, 2023 and April 2, 2022 were $47 million and $31 million, respectively. We continuously evaluate the composition of our inventory and make adjustments when the cost of inventory is not expected to be

43

Table of Contents

fully recoverable. The net realizable value of our inventory is estimated based on historical experience, current and forecasted demand and market conditions. In addition, reserves for inventory losses are estimated based on historical experience and inventory counts. Our inventory reserves are estimates, which could vary significantly from actual results if future economic conditions, customer demand or competition differ from expectations. Our historical estimates of these adjustments have not differed materially from actual results.

### Long-lived Assets

We evaluate all long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. For the purposes of impairment testing, we group long-lived assets at the lowest level of identifiable cash flow. Our leasehold improvements are typically amortized over the life of the store lease, including reasonably assured renewals and our shop-in-shops are amortized over a useful life of three to five years. Our impairment testing is based on our best estimate of the future operating cash flows. If the sum of our estimated undiscounted future cash flows associated with the asset is less than the asset's carrying value, we would recognize an impairment charge, which is measured as the amount by which the carrying value exceeds the fair value of the asset. The fair values determined by management require significant judgment and include certain assumptions regarding future sales and expense growth rates, discount rates and estimates of real estate market fair values. As such, these estimates may differ from actual results and are affected by future market and economic conditions.

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, we recorded impairment charges of $36 million, $83 million and $158 million, respectively, which were primarily related to operating lease right-of-use assets and fixed assets of our retail store locations. Please refer to Note 7 and Note 13 of the accompanying consolidated financial statements for additional information.

### Goodwill and Other Indefinite-lived Intangible Assets

We record intangible assets based on their fair value on the date of acquisition. Goodwill is recorded as the difference between the fair value of the purchase consideration and the fair value of the net identifiable tangible and intangible assets acquired. The brand intangible assets recorded in connection with the acquisitions of Versace and Jimmy Choo were determined to be indefinite-lived intangible assets, which are not subject to amortization. We perform an impairment assessment of goodwill, as well as the Versace brand and Jimmy Choo brand intangible assets on an annual basis, or whenever impairment indicators exist. In the absence of any impairment indicators, goodwill, the Versace brand and the Jimmy Choo brand are assessed for impairment during the fourth quarter of each fiscal year. Judgments regarding the existence of impairment indicators are based on market conditions and operational performance of the business.

We may assess our goodwill and our brand indefinite-lived intangible assets for impairment initially using a qualitative approach to determine whether it is more likely than not that the fair value of these assets is greater than their carrying value. When performing a qualitative test, we assess various factors including industry and market conditions, macroeconomic conditions and performance of our businesses. If the results of the qualitative assessment indicate that it is more likely than not that our goodwill and other indefinite-lived intangible assets are impaired, a quantitative impairment analysis is performed to determine if impairment is required. We may also elect to perform a quantitative analysis of goodwill and our indefinite-lived intangible assets initially rather than using a qualitative approach.

The impairment testing for goodwill is performed at the reporting unit level. We use industry accepted valuation models and set criteria that are reviewed and approved by various levels of management and, in certain instances, we engage independent third-party valuation specialists for assistance. To determine the fair value of a reporting unit, we use a combination of the income and market approaches, when applicable. We believe the blended use of both models, when applicable, compensates for the inherent risk associated with either model if used on a stand-alone basis, and this combination is indicative of the factors a market participant would consider when performing a similar valuation. If the fair value of a reporting unit exceeds the related carrying value, the reporting unit's goodwill is considered not to be impaired and no further testing is performed. If the carrying value of a reporting unit exceeds its fair value, an impairment loss is recorded for the difference. These valuations are affected by certain estimates, including future revenue growth rates, future operating expense growth rates, gross margins and discount rates. Future events could cause us to conclude that impairment indicators exist and goodwill may be impaired.

When performing a quantitative impairment assessment of our brand intangible assets, the fair value of the Versace and the Jimmy Choo brands is estimated using a discounted cash flow analysis based on the "relief from royalty" method, assuming that a third-party would be willing to pay a royalty in lieu of ownership for this intangible asset. This approach is dependent on many factors, including estimates of future revenue growth rates, royalty rates and discount rates. Actual future results may

44

Table of Contents

differ from these estimates. An impairment loss is recognized when the estimated fair value of the brand intangible assets is less than its carrying amount.

During the fourth quarter of Fiscal 2023, we performed our annual goodwill and indefinite-lived intangible assets impairment analysis. Based on a qualitative impairment assessment of the Michael Kors reporting units, we concluded that it is more likely than not that the fair value of the Michael Kors reporting units exceeded its carrying value and, therefore, was not impaired. We elected to perform quantitative impairment analyses for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair values of reporting units. We also elected to perform a quantitative impairment analysis for the Versace and Jimmy Choo brand intangible assets using an income approach to estimate the fair values.

Based on the results of these assessments, the Company determined there was no impairment for the Jimmy Choo Licensing reporting unit goodwill as its fair value is significantly higher than its carrying value and no impairment for the Wholesale brand intangible asset as its approximate fair value was equal to its carrying value. Further, the Company determined that there was no impairment for the Versace reporting units goodwill as their fair values significantly exceeded the carrying values and its Retail and Wholesale brand intangible assets fair value exceeded its carrying value by approximately 10% and 5%, respectively.

The Company further concluded that the fair value of the Jimmy Choo Retail and Wholesale reporting units goodwill, along with the Jimmy Choo Retail brand indefinite-lived intangible assets, did not exceed their related carrying amounts. The resulting impairment charges were primarily related to a higher discount rate in the current year driven by higher risk-free rates. Accordingly, the Company recorded impairment charges of $82 million related to the Jimmy Choo Retail and Wholesale reporting units goodwill and $24 million related to the Jimmy Choo Retail brand intangible assets during Fiscal 2023. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended April 1, 2023.

In Fiscal 2022, the Company did not incur any impairment charges. In Fiscal 2021, we recorded a goodwill impairment charge of $94 million related to the Jimmy Choo wholesale and Jimmy Choo licensing reporting units and $69 million impairment charge related to the Jimmy Choo brand intangible assets during Fiscal 2021. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended March 27, 2021. See Note 8 to the accompanying financial statements for information relating to the annual impairment analysis performed during the fourth quarters of Fiscal 2023, Fiscal 2022 and Fiscal 2021.

It is possible that our conclusions regarding impairment or recoverability of goodwill or other indefinite intangible assets could change in future periods if, for example, (i) our businesses do not perform as projected, (ii) overall economic conditions in future years vary from current assumptions, (iii) business conditions or strategies change from our current assumptions, (iv) discount rates change, (v) market multiples change or (vi) the identification of our reporting units change, among other factors. Such changes could result in a future impairment charge of goodwill or other indefinite intangible assets.

***Share-based Compensation***

We grant share-based awards to certain of our employees and directors. The grant date fair value of share options is calculated using the Black-Scholes option pricing model, which requires us to use subjective assumptions. The closing market price at the grant date is used to determine the grant date fair value of restricted stock units ("RSUs") and performance-based RSUs. These values are recognized as expense over the requisite service period, net of estimated forfeitures, based on expected attainment of pre-established performance goals for performance grants, or the passage of time for those grants which have only time-based vesting requirements. Compensation expense for performance-based RSUs is recognized over the employees' requisite service period when attainment of the performance goals is deemed probable, which involves judgment as to achievement of certain performance metrics.

We use our own historical experience in determining the expected holding period and volatility of our time-based share option awards. Determining the grant date fair value of share-based awards requires considerable judgment, including estimating expected volatility, expected term, risk-free rate and forfeitures. If factors change and we employ different assumptions, the fair value of future awards and resulting share-based compensation expense may differ significantly from what we have estimated in the past.

45

Table of Contents

***Derivative Financial Instruments***

***Forward Foreign Currency Exchange Contracts***

We use forward foreign currency exchange contracts to manage our exposure to fluctuations in foreign currency for certain transactions. We, in our normal course of business, enter into transactions with foreign suppliers and seek to minimize risks related to these transactions. We employ these contracts to hedge our cash flows, as they relate to foreign currency transactions. Certain of these contracts are designated as hedges for accounting purposes, while others remain undesignated. All of our derivative instruments are recorded in our consolidated balance sheets at fair value on a gross basis, regardless of their hedge designation.

We designate certain contracts related to the purchase of inventory that qualify for hedge accounting as cash flow hedges. Formal hedge documentation is prepared for all derivative instruments designated as hedges, including a description of the hedged item and the hedging instrument and the risk being hedged. The changes in the fair value for contracts designated as cash flow hedges is recorded in equity as a component of accumulated other comprehensive income until the hedged item affects earnings. When the inventory related to forecasted inventory purchases that are being hedged is sold to a third-party, the gains or losses deferred in accumulated other comprehensive income are recognized within cost of goods sold. The Company uses regression analysis to assess effectiveness of derivative instruments that are designated as hedges, which compares the change in the fair value of the derivative instrument to the change in the related hedged item. If the hedge is no longer expected to be highly effective in the future, future changes in the fair value are recognized in earnings. For those contracts that are not designated as hedges, changes in the fair value are recorded to foreign currency loss (gain) in our consolidated statements of operations and comprehensive income (loss). We classify cash flows relating to our forward foreign currency exchange contracts related to purchases of inventory consistently with the classification of the hedged item within cash flows from operating activities.

We are exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, we only enter into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure. The aforementioned forward contracts generally have a term of no more than 12 months. The period of these contracts is directly related to the foreign transaction they are intended to hedge.

***Net Investment Hedges***

We also use fixed-to-fixed cross currency swap agreements to hedge our net investments in foreign operations against future volatility in the exchange rates between different currencies. We have elected the spot method of designating these contracts under ASU 2017-12, *"Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities",* and have designated these contracts as net investment hedges. The net gain or loss on the net investment hedge is reported within foreign currency translation gains and losses ("CTA"), as a component of accumulated other comprehensive income on our consolidated balance sheets. Interest accruals and coupon payments are recognized directly in interest expense (income), net, in our consolidated statements of operations and comprehensive income (loss). Upon discontinuation of a hedge, all previously recognized amounts remain in CTA until the net investment is sold, diluted or liquidated.

We are exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, we only enter into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure.

During Fiscal 2021, the Company resumed its normal hedging program and entered into multiple fixed-to-fixed cross-currency swap agreements to hedge its net investment in Euro-denominated and Japanese Yen-denominated subsidiaries against future volatility in the exchange rate between the United States dollar and these currencies. During Fiscal 2021, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro-denominated subsidiaries and $194 million to hedge its net investment in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and these currencies.

During the first quarter of Fiscal 2022, we modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $2.875 billion to hedge its net investment in Euro denominated subsidiaries. Due to an other-than-insignificant financing element for certain of the first quarter modifications, net interest cash inflows of $31 million during Fiscal 2022 related to these contracts are classified as financing activities in our consolidated statements of cash flows.

Table of Contents

During the third and fourth quarter of Fiscal 2022, we modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.5 billion and $2.475 billion, respectively. The modification of these hedges resulted in the receipt of $59 million and $130 million in cash during the third and fourth quarter of Fiscal 2022, respectively. These amounts are classified within investing activities in our consolidated statements of cash flows.

During the first quarter of Fiscal 2023, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.094 billion to hedge its net investment, of which $900 million was in Euro denominated subsidiaries and $194 million was in Japanese Yen denominated subsidiaries. The modification of these swaps resulted in the Company receiving $66 million in cash during the first quarter of Fiscal 2023. These contracts have been designated as net investment hedges.

As of July 2, 2022, the Company had multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro denominated subsidiaries (the "Euro Net Investment Hedges") and $194 million to hedge its net investment in Japanese Yen denominated subsidiaries (the "Japanese Yen Net Investment Hedges"). During the month of July 2022, the Euro Net Investment Hedges with aggregate notional amounts of $4 billion outstanding as of July 2, 2022 were terminated resulting in the Company receiving $237 million in cash.

During the second quarter of Fiscal 2023, the Company also entered into, and subsequently terminated, additional Euro Net Investment Hedges with aggregate notional amounts of $4 billion. The termination of these contracts resulted in the Company receiving an additional $100 million in cash.

During the second quarter of Fiscal 2023, the Company also modified certain Japanese Yen Net Investment Hedges with notional amounts of $100 million. The modification of these hedges resulted in the Company receiving $6 million in cash during the second quarter of Fiscal 2023. The Company entered into additional Japanese Yen Net Investment Hedges with notional amount of $100 million. These contracts have been designated as net investment hedges.

During the second quarter of Fiscal 2023, the Company received a total of $343 million from the termination of its Euro Net Investment Hedges and the modification of its Japanese Yen Net Investment Hedges.

During the third quarter of Fiscal 2023, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of €1 billion (approximately $1.07 billion) to hedge its net investment in GBP denominated subsidiaries (the "GBP/EUR Net Investment Hedges"). Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between November 2024 and November 2027 and are designated as net investment hedges.

As of April 1, 2023, the Company had Japanese Yen Net Investment Hedges with aggregate notional amounts of $294 million. Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 2.665% in Japanese Yen. These contracts have maturity dates between May 2027 and February 2051 and are designated as net investment hedges.

Certain of these contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being September 2027. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

When a cross-currency swap is used as a hedging instrument in a net investment hedge assessed under the spot method, the cross-currency basis spread is excluded from the assessment of hedge effectiveness and is recognized as a reduction in interest expense (income) in the Company's consolidated statements of operations and comprehensive income (loss). Accordingly, the Company recorded interest income of $38 million, $63 million and $16 million, respectively, during Fiscal 2023, Fiscal 2022 and Fiscal 2021.

47

Table of Contents

**Fair Value Hedges**

The Company is exposed to transaction risk from foreign currency exchange rate fluctuations with respect to various cross-currency intercompany loans. This primarily includes exposure to exchange rate fluctuations in the Euro and British Pound which will impact earnings on a consolidated basis. To manage the exchange rate risk related to these balances, during the fourth quarter of Fiscal 2023 the Company entered into fair value cross-currency swap agreements to hedge its exposure in GBP denominated subsidiaries (the "GBP Fair Value Hedge") on a Euro denominated intercompany loan. As of April 1, 2023, the total notional values of outstanding fair value cross-currency swaps related to these loans were €1 billion (approximately $1.08 billion). Under the term of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between March 2025 and March 2026 and are designated as fair value hedges.

When a cross-currency swap is designated as a fair value hedge and qualifies as highly effective, the fair value hedge will be recorded at fair value each period on the Company's consolidated balance sheets, with the difference resulting from the changes in the spot rate at hedge inception to the current period recognized in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss), which will offset the earnings impact of the original transaction being hedged for. Accordingly, the Company recorded a foreign currency gain of $4 million during Fiscal 2023.

*Income Taxes*

Deferred income tax assets and liabilities reflect temporary differences between the tax basis and financial reporting basis of our assets and liabilities and are determined using the tax rates and laws in effect for the periods in which the differences are expected to reverse. We periodically assess the realizability of deferred tax assets and the adequacy of deferred tax liabilities, based on the results of local, state, federal or foreign statutory tax audits or our own estimates and judgments.

Realization of deferred tax assets associated with net operating loss and tax credit carryforwards is dependent upon generating sufficient taxable income prior to their expiration in the applicable tax jurisdiction. We periodically review the recoverability of our deferred tax assets and provide valuation allowances as deemed necessary to reduce deferred tax assets to amounts that more-likely-than-not will be realized. This determination involves considerable judgment and our management considers many factors when assessing the likelihood of future realization of deferred tax assets, including recent earnings results within various taxing jurisdictions, expectations of future taxable income, the carryforward periods remaining and other factors. Changes in the required valuation allowance are recorded in income in the period such determination is made. Deferred tax assets could be reduced in the future if our estimates of taxable income during the carryforward period are significantly reduced or alternative tax strategies are no longer viable.

We recognize the impact of an uncertain income tax position taken on our income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. The effect of an uncertain income tax position will not be taken into account if the position has less than a 50% likelihood of being sustained. Our tax positions are analyzed periodically (at least quarterly) and adjustments are made as events occur that warrant adjustments to those positions. We record interest and penalties payable to relevant tax authorities as income tax expense.

*New Accounting Pronouncements*

Please refer to Note 2 to the accompanying consolidated financial statements for detailed information relating to recently adopted and recently issued accounting pronouncements and the associated impacts.

Table of Contents

**Results of Operations**

A discussion regarding our results of operations for Fiscal 2023 compared to Fiscal 2022 is presented below. A discussion regarding our results of operations for Fiscal 2022 compared to Fiscal 2021 can be found under Item 7 in our Annual Report on Form 10-K for the year ended April 2, 2022, filed with the SEC on June 1, 2022, which is available on the SEC's website at www.sec.gov and our investor website at www.capriholdings.com.

*Comparison of Fiscal 2023 with Fiscal 2022*

The following table details the results of our operations for Fiscal 2023 and Fiscal 2022 and expresses the relationship of certain line items to total revenue as a percentage (dollars in millions):

| | Fiscal Years Ended | | | | % of Total Revenue for Fiscal 2023 | % of Total Revenue for Fiscal 2022 |
| | April 1, 2023 | April 2, 2022 | $ Change | % Change | | |
|---|---|---|---|---|---|---|
| **Statements of Operations Data:** | | | | | | |
| Total revenue | $ 5,619 | $ 5,654 | $ (35) | (0.6)% | | |
| Cost of goods sold | 1,895 | 1,910 | (15) | (0.8)% | 33.7% | 33.8% |
| Gross profit | 3,724 | 3,744 | (20) | (0.5)% | 66.3% | 66.2% |
| Selling, general and administrative expenses | 2,708 | 2,533 | 175 | 6.9% | 48.2% | 44.8% |
| Depreciation and amortization | 179 | 193 | (14) | (7.3)% | 3.2% | 3.4% |
| Impairment of assets | 142 | 73 | 69 | 94.5% | 2.5% | 1.3% |
| Restructuring and other charges | 16 | 42 | (26) | (61.9)% | 0.3% | 0.7% |
| Total operating expenses | 3,045 | 2,841 | 204 | 7.2% | 54.2% | 50.2% |
| Income from operations | 679 | 903 | (224) | (24.8)% | 12.1% | 16.0% |
| Other income, net | (3) | (2) | (1) | (50.0)% | (0.1)% | -% |
| Interest expense (income), net | 24 | (18) | 42 | NM | 0.4% | (0.3)% |
| Foreign currency loss | 10 | 8 | 2 | 25.0% | 0.2% | 0.1% |
| Income before provision for income taxes | 648 | 915 | (267) | (29.2)% | 11.5% | 16.2% |
| Provision for income taxes | 29 | 92 | (63) | (68.5)% | 0.5% | 1.6% |
| Net income | 619 | 823 | (204) | (24.8)% | | |
| Less: Net income attributable to noncontrolling interests | 3 | 1 | 2 | NM | | |
| Net income attributable to Capri | $ 616 | $ 822 | $ (206) | (25.1)% | | |

NM Not meaningful

*Total Revenue*

Total revenue decreased $35.0 million, or 0.6%, to $5.619 billion for Fiscal 2023, compared to $5.654 billion for Fiscal 2022, which included net unfavorable foreign currency effects of $333 million as a result of the strengthening of the U.S. dollar compared to all major currencies in which we operate in Fiscal 2023, as compared to Fiscal 2022. On a constant currency basis, our total revenue increased $298.0 million, or 5.3%. The increase is attributable to increased retail revenues in the Americas and increased retail and wholesale in EMEA, partially offset by decreased revenues in Greater China due to COVID-19 related disruptions for each of our brands and approximately $70 million of revenue attributable to the 53rd week in Fiscal 2022.

*Gross Profit*

Gross profit decreased $20.0 million, or 0.5%, to $3.724 billion during Fiscal 2023, compared to $3.744 billion for Fiscal 2022, which included net unfavorable foreign currency effects of $230 million. Gross profit as a percentage of total revenue increased 10 basis points to 66.3% during Fiscal 2023, compared to 66.2% during Fiscal 2022. The increase in gross profit margin was primarily attributable to a higher average unit price, partially offset by unfavorable regional sales mix.

Table of Contents

*Total Operating Expenses*

Total operating expenses increased $204 million, or 7.2%, to $3.045 billion during Fiscal 2023, compared to $2.841 billion for Fiscal 2022. Our operating expenses included a net favorable foreign currency impact of approximately $198 million. Total operating expenses as a percentage of total revenue increased to 54.2% in Fiscal 2023, compared to 50.2% in Fiscal 2022. The components that comprise total operating expenses are detailed below.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses increased $175 million, or 6.9%, to $2.708 billion during Fiscal 2023, compared to $2.533 billion for Fiscal 2022. As a percentage of total revenue, selling, general and administrative expenses increased to 48.2% during Fiscal 2023, compared to 44.8% for Fiscal 2022, primarily due to increased marketing and unallocated corporate expenses and deleverage of operating expenses on lower revenue for Fiscal 2023.

Unallocated corporate expenses, which are included within selling, general and administrative expenses discussed above, but are not directly attributable to a reportable segment, increased $43 million, or 22.6%, to $233 million for Fiscal 2023, compared to $190 million for Fiscal 2022, primarily due to an increase in professional fees and information technology costs related to the ongoing ERP system implementation and Capri transformation projects.

*Depreciation and Amortization*

Depreciation and amortization decreased $14 million, or 7.3%, to $179 million during Fiscal 2023, compared to $193 million for Fiscal 2022. Depreciation and amortization decreased to 3.2% as a percentage of total revenue during Fiscal 2023, compared to 3.4% for Fiscal 2022. The decrease in depreciation and amortization expense was primarily attributable to lower depreciation due to lower capital expenditures in Fiscal 2022 and Fiscal 2021.

*Impairment of Assets*

During Fiscal 2023, we recognized asset impairment charges of $142 million, primarily related to the impairment of the Jimmy Choo Retail and Wholesale reporting units goodwill and Jimmy Choo brand intangible assets, as well as the impairment of certain operating lease right-of-use assets. During Fiscal 2022, we recognized asset impairment charges of approximately $73 million, primarily related to the impairment of operating lease right-of-use assets (see Note 13 to the accompanying consolidated financial statements for additional information).

*Restructuring and Other Charges*

During Fiscal 2023, we recognized restructuring and other charges of $16 million, primarily relating to equity awards associated with the acquisition of Versace (see Note 10 to the accompanying consolidated financial statements for additional information).

During Fiscal 2022, we recognized restructuring and other charges of $42 million, which included other costs of $33 million, primarily related to equity awards associated with the acquisition of Versace and severance for an executive officer and $9 million related to our Capri Retail Store Optimization Program.

*Income from Operations*

As a result of the foregoing, income from operations decreased $224 million to $679 million during Fiscal 2023, compared to $903 million for Fiscal 2022. Income from operations as a percentage of total revenue decreased to 12.1% in Fiscal 2023, compared to 16.0% in Fiscal 2022. See *Segment Information* above for a reconciliation of our segment operating income to total operating income.

Table of Contents

*Interest Expense (Income), net*

During Fiscal 2023, we recognized $24 million of interest expense compared to $18 million of interest income during Fiscal 2022. The $42 million increase in interest expense (income), net, is primarily due to higher effective interest rates on our outstanding debt, higher average borrowings outstanding and lower interest income from our net investment hedges, partially offset by higher interest income earned on our cash and cash equivalents (see Note 11 and Note 14 to the accompanying consolidated financial statements for additional information).

*Foreign Currency Loss*

During Fiscal 2023 and Fiscal 2022, we recognized a net foreign currency loss of $10 million and $8 million, respectively, primarily attributable to the remeasurement of intercompany loans with certain of our subsidiaries.

*Provision for Income Taxes*

During Fiscal 2023, we recognized $29 million of income tax expense on pre-tax income of $648 million compared with $92 million of income tax expense on a pre-tax income of $915 million for Fiscal 2022. Our effective tax rate for Fiscal 2023 was lower than our effective tax rate in Fiscal 2022 primarily due to decreases in uncertain tax positions as well as a more favorable effect of our global financing activities during Fiscal 2023 as compared to Fiscal 2022. In addition, in Fiscal 2022, the Company recognized a benefit from the impact of enacted tax legislation in Italy which allowed the Company to reduce its deferred tax liabilities as well as a United States net operating loss ("NOL") benefit realized which was not recurring in Fiscal 2023.

The global financing activities are related to our previously disclosed 2014 move of our principal executive office from Hong Kong to the U.K. and decision to become a U.K. tax resident. In connection with this decision, we funded our international growth strategy through intercompany debt financing arrangements between certain of our United States, United Kingdom and Hungarian subsidiaries. Accordingly, due to the difference in the statutory income tax rates between these jurisdictions, we realized a lower effective tax rate on consolidated pre-tax income.

Our effective tax rate may fluctuate from time to time due to the effects of changes in United States state and local taxes and tax rates in foreign jurisdictions. In addition, factors such as the geographic mix of earnings, enacted tax legislation and the results of various global tax strategies, may also impact our effective tax rate in future periods.

*Net Income Attributable to Capri*

As a result of the foregoing, during Fiscal 2023 our net income attributable to Capri decreased $206 million to $616 million, compared to net income of $822 million for Fiscal 2022.

51

Table of Contents

**Segment Information**

*Versace*

| | Fiscal Years Ended | | | | % Change | | |
|---|---|---|---|---|---|---|---|
| | April 1, 2023 | April 2, 2022 | | $ Change | As Reported | | Constant Currency |
| Revenues | $ 1,106 | $ 1,088 | | $ 18 | 1.7 % | | 13.8 % |
| Income from operations | $ 152 | $ 185 | | $ (33) | (17.8) % | | |
| Operating margin | 13.7 % | 17.0 % | | | | | |

*Revenues*

Versace revenues increased $18 million, or 1.7%, to $1.106 billion for Fiscal 2023, compared to $1.088 billion for Fiscal 2022, which included unfavorable foreign currency effects of $132 million. On a constant currency basis, revenue increased $150 million, or 13.8%, primarily attributable to increased retail revenue in the Americas and EMEA and wholesale shipments in EMEA, partially offset by decreased revenues in Greater China due to COVID-19 related disruptions.

*Income from Operations*

During Fiscal 2023, Versace recorded income from operations of $152 million compared to $185 million for Fiscal 2022. Operating margin decreased from 17.0% for Fiscal 2022 to 13.7% for Fiscal 2023, primarily due to increased retail store costs from a higher store count and increased employee costs.

*Jimmy Choo*

| | Fiscal Years Ended | | | | % Change | |
|---|---|---|---|---|---|---|
| | April 1, 2023 | April 2, 2022 | | $ Change | As Reported | Constant Currency |
| Revenues | $ 633 | $ 613 | $ 20 | | 3.3% | 11.4% |
| Income from operations | $ 38 | $ 13 | $ 25 | | NM | |
| Operating margin | 6.0% | 2.1% | | | | |

NM Not meaningful

*Revenues*

Jimmy Choo revenues increased $20 million, or 3.3%, to $633 million for Fiscal 2023, compared to $613 million for Fiscal 2022, which included unfavorable foreign currency effects of $50 million. On a constant currency basis, revenue increased $70 million, or 11.4%, primarily attributable to increased revenue in the Americas and EMEA and increased licensing revenue, partially offset by decreased revenue in Greater China due to the impact of COVID-19 related disruptions.

*Income from Operations*

During Fiscal 2023, Jimmy Choo recorded income from operations of $38 million compared to $13 million for Fiscal 2022. Operating margin increased from 2.1% for Fiscal 2022 to 6.0% for Fiscal 2023, primarily due to a higher average unit price and leveraging of operating expenses on higher revenue.

Table of Contents

***Michael Kors***

| | Fiscal Years Ended | | | % Change | |
| --- | --- | --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | $ Change | As Reported | Constant Currency |
| Revenues | $ 3,880 | $ 3,953 | $ (73) | (1.8)% | 2.0% |
| Income from operations | $ 868 | $ 1,005 | $ (137) | (13.6)% | |
| Operating margin | 22.4% | 25.4% | | | |

*Revenues*

Michael Kors revenues decreased $73 million, or 1.8%, to $3.880 billion for Fiscal 2023, compared to $3.953 billion for Fiscal 2022, which included unfavorable foreign currency effects of $151 million. On a constant currency basis, revenue increased $78 million, or 2.0%, primarily attributable to increased retail revenue in the Americas, partially offset by decreased revenue in Greater China due to the impact of COVID-19 related disruptions.

*Income from Operations*

During Fiscal 2023, Michael Kors recorded income from operations of $868 million compared to $1.005 billion for Fiscal 2022. Operating margin decreased from 25.4% for Fiscal 2022 to 22.4% for Fiscal 2023, primarily due to increased marketing investments and deleveraging of operating expenses on lower revenue.

Table of Contents

**Liquidity and Capital Resources**

Our primary sources of liquidity are the cash flows generated from our operations, along with borrowings available under our credit facilities (see below discussion regarding "Revolving Credit Facilities") and available cash and cash equivalents. Our primary use of this liquidity is to fund the ongoing cash requirements, including our working capital needs and capital investments in our business, debt repayments, acquisitions, returns of capital, including share repurchases and other corporate activities. We believe that the cash generated from our operations, together with borrowings available under our revolving credit facilities and available cash and cash equivalents, will be sufficient to meet our working capital needs for the next 12 months and beyond, including investments made and expenses incurred in connection with our store growth plans, investments in corporate and distribution facilities, continued IT system development, e-commerce and marketing initiatives. We spent $226 million on capital expenditures during Fiscal 2023 and expect to spend approximately $260 million during Fiscal 2024. This anticipated increase reflects continued expenditures related to our retail operations (including e-commerce), ERP system implementation and Capri transformation programs. The majority of the Fiscal 2023 expenditures related to our retail operations (including e-commerce), ERP system implementation and Capri transformation programs.

The Capri transformation program represents a multi-year, multi-project initiative extending through Fiscal 2026 intended to improve the operating effectiveness and efficiency of our organization by creating best in class shared platforms across our brands and by expanding our digital capabilities. These initiatives cover multiple aspects of our operations including supply chain, marketing, omni-channel customer experience, e-commerce, data analytics and IT infrastructure. Over the next three fiscal years, we expect expenditures up to $220 million related to these efforts.

The Company is also in progress with a multi-year ERP implementation which includes accounting, finance and wholesale and retail inventory solutions in order to create standardized finance IT applications across our organization. This ERP implementation will continue through Fiscal 2026 and we expect expenditures up to $170 million over the next three fiscal years.

The following table sets forth key indicators of our liquidity and capital resources (in millions):

| | As of | | | |
| --- | --- | --- | --- | --- |
| | | April 1, 2023 | | April 2, 2022 |
| **Balance Sheet Data:** | | | | |
| Cash and cash equivalents | $ | 249 | $ | 169 |
| Working capital | $ | 420 | $ | 325 |
| Total assets | $ | 7,295 | $ | 7,480 |
| Short-term debt | $ | 5 | $ | 29 |
| Long-term debt | $ | 1,822 | $ | 1,131 |

| | Fiscal Years Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | April 1, 2023 | | April 2, 2022 | | March 27, 2021 |
| **Cash flows provided by (used in):** | | | | | | |
| Operating activities | $ | 771 | $ | 704 | $ | 624 |
| Investing activities | | 183 | | 58 | | (124) |
| Financing activities | | (776) | | (800) | | (870) |
| Effect of exchange rate changes | | (94) | | (24) | | 12 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | $ | 84 | $ | (62) | $ | (358) |

*Cash Provided by Operating Activities*

Cash provided by operating activities increased $67 million to $771 million during Fiscal 2023, as compared to $704 million for Fiscal 2022, which was as a result of the improvement in our working capital partially offset by a decrease in our net income after non-cash adjustments compared to prior year. The changes in our working capital were primarily due to the stabilization of inventory levels compared to prior year.

Table of Contents

Cash provided by operating activities increased $80 million to $704 million during Fiscal 2022, as compared to $624 million for Fiscal 2021, which was due to an increase in our net income after non-cash adjustments, partially offset by decreases related to changes in our working capital. The decreases related to the changes in our working capital are primarily attributable to an increase in our inventory levels and fluctuations in the timing of payments and receipts when compared to the prior year.

### Cash Provided by (Used in) Investing Activities

Net cash provided by investing activities was $183 million during Fiscal 2023, as compared to $58 million during Fiscal 2022. The $125 million increase in cash provided by investing activities was primarily attributable to higher cash received on the settlement of net investment hedges of $220 million during Fiscal 2023, partially offset by higher capital expenditures of $95 million compared to prior year due to ERP system implementations, increased Corporate investments related to Capri transformation programs and increased investments in our retail stores.

Net cash provided by investing activities was $58 million during Fiscal 2022, as compared to net cash used in investing activities of $124 million during Fiscal 2021. The $182 million increase in cash provided by investing activities was primarily attributable to a $189 million cash received on the settlement of certain net investment hedges during Fiscal 2022.

### Cash Used in Financing Activities

Net cash used in financing activities was $776 million during Fiscal 2023, as compared to $800 million during Fiscal 2022. The decrease in cash used by financing activities of $24 million was primarily due to an increase in net debt borrowings of $774 million, partially offset by a $703 million increase in cash payments to repurchase our ordinary shares.

Net cash used in financing activities was $800 million during Fiscal 2022, as compared to $870 million during Fiscal 2021. The decrease in cash used by financing activities of $70 million was primarily due to a decrease in net debt repayments of $681 million, higher cash proceeds from other financing activities and employee option exercises, partially offset by an increase of $660 million in cash payments to repurchase our ordinary shares during Fiscal 2022.

Table of Contents

**Debt Facilities**

The following table presents a summary of the Company's borrowing capacity and amounts outstanding as of April 1, 2023 and April 2, 2022 (dollars in millions):

| | | Fiscal Years Ended | | |
| --- | --- | --- | --- | --- |
| | | April 1, 2023 | | April 2, 2022 |
| **Revolving Credit Facility (excluding up to a $500 million accordion feature) [1]** | | | | |
| Total Availability | $ | 1,500 | $ | 1,000 |
| Borrowings outstanding [2] | | **874** | | **175** |
| Letter of credit outstanding | | 3 | | 21 |
| Remaining availability | $ | 623 | $ | 804 |
| **Versace Term Loan (450 Million Euro)** | | | | |
| Borrowings outstanding, net of debt issuance costs [3] | $ | **487** | $ | - |
| **Senior Notes due 2024** | | | | |
| Borrowings Outstanding, net of debt issuance costs and discount amortization [2] | $ | **449** | $ | **448** |
| **2018 Term Loan ($1.6 billion)** | | | | |
| Borrowings Outstanding, net of debt issuance costs [4] | $ | **-** | $ | **495** |
| **Other Borrowings [5]** | $ | **17** | $ | **42** |
| **Hong Kong Uncommitted Credit Facility:** | | | | |
| Total availability (70 million and 80 million Hong Kong Dollar) [6] | $ | 9 | $ | 10 |
| Borrowings outstanding | | - | | - |
| Remaining availability (70 million and 80 million Hong Kong Dollar) | $ | 9 | $ | 10 |
| **China Uncommitted Credit Facility:** | | | | |
| Total availability (75 million and 45 million Chinese Yuan) [6] | $ | 11 | $ | 7 |
| Borrowings outstanding | | - | | - |
| Remaining availability (75 million and 45 million Chinese Yuan) | $ | 11 | $ | 7 |
| **Japan Credit Facility:** | | | | |
| Total availability (1.0 billion Japanese Yen) | $ | 8 | $ | 8 |
| Borrowings outstanding | | - | | - |
| Remaining availability (1.0 billion Japanese Yen) | $ | 8 | $ | 8 |
| **Versace Uncommitted Credit Facility:** | | | | |
| Total availability (40 million and 48 million Euro) [6] | $ | 43 | $ | 52 |
| Borrowings outstanding | | - | | - |
| Remaining availability (40 million and 48 million Euro) | $ | 43 | $ | 52 |
| **Total borrowings outstanding [1]** | $ | **1,827** | $ | **1,160** |
| Total remaining availability | $ | 694 | $ | 881 |

---

[1] The financial covenant in our 2022 Credit Facility requires us to comply with the quarterly maximum net leverage ratio test of 4.00 to 1.0. As of April 1, 2023 and April 2, 2022, we were in compliance with all covenants related to our agreements then in effect governing our debt. See Note 11 to the accompanying consolidated financial statements for additional information.

[2] As of April 1, 2023 and April 2, 2022, all amounts are recorded as long-term debt in our consolidated balance sheets.

56

Table of Contents

(3)    On December 5, 2022, Gianni Versace S.r.l., our wholly owned subsidiary, entered into a credit facility, which provided a senior unsecured term loan in an aggregate principal amount of €450 million (approximately $488 million). As of April 1, 2023, all amounts are recorded as long-term debt in our consolidated balance sheets.

(4)    As of April 1, 2023, we no longer had an outstanding balance under the 2018 Term Loan as it was repaid. As of April 2, 2022, all amounts are recorded as long-term debt in our consolidated balance sheets.

(5)    The balance as of April 1, 2023 consists of primarily of $4 million related to our supplier finance program recorded within short-term debt in our consolidated balance sheets and $11 million related to the sale of certain Versace tax receivables, with $1 million and $10 million recorded within short-term debt and long-term debt, respectively, in our consolidated balance sheets. The balance as of April 2, 2022 consists of $21 million related to our supplier finance program recorded within short term debt in our consolidated balance sheets, $18 million related to the sale of certain Versace tax receivables, with $8 million and $10 million recorded within short-term debt and long-term debt, respectively, in our consolidated balance sheets and $3 million of other loans recorded as long-term debt in our consolidated balance sheets.

(6)    The balance as of April 1, 2023 represents the total availability of the credit facility, which excludes bank guarantees.

We believe that our 2022 Credit Facility is adequately diversified with no undue concentration in any one financial institution. As of April 1, 2023, there were 17 financial institutions participating in the facility, with none maintaining a maximum commitment percentage in excess of 10%. We have no reason to believe that the participating institutions will be unable to fulfill their obligations to provide financing in accordance with the terms of the 2022 Credit Facility.

See Note 11 in the accompanying consolidated financial statements for detailed information relating to our credit facilities and debt obligations.

### Share Repurchase Program

The following table presents our treasury share repurchases during the fiscal years ended April 1, 2023 and April 2, 2022 (dollars in millions):

|  | Fiscal Years Ended | |
|---|---|---|
|  | April 1, 2023 | April 2, 2022 |
| Cost of shares repurchased under share repurchase program | $ 1,350 | $ 650 |
| Fair value of shares withheld to cover tax obligations for vested restricted share awards | 14 | 11 |
| Total cost of treasury shares repurchased | $ 1,364 | $ 661 |
| Shares repurchased under share repurchase program | 27,356,549 | 11,014,541 |
| Shares withheld to cover tax withholding obligations | 301,326 | 203,863 |
|  | 27,657,875 | 11,218,404 |

During the first quarter of Fiscal 2022, the Company reinstated its $500 million share-repurchase program, which was previously suspended during the first quarter of Fiscal 2021 in response to the impact of the COVID-19 pandemic and the provisions of the Second Amendment of the 2018 Credit Facility. Subsequently, on November 3, 2021, the Company announced that its Board of Directors had terminated the Company's existing $500 million share repurchase program (the "Prior Plan"), which had $250 million of availability remaining at the time, and authorized a new share repurchase program (the "Fiscal 2022 Plan") pursuant to which the Company was permitted, from time to time, to repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program.

On June 1, 2022, the Board of Directors terminated our Fiscal 2022 Plan, with $400 million of availability remaining, and authorized a new share repurchase program (the "Fiscal 2023 Plan") pursuant to which we may, from time to time, repurchase up to $1.0 billion of our outstanding ordinary shares within period of two years from the effective date of the program.

On November 9, 2022, the Company announced that its Board of Directors approved a new share repurchase program (the "Existing Share Repurchase Plan") of up to $1 billion of its outstanding ordinary shares, providing additional capacity to return cash to shareholders over the longer term. This new two-year program replaced the Fiscal 2023 Plan which had

Table of Contents

$250 million of availability remaining. As of April 1, 2023, the remaining availability under the Company's share repurchase program was $400 million.

Share repurchases may be made in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

See Note 15 to the accompanying consolidated financial statements for additional information.

**Contractual Obligations and Commercial Commitments**

As of April 1, 2023, our contractual obligations and commercial commitments were as follows (in millions):

| Fiscal Years | Fiscal 2024 | Fiscal 2025-2026 | Fiscal 2027-2028 | Fiscal 2029 and thereafter | Total |
|---|---|---|---|---|---|
| Operating leases | $ 473 | $ 681 | $ 381 | $ 427 | $ 1,962 |
| Interest, net [1] | 16 | 11 | - | - | 27 |
| Inventory purchase obligations | 775 | - | - | - | 775 |
| Other commitments | 89 | 32 | 4 | - | 125 |
| Short-term debt | 5 | - | - | - | 5 |
| Long-term debt | - | 450 | 1,374 | - | 1,824 |
| **Total** | **$ 1,358** | **$ 1,174** | **$ 1,759** | **$ 427** | **$ 4,718** |

[1]  Beginning in Fiscal 2027, we expect to be in an interest income position, therefore we would not expect to have net interest expense obligations through the above periods.

*Operating lease obligations* represent equipment leases and the minimum lease rental payments due under non-cancelable operating leases for our real estate locations globally. In addition to the above amounts, we are typically required to pay real estate taxes, contingent rent based on sales volume and other occupancy costs relating to leased properties for our retail stores.

*Interest, net* represents the estimated net interest expense associated with our term loan based on the current interest rate. It also includes the estimated net interest income from our net investment hedges and fair value hedges.

*Inventory purchase obligations* represent contractual obligations for future purchases of inventory.

*Other commitments* include non-cancelable contractual obligations related to marketing and advertising agreements, information technology agreements and supply agreements.

The above table excludes current liabilities (other than short-term debt and short-term operating lease liabilities) recorded as of April 1, 2023, as these items will be paid within one year, and non-current liabilities that have no cash outflows associated with them (e.g., deferred taxes).

**Off-Balance Sheet Arrangements**

We have not created, and are not party to, any special-purpose or off-balance sheet entities for the purpose of raising capital, incurring debt or operating our business. In addition to the commitments in the above table, our off-balance sheet commitments relating to our outstanding letters of credit were $35 million at April 1, 2023, including $32 million in letters of credit issued outside of the 2022 Credit Facility. In addition, as of April 1, 2023, bank guarantees of approximately $36 million were supported by our various credit facilities. We do not have any other off-balance sheet arrangements or relationships with entities that are not consolidated into our financial statements that have or are reasonably likely to have a material current or future effect on our financial condition, changes in financial condition, revenues, expenses, results of operations, liquidity, capital expenditures or capital resources.

Table of Contents

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to certain market risks during the normal course of our business, such as risk arising from fluctuations in foreign currency exchange rates, as well as fluctuations in interest rates. In order to manage these risks, we employ certain strategies to mitigate the effect of these fluctuations. We enter into foreign currency forward contracts to manage our foreign currency exposure to the fluctuations of certain foreign currencies. The use of these instruments primarily helps to manage our exposure to our foreign purchase commitments and better control our product costs. We do not use derivatives for trading or speculative purposes.

***Foreign Currency Exchange Risk***

*Forward Foreign Currency Exchange Contracts*

We are exposed to risks on certain purchase commitments to foreign suppliers based on the value of our purchasing subsidiaries' local currency relative to the currency requirement of the supplier on the date of the commitment. As such, we enter into forward foreign currency exchange contracts that generally mature in 12 months or less and are consistent with the related purchase commitments, to manage our exposure to the changes in the value of the Euro and the Canadian Dollar. These contracts are recorded at fair value in our consolidated balance sheets as either an asset or liability, and are derivative contracts to hedge cash flow risks. Certain of these contracts are designated as hedges for hedge accounting purposes, while certain of these contracts are not designated as hedges for accounting purposes. Accordingly, the changes in the fair value of the majority of these contracts at the balance sheet date are recorded in equity as a component of accumulated other comprehensive income, and upon maturity (settlement) are recorded in, or reclassified into, our cost of goods sold or operating expenses, in our consolidated statements of operations and comprehensive income (loss), as applicable to the transactions for which the forward foreign currency exchange contracts were established.

There were no forward foreign currency exchange contracts outstanding as of April 1, 2023 and as a result we were not required to perform a sensitivity analysis on such contracts.

*Net Investment Hedges*

We are exposed to adverse foreign currency exchange rate movements related to our net investment hedges. As of April 1, 2023, we have multiple fixed to fixed cross-currency swap agreements with aggregate notional amounts of $294 million to hedge our net investments in Japanese Yen-denominated subsidiaries against future volatility in the exchange rates between the United States dollar and the Japanese Yen. Under the term of these contracts, we will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 2.665% in Japanese Yen. Based on the net investment hedges outstanding as of April 1, 2023, a 10% appreciation or devaluation of the U.S. Dollar compared to the level of foreign currency exchange rates for currencies under contract as of April 1, 2023, would result in a net increase or decrease, respectively, of approximately $40 million in the fair value of these contracts. These contracts have maturity dates between November 2024 and February 2051. In addition, certain other contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being September 2027. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

As of April 1, 2023, we have multiple fixed to fixed cross-currency swap agreements with aggregate notional amounts of €1 billion (approximately $1.07 billion) to hedge our net investments in Euro denominated subsidiaries against future volatility in exchange rates between the Euro and British pound. Under the term of these contracts, we will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. Based on the net investment hedges outstanding as of April 1, 2023, a 10% appreciation or devaluation of the British pound compared to the level of foreign currency exchange rates for currencies under contract as of April 1, 2023, would result in a net increase or decrease, respectively, of approximately £80 million (approximately $99 million) in the fair value of these contracts. These contracts have maturity dates between November 2024 and November 2027.

*Fair Value Hedges*

We are exposed to transaction risk from foreign currency exchange rate fluctuations with respect to various cross-currency intercompany loans which will impact earnings on a consolidated basis. To manage the exchange rate risk related to these balances, we enter into fair value forward cross-currency swap agreements to hedge its exposure in GBP denominated subsidiaries on a Euro denominated intercompany loan. As of April 1, 2023, the total notional values of outstanding fair value cross-currency swaps related to these loans were €1 billion (approximately $1.08 billion). Based on the fair value hedges outstanding as of April 1, 2023, a 10% appreciation or devaluation of the British pound compared to the level of foreign

Table of Contents

currency exchange rates for currencies under contract as of April 1, 2023, would result in a net increase or decrease, respectively, of approximately £82 million (approximately $101 million) in the fair value of these contracts. These contracts have maturity dates between March 2025 and March 2026.

***Interest Rate Risk***

We are exposed to interest rate risk in relation to borrowings outstanding under our 2022 Credit Facility, our Versace Term Loan, our Hong Kong Credit Facility, our Japan Credit Facility, and our Uncommitted Versace Credit Facilities. Our 2022 Credit Facility carries interest rates that are tied to the prime rate and other institutional lending rates (depending on the particular origination of borrowing), as further described in Note 11 to the accompanying consolidated financial statements. Our Versace Term Loan carries interest rates that are tied to EURIBOR. Our Hong Kong Credit Facility carries interest at a rate that is tied to the Hong Kong Interbank Offered Rate. Our China Credit Facility carries interest at a rate that is tied to the People's Bank of China's Benchmark lending rate. Our Japan Credit Facility carries interest at a rate posted by the Mitsubishi UFJ Financial Group. Our Uncommitted Versace Credit Facilities carries interest at a rate set by the bank on the date of borrowing that is tied to the European Central Bank. Therefore, our consolidated statements of operations and comprehensive income (loss) and cash flows are exposed to changes in those interest rates. At April 1, 2023, we had $874 million borrowings outstanding under our 2022 Credit Facility, $487 million, outstanding, net of debt issuance costs, under our Versace Term Loan and no borrowings outstanding under all other Credit Facilities, as further described in Note 11 to the accompanying consolidated financial statements. At April 2, 2022, we had $175 million borrowings outstanding under our Revolving Credit Facility, $495 million, net of debt issuance costs, outstanding under our 2018 Term Loan Facility and no borrowings outstanding under our Versace Credit Facility. These balances are not indicative of future balances that may be outstanding under our revolving credit facilities that may be subject to fluctuations in interest rates. Any increases in the applicable interest rate(s) would cause an increase to the interest expense relative to any outstanding balance at that date.

***Credit Risk***

As of April 1, 2023, our $450 million Senior Notes, due in 2024, bear interest at a fixed rate equal to 4.250% per year, payable semi-annually. Our Senior Notes interest rate payable may be subject to adjustments from time to time if either Moody's or S&P (or a substitute rating agency), downgrades (or downgrades and subsequently upgrades) the credit rating assigned to the Senior Notes.

**Item 8. Financial Statements and Supplementary Data**

See "Item 15. Exhibits and Financial Statement Schedules" for a listing of the consolidated financial statements and supplementary data included in this report.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

Table of Contents

**Item 9A. Controls and Procedures**

***Disclosure Controls and Procedures***

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, our principal executive officer and principal financial officer, respectively, of the design and operation of our disclosure controls and procedures (as such term is defined in Rules 13a - 15(e) and 15(d) - 15(e) under the Securities and Exchange Act of 1934, as amended, (the "Exchange Act")) as of April 1, 2023. Based on the evaluation, the Chief Executive Officer and Chief Financial Officer concluded that disclosure controls and procedures are effective as of April 1, 2023.

***Management's Report on Internal Control over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined under the Exchange Act Rule 13a-15 (f)) to provide reasonable assurance regarding the reliability of financial reporting and that the consolidated financial statements have been prepared in accordance with U.S. GAAP. Such internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets; (ii) provide reasonable assurance (A) that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors; and (B) regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Our management assessed the effectiveness of our internal control over financial reporting as of April 1, 2023. In making this assessment, it used the criteria set forth in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), the 2013 Framework. Based on this assessment, management has determined that, as of April 1, 2023, our internal control over financial reporting is effective based on those criteria.

The Company's internal control over financial reporting as of April 1, 2023, as well as the consolidated financial statements, have been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which appears herein.

***Changes in Internal Control over Financial Reporting***

Except as discussed below, there have been no changes in our internal control over financial reporting during the three months ended April 1, 2023, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We are currently undertaking a major, multi-year ERP implementation to upgrade our information technology platforms and systems worldwide. The implementation is occurring in phases over several years. We have launched the finance functionality of the ERP system in certain regions starting in Fiscal 2023.

As a result of this multi-year implementation, we expect certain changes to our processes and procedures, which in turn, could result in changes to our internal control over financial reporting. While we expect this implementation to strengthen our internal control over financial reporting by automating certain manual processes and standardizing business processes and reporting across our organization, we will continue to evaluate and monitor our internal control over financial reporting as processes and procedures in the affected areas evolve. See Item 1A. "Risk Factors" - "A material delay or disruption in our information technology systems or e-commerce websites or our failure or inability to upgrade our information technology systems precisely and efficiently could have a material adverse effect on our business, results of operations and financial condition.*"*

**Item 9B. Other Information**

***Amendment to Amended and Restated Memorandum and Articles of Association***

The Board of Directors of the Company approved an amendment to clauses 2 and 3 of the Company's amended and restated Memorandum and Articles of Association (the "Amendment to the Memorandum"), effective May 24, 2023, reflecting a change of the Company's registered agent and registered office from Vistra Corporate Services Centre to Conyers Trust

61

Table of Contents

Company (BVI) Limited. A copy of the Amendment to the Memorandum is attached as Exhibit 3.2 to this Annual Report on Form 10-K and incorporated herein by reference.

This disclosure is intended to satisfy the requirements of Item 5.03 of Form 8-K.

### Compensatory Arrangements of Certain Officers

On May 30, 2023, the Company and Michael Kors (USA), Inc. (together with the Company, the "Company Parties") entered into an amended and restated employment agreement with each of Thomas J. Edwards, Jr., Jenna A. Hendricks and Krista A. McDonough (the "Employment Agreements"). The material changes to the Employment Agreements from the executive officers' prior employment agreements include: (i) providing that upon a termination of employment by the Company Parties without "cause" (and other than by reason of death or disability) or by the executive officer for "good reason", in addition to the existing severance entitlements under the prior employment agreement, the executive officer would be entitled to a pro rata annual cash incentive award for the year in which the date of termination occurs based on the actual level of performance; (ii) updating the definitions of "cause" and "good reason"; and (iii) updating the restrictive covenants to reflect the most current such covenants used in the equity awards under the Company's Third Amended and Restated Omnibus Incentive Plan.

In addition, on May 30, 2023, each of Mr. Edwards and Msmes. Hendricks and McDonough entered into a Change in Control Continuity Agreement with the Company (the "CIC Agreements"), which provides for an initial two-year term that will renew automatically for additional years commencing on the first anniversary of the effective date and each annual anniversary thereafter, unless notice of nonrenewal is provided. The payments and benefits provided under the CIC Agreements are "double trigger" and are not payable upon a termination of the executive officer's employment for "cause," by a resignation by an executive officer without "good reason" or any termination of an executive officer's employment prior to a "change in control" of the Company. Defined terms referenced in this description of the CIC Agreements have the meaning given to them in such agreements.

The severance protections under the CIC Agreements become effective on a change in control of the Company and remain in effect for a two-year protected period thereafter. During such two-year period, the executive officer would generally be entitled to compensation and benefits consistent with those applicable prior to the change in control, and if the executive officer's employment is terminated by the Company without cause (and other than by reason of death or disability) or by the executive officer for good reason, the executive officer would be entitled to receive the following payments and benefits, subject to an effective release of claims against the Company and its affiliates: (i) an amount equal to two times the sum of the executive officer's annual base salary and target annual cash incentive; (ii) a prorated target bonus for the portion of the Company's fiscal year elapsed prior to the date of termination; (iii) a payment equal to the cost of the monthly COBRA premiums for group health care plan coverage for a period of 24 months; and (iv) outplacement services up to a maximum cost of $25,000. If the executive officer's employment is terminated during the protected period following a change in control due to death or disability, the executive officer would not be entitled to the benefits described above, but would be entitled to receive a prorated bonus based on the executive officer's target annual bonus opportunity and death or disability benefits not less than those provided prior to the change in control. The payments and benefits under the CIC Agreements will be reduced to the extent that they would be subject to an excise tax under Sections 280G and 4999 of the Internal Revenue Code of 1986, as amended, unless the executive officer would be better off on an after-tax basis receiving all such payments and benefits and paying his or her own excise tax. The CIC Agreements do not provide for an excise tax gross-up and include perpetual confidentiality and non-disparagement covenants, and non-solicitation covenants that apply while the executive officer is employed and for two years thereafter.

The foregoing summary is qualified in its entirety by reference to the Employment Agreements and the CIC Agreements, copies of which are filed herewith as Exhibits 10.11, 10.13, 10.16, 10.21, 10.22 and 10.23 and incorporated herein by reference.

This disclosure is intended to satisfy the requirements of Item 5.02(e) of Form 8-K.

### Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections

Not applicable.

Table of Contents

**Part III**

**Item 10. Directors, Executive Officers and Corporate Governance**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

**Item 11. Executive Compensation**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The following table sets forth information as of April 1, 2023 regarding compensation plans under which the Company's equity securities are authorized for issuance:

**Equity Compensation Plan Information**

| Plan category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights [2] | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders [1] | 3,576,840 | $ 43.98 | 6,169,920 |
| Equity compensation plans not approved by security holders | - | $ - | - |
| **Total** | 3,576,840 | $ 43.98 | 6,169,920 |

[1] Reflects share options and restricted stock units issued under the Company's Third Amended and Restated Omnibus Incentive Plan (or predecessor plan).

[2] Represents the weighted average exercise price of outstanding share awards only.

**Item 13. Certain Relationships, Related Transactions and Director Independence**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

Information with respect to this Item is included in the Company's Proxy Statement to be filed in June 2023, which is incorporated herein by reference.

Table of Contents

## PART IV

**Item 15.** *Exhibits and Financial Statement Schedules*

(a)      The following documents are filed as part of this annual report on Form 10-K:

1.      The following consolidated financial statements listed below are filed as a separate section of this Annual Report on Form 10-K:

Report of Independent Registered Public Accounting Firm - Ernst & Young LLP (PCAOB ID No. 42).

Consolidated Balance Sheets as of April 1, 2023 and April 2, 2022.

Consolidated Statements of Operations and Comprehensive Income (Loss) for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

Consolidated Statements of Shareholders' Equity for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

Consolidated Statements of Cash Flows for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

Notes to Consolidated Financial Statements for the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

2.      Exhibits:

### EXHIBIT INDEX

| Exhibit No. | Document Description |
| --- | --- |
| 2.1 | Stock Purchase Agreement, dated as of September 24, 2018, by and among Allegra Donata Versace Beck, Donatella Versace, Santo Versace, Borgo Luxembourg S.À R.L., Blackstone GPV Capital Partners (Mauritius) VI-D FDI Ltd., Blackstone GPV Tactical Partners (Mauritius)-N Ltd. and Capri Holdings Limited (f/k/a Michael Kors Holdings Limited) (included as Exhibit 2.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on September 25, 2018 and incorporated herein by reference). |
| 3.1 | Amended and Restated Memorandum and Articles of Association of Capri Holdings Limited (included as Exhibit 3.1 to the Company's Current Report on Form 8-K filed on December 31, 2018 and incorporated herein by reference). |
| 3.2 | Amendment to Amended and Restated Memorandum and Articles of Association of Capri Holdings, effective May 24, 2023. |
| 4.1 | Specimen of Ordinary Share Certificate of Capri Holdings Limited (included as Exhibit 4.1 to the Company's Annual Report on Form 10-K for the fiscal year ended March 30, 2019 (File No. 001-35368), filed on May 29, 2019 and incorporated herein by reference). |
| 4.2 | Indenture, dated as of October 20, 2017, by and among Michael Kors (USA), Inc., Michael Kors Holdings Limited, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee (included as Exhibit 4.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on October 20, 2017 and incorporated herein by reference). |
| 10.1 | Second Amendment, dated as of June 25, 2020, to the Third Amended and Restated Credit Agreement dated as of November 15, 2018 among Capri Holdings Limited, Michael Kors (USA), Inc., the foreign subsidiary borrowers party thereto, the guarantors party thereto, the financial institutions party thereto as lenders and issuing banks and JPMorgan Chase Bank, N.A., as administrative agent (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on July 1, 2020 and incorporated herein by reference). |
| 10.2 | Form of Indemnification Agreement between Michael Kors Holdings Limited and its directors and executive officers (included as Exhibit 10.5 to the Company's Registration Statement on Form F-1, as amended (File No. 333-178282), filed on December 2, 2011 and incorporated herein by reference). |
| 10.3 | Capri Holdings Limited Third Amended and Restated Omnibus Incentive Plan (included as Annex B to the Company's Definitive Proxy Statement on Schedule 14A (File No. 001-35368), filed on June 16, 2022 and incorporated herein by reference). |
| 10.4 | Fifth Amended and Restated Employment Agreement, dated as of March 7, 2022, by and among Michael Kors (USA), Inc., Capri Holdings Limited and John D. Idol (included as Exhibit 10.6 to the Company's Annual Report on Form 10-K for the fiscal year ended April 2, 2022 (File No. 001-35368), filed on June 1, 2022 and incorporated herein by reference). |
| 10.5 | Executive Bonus Program (included as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended June 29, 2013 filed on August 8, 2013 and incorporated herein by reference). |

64

Table of Contents

| Exhibit No. | Document Description |
|---|---|
| 10.6 | Form of Employee Non-Qualified Option Award Agreement (included as Exhibit 10.15 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.7 | Form of Employee Restricted Stock Unit Award Agreement (included as Exhibit 10.16 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.8 | Form of Performance-Based Restricted Stock Unit Award Agreement (included as Exhibit 10.17 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.9 | Form of Independent Director Restricted Stock Unit Award Agreement (included as Exhibit 10.18 to the Company's Annual Report on Form 10-K for the fiscal year ended March 28, 2015, filed on May 27, 2015 and incorporated herein by reference). |
| 10.10 | Aircraft Time Sharing Agreement, effective as of December 20, 2022, by and between Michael Kors (USA), Inc. and John Idol (included as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2022, filed on February 8, 2023 and incorporated herein by reference). |
| 10.11 | Amended and Restated Employment Agreement by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Thomas J. Edwards, Jr., dated as of May 30, 2023. |
| 10.12 | Capri Holdings Limited Deferred Compensation Plan (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001.35368), filed on November 14, 2019 and incorporated herein by reference). |
| 10.13 | Amended and Restated Employment Agreement by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Krista A. McDonough, dated as of May 30, 2023. |
| 10.14 | Employment Agreement, dated as of March 30, 2020, by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Daniel Purefoy (included as Exhibit 10.16 to the Company's Annual Report on Form 10-K for the fiscal year ended March 27, 2021, filed on May 26, 2021 and incorporated herein by reference). |
| 10.15 | Employment Agreement dated January 23, 2023, by and between Michael Kors (USA), Inc. and Cedric Wilmotte. |
| 10.16 | Amended and Restated Employment Agreement by and among Capri Holdings Limited, Michael Kors (USA), Inc. and Jenna Hendricks, dated as of May 30, 2023. |
| 10.17 | Suspension of Rights Agreement, dated as of September 23, 2021, to the Third Amended and Restated Credit Agreement, dated as of November 15, 2018 among, Michael Kors (USA), Inc., Capri Holdings Limited, the Foreign Subsidiary Borrowers party to the Credit Agreement, JPMorgan Chase Bank, N.A., as Administrative Agent, the Lenders thereto and the other parties party thereto (included as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 25, 2021 filed on November 3, 2021 and incorporated herein by reference). |
| 10.18 | Revolving Credit Agreement, dated as of July 1, 2022 among Capri Holdings Limited, Michael Kors (USA), Inc., the foreign subsidiary borrowers party thereto, the guarantors party thereto, the financial institutions party thereto as lenders and issuing banks and JPMorgan Chase Bank, N.A., as administrative agent (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on July 1, 2022 and incorporated herein by reference). |
| 10.19 | Term Facility Agreement by and among Gianni Versace S.r.l., as borrower, Intesa Sanpaolo S.p.A., Banca Nazionale Del Lavoro S.p.A. and UniCredit S.p.A., as arrangers and lenders, and Intesa Sanpaolo S.p.A., as agent, dated as of December 5, 2022 (included as Exhibit 10.1 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on December 6, 2022 and incorporated herein by reference). |
| 10.20 | Parent Company Guarantee by and among Capri Holdings Limited, as guarantor, Banca Nazionale del Lavoro S.p.A., Intesa Sanpaolo S.p.A. and UniCredit S.p.A., dated as of December 5, 2022 (included as Exhibit 10.2 to the Company's Current Report on Form 8-K (File No. 001-35368), filed on December 6, 2022 and incorporated herein by reference). |
| 10.21 | Change in Control Continuity Agreement by and between Capri Holdings Limited and Thomas J. Edwards, Jr., dated as of May 30, 2023. |
| 10.22 | Change in Control Continuity Agreement by and between Capri Holdings Limited and Jenna Hendricks, dated as of May 30, 2023. |
| 10.23 | Change in Control Continuity Agreement by and between Capri Holdings Limited and Krista A. McDonough, dated as of May 30, 2023. |
| 21.1 | List of subsidiaries of Capri Holdings Limited. |
| 23.2 | Consent of Ernst & Young LLP. |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of Sarbanes Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of Sarbanes Oxley Act of 2002. |

Table of Contents

| Exhibit No. | Document Description |
|---|---|
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.1 | Interactive Data Files. |

66

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: May 31, 2023

CAPRI HOLDINGS LIMITED

By:      /s/ John D. Idol
Name:    John D. Idol
Title:   Chairman & Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| By: | | | |
|---|---|---|---|
| /s/ John D. Idol | Chairman, Chief Executive Officer and Director (Principal Executive Officer) | May 31, 2023 | |
| John D. Idol | | | |
| By: /s/ Thomas J. Edwards, Jr. | Chief Financial Officer and Chief Operating Officer (Principal Financial and Accounting Officer) | May 31, 2023 | |
| Thomas J. Edwards Jr. | | | |
| By: /s/ Marilyn Crouther | Director | May 31, 2023 | |
| Marilyn Crouther | | | |
| By: /s/ Robin Freestone | Director | May 31, 2023 | |
| Robin Freestone | | | |
| By: /s/ Judy Gibbons | Director | May 31, 2023 | |
| Judy Gibbons | | | |
| By: /s/ Mahesh Madhavan | Director | May 31, 2023 | |
| Mahesh Madhavan | | | |
| By: /s/ Stephen F. Reitman | Director | May 31, 2023 | |
| Stephen F. Reitman | | | |
| By: /s/ Jane Thompson | Director | May 31, 2023 | |
| Jane Thompson | | | |
| By: /s/ Jean Tomlin | Director | May 31, 2023 | |
| Jean Tomlin | | | |

67

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and Board of Directors of Capri Holdings Limited

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Capri Holdings Limited and subsidiaries ("the Company") as of April 1, 2023 and April 2, 2022, and the related consolidated statements of operations and comprehensive income (loss), shareholders' equity and cash flows for each of the three years in the period ended April 1, 2023, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at April 1, 2023 and April 2, 2022, and the results of its operations and its cash flow for each of the three years in the period ended April 1, 2023, in conformity with the U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of April 1, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated May 31, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

### Valuation of Goodwill and Indefinite-lived Intangible Assets

| | |
|---|---|
| *Description of the Matter* | At April 1, 2023, the Company's goodwill and indefinite-lived intangible assets, consisting of brand names, totaled $1.3 billion and $1.2 billion, respectively. As discussed in Note 2 to the consolidated financial statements, goodwill and indefinite-lived intangible assets are assessed for impairment on an annual basis, or whenever impairment indicators exist. As a result of the Company's 2023 annual impairment test, the Company recorded a goodwill impairment charge of $82 million associated with its Jimmy Choo Retail and Wholesale reporting units. The Company also recognized an impairment charge of $24 million associated with the Jimmy Choo indefinite-lived retail brand name intangible asset. |
| | Auditing the Company's annual impairment assessments was complex and highly judgmental due to the significant estimation required in determining the fair value of the reporting units for goodwill and the fair value of indefinite-lived brand name intangible assets. In particular, the fair value estimates were sensitive to significant assumptions, such as changes in the discount rate, revenue growth rate, margin and royalty rates, which are affected by expectations about future market or economic conditions. |

68

Table of Contents

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's goodwill and indefinite-lived intangible assets impairment review process, including controls over management's review of the significant assumptions described above. |
| | To test the estimated fair value of the Company's reporting units and indefinite-lived intangible assets, we performed audit procedures that included, among others, assessing the valuation methodologies and testing the significant assumptions discussed above and the completeness and accuracy of the underlying data used by the Company in its analyses. We compared the significant assumptions used by management to current industry and economic trends and evaluated whether changes to the Company's business environment would affect the significant assumptions. For example, we compared the royalty rates used in estimating the fair value of certain indefinite-lived brand name intangible assets to current industry licensing agreements. We assessed the historical accuracy of management's estimates and performed sensitivity analyses of the significant assumptions to evaluate the changes in the fair value of the reporting units and indefinite-lived brand name intangible assets that would result from changes in the assumptions. We also involved our internal valuation specialists to assist in our evaluation of the significant assumptions and methodologies used by the Company in developing the fair value estimates. In addition, we tested management's reconciliation of the fair value of the reporting units to the market capitalization of the Company. |

### Impairment of Retail Store Long-Lived assets

| | |
|---|---|
| *Description of the Matter* | As discussed in Note 2 to the consolidated financial statements, the Company evaluates its long-lived assets, which primarily include property, plant, and equipment and operating lease right-of-use assets at retail stores, for impairment whenever events or changes in circumstances indicate that the carrying amounts of such assets may not be recoverable. During the year ended April 1, 2023, the Company recognized an impairment charge of $36 million related to its long-lived assets. |
| | Auditing the Company's impairment assessment of retail store long-lived assets was complex and highly judgmental due to the significant estimation required in determining the future cash flows used to assess recoverability of each retail store long-lived asset group (undiscounted) and determining the fair value (discounted). The significant assumptions used include estimated future cash flows directly related to the future operation of the stores (including sales and expense growth rates) and the discount rate used to determine fair value. Significant assumptions used in determining the fair value of certain operating lease right-of-use assets include the current market rent and discount rate for the remaining lease term of the related stores. These assumptions are subjective in nature and are affected by expectations about future market or economic conditions. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the retail store long-lived assets impairment process, including, determining the undiscounted future cash flows of the stores and the fair value of the long-lived assets (including those related to operating leases) for the stores that were deemed to be impaired. We also tested controls over management's review of the significant assumptions described above. |
| | Our testing of the Company's impairment measurement included, among other procedures, evaluating the significant assumptions and operating data used to calculate the estimated future cash flows and to determine the fair value of the store long lived asset groups. For a sample of retail stores, we tested the completeness and accuracy of the data used by the Company in its analyses and we compared the significant assumptions used to determine the forecasted cash flows to historical results of the retail stores, current industry and economic trends and inquired of the Company's executives to understand the business initiatives supporting the assumptions in the future cash flows. We involved our internal valuation specialists to assist in evaluating the fair value of certain operating lease right-of-use assets, which included assessing the estimated market rental rates of these leases by comparing them to rental rates for comparable leases and evaluating the applied discount rate. |

/s/ ERNST & YOUNG LLP

We have served as the Company's auditor since 2014.
New York, New York
May 31, 2023

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and Board of Directors of Capri Holdings Limited

**Opinion on Internal Control over Financial Reporting**

We have audited Capri Holdings Limited and subsidiaries' internal control over financial reporting as of April 1, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO crite
ria). In our opinion, Capri Holdings Limited and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of April 1, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of April 1, 2023 and April 2, 2022, the related consolidated statements of operations and comprehensive income (loss), shareholders' equity and cash flows for each of the three years in the period ended April 1, 2023, and the related notes and our report dated May 31, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ ERNST & YOUNG LLP

New York, New York
May 31, 2023

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except share data)**

| | | April 1, 2023 | | April 2, 2022 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 249 | $ | 169 |
| Receivables, net | | 369 | | 434 |
| Inventories, net | | 1,057 | | 1,096 |
| Prepaid expenses and other current assets | | 195 | | 192 |
| Total current assets | | 1,870 | | 1,891 |
| Property and equipment, net | | 552 | | 476 |
| Operating lease right-of-use assets | | 1,330 | | 1,358 |
| Intangible assets, net | | 1,728 | | 1,847 |
| Goodwill | | 1,293 | | 1,418 |
| Deferred tax assets | | 296 | | 240 |
| Other assets | | 226 | | 250 |
| Total assets | $ | 7,295 | $ | 7,480 |
| **Liabilities and Shareholders' Equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 475 | $ | 555 |
| Accrued payroll and payroll related expenses | | 154 | | 165 |
| Accrued income taxes | | 73 | | 52 |
| Short-term operating lease liabilities | | 429 | | 414 |
| Short-term debt | | 5 | | 29 |
| Accrued expenses and other current liabilities | | 314 | | 351 |
| Total current liabilities | | 1,450 | | 1,566 |
| Long-term operating lease liabilities | | 1,348 | | 1,467 |
| Deferred tax liabilities | | 508 | | 432 |
| Long-term debt | | 1,822 | | 1,131 |
| Other long-term liabilities | | 318 | | 326 |
| Total liabilities | | 5,446 | | 4,922 |
| Commitments and contingencies | | | | |
| Shareholders' equity | | | | |
| Ordinary shares, no par value; 650,000,000 shares authorized; 224,166,250 shares issued and 117,347,045 outstanding at April 1, 2023; 221,967,599 shares issued and 142,806,269 outstanding at April 2, 2022 | | - | | - |
| Treasury shares, at cost (106,819,205 shares at April 1, 2023 and 79,161,330 shares at April 2, 2022) | | (5,351) | | (3,987) |
| Additional paid-in capital | | 1,344 | | 1,260 |
| Accumulated other comprehensive income | | 147 | | 194 |
| Retained earnings | | 5,708 | | 5,092 |
| Total shareholders' equity of Capri | | 1,848 | | 2,559 |
| Noncontrolling interest | | 1 | | (1) |
| Total shareholders' equity | | 1,849 | | 2,558 |
| Total liabilities and shareholders' equity | $ | 7,295 | $ | 7,480 |

See accompanying notes to consolidated financial statements.

71

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)**
**(In millions, except share and per share data)**

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Total revenue | $ 5,619 | $ 5,654 | $ 4,060 |
| Cost of goods sold | 1,895 | 1,910 | 1,463 |
| Gross profit | 3,724 | 3,744 | 2,597 |
| Selling, general and administrative expenses | 2,708 | 2,533 | 2,018 |
| Depreciation and amortization | 179 | 193 | 212 |
| Impairment of assets | 142 | 73 | 316 |
| Restructuring and other charges | 16 | 42 | 32 |
| Total operating expenses | 3,045 | 2,841 | 2,578 |
| Income from operations | 679 | 903 | 19 |
| Other income, net | (3) | (2) | (7) |
| Interest expense (income), net | 24 | (18) | 43 |
| Foreign currency loss (gain) | 10 | 8 | (20) |
| Income before provision for income taxes | 648 | 915 | 3 |
| Provision for income taxes | 29 | 92 | 66 |
| Net income (loss) | 619 | 823 | (63) |
| Less: Net income (loss) attributable to noncontrolling interest | 3 | 1 | (1) |
| Net income (loss) attributable to Capri | $ 616 | $ 822 | $ (62) |
| | | | |
| Weighted average ordinary shares outstanding: | | | |
| Basic | 132,532,009 | 149,724,675 | 150,453,568 |
| Diluted | 134,002,480 | 152,497,907 | 150,453,568 |
| Net income (loss) per ordinary share attributable to Capri: | | | |
| Basic | $ 4.65 | $ 5.49 | $ (0.41) |
| Diluted | $ 4.60 | $ 5.39 | $ (0.41) |
| | | | |
| Statements of Comprehensive Income (Loss): | | | |
| Net income (loss) | $ 619 | $ 823 | $ (63) |
| Foreign currency translation adjustments | (41) | 127 | (15) |
| Net (loss) gain on derivatives | (6) | 10 | (4) |
| Comprehensive income (loss) | 572 | 960 | (82) |
| Less: Net income (loss) attributable to noncontrolling interest | 3 | 1 | (1) |
| Less: Foreign currency translation adjustments attributable to noncontrolling interest | - | (1) | - |
| Comprehensive income (loss) attributable to Capri | $ 569 | $ 960 | $ (81) |

See accompanying notes to consolidated financial statements.

72

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**
**(in millions, except share data which is in thousands)**

| | Ordinary Shares | | Additional Paid-in Capital | Treasury Shares | | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total Equity of Capri | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | | Shares | Amounts | | | | | |
| **Balance as of March 28, 2020** | 217,320 | $ - | $ 1,085 | (67,894) | $ (3,325) | $ 75 | $ 4,332 | $ 2,167 | $ 1 | $ 2,168 |
| Net loss | - | - | - | - | - | - | (62) | (62) | (1) | (63) |
| Other comprehensive loss | - | - | - | - | - | (19) | - | (19) | - | (19) |
| Total comprehensive loss | - | - | - | - | - | - | - | (81) | (1) | (82) |
| Vesting of restricted awards, net of forfeitures | 1,456 | - | - | - | - | - | - | - | - | - |
| Exercise of employee share options | 447 | - | 3 | - | - | - | - | 3 | - | 3 |
| Share based compensation expense | - | - | 70 | - | - | - | - | 70 | - | 70 |
| Repurchase of ordinary shares | - | - | - | (49) | (1) | - | - | (1) | - | (1) |
| Other | - | - | - | - | - | - | - | - | (1) | (1) |
| **Balance as of March 27, 2021** | 219,223 | - | 1,158 | (67,943) | (3,326) | 56 | 4,270 | 2,158 | (1) | 2,157 |
| Net income | - | - | - | - | - | - | 822 | 822 | 1 | 823 |
| Other comprehensive income (loss) | - | - | - | - | - | 138 | - | 138 | (1) | 137 |
| Total comprehensive income | - | - | - | - | - | - | - | 960 | - | 960 |
| Vesting of restricted awards, net of forfeitures | 2,336 | - | - | - | - | - | - | - | - | - |
| Exercise of employee share options | 408 | - | 17 | - | - | - | - | 17 | - | 17 |
| Share based compensation expense | - | - | 85 | - | - | - | - | 85 | - | 85 |
| Repurchase of ordinary shares | - | - | - | (11,218) | (661) | - | - | (661) | - | (661) |
| **Balance at April 2, 2022** | 221,967 | - | 1,260 | (79,161) | (3,987) | 194 | 5,092 | 2,559 | (1) | 2,558 |
| Net income | - | - | - | - | - | - | 616 | 616 | 3 | 619 |
| Other comprehensive loss | - | - | - | - | - | (47) | - | (47) | - | (47) |
| Total comprehensive income | - | - | - | - | - | - | - | 569 | 3 | 572 |
| Vesting of restricted awards, net of forfeitures | 2,078 | - | - | - | - | - | - | - | - | - |
| Exercise of employee share options | 121 | - | 6 | - | - | - | - | 6 | - | 6 |
| Share based compensation expense | - | - | 78 | - | - | - | - | 78 | - | 78 |
| Repurchase of ordinary shares | - | - | - | (27,658) | (1,364) | - | - | (1,364) | - | (1,364) |
| Other | - | - | - | - | - | - | - | - | (1) | (1) |
| **Balance at April 1, 2023** | 224,166 | - | 1,344 | (106,819) | $ (5,351) | $ 147 | $ 5,708 | $ 1,848 | $ 1 | $ 1,849 |

See accompanying notes to consolidated financial statements.

73

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In millions)**

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ 619 | $ 823 | $ (63) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 179 | 193 | 212 |
| Share-based compensation expense | 78 | 85 | 71 |
| Impairment of assets | 142 | 83 | 316 |
| Deferred income taxes | (101) | (57) | (70) |
| Changes to lease related balances, net | (99) | (142) | (112) |
| Foreign currency losses (gains) | 28 | - | (15) |
| Other non-cash charges | 7 | 10 | 7 |
| Change in assets and liabilities: | | | |
| Receivables, net | 50 | (78) | (52) |
| Inventories, net | 13 | (386) | 145 |
| Prepaid expenses and other current assets | (8) | 14 | (31) |
| Accounts payable | (100) | 69 | 50 |
| Accrued expenses and other current liabilities | (9) | 30 | 153 |
| Other long-term assets and liabilities | (28) | 60 | 13 |
| Net cash provided by operating activities | 771 | 704 | 624 |
| **Cash flows from investing activities** | | | |
| Capital expenditures | (226) | (131) | (111) |
| Cash paid for asset/business acquisitions, net of cash acquired | - | - | (13) |
| Settlement of net investment hedges | 409 | 189 | - |
| Net cash provided by (used in) investing activities | 183 | 58 | (124) |
| **Cash flows from financing activities** | | | |
| Debt borrowings | 4,061 | 945 | 2,443 |
| Debt repayments | (3,474) | (1,132) | (3,311) |
| Debt issuance costs | (5) | - | (4) |
| Repurchase of ordinary shares | (1,364) | (661) | (1) |
| Exercise of employee share options | 6 | 17 | 3 |
| Other financing activities | - | 31 | - |
| Net cash used in financing activities | (776) | (800) | (870) |
| Effect of exchange rate changes on cash and cash equivalents | (94) | (24) | 12 |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 84 | (62) | (358) |
| Beginning of period | 172 | 234 | 592 |
| End of period | $ 256 | $ 172 | $ 234 |
| **Supplemental disclosures of cash flow information** | | | |
| Cash paid for interest | $ 58 | $ 37 | $ 52 |
| Cash paid for income taxes | $ 133 | $ 43 | $ 45 |
| **Supplemental disclosure of non-cash investing and financing activities** | | | |
| Accrued capital expenditures | $ 33 | $ 39 | $ 17 |

See accompanying notes to consolidated financial statements.

Table of Contents

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Business and Basis of Presentation**

The Company was incorporated in the British Virgin Islands on December 13, 2002 as Michael Kors Holdings Limited and changed its name to Capri Holdings Limited ("Capri," and together with its subsidiaries, the "Company") on December 31, 2018. The Company is a holding company that owns brands that are leading designers, marketers, distributors and retailers of branded women's and men's accessories, apparel and footwear bearing the Versace, Jimmy Choo and Michael Kors tradenames and related trademarks and logos. The Company operates in three reportable segments: Versace, Jimmy Choo and Michael Kors. See Note 19 for additional information.

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and include the accounts of the Company and its wholly-owned or controlled subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation. The Company consolidates the results of its Versace business on a one-month lag, as consistent with prior periods.

The Company utilizes a 52- to 53-week fiscal year, and the term "Fiscal Year" or "Fiscal" refers to that 52-week or 53-week period. The fiscal years ending on April 1, 2023 and March 27, 2021 ("Fiscal 2023" and "Fiscal 2021", respectively) contain 52 weeks, whereas the fiscal year ending April 2, 2022 ("Fiscal 2022") contains 53 weeks. The Company's Fiscal 2024 is a 52-week period ending March 30, 2024.

**2. Summary of Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in accordance with U.S. GAAP requires management to use judgment and make estimates that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The level of uncertainty in estimates and assumptions increases with the length of time until the underlying transactions are completed. The most significant assumptions and estimates involved in preparing the financial statements include allowances for customer deductions, sales returns, sales discounts, credit losses, estimates of inventory net realizable value, the valuation of share-based compensation, the valuation of deferred taxes, goodwill, intangible assets, operating lease right-of-use assets and property and equipment, along with the estimated useful lives assigned to these assets. Actual results could differ from those estimates.

*Seasonality*

The Company experiences certain effects of seasonality with respect to its business. The Company generally experiences greater sales during its third fiscal quarter, primarily driven by holiday season sales, and the lowest sales during its first fiscal quarter.

*Revenue Recognition*

The Company accounts for contracts with its customers when there is approval and commitment from both parties, the rights of the parties and payment terms have been identified, the contract has commercial substance and collectability of consideration is probable. Revenue is recognized when control of the promised goods or services is transferred to the Company's customers in an amount that reflects the consideration the Company expects to be entitled to in exchange for goods or services. The Company recognizes retail store revenues when control of the product is transferred at the point of sale at Company owned stores, including concessions, net of estimated returns. Revenue from sales through the Company's e-commerce sites is recognized at the time of delivery to the customer, reduced by an estimate of returns. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, after merchandise is shipped and control of the underlying product is transferred to the Company's wholesale customers. To arrive at net sales for retail revenue, gross sales are reduced by actual customer returns as well as by a provision for estimated future customer returns, which is based on management's review of historical and future customer return expectations. Sales taxes collected from retail customers are presented on a net basis and, as such, are excluded from revenue. To arrive at net sales for wholesale revenue, gross sales are reduced by provisions for estimated future returns, based on current expectations, as well as trade discounts, markdowns,

75

Table of Contents

allowances, operational chargebacks, and certain cooperative selling expenses. These estimates are based on such factors as historical trends, actual and forecasted performance and current market conditions, which are reviewed by management on a quarterly basis.

The following table details the activity and balances of the Company's sales reserves for the fiscal years ended April 1, 2023, April 2, 2022, and March 27, 2021 (in millions):

| | Balance Beginning of Year | Amounts Charged to Revenue | Write-offs Against Reserves | Balance at Year End |
|---|---|---|---|---|
| **Total Sales Reserves:** | | | | |
| Fiscal Year Ended April 1, 2023 | $ 92 | $ 400 | $ (397) | $ 95 |
| Fiscal Year Ended April 2, 2022 | 98 | 333 | (339) | 92 |
| Fiscal Year Ended March 27, 2021 | 166 | 313 | (381) | 98 |

Royalty revenue generated from product licenses, which includes contributions for advertising, is based on reported sales of licensed products bearing the Company's trademarks at rates specified in the license agreements. These agreements are also subject to contractual minimum levels. Royalty revenue generated by geographic licensing agreements is recognized as it is earned under the licensing agreements based on reported sales of licensees applicable to specified periods, as outlined in the agreements. These agreements allow for the use of the Company's tradenames to sell its branded products in specific geographic regions.

**Loyalty Program**

The Company offers a loyalty program, which allows its Michael Kors United States customers to earn points on qualifying purchases toward monetary and non-monetary rewards, which may be redeemed for purchases at Michael Kors retail stores and e-commerce sites. The Company defers a portion of the initial sales transaction based on the estimated relative fair value of the benefits based on projected timing of future redemptions and historical activity. These amounts include estimated "breakage" for points that are not expected to be redeemed. The contract liability, net of an estimated "breakage," is recorded within accrued expenses and other current liabilities in the Company's consolidated balance sheets and is expected to be recognized within the next 12 months. See Note 3 for additional information.

*Advertising and Marketing Costs*

Advertising and marketing costs are generally expensed when the advertisement is first exhibited and are recorded in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss). Advertising and marketing expense was $374 million, $329 million and $137 million in Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively.

Cooperative advertising expense, which represents the Company's participation in advertising expenses of its wholesale customers, is reflected as a reduction to revenue. Expenses related to cooperative advertising for Fiscal 2023, Fiscal 2022 and Fiscal 2021, were $9 million, $4 million and $3 million, respectively.

*Shipping and Handling*

Inbound freight expenses are recorded as part of cost of goods sold, along with product costs and other costs to acquire inventory. The costs of preparing products for sale, including warehousing expenses, are included in selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss). Outbound freight expenses are recorded as part of selling, general and administrative expenses and include the costs of shipping products to the Company's e-commerce customers. Shipping and handling costs included within selling, general and administrative expenses in the Company's consolidated statements of operations and comprehensive income (loss) were $270 million, $236 million and $160 million for Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively. Shipping and handling costs charged to customers are included in total revenue.

*COVID-19 Related Government Assistance and Subsidies*

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, the Company recorded $6 million, $10 million and $37 million, respectively, related to government assistance and subsidies. These amounts mostly relate to rent support and payroll expense and were recorded as a reduction of selling, general and administrative expenses.

Table of Contents

***Cash, Cash Equivalents and Restricted Cash***

All highly liquid investments with original maturities of three months or less are considered to be cash equivalents. Included in the Company's cash and cash equivalents as of April 1, 2023 and April 2, 2022 are credit card receivables of $22 million and $18 million, respectively, which generally settle within two to three business days.

A reconciliation of cash, cash equivalents and restricted cash as of April 1, 2023 and April 2, 2022 from the consolidated balance sheets to the consolidated statements of cash flows is as follows:

| | Fiscal Years Ended | |
| --- | --- | --- |
| | April 1, 2023 | April 2, 2022 |
| Reconciliation of cash, cash equivalents and restricted cash | | |
| Cash and cash equivalents | $ 249 | $ 169 |
| Restricted cash included within prepaid expenses and other current assets | 7 | 3 |
| **Total cash, cash equivalents and restricted cash shown in the consolidated statements of cash flows** | $ 256 | $ 172 |

***Inventories***

Inventories primarily consist of finished goods with the exception of raw materials and work in process. The combined total of raw materials and work in process recorded on the Company's consolidated balance sheets as of April 1, 2023 and April 2, 2022 were $47 million and $31 million, respectively. Inventories are stated at the lower of cost or net realizable value. Cost is determined using the weighted-average cost method. Costs include amounts paid to independent manufacturers, plus duties and freight to bring the goods to the Company's warehouses, as well as shipments to stores. The Company continuously evaluates the composition of its inventory and makes adjustments when the cost of inventory is not expected to be fully recoverable. The net realizable value of the Company's inventory is estimated based on historical experience, current and forecasted demand and other market conditions. In addition, reserves for inventory losses are estimated based on historical experience and physical inventory counts. The Company's inventory reserves are estimates, which could vary significantly from actual results if future economic conditions, customer demand or competition differ from expectations. Our historical estimates of these adjustments have not differed materially from actual results.

***Store Pre-opening Costs***

Costs associated with the opening of new retail stores and start up activities are expensed as incurred.

***Property and Equipment***

Property and equipment is stated at cost less accumulated depreciation and amortization (carrying value). Depreciation is recorded on a straight-line basis over the expected remaining useful lives of the related assets. Equipment, furniture and fixtures are depreciated over five to seven years, computer hardware and software are depreciated over three to five years. The Company's share of the cost of constructing in-store shop displays within its wholesale customers' floor-space ("shop-in-shops"), which is paid directly to third-party suppliers, is capitalized as property and equipment and is generally amortized over a useful life of three to five years. Leasehold improvements are amortized using the straight-line method over the shorter of the estimated remaining useful lives of the related assets or the remaining lease term, including highly probable renewal periods. Maintenance and repairs are charged to expense in the year incurred.

The Company capitalizes, in property and equipment, direct costs incurred during the application development stage and the implementation stage for developing, purchasing or otherwise acquiring software for its internal use. These costs are amortized over the estimated useful lives of the software, generally five years, except for ERP systems which has an estimated useful life of ten years. All costs incurred during the preliminary project stage, including project scoping and identification and testing of alternatives, are expensed as incurred.

Table of Contents

***Definite-lived Intangible Assets***

The Company's definite-lived intangible assets consist of trademarks and customer relationships which are stated at cost less accumulated amortization. The Company's customer relationships are amortized over five to eighteen years. Reacquired rights recorded in connection with the acquisition of Michael Kors (HK) Limited and Subsidiaries ("MKHKL") are amortized through March 31, 2041, the original expiration date of the Michael Kors license agreement in the Greater China region. The trademark for the Michael Kors brand is amortized over twenty years.

***Long-lived Assets***

The Company evaluates all long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. For the purposes of impairment testing, the Company groups long-lived assets at the lowest level of identifiable cash flow. Leasehold improvements are typically amortized over the term of the store lease, including reasonably assured renewals and the shop-in-shops are amortized over a useful life of three to five years. The Company's impairment testing is based on its best estimate of the future operating cash flows. If the sum of our estimated undiscounted future cash flows associated with the asset is less than the asset's carrying value, the Company would recognize an impairment charge, which is measured as the amount by which the carrying value exceeds the fair value of the asset. The fair values determined by management require significant judgment and include certain assumptions regarding future sales and expense growth rates, discount rates and estimates of real estate market fair values. As such, these estimates may differ from actual results and are affected by future market and economic conditions.

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, the Company recorded impairment charges of $36 million, $83 million and $158 million, respectively, which were primarily related to operating lease right-of-use assets and fixed assets of our retail store locations. Please refer to Note 7 and Note 13 for additional information.

***Goodwill and Other Indefinite-lived Intangible Assets***

The Company records intangible assets based on their fair value on the date of acquisition. Goodwill is recorded as the difference between the fair value of the purchase consideration and the fair value of the net identifiable tangible and intangible assets acquired. The brand intangible assets recorded in connection with the acquisitions of Versace and Jimmy Choo were determined to be indefinite-lived intangible assets, which are not subject to amortization. The Company performs an impairment assessment of goodwill, as well as the Versace brand and Jimmy Choo brand intangible assets on an annual basis, or whenever impairment indicators exist. In the absence of any impairment indicators, goodwill, for the Versace brand and the Jimmy Choo brand are assessed for impairment during the fourth quarter of each fiscal year. Judgments regarding the existence of impairment indicators are based on market conditions and operational performance of the business.

The Company may assess its goodwill and its brand intangible assets for impairment initially using a qualitative approach to determine whether it is more likely than not that the fair value of these assets is greater than their carrying value. When performing a qualitative test, the Company assesses various factors, including industry and market conditions, macroeconomic conditions and performance of its businesses. If the results of the qualitative assessment indicate that it is more likely than not that our goodwill and other indefinite-lived intangible assets are impaired, a quantitative impairment analysis is performed to determine if impairment is required. The Company may also elect to perform a quantitative analysis of goodwill and its indefinite-lived intangible assets initially rather than using a qualitative approach.

The impairment testing for goodwill is performed at the reporting unit level. The Company uses industry accepted valuation models and set criteria that are reviewed and approved by various levels of management and, in certain instances, it engages independent third-party valuation specialists. To determine the fair value of a reporting unit, the Company uses a combination of the income and market approaches, when applicable. The Company believes the blended use of both models, when applicable, compensates for the inherent risk associated with either model if used on a stand-alone basis, and this combination is indicative of the factors a market participant would consider when performing a similar valuation. If the fair value of a reporting unit exceeds the related carrying value, the reporting unit's goodwill is considered not to be impaired and no further testing is performed. If the carrying value of a reporting unit exceeds its fair value, an impairment loss is recorded for the difference. These valuations are affected by certain estimates, including future revenue growth rates, future operating expense growth rates, gross margins and discount rates. Future events could cause us to conclude that impairment indicators exist and goodwill may be impaired.

78

Table of Contents

When performing a quantitative impairment assessment of our brand intangible assets, the fair value of the Versace and the Jimmy Choo brands is estimated using a discounted cash flow analysis based on the "relief from royalty" method, assuming that a third-party would be willing to pay a royalty in lieu of ownership for this intangible asset. This approach is dependent on many factors, including estimates of future revenue growth rates, royalty rates and discount rates. Actual future results may differ from these estimates. An impairment loss is recognized when the estimated fair value of the brand intangible assets is less than its carrying amount.

During the fourth quarter of Fiscal 2023, the Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for each brand. Based on a qualitative impairment assessment of the Michael Kors reporting units, the Company concluded that it is more likely than not that the fair value of the Michael Kors reporting units exceeded its carrying value and, therefore, was not impaired.

The Company elected to perform quantitative impairment analyses for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair values of reporting units. The Company also elected to perform a quantitative impairment analysis for the Versace and Jimmy Choo brand intangible assets using an income approach to estimate the fair values. The Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair value of each brands' reporting units. The Company also elected to perform a quantitative impairment analysis for both the Versace and Jimmy Choo brand indefinite-lived intangible assets using an income approach to estimate the fair values. Based on the results of these assessments, the Company determined there was no impairment for the Jimmy Choo licensing reporting unit and Jimmy Choo wholesale brand indefinite-lived intangible asset and Versace reporting units or brand intangible assets, as the fair values of the reporting units and the brand intangible assets exceeded the related carrying amounts.

However, the Company concluded that the fair value of the Jimmy Choo retail and wholesale reporting units goodwill, along with the Jimmy Choo retail brand indefinite-lived intangible assets, did not exceed their related carrying amounts. The resulting impairment charges were primarily related to a higher discount rate in the current year driven by higher risk-free rates. Accordingly, the Company recorded impairment charges of $82 million related to the Jimmy Choo retail and wholesale reporting units goodwill and $24 million related to the Jimmy Choo retail brand intangible assets during Fiscal 2023. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended April 1, 2023.

In Fiscal 2022, the Company did not incur any impairment charges. In Fiscal 2021, the Company recorded impairment charges of $94 million related to the Jimmy Choo retail and Jimmy Choo licensing reporting units and $69 million related to the Jimmy Choo brand intangible assets. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended March 27, 2021. See Note 8 for information relating to the Company's annual impairment analysis performed during the fourth quarter of Fiscal 2023, Fiscal 2022 and Fiscal 2021.

It is possible that the Company's conclusions regarding impairment or recoverability of goodwill or other indefinite-lived intangible assets could change in future periods if, for example, (i) the Company's businesses do not perform as projected, (ii) overall economic conditions in future years vary from current assumptions, (iii) business conditions or strategies change from our current assumptions, (iv) discount rates change, (v) market multiples change or (vi) the identification of the Company's reporting units change, among other factors. Such changes could result in a future impairment charge of goodwill or other indefinite-lived intangible assets.

*Insurance*

The Company uses a combination of insurance and self-insurance programs, including a wholly-owned captive insurance entity, to provide for the potential liabilities for certain risks, including workers' compensation and employee-related health care benefits. The Company also maintains stop-loss coverage with third-party insurers to limit its exposure arising from certain claims. Self-insurance claims filed and claims incurred but not reported are accrued based upon management's estimates of the discounted cost for self-insured claims incurred using actuarial assumptions, historical loss experience, actual payroll and other data. Although the Company believes that it can reasonably estimate losses related to these claims, actual results could differ from these estimates.

The Company also maintains other types of customary business insurance policies, including general liability, directors and officers, marine transport and inventory and business interruption insurance. Insurance recoveries represent gain contingencies and are recorded upon actual settlement with the insurance carrier.

Table of Contents

***Share-based Compensation***

The Company grants share-based awards to certain employees and directors of the Company. The grant date fair value of share options is calculated using the Black-Scholes option pricing model. The Company uses its own historical experience in determining the expected holding period and volatility of its time-based share option awards. The risk-free interest rate is derived from the zero-coupon United States ("U.S.") Treasury Strips yield curve based on the grant's estimated holding period. Determining the grant date fair value of share-based awards requires considerable judgment, including estimating expected volatility, expected term and risk-free rate. If factors change and the Company employs different assumptions, the fair value of future awards and the resulting share-based compensation expense may differ significantly from what the Company has estimated in the past.

The closing market price of the Company's shares on the date of grant is used to determine the grant date fair value of restricted shares, time-based restricted stock units ("RSUs") and performance-based RSUs. These fair values are recognized as expense over the requisite service period, net of estimated forfeitures, based on expected attainment of pre-established performance goals for performance grants, or the passage of time for those grants which have only time-based vesting requirements.

***Foreign Currency Translation and Transactions***

The financial statements of the majority of the Company's foreign subsidiaries are measured using the local currency as the functional currency. The Company's functional currency is the United States Dollar ("USD") for Capri and its United States based subsidiaries. Assets and liabilities are translated using period-end exchange rates, while revenues and expenses are translated using average exchange rates over the reporting period. The resulting translation adjustments are recorded separately in shareholders' equity as a component of accumulated other comprehensive income. Foreign currency income and losses resulting from the re-measuring of transactions denominated in a currency other than the functional currency of a particular entity are included in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss).

***Derivative Financial Instruments***

**Forward Foreign Currency Exchange Contracts**

The Company uses forward foreign currency exchange contracts to manage its exposure to fluctuations in foreign currencies for certain transactions. The Company, in its normal course of business, enters into transactions with foreign suppliers and seeks to minimize risks related to these transactions. The Company employs these forward contracts to hedge the Company's cash flows, as they relate to transactions denominated in foreign currencies. Certain of these contracts are designated as hedges for accounting purposes, while others remain undesignated. All of the Company's derivative instruments are recorded in the Company's consolidated balance sheets at fair value on a gross basis, regardless of their hedge designation.

The Company designates certain contracts related to the purchase of inventory that qualify for hedge accounting as cash flow hedges. Formal hedge documentation is prepared for all derivative instruments designated as hedges, including a description of the hedged transaction, the hedging instrument and the risk being hedged. The changes in the fair value for contracts designated as cash flow hedges are recorded in equity as a component of accumulated other comprehensive income until the hedged item affects earnings. When the inventory related to forecasted inventory purchases that are being hedged is sold to a third-party, the gains or losses deferred in accumulated other comprehensive income are recognized within cost of goods sold. The Company uses regression analysis to assess effectiveness of derivative instruments that are designated as hedges, which compares the change in the fair value of the derivative instrument to the change in the related hedged item. If the hedge is no longer expected to be highly effective, future changes in the fair value are recognized in earnings. For those contracts that are not designated as hedges, changes in the fair value are recorded to foreign currency loss (gain) in the Company's consolidated statements of operations and comprehensive income (loss). The Company classifies cash flows relating to its forward foreign currency exchange contracts related to purchase of inventory consistently with the classification of the hedged item, within cash flows from operating activities.

The Company is exposed to the risk that counterparties to derivative contracts will fail to meet their contractual obligations. In order to mitigate counterparty credit risk, the Company only enters into contracts with carefully selected financial institutions based upon their credit ratings and certain other financial factors, adhering to established limits for credit exposure. The aforementioned forward contracts generally have a term of no more than 12 months. The period of these contracts is directly related to the transactions they are intended to hedge.

80

Table of Contents

**Net Investment Hedges**

The Company also uses fixed-to-fixed cross currency swap agreements to hedge its net investments in foreign operations against future volatility in the exchange rates between different currencies. The Company has elected the spot method of designating these contracts under ASU 2017-12, "*Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities,*" and has designated these contracts as net investment hedges. The net gain or loss on the net investment hedge is reported within foreign currency translation income (loss) ("CTA"), as a component of accumulated other comprehensive income on the Company's consolidated balance sheets. Interest accruals and coupon payments are recognized directly in interest expense (income), net in the Company's consolidated statements of operations and comprehensive income (loss). Upon discontinuation of a hedge, all previously recognized amounts remain in CTA until the net investment is sold, diluted or liquidated.

**Fair Value Hedges**

When a cross-currency swap is designated as a fair value hedge and qualifies as highly effective, the fair value hedge will be recorded at fair value each period on the Company's consolidated balance sheets, with the difference resulting from the changes in the spot rate recognized in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss), which will offset the earnings impact of the original transaction being hedged for.

*Income Taxes*

Deferred income tax assets and liabilities provide for temporary differences between the tax bases and financial reporting bases of the Company's assets and liabilities using the tax rates and laws in effect for the periods in which the differences are expected to reverse. The Company periodically assesses the realizability of deferred tax assets and the adequacy of deferred tax liabilities, based on the results of local, state, federal or foreign statutory tax audits or estimates and judgments used.

Realization of deferred tax assets associated with net operating loss and tax credit carryforwards are dependent upon generating sufficient taxable income prior to their expiration in the applicable tax jurisdiction. The Company periodically reviews the recoverability of its deferred tax assets and provides valuation allowances, as deemed necessary, to reduce deferred tax assets to amounts that more-likely-than-not will be realized. The Company's management considers many factors when assessing the likelihood of future realization of deferred tax assets, including recent earnings within various taxing jurisdictions, expectations of future taxable income, the carryforward periods remaining and other factors. Changes in the required valuation allowance are recorded in income in the period such determination is made. Deferred tax assets could be reduced in the future if the Company's estimates of taxable income during the carryforward period are significantly reduced or alternative tax strategies are no longer viable.

The Company recognizes the impact of an uncertain income tax position taken on its income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. An uncertain income tax position will be recognized if it has less than a 50% likelihood of being sustained. The tax positions are analyzed periodically (at least quarterly) and adjustments are made as events occur that warrant adjustments for those positions. The Company records interest expense and penalties payable to relevant tax authorities as income tax expense.

*Leases*

On March 31, 2019, the Company adopted ASU 2016-02, "Leases (Topic 842)," which requires lessees to recognize a lease liability and a right-of-use asset on the balance sheet for all leases, except certain short-term leases. The Company adopted the new standard recognizing a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption without restating the comparative prior year periods.

The Company leases retail stores, office space and warehouse space under operating lease agreements that expire at various dates through September 2043. The Company's leases generally have terms of up to ten years, generally require fixed rent payments and may require the payment of additional rent if store sales exceed a negotiated amount. Although most of the Company's equipment is owned, the Company has limited equipment leases that expire on various dates through August 2027. The Company acts as sublessor in certain leasing arrangements, primarily related to closed stores under its restructuring initiatives, as defined in Note 10. Fixed sublease payments received are recognized on a straight-line basis over the sublease term. The Company determines the sublease term based on the date it provides possession to the subtenant through the expiration date of the sublease.

81

Table of Contents

The Company recognizes operating lease right-of-use assets and lease liabilities at lease commencement date, based on the present value of fixed lease payments over the expected lease term. The Company uses its incremental borrowing rates to determine the present value of fixed lease payments based on the information available at the lease commencement date, as the rate implicit in the lease is not readily determinable for the Company's leases. The Company's incremental borrowing rates are based on the term of the leases, the economic environment of the leases and reflect the expected interest rate it would incur to borrow on a secured basis. Certain leases include one or more renewal options, generally for the same period as the initial term of the lease. The exercise of lease renewal options is generally at the Company's sole discretion and as such, the Company typically determines that exercise of these renewal options is not reasonably certain. As a result, the Company generally does not include the renewal option period in the expected lease term and the associated lease payments are not included in the measurement of the operating lease right-of-use asset and lease liability. Certain leases also contain termination options with an associated penalty. Generally, the Company is reasonably certain not to exercise these options and as such, they are not included in the determination of the expected lease term. The Company recognizes operating lease expense on a straight-line basis over the lease term.

Leases with an initial lease term of 12 months or less are not recorded on the balance sheet. The Company recognizes lease expense for its short-term leases on a straight-line basis over the lease term.

The Company's leases generally provide for payments of non-lease components, such as common area maintenance, real estate taxes and other costs associated with the leased property. The Company accounts for lease and non-lease components of its real estate leases together as a single lease component and, as such, includes fixed payments of non-lease components in the measurement of the operating lease right-of-use assets and lease liabilities for its real estate leases. Variable lease payments, such as percentage rentals based on location sales, periodic adjustments for inflation, reimbursement of real estate taxes, any variable common area maintenance and any other variable costs associated with the leased property, are expensed as incurred as variable lease costs and are not recorded on the balance sheet. The Company's lease agreements do not contain any material residual value guarantees or material restrictions or covenants.

### Debt Issuance Costs and Unamortized Discounts

The Company defers debt issuance costs directly associated with acquiring third-party financing. These debt issuance costs and any discounts on issued debt are amortized on a straight-line basis, which approximates the effective interest method, as interest expense over the term of the related indebtedness. Deferred financing fees associated with the Company's Revolving Credit Facilities are primarily recorded within other assets in the Company's consolidated balance sheets. Deferred financing fees and unamortized discounts associated with the Company's other borrowings are primarily recorded as an offset to long-term debt in the Company's consolidated balance sheets. See Note 11 for additional information.

### Net Income (Loss) per Share

The Company's basic net income (loss) per ordinary share is calculated by dividing net income (loss) by the weighted average number of ordinary shares outstanding during the period. Diluted net income (loss) per ordinary share reflects the potential dilution that would occur if RSUs or any other potentially dilutive instruments, including share option grants, were converted or exercised into ordinary shares. These potentially dilutive securities are included in diluted shares to the extent they are dilutive under the treasury stock method for the applicable periods. Performance-based RSUs are included in diluted shares if the related performance conditions are considered satisfied as of the end of the reporting period and to the extent they are dilutive under the treasury stock method.

Table of Contents

The components of the calculation of basic net income (loss) per ordinary share and diluted net income (loss) per ordinary share are as follows (in millions, except share and per share data):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| **Numerator:** | | | |
| Net income (loss) attributable to Capri | $ 616 | $ 822 | $ (62) |
| **Denominator:** | | | |
| Basic weighted average shares | 132,532,009 | 149,724,675 | 150,453,568 |
| Weighted average dilutive share equivalents: | | | |
| Share options, restricted stock units, and performance restricted stock units | 1,470,471 | 2,773,232 | - |
| Diluted weighted average shares | 134,002,480 | 152,497,907 | 150,453,568 |
| Basic net income (loss) per share [1] | $ 4.65 | $ 5.49 | $ (0.41) |
| Diluted net income (loss) per share [1] | $ 4.60 | $ 5.39 | $ (0.41) |

[1]   Basic and diluted net income (loss) per share are calculated using unrounded numbers.

Share equivalents of 457,722 shares, 360,378 shares and 3,658,959 shares, for Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively, have been excluded from the above calculation due to their anti-dilutive effect.

Diluted net loss per share attributable to Capri for Fiscal 2021 excluded all potentially dilutive securities because there was a net loss attributable to Capri for the period and, as such, the inclusion of these securities would have been anti-dilutive.

*Noncontrolling Interest*

The Company has an ownership interest in the Michael Kors Latin American joint venture, MK (Panama) Holdings, S.A. and subsidiaries of 75%, an ownership interest in the Jimmy Choo EMEA joint venture JC Gulf Trading LLC of 49% and an ownership interest in the Jimmy Choo Macau joint venture J. Choo (Macau) Co. Limited of 70%.

*Recently Adopted Accounting Pronouncements*

**Government Assistance Disclosures**

In November 2021, the Financial Accounting Standards Board ("FASB") issued ASU 2021-10, "Disclosures by Business Entities about Government Assistance", which requires all businesses provide annual disclosures about transactions with a government that are accounted for by applying a grant or contribution accounting model by analogy. These disclosures include providing the nature of the transactions and the related accounting policy used to account for the transactions, the amounts and financial statement line items impacted by these transactions, and the significant terms and conditions of these transactions, including commitments and contingencies related to such transactions. ASU 2021-10 is effective for the Company beginning in its Fiscal 2023 with early adoption permitted. The Company early adopted ASU 2021-10 during the third quarter of Fiscal 2022 and will continue to utilize the grant accounting model.

*Recently Issued Accounting Pronouncements*

The Company has considered all new accounting pronouncements and, other than the recent pronouncements discussed below, have concluded that there are no new pronouncements that may have a material impact on the Company's results of operations, financial condition or cash flows based on current information.

Table of Contents

**Supplier Finance Programs**

In September 2022, the FASB issued ASU 2022-04, "Disclosure of Supplier Finance Program Obligations" which makes a number of changes. The amendments require a buyer in a supplier finance program to disclose sufficient information about the program to allow a user of financial statements to understand the program's nature, activity during the period, changes from period to period and potential magnitude. The amendments in this update are effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years, except for the amendment on roll forward information, which is effective for fiscal years beginning after December 15, 2023. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on the Company's disclosures.

**3. Revenue Recognition**

The Company accounts for contracts with its customers when there is approval and commitment from both parties, the rights of the parties and payment terms have been identified, the contract has commercial substance and collectability of consideration is probable. Revenue is recognized when control of the promised goods or services is transferred to the Company's customers in an amount that reflects the consideration the Company expects to be entitled to in exchange for goods or services.

The Company sells its products through three primary channels of distribution: retail, wholesale and licensing. Within the retail and wholesale channels, substantially all of the Company's revenues consist of sales of products that represent a single performance obligation, where control transfers at a point in time to the customer. For licensing arrangements, royalty and advertising revenue is recognized over time based on access provided to the Company's brands.

The Company has chosen to apply the practical expedient allowing it not to disclose the amount of the transaction price allocated to the remaining performance obligations that have an expected duration of 12 months or less.

*Retail*

The Company generates sales through directly operated stores and e-commerce sites throughout the Americas (United States, Canada and Latin America), certain parts of EMEA (Europe, Middle East and Africa) and certain parts of Asia (Asia and Oceania). Retail revenue is recognized when control of the product is transferred at the point of sale at Company owned stores, including concessions. For e-commerce transactions, control is transferred and revenue is recognized when products are delivered to the customer. To arrive at net sales for retail, gross sales are reduced by actual customer returns, as well as by a provision for estimated future customer returns.

Sales tax collected from retail customers are presented on a net basis and, as such, are excluded from revenue. Shipping and handling costs that are billed to customers are included in net sales, with the related costs recorded in cost of goods sold. Shipping and handling costs that are not billed to customers are accounted for as fulfillment costs.

*Gift Cards.* The Company sells gift cards that can be redeemed for merchandise, resulting in a contract liability upon issuance. Revenue is recognized when the gift card is redeemed or upon "breakage" for the estimated portion of gift cards that are not expected to be redeemed. "Breakage" revenue is calculated under the proportional redemption methodology, which considers the historical patterns of redemption in jurisdictions where the Company is not required to remit the value of the unredeemed gift cards as unclaimed property. The Company anticipates that substantially all of its outstanding gift cards will be redeemed within the next 12 months. The contract liability related to gift cards, net of estimated "breakage," was $14 million and $13 million as of April 1, 2023 and April 2, 2022, respectively, and is included in accrued expenses and other current liabilities in the Company's consolidated balance sheets.

*Loyalty Program.* The Company offers a loyalty program, which allows its Michael Kors United States customers to earn points on qualifying purchases toward monetary and non-monetary rewards, which may be redeemed for purchases at Michael Kors retail stores and e-commerce sites. The Company defers a portion of the initial sales transaction based on the estimated relative fair value of the benefits based on projected timing of future redemptions and historical activity. These amounts include estimated "breakage" for points that are not expected to be redeemed.

*Wholesale*

The Company's products are sold primarily to major department stores, specialty stores and travel retail shops throughout the Americas, EMEA and Asia. The Company also has arrangements where its products are sold to geographic

84

Table of Contents

licensees in certain parts of EMEA, Asia and South America. Wholesale revenue is recognized net of estimates for sales returns, discounts, markdowns and allowances, when merchandise is shipped and control of the underlying product is transferred to the Company's wholesale customers. To arrive at net sales for wholesale, gross sales are reduced by provisions for estimated future returns, as well as trade discounts, markdowns, allowances, operational chargebacks and certain cooperative selling expenses. These estimates are developed based on historical trends, actual and forecasted performance and market conditions, and are reviewed by management on a quarterly basis. Unfulfilled, non-cancelable purchase orders for products from wholesale customers (including the Company's geographic licensees) are expected to be fulfilled within the next 12 months.

*Licensing*

The Company provides its third-party licensees with the right to access its Versace, Jimmy Choo and Michael Kors trademarks under product and geographic licensing arrangements. Under product licensing arrangements, the Company allows third-parties to manufacture and sell luxury goods, including watches and jewelry, fragrances, eyewear and home furnishings, using the Company's trademarks. Under geographic licensing arrangements, third-party licensees receive the right to distribute and sell products bearing the Company's trademarks in retail and/or wholesale channels within certain geographical areas, including Brazil, the Middle East, Eastern Europe, South Africa and certain parts of Asia.

The Company recognizes royalty revenue and advertising contributions based on the percentage of sales made by the licensees. Advertising contributions are received to support the Company's branded advertising and marketing campaigns and are viewed as part of a single performance obligation with the right to access the Company's trademarks. Royalty revenue generated from licenses, which includes contributions for advertising, may be subject to contractual minimum levels, as defined in the contract. Such minimums are generally fixed annually, based on the previous year's sales. Licensing revenue is based on reported current period sales of licensed products at rates that are specified in the license agreements for contracts that are expected to exceed the related guaranteed minimums. If the Company expects the minimum guaranteed amounts to exceed amounts calculated based on actual sales, the guaranteed minimums are recognized ratably over the contractual year to which they relate. Generally, the Company's guaranteed minimum royalty amounts due from licensees relate to contractual periods that do not exceed 12 months, however, some of our guaranteed minimums for Versace are multi-year based. As of April 1, 2023, contractually guaranteed minimum fees from the Company's license agreements expected to be recognized as revenue during future periods were as follows (in millions):

|  | Contractually Guaranteed Minimum Fees |
| --- | --- |
| Fiscal 2024 | $ 33 |
| Fiscal 2025 | 33 |
| Fiscal 2026 | 30 |
| Fiscal 2027 | 25 |
| Fiscal 2028 | 18 |
| Fiscal 2029 and thereafter | 29 |
| **Total** | $ 168 |

*Sales Returns*

For the sale of goods with a right of return, the Company recognizes revenue for the consideration for which it expects to be entitled and a refund liability for the amount it expects to refund to its customers within accrued expenses and other current liabilities. The refund liability is estimated based on management's review of historical and current customer returns for its retail and wholesale customers, estimated future returns, adjusted for non-resalable products. The Company also considers its product strategies, as well as the financial condition of its customers, store closings by wholesale customers, changes in the retail environment and other macroeconomic factors. The Company recognizes an asset with a corresponding adjustment to cost of sales for the right to recover the products from its retail and wholesale customers. The refund liability recorded as of April 1, 2023 and April 2, 2022 was $54 million and $52 million, respectively, and the related asset for the right to recover returned product as of April 1, 2023 and April 2, 2022 was $17 million and $15 million, respectively.

85

Table of Contents

*Contract Balances*

The Company's contract liabilities are recorded within accrued expenses and other current liabilities and other long-term liabilities in its consolidated balance sheets depending on the short- or long-term nature of the payments to be recognized. The Company's contract liabilities primarily consist of gift card liabilities, advanced payments from product licensees and loyalty program liabilities. Total contract liabilities were $36 million and $30 million as of April 1, 2023 and April 2, 2022, respectively. During Fiscal 2023 and Fiscal 2022, the Company recognized $13 million and $10 million in revenue, respectively, relating to contract liabilities that existed at April 2, 2022 and March 27, 2021, respectively. There were no material contract assets recorded as of April 1, 2023 and April 2, 2022.

There were no changes in historical variable consideration estimates that were materially different from actual results.

*Disaggregation of Revenue*

The following table presents the Company's segment revenues disaggregated by geographic location (in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Versace revenue - the Americas | $ 408 | $ 408 | $ 201 |
| Versace revenue - EMEA | 468 | 425 | 276 |
| Versace revenue - Asia | 230 | 255 | 241 |
| **Total Versace revenue** | **1,106** | **1,088** | **718** |
| Jimmy Choo revenue - the Americas | 196 | 175 | 102 |
| Jimmy Choo revenue - EMEA | 255 | 229 | 146 |
| Jimmy Choo revenue - Asia | 182 | 209 | 170 |
| **Total Jimmy Choo revenue** | **633** | **613** | **418** |
| Michael Kors revenue - the Americas | 2,616 | 2,627 | 1,869 |
| Michael Kors revenue - EMEA | 819 | 835 | 607 |
| Michael Kors revenue - Asia | 445 | 491 | 448 |
| **Total Michael Kors revenue** | **3,880** | **3,953** | **2,924** |
| Total revenue - the Americas | 3,220 | 3,210 | 2,172 |
| Total revenue - EMEA | 1,542 | 1,489 | 1,029 |
| Total revenue - Asia | 857 | 955 | 859 |
| **Total revenue** | **$ 5,619** | **$ 5,654** | **$ 4,060** |

Table of Contents

**4. Leases**

The following table presents the Company's supplemental balance sheets information related to leases (in millions):

| | Balance Sheet Location | April 1, 2023 | April 2, 2022 |
|---|---|---:|---:|
| **Assets** | | | |
| Operating leases | Operating lease right-of-use assets | $ 1,330 | $ 1,358 |
| | | | |
| **Liabilities** | | | |
| Current: | | | |
| Operating leases | Short-term portion of operating lease liabilities | $ 429 | $ 414 |
| Non-current: | | | |
| Operating leases | Long-term portion of operating lease liabilities | $ 1,348 | $ 1,467 |

The components of net lease costs for the fiscal year ended April 1, 2023 and April 2, 2022 were as follows (in millions):

| | Consolidated Statement of Operations and Comprehensive Income (Loss) Location | April 1, 2023 | April 2, 2022 |
|---|---|---:|---:|
| Operating lease cost | Selling, general and administrative expenses | $ 405 | $ 410 |
| Variable lease cost [1] | Selling, general and administrative expenses | 170 | 135 |
| Short-term lease cost | Selling, general and administrative expenses | 8 | 16 |
| Sublease income | Selling, general and administrative expenses | (9) | (3) |
| Sublease income [2] | Restructuring and other charges | - | (5) |
| **Total lease cost, net** | | $ 574 | $ 553 |

[1]  The Company elected to account for rent concessions negotiated in connection with COVID-19 as if it were contemplated as part of the existing contract and these concessions are recorded as variable lease expense. As of the fiscal year ended April 1, 2023 and April 2, 2022, rent concessions due to COVID-19 were $14 million and $15 million, respectively.

[2]  The Company recorded sublease income related to certain leases in connection with the Capri Retail Store Optimization plan.

The following table presents the Company's supplemental cash flow information related to leases (in millions):

| | April 1, 2023 | April 2, 2022 |
|---|---:|---:|
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows used in operating leases | $ 501 | $ 543 |
| Non-cash transactions: | | |
| Lease assets obtained in exchange for new lease liabilities | 344 | 332 |
| Rent concessions due to COVID-19 | 14 | 15 |

87

Table of Contents

The following tables summarizes the weighted average remaining lease term and weighted average discount rate related to the Company's operating lease right-of-use assets and lease liabilities recorded on the balance sheets as of April 1, 2023 and April 2, 2022:

| | April 1, 2023 | April 2, 2022 |
|---|---|---|
| Operating leases: | | |
| Weighted average remaining lease term (years) | 5.9 | 6.0 |
| Weighted average discount rate | 3.3 % | 3.1 % |

At April 1, 2023, the future minimum lease payments under the terms of these noncancelable operating lease agreements are as follows (in millions):

| | April 1, 2023 |
|---|---|
| Fiscal 2024 | $ 473 |
| Fiscal 2025 | 384 |
| Fiscal 2026 | 297 |
| Fiscal 2027 | 212 |
| Fiscal 2028 | 169 |
| Thereafter | 427 |
| Total lease payments | 1,962 |
| Less: interest | (185) |
| **Total lease liabilities** | $ 1,777 |

At April 1, 2023, the future minimum sublease income under the terms of these noncancelable operating lease agreements are as follows (in millions):

| | April 1, 2023 |
|---|---|
| Fiscal 2024 | $ 8 |
| Fiscal 2025 | 7 |
| Fiscal 2026 | 5 |
| Fiscal 2027 | 4 |
| Fiscal 2028 | 4 |
| Thereafter | 8 |
| **Total sublease income** | $ 36 |

Additionally, the Company had approximately $139 million and $49 million of future payment obligations related to executed lease agreements for which the related lease has not yet commenced as of April 1, 2023 and April 2, 2022, respectively.

See Note 2 for additional information on the Company's accounting policies related to leases.

Table of Contents

**5. Receivables, net**

Receivables, net consist of (in millions):

|  | April 1, 2023 | | April 2, 2022 |
|---|---|---|---|
| Trade receivables [1] | $ | 412 | $ | 461 |
| Receivables due from licensees | | 14 | | 17 |
| | | 426 | | 478 |
| Less: allowances | | (57) | | (44) |
| **Total receivables, net** | $ | 369 | $ | 434 |

[1]  As of April 1, 2023 and April 2, 2022, $96 million and $83 million, respectively, of trade receivables were insured.

Receivables are presented net of allowances for discounts, markdowns, operational chargebacks and credit losses. Discounts are based on open invoices where trade discounts have been extended to customers. Markdowns are based on wholesale customers' sales performance, seasonal negotiations with customers, historical deduction trends and an evaluation of current market conditions. Operational chargebacks are based on deductions taken by customers, net of expected recoveries. Such provisions, and related recoveries, are reflected in revenues.

The Company's allowance for credit losses is determined through analysis of periodic aging of receivables and assessments of collectability based on an evaluation of historic and anticipated trends, the financial condition of the Company's customers and the impact of general economic conditions. The past due status of a receivable is based on its contractual terms. Amounts deemed uncollectible are written off against the allowance when it is probable the amounts will not be recovered. Allowance for credit losses was $8 million and $10 million as of April 1, 2023 and April 2, 2022, respectively. The Company had credit losses of $5 million, $7 million and $(3) million, respectively, for Fiscal 2023, Fiscal 2022 and Fiscal 2021.

**6. Concentration of Credit Risk, Major Customers and Suppliers**

Financial instruments that subject the Company to concentration of credit risk are cash and cash equivalents and receivables. As part of its ongoing procedures, the Company monitors its concentration of deposits with various financial institutions in order to avoid any undue exposure. The Company mitigates its risk by depositing cash and cash equivalents in major financial institutions. The Company also mitigates its credit risk by obtaining insurance coverage for a portion of its receivables (see Note 5). No individual customer accounted for 10% or more of the Company's total revenues during Fiscal 2023, Fiscal 2022 or Fiscal 2021.

The Company contracts for the purchase of finished goods principally with independent third-party contractors, whereby the contractor is generally responsible for all manufacturing processes. Although the Company does not have any long-term agreements with any of its manufacturing contractors, the Company believes it has mutually satisfactory relationships with them. The Company allocates product manufacturing among agents and contractors based on their capabilities, the availability of production capacity, quality, pricing and delivery. The inability of certain contractors to provide needed services on a timely basis could adversely affect the Company's operations and financial condition. For Fiscal 2023, Fiscal 2022 and Fiscal 2021, one contractor accounted for approximately 15%, 17% and 18%, respectively, of the Company's total finished goods purchases, based on dollar volume.

The Company also has relationships with various agents who source finished goods with numerous contractors on behalf of its Michael Kors brand. For Fiscal 2023, Fiscal 2022 and Fiscal 2021, one agent sourced approximately 15%, 14% and 15%, respectively, of Michael Kors finished goods, based on dollar volume.

Table of Contents

**7. Property and Equipment, net**

Property and equipment, net, consists of (in millions):

|  | April 1, 2023 | April 2, 2022 |
|---|---:|---:|
| Leasehold improvements | $ 577 | $ 575 |
| Computer equipment and software | 237 | 212 |
| Furniture and fixtures | 216 | 218 |
| Equipment | 106 | 81 |
| Building | 48 | 48 |
| In-store shops | 44 | 47 |
| Land | 18 | 19 |
| **Total property and equipment, gross** | 1,246 | 1,200 |
| Less: accumulated depreciation and amortization | (784) | (790) |
| Subtotal | 462 | 410 |
| Construction-in-progress | 90 | 66 |
| **Total property and equipment, net** | $ 552 | $ 476 |

Depreciation and amortization of property and equipment for the fiscal years ended April 1, 2023, April 2, 2022, and March 27, 2021 totaled $135 million, $144 million and $165 million, respectively. During Fiscal 2023, Fiscal 2022 and Fiscal 2021, the Company recorded property and equipment impairment charges of $3 million, $7 million and $23 million, respectively, primarily related to the Company's retail store locations. See Note 13 for additional information.

**8. Intangible Assets and Goodwill**

The following table details the carrying values of the Company's intangible assets other than goodwill (in millions):

|  | April 1, 2023 | | | April 2, 2022 | | |
|---|---:|---:|---:|---:|---:|---:|
|  | Gross Carrying Amount | Accumulated Amortization/Impairment | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization/Impairment | Net Carry Amount |
| *Definite-lived intangible assets:* |  |  |  |  |  |  |
| Reacquired rights | $ 400 | $ 109 | $ 291 | $ 400 | $ 94 | $ 306 |
| Trademarks | 23 | 23 | - | 23 | 22 | 1 |
| Customer relationships | 397 | 136 | 261 | 414 | 112 | 302 |
| **Total definite-lived intangible assets** | 820 | 268 | 552 | 837 | 228 | 609 |
| *Indefinite-lived intangible assets:* |  |  |  |  |  |  |
| Jimmy Choo brand [1] | 550 | 273 | 277 | 570 | 249 | 321 |
| Versace brand [2] | 899 | - | 899 | 917 | - | 917 |
| **Total indefinite-lived intangible assets** | 1,449 | 273 | 1,176 | 1,487 | 249 | 1,238 |
| Total intangible assets, excluding goodwill | $ 2,269 | $ 541 | $ 1,728 | $ 2,324 | $ 477 | $ 1,847 |

[1] The year-over-year change in net carrying amount reflects an impairment charge of $24 million and foreign currency translation of $20 million for the fiscal year ended April 1, 2023. There was no impairment charge for the fiscal year ended April 2, 2022.

[2] The year-over-year change in net carrying amount reflects foreign currency translation for the fiscal year ended April 1, 2023.

90

Table of Contents

Reacquired rights relate to the Company's reacquisition of the rights to use the Michael Kors trademarks and to import, sell, advertise and promote certain of its products in the previously licensed territories in the Greater China region and are being amortized through March 31, 2041, the expiration date of the former licensing agreement. The trademarks relate to the Michael Kors brand name and are amortized over twenty years. Customer relationships are generally amortized over five to eighteen years. Amortization expense for the Company's definite-lived intangibles was $44 million, $49 million and $47 million, respectively, for each of the fiscal years ended April 1, 2023, April 2, 2022 and March 27, 2021.

Indefinite-lived intangible assets other than goodwill included the Versace and Jimmy Choo brands, which were recorded in connection with the acquisitions of Versace and Jimmy Choo, and have an indefinite life as they are essential to the Company's ability to operate the Versace and Jimmy Choo businesses for the foreseeable future.

Estimated amortization expense for each of the next five years is as follows (in millions):

| | | |
|---|---|---:|
| Fiscal 2024 | $ | 44 |
| Fiscal 2025 | | 44 |
| Fiscal 2026 | | 44 |
| Fiscal 2027 | | 44 |
| Fiscal 2028 | | 43 |
| Fiscal 2029 and thereafter | | 333 |
| **Total** | $ | 552 |

The future amortization expense above reflects weighted-average estimated remaining useful lives of eighteen years for reacquired rights and ten years for customer relationships.

The following table details the changes in goodwill for each of the Company's reportable segments (in millions):

| | Versace | Jimmy Choo | Michael Kors | Total |
|---|---:|---:|---:|---:|
| Balance at March 27, 2021 | $ 933 | $ 445 | $ 120 | $ 1,498 |
| Foreign currency translation | (59) | (21) | - | (80) |
| Balance at April 2, 2022 | 874 | 424 | 120 | 1,418 |
| Impairment charges[1] | - | (82) | - | (82) |
| Foreign currency translation | (17) | (26) | - | (43) |
| Balance at April 1, 2023 | $ 857 | $ 316 | $ 120 | $ 1,293 |

[1] The Company recorded impairment charges of $82 million during Fiscal 2023 related to the Jimmy Choo retail and wholesale reporting units. As of April 1, 2023, the Company had accumulated impairment charges of $347 million related to Jimmy Choo reporting units.

The Company's goodwill and the Versace and Jimmy Choo brands are not subject to amortization but are evaluated for impairment annually in the last quarter of each fiscal year, or whenever impairment indicators exist. During the fourth quarter of Fiscal 2023, the Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis. The Company performed its goodwill impairment assessment for its Michael Kors reporting units using a qualitative assessment. Based on the results of the Company's qualitative impairment assessment, the Company concluded that it is more likely than not that the fair value of the Michael Kors' reporting units exceeded their carrying value and, therefore, were not impaired.

The Company performed its annual goodwill and indefinite-lived intangible assets impairment analysis for both the Versace and Jimmy Choo reporting units, using a combination of income and market approaches to estimate the fair value of each brands' reporting units. The Company also elected to perform an impairment analysis for both the Versace and Jimmy Choo brand indefinite-lived intangible assets using an income approach to estimate the fair values. Based on the results of these assessments, the Company determined there was no impairment for the Jimmy Choo Licensing reporting unit goodwill or Wholesale brand intangible assets and Versace reporting units goodwill or brand intangible assets, as the fair values of the reporting units and the brand intangible assets exceeded the related carrying amounts.

91

Table of Contents

However, the Company concluded that the fair value of the Jimmy Choo Retail and Wholesale reporting units goodwill, along with the Jimmy Choo Retail brand indefinite-lived intangible assets did not exceed their related carrying amounts. These impairment charges were primarily related to a higher discount rate in the current year driven by higher risk-free rates. Accordingly, the Company recorded goodwill impairment charges of $82 million related to the Jimmy Choo Retail and Wholesale reporting units and $24 million related to the Jimmy Choo Retail brand intangible assets during Fiscal 2023. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended April 1, 2023.

In Fiscal 2022, the Company did not incur any impairment charges. In Fiscal 2021, the Company recorded goodwill impairment charges of $94 million related to the Jimmy Choo Wholesale and Jimmy Choo Licensing reporting units and impairment charges of $69 million related to the Jimmy Choo brand intangible assets. The impairment charges were recorded within impairment of assets on our consolidated statement of operations and comprehensive income (loss) for the fiscal year ended March 27, 2021. See Note 13 for additional information.

## 9. Current Assets and Current Liabilities

Prepaid expenses and other current assets consist of the following (in millions):

|  | April 1, 2023 | | April 2, 2022 |
|---|---|---|---|
| Prepaid taxes | $ | 105 | $ 86 |
| Prepaid contracts | | 22 | 15 |
| Interest receivable related to hedges | | 10 | 13 |
| Other accounts receivables | | 10 | 17 |
| Other | | 48 | 61 |
| **Total prepaid expenses and other current assets** | $ | 195 | $ 192 |

Accrued expenses and other current liabilities consist of the following (in millions):

|  | April 1, 2023 | | April 2, 2022 |
|---|---|---|---|
| Return liabilities | $ | 54 | $ 52 |
| Accrued capital expenditures | | 33 | 39 |
| Other taxes payable | | 32 | 61 |
| Accrued advertising and marketing | | 26 | 21 |
| Accrued rent [1] | | 18 | 20 |
| Advance royalties | | 18 | 7 |
| Accrued interest | | 16 | 10 |
| Gift and retail store credits | | 14 | 17 |
| Professional services | | 14 | 15 |
| Accrued litigation | | 12 | 13 |
| Accrued purchases and samples | | 8 | 11 |
| Charitable donations [2] | | - | 10 |
| Other | | 69 | 75 |
| **Total accrued expenses and other current liabilities** | $ | 314 | $ 351 |

[1] The accrued rent balance relates to variable lease payments.

[2] The charitable donations balance relates to a $10 million unconditional pledge to The Versace Foundation as of April 2, 2022 which was funded during the third quarter ended December 31, 2022.

Table of Contents

**10. Restructuring and Other Charges**

*Restructuring Charges - Capri Retail Store Optimization Program*

During Fiscal 2022, the Company completed its plan to close certain retail stores as part of its Capri Retail Store Optimization Program.

The Company closed a total of 167 stores, with 66 and 101 stores closed during Fiscal 2022 and Fiscal 2021, respectively. Net restructuring charges recorded in connection with the Capri Retail Store Optimization Program was $14 million, of which $9 million and $5 million was recorded during Fiscal 2022 and Fiscal 2021, respectively.

*Other Charges*

During Fiscal 2023, the Company recorded costs of $16 million primarily relating to equity awards associated with the acquisition of Versace. During Fiscal 2022 the Company recorded costs of $33 million, primarily relating to equity awards associated with the acquisition of Versace, severance related to an executive officer and the closure of certain corporate locations. During Fiscal 2021, the Company recorded costs of $27 million, primarily relating to equity awards associated with the acquisition of Versace and the closure of certain corporate locations.

**11. Debt Obligations**

The following table presents the Company's debt obligations (in millions):

|  | April 1, 2023 | | April 2, 2022 | |
|---|---|---|---|---|
| Revolving Credit Facilities | $ | 874 | $ | 175 |
| Versace Term Loan |  | 488 |  | - |
| Senior Notes due 2024 |  | 450 |  | 450 |
| 2018 Term Loan |  | - |  | 497 |
| Other |  | 17 |  | 42 |
| **Total debt** |  | 1,829 |  | 1,164 |
| Less: Unamortized debt issuance costs |  | 2 |  | 3 |
| Less: Unamortized discount on senior notes |  | - |  | 1 |
| **Total carrying value of debt** |  | 1,827 |  | 1,160 |
| Less: Short-term debt |  | 5 |  | 29 |
| **Total long-term debt** | $ | 1,822 | $ | 1,131 |

*Senior Revolving Credit Facility*

On July 1, 2022, the Company entered into a revolving credit facility (the "2022 Credit Facility") with, among others, JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as administrative agent (the "Administrative Agent"), which refinanced its existing senior unsecured revolving credit facility. The Company, a U.S. subsidiary of the Company, a Canadian subsidiary of the Company, a Dutch subsidiary of the Company and a Swiss subsidiary of the Company are the borrowers under the 2022 Credit Facility, and the borrowers and certain subsidiaries of the Company provide unsecured guaranties of the 2022 Credit Facility. The 2022 Credit Facility replaced the third amended and restated senior unsecured credit facility, dated as of November 15, 2018 (the "2018 Credit Facility").

The 2022 Credit Facility provides for a $1.5 billion revolving credit facility (the "2022 Revolving Credit Facility"), which may be denominated in U.S. Dollars and other currencies, including Euros, Canadian Dollars, Pounds Sterling, Japanese Yen and Swiss Francs. The 2022 Revolving Credit Facility also includes sub-facilities for the issuance of letters of credit of up to $125 million and swing line loans at the Administrative Agent's discretion of up to $100 million. The Company has the ability to expand its borrowing availability under the 2022 Credit Facility in the form of increased revolving commitments or one or more tranches of term loans by up to an additional $500 million, subject to the agreement of the participating lenders and certain other customary conditions.

Table of Contents

Borrowings under the 2022 Credit Facility bear interest, at the Company's option, at the following rates:

- For loans denominated in U.S. Dollars, (A) an alternate base rate, which is the greatest of (a) the prime rate publicly announced from time to time by JPMorgan Chase, (b) the greater of the federal funds effective rate and the Federal Reserve Bank of New York overnight bank funding rate and zero, plus 50 basis points, and (c) the greater of term Secured Overnight Financing Rate ("SOFR") for an interest period of one month plus 10 basis points and zero, plus 100 basis points, (B) the greater of term SOFR for the applicable interest period plus 10 basis points ("Adjusted Term SOFR") and zero or (C) the greater of daily simple SOFR plus 10 basis points and zero;
- For loans denominated in Pounds Sterling, the greater of Secured Overnight Index Average ("SONIA") and zero;
- For loans denominated in Swiss Francs, the greater of Swiss Average Rate Overnight ("SARON") and zero;
- For loans denominated in Euro, the greater of Euro Interbank Offer Rate ("EURIBOR") for the applicable interest period adjusted for statutory reserve requirements ("Adjusted EURIBOR Rate") and zero;
- For loans denominated in Canadian Dollars, the greater of the rate applicable to Canadian Dollar Canadian banker's acceptances quoted on Reuters for the applicable interest period adjusted for statutory reserve requirements ("Adjusted CDOR Rate") and zero; and
- For loans denominated in Japanese Yen, the greater of Tokyo Interbank Offer Rate ("TIBOR") for the applicable interest period adjusted for statutory reserve requirements ("Adjusted TIBOR Rate") and zero; in each case, plus an applicable margin based on the Company's public debt ratings and/or net leverage ratio.

The 2022 Credit Facility provides for an annual administration fee and a commitment fee equal to 7.5 basis points to 17.5 basis points per annum, which was 15.0 basis points as of April 1, 2023. The fees are based on the Company's public debt ratings and/or net leverage ratio, applied to the average daily unused amount of the 2022 Credit Facility.

Loans under the 2022 Credit Facility may be prepaid and commitments may be terminated or reduced by the borrowers without premium or penalty other than customary "breakage" costs with respect to loans bearing interest based upon Adjusted Term SOFR, the Adjusted EURIBOR Rate, the Adjusted CDOR Rate and the Adjusted TIBOR Rate.

The 2022 Credit Facility requires the Company to maintain a net leverage ratio as of the end of each fiscal quarter of no greater than 4.0 to 1.0. Such net leverage ratio is calculated as the ratio of the sum of total indebtedness as of the date of the measurement plus the capitalized amount of all operating lease obligations, minus unrestricted cash and cash equivalents not to exceed $200 million, to Consolidated EBITDAR for the last four consecutive fiscal quarters. Consolidated EBITDAR is defined as consolidated net income plus provision for taxes based on income, profits or capital, net interest expense, depreciation and amortization expense, consolidated rent expense and other non-cash losses, charge and expenses, subject to certain additions and deductions. The 2022 Credit Facility also includes covenants that limit additional indebtedness, liens, acquisitions and other investments, restricted payments and affiliate transactions.

The 2022 Credit Facility also contains events of default customary for financings of this type, including, but not limited to, payment defaults, material inaccuracy of representations and warranties, covenant defaults, cross-defaults to certain indebtedness, certain events of bankruptcy or insolvency, certain events under the Employee Retirement Income Security Act, material judgments, actual or asserted failure of any guaranty supporting the 2022 Credit Facility to be in full force and effect, and changes of control. If such an event of default occurs and is continuing, the lenders under the 2022 Credit Facility would be entitled to take various actions, including, but not limited to, terminating the commitments and accelerating amounts outstanding under the 2022 Credit Facility.

As of April 1, 2023, the Company had $874 million of borrowings outstanding under the 2022 Revolving Credit Facility. The Company had $175 million of borrowings outstanding under revolver in the 2018 Credit Facility as of April 2, 2022. In addition, stand-by letters of credit of $3 million and $21 million were outstanding as of April 1, 2023 and April 2, 2022, respectively. At April 1, 2023, the amount available for future borrowings under the 2022 Revolving Credit Facility was $623 million. The amount available for future borrowings under the revolver in the 2018 Credit Facility was $804 million as of April 2, 2022.

As of April 1, 2023, the Company no longer had an outstanding balance related to the 2018 Term Loan. As of April 2, 2022, the carrying value of the 2018 Term Loan was $495 million, which was recorded within long-term debt in the Company's consolidated balance sheets.

The Company had $6 million and $3 million of deferred financing fees related to Revolving Credit Facilities as of April 1, 2023 and April 2, 2022, respectively, and are recorded within other assets in the Company's consolidated balance sheets. As of April 2, 2022, the Company had $2 million of deferred financing fees related to the 2018 Term Loan, which are recorded within long-term debt in the Company's consolidated balance sheets.

94

Table of Contents

*Versace Term Loan*

On December 5, 2022, Gianni Versace S.r.l., a wholly owned subsidiary of Capri Holdings Limited, entered into a credit facility with Intesa Sanpaolo S.p.A., Banco Nazionale del Lavoro S.p.A., and UniCredit S.p.A., as arrangers and lenders, and Intesa Sanpaolo S.p.A., as agent, which provides a senior unsecured term loan (the "Versace Term Loan") in an aggregate principal amount of €450 million (approximately $488 million). The Versace Term Loan is not subject to amortization and matures on December 5, 2025. The Company provides an unsecured guaranty of the Versace Term Loan.

The Versace Term Loan bears interest at a rate per annum equal to the greater of EURIBOR for the applicable interest period and zero, plus a margin of 1.35%.

The Versace Term Loan may be prepaid without premium or penalty other than customary "breakage" costs. The Versace Term Loan requires the Company to maintain a net leverage ratio as of the end of each fiscal quarter of no greater than 4.0 to 1.0. Such net leverage ratio is calculated as the ratio of the sum of total indebtedness as of the date of the measurement plus the capitalized amount of all operating lease obligations, minus unrestricted cash and cash equivalents not to exceed $200 million, to Consolidated EBITDAR for the last four consecutive fiscal quarters. Consolidated EBITDAR is defined as consolidated net income plus provision for taxes based on income, profits or capital, net interest expense, depreciation and amortization expense, consolidated rent expense and other non-cash losses, charge and expenses, subject to certain additions and deductions. The Versace Term Loan also includes covenants that limit additional financial indebtedness, liens, acquisitions, loans and guarantees, restricted payments and mergers of GIVI Holding S.r.l., Gianni Versace S.r.l. and their respective subsidiaries.

The Versace Term Loan contains events of default customary for financings of this type, including, but not limited to payment defaults, material inaccuracy of representations and warranties, covenant defaults, cross-defaults to material financial indebtedness, certain events of bankruptcy or insolvency, illegality or repudiation of any loan document under the Versace Term Loan or any failure thereof to be in full force and effect, and changes of control. If such an event of default occurs and is continuing, the lenders under the Versace Term Loan would be entitled to take various actions, including, but not limited to, accelerating amounts outstanding under the Versace Term Loan.

As of April 1, 2023, the carrying value of the Versace Term Loan was $487 million, net of $1 million of deferred financing fees, which was recorded within long-term debt in the Company's consolidated balance sheets.

As of April 1, 2023, and the date these financial statements were issued, the Company was in compliance with all covenants related to the 2022 Credit Facility and the Versace Term Loan.

*Senior Notes*

On October 20, 2017, Michael Kors (USA), Inc. (the "Issuer"), the Company's wholly owned subsidiary, completed its offering of $450 million aggregate principal amount senior notes due in 2024 (the "Senior Notes"), pursuant to an exemption from registration under the Securities Act of 1933, as amended. The Senior Notes were issued under an indenture dated October 20, 2017, among the Issuer, the Company, the subsidiary guarantors party thereto and U.S. Bank National Association, as trustee (the "Indenture"). The Senior Notes were issued to finance a portion of the Company's acquisition of Jimmy Choo and certain related refinancing transactions.

As of April 1, 2023, the Senior Notes bear interest at a rate of 4.250% per year, subject to adjustments from time to time if either Moody's or S&P (or a substitute rating agency therefore) downgrades (or downgrades and subsequently upgrades) the credit rating assigned to the Senior Notes. Interest on the Senior Notes is payable semi-annually on May 1 and November 1 of each year, beginning on May 1, 2018.

The Senior Notes are unsecured and are guaranteed by the Company and its existing and future subsidiaries that guarantee or are borrowers under the 2022 Credit Facility (subject to certain exceptions, including subsidiaries organized in China). The Senior Notes may be redeemed at the Company's option at any time in whole or in part at a price equal to 100% of the principal amount, plus accrued and unpaid interest, plus a "make-whole" amount calculated at the applicable Treasury Rate plus 30 basis points.

The Senior Notes rank equally in right of payment with all of the Issuer's and guarantors' existing and future senior unsecured indebtedness, senior in right of payment to any future subordinated indebtedness, effectively subordinated in right of payment to any of the Company's subsidiaries' obligations and any of the Company's secured obligations, to the extent of the assets securing such obligations.

95

Table of Contents

The Indenture contains covenants, including those that limit the Company's ability to create certain liens and enter into certain sale and leaseback transactions. In the event of a "Change of Control Triggering Event," as defined in the Indenture, the Issuer will be required to make an offer to repurchase the Senior Notes at a repurchase price in cash equal to 101% of the aggregate principal amount of the Senior Notes being repurchased plus any unpaid interest. These covenants are subject to important limitations and exceptions, as per the Indenture.

As of April 1, 2023 and April 2, 2022, the carrying value of the Senior Notes was $449 million and $448 million, respectively, net of issuance costs and unamortized discount of $1 million and $2 million, respectively, which were recorded within long-term debt in the Company's consolidated balance sheets.

### Supplier Financing Program

During Fiscal 2021, the Company began offering a supplier financing program to certain suppliers as the Company continues to identify opportunities to improve liquidity. This program enables suppliers, at their sole discretion, to sell their receivables (i.e., the Company's payment obligations to suppliers) to a financial institution on a non-recourse basis in order to be paid earlier than current payment terms provide. The Company's obligations, including the amount due and scheduled payment dates, are not impacted by a suppliers' decision to participate in this program. The Company does not reimburse suppliers for any costs they incur to participate in the program and their participation is voluntary. The amount outstanding under this program as of April 1, 2023 and April 2, 2022 was $4 million and $21 million, respectively and is presented as short-term debt in the Company's consolidated balance sheets.

### Japan Credit Facility

As of April 1, 2023, the Company's subsidiary in Japan had a short term credit facility ("Japan Credit Facility") with Mitsubishi UFJ Financial Group ("MUFJ"), which may be used to fund general working capital needs of Michael Kors Japan K.K., subject to the bank's discretion. The Japan Credit Facility is in effect until the Company's decides to terminate the revolving line of credit. The Japan Credit Facility provides Michael Kors Japan K.K. with a revolving credit line of up to ¥1.0 billion (approximately $8 million). The Japan Credit Facility bears interest at a rate posted by the Bank plus 0.300% two business days prior to the date of borrowing or the date of interest renewal. As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the Japan Credit Facility.

### Hong Kong Credit Facilities

As of April 1, 2023, the Company's Hong Kong subsidiary, Michael Kors (HK) Limited and Subsidiaries ("MKHKL"), had an uncommitted credit facility ("HK HSBC Credit Facility") with HSBC Bank ("HSBC"), which may be used to fund general working capital needs of MKHKL through January 2024 subject to HSBC's discretion. The HK Credit Facility provides MKHKL with a revolving line of credit of up to 50 million Hong Kong dollars (approximately $6 million), which includes bank guarantees of up to 20 million Hong Kong dollars (approximately $3 million). Borrowings under the HK HSBC Credit Facility must be made in increments of at least 5 million Hong Kong dollars and bear interest at the Hong Kong Interbank Offered Rate ("HIBOR") plus 200 basis points. As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the HK HSBC Credit Facility. As of April 1, 2023, bank guarantees supported by this facility were 4 million Hong Kong dollars (approximately $1 million).

As of April 1, 2023, the Company's Hong Kong subsidiary, MKHKL, had a short-term credit facility ("HK SCB Credit Facility") with Standard Charter Bank ("SCB"), which may be used to fund general working capital needs, not to exceed 12 months. The HK SCB Credit Facility is in effect through January 2024. The HK SCB Credit Facility provides MKHKL with a revolving loan of up to 20 million Hong Kong dollars (approximately $3 million). Borrowings under the HK SCB Credit Facility bear interest at 1.5% per annum at the time of borrowing. As of April 1, 2023, the Company had no borrowings outstanding under the HK SCB Credit Facility.

### China Credit Facilities

As of April 1, 2023, the Company's subsidiary in China, Michael Kors Trading (Shanghai) Company Limited ("MKTSCL"), had a short-term credit facility ("China HSBC Credit Facility") with HSBC, which may be used to fund general working capital needs, not to exceed 12 months. The China Credit Facility is in effect through January 2024. The China HSBC Credit Facility provides MKTSCL with a Revolving Loan Facility of up to RMB 65 million (approximately $9 million), which includes a revolving loan of RMB 35 million (approximately $5 million), an overdraft facility with a credit line of RMB 10 million (approximately $1 million) and a non-financial bank guarantee facility of RMB 20 million (approximately $3 million) or its equivalent in another currency, at lender's discretion. Borrowings under the China HSBC Credit Facility bear interest at

96

Table of Contents

plus 0.42% of the applicable People's Bank of China's benchmark lending rate at the time of borrowing. As of April 1, 2023 and April 2, 2022, the Company had no borrowings outstanding under the China HSBC Credit Facility.

As of April 1, 2023, the Company's subsidiary in China, MKTSCL, had a short-term credit facility ("China SCB Credit Facility") with SCB, which may be used to fund general working capital needs, not to exceed 12 months. The China SCB Credit Facility is in effect through April 2024. The China SCB Credit Facility provides MKTSCL with a Revolving Loan Facility of up to RMB 30 million (approximately $4 million), which includes a revolving loan of RMB 20 million (approximately $3 million) and a bank guarantee with a sublimit of the revolving loan of RMB 10 million (approximately $1 million). Borrowings under the China SCB Credit Facility bear interest at plus 0.15% of the applicable People's Bank of China's benchmark lending rate at the time of borrowing. As of April 1, 2023 and April 2, 2022, the Company had no borrowings outstanding under the China SCB Credit Facility.

### Versace Facilities

During Fiscal 2022, the Company's subsidiary, GIVI Holding S.r.l. ("GIVI"), entered into an agreement with Banco BPM Banking Group ("the Bank") to sell certain tax receivables to the Bank in exchange for cash. The arrangement was determined to be a financing arrangement because the de-recognition criteria for the receivables was not met at the time of the cash receipt from the Bank. As of April 1, 2023, the outstanding balance was $11 million, with $1 million and $10 million recorded within short-term debt and long-term debt, respectively, in the Company's consolidated balance sheets, respectively.

As of April 1, 2023, the Company's subsidiary, Gianni Versace S.r.l. ("Versace"), had two uncommitted short-term credit facilities, one with Unicredit and the other with Intesa ("Versace Credit Facilities"), which may be used for general working capital needs of Versace. The Versace Credit Facilities are in effect until Unicredit or Intesa decides to terminate the credit facilities. The Versace Credit Facilities provide Versace with a swing line of credit of up to €25 million (approximately $27 million), with interest set by Unicredit or Intesa on the date of borrowing. As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the Versace Credit Facility.

As of April 1, 2023, Versace had an uncommitted short-term credit facility with BNP Paribas ("Versace BNP Credit Facility"), which may be used for general working capital needs of Versace. The Versace BNP Credit Facility is in effect until BNP Paribas decides to terminate the credit facility. The Versace BNP Credit Facility provides Versace with a swing line of credit of up to €20 million (approximately $22 million), which includes a bank guarantee of €5 million (approximately $5 million), with interest set by BNP Paribas on the date of borrowing. As of April 1, 2023, bank guarantees outstanding under this facility were €4 million (approximately $4 million). As of April 1, 2023 and April 2, 2022, there were no borrowings outstanding under the Versace BNP Credit Facility.

## 12. Commitments and Contingencies

### Commitments

The Company has issued stand-by letters of credit to guarantee certain of its retail and corporate operating lease commitments, aggregating $35 million at April 1, 2023, including $3 million in letters of credit issued under the Revolving Credit Facility.

### Other Commitments

As of April 1, 2023, the Company also has other contractual commitments aggregating $2.729 billion, which consist of inventory purchase commitments of $775 million, debt obligations of $1.829 billion and other contractual obligations of $125 million, which primarily relate to the Company's marketing and advertising obligations, information technology agreements and supply agreements.

### Long-term Employment Contract

The Company has an employment agreement with the Chief Creative Officer of the Michael Kors brand that provides for continuous employment through the date of the officer's death or permanent disability at an annual salary of $1 million. In addition to salary, the agreement provides for an annual bonus and other employee related benefits.

Table of Contents

*Contingencies*

In the ordinary course of business, the Company is party to various legal proceedings and claims. Although the outcome of such items cannot be determined with certainty, the Company does not believe that the outcome of all pending legal proceedings in the aggregate will have a material adverse effect on its cash flow, results of operations or financial position.

**13. Fair Value Measurements**

Financial assets and liabilities are measured at fair value using the three-level valuation hierarchy for disclosure of fair value measurements. The determination of the applicable level within the hierarchy of a particular asset or liability depends on the inputs used in the valuation as of the measurement date, notably the extent to which the inputs are market-based (observable) or internally derived (unobservable). Observable inputs are inputs that market participants would use in pricing the asset or liability based on market data obtained from independent sources. Unobservable inputs are inputs based on a company's own assumptions about market participant assumptions based on the best information available in the circumstances. The hierarchy is broken down into three levels based on the reliability of inputs as follows:

Level 1 - Valuations based on quoted prices in active markets for identical assets or liabilities that a company has the ability to access at the measurement date.

Level 2 - Valuations based on quoted prices for similar assets or liabilities in active markets or quoted prices for identical assets or liabilities in inactive markets, inputs other than quoted prices that are observable for the asset or liability and inputs derived principally from or corroborated by observable market data.

Level 3 - Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

At April 1, 2023 and April 2, 2022, the fair value of the Company's derivative contracts were determined using broker quotations which were calculations derived from observable market information: the applicable currency rates at the balance sheet date and those forward rates particular to the contract at inception. The Company makes no adjustments to these broker obtained quotes or prices, but assesses the credit risk of the counterparty and would adjust the provided valuations for counterparty credit risk when appropriate. The fair values of the forward contracts are included in prepaid expenses and other current assets, and in accrued expenses and other current liabilities in the consolidated balance sheets, depending on whether they represent assets or liabilities of the Company. The fair values of net investment hedges and fair value hedges are included in other assets, and in other long-term liabilities in the consolidated balance sheets, depending on whether they represent assets or liabilities of the Company. See Note 14 for further detail.

Table of Contents

All contracts are measured and recorded at fair value on a recurring basis and are categorized in Level 2 of the fair value hierarchy, as shown in the following table (in millions):

| | Fair value at April 1, 2023, using: | | | Fair value at April 2, 2022, using: | | |
|---|---|---|---|---|---|---|
| | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| **Derivative assets:** | | | | | | |
| Forward foreign currency exchange contracts | $ - | $ - | $ - | $ - | $ 4 | $ - |
| Net investment hedges | - | 1 | - | - | 44 | - |
| Undesignated derivative contracts | - | - | - | - | 4 | - |
| **Total derivative assets** | $ - | $ 1 | $ - | $ - | $ 52 | $ - |
| | | | | | | |
| **Derivative liabilities:** | | | | | | |
| Forward foreign currency exchange contracts | $ - | $ - | $ - | $ - | $ - | $ - |
| Net investment hedges | - | 36 | - | - | 37 | - |
| Fair value hedges | - | 3 | - | - | - | - |
| **Total derivative liabilities** | $ - | $ 39 | $ - | $ - | $ 37 | $ - |

The Company's long-term debt obligations are recorded in its consolidated balance sheets at carrying values, which may differ from the related fair values. The fair value of the Company's long-term debt is estimated using external pricing data, including any available quoted market prices and based on other debt instruments with similar characteristics. Borrowings under revolving credit agreements, if outstanding, are recorded at carrying value, which approximates fair value due to the frequent nature of such borrowings and repayments. See Note 11 for detailed information related to carrying values of the Company's outstanding debt. The following table summarizes the carrying values and estimated fair values of the Company's short- and long-term debt, based on Level 2 measurements (in millions):

| | April 1, 2023 | | April 2, 2022 | |
|---|---|---|---|---|
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| Revolving Credit Facilities | $ 874 | $ 874 | $ 175 | $ 175 |
| Versace Term Loan | $ 487 | $ 481 | $ - | $ - |
| Senior Notes due 2024 | $ 449 | $ 435 | $ 448 | $ 451 |
| 2018 Term Loan | $ - | $ - | $ 495 | $ 490 |

The Company's cash and cash equivalents, accounts receivable and accounts payable, are recorded at carrying value, which approximates fair value.

**Non-Financial Assets and Liabilities**

The Company's non-financial assets include goodwill, intangible assets, operating lease right-of-use assets and property and equipment. Such assets are reported at their carrying values and are not subject to recurring fair value measurements. The Company's goodwill and its indefinite-lived intangible assets (Versace and Jimmy Choo brands) are assessed for impairment at least annually, while its other long-lived assets, including operating lease right-of-use assets, property and equipment and definite-lived intangible assets, are assessed for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable. The Company determines the fair values of these assets based on Level 3 measurements using the Company's best estimates of the amount and timing of future discounted cash flows, based on historical experience, market conditions, current trends and performance expectations. See Note 2 for additional information.

Table of Contents

The following table details the carrying values and fair values of the Company's assets that have been impaired (in millions):

| | Carrying Value Prior to Impairment | | Fair Value | | Impairment Charge [1] | |
|---|---|---|---|---|---|---|
| **Fiscal 2023:** | | | | | | |
| Goodwill | $ | 681 | $ | 599 | $ | 82 |
| Operating Lease Right-of-Use Assets | | 100 | | 67 | | 33 |
| Brands | | 224 | | 200 | | 24 |
| Property and Equipment | | 4 | | 1 | | 3 |
| **Total** | $ | 1,009 | $ | 867 | $ | 142 |
| **Fiscal 2022:** | | | | | | |
| Operating Lease Right-of-Use Assets | $ | 209 | $ | 133 | $ | 76 |
| Property and Equipment | | 12 | | 5 | | 7 |
| **Total** | $ | 221 | $ | 138 | $ | 83 |
| **Fiscal 2021:** | | | | | | |
| Operating Lease Right-of-Use Assets | $ | 326 | $ | 191 | $ | 135 |
| Goodwill | | 319 | | 225 | | 94 |
| Brands | | 407 | | 338 | | 69 |
| Property and Equipment | | 30 | | 7 | | 23 |
| **Total** | $ | 1,082 | $ | 761 | $ | 321 |

[1]   Includes $10 million and $5 million of impairment charges that were recorded within restructuring and other charges related to the Capri Retail Store Optimization Program during Fiscal 2022 and Fiscal 2021, respectively.

There were no impairment charges related to goodwill or indefinite-lived intangible assets in Fiscal 2022.

## 14. Derivative Financial Instruments

*Forward Foreign Currency Exchange Contracts*

The Company uses forward foreign currency exchange contracts to manage its exposure to fluctuations in foreign currencies for certain of its transactions. The Company, in its normal course of business, enters into transactions with foreign suppliers and seeks to minimize risks related to certain forecasted inventory purchases by using forward foreign currency exchange contracts. The Company only enters into derivative instruments with highly credit-rated counterparties. The Company does not enter into derivative contracts for trading or speculative purposes.

*Net Investment Hedges*

During the first quarter of Fiscal 2023, the Company modified multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.094 billion to hedge its net investment, of which $900 million was in Euro denominated subsidiaries and $194 million was in Japanese Yen denominated subsidiaries. The modification of these swaps resulted in the Company receiving $66 million in cash during the first quarter of Fiscal 2023. These contracts have been designated as net investment hedges.

As of July 2, 2022, the Company had multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $4 billion to hedge its net investment in Euro denominated subsidiaries (the "Euro Net Investment Hedges") and $194 million to hedge its net investment in Japanese Yen denominated subsidiaries (the "Japanese Yen Net Investment Hedges"). During the month of July 2022, the Euro Net Investment Hedges with aggregate notional amounts of $4 billion outstanding as of July 2, 2022 were terminated resulting in the Company receiving $237 million in cash.

Table of Contents

During the second quarter of Fiscal 2023, the Company also entered into, and subsequently terminated, additional Euro Net Investment Hedges with aggregate notional amounts of $4 billion. The termination of these contracts resulted in the Company receiving an additional $100 million in cash.

During the second quarter of Fiscal 2023, the Company also modified certain Japanese Yen Net Investment Hedges with notional amounts of $100 million. The modification of these hedges resulted in the Company receiving $6 million in cash during the second quarter of Fiscal 2023. The Company entered into additional Japanese Net Investment Hedges with notional amount of $100 million. These contracts have been designated as net investment hedges.

During the second quarter of Fiscal 2023, the Company received a total of $343 million from the termination of its Euro Net Investment Hedges and the modification of its Japanese Yen Net Investment Hedges.

During the third quarter of Fiscal 2023, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of €1 billion (approximately $1.07 billion) to hedge its net investment in GBP denominated subsidiaries (the "GBP/EUR Net Investment Hedges"). Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between November 2024 and November 2027 and are designated as net investment hedges.

As of April 1, 2023, the Company had Japanese Yen Net Investment Hedges with aggregate notional amounts of $294 million. Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on United States denominated debt for fixed rate payments of 0% to 2.665% in Japanese Yen. These contracts have maturity dates between May 2027 and February 2051 and are designated as net investment hedges.

Certain of these contracts are supported by a credit support annex ("CSA") which provides for collateral exchange with the earliest effective date being September 2027. If the outstanding position of a contract exceeds a certain threshold governed by the aforementioned CSA's, either party is required to post cash collateral.

When a cross-currency swap is used as a hedging instrument in a net investment hedge assessed under the spot method, the cross-currency basis spread is excluded from the assessment of hedge effectiveness and is recognized as a reduction in interest expense (income) in the Company's consolidated statements of operations and comprehensive income (loss). Accordingly, the Company recorded interest income of $38 million, $63 million and $16 million, respectively, during Fiscal 2023, Fiscal 2022 and Fiscal 2021.

*Fair Value Hedges*

The Company is exposed to transaction risk from foreign currency exchange rate fluctuations with respect to various cross-currency intercompany loans which will impact earnings on a consolidated basis. To manage the exchange rate risk related to these balances, during the fourth quarter of Fiscal 2023, the Company entered into fair value cross-currency swap agreements to hedge its exposure in GBP denominated subsidiaries (the "GBP Fair Value Hedge") on a Euro denominated intercompany loan. As of April 1, 2023, the total notional values of outstanding fair value cross-currency swaps related to these loans were €1 billion (approximately $1.08 billion). Under the term of these contracts, the Company will exchange the semi-annual fixed rate payments on GBP denominated debt for fixed rate payments of 0% in Euro. These contracts have maturity dates between March 2025 and March 2026 and are designated as fair value hedges.

When a cross-currency swap is designated as a fair value hedge and qualifies as highly effective, the fair value hedge will be recorded at fair value each period on the Company's consolidated balance sheets, with the difference resulting from the changes in the spot rate recognized in foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss), which will offset the earnings impact of the underlying transaction being hedged. Accordingly, the Company recorded a foreign currency gain of $4 million during Fiscal 2023.

101

Table of Contents

The following table details the fair value of the Company's derivative contracts, which are recorded on a gross basis in the consolidated balance sheets as of April 1, 2023 and April 2, 2022 (in millions):

| | Notional Amounts | | Fair Values | | | |
| | | | Assets | | Liabilities | |
| | April 1, 2023 | April 2, 2022 | April 1, 2023 | April 2, 2022 | April 1, 2023 | April 2, 2022 |
|---|---|---|---|---|---|---|
| Designated forward foreign currency exchange contracts | $ - | $ 119 | $ - | $ 4 [1] | $ - | $ - |
| Designated net investment hedges | 1,378 | 4,194 | 1 [2] | 44 [2] | 36 [3] | 37 |
| Designated fair value hedges | 1,084 | - | - | - | 3 [3] | - |
| Total designated hedges | 2,462 | 4,313 | 1 | 48 | 39 | 37 |
| Undesignated derivative contracts [4] | - | 38 | - | 4 | - | - |
| **Total** | $ 2,462 | $ 4,351 | $ 1 | $ 52 | $ 39 | $ 37 |

[1] Recorded within prepaid expenses and other current assets in the Company's consolidated balance sheets.
[2] Recorded within other assets in the Company's consolidated balance sheets.
[3] Recorded within other long-term liabilities in the Company's consolidated balance sheets.
[4] Primarily includes undesignated hedges of inventory purchases.

The Company records and presents the fair values of all of its derivative assets and liabilities in its consolidated balance sheets on a gross basis, as shown in the above table. However, if the Company were to offset and record the asset and liability balances for its derivative instruments on a net basis in accordance with the terms of its master netting arrangements, which provide for the right to set-off amounts for similar transactions denominated in the same currencies and with the same banks, the resulting impact as of April 1, 2023 and April 2, 2022 would be as follows (in millions):

| | Forward Currency Exchange Contracts | | Net Investment Hedges | | Fair Value Hedges | |
| | April 1, 2023 | April 2, 2022 | April 1, 2023 | April 2, 2022 | April 1, 2023 | April 2, 2022 |
|---|---|---|---|---|---|---|
| Assets subject to master netting arrangements | $ - | $ 8 | $ 1 | $ 44 | $ - | $ - |
| Liabilities subject to master netting arrangements | $ - | $ - | $ 36 | $ 37 | $ 3 | $ - |
| Derivative assets, net | $ - | $ 8 | $ 1 | $ 42 | $ - | $ - |
| Derivative liabilities, net | $ - | $ - | $ 36 | $ 35 | $ 3 | $ - |

Currently, the Company's master netting arrangements do not require cash collateral to be pledged by the Company or its counterparties.

Changes in the fair value of the Company's forward foreign currency exchange contracts that are designated as accounting hedges are recorded in equity as a component of accumulated other comprehensive income, and are reclassified from accumulated other comprehensive income into earnings when the items underlying the hedged transactions are recognized into earnings, as a component of cost of goods sold within the Company's consolidated statements of operations and comprehensive income (loss). The net gain or loss on net investment hedges are reported within foreign currency translation gains and losses ("CTA") as a component of accumulated other comprehensive income on the Company's consolidated balance sheets. Upon discontinuation of the hedge, such amounts remain in CTA until the related net investment is sold or liquidated. The net gain or loss on cross-currency swap contracts designated as fair value hedges and associated with cross-currency intercompany loans are recognized within foreign currency loss (gain) on the Company's consolidated statements of operations and comprehensive income (loss) generally in the period in which the related balances being hedged are revalued.

Table of Contents

The following table summarizes the pre-tax impact of the gains and losses on the Company's designated forward foreign currency exchange contracts, net investment hedges and interest rate swaps (in millions):

| | Fiscal Year Ended April 1, 2023 | Fiscal Year Ended April 2, 2022 | Fiscal Year Ended March 27, 2021 |
|---|---|---|---|
| | Pre-Tax Gains/(Losses) Recognized in OCI | Pre-Tax Gains Recognized in OCI | Pre-Tax (Losses) Recognized in OCI |
| Designated forward foreign currency exchange contracts | $ 8 | $ 11 | $ (2) |
| Designated net investment hedges | $ 338 | $ 435 | $ (263) |
| Designated fair value hedges | $ (6) | $ - | $ - |
| Designated interest rate swaps | $ - | $ - | $ (1) |

The following tables summarize the impact of the gains and losses within the consolidated statements of operations and comprehensive income (loss) related to the designated forward foreign currency exchange contracts (in millions):

| | Fiscal Year Ended | | | |
|---|---|---|---|---|
| | Pre-Tax (Gains) Losses Reclassified from Accumulated OCI | | | |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 | Location of (Gains) Losses Recognized |
| Designated forward foreign currency exchange contracts | $ (14) | $ 1 | $ (2) | Cost of goods sold |

The Company expects that substantially all of the amounts recorded in accumulated other comprehensive income for its forward foreign currency exchange contracts will be reclassified into earnings during the next 12 months, based upon the timing of inventory purchases and turnover.

*Undesignated Hedges*

During Fiscal 2023, Fiscal 2022 and Fiscal 2021, a gain of $2 million, a gain of $2 million and a loss of $1 million, respectively, were recognized within foreign currency loss (gain) in the Company's consolidated statements of operations and comprehensive income (loss) as a result of the changes in the fair value of undesignated forward foreign currency exchange contracts.

## 15. Shareholders' Equity

### Share Repurchase Program

During the first quarter of Fiscal 2022, the Company reinstated its $500 million share-repurchase program, which was previously suspended during the first quarter of Fiscal 2021 in response to the impact of the COVID-19 pandemic and the provisions of the Second Amendment of the 2018 Credit Facility. Subsequently, on November 3, 2021, the Company announced that its Board of Directors had terminated the Company's existing $500 million share repurchase program (the "Prior Plan"), which had $250 million of availability remaining at the time, and authorized a new share repurchase program (the "Fiscal 2022 Plan") pursuant to which the Company was permitted, from time to time, to repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program.

On June 1, 2022, the Board of Directors terminated the Fiscal 2022 Plan, with $500 million of availability remaining, and authorized a new share repurchase program (the "Fiscal 2023 Plan") pursuant to which the Company was permitted, from time to time, to repurchase up to $1.0 billion of its outstanding ordinary shares within a period of two years from the effective date of the program.

On November 9, 2022, the Company announced that its Board of Directors approved a new share repurchase program (the "Existing Share Repurchase Plan") of up to $1 billion of its outstanding ordinary shares, providing additional capacity to

103

Table of Contents

return cash to shareholders over the longer term. This new two-year program replaced the Fiscal 2023 Plan which had $250 million of availability remaining. Share repurchases may be made in open market or privately negotiated transactions and/or pursuant to Rule 10b5-1 trading plans, subject to market conditions, applicable legal requirements, trading restrictions under the Company's insider trading policy and other relevant factors. The program may be suspended or discontinued at any time.

During Fiscal 2023, the Company purchased 27,356,549 shares with a fair value of $1.350 billion through open market transactions. During Fiscal 2022, the Company purchased 11,014,541 shares with a fair value of $650 million through open market transactions. As of April 1, 2023, the remaining availability under the Company's existing share repurchase program was $400 million.

The Company also has in place a "withhold to cover" repurchase program, which allows the Company to withhold ordinary shares from certain employees and directors to satisfy minimum tax withholding obligations relating to the vesting of their restricted share awards. During Fiscal 2023 and Fiscal 2022, the Company withheld 301,326 shares and 203,863 shares, respectively, with a fair value of $14 million and $11 million, respectively, in satisfaction of minimum tax withholding obligations relating to the vesting of restricted share awards.

### Accumulated Other Comprehensive Income

The following table details changes in the components of accumulated other comprehensive income ("AOCI"), net of taxes, for Fiscal 2023, Fiscal 2022 and Fiscal 2021 (in millions):

| | Foreign Currency Translation Income (Loss) [1] | Net Gain (Loss) on Derivatives [2] | Other Comprehensive Income (Loss) Attributable to Capri |
|---|---|---|---|
| Balance at March 28, 2020 | $ 72 | $ 3 | $ 75 |
| Other comprehensive loss before reclassifications | (15) | (2) | (17) |
| Less: amounts reclassified from AOCI to earnings | - | 2 | 2 |
| Other comprehensive loss, net of tax | (15) | (4) | (19) |
| Balance at March 27, 2021 | 57 | (1) | 56 |
| Other comprehensive income before reclassifications | 127 | 10 | 137 |
| Less: amounts reclassified from AOCI to earnings | - | (1) | (1) |
| Other comprehensive income, net of tax | 127 | 11 | 138 |
| Balance at April 2, 2022 | 184 | 10 | 194 |
| Other comprehensive (loss) income before reclassifications | (41) | 8 | (33) |
| Less: amounts reclassified from AOCI to earnings | - | 14 | 14 |
| Other comprehensive loss, net of tax | (41) | (6) | (47) |
| Balance at April 1, 2023 | $ 143 | $ 4 | $ 147 |

[1] Foreign currency translation adjustments for Fiscal 2023 primarily include a net $266 million translation loss, partially offset by a $224 million gain, net of taxes of $114 million, primarily relating to the Company's net investment hedges. Foreign currency translation adjustments for Fiscal 2022 include a $321 million gain, net of taxes of $114 million, primarily relating to the Company's net investment hedges, and a net $210 million translation loss. Foreign currency translation gains for Fiscal 2021 include a $199 million loss, net of taxes of $63 million, primarily relating to the Company's net investment hedges, a net $189 million translation gain and a net loss of $8 million on intra-entity transactions that are of a long-term investment nature.

[2] Reclassified amounts relate to the Company's forward foreign currency exchange contracts for inventory purchases and are recorded within cost of goods sold in the Company's consolidated statements of operations and comprehensive income (loss). All tax effects were not material for the periods presented.

Table of Contents

### 16. Share-Based Compensation

The Company grants equity awards to certain employees and directors of the Company at the discretion of the Company's Compensation and Talent Committee. The Company has two equity plans which includes one stock option plan adopted in Fiscal 2008 (as amended and restated, the "2008 Plan"), and an Omnibus Incentive Plan adopted in the third fiscal quarter of Fiscal 2012 and amended and restated with shareholder approval in May 2015 and again in June 2020 (the "Incentive Plan"). The 2008 Plan only provided for grants of share options and was authorized to issue up to 23,980,823 ordinary shares. As of April 1, 2023, there were no shares available to grant equity awards under the 2008 Plan. The Incentive Plan allows for grants of share options, restricted shares and restricted stock units ("RSUs"), and other equity awards, and authorizes a total issuance of up to 22,471,000 ordinary shares after amendments in August 2022. At April 1, 2023, there were 6,169,920 ordinary shares available for future grants of equity awards under the Incentive Plan. Option grants issued from the 2008 Plan generally expire ten years from the grant date, and those issued under the Incentive Plan generally expire seven years from the grant date.

#### Share Options

Share options are generally granted with exercise prices equal to the fair market value on the date of grant. Generally, options vest on a pro-rata basis over a four year service period. The following table summarizes the share options activity during Fiscal 2023, and information about options outstanding at April 1, 2023:

| | Number of Options | | Weighted Average Exercise price | Weighted Average Remaining Contractual Life (years) | | Aggregate Intrinsic Value (in millions) |
|---|---|---|---|---|---|---|
| Outstanding at April 2, 2022 | 355,448 | $ | 57.54 | | | |
| Granted | - | $ | - | | | |
| Exercised | (120,873) | $ | 46.13 | | | |
| Canceled/forfeited | (4,900) | $ | 67.52 | | | |
| Outstanding at April 1, 2023 | 229,675 | $ | 63.33 | 1.84 | $ | 0.1 |
| Vested or expected to vest at April 1, 2023 | 229,675 | $ | 63.33 | 1.84 | | |
| Vested and exercisable at April 1, 2023 | 229,675 | $ | 63.33 | 1.84 | $ | 0.1 |

There were no unvested options and 229,675 vested options outstanding at April 1, 2023. The total intrinsic value of options exercised during Fiscal 2023 and Fiscal 2022 was $0.2 million and $7 million, respectively. The cash received from options exercised during Fiscal 2023 and Fiscal 2022 was $6 million and $17 million, respectively. As of April 1, 2023, there was no remaining unrecognized share-based compensation expense for unvested share options.

There were no options granted during Fiscal 2023, Fiscal 2022 or Fiscal 2021.

#### Restricted Awards

The Company grants RSUs at the fair market value on the grant date. The expense related to RSUs is based on the closing market price of the Company's shares on the date of grant and is recognized ratably over the vesting period, net of expected forfeitures.

The Company grants two types of RSUs: time-based RSUs and performance-based RSUs. Time-based RSUs generally vest in full on the first anniversary of the date of grant for our independent directors, or in equal increments on each of the third or fourth anniversaries of the date of grant (unless the employee is retirement-eligible). Performance-based RSUs generally vest in full on the second or third anniversary of the date of grant, subject to the employee's continued employment during the vesting period and only if certain pre-established cumulative performance targets are met. Expense related to performance-based RSUs is recognized ratably over the performance period, net of forfeitures, based on the probability of attainment of the related performance targets. The potential number of shares that may be earned ranges from 0%, if the minimum level of performance is not attained, to 200%, if the level of performance is at or above the predetermined maximum achievement level.

105

Table of Contents

The following table summarizes the RSU activity during Fiscal 2023:

| | Service-based | | Performance-based | |
|---|---|---|---|---|
| | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value |
| Unvested at April 2, 2022 | 3,827,700 | $ 38.65 | 210,192 | $ 34.25 |
| Granted | 1,790,501 | $ 48.31 | 152,921 | $ 47.41 |
| Change due to performance conditions, net | - | $ - | - | $ - |
| Vested | (2,015,072) | $ 39.81 | (197,874) | $ 33.86 |
| Canceled/forfeited | (421,203) | $ 45.50 | - | $ - |
| Unvested at April 1, 2023 | 3,181,926 | $ 42.44 | 165,239 | $ 46.90 |

The total fair value of service-based RSUs vested during Fiscal 2023, Fiscal 2022 and Fiscal 2021 was $56 million, $78 million and $56 million, respectively. The total fair value of performance-based RSUs vested during Fiscal 2023, Fiscal 2022 and Fiscal 2021 was $7 million, $18 million and $6 million, respectively. As of April 1, 2023, the remaining unrecognized share-based compensation expense for unvested service-based and performance-based RSU grants was $78 million and $5 million, respectively, which is expected to be recognized over the related weighted-average periods of approximately 2.0 years and 2.2 years, respectively.

### Share-Based Compensation Expense

The following table summarizes compensation expense attributable to share-based compensation for Fiscal 2023, Fiscal 2022 and Fiscal 2021 (in millions):

| | Fiscal Years Ended | | |
|---|---|---|---|
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Share-based compensation expense | $ 78 | $ 85 | $ 70 |
| Tax benefits related to share-based compensation expense | $ 8 | $ 14 | $ 12 |

Forfeitures are estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The Company estimates forfeitures based on its historical forfeiture rates. The estimated value of future forfeitures for equity awards as of April 1, 2023 is $11 million.

## 17. Taxes

The Company is a United Kingdom tax resident and is incorporated in the British Virgin Islands. Capri's subsidiaries are subject to taxation in the United States and various other foreign jurisdictions are aggregated in the "Non-United States" information captioned below.

Income (loss) before provision for income taxes consisted of the following (in millions):

| | Fiscal Years Ended | | |
|---|---|---|---|
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| United States | $ 85 | $ 247 | $ (56) |
| Non-United States | 563 | 668 | 59 |
| Total income before provision for income taxes | $ 648 | $ 915 | $ 3 |

106

Table of Contents

The provision for income taxes was as follows (in millions):

| | | Fiscal Years Ended | | |
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 |
|---|---|---|---|---|---|
| **Current** | | | | | |
| United States - Federal | $ 62 | | $ 36 | | $ 35 |
| United States - State | 22 | | 16 | | 20 |
| Non-United States | 46 [1] | | 98 | | 81 |
| Total current provision for income taxes | 130 | | 150 | | 136 |
| **Deferred** | | | | | |
| United States - Federal | (40) | | 24 [2] | | (37) |
| United States - State | (6) | | 7 | | (4) |
| Non-United States | (55) | | (89) [3] | | (29) |
| Total deferred provision for income taxes | (101) | | (58) | | (70) |
| **Total provision for income taxes** | $ 29 | | $ 92 | | $ 66 |

[1] Primarily relates to the remeasurement of an Asia income tax reserve.

[2] Reflects the impact of a United States tax accounting method change with respect to cost capitalization.

[3] Includes an Italian valuation allowance reversal during Fiscal 2022.

The Company's provision for income taxes for the years ended April 1, 2023, April 2, 2022 and March 27, 2021 was different from the amount computed by applying the statutory U.K. income tax rates to the underlying income before provision for income taxes as a result of the following (amounts in millions):

| | Fiscal Years Ended | | | | | |
| | April 1, 2023 | | April 2, 2022 | | March 27, 2021 | |
| | Amount | % [1] | Amount | % [1] | Amount | % [1] |
|---|---|---|---|---|---|---|
| Provision for income taxes at the U.K. statutory tax rate | $ 123 | 19.0 % | $ 174 | 19.0 % | 1 | 19.0 % |
| Effects of global financing arrangements [2] | (78) | (12.1)% | (61) | (6.7)% | (24) | (953.4)% |
| Effect of changes in valuation allowances on deferred tax assets | (37) | (5.8)% | (67) | (7.3)% | 24 | 955.7 % |
| Liability for uncertain tax positions | (3) | (0.4)% | 91 | 9.9 % | 11 | 414.2 % |
| Differences in tax effects on foreign income | (1) | (0.2)% | 10 | 1.1 % | 13 | 522.4 % |
| Non-deductible goodwill impairment | 15 | 2.4 % [3] | - | - % | 18 | 700.0 % [3] |
| State and local income taxes, net of federal benefit | 10 | 1.5 % | 12 | 1.3 % | 5 | 201.5 % |
| Share based compensation | 6 | 0.9 % | 3 | 0.4 % | 6 | 247.7 % |
| Withholding tax | 3 | 0.5 % | 5 | 0.6 % | 4 | 165.0 % |
| Brand tax basis step-up | - | - % | (46) | (5.0)% | - | - % |
| CARES Act tax loss carryback | - | - % | (43) | (4.6)% | - | - % |
| Tax rate change impact on deferred items | - | - % | 21 | 2.1 % | 9 | 351.3 % |
| Other [4] | (9) | (1.3)% | (7) | (0.7)% | (1) | (33.1)% |
| **Effective tax rate** | $ 29 | 4.5 % | $ 92 | 10.1 % | $ 66 | 2,590.5 % |

[1] Tax rates are calculated using unrounded numbers.

[2] Includes the tax related impacts of hedge terminations in conjunction with global financing arrangements.

[3] Attributable to goodwill impairment charges related to Jimmy Choo reporting units in Fiscal 2023 and Fiscal 2021.

[4] Primarily relates to individually immaterial United States and foreign permanent adjustments.

Table of Contents

Significant components of the Company's deferred tax assets (liabilities) consist of the following (in millions):

| | Fiscal Years Ended | |
| --- | --- | --- |
| | April 1, 2023 | April 2, 2022 |
| **Deferred tax assets** | | |
| Operating lease liabilities | $ 442 | $ 465 |
| Net operating loss carryforwards | 115 | 108 |
| Accrued interest | 70 | 20 |
| Depreciation | 61 | 53 |
| Sales allowances | 38 | 34 |
| Inventories | 21 | 26 |
| Stock compensation | 6 | 7 |
| Payroll related accruals | 3 | 3 |
| Other | 29 | 46 |
| **Total deferred tax assets** | **785** | **762** |
| Valuation allowance | (52) [1] | (92) [2] |
| **Net deferred tax assets** | **733** | **670** |
| | | |
| **Deferred tax liabilities** | | |
| Goodwill and intangibles | (420) | (449) [3] |
| Operating lease right-of-use-assets | (339) | (340) |
| Derivative financial instruments | (186) | (73) |
| **Total deferred tax liabilities** | **(945)** | **(862)** |
| **Net deferred tax liabilities** | $ **(212)** | $ **(192)** |

[1]  Includes a U.K. valuation allowance reversal during Fiscal 2023.
[2]  Includes an Italian valuation allowance reversal during Fiscal 2022.
[3]  Includes a reversal of an Italian brand intangible deferred tax liability.

The Company maintains valuation allowances on deferred tax assets applicable to subsidiaries in jurisdictions for which separate income tax returns are filed and where realization of the related deferred tax assets from future profitable operations is not reasonably assured. The valuation allowance decreased $40 million and $67 million in Fiscal 2023 and Fiscal 2022, respectively, and increased $24 million in Fiscal 2021. In certain jurisdictions, the Company increased the valuation allowance by $6 million, $34 million and $56 million and released valuation allowances of $46 million, $101 million and $32 million in Fiscal 2023, Fiscal 2022 and Fiscal 2021, respectively.

As of April 1, 2023, the Company had non-United States and United States net operating loss carryforwards of $581 million, a portion of which will begin to expire in Fiscal 2024.

As of April 1, 2023 and April 2, 2022, the Company had liabilities related to its uncertain tax positions, including accrued interest, of $194 million and $221 million, respectively, which are included in other long-term liabilities in the Company's consolidated balance sheets.

Table of Contents

The total amount of unrecognized tax benefits that, if recognized, would impact the effective tax rate was $178 million, $206 million and $92 million as of April 1, 2023, April 2, 2022 and March 27, 2021, respectively. A reconciliation of the beginning and ending amounts of unrecognized tax benefits, excluding accrued interest, for Fiscal 2023, Fiscal 2022 and Fiscal 2021, are presented below (in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| Unrecognized tax benefits beginning balance | $ 221 | $ 107 | $ 99 |
| Additions related to prior period tax positions | 12 [1] | 105 [1] | 12 |
| Additions related to current period tax positions | 14 [2] | 29 | 9 |
| Decreases related to audit settlements | (2) | (13) | (6) |
| Decreases in prior period positions due to lapses in statute of limitations | (3) | (3) | (4) |
| Decreases related to prior period tax positions | (42) [3] | (4) | (3) |
| **Unrecognized tax benefits ending balance** | $ 200 | $ 221 | $ 107 |

[1] Primarily relates to incremental reserves in North America and Europe.
[2] Primarily relates to North American and European tax reserves established in Fiscal 2023.
[3] Primarily relates to Asia tax reserves.

The Company classifies interest and penalties related to unrecognized tax benefits as components of the provision for income taxes. Interest and penalties recognized in the consolidated statements of operations and comprehensive income (loss) for Fiscal 2023, Fiscal 2022 and Fiscal 2021 was $42 million, $28 million and $15 million, respectively.

The total amount of unrecognized tax benefits relating to the Company's tax positions is subject to change based on future events including, but not limited to, the settlement of ongoing tax audits and assessments and the expiration of applicable statutes of limitations. The Company anticipates that the balance of gross unrecognized tax benefits, excluding interest and penalties, will be reduced by $85 million during the next 12 months, primarily due to the anticipated settlement of tax examinations as well as statute of limitation expirations. However, the outcomes and timing of such events are highly uncertain and changes in the occurrence, expected outcomes and timing of such events could cause the Company's current estimate to change materially in the future.

The Company files income tax returns in the United States and in various foreign, state and local jurisdictions. Most examinations have been completed by tax authorities or the statute of limitations has expired for United States federal, foreign, state and local income tax returns filed by the Company for years through Fiscal 2017.

Prior to the enactment of the Tax Cuts and Jobs Act ("Tax Act"), the Company's undistributed foreign earnings were considered permanently reinvested and, as such, United States federal and state income taxes were not previously recorded on these earnings. As a result of the Tax Act, substantially all of the Company's earnings in foreign subsidiaries generated prior to the enactment of the Tax Act were deemed to have been repatriated. It remains the Company's intent to either reinvest indefinitely substantially all of its foreign earnings outside of the United States or repatriate them tax neutrally. However, if future earnings are repatriated, the potential exists that the Company may be required to accrue and pay additional taxes, including any applicable foreign withholding tax and income taxes. It is not practicable to estimate the amount of tax that might be payable if these earnings were repatriated due to the complexities associated with the hypothetical calculation.

## 18. Retirement Plans

The Company maintains defined contribution retirement plans for its employees, who generally become eligible to participate after three months of service. Features of these plans allow participants to contribute a percentage of their compensation, up to statutory limits depending upon the country in which the employee resides, and provide for mandatory and/or discretionary matching contributions by the Company, which vary by country. During Fiscal 2023, Fiscal 2022, and Fiscal 2021, the Company recognized expenses of approximately $17 million, $16 million and $20 million, respectively, related to these retirement plans.

Table of Contents

**19. Segment Information**

The Company operates its business through three operating segments - Versace, Jimmy Choo and Michael Kors, which are based on its business activities and organization. The reportable segments are segments of the Company for which separate financial information is available and for which operating results are evaluated regularly by the Company's chief operating decision maker ("CODM") in deciding how to allocate resources, as well as in assessing performance. The primary key performance indicators are revenue and operating income for each segment. The Company's reportable segments represent components of the business that offer similar merchandise, customer experience and sales/marketing strategies.

The Company's three reportable segments are as follows:

- Versace - segment includes revenue generated through the sale of Versace luxury ready-to-wear, accessories and footwear through directly operated Versace boutiques throughout the Americas, certain parts of EMEA and certain parts of Asia, as well as through Versace outlet stores and e-commerce sites. In addition, revenue is generated through wholesale sales to distribution partners (including geographic licensing arrangements that allow third-parties to use the Versace trademarks in connection with retail and/or wholesale sales of Versace branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide, as well as through product license agreements in connection with the manufacturing and sale of jeans, fragrances, watches, jewelry, eyewear and home furnishings.

- Jimmy Choo - segment includes revenue generated through the sale of Jimmy Choo luxury footwear, handbags and small leather goods through directly operated Jimmy Choo retail and outlet stores throughout the Americas, certain parts of EMEA and certain parts of Asia, through its e-commerce sites, as well as through wholesale sales of luxury goods to distribution partners (including geographic licensing arrangements that allow third-parties to use the Jimmy Choo trademarks in connection with retail and/or wholesale sales of Jimmy Choo branded products in specific geographic regions), multi-brand department stores and specialty stores worldwide. In addition, revenue is generated through product licensing agreements, which allow third-parties to use the Jimmy Choo brand name and trademarks in connection with the manufacturing and sale of fragrances and eyewear.

- Michael Kors - segment includes revenue generated through the sale of Michael Kors products through four primary Michael Kors retail store formats: "Collection" stores, "Lifestyle" stores (including concessions), outlet stores and e-commerce sites, through which the Company sells Michael Kors products, as well as licensed products bearing the Michael Kors name, directly to consumers throughout the Americas, certain parts of EMEA and certain parts of Asia. The Company also sells Michael Kors products directly to department stores, primarily located across the Americas and Europe, to specialty stores and travel retail shops, and to its geographic licensees. In addition, revenue is generated through product and geographic licensing arrangements, which allow third-parties to use the Michael Kors brand name and trademarks in connection with the manufacturing and sale of products, including watches, jewelry, fragrances and eyewear.

In addition to these reportable segments, the Company has certain corporate costs that are not directly attributable to its brands and, therefore, are not allocated to its segments. Such costs primarily include certain administrative, corporate occupancy, shared service and information systems expenses, including enterprise resource planning system implementation costs and Capri transformation program costs. In addition, certain other costs are not allocated to segments, including restructuring and other charges, impairment costs, COVID-19 related charges and the war in Ukraine. The segment structure is consistent with how the Company's CODM plans and allocates resources, manages the business and assesses performance. All intercompany revenues are eliminated in consolidation and are not reviewed when evaluating segment performance.

110

Table of Contents

The following table presents the key performance information of the Company's reportable segments (in millions):

| | | Fiscal Years Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | April 1, 2023 | | April 2, 2022 | | March 27, 2021 |
| **Total revenue:** | | | | | | |
| Versace | $ | 1,106 | $ | 1,088 | $ | 718 |
| Jimmy Choo | | 633 | | 613 | | 418 |
| Michael Kors | | 3,880 | | 3,953 | | 2,924 |
| **Total revenue** | $ | 5,619 | $ | 5,654 | $ | 4,060 |
| | | | | | | |
| **Income (loss) from operations:** | | | | | | |
| Versace | $ | 152 | $ | 185 | $ | 21 |
| Jimmy Choo | | 38 | | 13 | | (55) |
| Michael Kors | | 868 | | 1,005 | | 595 |
| **Total segment income from operations** | | 1,058 | | 1,203 | | 561 |
| **Less:** Corporate expenses | | (233) | | (190) | | (152) |
| Impairment of assets [1] | | (142) | | (73) | | (316) |
| COVID-19 related charges [2] | | 9 | | 14 | | (42) |
| Impact of war in Ukraine [3] | | 3 | | (9) | | - |
| Restructuring and other charges | | (16) | | (42) | | (32) |
| **Total income from operations** | $ | 679 | $ | 903 | $ | 19 |

[1] Impairment of assets during Fiscal 2023 include $110 million, $30 million and $2 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively. Impairment of assets during Fiscal 2022 includes $50 million, $19 million and $4 million of impairment charges related to the Michael Kors, Versace and Jimmy Choo reportable segments, respectively. Impairment of assets during Fiscal 2021 includes $191 million, $91 million and $34 million of impairment charges related to the Jimmy Choo, Michael Kors and Versace reportable segments, respectively.

[2] COVID-19 related charges during Fiscal 2023, primarily include net inventory credits of $9 million. COVID-19 related charges during Fiscal 2022, primarily include net inventory credits and severance expense of $16 million and $2 million, respectively. COVID-19 related charges during Fiscal 2021, primarily include net inventory reserves and severance expense of $10 million and $24 million, respectively. Inventory related costs are recorded within costs of goods sold and severance expense and credit losses are recorded within selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss).

[3] These charges primarily relate to incremental credit losses and inventory reserves which are a direct impact of the war in Ukraine. Credit losses are recorded within selling, general and administrative expenses and inventory related costs are recorded within costs of goods sold in the consolidated statements of operations and comprehensive income (loss).

Depreciation and amortization expense for each segment are as follows (in millions):

| | | Fiscal Years Ended | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | April 1, 2023 | | April 2, 2022 | | March 27, 2021 |
| **Depreciation and amortization:** | | | | | | |
| Versace | $ | 51 | $ | 52 | $ | 54 |
| Jimmy Choo | | 29 | | 31 | | 31 |
| Michael Kors | | 95 | | 110 | | 127 |
| Corporate | | 4 | | - | | - |
| **Total depreciation and amortization** | $ | 179 | $ | 193 | $ | 212 |

See Note 8 for the Company's goodwill by reportable segment.

Table of Contents

Total revenue (based on country of origin) and long-lived assets by geographic location are as follows (in millions):

| | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| **Revenue:** | | | |
| The Americas [1] | $ 3,220 | $ 3,210 | $ 2,172 |
| EMEA | 1,542 | 1,489 | 1,029 |
| Asia | 857 | 955 | 859 |
| **Total revenue** | $ 5,619 | $ 5,654 | $ 4,060 |

| | As of | | |
| --- | --- | --- | --- |
| | April 1, 2023 | April 2, 2022 | March 27, 2021 |
| **Long-lived assets:** | | | |
| The Americas [1] | $ 882 | $ 908 | $ 1,001 |
| EMEA | 2,129 | 2,156 | 2,384 |
| Asia | 599 | 617 | 596 |
| **Total long-lived assets** | $ 3,610 | $ 3,681 | $ 3,981 |

[1] Net revenues earned in the United States during Fiscal 2023, Fiscal 2022 and Fiscal 2021 were $2.951 billion, $2.989 billion and $2.016 billion, respectively. Long-lived assets located in the United States as of April 1, 2023, April 2, 2022 and March 27, 2021 were $826 million, $858 million and $942 million, respectively.

As of April 1, 2023, the Company's total long-lived assets on its consolidated balance sheet were $3.610 billion, of which, $1.691 billion related to Versace, $1.333 billion related to Michael Kors and $586 million related to Jimmy Choo.

Total revenue by major product category are as follows (in millions):

| | Fiscal Years Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | April 1, 2023 | % of Total | April 2, 2022 | % of Total | March 27, 2021 | % of Total |
| Accessories | $ 2,826 | 50.3 % | $ 2,901 | 51.3 % | $ 2,158 | 53.2 % |
| Footwear | 1,217 | 21.7 % | 1,208 | 21.4 % | 796 | 19.6 % |
| Apparel | 1,107 | 19.7 % | 1,027 | 18.2 % | 720 | 17.7 % |
| Licensed product | 222 | 4.0 % | 241 | 4.3 % | 185 | 4.6 % |
| Licensing revenue | 211 | 3.8 % | 212 | 3.7 % | 155 | 3.8 % |
| Other | 36 | 0.5 % | 65 | 1.1 % | 46 | 1.1 % |
| **Total revenue** | $ 5,619 | | $ 5,654 | | $ 4,060 | |

Table of Contents

**20. Subsequent Events**

*Net Investment Hedges*

During the first quarter of Fiscal 2024, the Company entered into multiple fixed-to-fixed cross-currency swap agreements with aggregate notional amounts of $1.250 billion to hedge its net investment in CHF denominated subsidiaries. Under the terms of these contracts, the Company will exchange the semi-annual fixed rate payments on CHF denominated debt for fixed rate payments in United States dollars. These contracts have maturity dates between September 2024 and July 2026 and are designated as net investment hedges.

*Float-to-Float Hedges*

During the first quarter of Fiscal 2024, the Company entered into multiple float-to-float cross-currency swap agreements with aggregate notional amounts of $1 billion to hedge its net investment in Euro denominated subsidiaries. The company will be making Euro floating rate payments in exchange for receiving United States dollar floating rate amounts over the life of the agreement. These contracts have maturity dates between May 2028 and August 2030.

113

# Exhibit 3

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

**Date of report (Date of earliest event reported):** August 10, 2023

# Tapestry, Inc.
**(Exact Name of Registrant as Specified in Charter)**

| Maryland | 001-16153 | 52-2242751 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

10 Hudson Yards, New York, New York 10001
**(Address of Principal Executive Offices, and Zip Code)**

(212) 946-8400
**Registrant's Telephone Number, Including Area Code**

**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communication pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communication pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | TPR | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01    Entry into a Material Definitive Agreement.**

Merger Agreement

On August 10, 2023, Tapestry, Inc. (the "Company") entered into an Agreement and Plan of Merger (the "Merger Agreement") by and among the Company, Sunrise Merger Sub, Inc., a British Virgin Islands business company limited by shares with BVI company number 2129509 incorporated under the laws of the territory of the British Virgin Islands and a wholly owned subsidiary of the Company ("Merger Sub"), and Capri Holdings Limited, a British Virgin Islands business company limited by shares with BVI company number 524407 incorporated under the laws of the territory of the British Virgin Islands ("Capri"). Pursuant to the Merger Agreement, and upon the terms and subject to the conditions therein, Merger Sub will merge with and into Capri (the "Merger"), with Capri surviving the Merger and continuing as a wholly owned subsidiary of the Company.

Subject to the terms and conditions of the Merger Agreement, at the effective time of the Merger (the "Effective Time"), each outstanding ordinary share, no par value, of Capri (the "Ordinary Shares") (other than (i) Ordinary Shares owned or held in treasury by Capri or owned by the Company or any of its direct or indirect subsidiaries immediately prior to the Effective Time and (ii) Ordinary Shares as to which dissenters' rights have been properly perfected in accordance with Section 179 of the BVI Business Companies Act, as amended) will be converted into the right to receive $57.00 in cash, without interest (the "Merger Consideration").

The Merger Agreement and the consummation of the transactions contemplated thereby have been unanimously approved by the Capri board of directors, and the Capri board of directors has resolved to recommend that the holders of Company Ordinary Shares adopt a resolution authorizing the Merger Agreement and the Plan of Merger and approving the Merger and the other transactions contemplated by the Merger Agreement.

The Merger Agreement contains customary representations, warranties and covenants made by each of the Company, Merger Sub, and Capri, including, among others, covenants by Capri regarding the conduct of its business during the pendency of the transactions contemplated by the Merger Agreement, public disclosures and other matters. Capri is required, among other things, not to solicit alternative business combination transactions and, subject to certain exceptions, not to engage in discussions or negotiations regarding an alternative business combination transaction.

The Company will prepare and file a proxy statement with the U.S. Securities and Exchange Commission and, subject to certain exceptions, the Capri board will recommend that the Merger Agreement be approved by the Company's shareholders at a special meeting of the Company's shareholders (the "Company Board Recommendation"). However, subject to the satisfaction of certain terms and conditions, the Company and the Board, as applicable, are permitted to take certain actions which may, as more fully described in the Merger Agreement, include changing the Company Board Recommendation and entering into a definitive agreement with respect to a Superior Proposal (as defined in the Merger Agreement) if, among other things, the Board has concluded in good faith after consultation with its outside legal counsel that the failure to take such action would be reasonably likely to violate the directors' fiduciary and statutory duties under applicable law.

Under the terms of the Merger Agreement, the completion of the Merger is subject to certain customary closing conditions, including, among others: (i) the affirmative vote of the holders of a majority of the outstanding Ordinary Shares (the "Capri Shareholder Approval"); (ii) the accuracy of the parties' respective representations and warranties, subject to specified qualifications; (iii) compliance by the parties with their respective covenants in all material respects; (iv) the absence of any law or order of certain specified jurisdictions prohibiting the consummation of the Merger in certain jurisdictions; (v) the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and receipt of other regulatory approvals; and (vi) the absence of a material adverse effect on Capri's business, as more specifically defined in the Merger Agreement.

The Company and/or Capri may terminate the Merger Agreement under certain specified circumstances, including (i) by mutual written consent, (ii) if a governmental entity of certain specified jurisdictions has issued a final, non-appealable order or permanent action prohibiting the Merger, (iii) if the Merger is not consummated on or before August 10, 2024, subject to two extensions of up to three months each in certain circumstances in order to obtain required regulatory approvals, (iv) if the Capri Shareholder Approval is not obtained, (v) prior to the Effective Time, if there is an uncured breach of Capri's representations, warranties or covenants or the Company's representations, warranties or covenants such that the relevant closing conditions would not be satisfied, in each case, subject to a cure right, (vi) if, at any time prior to the receipt of the Capri Shareholder Approval, Capri materially breaches its non-solicit covenants, and (vii) if, at any time prior to the receipt of the Capri Shareholder Approval, Capri's board of directors makes an adverse recommendation change with respect to the proposed transaction or to enter into a Superior Proposal. In certain circumstances in connection with the termination of the Merger Agreement, including if the Merger Agreement is terminated due to Capri's board of directors changing or withdrawing its recommendation of the Merger to its shareholders, Capri entering into an agreement with respect to a Superior Proposal or Capri materially breaching its non-solicit covenants, Capri will be required to pay the Company a termination fee of $240 million in cash.

The foregoing description of the Merger Agreement does not purport to be complete and is qualified in its entirety by the full text of the Merger Agreement, a copy of which is filed as Exhibit 2.1 hereto and is incorporated by reference herein. The Merger Agreement has been attached to provide investors with information regarding its terms. It is not intended to provide any other factual information about the Company, Merger Sub, or Capri. In particular, the assertions embodied in the representations and warranties contained in the Merger Agreement are qualified by information in confidential disclosure letters provided by each of the Company and Capri to each other in connection with the signing of the Merger Agreement or in filings of the parties with the United States Securities and Exchange Commission (the "SEC"). These confidential disclosure letters contain information that modifies, qualifies and creates exceptions to the representations and warranties and certain covenants set forth in the Merger Agreement. Moreover, the representations and warranties in the Merger Agreement were used for the purposes of allocating risk between the Company and Capri rather than establishing matters of fact. Accordingly, the representations and warranties in the Merger Agreement should not be relied on as characterization of the actual state of facts about the Company, Merger Sub, or Capri.

The Merger Consideration is expected to be financed with a combination of new debt and cash on the Company's balance sheet. In connection with its entry into the Merger Agreement, the Company entered into a bridge facility commitment letter pursuant to which Bank of America, N.A., BofA Securities, Inc., and Morgan Stanley Senior Funding, Inc. committed to provide a $8.0 billion 364-day senior unsecured bridge loan facility, subject to customary conditions. The consummation of the Merger is not subject to any financing condition.

**Item 2.02        Results of Operations and Financial Condition.**

On August 10, 2023, the Company and Capri issued a joint press release announcing the execution of the Merger Agreement and certain other information, including that the Company expects to report annual revenue and earnings per diluted share consistent with its previously issued guidance range. Also on August 10, 2023, the Company held a conference call to discuss, among other things, the announcement and execution of the Merger Agreement and certain other information. A copy of the press release is attached hereto as Exhibit 99.1 and the presentation for such call is attached hereto Exhibit 99.2.

The information contained in this Section 2.02, including Exhibits 99.1 and 99.2, is being furnished to the SEC and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act") or otherwise subject to liability under that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01        Financial Statements and Exhibits.**

(d)Exhibits

| Exhibit Number | Description |
| --- | --- |
| 2.1* | Agreement and Plan of Merger, dated as of August 10, 2023, by and among Tapestry, Inc., Sunrise Merger Sub, Inc., and Capri Holdings Limited. |
| 99.1 | Joint Press Release, dated August 10, 2023, of Tapestry, Inc. and Capri Holdings Limited. |
| 99.2 | Presentation, dated August 10, 2023, by Tapestry, Inc. |
| 104 | Cover Page Interactive Data File-the cover page XBRL tags are embedded within the Inline XBRL document |

\*       Schedules omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company agrees to furnish supplementally a copy of any omitted schedule to the SEC upon request; provided, however, that the Company may request confidential treatment pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended, for any schedules or exhibits so furnished.

**Forward-Looking Statements**

This report includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements relate to future events and anticipated results of operations, business strategies, the anticipated benefits of the proposed transaction, the anticipated impact of the proposed transaction on the combined company's business and future financial and operating results, the expected amount and timing of synergies from the proposed transaction, the anticipated closing date for the proposed transaction and other aspects of the Company's operations or operating results. These forward-looking statements generally can be identified by phrases such as "will," "expects," "anticipates," "foresees," "forecasts," "estimates" or other words or phrases of similar import. It is uncertain whether any of the events anticipated by the forward-looking statements will transpire or occur, or if any of them do, what impact they will have on the results of operations and financial condition of the combined company or the price of the Company's or Capri's stock. These forward-looking statements involve certain risks and uncertainties, many of which are beyond the parties' control, that could cause actual results to differ materially from those indicated in such forward-looking statements, including but not limited to: the effect of the announcement of the Merger on the ability of the Company or Capri to retain and hire key personnel and maintain relationships with customers, suppliers and others with whom the Company or Capri do business, or on the Company's or Capri's operating results and business generally; risks that the Merger disrupts current plans and operations and the potential difficulties in employee retention as a result of the Merger; the outcome of any legal proceedings related to the Merger; the ability of the parties to consummate the proposed transaction on a timely basis or at all; the satisfaction of the conditions precedent to consummation of the proposed transaction, including the ability to secure regulatory approvals on the terms expected, at all or in a timely manner; the ability of the Company to successfully integrate Capri's operations; the ability of the Company to implement its plans, forecasts and other expectations with respect to its business after the completion of the transaction and realize expected synergies; and business disruption following the Merger. These risks, as well as other risks related to the proposed transaction, will be included in the proxy statement that will be filed with the SEC in connection with the proposed transaction. While the list of factors presented here is considered representative, no such list should be considered to be a complete statement of all potential risks and uncertainties. For additional information about other factors that could cause actual results to differ materially from those described in the forward-looking statements, please refer to the Company's and Capri's respective periodic reports and other filings with the SEC, including the risk factors identified in the Company's and Capri's most recent Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K. The forward-looking statements included in this communication are made only as of the date hereof. Neither the Company nor Capri undertakes any obligation to update any forward-looking statements to reflect subsequent events or circumstances, except as required by law.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: August 10, 2023

TAPESTRY, INC.

By: /s/ David E. Howard

David E. Howard
General Counsel and Secretary

# Exhibit 4

EX-2.1 2 brhc20057354_ex2-1.htm EXHIBIT 2.1

*EXECUTION VERSION*

**Exhibit 2.1**

**AGREEMENT AND PLAN OF MERGER**

by and among

**TAPESTRY, INC.,**

**SUNRISE MERGER SUB, INC.**

and

**CAPRI HOLDINGS LIMITED**

dated as of

August 10, 2023

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **ARTICLE I THE MERGER** | | 2 |
| | Section 1.1. The Merger | 2 |
| | Section 1.2. Effect of the Merger | 2 |
| | Section 1.3. The Closing | 2 |
| | Section 1.4. Effective Time | 2 |
| | Section 1.5. Governing Documents | 2 |
| | Section 1.6. Officers and Directors | 3 |
| **ARTICLE II TREATMENT OF SECURITIES** | | 3 |
| | Section 2.1. Treatment of Securities | 3 |
| | Section 2.2. Payment for Securities; Surrender of Certificates | 4 |
| | Section 2.3. Treatment of Company Equity Awards | 7 |
| | Section 2.4. Withholding | 8 |
| | Section 2.5. Further Assurances | 9 |
| **ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY** | | 9 |
| | Section 3.1. Qualification, Organization, Subsidiaries, etc. | 10 |
| | Section 3.2. Capitalization | 10 |
| | Section 3.3. Corporate Authority | 12 |
| | Section 3.4. Governmental Consents; No Violation | 12 |
| | Section 3.5. SEC Reports and Financial Statements | 13 |
| | Section 3.6. Internal Controls and Procedures | 14 |
| | Section 3.7. No Undisclosed Liabilities | 15 |
| | Section 3.8. Absence of Certain Changes or Events | 15 |
| | Section 3.9. Compliance with Law; Permits | 15 |
| | Section 3.10. Employee Benefit Plans | 17 |
| | Section 3.11. Labor Matters | 19 |
| | Section 3.12. Tax Matters | 20 |
| | Section 3.13. Litigation; Orders | 22 |
| | Section 3.14. Intellectual Property | 22 |
| | Section 3.15. Privacy and Data Protection | 24 |
| | Section 3.16. Real Property; Assets | 25 |
| | Section 3.17. Material Contracts | 26 |
| | Section 3.18. Environmental Matters | 28 |
| | Section 3.19. Customers; Suppliers | 29 |
| | Section 3.20. Insurance | 29 |
| | Section 3.21. Information Supplied | 30 |
| | Section 3.22. Opinion of Financial Advisor | 30 |
| | Section 3.23. State Takeover Statutes; Anti-Takeover Laws | 30 |
| | Section 3.24. Related Party Transactions | 30 |
| | Section 3.25. Finders and Brokers | 30 |
| | Section 3.26. No Other Representations | 30 |

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB                31

    Section 4.1.  Qualification, Organization, etc.                                 31
    Section 4.2.  Corporate Authority                                              31
    Section 4.3.  Governmental Consents; No Violation                              32
    Section 4.4.  Litigation; Orders                                               33
    Section 4.5.  Information Supplied                                             33
    Section 4.6.  Financing                                                        33
    Section 4.7.  Finders and Brokers                                             34
    Section 4.8.  Share Ownership                                                  34
    Section 4.9.  No Merger Sub Activity                                           35
    Section 4.10. Solvency                                                         35
    Section 4.11. No Other Representations                                         35

ARTICLE V COVENANTS RELATING TO CONDUCT OF BUSINESS PENDING THE MERGER            35

    Section 5.1.  Conduct of Business by the Company Pending the Closing            35
    Section 5.2.  No Solicitation by the Company                                   42
    Section 5.3.  Preparation of the Proxy Statement; Company Shareholders Meeting  45
    Section 5.4.  Conduct of Business by Parent Pending the Closing                47

ARTICLE VI ADDITIONAL AGREEMENTS                                                 48

    Section 6.1.  Access; Confidentiality; Notice of Certain Events                48
    Section 6.2.  Efforts                                                          49
    Section 6.3.  Publicity                                                        51
    Section 6.4.  D&O Insurance and Indemnification                                52
    Section 6.5.  Takeover Statutes                                                53
    Section 6.6.  Obligations of Merger Sub and Parent                             53
    Section 6.7.  Employee Matters                                                 54
    Section 6.8.  Rule 16b-3                                                       56
    Section 6.9.  Shareholder Litigation                                           57
    Section 6.10. Delisting                                                        57
    Section 6.11. Director Resignations                                            57
    Section 6.12. Financing                                                        57
    Section 6.13. Financing Cooperation                                            59
    Section 6.14. Treatment of Company Indebtedness                                63
    Section 6.15. Integration and Tax Matters                                      64
    Section 6.16. BVI Registered Agent                                             64

ARTICLE VII CONDITIONS TO CONSUMMATION OF THE MERGER                             65

    Section 7.1.  Conditions to Each Party's Obligations to Effect the Merger       65
    Section 7.2.  Conditions to Obligations of Parent                              65
    Section 7.3.  Conditions to Obligations of the Company                         66

ARTICLE VIII TERMINATION                                                         66

    Section 8.1.  Termination                                                      67
    Section 8.2.  Effect of Termination                                            69

ARTICLE IX MISCELLANEOUS                                                          72

    Section 9.1.   Amendment and Modification; Waiver                            72
    Section 9.2.   Non-Survival of Representations and Warranties                73
    Section 9.3.   Expenses                                                      73
    Section 9.4.   Notices                                                       73
    Section 9.5.   Interpretation                                                74
    Section 9.6.   Counterparts                                                  75
    Section 9.7.   Entire Agreement; Third-Party Beneficiaries                   75
    Section 9.8.   Severability                                                  75
    Section 9.9.   Governing Law; Jurisdiction                                   76
    Section 9.10.  Waiver of Jury Trial                                          76
    Section 9.11.  Assignment                                                    77
    Section 9.12.  Enforcement; Remedies                                         77
    Section 9.13.  Financing Entities                                            78

Annex A      Certain Definitions

Annex B      Articles of Merger

Annex C      Plan of Merger

**AGREEMENT AND PLAN OF MERGER**

This **AGREEMENT AND PLAN OF MERGER** (this "Agreement"), dated as of August 10, 2023, is by and among **TAPESTRY, INC.**, a Maryland corporation ("Parent"), **SUNRISE MERGER SUB, INC.**, a British Virgin Islands business company limited by shares with BVI company number 2129509 incorporated under the laws of the territory of the British Virgin Islands and a wholly owned Subsidiary of Parent ("Merger Sub"), and **CAPRI HOLDINGS LIMITED**, a British Virgin Islands business company limited by shares with BVI company number 524407 incorporated under the laws of the territory of the British Virgin Islands (the "Company"). All capitalized terms used in this Agreement shall have the meanings ascribed to such terms in Annex A or as otherwise defined elsewhere in this Agreement, unless the context clearly provides otherwise.  Parent, Merger Sub and the Company are each sometimes referred to herein as a "Party" and collectively, as the "Parties."

**RECITALS**

WHEREAS, it is proposed that Merger Sub shall merge with and into the Company, with the Company surviving the merger as a wholly owned Subsidiary of Parent (the "Merger"), upon the terms and subject to the conditions set forth in this Agreement and in accordance with the applicable provisions of the BVI Business Companies Act (Revised Edition 2020) (as amended) (the "BVI Act"), pursuant to which each ordinary share, no par value, of the Company ("Company Ordinary Shares") issued and outstanding immediately prior to the Effective Time, other than Dissenting Shares and Cancelled Shares, will be converted into the right to receive the Merger Consideration;

WHEREAS, the board of directors of the Company (the "Company Board of Directors") have adopted resolutions unanimously (i) approving and authorizing the Company to execute and deliver this Agreement, the Plan of Merger and the other documents contemplated thereby, and approving the Merger and the other transactions contemplated by this Agreement (the "Transactions"), (ii) determining that the Merger and the other Transactions are advisable, fair to and in the best interests of the Company and its shareholders, (iii) recommending that the holders of Company Ordinary Shares (the "Company Shareholders") adopt a resolution authorizing this Agreement and the Plan of Merger and approving the Merger and the Transactions (the "Company Board Recommendation"), and (iv) submitting this Agreement and the Plan of Merger to the Company Shareholders for their approval;

WHEREAS, the board of directors of each of Parent and Merger Sub have approved this Agreement and determined that this Agreement and the Transactions are advisable, fair to and in the best interests of, Parent and Merger Sub and their respective shareholder(s) and/or member(s); and

WHEREAS, Parent, Merger Sub and the Company desire to make certain representations, warranties, covenants and agreements in connection with the Transactions and also to prescribe various conditions to the Transactions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

## THE MERGER

Section 1.1.    The Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the relevant provisions of the BVI Act, at the Effective Time, Merger Sub shall be merged with and into the Company, and Merger Sub shall be struck off the BVI Register of Companies in accordance with the BVI Act. The Company will become a wholly owned Subsidiary of Parent and will continue as the surviving BVI business company in the Merger (the "Surviving Company").

Section 1.2.    Effect of the Merger.  At the Effective Time, the effects of the Merger shall be as provided in this Agreement, the Articles of Merger, the Plan of Merger and the applicable provisions of the BVI Act.

Section 1.3.    The Closing.  The closing of the Merger (the "Closing") shall take place by means of a virtual closing through electronic exchange of documents and signatures at 8:00 a.m., Eastern Time, on the third (3rd) Business Day after the satisfaction or, to the extent permitted by applicable Law, waiver of the last of the conditions set forth in Article VII to be satisfied or waived (other than any such conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted by applicable Law, waiver of such conditions at the Closing), unless another date or place is agreed to in writing by the Company and Parent.  The date on which the Closing takes place is referred to as the "Closing Date."

Section 1.4.    Effective Time.  Subject to the provisions of this Agreement, on the Closing Date, the Parties shall execute and file as a premium filing (as such term is used by the Registrar of Corporate Affairs of the British Virgin Islands (the "Registrar")) articles of merger in substantially the form attached as Annex B hereto (the "Articles of Merger"), which will have attached to it, a plan of merger in substantially the form attached as Annex C hereto (the "Plan of Merger") with the Registrar, and at the Closing, shall make any and all other filings or recordings required under the BVI Act in connection with the Merger (including the filing by Merger Sub's registered agent of a letter confirming it has no objections to the Merger).  The Merger shall become effective at such time as the Articles of Merger are duly registered by the Registrar, or at such other date or time as Parent and the Company shall agree in writing (subject to the requirements of the BVI Act) and shall specify in the Articles of Merger (the time the Merger becomes effective, the "Effective Time").

Section 1.5.    Governing Documents.  Unless otherwise determined by Parent prior to the Effective Time, and by virtue of the Merger and pursuant to the Articles of Merger, but subject to, and without limiting, Section 6.4, the Company Governing Documents as in effect immediately prior to the Effective Time shall be amended and restated in their entirety in the form of the memorandum and articles of association of Merger Sub, as in effect immediately prior to the Effective Time, and as so amended and restated, shall be the memorandum and articles of association of the Surviving Company until thereafter changed or amended as provided therein or by applicable Law; *provided* that the name of the Surviving Company shall be "Capri Holdings Limited."

Section 1.6.    <u>Officers and Directors</u>.  Unless otherwise determined by Parent prior to the Effective Time, the officers of Merger Sub immediately prior to the Effective Time, from and after the Effective Time, shall be the initial officers of the Surviving Company.  The directors of Merger Sub immediately prior to the Effective Time, from and after the Effective Time, shall be the initial directors of the Surviving Company.

## ARTICLE II

## TREATMENT OF SECURITIES

Section 2.1.    <u>Treatment of Securities</u>.

(a)    <u>The Merger</u>.  At the Effective Time by virtue of the Merger and without any action on the part of the holder thereof:

(i)    Each Company Ordinary Share issued and outstanding immediately prior to the Effective Time (other than any Dissenting Shares or Cancelled Shares) shall be converted into the right to receive $57.00 in cash, without interest (the "<u>Merger Consideration</u>").  From and after the Effective Time, all Company Ordinary Shares (other than any Dissenting Shares or Cancelled Shares) shall as a result of the conversion cease to be issued and outstanding and shall be cancelled and shall cease to exist, and each holder of a valid certificate or certificates which immediately prior to the Effective Time represented any such Company Ordinary Shares (each, a "<u>Certificate</u>") or evidenced by way of book-entry in the register of members of the Company immediately prior to the Effective Time (each, a "<u>Book-Entry Share</u>") shall thereafter cease to have any rights with respect to such Company Ordinary Shares, except the right to receive the applicable Merger Consideration upon the surrender of such Company Ordinary Shares in accordance with <u>Section 2.2</u>.

(ii)    Each Company Ordinary Share issued and outstanding immediately prior to the Effective Time that is owned or held in treasury by the Company or is owned by Parent or any of its direct or indirect Subsidiaries shall be cancelled and shall cease to exist, and no consideration shall be delivered in exchange therefor (collectively, the "<u>Cancelled Shares</u>").

(iii)    Each ordinary share of Merger Sub issued and outstanding immediately prior to the Effective Time shall be automatically converted into and become one validly issued, fully paid and nonassessable ordinary share, no par value, of the Surviving Company.

-3-

(b)        Dissenting Shares.  Notwithstanding anything in this Agreement to the contrary, and only to the extent available under the BVI Act, if a holder of Company Ordinary Shares (a "Dissenting Shareholder") properly demands in writing, and does not withdraw or lose, its dissenters' rights for such Company Ordinary Shares, in accordance with Section 179 of the BVI Act (the "Dissenting Shares") and otherwise complies with all provisions of the BVI Act relevant to the exercise and perfection of dissenters' rights, then the Dissenting Shareholder shall be entitled to receive an amount for such Dissenting Shares calculated in accordance with Section 179 of the BVI Act (the "Dissenter Consideration").  For the avoidance of doubt, from and after the Effective Time, the Dissenting Shares will automatically be cancelled as a result of the Merger and will cease to exist or be outstanding and each shareholder who has properly exercised such dissenters' rights will cease to be a member or shareholder of the Company (and will not be a member or shareholder of the Surviving Company) and will not have any rights of a shareholder of the Company or the Surviving Company with respect to the Dissenting Shares (including any right to receive such holder's portion of the Merger Consideration), except the right to receive payment of the Dissenter Consideration, unless, after the Effective Time, such holder fails to perfect or withdraws or otherwise loses his, her or its right to dissent, in which case the Dissenting Shares will only have the right to receive the Merger Consideration, without interest thereon, upon surrender of the Certificates, if any, in accordance with this Article II.

(c)        Adjustment to Merger Consideration.  The Merger Consideration shall be adjusted appropriately, without duplication, to reflect the effect of any division or combination of shares, share dividend (including any dividend or distribution of securities convertible into Company Ordinary Shares), reorganization, recapitalization, reclassification, exchange of shares or other like change with respect to the number of Company Ordinary Shares outstanding after the date hereof and prior to the Effective Time. Nothing in this Section 2.1(c) shall be construed to permit the Company or Parent to take any action with respect to its securities that is prohibited by the terms of this Agreement.

Section 2.2.        Payment for Securities; Surrender of Certificates.

(a)        Exchange Fund.  Prior to the Effective Time, Parent shall designate a national or international bank or trust company reasonably acceptable to the Company to act as the exchange agent in connection with the Merger (the "Exchange Agent"). The Exchange Agent shall also act as the agent for the Company Shareholders for the purpose of receiving and holding their Certificates and shall obtain no rights or interests in the shares represented thereby.  At or prior to the Effective Time, Parent shall deposit, or cause to be deposited, with the Exchange Agent cash in immediately available funds in an amount sufficient to pay the Merger Consideration in accordance with Section 2.1(a) (such cash amounts, the "Exchange Fund"), in each case, for the sole benefit of the holders of Company Ordinary Shares.  Parent shall cause the Exchange Agent to make, and the Exchange Agent shall make, delivery of the Merger Consideration of the Exchange Fund in accordance with this Agreement.  The Exchange Fund shall not be used for any purpose that is not expressly provided for in this Agreement. The Exchange Fund shall be invested by the Exchange Agent as reasonably directed by Parent; provided, however, that any investment of such cash shall in all events be limited to direct short-term obligations of, or short-term obligations fully guaranteed as to principal and interest by, the U.S. government, and that no such investment or loss thereon shall affect the amounts payable to holders of Company Ordinary Shares (other than Dissenting Shares and Cancelled Shares) pursuant to this Article II; provided, further, that following any losses from any such investment, Parent shall promptly provide additional funds to the Exchange Agent for the benefit of the holders of Company Ordinary Shares at the Effective Time in the amount of such losses, which additional funds shall be deemed to be part of the Exchange Fund.  Any interest and other income resulting from such investments shall be paid to Parent.

-4-

(b)        Procedures for Surrender.

(i)        *Company Ordinary Share Certificates*.  Promptly after the Effective Time, and in any event within two (2) Business Days following the Effective Time, Parent shall cause the Exchange Agent to mail to each holder of record of a Certificate and whose Company Ordinary Shares were converted pursuant to Section 2.1 into the right to receive the Merger Consideration (A) a letter of transmittal, which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates (or affidavits of loss in lieu thereof and, if reasonably required by Parent, an indemnity bond) to the Exchange Agent and shall be in such form and have such other provisions as Parent may reasonably specify and (B) customary instructions for effecting the surrender of the Certificates (or affidavits of loss in lieu thereof and, if reasonably required by Parent, an indemnity bond) in exchange for payment of the Merger Consideration into which such Company Ordinary Shares have been converted pursuant to Section 2.1.  Upon surrender of a Certificate (or an affidavit of loss in lieu thereof and, if reasonably required by Parent, an indemnity bond) for cancellation to the Exchange Agent or to such other agent or agents as may be appointed by Parent, together with such letter of transmittal duly completed and validly executed in accordance with the instructions thereto, and such other documents as may be required pursuant to such instructions, the holder of such Certificate shall be entitled to receive in exchange therefor the applicable Merger Consideration pursuant to the provisions of this Article II for each Company Ordinary Share formerly represented by such Certificate, and the Certificate (or affidavit of loss in lieu thereof and, if reasonably required by Parent, an indemnity bond) so surrendered shall be forthwith cancelled.  The Exchange Agent shall accept such Certificates (or affidavits of loss in lieu thereof and, if reasonably required by Parent, an indemnity bond) upon compliance with such reasonable terms and conditions as the Exchange Agent may impose to effect an orderly exchange thereof in accordance with normal exchange practices.  If payment of the Merger Consideration is to be made to a Person other than the Person in whose name the surrendered Certificate is registered, it shall be a condition precedent of payment that (x) the Certificate so surrendered shall be properly endorsed or shall be otherwise in proper form for transfer and (y) the Person requesting such payment shall have paid any Transfer Taxes required by reason of the payment of the Merger Consideration to a Person other than the registered holder of the Certificate surrendered or shall have established to the satisfaction of Parent that such Tax either has been paid or is not required to be paid.

(ii)        *Book-Entry Shares*.  Any holder of any Book-Entry Shares whose Company Ordinary Shares were converted pursuant to Section 2.1 into the right to receive the Merger Consideration shall not be required to deliver a Certificate or an executed letter of transmittal to the Exchange Agent to receive the Merger Consideration.  In lieu thereof, each registered holder of one or more Book-Entry Shares shall automatically upon the Effective Time be entitled to receive, and Parent shall cause the Exchange Agent to pay and deliver as promptly as reasonably practicable after the Effective Time, and in any event within two (2) Business Days following the Effective Time, the applicable Merger Consideration pursuant to the provisions of this Article II for each Company Ordinary Share formerly represented by such Book-Entry Share, and the Book-Entry Share so exchanged shall be forthwith cancelled.  Payment of the Merger Consideration with respect to Book-Entry Shares shall only be made to the person in whose name such Book-Entry Shares are registered.

-5-

(iii)    *No Interest*.  No interest shall be paid or accrue on any portion of the Merger Consideration payable upon surrender of any Certificate (or affidavit of loss in lieu thereof in accordance with Section 2.2(e)) or in respect of any Book-Entry Share.

(c)    Transfer Books; No Further Ownership Rights in Company Ordinary Shares.  At the Effective Time, the register of members of the Company shall be closed and thereafter there shall be no further registration of transfers of Company Ordinary Shares on the records of the Company.  Until surrendered as contemplated by this Section 2.2, each Company Ordinary Share (other than any Dissenting Shares or Cancelled Shares) shall be deemed at any time after the Effective Time to represent only the right to receive the applicable Merger Consideration as contemplated by this Article II.  If, after the Effective Time, a Certificate is presented to Parent for any reason, they shall be cancelled and exchanged as provided in this Agreement.

(d)    Termination of Exchange Fund; No Liability.  At any time following the first (1st) anniversary of the Effective Time, Parent shall be entitled to require the Exchange Agent to deliver to it any funds (including any interest received with respect thereto) remaining in the Exchange Fund that have not been disbursed, or for which disbursement is pending subject only to the Exchange Agent's routine administrative procedures, to holders of Company Ordinary Shares (other than any Dissenting Shares or Cancelled Shares), and thereafter such holders shall be entitled to look only to Parent (subject to abandoned property, escheat or similar Laws) as general creditors thereof with respect to the applicable Merger Consideration payable upon due surrender of their Certificates (or affidavit of loss in lieu thereof in accordance with Section 2.2(e)) and compliance with the procedures in Section 2.2(a), without any interest thereon.  Notwithstanding the foregoing, none of Parent, the Company, Merger Sub, the Surviving Company or the Exchange Agent shall be liable to any holder of Company Ordinary Shares for any Merger Consideration or other amounts delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(e)    Lost, Stolen or Destroyed Certificates.  In the event that any Certificates shall have been lost, stolen or destroyed, the Exchange Agent shall issue in exchange for such lost, stolen or destroyed Certificates, upon the making of an affidavit of that fact by the holder thereof and, if reasonably required by Parent, an indemnity bond, the applicable Merger Consideration payable in respect thereof pursuant to Section 2.1.

-6-

Section 2.3.      Treatment of Company Equity Awards.

(a)      At the Effective Time, each Company Option with a per share exercise price equal to or in excess of the Merger Consideration and that is outstanding and unexercised immediately prior to the Effective Time shall, without any action on the part of Parent, the Company or the holder thereof, cease to represent a right to acquire Company Ordinary Shares and shall be assumed and converted automatically into an option to purchase the number of shares of Parent Common Stock (each, an "Adjusted Option") equal to the product obtained by *multiplying* (x) the number of Company Ordinary Shares subject to the Company Option immediately prior to the Effective Time, *by* (y) the Conversion Ratio, with any fractional shares rounded down to the nearest whole share.  Each Adjusted Option shall have an exercise price per share of Parent Common Stock equal to (i) the per share exercise price for Company Ordinary Shares subject to the corresponding Company Option immediately prior to the Effective Time *divided by* (ii) the Conversion Ratio, rounded up to the nearest whole cent.  Each Adjusted Option shall otherwise be subject to the same terms and conditions applicable to the corresponding Company Option under the applicable Company Equity Plan and the agreements evidencing grants thereunder, including vesting terms and terms related to the treatment upon termination of employment.

(b)      At the Effective Time, each Company Option with a per share exercise price that is less than the Merger Consideration and that is outstanding and unexercised immediately prior to the Effective Time shall, without any action on the part of Parent, the Company or the holder thereof, be cancelled, with the holder of such Company Option becoming entitled to receive, in full satisfaction of the rights of the holder with respect thereto, an amount in cash equal to the product obtained by *multiplying* (i) the number of Company Ordinary Shares subject to such Company Option as of immediately prior to the Effective Time, *by* (ii) the excess of the Merger Consideration over the per share exercise price applicable to the Company Option.

(c)      At the Effective Time, each Company RSU that is outstanding immediately prior to the Effective Time and that is held by a non-employee director of the Company will vest as of the Effective Time and shall, without any action on the part of Parent, the Company or the holder thereof, be cancelled, with the holder of such Company RSU becoming entitled to receive, in full satisfaction of the rights of such holder with respect thereto, the Merger Consideration in respect of each Company Ordinary Share subject to such Company RSU immediately prior to the Effective Time.

(d)      Except as set forth on Section 2.3(d) of the Company Disclosure Letter, at the Effective Time, each Company RSU (other than any Company RSU covered by Section 2.3(c)) that is outstanding immediately prior to the Effective Time shall, without any action on the part of Parent, the Company or the holder thereof, be assumed and converted automatically into a restricted stock unit award with respect to a number of shares of Parent Common Stock (each, an "Adjusted RSU") equal to the product obtained by *multiplying* (i) the total number of Company Ordinary Shares subject to the Company RSU immediately prior to the Effective Time *by* (ii) the Conversion Ratio, with any fractional shares rounded to the nearest whole share.  Each Adjusted RSU shall otherwise be subject to the same terms and conditions applicable to the corresponding Company RSU under the applicable Company Equity Plan and the agreements evidencing grants thereunder, including vesting terms and terms related to the treatment upon termination of employment.

(e)        At the Effective Time, each Company PSU that is outstanding immediately prior to the Effective Time shall, without any action on the part of Parent, the Company or the holder thereof, fully vest and be cancelled in consideration for the right to receive the Merger Consideration with respect to the number of Company Ordinary Shares equal to the number of Company Ordinary Shares subject to such Company PSU immediately prior to the Effective Time (with such number of Company Ordinary Shares determined based on (i) actual performance as determined by the Compensation and Talent Committee of the Company Board of Directors for any fully completed measurement period or performance period, as applicable, ended prior to the Effective Time to the extent the Compensation and Talent Committee of the Company Board of Directors can reasonably determine the level of achievement of performance for such completed measurement period or performance period, as applicable, prior to the Effective Time, and (ii) target performance for any measurement period or performance period, as applicable, for which performance has not previously been determined as provided in <u>clause (i)</u>).

(f)        Parent shall cause the Company or the Company Subsidiaries to pay through the payroll system of the Surviving Company or one of its Subsidiaries (to the extent applicable) to each holder of a Company Option, Company RSU or Company PSU the amounts due to such holder under <u>Section 2.3(b)</u>, <u>Section 2.3(c)</u>, <u>Section 2.3(d)</u> and <u>Section 2.3(e)</u>, as applicable, without interest and less such amounts as are required to be withheld or deducted under applicable Law with respect to the making of such payment, as promptly as practicable (but no later than two (2) Business Days) following the Effective Time; *provided* that the Merger Consideration with respect to any Company Equity Award that constitutes nonqualified deferred compensation subject to Section 409A of the Code shall be paid at the earliest time permitted under the terms of such award that will not result in the application of a Tax or penalty under Section 409A of the Code.

(g)        Parent shall file or cause to be filed with the SEC, no later than the date on which the Effective Time occurs, a registration statement on a Form S-8 (or any successor form or other appropriate form, including a Form S-1 or Form S-3) relating to the shares of Parent Common Stock issuable with respect to the Adjusted Options and Adjusted RSUs. Parent shall use reasonable best efforts to maintain the effectiveness of such registration statement or statements (and maintain the current status of the prospectuses or prospectuses contained therein) for so long as such awards remain outstanding.

(h)        Prior to the Effective Time, the Company shall take all actions and adopt all such resolutions as are necessary to effectuate the treatment of the Company Equity Awards as contemplated by this <u>Section 2.3</u>.

Section 2.4.        <u>Withholding</u>.  Each of the Company, Parent, Merger Sub, the Surviving Company and the Exchange Agent (without duplication) shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement any amounts as are required to be withheld or deducted with respect to such payment under the Code, or any other applicable state, local or non-U.S. Law.  To the extent that amounts are so deducted or withheld, (a) such deducted or withheld amounts shall be remitted to the appropriate Governmental Entity in accordance with applicable Law and (b) any such deducted or withheld amounts so remitted shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.  If Parent or Merger Sub determines that it or any of its affiliates, permitted successors or assigns is required to deduct or withhold any amount from any payment hereunder (other than any backup withholding under Section 3406 of the Code (or a similar provision of state, local or foreign Law) or any withholding in respect of Company Equity Awards covered by <u>Section 2.3</u>) or in connection with the transactions contemplated hereby, then Parent or Merger Sub, as applicable, shall provide notice to the Company of the intent to deduct or withhold such amount and the basis for such deduction or withholding as promptly as reasonably practicable, and the parties shall, and shall cause their applicable affiliates, permitted successors and assigns to, reasonably cooperate with one another in order to eliminate or reduce any such deduction or withholding, including providing a reasonable opportunity for the applicable payee to provide forms or other evidence that would mitigate, reduce or eliminate such deduction or withholding.

-8-

Section 2.5. <u>Further Assurances</u>. If at any time before or after the Effective Time, Parent or the Company reasonably believes or is advised that any further instruments, deeds, assignments or assurances are reasonably necessary to consummate the Merger or to carry out the purposes and intent of this Agreement at or after the Effective Time, then Parent, Merger Sub, the Company and the Surviving Company and their respective officers and directors shall execute and deliver all such instruments, deeds, assignments or assurances and do all other things reasonably necessary to consummate the Merger and to carry out the purposes and intent of this Agreement, but in each case subject to the terms and conditions of this Agreement.

**ARTICLE III**

**REPRESENTATIONS AND
WARRANTIES OF THE COMPANY**

Except as disclosed in (x) any Company SEC Documents filed or furnished by the Company with the SEC and publicly available prior to the date of this Agreement (but excluding any predictive, cautionary or forward looking disclosures contained under the captions "risk factors," "forward looking statements" or any similar predictive or precautionary sections; *provided* that nothing set forth or disclosed in any such Company SEC Documents will be deemed to modify or qualify the representations and warranties set forth in <u>Section 3.2</u>, <u>Section 3.3</u> and <u>Section 3.8(a)</u>) or (y) the applicable section of the disclosure letter delivered by the Company to Parent immediately prior to the execution of this Agreement (the "<u>Company Disclosure Letter</u>") (it being understood that any information set forth in one section or subsection of the Company Disclosure Letter shall be deemed to apply to and qualify (or, as applicable, a disclosure for purposes of) the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this <u>Article III</u> for which it is reasonably apparent on its face that such information is relevant to such other section), the Company represents and warrants to Parent and Merger Sub as set forth below.

Section 3.1.    Qualification, Organization, Subsidiaries, etc.

(a)    The Company is a legal entity duly incorporated, validly existing and in good standing under the Laws of its jurisdiction of incorporation.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company's Subsidiaries is a legal entity duly organized or incorporated (as applicable) and validly existing under the Laws of its respective jurisdiction of organization or incorporation (as applicable).  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, each of the Company and the Company's Subsidiaries has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted.  Each of the Company and the Company's Subsidiaries is qualified to do business and, where relevant, is in good standing as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or, where relevant, in good standing, has not and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  The Company has filed with the SEC, prior to the date hereof, a complete and accurate copy of the Company Governing Documents as amended to the date hereof.  The Company Governing Documents are in full force and effect and the Company is not in violation of the Company Governing Documents.  The Company has made available to Parent prior to the date hereof complete and accurate copies of the certificates of incorporation, bylaws, certificate(s) of change of name, certificate(s) of merger and memorandum and articles of association, or equivalent organizational or governing documents, of and each of the Company's "significant subsidiaries" within the meaning of Rule 1-02 of Regulation S-X of the SEC, each as currently in effect.

(b)    All the issued and outstanding ordinary shares of, or other equity interests in, each Company Subsidiary have been validly issued and are fully paid and nonassessable and are wholly owned, directly or indirectly, by the Company free and clear of all Liens, other than Permitted Liens.  Section 3.1(b) of the Company Disclosure Letter sets forth, as of the date hereof, (i) an organizational chart which shows the name and jurisdiction of incorporation of each Company Subsidiary, (ii) the percentage of interests held, directly or indirectly, by the Company in each Company Subsidiary and (iii) the names and the type of and percentage of interests held by any Person other than the Company or a Company Subsidiary in each Company Subsidiary.

Section 3.2.    Capitalization.

(a)    As of the date hereof, the Company is authorized to issue up to 650,000,000 ordinary shares, each of no par value.  As of August 7, 2023 (the "Company Capitalization Date"), (A) 116,138,350 Company Ordinary Shares were issued and outstanding (not including shares held in treasury), (B) 109,627,881 Company Ordinary Shares were held in the Company's treasury, (C) Company Options covering 191,967 Company Ordinary Shares were outstanding, (D) Company RSUs covering 3,921,056 Company Ordinary Shares were outstanding, (E) Company PSUs covering 368,932 Company Ordinary Shares were outstanding (assuming achievement of the applicable performance goals at the target level), and (F) 4,138,694 Company Ordinary Shares were reserved for issuance but not yet granted pursuant to the Company Equity Plan.  All the outstanding Company Ordinary Shares are, and all Company Ordinary Shares reserved for issuance as described above shall be, when issued in accordance with the respective terms thereof, duly authorized, validly issued, fully paid and nonassessable and free of preemptive rights.

(b)    Section 3.2(b) of the Company Disclosure Letter sets forth a true and complete list, as of the Company Capitalization Date, of (i) each Company Equity Award, (ii) the name or employee identification number of the Company Equity Award holder, (iii) the number of Company Ordinary Shares underlying each Company Equity Award (assuming that applicable performance metrics in respect of the Company PSUs are achieved at "target" levels), (iv) the date on which the Company Equity Award was granted, (v) the ordinary vesting schedule with respect to the Company Equity Award, (vi) the exercise price of each Company Option, and (vii) the expiration date of each Company Option.

(c)        Except as set forth in <u>Section 3.2(a)</u> and <u>Section 3.2(b)</u>, and other than the Company Ordinary Shares that have become outstanding after the Company Capitalization Date that were reserved for issuance under the Company Equity Plan and issued in accordance with the terms of the Company Equity Plan and applicable Company Equity Award, in each case in effect as of the date hereof:  (i) the Company does not have any ordinary shares or other equity or equity-based interests issued or outstanding and (ii) there are no outstanding subscriptions, options, phantom equity rights, share appreciation, restricted share unit awards, warrants, puts, calls, exchangeable or convertible securities or other similar rights or agreements or any other Contract to which the Company or any Company Subsidiary is a party or is otherwise bound obligating the Company or any Company Subsidiary (other than transactions solely among wholly owned Company Subsidiaries and/or the Company) to (A) issue, transfer or sell, or make any payment with respect to, any ordinary shares or other equity interests of the Company or any Company Subsidiary or securities convertible into, exchangeable for or exercisable for such shares or equity interests, (B) grant, extend or enter into any such subscription, option, warrant, put, call, exchangeable or convertible securities or other similar right or agreement or (C) redeem or otherwise acquire any ordinary shares or other equity interests.  Except as set forth in <u>Section 3.2(a)</u> and <u>Section 3.2(b)</u>, and other than the Company Ordinary Shares that have become outstanding after the Company Capitalization Date that were reserved for issuance under the Company Equity Plan and issued in accordance with the terms of the Company Equity Plan and applicable Company Equity Award, in each case in effect as of the date hereof, there are no outstanding subscriptions, options, phantom equity rights, share appreciation, restricted share unit awards, warrants, puts, calls, exchangeable or convertible securities or other similar rights or agreements or any other Contract to which the Company or any Company Subsidiary is a party or is otherwise bound obligating the Company or any Company Subsidiary (other than transactions solely among wholly owned Company Subsidiaries and/or the Company) to make any investment (in the form of a loan, capital contribution or similar form) in any Company Subsidiary that is not wholly owned or in any other Person.  There are no outstanding obligations of the Company nor, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, any Company Subsidiary (other than in respect of transactions solely among wholly owned Company Subsidiaries and/or the Company) (1) restricting the transfer of, (2) affecting the voting rights of, (3) requiring the repurchase, redemption or disposition of, or containing any right of first refusal, right of first offer or similar right with respect to, (4) requiring the registration for sale of or (5) granting any preemptive or anti-dilutive rights with respect to, any ordinary shares or other equity interests of the Company or any Company Subsidiary.

(d)        Neither the Company nor any Company Subsidiary has outstanding bonds, debentures, notes or other similar obligations, the holders of which have the right to vote (or which are convertible into or exercisable for securities having the right to vote) with the Company Shareholders on any matter.

Section 3.3.    Corporate Authority.

(a)    The Company has the requisite corporate power and authority to execute and deliver this Agreement and to consummate the Transactions, including the Merger. The execution and delivery of this Agreement, the performance of the Company's obligations under this Agreement, and the consummation of the Transactions have been duly and validly authorized by the Company Board of Directors and no other corporate proceedings (pursuant to the Company Governing Documents or otherwise) on the part of the Company are necessary to authorize the performance of the Company's obligations under this Agreement or the consummation of, and to consummate, the Transactions, except, with respect to the Merger, the receipt of the Company Shareholder Approval and the filing of the Articles of Merger and Plan of Merger with the Registrar.

(b)    The affirmative vote of the holders of a majority of the outstanding Company Ordinary Shares entitled to vote thereon (the "Company Shareholder Approval") authorizing this Agreement and the Plan of Merger and approving the Merger and the Transactions is the only vote of the Company Shareholders necessary to approve the Merger and the Transactions.

(c)    On or prior to the date hereof, the Company Board of Directors has adopted resolutions unanimously (i) approving and authorizing the Company to execute and deliver this Agreement, the Articles of Merger, the Plan of Merger and the other documents contemplated thereby, and approving the Merger and the Transactions, (ii) determining that the Merger and the other Transactions are advisable, fair to and in the best interests of the Company and its shareholders, (iii) recommending that the Company Shareholders adopt a resolution authorizing this Agreement and the Plan of Merger and approving the Merger and the Transactions and (iv) submitting this Agreement and the Plan of Merger to the holders of Company Ordinary Shares for their approval. None of the foregoing actions by the Company Board of Directors has been rescinded or modified in any way as of the entry into this Agreement.

(d)    This Agreement has been duly and validly executed and delivered by the Company and, assuming this Agreement constitutes the valid and binding agreement of Parent and Merger Sub, constitutes the valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, except that (i) such enforcement may be subject to applicable bankruptcy, insolvency, examinership, reorganization, moratorium or other similar Laws, now or hereafter in effect, relating to creditors' rights generally and (ii) equitable remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought (collectively, the "Enforceability Limitations").

Section 3.4.    Governmental Consents; No Violation.

(a)    Other than in connection with or in compliance with (i) the BVI Act, (ii) the filing of the Proxy Statement with the SEC and any amendments or supplements thereto and the mailing of the Proxy Statement, (iii) the Securities Act, (iv) the Exchange Act, (v) applicable state, federal or foreign securities, takeover and "blue sky" Laws, (vi) the HSR Act and any other requisite authorizations, consents, orders, licenses, permits, registrations, declarations, notices, filings, clearances or approvals under any other applicable requirements of other Regulatory Laws and (vii) any applicable rules, regulations or requirements of the NYSE, and subject to the accuracy of Parent's and Merger Sub's representations and warranties set forth in this Agreement, no authorization, permit, notification to, consent or approval of, or filing with, any Governmental Entity is required, under applicable Law, for the consummation by the Company of the Transactions, except for such authorizations, consents, orders, licenses, permits, approvals, registrations, declarations, notices and filings that are not required to be made or obtained prior to the consummation of such transactions or that the failure to make or obtain would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

-12-

(b)        The execution and delivery by the Company of this Agreement do not, and, subject to the receipt of the Company Shareholder Approval and except as described in Section 3.4(a), the consummation of the Transactions and performance and compliance with the provisions hereof will not, (i) in each case excluding Company Leases, conflict with or result in any violation or breach of, or default or change of control (with or without notice or lapse of time, or both) under, or give rise to a right of, or result in, termination, modification, cancellation, or acceleration of any obligation or to the loss of a benefit under any Material Contract binding upon the Company or any Company Subsidiary or to which any of them are a party or by or to which any of their respective properties or assets are bound, or result in the creation of any Lien upon any of the properties or assets of the Company or any Company Subsidiary, other than Permitted Liens, (ii) conflict with or result in any violation of any provision of the Company Governing Documents or (iii) conflict with or violate any Laws applicable to the Company or any Company Subsidiary or any of their respective properties or assets, other than in the case of each of clauses (i) and (iii), any such violation, breach, conflict, default, termination, modification, cancellation, acceleration, right, loss or Lien that has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.5.        SEC Reports and Financial Statements.

(a)        Since April 3, 2022, the Company has timely filed or furnished all forms, documents and reports required to be filed or furnished by it with the SEC (such forms, statements, schedules, documents and reports, the "Company SEC Documents"). As of their respective filing dates or, if amended prior to the date hereof, as of the date of (and giving effect to) the last such amendment, the Company SEC Documents complied in all material respects with the applicable requirements of the Sarbanes-Oxley Act of 2002, as amended, the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents contained (or with respect to the Company SEC Documents filed after the date hereof, will contain) any untrue statement of a material fact or omitted (or with respect to the Company SEC Documents filed after the date hereof, will omit) to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  No Company Subsidiary is required to file any forms, reports or other documents with the SEC.

(b)        The audited consolidated financial statements and the unaudited consolidated interim financial statements (including, in each case, all related notes and schedules) of the Company and its consolidated Subsidiaries included or incorporated by reference in the Company SEC Documents when filed or, if amended prior to the date hereof, as of the date of (and giving effect to) the last such amendment, fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries, as at the respective dates thereof, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited quarterly financial statements, to normal year-end audit adjustments and any other adjustment described therein, including the notes thereto, permitted by the rules and regulations of the SEC) in conformity with United States Generally Accepted Accounting Principles ("GAAP") applied on a consistent basis during the periods involved (subject, in the case of the unaudited quarterly financial statements, to normal year-end audit adjustments and any other adjustment described therein, including the notes thereto, permitted by the rules and regulations of the SEC).

-13-

(c)        Except as would not reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole, (i) the Company is in compliance with the applicable provisions of the Sarbanes-Oxley Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended, (ii) each required form, report and document containing financial statements that has been filed with or submitted to the SEC was accompanied by any certifications required to be filed or submitted by the Company's principal executive officer and principal financial officer pursuant to the Sarbanes-Oxley Act and, at the time of filing or submission of each such certification, such certification complied in all material respects with the applicable provisions of the Sarbanes-Oxley Act.  In the past three years, as of the entry into this Agreement, to the Company's knowledge, neither the Company nor any of its executive officers has received written notice from any Governmental Entity challenging or questioning the accuracy, completeness, form or manner of filing of such certifications.

(d)        Neither the Company nor any Company Subsidiary is a party to, or has any Contract to become a party to, any joint venture, off-balance sheet partnership or any similar Contract, including any Contract relating to any transaction or relationship between or among the Company or any Company Subsidiary, on the one hand, and any unconsolidated affiliate, including any structured finance, special purpose or limited purpose entity or Person, on the other hand, or any off-balance sheet arrangements (as defined in Item 303(a) of Regulation S-K of the SEC), in any such case, where the purpose of such Contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Company in the Company's published financial statements or any Company SEC Documents.

Section 3.6.        Internal Controls and Procedures.  The Company has established and maintains disclosure controls and procedures and internal control over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act, designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.  The Company's disclosure controls and procedures are reasonably designed to ensure that all material information required to be disclosed by the Company in the reports that it files or furnishes under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such material information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure.  Based on its most recent evaluation of internal controls over financial reporting prior to the date hereof, management of the Company has disclosed to the Company's auditors and the audit committee of the Company Board of Directors (i) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting, (ii) any fraud, whether or not material, that involves management or other employees involved in financial reporting and (iii) any claim or allegation regarding any of the foregoing.  Since April 3, 2022, neither the Company nor any Company Subsidiary has received any material, unresolved complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any Company Subsidiary or their respective internal accounting controls.

-14-

Section 3.7.    No Undisclosed Liabilities.  Neither the Company nor any Company Subsidiary has any liabilities of any nature, whether or not accrued, contingent, absolute or otherwise, except for (a) liabilities that are reflected or reserved against on the audited consolidated balance sheet of the Company and the Company Subsidiaries included in its Annual Report on Form 10-K for the annual period ended April 1, 2023 (including any notes thereto), (b) liabilities arising in connection with the transactions contemplated hereby or in connection with obligations under existing Contracts or applicable Law, (c) liabilities incurred or which have been discharged or paid in full, in each case, in the ordinary course of business since April 1, 2023 (other than any liability for any material breaches of Contracts), (d) liabilities expressly required or contemplated by this Agreement and (e) liabilities which have not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 3.8.    Absence of Certain Changes or Events.

(a)    From April 1, 2023 through the entry into this Agreement, there has not occurred any Effect that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)    From April 1, 2023 through the entry into this Agreement, except to the extent it relates to the events giving rise to and the discussion and negotiation of this Agreement and the Transactions, the businesses of the Company and the Company Subsidiaries have been conducted in all material respects in the ordinary course of business consistent with past practice.

Section 3.9.    Compliance with Law; Permits.

(a)    The Company and each Company Subsidiary are and have been since March 28, 2020 in compliance with any Laws (including Environmental Laws and employee benefits and labor Laws) applicable to the Company or such Company Subsidiary or any of their respective properties or assets, except where such non-compliance has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b)    The Company and the Company Subsidiaries hold, and at all relevant times since March 28, 2020 have held, all franchises, grants, authorizations, licenses, permits, certificates, easements, variances, exemptions, approvals, registrations and clearances of any Governmental Entity or pursuant to any applicable Law necessary for the Company and the Company Subsidiaries to own, lease and operate their properties and assets or to carry on their businesses as they are now being conducted (the "Company Permits"), except where the failure to have any of the Company Permits has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(c)        Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) all Company Permits are in full force and effect, no default (with or without notice, lapse of time or both) has occurred under any such Company Permit, and none of the Company or any Company Subsidiary has received any written notice from any Governmental Entity threatening to suspend, revoke, withdraw or modify any such Company Permit, or (ii), taken any action which could result in the Company's or any Company Subsidiary's liability pursuant to Italian Legislative Decree no. 231/2001.

(d)        In the past five (5) years, none of the Company or any Company Subsidiary, or, to the Company's Knowledge, any of the Company's or the Company Subsidiaries' respective Representatives or any other third party acting on behalf of the Company or any Company Subsidiary, has directly or indirectly (A) taken any action in violation of any applicable Anti-Corruption Law, or (B) offered, authorized, provided or given any payment or thing of value to any Person, including a "foreign official" (as defined by the FCPA), for the purpose of influencing any act or decision of such Person to unlawfully obtain or retain business or other advantage.

(e)        Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, in the past five (5) years, (i) none of the Company or any Company Subsidiary has been subject to any actual, pending, or, to the Company's Knowledge, threatened civil, criminal, or administrative actions, suits, demands, claims, whistleblower reports, Actions, settlements or enforcement actions or, to the Company's Knowledge, investigations (internal or external), or made any voluntary disclosures to any Governmental Entity, involving the Company or any Company Subsidiary in any way relating to applicable Anti-Corruption Laws or, (ii) any applicable provisions of Italian Legislative Decree no. 231/2001 (the "231 Decree").

(f)        Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, at all times during the past five (5) years, the Company and each Company Subsidiary has established and maintains a compliance program and internal controls and procedures reasonably designed to promote and ensure compliance with applicable Anti-Corruption Laws, and the Company and Company Subsidiaries have at all times conducted their business in compliance with all applicable Anti-Money Laundering Laws.

(g)        To the Company's Knowledge, there are no Governmental Authorizations that the Company has obtained, or to which it is a party, under Trade Controls or Sanctions.

(h)        Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, the Company and the Company Subsidiaries have, in the past five years: (i) complied with applicable Trade Controls and Sanctions; (ii) not engaged in a transaction or dealing with or involving a Sanctioned Country or Sanctioned Person; (iii) maintained in place and implemented controls and systems to comply with applicable Trade Controls and Sanctions; and (iv) to the Company's Knowledge, not been the subject of or otherwise involved in investigations or enforcement actions by any Governmental Entity or other legal proceedings with respect to any actual or alleged violations of Trade Controls or Sanctions, and has not been notified of any such pending or threatened actions.

-16-

(i)          None of the Company or any Company Subsidiary, nor any director or officer, or, to the Company's Knowledge, agent, employee or affiliate of the Company or any Company Subsidiary is: (i) a Sanctioned Person; (ii) subject to disbarment or any list-based designations under any Trade Controls; or (iii) engaged in transactions, dealings, or other activities that might reasonably be expected to cause such Person to become a Sanctioned Person.

(j)          The Company is in compliance in all material respects with the applicable listing and other rules and regulations of the NYSE.

Section 3.10.          Employee Benefit Plans.

(a)          Section 3.10(a) of the Company Disclosure Letter sets forth an accurate and complete list, as of the entry into this Agreement, of each material Company Benefit Plan that is maintained primarily for the benefit of employees in the United States (a "U.S. Company Benefit Plan") and each material Company Benefit Plan that is maintained primarily for the benefit of employees outside of the United States (a "Non-U.S. Company Benefit Plan").  For purposes of this Agreement, "Company Benefit Plan" means each employee benefit plan (as defined in Section 3(3) of ERISA), whether or not subject to ERISA, and each bonus, stock, equity, stock option, restricted stock unit, performance stock unit or other equity-based compensation arrangement or plan, incentive, commission, deferred compensation, retirement or supplemental retirement, severance, employment, individual consulting arrangement with a natural person providing for annual compensation of $400,000 or more based on expected services, change-in-control, retention, profit sharing, pension, vacation, cafeteria, dependent care, health, welfare, medical care, employee assistance program, education or tuition assistance programs, and each other fringe, employee benefit or compensation plan, policy, program, agreement or arrangement, in each case, for the benefit of current employees, individual consultants who are natural persons with annual compensation of $400,000 or more based on expected services, or directors (or any dependent or beneficiary thereof) of the Company or any Company Subsidiary or with respect to which the Company or any Company Subsidiary has or may have any obligation or liability (whether actual or contingent), but in each case excluding any Multiemployer Plan (save, for the avoidance of doubt, any UK defined benefit pension plan) and any plan, policy, program, agreement or arrangement maintained by, or required to be established by, a Governmental Entity to which the Company or any Company Subsidiary contributes pursuant to applicable Law. With respect to each material Company Benefit Plan, the Company has made available to Parent correct and complete copies of (or, to the extent no such copy exists, a description of), in each case, to the extent applicable, (i) the plan document and any amendments thereto (which, for the avoidance of doubt, with respect to any material Company Benefit Plan for which a form agreement is used, shall consist of a copy of such form) and the most recent summary plan description, (ii) the most recent Form 5500 Annual Report, (iii) the most recent audited financial statement and actuarial valuation, (iv) the most recent determination or opinion letter from the IRS regarding the tax qualified status of such Company Benefit Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code, (v) all material non-routine correspondence with any Governmental Entity and (vi) all material related trust or funding agreements or insurance policies; *provided*, that with respect to each material Non-U.S. Company Benefit Plan, copies of the foregoing items, to the extent applicable, will be made available to Parent by the Company within thirty (30) Business Days following the date hereof.

-17-

(b)       Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) each of the U.S. Company Benefit Plans has been operated and administered in all material respects in accordance with its terms and in compliance with applicable Law, including without limitation ERISA, the Code and, in each case, the regulations thereunder, (ii) all material contributions or other material amounts payable by the Company or the Company Subsidiaries pursuant to each U.S. Company Benefit Plan in respect of the current or two (2) prior plan years have been timely paid or accrued in accordance with GAAP or applicable international accounting standards and (iii) there are no pending, or to the Company's Knowledge, threatened or anticipated claims (other than routine claims for benefits), investigations or audits by, on behalf of or against any of the U.S. Company Benefit Plans or any trusts related thereto that would result in a material liability.

(c)       Within the last six (6) years, no Company Benefit Plan has been an employee benefit plan subject to Section 302 or Title IV of ERISA or Section 412, 430 or 4971 of the Code.  None of the Company, the Company Subsidiaries or any of their respective ERISA Affiliates has incurred within the last six (6) years or is reasonably expected to incur any Controlled Group Liability that has not been satisfied in full, and to the Company's Knowledge, no condition exists that is likely to cause the Company, the Company Subsidiaries or any of their ERISA Affiliates to incur any such liability.

(d)       Except as would not reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole, neither the Company, the Company Subsidiaries nor any of their respective ERISA Affiliates has, at any time during the last six (6) years, contributed to, been obligated to contribute to or had any liability (including any actual or contingent liability) with respect to any Multiemployer Plan or a plan that has two (2) or more contributing sponsors, at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA.

(e)       No Company Benefit Plan provides life insurance or medical benefits (whether or not insured) with respect to current or former employees, consultants or directors of the Company or the Company Subsidiaries beyond their retirement or other termination of service, other than coverage mandated by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or comparable U.S. state or non-U.S. local Law.

(f)       (i) Each of the Company Benefit Plans that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter or opinion letter as to its qualification and (ii) to the Company's Knowledge, there are no existing circumstances or any events that have occurred that would reasonably be expected to adversely affect the qualified status of any such plan.

(g)       Neither the execution and delivery of this Agreement nor the consummation of the Transactions (either alone or in conjunction with any other event) will, except as required by the terms of this Agreement, (i) result in any material payment (including, without limitation, severance) becoming due to any current or former director, independent contractor (who is a natural person) or any employee of the Company or any Company Subsidiary under any Company Benefit Plan or otherwise, (ii) materially increase any benefits otherwise payable under any Company Benefit Plan, (iii) result in any acceleration of the time of payment, funding or vesting of any material benefits or material compensation otherwise due or payable under any Company Benefit Plan to any current or former director, independent contractor (who is a natural person) or any employee of the Company or any Company Subsidiary, or (iv) result in any payment (whether in cash or property or the vesting of property) to any "disqualified individual" (as such term is defined in Treasury Regulations Section 1.280G-1) that would, individually or in combination with any other such payment, constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).

-18-

(h)      Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, each Non-U.S. Company Benefit Plan (i) has been operated in conformance with the applicable statutes or governmental regulations and rulings relating to such plans in the jurisdictions in which such Non-U.S. Company Benefit Plan is present or operates, (ii) that is intended to qualify for special tax treatment meets all requirements for such treatment and (iii) that is intended to be funded or book-reserved is fully funded or book reserved, as appropriate, based upon reasonable actuarial assumptions.

(i)      Each Company Benefit Plan has been maintained and operated in documentary and operational compliance in all material respects with Section 409A of the Code or an available exemption therefrom.

(j)      Neither the Company nor any Company Subsidiary is a party to nor do they have any obligation to compensate any Person for excise Taxes payable pursuant to Section 4999 of the Code or for additional Taxes payable pursuant to Section 409A of the Code.

Section 3.11.      Labor Matters.

(a)      As of the entry into this Agreement, (i) no employee of the Company or any Company Subsidiary is represented by a labor or trade union, works council or other employee representative body (each, a "Union"), and, to the Company's Knowledge, no union organizing efforts are currently being conducted, (ii) neither the Company nor any Company Subsidiary is a party or subject to, or is currently negotiating any entry into or under an obligation to negotiate, any collective bargaining agreement or other similar labor-related Contract with a Union, (iii) no strike, picket, work stoppage, work slowdown or other organized labor dispute or disruption exists, or within the past year has existed, in respect of the Company or any Company Subsidiary that would be material to the Company and the Company Subsidiaries, taken as a whole, and (iv) as of the entry into this Agreement, except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (A) there is no pending charge or complaint against the Company or any Company Subsidiary by or before the National Labor Relations Board or any comparable U.S. or foreign Governmental Entity, and (B) none of the Company or the Company Subsidiaries are a party, or otherwise bound by, any consent decree with, or citation by or with any Governmental Entity relating to employees or employment practices. Neither the Company nor any Company Subsidiary is obliged to consult with any Union in connection with the Merger or entry into this Agreement, prior to the date of entry into this Agreement.

-19-

(b)        Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) the Company and the Company Subsidiaries are, and for the past three (3) years have been, in compliance with all applicable Law relating to labor and/or employment, including all applicable Law relating to wages, hours, classification of exempt employees, classification of independent contractors and other non-employees, collective bargaining, immigration, authorization to work, background checks, employment discrimination, harassment, civil rights, human rights, child labor, plant closings (within the meaning of the federal Worker Adjustment and Retraining Notification Act and any similar local, state, or foreign Law (each, a "WARN Act")), mass layoffs, fair labor standards, safety and health, workers' compensation, minimum working age, prohibition of forced labor, pay equity, wrongful discharge or violation of rights of employees, former employees or prospective employees, and the collection and payment of withholding or social security taxes, and (ii) neither the Company nor any of the Company Subsidiaries has incurred any liability or obligation under any WARN Act within the three (3) year period prior to the date of this Agreement that remains unsatisfied.

(c)        To the Company's Knowledge, in the last five (5) years, (i) no allegations of sexual harassment have been made against any employee at the level of Vice President or above or with an annual base salary above $200,000 USD, and (ii) neither the Company nor any of the Company Subsidiaries have entered into any settlement agreements related to allegations of sexual harassment or misconduct by any employee at the level of Vice President or above or with an annual base salary above $200,000 USD.

Section 3.12.        Tax Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect,

(a)        the Company and the Company Subsidiaries have timely filed (taking into account any extension of time within which to file) all Tax Returns that are required to be filed by any of them and all such Tax Returns are true, correct and complete;

(b)        the Company and the Company Subsidiaries have timely paid in full to the appropriate Governmental Entity all Taxes required to be paid by any of them except for Taxes contested in good faith or for which adequate reserves have been established in accordance with GAAP;

(c)        the Company and the Company Subsidiaries have (i) timely paid, deducted, withheld and collected all amounts required to be paid, deducted, withheld or collected by any of them with respect to any payment owing to, or received from, their employees, creditors, independent contractors, customers and other third parties (and have timely paid over any amounts so withheld, deducted or collected to the appropriate Governmental Entity) and (ii) have otherwise complied with all applicable Laws relating to the payment, withholding, collection and remittance of Taxes (including information reporting requirements);

(d)        there is no (i) claim, litigation, audit, examination, investigation or other proceeding pending or threatened in writing with respect to any Taxes or Tax Returns of the Company or any Company Subsidiary, or (ii) deficiency for Taxes that has been assessed by any Governmental Entity against the Company or any Company Subsidiary and that has not been withdrawn, settled or fully satisfied by payment, in each case, without any further liability to the Company or any Company Subsidiary from and after the Closing;

(e)        neither the Company nor any Company Subsidiary has waived any statute of limitations with respect to any Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency (in each case, other than an automatic or automatically granted waiver or extension), which waiver or extension will still be in effect after the Closing;

(f)        within the last two (2) years, neither the Company nor any Company Subsidiary has distributed the stock of another Person, or has had its shares distributed by another Person, in a transaction that was intended to be governed by Section 355(a) of the Code;

(g)        none of the Company or any Company Subsidiary (i) is a party to or bound by, or has any obligation under, any Tax allocation, sharing, indemnity, or reimbursement agreement (other than any Tax indemnification provisions in ordinary course commercial agreements or lease agreements not primarily related to Taxes, and other than any agreement or arrangement solely among the Company and/or the Company Subsidiaries, and other than any purchase agreement not primarily related to Taxes), (ii) has ever been a member of an affiliated group filing a consolidated federal income Tax Return or any similar group for federal, state, local or non-U.S. Tax purposes (other than a group the only members of which were any of the Company and/or one or more of present or former Company Subsidiaries or a group the parent of which was the Company or a Company Subsidiary) or (iii) has any liability for Taxes of any Person (other than the Company or any Company Subsidiary) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local, or non-U.S. Law) or as transferee or successor;

(h)        there are no Liens for Taxes upon any property of the Company or any Company Subsidiary, other than Permitted Liens;

(i)        within the last three (3) years, no claim has been made in writing by any Tax authority in a jurisdiction where the Company or any Company Subsidiary has not filed Tax Returns of a particular type that the Company or any Company Subsidiary is or may be subject to Tax of such type by, or required to file Tax Returns of such type in, such jurisdiction;

(j)        neither the Company nor any Company Subsidiary has entered into any closing agreement (within the meaning of Section 7121(a) of the Code or any similar provision of state, local or non-U.S. Law) or received a written ruling from a Tax authority, in each case, which ruling or agreement would be binding on the Company or such Company Subsidiary, as applicable, in a Tax period (or portion thereof) beginning after the Closing Date;

(k)        neither the Company nor any Company Subsidiary has participated in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2) (or any similar provision of state, local or non-U.S. Law);

(l)        neither the Company nor any Company Subsidiary will be required to include an item of income in (or exclude an item of deduction from) taxable income for any Tax period (or portion thereof) beginning after the Closing Date as a result of (A) an adjustment pursuant to Section 481(c) of the Code (or any similar provision of state, local or non-U.S. Law) as a result of any change in method of accounting made prior to the Closing Date, (B) deferred revenue or other prepaid amount received prior to the Closing outside of the ordinary course of business with respect to which economic performance will occur after the Closing Date, or (C) any installment sale made prior to the Closing outside of the ordinary course of business;

(m)    neither the Company nor any Company Subsidiary has any obligation to pay any amounts in a Tax period (or portion thereof) beginning after the Closing Date as a result of an election made pursuant to Section 965(h) of the Code;

(n)    to the Company's Knowledge, the Company and the Company Subsidiaries have timely paid to the appropriate Governmental Entity all amounts required to be paid over under all escheat and unclaimed property Law; and

(o)    Section 3.1(b) of the Company Disclosure Schedule lists the entity classification of the Company and each Company Subsidiary for U.S. federal income tax purposes.

Section 3.13.    Litigation; Orders

.    There are no Actions pending or, to the Company's Knowledge, threatened against the Company or any Company Subsidiary or any of their respective properties, rights or assets by or before, and there are no orders, judgments or decrees of or settlement agreements with, any Governmental Entity that have had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  There is no Action to which the Company or any of its Subsidiaries is a party pending or, to the Company's Knowledge, threatened seeking to prevent, hinder, modify, delay or challenge the Merger or the other Transactions contemplated by this Agreement.

Section 3.14.    Intellectual Property.

(a)    Section 3.14(a) of the Company Disclosure Letter sets forth a substantially complete and accurate list of all Company Registered Intellectual Property, in each case including, where applicable, the record owner, jurisdiction, registration, patent, trademark or copyright number or application number, filing date and issue date.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) the Company solely owns each item of Company Intellectual Property free and clear of all Liens, other than Permitted Liens; (ii) each item of Company Registered Intellectual Property is subsisting, valid and, other than Company Registered Intellectual Property constituting applications, to the Company's Knowledge, enforceable; and (iii) as of the entry into this Agreement, no Action (other than office actions in connection with the prosecution of applications) is pending or, to the Knowledge of the Company, threatened by or before any Governmental Entity, that challenges the legality, validity, enforceability, registration, use or ownership of any Company Registered Intellectual Property.

(c)    The Company and the Company Subsidiaries own, have a valid license or sublicense, or otherwise have a legally enforceable and sufficient rights to use all Intellectual Property material to the conduct of the business of the Company and the Company Subsidiaries, taken as a whole, as currently conducted.  Notwithstanding anything to the contrary, this Section 3.14(c) shall not be considered to make any representation or warranty regarding the infringement, misappropriation, dilution or other violation of Intellectual Property (which, for the avoidance of doubt, is addressed in Section 3.14(d)).

-22-

(d)         Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) no Actions are pending or, to the Company's Knowledge, threatened against the Company or any Company Subsidiary, alleging that the Company or any Company Subsidiary is infringing, misappropriating, diluting or otherwise violating the Intellectual Property of any third party; (ii) the conduct of the business of the Company and the Company Subsidiaries including, their manufacture, sale, marketing, licensing and distribution of Company Products, as currently conducted, does not infringe, misappropriate, dilute, or otherwise violate any Intellectual Property of any third party (and as conducted since March 28, 2020, has not infringed, violated, diluted, or misappropriated any Intellectual Property of any third party), (iii) to the Company's Knowledge, no third party is infringing, misappropriating, diluting, using in an unauthorized manner or otherwise violating any Company Intellectual Property, and (iv) as of the entry into this Agreement, neither the Company nor any Company Subsidiary has instituted or threatened to institute any Action that is currently pending against any third party alleging that such third party is infringing, misappropriating, diluting, using in an unauthorized manner or otherwise violating any Company Intellectual Property.

(e)         Each employee who has since March 28, 2020, contributed to or participated in the development or creation of any material Company Intellectual Property on behalf of the Company or any Company Subsidiary has executed a written agreement assigning or transferring, or otherwise vesting exclusive ownership of all such Intellectual Property in or to the Company or such Company Subsidiary, or such ownership has otherwise vested in the Company or the Company Subsidiaries under applicable Laws. The Company and each Company Subsidiary have taken commercially reasonable actions to maintain and protect all of the Trade Secrets constituting material Company Intellectual Property ("Business Confidential Information"), and except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, all such Business Confidential Information has, since March 28, 2020, been maintained in confidence in accordance with procedures that are customarily used in the industry to protect rights of like importance, without unauthorized disclosure thereof.  Without limiting the generality of the foregoing, the Company and the Company Subsidiaries have used reasonable efforts to enforce a policy requiring each employee or third party that has access to any Business Confidential Information to execute a confidentiality agreement that obligates such Person to maintain the confidentiality thereof, and except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, no such Person is, or, since March 28, 2020, was during their employment or engagement with the Company or any Company Subsidiaries, in violation of such confidentiality obligations.

(f)         Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect:  (i) the Company or a Company Subsidiary owns or has a valid right to access and use all IT Assets used in the operation of the business of the Company and the Company Subsidiaries; and (ii) the IT Assets owned or controlled by the Company and the Company Subsidiaries ("Company IT Systems") are in good working condition and perform the information technology operations required of them by the Company and Company Subsidiaries. Without limiting the foregoing, the Company and the Company Subsidiaries have taken reasonable steps and implemented reasonable procedures to ensure that the Company IT Systems are free from Malicious Code and to implement security patches and upgrades that are generally available and applicable to the Company IT Systems.  Since March 28, 2020, there has been no failure of any Company IT Systems that has caused any material disruption to the business of the Company and the Company Subsidiaries, taken as a whole.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, none of the Company or any of the Company Subsidiaries have suffered any (x) data loss, or (y) business interruptions or other harm resulting from a Security Incident.

-23-

Section 3.15.    <u>Privacy and Data Protection</u>.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect: (i) the Company's and each Company Subsidiary's, and to the Company's Knowledge, each Data Partner's, receipt, collection, monitoring, maintenance, hosting, creation, transmission, use, analysis, disclosure, storage, retention, disposal and security, as the case may be, of Personal Data, have, since March 28, 2020, complied with their respective obligations arising from (in each case, to the extent applicable) (A) all Information Privacy and Security Laws, (B) PCI DSS, (C) all Privacy Statements, (D) all Contracts to which the Company or Company Subsidiary are bound and that govern their respective use of Personal Data, and (E) all consents and authorizations that apply to the Personal Data that have been obtained by the Company or a Company Subsidiary (such obligations, collectively, "<u>Data Privacy Obligations</u>"); (ii) the Company and each Company Subsidiary have all rights, authority, consents and authorizations necessary to receive, retain, access, use and disclose the Personal Data in their possession or under their control in connection with the operation of their business as currently retained, accessed, used and disclosed by them, including under the Transactions; and (iii) the Company and each Company Subsidiary have at all times posted, to the extent required under, and in accordance with, applicable Data Privacy Obligations, privacy policies governing their use of Personal Data on their websites made available by the Company and each Company Subsidiary. The execution, delivery, and performance of this Agreement and the Transactions will not materially conflict with or result in a material violation or breach of any Data Privacy Obligations.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, since March 28, 2020, there has been no (i) data security breach of, unauthorized access to, or malicious disruption of any Company IT Systems that transmit or maintain Protected Information owned, used, hosted, maintained or controlled by or on behalf of the Company or the Company Subsidiaries or (ii) incident involving the loss, damage, unauthorized access, unauthorized acquisition, unauthorized modification, unauthorized use or unauthorized disclosure of any Protected Information owned, used, hosted, maintained or controlled by or on behalf of the Company or the Company Subsidiaries (clauses (i) and (ii) collectively, a "<u>Security Incident</u>").  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, none of the Company's or any Company Subsidiary's Data Partners have, since March 28, 2020, suffered any Security Incident that resulted in any unauthorized access to, unauthorized modification of, unauthorized use of, unauthorized disclosure of or loss of or damage to any Personal Data held for or on behalf of the Company or any Company Subsidiaries, or violated any Information Privacy and Security Laws with respect thereto.

-24-

(c)        The Company and each Company Subsidiary have, and have required their Data Partners to have, implemented, monitored and maintained a written information security program, covering the Company and each Company Subsidiary, designed to meet or exceed applicable industry standards, to (i) identify and address internal and external risks to the security, integrity or privacy of any proprietary or confidential information (including Protected Information) in their possession, (ii) implement, monitor and improve adequate and effective administrative, technical and physical safeguards to control these risks and protect the proprietary or confidential information (including Protected Information) in their possession, (iii) protect against Security Incidents, and (iv) maintain notification procedures in compliance with applicable Information Privacy and Security Laws in the case of any breach of security, integrity or privacy compromising data containing Personal Data in their possession.  In each of the past three (3) fiscal years, the Company and each of the Company Subsidiaries have performed a security risk assessment covering the Company and each Company Subsidiary, in each case, as required under PCI DSS, and addressed and remediated all critical, high risk or material threats and deficiencies identified in those security risk assessments.

(d)        Except as would not reasonably be expected to result in material liability, disruption, or other material obligation to or of the Company or any Company Subsidiary, since March 28, 2020, (i) provided a written notice or audit request to the Company or a Company Subsidiary, (ii) made any written claim against the Company or a Company Subsidiary or (iii) to the Company's Knowledge, commenced any Action as of the entry into this Agreement, in each case, with respect to (A) any suspected, potential or alleged violation of Data Privacy Obligations by the Company or any Company Subsidiary or (B) any of the Company's or a Company Subsidiary's privacy or data security practices, including any Security Incident.

(e)        The Company and the Company Subsidiaries have in place written disaster recovery plans and procedures with respect to the IT Assets that they have identified as essential to the continuity of their business.

Section 3.16.        Real Property; Assets.

(a)        Section 3.16(a) of the Company Disclosure Letter lists the common street address for all real property owned by the Company or any Company Subsidiary in fee as of the entry into this Agreement, and each such Company Subsidiary owning such real property (such real property interests, together with all right, title, and interest of the Company or any Company Subsidiaries in and to all buildings, structures, improvements, and fixtures located thereon, and all easements, rights, and interests appurtenant thereto, are, as the context may require, individually or collectively referred to as the "Owned Real Property").  Except as would not reasonably be expected to be, individually or in the aggregate, material to the Company and the Company Subsidiaries, taken as a whole, the Company and each Company Subsidiary has good, exclusive and valid fee simple title to all Owned Real Property, in each case free and clear of all Liens except for Permitted Liens.

(b)        Section 3.16(b) of the Company Disclosure Letter sets forth a list, as of the entry into this Agreement, of the street address of each office space, distribution center and material retail space ("Material Real Property") with respect to which there is any Contract pursuant to which the Company or any Company Subsidiary leases, subleases or occupies any such real property ("Company Leases").  Except as would not reasonably be expected to material to the Company and the Company Subsidiaries, taken as a whole, neither the Company nor any Company Subsidiary has assigned, subleased, licensed or otherwise granted any Person the right to use or occupy any Material Real Property.

-25-

(c)        Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (i) each Company Lease is valid, binding and in full force and effect, subject to the Enforceability Limitations, and no uncured default or any event which has occurred that, with notice or the lapse of time would constitute a default, in each case, on the part of the Company or, if applicable, any Company Subsidiary or, to the Company's Knowledge, the landlord thereunder exists with respect to any Company Lease, (ii) all work required to be performed under any Company Lease on or prior to the entry into this Agreement by the landlord thereunder or by the Company or any Company Subsidiary has been performed, and (iii) the Company or a Company Subsidiary has a good and valid leasehold interest in or contractual right to use or occupy, subject to the terms of the applicable Company Lease, each real property subject to the Company Leases, free and clear of all Liens, other than Permitted Liens.

(d)        Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, in the past three (3) years, (i) neither the Company nor any Company Subsidiary has received any written notice of any pending or, to the Company's Knowledge, threatened condemnation proceedings in connection with any parcel of real property described in a Company Lease and no eminent domain or condemnation action is pending or threatened, and to the Company's Knowledge, neither the Company nor any Company Subsidiary has received any written notice of nonconforming use under or a violation of any applicable building, zoning, subdivision and other land use or similar laws, regulations and ordinances with respect to any real property described in any Company Lease, and (ii) to the Company's Knowledge, the Company and the Company Subsidiaries (A) have rights to access, use and operate all property described in the Company Leases, (B) enjoy peaceful and undisturbed possession of all such real property and (C) have not served or received written notice to terminate any Company Lease.  Except as would not reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole, there are no outstanding options or rights of first refusal to purchase or lease any Material Real Property or any portion thereof or interests therein, in either case, granted by the Company or any Company Subsidiary.

(e)        Neither the Company nor any Company Subsidiary owns real property or land situated in the British Virgin Islands.

Section 3.17.        <u>Material Contracts</u>.

(a)        Except for this Agreement, <u>Section 3.17</u> of the Company Disclosure Letter contains a complete and correct list, as of the entry into this Agreement, of each Contract, including all amendments, supplements, and side letters thereto that modify each such Contract, described below in this <u>Section 3.17(a)</u> to which the Company or any Company Subsidiary is a party or by which they are bound or by which they or any of their respective properties or assets are subject or bound, as of the entry into this Agreement, other than any Company Leases (all Contracts of the type described in this <u>Section 3.17(a)</u>, whether or not set forth on <u>Section 3.17</u> of the Company Disclosure Letter, being referred to herein as the "<u>Material Contract</u>"):

(i)        each Contract that limits the freedom of the Company, any Company Subsidiary or any of their respective affiliates to compete or engage in any line of business or geographic region or with any Person or sell, supply or distribute any product or service or that otherwise has the effect of restricting the Company, the Company Subsidiaries or any of their respective affiliates (including Parent and its affiliates after the Effective Time) from the development, marketing or distribution of products and services, in each case, in any geographic area, in each case, both (A) in any geographic area and (B) in a manner that is material to the Company and the Company Subsidiaries, taken as a whole;

-26-

(ii)         any material joint venture, strategic alliance (other than any such agreement solely between or among the Company and its wholly owned Subsidiaries) or similar Contract;

(iii)        each acquisition or divestiture Contract that (A) requires future acquisition or divestiture by the Company with a value in excess of $5,000,000, or (B) contains representations, covenants, indemnities or other obligations (including "earnout" or other contingent payment obligations) that would reasonably be expected to result in the receipt or making by the Company or any Company Subsidiary of future payments in excess of $5,000,000;

(iv)        each Contract that gives any Person the right to acquire any assets of the Company or any Company Subsidiary (excluding ordinary course commitments to purchase Company Products) after the entry into this Agreement with consideration of more than $5,000,000;

(v)         each Contract pursuant to which the Company or any Company Subsidiary (A) grants any license, covenant not to assert or similar right to any third party under or to any Company Intellectual Property that is material to the business of the Company and the Company Subsidiaries, taken as a whole, except Ordinary Course Licenses, or (B) is granted a license, covenant not to assert, or similar right under or to any third party's Intellectual Property that is material to the business of the Company and the Company Subsidiaries, taken as a whole, other than non-exclusive licenses granted on substantially standard terms with respect to commercially available Software or information technology services;

(vi)        each Contract not otherwise described in any other subsection of this Section 3.17(a) pursuant to which the Company or any Company Subsidiary is obligated to pay, or entitled to receive, payments in excess of $5,000,000 during the Company's Fiscal Year most recently ended prior to entry into this Agreement;

(vii)       any Contract that obligates the Company or any Company Subsidiary to make any capital investment or capital expenditure outside the ordinary course of business and in excess of $5,000,000 per annum;

(viii)      each Contract that is a Material Customer Agreement or a Material Supplier Agreement;

(ix)        each Contract that grants any right of first refusal or right of first offer that is material to the Company and the Company Subsidiaries, taken as a whole, with respect to any material assets of the Company or the Company Subsidiaries;

(x)        each Contract that contains any exclusivity rights or "most favored nations" provisions or minimum use, supply or display requirements that are binding on the Company or its affiliates (including Parent and its affiliates after the Effective Time) and, in each case, are material to the Company and the Company Subsidiaries, taken as a whole;

(xi)        each Contract relating to outstanding Indebtedness for borrowed money (other than intercompany Indebtedness owed by the Company or any Company Subsidiary) of the Company or any Company Subsidiary (whether incurred, assumed, guaranteed or secured by any asset) in an aggregate principal amount in excess of $5,000,000;

(xii)        each Contract governing any collaboration, co-promotion, strategic alliance or design project contract which, in each case, is material to the Company and the Company Subsidiaries, taken as a whole;

(xiii)        each Contract involving any material collective bargaining agreement or other material Contract with any labor union (or similar organization); and

(xiv)        any Contract not otherwise described in any other subsection of this Section 3.17(a) that would constitute a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC) with respect to the Company.

(b)        True and complete copies of each Material Contract in effect as of the date hereof have been made available to Parent or publicly filed with the SEC prior to the date hereof.  None of the Company or any Company Subsidiary is in (or has received any written claim of) breach or default under the terms of any Material Contract and no event has occurred with notice or lapse of time or both that would constitute a breach or default thereunder by the Company or any of the Company Subsidiaries, in each case except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  To the Company's Knowledge, as of the entry into this Agreement, no other party to any Material Contract is in breach of or default under the terms of any Material Contract where such breach or default has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.  Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, each Material Contract is a valid, binding and enforceable, obligation of the Company or the Company Subsidiary which is party thereto and, to the Company's Knowledge, of each other party thereto, and is in full force and effect, in each case, subject to the Enforceability Limitations.

Section 3.18.        Environmental Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (a) neither the Company nor any Company Subsidiary is or, since March 28, 2020, has been in violation of any Environmental Law, (b) none of the properties owned leased, operated or occupied by the Company or any Company Subsidiary is contaminated with any Hazardous Substance, (c) neither the Company nor any Company Subsidiary has been identified as responsible or potentially responsible for the investigation, cleanup, or remediation of Hazardous Substances at any property, including any third-party property, (d) the Company and the Company Subsidiaries have all Company Permits required under any Environmental Law, and the Company and the Company Subsidiaries are and, since March 28, 2020, have been in compliance with such Company Permits, and (e) no Action is pending, or to the Company's Knowledge, threatened that seeks to rescind, revoke, modify or terminate any Company Permit required under Environmental Law, or otherwise impose, or that is reasonably likely to result in the imposition of, any liability arising under any Environmental Law on the Company or any Company Subsidiary.

Section 3.19.    Customers; Suppliers.

(a)    Section 3.19(a) of the Company Disclosure Letter sets forth a list of the top ten (10) customers of the Company and the Company Subsidiaries based on revenue received by the Company or any Company Subsidiary during the twelve (12) months ended April 1, 2023 (each, a "Material Customer" and each material Contract with a Material Customer, a "Material Customer Agreement").  As of the entry into this Agreement, in the past year, to the Company's Knowledge, neither the Company nor any Company Subsidiary has received any written notice from any Material Customer that such Material Customer shall not continue as a customer of the Company or that such Material Customer intends to terminate existing material Contracts with the Company or the Company Subsidiaries.

(b)    Section 3.19(b) of the Company Disclosure Letter sets forth a list of the top ten (10) suppliers of the Company and the Company Subsidiaries based on payments made by the Company or any Company Subsidiary during the last twelve (12) months ended April 1, 2023 (each, a "Material Supplier" and each material Contract pursuant to which the Company or a Company Subsidiary paid those amounts to the applicable Material Supplier, a "Material Supplier Agreement").  As of the entry into this Agreement, in the past year, to the Company's Knowledge, neither the Company nor any Company Subsidiary has received any written notice from any Material Supplier that such supplier shall not continue as a supplier to the Company or that such supplier intends to terminate existing material Contracts with the Company or the Company Subsidiaries.

Section 3.20.    Insurance.  The Company has made available to Parent a copy of all material insurance policies maintained by the Company or any Company Subsidiary.  Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (a) all current insurance policies and insurance Contracts of the Company and the Company Subsidiaries are in full force and effect and are valid and enforceable and cover against the risks as are customary for companies of similar size in the same or similar lines of business and (b) all premiums due thereunder have been paid.  Neither the Company nor any Company Subsidiary has received notice of cancellation or termination with respect to any current third-party insurance policies or insurance Contracts (other than in connection with normal renewals of any such insurance policies or Contracts) where such cancellation or termination would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

-29-

Section 3.21.        Information Supplied.  The information supplied by or on behalf the Company and the Company Subsidiaries to be contained in, or incorporated by reference in the definitive proxy statement to be sent to the Company Shareholders in connection with the Merger and the Transactions (including any amendments or supplements, the "Proxy Statement") will not, at the date the Proxy Statement is first mailed to the Company Shareholders or at the time of the Company Shareholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, at the time and in light of the circumstances under which they are made, not false or misleading.  Notwithstanding the foregoing provisions of this Section 3.21, no representation or warranty is made by the Company with respect to information or statements made or incorporated by reference in the Proxy Statement, which information or statements were supplied by or on behalf of Parent or Merger Sub.

Section 3.22.      Opinion of Financial Advisor.  The Company Board of Directors has received an opinion of Barclays Capital Inc. to the effect that, as of the date of such opinion and based upon and subject to the various matters and limitations set forth therein, the consideration to be offered to the shareholders of the Company pursuant to this Agreement is fair to such shareholders from a financial point of view.  A written copy of such opinion will be provided by the Company to Parent promptly following entry into this Agreement for informational purposes only.

Section 3.23.        State Takeover Statutes; Anti-Takeover Laws.  Assuming the accuracy of Parent's representations and warranties set forth in Section 4.8, the Company Board of Directors has taken all action necessary to render inapplicable to this Agreement and the Transactions any applicable Takeover Statute.  The Company has no shareholder rights plan, "poison-pill" or other comparable agreement or device in effect designed to have the effect of delaying, deferring or discouraging any Person from acquiring control of the Company.

Section 3.24.        Related Party Transactions.  Except as set forth in the Company SEC Documents, as of the entry into this Agreement, there are no transactions, agreements, arrangements or understandings between the Company or any Company Subsidiary, on the one hand, and any affiliate (including any officer or director) thereof, but not including any wholly owned Subsidiary of the Company, on the other hand, that would be required to be disclosed under Item 404 of Regulation S-K of the SEC that are not so disclosed, except as would not reasonably be expected to be, individually or in the aggregate, material to the Company and the Company Subsidiaries, taken as a whole.

Section 3.25.        Finders and Brokers.  Other than Barclays Capital Inc., neither the Company nor any Company Subsidiary has employed, engaged or made any arrangements with any investment banker, broker or finder in connection with the Transactions who is entitled to any fee, any commission or any reimbursement of expenses in connection with this Agreement or upon or as a result of the consummation of the Merger.  The Company has furnished to Parent true and complete copies of all Contracts between the Company or any Company Subsidiary and Barclays Capital Inc. entered into in connection with the Merger.

Section 3.26.        No Other Representations.  Except for the express written representations and warranties made by the Company contained in this Article III, neither the Company nor any Representative or other Person on behalf of the Company makes any express or implied representation or warranty with respect to the Company or any of its affiliates, or the Company's business, assets, liabilities, financial condition or results of operations or with respect to any other information provided to Parent or Merger Sub in connection with the Transactions or with respect to future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects), and Parent and Merger Sub expressly disclaim reliance on any representation or warranty of the Company or any other Person other than the representations and warranties expressly contained in this Article III.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES
## OF PARENT AND MERGER SUB

Except as disclosed in (x) any forms, statements, schedules, documents and reports filed or furnished by Parent with the SEC and publicly available prior to the date of this Agreement (but excluding any predictive, cautionary or forward looking disclosures contained under the captions "risk factors," "forward looking statements" or any similar predictive or precautionary sections and any other disclosures contained therein that are non-specific, predictive, cautionary or forward looking in nature) or (y) the applicable section of the disclosure letter delivered by Parent to the Company immediately prior to the execution of this Agreement (the "Parent Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Parent Disclosure Letter shall be deemed to apply to and qualify (or, as applicable, a disclosure for purposes of) the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this Article IV for which it is reasonably apparent on its face that such information is relevant to such other section), Parent and Merger Sub represent and warrant to the Company as set forth below.

Section 4.1.    Qualification, Organization, etc. Each of Parent and Merger Sub is duly organized or incorporated (as applicable) and validly existing and in good standing under the Laws of the jurisdiction of its organization or incorporation (as applicable), with all requisite power and authority to own its properties and conduct its business as currently conducted, except for such failures to be in good standing or have such power that would prevent or materially impair the ability of Parent or Merger Sub to consummate the Transactions, including the Merger, prior to the Outside Date. All of the issued and outstanding shares of Merger Sub are owned directly by Parent. Both Parent and Merger Sub are in compliance with the provisions of their respective certificates of incorporation and bylaws (or other similar governing documents) and the Parent Governing Documents and governing documents of Merger Sub are in full force and effect.

Section 4.2.    Corporate Authority.

(a)    Parent and Merger Sub have the requisite corporate power and authority to execute and deliver this Agreement and to consummate the Transactions, including the Merger.  The execution and delivery of this Agreement, the performance of Parent's and Merger Sub's obligations under this Agreement, and the consummation of the Transactions have been duly and validly authorized by all necessary corporate action of Parent and Merger Sub and no other corporate proceedings (pursuant to the Parent Governing Documents or otherwise) on the part of Parent or Merger Sub are necessary to authorize the performance of the Company's obligations under this Agreement or the consummation of, and to consummate, the Transactions, except, with respect to the Merger, for the filing of the Articles of Merger and the Plan of Merger with the Registrar.

-31-

(b)        No vote or consent of the holders of any class or series of capital stock of Parent or the holders of any other securities of Parent (equity or otherwise) is necessary to adopt this Agreement, or to approve the Merger or the other Transactions.  The vote or consent of Parent, as the sole shareholder of Merger Sub, is the only vote or consent of the holders of any class or series of shares of Merger Sub, which vote or consent will be obtained immediately following the entry into this Agreement.

(c)        This Agreement has been duly and validly executed and delivered by Parent and Merger Sub and, assuming this Agreement constitutes the valid and binding agreement of the Company, constitutes the valid and binding agreement of Parent and Merger Sub, is enforceable against Parent and Merger Sub in accordance with its terms, subject to the Enforceability Limitations.

Section 4.3.        Governmental Consents; No Violation.

(a)        Other than in connection with or in compliance with (i) the BVI Act and (ii) the HSR Act and any other requisite authorizations, consents, orders, licenses, permits, restrictions, declarations, notices, filings, clearances or approvals under any other applicable requirements of other Regulatory Laws, and subject to the accuracy of the Company's representations and warranties set forth in this Agreement, no authorization, permit, notification to, consent or approval of, or filing with, any Governmental Entity is required, under applicable Law, for the consummation by Parent and Merger Sub of the Transactions, except for such authorizations, permits, notifications, consents, approvals or filings that, if not obtained or made, would prevent or materially impair the ability of Parent or Merger Sub to consummate the Transactions, including the Merger, prior to the Outside Date.

(b)        The execution and delivery by Parent and Merger Sub of this Agreement do not, and, except as described in Section 4.3(a), the performance and the consummation of the Transactions and compliance with the provisions hereof will not (i) conflict with or result in any violation or breach of, or default or change of control (with or without notice or lapse of time, or both) under, or give rise to a right of, or result in, termination, modification, cancellation or acceleration of any obligation or to the loss of a benefit under, any Contract binding upon Parent or any Parent Subsidiary or to which any of them are a party or by which or to which any of their respective properties, rights or assets are bound or subject, or result in the creation of any Lien upon any of the properties, rights or assets of Parent or any Parent Subsidiary, other than Permitted Liens, (ii) conflict with or result in any violation of any provision of the Parent Governing Documents or the organizational or governing documents of any Parent Subsidiary or (iii) conflict with or violate any Laws applicable to Parent or any Parent Subsidiary or any of their respective properties, rights or assets, other than in the case of clauses (i) and (iii), any such violation, breach, conflict, default, termination, modification, cancellation, acceleration, right, loss or Lien that has not prevented or materially impaired and would not prevent or materially impair the ability of Parent or Merger Sub to consummate the Transactions, including the Merger, prior to the Outside Date.

Section 4.4.       <u>Litigation; Orders</u>.  There are no Actions pending or, to Parent's Knowledge, threatened against Parent or any Parent Subsidiary or any of their respective properties, rights or assets, and there are no orders, judgments or decrees of or settlement agreements with, any Governmental Entity, that have prevented or materially impaired or would reasonably be expected to prevent or materially impair on the ability of Parent or Merger Sub to consummate the Transactions, including the Merger, prior to the Outside Date.

Section 4.5.       <u>Information Supplied</u>.  The information supplied by or on behalf of Parent and Merger Sub to be contained in, or incorporated by reference in the Proxy Statement will not, at the date the Proxy Statement is first mailed to the Company Shareholders or at the time of the Company Shareholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, at the time and in light of the circumstances under which they were made, not false or misleading.  Notwithstanding the foregoing provisions of this <u>Section 4.5</u>, no representation or warranty is made by Parent or Merger Sub with respect to information or statements made or incorporated by reference in the Proxy Statement, which information or statements were supplied by or on behalf of the Company.

Section 4.6.       <u>Financing</u>.

(a)       Parent is a party to and has accepted a fully executed commitment letter dated as of August 10, 2023 (together with all exhibits and schedules thereto, the "<u>Debt Commitment Letter</u>") from the lenders party thereto (collectively, the "<u>Lenders</u>") pursuant to which the Lenders have agreed, subject to the terms and conditions thereof, to provide debt financing in the amounts set forth therein.  The debt financing contemplated pursuant to the Debt Commitment Letter is collectively referred to in this Agreement as the "<u>Debt Financing</u>."

(b)       Parent has delivered to the Company a true, complete and correct copy of the executed Debt Commitment Letter and fee letters related thereto, subject, in the case of such fee letters, to redaction solely of fee amounts, the rates and amounts included in the "market flex" and other economic provisions that are customarily redacted in connection with transactions of this type and that could not in any event affect the conditionality, enforceability, availability, termination or amount of the Debt Financing.

(c)       Except as expressly set forth in the Debt Commitment Letter, there are no conditions precedent to the obligations of the Lenders to provide the full amount of the Debt Financing pursuant to the Debt Commitment Letter.  Parent does not have any reason to believe that it will be unable to satisfy on a timely basis all terms and conditions to be satisfied by it in any of the Debt Commitment Letter on or prior to the Closing Date, nor does Parent have Knowledge that any Lender will not perform its obligations thereunder, in each case, assuming the accuracy of the Company's representations and warranties contained in <u>Article III</u> and compliance by the Company with its covenants contained in <u>Article V</u> and <u>Article VI</u>, in each case, in all material respects.  There are no side letters, understandings or other Contracts of any kind relating to the Debt Commitment Letter or the Debt Financing that could adversely affect the conditionality, enforceability, availability, termination or amount of the Debt Financing.

-33-

(d)        The Debt Financing, when funded in accordance with the Debt Commitment Letter and giving effect to any "flex" provision in or related to the Debt Commitment Letter (including with respect to fees and original issue discount), and assuming the accuracy of the Company's representations and warranties contained in Article III and compliance by the Company with its covenants contained in Article V and Article VI, in each case, in all material respects, together with cash on hand at Parent, shall provide Parent with cash proceeds on the Closing Date sufficient for the satisfaction of all of Parent's obligations under this Agreement and the Debt Commitment Letter, including the payment of the Merger Consideration, and any fees and expenses of or payable by Parent or Merger Sub or the other Parent Subsidiaries, and for any repayment or refinancing of any outstanding indebtedness of the Company and/or the Company Subsidiaries contemplated by, or required in connection with the transactions described in, this Agreement or the Debt Commitment Letter (such amounts, collectively, the "Financing Amounts").

(e)        The Debt Commitment Letter constitutes the legal, valid, binding and enforceable obligations of Parent and, to the Knowledge of Parent, all the other parties thereto and are in full force and effect, subject to (a) the effect of bankruptcy, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting the enforcement of creditors' rights generally and (b) general equitable principles (whether considered in an Action in equity or at law).  No event has occurred which (with or without notice, lapse of time or both) would reasonably be expected to constitute a default, breach or failure to satisfy a condition by Parent under the terms and conditions of the Debt Commitment Letter.  Parent does not have any reason to believe that any of the conditions to the Debt Financing will not be satisfied by Parent on a timely basis or that the Debt Financing will not be available to Parent on the Closing Date, assuming the accuracy of the Company's representations and warranties contained in Article III and compliance by the Company with its covenants contained in Article V and Article VI, in each case, in all material respects.  Parent has paid in full any and all commitment fees or other fees required to be paid pursuant to the terms of the Debt Commitment Letter on or before the entry into this Agreement.  The Debt Commitment Letter has not been modified, amended or altered prior to the execution and delivery of this Agreement and none of the respective commitments under the Debt Commitment Letter have been terminated, reduced, withdrawn or rescinded in any respect.

(f)        In no event shall the receipt or availability of any funds or financing (including the Debt Financing) by Parent or any Parent Subsidiaries or any other financing or other transactions be a condition to any of the Parent or Merger Sub's obligations under this Agreement.

Section 4.7.        Finders and Brokers.  Other than Morgan Stanley & Co., LLC, neither Parent nor any Parent Subsidiary has employed, engaged or made any arrangements with any investment banker, broker or finder in connection with the Transactions who is entitled to any fee, any commission or any reimbursement of expenses in connection with this Agreement or upon or as a result of the consummation of the Merger.

Section 4.8.        Share Ownership.  Neither Parent nor any Parent Subsidiary owns any Company Ordinary Shares as of the date hereof.

-34-

Section 4.9.    <u>No Merger Sub Activity</u>.  Since its date of formation, Merger Sub has not engaged in any activities or incurred any obligations other than in connection with this Agreement and the Transactions.

Section 4.10.    <u>Solvency</u>.  No transfer of property is being made, and no obligation is being incurred, in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Parent, the Company, any Company Subsidiaries or any Parent Subsidiaries. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement (including any financings being entered into in connection therewith):  (a) the Fair Value of the assets of Parent and Parent Subsidiaries, taken as a whole, shall be greater than the total amount of Parent's and Parent Subsidiaries' liabilities (including all liabilities, whether or not reflected in a balance sheet prepared in accordance with GAAP, and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed), taken as a whole; (b) Parent and Parent Subsidiaries, taken as a whole, shall be able to pay their debts and obligations in the ordinary course of business as they become due; and (c) Parent and Parent Subsidiaries, taken as a whole, shall have adequate capital to carry on their businesses and all businesses in which they are about to engage.  For the purposes of this Agreement, "<u>Fair Value</u>" means the amount at which the assets (both tangible and intangible), in their entirety, of Parent and Parent Subsidiaries would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

Section 4.11.    <u>No Other Representations</u>.  Except for the express written representations and warranties made by Parent and Merger Sub contained in this <u>Article IV</u>, neither Parent, Merger Sub nor any Representative or other Person on behalf of Parent or Merger Sub makes any express or implied representation or warranty with respect to Parent, Merger Sub or any of their respective affiliates, or of Parent's or Merger Sub's business, assets, liabilities, financial condition or results of operations or with respect to any other information provided to the Company in connection with the Transactions or with respect to future operating or financial results, estimates, projections, forecasts, plans or prospects (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, plans or prospects), and the Company expressly disclaims reliance on any representation or warranty of Parent, Merger Sub or any other Person other than the representations and warranties expressly contained in this <u>Article IV</u>.

**ARTICLE V**
**COVENANTS RELATING TO CONDUCT OF BUSINESS**
**PENDING THE MERGER**

Section 5.1.    <u>Conduct of Business by the Company Pending the Closing</u>.  The Company agrees that between the date hereof and the earlier of the Effective Time or the date, if any, on which this Agreement is validly terminated pursuant to <u>Section 8.1</u>, except as set forth in <u>Section 5.1</u> of the Company Disclosure Letter, as specifically permitted or required by this Agreement, as required by applicable Law or as consented to in writing by Parent (which consent shall not be unreasonably withheld, conditioned or delayed), the Company (a) shall, and shall cause each Company Subsidiary to, use reasonable best efforts to conduct its business in all material respects in the ordinary course of business, preserve intact its and their present business organizations, goodwill and ongoing businesses and preserve its and their relationships with material customers, suppliers, vendors, licensors and licensees (*provided*, that any action or inaction addressed in, and permitted by, <u>Section 5.1(b)</u>, shall not constitute a breach of this <u>Section 5.1(a)</u>); and (b) shall not, and shall cause each Company Subsidiary not to, directly or indirectly:

-35-

(i)        amend, modify, waive, rescind, change or otherwise restate (i) the Company's or (ii) any Company Subsidiary's certificate of incorporation, bylaws or equivalent organizational documents, in the case of this clause (ii), in a manner that would reasonably be expected to be material to the Company or any Company Subsidiary, respectively;

(ii)        authorize, declare, set aside, make or pay any dividends on or make any distribution with respect to its outstanding ordinary shares or other equity interests (whether in cash, assets, shares or other securities of the Company or any Company Subsidiary) (other than dividends or distributions made by any wholly owned Company Subsidiary to the Company or any wholly owned Company Subsidiary), or enter into any agreement and arrangement with respect to voting or registration, or file any registration statement (other than any Form S-8 or Form S-3) with the SEC with respect to any, of its ordinary shares or other equity interests or securities;

(iii)        split, combine, subdivide, reduce or reclassify any of its ordinary shares, other equity interests or securities convertible or exchangeable into, or exercisable for, any of its ordinary shares or other equity interests, or redeem, purchase or otherwise acquire any of its ordinary shares, other equity interests or securities convertible or exchangeable into, or exercisable for, any of its ordinary shares or other equity interests, or issue or authorize the issuance of any of its ordinary shares, other equity interests, securities convertible or exchangeable into, or exercisable for, any of its ordinary shares or other equity interests or any other securities in respect of, in lieu of or in substitution for, any of its ordinary shares or other equity interests or securities convertible or exchangeable into, or exercisable for, any of its ordinary shares or other equity interests, except for (A) the acceptance of Company Ordinary Shares as payment of the exercise price of Company Options or for withholding Taxes in respect of Company Equity Awards or (B) any such transaction involving only wholly owned Company Subsidiaries;

(iv)        issue, deliver, grant, sell, pledge, dispose of or encumber, or authorize the issuance, delivery, grant, sale, pledge, disposition or encumbrance of, any shares, voting securities or other equity interest in the Company or any Company Subsidiary or any securities convertible into or exchangeable or exercisable for any such shares, voting securities or equity interest, or any rights, warrants or options to acquire any such shares, voting securities or equity interest or any "phantom" shares, "phantom" share rights, share appreciation rights or share based performance units, including without limitation any Company Equity Award under any existing Company Equity Plan (except as otherwise provided by the terms of the Company Equity Award), other than (A) issuances of Company Ordinary Shares in respect of any exercise, vesting or settlement, as applicable, of Company Equity Awards in accordance with their respective terms, (B) withholding or sales of Company Ordinary Shares pursuant to the exercise of Company Options or pursuant to the settlement of Company Equity Awards in order to satisfy payment of the exercise price of Company Options or for withholding Taxes, or (C) transactions solely between the Company and a wholly owned Company Subsidiary or solely between wholly owned Company Subsidiaries or (D) as expressly permitted pursuant to Section 5.1(b)(v);

-36-

(v)        except as required by any Company Benefit Plan as in existence as of the date hereof or any collective bargaining agreement or other agreement with a Union, (A) increase the compensation or benefits payable or to become payable to any current or former directors, individual consultants who are natural persons or employees of the Company or any Company Subsidiary, other than increases in annual base compensation (whether salary, wage rates or fees) in the ordinary course of business consistent with past practice for individuals who are not Specified Employees, *provided* that the aggregate budgeted amount of such increases shall not increase by more than four percent (4%) of the aggregate budgeted amount of such compensation as in effect as of the date hereof with respect to such employees, (B) enter into any collective bargaining agreement or other contract with a Union, or recognize any Union or other employee representative group or labor organization as the representative of any of the employees of the Company or any of the Company Subsidiaries, (C) establish, adopt, enter into, materially amend or terminate any Company Benefit Plan or any plan or arrangement which would be a Company Benefit Plan if in effect as of the date hereof (including any employment, severance, incentive, change in control or retention arrangement), other than any such actions that are in the ordinary course of business consistent with past practice, and, with respect to Company Benefit Plans providing health, dental, vision or other medical benefits, would not increase costs to the Company or any of the Company Subsidiaries under such existing Company Benefit Plans by more than four percent (4%) of the aggregate costs of providing benefits under such Company Benefit Plans in effect as of the date hereof to the Company and the Company Subsidiaries (and, for the avoidance of doubt, excluding any increases in costs resulting from ordinary course market rate increase or healthcare cost trends in the applicable jurisdictions), (D) take any action to amend or waive any performance or vesting criteria or accelerate vesting, exercisability or funding of any Company Equity Award or under any Company Benefit Plan, (E) terminate the employment of any Specified Employee, other than for cause, (F) hire any new employee who would be a Specified Employee, (G) provide any funding for any rabbi trust or similar arrangement, or (H) expressly waive any confidentiality, non-compete, non-solicit or other material restrictive covenant agreement of any current or former directors, individual consultants or employees of the Company or any Company Subsidiary;

(vi)        acquire (including by merger, consolidation or acquisition of shares or assets or any other means) or authorize or enter into any Contracts providing for any acquisitions of, any equity interests in or assets, real property, personal property or equipment of any Person or any business or division thereof, or otherwise engage in any mergers, consolidations or business combinations, except for (A) transactions solely between the Company and a wholly owned Company Subsidiary or solely between wholly owned Company Subsidiaries, (B) acquisitions of assets, personal property or equipment in the ordinary course of business or (C) acquisitions that are not in excess of $2,000,000 individually or $10,000,000 in the aggregate;

-37-

(vii)        liquidate (completely or partially), dissolve, restructure, recapitalize or effect any other reorganization (excluding any restructuring, recapitalization or reorganization solely between or among any of the Company and/or the Company Subsidiaries), or adopt any plan or resolution providing for any of the foregoing, excluding the liquidation or dissolving of any inactive or de minimis Company Subsidiaries;

(viii)        make any loans, advances or capital contributions to, or investments in, any other Person, except for (A) any such transactions solely among the Company and its wholly owned Company Subsidiaries or solely among the Company's wholly owned Company Subsidiaries, (B) advances for reimbursable employee expenses in the ordinary course of business or (C) loans, advances, capital contributions or investments that are not in excess of $2,000,000 individually or $10,000,000 in the aggregate;

(ix)        other than in accordance with Contracts in effect on the date hereof, sell, lease, assign, abandon, permit to lapse, transfer, exchange, swap or otherwise dispose of, or subject to any Lien (other than Permitted Liens), any of its properties, rights or assets (including shares in the capital of the Company or the Company Subsidiaries) having a value in excess of $2,000,000 individually or $10,000,000 in the aggregate to any Person (*provided* that such values shall not apply to assets constituting Intellectual Property, *provided further* that this Section 5.1(b)(ix) shall apply only to Intellectual Property that is material to the business of the Company and the Company Subsidiaries), except (A) dispositions of obsolete, expired or worthless equipment, properties, rights or assets in the ordinary course of business, (B) licenses of Company Intellectual Property entered into in the ordinary course of business consistent with past practice, (C) pursuant to transactions solely among the Company and its wholly owned Company Subsidiaries or solely among wholly owned Company Subsidiaries, (D) sales and transfers and other dispositions of products and services in the ordinary course of business, (E) Company Leases or subleases entered into in the ordinary course of business (provided, that this exception shall not apply to any Company Lease or sublease involving an annual payment of more than $5,000,000), including guarantees in connection with any Company Leases, and (F) dispositions of Company Registered Intellectual Property constituting applications in the ordinary course of prosecution;

(x)        enter into any Contract that would, if entered into prior to the date hereof, be a Material Contract, or modify in a manner materially adverse to the Company, amend in a manner materially adverse to the Company or voluntarily terminate any Material Contract (or waive, release or assign any material rights or material claims thereunder), in each case, other than in connection with (A) any action expressly permitted another provision of this Section 5.1(b) or (B) any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Law) (which shall solely be governed by clause (xv));

(xi)        except in accordance with the Company's capital budget provided to Parent on Section 5.1(b)(xi) of the Company Disclosure Letter, make any capital expenditure or expenditures, enter into agreements or arrangements providing for capital expenditure or expenditures or otherwise commit to do so, except for variations of up to ten percent (10)% of such budget in the aggregate during any specified period;

-38-

(xii)        commence (other than in the ordinary course of business), waive, release, assign, compromise or settle any claim, litigation, investigation or proceeding (for the avoidance of doubt, including with respect to matters in which the Company or any Company Subsidiary is a plaintiff, or in which any of their officers or directors in their capacities as such are parties), other than the compromise or settlement of any Tax audit, claim or other proceeding (which shall solely be governed by clause (xv)) or any claim, litigation or proceeding that is not brought by Governmental Entities and that: (A) is for an amount not to exceed, for any such compromise or settlement, $1,000,000, individually, or $5,000,000, in the aggregate (in either case, in excess of any amounts covered by insurance) and (B) does not impose any injunctive relief on the Company and the Company Subsidiaries and does not involve the admission of wrongdoing by the Company, any Company Subsidiary or any of their respective officers or directors;

(xiii)        make any material change in financial accounting policies, practices, principles or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(xiv)        amend or modify in any material respect any Privacy Statement of the Company or any Company Subsidiary other than in the ordinary course of business consistent with past practice or as reasonably necessary to comply with an applicable Data Privacy Obligation;

(xv)        (A) change or revoke any material Tax election or adopt or change any material Tax accounting period or material method of Tax accounting, in the case of this clause (A), other than in the ordinary course of business or in a manner consistent with past practice (*provided* that it is agreed and understood that an entity classification election pursuant to Treasury Regulation Section 301.7701-3 shall be treated as not being made in the ordinary course of business or in a manner consistent with past practice), (B) settle or compromise any material liability for Taxes or any Tax audit, claim or other proceeding relating to a material amount of Taxes for an amount materially in excess of the amount reserved for the Taxes subject to such proceeding on the financial statements of the Company, (C) enter into any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Law) with respect to material Taxes, (D) amend any material Tax Returns (other than any amendments that would not reasonably be expected to result in a material increase to the Tax liability of the Company, the Company Subsidiaries or Parent or its affiliates) or file any material Tax Return that is materially inconsistent with past practice, if any, with respect to filing Tax Returns of the same type for a prior taxable period, (E) surrender any right to claim a material refund of Taxes other than in the ordinary course of business, or (F) with respect to any Company Subsidiary (I) that is treated as a foreign corporation for U.S. federal income Tax purposes and (II) equity interests (meeting the requirements of Section 1504(a)(2) of the Code) of which are owned, for U.S. federal income Tax purposes, by one or more of any of the Company and the Company Subsidiaries that are part of an "Affiliated Group" within the meaning of Section 338(h)(5) of the Code (a "Section 338(g) Company Subsidiary"), cause (x) such Section 338(g) Company Subsidiary not to be a Section 338(g) Company Subsidiary or (y) any "United States person" within the meaning of Section 7701(a)(30) of the Code (excluding any shareholder of the Company) to own (within the meaning of Section 958(a) of the Code), or to be considered as owning by applying the rules of ownership of Section 958(b) of the Code, equity interests (or additional equity interests, as relevant) of such Section 338(g) Company Subsidiary (it being agreed and understood that none of clauses (i) through (xiv) nor clauses (xvi) through (xxvii) of this Section 5.1(b) shall apply to any action to the extent such action would be taken into account solely for Tax purposes and not for corporate or other applicable Law purposes);

-39-

(xvi)        incur, assume, endorse, guarantee or otherwise become liable for or modify in any material respects the terms of any Indebtedness for borrowed money, issue or sell any debt securities or calls, options, warrants or other rights to acquire any debt securities (directly, contingently or otherwise) or enter into any swap, forward, futures or hedging transaction or other derivative agreements (or amend or modify any such transaction or agreement)), except for (A) any Indebtedness solely among the Company and its wholly owned Company Subsidiaries or solely among wholly owned Company Subsidiaries, (B) guarantees by the Company of Indebtedness for borrowed money of Company Subsidiaries or guarantees by Company Subsidiaries of Indebtedness for borrowed money of the Company or any Company Subsidiary, which Indebtedness is incurred in compliance with this Section 5.1(b)(xvi) or is outstanding on the date hereof, (C) refinancings, replacements or amendments on market standard terms of Indebtedness incurred pursuant to agreements entered into by the Company or any Company Subsidiary in effect prior to the execution of this Agreement (including the refinancing of the Company Notes), *provided*, that only existing Indebtedness with a maturity date within eighteen (18) months of the date of this Agreement may be refinanced or replaced pursuant to this clause (C) above, *provided further*, that such refinanced Indebtedness does not become due in connection with the Merger or does not include material prepayment penalties, and (D) drawing on the Company Credit Agreement as it exists on the date of this Agreement, without giving effect to any expansion or accordion feature, in the ordinary course of business or in order to repay existing Indebtedness if so repaying is commercially reasonable;

(xvii)        enter into any transactions or Contracts with any affiliate or other Person (other than any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Law)) (which shall solely be governed by clause (xv)) that would be required to be disclosed by the Company under Item 404 of Regulation S-K of the SEC, except in the ordinary course of business;

(xviii)        fail in any material respect to maintain the Company's material insurance policies or comparable replacement policies with respect to the material assets, operations and activities of the Company and the Company Subsidiaries;

(xix)        acquire any Material Real Property or modify in a manner materially adverse to the Company or amend in a manner materially adverse to the Company or exercise any right to renew any material Company Lease, in each case, other than in the ordinary course of business and with respect to any Company Lease with payments per annum from the Company less than $5,000,000; *provided*, that entry into such Company Lease must be consistent with the Company's capital budget provided to Parent on Section 5.1(b)(xi) of the Company Disclosure Letter;

(xx)        other than the Company Shareholders Meeting or as required by the Company Governing Documents or by applicable Law, convene any special meeting (or any adjournment or postponement thereof) of the Company Shareholders;

(xxi)        adopt or otherwise implement any shareholder rights plan, "poison-pill" or other comparable agreement;

(xxii)        enter into any material new line of business outside the businesses being conducted by the Company and the Company Subsidiaries on the date hereof (excluding planned extensions as of the date hereof and retail marketing initiatives);

(xxiii)        except as expressly provided for in any Contracts entered into between the Company and any Company Subsidiaries, on the one hand, and any third party, on the other hand, prior to the date hereof, open or commit to open any new stores or similar retail location or close any stores or similar retail location, unless in any case, such store opening, commitment or closing is in the ordinary course of business and involves an annual payment less than $5,000,000; *provided*, that any such store opening or commitment must be consistent with the Company's capital budget provided to Parent on Section 5.1(b)(xi) of the Company Disclosure Letter;

(xxiv)        materially deviate from the ordinary course inventory and distribution management practices (by brand or by distribution channel) of the Company or any Company Subsidiary;

(xxv)        terminate, modify, or waive in any material respect any right under any material Company Permit;

(xxvi)        make any distribution or contribution with respect to cash or other assets of the Company Foundations, other than distributions not in excess of five percentage points (5%) above the minimum annual distributions (i.e., 10% in total) under the Code; or

(xxvii)        agree or authorize, in writing or otherwise, to take any of the foregoing actions.

-41-

Section 5.2.        No Solicitation by the Company.

(a)        From and after the date hereof until the earlier of the Closing Date or the date, if any, on which this Agreement is validly terminated pursuant to Section 8.1, the Company agrees that it shall not, and shall cause the Company's controlled affiliates and all of its directors and officers and any of their other respective Representatives acting on their behalf not to, directly or indirectly: (i) solicit, initiate or knowingly encourage or knowingly facilitate any inquiry, proposal or offer, or the making, submission or announcement of any inquiry, proposal or offer which constitutes or would reasonably be expected to lead to an Acquisition Proposal; (ii) participate in any negotiations regarding, or furnish to any person any information relating to the Company or any Company Subsidiary in connection with an Acquisition Proposal; (iii) adopt, approve, endorse or recommend, or propose to adopt, approve, endorse or recommend, any Acquisition Proposal; (iv) withdraw, change, amend or modify, or otherwise propose to withdraw, change, amend or modify, in a manner adverse to Parent, the Company Board Recommendation; (v) if an Acquisition Proposal has been publicly disclosed, fail to publicly recommend against any such Acquisition Proposal within ten (10) Business Days after the public disclosure of such Acquisition Proposal (or subsequently withdraw, change, amend, modify or qualify, in a manner adverse to Parent, such rejection of such Acquisition Proposal) and reaffirm the Company Board Recommendation within such ten (10) Business Day period (or, if earlier, by the second (2nd) Business Day prior to the Company Shareholders Meeting); (vi) fail to include the Company Board Recommendation in the Proxy Statement; (vii) approve, or authorize, or cause or permit the Company or any Company Subsidiary to enter into, any merger agreement, acquisition agreement, reorganization agreement, letter of intent, memorandum of understanding, agreement in principle, option agreement, joint venture agreement, partnership agreement or similar agreement with respect to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement entered into in accordance with this Section 5.2) (a "Company Acquisition Agreement"); (viii) call or convene a meeting of the Company Shareholders to consider a proposal that would reasonably be expect to materially impair, prevent or delay the consummation of the Transactions; or (ix) resolve or agree to do any of the foregoing (any act described in clauses (iii), (iv), (v), (vi) or (vii) a "Change of Recommendation"). The Company shall, and shall cause the Company's controlled affiliates and its directors and officers and any of their other respective Representatives acting on their behalf to, cease any activities occurring prior to the date hereof prohibited by the first sentence of this Section 5.2(a) with any persons with respect to any inquiry, proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal. Promptly after the date hereof (and in any event within two (2) Business Days following the date hereof), the Company shall (A) request in writing that each person that has heretofore executed a confidentiality agreement in connection with its consideration of an Acquisition Proposal promptly destroy or return to the Company all nonpublic information heretofore furnished by the Company or any of its Representatives to such person or any of its Representatives and (B) terminate access to any physical or electronic data rooms relating to an acquisition of the Company or any portion thereof by such person and its Representatives. The Company shall enforce, and not waive, terminate or modify without Parent's prior written consent, any standstill or similar provision in any confidentiality, standstill or other agreement; *provided* that, if the Company Board of Directors determines in good faith after consultation with the Company's outside legal counsel that the failure to waive a particular standstill provision would be reasonably likely to violate the directors' fiduciary or statutory duties under applicable Law, the Company may, with prior written notice to Parent, waive such standstill solely in order to permit the applicable person (if it has not been solicited in violation of this Section 5.2 in any non-de minimis respect) to make, on a confidential basis to the Company Board of Directors, an Acquisition Proposal, conditioned upon such person agreeing to disclosure of such Acquisition Proposal to Parent, in each case as contemplated by this Section 5.2. For purposes of this Section 5.2, the term "person" means any Person or "group," as defined in Section 13(d) of the Exchange Act, other than, with respect to the Company, Parent or any Parent Subsidiary or any of its or their Representatives. For the avoidance of doubt, any violation of the restrictions set forth in this Section 5.2 by any of the Company's controlled affiliates or any of its directors or officers shall be a breach of this Section 5.2 by the Company.

-42-

(b)         Notwithstanding the limitations set forth in Section 5.2(a), if the Company receives, prior to the Company Shareholder Approval being obtained, an unsolicited, bona fide, written Acquisition Proposal that did not result from a non-de minimis breach of this Section 5.2, which the Company Board of Directors determines in good faith after consultation with the Company's outside legal counsel and financial advisor (i) constitutes a Superior Proposal or (ii) would reasonably be expected to result in a Superior Proposal, then in either event the Company may take the following actions: (x) furnish nonpublic information with respect to the Company to the person making such Acquisition Proposal, if, and only if, prior to so furnishing such information, the Company receives from such person an executed Acceptable Confidentiality Agreement and the Company also provides Parent, prior to or substantially concurrently with the time such information is provided or made available to such person, any nonpublic information furnished to such other person that was not previously furnished to Parent, and (y) engage in or otherwise participate in discussions or negotiations with such person with respect to such Acquisition Proposal and its Representatives.

(c)         The Company shall promptly (and in any event within forty-eight (48) hours) notify Parent of the Company's or any of its affiliates' or its or their respective Representatives' receipt of any Acquisition Proposal, any proposals or inquiries that would reasonably be expected to lead to an Acquisition Proposal, or any inquiry or request for nonpublic information relating to the Company or any Company Subsidiary by any person who has made or would reasonably be expected to make any Acquisition Proposal.  Such notice shall indicate the identity of the person making the Acquisition Proposal, inquiry or request, and the material terms and conditions of any such proposal or offer, including unredacted copies of all written proposals or offers, including proposed agreements received by the Company or, if such Acquisition Proposal is not in writing, a reasonably detailed written description of the material terms and conditions thereof.  Without limiting the Company's other obligations under this Section 5.2, the Company shall keep Parent reasonably informed on a prompt and timely basis (and in any event, within forty-eight (48) hours) of the status and material terms (including any amendments or proposed amendments to such material terms) of any such Acquisition Proposal or potential Acquisition Proposal, including by providing unredacted copies of all written proposals or offers.  Without limiting the Company's other obligations under this Section 5.2, the Company shall promptly provide (and in any event within twenty-four (24) hours) to Parent any material nonpublic information concerning the Company provided to any other person in connection with any Acquisition Proposal that was not previously provided to Parent.  Without limiting the foregoing, the Company shall promptly (and in any event within twenty-four (24) hours after such determination) inform Parent in writing if the Company determines to begin providing information or to engage in discussions or negotiations concerning an Acquisition Proposal pursuant to Section 5.2(b).  The Company agrees that it will not, directly or indirectly, enter into any agreement with any person which directly or indirectly prohibits the Company from providing any information to Parent in accordance with, or otherwise complying with, this Section 5.2.

-43-

(d)    Notwithstanding anything in this Section 5.2 to the contrary, but subject to Section 5.2(e), at any time prior to the Company Shareholder Approval being obtained, the Company Board of Directors may (i) make a Change of Recommendation in response to an Intervening Event if the Company Board of Directors has determined in good faith after consultation with the Company's outside legal counsel and financial advisor, that the failure to take such action would be reasonably likely to violate the directors' fiduciary or statutory duties under applicable Law or (ii) make a Change of Recommendation and/or cause the Company to terminate this Agreement pursuant to and in accordance with Section 8.1(h) in order to enter into a Company Acquisition Agreement for an Acquisition Proposal received after the date of this Agreement that did not result from a non-de minimis breach of this Section 5.2 (and such Acquisition Proposal is not withdrawn) if the Company Board of Directors determines in good faith after consultation with the Company's outside legal counsel and financial advisor that such Acquisition Proposal constitutes a Superior Proposal, but only if the Company Board of Directors has determined in good faith after consultation with the Company's outside legal counsel and financial advisors, the failure to take such action would be reasonably likely to violate the directors' fiduciary or statutory duties under applicable Law; *provided* that notwithstanding anything to the contrary herein, neither the Company nor any Company Subsidiary shall enter into any Company Acquisition Agreement unless this Agreement has been, or is concurrently, validly terminated in accordance with Section 8.1.

(e)    Prior to the Company taking any action permitted (i) under Section 5.2(d)(i), the Company shall provide Parent with three (3) Business Days' prior written notice advising Parent that the Company Board of Directors intends to effect a Change of Recommendation and specifying, in reasonable detail, the reasons therefor, and during such three (3) Business Day period (which period shall expire at 11:59 p.m., Eastern Time, on the third (3rd) Business Day), the Company shall cause its Representatives (including its executive officers) to negotiate in good faith (to the extent Parent desires to negotiate) any proposal by Parent to amend the terms and conditions of this Agreement in a manner that would obviate the need to effect a Change of Recommendation and, if at the end of such three (3) Business Day period (which period shall expire at 11:59 p.m., Eastern Time, on the third (3rd) Business Day) the Company Board of Directors again makes the determination under Section 5.2(d)(i) in good faith (after taking into account any amendments proposed by Parent) or (ii) under Section 5.2(d)(ii), the Company shall provide Parent with three (3) Business Days' prior written notice advising Parent that the Company Board of Directors intends to take such action and specifying the material terms and conditions of the Acquisition Proposal, including a copy of any proposed definitive documentation, and during such three (3) Business Day period (which period shall expire at 11:59 p.m., Eastern Time, on the third (3rd) Business Day), the Company shall cause its Representatives (including its executive officers) to negotiate in good faith (to the extent Parent indicates to the Company in writing that it desires to negotiate) any proposal by Parent to amend the terms and conditions of this Agreement such that such Acquisition Proposal would no longer constitute a Superior Proposal and at the end of such three (3) Business Day period (which period shall expire at 11:59 p.m., Eastern Time, on the third (3rd) Business Day) the Company Board of Directors again makes the determination under Section 5.2(d)(ii) (after in good faith taking into account the amendments proposed by Parent).  With respect to Section 5.2(e)(ii), if there are any material amendments, revisions or changes to the terms of any such Superior Proposal (including any revision to the amount, form or mix of consideration the Company Shareholders would receive as a result of the Superior Proposal), the Company shall notify Parent of each such amendment, revision or change in compliance with Section 5.2(c) and the applicable three (3) Business Day period shall be extended until at least two (2) Business Days after the time that Parent receives notification from the Company of each such revision, and the Company Board of Directors shall not take any such action permitted under Section 5.2(d)(ii) prior to the end of any such period (which period shall expire at 11:59 p.m., Eastern Time, on the applicable day) as so extended in accordance with the terms of this Section 5.2(e).

-44-

(f)        Nothing in this Agreement shall prohibit the Company or the Company Board of Directors from (i) disclosing to the Company Shareholders a position contemplated by Rules 14d-9 and 14e-2(a) or Item 1012(a) of Regulation M-A promulgated under the Exchange Act, (ii) making any "stop, look and listen" communication to the Company Shareholders pursuant to Rule 14d-9(f) promulgated under the Exchange Act or (iii) making any legally required disclosure to the Company Shareholders with regard to an Acquisition Proposal, which actions, in the case of clauses (i) - (iii), shall not constitute or be deemed to constitute a Change of Recommendation; provided that, if any such disclosure or communication have the substantive effect of withdrawing, qualifying or modifying the Company Board Recommendation, such disclosure or communication shall constitute a Change of Recommendation unless the Company expressly reaffirms the Company Board Recommendation in such disclosure or communication.

Section 5.3.        Preparation of the Proxy Statement; Company Shareholders Meeting.

(a)        As promptly as reasonably practicable following the date of this Agreement (but in no event more than twenty (20) Business Days thereafter (provided, that Parent complies with its obligations in this Section 5.3)), the Company shall prepare the Proxy Statement in preliminary form and shall cause such Proxy Statement to be filed with the SEC.  Parent shall provide to the Company all information concerning Parent, Merger Sub, and their respective affiliates as may be reasonably requested by the Company in connection with the Proxy Statement and shall otherwise reasonably assist and cooperate with the Company in the preparation of the Proxy Statement and the resolution of any comments thereto received from the SEC. The parties shall respond as promptly as practicable to any comments from the SEC or the staff of the SEC and file such other documents with the SEC as may be reasonably requested by the SEC in connection with the Proxy Statement. Each party shall notify the other party promptly of the receipt of any comments (whether written or oral) from the SEC or the staff of the SEC and of any request by the SEC or the staff of the SEC for amendments or supplements to the Proxy Statement or for additional information and shall supply the other party with copies of all correspondence between such party and any of its Representatives, on the one hand, and the SEC or the staff of the SEC, on the other hand, with respect to the Proxy Statement or the transactions contemplated by this Agreement. The Proxy Statement shall comply as to form in all material respects with the requirements of the Exchange Act and the Securities Act. If at any time prior to the Company Shareholders Meeting (or any adjournment or postponement thereof) any information relating to Parent or the Company, or any of their respective affiliates, officers or directors, is discovered by Parent or the Company, as applicable, that should be set forth in an amendment or supplement to the Proxy Statement, so that the Proxy Statement would not include a misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party that discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information shall be promptly filed by the parties with the SEC and, to the extent required by applicable Law, disseminated to the Company Shareholders.  The Company shall use reasonable best efforts to cause the commencement of the dissemination of the Proxy Statement to occur as promptly as reasonably practicable after the earlier of (i) two (2) Business Days after the resolution of any comments of the SEC or the staff of the SEC with respect to the preliminary Proxy Statement or (ii) two (2) Business Days after (A) receiving notification that the SEC is not reviewing the preliminary Proxy Statement or (B) if the SEC has not affirmatively notified the Company by 11:59 P.M. (Eastern time) on the tenth (10th) calendar day following the filing of the preliminary Proxy Statement with the SEC, oral confirmation from the staff of the SEC that the SEC is not reviewing the preliminary Proxy Statement (it being agreed that if the Company shall not receive such notification within such 10 calendar day period, the Company shall promptly contact the staff of the SEC to request confirmation that the SEC does not intend to review the preliminary Proxy Statement). Prior to the filing of the Proxy Statement (or any amendment or supplement thereto) or any dissemination thereof to the shareholders of the Company, or responding to any comments from the SEC with respect thereto, the Company shall provide Parent with a reasonable opportunity to review and to propose comments on such document or response, which the Company shall consider in good faith.

-45-

(b)       Subject to the earlier termination of this Agreement in accordance with <u>Section 8.1</u>, the Company shall (i) within five (5) days after the date of this Agreement, conduct a "broker search" in accordance with Rule 14a-13 of the Exchange Act for a record date for the Company Shareholders Meeting and (ii) duly call, give notice of, convene and hold a meeting of the Company Shareholders for the purpose of seeking the Company Shareholder Approval (as it may be adjourned or postponed as provided below, the "<u>Company Shareholders Meeting</u>") as soon as reasonably practicable and legally permitted after the date hereof (but in no event later than forty (40) days following the mailing of the Proxy Statement), and the Company shall submit such proposal to the Company Shareholders at the Company Shareholders Meeting and shall not submit any other proposal to the Company Shareholders in connection with the Company Shareholders Meeting (other than an advisory vote regarding merger-related compensation and a customary proposal regarding adjournment of the Company Shareholders Meeting or any proposal reasonably required by applicable Law in connection with the transactions contemplated by this Agreement) without the prior written consent of Parent. The Company agrees to use its reasonable best efforts to provide Parent with periodic updates (including voting reports) concerning proxy solicitation results, as reasonably requested by Parent.

(c)       Notwithstanding anything to the contrary contained in this Agreement, the Company shall not adjourn or postpone the Company Shareholders Meeting without Parent's prior written consent; *provided* that without Parent's prior written consent, the Company may adjourn or postpone the Company Shareholders Meeting (i) to the extent necessary to ensure that any supplement or amendment to the Proxy Statement required by Law is provided to the shareholders of the Company within a reasonable amount of time in advance of the Company Shareholders Meeting, (ii) if there are not sufficient affirmative votes in person or by proxy at such meeting to constitute a quorum at the Company Shareholders Meeting or to obtain the Company Shareholder Approval, to allow reasonable additional time for solicitation of proxies for purposes of obtaining a quorum or the Company Shareholder Approval or (iii) if the Company otherwise reasonably determines in good faith that the Company Shareholder Approval is unlikely to be obtained or that it is otherwise advisable to do so to ensure that any information is provided to its shareholders within a reasonable amount of time in advance of the Company Shareholders' Meeting; *provided* that unless agreed to in writing by Parent, any such adjournment or postponement shall be for a period of no more than ten (10) Business Days. The Company shall use its reasonable best efforts to (A) solicit from the Company Shareholders proxies in favor of the adoption of this Agreement and approval of the Transactions, including the Merger and (B) take all other action necessary or advisable to secure the Company Shareholder Approval, including, unless the Company Board of Directors has validly made a Change of Recommendation in accordance with <u>Section 5.2</u>, by communicating to the Company Shareholders the Company Board Recommendation and including such Company Board Recommendation in the Proxy Statement. Notwithstanding any Change of Recommendation, unless this Agreement is terminated in accordance with its terms, (x) the Company Shareholders Meeting shall be convened and this Agreement shall be submitted to the Company Shareholders for approval at the Company Shareholders Meeting, and nothing contained herein shall be deemed to relieve the Company of such obligation and (y) all other obligations of the Parties hereunder shall continue in full force and effect and such obligations shall not be affected by the commencement, public proposal, public disclosure or communication to the Company of any Acquisition Proposal (whether or not a Superior Proposal).

(d)        Following receipt of Company Shareholder Approval, the Company shall promptly deliver notice (the "Shareholder Notice") to each Company Shareholder who gave written objection to the Merger in accordance with Section 179(2) of the BVI Act and each Company Shareholder from whom written objection was not required in accordance with Section 179(2) of the BVI Act, which notice shall include the notice to shareholders required by Section 179 of the BVI Act of the approval of the Merger. The Company shall (i) give Parent a reasonable opportunity to review and comment on the Shareholder Notice, and (ii) consider in good faith, and incorporate therein, all comments thereon reasonably proposed by Parent.

Section 5.4.        Conduct of Business by Parent Pending the Closing.  Notwithstanding anything to the contrary set forth in this Agreement and not in limitation of any other obligations set forth herein, Parent shall, and shall cause each of the Parent Subsidiaries to, from and after the entry into this Agreement until the Effective Time, not acquire a footwear or handbag brand, directly or indirectly by merger, consolidation, acquisition of stock or assets or otherwise, any business, Person or assets from any other Person if such transaction would reasonably be expected to (i) impose any material delay in the obtaining of, or materially increase the risk of not obtaining, any approval, consent, clearance, non-action or other similar action or inaction from any Governmental Entity required in connection with the Transactions, including the Merger, (ii) materially increase the risk of any Governmental Entity enacting, issuing, promulgating, enforcing or entering any Order (whether temporary, preliminary or permanent) that makes unlawful or materially delays the consummation of the Transactions, including the Merger, or (iii) materially increase the risk of the Parties not being able to remove any such Law described in the preceding clause (ii).

# ARTICLE VI
## ADDITIONAL AGREEMENTS

Section 6.1.    Access; Confidentiality; Notice of Certain Events.

(a)    From the date hereof until the earlier of the Effective Time or the date, if any, on which this Agreement is validly terminated pursuant to Section 8.1, to the extent permitted by applicable Law and subject to the other provisions of this Section 6.1, the Company shall, and shall cause each Company Subsidiary to, afford to Parent and Parent's Representatives reasonable access during normal business hours and upon reasonable advance notice to the Company's and the Company Subsidiaries' offices, properties, Contracts, personnel, books and records (so long as any such access does not unreasonably interfere with the Company's business), in each case for the purpose of transition and integration planning and reviewing the performance and operations of the business, the Company and the Company Subsidiaries during such period (and not for the purpose of any actual or potential adverse Action or dispute between the parties or their affiliates) (such permitted purpose, the "Intended Purpose"), and during such period, the Company shall, and shall cause each Company Subsidiary to, furnish as promptly as practicable to Parent all information (financial or otherwise) concerning its business, properties, offices, Contracts and personnel as Parent may reasonably request for the Intended Purpose. Notwithstanding the foregoing, the Company shall not be required to provide Parent or Parent's Representatives with access to or to disclose information (i) that is prohibited from being disclosed pursuant to the terms of a Contract with a third party entered into prior to the date hereof or after the date hereof in the ordinary course of business (*provided*, *however*, that, at Parent's written request, the Company shall use its reasonable best efforts to (x) obtain the required consent of such third party to such access or disclosure or (y) make appropriate substitute arrangements to permit reasonable access or disclosure not in violation of such consent requirement), (ii) the disclosure of which would violate applicable Law (*provided*, *however*, that the Company shall use its reasonable best efforts to make appropriate substitute arrangements to permit reasonable disclosure not in violation of such Law) or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege (*provided*, *however*, that the Company shall use its reasonable best efforts to allow for such access or disclosure to the maximum extent that such access or disclosure would not jeopardize attorney-client, attorney work product or other legal privilege). Notwithstanding anything to the contrary contained in this Section 6.1(a), any document, correspondence or information or other access provided pursuant to this Section 6.1(a) may be redacted or otherwise limited to prevent disclosure of information concerning or relating to (A) the valuation of the Company, consideration or valuation of the Merger, (B) any Acquisition Proposal, Superior Proposal or Change of Recommendation, each subject to their respective obligations under Section 5.2 or (C) any other similarly confidential information, or any competitively sensitive information. All access pursuant to this Section 6.1(a) shall be (x) coordinated through the General Counsel of the Company or a designee thereof and (y) subject to the Company's reasonable security measures and insurance requirements. Access pursuant to this Section 6.1(a) shall not include the right to perform invasive testing or environmental sampling of any kind, without the prior written consent of the Company.

(b)    Each of the Company and Parent will hold, and will cause its Representatives and affiliates to hold, any nonpublic information in confidence to the extent required by and in accordance with, and will otherwise comply with, the terms of the Confidentiality Agreement.

(c)    The Company shall give prompt notice to Parent, and Parent shall give prompt written notice to the Company (subject to Section 6.2(b)) (i) of any notice or other communication received by such Party from any Governmental Entity in connection with this Agreement and the Transactions, including the Merger, or from any Person alleging that the consent of such Person is or may be required in connection with the Merger, and (ii) of any legal proceeding commenced or, to such Party's Knowledge, threatened against such Party or any of its Subsidiaries, affiliates, directors or officers or otherwise relating to, involving or affecting such Party or any of its Subsidiaries, affiliates, directors or officers, in each case in connection with, arising from or otherwise relating to the Merger or any other transaction contemplated by this Agreement.

-48-

Section 6.2.    Efforts.

(a)    Subject to the terms and conditions of this Agreement, Parent (and the Parent Subsidiaries) and the Company (and the Company Subsidiaries) shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the Transactions, including the Merger, as soon as practicable after the date hereof (and in any event by the Outside Date), including (i) preparing and filing or otherwise providing, in consultation with the other Party and as promptly as reasonably practicable and advisable after the date hereof, all documentation to effect all necessary applications, notices, petitions, filings and other documents and to obtain as promptly as reasonably practicable (and in any event by the Outside Date) all waiting period expirations or terminations, consents, clearances, waivers, licenses, orders, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in order to consummate the Transactions, including the Merger, and (ii) taking all steps as may be necessary, subject to the limitations in this Section 6.2, to obtain all such waiting period expirations or terminations, consents, clearances, waivers, licenses, registrations, permits, authorizations, orders and approvals. In furtherance and not in limitation of the foregoing, each Party, as applicable, agrees to (x) make, or cause to be made, an appropriate filing of a Notification and Report Form pursuant to the HSR Act with respect to the Transactions as promptly as reasonably practicable, and in any event within fifteen (15) Business Days after the execution of this Agreement (unless a later date is mutually agreed between the Parties), and to supply as promptly as reasonably practicable and advisable any additional information and documentary materials that may be requested pursuant to the HSR Act and to take all other actions necessary to cause the expiration or termination of the applicable waiting period under the HSR Act as soon as reasonably practicable (and in any event by the Outside Date) and (y) make all other necessary filings under any applicable Regulatory Law as promptly as reasonably practicable, and to supply as promptly as reasonably practicable and advisable any additional information and documentary materials that may be requested under any Regulatory Laws. Notwithstanding anything to the contrary set forth in this Agreement, none of Parent, Merger Sub or any of their respective Subsidiaries shall be required to, and the Company may not, and not permit any Company Subsidiary to, without the prior written consent of Parent, become subject to, consent to, or offer or agree to, take or commit to take any action with respect to, any requirement, condition, limitation, understanding, agreement or order to (A) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of the Company, the Surviving Company, Parent, Merger Sub or any Subsidiary of any of the foregoing or (B) impose any restriction, requirement or limitation on the operation of the business or portion of the business of the Company, the Surviving Company, Parent, Merger Sub or any Subsidiary of any of the foregoing (unless, within such clause (B), such restriction, requirement or limitation shall have no material impact on the Company, the Surviving Company, Parent, Merger Sub or any Subsidiary of any of the foregoing or the Transactions); provided that if requested by Parent, the Company or its Subsidiaries will become subject to, consent to or offer or agree to, or otherwise take any action with respect to, any such requirement, condition, limitation, understanding, agreement or order so long as such requirement, condition, limitation, understanding, agreement or order is only binding on the Company or the Company Subsidiaries in the event the Closing occurs. Further, if any Action, including any proceeding by a private party, is instituted (or threatened) challenging or seeking to restrain, prohibit or place conditions on the consummation of the Transactions, including the Merger, or the ownership or operation by Parent, the Company or any of their respective Subsidiaries of all or any portion of their respective businesses as presently conducted and as currently proposed to be conducted, Parent (and the Parent Subsidiaries) and the Company (and the Company Subsidiaries) shall use their reasonable best efforts to defend or contest, including through litigation or other means, any objection to, or Actions challenging, the consummation of the Transactions, and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the Transactions, including the Merger.

-49-

(b)    Each of Parent and the Company shall, in connection with and without limiting the efforts referenced in Section 6.2(a) to obtain all waiting period expirations or terminations, consents, clearances, waivers, licenses, orders, registrations, approvals, permits and authorizations for the Transactions under the HSR Act or any other Regulatory Law, (i) cooperate in all respects, including by furnishing to the other as promptly as practicable information and assistance as the other may reasonably request, and consult with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, including by allowing the other Party to have a reasonable opportunity to review in advance and comment on drafts of filings and submissions and reasonably considering in good faith comments of the other Party, (ii) promptly inform the other Party of any communication received by such Party from, or given by such Party to, the Antitrust Division of the Department of Justice (the "DOJ"), the Federal Trade Commission (the "FTC") or any other Governmental Entity, by promptly providing copies to the other Party of any such written communications, and of any communication received or given in connection with any proceeding by a private party, in each case regarding any of the Transactions and (iii) permit the other Party to review in advance any communication that it gives to, and consult with each other in advance of any in-person meeting, telephone call or other meeting or conference (whether by video or otherwise) with, the DOJ, the FTC or any other Governmental Entity or, in connection with any proceeding by a private party, with any other Person, and to the extent not prohibited by the DOJ, the FTC or other applicable Governmental Entity or other Person, give the other Party the reasonable opportunity to attend and participate thereat; *provided*, *however*, that materials required to be provided pursuant to the foregoing clauses (i) - (iii) may be redacted (A) to remove references concerning the valuation of Parent, Company or any of their respective Subsidiaries, (B) as necessary to comply with contractual arrangements and (C) as necessary to address reasonable privilege or confidentiality concerns; *provided*, *further*, that each of Parent and the Company may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 6.2(b) as "Outside Counsel Only Material" which such material and the information contained therein shall be given only to the outside antitrust counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient unless express permission is obtained in advance from the source of the materials (Parent on the one hand or the Company on the other) or its legal counsel.  Notwithstanding anything in this Agreement to the contrary, Parent shall be entitled to lead the strategy and course of action for seeking and obtaining all waiting period expirations or terminations, consents, clearances, waivers, licenses, orders, registrations, approvals, permits and authorizations for the Transactions under the HSR Act or any other Regulatory Law, including but not limited to directing and unilaterally determining (i) any decision to pull and refile any Governmental Filing or voluntarily extend any waiting period or review period under the HSR Act or any other applicable Regulatory Law and (ii) any decision to enter into, and the contents of, any agreement (including a timing agreement) with any Governmental Entity to delay and not to consummate the Transactions, *provided*, that (x) at the time of entry into any timing or similar agreement, the term thereof would not reasonably be expected to extend beyond such time as would allow the parties sufficient time to consummate the Closing prior to the Outside Date and (y) in doing so it must act reasonably and must consider in good faith the views of the Company.

(c)  In connection with and without limiting the foregoing, in the event that Parent requests the Company to do so, the Company shall give any notices to third parties required under Contracts, and the Company shall use, and cause each of the Company Subsidiaries to use, its reasonable best efforts to obtain any third party consents to any Contracts that are necessary to consummate the Transactions, including the Merger.  Notwithstanding anything to the contrary herein, none of Parent, the Company or any of their respective Subsidiaries shall be required to pay any consent or other similar fee, payment or consideration, make any other concession or provide any additional security (including a guaranty), or amend or modify any Contract, to obtain such third party consents (except, in the case of the Company, if requested by Parent and either (i) reimbursed or indemnified for by Parent or (ii) subject to the occurrence of the Closing).

Section 6.3.  Publicity.  From and after the date hereof until the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Section 8.1, neither the Company nor Parent, nor any of their respective Subsidiaries, shall issue or cause the publication of any press release or other public announcement or disclosure with respect to the Merger, the other Transactions or this Agreement without the prior written consent of the other Party, unless such Party determines, after consultation with outside counsel, that it is required by applicable Law or by any listing agreement with or the listing rules of a national securities exchange or trading market to issue or cause the publication of such press release or other public announcement or disclosure with respect to the Merger, the other Transactions or this Agreement, in which event such Party shall endeavor, on a basis reasonable under the circumstances, to provide a meaningful opportunity to the other Party to review and comment upon such press release or other announcement or disclosure in advance and shall give due consideration to all reasonable additions, deletions or changes suggested thereto; *provided*, *however*, that the Company and Parent shall be permitted to issue press releases or make public announcements or disclosure (i) with respect to any Acquisition Proposal or from and after a Change of Recommendation, subject to the obligations of the Company set forth in Section 5.2, or (ii) with respect to any litigation between the Parties relating to this Agreement; *provided*, *further*, that each Party and their respective Subsidiaries and Representatives may make statements that are consistent with previous press releases, public disclosures or public statements made by Parent or the Company in compliance with this Section 6.3 or make statements regarding the actual or expected financial impact (including earnings guidance) of this Agreement or the Transactions on such Party.

Section 6.4.    D&O Insurance and Indemnification.

(a)    For six (6) years from and after the Effective Time, Parent shall, and shall cause the Surviving Company to, indemnify and hold harmless each past and present director, officer and employee of the Company or any Company Subsidiary and each Person who served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request or for the benefit of the Company or any Company Subsidiary (collectively, the "Indemnified Parties") against any costs or expenses (including advancing attorneys' fees and expenses prior to the final disposition of any actual or threatened claim, suit, proceeding or investigation to each Indemnified Party to the fullest extent permitted by applicable Law and the Company Governing Documents; *provided* that such Indemnified Party agrees in advance to return any such funds to which a court of competent jurisdiction determines in a final, nonappealable judgment that such Indemnified Party is not ultimately entitled), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened claim, action, investigation, suit or proceeding in respect of acts or omissions occurring or alleged to have occurred at or prior to the Effective Time (including acts or omissions occurring in connection with the approval of this Agreement and the consummation of the Merger or any of the other Transactions), whether asserted or claimed prior to, at or after the Effective Time, in connection with such Person serving as an officer, director, employee or other fiduciary of the Company or any Company Subsidiary or of any other Person, to the fullest extent permitted by applicable Law and the Company Governing Documents or the organizational documents of the applicable Company Subsidiary (as applicable) or any indemnification agreements with such Person in existence on the date of this Agreement.  The Parties agree that all rights to elimination of liability, indemnification and advancement of expenses for acts or omissions occurring or alleged to have occurred at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, now existing in favor of the Indemnified Parties as provided in the Company's or the Company Subsidiaries' respective certificate of incorporation, certificate(s) of change of name (if any), certificate(s) of merger (if any), memorandum and articles of association or bylaws (or comparable organizational documents) or in any indemnification agreement of the Company or a Company Subsidiary with any Indemnified Party in existence on the date of this Agreement shall survive the Transactions, including the Merger, and shall continue in full force and effect in accordance with the terms thereof.  Notwithstanding anything herein to the contrary, if any Indemnified Party notifies the Surviving Company on or prior to the sixth (6th) anniversary of the Effective Time of a matter in respect of which such Person intends in good faith to seek indemnification pursuant to this Section 6.4, the provisions of this Section 6.4 shall continue in effect with respect to such matter until the final disposition of all claims, actions, investigations, suits and proceedings relating thereto.

(b)    For six (6) years after the Effective Time, Parent shall cause to be maintained in effect the provisions in (i) the Company Governing Documents and (ii) any indemnification agreement of the Company or a Company Subsidiary with any Indemnified Party in existence on the date of this Agreement, except to the extent that such agreement provides for an earlier termination, in each case, regarding elimination of liability, indemnification of officers, directors and employees and advancement of expenses that are in existence on the date hereof, and no such provision shall be amended, modified or repealed in any manner that would adversely affect the rights or protections thereunder of any such Indemnified Party in respect of acts or omissions occurring or alleged to have occurred at or prior to the Effective Time (including acts or omissions occurring in connection with the approval of this Agreement and the consummation of the Merger or any of the other Transactions).

(c)    At or prior to the Effective Time, the Company shall purchase a six (6)-year prepaid "tail" policy on terms and conditions providing coverage retentions, limits and other material terms substantially equivalent to the current policies of directors' and officers' liability insurance and fiduciary liability insurance maintained by the Company and the Company Subsidiaries with respect to matters arising at or prior to the Effective Time; *provided*, *however*, that the Company shall not commit or spend on such "tail" policy, in the aggregate, more than three hundred percent (300%) of the last aggregate annual premium paid by the Company prior to the date hereof for the Company's current policies of directors' and officers' liability insurance and fiduciary liability insurance (the "Base Amount"), and if the cost of such "tail" policy would otherwise exceed the Base Amount, the Company shall be permitted to purchase only as much coverage as reasonably practicable for the Base Amount.  The Company shall in good faith consult with Parent prior to the Closing with respect to the procurement of such "tail" policy, including with respect to the selection of the broker, available policy price and coverage options.

(d)        In the event Parent or the Surviving Company or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving company or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of Parent or the Surviving Company, as the case may be, shall assume the obligations set forth in this Section 6.4.  The rights and obligations under this Section 6.4 shall survive consummation of the Merger and shall not be terminated or amended in a manner that is adverse to any Indemnified Party without the written consent of such Indemnified Party. The Parties acknowledge and agree that the Indemnified Parties shall be third party beneficiaries of this Section 6.4, each of whom may enforce the provisions thereof.  Parent shall pay all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any Indemnified Party in enforcing the indemnity and other obligations provided in this Section 6.4.  The rights of each Indemnified Party hereunder shall be in addition to, and not in limitation of, any other rights such Indemnified Parties have under any organizational documents of the Company or any Company Subsidiary.

Section 6.5.        Takeover Statutes.  The Parties shall use their respective reasonable best efforts (a) to take all action necessary so that no Takeover Statute is or becomes applicable to the Merger or any of the other Transactions and (b) if any such Takeover Statute is or becomes applicable to any of the foregoing, to take all action necessary so that the Merger and the other Transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise to eliminate or minimize the effect of such Takeover Statute on the Merger and the other Transactions.  No Change of Recommendation shall change, or be deemed to change, or permit the Company or the Company Board of Directors to change, in any manner or respect, the approval of the Company Board of Directors for purposes of causing any Takeover Statute to be inapplicable to the Merger or any of the other Transactions.

Section 6.6.        Obligations of Merger Sub and Parent.  Parent shall take all action necessary to cause Merger Sub to perform its obligations under this Agreement and to consummate the Transactions, including the Merger, upon the terms and subject to the conditions set forth in this Agreement.  For the avoidance of doubt, any violation of the obligations of Merger Sub under this Agreement shall also be deemed to be a breach of this Agreement by Parent.  Immediately after the execution of this Agreement, Parent shall deliver to the Company evidence of the adoption of this Agreement by Parent, in its capacity as the sole shareholder of Merger Sub, and the consent effecting such adoption shall not be modified or withdrawn after the entry into this Agreement.

-53-

Section 6.7.    <u>Employee Matters</u>.

(a)    Effective as of the Effective Time and for a period of twelve (12) months thereafter (the "<u>Continuation Period</u>"), Parent shall provide or shall cause to be provided to each employee of the Company and Company Subsidiary who continues to be employed by Parent or any Subsidiary thereof (the "<u>Continuing Employees</u>"), (i) a base salary or hourly wage rate and short-term (annual or more frequent) cash bonus or commission opportunities that are no less favorable in the aggregate than the base salary or hourly wage rate and short-term (annual or more frequent) cash bonus or commission opportunities, as applicable, as provided to such Continuing Employee immediately prior to the Effective Time, *provided* that during the Continuation Period, Parent shall provide or shall cause to be provided to such Continuing Employee a base salary or hourly wage rate, as applicable, that is no less favorable than that provided to such Continuing Employee immediately prior to the Effective Time, (ii) long-term incentive compensation opportunities that are no less favorable than the long-term incentive compensation opportunities provided to such Continuing Employee immediately prior to the Effective Time, *provided* that in lieu of equity or equity-based compensation, Parent may elect to substitute cash incentive compensation of equivalent value, and (iii) benefits (excluding retention, change in control, defined benefit pension and post-retirement welfare payments or benefits) that are no less favorable in the aggregate to such Continuing Employee than those provided to similarly situated employees of Parent or the Parent Subsidiaries, *provided* that providing for such Continuing Employee to continue to participate in Company Benefit Plans as in effect immediately prior to the Effective Time shall satisfy this clause (iii) (it being understood that participation in the Parent benefit plans may commence at different times with respect to each Parent benefit plan as determined by Parent in its sole discretion), and *provided further* that during the Continuation Period, the medical, dental, vision and other health benefits provided to such Continuing Employee shall be no less favorable in the aggregate than those provided to such Continuing Employee immediately prior to the Effective Time.  In addition, Parent shall, and shall cause the Company and the Company Subsidiaries to, provide to each Continuing Employee who is terminated by Parent, the Company or any Company Subsidiary other than for cause during the Continuation Period the severance payments and benefits as set forth on <u>Section 6.7(a)</u> of the Company Disclosure Letter, taking into account the Continuing Employee's service prior the Effective Time in accordance with <u>Section 6.7(e)</u> and after the Effective Time through the date of termination and without giving effect to any reductions in compensation occurring at or after the Effective Time.

(b)    Parent shall, or shall cause the Company and the Company Subsidiaries to, honor all Company Benefit Plans (including all severance, change of control and similar plans and agreements) to Continuing Employees in accordance with their terms as in effect immediately prior to the Effective Time.  Without limiting the generality of the foregoing, Parent shall, and shall cause the Company and the Company Subsidiaries to, honor the Company's retention program providing for retention payments to certain individuals set forth on <u>Section 6.7(b)</u> of the Company Disclosure Letter in connection with the provision of services relating to the Merger to such individuals and on the terms as set forth on <u>Section 6.7(b)</u> of the Company Disclosure Letter (the "<u>Retention Program</u>"). Following the Effective Time, Parent, the Company or one of the Company Subsidiaries shall pay or cause to be paid such retention payments pursuant to the terms of the Retention Program.

(c)        Parent agrees to, and agrees to cause the Company and the Company Subsidiaries to, pay bonuses to Continuing Employees under the Company's annual incentive plan in respect of the fiscal year in which the Effective Time occurs in an amount equal to the annual incentive award earned by such Continuing Employee based on the actual level of performance for the applicable fiscal year through the latest practicable date prior to the Effective Time as determined by the Compensation and Talent Committee of the Company Board of Directors in good faith and consistent with such annual incentive plan, as multiplied by a fraction, the numerator of which is the number of days elapsed during the applicable fiscal year through and including the date of the Effective Time and the denominator of which is the total number of days in the fiscal year in which the Effective Time occurs (the "Prorated Annual Bonuses").  The Prorated Annual Bonuses shall be paid by Parent, the Company or the Company Subsidiaries at the time or times that the Prorated Annual Bonuses would normally be paid by the Company and the Company Subsidiaries, subject to such Continuing Employee's continued employment through the date that Prorated Annual Bonuses are paid; *provided*, *however*, that any Continuing Employee whose employment is terminated on or following the Closing Date and prior to the Prorated Annual Bonus payment date under circumstances that entitle such employee to severance and/or equity award vesting shall be entitled to receive his or her Prorated Annual Bonus, payable as soon as reasonably practicable following the date of such termination of employment.

(d)        Notwithstanding anything in this Agreement to the contrary, with respect to any Continuing Employees who are covered by a collective bargaining agreement or other agreement with a Union, Parent's obligations under this Section 6.7 shall be in addition to, and not in contravention of, any obligations under the applicable collective bargaining agreement or Union agreement or applicable Law.

(e)        For all purposes (including purposes of vesting, eligibility to participate and level of benefits) under the employee benefit plans of Parent and the Parent Subsidiaries providing benefits to any Continuing Employees after the Effective Time (the "New Plans"), each Continuing Employee shall be credited with his or her years of service with the Company and the Company Subsidiaries and their respective predecessors before the Effective Time, to the same extent as such Continuing Employee was entitled, before the Effective Time, to credit for such service under any similar or comparable Company Benefit Plan in which such Continuing Employee participated or was eligible to participate immediately prior to the Effective Time; *provided* that the foregoing shall not apply to the extent that its application would result in a duplication of benefits for the same period of service or with respect to benefit accrual under any defined benefit pension plan.  For purposes of each New Plan providing health or welfare benefits to any Continuing Employee, Parent or its applicable Subsidiary shall (i) waive or cause all preexisting condition exclusions or limitations and actively-at-work requirements of such New Plan to be waived for such Continuing Employee and his or her covered dependents to the extent that such exclusions or limitations and waiting periods would not apply under a similar or comparable Company Benefit Plan in which such employee participated prior to the Effective Time, and (ii) use reasonable best efforts to cause such Continuing Employee to be given credit under such New Plan for all amounts paid by such Continuing Employee under any similar or comparable Company Benefit Plan for the plan year that includes the Effective Time for purposes of applying deductibles, co-payments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the plans maintained by Parent or any Parent Subsidiary, as applicable, for the plan year in which the Effective Time occurs.

(f)        If, at least thirty (30) Business Days prior to the Effective Time, Parent provides written notice to the Company directing the Company to terminate its 401(k) plan(s), the Company shall terminate any and all 401(k) plans effective as of the day immediately preceding the day on which the Effective Time occurs (the "401(k) Termination Date").  In the event that Parent requests that such 401(k) plan(s) be terminated, the Company shall provide Parent with evidence that such 401(k) plan(s) have been terminated pursuant to resolution of the Company's Board of Directors at least two (2) Business Days prior to the day on which the Effective Time occurs; *provided* that, prior to terminating the Company's 401(k) plan, the Company shall provide Parent with the form and substance of any applicable resolutions or amendments for review and comment and the Company shall consider in good faith any comments promptly received from Parent.  If the Company 401(k) plan is terminated pursuant to this Section 6.7(f), then on the Closing Date (such that there is no gap in 401(k) plan participation), Parent shall permit all Continuing Employees who were eligible to participate in any of the Company's 401(k) plan(s) immediately prior to the 401(k) Termination Date to participate in Parent's 401(k) plan and shall permit each such Continuing Employee to elect to transfer his or her account balance when distributed from the terminated Company 401(k) plan(s), including any outstanding participant loans, to Parent's 401(k) plan.

(g)        Nothing in this Agreement shall confer upon any Continuing Employee any right to continue in the employ or service of Parent or any affiliate of Parent, or shall interfere with or restrict in any way the rights of Parent or any affiliate of Parent, which rights are hereby expressly reserved, to discharge or terminate the services of any Continuing Employee at any time for any reason whatsoever, with or without cause, except to the extent expressly provided otherwise in a written agreement between Parent, the Company or any affiliate of Parent and the Continuing Employee or any severance, benefit or other applicable plan or program covering such Continuing Employee.  Notwithstanding any provision in this Agreement to the contrary, nothing in this Section 6.7 or otherwise in this Agreement shall (i) be deemed or construed to be an amendment, termination, adoption or other modification of any Company Benefit Plan or employee benefit plan of Parent, Merger Sub or any affiliate thereof, (ii) alter or limit the ability of Parent to amend, modify or terminate any Company Benefit Plan or any other benefit plan, program, agreement or arrangement, or (iii) create any third party rights in any current or former employee or other service provider (or any beneficiaries or dependents thereof) of Parent, the Company or its affiliates.

Section 6.8.    Rule 16b-3.  Prior to the Effective Time, the Company and Parent shall, as applicable, take all such steps as may be reasonably necessary or advisable hereto to cause any dispositions of Company equity securities (including derivative securities) pursuant to the Transactions by each individual who is a director or officer of the Company subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Company to be exempt under Rule 16b-3 promulgated under the Exchange Act.

-56-

Section 6.9.        <u>Shareholder Litigation</u>.  The Company shall provide Parent prompt notice (and in any event within forty-eight (48) hours of the Company having Knowledge of any such litigation) of any litigation brought by any shareholder of the Company or purported shareholder of the Company against the Company, any of the Company Subsidiaries and/or any of their respective directors or officers relating to the Merger or any of the other Transactions or this Agreement, and shall keep Parent informed on a prompt (and in any event within forty-eight (48) hours of any development or update) and timely basis with respect to the status thereof.  The Company shall give Parent the opportunity to participate (at Parent's expense) in the defense or settlement of any such litigation and reasonably cooperate with Parent in conducting the defense or settlement of such litigation (provided, that the Company shall in any event control such defense and/or settlement), and no such settlement shall be agreed without Parent's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).  In the event of, and to the extent of, any conflict or overlap between the provisions of this <u>Section 6.9</u> and <u>Section 5.1</u> or <u>Section 6.2</u>, the provisions of this <u>Section 6.9</u> shall control.

Section 6.10.        <u>Delisting</u>.  Each of the Parties agrees to cooperate with the other Parties in taking, or causing to be taken, all actions reasonably necessary to delist the Company Ordinary Shares from the NYSE and terminate its registration under the Exchange Act; *provided* that such delisting and termination shall not be effective until at or after the Effective Time.

Section 6.11.        <u>Director Resignations</u>. The Company shall use its reasonable best efforts to cause to be delivered to Parent resignations executed by each director of the Company in office as of immediately prior to the Effective Time and effective upon the Effective Time.  The Company shall use its reasonable best efforts to: (a) cause to be delivered to Parent resignations executed by each director of the Company Foundations in office as of immediately prior to the Effective Time and effective upon the Effective Time, and (b) take such actions as reasonably requested by Parent to appoint the individuals designated in writing by Parent to the board of directors of the Company Foundations with effect upon the Effective Time.

Section 6.12.        <u>Financing</u>.

(a)        Parent shall, and shall cause each Parent Subsidiary to, use reasonable best efforts to take, or cause to be taken, all actions, and do, or cause to be done, all things reasonably necessary or advisable to obtain funds sufficient to fund the Financing Amounts on or prior to the date on which the Merger is required to be consummated pursuant to the terms hereof, which may include the issuance and sale of senior unsecured notes and/or the entry into a committed term loan facility (any such (1) notes that have been funded and are not subject to an escrow arrangement, (2) notes that are subject to an escrow agreement, which shall have conditions to funding not less favorable than those set forth in the Debt Commitment Letter as of the date hereof and (3) committed term loan facility, which shall have conditions to funding not less favorable than those set forth in the Debt Commitment Letter as of the date hereof, collectively, the "<u>Replacement Financing</u>")).  In furtherance and not in limitation of the foregoing, Parent shall use reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary or advisable to obtain the proceeds of the Debt Financing on the terms and subject only to the conditions described in the Debt Commitment Letter on or prior to the date on which the Merger is required to be consummated pursuant to the terms hereof, including by (i) maintaining in effect the Debt Commitment Letter, (ii) negotiating and entering into definitive agreements with respect to the Debt Financing (the "<u>Definitive Agreements</u>") consistent with the terms and conditions contained in the Debt Commitment Letter (including, as necessary, the "flex" provisions contained in any related fee letter) or with other terms agreed by Parent and the Financing Parties provided that the conditions to the consummation thereof are not more onerous than the conditions set forth in the Debt Commitment Letter as of the date hereof, without any Prohibited Modification, (iii) satisfying (or obtaining the waiver of) on a timely basis all conditions in the Debt Commitment Letter and the Definitive Agreements that are in Parent's of any Parent Subsidiary's control and complying with its obligations thereunder and (iv) enforcing its rights under the Debt Commitment Letter.  Parent shall pay, or cause to be paid, as the same shall become due and payable, all fees and other amounts under the Debt Commitment Letter and Definitive Agreements.

-57-

(b)        Parent or any Parent Subsidiary may (i) amend, modify, replace, assign or agree to any waiver under the Debt Commitment Letter or any Definitive Agreements without the prior written approval of the Company, *provided*, that neither Parent nor any Parent Subsidiary shall, without the prior written consent of the Company (except if Parent has available sufficient cash on hand or cash from other funding sources pursuant to a Replacement Financing to fund the Financing Amounts) permit, consent to or agree to any amendment, replacement, supplement or modification to, or any waiver of, any provision or remedy under, the Debt Commitment Letter or the Definitive Agreements if such amendment, replacement, supplement, modification, waiver or remedy (A) adds new (or adversely modifies any existing) conditions to the consummation of all or any portion of the Debt Financing, (B) reduces the aggregate principal amount of the Debt Financing unless the aggregate amount of the Debt Financing following such reduction, together with cash on hand and cash available to Parent pursuant to a Replacement Financing, is sufficient to consummate the Merger and pay the other Financing Amounts (it being understood that any mandatory commitment reduction due to obtaining net proceeds of a debt or equity issuance, entry into a limited condition bank loan or obtaining net proceeds of certain asset sales in accordance with the terms of such Debt Commitment Letter (a "Replacement Financing Reduction") shall be permitted), (C) adversely affects the ability of Parent to enforce its rights against other parties to the Debt Commitment Letter or the Definitive Agreements as so amended, replaced, supplemented or otherwise modified or (D) would otherwise reasonably be expected to prevent, materially impede or materially delay the consummation of the Merger and the other transactions contemplated by this Agreement (the effects described in clauses (A) through (D), collectively, the "Prohibited Modifications"); *provided*, that notwithstanding the foregoing, Parent or any Parent Subsidiary may modify, supplement or amend the Debt Commitment Letter to (1) add lenders, lead arrangers, bookrunners, syndication agents or similar entities that have not executed the Debt Commitment Letter as of the date of this Agreement and (2) implement or exercise any "market flex" provisions contained in the Debt Commitment Letter or (ii) terminate the Debt Commitment Letter or any Definitive Agreement only if it has obtained Replacement Financing with net proceeds that, together with cash on hand, is sufficient to pay the Financing Amounts. In the event that new commitment letters and/or fee letters are entered into in accordance with any amendment, replacement, supplement, termination or other modification of the Debt Commitment Letter permitted pursuant to this Section 6.12, such new commitment letters and/or fee letters shall be deemed to be the "Debt Commitment Letter" for all purposes of this Agreement and references to "Debt Financing" herein shall include and mean the financing contemplated by the Debt Commitment Letter as so amended, replaced, supplemented or otherwise modified, as applicable.  Parent shall promptly deliver to the Company copies of any amendment, replacement, supplement, termination, modification, waiver or replacement of the Debt Commitment Letter and/or any Definitive Agreement.

-58-

(c)        In the event that any portion of the Debt Financing becomes unavailable (other than in connection with a Replacement Financing Reduction), Parent shall (i) promptly as practicable notify the Company in writing of such unavailability and the reason therefor and (ii) unless Parent has available sufficient cash on hand or cash from other funding sources pursuant to a Replacement Financing to fund the Financing Amounts, use reasonable best efforts, and cause each Parent Subsidiary to use their reasonable best efforts, to arrange and obtain, as reasonably promptly as practicable following the occurrence of such event, alternative financing (on terms and conditions that are not materially less favorable to Parent and/or any Parent Subsidiary, taken as a whole, than the terms and conditions as set forth in the Debt Commitment Letter, taking into account any "market flex" provisions thereof) for any such unavailable portion from the same or alternative sources (the "Alternative Financing") in an amount sufficient, when taken together with the available portion of the Debt Financing, to consummate the transactions contemplated by this Agreement and to pay the Financing Amounts and, without limiting the foregoing, shall use reasonable best efforts to cause such Alternative Financing to not include any Prohibited Modifications or conditions to the consummation thereof that are more onerous than those set forth in Debt Commitment Letter as of the date hereof.  Promptly after obtaining knowledge thereof, Parent shall provide the Company with written notice of any actual or threatened breach, default, cancellation, termination or repudiation by any party to the Debt Commitment Letter or any Definitive Agreement and a copy of any written notice or other written communication from any Lender or other financing source with respect to any actual or threatened breach, default, cancellation, termination or repudiation by any party to the Debt Commitment Letter or any Definitive Agreement of any provision thereof.  Parent shall keep the Company reasonably informed on a timely basis of the status of its efforts to consummate the Debt Financing, including any Alternative Financing.

(d)        Notwithstanding the foregoing, compliance by Parent with this Section 6.12(d) (or any other provision of this Agreement) shall not relieve Parent of its obligations to consummate the transactions contemplated by this Agreement whether or not the Debt Financing or any Alternative Financing is available.  To the extent Parent obtains Alternative Financing or amends, replaces, supplements, terminates, modifies or waives any of the Debt Financing, in each case pursuant to this Section 6.12 and without any Prohibited Modification, references to the "Debt Financing," "Debt Commitment Letters" and "Definitive Agreements" (and other like terms in this Agreement) shall be deemed to refer to such Alternative Financing, the commitments thereunder and the agreements with respect thereto, or the Debt Financing as so amended, replaced, supplemented, terminated, modified or waived.

Section 6.13.        Financing Cooperation.

(a)        Prior to the Effective Time, the Company shall use its reasonable best efforts, and shall cause the Company Subsidiaries to use their reasonable best efforts, and shall use its reasonable best efforts, to cause its and their respective Representatives to, provide all customary cooperation and all customary financial information, in each case that is reasonably requested by Parent in connection with any financing, including the Debt Financing, obtained or to be obtained by Parent for the purpose of financing the Transactions or any transaction undertaken in connection therewith (it being understood that the receipt of any such financing is not a condition to the Merger), including by using reasonable best efforts to:

-59-

(i)        furnish, or cause to be furnished, to Parent (x) audited consolidated balance sheets and related consolidated statements of operations and comprehensive income (loss), consolidated statements of shareholders' equity and consolidated statements of cash flows for the Company for each of the three (3) most recently completed fiscal years of the Company ended at least sixty (60) days prior to the Closing Date prepared in accordance with GAAP applied on a basis consistent with that of the most recent fiscal year (which Parent hereby acknowledges receiving for the three (3) fiscal years ended March 27, 2021, April 2, 2022 and April 1, 2023) and (y) unaudited consolidated balance sheets and related consolidated statements of operations and comprehensive income (loss), consolidated statements of shareholders' equity and consolidated statements of cash flows (in each case, subject to normal year-end adjustments and absence of footnotes) for each subsequent fiscal quarter ended on a date that is at least forty (40) days before the Closing Date;

(ii)       cause the Company's and the Company Subsidiaries' independent accountants, as reasonably requested by Parent, to (a) consent to the use of their audit reports on the financial statements of the Company and the Company Subsidiaries in any materials relating to, or any filings made with the SEC related to, such financing, (b) provide, consistent with customary practice, "comfort letters," including customary "negative assurances" (including drafts thereof which such accountants are prepared to issue at the time of pricing and at closing of any offering or placement of the Debt Financing) necessary and reasonably requested by Parent in connection with any debt capital markets transaction comprising a part of such financing, and (c) participate in reasonable and customary due diligence sessions, which sessions shall be telephonic or held by videoconference and held at reasonable and mutually agreeable times;

(iii)      assist Parent in (including by providing information relating to the Company and the Company Subsidiaries reasonably required and requested by Parent in connection with) its preparation of rating agency presentations, road show materials, bank information memoranda, projections, prospectuses, bank syndication materials, credit agreements, offering memoranda, private placement memoranda, definitive financing documents (as well as customary certificates and "backup" support) and similar or related documents to be prepared by Parent in connection with such financings, and which may incorporate by reference periodic and current reports filed by the Company with the SEC, including any historical financial information of the Company and the Company Subsidiaries required for the preparation by Parent of customary pro forma financial information and pro forma financial statements to the extent required by Regulation S-X under the Securities Act or any other accounting rules and regulations of the SEC, and/or in connection with such financing (it being agreed that the Company need only assist in the preparation thereof but shall not be required to (x) prepare independently any pro forma financial statements or (y) provide any information or assistance relating to (A) the proposed aggregate amount of debt financing, together with assumed interest rates, dividends (if any) and fees and expenses relating to the incurrence of such debt, (B) any post-Closing or pro forma cost savings, synergies, capitalization or ownership desired to be incorporated into any information used in connection with such financing or (C) any financial information related to Parent or any Parent Subsidiaries);

(iv)    cooperate with customary marketing efforts of Parent for such financing, including using reasonable best efforts to cause its management team, with appropriate seniority and expertise, to assist in preparation for and to participate in a reasonable number of meetings, presentations, road shows, due diligence sessions (including accounting due diligence sessions), drafting sessions, and sessions with rating agencies, in each case, upon reasonable notice and at mutually agreeable dates and times, which sessions meetings, presentations, road shows and sessions shall be telephonic or held by video conference;

(v)    deliver to Parent, no later than four (4) Business Days prior to the Closing Date, any materials and documentation about the Company and the Company Subsidiaries required under applicable "know your customer" and anti-money laundering Laws (including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001), to the extent requested by Parent no less than nine (9) Business Days prior to the Closing Date;

(vi)    inform Parent promptly in writing if the Company (A) concludes that any previously issued financial statement of the Company or any of Subsidiaries included in any materials with respect to such financing should no longer be relied upon as per Item 4.02 of Form 8-K under the Exchange Act or (B) shall have determined a restatement of any of the Company's or the Company Subsidiaries' financial statements is required or reasonably likely;

(vii)    cooperate with respect to the provision of guarantees required by such financing, including by executing and delivering definitive documents related thereto, it being understood that the effectiveness of any such guarantees shall be conditioned upon the occurrence of the Closing; and

(viii)    provide customary authorization letters to the Financing Parties authorizing the distribution of information to prospective lenders or investors and containing a representation that the public side versions of such documents, if any, do not include material non-public information about the Company or the Company Subsidiaries (only to the extent such authorization letters contain customary disclaimers for the Company, its affiliates and their respective Representatives with respect to responsibility for the use or misuse of the contents thereof), *provided* that the Company is afforded adequate time to review such authorization letters and related materials;

-61-

*provided*, *however*, that (a) no such cooperation shall be required under this Section 6.13 or Section 6.14(b) to the extent it would (i) unreasonably disrupt the conduct of the Company's business, (ii) require the Company or the Company Subsidiaries to incur any fees, expenses or other liability prior to the Effective Time for which it is not promptly reimbursed or simultaneously indemnified, (iii) be reasonably expected to cause any director, officer or employee of the Company or any Company Subsidiary to incur any personal liability, (iv) require the Company to waive or amend any terms of this Agreement, (v) require the Company or any Company Subsidiary to provide any information that is prohibited or restricted by applicable Law or is legally privileged (*provided*, *however*, that the Company shall use its reasonable best efforts to make appropriate substitute arrangements to permit reasonable disclosure not in violation of Law or to allow for such access or disclosure to the maximum extent that does not result in a loss of such legal privilege), (vi) require the Company or any Company Subsidiary or any persons who are officers or directors of such entities to pass resolutions or consents to approve or authorize the execution of such financing or enter into, execute or deliver any certificate, document, instrument or agreement (other than the authorization letters referred to in Section 6.13(a)(viii) above, customary representation letters required in connection with the provision of any "comfort letters" in accordance with Section 6.13(a)(i) above and any supplemental indenture related to a consent solicitation pursuant to Section 6.14(b) in which the changes do not become effective until Closing) or agree to any change or modification of any existing certificate, document, instrument or agreement, (vii) cause any representation or warranty in this Agreement to be breached by the Company or any of the Company Subsidiaries, (viii) conflict with the organizational documents of the Company or any Company Subsidiary or any Laws, (ix) reasonably be expected to result in a material violation or material breach of, or a default (with or without notice, lapse of time, or both) under, any material Contract to which the Company or any of the Company Subsidiaries is a party, (x) require the delivery of any opinion of counsel, or (xi) require the Company or any Company Subsidiary to prepare any financial statements or information that cannot be produced or provided without unreasonable cost or expense and are not prepared in the ordinary course of its financial reporting practice. Nothing contained in this Section 6.13 or otherwise shall require the Company or any Company Subsidiary, prior to the Effective Time, to be an issuer or other obligor with respect to such financing. Parent shall, promptly upon request by the Company, reimburse the Company or any Company Subsidiary for all reasonable and documented out-of-pocket costs incurred by them or their respective representatives in connection with such cooperation and shall reimburse, indemnify and hold harmless the Company and Company Subsidiaries and their respective representatives from and against any and all losses actually suffered or incurred by them in connection with the arrangement of such financing, any action taken by them at the request of Parent or its representatives pursuant to this Section 6.13 and Section 6.14 and any information used in connection therewith, except to the extent resulting from the gross negligence, fraud or willful misconduct of the Company or any Company Subsidiary or any of its their respective representatives, arising from incorrect or misleading information provided by the Company or any Company Subsidiary or any of its their respective representatives.

(b)        The Company hereby consents to use of all of its and the Company Subsidiaries' logos in connection with any financing (subject to the Company having a reasonable opportunity for advance review of and consultation with respect to such use); *provided* that such logos are used solely in a manner that is reasonable and customary for such purposes and solely in a manner that is not intended to, nor reasonably likely to, harm or disparage the Company or the Company Subsidiaries or the Company's or the Company Subsidiaries' reputation or goodwill.

(c)        In no event shall the receipt or availability of any funds or financing (including the Debt Financing) by Parent any of its affiliates or any other financing or other transactions be a condition to any of Parent's obligations under this Agreement.  Notwithstanding anything to the contrary in this Agreement, the Company's breach of any of the covenants required to be performed by it under this Section 6.13 shall not be considered in determining the satisfaction of the condition set forth in Section 7.2(b), unless such breach is the primary cause of Parent being unable to obtain the proceeds of any financing at the Closing.

(d)        All non-public or otherwise confidential information regarding the Company or any of the Company Subsidiaries obtained by Parent, the Parent Subsidiaries or any of their respective Representatives pursuant to this Section 6.13 shall be kept confidential in accordance with the Confidentiality Agreement; *provided* that such information may be disclosed (i) on a confidential basis to prospective lenders, underwriters, initial purchasers, placement agents, dealer managers, solicitation agents, information agents and depositary or other agents during syndication and marketing of the financing subject to such entities entering into confidentiality obligations with Parent on terms similar to those in the Confidentiality Agreement and (ii) on a confidential basis to rating agencies.

Section 6.14.    <u>Treatment of Company Indebtedness</u>.

(a)        The Company shall use reasonable best efforts (and shall cause the Company Subsidiaries to use their reasonable best efforts) deliver all notices and take all other actions required to facilitate at or prior to the Effective Time the termination of all commitments outstanding under the Company Credit Facilities, the repayment in full of all obligations outstanding thereunder, the release of all Liens securing such obligations and the release of all guarantees in connection therewith.  In furtherance and not in limitation of the foregoing, the Company shall use its reasonable best efforts, and shall cause the Company Subsidiaries to use their reasonable best efforts, to deliver to Parent least five (5) days prior to the Closing Date, a draft payoff letter and deliver to Parent at least two (2) Business Days prior to the Closing Date, an executed payoff letter, in each case with respect to each Company Credit Facility (the "<u>Payoff Letter</u>") in form and substance customary for transactions of this type, from the agent on behalf of the Persons to whom such Indebtedness is owed, which Payoff Letter shall, among other things, include the payoff amount and provide that all guarantees in connection therewith shall, upon the payment of the amount set forth in the Payoff Letter at or prior to the Effective Time, be released and terminated. The Company shall use its reasonable best efforts to include in the Payoff Letter any proposed changes thereto that Parent reasonably requests.

(b)        Prior to the Closing Date, Parent shall consult with the Company in good faith with respect to any plans for Parent to (i) commence a tender offer, exchange offer and/or consent solicitation or change of control offer for any of the Company Notes prior to the Closing Date, the settlement of which, in each case, will be contingent on the Closing or (ii) redeem or satisfy and discharge any Company Notes, as of the Effective Time. To the extent reasonably requested by Parent, the Company shall provide reasonable and customary assistance, at Parent's sole cost and expense, in connection therewith, including using reasonable best efforts to (i) take any actions reasonably necessary or appropriate to be taken to issue conditional redemption notices and/or conditional notices of offers to purchase the Company Notes, the redemption or repurchase of which closes at or following the Effective Time, or other documents necessary to commence a tender offer, exchange offer and/or consent solicitation or change of control offer, as the case may be, for the Company Notes and (ii) cause the applicable trustee to proceed with a tender offer, exchange offer and/or consent solicitation or change of control offer, as the case may be, for the Company Notes, and take any such action as is reasonably necessary to cause the applicable trustee and/or other applicable agent to send the notices of offers to purchase and/or redemption, consent solicitation statement and/or other documents necessary to commence such a transaction, to the holders of the Company Notes on or prior to the Closing Date, as applicable. Parent shall draft all documentation related to any tender offer, exchange offer and/or consent solicitation and shall provide advanced review and consultation to the Company and give reasonable consideration to the comments raised by the Company and its counsel.  Notwithstanding the foregoing, the Company shall not be required to give a notice of redemption that is not conditional on Closing.

Section 6.15.    <u>Integration and Tax Matters</u>.

(a)    The Company (i) shall use commercially reasonable efforts to consult with Parent with respect to, and keep Parent reasonably apprised of, (A) any reorganizations of the corporate structure of the Company and the Company Subsidiaries or (B) any reorganizations, restructurings, transactions or other actions by or among the Company and the Subsidiaries which have a substantial or principal objective relating to Tax planning, including in respect of OECD Pillar Two, in the case of each of clauses (A) and (B), (I) which have a material Tax impact, but (II) excluding (x) any items set forth in <u>Section 5.1</u> of the Company Disclosure Letter and (y) any actions consistent with past practice and in the ordinary course of the Tax compliance function of the Company and its Subsidiaries (collectively, "<u>Tax Actions</u>"), (ii) shall consider in good faith any comments from Parent in respect of such Tax Actions, and (iii) if Parent reasonably objects to any such Tax Action on the basis that such Tax Action would materially increase the Tax liability of Parent, the Company, or their respective Subsidiaries after the Closing (or materially increase the risk of any material Tax liability of Parent, the Company and their respective Subsidiaries, including as a result of a Tax audit, claim, or other proceeding after the Closing with respect to any taxable period (or portion thereof) ending on or before the Closing Date), shall not, and shall cause each Company Subsidiary not to, consummate such Tax Action unless the Company has received an opinion from a "Big-4" accounting firm or other nationally recognized accounting firm concluding that there is at least "more likely than not-level" support for the reporting position(s) with respect to such Tax Action.

(b)    Upon the written request of Parent and at Parent's sole cost and expense, the Company shall consider in good faith any reasonable request by Parent that the Company and the Company Subsidiaries make Tax elections, implement restructuring transactions, or otherwise take actions, in each case, prior to the Closing, in furtherance of Parent's integration and Tax planning with respect to the Company and the Company Subsidiaries; *provided*, for the avoidance of doubt, the Company shall not be required to make any Tax election, implement any restructuring transaction, or otherwise take any action pursuant to this <u>Section 6.15(b)</u> that the Company determines, in its discretion, exercised in good faith, not to make, implement, or take.

(c)    At or prior to the Closing, upon the written request of Parent received by the Company at least ten (10) Business Days prior to the Closing, with respect to any Company Subsidiary that is classified as a domestic C corporation for U.S. federal income tax purposes, to the extent the Company is legally able to do so, the Company shall deliver to Parent a certification from such Company Subsidiary pursuant to Treasury Regulations Section 1.1445-2(c) signed by a responsible corporate officer, together with a signed notice as contemplated by Treasury Regulations Section 1.897-2(h).

Section 6.16.    <u>BVI Registered Agent</u>. On or prior to the Closing, the Company and Parent shall reasonably cooperate to obtain evidence that the registered agent of the Company in the British Virgin Islands will recognize the authority of Parent to give instructions in relation to the Surviving Company with effect from the Effective Time, including for the purposes of updating the corporate records of the Company to reflect the Merger, the changes to the Company Board of Directors contemplated by <u>Section 1.6</u> and (if so required by Parent) register the amended and restated memorandum and articles of association of the Company with the Registrar.

**ARTICLE VII**

**CONDITIONS TO CONSUMMATION OF THE MERGER**

Section 7.1.    Conditions to Each Party's Obligations to Effect the Merger.  The respective obligations of each Party to consummate the Merger shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any and all of which may be waived in whole or in part by Parent, Merger Sub and the Company, as the case may be, to the extent permitted by applicable Law:

(a)    Company Shareholder Approval.  The Company shall have obtained the Company Shareholder Approval.

(b)    Government Consents.  (i) The waiting period (or extensions thereof) under the HSR Act relating to the Transactions shall have expired or been terminated and (ii) all applicable filings, registrations, waiting periods (or extensions thereof) and approvals under each other applicable Regulatory Laws relating to the Transactions that is set forth on Section 7.1(b) of the Company Disclosure Letter shall have been made, expired, terminated or obtained, as the case may be.

(c)    No Legal Prohibition.  No Governmental Entity of competent jurisdiction in any of the jurisdictions set forth on Section 7.1(c) of the Company Disclosure Letter shall have, after the entry into this Agreement, (i) enacted, issued or promulgated any Law that is in effect as of immediately prior to the Effective Time or (ii) issued or granted any order or injunction (whether temporary, preliminary or permanent), and (iii) there shall be no timing agreement with a Governmental Entity entered into in accordance with Section 6.2(b) that is in effect as of immediately prior to the Effective Time, in each case of clauses (i) – (iii), which has the effect of restraining, enjoining or otherwise prohibiting the consummation of the Merger.

Section 7.2.    Conditions to Obligations of Parent. The obligations of Parent and Merger Sub to consummate the Merger shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any and all of which may be waived in whole or in part by Parent and Merger Sub, as the case may be, to the extent permitted by applicable Law:

(a)    Representations and Warranties.  (A) The representations and warranties of the Company set forth in Section 3.1(a) (Qualification, Organization, etc.), Section 3.1(b) (Qualification, Organization, etc.), Section 3.2(c) (Capitalization) (other than the first sentence thereof), Section 3.3 (Corporate Authority), Section 3.22 (Opinion of Financial Advisor), Section 3.23 (State Takeover Statues; Anti-Takeover Laws) and Section 3.25 (Finders and Brokers) (in each case, without giving effect to any qualification as to materiality or Company Material Adverse Effect contained therein) shall be true and correct in all material respects as of the Closing as though made as of the Closing (except representations and warranties that by their terms speak specifically as of another date, in which case as of such date); (B) the representations and warranties of the Company set forth in Section 3.8(a) (Absence of Certain Changes) shall be true and correct in all respects as of the Closing as though made as of the Closing; (C) the representations and warranties of the Company set forth in Section 3.2(a) (Capitalization) and the first sentence of Section 3.2(c) (Capitalization) shall be true and correct other than for *de minimis* inaccuracies as of the Closing as though made as of the Closing (except representations and warranties that by their terms speak specifically as of another date, in which case as of such date); and (D) the other representations and warranties of the Company set forth in this Agreement (without giving effect to any qualification as to materiality or Company Material Adverse Effect contained therein) shall be true and correct as of the Closing as though made as of the Closing (except representations and warranties that by their terms speak specifically as of another date, in which case as of such date), except, with respect to this clause (D), where any failure of any such representation or warranty to be true and correct (without giving effect to any qualification as to materiality or Company Material Adverse Effect contained therein) has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

-65-

(b)	<u>Performance of Obligations of the Company</u>. The Company shall have performed or complied in all material respects with the obligations, covenants and agreements required to be performed or complied with by it under the Agreement at or prior to the Closing.

(c)	<u>No Company Material Adverse Effect</u>.  A Company Material Adverse Effect shall not have occurred on or after the date of the Agreement.

(d)	<u>Company Officer's Certificate</u>. Parent shall have received a certificate, dated as of the Closing Date, signed by the chief executive officer or chief financial officer of the Company, on behalf of the Company, certifying that each of the conditions set forth in <u>Section 7.2(a)</u>, <u>Section 7.2(b)</u> and <u>Section 7.2(c)</u> has been satisfied.

Section 7.3.	<u>Conditions to Obligations of the Company</u>.  The obligations of the Company to consummate the Merger shall be subject to the satisfaction on or prior to the Closing Date of each of the following conditions, any and all of which may be waived in whole or in part by the Company to the extent permitted by applicable Law:

(a)	<u>Representations and Warranties</u>.  (i) The representations and warranties of Parent and Merger Sub set forth in <u>Section 4.1</u> (Qualification, Organization, etc.), <u>Section 4.2</u> (Corporate Authority) and <u>Section 4.7</u> (Finders and Brokers) (in each case, without giving effect to any qualification as to materiality contained therein) shall be true and correct in all material respects as of the Closing as though made as of the Closing (except representations and warranties that by their terms speak specifically as of another date, in which case as of such date); and (ii) the other representations and warranties of Parent and Merger Sub set forth in this Agreement (without giving effect to any qualification as to materiality contained therein) shall be true and correct as of the Closing as though made as of the Closing (except representations and warranties that by their terms speak specifically as of another date, in which case as of such date), except, with respect to this clause (ii), where any failures of any such representation or warranty to be true and correct (without giving effect to any qualification as to materiality contained therein) would not prevent or materially impair the ability of Parent or Merger Sub to consummate the Transactions, including the Merger, prior to the Outside Date.

(b)	<u>Performance of Obligations of Parent</u>.  Each of Parent and Merger Sub shall have performed or complied in all material respects with the obligations, covenants and agreements required to be performed or complied with by it under the Agreement at or prior to the Closing.

-66-

(c)        Parent Officer's Certificate.  The Company shall have received a certificate, dated as of the Closing Date, signed by the chief executive officer or chief financial officer of Parent, on behalf of Parent, certifying that each of the conditions set forth in Section 7.3(a) and Section 7.3(b) has been satisfied.

## ARTICLE VIII

## TERMINATION

Section 8.1.        Termination.  This Agreement may be terminated and the Merger and the other Transactions may be abandoned at any time before the Closing, as follows (with any termination by Parent also being an effective termination by Merger Sub):

(a)        by mutual written consent of Parent and the Company;

(b)        by the Company, in the event that (i) Parent and/or Merger Sub shall have breached, failed to perform or violated their respective covenants or agreements under this Agreement or (ii) any of the representations and warranties of Parent or Merger Sub set forth in this Agreement shall have become inaccurate, in either case of clauses (i) or (ii) in a manner that would give rise to the failure of a condition set forth in Section 7.3(a) or Section 7.3(b), as applicable, and such breach, failure to perform, violation or inaccuracy is not capable of being cured by the Outside Date or, if capable of being cured by the Outside Date, is not cured by Parent or Merger Sub, as applicable, before the earlier of (x) the third (3rd) Business Day immediately prior to the Outside Date and (y) the forty-fifth (45th) calendar day following receipt of written notice from the Company of such breach, failure to perform, violation or inaccuracy; *provided* that the Company shall not have the right to terminate this Agreement pursuant to this Section 8.1(b) if the Company is then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would give rise to the failure of a condition set forth in Section 7.2(a), Section 7.2(b) or Section 7.2(c), as applicable;

(c)        by Parent, in the event that (i) the Company shall have breached, failed to perform or violated its covenants or agreements under this Agreement or (ii) any of the representations and warranties of the Company set forth in this Agreement shall have become inaccurate, in either case of clauses (i) or (ii) in a manner that would give rise to the failure of a condition set forth in Section 7.2(a), Section 7.2(b), as applicable, and such breach, failure to perform, violation or inaccuracy is not capable of being cured by the Outside Date or, if capable of being cured by the Outside Date, is not cured by the Company before the earlier of (x) the third (3rd) Business Day immediately prior to the Outside Date and (y) the forty-fifth (45th) calendar day following receipt of written notice from Parent of such breach, failure to perform, violation or inaccuracy; *provided* that Parent shall not have the right to terminate this Agreement pursuant to this Section 8.1(c) if Parent or Merger Sub is then in breach of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would give rise to the failure of a condition set forth in Section 7.3(a) or Section 7.3(b), as applicable;

(d)        by either Parent or the Company if the Closing has not occurred on or before the first anniversary of the date of this Agreement (the "Outside Date"); *provided* that if on such date, the condition to Closing set forth in Section 7.1(b) or Section 7.1(c) shall not have been satisfied but all other conditions to Closing shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but provided that such conditions shall then be capable of being satisfied if the Closing were to take place on such date), then the Outside Date shall be automatically extended for one three (3) month period and such date shall become the Outside Date for purposes of this Agreement; *provided further* that if on the date which is three months after the first anniversary of the date of this Agreement, the condition to Closing set forth in Section 7.1(b) or Section 7.1(c) shall not have been satisfied but all other conditions to Closing have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but provided that such conditions shall then be capable of being satisfied if the Closing were to take place on such date), then the Outside Date shall be automatically further extended for one additional three (3) month period and such date as so extended shall become the Outside Date for purposes of this Agreement; *provided further* that the right to terminate this Agreement pursuant to this Section 8.1(d) shall not be available to any Party whose failure to fulfill or perform any obligation or covenant under this Agreement has been a principal cause of the failure of the Transactions to be consummated by the Outside Date and such action or failure to act constitutes a material breach of this Agreement (it being agreed that any such failure of Merger Sub shall be deemed to be a failure of Parent);

(e)        by Parent, if, prior to obtaining the Company Shareholder Approval, (i) the Company Board of Directors shall have effected a Change of Recommendation or (ii) the Company has materially breached Section 5.2;

(f)        by either the Company or Parent if a Governmental Entity of competent jurisdiction shall have issued a final, non-appealable order, injunction, decree or ruling in each case permanently restraining, enjoining or otherwise prohibiting the consummation of the Transactions; *provided*, that the right to terminate this Agreement pursuant to this Section 8.1(f) shall not be available to any Party whose failure to fulfill or perform any obligation or covenant under this Agreement has been a principal cause of the issuance of such order, injunction, decree or ruling (it being agreed that any such failure of Merger Sub shall be deemed to be a failure of Parent);

(g)        by either the Company or Parent, if the Company Shareholder Approval shall not have been obtained upon a vote taken thereon at the Company Shareholders Meeting duly convened therefor or at any adjournment or postponement thereof; or

(h)        by the Company, upon written notice to Parent, at any time prior to the receipt of the Company Shareholder Approval, in accordance with Section 5.2(d), in order to accept a Superior Proposal and enter into a Company Acquisition Agreement providing for the consummation of such Superior Proposal; *provided*, that the Company shall have (i) previously or concurrently paid the Termination Fee in accordance with Section 8.2(b)(iii) and (ii) substantially concurrently with such termination, entered into a Company Acquisition Agreement.

-68-

Section 8.2.        Effect of Termination.

(a)        In the event of the valid termination of this Agreement as provided in Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties specifying the provision hereof pursuant to which such termination is made, and this Agreement shall forthwith become null and void and there shall be no liability on the part of Parent, Merger Sub or the Company, except that the Confidentiality Agreement, the last sentence of Section 6.13(a), Section 6.13(c), Section 6.13(d), this Section 8.2 and Section 9.3 through Section 9.12 shall survive such termination; *provided* that nothing herein shall relieve any Party from liability for actual and intentional fraud or willful breach of this Agreement prior to such termination.  For purposes of this Agreement, "willful breach" shall mean an action or omission taken or omitted to be taken that the breaching party intentionally takes (or fails to take) and actually knows would, or would reasonably be expected to, be or cause a material breach of this Agreement.

(b)        Termination Fee.

(i)        If (A) Parent or the Company terminates this Agreement pursuant to Section 8.1(d) or Section 8.1(g), or Parent terminates this Agreement pursuant to Section 8.1(c), (B) prior to the date of such termination, an Acquisition Proposal is made to the Company Board of Directors, the Company's management or the Company Shareholder or otherwise becomes publicly known, or any Person publicly proposes or announces an intention to make an Acquisition Proposal, and (C) within twelve (12) months of such termination, an Acquisition Proposal is consummated or a definitive agreement with respect to an Acquisition Proposal is entered into (and such Acquisition Proposal is subsequently consummated), then on or prior to the date any such Acquisition Proposal is consummated, the Company shall, by way of compensation, pay to Parent a fee of $240,000,000 in cash (the "Termination Fee").  Solely for purposes of this Section 8.2(b)(i), the term "Acquisition Proposal" shall have the meaning assigned to such term in Annex A, except that all references to "twenty" percent (20%)" and "eighty percent (80%)" therein shall be deemed to be references to "fifty percent (50%)."

(ii)        If (x) Parent terminates this Agreement pursuant to Section 8.1(e), within two (2) Business Days after such termination, the Company shall, by way of compensation, pay to Parent the Termination Fee.

(iii)        If the Company terminates this Agreement pursuant to Section 8.1(h), the Company shall, by way of compensation, pay to Parent the Termination Fee prior to or concurrently with and as a condition of its termination pursuant to Section 8.1(h).

(iv)        In the event any amount is payable by the Company pursuant to the preceding clauses (i), (ii) or (iii), such amount shall be paid by wire transfer of immediately available funds to an account designated in writing by Parent. For the avoidance of doubt, in no event shall the Company be obligated to pay the Termination Fee on more than one occasion.

(c)     Company Expense Reimbursement. Parent shall reimburse the Company on an indemnity basis (by wire transfer of immediately available funds) for its reasonable and documented costs and expenses, including all fees and expenses incurred in connection with the Transactions and the fees and expenses of counsel, accountants, investment bankers, experts and consultants, incurred by the Company in connection with this Agreement and the Transactions (but excluding any success-based fees payable upon the consummation of the Transactions) in an amount not to exceed the Reimbursement Cap in the aggregate (the "Company Expenses") in the event that: (i) (A) the Company terminates this Agreement pursuant to Section 8.1(d) or Section 8.1(f) or (B) Parent terminates this Agreement pursuant to Section 8.1(d) or Section 8.1(f) at a time when the Agreement is terminable by the Company pursuant to Section 8.1(d) or Section 8.1(f), and (ii) in the event of a termination pursuant to Section 8.1(d), at the time of such termination, all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied (or, if any such conditions are by their nature to be satisfied at the Closing, would have been capable of being satisfied on the date of such termination) or waived other than the conditions set forth in Section 7.1(b) and/or Section 7.1(c).

(d)     Each Party acknowledges that the agreements contained in this Section 8.2 are an integral part of the Transactions and that, without these agreements, the Parties would not enter into this Agreement. Each Party further acknowledges that the Termination Fee and the Company Expenses are not a penalty, but rather are liquidated damages in a reasonable amount that will compensate Parent and Merger Sub or the Company, as applicable, in the circumstances in which the Termination Fee or the Company Expenses, as applicable, are payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions. In addition, if the Company or Parent fails to pay in a timely manner any amount due pursuant to Section 8.2(b) or Section 8.2(c), then (i) the breaching Party shall reimburse the non-breaching Party for all reasonable out-of-pocket costs and expenses (including disbursements and fees of counsel) incurred in the collection of such overdue amounts, including in connection with any related claims, actions or proceedings commenced and (ii) the breaching Party shall pay the non-breaching Party interest on the amounts payable pursuant to Section 8.2(b) or Section 8.2(c), as applicable, from and including the date payment of such amounts were due to but excluding the date of actual payment at the prime rate set forth in the *Wall Street Journal* in effect on the date such payment was required to be made. Notwithstanding anything to the contrary in this Agreement, except for the right to seek monetary damages for actual and intentional fraud (solely as it relates to the representations and warranties expressly made in Article III or Article IV) or willful breach (as defined in Section 8.2(a)) occurring prior to the valid termination of this Agreement, and without limiting the Company's, Parent's or Merger Sub's right to specific performance in accordance with Section 9.12, (A) the Termination Fee and the Company Expenses (and any other amounts expressly contemplated by this Section 8.2, if any) shall be the sole and exclusive monetary remedy available to Parent, Merger Sub or the Company, as applicable, in connection with this Agreement and the Transactions in any circumstance in which the Termination Fee or the Company Expenses are required to be paid pursuant to this Section 8.2 and are paid by the Company or Parent, as applicable, in accordance with this Agreement, and (B) upon Parent's or the Company's receipt of the full Termination Fee or Company Expenses, as applicable (and any other amounts contemplated by this Section 8.2(d)), pursuant to this Section 8.2 in circumstances in which the Termination Fee or the Company Expenses are required to be paid pursuant to this Section 8.2, none of the Company, any Company Subsidiary, Parent or any Parent Subsidiary or any of their respective former, current or future officers, directors, partners, shareholders, managers, members, affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the Transactions, except for actual and intentional fraud or willful breach (as defined in Section 8.2(a)) or any breach of the Confidentiality Agreement. For the avoidance of doubt, Parent may seek specific performance to cause the Company to consummate the Transactions in accordance with Section 9.12 and the payment of the Termination Fee pursuant to Section 8.2(b), but in no event shall Parent be entitled to both (i) specific performance to cause the Company to consummate the Transactions in accordance with Section 9.12 and (ii) the payment of the Termination Fee pursuant to Section 8.2(b). For the avoidance of doubt, the Company may seek specific performance to cause Parent to consummate the Transactions in accordance with Section 9.12 and the payment of the Company Expenses pursuant to Section 8.2(c), but in no event shall the Company be entitled to both (i) specific performance to cause Parent to consummate the Transactions in accordance with Section 9.12 and (ii) the payment of the Company Expenses pursuant to Section 8.2(c).

-70-

(e)

(i)    The parties intend that any payment of the Termination Fee, being compensatory in nature, shall not be treated (in whole or in part) as consideration for a taxable supply for the purposes of VAT and, accordingly, each of the Parent and the Company shall, and shall, where relevant, procure that the representative member of any VAT group of which it is a member shall (A) use reasonable best efforts to secure that any Termination Fee payable under this Section 8.2 will not be subject to any VAT and (B) pay the full amount of any such Termination Fee free and clear of any deduction or adjustment pursuant to the following Section 8.2(e)(ii).

(ii)    If:

(A)    a Tax authority (or, following an appeal to a court or tribunal, such court or tribunal) finally determines that any payment of the Termination Fee constitutes all or part of the consideration for a supply made for VAT purposes in respect of which the recipient of the sum (or the representative member of the VAT group of which the recipient of the sum is a member) is liable to account for VAT, to the extent that such VAT is recoverable by the payor of the sum (or the representative member of the VAT group of which the payor is a member) by way of repayment or credit as input tax, the amount of the sum shall be increased to such amount so that the amount of the sum (including any amount in respect of VAT), less the amount of such repayment or credit in respect of input tax equals the amount of the sum had no such VAT arisen; for the avoidance of doubt if and to the extent that such VAT is irrecoverable by the payor (or the representative member of the VAT group of which the payor is a member) then no additional amount shall to that extent be paid in respect of such VAT and the sum shall, to that extent, be VAT inclusive; and

-71-

(B)        a Tax authority (or, following an appeal to a court or tribunal, such court or tribunal) finally determines that any payment of the Termination Fee constitutes all or part of the consideration for a supply made for VAT purposes in respect of which the payor of the sum (or the representative member of the VAT group of which the payor is a party) is liable to account for VAT under the reverse charge mechanism, then to the extent that any VAT chargeable on the supply is not recoverable by such payor (or the representative member of the VAT group of which the payor is a member) by way of repayment or credit as input tax, the amount of the sum shall be reduced to such amount so that the aggregate of the sum (as so reduced) and such irrecoverable reverse charge VAT equals the amount of the sum had no such irrecoverable reverse charge VAT arisen.

Such adjusting payment as may be required between the parties to give effect to this Section 8.2(e)(ii) shall be made five (5) Business Days after the date on which the determination by the Tax authority (or court or tribunal, as the case may be) has been communicated to the party required to make the adjusting payment pursuant to this Section 8.2(e)(ii) (together with such evidence of it as it is reasonable in the circumstances to provide and, where Section 8.2(e)(ii)(A) applies, together with the provision of a valid VAT invoice)) or, if later, five (5) Business Days (y) in the case of Section 8.2(e)(ii)(A) after the date on which the VAT is recovered or (z) in the case of Section 8.2(e)(ii)(B) before the date on which the irrecoverable VAT is required to be accounted for (taking into account any applicable extensions of time), *provided* that in the case of Section 8.2(e)(ii)(B) the party making the adjusting payment has been given written notice of such date not less than fifteen (15) Business Days before.

The party paying the Termination Fee shall (or shall procure that the representative member of the VAT group of which such party is a member shall) use its reasonable best efforts to obtain any available repayment or credit in respect of VAT (as referred to in this Section 8.2(e)(ii)) and for the purposes of this Section 8.2(e)(ii) the extent of such repayment or credit shall be determined by such party, or the relevant representative member of the VAT group, acting reasonably.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1.        Amendment and Modification; Waiver.

(a)        Subject to applicable Law and except as otherwise provided in this Agreement, this Agreement may be amended, modified and supplemented by written agreement of each of the Parties.

(b)        At any time and from time to time prior to the Effective Time, either the Company, on the one hand, or Parent and Merger Sub, on the other hand, may, to the extent legally allowed and except as otherwise set forth herein, (i) extend the time for the performance of any of the obligations or other acts of the other Parties, as applicable, (ii) waive any inaccuracies in the representations and warranties made by the other Parties contained herein or in any document delivered pursuant hereto and (iii) waive compliance with any of the agreements or conditions for their respective benefit contained herein.  Any agreement on the part of Parent, Merger Sub or the Company to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of Parent or the Company, as applicable.  No failure or delay by the Company, Parent or Merger Sub in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

Section 9.2.        <u>Non-Survival of Representations and Warranties</u>.  None of the representations and warranties in this Agreement or in any schedule, instrument or other document delivered pursuant to this Agreement shall survive the Effective Time.

Section 9.3.        <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the Transactions shall be paid by the Party incurring such costs and expenses.  Except as otherwise provided in Section 2.2(b)(i), all transfer, documentary, sales, use, stamp, registration and other such Taxes ("Transfer Taxes") imposed with respect to or as a result of the transfer of Company Ordinary Shares pursuant to the Merger shall be borne and paid by Parent or Merger Sub and expressly shall not be a liability of holders of Company Ordinary Shares.

Section 9.4.        <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally (notice deemed given upon receipt), by electronic mail (notice deemed given upon transmission so long as there is no return error message or other notification of non-delivery received by the sender) or sent by a nationally recognized overnight courier service or express delivery service (notice deemed given upon receipt of proof of delivery), to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

if to Parent or Merger Sub, to:

Tapestry, Inc.
10 Hudson Yards
New York, New York  10001
Email:      dhoward@tapestry.com
Attention:  David E. Howard

with a copy to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York  10020
Email:      Charles.Ruck@lw.com
            Josh.Dubofsky@lw.com
            Leah.Sauter@lw.com
Attention:  Charles Ruck
            Josh Dubofsky
            Leah Sauter

-73-

if to the Company, to:

Capri Holdings Limited
90 Whitfield Street, 2nd Floor
London, United Kingdom  W1T 4EZ
Email:        Krista.Mcdonough@capriholdings.com
Attention:  Krista Mcdonough

with copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Email:        JRCammaker@wlrk.com
              MAStagliano@wlrk.com
Attention:  Joshua R. Cammaker
              Mark A. Stagliano

Section 9.5.        Interpretation.  When a reference is made in this Agreement to sections, such reference shall be to a section of this Agreement, unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." As used in this Agreement, the term "affiliates" shall have the meaning set forth in Rule 12b-2 of the Exchange Act.  The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other things extends, and such word or phrase shall not merely mean "if."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, unless the context otherwise requires.  The term "or" is not exclusive, and shall be interpreted as "and/or."  The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import shall be deemed to refer to the date set forth in the preamble to this Agreement.  All references herein to "$" or "dollars" shall be to U.S. dollars.  All references to "written" or "in writing" include in electronic form.  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.  All references to "days" mean calendar days unless Business Days are expressly specified.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.  The table of contents and headings set forth in this Agreement or any schedule delivered pursuant to this Agreement are for convenience of reference purposes only and shall not affect or be deemed to affect in any way the meaning or interpretation of this Agreement or such schedule or any term or provision hereof or thereof.  All references herein to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person, unless otherwise indicated or the context otherwise requires.  A reference to any specific Law or to any provision of any Law, whether or not followed by the phrase "as amended," includes any amendment to, and any modification, re-enactment or successor thereof, any legislative provision substituted therefor and all rules, regulations and statutory instruments issued thereunder or pursuant thereto, except that, for purposes of any representations and warranties in this Agreement that are made as a specific date, references to any specific Law will be deemed to refer to such legislation or provision (and all rules, regulations and statutory instruments issued thereunder or pursuant thereto) as of such date.  The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

-74-

Section 9.6.    Counterparts.  This Agreement may be executed manually or by other electronic transmission by the Parties, in any number of counterparts, each of which shall be considered one and the same agreement and shall become effective when a counterpart hereof shall have been signed by each of the Parties and delivered to the other Parties.  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .pdf or DocuSign format shall be sufficient to bind the Parties to the terms and conditions of this Agreement.

Section 9.7.    Entire Agreement; Third-Party Beneficiaries.

(a)    This Agreement (including the Company Disclosure Letter and the Parent Disclosure Letter) and the Confidentiality Agreement constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede all other prior agreements (except that the Confidentiality Agreement shall be deemed amended hereby so that until the termination of this Agreement in accordance with Section 8.1, Parent, Merger Sub and the Company shall be permitted to take the actions contemplated by this Agreement) and understandings, both written and oral, among the Parties or any of them with respect to the subject matter hereof and thereof.

(b)    Except as provided in Section 6.4, nothing in this Agreement (including the Company Disclosure Letter and the Parent Disclosure Letter) or in the Confidentiality Agreement, express or implied, is intended to confer upon any Person other than the Parties any rights or remedies hereunder or thereunder.

Section 9.8.    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Merger is not affected in any manner adverse to any Party or holders of Company Ordinary Shares.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the Merger is consummated as contemplated hereby to the extent possible.

-75-

Section 9.9.        Governing Law; Jurisdiction.

(a)        This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of laws principles that would result in the application of the Law of any other state, *provided* that (i) the provisions of the BVI Act applicable to the authorization, effectiveness and effects of the Merger will apply to the Merger and (ii) the applicable Law of the BVI shall apply to the standard of conduct governing acts by the Company Board of Directors in connection with this Agreement, including with respect to compliance with statutory and fiduciary duties.

(b)        Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Court of Chancery of the State of Delaware, or, if (and only if) such court finds it lacks jurisdiction, the Federal court of the United States of America sitting in Delaware, or, if (and only if) such courts find they lack jurisdiction, any state court sitting in Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the agreements delivered in connection herewith or the transactions contemplated hereby or thereby or for recognition or enforcement of any judgment relating thereto, and each of the Parties hereby irrevocably and unconditionally (i) agrees not to commence any such action or proceeding, except in the Court of Chancery of the State of Delaware, or, if (and only if) such court finds it lacks jurisdiction, the Federal court of the United States of America sitting in Delaware, or, if (and only if) such courts find they lack jurisdiction, any state court sitting in Delaware, and any appellate court from any thereof; (ii) agrees that any claim in respect of any such action or proceeding may be heard and determined in the Court of Chancery of the State of Delaware, or, if (and only if) such court finds it lacks jurisdiction, the Federal court of the United States of America sitting in Delaware, or, if (and only if) such courts find they lack jurisdiction, any state court sitting in Delaware, and any appellate court from any thereof; (iii) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in such courts; and (iv) waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in such courts.  Each of the Parties hereto agrees that, notwithstanding the foregoing, a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.  Each Party to this Agreement irrevocably consents to service of process inside or outside the territorial jurisdiction of the courts referred to in this Section 9.9(b) in the manner provided for notices in Section 9.4.  Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by applicable Law.

Section 9.10.        Waiver of Jury Trial.  EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE MERGERS OR THE OTHER TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

Section 9.11.    Assignment.  This Agreement shall not be assigned by any of the Parties (whether by operation of Law or otherwise) without the prior written consent of the other Parties.  Subject to the preceding sentence, but without relieving any Party of any obligation hereunder, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns; *provided*, that Merger Sub may assign this Agreement to any other wholly owned Subsidiary of Parent (it being understood and agreed that (a) no such assignment shall be permitted if such assignment would, or would reasonably be expected to, prevent, impede or materially delay Parent or Merger Sub from performing their respective obligations under this Agreement or consummating the Merger and the other transactions contemplated by this Agreement and (b) no such assignment shall relieve Parent of any of their respective obligations pursuant to this Agreement); *provided*, *further*, that, notwithstanding anything in this Agreement to the contrary, Parent shall be responsible for, and shall indemnify and hold harmless the Company and its shareholders from and against, any and all incremental Taxes that result from an assignment by Parent pursuant to this Section 9.11, for the avoidance of doubt including any increase in the amount of Tax required to be deducted or withheld pursuant to Section 2.4.

Section 9.12.    Enforcement; Remedies.

(a)    Except as otherwise expressly provided herein, any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)    The Parties agree that irreparable injury, for which monetary damages (even if available) would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Merger or the other Transactions) is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, it is agreed that each Party shall be entitled to an injunction or injunctions to prevent or remedy any breaches or threatened breaches of this Agreement by any other Party, a decree or order of specific performance specifically enforcing the terms and provisions of this Agreement and any further equitable relief, in each case in accordance with Section 9.9, this being in addition to any other remedy to which such Party entitled under the terms of this Agreement at law or in equity. The Company's pursuit of an injunction, specific performance or other equitable remedies at any time shall not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which the Company may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by the Company and its shareholders.

(c)    The Parties' rights in this Section 9.12 are an integral part of the Transactions and each Party hereby waives any objections to any remedy referred to in this Section 9.12 (including any objection on the basis that there is an adequate remedy at Law or that an award of such remedy is not an appropriate remedy for any reason at Law or equity).  For the avoidance of doubt, each Party agrees that there is not an adequate remedy at Law for a breach of this Agreement by any Party.  In the event any Party seeks any remedy referred to in this Section 9.12, such Party shall not be required to obtain, furnish, post or provide any bond or other security in connection with or as a condition to obtaining any such remedy.

Section 9.13.    <u>Financing Entities</u>.  Notwithstanding anything in this Agreement to the contrary, the Company, on behalf of itself, the Company Subsidiaries and each of their controlled affiliates hereby: (a) agrees that any legal action, whether in law or in equity, whether in contract or in tort or otherwise, involving the Financing Entities, arising out of or relating to, this Agreement or the Debt Financing shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each Party irrevocably submits itself and its property with respect to any such legal action to the exclusive jurisdiction of such court, (b) agrees that any such legal action shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in any applicable agreement or document relating to the Debt Financing and except to the extent relating to the interpretation of any provisions in this Agreement (including any provision in the Debt Commitment Letter or in any definitive documentation related to the Debt Financing that expressly specifies that the interpretation of such provisions shall be governed by and construed in accordance with the laws of the State of Delaware), (c) knowingly, intentionally and voluntarily waives to the fullest extent permitted by applicable law trial by jury in any such legal action brought against the Financing Entities in any way arising out of or relating to, this Agreement or the Debt Financing, (d) agrees that none of the Financing Entities will have any liability to the Company, the Company Subsidiaries or any of their controlled affiliates (in each case, other than Parent or the Parent Subsidiaries) relating to or arising out of this Agreement or the Debt Financing (subject to the last sentence of this <u>Section 9.13</u>) and (e) agrees that the Financing Entities are express third party beneficiaries of, and may enforce, any of the provisions of this <u>Section 9.13</u>, and that such provisions and the definition of "Financing Parties" shall not be amended in a manner materially adverse to the Financing Parties without the prior written consent of the Financing Entities (such consent not to be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, nothing in this <u>Section 9.13</u> shall in any way limit or modify the rights and obligations of the Parent under this Agreement, or any Financing Party's obligations under the Debt Commitment Letter, or the rights of the Company and the Company Subsidiaries against the Financing Parties with respect to the Debt Financing or any of the transactions contemplated thereby or any services thereunder following the Closing Date.

[*Remainder of Page Intentionally Left Blank*]

-78-

IN WITNESS WHEREOF, Parent, Merger Sub and the Company have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

**TAPESTRY, INC.**

By /s/ Joanne C. Crevoiserat
_____
Name: Joanne C. Crevoiserat
Title:  Chief Executive Officer

**SUNRISE MERGER SUB, INC.**

By /s/ David E. Howard
_____
Name:  David E. Howard
Title:  Sole Director

**CAPRI HOLDINGS LIMITED**

By /s/ John D. Idol
_____
Name:  John D. Idol
Title:  Chief Executive Officer

[*Signature Page to Agreement and Plan of Merger*]

Annex A

**Certain Definitions**

For the purposes of this Agreement, the term:

"Acceptable Confidentiality Agreement" means a confidentiality agreement entered into after the date hereof that contains terms that (i) are similar in all material respects to the Company than those contained in the Confidentiality Agreement (it being understood that such confidentiality agreement need not contain a "standstill" or similar provision) and (ii) do not in any way restrict the Company or its Representatives from complying with its disclosure obligations under this Agreement.

"Acquisition Proposal" means any offer, proposal or indication of interest from a Person (other than a proposal or offer by Parent or any Parent Subsidiary) at any time relating to any transaction or series of related transactions (other than the Transactions) involving: (a) any acquisition or purchase by any person, directly or indirectly, of more than twenty percent (20%) of any class of outstanding voting or equity securities of the Company (whether by voting power or number of shares), or any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in any person beneficially owning more than twenty percent (20%) of any class of outstanding voting or equity securities of the Company (whether by voting power or number of shares); (b) any merger, consolidation, share exchange, business combination, joint venture, recapitalization, reorganization or other similar transaction involving the Company and a person pursuant to which the shareholders of the Company immediately preceding such transaction hold less than eighty percent (80%) of the equity interests in the surviving, resulting or ultimate parent entity of such transaction (whether by voting power or number of shares); or (c) any sale, lease, exchange, transfer or other disposition to a person of more than twenty percent (20%) of the consolidated assets of the Company and the Company Subsidiaries (measured by the fair market value thereof).

"Action" means any demand, action, suit, countersuit, litigation, investigation, audit, claim, examination, arbitration or proceeding by or before any Governmental Entity or any arbitration or mediation tribunal.

"Anti-Corruption Law" means any Law related to combating bribery and corruption, including legislation implementing the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions or the U.N. Convention Against Corruption including, the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and the U.K. Bribery Act 2010, as well as the relevant provisions of the 231 Decree.

"Anti-Money Laundering Law" means any Law related to combatting money laundering and terrorist financing, including but not limited to the U.S. Bank Secrecy Act of 1970, as amended by the USA PATRIOT ACT of 2001, and the rules and regulations promulgated thereunder, the Currency Transactions Reporting Act of 1970, as amended, and any other similar anti-money laundering and counter-terrorism financing Laws, including Italian Legislative Decree no. 231/2007 and the relevant provisions of the 231 Decree.

"Business Days" means any day, other than a Saturday, Sunday and any day on which banking institutions located in New York City, the British Virgin Islands or London are authorized or required by applicable Law or other governmental action to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Credit Agreement" means that certain Revolving Credit Agreement, dated as of July 1, 2022, by and among the Company, Michael Kors (USA), Inc., the Foreign Subsidiary Borrowers (as defined therein) from time to time party thereto, the Guarantors (as defined therein) from time to time party thereto, the Lenders (as defined therein) from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and the Issuing Banks (as defined therein) from time to time party thereto.

"Company Credit Facility" means each of the Company Credit Agreement, the Company Term Loan and the Company Guarantee.

"Company Equity Awards" means the Company Options, the Company RSUs and the Company PSUs.

"Company Equity Plan" means the Company's Third Amended and Restated Omnibus Incentive Plan, as it may be amended and restated from time to time.

"Company Foundations" means the Versace Foundation, the Jimmy Choo Foundation and the Capri Holdings Foundation for the Advancement in Diversity in Fashion.

"Company Governing Documents" means the Amended and Restated Memorandum and Articles of Association of the Company, as amended.

"Company Guarantee" means the Parent Company Guarantee, dated as of December 5, 2022, by and among the Company, as guarantor, Banca Nazionale del Lavoro S.p.A., Intesa Sanpaolo S.p.A. and UniCredit S.p.A.

"Company Intellectual Property" means all Intellectual Property owned by the Company or any Company Subsidiary.

"Company Material Adverse Effect" means any Effect that, (a) individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the financial condition, business or operations of the Company and the Company Subsidiaries, taken as a whole; *provided*, *however*, that no Effects to the extent resulting or arising from the following shall be deemed to constitute a Company Material Adverse Effect or shall be taken into account when determining whether a Company Material Adverse Effect exists or has occurred:  (i) any changes in United States, regional, global or international economic conditions, including any changes affecting financial, credit, foreign exchange or capital market conditions; (ii) any changes in conditions in the industry in which the Company and the Company Subsidiaries operate; (iii) any changes in political, geopolitical, regulatory or legislative conditions in the United States or any other country or region of the world; (iv) any changes after the date hereof in GAAP or the interpretation thereof; (v) any changes after the date hereof in applicable Law or the interpretation thereof; (vi) any failure by the Company to meet any internal or published projections, estimates or expectations of the Company's revenue, earnings or other financial performance or results of operations for any period, in and of itself (it being understood that the facts or occurrences giving rise or contributing to such failure that are not otherwise excluded from this definition of a "Company Material Adverse Effect" may be taken into account) (*provided*, that this clause shall not be construed as implying that the Company is making any representation or warranty hereunder with respect to any internal or analysts' projections, estimates or expectations); (vii) any acts of terrorism or sabotage, war (whether or not declared, including the conflict between the Russian Federation and Ukraine), the commencement, continuation or escalation of a war, acts of armed hostility, weather conditions, natural disasters, epidemics or Pandemics or other force majeure events, including any material worsening of such conditions threatened or existing as of the date hereof; (viii) the execution and delivery of this Agreement, the identity of Parent or any Parent Subsidiary, the pendency or consummation of this Agreement, the Merger and the other Transactions, or the public announcement of this Agreement or the Transactions (*provided* that this clause (viii) shall not apply to any representation or warranty to the extent the purpose of such representation or warranty is to address, as applicable, the consequences resulting from the execution and delivery of this Agreement, the pendency or consummation of this Agreement or the Merger and the other Transactions); (ix) any action or failure to take any action which action or failure to act is requested or consented to in writing by Parent or otherwise expressly required by this Agreement; and (x) any breach by Parent or any of its affiliates of this Agreement; *provided* that with respect to the exceptions set forth in clauses (i), (ii) and (vii), if such Effect has had a disproportionate adverse effect on the Company or any Company Subsidiary relative to other companies operating in the business in which the Company and the Company Subsidiaries operate, then only the incremental disproportionate adverse effect of such Effect shall be taken into account for the purpose of determining whether a Company Material Adverse Effect exists or has occurred or (b) prevents or materially impairs the ability of Company to consummate the Transactions, including the Merger, prior to the Outside Date.

"Company Notes" means the Company's $450,000,000 notes due November 2024.

"Company Option" means each option to purchase Company Ordinary Shares granted under the Company Equity Plan.

"Company Products" means any and all products and services, including Software as a service (SaaS) and any professional or consulting services, that are or have been in the three (3) years prior to the date of this Agreement marketed, offered, sold, licensed, imported, developed, made available or distributed by the Company or any Company Subsidiary.

"Company PSU" means each restricted stock unit award relating to Company Ordinary Shares granted under the Company Equity Plan for which vesting is conditioned in whole or in part based on achievement of performance goals or metrics and for which the applicable performance period has not been completed as of the applicable determination date.

"Company Registered Intellectual Property" means all Company Intellectual Property that is, as of the entry into this Agreement, the subject of a pending application before, registered with, or issued by any Governmental Entity, whether wholly or jointly owned by the Company or any Company Subsidiary.

"Company RSU" means each restricted stock unit award relating to Company Ordinary Shares granted under the Company Equity Plan subject solely to service-based vesting requirements.

"Company Subsidiaries" means the Subsidiaries of the Company; *provided* that, for the avoidance of doubt, the Company Foundations shall be deemed Subsidiaries of the Company for the purposes of this Agreement.

"Company Term Loan" means the Facility Agreement, dated as of December 5, 2022, by and among Gianni Versace S.r.l., as borrower, Intesa Sanpaolo S.p.A., Banca Nazionale Del Lavoro S.p.A. and UniCredit S.p.A., as arrangers and lenders, and Intesa Sanpaolo S.p.A., as agent.

"Confidentiality Agreement" means the Confidentiality Agreement, dated June 13, 2023, between Parent and the Company, as may be amended or supplemented by a clean team or similar agreement.

"Contract" means any legally binding written or oral agreement, contract, subcontract, settlement agreement, lease, sublease, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or undertaking of any nature (other than a Company Benefit Plan).

"Controlled Group Liability" means any and all liabilities (i) under Title IV of ERISA; (ii) under Section 302 of ERISA; (iii) under Sections 412 and 4971 of the Code; and (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code, other than such liabilities that arise solely out of, or relate solely to, plans directly sponsored by the Company and the Company Subsidiaries.

"Conversion Ratio" means the quotient, rounded to the second decimal place, obtained by dividing (a) the Merger Consideration by (b) the Parent Trading Price.

"Copyrights" means all copyrights and works of authorship, and associated moral rights, and all copyright registrations and pending copyright applications, and any renewals or extensions of any of the foregoing.

"Data Partner" means any affiliate, vendor, processor, or other third party processing or otherwise accessing, or sharing Personal Data for, with or on behalf of the Company or any Company Subsidiary.

"Effect" means any change, effect, development, circumstance, condition, state of facts, event or occurrence.

"Environmental Law" means any and all applicable Law which (a) regulate or relate to the protection or clean-up of the environment; the generation, use, treatment, storage, transportation, handling, disposal or Release of, or exposure to, Hazardous Substances, the preservation or protection of waterways, groundwater, drinking water, air, wildlife, threatened or endangered species, plants or other natural resources, or the health and safety of persons or property, including protection of the health and safety of employees or (b) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), or any other Law of similar effect.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Financing Entities" means the Financing Parties and their respective affiliates and their and their respective affiliates' officers, directors, employees, agents and representatives and their respective successors and assigns; *provided* that neither Parent nor any affiliate of Parent shall be a Financing Party

"Financing Parties" means the entities that have committed to or commit to provide or have otherwise entered into or enter into agreements in connection with the Debt Financing.

"GDPR" means Regulation (EU) 2016/679 (General Data Protection Regulation) of the European Parliament and of the Council on the protection of natural persons with regard to the processing of personal data and on the free movement of such data as currently in effect and as may be amended from time to time.

"Governmental Authorization" means any licenses, approvals, clearances, permits, certificates, waivers, amendments, consents, exemptions, variances, expirations, and terminations of any waiting period requirements, other actions by, and notices, filings, registrations, qualifications, declarations and designations with, and other authorizations and approvals issued by or obtained from, a Governmental Entity.

"Governmental Entity" means any government, court of competent jurisdiction, regulatory or administrative agency, commission or other governmental authority or instrumentality, whether Federal, state, provincial, local, domestic, foreign or multinational.

"Governmental Filing" means any notification, application, registration, declaration, filing or other submission to or with any Governmental Entity.

"Hazardous Substances" means any chemical, material, substance or waste that is defined or listed as hazardous, toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable, or as a pollutant or contaminant, or words of similar meaning or regulatory effect, under any Environmental Law, including any quantity of petroleum product or byproduct, solvent, flammable or explosive material, radioactive material, asbestos or asbestos-containing material, lead paint, polychlorinated biphenyls (or PCBs), per- and polyfluoroalkyl substances (or PFAS), dioxins, dibenzofurans, heavy metals, radon gas, mold, mold spores, and mycotoxins.

"HSR Act" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" means, with respect to any Person, (a) all obligations for borrowed money; (b) all obligations evidenced by bonds, debentures, notes or similar instruments; (c) all Indebtedness of others secured by any Lien on owned or acquired property, whether or not the Indebtedness secured thereby has been assumed; (d) all guarantees (or any other arrangement having the economic effect of a guarantee) of Indebtedness of others; (e) all finance lease obligations; (f) all obligations, contingent or otherwise, of such Person as an account party in respect of financial guaranties, letters of credit, letters of guaranty, surety bonds and other similar instruments; (g) all securitization transactions; (h) all obligations representing the deferred and unpaid purchase price of property (other than trade payables incurred in the ordinary course of business); (i) all obligations, contingent or otherwise, in respect of bankers' acceptances; and (j) net cash payment obligations of such Person under swaps, options, derivatives and other hedging agreements or arrangements that will be payable upon termination thereof (assuming they were terminated on the date of determination).

"Information Privacy and Security Laws" means any Law and applicable binding guidance and standards governing the privacy, protection, or security of Personal Data (including, as applicable to the privacy and the protection and security of Personal Data, data breach notification, and consumer protection), online behavioral advertising, tracking technologies, call or electronic monitoring or recording, any outbound calling and text messaging, telemarketing, or email marketing, including as relevant to the collection, use, storage, retention, processing, transfer, disclosure, sharing, disposal and destruction of Personal Data, including, to the extent applicable to the Company's and any Company Subsidiary's collection, storage, retention, processing, transfer, disclosure, sharing, disposal and destruction of Personal Data, the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, the Telecommunications (Interception and Access) Act and analogous state recording laws, the Video Privacy Protection Act, the Children's Online Privacy Protection Act, the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Reporting Act, the Health Insurance Portability and Accountability Act of 1996, the California Consumer Privacy Act as amended by the California Privacy Rights Act, the Colorado Privacy Act, the Connecticut Act Concerning Personal Data Privacy and Online Monitoring, the Virginia Consumer Data Protection Act, the GDPR (and any European Union member states' laws and regulations implementing the GDPR), the Canadian Personal Information Protection and Electronic Documents Act, India's Information Technology Act, Japan's Act on the Protection of Personal Information, Hong Kong's Personal Data (Privacy) Ordinance, People Republic of China's Cybersecurity Law ("CSL"), Data Security Law ("DSL"), Personal Information Protection Law ("PIPL"), and Australia's Privacy Amendment (Private Sector) Act 2000, as amended by the Privacy Amendment (Enhancing Privacy Protection) Act 2012.

"Intellectual Property" means all intellectual property and other proprietary rights, whether statutory, common law or otherwise, whether registered or unregistered in any jurisdiction throughout the world, including in or with respect to any of the following:  (a) Patents; (b) Marks, Internet domain names and URLs, and social media handles; (c) all Copyrights; (d) Software; and (e) Trade Secrets.

"Intervening Event" means any Effect that (i) is neither known by, nor reasonably foreseeable (with respect to magnitude or material consequences) by the Company or the Company Board of Directors as of or prior to the date of this Agreement and (ii) first occurs, arises or becomes known to the Company or the Company Board of Directors after the entry into this Agreement and prior to obtaining the Company Shareholder Approval; *provided*, that none of the following shall constitute an Intervening Event: any Effect (1) relating to any Acquisition Proposal or (2) resulting from (A) the announcement, pendency, and consummation of this Agreement and the transactions contemplated hereby, (B) any actions required to be taken or to be refrained from being taken pursuant to this Agreement, (C) a breach of this Agreement by the Company or any Company Subsidiary, (D) the fact that the Company or any of the Company Subsidiaries meets or exceeds any internal or analysts' expectations or projections, in and of itself or (E) any changes after the date hereof in the market price or trading volume of the Company, Merger Sub, Parent or any of their respective Subsidiaries, or any change in credit rating, in each case in and of themselves.

"IT Assets" means computers, Software, websites, networks, hardware, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology and related equipment.

"Knowledge" will be deemed to be, as the case may be, the actual knowledge of (a) the individuals set forth on Section 1.1(a) of the Parent Disclosure Letter with respect to Parent or Merger Sub or (b) the individuals set forth on Section 1.1(a) of the Company Disclosure Letter with respect to the Company.

"Law" means any law (including common law), statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

"Lien" means any lien, pledge, hypothecation, mortgage, deed of trust, security interest, conditional or installment sale agreement, encumbrance, covenant, charge, claim, option, right of first refusal, easement, right of way, encroachment, occupancy right, preemptive right, community property interest or restriction of any nature (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, or any restriction on the possession, exercise or transfer of any other attribute of ownership of any asset), whether voluntarily incurred or arising by operation of Law; *provided* that a license, covenant not to assert or similar right granted in or with respect to Intellectual Property shall not be considered a "Lien."

"Malicious Code" means any (a) back door, time bomb, drop dead device, or other Software routine designed to disable a computer program automatically with the passage of time or under the positive control of a Person other than the user of the program, or (b) virus, Trojan horse, worm, or other Software routine or hardware component designed to permit unauthorized access, to disable, erase, or otherwise harm Software, hardware, or data.

"Marks" means all trademarks, service marks, trade dress, trade names, logos and slogans, corporate names, designs, brand names, doing business designations used in connection with the conduct of an entity's business to identify any product, service, business or company, and all other indicia of origin, and registrations and applications for registration and any renewals or extensions thereof, together in each case with the goodwill symbolized by any of the foregoing.

"Multiemployer Plan" means any "multiemployer plan" within the meaning of Section 3(37) of ERISA or 4001(a)(3) of ERISA.

"NYSE" means the New York Stock Exchange.

"Ordinary Course License" means licenses contained in:  (a) customer subscription, terms of use or terms of service, license or service agreements, in each case, with respect to Company Products; (b) non-exclusive authorizations to open travel retail locations; (c) confidentiality agreements; (d) agreements facilitating any consultant's, contractor's, or other service provider's provision of services for or on behalf of the Company or any Company Subsidiary where such rights are substantially limited to those granted for the purpose of facilitating the provision of such services; or (e) agreements whose terms are consistent in all material respects with the terms of a form used by the Company or any Company Subsidiary that has been made available to Parent, including each form of (i) software development kit (SDK), connector, or API agreement and (ii) distributor or sales representatives agreement.

"Pandemic" means SARS-CoV-2 or COVID-19, and any variants, sub-variants or evolutions thereof or any other epidemics, pandemics or disease outbreaks.

"Parent Common Stock" means common stock of Parent, par value $0.01 per share.

"Parent Governing Documents" means the Articles of Incorporation of Parent, as amended.

"Parent Subsidiaries" means the Subsidiaries of Parent.

"Parent Trading Price" means the volume weighted average closing sale price of one (1) share of Parent Common Stock as reported on NYSE for the ten (10) consecutive trading days ending on the trading day immediately preceding the Closing Date (as adjusted as appropriate to reflect any stock splits, stock dividends, combinations, reorganizations, reclassifications or similar events).

"Patents" means all patents and patent applications of any kind, patentable inventions and invention disclosures and all reissues, divisionals, continuations, continuations-in-part, provisionals, reexaminations, substitutes and extensions of any of the foregoing.

"PCI DSS" means the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as may be revised from time to time.

"Permitted Liens" means any Lien (i) for Taxes or governmental assessments, charges or claims of payment not yet due or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP; (ii) which is a carriers', warehousemen's, mechanics', materialmen's, repairmen's or other similar Lien arising by operation of Law in the ordinary course of business for amounts not yet delinquent; (iii) which is a statutory or common law Lien to secure landlords, lessors or renters under leases or rental agreements; (iv) which is imposed on the underlying fee interest in real property subject to a Company Lease; (v) any non-exclusive license, covenant not to assert or other similar non-exclusive grant of rights under or to Intellectual Property; (vi) that arises from pledges or deposits to secure obligations pursuant to workers' compensation Laws, unemployment insurance, social security, retirement and similar Laws or similar legislation or to secure public or statutory obligations, in each case in the ordinary course of business; (vii) which is an immaterial defect, imperfection or irregularity in title, charge, easement, covenant and right of way of record or zoning, building and other similar restriction, in each case, that do not adversely affect in any material respect the current use of the applicable property owned, leased, used or held for use by the Company or any Company Subsidiary; (viii) is a pledge or deposit to secure performance of bids, trade contracts, leases, surety and appeal bonds, performance bonds and other obligations of a similar nature that, in each case, is not material; and (ix) that has arisen in the ordinary course of business and does not adversely affect the value, ownership, use or operation of the property subject thereto and is not incurred in connection with the borrowing of money.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"Personal Data" means any and all information that identifies or could be used to identify, alone or in combination with other reasonably available information, an individual natural person and/or any other information that is defined as "personal data," "personally identifiable information," or "personal information" or similar term under any applicable data privacy Laws.

"Privacy Statements" means, collectively, all of the Company's and the Company Subsidiaries' published privacy policies, written statements and published notices (including if posted on the Company's or the Company Subsidiaries' products and services) regarding the collection, use, disclosure, transfer, storage, maintenance, retention, deletion, disposal, modification or processing of Personal Data.

"Protected Information" means (a) Personal Data; (b) any Business Confidential Information; (c) other material confidential or non-public information that relates to the businesses of the Company and the Company Subsidiaries or the Company Products or (d) any material information that the Company or a Company Subsidiary is contractually obligated to keep confidential.

"Regulatory Laws" means any applicable supranational, national, federal, state, county, local or foreign antitrust, competition, trade regulation, or foreign investment or foreign subsidies Laws that are designed or intended to prohibit, restrict or regulate (a) actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, including the HSR Act, the Sherman Act, the Clayton Act and the Federal Trade Commission Act, in each case, as amended, and other similar antitrust, competition or trade regulation laws of any jurisdiction other than the United States or (b) investments by entities that are deemed a foreign entity or by entities that are deemed to have received foreign subsidies for purposes of any applicable law or regulation.

"Reimbursement Cap" has the meaning set forth on Section P.1(b) of the Company Disclosure Letter.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into, onto, under or through the environment (including ambient air, surface water, groundwater, land surface or subsurface strata).

"Representatives" means, when used with respect to any Person, the directors, officers, employees, consultants, financial advisors, accountants, legal counsel, investment bankers and other agents, advisors and representatives of such Person and its Subsidiaries.

"Sanctioned Country" means, at any time, a country or territory that is itself the target of comprehensive Sanctions (as of the date of this Agreement, Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic, and the so-called Luhansk People's Republic)

"Sanctioned Person" means any Person that is the target of Sanctions, including:  (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State, the United Nations Security Council, the European Union, any Member State of the European Union, or the United Kingdom; (b) any Person operating, organized, or resident in a Sanctioned Country; (c) the government of a Sanctioned Country or the Government of Venezuela; or (d) any Person 50% or more owned or controlled by any such Person or Persons or acting for or on behalf of such Person or Persons.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or the United Kingdom.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the United States Securities Act of 1933, as amended.

"Software" means any and all software and computer programs, including any and all applications, interfaces, tools, operating systems, and software implementations of algorithms, models and methodologies, whether in source code, object code or other form, databases and compilations, including any and all data and collections of data and all documentation, including programmers' notes and source code annotations, user manuals and training materials, and materials relating to any of the foregoing.

"Specified Employee" means each employee of the Company (a) with annual base compensation in excess of $500,000, (b) who is an executive officer under Rule 3b-7 promulgated under the Exchange Act, or (c) who is the Chief Executive Officer of any of Michael Kors, Jimmy Choo or Versace, or has a title of President.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership or other organization, whether incorporated or unincorporated, of which (a) at least a majority of the outstanding shares of capital stock of, or other equity interests, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation, limited liability company, partnership or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries, or (b) with respect to a partnership, such Person or any other Subsidiary of such Person is a general partner or managing member of such partnership.

"Superior Proposal" means a bona fide, written Acquisition Proposal (with references in the definition thereof to twenty percent (20%) and eighty percent (80%) being deemed to be replaced with references to fifty percent (50%)) by a third party, which the Company Board of Directors determines in good faith after consultation with the Company's outside legal counsel and financial advisors to be more favorable to the Company Shareholders than the Merger, taking into account all relevant factors and any changes to the terms of this Agreement proposed by Parent pursuant to Section 5.2(e); *provided*, *however*, that any offer, proposal or indication of interest involving the sale or disposition of any of the Michael Kors, Versace or Jimmy Choo brands individually or in a combination of two shall not constitute an Acquisition Proposal for purposes of this definition.

"Takeover Statute" means any "business combination," "control share acquisition," "fair price," "moratorium" or other takeover or anti-takeover statute or similar Law.

"Tax" or "Taxes" means any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto, whether disputed or not.

"Tax Return" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

"Trade Controls" means (a) all applicable trade, export control, import, and antiboycott laws and regulations imposed, administered, or enforced by the U.S. government, including the Arms Export Control Act (22 U.S.C. § 1778), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1706), Section 999 of the Internal Revenue Code, the U.S. customs laws at Title 19 of the U.S. Code, the Export Control Reform Act of 2018 (50 U.S.C. §§ 4801-4861), the International Traffic in Arms Regulations (22 C.F.R. Parts 120–130), the Export Administration Regulations (15 C.F.R. Parts 730-774), the U.S. customs regulations at 19 C.F.R. Chapter 1, and the Foreign Trade Regulations (15 C.F.R. Part 30); and (b) all applicable trade, export control, import, and antiboycott laws and regulations imposed, administered or enforced by any other country, except to the extent inconsistent with U.S. law.

"Trade Secrets" means all trade secrets, know-how, and confidential or proprietary information, including ideas, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, customer lists, supplier lists, mailing lists, business plans and techniques, in each case, that derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others.

"Treasury Regulations" means the U.S. Treasury regulations promulgated under the Code.

"VAT" means value added tax and any equivalent tax on the sale of goods and supply of services.

**Annex B**

**Articles of Merger**

**ARTICLES OF MERGER**

**SECTION 171 OF THE BVI BUSINESS COMPANIES ACT**

These Articles of Merger are entered into this____day of _____, 20___ by Capri Holdings Limited ("**Capri**" or the "**Surviving Company**"), a BVI business company incorporated under the laws of the British Virgin Islands with company number 524407 and its registered office at Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, VG1110 and Sunrise Merger Sub, Inc. (the "**Merging Company**"), a BVI business company incorporated under the laws of the British Virgin Islands with company number 2129509 and its registered office at 171 Main Street, PO Box 92, Road Town, Tortola, VG1110, British Virgin Islands, pursuant to the provisions of section 171 of the BVI Business Companies Act, as amended (the "**Act**").

**WITNESSETH** as follows:

1.      Capri and the Merging Company HEREBY ADOPT a plan of merger, a copy of which is annexed hereto (the "**Plan of Merger**"), with the intent that the Merging Company shall merge with and into the Surviving Company (the "**Merger**") and that the Merger shall be effective on the date these Articles of Merger are registered by the Registrar of Corporate Affairs (the "**Effective Date**").

2.      Capri was incorporated under the laws of the British Virgin Islands as an international business company incorporated under the International Business Companies Act on 13 December 2002 and re-registered as a BVI business company under the Act on 1 January 2007 with company number 524407.

3.      The Merging Company was incorporated under the laws of the British Virgin Islands as a BVI business company incorporated under the Act on 3 August 2023 with company number 2129509.

4.      The memorandum of association and articles of association of Capri were first registered by the Registrar of Corporate Affairs on 13 December 2002, and were last amended on 24 May 2023.

5.      The memorandum of association and articles of association of the Merging Company were first registered by the Registrar of Corporate Affairs on 3 August 2023.

6.      The memorandum of association and articles of association of the Surviving Company shall be the memorandum of association and articles of association of Capri immediately prior to the Effective Date.

7.      The Plan of Merger was approved by the directors of Capri on [●] 2023 and was authorised by the members of Capri on [●] 2023.

8.      The Plan of Merger was approved by the directors of the Merging Company on [●] 2023 and was authorised by the sole member of the Merging Company on [●] 2023.

9.    The name of the Surviving Company upon the consummation and effectiveness of the Merger shall remain unchanged.

10.    These Articles of Merger shall be governed by and construed in accordance with the laws of the British Virgin Islands.

11.    These Articles of Merger may be executed in one or more counterparts which, when taken together, shall constitute one instrument.

**IN WITNESS WHEREOF** the parties hereto have caused these Articles of Merger to be executed on the date first set out in these Articles of Merger.

[*Signature page(s) follow*]

[*Signature page(s)*]

|  |  |  |
|---|---|---|
| **SIGNED** for and on behalf of | ) | |
| **Capri Holdings Limited** | ) | |
| Name: | ) | |
| Director | ) | _____ |
|  | ) | |
|  |  |  |
|  | ) | |
| **SIGNED** for and on behalf of | ) | |
| **Sunrise Merger Sub, Inc.** | ) | |
| Name: | ) | |
| Director | ) | _____ |
|  | ) | |

Annex C

**Plan of Merger**

**PLAN OF MERGER**

**SECTION 170 OF THE BVI BUSINESS COMPANIES ACT**

This Plan of Merger is made the ____day of _____, 20___ by Capri Holdings Limited ("**Capri**" or the "**Surviving Company**"), a BVI business company incorporated under the laws of the British Virgin Islands with company number 524407 and its registered office at Commerce House, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, VG1110, and Sunrise Merger Sub, Inc. (the "**Merging Company**"), a BVI business company incorporated under the laws of the British Virgin Islands with company number 2129509 and its registered office at 171 Main Street, PO Box 92, Road Town, Tortola, VG1110, British Virgin Islands pursuant to the provisions of section 170 of the BVI Business Companies Act, as amended (the "**Act**").

**Whereas** Capri is existing under and by virtue of the Act and is entering into this Plan of Merger pursuant to the provisions of section 170 of the Act.

**Whereas** the Merging Company is existing under and by virtue of the Act and is entering into this Plan of Merger pursuant to the provisions of section 170 of the Act.

**Whereas** the parties hereto deem it desirable and in the best interest of the companies and their members that the Merging Company be merged into the Surviving Company (the "**Merger**").

**Now therefore** this Plan of Merger provides as follows:

1.      The constituent companies are the Surviving Company and the Merging Company (together, the "**Constituent Companies**").

2.      The name of the Surviving Company is "Capri Holdings Limited".

3.      Capri has [●] ordinary shares of no par value each in issue, all of which are entitled to vote on the Merger as one class.

4.      The Merging Company has 1,000 (one thousand) ordinary shares of no par value each in issue, all of which are entitled to vote on the Merger as one class.

5.      Upon the Merger, the separate corporate existence of the Merging Company shall cease and the assets of every description, including choses in action, of each of Capri and the Merging Company shall immediately vest in the Surviving Company, and the Surviving Company shall become subject to all claims, debts, liabilities, and obligations of the Constituent Companies.

6.      The manner and basis of converting the shares of the Constituent Companies into shares of the Surviving Company on the Merger shall be as follows:

    (a)      each issued and outstanding ordinary share of Capri shall be cancelled, other than the Dissenting Shares or the Cancelled Shares, and the holder of each ordinary share shall have the right to receive $[●] per ordinary share in cash without interest;

    (b)      each Cancelled Share shall be cancelled, and no consideration shall be delivered with respect thereto;

    (c)      each Dissenting Share shall be cancelled, and each holder of such Dissenting Shares shall cease to be a shareholder of the Surviving Company and shall solely have the rights granted to them under section 179 of the Act; and

(d)      each issued and outstanding ordinary share of the Merging Company shall continue as one validly issued, fully paid and non-assessable ordinary share of no par value of the Surviving Company.

For these purposes:

"**Cancelled Shares**" means each issued and outstanding ordinary share of Capri which is owned or held in treasury by Capri, or is owned by Tapestry Inc. or any of its direct or indirect subsidiaries.

"**Dissenting Shares**" means each issued and outstanding ordinary share Capri in respect of which the holder thereof has duly and validly exercised a right of dissent in accordance with section 179 of the Act.

7.      The date on which it is intended that the Merger is to take effect is the date on which the Articles of Merger for the Surviving Company are registered by the Registrar of Corporate Affairs of the British Virgin Islands and the certificate of merger is issued (the "**Effective Date**").

8.      The memorandum of association and articles of association of Capri immediately prior to the Effective Date shall be the memorandum of association and articles of association of the Surviving Company.

9.      This Plan of Merger shall be submitted to the members of both the Constituent Companies for their approval by a resolution of members.

10.      This Plan of Merger shall be governed by and construed in accordance with the laws of the British Virgin Islands.

11.      This Plan of Merger may be executed in one or more counterparts which, when taken together, shall constitute one instrument.

**IN WITNESS WHEREOF** the parties hereto have caused this Plan of Merger to be executed on the date first set out in this Plan of Merger.

*[Signature page(s) follow]*

[*Signature page(s)*]

|  |  |  |
|---|---|---|
| | ) | |
| **SIGNED** for and on behalf of | ) | |
| **Capri Holdings Limited** | ) | |
| Name: | ) | _____ |
| Director | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| | ) | |
| **SIGNED** for and on behalf of | ) | |
| **Sunrise Merger Sub, Inc.** | ) | |
| Name: | ) | _____ |
| Director | ) | |
| | ) | |

# Exhibit 5



https://finance.yahoo.com/quote/CPRI/history/?period1=1688860800&period2=1691539200

July 13, 2025

## Capri Holdings Limited (CPRI)

**19.25** -0.49 (-2.48%)  **19.10** -0.15 (-0.78%)

At close: July 11 at 4:00:02 PM EDT | After hours: July 11 at 7:29:41 PM EDT

Jul 09, 2023 - Aug 09, 2023 | Historical Prices | Daily

Currency in USD | Download

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Aug 8, 2023 | 35.35 | 35.35 | 34.39 | 35.21 | 35.21 | 2,912,300 |
| Aug 7, 2023 | 35.49 | 36.60 | 35.43 | 35.95 | 35.95 | 3,226,900 |
| Aug 4, 2023 | 35.47 | 35.69 | 35.34 | 35.51 | 35.51 | 3,075,900 |
| Aug 3, 2023 | 35.97 | 36.03 | 35.02 | 35.35 | 35.35 | 2,523,600 |
| Aug 2, 2023 | 35.95 | 36.21 | 35.36 | 36.00 | 36.00 | 1,868,400 |
| Aug 1, 2023 | 36.68 | 36.97 | 36.02 | 36.42 | 36.42 | 1,788,000 |
| Jul 31, 2023 | 36.11 | 37.49 | 36.11 | 36.91 | 36.91 | 2,193,700 |
| Jul 28, 2023 | 36.44 | 37.97 | 36.25 | 37.07 | 37.07 | 2,089,900 |
| Jul 27, 2023 | 36.74 | 37.07 | 35.69 | 35.87 | 35.87 | 1,392,300 |
| Jul 26, 2023 | 36.00 | 36.65 | 35.67 | 36.47 | 36.47 | 1,463,300 |
| Jul 25, 2023 | 36.52 | 36.64 | 35.83 | 36.16 | 36.16 | 1,675,200 |
| Jul 24, 2023 | 35.74 | 36.69 | 35.60 | 36.44 | 36.44 | 1,502,300 |
| Jul 21, 2023 | 36.42 | 36.47 | 35.67 | 35.83 | 35.83 | 1,398,200 |
| Jul 20, 2023 | 37.42 | 37.42 | 36.11 | 36.15 | 36.15 | 1,490,200 |
| Jul 19, 2023 | 36.85 | 37.33 | 36.28 | 37.20 | 37.20 | 2,573,500 |
| Jul 18, 2023 | 34.80 | 36.54 | 34.60 | 36.48 | 36.48 | 3,489,900 |
| Jul 17, 2023 | 34.56 | 35.01 | 34.30 | 34.79 | 34.79 | 2,507,800 |
| Jul 14, 2023 | 36.20 | 36.27 | 35.17 | 35.26 | 35.26 | 1,984,500 |
| Jul 13, 2023 | 36.38 | 36.66 | 36.07 | 36.18 | 36.18 | 1,535,900 |
| Jul 12, 2023 | 37.00 | 37.19 | 36.27 | 36.35 | 36.35 | 1,494,700 |
| Jul 11, 2023 | 36.13 | 36.62 | 35.90 | 36.35 | 36.35 | 1,962,000 |
| Jul 10, 2023 | 35.12 | 36.10 | 35.00 | 35.94 | 35.94 | 1,792,700 |

### Related Tickers

| TPR | SIG | MOV | REAL | KER.PA | LVMUY | PPRUY | BUR |
|---|---|---|---|---|---|---|---|
| Tapestry, Inc. | Signet Jewelers Limited | Movado Group, Inc. | The RealReal, Inc. | Kering SA | LVMH Moët Hennessy ... | Kering SA | Burbe... |
| 98.43 +0.91% | 79.57 -1.44% | 18.95 +0.30% | 5.29 -2.58% | 198.69 -3.74% | 114.10 -3.27% | 23.17 -3.94% | 18.42 |

# Exhibit 6

**BoF** The Business of Fashion
Agenda-setting intelligence, analysis and advice for the global fashion community.

RETAIL

# US Sues to Block $8.5 Billion Union of Coach, Michael Kors

Antitrust enforcers said Tapestry's acquisition of Capri would raise prices on handbags and accessories in the affordable luxury sector, harming consumers.



Coach store. (Shutterstock)

By **BLOOMBERG**

22 April 2024

## The Daily Digest Newsletter

The essential daily round-up of fashion news, analysis, and breaking news alerts.
Plus, access one complimentary BoF Professional article of your choice, each month.

| Enter your email address |
|---|

☑ Receive news, offers and invites from BoF

Our newsletters may include 3rd-party advertising, by subscribing you agree to the Terms and Conditions & Privacy Policy.

The US Federal Trade Commission sued to stop Tapestry Inc.'s $8.5 billion takeover of rival Capri Holdings Ltd., marking the first time the Biden administration has used its aggressive antitrust enforcement to try to stop a deal in the fashion accessories sector.

Antitrust enforcers said Tapestry's acquisition of Capri would raise prices on handbags and accessories in the affordable luxury sector, harming consumers. The FTC, which voted unanimously to block the deal, simultaneously filed complaints in its in-house and federal courts on Monday.

Tapestry owns Coach, Kate Spade and Stuart Weitzman; Capri controls labels Michael Kors, Versace and Jimmy Choo.

Tapestry were little changed in postmarket trading as of 5:17 p.m. in New York. Capri shares are 0.1% lower from Monday's closing price after an initial pop when the news came. Investors are parsing statements from the FTC and the company to assess the deal's chance of winning in the court.

"With the goal to become a serial acquirer, Tapestry seeks to acquire Capri to further entrench its stronghold in the fashion industry," Henry Liu, director of the FTC's Bureau of Competition, said in a statement.

In an emailed statement, Tapestry said: "There is no question that this is a pro-competitive, pro-consumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop." The company said that **both Tapestry and Capri** "operate in an intensely competitive and highly fragmented industry alongside hundreds of rival brands," adding that it will work to close the transaction this calendar year.

Capri said the government is ignoring "market realities," which "overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition." In a statement, Capri said it will "vigorously defend this case in court alongside Tapestry and complete the pending acquisition."

## Price Competition

The FTC said that Tapestry's Coach and Kate Spade brands and Capri's Michael Kors brand compete closely on price, discounts and promotions, innovation, design, marketing and advertising. The agency also alleged that the merger would likely harm the companies' 33,000 workers since Tapestry and Capri often compete for employees.

This is the first time that President Joe Biden's aggressive antitrust enforcement has targeted the fashion sector. Since their appointment, FTC Chair Lina Khan and Justice Department antitrust chief Jonathan Kanter have brought the highest number of merger challenges since the US began requiring antitrust reviews before deals close in 1976. Their success in litigation has been more mixed, however, with the FTC losing two high-profile challenges in its first year.

Tapestry Chief Executive Officer Joanne Crevoiserat spearheaded the company's acquisition of Capri last year with the aim of creating a US-based fashion conglomerate to expand market share in what's known as the accessible luxury sector, selling handbags and other accessories that are high-end but cheaper in price than those sold by European luxury juggernauts like Moet Hennessy Louis Vuitton SE.

The proposed acquisition, announced in August, capped a decade or so of rivalry between Coach and Michael Kors to dominate the US handbag market. Coach ultimately won the battle after Crevoiserat and her team transformed Tapestry's signature brand by cutting its exposure to struggling department stores, investing in sprucing up stores and rolling out more expensive versions of its chic but classic handbags. The prices of Coach's merchandise, and overall sales, outpaced Michael Kors in recent years as a result.

## Coach Playbook

Tapestry's proposed purchase of Capri is aimed at parlaying that successful Coach playbook to turn around Michael Kors and, in turn, boost the combined company's revenue and stock price. Coach has robust sales in China, while Michael Kors is stronger in Europe. Tapestry executives have said they want to use that complementary market know-how to expand both brands' geographic reach.

Those strategies are on hold until a judge weighs in on the FTC's case.

Tapestry executives have said since the deal was announced that they expected it to close at some point in 2024. But the longer the potential acquisition is delayed, the more work they are likely to have to turn around Michael Kors, whose sales have continued to drop. In the most recent quarter that ended on Dec. 30, sales at Capri fell 5.6 percent to $1.4 billion. At Tapestry, meanwhile, revenue was up nearly 3 percent to $2.1 billion during the same time frame.

A combined Tapestry and Capri would be the second-largest personal luxury goods company in the US in sales, behind LVMH and ahead of Gucci owner Kering SA and Cartier owner Cie Financiere Richemont SA, according to data provider Euromonitor. That would give the new conglomerate close to 10 percent of the US market for personal luxury goods, which includes handbags, clothing, footwear and jewelry.

*By Leah Nylen and Jeannette Neumann*

**Learn more:**

**Is the FTC Really Going to Stop Tapestry and Capri From Merging?**

*Blocking the deal would set a new precedent for fashion M&A in the US and leave Capri Holdings in a precarious position as it attempts to turn around its Michael Kors brand.*

© 2025 The Business of Fashion. All rights reserved. For more information read our Terms & Conditions

# Exhibit 7

Retailing/Specialty Stores, Luxury Brands

**Published and distributed by Cowen and Company, LLC**

## TD Cowen
### a division of TD Securities

# CAPRI HOLDINGS

## EQUITY RESEARCH

February 11, 2024

**Price: $46.83** (02/9/2024)
**Price Target: $57.00**

**MARKET PERFORM (2)**

**ESG SCORE: 60/100**

---

**Oliver Chen, CFA**
646 562 1424
oliver.chen@cowen.com

**Katy Hallberg**
646 562 1321
katy.hallberg@cowen.com

**Tom Nass, CFA**
646 562 1316
thomas.nass@cowen.com

**Neil Goh**
646 562 1322
neil.goh@cowen.com

**Jonna Kim, CFA**
646 562 1419
jonna.kim@cowen.com

### Key Data

| | |
|---|---|
| Symbol | NYSE: CPRI |
| Beta: | 2.08 |
| 52-Week Range: | $53.90-$34.43 |
| Market Cap: | $5.4B |
| Net Debt (MM): | $3,456.0 |
| Cash/Share: | $1.88 |
| Dil. Shares Out (MM): | 118.2 |
| Enterprise Value (MM): | $8,990.6 |
| ROIC: | 48.0% |
| ROE (LTM): | 46.0% |
| BV/Share: | $16.45 |
| Dividend: | $0.00 |
| Yield: | 0.00% |

| FY (Mar) | 2023A | 2024E | 2025E |
|---|---|---|---|
| **EPS** | | | |
| Q1 | $1.50 | $0.74A | - |
| Q2 | $1.79 | $1.13A | - |
| Q3 | $1.84 | $1.20A | - |
| Q4 | $0.95 | $0.69 | - |
| Year | $6.10 | $3.77 | $4.16 |
| *Prior Year* | *-* | *$5.59* | *$5.98* |
| P/E | 7.7x | 12.4x | 11.3x |
| Excludes one-time items. | | | |
| Consensus EPS | $6.13 | $3.92 | $4.51 |
| Consensus source: FactSet | | | |

**Revenue (MM)**

| | | | |
|---|---|---|---|
| Year | $5,619.0 | $5,284.8 | $5,434.1 |
| *Prior Year* | *-* | *$5,541.4* | *$5,698.4* |
| EV/S | 1.6x | 1.7x | 1.7x |

## EARNINGS UPDATE

# 3Q MODEL UPDATE

---

### THE TD COWEN INSIGHT

**3Q EPS of $1.20 vs $1.84 LY & Street's $1.73.** Revenue fell -6.6% cc driven by -MSD% declines at Michael Kors as the company saw soft demand for luxury goods and lower wholesale sales, although sales in the owned retail channel outperformed wholesale. EBIT margin fell -488bps to 12.1% largely due to promotional activity, unfavorable channel mix, higher store costs, and sales deleverage.

---

**3Q EPS Recap:**

- Revenue -6.6% cc with retail sales -mid-single digit% and wholesale remaining pressured at a -low-teens% due to softer demand in Americas and EMEA. Sales fell -8% in Americas, -4.8% in EMEA, while sales improved +3.5% in Asia. While sales improved to -5.6% (reported) from -8.6% in 2Q, sales decelerated sequentially on a two-year basis to -11% from -1%. Total revenue of $1.43bn missed the consensus estimate of $1.48bn, although estimates may have been stale given the pending acquisition. By brand, Michael Kors revenue of $1.03bn missed Street's $1.08bn, Jimmy Choo $166mm missed Street's $173.3mm, and Versace's $227mm missed Street's $262.7mm.

- Gross margin fell -130bps y/y to 65.0% (in-line with Street's 65.0% estimate) which was primarily driven by promotional activity during the period. Lower gross margin combined with SG&A deleverage on store fixed costs, unfavorable channel mix, and lower sales drove -488bps of pressure on the EBIT margin to 12.1%. This implies EBIT dollar decline of -32.8% to $172mm.

**TD Cowen's Updated Thoughts on the CPRI Acquisition:** TPR (Outperform, $42.00) continues to work toward completing the acquisition of CPRI and was recently granted approval by China's SAMR. The approval was also granted without conditions. Recall, the FTC issued a second request in early November and investors continue to be in a wait-and-see mode in terms of FTC approval. We continue to believe the deal will close given the competitive and discretionary nature of handbags. We also see opportunity for TPR to monetize one of the assets if needed post-close, in order to pay down debt, although we believe there is sufficient FCF from the combined entity to reduce leverage.

In our view, we do not believe consumers would be harmed with a combination given the competitive nature of the category and varying degrees of cultural relevance. We acknowledge the combined market share is substantial if you chose to define the outlet market or $300-500 price band only. See our thoughts on TPR EPS here.

---

**TD COWEN**
EQUITY RESEARCH

Capri Holdings
February 11, 2024

## AT A GLANCE

### Our Investment Thesis

While we believe CPRI has meaningful opportunity with the Versace brand, we remain on the sidelines until management rationalizes the wholesale channel (~27% of sales) exposure through lower sell-in. Additionally, in order to get more constructive on the name, we would like to see further engagement with younger customers at the Michael Kors brand (~70% of sales) through advanced customer data platform capabilities, relevant brand collaborations, and organic social media engagement. We believe there is further opportunity with the Versace brand (~20% of revenue) as Versace's refocus on accessories & footwear from ready-to-wear, and key renditions of brand icons could support margins. In our view, Jimmy Choo's (~10% of revenue) brand codes and logo are in earlier innings, and we continue to watch for upside.

### Forthcoming Catalysts

- 4Q EPS in May
- News surrounding TPR acquisition

### Base Case Assumptions

- Improving conditions in Asia and solid performance in Americas and EMEA.
- Improving margin growth following the wholesale channel rationalization.
- Category diversification at Versace and Jimmy Choo

### Upside Scenario

- Better than expected top-line across all brands with increased traffic & conversion aided by higher consumer confidence
- Lower than expected sales deleverage and prudent expense management leading to better margins

### Downside Scenario

- Weakening trends in the Americas and EMEA due to the macro environment
- Wholesale inventory reduction leading to lower sales and less than expected full-price selling
- Product not resonating with customers, which could lower customer acquisition & sales expectations

### Price Performance



Source: Bloomberg

### Company Description

Capri Holdings is a global luxury lifestyle brand portfolio that offers apparel, footwear, and accessories with an elegant and glamorous aesthetic. Across brands, the company focuses on handbags and small leather goods that retail from $200 to $6,000, and accessories, which it offers alongside a range of womenswear, menswear, and footwear. With 825 retail locations and over 2,700 wholesale customers worldwide, retail sales contribute the bulk of Michael Kors's revenues. The company also licenses watches and jewelry as well as eyewear and owns both Jimmy Choo and Versace. Capris Holdings long-term revenue target is reaching revenues of $8bn globally – $5bn in Michael Kors, $2bn in Versace, and $1bn in Jimmy Choo.

### Analyst Top Picks

| | Ticker | Price ( 02/9/2024) | Price Target | Rating |
|---|---|---|---|---|
| Walmart | WMT | $169.28 | $188.00 | Outperform |
| Costco Wholesale | COST | $723.40 | $700.00 | Outperform |
| Ulta Beauty | ULTA | 522.63 | 580.00 | Outperform |

**TDCOWEN**.COM

**TD COWEN**
EQUITY RESEARCH

Capri Holdings
February 11, 2024

# TD COWEN ESG SCORES

## Capri Holdings
## NYSE: CPRI

**ESG Score: 60/100**

**ESG Industry Percentile: 30th**

**Capri Holdings(CPRI) ESG Material Category Rankings as of February 11, 2024**

| Top 3 Material ESG Categories | Dynamic Materiality TM | Score |
|---|---|---|
| Supply Chain | 24% | 71 |
| Material Sourcing | 20% | N/A |
| Ecological | 9% | 67 |

## ESG MATERIALITY

Establishing **materiality** is critical to evaluating a company's ESG performance. Factors most material in one sector (or to a particular company) may not be as important to another. In addition, the factors that are material – and the degree to which factors are material – can change over time.

Applying data to frameworks established by SASB (the Sustainability Accounting Standards Board) and by Truvalue Labs, we present in the chart above the three most material ESG factors that investors should focus on for the company that is the subject of this report; the Dynamic Materiality™ of each factor (i.e., what percentage of overall materiality the category represents for the subject company); and a Score for the subject company in each of these three categories (on a 0 to 100 basis, with 50 being average).

We also calculate an **overall ESG Score** for the subject company, which is presented above (in green) and on the cover of this report. A full explanation of how this ESG Score is derived is presented below.

## HOW ARE TD COWEN'S ESG SCORES CALCULATED?

*100,000+ SOURCES* → *4,500,000+ DATA POINTS processed per month* → *300,000 SIGNALS generated monthly* → *SCREENED BY ESG FRAMEWORK* → *0-100 SCORE CALCULATED*

TD Cowen leverages technology from Truvalue Labs to generate our ESG scores. Truvalue Labs uses artificial intelligence to capture the stakeholder view of how companies are performing on ESG metrics, using the Sustainability Accounting Standards Board (SASB) materiality framework (www.sasb.org). These data are leveraged to calculate a score for each company, which allows TD Cowen to have a **common framework** and uniform way to approach ESG discussions with our clients. TD Cowen ESG scores appear on Company and Company Quick Take notes and are updated daily.

## HOW DOES THE PROCESS WORK?

The process begins with capturing unstructured data from more than 100,000 sources, in 14 languages. These data are culled from a wide range of sources with varied perspectives, including industry publications, news outlets, NGOs, trade unions, government sources, legal and regulatory filings, and academic publications.

Natural language processing is used to interpret semantic content from the original sources and generate analytics by applying criteria consistent with established sustainability and ESG frameworks. Performance is scored on a 0 to 100 scale. **A score of 50 represents a neutral impact.** Scores above 50 indicate more positive performance, and scores below reflect more negative performance. A score of NA means not enough data is available on the company to generate a score.

**TD COWEN**
EQUITY RESEARCH

<span style="color:green">**Capri Holdings**</span>
February 11, 2024

**CPRI IS**

| $ in MM, except per share data | FY16A | FY17A | FY18A | FY19A | FY20A | FY21A | FY22A | 1Q23A | 2Q23A | 3Q23A | 4Q23A | FY23A | 1Q24A | 2Q24E | 3Q24E | 4Q24E | FY24E | FY25E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income statement** | | | | | | | | | | | | | | | | | | |
| Total Michael Kors revenue | 4,712 | 4,494 | 4,496 | 4,511 | 4,153 | 2,924 | 3,953 | 913 | 962 | 1,095 | 910 | 3,880 | 787 | 879 | 1,034 | 907 | 3,607 | 3,671 |
| Jimmy Choo Revenue | - | - | 223 | 590 | 555 | 418 | 613 | 172 | 142 | 168 | 151 | 633 | 183 | 132 | 166 | 153 | 634 | 660 |
| Versace Revenue | | | 137 | 843 | 718 | 1,088 | 1,088 | 275 | 308 | 249 | 274 | 1,106 | 259 | 280 | 227 | 278 | 1,044 | 1,104 |
| **Total Company revenue** | **4,712** | **4,494** | **4,719** | **5,238** | **5,551** | **4,060** | **5,654** | **1,360** | **1,412** | **1,512** | **1,335** | **5,619** | **1,229** | **1,291** | **1,427** | **1,338** | **5,285** | **5,434** |
| COGS | 1,915 | 1,832 | 1,855 | 2,048 | 2,175 | 1,453 | 1,924 | 460 | 464 | 509 | 472 | 1,905 | 417 | 459 | 499 | 486 | 1,861 | 1,900 |
| SG&A | 1,455 | 1,595 | 1,768 | 2,074 | 2,372 | 1,960 | 2,464 | 604 | 625 | 704 | 694 | 2,627 | 656 | 627 | 710 | 708 | 2,701 | 2,754 |
| D&A | 167 | 167 | 209 | 225 | 249 | 212 | 193 | 45 | 43 | 43 | 48 | 179 | 45 | 48 | 46 | 48 | 187 | 192 |
| Impairment of long-lived assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Operating income** | **1,175** | **900** | **887** | **892** | **755** | **435** | **1,073** | **251** | **280** | **256** | **121** | **908** | **111** | **157** | **172** | **95** | **535** | **588** |
| Interest exp & non-operating loss (gain) | 3 | -8 | 22 | 41 | 22 | 16 | -12 | 0 | -7 | 9 | 16 | 18 | 13 | -1 | -1 | -1 | 10 | 10 |
| **Pretax income** | **1,172** | **908** | **865** | **850** | **733** | **419** | **1,085** | **251** | **287** | **248** | **105** | **891** | **98** | **158** | **173** | **96** | **525** | **578** |
| Taxes | 335 | 196 | 164 | 98 | 144 | 131 | 136 | 34 | 42 | 8 | -17 | 67 | 10 | 25 | 31 | 14 | 80 | 87 |
| **Net Income** | **838** | **712** | **700** | **752** | **589** | **288** | **949** | **217** | **245** | **240** | **122** | **824** | **88** | **133** | **142** | **82** | **445** | **491** |
| Diluted shares | 189 | 168 | 155 | 151 | 152 | 153 | 153 | 144 | 137 | 130 | 125 | 135 | 118 | 118 | 118 | 118 | 118 | 118 |
| EPS, Reported | $4.44 | $4.24 | $4.52 | $4.97 | $3.88 | $1.89 | $6.21 | $1.50 | $1.79 | $1.84 | $0.97 | $6.10 | $0.74 | $1.13 | $1.20 | $0.69 | $3.77 | $4.16 |
| One-time gains (losses)[1] | | | | | | | | | | | | | | | | | | |
| **EPS, adjusted** | **$4.44** | **$4.24** | **$4.52** | **$4.97** | **$3.88** | **$1.89** | **$6.21** | **$1.50** | **$1.79** | **$1.84** | **$0.97** | **$6.10** | **$0.74** | **$1.13** | **$1.20** | **$0.69** | **$3.77** | **$4.16** |
| **Growth and ratio analysis** | | | | | | | | | | | | | | | | | | |
| **Total revenue YoY growth** | **8%** | **-5%** | **0%** | **1%** | **-8%** | **-30%** | **39%** | **9%** | **9%** | **-6%** | **-11%** | **-1%** | **-10%** | **-9%** | **-6%** | **0%** | **-6%** | **3%** |
| Gross margin | 59.4% | 59.2% | 60.7% | 60.9% | 60.8% | 64.2% | 66.0% | 66.2% | 67.1% | 66.3% | 64.6% | 66.1% | 66.1% | 64.4% | 65.0% | 63.6% | 64.8% | 65.0% |
| YoY change | -120 bps | -13 bps | 145 bps | 23 bps | -9 bps | 339 bps | 176 bps | -190 bps | -48 bps | 126 bps | 90 bps | 13 bps | -11 bps | -269 bps | -130 bps | -100 bps | -132 bps | 25 bps |
| Adjusted SG&A rate, excl 1-time items[1] | 30.9% | 35.5% | 37.5% | 39.6% | 42.7% | 48.3% | 43.6% | 44.4% | 44.3% | 46.6% | 52.0% | 46.8% | 53.4% | 48.6% | 49.8% | 52.9% | 51.1% | 50.7% |
| YoY change | 222 bps | 461 bps | 198 bps | 212 bps | 314 bps | 554 bps | -470 bps | 116 bps | -104 bps | 672 bps | 560 bps | 317 bps | 896 bps | 430 bps | 319 bps | 94 bps | 436 bps | -43 bps |
| D&A as % of sales | 3.5% | 3.7% | 4.4% | 4.3% | 4.5% | 5.2% | 3.4% | 3.3% | 3.0% | 2.8% | 3.6% | 3.2% | 3.7% | 3.7% | 3.2% | 3.6% | 3.5% | 3.5% |
| Adjusted operating income | 24.9% | 20.0% | 18.8% | 17.0% | 13.6% | 10.7% | 19.0% | 18.5% | 19.8% | 16.9% | 9.1% | 16.2% | 9.0% | 12.2% | 12.1% | 7.1% | 10.1% | 10.8% |
| YoY change | -382 bps | -490 bps | -124 bps | -177 bps | -342 bps | -289 bps | 826 bps | -237 bps | 129 bps | -538 bps | -515 bps | -282 bps | -942 bps | -767 bps | -488 bps | -194 bps | -603 bps | 68 bps |
| **EPS Growth** | **4%** | **-5%** | **7%** | **10%** | **-22%** | **-51%** | **229%** | **5%** | **17%** | **-17%** | **-5%** | **-2%** | **-50%** | **-37%** | **-35%** | **-29%** | **-38%** | **10%** |
| Tax rate | 28.5% | 21.5% | 19.0% | 11.5% | 19.6% | 31.3% | 12.5% | 13.5% | 14.6% | 3.2% | (16.2%) | 7.5% | 10.2% | 15.8% | 17.9% | 15.0% | 15.3% | 15.0% |

Source: TD Cowen.

## VALUATION METHODOLOGY AND RISKS

### Valuation Methodology

**Luxury Brands:**

Our valuation methodology is primarily based on Price-to-Earnings (P/E), followed by Enterprise Value to EBITDA (EV/EBITDA), Price-to-Free Cash Flow (P/FCF) ratios, and DCF analysis. We may also use Enterprise Value to Revenue (EV/Revs) for companies operating at depressed levels of profitability. In some cases we use probability weighed, scenario-based decision trees as a basis for devising our price targets. We incorporate the company's and its peers' historical and current valuation multiples, as well as our analysis of future growth rates, company-specific risks, return on invested capital, and other inputs from our research when devising our valuation multiples and the probabilities we assign to different scenarios when developing our price targets.

We make investment recommendations on certain early stage, pre-revenue companies based upon an assessment of their business model, technology, probability of market success, and the potential market opportunity, balanced by an assessment of applicable risks. Such companies may not be assigned a price target.

### Investment Risks

**Luxury Brands:**

Risks to the companies in our sector include risks and uncertainties associated with the global economic environment and consumer spending, as well as general competition within the consumer and fashion products industries and fluctuating consumer demand trends, which can create variability in sales and margins. Increases in the prices of raw materials, rent, freight, labor, tariffs, or manufacturers' inability to produce goods on time or to specifications may negatively impact results. Execution flaws and the departure of certain key executives may negatively affect performance and financial results. Legal, regulatory, political, currency, and economic risks, as well as challenges to maintain favorable brand recognition, loyalty, and reputation for quality, may affect the ability to conduct business in both domestic and international markets.

### Risks To The Price Target

CPRI could outperform our price target on (1) better than expected performance in the wholesale channel, which could support margin stability; (2) store productivity accelerates following renovations and tourism rebounding; and (3) customers accept higher prices, which drive improved gross margins. Additionally, the company could underperform our price target should the wholesale channel continue to face slower trends and the macro environment pressures consumer spending.

# ADDENDUM

## Stocks Mentioned In Important Disclosures

| Ticker | Company Name |
|--------|--------------|
| CPRI | Capri Holdings |
| COST | Costco Wholesale |
| TPR | Tapestry |
| ULTA | Ulta Beauty |
| WMT | Walmart |

## Analyst Certification

Each author of this research report hereby certifies that (i) the views expressed in the research report accurately reflect his or her personal views about any and all of the subject securities or issuers, and (ii) no part of his or her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed in this report.

## Important Disclosures

Cowen and Company, LLC makes a market in the stock of Capri Holdings, Costco Wholesale, Tapestry, Ulta Beauty and Walmart securities.

Cowen and Company, LLC or its affiliates managed or co-managed a public offering of Tapestry and Walmart in the past 12 months.

Cowen and Company, LLC or its affiliates received compensation for investment banking services from Tapestry and Walmart in the past 12 months.

Cowen and Company, LLC or its affiliates expect to receive, or intend to seek, compensation for investment banking services in the next 3 months from Tapestry.

Tapestry and Walmart is or has been in the past 12 months a client of Cowen and Company, LLC; Cowen and Company, LLC has provided investment banking services during the past 12 months.

Cowen and Company, LLC compensates research analysts for activities and services intended to benefit the firm's investor clients. Individual compensation determinations for research analysts, including the author(s) of this report, are based on a variety of factors, including the overall profitability of the firm and the total revenue derived from all sources, including revenues from investment banking, sales and trading or principal trading revenues. Cowen and Company, LLC does not compensate research analysts based on specific investment banking transactions or specific sales and trading or principal trading revenues.

## Disclaimer

**TD Cowen Research Reports:** TD Cowen research reports are simultaneously available to all clients on our client website. Research reports are for our clients only. Not all research reports are disseminated, e-mailed or made available to third-party aggregators. Cowen and Company, LLC is not responsible for the redistribution of TD Cowen research by third party aggregators. Selected research reports are available in printed form in addition to an electronic form. All published research reports can be obtained on the firm's client website, https://tdcowenlibrary.bluematrix.com/client/library.jsp.

THIS RESEARCH REPORT WAS PRODUCED SOLELY BY COWEN AND COMPANY, LLC.

THIS RESEARCH REPORT WAS PREPARED IN ACCORDANCE WITH THE RULES UNDER THE FINANCIAL INDUSTRY REGULATORY AUTHORITY (FINRA). THIS REPORT WAS NOT PREPARED IN ACCORDANCE WITH CANADIAN DISCLOSURE REQUIREMENTS RELATING TO RESEARCH REPORTS.

The information, opinions, estimates and forecasts are as of the date of this report and subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Research reports are published at irregular intervals as appropriate in the analyst's judgement.

Further information on subject securities may be obtained from our offices. This research report is published solely for information purposes, and is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Other than disclosures relating to Cowen and Company, LLC and its affiliates, the information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete statement or summary of the available data. Any opinions expressed herein are statements of our judgment on this date and are subject to change without notice. The opinions and recommendations herein do not take into account individual client circumstances, objectives or needs and are not intended as recommendations of investment strategy. The recipients of this report must make their own independent decisions regarding any securities subject to this research report. In some cases, securities and other financial instruments may be difficult to value or sell and reliable information about the value or risks related to the security or financial instrument may be difficult to obtain. To the extent that this report discusses any legal proceedings or issues, it has not been prepared to express or intended to express any legal conclusion, opinion or advice. Our salespeople, traders and other professionals may provide oral or written market commentary or trading strategies to our clients that reflect opinions that are contrary to the opinions expressed in our research. Our principal trading area and investing businesses may make investment decisions that are inconsistent with recommendations or views expressed in our research.

For important disclosures regarding the companies that are the subject of this research report, please contact Compliance Department, Cowen and Company, LLC, 599 Lexington Avenue, 20th Floor, New York, NY 10022. In addition, the same important disclosures, with the exception of the valuation methods and risks, are available on the Firm's disclosure website at https://tdcowen.bluematrix.com/sellside/Disclosures.action.

**Equity Research Price Targets:** Cowen and Company, LLC assigns price targets on all companies covered in equity research unless noted otherwise. The equity research price target for an issuer's stock represents the value that the analyst reasonably expects the stock to reach over a performance period of twelve months. Any price targets in equity securities in this report should be considered in the context of all prior published Cowen and Company, LLC equity research reports (including the disclosures in any such equity report or on the Firm's disclosure website), which may or may not include equity research price targets, as well as developments relating to the issuer, its industry and the financial markets. For equity research price target valuation methodology and risks associated with the achievement of any given equity research price target, please see the analyst's equity research report publishing such targets.

**TD Cowen Cross-Asset Research:** Due to the nature of the fixed income market, the issuers or debt securities of the issuers discussed in "TD Cowen Cross-Asset Research" reports do not assign ratings and price targets and may not be continuously followed. Accordingly, investors must regard such branded reports as providing stand-alone analysis and reflecting the analyst's opinion as of the date of the report and should not expect continuing analysis or additional reports relating to such issuers or debt securities of the issuers.

From time to time "TD Cowen Cross-Asset Research" analysts provide investment recommendations on securities that are the subject of this report. These recommendations are intended only as of the time and date of publication and only within the parameters specified in each individual report. "TD Cowen Cross-Asset Research" investment recommendations are made strictly on a case-by-case basis, and no recommendation is provided as part of an overarching rating system or other set of consistently applied benchmarks. The views expressed in "Cross-Asset Research" report may differ from the views offered in the firm's equity research reports prepared for our clients.

**Notice Related To Branding:** "TD Cowen" is a division of TD Securities and is the name under which Cowen and Company, LLC and certain entities that fall under the brand TD Securities conduct certain of its businesses.

"TD Securities" is a trademark of The Toronto-Dominion Bank and represents certain investment banking, capital markets and wholesale banking activities conducted through certain subsidiaries and branches of The Toronto-Dominion Bank. Cowen and Company, LLC is a wholly-owned, indirect subsidiary of The Toronto-Dominion Bank. TD Securities Inc. is regulated by the Investment Industry Regulatory Organization of Canada, a member of the Canadian Investor Protection Fund and a member of Canadian Marketplaces. This material is for general informational purposes only and is not investment advice nor does it constitute an offer, recommendation or solicitation to buy or sell a particular financial instrument.

**Notice to UK and European Union Investors:** This publication is produced and published by Cowen and Company, LLC which is regulated in the United States by Financial Industry Regulatory Authority. Cowen and Company's principal trading area and investing businesses may make investment decisions that are inconsistent with recommendations or views expressed in our research. Cowen and Company, LLC maintains physical, electronic and procedural information barriers to address the flow of information between and among departments within Cowen and Company, LLC, as well as its affiliates. Additionally, the persons who are not involved with the production of the recommendation but are reasonably expected to have access to the recommendation prior to its completion are subject to policies and procedures preventing them to trade related to expected recommendation. Research department related policies are designed to prevent, monitor, surveil and avoid appearance of conflicts of interest with respect to the persons or associated persons involved in the production of the recommendation. This research report is to be communicated only to persons of a kind described in Articles 19 and 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005. It must not be further transmitted to any other person without our consent. The Toronto-Dominion Bank and TD Bank Europe Limited ("TDBEL") are regulated for investment business conducted in the UK by the UK Financial Conduct Authority. TD Global Finance unlimited company is regulated for investment business conducted in Ireland by the Central Bank of Ireland. Cowen Execution Services Limited is authorised and regulated in the UK by the Financial Conduct Authority.

This document it is intended only to be issued to persons who (i) are persons falling within Article 19(5) ("Investment professional") of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended, the "Financial Promotion Order"), (ii) are persons falling within Article 49(2)(a) to (d) ("High net worth companies, unincorporated associations, etc.") of the Financial Promotion Order, or (iii) are persons to whom an invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000) in connection with the issue or sale of any securities may otherwise lawfully be communicated or caused to be communicated. Insofar as the document is issued in or to the European Union, it is intended only to be issued to persons categorized as 'Per Se Professional' or 'Eligible Counterparties' as defined in S.I. No 375 of 2017, European Union (Markets in Financial Instruments) Regulations 2017, Schedule 2. Clients in the United Kingdom wishing to effect transactions in any security discussed herein should do so through a qualified salesperson of TDBEL. European clients wishing to effect transactions in any security discussed herein should do so through a qualified salesperson of TD Global Finance unlimited company. Article 20 Market Abuse Regulation 596/2014 ("MAR") requires market participants who produce or disseminate Investment Recommendations or other information recommending or suggesting an investment strategy to take reasonable care that such information is objectively presented, and to disclose their interests or indicate conflicts of interest.

**Australia**

If you receive this document and you are domiciled in Australia, please note that it is intended to be issued for general information purposes only and distributed to a person who is a wholesale client, as defined in the Corporations Act 2001 and Corporations Regulations 2001, by Toronto Dominion (South East Asia) Limited ("TDSEA"). TDSEA does not hold itself out to be providing financial advice in these circumstances. TD Securities is a trademark and represents certain investment dealing and advisory activities of The Toronto-Dominion Bank and its subsidiaries, including TDSEA. The Toronto-Dominion Bank is not an authorized deposit-taking or financial services institution in Australia. TDSEA is a holder of an Australian Financial Services License (528885) and is regulated in Australia by the Australian Securities and Investments Commission.

**Canada**

No securities commission or similar regulatory authority in Canada has reviewed or in any way passed judgment upon this research report, the information contained herein or the merits of the securities described herein, and any representation to the contrary is an offence. Cowen and Company, LLC operates as a dealer in Canada under an exemption from the dealer registration requirements contained in National Instrument 31-103 – Registration Requirements and Exemptions (NI 31-103) and, as such, Cowen and Company, LLC is not required to be and is not a registered dealer in Canada. Canadian clients wishing to effect transactions in any security discussed herein should do so through a qualified salesperson of TD Securities or TD Securities Inc. TD Securities Inc. is a member of the Canadian Investor Protection Fund.

**China, India, and South Korea**

Insofar as the document is received by any persons in the People's Republic of China ("PRC"), India and South Korea, it is intended only to be issued to persons who have the relevant qualifications to engage in the investment activity mentioned in this document. The recipient is responsible for obtaining all relevant government regulatory approvals/licenses themselves, and represents and warrants to The Toronto-Dominion Bank that the recipient's investments in those securities do not violate any law or regulation, including, but not limited to, any relevant foreign exchange regulations and/or overseas investment regulations. The Toronto-Dominion Bank has a representative office in Shanghai, Mumbai and Seoul which should be contacted for any general enquiry related to The Toronto-Dominion Bank or its business. However, neither any of the Toronto-Dominion Bank offshore branches/ subsidiaries nor its representative offices are permitted to conduct business within the borders of the PRC, India and South Korea. In locations in Asia where the Bank does not hold licenses to conduct business in financial services, it is not our intention to, and the information contained in this document should not be construed as, conducting any regulated financial activity, including dealing in, or the provision of advice in relation to, any regulated instrument or product. This publication is for general information only, without addressing any particular needs of any individual or entity, and should not be relied upon without obtaining specific advice in the context of specific circumstances.

**Hong Kong SAR (China)**

This document, which is intended to be issued in Hong Kong SAR (China) ("Hong Kong") only to Professional Investors within the meaning of the Securities and Futures Ordinance (the "SFO") and the Securities and Futures (Professional Investor) Rules made under the SFO, has been distributed through Toronto-Dominion Bank, Hong Kong Branch, which is regulated by the Hong Kong Monetary Authority and the Securities and Futures Commission.

**Japan**

For Japanese residents, please note that if you have received this document from The Toronto-Dominion Bank entities based outside Japan, it is being provided to qualified financial institutions ("QFI") only under a relevant exemption to the Financial Instruments and Exchange Act.

If you have received this document from TD Securities (Japan) Co., Ltd., it is being provided only to institutional investors. TD Securities (Japan) Co., Ltd. is regulated by the Financial Services Agency of Japan and is distributing this document in Japan as a Type 1 Financial Instruments Business Operator registered with the Kanto Local Finance Bureau under registration number, Kinsho 2992, and a member of Japan Securities Dealers Association.

**New Zealand**

The Toronto-Dominion Bank is not a "registered bank" in New Zealand under the Reserve Bank Act 1989.

**Singapore**

This report is distributed in Singapore by The Toronto-Dominion Bank, Singapore Branch, and recipients in Singapore of this report are to contact The Toronto-Dominion Bank, Singapore Branch in respect of any matters arising from, or in connection with, this report. The Toronto-Dominion Bank, Singapore Branch is regulated by the Monetary Authority of Singapore. Where this report is issued or promulgated in Singapore, it is only intended for distribution to a person who is an accredited investor, expert investor or institutional investor as defined in the Securities and Futures Act (Cap. 289), the Securities and Futures (Prescribed Specific Classes of Investors) Regulations 2005, or the Securities and Futures (Classes of Investors) Regulations 2018 issued by the Monetary Authority of Singapore.

**Additional Notice to European Union Investors:** Individuals producing recommendations are required to obtain certain licenses by the Financial Regulatory Authority (FINRA). You can review the author's current licensing status and history, employment history and, if any, reported regulatory, customer dispute, criminal and other matters via "Brokercheck by FINRA" at http://brokercheck.finra.org/. An individual's licensing status with FINRA should not be construed as an endorsement by FINRA. General biographical information is also available for each Research Analyst at www.tdcowen.com.

Additionally, the complete preceding 12-month recommendations history related to recommendation in this research report is available at https://tdcowen.bluematrix.com/sellside/Disclosures.action

The recommendation contained in this report was produced at February 11, 2024, 19:59ET. and disseminated at February 11, 2024, 21:00ET.

**Copyright, User Agreement and other general information related to this report**

© 2024 Cowen and Company, LLC. All rights reserved. Member NYSE, FINRA and SIPC. This research report is prepared for the exclusive use of TD Cowen clients and may not be reproduced, displayed, modified, distributed, transmitted or disclosed, in whole or in part, or in any form or manner, to others outside your organization without the express prior written consent of TD Cowen. TD Cowen research reports are distributed simultaneously to all clients eligible to receive such research reports. Any unauthorized use or disclosure is prohibited. Receipt and/or review of this research constitutes your agreement not to reproduce, display, modify, distribute, transmit, or disclose to others outside your organization. All TD Cowen trademarks displayed in this report are owned by TD Cowen and may not be used without its prior written consent.

**Cowen and Company, LLC. New York** 646 562 1010 **Boston** 617 946 3700 **San Francisco** 415 646 7200 **Chicago** 312 577 2240 **Cleveland** 440 331 3531 **Atlanta** 866 544 7009 **Stamford** 646 616 3000 **Washington, D.C.** 202 868 5300 **London** (affiliate) 44 207 071 7500

**TD COWEN EQUITY RESEARCH RATING DEFINITIONS**

**Outperform (1):** The stock is expected to achieve a total positive return of at least 15% over the next 12 months

**Market Perform (2):** The stock is expected to have a total return that falls between the parameters of an Outperform and Underperform over the next 12 months

**Underperform (3):** Stock is expected to achieve a total negative return of at least 10% over the next 12 months

**Assumption:** The expected total return calculation includes anticipated dividend yield

## TD Cowen Equity Research Rating Distribution

**Distribution of Ratings/Investment Banking Services (IB) as of 12/31/23**

| Rating | Count | Ratings Distribution | Count | IB Services/Past 12 Months |
|---|---|---|---|---|
| Buy (a) | 623 | 65.86% | 189 | 30.34% |
| Hold (b) | 315 | 33.30% | 52 | 16.51% |
| Sell (c) | 8 | 0.85% | 1 | 12.50% |

(a) Corresponds to "Outperform" rated stocks as defined in Cowen and Company, LLC's equity research rating definitions. (b) Corresponds to "Market Perform" as defined in Cowen and Company, LLC's equity research ratings definitions. (c) Corresponds to "Underperform" as defined in Cowen and Company, LLC's equity research ratings definitions. Cowen and Company Equity Research Rating Distribution Table does not include any company for which the equity research rating is currently suspended or any debt security followed by TD Cowen Cross-Asset Research.

Note: "Buy", "Hold" and "Sell" are not terms that Cowen and Company, LLC uses in its ratings system and should not be construed as investment options. Rather, these ratings terms are used illustratively to comply with FINRA regulation.



**Costco Wholesale Rating History as of 02/09/2024**

**TD COWEN**
EQUITY RESEARCH

Capri Holdings
February 11, 2024







**TD COWEN**
EQUITY RESEARCH

Capri Holdings
February 11, 2024



Walmart Rating History as of 02/09/2024

**Legend for Price Chart:**

I = Initiation | 1 = Outperform | 2 = Market Perform | 3 = Underperform | UR = Price Target Under Review | D = Discontinued Coverage | $xx = Price Target | NA = Not Available | S=Suspended

## POINTS OF CONTACT

### Analyst Profiles

 **Oliver Chen, CFA**

New York

646 562 1424

oliver.chen@cowen.com

Oliver Chen is an *II*-ranked analyst covering retailing/specialty, broadlines, department stores, & luxury goods. He has an MBA from Wharton.

 **Katy Hallberg**

New York

646 562 1321

katy.hallberg@cowen.com

Katy Hallberg is an associate on the specialty retail & broadlines/department stores team. She joined TD Cowen in 2021.

 **Tom Nass, CFA**

New York

646 562 1316

thomas.nass@cowen.com

Tom Nass is an associate on the specialty retail & broadlines/department stores team. He joined TD Cowen in 2022.

 **Neil Goh**

New York

646 562 1322

neil.goh@cowen.com

Neil Goh is an associate on the specialty retail & broadlines/department stores team. He joined TD Cowen in 2023 from Morgan Stanley.

 **Jonna Kim, CFA**

New York

646 562 1419

jonna.kim@cowen.com

Jonna Kim covers the specialty retail & broadlines/department stores team. She joined TD Cowen in 2018 from JPMorgan Chase.

### Reaching TD Cowen

#### Main Cowen and Company Locations

**New York**
599 Lexington Avenue
New York, NY 10022
646 562 1010
800 221 5616

**Boston**
Two International Place
Boston, MA 02110
617 946 3700
800 343 7068

**Cleveland**
20006 Detroit Road
Suite 100
Rocky River, OH 44116
440 331 3531

**San Francisco**
One Maritime Plaza, 9th Floor
San Francisco, CA 94111
415 646 7200
800 858 9316

**Atlanta**
3424 Peachtree Road NE
Suite 2200
Atlanta, GA 30326
866 544 7009

**Chicago**
181 West Madison Street
Suite 3135
Chicago, IL 60602
312 577 2240

**Stamford**
262 Harbor Drive
Stamford, CT 06902
646 616 3000

**Washington, D.C.**
2900 K Street, NW
Suite 520
Washington, DC 20007
202 868 5300

#### International Location

**Cowen Execution Services Limited**

**London**
1 Snowden Street - 11th Floor
London EC2A 2DQ
United Kingdom
44 20 7071 7500

  **@TDCOWEN**RESEARCH      **TD COWEN**      **TD COWEN**

# Exhibit 8

https://finance.yahoo.com/quote/CPRI/history/?period1=%E2%80%8C1691625600&period2=1729728000    July 13, 2025



## Capri Holdings Limited (CPRI)

NYSE · Nasdaq Real Time Price · USD

☆ Follow    + Add holdings

**19.25** -0.49 (-2.48%)    19.10 -0.15 (-0.78%)
At close: July 11 at 4:00:02 PM EDT    After hours: July 11 at 7:29:41 PM EDT

Currency in USD    🔒 Download

| Date | Open | High | Low | Close | Adj Close | Volume |
|------|------|------|-----|-------|-----------|--------|
| Oct 23, 2024 | 41.91 | 42.01 | 41.23 | 41.81 | 41.81 | 1,173,700 |
| Oct 22, 2024 | 41.91 | 42.21 | 41.72 | 42.06 | 42.06 | 840,600 |
| Oct 21, 2024 | 41.92 | 42.33 | 41.71 | 42.04 | 42.04 | 949,700 |
| Oct 18, 2024 | 42.90 | 42.91 | 41.90 | 41.98 | 41.98 | 1,360,000 |
| Oct 17, 2024 | 42.77 | 42.95 | 41.96 | 42.64 | 42.64 | 1,204,100 |
| Oct 16, 2024 | 43.04 | 43.15 | 42.67 | 42.91 | 42.91 | 1,138,700 |
| Oct 15, 2024 | 43.00 | 43.20 | 42.78 | 43.04 | 43.04 | 919,800 |
| Oct 14, 2024 | 43.01 | 43.20 | 42.76 | 43.05 | 43.05 | 1,023,000 |
| Oct 11, 2024 | 43.19 | 43.34 | 42.79 | 42.98 | 42.98 | 882,300 |
| Oct 10, 2024 | 42.95 | 43.21 | 42.41 | 43.15 | 43.15 | 1,392,300 |
| Oct 9, 2024 | 42.89 | 43.04 | 42.61 | 43.00 | 43.00 | 900,700 |
| Oct 8, 2024 | 42.29 | 42.75 | 42.28 | 42.62 | 42.62 | 869,000 |
| Oct 7, 2024 | 42.30 | 42.82 | 42.09 | 42.64 | 42.64 | 1,379,700 |
| Oct 4, 2024 | 42.30 | 42.64 | 42.05 | 42.28 | 42.28 | 1,751,300 |
| Oct 3, 2024 | 42.09 | 42.22 | 41.96 | 41.97 | 41.97 | 992,300 |
| Oct 2, 2024 | 42.05 | 42.45 | 41.77 | 42.18 | 42.18 | 1,383,000 |
| Oct 1, 2024 | 42.97 | 43.14 | 41.88 | 42.14 | 42.14 | 2,281,500 |
| Sep 30, 2024 | 39.47 | 42.73 | 39.04 | 42.44 | 42.44 | 4,496,000 |
| Sep 27, 2024 | 38.91 | 39.58 | 38.88 | 39.47 | 39.47 | 1,506,900 |
| Sep 26, 2024 | 39.00 | 39.06 | 38.27 | 38.81 | 38.81 | 2,244,800 |
| Sep 25, 2024 | 38.30 | 38.50 | 38.06 | 38.41 | 38.41 | 986,300 |
| Sep 24, 2024 | 38.75 | 38.75 | 38.13 | 38.28 | 38.28 | 1,082,700 |
| Sep 23, 2024 | 38.42 | 38.70 | 37.73 | 38.10 | 38.10 | 1,305,400 |
| Sep 20, 2024 | 38.83 | 39.10 | 38.00 | 38.29 | 38.29 | 2,640,400 |
| Sep 19, 2024 | 39.60 | 39.55 | 38.69 | 38.87 | 38.87 | 1,037,000 |
| Sep 18, 2024 | 39.77 | 40.06 | 38.88 | 39.07 | 39.07 | 1,222,100 |
| Sep 17, 2024 | 38.02 | 41.01 | 38.68 | 39.89 | 39.89 | 3,269,900 |
| Sep 16, 2024 | 38.25 | 38.87 | 37.58 | 38.86 | 38.86 | 1,087,700 |
| Sep 13, 2024 | 38.55 | 39.31 | 37.91 | 38.22 | 38.22 | 2,044,500 |
| Sep 12, 2024 | 40.45 | 40.70 | 38.57 | 39.26 | 39.26 | 1,978,400 |
| Sep 11, 2024 | 37.71 | 40.52 | 37.17 | 40.46 | 40.46 | 3,622,400 |
| Sep 10, 2024 | 36.50 | 37.93 | 36.32 | 37.81 | 37.81 | 2,212,000 |
| Sep 9, 2024 | 34.31 | 37.05 | 34.31 | 36.55 | 36.55 | 2,509,300 |
| Sep 6, 2024 | 35.27 | 35.52 | 34.70 | 34.77 | 34.77 | 1,968,600 |
| Sep 5, 2024 | 36.13 | 36.16 | 35.00 | 35.22 | 35.22 | 1,497,000 |
| Sep 4, 2024 | 35.84 | 36.61 | 35.78 | 36.05 | 36.05 | 874,600 |
| Sep 3, 2024 | 35.65 | 36.15 | 35.28 | 36.03 | 36.03 | 995,400 |
| Aug 30, 2024 | 36.19 | 36.23 | 35.64 | 35.72 | 35.72 | 1,313,400 |
| Aug 29, 2024 | 35.96 | 36.05 | 35.62 | 35.88 | 35.88 | 866,800 |
| Aug 28, 2024 | 35.82 | 36.14 | 35.42 | 35.90 | 35.90 | 969,200 |
| Aug 27, 2024 | 35.85 | 36.03 | 35.06 | 35.88 | 35.88 | 898,500 |
| Aug 26, 2024 | 35.96 | 35.99 | 35.31 | 35.39 | 35.39 | 949,400 |
| Aug 23, 2024 | 35.24 | 35.92 | 35.13 | 35.78 | 35.78 | 1,984,700 |
| Aug 22, 2024 | 35.70 | 35.95 | 34.81 | 35.05 | 35.05 | 1,675,300 |
| Aug 21, 2024 | 33.90 | 35.50 | 33.71 | 35.44 | 35.44 | 4,239,700 |
| Aug 20, 2024 | 32.98 | 33.07 | 32.52 | 33.01 | 33.01 | 705,500 |
| Aug 19, 2024 | 32.60 | 33.28 | 32.60 | 32.91 | 32.91 | 944,400 |
| Aug 16, 2024 | 31.84 | 32.60 | 31.78 | 32.47 | 32.47 | 1,464,600 |
| Aug 15, 2024 | 31.50 | 31.79 | 31.05 | 31.72 | 31.72 | 1,743,200 |
| Aug 14, 2024 | 30.05 | 30.33 | 29.85 | 30.13 | 30.13 | 1,143,000 |
| Aug 13, 2024 | 29.70 | 30.18 | 29.70 | 29.81 | 29.81 | 854,100 |
| Aug 12, 2024 | 30.54 | 30.80 | 29.28 | 29.81 | 29.81 | 1,806,800 |
| Aug 9, 2024 | 30.75 | 31.35 | 30.44 | 30.54 | 30.54 | 3,019,500 |
| Aug 8, 2024 | 32.60 | 32.71 | 31.81 | 32.10 | 32.10 | 1,068,800 |
| Aug 7, 2024 | 32.70 | 32.78 | 31.73 | 31.88 | 31.88 | 1,278,700 |
| Aug 6, 2024 | 32.37 | 33.23 | 32.09 | 32.48 | 32.48 | 2,527,400 |

Terms - Privacy Help
Privacy Dashboard
Ad Terms - Feedback

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Aug 5, 2024 | 32.50 | 32.68 | 32.10 | 32.29 | 32.29 | 948,600 |
| Aug 2, 2024 | 32.77 | 33.35 | 32.10 | 33.20 | 33.20 | 585,500 |
| Aug 1, 2024 | 33.50 | 33.60 | 33.04 | 33.29 | 33.29 | 560,400 |
| Jul 31, 2024 | 33.97 | 34.01 | 33.42 | 33.54 | 33.54 | 568,200 |
| Jul 30, 2024 | 33.77 | 33.98 | 33.39 | 33.95 | 33.95 | 407,000 |
| Jul 29, 2024 | 33.75 | 33.76 | 33.37 | 33.70 | 33.70 | 463,500 |
| Jul 26, 2024 | 33.54 | 33.80 | 23.40 | 33.75 | 33.75 | 476,600 |
| Jul 25, 2024 | 32.96 | 23.43 | 32.67 | 33.31 | 33.31 | 475,500 |
| Jul 24, 2024 | 33.58 | 33.69 | 32.80 | 32.95 | 32.95 | 634,900 |
| Jul 23, 2024 | 33.93 | 34.11 | 33.44 | 33.63 | 33.63 | 760,800 |
| Jul 22, 2024 | 33.70 | 34.02 | 33.34 | 34.00 | 34.00 | 603,500 |
| Jul 19, 2024 | 34.20 | 34.29 | 33.55 | 33.68 | 33.68 | 648,000 |
| Jul 18, 2024 | 34.90 | 35.10 | 34.18 | 34.17 | 34.17 | 538,300 |
| Jul 17, 2024 | 35.00 | 35.50 | 34.91 | 34.91 | 34.91 | 1,034,100 |
| Jul 16, 2024 | 35.17 | 35.60 | 35.00 | 35.40 | 35.40 | 1,278,400 |
| Jul 15, 2024 | 35.91 | 35.92 | 34.70 | 35.05 | 35.05 | 1,577,600 |
| Jul 12, 2024 | 35.49 | 35.93 | 35.26 | 35.81 | 35.81 | 979,900 |
| Jul 11, 2024 | 34.95 | 35.19 | 34.90 | 35.17 | 35.17 | 1,609,100 |
| Jul 10, 2024 | 34.05 | 34.19 | 33.87 | 34.09 | 34.09 | 753,900 |
| Jul 9, 2024 | 33.89 | 34.08 | 33.63 | 33.99 | 33.99 | 816,700 |
| Jul 8, 2024 | 33.40 | 34.16 | 33.35 | 34.02 | 34.02 | 966,800 |
| Jul 5, 2024 | 33.24 | 33.39 | 33.06 | 33.39 | 33.39 | 682,300 |
| Jul 3, 2024 | 33.60 | 33.77 | 33.23 | 33.33 | 33.33 | 374,700 |
| Jul 2, 2024 | 33.98 | 34.06 | 33.07 | 33.43 | 33.43 | 1,123,700 |
| Jul 1, 2024 | 33.03 | 34.07 | 32.97 | 33.92 | 33.92 | 1,483,000 |
| Jun 28, 2024 | 32.33 | 33.13 | 32.27 | 33.08 | 33.08 | 1,878,000 |
| Jun 27, 2024 | 32.26 | 32.48 | 32.03 | 32.46 | 32.46 | 970,300 |
| Jun 26, 2024 | 31.90 | 32.40 | 31.78 | 32.31 | 32.31 | 1,370,300 |
| Jun 25, 2024 | 32.14 | 32.44 | 31.70 | 31.90 | 31.90 | 1,668,500 |
| Jun 24, 2024 | 31.50 | 31.94 | 31.15 | 31.51 | 31.51 | 1,097,000 |
| Jun 21, 2024 | 30.80 | 31.84 | 30.79 | 31.30 | 31.30 | 1,897,400 |
| Jun 20, 2024 | 31.77 | 31.84 | 30.91 | 30.95 | 30.95 | 1,701,200 |
| Jun 18, 2024 | 32.00 | 32.24 | 31.59 | 31.73 | 31.73 | 719,300 |
| Jun 17, 2024 | 32.74 | 32.92 | 31.88 | 32.00 | 32.00 | 1,577,100 |
| Jun 14, 2024 | 31.96 | 32.11 | 31.42 | 31.70 | 31.70 | 1,733,300 |
| Jun 13, 2024 | 32.56 | 32.59 | 31.65 | 32.18 | 32.18 | 1,309,100 |
| Jun 12, 2024 | 32.84 | 32.96 | 32.59 | 32.62 | 32.62 | 604,000 |
| Jun 11, 2024 | 33.54 | 33.59 | 32.88 | 32.84 | 32.84 | 1,326,900 |
| Jun 10, 2024 | 33.65 | 33.88 | 33.51 | 33.51 | 33.51 | 633,100 |
| Jun 7, 2024 | 33.75 | 33.98 | 33.70 | 33.90 | 33.90 | 511,300 |
| Jun 6, 2024 | 33.97 | 34.31 | 33.92 | 33.96 | 33.96 | 592,100 |
| Jun 5, 2024 | 33.71 | 34.21 | 33.66 | 33.97 | 33.97 | 1,702,000 |
| Jun 4, 2024 | 34.12 | 34.25 | 33.87 | 33.84 | 33.84 | 933,600 |
| Jun 3, 2024 | 34.75 | 34.75 | 34.30 | 34.41 | 34.41 | 1,187,000 |
| May 31, 2024 | 33.88 | 34.68 | 33.83 | 34.55 | 34.55 | 1,564,100 |
| May 30, 2024 | 33.40 | 34.26 | 32.85 | 33.85 | 33.85 | 2,630,600 |
| May 29, 2024 | 34.04 | 34.31 | 33.88 | 34.18 | 34.18 | 2,169,600 |
| May 28, 2024 | 34.60 | 34.88 | 33.76 | 34.25 | 34.25 | 1,437,200 |
| May 24, 2024 | 35.00 | 35.00 | 34.54 | 34.63 | 34.63 | 999,300 |
| May 23, 2024 | 34.79 | 34.87 | 34.50 | 34.80 | 34.80 | 722,400 |
| May 22, 2024 | 35.24 | 35.25 | 34.83 | 34.93 | 34.93 | 933,500 |
| May 21, 2024 | 35.53 | 35.57 | 34.97 | 35.15 | 35.15 | 884,900 |
| May 20, 2024 | 36.08 | 36.21 | 35.40 | 35.73 | 35.73 | 916,700 |
| May 17, 2024 | 36.48 | 36.48 | 35.90 | 35.96 | 35.96 | 597,500 |
| May 16, 2024 | 36.00 | 36.32 | 35.54 | 36.15 | 36.15 | 841,100 |
| May 15, 2024 | 36.06 | 36.50 | 35.83 | 36.15 | 36.15 | 720,500 |
| May 14, 2024 | 36.20 | 36.24 | 35.69 | 36.20 | 36.20 | 630,600 |
| May 13, 2024 | 36.24 | 36.91 | 35.53 | 35.76 | 35.76 | 1,535,400 |
| May 10, 2024 | 36.50 | 36.56 | 35.92 | 36.12 | 36.12 | 758,700 |
| May 9, 2024 | 36.60 | 36.71 | 36.02 | 36.24 | 36.24 | 1,333,300 |
| May 8, 2024 | 36.74 | 36.89 | 36.55 | 36.71 | 36.71 | 1,292,200 |
| May 7, 2024 | 36.83 | 37.00 | 36.75 | 36.96 | 36.96 | 2,936,300 |
| May 6, 2024 | 36.33 | 36.33 | 35.69 | 35.73 | 35.73 | 863,800 |
| May 3, 2024 | 35.24 | 35.85 | 35.12 | 35.68 | 35.68 | 913,500 |
| May 2, 2024 | 35.53 | 35.60 | 35.10 | 35.10 | 35.10 | 808,400 |
| May 1, 2024 | 35.28 | 35.54 | 35.03 | 35.25 | 35.25 | 1,398,200 |
| Apr 30, 2024 | 35.53 | 35.77 | 34.82 | 35.48 | 35.48 | 1,893,500 |
| Apr 29, 2024 | 35.92 | 36.25 | 35.58 | 35.83 | 35.83 | 1,156,900 |
| Apr 26, 2024 | 34.82 | 35.62 | 34.70 | 35.54 | 35.54 | 1,854,400 |
| Apr 25, 2024 | 35.00 | 35.04 | 34.30 | 34.81 | 34.81 | 2,464,900 |
| Apr 24, 2024 | 36.97 | 36.48 | 34.78 | 35.40 | 35.40 | 4,546,900 |
| Apr 23, 2024 | 37.20 | 37.50 | 36.29 | 36.51 | 36.51 | 6,201,600 |
| Apr 22, 2024 | 38.60 | 38.70 | 37.84 | 37.96 | 37.96 | 1,575,700 |
| Apr 19, 2024 | 37.59 | 38.66 | 37.36 | 38.53 | 38.53 | 2,373,100 |
| Apr 18, 2024 | 37.95 | 38.28 | 37.73 | 37.83 | 37.83 | 1,761,900 |
| Apr 17, 2024 | 38.25 | 39.05 | 37.85 | 37.87 | 37.87 | 3,737,900 |
| Apr 16, 2024 | 38.75 | 39.81 | 38.22 | 38.93 | 38.93 | 3,497,500 |
| Apr 15, 2024 | 39.25 | 41.63 | 38.85 | 39.33 | 39.33 | 5,734,200 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Apr 12, 2024 | 40.78 | 41.00 | 39.11 | 39.31 | 39.31 | 3,440,400 |
| Apr 11, 2024 | 42.87 | 43.02 | 40.78 | 40.78 | 40.78 | 3,703,200 |
| Apr 10, 2024 | 43.83 | 43.94 | 42.32 | 42.60 | 42.60 | 1,988,400 |
| Apr 9, 2024 | 43.91 | 44.11 | 43.50 | 44.03 | 44.03 | 643,700 |
| Apr 8, 2024 | 43.90 | 44.05 | 43.70 | 43.75 | 43.75 | 580,200 |
| Apr 5, 2024 | 44.67 | 44.83 | 43.74 | 43.75 | 43.75 | 1,037,400 |
| Apr 4, 2024 | 45.48 | 45.49 | 44.67 | 44.79 | 44.79 | 600,000 |
| Apr 3, 2024 | 45.00 | 45.70 | 44.99 | 45.29 | 45.29 | 909,300 |
| Apr 2, 2024 | 45.05 | 45.32 | 44.40 | 44.87 | 44.87 | 692,800 |
| Apr 1, 2024 | 45.20 | 45.77 | 45.16 | 45.38 | 45.38 | 658,800 |
| Mar 28, 2024 | 45.48 | 46.09 | 45.08 | 45.30 | 45.30 | 1,238,000 |
| Mar 27, 2024 | 44.90 | 45.26 | 44.67 | 45.26 | 45.26 | 458,000 |
| Mar 26, 2024 | 45.05 | 45.07 | 44.55 | 44.76 | 44.76 | 747,500 |
| Mar 25, 2024 | 45.30 | 45.37 | 44.59 | 44.95 | 44.95 | 574,300 |
| Mar 22, 2024 | 45.31 | 45.50 | 45.10 | 45.29 | 45.29 | 740,000 |
| Mar 21, 2024 | 45.89 | 45.89 | 45.32 | 45.55 | 45.55 | 701,200 |
| Mar 20, 2024 | 46.00 | 46.15 | 45.48 | 45.75 | 45.75 | 1,297,000 |
| Mar 19, 2024 | 45.90 | 46.06 | 45.25 | 46.05 | 46.05 | 658,700 |
| Mar 18, 2024 | 46.85 | 46.91 | 45.64 | 45.89 | 45.89 | 1,392,600 |
| Mar 15, 2024 | 46.81 | 46.92 | 46.31 | 46.82 | 46.82 | 1,877,800 |
| Mar 14, 2024 | 46.70 | 46.95 | 46.38 | 46.93 | 46.93 | 569,200 |
| Mar 13, 2024 | 46.76 | 46.97 | 46.56 | 46.70 | 46.70 | 625,200 |
| Mar 12, 2024 | 46.50 | 46.80 | 46.40 | 46.84 | 46.84 | 422,400 |
| Mar 11, 2024 | 46.73 | 46.96 | 46.44 | 46.50 | 46.50 | 1,184,200 |
| Mar 8, 2024 | 46.53 | 47.17 | 46.57 | 46.79 | 46.79 | 605,000 |
| Mar 7, 2024 | 45.85 | 46.58 | 45.78 | 46.48 | 46.48 | 608,300 |
| Mar 6, 2024 | 45.97 | 46.07 | 45.72 | 45.78 | 45.78 | 861,000 |
| Mar 5, 2024 | 45.72 | 46.22 | 45.72 | 45.90 | 45.90 | 615,000 |
| Mar 4, 2024 | 45.80 | 46.03 | 45.70 | 45.83 | 45.83 | 523,200 |
| Mar 1, 2024 | 46.30 | 46.37 | 45.76 | 45.81 | 45.81 | 988,100 |
| Feb 29, 2024 | 46.27 | 46.39 | 46.09 | 46.13 | 46.13 | 798,900 |
| Feb 28, 2024 | 46.19 | 46.52 | 46.07 | 46.27 | 46.27 | 701,200 |
| Feb 27, 2024 | 46.13 | 46.55 | 46.04 | 46.32 | 46.32 | 625,300 |
| Feb 26, 2024 | 46.37 | 46.64 | 46.11 | 46.11 | 46.11 | 438,800 |
| Feb 23, 2024 | 46.55 | 46.73 | 46.36 | 46.37 | 46.37 | 744,700 |
| Feb 22, 2024 | 46.60 | 46.86 | 46.30 | 46.59 | 46.59 | 904,800 |
| Feb 21, 2024 | 47.15 | 47.15 | 46.51 | 46.55 | 46.55 | 832,100 |
| Feb 20, 2024 | 47.25 | 47.29 | 46.54 | 47.05 | 47.05 | 769,000 |
| Feb 16, 2024 | 47.32 | 47.59 | 47.26 | 47.32 | 47.32 | 785,700 |
| Feb 15, 2024 | 47.52 | 47.72 | 47.32 | 47.48 | 47.48 | 522,700 |
| Feb 14, 2024 | 47.21 | 47.48 | 47.07 | 47.34 | 47.34 | 711,800 |
| Feb 13, 2024 | 46.80 | 47.36 | 46.74 | 47.04 | 47.04 | 1,066,700 |
| Feb 12, 2024 | 46.81 | 47.61 | 46.64 | 47.50 | 47.50 | 1,100,000 |
| Feb 9, 2024 | 46.64 | 46.90 | 45.86 | 46.83 | 46.83 | 1,976,400 |
| Feb 8, 2024 | 47.11 | 47.80 | 46.98 | 47.54 | 47.54 | 1,977,000 |
| Feb 7, 2024 | 46.91 | 47.07 | 46.00 | 46.22 | 46.22 | 2,007,900 |
| Feb 6, 2024 | 47.00 | 47.01 | 46.40 | 46.58 | 46.58 | 1,277,000 |
| Feb 5, 2024 | 47.32 | 47.40 | 46.71 | 47.00 | 47.00 | 1,306,400 |
| Feb 2, 2024 | 47.60 | 47.70 | 47.08 | 47.57 | 47.57 | 1,273,700 |
| Feb 1, 2024 | 48.92 | 49.05 | 48.34 | 47.45 | 47.45 | 4,423,000 |
| Jan 31, 2024 | 49.20 | 49.20 | 48.73 | 48.74 | 48.74 | 862,300 |
| Jan 30, 2024 | 49.28 | 49.36 | 49.08 | 49.25 | 49.25 | 455,000 |
| Jan 29, 2024 | 48.70 | 49.43 | 48.54 | 49.42 | 49.42 | 1,422,400 |
| Jan 26, 2024 | 48.75 | 48.86 | 48.45 | 48.71 | 48.71 | 1,270,500 |
| Jan 25, 2024 | 49.00 | 49.21 | 48.50 | 48.52 | 48.52 | 1,274,300 |
| Jan 24, 2024 | 49.49 | 49.65 | 48.90 | 48.99 | 48.99 | 2,031,400 |
| Jan 23, 2024 | 50.20 | 50.27 | 49.44 | 49.49 | 49.49 | 1,775,600 |
| Jan 22, 2024 | 50.50 | 50.51 | 49.87 | 50.05 | 50.05 | 1,127,300 |
| Jan 19, 2024 | 50.51 | 50.62 | 50.13 | 50.22 | 50.22 | 927,900 |
| Jan 18, 2024 | 50.78 | 50.79 | 50.38 | 50.50 | 50.50 | 817,500 |
| Jan 17, 2024 | 50.52 | 50.78 | 50.38 | 50.64 | 50.64 | 1,008,400 |
| Jan 16, 2024 | 50.60 | 50.84 | 50.10 | 50.73 | 50.73 | 549,200 |
| Jan 12, 2024 | 51.11 | 51.11 | 50.54 | 50.66 | 50.66 | 996,100 |
| Jan 11, 2024 | 51.13 | 51.23 | 50.58 | 50.98 | 50.98 | 1,077,300 |
| Jan 10, 2024 | 51.00 | 51.16 | 50.45 | 51.03 | 51.03 | 1,691,500 |
| Jan 9, 2024 | 50.49 | 50.53 | 50.22 | 50.39 | 50.39 | 1,121,100 |
| Jan 8, 2024 | 50.55 | 50.77 | 50.38 | 50.49 | 50.49 | 679,400 |
| Jan 5, 2024 | 50.20 | 50.73 | 50.19 | 50.69 | 50.69 | 1,462,300 |
| Jan 4, 2024 | 50.05 | 50.38 | 49.91 | 50.24 | 50.24 | 697,700 |
| Jan 3, 2024 | 50.17 | 50.34 | 50.06 | 50.15 | 50.15 | 495,300 |
| Jan 2, 2024 | 50.07 | 50.55 | 50.01 | 50.31 | 50.31 | 984,600 |
| Dec 29, 2023 | 50.48 | 50.68 | 50.15 | 50.24 | 50.24 | 691,600 |
| Dec 28, 2023 | 50.39 | 50.46 | 50.27 | 50.44 | 50.44 | 531,100 |
| Dec 27, 2023 | 50.35 | 50.52 | 50.26 | 50.42 | 50.42 | 689,700 |
| Dec 26, 2023 | 50.35 | 50.38 | 50.13 | 50.34 | 50.34 | 431,500 |
| Dec 22, 2023 | 49.73 | 50.13 | 49.60 | 50.08 | 50.08 | 430,000 |
| Dec 21, 2023 | 49.78 | 50.19 | 49.65 | 49.93 | 49.93 | 396,800 |
| Dec 20, 2023 | 49.57 | 50.29 | 49.53 | 49.65 | 49.65 | 892,400 |

| Date | Open | High | Low | Close | Adj Close | Volume |
|---|---|---|---|---|---|---|
| Dec 19, 2023 | 49.40 | 49.60 | 49.40 | 49.68 | 49.68 | 1,192,400 |
| Dec 18, 2023 | 49.50 | 49.52 | 49.21 | 49.28 | 49.28 | 858,500 |
| Dec 15, 2023 | 49.57 | 49.76 | 49.28 | 49.28 | 49.28 | 2,557,700 |
| Dec 14, 2023 | 49.71 | 49.88 | 49.50 | 49.57 | 49.57 | 1,482,900 |
| Dec 13, 2023 | 49.00 | 49.47 | 48.90 | 49.37 | 49.37 | 977,300 |
| Dec 12, 2023 | 49.20 | 49.63 | 49.10 | 49.38 | 49.38 | 1,329,100 |
| Dec 11, 2023 | 48.62 | 48.70 | 48.43 | 48.54 | 48.54 | 468,100 |
| Dec 8, 2023 | 48.18 | 48.61 | 48.10 | 48.44 | 48.44 | 355,100 |
| Dec 7, 2023 | 47.95 | 48.31 | 47.85 | 48.21 | 48.21 | 502,500 |
| Dec 6, 2023 | 48.59 | 48.75 | 47.94 | 47.97 | 47.97 | 872,600 |
| Dec 5, 2023 | 48.60 | 48.71 | 48.32 | 48.49 | 48.49 | 678,000 |
| Dec 4, 2023 | 48.50 | 48.97 | 48.46 | 48.73 | 48.73 | 837,600 |
| Dec 1, 2023 | 48.45 | 48.91 | 48.22 | 48.42 | 48.42 | 958,400 |
| Nov 30, 2023 | 48.90 | 49.05 | 48.35 | 48.44 | 48.44 | 1,885,700 |
| Nov 29, 2023 | 49.31 | 49.44 | 48.87 | 48.92 | 48.92 | 1,077,500 |
| Nov 28, 2023 | 49.29 | 49.56 | 49.10 | 49.16 | 49.16 | 681,200 |
| Nov 27, 2023 | 49.22 | 49.40 | 48.91 | 49.15 | 49.15 | 757,100 |
| Nov 24, 2023 | 48.99 | 49.38 | 48.92 | 49.25 | 49.25 | 290,400 |
| Nov 22, 2023 | 48.75 | 49.33 | 48.64 | 48.91 | 48.91 | 849,600 |
| Nov 21, 2023 | 48.30 | 48.94 | 48.25 | 48.84 | 48.84 | 1,585,200 |
| Nov 20, 2023 | 48.42 | 48.42 | 48.13 | 48.21 | 48.21 | 858,900 |
| Nov 17, 2023 | 48.32 | 48.45 | 48.10 | 48.36 | 48.36 | 1,226,100 |
| Nov 16, 2023 | 48.20 | 48.27 | 47.83 | 48.00 | 48.00 | 1,234,100 |
| Nov 15, 2023 | 47.73 | 48.40 | 47.63 | 48.16 | 48.18 | 1,490,400 |
| Nov 14, 2023 | 47.43 | 47.73 | 46.96 | 47.51 | 47.51 | 1,781,600 |
| Nov 13, 2023 | 47.00 | 47.17 | 46.80 | 46.88 | 46.88 | 2,392,800 |
| Nov 10, 2023 | 46.70 | 47.90 | 46.59 | 47.11 | 47.11 | 3,691,100 |
| Nov 9, 2023 | 48.50 | 48.75 | 48.14 | 48.19 | 48.19 | 2,078,300 |
| Nov 8, 2023 | 48.95 | 49.00 | 48.19 | 48.21 | 48.21 | 2,600,400 |
| Nov 7, 2023 | 48.86 | 49.23 | 48.47 | 48.82 | 48.82 | 4,570,400 |
| Nov 6, 2023 | 51.09 | 51.18 | 50.56 | 50.66 | 50.66 | 1,938,400 |
| Nov 3, 2023 | 50.89 | 51.15 | 50.70 | 51.05 | 51.05 | 1,785,500 |
| Nov 2, 2023 | 50.83 | 50.96 | 50.71 | 50.75 | 50.75 | 872,400 |
| Nov 1, 2023 | 51.10 | 51.20 | 50.63 | 50.63 | 50.63 | 1,786,600 |
| Oct 31, 2023 | 51.11 | 51.26 | 51.03 | 51.18 | 51.18 | 744,200 |
| Oct 30, 2023 | 51.14 | 51.46 | 50.96 | 51.14 | 51.14 | 659,900 |
| Oct 27, 2023 | 51.22 | 51.25 | 50.84 | 50.93 | 50.93 | 914,000 |
| Oct 26, 2023 | 51.20 | 51.38 | 50.95 | 50.96 | 50.96 | 1,419,500 |
| Oct 25, 2023 | 51.50 | 51.73 | 51.15 | 51.25 | 51.25 | 1,664,300 |
| Oct 24, 2023 | 51.13 | 51.28 | 50.87 | 51.15 | 51.15 | 1,294,900 |
| Oct 23, 2023 | 51.00 | 51.45 | 50.78 | 51.08 | 51.08 | 1,094,400 |
| Oct 20, 2023 | 51.43 | 51.35 | 51.00 | 51.06 | 51.06 | 897,900 |
| Oct 19, 2023 | 51.31 | 51.46 | 51.00 | 51.24 | 51.24 | 1,078,700 |
| Oct 18, 2023 | 51.90 | 51.99 | 51.23 | 51.45 | 51.45 | 1,530,500 |
| Oct 17, 2023 | 51.56 | 52.06 | 51.51 | 51.90 | 51.90 | 1,708,000 |
| Oct 16, 2023 | 51.75 | 51.80 | 51.38 | 51.63 | 51.63 | 1,069,400 |
| Oct 13, 2023 | 51.34 | 51.81 | 51.29 | 51.60 | 51.60 | 1,193,700 |
| Oct 12, 2023 | 52.00 | 52.00 | 51.18 | 51.18 | 51.18 | 2,212,100 |
| Oct 11, 2023 | 51.22 | 52.19 | 51.08 | 52.02 | 52.02 | 4,882,000 |
| Oct 10, 2023 | 51.68 | 51.68 | 51.04 | 51.15 | 51.15 | 1,864,700 |
| Oct 9, 2023 | 51.43 | 51.61 | 51.36 | 51.49 | 51.49 | 880,400 |
| Oct 6, 2023 | 51.35 | 51.72 | 51.34 | 51.57 | 51.57 | 1,585,700 |
| Oct 5, 2023 | 51.64 | 51.80 | 51.30 | 51.32 | 51.32 | 1,277,100 |
| Oct 4, 2023 | 51.70 | 51.79 | 51.49 | 51.64 | 51.64 | 1,464,600 |
| Oct 3, 2023 | 52.11 | 52.12 | 51.17 | 51.75 | 51.75 | 3,626,000 |
| Oct 2, 2023 | 52.60 | 52.64 | 52.29 | 52.44 | 52.44 | 2,398,100 |
| Sep 29, 2023 | 52.88 | 52.88 | 52.51 | 52.61 | 52.61 | 2,844,100 |
| Sep 28, 2023 | 52.39 | 52.77 | 52.39 | 52.73 | 52.73 | 1,796,100 |
| Sep 27, 2023 | 52.35 | 52.59 | 52.25 | 52.25 | 52.25 | 984,900 |
| Sep 26, 2023 | 52.25 | 52.43 | 52.21 | 52.29 | 52.29 | 1,940,600 |
| Sep 25, 2023 | 52.21 | 52.47 | 52.16 | 52.36 | 52.38 | 1,481,300 |
| Sep 22, 2023 | 52.54 | 52.54 | 52.25 | 52.36 | 52.38 | 1,961,800 |
| Sep 21, 2023 | 52.45 | 52.55 | 52.23 | 52.35 | 52.35 | 1,600,700 |
| Sep 20, 2023 | 52.45 | 52.80 | 52.38 | 52.43 | 52.43 | 1,357,700 |
| Sep 19, 2023 | 52.25 | 52.37 | 52.20 | 52.36 | 52.36 | 1,168,400 |
| Sep 18, 2023 | 52.28 | 52.37 | 52.20 | 52.20 | 52.20 | 1,164,800 |
| Sep 15, 2023 | 52.47 | 52.58 | 52.10 | 52.19 | 52.19 | 7,532,100 |
| Sep 14, 2023 | 52.57 | 52.69 | 52.37 | 52.63 | 52.63 | 2,039,300 |
| Sep 13, 2023 | 52.60 | 52.86 | 52.25 | 52.40 | 52.40 | 2,317,300 |
| Sep 12, 2023 | 52.99 | 53.06 | 52.61 | 52.62 | 52.62 | 1,965,600 |
| Sep 11, 2023 | 52.80 | 53.00 | 52.77 | 52.95 | 52.95 | 1,875,600 |
| Sep 8, 2023 | 52.75 | 52.90 | 52.63 | 52.78 | 52.78 | 1,062,200 |
| Sep 7, 2023 | 52.71 | 52.82 | 52.60 | 52.71 | 52.71 | 1,762,600 |
| Sep 6, 2023 | 52.65 | 52.96 | 52.60 | 52.90 | 52.90 | 2,305,700 |
| Sep 5, 2023 | 52.58 | 52.96 | 52.58 | 52.70 | 52.70 | 2,436,900 |
| Sep 1, 2023 | 52.85 | 52.87 | 52.51 | 52.75 | 52.78 | 1,782,400 |
| Aug 31, 2023 | 52.55 | 52.62 | 52.43 | 52.49 | 52.49 | 2,196,100 |
| Aug 30, 2023 | 52.45 | 52.59 | 52.35 | 52.47 | 52.47 | 1,847,200 |

| Date | | | | | |
|---|---|---|---|---|---|
| Aug 29, 2023 | 52.46 | 52.60 | 52.33 | 52.45 | 52.75 | 2,412,000 |
| Aug 28, 2023 | 51.98 | 52.80 | 51.82 | 52.38 | 52.38 | 2,366,300 |
| Aug 25, 2023 | 52.00 | 52.10 | 51.44 | 52.03 | 52.03 | 2,841,300 |
| Aug 24, 2023 | 52.00 | 52.09 | 51.74 | 51.87 | 51.87 | 2,018,200 |
| Aug 23, 2023 | 51.65 | 52.24 | 51.55 | 52.02 | 52.02 | 2,759,700 |
| Aug 22, 2023 | 51.80 | 51.86 | 51.51 | 51.65 | 51.65 | 2,601,000 |
| Aug 21, 2023 | 51.90 | 52.14 | 51.69 | 51.85 | 51.85 | 1,935,500 |
| Aug 18, 2023 | 51.51 | 52.10 | 51.50 | 52.02 | 52.02 | 2,487,800 |
| Aug 17, 2023 | 51.60 | 51.95 | 51.60 | 51.63 | 51.63 | 3,612,300 |
| Aug 16, 2023 | 51.80 | 52.32 | 51.50 | 51.51 | 51.51 | 5,524,800 |

## Related Tickers

>

| TPR | SIG | MOV | REAL | KER.PA | LVMUY | PPRUY | BUR |
|---|---|---|---|---|---|---|---|
| Tapestry, Inc. | Signet Jewelers Limited | Movado Group, Inc. | The RealReal, Inc. | Kering SA | LVMH Moët Hennessy | Kering SA | Burbe |
| 98.43 +0.81% | 79.57 -1.44% | 16.86 +0.30% | 5.29 -2.58% | 198.68 -3.74% | 114.10 -3.27% | 23.17 -3.94% | 16.42 |

yahoo!finance

Copyright © 2025 Yahoo
All rights reserved.

**What's trending**
Dow Jones
S&P 500
DAX Index
Nasdaq
Tesla
DJT
Fordis

**Explore more**
Mortgages
Credit Cards
Sectors
Crypto Heatmap
Financial News

**About**
Data Disclaimer
Help
Feedback
Sitemap
Licensing
What's New
About Our Ads
Premium Plans
Terms and Privacy Policy
Privacy Dashboard

# Exhibit 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | 1:24-cv-03109-JLR |
| TAPESTRY, INC., | |
| and | |
| CAPRI HOLDINGS LIMITED, | |
| Defendants. | |

## DEFENDANT TAPESTRY, INC.'S ANSWER AND DEFENSES

Defendant Tapestry, Inc. ("Tapestry") responds as follows to the allegations set forth in Plaintiff Federal Trade Commission's ("Plaintiff" or "FTC") April 22, 2024 Complaint.

## PRELIMINARY STATEMENT

The FTC's attempt to block Tapestry's revitalization of Michael Kors, a once great American fashion brand, makes no sense. It is based on an unrealistic view of the marketplace as consisting only of vulnerable, choice-constrained consumers that care deeply about fashion, but are unwilling to pay for it, and who are highly sensitive to price, but refuse to consider hundreds of bags available at every price point in competition with Tapestry and Capri. The FTC mistakenly believes there are only three options for a consumer seeking a high-quality handbag in whatever price range the FTC ultimately settles on for its untenable "accessible luxury" handbag market: Tapestry's Coach and Kate Spade, and Capri's Michael Kors. Indeed, the FTC's Complaint incredibly goes so far as to decry that these three brands constitute a "duopoly" in that market.

Compl. ¶¶ 2, 71. Even a quick department-store visit, online search, skim of a fashion magazine, scroll on social media, browse of a fashion resale website, stroll through a mall, or scan of restaurant patrons shatters the image of such a narrow and artificial market. *Well over one hundred fifty handbag brands, across prices and bag types, compete in the United States today with Tapestry and Capri.*[1] New brands and dynamic competitors are leveraging the COVID-accelerated shift to online sales, marketing, and product placement to rapidly build brand value, tap into consumer sentiment, and aggressively win sales. Meanwhile, longstanding brands like Burberry, Cole Haan, Gucci, Longchamp, Louis Vuitton, Marc Jacobs, Ralph Lauren, Tory Burch, Tumi,

---

[1]  This reference to more than one hundred fifty brands is no exaggeration. It is conservative, as there are at least that many brands offering leather handbags on popular department store websites or other websites today and even more offering handbags of other materials. That very conservative list includes at least the following brands, each of which market numerous handbags, in alphabetical order: 3.1 Phillip Lim, A.P.C., Acne Studios, Aerin, Aimee Kestenberg, Akris, Alexander McQueen, Alexander Wang, Alexis Bittar, AllSaints, Altuzarra, Anima Iris, Anine Bing, Anne Klein, Anya Hindmarch, Aqua, ASHYA, ATP Atelier, Aupen, Balenciaga, Balmain, Béis, Bembien, Bendetta Bruzziches, BOSS, Botkier, Bottega Veneta, Brahmin, Brandon Blackwood, BTB Los Angeles, Burberry, By Far, Callista, Calvin Klein, Chloé, Christian Louboutin, Clare V., Cole Haan, Comme des Garçons, Coperni, COS, Cult Gaia, Cuyana, Daana Saakena, Dagne Dover, DeMellier, DIESEL, Dior, DKNY, Dolce & Gabbana, Donna Karan, Dooney & Bourke, Dragon Diffusion, Dries Van Noten, Elleme, Emporio Armani, Everlane, Fendi, Ferragamo, Filson, Frame, Frances Valentine, Frankie Shop, Free People, Freja New York, Frye, Gabriela Hearst, Ganni, Gerard Darel, GiGi New York, Givenchy, Golden Goose, Gucci, Guess, Hammitt, Hereu, Hermès, Herschel, Hobbs London, HOBO, Isabel Marant, Jacquemus, Jil Sander, JW Anderson, JW Pei, Khaite, Ksubi, Kurt Geiger London, L'alingi, Larroude, Lele Sadoughi, Le Tanneur, Liselle Kiss, Little Liffner, Loeffler Randall, Longchamp, Louis Vuitton, Luar, Lusso, Madewell, Maison Margiela, Maje, Mango, Mansur Gavriel, Marc Jacobs, Marine Serre, Marni, MCM, Moncler, Montblanc, Moschino, Mulberry, MZ Wallace, NEOUS, Nine West, Off-White, Oroton, Oryany, Parker Clay, Petit Kouraj, Pinko, Polène, Polo Ralph Lauren, Prada, Proenza Schouler, Puppets & Puppets, Rabanne, Rag & Bone, Rebecca Minkoff, Ree Projects, Reformation, Reiss, Roberto Cavalli, ROYCE New York, Sacai, Saint Laurent, Samsonite, Sandro, Savette, SC103, Senreve, Sézane, Shinola, Silver & Riley, Simkhai, Simone Rocha, Sophia Webster, St. Agni, Stand Studio, Staud, Stella McCartney, Steve Madden, Strathberry, Ted Baker, Teddy Blake, Telfar, Theory, The Kooples, Timbuk2, Tom Ford, Tory Burch, TOTEME, Tumi, Ugg, Valentino, Valentino Garavani, Victoria Beckham, Vidakush, Vince, Vince Camuto, Wandler, We-AR4, Weekend Max Mara, Whistles, Yuzefi, Yvonne Koné, Zadig & Voltaire, and Zara.

and others continue to compete aggressively to stay relevant in this evolving industry.  Michael Kors' struggles over the last several years demonstrate this challenge:  as other brands have entered or stayed fresh and relevant amongst robust competition, its star has fallen.  Against this backdrop, Tapestry seeks to acquire Capri so that it can achieve its procompetitive goal of reinvigorating consumer perception of Michael Kors to increase demand, expand sales, and deliver Michael Kors (and Capri's other brands) to more consumers.

The FTC's unintelligible market definition and theory of consumer harm make no sense in this industry.  The FTC's worldview cannot explain why consumers spend hundreds or more to buy a frog-shaped crossbody bag, a bright pink puffed satchel, or a top-handle bag that looks like a pizza box (all handbags that Kate Spade offers), let alone why they pay more than $1,000 for a leather pouch mimicking a household trash bag (offered by what the FTC calls a "true luxury" brand).  A handbag purchase is far more emotional, multifaceted, and discretionary than the FTC's theory can tolerate.  For some, handbags are an extension of their self-expression.  For others, they are purely functional, holding little or no sentimental value.  Some shoppers have twenty handbags and seek out the most on-trend designs each season by obsessively tracking influencers and new styles.  Others may use a single black leather tote as a wardrobe staple for years.  An individual with a higher income may care little about designer bags or fashion at all, while other consumers might save and ultimately stretch to buy a bag of their dreams to celebrate a personal milestone or as a gift after searching widely.  There is no definable captive consumer of fashionable handbags who cannot readily switch from brand to brand, across price ranges.  The FTC's worldview comes from its experience litigating business tie-ups involving critical healthcare infrastructure, essential

3

manufacturing inputs, or ubiquitous digital platforms, but those industries are far from this world of fashion.[2]

A proper investigation into the commercial realities of this industry would have led to the unavoidable conclusion that this transaction cannot harm consumers, or anyone else. Antitrust enforcers in Europe, China, Japan, Korea, and elsewhere reviewed this merger, but did not find cause to stop it. The European Commission, for example, conducted a market investigation of competitors and customers over many months and concluded that the handbag industry is "constantly evolving and characterized by low barriers to entry and frequent entry of new players." The European Commission also explained that "the relevance of Michael Kors is declining," that even "relatively small" competitors can constrain prices of larger companies, and that "independent brands and new entrants would be able to compete effectively with the [Defendants] post-merger." The FTC fails to address the market realities in any detail in its Complaint, and does not appear to have inquired into them through any rigorous investigation. Despite having over seven months to evaluate this transaction, the FTC failed to obtain written or oral testimony from any handbag consumer, manufacturer, or competitor of Tapestry or Capri. It issued some demands for documents to companies, but then did not meaningfully follow-through on its own requests. Some companies produced a few documents each, and the FTC did not bother to pursue more. The scope of its subpoenas hardly evidences any attempt to learn about new entrants.

---

[2]     Even in its familiar territory, the FTC has suffered a string of recent loses in merger challenges litigated to completion in federal court. *See, e.g.*, *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892 (N.D. Cal. Feb. 3, 2023) (FTC losing motion for preliminary injunction involving social media network); *FTC v. Thomas Jefferson Univ. Hosp.*, 505 F. Supp. 3d 522 (E.D. Pa. 2020) (FTC losing motion for preliminary injunction involving hospital merger); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) (FTC losing motion for preliminary injunction involving chemical used for the manufacturing of semiconductors).

The FTC's inadequate investigation has contributed to its unrealistic view of the handbag industry, and caused it to falter at the gating element of its claim—defining the relevant product market. A "proper market definition [] can be determined only after a factual inquiry into the commercial realities faced by consumers," *United States v. Am. Express Co.*, 838 F.3d 179, 197 (2d Cir. 2016), *aff'd*, *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) (internal quotations omitted), which the FTC did not meaningfully engage in. Instead of using its investigatory-subpoena power to identify "products that have reasonable interchangeability from the perspective of the relevant consumer with the product sold by the defendant firm," *In re Am. Express Anti-Steering Rules Antirust Litig.*, 361 F. Supp. 3d 324, 335 (E.D.N.Y. 2019) (internal quotations omitted), the FTC merely identified one of the many categories of products that Defendants sell, saw some similarities and documents showing that the Defendants unremarkably pay attention to one another (along with dozens of other handbag designers), and stopped looking for reasonable substitutes. Its effort to capture headlines by claiming that mergers between companies that are "close competitors" are presumptively illegal wrongly tracks the mistake that many plaintiffs make when trying to plead a relevant antitrust market consisting of only the defendant's brand. That type of market definition is improper because it "fails to include all products reasonably interchangeable by consumers for the same purposes," which is exactly what the FTC ignores in its pleading. *Skyline Travel, Inc. v. Emirates*, 476 F. App'x 480, 481 (2d Cir. 2012); *In re Am. Express Anti-Steering Rules*, 361 F. Supp. 3d at 343 ("It is an understatement to say that single-brand markets are disfavored.").

The FTC compounded its error by failing to articulate how the subjective marketing term "accessible luxury" could possibly describe a "distinct" product market for antitrust purposes. The handbag industry is awash with descriptive verbiage, including "semi luxury," "trendy luxury,"

5

"contemporary," "classics," "lux," "supreme luxury," "timeless luxury," "premium," "premier," and many more, but there is no agreement on what any of those categories mean. The FTC vaguely tries to draw lines separating "mass market," "accessible luxury," and "true luxury" handbags, but the so-called "distinct" features it identifies for each group transcend all three and provide no real insight into what the FTC alleges is in, or out, of the alleged "accessible luxury" handbag market. For example:

- The Complaint contends that accessible luxury handbags have "distinct prices," but never articulates what those prices are. Compl. ¶ 33. Is a $90 handbag included? Does a $1,500 handbag fit? What about a $3,000 handbag sold secondhand for $1,000? What about a $150 handbag that is 40% off? Is it in the market when it goes on sale? The Complaint is unclear.

- The Complaint suggests that bags made of "manmade materials" are inferior to "accessible luxury" bags, Compl. ¶ 39, but it overlooks that Chanel, Hermès, Louis Vuitton, Gucci, Fendi, and Valentino (all "true luxury" brands according to the FTC) offer nylon handbags, as do Tapestry and Capri, in addition to bags made of canvas, tweed, straw, denim, and even astroturf. Is a Prada faux leather bag in the FTC's market then? What about vegan leather products at higher price points? Again, the Complaint is unclear.[3]

- The Complaint contends there are "distinct customers" for accessible luxury bags because a certain percentage of buyers fall below a specific income level, even though large percentages of that same income group buy "true luxury" bags as well, as the Complaint concedes. Compl. ¶ 36. Likewise, the Complaint suggests Capri estimated in 2023 that over 60 percent of the consumers of the FTC-designated "true luxury" brands Gucci, Dior, Fendi, and Valentino had household income in excess of $100,000, Compl. ¶ 37; but then what about those that make less but still choose to buy these more expensive brands? Are those sales in or out of the FTC's market? Once again, the Complaint is silent.

---

[3]   At a May 13, 2024 hearing, counsel for the FTC represented that the FTC would answer, even before any deadline for contention interrogatories, an interrogatory requiring the FTC to "identify each person you have included as a competitor of Coach, Michael Kors, and Kate Spade in the relevant antitrust market in your complaint." May 13, 2024 Hrg. Tr. 21:3-14. Defendants served just such an interrogatory on the FTC on May 14, 2024, and eagerly await the FTC's response. *See also id.* at 27:11-17 (counsel for FTC representing that "if they propound interrogatory like most defendants do asking for the information, certainly with the list of competitors, we'd provide that").

As these examples show, the list of features that the FTC contends are "distinct" to accessible luxury products actually transcend handbags of all types, classes, and brands. It is impossible to know from the Complaint's allegations even whether all Coach, Kate Spade, and Michael Kors handbags fit into the FTC's definition of "accessible luxury." Are materials the determinant or is price? Or is it the location of manufacturing? Perhaps it is all three, but in what measure? Or is it the brand alone that determines what product is in the FTC's market? Or is this a case of the FTC "knows it when it sees it"? The Complaint is again unclear. "Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act," *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957), but the FTC fails to articulate a viable market, and will not be able to cure that failure at an evidentiary hearing or trial.

Even more fundamentally, the FTC appears to have confused itself as to what it considers to be a "handbag" for purposes of its relevant market allegations. Although the Complaint provides no definition, counsel for the FTC represented at the May 13, 2024 hearing that "handbag," as the FTC uses that term here, means "[a] bag held in the hand or hung from a shoulder strap and used for carrying small personal articles and money." May 13, 2024 Hrg. Tr. at 23:17-20. That definition would seem to capture a duffle bag, among many other products, but the FTC has now said that a "duffle bag would not" be a "handbag." *Id.* at 25:9-10. And the FTC has expressed uncertainty about whether men's handbags fit within its definition, *id.* at 25:14-17, but then later confirmed by email that "men's and women's handbags are part of the alleged relevant product market," at least for now.[4] The Complaint, however, is silent about any demand substitutability

---

[4]     Counsel for the FTC's May 16, 2024 email contained a reservation that this "preliminary market analysis" is "subject to further analysis through fact and expert discovery."

between men's and women's bags, or the myriad other bags that might fall within the definition of a "handbag," such as a backpack, briefcase, or laptop bag.

The FTC's case fails for the additional independent reason that, in any properly defined market, the combined share of Tapestry's and Capri's handbag brands is not large enough to show any likelihood of harm to consumers, much less a likelihood of ultimate success. Proving "undue concentration" in the relevant market is part of the FTC's *prima facie* case. *See FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 310 (D.D.C. 2020). But as economic analysis will show, in any properly defined market, Coach, Kate Spade, and Michael Kors would represent less than 30 percent of sales, which does not give rise to any presumption of likely harm in this highly dynamic and differentiated industry. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) ("A presumption of anticompetitive effects from a combined share of 35% in a differentiated product market is unwarranted. Indeed, the opposite is likely true."). The combined trends of declining Michael Kors' sales and the increasing sales and shares of competing products further demonstrate that the merged entity will not have power to harm consumers. *See United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984) (finding no anticompetitive effect from 48.8% market share where there was "easy" entry "into the relevant product and geographic market by new firms or by existing firms").[5]

---

[5] The FTC's allegations about market concentration reveal that it did not have data sufficient to perform reliable share calculations when it filed this lawsuit—another defect of its inadequate investigation. Instead of presenting actual market-share or Herfindahl-Hirschman Index ("HHI") calculations, the Complaint baldly claims that those calculations (whatever they are) are "considerably more than 30 percent" market share and "above" the HHI levels that the FTC considers problematic, Compl. ¶ 75, based on what the FTC has since called a "preliminary estimate," May 13, 2024 Hrg. Tr. at 32:24-33:2. The data source and methodology the FTC employed to reach those undisclosed estimates remain murky (other than that it included men's and women's handbags), but the FTC certainly did not include data from the more than one hundred fifty brands currently selling handbags in competition with Tapestry and Capri in the United States.

The FTC attempts to bandage the holes in its case by claiming the loss of head-to-head competition is enough of a basis alone to block the Transaction.  Not true.  There is no legal support for the theory that loss of head-to-head competition, absent an undue concentration in a properly defined market, can violate Section 7 of the Clayton Act.  As recently as four years ago, a court found in another FTC merger challenge that there was not "a single case in which a court has enjoined a merger, even at this preliminary stage, where the Government failed to show undue concentration in a relevant market as its prima facie case requires, almost always through an HHI or similar metric."  *RAG-Stiftung*, 436 F. Supp. 3d at 287, 291, 310.  The law has not changed since the Supreme Court laid down the requirement that "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition," *E.I. du Pont de Nemours*, 353 U.S. at 593, a standard the FTC has acknowledged.[6]

The need for proof of a substantial lessening of competition in a relevant market is necessary to prevent the overreach the FTC engages in here.  Defendants produced over four million documents to the FTC showing they face robust competition from other brands, they are losing share to new entrants, "true luxury" brands, and dynamic competitors, and that Michael Kors (in particular) is in decline.  From that mountain of materials, the FTC cherry-picks a handful of documents discussing competition between Tapestry and Capri.  But the competitive effects of

---

[6]    The FTC has previously acknowledged that "[t]he government must show that the merger would produce a 'firm controlling an undue percentage share of the relevant market, and [would] result[] in a significant increase in the concentration of firms in that market.'"  FTC Mem. in Supp., *FTC v. Tronox Ltd.*, No. 18-cv-1622 (D.D.C. Aug. 3, 2018), ECF No. 91 (citation omitted); *see also* FTC Mem. of Points & Authorities, *FTC v. Meta Platforms, Inc.*, No. 22-cv-04325 (N.D. Cal. Oct. 31, 2022), ECF No. 164 ("Determination of the relevant product market and geographic markets is a necessary predicate [to] deciding whether a merger contravenes the Clayton Act." (citation omitted)).

9

the merger can only be assessed in the context of the broader competition, not in strategic ignorance of it—hence the obligation to plead a relevant market.

The FTC's tag-along allegations relating to perceived harms to labor are even more fanciful. No evidence will support the FTC's claim that the merger "could have substantial effects on employment wages, benefits, and conditions for people who work for or seek employment from the parties and their brands." Compl. ¶ 63. The FTC makes no effort to identify a relevant market of laborers that will be adversely affected by the merger, let alone show that Tapestry and Capri combined will have an undue concentration of any such market in the United States—because, it appears, the FTC is not pursuing a separate case about labor markets at all. Instead, the Complaint emphasizes a single instance in 2021, when Tapestry announced an increase of its U.S. minimum wage to $15 an hour in July 2021, and Michael Kors later increased its minimum wage to $15 effective in October 2021. Compl. ¶¶ 9, 62. The Complaint omits any reference to the fact that because of the nationwide retail-labor shortages brought about by the pandemic, and to compete with retailers of all product types (and employers in other industries), huge numbers of retailers moved to a $15 minimum wage in 2020 and 2021.[7] Retail workers for Tapestry and Capri could easily switch to many or all of those employers and others, which explains why both companies increased their U.S. wages to a $15 per hour baseline in 2021.

The FTC's Complaint suffers numerous flaws that eviscerate any likelihood of success on the merits of its case. The FTC bears the burden of proof. But the FTC has not articulated a viable product market, cannot show that Defendants would possess undue concentration in any properly

---

[7]     The list of nationwide retailers that bumped up to a $15 per hour minimum wage between June 2020 and November 2021 includes Target, Best Buy, Wayfair, Starbucks, Signet Jewelers, Chipotle, McDonald's, Under Armour, CVS, Lululemon, Walgreens, Williams-Sonoma, Saks Off Fifth, Macy's, Puma, and many more.

defined market, and cannot show the likelihood of anticompetitive harm in connection with the sale of their handbags (however defined) post-transaction. The FTC's theory ignores the commercial realties of the industry and stretches to assert issues where none exist.

## RESPONSE TO THE SPECIFIC ALLEGATIONS IN THE COMPLAINT

All allegations not expressly admitted herein are denied. Tapestry does not interpret the headings and subheadings throughout the Complaint as well-pleaded allegations to which any response is required. To the extent a response is required, Tapestry denies all allegations in the headings and subheadings of the Complaint. Use of certain terms or phrases defined in the Complaint is not an acknowledgment or admission of any characterization FTC may ascribe to the terms. Unless otherwise defined, capitalized terms shall refer to the capitalized terms defined in the Complaint, but any such use is not an acknowledgment or admission of any characterization FTC may ascribe to the capitalized terms.

Tapestry does not concede the truthfulness of third-party sources quoted or referenced in the Complaint. To the extent a response is required, Tapestry denies all allegations of the third-party sources quoted in or referenced in the Complaint. Unless expressly acknowledged below, Tapestry further does not concede the accuracy or completeness of alleged quotations attributed to or from Tapestry employees or documents, which are provided without the appropriate context or proffered in part to assert truth in a manner that may not be consistent with the declarant's intent. Tapestry reserves the right to amend and/or supplement this Answer at a later stage of the proceedings. Each paragraph below corresponds to the same-numbered paragraph in the Complaint.

The preamble to the Complaint characterizes this action and does not require a response. To the extent that a response is deemed necessary, Tapestry admits that the FTC purports to bring an action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

11

§ 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26. Tapestry further admits that the FTC purports to bring an action in the administrative proceedings, *In the Matter of Tapestry, Inc. and Capri Holdings Limited,* Docket No. 9429 (the "FTC Administrative Action"), under Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, to prevent Tapestry from acquiring Capri.

Tapestry denies that the FTC has any legitimate claim against Defendants, that the Proposed Transaction violates the Clayton Act or FTC Act, that the FTC has any likelihood of success on the merits, or that the FTC is entitled to any relief, including for all of the reasons articulated in Tapestry's and Capri's Answers filed in the FTC Administrative Action on May 7, 2024. Tapestry denies in all other respects the allegations in the preamble to the Complaint.

### ANSWER TO COMPLAINT

1. Tapestry admits that Tapestry proposes to acquire Capri in a transaction valued at $8.5 billion. Tapestry further admits that if the Proposed Transaction closes, Coach, Kate Spade, and Michael Kors would be owned by Tapestry. Tapestry further responds that the selective quotation of material in Paragraph 1 is taken out of context and misleading; the full document speaks for itself. The rest of Paragraph 1 contains legal arguments and conclusions to which a response is not required. To the extent a response is required, Tapestry denies that the Proposed Transaction would harm consumers; instead, it will lead to innovation and benefit consumers. Tapestry denies the remaining allegations in Paragraph 1.

2. Paragraph 2 contains legal arguments and conclusions to which a response is not required. To the extent a response is required, Tapestry denies the allegations in Paragraph 2, except admits that it sells products from clothing to eyewear to footwear and competes with numerous sellers of those products. Tapestry denies that "'accessible luxury' handbags" constitutes a relevant product market and lacks sufficient information to understand the contours

of FTC's proposed market. Tapestry further denies FTC's characterization of Tapestry and Capri's combined market share, that the Proposed Transaction will result in a player that will dwarf all other market players, and that Tapestry and Capri currently operate a "duopoly."

3.       Tapestry admits that it first used the phrase "accessible luxury" over 20 years ago as part of marketing efforts and has continued to use the phrase, generally in marketing, including as a way to convey that its handbags and other products were high quality, yet approachable. Tapestry denies the phrase "accessible luxury" was intended to define a relevant product market or that it does define one. In fact, Coach has introduced a new marketing phrase, pivoting away from "accessible luxury" and toward "expressive luxury." Industry commentators such as Vogue and other sellers of handbags have made clear that FTC's complaint provides "a limited view of a category that has exploded and morphed in recent years" and that the terminology "accessible luxury" is "limiting or not reflective of the reality of the place we hold, which is a unique one." Madeleine Schulz, These brands are reinventing accessible luxury. Just don't call it that, Vogue, May 1, 2024, https://www.voguebusiness.com/story/fashion/these-brands-are-reinventing-accessible-luxury-just-dont-call-it-that. Tapestry denies the remaining allegations in Paragraph 3, and further states that the quoted language Paragraph 3 is taken out of context and is misleading, and that the full content of the documents speaks for itself.

4.       Tapestry admits that it has used the phrase "accessible luxury" in the context of marketing, but denies that "'accessible luxury' handbags" constitutes a product market and lacks sufficient information to understand the contours of FTC's proposed market. Tapestry admits that it has used the phrase "luxury," "true luxury," high-end luxury" or "European luxury," but denies that these are a separate product market for antitrust purposes. Tapestry lacks sufficient knowledge to form a belief as to the truth of whether undefined "elite" brands claim affluent, high-wealth

13

consumers. Tapestry further lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4, and denies those allegations on that basis.

5. Tapestry admits that it engages in consumer research and collects demographic and income information as part of this research. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri document cited in Paragraph 5 or whether it even relates to FTC's alleged handbag product market or the product market for some other good. Tapestry denies the remaining allegations in Paragraph 5.

6. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri document cited in Paragraph 6. With respect to the quote from the Coach document, Tapestry responds that the selective quotation of material in Paragraph 6 is taken out of context and is misleading, and that the full document speaks for itself. The rest of Paragraph 6 contains legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies the allegations. The Proposed Transaction is procompetitive and will benefit American consumers and employees of the Defendants.

7. Paragraph 7 contains legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies the allegations. The Proposed Transaction is procompetitive and will benefit American consumers and employees of the Defendants. Tapestry further denies that FTC's 2023 Merger Guidelines have any relevance. They are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw.

8. Tapestry lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 8, and denies the allegations on that basis,

14

except admits that in the U.S., Tapestry competes for employees working in a variety of locations and from a across a range of functions and industries. The first and third sentences of Paragraph 8 assert legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies the allegations.

9. Tapestry admits that Tapestry publicly committed to a $15 per hour minimum wage for U.S. hourly employees on or about July 2021, like many U.S. retailers who also increased their minimum wages to $15 per hour. For instance, Tapestry is informed and believes that in the U.S., retailers that moved to a $15 minimum wage between June 2020 and November 2021 include Target, Best Buy, Wayfair, Starbucks, Signet Jewelers, Chipotle, McDonald's, Under Armour, CVS, Lululemon, Walgreens, Williams-Sonoma, Saks Off Fifth, Macy's, Puma, and many more. Tapestry also admits that Michael Kors publicly committed to a $15 per hour minimum wage effective on or about October 3, 2021. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri document cited in Paragraph 9. Tapestry denies the remaining allegations in Paragraph 9, and further states that the quoted language in the first sentence is taken out of context and is misleading, and that the full content of the document speaks for itself.

10. Paragraph 10 asserts legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry admits that it has used the term "Coachenomics," but denies the allegation's characterization of "Coachenomics." "Coachenomics" has been used to describe greater investments in marketing to highlight the attractiveness and value of Coach products for consumers along with strategic cost reductions that do not affect the customer. Tapestry intends to revitalize the Michael Kors brand and invest in other Capri brands, including by supporting them with Tapestry's consumer engagement platform and technology-based data analytics capabilities to help grow consumer connection and brand

sales. The Proposed Transaction will increase demand for Capri's products (including handbags), expand output, and ultimately deliver the Capri brands to more consumers. Tapestry denies all other allegations.

11. Tapestry states that the quoted language is taken out of context and is misleading, and that the full content of the document speaks for itself. Paragraph 11 further asserts legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies the allegations.

12. Paragraph 12 asserts legal arguments and conclusions to which no response is required. To the extent that a response is deemed necessary, Tapestry denies that "'accessible luxury' handbags" constitutes an antitrust product market and lacks sufficient information to understand the contours of FTC's proposed market. Tapestry further denies the remaining allegations in Paragraph 12.

13. Paragraph 13 asserts legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies that "'accessible luxury' handbags" constitutes an antitrust product market and lacks sufficient information to understand the contours of FTC's proposed market. Tapestry further states that the quoted language is taken out of context and is misleading, and that the full content of the documents speaks for itself. Tapestry denies the remaining allegations in Paragraph 13.

14. Paragraph 14 asserts legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies that "'accessible luxury' handbags" constitutes an antitrust product market and lacks sufficient information to understand the contours of FTC's proposed market. Tapestry further states that entry and expansion are easy and ongoing, contributing to a dynamic marketplace. Tapestry denies the remaining allegations except that

16

Tapestry lacks sufficient information to form a belief about the purported story of Rebecca Minkoff.

15.    Paragraph 15 asserts legal arguments and conclusions that do not warrant a response.  To the extent a response is required, Tapestry denies the allegations.  Tapestry further states that the Proposed Transaction is complementary, will result in procompetitive efficiencies, and will revitalize the declining Michael Kors brand.

16.    Tapestry admits that on April 22, 2024, the Commission held a vote on the Transaction, and initiated an administrative proceeding to determine the antitrust merits of the Proposed Transaction.  The rest of Paragraph 16 asserts legal arguments and conclusions that do not warrant a response.  To the extent a response is required, Tapestry denies the allegations.

17.    Paragraph 17 purports to characterize the temporary restraining order stipulated by the parties, and Tapestry respectfully refers the Court to that document for a complete and accurate statement of its contents.  To the extent the allegations in Paragraph 17 are inconsistent with that document, Tapestry denies the allegations.

18.    Paragraph 18 asserts legal conclusions and arguments to which no response is required.  To the extent that a response is deemed necessary, Tapestry denies the allegations in Paragraph 18.

19.    Tapestry admits that Defendants are engaged in activities affecting commerce. Tapestry further admits that the Federal Trade Commission filed this proceeding.  Tapestry denies any implication that this civil action is appropriate.  Tapestry further denies any remaining allegations in Paragraph 19.

20.    Paragraph 20 is an excerpt of Section 13(b) of the FTC Act, which does not require a response.  To the extent that it suggests that a preliminary injunction should be granted in this

proceeding, Paragraph 20 asserts legal conclusions to which no response is required. To the extent a response is required, Tapestry denies the allegations contained in Paragraph 20.

21. Tapestry admits that Defendants are engaged in activities affecting commerce.

22. Tapestry admits that venue is proper, and that this Court has personal jurisdiction of Tapestry for this action.

23. Paragraph 23 asserts legal conclusions that do not warrant a response. To the extent a response is required, Tapestry admits that FTC is an agency of the United States government.

24. Tapestry admits that for Fiscal Year 2023 its gross margins are approximately 71% and that Coach constitutes 74.5% of Tapestry's sales and Kate Spade constitutes 21.3%. These numbers change from period to period, and the FTC has not identified a time period with respect to its allegations. The last two sentences contain legal conclusions and arguments to which a reply is not required. To the extent a reply is required, Tapestry denies the legal arguments and conclusions in the last two sentences of Paragraph 24. Tapestry otherwise admits the allegations in this Paragraph other than the last three sentences where Tapestry only admits that Coach and Kate Spade stores are located throughout the United States.

25. Tapestry lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 and denies the allegations on that basis.

26. Tapestry admits the allegations in Paragraph 26.

27. Paragraph 27 asserts legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies the allegations, including that that "'accessible luxury' handbags" constitutes an antitrust product market and that the Proposed Transaction may substantially lessen competition, or tend to create a monopoly, in this undefined proposed market. However, Tapestry admits that it sells handbags in the United States along with

18

multiple other sellers. Tapestry further contends that it lacks sufficient information to understand the contours of FTC's proposed market.

28. Tapestry admits that it and Coach have used the phrase "accessible luxury" in the context of marketing and admits that it sells handbags. Tapestry lacks sufficient knowledge to form a belief as to the statements of unidentified persons referenced in Paragraph 28. The rest of Paragraph 28 asserts legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies the allegations including that "accessible luxury" constitutes a product market and lacks sufficient information to understand the contours of that proposed market. Tapestry further denies the second sentence in Paragraph 28 because Tapestry competes with numerous competitors for the sale of handbags, regardless of how that market is defined.

29. Tapestry admits that it and Coach have used the phrase "accessible luxury," "aspirational luxury," and other terms in the context of marketing and certain internal documents. The rest of Paragraph 29 asserts legal arguments and conclusions that do not warrant a response. To the extent a response is required, Tapestry denies the allegations, including that "'accessible luxury' handbags" constitutes an antitrust product market. Tapestry further states that the quoted language is taken out of context and is misleading, and that the full content of the documents speaks for itself.

30. Tapestry admits that it has used the phrase "accessible luxury" in the context of marketing and certain internal documents, but denies that "'accessible luxury' handbags" constitutes an antitrust product market and contends that it lacks sufficient information to understand the contours of that proposed market. Tapestry further states that the quoted language

19

is taken out of context and is misleading, and that the full content of the document speaks for itself. Tapestry denies the remaining allegations in Paragraph 30.

31. Tapestry admits that it has used the phrase "accessible luxury" in the context of marketing, but denies that "accessible luxury" constitutes an antitrust product market and contends that it lacks sufficient information to understand the contours of that proposed market. Tapestry further states that the quoted language is taken out of context and is misleading, and that the full content of the document speaks for itself. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in Paragraph 31. Tapestry denies the remaining allegations in Paragraph 31.

32. Tapestry admits that the marketing phrase "accessible luxury" is used from time-to-time by others, but denies that "'accessible luxury' handbags" constitutes an antitrust product market and contends that it lacks sufficient information to understand the contours of that proposed market. Tapestry states that the quoted language is taken out of context and is misleading, and that the full content of the document speaks for itself. Tapestry further states that Paragraph 32's use of the undefined or vague term "other industry participants" renders Paragraph 32's allegations incapable of further response as written. Tapestry denies the remaining allegations in Paragraph 32.

33. Tapestry admits it has used the phrase "accessible luxury" in the context of marketing and certain internal documents, but denies that "'accessible luxury' handbags" constitutes a relevant product market for antitrust purposes and contends that it lacks sufficient information to understand the contours of that proposed market. Tapestry further states that the quoted language is taken out of context and is misleading, and that the full content of the document speaks for itself. Tapestry denies the remaining allegations in Paragraph 33.

20

34. Tapestry denies the FTC's characterization of Tapestry's document in Paragraph 34, and further states that the excerpt is taken of context and is misleading, and that the full content of the document speaks for itself.

35. Tapestry denies the allegations in Paragraph 35. Tapestry further states that Paragraph 35's use of quotations from unidentified sources renders Paragraph 35's allegations incapable of further response as written.

36. Tapestry denies that "'accessible luxury' handbags" constitutes an antitrust product market and contends that it lacks sufficient information to understand the contours of FTC's proposed market. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in Paragraph 36. Tapestry further states that the quoted language is taken out of context and is misleading, and that the full content of the documents speaks for itself. Tapestry denies the remaining allegations in Paragraph 36.

37. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents cited in Paragraph 37.

38. Tapestry denies the allegations in Paragraph 38 to the extent they are intended to assert that "'accessible luxury' handbags" constitute a product market. Tapestry lacks sufficient information to understand the contours of that proposed market.

39. The first sentence of this Paragraph contains legal arguments and conclusions to which a response is not required. For the second sentence, Tapestry states that the quoted language is taken out of context and is misleading, and that the full content of the documents speaks for itself. The third sentence and second to last sentence purport to quote language from Capri, and Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents cited. The fifth sentence purports to characterize the contents of regulatory filings, and Tapestry

respectfully refers to those filings for a complete and accurate statement of their contents. The rest of this Paragraph contains legal arguments and conclusions to which a response is not required. To the extent a response is required, Tapestry denies those allegations. Tapestry further denies any allegations not specifically addressed above.

40.     Paragraph 40 purports to make generalizations regarding the "discounting and promotions" of undefined or vaguely defined groups of handbags. Accordingly, Tapestry lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 40 as written, and therefore denies them. Tapestry further denies that "'accessible luxury' handbags" constitutes an antitrust product market and contends that it lacks sufficient information to understand the contours of that proposed market.

41.     Paragraph 41 purports to make generalizations regarding the "omnichannel approach and sales experience" of undefined or vaguely defined groups of handbags. Accordingly, Tapestry lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 41 as written, and therefore denies them, except admits that handbags are sold in multiple channels. Tapestry further denies that "'accessible luxury' handbags" constitutes an antitrust product market and contends that it lacks sufficient information to understand the contours of that proposed market.

42.     Tapestry lacks sufficient knowledge to form a belief as to the truth of the statement by Simone cited in Paragraph 42. With respect to the last sentence, Tapestry states that the quote is taken out of context and is misleading, and that the full content of the documents speaks for itself. Tapestry denies the remaining allegations in Paragraph 42, and further denies that "'accessible luxury' handbags" constitutes an antitrust product market and contends that it lacks sufficient information to understand the contours of that proposed market.

43. The first two sentences of Paragraph 43 assert legal arguments and conclusions to which no response is required. To the extent a response is required, Tapestry denies the allegations contained in the first two sentences of Paragraph 43. The third sentence contains quoted language that is taken out of context and is misleading, and the full content of the documents speaks for itself. The final sentence of Paragraph 43 purports to characterize the contents of regulatory filings, and Tapestry respectfully refers to those filings for a complete and accurate statement of their contents. To the extent the allegations set forth in the final sentence of Paragraph 43 are inconsistent with those filings, Tapestry denies the allegations. Tapestry denies any remaining allegations in Paragraph 43.

44. Paragraph 44 asserts legal conclusions and argument that do not warrant a response.

45. Tapestry denies that "'accessible luxury' handbags" constitutes an antitrust product market and lacks sufficient information to understand the contours of that proposed market. Paragraph 45 asserts legal conclusions and argument that do not require a response. To the extent that a response is required, Tapestry denies that FTC's 2023 Merger Guidelines have any relevance. They are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw. Tapestry denies the remaining allegations in Paragraph 45.

46. The first sentence of Paragraph 46 asserts legal conclusions and argument that do not warrant a response. To the extent that a response is required, Tapestry admits that it sells handbags in the United States. Tapestry further admits that it has U.S.-specific marketing. Tapestry lacks sufficient knowledge to form a belief as to the truth of the marketing practices and business strategies of undefined or vaguely defined other "industry participants." Tapestry denies the remaining allegations in Paragraph 46.

47.  Paragraph 47 asserts legal conclusions and argument that do not warrant a response. To the extent that a response is required, Tapestry denies the allegations in Paragraph 47.

48.  Paragraph 48 asserts legal conclusions and argument that do not warrant a response. To the extent that a response is required, Tapestry denies that FTC's 2023 Merger Guidelines have any relevance.  They are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw.  Tapestry denies the remaining allegations in Paragraph 48.

49.  Paragraph 49 asserts legal conclusions and argument that do not warrant a response. To the extent that a response is required, Tapestry denies the allegations in Paragraph 49.

50.  Paragraph 50 asserts legal conclusions and argument that do not warrant a response. To the extent that a response is required, Tapestry denies the allegations in Paragraph 50.  The Proposed Transaction will benefit consumers.

51.  Tapestry lacks sufficient knowledge to form a belief about a letter from an unidentified Tapestry shareholder and therefore denies the second sentence on that basis.  Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in the fourth and fifth sentences in Paragraph 51.  Tapestry further states that the quoted language is taken out of context and misleading, and that the full content of the documents speaks for itself. Tapestry denies the remaining allegations in Paragraph 51.

52.  Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in Paragraph 52.  Tapestry denies the remaining allegations in Paragraph 52. Tapestry further states that the quoted language is taken out of context and misleading, and that the full content of the documents speaks for itself.

53.  Paragraph 53 asserts legal conclusions and argument that do not warrant a response. To the extent that a response is required, Tapestry denies that FTC's 2023 Merger Guidelines have

24

any relevance. They are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw. Tapestry further denies the allegations in Paragraph 53.

54. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in Paragraph 54. Paragraph 54 purports to characterize the contents of various documents, and Tapestry respectfully refers the Court to those documents for a complete and accurate statement of their contents. To the extent the allegations set forth in Paragraph 54 are inconsistent with those documents, Tapestry denies the allegations. Tapestry denies any remaining allegations in Paragraph 54.

55. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in Paragraph 55. The rest of Paragraph 55 contains legal arguments and conclusions to which no response is required. To the extent a response is required, Tapestry denies the remaining allegations in Paragraph 55.

56. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in Paragraph 56. Tapestry denies the remaining allegations in Paragraph 56.

57. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced in Paragraph 57. Tapestry denies any remaining allegations in Paragraph 57.

58. Tapestry admits that digital sales are an important and growing part of its business. Tapestry lacks sufficient knowledge to form a belief as to the truth of Capri's actions characterized in Paragraph 58. With respect to the last sentence of Paragraph 58, Tapestry states that the quoted language is taken out of context and is misleading, and that the full content of the statement speaks for itself. Tapestry denies the remaining allegations in Paragraph 58.

59. The first two sentences of Paragraph 59 assert legal argument and conclusions to which no response is required. To the extent a response is required, Tapestry denies the allegations contained in the first two sentences of Paragraph 59. The third and fourth sentences of Paragraph 59 purport to reference statements by Capri personnel, and Tapestry lacks sufficient knowledge to form a belief as to the truth of those statements. Tapestry denies any remaining allegations in Paragraph 59.

60. The first sentence contains legal arguments and conclusions to which no response is required. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents and actions characterized in the second sentence of Paragraph 60. The third sentence contains quoted language that is taken out of context and is misleading, and the full content of the documents speaks for itself. Tapestry denies the remaining allegations in Paragraph 60.

61. Paragraph 61 contains legal arguments and conclusions to which no response is required. To the extent a response is required, Tapestry denies the allegations in Paragraph 61.

62. Tapestry lacks sufficient knowledge to form a belief as to the truth of the Capri documents referenced and characterized in Paragraph 62. Tapestry admits that Michael Kors publicly committed to a $15 per hour minimum wage effective October 3, 2021. To the extent a response is required on any other allegation, Tapestry denies the allegations in Paragraph 62 except as explicitly admitted.

63. Paragraph 63 asserts legal arguments and conclusions that do not require a response. To the extent that a response is required, Tapestry denies those allegations, denies the remaining allegations in Paragraph 63, and further states that with respect to the third sentence, the quoted language is taken out of context and is misleading, and that the full content of the documents speaks for itself.

26

64. Paragraph 64 purports to characterize the contents of deal documents, and Tapestry respectfully refers to those documents for a complete and accurate statement of their contents. To the extent the documents are inconsistent, Tapestry denies the allegations in Paragraph 64.

65. Tapestry admits that it has used the term "Coachenomics," but denies the allegation's characterization of "Coachenomics." "Coachenomics" describes the procompetitive strategy of making greater investments in marketing to increase the attractiveness and the value of Coach products for consumers along with strategic cost reductions that do not affect the customer. Tapestry admits that in 2016 it discussed a plan for North American department store distribution, to enable Tapestry to maintain long-term brand health and minimize confusion across channels. Tapestry further states that numerous factors contribute to Average Unit Retail price at a given point in time. Paragraph 65 also purports to characterize the contents of Tapestry documents, and Tapestry respectfully refers to those documents for a complete and accurate statement of their contents. Tapestry denies the remaining allegations in Paragraph 65.

66. Paragraph 66 contains legal arguments and conclusions to which a response is not required. To the extent a response is required, Tapestry denies the allegations in Paragraph 66. Tapestry further states that the quoted language is taken out of context and is misleading, and that the full content of the document speaks for itself.

67. Tapestry lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence regarding Michael Kors. The rest of the first sentence and the second sentence contain legal arguments and conclusions to which a response is not required. To the extent a response is required, Tapestry denies the allegations. With respect to the last sentence, Tapestry contends that the quoted language is taken out of context and misleading, and

that the full content of the document speaks for itself and does not support the allegations in Paragraph 67.

68.     Tapestry admits that it has used the term "Coachenomics," but denies the allegation's characterization of "Coachenomics." "Coachenomics" describes the procompetitive strategy of making greater investments in marketing to increase the attractiveness and the value of Coach products for consumers along with strategic cost reductions that do not affect the customer. Tapestry denies the remaining allegations in Paragraph 68. Tapestry further states that the quoted language is taken out of context and is misleading, and that the full content of the documents speaks for itself.

69.     Tapestry admits that it has a brand growth platform and states that numerous factors contribute to pricing, Average Unit Retail, and gross margin at a given point of time, including investments in marketing and product, changing consumer trends and preferences, and competition. Tapestry intends to revitalize the Michael Kors brand and invest in other Capri brands, including by supporting them with Tapestry's consumer engagement platform and technology-based data analytics capabilities to grow consumer connection and brand sales. The Proposed Transaction will increase demand for Capri's products, expand output, and ultimately deliver the Capri brands to more consumers. Tapestry denies the remaining allegations in Paragraph 69.

70.     Paragraph 70's use of the undefined or vague terms "enormous" and "superior" renders Paragraph 70's allegations incapable of further response as written. Tapestry admits that it has made procompetitive investments in data and technological capabilities. Tapestry states that these investments allow Tapestry to market its brands and products more effectively to help drive value in the eyes of the consumers and to deliver the products that consumers desire more

28

efficiently.  Tapestry intends to revitalize the Michael Kors brand and invest in other Capri brands, including by supporting them with Tapestry's consumer engagement platform and technology-based data analytics capabilities to grow consumer connection, improve Capri products and increase brand sales.  The Proposed Transaction will increase demand for Capri's products, expand output, and ultimately deliver the Capri brands to more consumers.  Tapestry otherwise denies the allegations in Paragraph 70.

71.     Paragraph 71 asserts legal arguments and conclusions that do not warrant a response.  Additionally, Tapestry lacks sufficient information to assess the "'accessible luxury' handbag" market and what the FTC contends is included in that market.  To the extent a response is required, Tapestry denies the allegations in Paragraph 71.

72.     Paragraph 72 asserts legal arguments and conclusions that do not warrant a response.  To the extent that a response is required, Tapestry denies that FTC's 2023 Merger Guidelines have any relevance.  They are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw.

73.     Paragraph 73 asserts legal arguments and conclusions that do not warrant a response.  To the extent that a response is required, Tapestry denies the allegations in Paragraph 73, denies that FTC's 2023 Merger Guidelines have any relevance, and states that they are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw.

74.     Tapestry denies the allegations contained in the first sentence of Paragraph 74.  The remainder of Paragraph 74 asserts legal arguments and conclusions that do not require a response.  To the extent a response is required, Tapestry denies the remaining allegations in Paragraph 74 including that FTC's 2023 Merger Guidelines have any relevance here.  They are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw.

75.     Paragraph 75 asserts legal arguments and conclusions that do not require a response.  To the extent that a response is required, Tapestry denies that "'accessible luxury' handbags" constitutes an antitrust product market and lacks sufficient information to understand the contours of that proposed market.  Tapestry further denies the remaining allegations in Paragraph 75.

76.     Tapestry admits that Tapestry owns Coach, Kate Spade, and Stuart Weitzman.  Tapestry admits that Capri owns Michael Kors, Versace, and Jimmy Choo.  Tapestry further admits that the Proposed Transaction contemplates Tapestry purchasing Capri.  The remaining allegations in Paragraph contain legal arguments and conclusions to which a response is not required.  To the extent a response is required, Tapestry denies the remaining allegations in Paragraph 76.

77.     Paragraph 77 is an excerpt of the Merger Guidelines, which does not require a response.  Tapestry refers to the Merger Guidelines for a complete and accurate statement of their contents.  To the extent that a response is required, Tapestry denies that FTC's 2023 Merger Guidelines have any relevance here.  They are non-binding statements that identify the enforcement practices of the FTC and depart from modern caselaw.

78.     Paragraph 78 asserts legal arguments and conclusions that do not warrant a response. Tapestry further states that the quoted language is taken out of context and misleading, and the full content of the documents speaks for itself.  To the extent that a response is required, Tapestry denies the allegations in Paragraph 78.

79.     Tapestry denies the allegations in Paragraph 79.  Tapestry further states that the quoted language is taken out of context and is misleading, and the full content of the documents speaks for itself.

30

80.     Tapestry states that the quoted language is taken out of context and misleading, and the full content of the documents speaks for itself.  This Paragraph further contains legal arguments and conclusions purportedly based on Tapestry documents to which no response is required.  To the extent a response is required, Tapestry denies the allegations in Paragraph 80.

81.     Tapestry denies that "'accessible luxury' handbags" constitutes an antitrust product market and lacks sufficient information to understand the contours of that proposed market.  Tapestry denies the remaining allegations in Paragraph 81.  Tapestry further states that the quoted language is taken out of context and misleading, and the full content of the documents speaks for itself.

82.     Paragraph 82 asserts legal arguments and conclusions that do not warrant a response.  Tapestry further states that the quoted language is taken out of context and misleading, and the full content of the documents speaks for itself.  To the extent that a response is required, Tapestry denies the allegations in Paragraph 82.

83.     Paragraph 83 contains legal arguments and conclusions that do not warrant a response.  Tapestry further states that the quoted language is taken out of context and misleading, and the full content of the documents speaks for itself.  To the extent that a response is required, Tapestry denies the allegations in Paragraph 83.

84.     Paragraph 84 contains legal arguments and conclusions that do not warrant a response.  Tapestry further states that the quoted language is taken out of context and misleading, and the full content of the documents speaks for itself.  To the extent that a response is required, Tapestry denies the allegations in Paragraph 84.

85.     Tapestry lacks sufficient information to form a belief as to the truth of the allegations contained in the second to last sentence of Paragraph 85 regarding Rebecca Minkoff

and denies the allegations on that basis. The rest of Paragraph 85 asserts legal arguments and conclusions that do not warrant a response. To the extent that a response is required, Tapestry denies the allegations, and further states that entry and expansion are easy and ongoing, such that it competes in a dynamic marketplace.

86. The second sentence of Paragraph 86 contains quoted language that is taken out of context, and the full content of the documents speaks for itself. The rest of Paragraph 86 contains legal arguments and conclusions that do not warrant a response. To the extent that a response is required, Tapestry denies the allegations. Tapestry further states that there are numerous ways to sell products including through online channels, which makes consumers highly accessible for new entrants. Additionally, wholesale retailers carry a large variety of brands in both their brick-and-mortar and online stores, allowing brands to expand their exposure and reach an even broader consumer base.

87. Tapestry admits that its brands have marketing departments, and Tapestry invests money in marketing. Tapestry further admits that it participates in fashion events. The rest of Paragraph 87 contains legal arguments and conclusions that do not require a response. To the extent a response is required, Tapestry denies the allegations. Tapestry further states that the internet enables entrants to easily reach millions of prospective consumers through social media. For example, a celebrity posting a photo with a product or engagement with a popular influencer can both drive demand.

88. Tapestry admits that it maintains consumer data that it utilizes to develop and market its brands and products more effectively to drive value in the eyes of the consumers and to deliver the products that consumers desire more efficiently. The third sentence of Paragraph 88 contains quoted language that is taken out of context, and the full content of the documents speaks

32

for itself.  The rest of Paragraph 88 contains legal arguments and conclusions that do not warrant a response.  To the extent that a response is required and except as specifically admitted herein, Tapestry denies the allegations.

89.　　Paragraph 89 contains legal arguments and conclusions that do not warrant a response.  To the extent that a response is required, Tapestry denies the allegations.  Tapestry further states that are no significant barriers to procuring manufacturing services.  There are many manufacturers of fashion products, and entrants have numerous choices when looking to manufacture their products.

90.　　Paragraph 90 asserts legal arguments and conclusions that do not warrant a response.  To the extent that a response is required, Tapestry denies the allegations in Paragraph 90, and further states that the Proposed Transaction is complementary and will result in procompetitive efficiencies and will revitalize the declining Michael Kors brand by providing consumers better products.

91.　　Paragraph 91 asserts legal arguments and conclusions that do not warrant a response.  To the extent that a response is required, Tapestry denies the allegations in Paragraph 91.

92.　　Tapestry denies the allegations in Paragraph 92.

93.　　Paragraph 93 asserts legal arguments and conclusions that do not warrant a response.  To the extent that a response is required, Tapestry specifically denies that preliminary relief is warranted and necessary and that the timing of the Commission's ruling has any relevance here whatsoever, and further denies the remaining allegations in Paragraph 93.

94.　　Tapestry denies the allegations contained in the first sentence of Paragraph 94.  The remainder of Paragraph 94 is a request for relief to which no response is required.  To the extent a

33

response is required, Tapestry denies that the FTC is entitled to the relief requested in Paragraph 94 or elsewhere in the Complaint.

Tapestry denies the allegations in the Complaint, whether express or implied, that are not specifically addressed herein.

## AFFIRMATIVE AND OTHER DEFENSES

Tapestry asserts the following defenses with respect to the causes of action alleged in the Complaint, without assuming the burden of proof or persuasion where such burden rests on the FTC. Tapestry has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other applicable defenses that may become available or apparent throughout the course of the action. Tapestry reserves the right to amend, or seek to amend, its Answer, including its affirmative and other defenses.

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

The alleged market definition fails as a matter of both fact and law.

### THIRD DEFENSE

The Complaint fails to allege any plausible harm to competition, consumers, or consumer welfare.

### FOURTH DEFENSE

The Complaint fails to allege undue share in any plausibly defined relevant market.

### FIFTH DEFENSE

Any alleged harm to competition is not actionable.

34

## SIXTH DEFENSE

The Complaint fails to state a claim because new entrants to the relevant market were (and are) timely, likely, and sufficient to offset any alleged anticompetitive effects of the Proposed Acquisition.

## SEVENTH DEFENSE

The Proposed Acquisition is procompetitive, and will result in merger-specific efficiencies, cost synergies, product-quality improvements, and other procompetitive effects that benefit consumers. The benefits outweigh any alleged anticompetitive effects.

## EIGHTH DEFENSE

The combination of Respondents' businesses is not likely to substantially lessen competition under the analytical framework set forth in the Clayton Act.

## NINTH DEFENSE

Neither the filing of this action nor the contemplated relief is in the public interest, pursuant to 15 U.S.C. § 45.

## TENTH DEFENSE

The Commission's claims under Section 5 of the Federal Trade Commission Act are nonactionable to the extent the Commission purports to apply Section 5 beyond the boundaries of the Clayton Act.

## ELEVENTH DEFENSE

The Commission fails to allege a time frame for the alleged anticompetitive effects.

Dated:　　　　May 16, 2024

**LATHAM & WATKINS LLP**

By: */s/ Alfred C. Pfeiffer*

　　Alfred C. Pfeiffer (*pro hac vice*)
　　Christopher S. Yates (*pro hac vice*)
　　505 Montgomery Street, Suite 2000
　　San Francisco, CA 94111
　　Telephone: (415) 395-8240
　　al.pfeiffer@lw.com
　　chris.yates@lw.com

　　Amanda P. Reeves (*pro hac vice*)
　　Ian R. Conner (*pro hac vice*)
　　Lindsey S. Champlin (*pro hac vice*)
　　Jennifer L. Giordano
　　David L. Johnson (*pro hac vice*)
　　Seung Wan (Andrew) Paik (*pro hac vice*)
　　Mary A. Casale (*pro hac vice*)
　　Christopher J. Brown (*pro hac vice*)
　　555 Eleventh Street, NW, Suite 1000
　　Washington, DC 20004
　　Telephone: (202) 637-2200
　　amanda.reeves@lw.com
　　ian.conner@lw.com
　　lindsey.champlin@lw.com
　　jennifer.giordano@lw.com
　　david.johnson@lw.com
　　andrew.paik@lw.com
　　mary.casale@lw.com
　　chris.brown@lw.com

　　Lawrence E. Buterman
　　1271 Avenue of the Americas
　　New York, NY 10020
　　Telephone: (212) 906-1200
　　lawrence.buterman@lw.com

　　Sean M. Berkowitz (*pro hac vice*)
　　330 North Wabash Avenue, Suite 2800
　　Chicago, IL 60611
　　Telephone: (312) 876-7700
　　sean.berkowitz@lw.com

　　*Attorneys for Tapestry, Inc.*

# Exhibit 10

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

**Date of report (Date of earliest event reported):** November 3, 2023

# Tapestry, Inc.
**(Exact Name of Registrant as Specified in Charter)**

| Maryland | 001-16153 | 52-2242751 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

10 Hudson Yards, New York,
New York 10001
**(Address of Principal Executive Offices, and Zip Code)**

(212) 946-8400
**Registrant's Telephone Number, Including Area Code**

**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐  Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communication pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communication pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | TPR | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01    Other Events.**

As previously disclosed, on August 10, 2023, Tapestry, Inc. (the "Company") entered into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, Sunrise Merger Sub, Inc., a British Virgin Islands business company limited by shares with BVI company number 2129509 incorporated under the laws of the territory of the British Virgin Islands and a wholly owned subsidiary of the Company, and Capri Holdings Limited, a British Virgin Islands business company limited by shares with BVI company number 524407 incorporated under the laws of the territory of the British Virgin Islands ("Capri"), pursuant to which, and upon the terms and subject to the conditions therein, the Company has agreed to acquire Capri (the "Transaction").

On November 3, 2023, the Company and Capri each received a request for additional information and documentary materials (the "Second Request") from the Federal Trade Commission (the "FTC") in connection with the FTC's review of the Transaction. The effect of the Second Request is to extend the waiting period imposed by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), until 30 days after the Company and Capri have substantially complied with the Second Request, unless that period is extended voluntarily by the Company and Capri or terminated sooner by the FTC. Both the Company and Capri expect to promptly respond to the Second Request and to continue to work cooperatively with the FTC in its review of the Transaction. The Company continues to expect that the Transaction will be completed in calendar year 2024, subject to the expiration or termination of the waiting period under the HSR Act and the satisfaction or waiver of the other closing conditions specified in the Merger Agreement.

**Forward-Looking Statements**

This report includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements relate to future events and anticipated results of operations, business strategies, the anticipated benefits of the proposed transaction, the anticipated impact of the proposed transaction on the combined company's business and future financial and operating results, the expected amount and timing of synergies from the proposed transaction, the anticipated closing date for the proposed transaction and other aspects of the Company's operations or operating results. These forward-looking statements generally can be identified by phrases such as "will," "expects," "anticipates," "foresees," "forecasts," "estimates" or other words or phrases of similar import. It is uncertain whether any of the events anticipated by the forward-looking statements will transpire or occur, or if any of them do, what impact they will have on the results of operations and financial condition of the combined company or the price of the Company's or Capri's stock. These forward-looking statements involve certain risks and uncertainties, many of which are beyond the parties' control, that could cause actual results to differ materially from those indicated in such forward-looking statements, including but not limited to, statements regarding the Company's expectations regarding the timing for the completion of the Transaction. For additional information about other factors that could cause actual results to differ materially from those described in the forward-looking statements, please refer to the Company's and Capri's respective periodic reports and other filings with the SEC, including the risk factors identified in the Company's and Capri's most recent Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K. The forward-looking statements included in this communication are made only as of the date hereof. Neither the Company nor Capri undertakes any obligation to update any forward-looking statements to reflect subsequent events or circumstances, except as required by law.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: November 6, 2023

TAPESTRY, INC.

By: /s/ David E. Howard
David E. Howard
General Counsel and Secretary

# Exhibit 11

*09-Nov-2023*

# TAPESTRY, INC.

*Q1 2024 Earnings Call*

# CORPORATE PARTICIPANTS

## Christina Colone

*Global Head of Investor Relations*

*TAPESTRY, INC.*

## Joanne Crevoiserat

*Chief Executive Officer*

*TAPESTRY, INC.*

## Scott Roe

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

## Todd Kahn

*CEO and Brand President of Coach*

*TAPESTRY, INC.*

## Operator

# OTHER PARTICIPANTS

## Robert Drbul

*Analyst*

*Guggenheim Securities*

## Irwin Boruchow

*Analyst*

*Wells Fargo*

## Lorraine Maikis

*Analyst*

*BOFA*

## Matthew Boss

*Analyst*

*JP Morgan*

## Michael Binetti

*Analyst*

*Evercore*

Mark Altschwager

*Analyst*

*Baird*

Brooke Roach

*Analyst*

*Goldman Sachs*

Oliver Chen

*Analyst*

*TD Cowen*

# MANAGEMENT DISCUSSION SECTION

## Operator

Good day, and welcome to this Tapestry Conference Call. Today's call is being recorded.

[Operator Instructions] At this time, for opening remarks and introductions, I would like to turn the call over to the Global Head of Investor Relations, Christina Colone.

## Christina Colone

*Global Head of Investor Relations*

*TAPESTRY, INC.*

Good morning. Thank you for joining us. With me today to discuss our first quarter results as well as our strategies and outlook are Joanne Crevoiserat, Tapestry's Chief Executive Officer; and Scott Roe, Tapestry's Chief Financial Officer and Chief Operating Officer.

Before we begin, we must point out that this conference call will involve certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act. This includes projections for our business in the current or future quarters or fiscal years. Forward-looking statements are not guarantees, and our actual results may differ materially from those expressed or implied in the forward-looking statements. Please refer to our annual report on Form 10-K, the press release we issued this morning and our other filings with the Securities and Exchange Commission for a complete list of risks and other important factors that could impact our future results and performance.

Non-GAAP financial measures are included in our comments today and in our presentation slides. For a full reconciliation to corresponding GAAP financial information, please visit our website, Www.tapestry.com/investors, and then view the earnings release and the presentation posted today.

Now let me outline the speakers and topics for this conference call. Joanne will begin with highlights for Tapestry and our brands. Scott will continue with our financial results, capital allocation priorities and our outlook going forward. Following that, we will hold a question-and-answer session, where we will be joined by Todd Kahn, CEO and Brand President of Coach. After Q&A, Joanne will conclude with brief closing remarks. I'd now like to turn the call over to Joanne Crevoiserat, Tapestry's CEO.

## Joanne Crevoiserat

*Chief Executive Officer*

*TAPESTRY, INC.*

Good morning. Thank you, Christina, and welcome, everyone. As noted in our press release, we achieved record first quarter earnings per share as we meaningfully advanced our strategic priorities against the dynamic external backdrop. Our consistent progress demonstrates the power of brand building, customer centricity and disciplined execution, which enable us to fuel innovation and cultivate new and lasting relationships with consumers around the world.

I want to thank our talented global teams for their passion and unwavering focus, which continue to drive our strong and differentiated results. Touching on the strategic and financial highlights for the quarter. First, we powered global growth, achieving 2% constant currency revenue gains consistent with our outlook and underscoring the benefits of our globally diversified business model. This top line growth was fueled by a 7% gain internationally, which included a 9% increase in Greater China, again surpassing our peak in FY '21. In addition, our business with Chinese consumers globally rose low double digits, supported by improving tourist trends in Asia and Europe.

Looking ahead, while the consumer environment in China continues to be volatile, we remain committed to investing behind our brands leveraging Tapestry's established platform in the region to drive long-term growth, both in China and with this important consumer cohort worldwide. Turning to Japan. We drove continued momentum with revenue rising 12%. And in other Asia and Europe, sales were relatively in line with the prior year. Finally, in North America, we delivered revenue roughly in line with last year and consistent with our expectations.

Despite the challenging consumer backdrop in the United States, we are driving a healthy business, underscored by significant growth and operating margin expansion compared to last year. Second, we remain focused on building customer engagement across our brands, harnessing the power of our data-rich platform. In the quarter, we acquired over 1.2 million new customers in North America alone of which roughly half were Gen Z and millennials, as we advance our strategy to attract younger consumers to our brands. Importantly, we continue to see new customers transact at a higher AUR than the balance of our customer base.

Third, we delivered unique and seamless omnichannel experiences, reinforcing the benefits of our operating model. We drove growth in direct-to-consumer sales on a constant currency basis, including a low single-digit gain in brick-and-mortar sales supported by our world-class field organization and a store fleet that is proven and highly profitable. In addition, we maintained our strong positioning in digital, leveraging our established capabilities to connect with consumers across their purchase journey. While sales declined slightly, revenues still represented nearly 25% of sales, approximately 3x pre-pandemic levels. Fourth, we fueled fashion innovation and product excellence delivering compelling newness and value to customers around the world with success in new launches and bring elements outperforming expectations and fueling handbag AURs globally. At the same time, we delivered outsized top line gains in our small leather goods and lifestyle offerings, key to enhancing brand relevance and fueling customer lifetime value.

Taken together, we generated record first quarter earnings per share, increasing at a high teens rate compared to the prior year, which we accomplished despite a volatile demand backdrop. Our strong and consistent results reinforce the power of our brands and strategies amplified by the advantages and agility of our model. As we look forward, we remain laser-focused and confident in our ability to drive sustainable, profitable growth.

Now turning to the highlights across each of our brands, starting with Coach. Our team continued to bring expressive luxury to life building the brand through emotional consumer connections, innovation that encourages self-expression and immersive omnichannel experiences. These strategies are driving sustainable momentum and exceptional financial results highlighted by 5% constant currency revenue growth and 180 basis points of operating margin expansion, supported by strong gross margin gains.

Touching on some details of the quarter. First, we fueled growth in our leather goods offering by leaning into our iconic platforms. We reinforced our key families, including Tabby, Willow and Rogue through a continued focus on core styles while animating the icons to drive excitement. Tabby again outperformed expectations, nearly doubling versus last year, with strength across bags and small leather goods at strong AUR relative to the balance. We're continuing to iterate on this icon, including a new size in our shoulder bag, which over-indexed with the younger consumer as well as a braided option of our soft style. Overall, Tabby remains an important volume and recruitment driver for the brand, and we see even further runway ahead.

At the same time, Willow and Rogue remained important volume drivers within the assortment. In keeping with consumer trends, we also launched new silhouettes across a range of price points and sensibilities, including the idle shoulder bag, which was a notable highlight in Greater China, where AUR was well ahead of the average. Overall, our creative and innovative products supported a mid-single-digit gain in global handbag AUR at constant currency, including growth in North America. Importantly, we see continued runway for pricing improvements given our innovation pipeline and brand heat. Second, we delivered gains across lifestyle, an area of long-term opportunity for the brand. We drove top line growth in ready-to-wear, footwear and men's as we develop our core families with a goal of driving customer recruitment, purchase frequency and ultimately, customer lifetime value. In ready-to-wear, we focused on our strategy of building a timeless assortment of key styles that represent a compelling value. This included the successful launch of our snap front leather jacket at a $695 price point as well as success in our evergreen trench coats.

In footwear, the Leah Loafer remained a top seller and delivered significant growth. And in men's we delivered outsized gains driven by the performance of our relay tote, which was again a top style while the newly introduced Beck family of sporty and sophisticated options also delivered strong results. Third, we created purpose-led storytelling directly tied to our product. We began the quarter with the debut of our third purpose campaign Wear Your Shine which inspires consumers to express themselves authentically using fashion as a means for personal expression and empowerment. The Shine collection includes metallic and sparkle bags, ready-to-wear and accessories allowing customers to shine brightly.

Our campaign featured new global ambassadors, including Dove Cameron and Youngji Lee. We brought the campaign to life through experiences across the world with physical and digital activations from campus takeovers in the U.S. to a partnership with Vogue world in Europe to pop up installments across Asia. Overall, the success of this campaign helped to support the acquisition of approximately 800,000 new customers in North America including a growing number of millennials and Gen Z. Fourth, we focused on deepening connections with consumers by further developing our customer insights capabilities to build stronger and longer-term connections. In keeping with this strategic pillar, we launched a trial on Amazon in September. The platform provides broad consumer reach and plays a vital role in the customers' discovery and purchase journey, specifically for young cohorts.

And finally, we built momentum in our subbrand Coachtopia, a reimagination of the product creation process to evolve our vision of circularity. We expanded our reach in North America while launching in Japan with additional international opportunities in the pipeline. We've also further innovated across the assortment, including our Coachtopia Loop collection designed with a mono material approach, recycled PET plastic. While Coachtopia remains a small portion of the assortment, we are very excited by the significant consumer attention, specifically with younger audiences.

Looking ahead to holiday. We're continuing to focus on building stronger emotional connections with our consumer base while prioritizing brand health, and we remain disciplined in our approach to discounting in an increasingly promotional environment. We're bringing our purpose to life, delivering an emotional narrative through our more than a gift holiday campaign, which celebrates the gifts that give us confidence to be ourselves. We're also leaning into the strength of our Shine campaign, layering on to the successful launch of our metallic series with a gold addition to capitalize on the holiday theme.

In closing, Coach continues to deliver with a clear strategy, unique and authentic purpose and commitment to driving sustainable, healthy growth through profit gains that fund brand building. We remain focused on fueling further momentum and are confident in the tremendous runway ahead for this iconic brand.

Now moving to Kate Spade. During the quarter, top line performance improved sequentially amid a difficult demand backdrop. Importantly, we expanded gross margin and delivered another quarter of handbag AUR gains, which fueled increases in operating profit and margin. At the same time, we continue to invest in the brand and capabilities that underpin our long-term ambition. We remain confident in our strategies and are agile, as we focus on driving enhanced innovation and financial results.

In the quarter, we advanced our strategic initiatives. First, we remain focused on building a compelling and innovative handbag offering. We launched the Dakota family in retail, which features new signature hardware. The bold and modern collection outperformed our expectations, resonating with younger consumers at an above-average AUR. Based on Dakota's initial performance, we're excited to build momentum through marketing amplification and the introduction of new styles within the family. And in outlet, we accelerated the introduction of Madison, a collection of reinvigorated Saffiano Leather styles to build out the core offering. The family outperformed plan and over-indexed with new and younger customers while also driving an increase in customer reactivation underscoring future opportunity.

Having said that, performance in carryover families declined, reinforcing our strategic decision to move with urgency to accelerate the pace of newness to drive stronger customer engagement and financial results. Touching on novelty, which continued to bring heightened emotion to the brand and build out the world of Kate Spade our Martini collection, embedded across our lifestyle categories resonated with our customer base, notably among our highest spending customers. Overall, our product initiatives, coupled with our use of data to deepen our understanding of consumer preferences, supported mid-single-digit handbag AUR growth globally, demonstrating our commitment to brand building and fueling innovation.

Next, we advanced our strategy to become more lifestyle with momentum in jewelry and footwear where we delivered double-digit top line growth. Jewelry remained an important acquisition vehicle with outsized resonance among younger consumers, while footwear outperformed on strength in loafers and sneakers as we infuse Kate Spade's branding and codes into key styles. We know that customers who shop across categories are our highest value customers, demonstrating the importance of the brand's lifestyle offering as a long-term growth driver.

Now touching on marketing. We delivered campaigns that express the world of Kate Spade with a direct link to our product offering. In the quarter, we evolved our New York Fashion Week presentation to further engage the broader community, including our creators loft, a 3-day pop-up design to support up-and-coming Gen Z creators. Further, in keeping with our brand values, we hosted the Global Summit on Women's Mental Health and Empowerment in partnership with Pinterest, which brought together leaders from Kate Spade's Social Impact Council and key industry partners to encourage conversation, education and research around this important cause. These campaigns and engagements alongside our compelling product offering, drove an improvement in brand consideration in the U.S. compared to last year, which included notable increase among young female millennials for YouGov.

At the same time, our efforts helped to support the recruitment of over 400,000 new customers in North America alone. Next, consistent with our priority of becoming more global, we invested in brand activations across international markets to drive awareness, a key opportunity. As such, we launched experiential events supporting the introduction of Dakota including a playful giant Dakota bag in Japan, a traveling bus serving Matcha across Singapore and branded taxis, featuring our iconic green dots and stripes in the U.K. These activations successfully introduce new and younger customers to our brand.

Finally, we remain focused on the omnichannel opportunities for the brand. In October, we launched a dedicated katespadeoutlet.com site, replacing the brand's surprise site in order to provide a more cohesive way for outlet consumers to discover and shop the brand online. Importantly, the seamless launch of the site enables us to offer our customers a consistent omnichannel outlet experience across products, marketing and messaging. For the upcoming holiday shopping season, we will lean into Kate Spade positioning as a brand that embodies joy and celebration. We're launching distinctive newness in core platforms across channels. In retail, we will expand the Dakota family building on our recent success. In outlet, we will animate the Madison collection with the introduction of a Mini Duffel. We're also excited to launch our spade flower coated cannabis pattern, establishing a new signature branding platform for the channel. We also have compelling gifting and novelty assortments designed to drive differentiation and customer engagement.

In marketing, we will focus on storytelling, highlighting Kate Spade's optimistic and playful spirit true to the brand and the holiday season. In addition, we are launching physical activations of our brand codes globally while delivering content that reinforces our product strategies. Overall, we're making important progress at Kate Spade, executing with intention and agility to forge strong emotional bonds with consumers, while at the same time, driving enhanced profitability. Our go-forward strategy is clear, and we are well positioned to successfully navigate the dynamic environment in the near term while delivering on our long-term ambition for the brand.

Turning to Stuart Weitzman. Results in the quarter were pressured against the volatile external backdrop. Specifically, top line trends reflected a continued reduction in off-price wholesale shipments, as well as a slower-than-anticipated recovery in China. That said, we achieved positive wholesale trends at POS and expanded gross margin. While we are unsatisfied with the brand's performance, we are focused on prioritizing brand health and delivering innovation for consumers.

Touching on key elements of the brand's strategic growth pillars. First, during the quarter, we curated a relevant offering of emotional product. Our core collection of boots and booties drove outsized recruitment of younger customers, while at the same time, driving lapsed customer reactivation. Our expanded 50-50 family outperformed expectations as we introduced modern takes on the iconic boot, including new colorways backed by our fall campaign, which I'll touch on in a moment. Further, we continued to build out the brand's offering, notably with more seasonless casual styles and keeping with evolving consumer preferences. To this end, loafers as well as our assortment of on-trend ballet style flats resonated with consumers, highlighting potential in these relatively underpenetrated categories. And just this month, we launched a new sneaker campaign, featuring an extensive range of innovative designs, engineered to combine fashion and function, a hallmark of the brand.

At the same time, our handbag collection, while still a small portion of the assortment drove engagement with both new and existing clients at high AUR. Next, we leveraged new marketing tactics to fuel brand heat and consideration. In September, we launched the Invincibly Iconic Fall campaign centered around a nostalgic 50-50 boot and celebration of our 30th anniversary. We've employed a multipronged approach to our marketing, including utilizing an array of influencers to organically engage with consumers from He Cong to Kim Kardashian to Sofia Richie Grainge. For holiday, we will continue to drive engagement through this campaign, celebrating the brand's heritage and capitalizing on its strength in boots and booties during the peak season.

Overall, while the brand has seen continued pressure from external conditions in its core markets, the Stuart Weitzman team is focused on executing against the brand's strategic priorities building a stronger foundation with relevant assortments in new categories to deepen consumer engagement and improve profitability over the long term.

In closing, we have meaningfully advanced our strategic agenda, remaining focused on powering our iconic brands to move the consumer in an ever-changing environment. As a result, we are in a position of strength with meaningful runway for sustainable growth. Through a relentless drive to fuel brand magic and deliver for our customers, we are confident in our ability to achieve organic top and bottom line gains. Further, through the planned acquisition of Capri Holdings, we see a significant opportunity to accelerate our strategies while driving accretion to our strong stand-alone financial plan. Importantly, this combination establishes a new powerful global house of luxury and fashion brands that expand our portfolio reach across consumer segments, geographies and product categories. By bringing together 6 iconic brands with heritage in design and craftsmanship and leveraging our modern consumer engagement platform, we will drive greater innovation, consumer connectivity and cultural relevance creating superior value for our consumers, employees, communities and shareholders around the world.

We are making progress towards closing the transaction and look forward to sharing more detailed strategies for the future at the appropriate time.

With that, I'll turn it over to Scott, who will discuss our financial results, capital priorities and fiscal '24 outlook. Scott?

## Scott Roe

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

Thanks, Joanne, and good morning, everyone. Our results continue to demonstrate the benefits of our business model as well as our financial discipline and agility. In the first quarter, we drove growth across revenue, operating income and earnings despite the volatile backdrop.

Moving to the details of the quarter, beginning with revenue trends on a constant currency basis. Sales increased roughly 2% compared to the prior year when excluding a 130 basis point FX headwind. Our results were again fueled by international, which grew 7%. In Greater China, revenue rose 9% and represented growth against our prior peak levels in 2021. At the same time, we've continued to see an uptick in travel spend from Mainland China tourists with notable increases in Japan, Hong Kong, Macau, Southeast Asia and to a lesser extent Europe. While these trends have been encouraging, sales to Chinese tourists globally remain below pre-pandemic levels, representing further opportunity ahead.

In Japan, we drove continued momentum with sales growth of 12%, aided by increased of the tourist and in other Asia, revenue was roughly flat to last year as the region lapped last year's growth of over 100%. In Europe, revenue was 1% below last year, largely in line with plan. And in North America, sales were roughly flat to last year as expected. Despite the continued difficult backdrop in the region, we delivered gross and operating margin expansion, underscoring our commitment to brand health and not chasing sales.

Now touching on revenue by channel for the quarter. Our direct-to-consumer business grew 1%, fueled by low single-digit gain in stores and in wholesale, revenue was 4% ahead of prior year, reflecting growth in our full-price accounts, mostly from Coach's trial on Amazon partially offset by a strategic reduction in off-price shipments and broader wholesale market pressure in North America.

Moving down the P&L. We delivered our strongest first quarter gross margin in a decade which was ahead of our projection and 250 basis points above last year, This year-over-year expansion included 150 basis points of favorable freight expense as well as operational outperformance, fueled by net pricing improvements. SG&A rose 3% favorable to our forecast on both a dollar and rate basis, reflecting operational savings. We continue to utilize these savings to reinvest in the business through high-return initiatives, notably platform investments and brand-building activities to drive long-term growth.

Taken together, operating margin and operating income were ahead of the prior year and our expectations and our record first quarter EPS of $0.93 was ahead of our guidance and represented growth of 18%.

Moving to the balance sheet and cash flows. We ended the quarter with $639 million in cash and investments and total borrowings of $1.65 billion. Free cash flow was an inflow of $54 million, including CapEx and implementation costs related to cloud computing of $29 million. Inventory levels at quarter end were 17% below prior year reflecting our focus on disciplined inventory management as well as a lower level of in-transits given the normalization and lead times. Heading into the important holiday season, we're pleased with the makeup of our inventory and are well positioned globally.

Turning to our dividend program. Our Board of Directors declared a quarterly cash dividend of $0.35 per common share, representing $80 million in dividend payments for the quarter. For the fiscal year, we continue to expect to return approximately $325 million to shareholders through the dividend for an annual rate of $1.40 per share a 17% increase compared to last year. As a reminder, given the acquisition of Capri Holdings, we've made the strategic decision to suspend share repurchase activity.

Now moving to our guidance for fiscal '24, which is provided on a non-GAAP basis and does not include any potential impact from the planned acquisition of Capri. We are maintaining our earnings and operating cash flow outlook for the fiscal year despite forecasting a more moderate rate of sales growth and have reduced our top line guidance by approximately $175 million. This includes roughly $100 million of FX pressure on a year-over-year basis and approximately $75 million related to a more cautious outlook in Asia and North America, given the difficult demand backdrop. Despite these pressures, we are able to reiterate our fiscal '24 EPS expectations on a stronger-than-anticipated margin performance, reinforcing the benefits of our agile platform and our focus on disciplined execution and brand management.

Moving into the fiscal year in further detail. We expect revenue of approximately $6.7 billion, representing a slight increase versus the prior year on a reported basis. Excluding an FX headwind of roughly 150 basis points, we anticipate constant currency sales growth of 2% to 3%.

Turning to sales details by region at constant currency. In North America, we anticipate revenue to be in line with to slightly above last year. This forecast reflects our commitment to maintaining promotional discipline and higher margins as we manage our brands and business for the long term. In Greater China, our outlook contemplates mid-single-digit growth, led by gains in the first half as we lapped last year's COVID-related headwinds. In Japan, we expect to grow mid-single digits, while Other Asia is forecasted to increase at a low double-digit rate. And in Europe, we anticipate high single-digit growth.

In addition, our outlook assumes operating margin expansion of over 70 basis points. We anticipate gross margin gains to drive this increase, which includes a benefit from moderating freight costs. On SG&A expenses, we anticipate slight deleverage for the year, reflecting continued investments in growth driving initiatives across the portfolio. In light of the current environment, we're continuing to monitor our cost base and take proactive actions where needed.

Moving to below the line expectations for the year. Net interest expense is anticipated to be approximately $20 million. The tax rate is expected to be approximately 20% and our weighted average diluted share count is forecasted to be in the area of 235 million shares. So taken together, we continue to project EPS of $4.10 to $4.15, representing 6% to 7% growth versus last year. And finally, before contemplating any deal-related costs, we still anticipate free cash flow of approximately $1.1 billion. This includes the expectation for CapEx and cloud computing costs to be in the area of $200 million. We expect roughly half to be related to stores, renovations and relocations mostly in Asia. The balance of spend is primarily related to our ongoing digital and IT investments.

Now let me take you through the shaping of the year. We expect relatively balanced constant currency top line and operating income growth between the first and second half of the year. Our operating margin expansion in the first half is fueled by gross margin gains, while SG&A growth is expected to moderate in the second half based on the pace of investments. We continue to forecast EPS growth to be front half weighted, primarily due to the phasing of our share count and tax rate assumptions. Looking at the second quarter specifically, we expect revenue growth of approximately 2% on a constant currency basis, which excludes roughly 60 basis points of FX pressure, and we anticipate second quarter EPS to be in the area of $1.45, representing 6% to 8% growth over the prior year.

Now to outline our capital allocation priorities looking forward, which are unchanged. First, we will invest in our brands and businesses to support sustainable growth. Second, we will utilize our strong free cash flow for rapid debt repayment. We are committed to maintaining a solid investment-grade rating. To this end, we initiated a long-term leverage target of less than 2.5x on a gross debt to adjusted EBITDA basis and expect to achieve that within 2 years of the Capri transaction close.

Finally, we will return capital to shareholders through our dividend. Importantly, we believe our strong cash flow profile provides us with further opportunity for investment and capital return. Following the achievement of our leverage target, over time, we expect to increase our dividend with the goal of achieving our stated payout ratio of 35% to 40% and see the opportunity to resume share repurchases in the future.

Before closing, I wanted to touch more holistically on the planned acquisition of Capri. We believe the acquisition will drive significant value creation with immediate accretion to adjusted earnings, enhanced cash flow and strong financial returns underpinned by a compelling industrial logic that's consistent with our commitment to being disciplined financial operators. It's important to highlight that we still expect Capri to generate double-digit EPS accretion on an adjusted basis and compelling ROIC. Embedded in these expectations is the assumption that the stand-alone Capri business will generate free cash flow in the area of $500 million on a non-GAAP unsynergized basis.

Importantly, we're making progress towards transaction close. First, the shareholders of Capri Holdings Limited approved the transaction last month, satisfying one of the conditions to close. Second, we're working towards receiving all required regulatory approvals, including responding to the FTC's second request. We remain confident in our ability to complete the transaction with a close anticipated in calendar 2024, consistent with our prior outlook. Third, we expect to fund the purchase through a combination of permanent financing, term loans, excess Tapestry cash and expected future cash flow. A portion of which will be used to pay certain of Capri's existing outstanding debt. Our financing strategy will support rapid debt paydown with prepayable debt in order to achieve our stated leverage target within 24 months post close, given the combined company's strong cash flow generation.

And finally, our integration planning efforts are moving forward as planned, and we continue to project run rate cost synergies of more than $200 million achieved within 3 years of the close. Overall, we remain excited by the opportunity to expand our house of powerful brands, increasing our position in growing and durable categories with enhanced cash flow to invest in brand building, while funding debt pay down. This combination is transformational, and we are confident in our ability to execute, positioning Tapestry as a leader in innovation, talent development and shareholder return for years to come.

In closing, for the quarter, we delivered revenue growth, strong margin expansion and high teens EPS increase despite a rapidly shifting backdrop. Our differentiated and consistent performance demonstrates the strength of our brands and our business model and the disciplined execution of our talented global teams. We remain focused on delivering against our long-term priorities driving sustainable, profitable growth, strong free cash flow and shareholder returns. I'd now like to open it up for your questions.

Operator

[Operator Instructions]. We'll take our first question from Bob Drbul of Guggenheim Securities.

# QUESTION AND ANSWER SECTION

Robert Drbul                                                                                        Q

*Analyst*

*Guggenheim Securities*

Congratulations on a nice quarter. Can you talk a little bit more around your confidence of the continued momentum at Tapestry and I think particularly at the Coach brand?

Joanne Crevoiserat                                                                                 A

*Chief Executive Officer*

*TAPESTRY, INC.*

Thanks, Bob. First, I want to recognize that we delivered growth across revenue, margin and earnings, and we delivered record earnings per share in the first quarter. We are executing consistently in a volatile environment, which I think speaks to the operating discipline that we've been showing now for over 3 years. Our focus is on maintaining brand health, expanding gross margins, and delivering against our earnings commitments. And we continue to drive strong and consistent free cash flow against the dynamic backdrop. And to your point, at Coach, the brand is strong, and we're driving continued momentum behind the brand. We're delivering sales growth and margin improvement on top of already strong margins, and we see significant runway ahead.

Our team isn't thinking to next quarter and for the fiscal year, which we're confident in, we're thinking 10 years out for the Coach brand. And I think it speaks to the innovation that they're delivering, the relevance and the differentiation we're building in the market. The operational excellence, this team is building a reputation for, they're executing with agility taking the data that we have and consumer insights, and that's fueling the brand magic that Stuart Vevers and our creative teams are delivering. So we are confident into holiday and beyond.

Robert Drbul                                                                                        Q

*Analyst*

*Guggenheim Securities*

Great. Just have a follow-up. Can you share just, I guess, an updated thinking around the deal? Any sort of more on the updates that you could actually tell us about?

Joanne Crevoiserat                                                                                 A

*Chief Executive Officer*

*TAPESTRY, INC.*

Sure. Thanks, Bob. We continue to see this as a great acquisition. It is really transformational for our business and for our industry. We are adding truly iconic brands to our platform and it's extending our reach across customer segments, across geographies and product categories. And I can't think of a better home for these brands. Tapestry's platform and our disciplined operations will unlock significant value across the broader portfolio. And we are making progress, as we expected towards a calendar year '24 close. That's really unchanged from our prior outlook.

In the meantime, integration planning efforts, they're in full swing. We continue to make progress in integration planning and we remain really excited about this transaction. We're confident in the strategic and the financial rationale and the targets we've outlined. But importantly, as you can see from our performance, we are laser-focused on our existing brands and our business, and we remain confident in the runway ahead.

## Operator                                                                    Q

Our next question is from Ike Boruchow of Wells Fargo.

## Irwin Boruchow                                                              Q

*Analyst*

*Wells Fargo*

So Joanne or Scott, wanted to ask about North America. So the guide for the year didn't really move that much. It was up slightly, I think, before, and now it's kind of more in line -- was in line with plan for Q1. I guess specifically embedded in that Q2 guide. What are you guys expecting for North America? Would be great to know Coach specifically in North America? And then it just seems like you guys are expecting kind of more stability in the back half. I guess I'm just the shaping of how you're thinking about that geography relative to your guide would be very helpful.

## Joanne Crevoiserat                                                          A

*Chief Executive Officer*

*TAPESTRY, INC.*

Yes. Let me start and then maybe kick it to Scott to give you some more color on our guide. But what I will say, Ike, is that our outlook for the year was incredibly balanced and we think prudent when we started. We weren't looking for a big inflection one way or the other as we started the year. We were seeing the trends in the consumer environment unfold, and we positioned our business well against those trends. As we've come into this year, we are seeing those trends develop a little differently, and we've reflected that in our outlook, but we are still very confident in terms of how we've positioned the business, positioned our inventory and positioned our innovation pipeline to speak to consumers in the world and the dynamic backdrop that exists today. But I'll pass it to Scott to give you a little more color on the numbers.

## Scott Roe                                                                   A

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

Yes. I think that pretty much covers it, honestly. The trends that we see are what we projected forward, as Joanne just said, I would just point out a couple of things the continued gross margin strength in addition to the -- while we see the demand backdrop is a little uncertain. We continue to operate the business for the quality of the sales, not chasing the last sale. You see that in the gross margin performance in the first quarter with over 100 basis points from operational gross margin. That continues into the second quarter and into the second half of the year which is one of the reasons that we can reaffirm our profit guidance even with a modest decline in the top line, which really just reflects the current trends that we're seeing in the business today.

## Irwin Boruchow                                                             Q

*Analyst*

*Wells Fargo*

Got it. And those regional growth rates you gave for the year for guide, Scott, those are all constant currency?

## Scott Roe                                                                   A

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

Yes, that's right. That's right. Yes. We took about $100 million out of FX as you saw that's predominantly in the yen and RMB is where we see the biggest impact there, that $100 million.

## Operator                                                                        Q

Our next question is from Lorraine Hutchinson of Bank of America.

## Lorraine Maikis                                                                 Q

*Analyst*

*BOFA*

I wanted to shift gears to Kate Spade. It seems like when you're launching newness, it's working, it's well received. Do you think you have sufficient newness coming through the pipeline to turn sales positive this year? And then separately, any update on Kate's progress in building out their China business?

## Joanne Crevoiserat                                                              A

*Chief Executive Officer*

*TAPESTRY, INC.*

Yes. It's a great observation, Lorraine, and it's exactly right. We are making progress, but we clearly have more to do, and we're really challenging ourselves on how we can move faster. As you pointed out, as we deliver newness, it is working and innovation in the business continues to -- the customers continue to respond to the innovation we're delivering. And we just need to move faster, and we're working with speed. What we saw in the quarter was a sequential improvement in the trend. And we did that as we expanded gross and operating margin. So it's a business that we're continuing to manage to ensure we manage it in a healthy way, and we drive our growth in a healthy way. We delivered higher income, operating income year-over-year.

So we are making progress. We do see opportunity as we continue to focus on strengthening that core handbag foundation. And when I talk about moving with speed, we've pulled up our launches. We talked about accelerating Madison an outlet last quarter and that gaining traction. We also talked about pulling up and delivering a new signature platform in outlet this quarter, and we're excited about the potential that represents a signature platform for the brand, and we do expect that to -- as we build this core handbag foundation to help us drive positive growth, again, on the top line.

But again, we're maintaining healthy brands. We drove mid-single-digit handbag AUR in the quarter, and we continue to see opportunity to take those AURs higher as we build out our growth plans. So there's a lot going on at Kate Spade. We're making progress as well in building our business in China. We're doing that thoughtfully and making sure we're investing behind the brand to build awareness. At the same time, we're rolling out a new store format. We see that resonating with consumers as well as our life stuff categories, including jewelry, which is incredibly strong in China. So we have a lot of runway ahead at Kate in our current markets but as well as in China.

## Operator                                                                        Q

Our next question is from Matthew Boss of JPMorgan.

## Matthew Boss                                                                    Q

*Analyst*

*JP Morgan*

Great. So Joanne, on pricing power at the Coach brand, could you elaborate on drivers of the mid-single-digit AUR expansion in the first quarter, and then initiatives in place that support the further pricing opportunities ahead that you cited despite the more dynamic backdrop that you've embedded in the forecast?

And then Scott, just help us to think about the cadence of gross margin through the balance of the year? Or just any specific puts and takes that you'd want us to consider.

## Joanne Crevoiserat                                                              A

*Chief Executive Officer*

*TAPESTRY, INC.*

Yes. I'd love to go into details of the Coach brand, but I fear that I steal Todd's thunder. So why don't, Todd, I push it to you, and we're delighted with what we're seeing at Coach. Todd?

## Todd Kahn                                                                                              A

*CEO and Brand President of Coach*

*TAPESTRY, INC.*

Thank you, Joanne. Yes. I mean as you've noticed over the 3 years, we've increased our AURs by more than 30%. And I am very confident that we will continue to see AUR growth. And what gives me this confidence is what we have been doing now for a couple of years, and it's compounding, our innovation, our storytelling, our laser focused on the consumer we're going after. That gives us so much confidence in what we're doing. And what I love and what is so important about our category, yes, there's choppy environments out there, but we sell an emotional category. And given that emotion and given that our -- we're resonating with our customer, coupled with the fact that, as we've talked about in the past, there's so much white space today between where our brand fits and where traditional European luxury sits.

So even in challenging times, we have so much room. And our room is in twofold. One, it's raising the bottom, but it's also touching the top. We -- Joanne mentioned in our prepared remarks, the idle bag. The idle bag is phenomenal bag. I was in Asia very a few weeks ago, and we're chasing inventory for the idle bag. We're basing inventory for Tabby. Those are great opportunities, but we're so disciplined in our approach that I would rather be in a chase mode, maintain our gross margin and continue to deliver, and that's what you're going to see us do for the balance of the year and the years to come.

## Scott Roe                                                                                              A

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

And Matt, just to speak to your question on gross margin cadence. First of all, what a strong Q1 we had, right, at 250 strongest gross margin expansion that we've seen. And while -- yes, it's true that 150 basis points of that was freight. 100 of it was operational, which is all the things that Todd just talked about, right? Our continued investment in the brand focused on engagement versus just the price message, the innovation that's coming down the pipeline. All those things combined are giving us pricing power. And when you look at the full year, we said that our freight tailwinds would moderate in the second half. They don't go to 0, but it's 150 basis points. It's very significant in the first half, and it will be similar in the second quarter and then waning in the second half.

But importantly, our gross margin for the entire year, including the back half, it remains very strong because of that operational gross margin performance that we just talked about. I mean we're up in the 150 basis points kind of range for the full year. So I don't want the freight to become the message. The message is operational discipline, continuing to reinvest in the brands focused on quality of sales and engagement is driving gross margin. And that is really holding this guide together for the full year, where even on a little bit moderated top line, we're able to hold our profitability guidance. That, coupled with the expense control that we talked about, we'll start to see expense leverage in the second half which, combined with the gross margin is what allows us to hold that profitability forecast.

Balanced first half, second half operating income, really, why EPS is front-weighted is more about the shares and tax cadence as we stop the repurchase, which is going to benefit us less in the second half.

## Operator                                                                                              Q

Our next question is from Michael Binetti of Evercore ISI.

## Michael Binetti                                                                                        Q

*Analyst*

*Evercore*

Congrats on a nice quarter. I just want to clarify one thing you just said to Matt's question there, Scott. You said that we're up 150 basis point range for the year. Was that referring to the total gross margin or the underlying operational portion of the gross margin that you and Todd talked about?

## Scott Roe                                                                                              A

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

Yes. First of all, welcome back, Michael. And secondly, yes, you had it right. It's the total gross margin for the year -- implied in the guide. We didn't actually guide to a gross margin. We did op margin, but that's how you get there.

## Michael Binetti                                          Q

*Analyst*

*Evercore*

Understood. I guess then could -- maybe we could speak to the -- I know I asked about this a little bit, but what you're embedding in the trajectory for Coach China sales 2Q and second half within the -- I know you gave us the year. And then, Joanne, you're about to own a huge share of the aspirational handbag market globally. You don't have the Capri brands in-house yet, but I know you've studied them a lot. And as you look ahead and as the acquisition comes forward here and we start to sink in, what are some of the most attractive things you see as opportunities to drive the category in the global marketplace with all 3 of these big brands on the handbag side in-house that some of the opportunities that are incremental to what you think you can do today.

## Joanne Crevoiserat                                       A

*Chief Executive Officer*

*TAPESTRY, INC.*

Well, I think first, let me just say that we play in a very large market, right? This market is $200 billion accessories, footwear and apparel. And it is the fragmented market. And I've been in this business for more years than I'd like to probably admit on the call. And over time, in a world where consumers can get pretty much anything they want, anywhere they want, any time they want. What matters are brands. Brands matter in this marketplace. And brands matter with consumers and what consumers value has changed over time and how they shop has changed over time. And I think what we've done in the last 3 years has really positioned our business to be able to speak to consumers to win in a marketplace where brands matter and we need to reach consumers in a different way.

So we've built the capabilities and the platform to be able to do that, and we've invested behind our brands. Coach is a great example of the power of the platform where we've gotten laser-focused on our brand positioning and clarified it. We've gotten laser-focused on our target consumer and we're reaching the consumer in an omnichannel way. We're talking to them about things that matter to them and how our brands show up in their life and that is the brand heat that is driving the Coach momentum, and the team is executing really well behind that. And we're delivering really great product, leveraging all the insights from the data that we have and bringing that balance of magic and logic together to deliver really compelling product and experiences in the marketplace. And that is the platform that's scalable. We can leverage that across more brands. So we're excited for the Capri transaction to close.

Again, these are truly iconic brands. These are brands that already matter in the marketplace today. And we believe that we can improve the execution behind these brands and really take them to another level and reach consumers in a big marketplace, a crowded marketplace and a noisy marketplace, we have the capabilities to help these brands cut through.

## Scott Roe                                                A

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

And I'll just chip in real quick, Mike, one of your China question. I think you asked about Coach China. Our China business in total, which obviously coaches the driver. We grew 9% in the first quarter. We expect mid-single digit for the full year, which would have us about flattish in the second half. We still think we'll be above 2021 levels or slightly above 2021 levels for the full year. But that's really reflecting the trends that we're seeing on the ground right now.

## Operator                                                 Q

Our next question is from Mark Altschwager with Baird.

## Mark Altschwager                                         Q

*Analyst*

*Baird*

I guess, first for Scott, just a question regarding the transaction. Any changes to how you're thinking about initial revenue and EBITDA contribution from Capri Holdings, timing, magnitude of accretion just in light of the evolving macro environment. And also curious if you're willing to share any expectations you have for interest rates on the deal financing?

## Scott Roe

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

A

So as you can appreciate, Mark, what I can say is very limited at this point, given where we're at. I'll just reiterate what we said at the time of the deal. Our expectations for Capri were that in our planned horizon, which is the first 3 years. We expected modest growth, kind of low single digits, with it being down in the first year this year with the most pressure in Michael Kors. Based on our assumptions, we saw and we're confident in strong accretion, immediate double-digit accretion, strong returns, et cetera. So we can't really update what we've said publicly at this point, given where we're at in the process.

As it relates to interest rates, we all see what's going on out there. There has been some upward pressure, some moderation more recently. But a couple of things I'll remind you of. Well, I can't give you any specific numbers, we did put some hedges in place on the risk-free rate. So the treasury rate, which mitigate whatever movement that you might see, and we're still confident in the overall economics of the deal. More to come on financing as time goes on.

## Mark Altschwager

*Analyst*

*Baird*

Q

Okay. Maybe switching gears, I guess for Scott or Joanne. The execution on gross margin really putting you in a healthy position to be able to invest. How are you thinking about the balance between letting the gross margin flow to the bottom line versus maybe investing more aggressively in marketing to drive the top line in a tougher consumer backdrop.

## Joanne Crevoiserat

*Chief Executive Officer*

*TAPESTRY, INC.*

A

I'll start by saying we're doing both. We are managing the business with strong gross margin because we won't compromise brand health. We see tremendous long-term runway for our brands, and we're thinking longer term and executing in a way that we can deliver compelling value to our consumers and continue to drive stronger gross margins. You've seen us do it this quarter, last year, and we'll continue to do that. We did it across all of our brands. And we're continuing to invest in brand building because that is the dynamic that creates the flywheel, right? As we continue to drive gross margin and expand gross margin, we're leveraging that margin expansion to invest in brand building, which then helps drive top line creates the brand heat that creates the flywheel.

So we're doing both, but we are protecting brand health. We're not going to chase every last sale. And we've been navigating what I would call a dynamic environment, but also a highly promotional environment for a while, and you've seen us operate with discipline. It includes not only just the desire and will have disciplined pricing, but it includes the data and analytics that support our SKU breadth and assortment. It includes the inventory management discipline that we've built over the last few years to make sure we've got inventory well positioned that we're responding to demand signals when we see them and connecting the back end of our supply chain to our front-end demand signal.

So there's a lot of process and system and people -- that support our ability to continue to maintain gross margin and then also, we're looking to continue to invest in our brands.

## Scott Roe

*Chief Financial Officer and Chief Operating Officer*

*TAPESTRY, INC.*

A

Yes. Maybe just a quick build Mark. A lot of times the question that we get is, where do you see the evidence of the platforms that you've built your data and analytics capabilities, where is the evidence in the P&L? I would say in 2 areas. Number one, the ability to understand the trends in our business and the fact that we're a data business, and we use that data has helped us moderate our spending, and that's why you're going to see leverage in light of a lighter demand environment in the second half. And then secondly, it's -- we don't guess on those decisions that Joanne just mentioned. We're very thoughtful in looking at the returns as we make these investments, we don't just say we're going to invest more in our brands. We're looking at those returns, we're leaning in where they work or leaning back where they don't. And that discipline is helping us to I think, have a high-quality P&L in a very tough environment right now. And the last proof point is our inventory, right, down 17%. Most of that's in transit, but the combination of strong gross margins and really well-positioned inventory, I think, is just a testament of the insights that we're getting into the business and the discipline that you see.

## Operator

Q

Our next question is from Brooke Roach with Goldman Sachs.

## Brooke Roach

Q

*Analyst*

*Goldman Sachs*

Can you elaborate on what you're seeing with consumer engagement in North America by brand across outlet versus full line and also household income cohort? What changes have you seen in the consumer environment that are developing differently than your prior outlook? And are you seeing any signs of increased price sensitivity among consumers in North America?

## Joanne Crevoiserat

A

*Chief Executive Officer*

*TAPESTRY, INC.*

Great question, Brooke. North America is -- we're operating in a more challenging environment. Our -- having said that, our first quarter results were flattish to last year, which was a meaningful sequential improvement from the fourth quarter, and it was in line with our expectations as we came into the quarter. But to your question, the aspirational consumer, that lower income cohorts -- I would say this is across channels. We're not seeing major distinction between our channels, across channels. The aspirational consumer is under more pressure on a relative basis. They're being more choiceful. But again, that hasn't materially changed from Q4.

As a business, we're focused on the controllables. We're focused, as we just talked about on brand building, delivering product excellence to Lorraine's question, when we deliver innovation and newness, we see the consumer respond. And we're focused on strong execution. So we're delivering that newness. We're delivering that innovation across our brands. You saw it with the Coach Shine campaign, and the Coachtopia rollout, the icons at Kate that we're rolling out. And even the launch of sneakers at Stuart Weitzman, really responding with innovation to what we're hearing and seeing from the consumer, and we're managing the business in a healthy way. We'll continue to expand AUR and gross margin. I'm sorry, go ahead, Todd.

## Todd Kahn

A

*CEO and Brand President of Coach*

*TAPESTRY, INC.*

No, no, sorry. I just quickly add, Brooke. I mean globally, we -- our direct business was up. North America was up. And we feel good because, again, it goes back to the emotion and the connection we're making with the consumer. And by way of example, even in value channel, we're introducing more Tabby bags directly at full price because it's just a point of distribution. And we're seeing that in North America resonate, and we're going to roll that out over time to more and more doors. So it's very interesting. We're finding some time even the young cohort might come into the Coach brand buying [indiscernible]. That might be the first thing they buy, they might even buy it at one of our value channels. Then they end up buying a Tabby bag.

So this concept of one Coach of this desirability that we're creating, that people are coming in into an outlet store with the image of the Coach Tabby bag and wanting that. That, to me, creates so much more desire across all value channels and full price channel.

## Brooke Roach

Q

*Analyst*

*Goldman Sachs*

Great. And if I could just ask one quick follow-up. I'm curious what you think the health of the industry, it looks like in North America between wholesale and DTC? Understood that you currently don't have much wholesale exposure, but like the pre portfolio does. And I'm curious what your thoughts are about the ongoing run rate momentum of those 2 channels as you look ahead?

## Joanne Crevoiserat

A

*Chief Executive Officer*

*TAPESTRY, INC.*

Well, we have seen, I think, in North America and the market generally more pressure in the wholesale channel over the last year. That's not something new. To your point, our business is roughly 90% direct. And we like that direct relationship that we have with the consumer. It allows us to understand and see trends faster as they're happening. There is a reason to have wholesale. I think they're wholesale, and we appreciate the partners that we have in the wholesale market that provide exposure of the brand to a broader base of consumers. But again, we like the direct relationship that we have with our consumers. We've worked to build our platform to be able to reach consumers as their shopping habits evolve. And our focus is really following the consumer. And I would say we see an opportunity to build the direct business with the Capri brands. That's something that our platform will provide, and we see runway ahead.

## Todd Kahn A

*CEO and Brand President of Coach*

*TAPESTRY, INC.*

And the one thing I will add again, as Joanne said, we love our direct -- is we love our wholesale partners that we're in. I'm looking forward to the opportunities that may come to enhance wholesale in a selective way when we take -- we have the leverage of multiple brands. So I think that's going to be a benefit to the consumer and the benefit to our wholesale partners.

## Operator Q

And we'll take our final question from Oliver Chen with TD Cowen.

## Oliver Chen Q

*Analyst*

*TD Cowen*

A lot of premium luxury brands are not on Amazon. Just what was your philosophy for that? And Amazon can also often employ variable pricing and think about brands differently. Also the sales decline in digital, just what's underpinning that, we've seen tougher performance marketing online. And then lastly, on thinking about the second request, diversion ratio, suitability as well as the outlet channel. Those may be topics and focus? Any thoughts on catalysts around the second would be helpful as well.

## Todd Kahn A

*CEO and Brand President of Coach*

*TAPESTRY, INC.*

I guess you have the question for every one of us.

## Joanne Crevoiserat A

*Chief Executive Officer*

*TAPESTRY, INC.*

Yes. Go ahead, Todd, I'll let you kick it off.

## Todd Kahn A

*CEO and Brand President of Coach*

*TAPESTRY, INC.*

I'll do the Amazon one. And that's it. Thank you.

## Joanne Crevoiserat A

*Chief Executive Officer*

*TAPESTRY, INC.*

I'll pick up digital.

## Todd Kahn A

*CEO and Brand President of Coach*

*TAPESTRY, INC.*

Okay. Oliver, it's interesting. We did a lot of due diligence on Amazon. And we talk a lot at the Coach brand about being consumer offset. And through that due diligence and through this trial that we've launched with Amazon, we recognize, particularly with the young consumer that the journey, the discovery, the particularly of fashion brands and our category starts at Amazon. And we've been on Amazon. And one of the things that I love with this trial that we're working with Amazon is we opened up a beautiful brand-enhancing shop on Amazon. We're learning. We're using their technology. Their 3D technology alone is fascinating in terms of showing the functionality and the desirability of our product. They've been a very good partner. It's a wholesale relationship. And to date, we've seen no cannibalization. So again, when you put things through a consumer lens and say, how does the consumer see a brand, how do you create desirability, how do you create accessibility. This looks like a pretty great start for us, and we're happy with the performance we've seen.

## Joanne Crevoiserat                                           A

*Chief Executive Officer*

*TAPESTRY, INC.*

And on digital, Oliver, I'll take the next 2 parts of your question. On digital, our focus is on driving engagement with the consumer and meeting them where they are. And we still believe that digital is an important part of the consumer journey. In the quarter, we saw slight declines in digital, but our penetration in digital remains basically in line with where it was last year at 25%, still triple where it was pre-pandemic. So we've built this digital scale and the digital business, and we're available to customers to transact absolutely online, but they're leveraging our digital channel for more than just the transaction, and we believe it's important to maintain those capabilities. And we'll follow the consumer. We're happy to meet consumers in stores. We have great field teams and we have a highly profitable store fleet, and we have a highly profitable digital channel. So we're agnostic as to where they shop, and we're available to meet them, and we continue to improve the experience in the digital space to make sure that consumers receive a seamless experience and a really great brand experience that it becomes a -- and continues to be a great touch point for the brand.

If they're just discovering and choose to go into a store to finalize that transaction, we want to be there for them, and we continue to improve our game in digital. We see it as critically important moving forward. And then on the regulatory front, we are working to receive all the required regulatory approvals, including -- and that includes, as you saw, responding to the FTC second request. Our outlook for closing the deal is unchanged. We still expect to close the deal in fiscal '24. And as you know, we operate in a large market, as I talked about, it's the $200 billion market. It's fragmented. There are low barriers to entry and the transaction is pro-consumer. So we remain confident in our ability to complete the transaction, again, closing expected in calendar '24, consistent with our prior expectations.

## Operator                                                     Q

Thank you. That concludes our question-and-answer session. I will now turn it over to Joanne for some concluding remarks.

## Joanne Crevoiserat                                           A

*Chief Executive Officer*

*TAPESTRY, INC.*

Well, thank you for joining us today and for your interest in our story, and thank you to our passionate teams around the world that make these results happen. Our strong and consistent results reinforce the power of our brands, our strategies and our agile operating model, which enable us to continue to deliver for our customers against the dynamic backdrop. Moving forward, I'm confident in our organic runway, and look forward to accelerating our strategic and financial results through the acquisition of Capri Holdings.

At Tapestry, we are focused, and we have a relentless drive to lead in innovation and shareholder returns for years to come. Have a great day.

## Operator                                                     Q

This concludes Tapestry's earnings conference call. We thank you for your participation.

# Exhibit 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. _____ |
| TAPESTRY, INC., | **UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |
| and | |
| CAPRI HOLDINGS LIMITED, | |
| Defendants. | |

**COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission" or "Plaintiff"), by its designated attorneys, petitions this Court to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining Defendant Tapestry, Inc. ("Tapestry") from consummating its proposed acquisition (the "Proposed Acquisition") of Defendant Capri Holdings Limited ("Capri"). The Commission seeks this relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26.

Plaintiff requires the aid of this Court to preserve the status quo and to protect competition during the pendency of an administrative trial on the merits. The Commission

1

initiated the administrative trial, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by issuing an administrative complaint on April 22, 2024. Pursuant to FTC regulations, the administrative proceeding on the merits will begin on September 25, 2024. The administrative proceeding will determine the legality of the Proposed Acquisition and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Proposed Acquisition.

Allowing Tapestry and Capri (collectively, "Defendants") to consummate the Proposed Acquisition and combine their operations prior to the issuance of a decision on the merits by the Commission through the administrative process would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is ultimately found unlawful.

Accordingly, pursuant to Section 13(b) of the Federal Trade Commission Act, Plaintiff requests (1) a preliminary injunction to protect the Commission's ability to evaluate the antitrust merits of the Proposed Acquisition and (2) enter a stipulated temporary restraining order to protect this Court's ability to decide the FTC's request for a preliminary injunction and order appropriate relief.

## **NATURE OF THE CASE**

1. Tapestry proposes to acquire Capri in a $8.5 billion transaction that would combine six iconic brands, including three—Tapestry's Coach and Kate Spade and Capri's Michael Kors—that are close competitors, into a conglomerate that has professed goals of becoming a "Global Premium Fashion Powerhouse." In its own words, the goal of Tapestry's

2

M&A strategy is to "be the leading global accessible luxury company" and "own" the "accessible luxury" space in which Coach, Kate Spade, and Michael Kors compete. With Tapestry's acquisition of Michael Kors, the closest competitor of Coach and Kate Spade, consumers will lose the benefit of head-to-head competition on price, discounts and promotions, innovation, design, marketing, and employee wages and workplace benefits.

2. Today both companies compete on everything from clothing to eyewear to shoes. But where Coach, Kate Spade, and Michael Kors most fiercely compete, and where they boast eye-popping market shares, are in handbags—specifically, "accessible luxury" handbags—where the parties offer high-quality products purchased by tens of millions of Americans. This is big business too—Coach, Kate Spade, and Michael Kors handbags generated approximately $3 billion in sales in the United States in 2022. And it is in "accessible luxury" handbags that the Proposed Acquisition will create a colossus with over 50 percent market share in the United States, dwarfing all other market players and combining two firms to which Wall Street have long referred as a "duopoly."

3. The term "accessible luxury" was coined by Coach during its initial public offering over 20 years ago to distinguish Coach products, which filled the void between "mass-market" items on the one hand and "true luxury" products on the other. As Tapestry explained at a recent Investor Day, "It was the idea that you didn't have to spend an exorbitant amount of money to buy a high-quality bag." In the years since, the parties, along with other industry players, have embraced the term—and its equivalents "affordable luxury" and "aspirational luxury" (hereinafter "accessible luxury")—consistently, and routinely, using it in public statements, in calls with investors, and in internal documents to describe a very distinct handbag

3

product: one that is crafted predominantly in Asia from high-quality materials with fine craftsmanship at affordable prices, distinguishing "accessible luxury" handbags from both the mass-market products that are made in bulk in China from lower-quality materials and sold at lower prices, and the high-end luxury handbags crafted predominantly in Europe that sell at significantly higher prices.

4.    Indeed, despite its incorporation of the word "luxury," "accessible luxury" is very distinct from what the parties and other industry players call "luxury," "true luxury," "high-end luxury" or "European luxury" (hereinafter, "true luxury") brands, like Chanel, Louis Vuitton, and Hermes, whose handbags retail in the thousands of dollars—multiple times the prices of Coach, Kate Spade, and Michael Kors handbags—and are made from the finest materials and leather, often in Europe. These elite brands also claim affluent, high-wealth consumers—in contrast to the millions of working- and middle-class clientele who comprise a large part of the customer base for Coach, Kate Spade, and Michael Kors.

5.    Indeed, while the parties advertise their products in the hands of jet-setting celebrities, the parties' reams of consumer research paint a different picture of their typical consumer. These consumer surveys reveal that approximately half of Coach and Michael Kors customers have household incomes of less than $75,000-$80,000 a year, as depicted in the graphic below, which appears in a document sent to the Capri board in May 2023, while Capri was mulling an acquisition offer by Tapestry:

4



6.      As Coach has acknowledged in internal documents: "The reality [is] that the majority of our demand at Coach is coming from low-income consumers." Or, as the Vice President of Retail for Michael Kors has observed: "The lower income customer still thinks of us as a leader in all categories, with Handbags being the item she covets and saves for." Kate Spade sells its handbags to consumers with ██████ income demographics. It will be these everyday American consumers—and employees of the companies—who will experience the effects of the substantial lessening of competition as a result of the Proposed Acquisition.

7.      The Proposed Acquisition will eliminate fierce competition between Coach, Kate Spade, and Michael Kors. A merger is unlawful if it substantially lessens competition between the parties independent of the analysis of market shares, as recognized by the 2023 U.S. Department of Justice and FTC Merger Guidelines (hereinafter, the "Merger Guidelines"). Tens

5

of millions of consumers are the beneficiaries of an intense, long-standing rivalry between Coach, Michael Kors, and Kate Spade that would be squelched as a result of the Proposed Acquisition. This fierce head-to-head competition, which is monitored by the highest levels of Tapestry and Capri, comes in many forms—prices, discounts, promotions, innovation, design, marketing, and brick-and-mortar store experiences.

8.      The competition between the parties today benefits not just consumers, but other constituencies, such as employees. Tapestry and Capri together employ more than 33,000 employees worldwide and compete for employees working in a variety of locations and functions—including thousands of non-union retail employees. This competition for labor has resulted in higher wages, better benefits, and improved working conditions.

9.      For example, in July of 2021, Tapestry publicly committed to a $15/hour minimum wage for U.S. hourly employees, which CEO Joanne Crevoiserat internally acknowledged as "an important competitive differentiator for us." Its rival Capri immediately took notice, with its CEO John Idol requesting a meeting "to understand the financial impact on taking the US [Michael Kors] store fleet full price and outlet to $15 per hour." Michael Kors' VP of Stores wrote separately: "It is official, Tapestry has announced a guaranteed $15 minimum wage. We are not going to have a choice if we want to be staffed for Holiday!" Less than two months later, Michael Kors announced plans to raise its minimum wage to $15 per hour, effective October 3, 2021, which benefitted nearly 2500 Capri employees.

10.     The elimination of this multi-faceted competition between the close rivals will harm consumers and employees, likely leading to higher prices, decreased innovation, and reduced wages. Indeed, it is not surprising that Tapestry's stated and unabashed goal is to raise

6

prices post-merger. Tapestry plans to do so by pulling back on wholesale channel sales—where brands have less control over pricing and discounting is more likely. Coach followed this course in 2016, and later employed the same playbook with Kate Spade following its acquisition in 2017. Tapestry has publicly referred to these efforts as "Coachenomics" and has promised to employ these same lessons to Michael Kors following the Proposed Acquisition.

11.    And with the eradication of this fierce rivalry, it is also no surprise that, as chronicled by Tapestry's own banker on the deal, Wall Street heralded the Proposed Acquisition as an end to "unnecessary promotional activity" and a "race to the bottom" on price and a return of "price integrity":



## Morgan Stanley

## Summary of Investor Themes Following Announcement

Promotional Activity. Investors are looking forward to unnecessary promotional activity, most of it viewed to be between Tapestry and Capri, subsiding. It felt like a "race to the bottom" on price, and investors hope to see a return of more price integrity as a result of the combination

12.    By combining three of the top players in the market for "accessible luxury" handbags in the United States—including the top two (Coach and Michael Kors) by far—the Proposed Acquisition will significantly increase concentration and result in a highly concentrated market, making the Proposed Acquisition presumptively unlawful under controlling caselaw and the Merger Guidelines, which are rooted in case law and outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess a transaction's legality.

13.    The Proposed Acquisition is also part of Tapestry's pattern and strategy of serial acquisitions. The Merger Guidelines state that a "firm that engages in an anticompetitive pattern

7

or strategy of multiple acquisitions in the same or related business lines may violate Section 7." The Proposed Acquisition builds on a deliberative, decade-long M&A strategy by Tapestry—and is just one in a string of acquisitions for Tapestry to achieve its goal to become the major American fashion conglomerate—or, in Tapestry's own words, a "Global Premium Fashion Powerhouse." Its documents detail its strategy and goal of operating as a "Serial Acquirer," "an M&A Powerhouse," and "the acquirer of choice." Tapestry's plan is to start first with "accessible luxury" handbags and then move into other parts of the fashion industry, which will only solidify its dominance in "accessible luxury," stifle competition from smaller competitors and potential entrants, and contribute to a trend of consolidation in the broader fashion industry. In the last decade, Tapestry has already consolidated Coach, Kate Spade, and Stuart Weitzman, and Capri consolidated Michael Kors, Versace, and Jimmy Choo. If the Proposed Acquisition is completed, Tapestry will have consolidated six viable firms into one. And Tapestry will not be finished: its SVP of Strategy and Consumer Insights has observed that the Proposed Acquisition would "set the table for [a] string of pearls[,] or smaller deals."

14. New entry will not be timely, likely, or sufficient to counteract the anticompetitive effects of the Proposed Acquisition. Even assuming that a new potential entrant could make a quick splash, scaling its sales and presence to replace the loss of competition between the parties would take many years. It would require, among other things, building a strong brand, a heavy brick-and-mortar presence, sizable investments in marketing and manufacturing, access to consumer data rivaling that of the parties, to name a few—all of which is extremely expensive and takes time. The story of Rebecca Minkoff embodies the struggle of an "accessible luxury" handbag entrant. Ms. Minkoff launched her brand in 2001, and the

8

eponymous founder has spoken openly about the significant challenges she faced in scaling her company. Ms. Minkoff ultimately sold her company to Los Angeles-based diversified apparel company Sunrise Brands in February 2022 for a price estimated between $13-19 million.

15. Respondents also cannot show cognizable, merger-specific efficiencies that would offset the reasonably probable and substantial competitive harm resulting from the Proposed Acquisition.

16. On April 22, 2024, by a bipartisan 5-0 vote, the Commission found reason to believe that the Proposed Transaction may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45, or constitutes an unfair method of competition in violation of Section 5 of the FTC Act. On the same day, the Commission initiated an administrative proceeding to determine the antitrust merits of the Proposed Transaction. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a hearing before an Administrative Law Judge with up to 210 hours of live testimony. After reviewing the recommended decision of the Administrative Law Judge, the Commission will issue a decision, which is then subject to review in a United States Court of Appeals.

17. The parties have stipulated to entry of a temporary restraining order to preserve the status quo and protect competition while the Court considers the FTC's application for a preliminary injunction. Under this temporary restraining order, Defendants cannot consummate the Proposed Transaction until the fifth business day after the Court rules on the FTC's request for a preliminary injunction or until after the date set by the Court, whichever is later.

18.      Preliminary injunctive relief is necessary to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding.  Allowing Defendants to consummate the Proposed Acquisition while the Commission adjudicates its merits would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is found unlawful.

## JURISDICTION AND VENUE

19.      This Court's jurisdiction arises under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

20.      Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe

(1)      that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2)      that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public,

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of

ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

21.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

22.     The Federal Trade Commission Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute.  Fed. R. Civ. P. 4(k)(1)(C).  Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(c)(3), as well as under 28 U.S.C. § 1391(c)(2) and 15 U.S.C. § 53(b). Defendants are found, reside, and/or transact business in this state and district, and are subject to personal jurisdiction therein.

**THE PARTIES AND THE PROPOSED ACQUISITION**

23.     Plaintiff, the Federal Trade Commission, is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 et seq., with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, inter alia, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

24.     Defendant Tapestry is a global fashion firm incorporated in the state of Maryland and headquartered in New York City. Tapestry generated over $6.6 billion in revenue for the fiscal year spanning 2022-2023, $4.3 billion of which came from North American sales, with gross margins of approximately 71 percent.  Tapestry owns the following brands:

11

- **Coach:** Founded in New York City in 1941, Coach sells handbags, small leather goods, footwear, accessories, ready-to-wear apparel, jewelry, eyewear, luggage, watches, and fragrances. Coach accounts for 74.5% of Tapestry's total net sales.

- **Kate Spade:** Acquired by then-Coach for approximately $2.4 billion in 2017, Kate Spade sells handbags, small leather goods, ready-to-wear apparel, footwear, accessories, and home furnishings. Kate Spade accounts for 21.3% of Tapestry's total net sales.

- **Stuart Weitzman:** Stuart Weitzman predominantly sells women's footwear and accounts for less than 5 percent of Tapestry's total net sales. In 2015, then-Coach acquired Stuart Weitzman for approximately $530 million.

In 2017, after acquiring Kate Spade and Stuart Weitzman, Coach renamed itself "Tapestry." In North America, Tapestry operates 331 Coach stores and 205 Kate Spade stores. Coach and Kate Spade stores are located throughout the United States, not just in metropolitan centers and big cities such as New York, Los Angeles, or Miami. Coach and Kate Spade, for example, have stores in Branson, Missouri; Foley, Alabama; and Gretna, Nebraska.

25. Defendant Capri is a global fashion firm incorporated in the British Virgin Islands and headquartered in the United Kingdom. Capri has U.S. corporate offices for Michael Kors, Jimmy Choo, and Versace in New York City. In the fiscal year spanning 2022-2023, Capri generated about $5.6 billion in total global revenue, including $3.2 billion in revenue in the Americas, with gross margins of approximately 66 percent. Capri owns the following brands:

- **Michael Kors:** Michael Kors founded his namesake brand in New York City in 1981, which now accounts for approximately 69% of Capri's overall revenue. The vast

12

majority of Michael Kors' sales come from its MICHAEL Michael Kors line, which sells women's handbags, small leather goods, other accessories, footwear, apparel, and luggage. Capri refers to MICHAEL Michael Kors as an "accessible luxury line" in SEC filings.

- **Versace:** Acquired by then-Michael Kors in 2018, Versace sells women's and men's ready-to-wear, footwear, handbags, home furnishing, accessories, small leather goods, and fragrance products, and haute couture.

- **Jimmy Choo:** Jimmy Choo's core product is women's footwear, but it also sells accessories, handbags, and small leather goods. In 2017, Capri acquired Jimmy Choo.

In 2018, when announcing its deal to acquire Versace, Michael Kors re-named itself Capri. Capri operates 224 Michael Kors stores in the United States. As with Coach and Kate Spade, Michael Kors stores are located throughout the United States, including, for example, Altoona, Iowa; Branson, Missouri; Foley, Alabama; and Gretna, Nebraska.

26. On August 10, 2023, Tapestry and Capri entered into an Agreement and Plan of Merger, whereby Capri agreed to sell 100% of its voting securities to Tapestry for approximately $8.5 billion.

## THE MARKET FOR "ACCESSIBLE LUXURY" HANDBAGS

27. The parties' Coach, Kate Spade, and Michael Kors brands compete to sell "accessible luxury" handbags to millions of American consumers each day. Industry participants recognize a distinct market for "accessible luxury" handbags, which have peculiar characteristics, as well as distinct prices and consumers and unique production facilities, that distinguish them from other types of handbags. A relevant antitrust market in which the

13

Proposed Acquisition may substantially lessen competition, or tend to create a monopoly, is "accessible luxury" handbags sold in the United States.

> **A.     The Parties Compete in a Relevant Market for "Accessible Luxury" Handbags.**

28.     In the two decades since Coach gave birth to the term "accessible luxury," the parties, press and analysts, and other industry participants have adopted "accessible luxury" to signify handbags that can boast quality leather and craftsmanship (as distinguished from mass-market handbags) at an affordable price (as distinguished from true luxury handbags). The major players in this market are Tapestry's Coach and Kate Spade, and Capri's Michael Kors.

29.     The term "accessible luxury"—or its equivalents, "affordable luxury" and "aspirational luxury"—is ubiquitous in the parties' internal strategy documents and industry analyses, including those prepared by and for the highest executive levels of each company and their respective boards. For instance, even after the Proposed Acquisition was announced, Capri continued to present documents to its board that clearly (and visually) distinguished between true luxury, "affordable luxury," and mass-market. And earlier in 2023, Tapestry's CEO Joanne Crevoiserat told the Business of Fashion: "For accessible luxury brands like those in Tapestry's stable, the key is to focus on creating value for the customer beyond pricing." The year before, Tapestry's Consumer Insights team had conducted research affirming that "Coach formally define their global brand position as 'accessible luxury' and aligning that to our position, purpose, target consumer and price point to inform their [long-range planning]."

14

30.    Further establishing party recognition of a distinct market for "accessible luxury" handbags, Coach made clear to the Tapestry board in █████████████

████████████████████████████████



31.    The repeated, and consistent, recognition of an "accessible luxury" market in the parties' strategy documents mirrors their frequent references to "accessible luxury" and its equivalents in their filings with the Securities and Exchange Commission and in earnings calls, including in 10-Ks filed the year just prior to their deal:

- "Tapestry, Inc. is a leading New York-based house of **accessible luxury** accessories and lifestyle brands . . . . Coach is a leading design house of **accessible luxury** accessories and lifestyle collections, with a long-standing reputation built on quality craftsmanship." (emphases added).

15

- "MICHAEL Michael Kors is the **accessible luxury collection** and offers women's accessories, primarily handbags and small leather goods, as well as footwear and apparel and is carried in all of the Michael Kors lifestyle stores and leading department stores around the world." (emphasis added).

32. The parties are far from alone in their recognition of an "accessible luxury" handbag market. Other industry participants widely acknowledge a distinct market for "accessible luxury" handbags. Likewise, press and analyst reports regularly address Coach, Kate Spade, and Michael Kors as "accessible luxury" brands. Even Morgan Stanley, Tapestry's investment banker for the Proposed Acquisition, used "affordable luxury" and "accessible luxury" in deal documents, observing that Michael Kors' "high-cross purchase overlap with Coach and Kate Spade consumers could present cannibalization risks, though reinforces the 'affordable luxury' nature of the portfolio."

33. As reflected in the Tapestry board document in paragraph 30, "accessible luxury" handbags have a distinct price range, which is recognized by other industry participants as well. The parties recognize this range as separate and distinct from mass-market offerings, which typically fall under $100, and true luxury handbags, which have an "entry point of $1000+." Indeed, pricing analyses conducted by the parties demonstrate the massive price gap between "accessible luxury" and true luxury handbags:

16



34.     In another Tapestry board document, dated March 2022, Coach made it clear that its "product portfolio starts at $100 as point of entry and does not exceed $1000 where luxury owns the market:"



35.     The parties tout this pricing "white space" or "delta" between their "accessible luxury" brands and true luxury brands both to distinguish themselves from true luxury brands and to demonstrate to investors that there is room to "elevate" their brands (i.e., raise prices) without losing customers to the European luxury houses.

17

36.     The market for "accessible luxury" handbags also has distinct customers: middle- and lower-income consumers who seek out high-quality items at affordable prices. As previously explained, party documents consistently show that consumers with household incomes of less than $75,000-$80,000 make up a large part—if not the majority—of purchasers for Coach, Kate Spade, and Michael Kors handbags. For instance, a Michael Kors consumer insights deck from last summer showed that the Michael Kors' handbag purchasers were a "[m]oderate to low-income group with ███████████████████████████ aligning to the Michael Kors archetypes value driven mindset." A document presented to the Tapestry board just a few months earlier shows that over 50 percent of Coach consumers have household incomes of $75,000 or less— but respondents in the survey "were terminated under $40K, so percentage could be higher." Kate Spade's income demographics are similar, as are those of the other brands widely recognized as major (albeit much smaller) players in the "accessible luxury" space:



18

37.     In contrast, Capri estimated in 2023 that over 60 percent of the consumers of true luxury brands Gucci, Dior, Fendi, and Valentino had household income in excess of $100,000.

38.     "Accessible luxury" handbags also have peculiar characteristics that distinguish them from those offered by mass-market brands and by the European true luxury fashion houses. These include:

39.     **Quality.** "Accessible luxury" handbags boast quality materials and craftsmanship. Coach states that it works with only the finest leather hides, and its handbags may require more than 100 steps to make, including "up to 90 skilled artisans working together to assemble as many as 200 pieces." And Michael Kors specifically uses a "handcrafted capsule," woven leather," and "artisanal stitch" for many of its handbags, "making this a truly artisanal technique" that demonstrates "delicate craftsmanship and artisanal skill." These qualities separate "accessible luxury" from mass-market handbags, which are often composed of manmade materials such as polyurethane and nylon and produced in bulk in China. In fact, in conceding that mass-market items were a separate and distinct market to China's State Administration for Market Regulation (China's antitrust regulatory authority), the parties argued that even "high-end mass market products" are not substitutes for their offerings: these products "offer good quality and performance and are made with decent materials and manufacturing processes, [but] they are not on the same level as luxury products." On the other end of the spectrum, "true luxury" handbags carry the imprimatur of the finest craftsmanship and materials and are nearly all manufactured in Europe.

40.     **Discounting and Promotions.** "Accessible luxury" handbags are characterized by a high degree of, and frequent, discounting and promotions, particularly around major

19

shopping holidays like Black Friday and Mother's Day. For instance, ■ percent of Kate Spade's "full price" (non-outlet) customers purchase products with a discount. And a Tapestry analysis from late 2022 showed average selling price of "accessible luxury" handbags in the United States was close to ■ percent less than manufacturer's suggested retail price ("MSRP"). This is in stark contrast to true luxury brands. Louis Vuitton, Prada, and Gucci all have a very public no-discounting policy; this is one way that true luxury brands distinguish their authentic products from counterfeits.

41.     **Omnichannel Approach and Sales Experience.** "Accessible luxury" brands sell handbags through multiple sales channels: company-operated (also called "monobrand") stores, including retail and outlet stores; online retail and outlet websites; and wholesale stores (e.g., Nordstrom's, Macy's, TJ Maxx, Ross). And their in-store shopping experience is also widely available throughout the United States—not just in metropolitan centers and big cities such as New York, Los Angeles, or Miami. On the other hand, true luxury handbag brands narrow the channels through which a customer can acquire their products, offering a more exclusive shopping experience. Some true luxury brands do not sell their products in any outlet or wholesale channels, maintaining close control over the distribution of their wares. Chanel and Hermes even go so far as to never sell certain handbags online—a customer must go into a store to purchase a Chanel or certain Hermes bag.

42.     Finally, "accessible luxury" handbags are made in unique production facilities, typically offshore in Asia but still with quality craftsmanship, which distinguishes their production from mass-market handbags made in bulk in China. One key supplier for "accessible luxury" handbags is Simone, which touts its quality-assurance system and the craftsmanship of

20

its artisans, which has enabled it to "grow concurrently with the emergence of accessible luxury in the US market." Notably, Simone has acknowledged, "Accessible luxury players are more heavily skewed toward offshore sourcing compare[d] to true luxury brands that instead more heavily rely on European manufacturing." Tapestry integration planning documents are more blunt: "True luxury and affordable luxury supply chains are fundamentally different."

43.     True luxury and mass-market handbags do not share the same characteristics as "accessible luxury" handbags and thus are not part of the relevant product market. With jaw-dropping prices at multiples of the offerings of Coach, Kate Spade, and Michael Kors, true luxury handbags are not substitutes for "accessible luxury" handbags. In the words of Coach's President: "Gucci bags at $2000 is just not our customer in N[orth]A[merica]."  The President of Kate Spade put it more bluntly: "Bottom line, saying we're in the same market with true luxury is a joke. . . . Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?'"  Neither are mass-market handbags, which, as noted above, Defendants have conceded in filings with foreign regulators.

44.     Although a relevant antitrust market can be defined solely based on qualitative evidence regarding market characteristics, or "practical indicia," another common method employed by courts and the Agencies to determine the relevant market is the hypothetical monopolist test.

45.     As explained by the case law and Merger Guidelines, the hypothetical monopolist test is a tool used to determine if a group of products is sufficiently broad to be a properly defined antitrust product market. If a single firm (i.e., a hypothetical monopolist) seeking to maximize profits controlled all sellers of a set of products or services and likely would undertake

21

a small but significant and non-transitory increase in price or other worsening of terms ("SSNIPT"), then that group of products is a properly defined antitrust product market. Here, a hypothetical monopolist of "accessible luxury" handbags likely would undertake a SSNIPT on consumers. In the event of a SSNIPT for "accessible luxury" handbags, consumers would not switch to mass-market handbags or to true luxury handbags in sufficient volumes to render the price increase unprofitable. Accordingly, "accessible luxury" handbags constitute a properly defined product market.

      **B.**       **The Parties Compete in a Relevant Geographic Market of the United States.**

46.      The parties compete in a relevant geographic market of the United States. Coach, Kate Spade, and Michael Kors set pricing for "accessible luxury" handbags, including MSRP and discounts, by region based on factors like local currency, markup targets, and consumers' preferences and perceptions of brand value—and have separate pricing specifically for the United States. The parties' shipping practices, including limitations on international shipping, also support that the geographic market is the United States. The parties and other "accessible luxury" handbag industry participants have U.S.-specific marketing and business strategies for their brands and handbags, monitor U.S. prices and market shares for handbags, and study U.S. customers as distinct from other regional customer bases (e.g., Europe, China).

47.      A hypothetical monopolist controlling all sellers of "accessible luxury" handbags in the United States could profitably implement a SSNIPT in the United States. Therefore, the United States is a relevant geographic market in which to assess the competitive effects of the Proposed Acquisition.

## THE PROPOSED ACQUISITION WILL ELIMINATE
## DIRECT HEAD-TO-HEAD COMPETITION

48.     The elimination of head-to-head competition between Coach, Kate Spade, and Michael Kors makes the Proposed Acquisition unlawful. A merger is unlawful if it substantially lessens competition between the parties, as recognized by the Merger Guidelines. The parties' internal documents show that Tapestry and Capri closely monitor each other's business strategy and routinely respond to each other's competitive decision-making. The Proposed Acquisition would eliminate this fierce competition, which manifests through pricing, discounts, promotions, innovation, design, marketing, and brick-and-mortar store experiences—all of which benefit consumers.

49.     Consumers are not the only constituency that profits from this rich, and fierce, competition: employees reap rewards from head-to-head competition between the parties' concerning wages and workplace policies.

50.     There is a reasonable probability that the elimination of competition as a result of the Proposed Acquisition would result in increased prices, fewer discounts and promotions, decreased innovation, and reduced wages and employee benefits.

### A.     Coach, Kate Spade, and Michael Kors Are Close Competitors.

51.     Tapestry and Capri recognize their Coach, Michael Kors, and Kate Spade brands as close competitors for handbags, so much so that Tapestry's own deal documents show a concern for "cannibalization" between the Coach, Kate Spade, and Michael Kors brands post-acquisition. While the company was negotiating the Proposed Acquisition, a Tapestry shareholder stated in a letter to its Board of Directors that Michael Kors was Coach's "closest competitor." Another Tapestry document recognizes that "Michael Kors and Kate Spade remain

23

the closest competitors in terms of overlap of customer base in NA." Similarly, Capri's documents, including several that made their way to the company's Board of Directors, are laced with analyses comparing Coach and Michael Kors, including on pricing and designs, as well as consumer demographics. And Capri CEO and Chairman John Idol maintains an almost-singular focus on Coach and Kate Spade—calling the former "[o]ur key competitor." Mr. Idol is not alone: his counterpart at Tapestry, Joanne Crevoiserat, receives reports about Coach and Kate Spade's performance versus Michael Kors, lamenting in late 2021: "these actualized numbers are even worse than I expected in handbags. Have we really lost that much share to [Michael Kors] in Q3 in the wholesale channel (their business +26% to [Coach] -18% and [Kate Spade] -41%)?" And internal Coach and Kate Spade documents discuss the goal to "take share" from or, in the words of a slide deck presented to Coach's Chief Marketing Officer in 2021, "kill Kors."

52.     Mr. Idol and Ms. Crevoiserat have good reason to focus on each other's "accessible luxury" handbag brands, as the parties' own consumer research shows that their customers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tapestry's ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

for handbags across a myriad of metrics. For example, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ The data compiled in these consumer surveys and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Capri has conducted similar research, ▮▮▮▮▮▮▮▮▮▮

24

**B.      There Is a Reasonable Probability That the Proposed Acquisition Will Eliminate Head-to-Head Competition Between Coach, Kate Spade, and Michael Kors.**

53.      Coach, Kate Spade, and Michael Kors have a laser-like focus on each other, continuously monitoring each other's "accessible luxury" handbag brands from look and feel to pricing and performance, and then using that information to inform their strategic deliberations and actions. The Merger Guidelines state that "[c]ompetition often involves firms trying to win business by offering lower prices, new or better products and services, more attractive features, higher wages, improved benefits, or better terms relating to various additional dimensions of competition." All of those forms of competition are here—and there is a reasonable probability that all would be eliminated if the Proposed Acquisition is allowed to proceed.

54.      **Price and discounts.** Examples abound in the parties' documents of analyses tracking each other's prices for "accessible luxury" handbags, with reports making their way up to the Board of Directors of each company. Mr. Idol himself has instructed his subordinates to "align [Michael Kors] pricing with Coach pricing." And when a Coach email blast showed Coach leading with what Mr. Idol called "very sharp price points," he instructed his subordinates: "We need to develop a strategy to compete with this. I don't love it but we have no choice." Indeed, Mr. Idol has testified on behalf of Capri that Coach is the competitor to which he most frequently compares Michael Kors handbag prices.

25

55.     Price competition between Coach, Kate Spade, and Michael Kors occurs beyond simply aligning on list prices, however, as the parties closely monitor, and often match, each other's discounts and promotions, including on items as specific as Mother's Day promotions and discounts for members of the military. In fact, the parties—and Wall Street—have complained about the fierce undercutting and discounting between these three brands, so much so that Michael Kors' CEO demanded that a subordinate prepare a page in a presentation to Capri's Board of Directors with "examples of coach and kate spade racing to the bottom with such promotions" for "the board to see what we are up against."

56.     **Marketing.** Coach, Kate Spade, and Michael Kors pay close each attention to each other's marketing—and no detail is too small. In May 2023, Mr. Idol wrote to his team: "Coach's creativity on these emails (outlet in particular) is killing us . . . our [Michael Kors] backgrounds look cheap and uninspiring . . . They are just bland product photos with no inspiration. Help!!! Fast!!!" The year before, Jaryn Bloom, Michael Kors' Group President of Retail, observed that Coach and Kate Spade were "going after market share by increasing frequency of highly promotional emails which is fueling their growth and we see in the data, hurting us." Michael Kors' next step was clear: "We need to compete."

57.     Competition between the parties is particularly fierce in internet search advertising. Both Capri and Tapestry engage in "conquesting" strategies designed to bid on each other's online search terms so that customers looking for one will also be shown the other's website in search results. At one point, this competition became so intense Michael Kors eschewed a "more cost-effective way to increase market share" (i.e., digital advertising using non-brand terms) in favor of continuing its "conquesting" of its competitor.

26

58. **Brick-and-mortar stores.** Although each heavily relies on digital sales, the parties recognize the value of a strong brick-and-mortar presence, whether it be through their own retail stores or department stores like Macy's. As such, Coach, Kate Spade, and Michael Kors monitor each other's brick-and-mortar presence, taking cues from other's store layouts, product display and assortments, and in-store marketing campaigns. These brands also track each other's retail store locations, openings and closings, and in-store customer traffic. For example, when Michael Kors closed stores, Tapestry's CEO perceived opportunity: "Looking at the [Capri] note – do we know where [Michael Kors] is closing stores? Feels like an opportunity to grab share if we can adjust marketing and if we have a presence in these areas."

59. **Innovation and design.** Coach, Michael Kors, and Kate Spade also compete head-to-head on the quality of their products, including on designs of their handbags. Examples abound of Coach, Kate Spade, and Michael Kors monitoring, and mimicking, designs and elements that they observe in each other's handbags. For example, with regard to Michael Kors' tote bag straps, a Michael Kors employee mused that "[o]ne of the main differences that contributes to cost is our tote has shoulder straps, whereas the coach version has top handles for hand carry. I don't want to copy coach, but do think revisiting may be a good idea." Capri CEO John Idol likewise monitored Coach designs, reviewing Coach marketing e-mails for inspiration and advising his team to follow suit.

60. Coach, Kate Spade, and Michael Kors compete on forms of innovation besides handbag design. For instance, when Coach launched Coach "(Re)Loved," its handbag recycling program, Michael Kors immediately took notice and began plans to adopt a "sustainability campaign like Coach's 'Coach (Re)Loved," which it launched in August 2022 as the Michael

27

Kors "Pre-Loved" program. Tapestry took note of its copycat: "Kors is coming for Coach Reloved!", and one executive called Michael Kors "ankle biters," saying "[t]hey do know how to, rinse-repeat and repackage to the next level."

61.     **Labor.** Evidence shows that Tapestry and Capri compete on metrics that affect other constituencies, including their thousands of employees. Both parties have recognized their retail employees as providing a "competitive advantage" in the sale of their "accessible luxury" handbags—and both monitor one another's decisions on wages and workplace policies.

62.     For example, after Tapestry publicly committed to a $15/hour minimum wage for U.S. hourly employees, its rival Capri immediately took notice, with CEO John Idol requesting a meeting "to understand the financial impact on taking the US [Michael Kors] store fleet full price and outlet to $15 per hour." Michael Kors' VP of Stores wrote separately: "It is official, Tapestry has announced a guaranteed $15 minimum wage. We are not going to have a choice if we want to be staffed for Holiday!" Less than two months later, Michael Kors announced plans to raise its minimum wage to $15 per hour, effective October 3, 2021, which benefitted nearly 2500 Capri employees despite estimates showing the initiative would cost the company nearly $5 million in FY 2023.

63.     The parties also closely follow how they compare to each other on labor conditions, such as "worker well-being" and "living wages," ███████████████████ ███████████████████████████████ Reputation matters to both Capri and Tapestry—as it should, because analysts like UBS include information from Glass Door regarding employee views on the companies—and the parties are aware that potential employees look at Glass Door reviews as well. As Tapestry wrote, "[w]orkplace perceptions are

28

increasingly critical in a tight job market, presenting an opportunity to enhance the workplace experience." Tapestry hired a consultant to compare its reputation to Capri's in January 2022, and ███████████████████████████████████████████████

███████████████████████ Moreover, the parties publicly release annual reports that tout their goals and accomplishments with regard to employees, including information about work environment, compensation, leave policies, promotions and training programs. This competition prompts the parties to improve their workplaces and worker benefits to attract and retain employees—all to maintain a "competitive advantage" for selling their products, including their "accessible luxury" handbags. Its elimination as a result of the Proposed Acquisition could have substantial effects on employment wages, benefits, and conditions for people who work for or seek employment from the parties and their brands.

### C. Tapestry Intends to Raise Michael Kors' Prices Post-Transaction by Reducing Discounts and Pulling Back from Wholesale.

64. Deal documents show that following the Proposed Acquisition, with competition between the Coach, Kate Spade, and Michael Kors brands eliminated, Tapestry intends to raise prices for Michael Kors through reducing discounts and promotions and pulling back on wholesale (where it has less control over pricing)—which is exactly what Coach did in 2016 and Kate Spade later did following its acquisition in 2017.

65. Tapestry boasts a name for this playbook: "Coachenomics." Almost a decade ago, in 2016, Coach announced strategic plans to "rationalize" its department store distribution and remove Coach products from approximately a quarter of department stores, in a move "specifically designed to move away from the discounting." Coach's plans included reducing

29

markdown allowances, because "heavy discounts offered in [the department store] channel make it harder for consumers to spend more on a similar bag at the company's own stores or its e-commerce websites." These decisions helped Coach increase sales prices, with Coach's handbag AURs (Average Unit Retail) increasing to over $300.

66. After Coach (now Tapestry) acquired Kate Spade in 2017, it did not try to hide that it intended to use similar strategies to reduce Kate Spade's wholesale presence and discounts and to raise prices. As Coach's then-CFO Kevin Wills explained in the press release announcing the deal: "[T]o ensure the long-term viability and health of the Kate Spade brand, and similar to the steps Coach has itself taken over the last three years, we plan to reduce sales in Kate Spade's wholesale disposition and online flash sales channels."

67. While Tapestry attempted to pursue this strategy with its Coach and Kate Spade brands, Michael Kors has taken a different path, using discounts to undercut competitors and increase its own sales volume and threatening to undermine the pricing "discipline" that Tapestry had heralded to investors. Tapestry's acquisition of Capri will eliminate that competition. As Morgan Stanley, Tapestry's bankers on the deal, wrote in a slide deck with investor commentary, "it felt like a 'race to the bottom' on price, and investors hope to see a return of more price integrity as a result of the combination."

68. Indeed, deal documents demonstrate that Tapestry intends to apply "Coachenomics" to Michael Kors post-acquisition. Specifically, Tapestry plans to "[r]educe [Michael Kors's] reliance on 'non-premium' wholesale doors and further elevate the brand," "[e]mploy[ing] learnings from [Tapestry's] successful elevation of C[oach]." It intends to

30

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

69.    Tapestry also plans to leverage its "brand growth platform" for Michael Kors, and use strategies like reduced discounting that have helped its brands improve pricing, AUR, and gross margin. While observing similarities between Michael Kors and Coach, Tapestry found that ████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

31



70.     Tapestry's plans will be fueled by its enormous consumer database and superior analytical capabilities. The company has assembled an arsenal of consumer data, boasting a database of ███████████████████████████████████. Rich data analysis, and heavy investment in other technological capabilities, such as artificial intelligence, have enabled Tapestry to strategically implement targeted price increases, reduce discounts and promotions, and limit inventory. Tapestry plans to leverage these capabilities for Capri's brands, including Michael Kors, to drive similar results.

## THE PROPOSED ACQUISITION IS PRESUMPTIVELY UNLAWFUL BECAUSE IT SIGNIFICANTLY INCREASES CONCENTRATION

71.     Apart from the elimination of fierce head-to-head competition, the Proposed Acquisition is also presumptively unlawful because it significantly increases concentration in the "accessible luxury" handbag market.  Already recognized by Wall Street as a "duopoly,"

32

Tapestry and Capri combined would control more than 50 percent of the market for "accessible luxury" handbags in the United States. Given the parties' high market shares, the Proposed Acquisition would lead to a significant increase in concentration in the "accessible luxury" handbag market that exceeds the threshold for presumptive illegality.

72. The Merger Guidelines employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration. The HHI is the sum of the squares of the market shares of the market participants. For example, a market with five firms, each with 20% market share, would have an HHI of 2000 ($20^2 + 20^2 + 20^2 + 20^2 + 20^2 = 2000$). The HHI is low when there are many small firms and grows higher as the market becomes more concentrated. A market with a single firm would have an HHI of 10,000 ($100^2 = 10,000$).

73. The Department of Justice and the Federal Trade Commission jointly publish the Merger Guidelines. Rooted in established caselaw and widely accepted economic thinking, the Merger Guidelines outline the legal tests, analytical frameworks, and economic methodologies both agencies use to assess whether transactions violate the antitrust laws, including measuring market shares and changes in market concentration from a merger. The Merger Guidelines— themselves guided by numerous court decisions—support using the HHI method to calculate market concentration.

74. The increase in market concentration caused by the Proposed Acquisition is indicative of the Proposed Acquisition's likely negative impact on competition. The Merger Guidelines explain that a merger that significantly increases market concentration is presumptively unlawful. Specifically:

33

- A merger that creates a firm with a market share of over 30 percent and that increases the HHI of the market by more than 100 points is presumed to substantially lessen competition in that market and is thus presumptively illegal.

- A merger is also likely to create or enhance market power—and, again, is presumptively illegal—when the post-merger HHI exceeds 1800 and the merger increases the HHI by more than 100 points.

75. The Proposed Acquisition is presumptively illegal in the "accessible luxury" handbag market in the United States. Although a merger need meet only one of the two aforementioned measures to be presumptively illegal, the Proposed Acquisition satisfies both: it is presumed likely to create or enhance market power—and is presumptively illegal—in the "accessible luxury" handbag market because it increases the HHI in the market for "accessible luxury" handbags in the United States by over 1,000 points, leading to a post-acquisition HHI above 3,000 points and a post-acquisition market share for Tapestry of considerably more than 30 percent.

## THE PROPOSED ACQUISITION IS PART OF TAPESTRY'S STRATEGY OF SERIAL ACQUISITIONS

76. In the last decade, Tapestry has already consolidated Coach, Kate Spade, and Stuart Weitzman. Capri has likewise consolidated Michael Kors, Versace, and Jimmy Choo. If the Proposed Acquisition is completed, Tapestry will have consolidated six viable firms into one.

77. The Merger Guidelines state: "A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7." "[T]he Agencies will consider individual acquisitions in light of the cumulative effect of related patterns or business strategies."

34

78.     Tapestry has engaged in an anticompetitive pattern and strategy of acquisitions in the "accessible luxury" market and intends to continue this pattern and strategy after the Proposed Acquisition, in a quest to become a "Global Premium Fashion Powerhouse." Its pattern and strategy of acquisition will entrench Tapestry as the dominant player in "accessible luxury" handbags and make it harder for new brands to both enter and have a meaningful presence.

79.     The Proposed Acquisition is part of Tapestry's long articulated strategy and pattern to become "a serial acquirer," and Tapestry's documents demonstrate that its goal is to "become the acquirer of choice," aspiring to "become a M&A Powerhouse," and to ultimately "own 'accessible luxury.'"

80.     This strategy began over a decade ago, when in 2012 then-Coach developed a steering committee to address "Coach's M&A strategy," which considered "acquir[ing] a luxury brand and extend[ing] to accessible luxury market," and buying Simone, a major manufacturer of "accessible luxury" handbags, "limiting market capacity and creating scarcity." By the next year, Coach had set its sights on becoming "the leading global accessible luxury company." To do so, Coach devised "Two Parallel, Complimentary Strategies": "Create strong, sustainable Coach brand" and "Acquire high potential accessible luxury brands." Over the next two years, it considered acquiring "accessible luxury" handbag competitor Michael Kors because of the "strong strategic rationale," as well as "accessible luxury" handbag brands Kate Spade, Rebecca Minkoff, and Tory Burch.

81.     In 2015, Coach successfully took its first steps to become this "leading global accessible luxury company," when it purchased Stuart Weitzman for $574 million, to enable Coach, in part, to be "well positioned to consolidate further luxury brands." Just months after this

35

acquisition, Coach again looked at numerous "potential opportunities" for acquisitions in "accessible luxury" handbags, including Kate Spade, Ralph Lauren, and Michael Kors.

82.     A Kate Spade acquisition finally became a reality for Coach in 2017, when Coach purchased the brand for $2.4 billion and became Tapestry. A McKinsey presentation prepared for Coach around this time said a merger with Kate Spade would allow Coach to "[d]ominate the accessible leather and accessories market," and Coach told investors the merger would "creat[e] the first New York-based house of modern luxury." Coach also acknowledged concerns of "potential cannibalization of Coach core consumer base" resulting from the merger. Notably, just prior to purchasing Kate Spade, Coach told its board, specifically calling out Kate Spade and Michael Kors, that "accessible luxury" handbags "have become **more promotional,** especially in North America," and that Coach wanted to "continue with Coach Inc. strategy through acquisitions."

83.     That same year Coach also revisited its strategy to acquire Tory Burch. Later, in 2019, Tapestry looked at acquiring Capri, the owner of Michael Kors, and, in 2022, it focused its



on ▮▮▮▮▮ That same year, ▮▮▮▮▮, and, in fact, as it was pursuing Capri in April 2023, ▮▮▮▮▮. Tapestry instructed Morgan Stanley to ▮▮▮▮▮ in addition to the acquisition of Capri.

84.     Tapestry's strategy to acquire "accessible luxury" handbag brands is clear and continuing. In 2021, Tapestry CEO Joanne Crevoiserat made clear that she wanted a board seat filled by "someone with company experience – building value creating M&A strategy." Tapestry

created documents for its Board of Directors leading up to the Proposed Acquisition saying it

███████████████████████████████ and its SVP of Strategy and Consumer Insights observed

the Proposed Acquisition would "set the table for [a] string of pearls[,] or smaller deals." Not

only would the Proposed Acquisition create a North American "accessible luxury" handbag

powerhouse, but Tapestry would be able to leverage its combined size for even more acquisitions

of rivals in the "accessible luxury" handbag market by which it could entrench its position and

make it harder for smaller rivals and new entrants to compete. Indeed, using the new balance

sheet from the Capri acquisition, Tapestry would have "significantly more scale to pursue larger

transactions," a draft board document claims. Additionally, Tapestry would have ████████

██████████████

## THERE ARE NO COUNTERVAILING FACTORS TO
## JUSTIFY THE PROPOSED ACQUISITION

85.     Entry and repositioning to counteract the Proposed Acquisition's anticompetitive

effects is not likely, timely, or sufficient. Coach, Kate Spade, and Michael Kors are household

names in the United States, scoring as some of the most recognized brands in the fashion

industry in consumer research studies. These types of brands do not appear overnight, and more

importantly, are not easily scaled; as designer Rebecca Minkoff, whose handbags compete in the

"accessible luxury" market, observed: "We've been doing it [the brand] for 15 years and

everyone who wants to have a brand forgets how long it takes….brands[s] are going to take 10-

15 years to really get into society and get to the middle of the country." The fact that Tapestry

has chosen to purchase Kate Spade, and now Michael Kors, instead of use that money to build

new brands demonstrates just how long, and difficult, it is to build a new "accessible luxury"

handbag brand.

86.     On top of the time and money it takes to build a brand are the costs associated with a brick-and-mortar presence. Tapestry has observed that "in-store remains an important touchpoint for consumers to interact with the product live" and that "interacting with the product in a brick-and-mortar store is important to assess quality, comfort, and pushing a product from "'love' to 'need'." Brick-and-mortar presence, however, is challenging and costly. Among other things, it requires hiring and training staff and employees—necessary not just to manage the location but also as a tool of building brand awareness and customer loyalty. Wholesale is also an option for an entrant, or smaller existing competitor, to achieve a brick-and-mortar presence. But wholesale distribution presents unique challenges, including building relationships with wholesalers as well as establishing strong brand recognition such that wholesalers will want to work with the entrant in the first place.

87.     Marketing and advertising are essential for entrants to compete in the "accessible luxury" handbag market. The parties invest millions of dollars each year across numerous promotional channels. The parties have entire departments dedicated to creating promotional advertisements, photoshoots, and marketing campaigns. They partake in special events for high-profile fashion events (e.g., fashion shows) around the world—something that is unavailable to new entrants.

88.     The parties' treasure trove of consumer data is also a barrier to entry. Tapestry has publicly and internally hailed its vast access to consumer data to leverage strategic promotions, increase prices, and respond to its customer demands. Capri has done the same. This data provides both Tapestry and Capri with a significant competitive advantage; as Tapestry's CEO told investors, "Tapestry is in a position of strength. Over the last few years, we've transformed

our business. We've leaned into brand building with our portfolio of iconic brands, we've

created a dynamic platform with digital and data capabilities, which has enabled us to deliver

strong and consistent results. And we see these as competitive advantages that are increasingly

important in the environment today, and they're also scalable." Post-acquisition, Tapestry's vast

access to data will increase barriers to entry, making it harder for smaller brands to enter and

compete against the combined firm's ability to price, respond to consumer demand, and drive

scale.

89.     Moreover, new entrants require access to manufacturing, and here too the parties'

rich relationships with suppliers put them at a distinct advantage—and make it harder for new

brands to emerge and scale to replace the loss of competition between the parties that would

result from the Proposed Acquisition.

90.     Respondents cannot demonstrate merger-specific, verifiable, and cognizable

efficiencies sufficient to rebut the presumption and evidence of the Proposed Acquisition's likely

anticompetitive effects.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF THE EQUITIES, AND NEED FOR RELIEF

91.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission,

whenever it has reason to believe that an acquisition is unlawful, to seek preliminary injunctive

relief to prevent consummation of the acquisition until the Commission has had an opportunity to

adjudicate the acquisition's legality in an administrative trial. In deciding whether to grant relief,

the Court must balance the likelihood of the Commission's ultimate success on the merits against

the public equities. The principal public equity weighing in favor of issuance of preliminary

39

injunctive relief is the public interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

92. The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the Federal Trade Commission Act, 15 U.S.C § 45, and that the Agreement and Plan of Merger and the Proposed Acquisition constitute unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act.

93. Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative trial, that the Proposed Acquisition is unlawful, reestablishing the status quo ante if the parties have consummated the Proposed Acquisition and combined their operations in the absence of preliminary relief would be extremely difficult.  Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim.

94. Accordingly, the equitable relief requested here is in the public interest. Wherefore, the Commission respectfully requests that the Court:

 a. Enter the parties' stipulated temporary restraining order;

 b. Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

 c. Retain jurisdiction and maintain the *status quo* until the administrative proceeding initiated by the Commission is concluded; and

    d.  Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: April 22, 2024

Of counsel:

HENRY LIU
Director
Bureau of Competition

KYLE MACH
Acting Deputy Director
Bureau of Competition

SHAOUL SUSSMAN
Associate Director for Litigation
Bureau of Competition

Respectfully submitted,

_____
DANIELLE QUINN (NY Bar No. 5408943)
Federal Trade Commission
600 Pennsylvania Avenue, NM
Washington, DC 20580
Phone: 202-326-2494
Email: dquinn@ftc.gov

ABBY DENNIS (DC Bar No. 994476)
Lead Counsel (*pro hac vice*)
Deputy Assistant Director

PEGGY BAYER FEMENELLA
(DC Bar No. 472770) (*pro hac vice*)
Assistant Director

NICOLE LINDQUIST (DC Bar No. 975593)
(*pro hac vice*)

LAURA ANTONINI (CA Bar No. 271658)
(*pro hac vice*)

BRANDON BOXBAUM
(DC Bar No. 1615988) (*pro hac vice*)

PETER COLWELL (DC Bar. No. 100287)
(*pro hac vice*)

KASSANDRA DIPIETRO
(MN Bar. No. 0403547) (*pro hac vice*)

FRANCES ANNE JOHNSON
(MD Bar – No Number) (*pro hac vice*)

SARAH KERMAN (DC Bar No. 90017957)
(*pro hac vice*)

ANDREW LOWDON (DC Bar No. 230095)
(*pro hac vice*)

41

BLAKE RISENMAY (WA Bar No. 52888)
(*pro hac vice*)

VICTORIA SIMS (DC Bar No. 1006974)
(*pro hac vice*)

TIMOTHY SINGER (DC Bar No. 1048769)
(*pro hac vice*)

*Counsel for Plaintiff Federal Trade Commission*

# Exhibit 13 Intentionally Omitted

# Exhibit 14

4/22/24 REUTERS 20:56:11

REUTERS
Copyright (c) 2024 Thomson Reuters

April 22, 2024

US sues to block merger of Coach and Michael Kors handbag makers

Jasper Ward

Granth Vanaik

Granth Vanaik; Bengaluru Anirban Sen

Abigail Summerville; New York

Richard Chang

Matthew Lewis

Abigail Summerville

Jasper Ward; Washington

(Reuters) -The U.S. Federal Trade Commission on Monday sued to block Coach parent Tapestry's $8.5 billion deal to buy Michael Kors owner Capri, saying it would eliminate "direct head-to-head competition" between the flagship brands of the two luxury handbag makers.

In a statement, the FTC said the tie-up, which would create a company with about 33,000 employees worldwide, could reduce wages and employee benefits.

"The proposed merger threatens to deprive millions of American consumers of the benefits of Tapestry and Capri's head-to-head competition, which includes competition on price, discounts and promotions, innovation, design, marketing and advertising," the FTC said.

The FTC's rare antitrust challenge against a high-end fashion merger could set a precedent for luxury deal regulation, several antitrust lawyers said.

In an interview with Reuters, Tapestry CEO Joanne Crevoiserat said the company was "proud of the wages and benefits" it offers to employees and that the competition for talent goes beyond just the fashion industry.

"We see the FTC as fundamentally misunderstanding the marketplace and the way consumers shop today as well as the impact of this deal on employees and workers in our industry," Crevoiserat said.

"We source talent and lose talent to a vast array of competitors," she added.

The U.S. luxury market is highly fragmented with several differentiated brands catering to a wide range of consumers, antitrust experts said, arguing that legacy fashion brands typically face healthy competition from labels launched every year.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    1

"The FTC's decision to sue is surprising because there's no shortage of competition for fashion, apparel and accessories. The commission has latched onto a marketing term - 'accessible luxury' - and treats it like a unique market that exists in a vacuum," said Howard Hogan, chair of the fashion, retail and consumer practice at law firm Gibson Dunn.

NEW GUIDELINES

U.S. antitrust enforcers issued new merger guidelines in December to encourage fair, open and competitive markets.

Antitrust lawyers noted that the FTC is using a new tactic under the guidelines by arguing that the merger would directly affect hourly workers who may lose out on higher wages due to reduced competition for employees.

"The revised federal merger guidelines outlined that potential effects on labor like lowering wages or work conditions is a basis to challenge a merger, so that is a newer trend. It's not surprising since the agencies announced they'd do that but it is something new to test in court," said Jennifer Lada, litigation attorney at Holland & Knight.

Tapestry had offered to buy Capri in August, hoping to create a U.S. fashion behemoth that could effectively battle bigger European rivals such as Louis Vuitton parent LVMH and potentially win more share in the global luxury market.

But the FTC requested more information from the firms on their deal in November.

"Capri Holdings strongly disagrees with the FTC's decision," the company said in a statement. "The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition."

Earlier in April, the companies received regulatory clearance from the European Union and Japan for their deal, which would bring top luxury labels such as Kate Spade and Jimmy Choo under one roof.

While investors are skeptical of the deal winning approval, most analysts expect the deal to close before Aug. 10, the deadline for the two companies to complete the transaction. Capri's stock closed at $37.96 on Monday, well below the $57-per-share price Tapestry has offered to pay.

"In our view, we do not believe consumers would be harmed with a combination given the competitive nature of the category and varying degrees of cultural relevance," analysts at TD Cowen wrote in a note earlier in April.

---- Index References ----

Company: COWEN AND COMPANY, LLC; Capri Holdings Limited

News Subject: (Antitrust Regulatory (1AN52); Monopolies (1MO68))

Industry: (Apparel (1AP19); Apparel & Textiles (1AP20); Clothing Accessories (1CL17); Consumer Products & Services (1CO62); Fashion Industry (1FA88); Financial Services (1FI37); Luxury Items (1LU28); Retail (1RE82))

Language: EN

Other Indexing: (Coach; TD Cowen; Capri Holdings)

Keywords: litigation; securities; ma; ma

Word Count: 644

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**US sues to block merger of Coach and Michael Kors handbag makers**

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 15 Intentionally Omitted