# Exhibit 46

# TAPESTRY INC: 2024 Luxury Conference Management Meetings – Our Key Takeaways

## Table of Contents

**Page 1**
- durability, & future M&A opptys. interest in TPR's '25e expectations, consumer health, GM
- Key Takeaways
- Management Meetings – Our 2024 Luxury Conference

**Page 3**
- Key Takeaways

**Page 7**
- Disclosure Section
- Analyst Certification
- Global Research Conflict Management Policy

## Keyword Mentions

Search

### Keyword in Context



1          2          3

Please enter a keyword above and hit search to see keyword mentions here.

## More Information

**Abstract** Meetings focused primarily on the proposed CPRI acquisition, particularly 1) deal status, 2) drivers of CPRI's recent financial deterioration, & 3) opptys mgmt. sees to improve the business/add value. Outside of the transaction, there was also investor interest in TPR's '25e expectations, consumer health, GM durability, & future M&A opptys. We hosted investor meetings in Paris at Morgan Stanley's second annual Luxury Conference with TPR CEO Joanne Crevoiserat, COO/CFO Scott Roe, & Global Head of IR Christina Colone. We highlight 9 key takeaways from the meetings: Transaction commitment permeated mgmt. responses throughout conference meetings, in-line with positioning on TPR's 3Q24 earnings call. Recent CPRI financial challenges viewed by mgmt as episodic & execution-related, rather than structural or brand equity-related (Capri is no longer covered by Morgan Stanley Research). CPRI's recent execution

**Posted** May-23-2024 5:50 PM

**Firm** Morgan Stanley

**Analyst** Straton, Alexandra Ann

**Type** EPS Estimates*

**Pages** 11

**File size**

**Summary**

Meetings focused primarily on the proposed CPRI acquisition, particularly 1) deal status, 2) drivers of CPRI's recent financial deterioration, & x) opptys mgmt. sees to improve the business/add value. Outside of the transaction, there was also investor interest in TPR's '25e expectations, consumer health, GM durability, & future M&A opptys. We hosted investor meetings in Paris at Morgan Stanley's second annual Luxury Conference with TPR CEO Joanne Crevoiserat, COO/CFO Scott Roe, & Global Head of IR Christina Colone. We highlight x key takeaways from the meetings: Transaction commitment permeated mgmt. responses throughout conference meetings, in-line with positioning on TPR's 3Q24 earnings call. Recent CPRI financial challenges viewed by mgmt as episodic & execution-related, rather than structural or brand equity-related (Capri is no longer covered by Morgan Stanley Research). CPRI's recent execution challenges appear most acute in wholesale & digital, both of which TPR speculates it could assist with/has expertise in. Mgmt confidence in standalone TPR '25e EPS target achievability remains. Committed to growth in '25e, though we suspect this may be 2H weighted – in-line with Street expectations. NA & China consumer outlook – maintaining "increasingly cautious" view communicated LQ. Mgmt sees many areas for TPR to potentially add value to CPRI – data & analytics usage, marketing, China exposure, digital, consumer insights, SKU rationalization, among many others.M&A framework predicated on x-lens approach, making for a high bar when contemplating current/future assets.Recent GM expansion impressive, with drivers intact, though it appears the market wonders if some reversion risk lingers. For more detail on these items, please see Key Takeaways. For key takeaways from the luxury conference, see below:Morgan Stanley Luxury Conference: Day x - Live from ParisMorgan Stanley Luxury Conference: Day x - Live from Paris Video | Morgan Stanley Luxury Conference 2024: Highlights

---

**Tables**                                                                 Page

- Katy Delahunt Research Associate                                           1
  Periods covered: 06/23 06/24e 06/25e 06/26e

  Katy.Delahunt@morganstanley.com          +1 212 761-6034

  Chad Britnell, CFA
  Research Associate
  Chad.Britnell@morganstanley.com

  **TAPESTRY INC (TPR.N, TPR UN)**

  Retail, Specialty Retail | United States of America

  Stock Rating
  Industry View
  Price target
  Shr price, close (May 22, 2024)
  Mkt cap, curr (mm)
  52-Week Range

  | Fiscal Year Ending | 06/23 | 06/24e | 06/25e | 06/26e |
  |---|---|---|---|---|
  | EPS ($)** | | | | |
  | EPS ($)§ | | | | |
  | P/E** | | | | |
  | Div yld (%) | | | | |
  | ModelWare EPS ($) | | | | |

- Quarterly ModelWare EPS ($)                                                1
  Periods covered: 2024e 2025e

  | Quarter | 2023 | 2024e Prior | 2024e Current | 2025e Prior | 2025e Current |
  |---|---|---|---|---|---|
  | Q1 | | | | | |
  | Q2 | | | | | |
  | Q3 | | | | | |
  | Q4 | | | | | |

- Stock Rating Category                                                      8

---

# Exhibit 47

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 8-K

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(D)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**Date of Report (Date of earliest event reported): May 29, 2024**



**(Exact name of Registrant as Specified in its Charter)**

**001-35368**
**(Commission File Number)**

| **British Virgin Islands** | **N/A** |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |

**90 Whitfield Street**
**2nd Floor**
**London, United Kingdom**
**W1T 4EZ**
**(Address of Principal Executive Offices)**

**44 207 632 8600**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on which Registered |
|---|---|---|
| Ordinary Shares, no par value | CPRI | New York Stock Exchange |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**ITEM 2.02**     **RESULTS OF OPERATIONS AND FINANCIAL CONDITION.**

On May 29, 2024, the Company issued a press release containing its unaudited financial results for its fourth fiscal quarter and fiscal year ended March 30, 2024. A copy of the press release is attached hereto as Exhibit 99.1.

**ITEM 9.01**     **FINANCIAL STATEMENTS AND EXHIBITS.**

(d) Exhibits.

| Exhibit No. | |
|---|---|
| 99.1 | Press Release issued by Capri Holdings Limited, dated May 29, 2024. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

Exhibit 99.1 is furnished to comply with Item 2.02 and Item 9.01 of Form 8-K. Exhibit 99.1 is not to be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, nor shall Exhibit 99.1 be deemed incorporated by reference in any filing under the Securities Act of 1933 (except as shall be expressly set forth by specific reference in such filing).

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**CAPRI HOLDINGS LIMITED**

Date: May 29, 2024

| | |
|---|---|
| By: | /s/ Thomas J. Edwards, Jr. |
| Name: | Thomas J. Edwards, Jr. |
| Title: | Executive Vice President, Chief Financial Officer and Chief Operating Officer |

# Exhibit 48



**Exhibit 99.1**

## Capri Holdings Limited Announces Fourth Quarter and Full Year Fiscal 2024 Results



**London - May 29, 2024 -** Capri Holdings Limited (NYSE:CPRI), a global fashion luxury group, today announced its financial results for the fourth quarter and full year fiscal 2024 ended March 30, 2024.

**Fourth Quarter Fiscal 2024 Highlights**

- Revenue decreased 8.4% on a reported basis and 7.9% in constant currency
- Adjusted operating margin of 6.4%
- Adjusted earnings per share of $0.42

John D. Idol, the Company's Chairman and Chief Executive Officer said, "Overall, we were disappointed with our results as performance in the fourth quarter continued to be impacted by softening demand globally for fashion luxury goods. In our retail channel, sales trends improved sequentially in the Americas and EMEA while trends slowed in Asia. In our wholesale channel, sales remained challenged."

Mr. Idol continued, "Versace, Jimmy Choo and Michael Kors continued to resonate with consumers as evidenced by the 11.6 million new consumers added across our databases, representing 14% growth versus last year. This reflects the strong brand equity and enduring value of our three iconic houses. Looking forward, we remain focused on executing our strategic initiatives to deliver long-term sustainable growth across each of our luxury houses."

Mr. Idol concluded, "Last August Capri Holdings announced that we entered into a definitive agreement to be acquired by Tapestry. In April, the FTC filed an unprecedented lawsuit to block the proposed transaction. We strongly disagree with the FTC's decision and firmly believe in the merits of this acquisition. The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition. Tapestry and Capri operate in the fiercely competitive and highly fragmented global fashion luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low. As we previously stated, Capri intends to vigorously defend this case in court alongside Tapestry and we look forward to the successful completion of the pending acquisition. This combination will deliver value to our shareholders as well as provide new opportunities for



our dedicated employees around the world as Capri Holdings becomes part of a larger and more diversified company. By joining with Tapestry, our brands will have greater resources and capabilities to accelerate the expansion of their global reach while preserving their unique DNA."

**Fourth Quarter Fiscal 2024 Results**

**Financial Results and non-GAAP Reconciliation**

The Company's results are reported in this press release in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and on an adjusted, non-GAAP basis. A reconciliation of GAAP to non-GAAP financial information is provided at the end of this press release.

**Overview of Capri Holdings Fourth Quarter Fiscal 2024 Results**

- Total revenue of $1.223 billion decreased 8.4% compared to last year. On a constant currency basis, total revenue decreased 7.9%. Total company retail sales declined in the mid-single-digits with trends being impacted by softening demand globally for fashion luxury goods. In wholesale, revenue decreased in the high-teens driven by softer demand in the Americas and EMEA.

- Gross profit was $767 million and gross margin was 62.7%, compared to $867 million and 64.9% in the prior year. Adjusted gross profit was $767 million and adjusted gross margin was 62.7%, compared to $863 million and 64.6% in the prior year. Gross profit margin decreased relative to prior year primarily driven by lower full price sell-throughs.

- Loss from operations was $543 million and operating margin was (44.4)% compared to loss from operations of $40 million and operating margin of (3.0)% in the prior year primarily due to non-cash impairments. Adjusted income from operations was $78 million and operating margin was 6.4%, compared to $121 million and 9.1% in the prior year. The decline in adjusted operating margin primarily reflects lower gross margin and expense deleverage on lower revenue.

- Net loss was $472 million, or $(4.03) per diluted share, compared to net loss of $34 million, or $(0.28) per diluted share, in the prior year, impacted by non-cash impairments. Adjusted net income was $50 million, or $0.42 per diluted share, compared to $121 million, or $0.97 per diluted share, in the prior year.

- Net inventory at March 30, 2024 was $862 million, an 18.4% decrease compared to the prior year.

- Cash flow from operating activities for the fourth quarter was an inflow of $44 million, while free cash flow was an outflow of $6 million. This result was well below our expectations reflecting lower operating results, higher working capital usage and higher cash taxes.

- For the full year cash flow from operating activities was an inflow of $309 million, while free cash flow was an inflow of $120 million. This includes approximately $130 million of spending on transformation initiatives that are largely complete. It also includes the negative impact of over $200 million related to accounts payable, accrued expenses and prepaid expenses as well as higher cash taxes paid.

- Capri Holdings anticipates free cash flow to normalize in Fiscal 2025.

- Cash and cash equivalents totaled $199 million, and total borrowings outstanding were $1.723 billion, resulting in net debt of $1.524 billion.



**Versace Fourth Quarter Fiscal 2024 Results**

- Versace revenue of $264 million decreased 3.6% on a reported basis and 2.9% on a constant currency basis driven primarily by softening demand globally for fashion luxury goods. Retail sales increased mid-single-digits while wholesale revenue decreased double-digits. Revenue in the Americas declined 1%, while revenue in EMEA decreased 11% and revenue in Asia increased 6%. Versace's global database increased by 1.9 million new consumers, representing 30% growth over the last year.

- Versace operating income was $1 million and operating margin was 0.4% compared to an operating income of $14 million and operating margin of 5.1% in the prior year. The decline in operating margin rate was primarily due to lower full price sell-throughs and expense deleverage on lower revenue.

**Jimmy Choo Fourth Quarter Fiscal 2024 Results**

- Jimmy Choo revenue of $137 million decreased 9.3% on both a reported and constant currency basis driven primarily by softening demand globally for fashion luxury goods. Retail sales decreased low-single-digits while wholesale revenue decreased double-digits. Revenue in the Americas declined 9%, while revenue in EMEA decreased 6% and revenue in Asia declined 14%. Jimmy Choo's global database increased by 0.7 million new consumers, representing 12% growth over the last year.

- Jimmy Choo operating loss was $8 million and operating margin was (5.8)%, compared to an operating loss of $7 million and operating margin of (4.6)% in the prior year. The decline in operating margin rate was primarily due to lower full price sell-throughs and expense deleverage on lower revenue.

**Michael Kors Fourth Quarter Fiscal 2024 Results**

- Michael Kors revenue of $822 million decreased 9.7% on a reported basis and 9.2% on a constant currency basis. The decline versus prior year was primarily attributable to softening demand globally for fashion luxury goods. Retail sales declined in the high-single-digits while wholesale revenue decreased double-digits. Revenue in the Americas declined 9%, while revenue in EMEA decreased 7% and revenue in Asia declined 16%. Michael Kors' global database increased by 9.0 million new consumers, representing 13% growth over the last year.

- Michael Kors operating income was $116 million and operating margin was 14.1%, compared to operating income of $147 million and operating margin of 16.2% in the prior year. The decline in operating margin rate was primarily related to lower full price sell-throughs and expense deleverage on lower revenue.

**Outlook**

As previously stated, given the pending merger transaction of Capri Holdings Limited by Tapestry, Inc., the Company does not intend to provide financial guidance.



## Use of Non-GAAP Financial Measures

Constant currency effects are non-GAAP financial measures, which are provided to supplement our reported operating results to facilitate comparisons of our operating results and trends in our business, excluding the effects of foreign currency rate fluctuations. Because we are a global company, foreign currency exchange rates may have a significant effect on our reported results. We calculate constant currency measures and the related foreign currency impacts by translating the current year's reported amounts into comparable amounts using prior year's foreign exchange rates for each currency. All constant currency performance measures discussed below should be considered a supplement to and not in lieu of our operating performance measures calculated in accordance with U.S. GAAP. Additionally, this earnings release includes certain non-GAAP financial measures that exclude certain costs associated with restructuring and other charges, ERP implementation costs, COVID-19 related expenses, war in Ukraine related costs, Capri transformation costs, costs related to the pending merger transaction with a wholly-owned subsidiary of Tapestry, Inc. (the "Merger") and long-lived asset impairments. The Company uses non-GAAP financial measures, among other things, to evaluate its operating performance and in order to represent the manner in which the Company conducts and views its business. The Company believes that excluding these items helps its management and investors compare operating performance based on its ongoing operations. While the Company considers the non-GAAP measures to be useful supplemental measures in analyzing its results, they are not intended to replace, nor act as a substitute for, any amounts presented in its consolidated financial statements prepared in conformity with U.S. GAAP and may be different from non-GAAP measures reported by other companies.

## About Capri Holdings Limited

Capri Holdings is a global fashion luxury group consisting of iconic, founder-led brands Versace, Jimmy Choo and Michael Kors. Our commitment to glamorous style and craftsmanship is at the heart of each of our luxury brands. We have built our reputation on designing exceptional, innovative products that cover the full spectrum of fashion luxury categories. Our strength lies in the unique DNA and heritage of each of our brands, the diversity and passion of our people and our dedication to the clients and communities we serve. Capri Holdings Limited is publicly listed on the New York Stock Exchange under the ticker CPRI.

## Forward Looking Statements

*This press release contains statements which are, or may be deemed to be, "forward-looking statements." Forward-looking statements are prospective in nature and are not based on historical facts, but rather on current expectations and projections of the management of Capri about future events and are therefore subject to risks and uncertainties which could cause actual results to differ materially from the future results expressed or implied by the forward-looking statements. All statements other than statements of historical facts included herein, may be forward-looking statements. Without limitation, any statements preceded or followed by or that include the words "plans", "believes", "expects", "intends", "will", "should", "could", "would", "may", "anticipates", "might" or similar words or phrases, are forward-looking statements. Such forward-looking statements involve known and unknown risks and uncertainties that could significantly affect expected results and are based on certain key assumptions, which could cause actual results to differ materially from those projected or implied in any forward-looking statements, including regarding the pending Merger. These risks, uncertainties and other factors include but are not limited to, our ability to respond to changing fashion, consumer traffic and retail trends; fluctuations in demand for our products; high consumer debt levels, recession and inflationary pressures; loss of market share and increased competition; reductions in our wholesale channel; the impact of the COVID-19 pandemic, or other unforeseen epidemics, pandemics, disasters or catastrophes; levels of cash flow and future availability of credit; Capri's ability to successfully execute its growth strategies; departure of key employees or failure to attract and retain highly qualified personnel; risks associated with operating in international markets and global sourcing activities, including disruptions or delays in manufacturing or shipments; the risk of cybersecurity threats and privacy or data security breaches; extreme weather conditions and natural disasters; general economic, political, business or market conditions; acts of war and other geopolitical conflicts; the outcome of the U.S. Federal Trade Commission's lawsuit attempting to block the pending Merger, the occurrence of any other event, change or other circumstances that could give rise to the termination of the merger agreement entered into in connection with the pending Merger; the risk that the parties to the merger agreement may not be able to satisfy the*



*conditions to the pending Merger in a timely manner or at all; risks related to disruption of management time from ongoing business operations due to the pending Merger; the risk that any announcements relating to the pending Merger could have adverse effects on the market price of Capri's ordinary shares; the risk of any unexpected costs or expenses resulting from the pending Merger; the risk of any litigation relating to the pending Merger; the risk that the pending Merger could have an adverse effect on the ability of Capri to retain and maintain relationships with customers, suppliers and other business partners and retain and hire key personnel and on its operating results and business generally, as well as those risks that are outlined in Capri's disclosure filings and materials, which you can find on http://www.capriholdings.com, such as its Form 10-K, Form 10-Q and Form 8-K reports that have been filed with the SEC. Please consult these documents for a more complete understanding of these risks and uncertainties. Any forward-looking statement in this press release speaks only as of the date made and Capri disclaims any obligation to update or revise any forward-looking or other statements contained herein other than in accordance with legal and regulatory obligations.*

**CONTACTS:**

Investor Relations:
Jennifer Davis
+1 (201) 514-8234
Jennifer.Davis@CapriHoldings.com

Media:
Press@CapriHoldings.com



SCHEDULE 1

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except share and per share data)**
**(Unaudited)**

| | Three Months Ended | | Fiscal Years Ended | |
| --- | --- | --- | --- | --- |
| | March 30, 2024 | April 1, 2023 | March 30, 2024 | April 1, 2023 |
| Total revenue | $ 1,223 | $ 1,335 | $ 5,170 | $ 5,619 |
| Cost of goods sold | 456 | 468 | 1,831 | 1,895 |
| Gross profit | 767 | 867 | 3,339 | 3,724 |
| Total operating expenses | 1,310 | 907 | 3,580 | 3,045 |
| (Loss) income from operations | (543) | (40) | (241) | 679 |
| Other income, net | (1) | (1) | (1) | (3) |
| Interest (income) expense, net | (6) | 11 | 6 | 24 |
| Foreign currency loss | 21 | 20 | 37 | 10 |
| (Loss) income before (benefit) provision for income taxes | (557) | (70) | (283) | 648 |
| (Benefit) provision for income taxes | (85) | (37) | (54) | 29 |
| Net (loss) income | (472) | (33) | (229) | 619 |
| Less: Net income attributable to noncontrolling interests | - | 1 | - | 3 |
| Net (loss) income attributable to Capri | $ (472) | $ (34) | $ (229) | $ 616 |
| Weighted average ordinary shares outstanding: | | | | |
| Basic | 117,156,327 | 123,327,209 | 117,014,420 | 132,532,009 |
| Diluted | 117,156,327 | 123,327,209 | 117,014,420 | 134,002,480 |
| Net income (loss) per ordinary share: | | | | |
| Basic | $ (4.03) | $ (0.28) | $ (1.96) | $ 4.65 |
| Diluted | $ (4.03) | $ (0.28) | $ (1.96) | $ 4.60 |



**SCHEDULE 2**

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(In millions, except share data)**
**(Unaudited)**

| | | March 30, 2024 | | April 1, 2023 |
|---|---|---:|---|---:|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 199 | $ | 249 |
| Receivables, net | | 332 | | 369 |
| Inventories, net | | 862 | | 1,057 |
| Prepaid expenses and other current assets | | 215 | | 195 |
| Total current assets | | 1,608 | | 1,870 |
| Property and equipment, net | | 579 | | 552 |
| Operating lease right-of-use assets | | 1,438 | | 1,330 |
| Intangible assets, net | | 1,394 | | 1,728 |
| Goodwill | | 1,106 | | 1,293 |
| Deferred tax assets | | 352 | | 296 |
| Other assets | | 212 | | 226 |
| Total assets | $ | 6,689 | $ | 7,295 |
| **Liabilities and Shareholders' Equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 352 | $ | 475 |
| Accrued payroll and payroll related expenses | | 107 | | 154 |
| Accrued income taxes | | 64 | | 73 |
| Short-term operating lease liabilities | | 400 | | 429 |
| Short-term debt | | 462 | | 5 |
| Accrued expenses and other current liabilities | | 310 | | 314 |
| Total current liabilities | | 1,695 | | 1,450 |
| Long-term operating lease liabilities | | 1,452 | | 1,348 |
| Deferred tax liabilities | | 362 | | 508 |
| Long-term debt | | 1,261 | | 1,822 |
| Other long-term liabilities | | 319 | | 318 |
| Total liabilities | | 5,089 | | 5,446 |
| Commitments and contingencies | | | | |
| Shareholders' equity | | | | |
| Ordinary shares, no par value; 650,000,000 shares authorized; 226,271,074 shares issued and 116,629,634 outstanding at March 30, 2024; 224,166,250 shares issued and 117,347,045 outstanding at April 1, 2023 | | - | | - |
| Treasury shares, at cost (109,641,440 shares at March 30, 2024 and 106,819,205 shares at April 1, 2023) | | (5,458) | | (5,351) |
| Additional paid-in capital | | 1,417 | | 1,344 |
| Accumulated other comprehensive income | | 161 | | 147 |
| Retained earnings | | 5,479 | | 5,708 |
| Total shareholders' equity of Capri | | 1,599 | | 1,848 |
| Noncontrolling interest | | 1 | | 1 |
| Total shareholders' equity | | 1,600 | | 1,849 |
| Total liabilities and shareholders' equity | $ | 6,689 | $ | 7,295 |



**SCHEDULE 3**

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSOLIDATED SEGMENT DATA**
**($ in millions)**
**(Unaudited)**

| | | Three Months Ended | | Fiscal Years Ended | |
| --- | --- | --- | --- | --- | --- |
| | | March 30, 2024 | April 1, 2023 | March 30, 2024 | April 1, 2023 |
| **Revenue by Segment and Region:** | | | | | |
| Versace | The Americas | $ 87 | $ 88 | $ 338 | $ 408 |
| | EMEA | 105 | 118 | 444 | 468 |
| | Asia | 72 | 68 | 248 | 230 |
| **Versace Revenue** | | 264 | 274 | 1,030 | 1,106 |
| Jimmy Choo | The Americas | 41 | 45 | 176 | 196 |
| | EMEA | 58 | 62 | 266 | 255 |
| | Asia | 38 | 44 | 176 | 182 |
| **Jimmy Choo Revenue** | | 137 | 151 | 618 | 633 |
| Michael Kors | The Americas | 519 | 571 | 2,298 | 2,616 |
| | EMEA | 189 | 203 | 791 | 819 |
| | Asia | 114 | 136 | 433 | 445 |
| **Michael Kors Revenue** | | 822 | 910 | 3,522 | 3,880 |
| **Total Revenue** | | $ 1,223 | $ 1,335 | $ 5,170 | $ 5,619 |
| | | | | | |
| **(Loss) Income from Operations:** | | | | | |
| Versace | | $ 1 | $ 14 | $ 25 | $ 152 |
| Jimmy Choo | | (8) | (7) | 3 | 38 |
| Michael Kors | | 116 | 147 | 634 | 868 |
| Total segment income from operations | | 109 | 154 | 662 | 1,058 |
| Less: Corporate expenses | | (65) | (62) | (275) | (233) |
| Restructuring and other charges | | (30) | (5) | (33) | (16) |
| Impairment of long-lived assets | | (549) | (130) | (575) | (142) |
| Merger related costs | | (8) | - | (20) | - |
| Impact of war in Ukraine | | - | - | - | 3 |
| COVID-19 related charges | | - | 3 | - | 9 |
| **Total (Loss) Income from Operations** | | $ (543) | $ (40) | $ (241) | $ 679 |
| | | | | | |
| **Operating Margin:** | | | | | |
| Versace | | 0.4% | 5.1% | 2.4% | 13.7% |
| Jimmy Choo | | (5.8)% | (4.6)% | 0.5% | 6.0% |
| Michael Kors | | 14.1% | 16.2% | 18.0% | 22.4% |
| Capri | | (44.4)% | (3.0)% | (4.7)% | 12.1% |



**SCHEDULE 4**

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**SUPPLEMENTAL RETAIL STORE INFORMATION**
**(Unaudited)**

| Retail Store Information: | As of March 30, 2024 | April 1, 2023 |
|---|---|---|
| Versace | 236 | 223 |
| Jimmy Choo | 234 | 237 |
| Michael Kors | 769 | 812 |
| Total number of retail stores | 1,239 | 1,272 |



**SCHEDULE 5**

**CAPRI HOLDINGS LIMITED AND SUBSIDIARIES**
**CONSTANT CURRENCY DATA**
**(In millions)**
**(Unaudited)**

| | Three Months Ended | | % Change | |
| | March 30, 2024 | April 1, 2023 | As Reported | Constant Currency |
|---|---|---|---|---|
| Total revenue: | | | | |
| Versace | $ 264 | $ 274 | (3.6)% | (2.9)% |
| Jimmy Choo | 137 | 151 | (9.3)% | (9.3)% |
| Michael Kors | 822 | 910 | (9.7)% | (9.2)% |
| **Total revenue** | **$ 1,223** | **$ 1,335** | **(8.4)%** | **(7.9)%** |

| | Fiscal Years Ended | | % Change | |
| | March 30, 2024 | April 1, 2023 | As Reported | Constant Currency |
|---|---|---|---|---|
| Total revenue: | | | | |
| Versace | $ 1,030 | $ 1,106 | (6.9)% | (7.9)% |
| Jimmy Choo | 618 | 633 | (2.4)% | (3.0)% |
| Michael Kors | 3,522 | 3,880 | (9.2)% | (9.5)% |
| **Total revenue** | **$ 5,170** | **$ 5,619** | **(8.0)%** | **(8.4)%** |



**SCHEDULE 6**

### RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES
### (In millions, except share and per share data)
### (Unaudited)

| | As Reported | Impairment of Assets[1] | Restructuring and Other Charges[2] | ERP Implementation[3] | Capri Transformation[4] | Merger Costs | As Adjusted |
|---|---|---|---|---|---|---|---|
| | | | Three Months Ended March 30, 2024 | | | | |
| Gross profit | $ 767 | $ - | $ - | $ - | $ - | $ - | $ 767 |
| Operating expenses | $ 1,310 | $ (549) | $ (30) | $ (5) | $ (29) | $ (8) | $ 689 |
| Total (loss) income from operations | $ (543) | $ 549 | $ 30 | $ 5 | $ 29 | $ 8 | $ 78 |
| Foreign currency loss | $ 21 | $ - | $ - | $ - | $ - | $ - | $ 21 |
| (Loss) income before (benefit) provision for income taxes | $ (557) | $ 549 | $ 30 | $ 5 | $ 29 | $ 8 | $ 64 |
| (Benefit) provision for income taxes | $ (85) | $ 86 | $ 7 | $ 1 | $ 4 | $ 1 | $ 14 |
| Net (loss) income attributable to Capri | $ (472) | $ 463 | $ 23 | $ 4 | $ 25 | $ 7 | $ 50 |
| Weighted average diluted ordinary shares outstanding | 117,156,327 | | | | | | 118,221,490 |
| Diluted net (loss) income per ordinary share - Capri | $ (4.03) | $ 3.93 | $ 0.20 | $ 0.04 | $ 0.22 | $ 0.06 | $ 0.42 |

_____

[1]  Asset impairment charges primarily relate to the impairment of the Jimmy Choo Retail and Wholesale reporting units goodwill and Versace and Jimmy Choo brand intangible assets, as well as the impairment of certain operating lease right-of-use assets.

[2]  Amounts impacting operating expenses primarily relate to Global Optimization Plan costs, equity awards associated with the acquisition of Gianni Versace S.r.l and severance expenses incurred during the fourth quarter.

[3]  Represents a multi-year ERP implementation which includes accounting, finance and wholesale and retail inventory solutions in order to create standardized finance IT applications across our organization.

[4]  The Capri transformation program represents a multi-year, multi-project initiative extending through Fiscal 2026 intended to improve the operating effectiveness and efficiency of our organization by creating best in class shared platforms across our brands and by expanding our digital capabilities. These initiatives cover multiple aspects of our operations including supply chain, marketing, omni-channel customer experience, e-commerce, data analytics and IT infrastructure. During Fiscal 2024, the remaining transformation projects were paused due to the pending Merger and we will reassess this program, along with related timing, in Fiscal 2025.



**SCHEDULE 7**

**RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES**
**(In millions, except share and per share data)**
**(Unaudited)**

| | As Reported | Impairment of Assets[1] | Restructuring and Other Charges [2] | ERP Implementation [3] | Capri Transformation[4] | Merger Costs | As Adjusted |
|---|---|---|---|---|---|---|---|
| Gross profit | $ 3,339 | $ - | $ - | $ - | $ - | $ - | $ 3,339 |
| Operating expenses | $ 3,580 | $ (575) | $ (33) | $ (18) | $ (113) | $ (20) | $ 2,821 |
| Total (loss) income from operations | $ (241) | $ 575 | $ 33 | $ 18 | $ 113 | $ 20 | $ 518 |
| Foreign currency loss | $ 37 | $ - | $ (17) | $ - | $ - | $ - | $ 20 |
| (Loss) income before (benefit) provision for income taxes | $ (283) | $ 575 | $ 50 | $ 18 | $ 113 | $ 20 | $ 493 |
| (Benefit) provision for income taxes | $ (54) | $ 92 | $ 11 | $ 4 | $ 23 | $ 4 | $ 80 |
| Net (loss) income attributable to Capri | $ (229) | $ 483 | $ 39 | $ 14 | $ 90 | $ 16 | $ 413 |
| Weighted average diluted ordinary shares outstanding | 117,014,420 | | | | | | 118,057,806 |
| Diluted net (loss) income per ordinary share - Capri | $ (1.96) | $ 4.10 | $ 0.33 | $ 0.12 | $ 0.77 | $ 0.14 | $ 3.50 |

_____

[1] Asset impairment charges primarily relate to the impairment of the Jimmy Choo Retail and Wholesale reporting units goodwill and Versace and Jimmy Choo brand intangible assets, as well as the impairment of certain operating lease right-of-use assets.

[2] Amounts impacting operating expenses primarily relate to Global Optimization Plan costs, equity awards associated with the acquisition of Gianni Versace S.r.l and severance expense.

[3] Represents a multi-year ERP implementation which includes accounting, finance and wholesale and retail inventory solutions in order to create standardized finance IT applications across our organization.

[4] The Capri transformation program represents a multi-year, multi-project initiative extending through Fiscal 2026 intended to improve the operating effectiveness and efficiency of our organization by creating best in class shared platforms across our brands and by expanding our digital capabilities. These initiatives cover multiple aspects of our operations including supply chain, marketing, omni-channel customer experience, e-commerce, data analytics and IT infrastructure. During Fiscal 2024, the remaining transformation projects were paused due to the pending Merger and we will reassess this program, along with related timing, in Fiscal 2025.



**SCHEDULE 8**

### RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES
### (In millions, except share and per share data)
### (Unaudited)

| | As Reported | Impairment of Assets | Restructuring and Other Charges [1] | COVID-19 Related Charges | ERP Implementation [2] | Capri Transformation [3] | War in Ukraine | As Adjusted |
|---|---|---|---|---|---|---|---|---|
| | | | | Three Months Ended April 1, 2023 | | | | |
| Gross profit | $ 867 | $ - | $ - | $ (3) | $ - | $ - | $ (1) | $ 863 |
| Operating expenses | $ 907 | $ (130) | $ (5) | $ - | $ (5) | $ (24) | $ (1) | $ 742 |
| Total (loss) income from operations | $ (40) | $ 130 | $ 5 | $ (3) | $ 5 | $ 24 | $ - | $ 121 |
| Foreign currency loss (gain) | $ 20 | $ - | $ (14) | $ - | $ - | $ - | $ - | $ 6 |
| (Loss) income before provision for income taxes | $ (70) | $ 130 | $ 19 | $ (3) | $ 5 | $ 24 | $ - | $ 105 |
| (Benefit) for income taxes | $ (37) | $ 12 | $ 5 | $ (1) | $ 1 | $ 3 | $ - | $ (17) |
| Net (loss) income attributable to Capri | $ (34) | $ 118 | $ 14 | $ (2) | $ 4 | $ 21 | $ - | $ 121 |
| Weighted average diluted ordinary shares outstanding | 123,327,209 | | | | | | | 124,859,442 |
| Diluted net (loss) income per ordinary share - Capri | $ (0.28) | $ 0.95 | $ 0.11 | $ (0.02) | $ 0.04 | $ 0.17 | $ - | $ 0.97 |

_____

[1] Amounts impacting operating expenses primarily includes charges recorded in connection with the acquisition of Gianni Versace S.r.l. The foreign currency exchange loss represents a charge recognized in conjunction with restructuring activities to rationalize certain legal entities within our structure.

[2] Represents a multi-year ERP implementation which includes accounting, finance and wholesale and retail inventory solutions in order to create standardized finance IT applications across our organization.

[3] The Capri transformation program represents a multi-year, multi-project initiative extending through Fiscal 2026 intended to improve the operating effectiveness and efficiency of our organization by creating best in class shared platforms across our brands and by expanding our digital capabilities. These initiatives cover multiple aspects of our operations including supply chain, marketing, omni-channel customer experience, e-commerce, data analytics and IT infrastructure.



**SCHEDULE 9**

### RECONCILIATION OF GAAP TO NON-GAAP FINANCIAL MEASURES
### (In millions, except share and per share data)
### (Unaudited)

| | As Reported | Impairment of Assets | Restructuring and Other Charges[1] | COVID-19 Related Charges | ERP Implementation[2] | Capri Transformation[3] | War in Ukraine | As Adjusted |
|---|---|---|---|---|---|---|---|---|
| | | | | Fiscal Year Ended April 1, 2023 | | | | |
| Gross profit | $ 3,724 | $ - | $ - | $ (9) | $ - | $ - | $ (1) | $ 3,714 |
| Operating expenses | $ 3,045 | $ (142) | $ (16) | $ - | $ (25) | $ (58) | $ 2 | $ 2,806 |
| Total income from operations | $ 679 | $ 142 | $ 16 | $ (9) | $ 25 | $ 58 | $ (3) | $ 908 |
| Foreign currency loss (gain) | $ 10 | $ - | $ (14) | $ - | $ - | $ - | $ - | $ (4) |
| Income before provision for income taxes | $ 648 | $ 142 | $ 30 | $ (9) | $ 25 | $ 58 | $ (3) | $ 891 |
| Provision for income taxes | $ 29 | $ 14 | $ 8 | $ (2) | $ 6 | $ 13 | $ (1) | $ 67 |
| Net income attributable to Capri | $ 616 | $ 128 | $ 22 | $ (7) | $ 19 | $ 45 | $ (2) | $ 821 |
| Diluted net income per ordinary share - Capri | $ 4.60 | $ 0.96 | $ 0.16 | $ (0.05) | $ 0.13 | $ 0.34 | $ (0.01) | $ 6.13 |

_____

[1]  Amounts impacting operating expenses primarily includes charges recorded in connection with the acquisition of Gianni Versace S.r.l. The foreign currency exchange loss represents a charge recognized in conjunction with restructuring activities to rationalize certain legal entities within our structure.

[2]  Represents a multi-year ERP implementation which includes accounting, finance and wholesale and retail inventory solutions in order to create standardized finance IT applications across our organization.

[3]  The Capri transformation program represents a multi-year, multi-project initiative extending through Fiscal 2026 intended to improve the operating effectiveness and efficiency of our organization by creating best in class shared platforms across our brands and by expanding our digital capabilities. These initiatives cover multiple aspects of our operations including supply chain, marketing, omni-channel customer experience, e-commerce, data analytics and IT infrastructure.

# Exhibit 49

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of report (Date of earliest event reported): August 15, 2024

# Tapestry, Inc.

(Exact name of registrant as specified in its charter)

| Maryland | 1-16153 | 52-2242751 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

10 Hudson Yards, New York, NY 10001
(Address of principal executive offices) (Zip Code)

(212) 946-8400
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | TPR | New York Stock Exchange |

**Item 2.02   Results of Operations and Financial Condition.**

On August 15, 2024, Tapestry, Inc. ("Tapestry" or the "Company") issued a press release (the "Press Release") in which the Company announced its financial results for its fourth fiscal quarter and full year ended June 29, 2024. The Company also posted a slide presentation entitled "Investor Presentation" dated August 15, 2024 on the "Presentations & Financial Reports" investor section of its website (www.tapestry.com). A copy of the Press Release is furnished herewith as Exhibit 99.1. Information on the Company's website is not, and will not be deemed to be, a part of this Current Report on Form 8-K or incorporated into any other filings the Company may make with the Securities and Exchange Commission.

The information in this Current Report on Form 8-K, including Exhibit 99.1, is being furnished to the Securities and Exchange Commission and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act") or otherwise subject to liability under that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01   Financial Statements and Exhibits.**

(d) *Exhibits.* The following exhibits are being furnished herewith:

99.1 Text of Press Release, dated August 15, 2024

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: August 15, 2024

TAPESTRY, INC.

By:   /s/ David E. Howard

David E. Howard
General Counsel and Secretary

EXHIBIT INDEX

99.1          Text of Press Release, dated August 15, 2024

# Exhibit 50

**Exhibit 99.1**

tapestry

*CONTACTS:*
Tapestry, Inc.
*Media:*
Andrea Shaw Resnick
Chief Communications Officer
212/629-2618
aresnick@tapestry.com
*Analysts and Investors:*
Christina Colone
Global Head of Investor Relations
212/946-7252
ccolone@tapestry.com

### TAPESTRY, INC. REPORTS FOURTH QUARTER AND FULL YEAR FISCAL 2024 RESULTS

- **Achieved Fiscal Year 2024 Reported Diluted EPS of $3.50 and Record non-GAAP Diluted EPS of $4.29, Exceeding the Company's Outlook**

- **Drove Operational Outperformance, Highlighted by Gross Margin Expansion of 250 Basis Points and Robust Operating and Free Cash Flow of Over $1.1 Billion in Fiscal Year 2024**

- **Delivered Record Annual Revenue at the Coach Brand**

Link to Download Tapestry's Q4 and Fiscal Year Earnings Presentation, Including Brand Highlights

**New York**, August 15, 2024 - Tapestry, Inc. (NYSE: TPR), a house of iconic accessories and lifestyle brands consisting of Coach, Kate Spade, and Stuart Weitzman, today reported results for the fourth quarter and year ended June 29, 2024.

**10 HUDSON YARDS, NEW YORK, NY 10001 TELEPHONE 212 594 1850 FAX 212 594 1682 WWW.TAPESTRY.COM**

Joanne Crevoiserat, Chief Executive Officer of Tapestry, Inc., said, "Our fourth quarter results exceeded expectations, capping a successful year. This is a testament to our passionate global teams whose creativity and exceptional execution continue to fuel our brands and business. Importantly, through an unwavering focus on powering innovation and consumer connections, we meaningfully advanced our strategic agenda in fiscal year 2024, delivering strong financial results against a dynamic backdrop. From this position of strength, we have a bold vision for the future and a steadfast commitment to drive growth and shareholder value for years to come."

**Tapestry, Inc. Financial & Strategic Highlights**

**The Company advanced its strategic priorities throughout the year, resulting in constant currency topline gains, significant gross margin expansion, double-digit adjusted EPS growth, and robust cash flow generation in FY24 despite the complex global economic and consumer environment**. Highlights include:

*Build Lasting Customer Relationships*

- **Drove customer engagement,** acquiring over 6.5 million new customers during the year in North America alone, over half of which were Gen Z and Millennials.

*Power Global Growth*

- **Delivered 1% constant currency revenue growth in FY24, including a record year at Coach, which surpassed $5 billion in sales;**

- **Achieved International topline growth of 6% at constant currency in FY24**, which included revenue gains in Europe (+14%), Other Asia (+9%), Japan (+5%), and Greater China (+3%) compared to the prior year;

- **Realized a 1% sales decline in North America in the fiscal year,** while delivering higher operating margin and profit dollars in the region compared to last year driven by gross margin expansion;

- **Delivered double-digit adjusted earnings per diluted share growth in the fiscal year,** ahead of expectations which included operational outperformance as well as a benefit from a lower tax rate**;**

2

- **Generated robust operating and free cash flow of over $1.1 billion in FY24,** fueling the Company's strategic growth agenda.

*Deliver Compelling Omni-Channel Experiences*

- **Achieved Direct-to-Consumer sales in-line with prior year on a constant currency basis in FY24;** wholesale revenue increased led by International, including growth on Digital platforms;

- **Drove global brick and mortar sales growth at constant currency in FY24**, fueled by higher productivity per square foot; launched immersive retail experiences and new concepts globally, which helped to drive awareness and engagement among younger customer cohorts;

- **Maintained strong Digital positioning,** with revenue more than three times above pre-pandemic levels, or nearly 30% of sales in the fiscal year.

*Fuel Fashion Innovation and Product Excellence*

- **Delivered compelling and distinctive assortments to consumers,** with notable momentum at Coach, which drove handbag revenue growth and AUR gains in the fiscal year;

- **Remained disciplined brand-builders and operators, underscored by strong gross margin expansion of 250 basis points in the fiscal year,** which included lower freight expense, operational outperformance, and FX tailwinds;

- **Leveraged Tapestry's customer engagement platform** to embed data-driven insights across go-to-market processes, enabling agility and diligent inventory management.

**Overview of Fiscal 2024 Fourth Quarter Financial Results**

- **Net sales** totaled $1.59 billion compared to $1.62 billion in the prior year period, representing a decline of 2% on a reported basis. Excluding a currency headwind of approximately 170 basis points, sales were approximately even with the prior year.

3

- **Gross profit** totaled $1.19 billion, while gross margin was 74.9%, which included operational improvements, a benefit of approximately 90 basis points from lower freight expense, as well as FX tailwinds. This compared to prior year gross profit of $1.17 billion, representing a gross margin of 72.4%.

- **SG&A expenses** totaled $956 million and represented 60.1% of sales on a reported basis. On a non-GAAP basis, SG&A expenses totaled $929 million and represented approximately 58.4% of sales. In the prior year period, SG&A expenses on both a reported and non-GAAP basis totaled $899 million, representing 55.5% of sales.

- **Operating income** was $235 million on a reported basis, while operating margin was 14.8%. On a non-GAAP basis, operating income was $262 million, while operating margin was 16.5%. This compares to reported and non-GAAP operating income of $274 million and a 16.9% operating margin in the prior year period.

- **Net interest expense** was $31 million on a reported basis, reflecting the incremental debt incurred related to the financing of the proposed acquisition of Capri Holdings Limited. On a non-GAAP basis, net interest income was $3 million. This compared to net interest expense of $6 million in the prior year period on both a reported and non-GAAP basis.

- **Other expense** was $4 million, primarily due to an FX loss associated with the movement of the U.S. Dollar within the quarter. This compared to other expense of $1 million in the prior year period.

- **Net income** was $159 million, with earnings per diluted share of $0.68. On a non-GAAP basis, net income was $217 million, with earnings per diluted share of $0.92. In the prior year period, net income was $224 million, with earnings per diluted share of $0.95 on both a reported and non-GAAP basis. The tax rate for the quarter was 20.7% on a reported basis and 16.8% on a non-GAAP basis. In the prior year period, the tax rate was 16.0% on both a reported and non-GAAP basis.

4

**Overview of Fiscal 2024 Full Year Financial Results**

- **Net sales** totaled $6.67 billion as compared to $6.66 billion in the prior year. Excluding a headwind of approximately 110 basis points from currency, revenue increased 1% versus last year.

- **Gross profit** totaled $4.89 billion, while gross margin was 73.3%, which reflected a benefit of 130 basis points from lower freight expense, as well as operational improvements and FX tailwinds. This compared to prior year gross profit of $4.71 billion, representing a gross margin of 70.8%.

- **SG&A expenses** totaled $3.75 billion and represented 56.2% of sales. On a non-GAAP basis, SG&A expenses totaled $3.64 billion and represented approximately 54.5% of sales. In the prior year, SG&A expenses on both a reported and non-GAAP basis totaled $3.54 billion, representing 53.1% of sales.

- **Operating income** was $1.14 billion on a reported basis, while operating margin was 17.1%. On a non-GAAP basis, operating income was $1.25 billion, while operating margin was 18.7%. This compares to reported and non-GAAP operating income of $1.17 billion and a 17.6% operating margin in the prior year.

- **Net interest expense** was $125 million on a reported basis, reflecting the incremental debt incurred related to the financing of the proposed acquisition of Capri Holdings Limited. On a non-GAAP basis, net interest expense was $8 million. This compared to net interest expense of $28 million in the prior year on both a reported and non-GAAP basis.

- **Other expense** was $3 million, primarily due to an FX loss associated with the movement of the U.S. Dollar. This compared to other expense of $2 million in the prior year.

5

- **Net income** was $816 million, with earnings per diluted share of $3.50. On a non-GAAP basis, net income was $1.00 billion, with earnings per diluted share of $4.29. In the prior year, net income was $936 million, with earnings per diluted share of $3.88 on both a reported and non-GAAP basis. The tax rate for the year was 19.4% on a reported basis and 19.2% on a non-GAAP basis. In the prior year, the tax rate was 18.1% on both a reported and non-GAAP basis.

**Summary of Revenue Information (Unaudited) - in USD millions**

| | Quarter Ended June 29, 2024 | % Change | | Year Ended June 29, 2024 | % Change | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Reported | Constant Currency | | Reported | Constant Currency |
| **Brand** | | | | | | |
| Coach | 1,250.4 | 0% | 2% | 5,095.3 | 3% | 4% |
| Kate Spade | 290.1 | -6% | -5% | 1,334.4 | -6% | -5% |
| Stuart Weitzman | 50.6 | -19% | -19% | 241.5 | -14% | -13% |
| | | | | | | |
| **Region** | | | | | | |
| North America | 1,020.4 | -1% | -1% | 4,314.0 | -1% | -1% |
| Greater China (1) | 232.4 | -13% | -10% | 1,012.6 | 0% | 3% |
| Japan | 127.4 | -9% | 2% | 554.4 | -3% | 5% |
| Other Asia (2) | 86.2 | 9% | 12% | 348.5 | 7% | 9% |
| Europe | 92.3 | 26% | 26% | 326.6 | 17% | 14% |
| Other (3) | 32.4 | 11% | 10% | 115.1 | 4% | 3% |
| | | | | | | |
| **Tapestry** | **1,591.1** | **-2%** | **0%** | **6,671.2** | **0%** | **1%** |

*(1) Greater China includes mainland China, Hong Kong SAR and Macao SAR, and Taiwan.*
*(2) Other Asia includes Malaysia, Australia, New Zealand, South Korea, Singapore, and other countries within Asia.*
*(3) Other primarily represents royalties earned from the Company's licensing partners and sales in the Middle East.*

**Balance Sheet and Cash Flow Highlights**

- **Cash, cash equivalents and short-term investments** totaled $7.20 billion and **total borrowings outstanding** were $7.24 billion, reflecting $6.1 billion in senior notes issued in November 2023 to fund the proposed acquisition of Capri Holdings Limited, as well the paydown of the Company's $450 million term loan in the fiscal fourth quarter.

- **Inventory** of $825 million was favorable to expectations and 10% below the prior year's ending inventory of $920 million, reflecting strong inventory control as well as a shift in receipt timing into the fiscal first quarter of 2025.

- **Cash flow from operating activities** for the fiscal year was an inflow of $1.26 billion compared to an inflow of $975 million in the prior year. **Free cash flow** for the fiscal year was an inflow of $1.15 billion compared to an inflow of $791 million in the prior year. Excluding deal-related costs, free cash flow for the fiscal year was $1.28 billion.

- **CapEx** and **implementation costs related to Cloud Computing** for the fiscal year were $144 million versus $261 million a year ago.

## Dividend

As anticipated, the Board of Directors approved the return of $321 million to shareholders in Fiscal 2024 through dividend payments, for an annual dividend rate of $1.40 per common share, which represented an increase of 17% versus prior year and a dividend payout ratio of 39% on a reported basis.

In Fiscal 2025, Tapestry expects to maintain its annual dividend rate of $1.40 per common share, and the Company's Board of Directors declared a quarterly cash dividend of $0.35 per common share payable on September 23, 2024, to shareholders of record as of the close of business on September 6, 2024.

## Acquisition of Capri Holdings Limited

On August 10, 2023, Tapestry, Inc. announced a definitive agreement to acquire Capri Holdings Limited, establishing a powerful global house of iconic luxury and fashion brands. Importantly, this transaction will bring significant benefits to the combined Company's customers, employees, partners, and shareholders around the world. Further, the acquisition builds on Tapestry's track record as a consumer-centric brand-builder and disciplined operator and accelerates its strategic and financial growth agenda.

On April 22, 2024, the Federal Trade Commission (FTC) filed a lawsuit in an attempt to block the proposed acquisition. The Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction and looks forward to presenting its strong legal arguments in court, working expeditiously to close the transaction in calendar year 2024.

7

**Non-GAAP Reconciliation**

During the fiscal fourth quarter of 2024, the Company recorded certain items that decreased pre-tax income by $60 million, net income by $58 million, and earnings per diluted share by approximately $0.24. For the full fiscal year, the Company recorded certain items that decreased pre-tax income by $227 million, net income by $184 million, and earnings per diluted share by approximately $0.79. These items relate to costs associated with the proposed acquisition of Capri Holdings Limited, primarily financing charges and professional fees.

Please refer to Financial Schedules 3 and 4 included herein for a detailed reconciliation of the Company's reported GAAP to non-GAAP results.

**Financial Outlook**

Tapestry expects the following for Fiscal 2025 on a non-GAAP basis:

- **Revenue** in the area of $6.7 billion, representing growth compared to the prior year on a reported basis, including approximately 50 basis points of currency pressure. On a constant currency basis, revenue is expected to increase approximately 1% versus prior year;

- **Operating margin** expansion in the area of 50 basis points compared to prior year;

- **Net interest income** of approximately $20 million;

- **Tax rate** of approximately 19%;

- **Weighted average diluted share count** of approximately 238 million shares;

- **Earnings per diluted share** of $4.45 to $4.50, representing mid-single digit growth compared to the prior year. This incorporates a negative impact of $0.35 related to the suspension of share repurchase activity due to the proposed acquisition of Capri Holdings Limited, as previously outlined, and an estimated currency headwind of approximately $0.20 versus the Company's Fiscal 2025 EPS target as provided at its Investor Day in 2022;

8

- **Free cash flow** of approximately $1.1 billion, excluding deal-related costs.

Please note this outlook assumes the following:

- No revenue, net interest, or earnings impact related to the proposed acquisition of Capri Holdings Limited;

- No further appreciation of the U.S. Dollar; information provided based on spot rates at the time of forecast;

- No material worsening of inflationary pressures or consumer confidence;

- No benefit from the potential reinstatement of the Generalized System of Preferences ("GSP"); and

- No impact related to any potential policy changes resulting from the outcome of U.S. Presidential election in November 2024.

Given the dynamic nature of these and other external factors, financial results could differ materially from the outlook provided.

*Financial Outlook - Non-GAAP Adjustments*:
The Company is not able to provide a full reconciliation of the non-GAAP financial measures to GAAP presented in this release and on the Company's conference call because certain material items that impact these measures, such as the timing and exact amount of acquisition, financing, purchase accounting and integration-related charges and Company costs associated with the acquisition of Capri Holdings Limited have not yet occurred and cannot be reasonably estimated at this time. Accordingly, a reconciliation of the Company's non-GAAP financial measure guidance to the corresponding GAAP measure is not available without unreasonable effort.

**Conference Call Details**

The Company will host a conference call to review these results at 8:00 a.m. (ET) today, August 15, 2024. Interested parties may listen to the conference call via live webcast by accessing www.tapestry.com/investors or calling 1-866-847-4217 or 1-203-518-9845 and providing the Conference ID 2329867. A telephone replay will be available starting at 12:00 p.m. (ET) today for a period of five business days. To access the telephone replay, call 1-800-283-4641 or 1-402-220-0851. A webcast replay of the earnings conference call will also be available for five business days on the Tapestry website. In addition, presentation slides have been posted to the Company's website at www.tapestry.com/investors.

**Upcoming Events**

The Company expects to report fiscal 2025 first quarter results on Thursday, November 7, 2024.

To receive notification of future announcements, please register at www.tapestry.com/investors ("Subscribe to E-Mail Alerts").

**About Tapestry, Inc.**

Our global house of brands unites the magic of Coach, kate spade new york and Stuart Weitzman. Each of our brands are unique and independent, while sharing a commitment to innovation and authenticity defined by distinctive products and differentiated customer experiences across channels and geographies. We use our collective strengths to move our customers and empower our communities, to make the fashion industry more sustainable, and to build a company that's equitable, inclusive, and diverse. Individually, our brands are iconic. Together, we can stretch what's possible. To learn more about Tapestry, please visit www.tapestry.com. For important news and information regarding Tapestry, visit the Investor Relations section of our website at www.tapestry.com/investors. In addition, investors should continue to review our news releases and filings with the SEC. We use each of these channels of distribution as primary channels for publishing key information to our investors, some of which may contain material and previously non-public information. The Company's common stock is traded on the New York Stock Exchange under the symbol TPR.

10

*This information to be made available in this press release may contain forward-looking statements based on management's current expectations. Forward-looking statements include, but are not limited to, the statements under "Financial Outlook," statements regarding long term performance, statements regarding the Company's capital deployment plans, including anticipated annual dividend rates and share repurchase plans, and statements that can be identified by the use of forward-looking terminology such as "may," "will," "can," "should," "expect," "expectation," "proposed acquisition," "looks forward to," "working expeditiously," "potential," "intend," "estimate," "continue," "guidance," "forecast," "outlook," "commit," "anticipate," "goal," "leveraging," "create," accelerating," "expand," "unlock," "generate," "enhancing," "innovation," "drive," "targeting," "assume," "plan," "effort," "progress," "confident," "future," "uncertain," "achieve," "strategic," "growth," "vision," "we can stretch what's possible," or comparable terms. Future results may differ materially from management's current expectations, based upon a number of important factors, including risks and uncertainties such as the impact of economic conditions, recession and inflationary measures, risks associated with operating in international markets and our global sourcing activities, the impact of the Covid-19 pandemic, the ability to anticipate consumer preferences and retain the value of our brands, including our ability to execute on our e-commerce and digital strategies, the ability to successfully implement the initiatives under our 2025 growth strategy, the effect of existing and new competition in the marketplace, the satisfaction of the conditions precedent to consummation of the proposed acquisition of Capri Holdings Limited ("Capri"), including the ability to secure regulatory approval in the United States on the terms expected, at all or in a timely manner, our ability to achieve intended benefits, cost savings and synergies from acquisitions including our proposed acquisition of Capri, the outcome of the antitrust lawsuit by the Federal Trade Commission against us and Capri related to the consummation of the proposed acquisition, our ability to control costs, the effect of seasonal and quarterly fluctuations on our sales or operating results; the risk of cybersecurity threats and privacy or data security breaches, our ability to satisfy our outstanding debt obligations or incur additional indebtedness, the risks associated with climate change and other corporate responsibility issues, the impact of tax and other legislation, the risks associated with potential changes to international trade agreements and the imposition of additional duties on importing our products, our ability to protect against infringement of our trademarks and other proprietary rights, and the impact of pending and potential future legal proceedings, etc. In addition, purchases of shares of the Company's common stock will be made subject to market conditions and at prevailing market prices. Please refer to the Company's latest Annual Report on Form 10-K and its other filings with the Securities and Exchange Commission for a complete list of risks and important factors. The Company assumes no obligation to revise or update any such forward-looking statements for any reason, except as required by law.*

11

*Schedule 1: Consolidated Statements of Operations*

**TAPESTRY, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**For the Quarter and Year Ended June 29, 2024 and July 1, 2023**
**(in millions, except per share data)**

|  | (unaudited) QUARTER ENDED | | (unaudited) YEAR ENDED | (audited) |
|---|---|---|---|---|
|  | **June 29, 2024** | **July 1, 2023** | **June 29, 2024** | **July 1, 2023** |
| **Net sales** | $ 1,591.1 | $ 1,619.5 | $ 6,671.2 | $ 6,660.9 |
| Cost of sales | 399.9 | 446.8 | 1,781.7 | 1,946.0 |
| **Gross profit** | 1,191.2 | 1,172.7 | 4,889.5 | 4,714.9 |
| Selling, general and administrative expenses | 956.2 | 899.1 | 3,749.4 | 3,542.5 |
| **Operating income (loss)** | 235.0 | 273.6 | 1,140.1 | 1,172.4 |
| Interest expense, net | 30.5 | 6.2 | 125.0 | 27.6 |
| Other expense (income) | 3.7 | 0.6 | 3.2 | 1.7 |
| Income (loss) before provision for income taxes | 200.8 | 266.8 | 1,011.9 | 1,143.1 |
| Provision (benefit) for income taxes | 41.5 | 42.7 | 195.9 | 207.1 |
| **Net income (loss)** | $ 159.3 | $ 224.1 | $ 816.0 | $ 936.0 |
| **Net income (loss) per share:** | | | | |
| **Basic** | $ 0.69 | $ 0.97 | $ 3.56 | $ 3.96 |
| **Diluted** | $ 0.68 | $ 0.95 | $ 3.50 | $ 3.88 |
| Shares used in computing net income (loss) per share: | | | | |
| Basic | 230.0 | 230.2 | 229.2 | 236.4 |
| Diluted | 234.7 | 235.4 | 233.2 | 241.3 |

12

*Schedule 2: Detail to Net Sales*

**TAPESTRY, INC.**
**DETAIL TO NET SALES**
**For the Quarter and Year Ended June 29, 2024 and July 1, 2023**
**(in millions)**
**(unaudited)**

| | QUARTER ENDED | | | |
| --- | --- | --- | --- | --- |
| | June 29, 2024 | July 1, 2023 | % Change | Constant Currency % Change |
| Coach | $ 1,250.4 | $ 1,247.4 | -% | 2% |
| Kate Spade | 290.1 | 309.5 | (6)% | (5)% |
| Stuart Weitzman | 50.6 | 62.6 | (19)% | (19)% |
| **Total Tapestry** | $ 1,591.1 | $ 1,619.5 | (2)% | -% |

| | YEAR ENDED | | | |
| --- | --- | --- | --- | --- |
| | June 29, 2024 | July 1, 2023 | % Change | Constant Currency % Change |
| Coach | $ 5,095.3 | $ 4,960.4 | 3% | 4% |
| Kate Spade | 1,334.4 | 1,418.9 | (6)% | (5)% |
| Stuart Weitzman | 241.5 | 281.6 | (14)% | (13)% |
| **Total Tapestry** | $ 6,671.2 | $ 6,660.9 | -% | 1% |

13

*Schedules 3 & 4: Consolidated Segment Data and GAAP to Non-GAAP Reconciliation*

**TAPESTRY, INC.**
**CONSOLIDATED SEGMENT DATA AND**
**GAAP TO NON-GAAP RECONCILIATION**
**(in millions, except per share data)**
**(unaudited)**

| | For the Quarter Ended June 29, 2024 | | | For the Year Ended June 29, 2024 | | |
| | Items Affecting Comparability | | | Items Affecting Comparability | | |
| | GAAP Basis (As Reported) | Acquisition Costs | Non-GAAP Basis (Excluding Items) | GAAP Basis (As Reported) | Acquisition Costs | Non-GAAP Basis (Excluding Items) |
|---|---|---|---|---|---|---|
| **Gross Profit** | | | | | | |
| Coach | 969.0 | - | 969.0 | 3,875.4 | - | 3,875.4 |
| Kate Spade | 194.3 | - | 194.3 | 871.2 | - | 871.2 |
| Stuart Weitzman | 27.9 | - | 27.9 | 142.9 | - | 142.9 |
| **Gross profit** | $ 1,191.2 | $ - | $ 1,191.2 | $ 4,889.5 | $ - | $ 4,889.5 |
| | | | | | | |
| **SG&A expenses** | | | | | | |
| Coach | 580.2 | - | 580.2 | 2,224.3 | - | 2,224.3 |
| Kate Spade | 170.4 | - | 170.4 | 738.6 | - | 738.6 |
| Stuart Weitzman | 37.2 | - | 37.2 | 164.1 | - | 164.1 |
| Corporate | 168.4 | 27.0 | 141.4 | 622.4 | 109.9 | 512.5 |
| **SG&A expenses** | $ 956.2 | $ 27.0 | $ 929.2 | $ 3,749.4 | $ 109.9 | $ 3,639.5 |
| | | | | | | |
| **Operating income (loss)** | | | | | | |
| Coach | 388.8 | - | 388.8 | 1,651.1 | - | 1,651.1 |
| Kate Spade | 23.9 | - | 23.9 | 132.6 | - | 132.6 |
| Stuart Weitzman | (9.3) | - | (9.3) | (21.2) | - | (21.2) |
| Corporate | (168.4) | (27.0) | (141.4) | (622.4) | (109.9) | (512.5) |
| **Operating income (loss)** | $ 235.0 | $ (27.0) | $ 262.0 | $ 1,140.1 | $ (109.9) | $ 1,250.0 |
| | | | | | | |
| Interest expense, net | 30.5 | 33.0 | (2.5) | 125.0 | 116.7 | 8.3 |
| | | | | | | |
| **Provision for income taxes** | 41.5 | (2.2) | 43.7 | 195.9 | (42.4) | 238.3 |
| **Net income (loss)** | $ 159.3 | $ (57.8) | $ 217.1 | $ 816.0 | $ (184.2) | $ 1,000.2 |
| **Net income (loss) per diluted common share** | $ 0.68 | $ (0.24) | $ 0.92 | $ 3.50 | $ (0.79) | $ 4.29 |

14

**TAPESTRY, INC.**
**CONSOLIDATED SEGMENT DATA AND**
**GAAP TO NON-GAAP RECONCILIATION**
**(in millions, except per share data)**
**(unaudited)**

| | For the Quarter Ended July 1, 2023 GAAP Basis (As Reported) (1) | For the Year Ended July 1, 2023 GAAP Basis (As Reported) (1) |
|---|---|---|
| **Gross Profit** | | |
| Coach | 936.4 | 3,647.1 |
| Kate Spade | 199.1 | 900.1 |
| Stuart Weitzman | 37.2 | 167.7 |
| **Gross profit** | $ 1,172.7 | $ 4,714.9 |
| | | |
| **SG&A expenses** | | |
| Coach | 541.1 | 2,117.2 |
| Kate Spade | 184.3 | 785.1 |
| Stuart Weitzman | 40.3 | 174.4 |
| Corporate | 133.4 | 465.8 |
| **SG&A expenses** | $ 899.1 | $ 3,542.5 |
| | | |
| **Operating income (loss)** | | |
| Coach | 395.3 | 1,529.9 |
| Kate Spade | 14.8 | 115.0 |
| Stuart Weitzman | (3.1) | (6.7) |
| Corporate | (133.4) | (465.8) |
| **Operating income (loss)** | $ 273.6 | $ 1,172.4 |
| | | |
| Interest expense, net | 6.2 | 27.6 |
| | | |
| Provision for income taxes | 42.7 | 207.1 |
| **Net income (loss)** | $ 224.1 | $ 936.0 |
| **Net income (loss) per diluted common share** | $ 0.95 | $ 3.88 |

*(1) There were no items affecting comparability in the fourth quarter and fiscal year ended on July 1, 2023*

*Management utilizes non-GAAP and constant currency measures to conduct and evaluate its business during its regular review of operating results for the periods affected and to make decisions about Company resources and performance. The Company believes presenting these non-GAAP measures, which exclude items that are not comparable from period to period, is useful to investors and others in evaluating the Company's ongoing operating and financial results in a manner that is consistent with management's evaluation of business performance and understanding how such results compare with the Company's historical performance. Additionally, the Company believes presenting these metrics on a constant currency basis will help investors and analysts to understand the effect of significant year-over-year foreign currency exchange rate fluctuations on these performance measures and provide a framework to assess how business is performing and expected to perform excluding these effects.*

15

*The Company reports information in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"). The Company's management does not, nor does it suggest that investors should, consider non-GAAP financial measures in isolation from, or as a substitute for, financial information prepared in accordance with GAAP. Further, the non-GAAP measures utilized by the Company may be unique to the Company, as they may be different from non-GAAP measures used by other companies.*

*The Company operates on a global basis and reports financial results in U.S. dollars in accordance with GAAP. Percentage increases/decreases in net sales for the Company and each segment have been presented both including and excluding currency fluctuation effects from translating foreign-denominated sales into U.S. dollars and compared to the same periods in the prior quarter and fiscal year. The Company calculates constant currency net sales results by translating current period net sales in local currency using the prior year period's currency conversion rate.*

*The segment operating income and supplemental segment SG&A expenses presented in the Consolidated Segment Data, and GAAP to non-GAAP Reconciliation Table above, as well as SG&A expense ratio, and operating margin, are considered non-GAAP measures. These measures have been presented both including and excluding acquisition costs for the fourth quarter and fiscal year ended June 29, 2024. In addition, segment Operating Income (loss), Net income (loss), and Net Income (loss) per diluted common share, have been presented both including and excluding acquisition costs for the fourth quarter and fiscal year ended June 29, 2024.*

*There were no items affecting comparability for the fourth quarter and fiscal year ended July 1, 2023.*

*The Company also presents free cash flow, which is a non-GAAP measure, Free cash flow is calculated by taking the "Net cash flows provided by (used in) operating activities" less "Purchases of property and equipment" from the Condensed Consolidated Statement of Cash Flows. The Company believes that free cash flow is an important liquidity measure of the cash that is available after capital expenditures for operational expenses and investment in our business. The Company believes that free cash flow is useful to investors because it measures the Company's ability to generate or use cash. Once our business needs and obligations are met, cash can be used to maintain a strong balance sheet, invest in future growth and return capital to stockholders. Adjusted EBITDA is calculated as Net Income, excluding, Interest expense, Provision for income taxes, Depreciation and amortization, Cloud computing amortization costs, Share-based compensation and Items affecting comparability including Acquisition and Integration costs.*

16

*Schedule 5: Condensed Consolidated Balance Sheets*

**TAPESTRY, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**At June 29, 2024 and July 1, 2023**
**(in millions)**

|  | (unaudited) June 29, 2024 | (audited) July 1, 2023 |
|---|---|---|
| **ASSETS** |  |  |
| Cash, cash equivalents and short-term investments | $ 7,203.8 | $ 741.5 |
| Receivables | 228.2 | 211.5 |
| Inventories | 824.8 | 919.5 |
| Other current assets | 546.9 | 491.0 |
| **Total current assets** | 8,803.7 | 2,363.5 |
| Property and equipment, net | 514.7 | 564.5 |
| Operating lease right-of-use assets | 1,314.4 | 1,378.7 |
| Other assets | 2,763.5 | 2,810.1 |
| **Total assets** | $ 13,396.3 | $ 7,116.8 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |
| Accounts payable | $ 452.2 | $ 416.9 |
| Accrued liabilities | 656.3 | 547.1 |
| Current portion of operating lease liabilities | 299.7 | 297.5 |
| Current debt | 303.4 | 25.0 |
| **Total current liabilities** | 1,711.6 | 1,286.5 |
| Long-term debt | 6,937.2 | 1,635.8 |
| Long-term operating lease liabilities | 1,224.2 | 1,333.7 |
| Other liabilities | 626.4 | 583.0 |
| Stockholders' equity | 2,896.9 | 2,277.8 |
| **Total liabilities and stockholders' equity** | $ 13,396.3 | $ 7,116.8 |

17

*Schedule 6: Condensed Consolidated Statement of Cash Flows*

**TAPESTRY, INC.**
**CONDENSED CONSOLIDATED STATEMENT OF CASH FLOWS**
**For the Fiscal Years Ended June 29, 2024 and July 1, 2023**
**(in millions)**

|  | (unaudited) June 29, 2024 | (audited) July 1, 2023 |
|---|---|---|
| **CASH FLOWS PROVIDED BY (USED IN) OPERATING ACTIVITIES** | | |
| Net income (loss) | $ 816.0 | $ 936.0 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 174.0 | 182.2 |
| Amortization of cloud computing arrangements | 55.0 | 42.0 |
| Other non-cash items | 42.7 | 73.9 |
| Changes in operating assets and liabilities | 167.9 | (258.9) |
| **Net cash provided by (used in) operating activities** | 1,255.6 | 975.2 |
| | | |
| **CASH FLOWS PROVIDED BY (USED IN) INVESTING ACTIVITIES** | | |
| Purchases of property and equipment | (108.9) | (184.2) |
| Purchases of investments | (2,713.0) | (6.7) |
| Proceeds from maturities and sales of investments | 1,676.3 | 154.7 |
| Other items | 103.7 | 41.9 |
| **Net cash provided by (used in) investing activities** | (1,041.9) | 5.7 |
| | | |
| **CASH FLOWS PROVIDED BY (USED IN) FINANCING ACTIVITIES** | | |
| Payment of dividends | (321.4) | (283.3) |
| Repurchase of common stock | - | (703.5) |
| Proceeds from issuance of debt, net of discount | 6,089.5 | - |
| Repayment of debt | (468.8) | (31.2) |
| Other items | (84.9) | (17.9) |
| **Net cash provided by (used in) financing activities** | 5,214.4 | (1,035.9) |
| | | |
| Effect of exchange rate on cash and cash equivalents | (12.2) | (8.7) |
| **Net (decrease) increase in cash and cash equivalents** | 5,415.9 | (63.7) |
| **Cash and cash equivalents at beginning of year** | $ 726.1 | $ 789.8 |
| **Cash and cash equivalents at end of year** | $ 6,142.0 | $ 726.1 |

18

*Schedules 7 & 8: Store Count by Brand*

**TAPESTRY, INC.**
**STORE COUNT**
**At March 30, 2024 and June 29, 2024**
**(unaudited)**

| Directly-Operated Store Count: | As of March 30, 2024 | Openings | (Closures) | As of June 29, 2024 |
|---|---|---|---|---|
| **Coach** | | | | |
| North America | 326 | - | (2) | 324 |
| International | 611 | 4 | (9) | 606 |
| | | | | |
| **Kate Spade** | | | | |
| North America | 198 | 2 | (3) | 197 |
| International | 185 | 2 | (6) | 181 |
| | | | | |
| **Stuart Weitzman** | | | | |
| North America | 38 | - | (4) | 34 |
| International | 62 | - | (2) | 60 |

**TAPESTRY, INC.**
**STORE COUNT**
**At July 1, 2023 and June 29, 2024**
**(unaudited)**

| Directly-Operated Store Count: | As of July 1, 2023 | Openings | (Closures) | As of June 29, 2024 |
|---|---|---|---|---|
| **Coach** | | | | |
| North America | 330 | 3 | (9) | 324 |
| International | 609 | 21 | (24) | 606 |
| | | | | |
| **Kate Spade** | | | | |
| North America | 205 | 4 | (12) | 197 |
| International | 192 | 9 | (20) | 181 |
| | | | | |
| **Stuart Weitzman** | | | | |
| North America | 36 | 2 | (4) | 34 |
| International | 57 | 10 | (7) | 60 |

### 

19

# Exhibit 51

TABLE OF CONTENTS

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## SCHEDULE 14A

(Rule 14a-101)

## SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934 (Amendment No.      )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under §240.14a-12

# Tapestry, Inc.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒      No fee required.

☐      Fee paid previously with preliminary materials.

☐      Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and O-11.

TABLE OF CONTENTS

tapestry

NOVEMBER 14, 2024

NOTICE OF

# 2024 Annual Meeting of Stockholders & Proxy Statement



TABLE OF CONTENTS



# *Dear Fellow Stockholders:*



**ANNE GATES**



**JOANNE CREVOISERAT**

Fiscal 2024 was a successful year for Tapestry - a testament to our talented global teams whose creativity and exceptional execution continue to fuel our brands and business.

Through an unwavering focus on powering innovation and consumer connections, we meaningfully advanced our *future*speed strategic growth agenda. To this end, we delivered strong financial results against a dynamic backdrop, highlighted by constant currency revenue gains, significant gross margin expansion, double-digit adjusted EPS growth, and robust cash flow generation. Our progress from the year includes:

•**Building Lasting Customer Relationships:** We acquired over 6.5 million new customers in North America alone, of which over half were Gen Z and Millennials, consistent with our strategy to recruit younger consumers to our brands. At the same time, we improved lapsed customer reactivation in North America, which highlights our ability to successfully engage our existing customer base as we drive new customer recruitment.

•**Delivering Compelling Omni-Channel Experiences:** Leveraging our data-rich, direct-to-consumer customer engagement platform, we remained committed to meeting and delighting our customers wherever they choose to shop. As a result, our global brick and mortar sales rose for the year on a constant currency basis driven by an increase in sales per square foot across a fleet which is highly profitable. In addition, we maintained our strong Digital positioning, with sales more than three times above pre-pandemic levels, representing nearly 30% of revenue at accretive margins. Our Digital business is powered by Tapestry's leading capabilities, which have enabled us to enhance the consumer experience across their purchase journey.

•**Fueling Fashion Innovation and Product Excellence:** Throughout the year, we remained focused on bringing the creativity, quality, and compelling value required to win with consumers. Nowhere was this more evident than at our largest brand, Coach, where we delivered record annual revenue and handbag and accessories growth above the industry, underscoring the strength of our brand and product offering. Our success is also reflected in our Company's strong gross margin delivery, as we achieved our highest annual gross margin in over 15 years.

•**Powering Global Growth:** Overall, we delivered total revenue growth on a constant currency basis, reflecting the benefits of our globally diversified business model. These topline results were led by international growth with gains across key regions. Further, we generated record adjusted earnings per share, growing significantly above prior year, while making strategic investments in our brands and business.

•**Stretching What's Possible - the Fabric of Change:** Corporate responsibility is central to Tapestry's purpose and fundamental to driving our strategic and business initiatives. Throughout the year, we made progress across our four-pillar framework - People, Planet, Products, and Communities - with highlights that included the validation of our Science-Based Targets, the achievement of Gold-level TRUE zero waste certification at our Coach (Re)Loved & Repair Workshop, and recognition by USA Today as one of America's Climate Leaders.

From this position of strength, we have a bold vision for the future. We entered our new fiscal year with a bias for action and growth and a steadfast commitment to bringing the innovation and execution required grow iconic brands with modern consumer relevance. In addition to our organic growth opportunities, there is a clear and compelling path to value creation through the proposed acquisition of Capri Holdings Limited, harnessing the power of our platform and leadership to bring meaningful benefits to customers, employees, partners, and shareholders around the world.

Importantly, the year ahead will again require agility and adaptability - controlling the factors we can and managing our business responsibly to drive long-term growth. While we are not immune to macroeconomic and other external factors, we can define our own destiny given our distinctive brands, talented global teams, and strong cash flow. These differentiators provide us with strategic and financial flexibility to continue to deliver enhanced value and shareholder returns in Fiscal 2025 and for years to come.

TABLE OF CONTENTS

We value your investment in our company and thank you for your continued support. We hope that you will join us for our 2024 Annual Meeting of Stockholders at 9:00 a.m., Eastern Time, on November 14, 2024. We will conduct our meeting exclusively online via live webcast at www.virtualshareholdermeeting.com/TPR2024. As always, your participation is important. Please refer to the attached Notice of 2024 Annual Meeting of Stockholders and Proxy Statement for information detailing matters to be considered and voted upon at this year's meeting.

Sincerely,

**Anne Gates**
Chair of the Board of Directors

**Joanne Crevoiserat**
Director and Chief Executive Officer

TABLE OF CONTENTS

 *NOTICE OF 2024 ANNUAL MEETING OF STOCKHOLDERS*

We will hold the 2024 Annual Meeting of Stockholders (the "Annual Meeting") of Tapestry, Inc., a Maryland corporation (the "Company" or "Tapestry"), virtually via live webcast by visiting www.virtualshareholdermeeting.com/TPR2024, on November 14, 2024, at 9:00 a.m., Eastern Time, for the following purposes:

1.  To consider and vote upon the election of 11 directors (the "Directors");

2.  To consider and vote upon the ratification of the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending June 28, 2025 ("fiscal year 2025");

3.  To consider the advisory vote to approve the Company's executive compensation, as discussed and described in the proxy statement for the Annual Meeting; and

4.  To transact any other business that may properly come before the Annual Meeting or any postponement or adjournment thereof.

The foregoing items of business are more fully described in the accompanying proxy statement. The Board of Directors has fixed the close of business on September 18, 2024 as the record date for the Annual Meeting (the "Record Date"), and only holders of record of common stock at such time will be entitled to notice of or to vote at the Annual Meeting or any postponement or adjournment thereof.

BY ORDER OF THE BOARD OF DIRECTORS,

**David E. Howard**
*General Counsel and Secretary*
*New York, New York*
*September 27, 2024*

TABLE OF CONTENTS

## *YOUR VOTE IS IMPORTANT*

Regardless of whether you plan to join the meeting, please follow the instructions you received to authorize a proxy to vote your shares as soon as possible to ensure that your shares are represented and voted at the meeting. If you attend the meeting you may vote your shares personally even if you have sent in proxies or authorized a proxy to vote online. You will need your unique control number which appears on the Notice of Internet Availability of Proxy Materials, the proxy card (printed in the box and marked by the arrow) and the instructions that accompanied the proxy materials in order to vote your shares at the Annual Meeting.

If you hold your shares in street name, based on current New York Stock Exchange ("NYSE") rules, your broker will NOT be able to vote your shares with respect to the election of Directors (Proposal No. 1) or the advisory vote to approve the Company's executive compensation (Proposal No. 3) if you have not provided directions to your broker. We strongly encourage you to provide directions to your broker to vote your shares and exercise your right to vote as a stockholder.

Help us make a difference by eliminating paper proxy mailings to your home or business: with your consent, we will provide all future proxy voting materials and annual reports to you electronically. Instructions for consenting to electronic delivery can be found on your proxy card. Your consent to receive stockholder materials electronically will remain in effect until canceled.

### SPECIAL NOTE ON FORWARD-LOOKING INFORMATION

This document contains certain "forward-looking statements" within the meaning of the federal securities laws, including Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and are based on management's current expectations, that involve risks and uncertainties that could cause actual results to differ materially from current expectations. In this context, forward-looking statements often address expected future business and financial performance and financial condition, and often contain words such as "believes," "may," "can," "will," "should," "expect," "confidence," "trends," "intend," "estimate," "on track," "are positioned to," "on course," "opportunity," "continue," "project," "guidance," "target," "forecast," "anticipate," "plan," "potential," "position," "see," "would," the negative of these terms or comparable terms. These statements include, but are not limited to, those regarding the Company's 2025 growth strategy, *future*speed and other strategic initiatives and certain agreements and plans that will require us to provide compensation to our executives upon the occurrence of future events, such as the achievement of Company objectives and the termination of an individual's employment or a change in control of the Company, and those regarding expectations that certain performance goals and/or targets for management and/or the Company will be attained. These future events may not occur as and when expected, if at all, and, together with the Company's business, are subject to various risks and uncertainties. These risks and uncertainties include that future compensation to our Named Executive Officers, and the events that could trigger such payments, may vary materially from the descriptions described herein due to factors beyond our control, such as the timing during the year of a triggering event, the amount of future non-equity incentive compensation and the value of our stock on the date of a triggering event. The Company assumes no obligation to revise or update any such forward-looking statements for any reason, except as required by law.

The Company's actual results could differ materially from the results contemplated by these forward-looking statements and are subject to a number of risks, uncertainties, estimates and assumptions that may cause actual results to differ materially from current expectations due to a number of important factors, including but not limited to: (i) the impact of economic conditions, recession and inflationary measures; (ii) our exposure to international risks, including currency fluctuations and changes in economic or political conditions in the markets where we sell or source our products; (iii) the impact of the coronavirus ("Covid-19") global pandemic; (iv) our ability to retain the value of our brands and to respond to changing fashion and retail trends in a timely manner, including our ability to execute on our e-commerce and digital strategies; (v) our ability to successfully implement the initiatives under our 2025 growth strategy; (vi) the effect of existing and new competition in the marketplace; (vii) satisfaction of the conditions precedent to consummation of the proposed acquisition of Capri Holdings Limited ("Capri"), including the ability to secure regulatory approval in the United States on the terms expected, at all or in a timely manner; (viii) our ability to achieve intended benefits, cost

TABLE OF CONTENTS

savings and synergies from acquisitions, including our proposed acquisition of Capri; (ix) the outcome of the antitrust lawsuit by the Federal Trade Commission against us and Capri related to the consummation of the proposed acquisition; (x) our ability to control costs; (xi) the effect of seasonal and quarterly fluctuations on our sales or operating results; (xii) the risk of cybersecurity threats and privacy or data security breaches; (xiii) our ability to satisfy our outstanding debt obligations or incur additional indebtedness; (xiv) the risks associated with climate change and other corporate responsibility issues; (xv) the impact of tax and other legislation; (xvi) the risks associated with potential changes to international trade agreements and the imposition of additional duties on importing our products; (xvii) our ability to protect against infringement of our trademarks and other proprietary rights; (xviii) the impact of pending and potential future legal proceedings; and (xix) the other risk factors set forth in the Company's Annual Report on Form 10-K for the fiscal year ended June 29, 2024 ("fiscal year 2024"), or those described from time to time in the Company's future reports filed with the Securities and Exchange Commission (the "SEC"). In this proxy statement references to "we," "our," "us," "Tapestry" and the "Company" refer to Tapestry, Inc., including its consolidated subsidiaries as of June 29, 2024. Unless the context requires otherwise, references to "Coach," "Kate Spade" and "Stuart Weitzman" throughout this proxy statement refer only to the identified brand. References to fiscal year 2023 refer to the Company's fiscal year ended July 1, 2023 ("fiscal year 2023").

**TABLE OF CONTENTS**

## *2024 ANNUAL MEETING OF STOCKHOLDERS*

| DATE & TIME | VIRTUAL MEETING LOCATION | RECORD DATE |
|---|---|---|
| Thursday, November 14, 2024 9:00 a.m. Eastern Time | Held virtually via live webcast at www.virtualshareholdermeeting.com/TPR2024 | Close of business on September 18, 2024 |

## VOTING ROADMAP

| Proposal | The Board Recommends Voting: | Page Reference (for more detail) |
|---|---|---|
| **Proposal 1:** Election of 11 Directors | **FOR EACH NOMINEE** | 22 |
| **Proposal 2:** Ratification of appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending June 28, 2025 | **FOR** | 31 |
| **Proposal 3:** Advisory vote to approve the Company's executive compensation, as discussed and described in this proxy statement | **FOR** | 36 |

### PARTICIPATING IN THE ANNUAL MEETING & VOTING YOUR SHARES

We invite you to join the Annual Meeting online via live webcast. There will not be a physical meeting. You will be able to participate in the virtual Annual Meeting online, vote your shares electronically and submit your questions during the Annual Meeting by visiting www.virtualshareholdermeeting.com/TPR2024.

Stockholders at the close of business on the Record Date are entitled to notice and to vote at the Annual Meeting. Each share of common stock is entitled to one vote for each Director nominee and each of the other proposals.

Prior to the Annual Meeting, you may authorize a proxy to vote your shares and submit pre-meeting questions online by visiting proxyvote.com and following the instructions on your proxy card. You do not need to participate in the Annual Meeting to vote if you submitted your proxy in advance of the Annual Meeting.

In order to vote your shares or ask questions at the Annual Meeting:

• You will need your unique control number which appears on your Notice of Internet Availability of Proxy Materials, the proxy card (printed in the box and marked by the arrow) and the instructions that accompanied the proxy materials.

• If your shares are held in a brokerage, financial institution or another account that bears the name of the holder and not you (shares referred to as held in "street name") and you do not have a control number, you must contact your broker or other financial institution to obtain a control number or voting instructions.

Please authorize a proxy to vote your shares as soon as possible. If you are a beneficial owner of shares of our common stock, your broker will NOT be able to vote your shares with respect to any of the matters presented at the meeting other than the ratification of the selection of our independent registered public accounting firm, unless you give your broker specific voting instructions.

See "Questions You May Have Regarding this Proxy Statement" in *Appendix B* of this proxy statement for more information.

**Even if you plan to join our Annual Meeting, please authorize a proxy to cast your vote as soon as possible by:**

           

| using the Internet at www.proxyvote.com | scanning this QR code to vote with your mobile device | calling toll-free from the United States, U.S. territories and Canada to 1-800-690-6903 | mailing your signed proxy or voting instruction form |
|---|---|---|---|

# *TABLE OF CONTENTS*

## Notice of 2024 Annual Meeting of Stockholders

| | |
|---|---|
| PROXY SUMMARY | 1 |
| CORPORATE GOVERNANCE | 10 |
| Meetings and Committees of the Board | 10 |
| Board Oversight Structure | 15 |
| Compensation Committee Interlocks and Insider Participation | 18 |
| Code of Conduct and Other Policies | 18 |
| Other Corporate Governance Matters | 19 |
| Director Compensation | 20 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 22 |
| PROPOSAL 2: RATIFICATION OF APPOINTMENT OF OUR INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 31 |
| AUDIT COMMITTEE REPORT | 32 |
| EXECUTIVE OFFICERS | 33 |
| TAPESTRY STOCK OWNERSHIP BY CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 34 |
| PROPOSAL 3: ADVISORY VOTE TO APPROVE THE COMPANY'S EXECUTIVE COMPENSATION | 36 |
| COMPENSATION DISCUSSION AND ANALYSIS | 37 |
| Executive Summary | 38 |
| What We Pay and Why | 42 |
| Fiscal Year 2024 Compensation | 46 |
| Other Compensation and Benefit Elements | 54 |
| Compensation Decision Making Process | 55 |
| Additional Information | 57 |
| HUMAN RESOURCES COMMITTEE REPORT | 59 |

| | |
|---|---|
| COMPENSATION RISK ASSESSMENT | 60 |
| EXECUTIVE COMPENSATION | 61 |
| Summary Compensation Table | 61 |
| Grants of Plan-based Awards | 63 |
| Outstanding Equity Awards at Fiscal Year-end 2024 | 64 |
| 2024 Option Exercises and Stock Vested | 66 |
| 2024 Non-Qualified Deferred Compensation | 67 |
| Employment Agreements and Compensatory Arrangements | 68 |
| Potential Payments Upon Termination or Change in Control | 71 |
| CEO Pay Ratio | 74 |
| Pay versus Performance | 75 |
| SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS | 80 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 81 |
| Transactions with Related Persons | 81 |
| Policies and Procedures for Related Person Transactions | 81 |
| OTHER INFORMATION | 82 |
| Communicating with the Board | 82 |
| Stockholder Proposals for the 2025 Annual Meeting | 82 |
| Other Business | 82 |
| Tapestry's Form 10-K and Other Matters | 83 |
| Expenses of Solicitation | 83 |
| Householding | 83 |
| APPENDIX A - RECONCILIATION OF GAAP AND NON-GAAP FINANCIAL MEASURES | 84 |
| APPENDIX B: - QUESTIONS YOU MAY HAVE REGARDING THIS PROXY STATEMENT | 86 |

**TABLE OF CONTENTS**

 # *PROXY SUMMARY*

This summary highlights information contained elsewhere in this proxy statement. For more complete information about these topics, please review the Tapestry, Inc. (the "Company" or "Tapestry") Annual Report on Form 10-K (the "Form 10-K") for fiscal year 2024 and this entire proxy statement. We are mailing the Notice of 2024 Annual Meeting of Stockholders and instructions on how to access this proxy statement via the Internet (or, for those who request it, a hard copy of this proxy statement and the proxy card) to our stockholders on or about September 27, 2024.

## *About Tapestry*

Tapestry, Inc. is a house of iconic accessories and lifestyle brands. Our global house of brands unites the magic of Coach, kate spade new york and Stuart Weitzman. Each of our brands are unique and independent, while sharing a commitment to innovation and authenticity defined by distinctive products and differentiated customer experiences across channels and geographies. We use our collective strengths to move our customers and empower our communities, to make the fashion industry more sustainable, and to build a company that's equitable, inclusive and diverse. Individually, our brands are iconic. ***Together, we can stretch what's possible.***

Our corporate headquarters are in midtown Manhattan at 10 Hudson Yards, New York, New York 10001. Tapestry is a publicly traded company (NYSE: TPR).

## *Fiscal Year 2024 Business Highlights*

Tapestry meaningfully advanced its strategic agenda in fiscal year 2024, delivering strong financial results despite the complex global economic and consumer environment. The Company drove constant currency topline gains, significant gross margin expansion, and double-digit adjusted earnings per diluted share ("EPS") growth.

Importantly, Tapestry also remained committed to creating value for stockholders, utilizing robust free cash flow generation to return $321 million to our stockholders in fiscal year 2024 through quarterly dividends.

### Financial Highlights

| DELIVERED REVENUE OF | GENERATED OVER |
|---|---|
| **$6.7 billion** | **$1.1 billion** |
| INCLUDING RECORD ANNUAL SALES AT THE COACH BRAND | IN OPERATING AND FREE CASH FLOW |
| EXPANDED GROSS MARGIN BY | DROVE RECORD ADJUSTED EPS OF |
| **250bps** | **$4.29** |
| TO THE HIGHEST LEVEL IN OVER 15 YEARS | A DOUBLE-DIGIT INCREASE FROM PRIOR YEAR |

TABLE OF CONTENTS

PROXY SUMMARY

## Strategic Highlights











| BUILD LASTING CUSTOMER RELATIONSHIPS | FUEL FASHION INNOVATION & PRODUCT EXCELLENCE | DELIVER COMPELLING OMNI-CHANNEL EXPERIENCES | POWER GLOBAL GROWTH | MAINTAIN OPERATIONAL DISCIPLINE |
| --- | --- | --- | --- | --- |
| Acquired over 6.5 million new customers in North America alone, of which over half were Gen Z and Millennials | Delivered compelling and distinctive assortments to consumers, with notable momentum at Coach, which drove handbag revenue growth and AUR gains | Drove global brick and mortar sales growth fueled by higher productivity per store, while maintaining a strong digital positioning | Achieved international topline growth of 6% at constant currency which included gains of 14% in Europe, 9% in Other Asia, 5% in Japan, and 3% in Greater China, which offset a 1% decline in North America | Delivered significant gross margin expansion, double-digit adjusted EPS growth, and robust cash flow generation |

Looking ahead, Tapestry maintains a bold vision for the future and a steadfast commitment to drive growth and shareholder value for years to come. Tapestry's outlook for fiscal year 2025 for its organic business incorporates revenue and earnings per share growth, reflecting continued disciplined brand building and operational excellence.

On August 10, 2023, Tapestry, Inc. announced a definitive agreement to acquire Capri Holdings Limited, establishing a powerful global house of iconic luxury and fashion brands.

On April 22, 2024, the Federal Trade Commission ("FTC") filed a lawsuit in an attempt to block the proposed acquisition and a trial was conducted in September 2024, the results of which are pending. The Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction and is working expeditiously to close the transaction in calendar year 2024.

tapestry

TABLE OF CONTENTS

## *The Fabric of Change: Purpose-Led, People-Centered Business Initiatives*

### Strategy

At Tapestry, we believe that corporate responsibility is a business imperative and we are taking action to ensure the sustainability of our business over time and protect our ability to bring creativity to the marketplace. Tapestry's corporate responsibility framework, *The Fabric of Change*, unites teams across our business in a shared ambition: to make every beautiful choice a responsible choice.

*The Fabric of Change* covers four strategic pillars: Power of Our People, Sustain the Planet, Create Products with Care, and Uplift Our Communities. In addition to longer term strategic objectives outlined below, Tapestry has set and publicly tracks progress against specific goals and targets tied to each of these pillars (the "Goals").

- **Power of Our People**: We aim to foster a culture of purpose and fulfillment at Tapestry by embedding equity, inclusion and diversity ("EI&D") throughout our organization, and attracting and retaining talent with a compelling and engaging employee experience.

- **Sustain the Planet**: We aim to preserve and restore our planet through continuous investments into solutions that improve biodiversity and reduce the impacts of climate change.

- **Create Products with Care**: We aim to increase the use of innovative materials and focus on production methods that design out waste and pollution, keep products in use and restore natural systems.

- **Uplift Our Communities**: We aim to empower the communities where our employees live and work, and provide the resources and capacity needed to support supply chain partners in the regions where we operate.

### Governance and Oversight

Our strategy, including oversight, management and identification of risks, including climate-related risks, is ultimately governed by our Board of Directors (the "Board") and driven by a Task Force comprised of senior leaders and cross-functional members from major business functions. The Board approves long-term corporate responsibility goals, strategic moves and major actions and receives updates at least annually. The Governance and Nominations Committee of the Board receives quarterly updates on corporate responsibility strategy and progress updates on our Goals and initiatives. The Human Resources Committee also receives regular updates on the "Power of Our People" pillar of *The Fabric of Change* strategy. In addition, the Audit Committee periodically reviews risk management regarding these matters to confirm our corporate responsibility actions are consistent with the Company's corporate strategy.

The Company is a signatory to the United Nations ("UN") Global Compact, and as such, our corporate responsibility strategy is aligned with the UN Sustainable Development Goals. Additional information on *The Fabric of Change* and progress on our Goals and other commitments, along with our annual Corporate Responsibility Report, Global Reporting Initiative (GRI), Sustainability Accounting Standards Board (SASB) and Task Force on Climate-Related Financial Disclosures (TCFD) indices are available at www.tapestry.com/responsibility. The content on this website and the content in our Corporate Responsibility Reports are not incorporated by reference into this proxy statement or in any other report or document we file with the SEC. The Company regularly evaluates its programs, Goals and initiatives.

TABLE OF CONTENTS

PROXY SUMMARY

## Corporate Responsibility Highlights & Awards

**Achieved goal**
of sourcing over 90%
of leather from Gold- and
Silver-rated Leather
Working Group tanneries
2 years ahead of schedule

**Received validation of
our near- and long-term
GHG emissions
reductions targets**
from the SBTi

**Achieved Gold-level
TRUE Zero
Waste Certification**
for our Coach (Re)Loved &
Repair Workshop

Joined the **Inclusion Works** coalition of more than
100 Disability:IN corporate partners











Hit milestone of **200,000 hours** served to date
globally toward our 2030 goal of 500,000 hours

**4 | 2024 PROXY STATEMENT**

tapestry

TABLE OF CONTENTS

PROXY SUMMARY

## *Human Capital Management*

Unlocking the power of our people is a key strategic pillar for the Company, supported by the Company's senior leadership, as reflected in the key programs and focus areas described below. The Board and the Human Resources Committee oversee and regularly engage with management on these areas, including quarterly updates to the Human Resources Committee and the full Board on talent development, succession planning and other areas of human capital management. Our people strategy aims to build a talent engine where diverse talent can thrive and to foster an inclusive culture by welcoming people and ideas from everywhere to stretch what's possible.

### Equity, Inclusion and Diversity

Our EI&D strategy is grounded in our purpose and values and is a core element to stretching what's possible for our workforce, in our workplace and for our customers. To support these actions, we are guided by four interconnected principles:

- **Talent**. Attracting, retaining and growing top talent - making us an employer of choice in a rapidly evolving talent marketplace.

- **Culture**. Fostering a culture of inclusion, where people and ideas from everywhere are welcomed.

- **Community**. Nurturing the vibrancy of the communities in which we live and work to advance equity, opportunity and dignity for all.

- **Marketplace**. Embracing our responsibility in the marketplace as a global fashion company. We are committed to affecting positive change for our industry and delivering on our value proposition to stakeholders - consumers, investors and vendor partners.

The Company is committed to fostering an equitable, inclusive and diverse culture. We are a member of CEO Action for Diversity and Inclusion, the largest business coalition committed to advancing diversity and inclusion. Our Chief Inclusion and Social Impact Officer is responsible for shaping and delivering the Company's EI&D strategy and overseeing our social impact efforts through advocacy, philanthropy and volunteerism. See *Corporate Responsibility Highlights & Awards* for recognition we have received for our focus on fostering an equitable work environment. We monitor our employee representation by gender, race and ethnicity throughout the Company, and disclose this information, including our EEO-1 Consolidated Report for calendar year 2023, on our website at www.tapestry.com/responsibility/our-people. See *At a Glance: 2024 Board of Directors Nominees* for information on the diversity of our Director nominees.

### Total Rewards

Tapestry is dedicated to being a place where our employees love to work, where they feel recognized and rewarded for all that they do. Tapestry's primary compensation principle is to "pay for performance" and to maintain a competitive total rewards program to attract, motivate and retain the key talent we need. To accomplish this goal, we strive to appropriately align our total compensation with the pay, benefits and rewards offered by other companies that compete with us for talent in the marketplace and to align those pay programs with achieving outstanding business and financial results.

### Talent Development

Our talented employees are vitally important to our near and long-term success. Our recruitment strategies focus on attracting the best diverse talent to our organization and then retaining them through career development, mobility and advancement within our open and inclusive culture. We strive to provide a working environment where our highly engaged teams can grow and progress their careers. We also work to foster a dynamic, performance-driven culture, which includes regular feedback and coaching. We listen to our employees through regular pulse surveys that inform on how we can continue to strive for excellence in our work culture.

### Well-being and Safety

We are committed to providing a safe working environment and supporting our employees in achieving and sustaining their health and well-being goals. We provide our employees with supplemental resources to achieve work-life integration and wellness, such as access to our Employee Assistance Program, the Tapestry Associate Relief Fund, regular employee programming and a subscription to a smartphone application dedicated to meditation and mindfulness. We also believe in

**tapestry**

TABLE OF CONTENTS

PROXY SUMMARY

encouraging and empowering our employees to take part in building a welcoming and inclusive community, through supplemental time-off to perform community service and a matching gift program that matches up to $10,000 per eligible employee in donations to eligible nonprofits in North America from the Tapestry Foundation.

## *Corporate Governance Highlights*

| Engaged and Independent Board Focused on Continuous Evaluation and Refreshment | Commitment to Stockholder Rights | Demonstrated Corporate Governance and Compensation Best Practices |
|---|---|---|
| Ten of Eleven Director nominees are independent | Bylaws contain Proxy Access provision | Longstanding corporate responsibility commitments, with strong board oversight and measurable short and long-term goals |
| Independent Chair of the Board and Board Committees comprised solely of Independent Directors | Bylaws may be amended by stockholders representing a majority of outstanding shares entitled to vote | Diverse Board, representing strong company-wide commitment to EI&D |
| Demonstrated commitment to Board refreshment and rigorous director selection criteria | Active year-round stakeholder engagement | Active Board oversight of risk management, including cybersecurity |
| Annual election of all Directors | Majority vote standard for uncontested director elections | Code of Conduct for ethical business policies and conduct |
| Annual Board, Committee and Director assessments, as well as annual CEO evaluation | Annual "Say on Pay" advisory vote | Stock ownership guidelines for Directors and executives and clawback for incentive awards |
| Regular executive sessions of Independent Directors | | Prohibition on political expenditures |

tapestry

TABLE OF CONTENTS

## At a Glance: 2024 Board of Directors Nominees

Our 2024 Director nominees bring an effective mix of viewpoints, backgrounds, diversity and experiences to the Board.



| Independent Directors | 91% | | | |
|---|---|---|---|---|
| Average Tenure | 3.5 Years | | | |
| Gender | **Male** | **Female** | | |
| | 55% | 45% | | |
| Average Age | 57.5 Years | | | |
| Race / Ethnicity | **White / Caucasian** | **Black / African American** | **Asian** | |
| | 64% | 18% | 18% | |
| Born or Reside Outside the U.S. | 45% | | | |
| Identified as LGBTQ | 9% | | | |

tapestry

TABLE OF CONTENTS

**PROXY SUMMARY**

The following table provides summary information about each Director nominee. All of the Director nominees are currently members of the Board.

| Name | Age | Director Since | Principal Occupation | Independent | Audit Committee | Human Resources Committee | Governance and Nominations Committee | Other U.S. listed Public Company Boards |
|---|---|---|---|---|---|---|---|---|
| John P. Bilbrey | 68 | 2020 | Executive Chairman, Olaplex | ✓ | | ● Chair | ● Member | • Colgate-Palmolive<br>• Elanco Animal Health<br>• Olaplex |
| Darrell Cavens | 51 | 2018 | Retired Founder and Chief Executive Officer of zulily, inc. | ✓ | | ● Member | | |
| Joanne Crevoiserat | 60 | 2020 | Director and Chief Executive Officer of Tapestry, Inc. | | | | | • General Motors Co. |
| David Elkins* | 56 | 2024 | Executive Vice President and Chief Financial Officer, Bristol Myers Squibb | ✓ | ● Member | | | |
| Hanneke Faber* | 55 | 2021 | Chief Executive Officer, Logitech | ✓ | ● Member | | | • Logitech International S.A. |
| Anne Gates* | 64 | 2017 | Retired President of MGA Entertainment, Inc. | ✓ | ● Member | | ● Chair | • Kroger<br>• Raymond James Financial |
| Thomas Greco* | 66 | 2020 | Retired President, Chief Executive Officer of Advance Auto Parts | ✓ | ● Chair | | ● Member | • Centene Corporation |
| Kevin Hourican | 51 | 2024 | Chair of the Board and Chief Executive Officer, Sysco Corporation | ✓ | | ● Member | | • Sysco Corporation |
| Alan Lau* | 49 | 2023 | Chief Business Officer of Animoca Brands | ✓ | ● Member | | | |
| Pamela Lifford | 61 | 2020 | Retired President, Global Brands and Experiences, Warner Bros. Discovery | ✓ | | ● Member | | |
| Annabelle Yu Long | 51 | 2016 | Founding and Managing Partner of BAI Capital | ✓ | | | | • LexinFintech Holdings<br>• NIO Inc |
| **Number of Meetings in fiscal year 2024** | | | | | **4** | **5** | **4** | |

● Committee Chair   ● Member   * Audit Committee Financial Expert

tapestry

## Overview of 2024 Executive Compensation

Set forth below is the fiscal year 2024 compensation for each named executive officer ("NEO" or "Named Executive Officer") as determined under SEC rules. The hallmarks of our program include a strong pay-for-performance focus and annual and long-term incentives that support our business priorities, our talent objectives and stockholder value creation. See the notes accompanying the *Summary Compensation Table* on page 61 for more information.

| Name & Principal Position | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| **Joanne Crevoiserat** *Chief Executive Officer* | 1,390,385 | - | 6,323,364 | 3,999,753 | 3,654,000 | 62,711 | 15,430,213 |
| **Scott Roe** *Chief Financial Officer and Chief Operating Officer* | 965,385 | - | 2,371,288 | 1,499,903 | 1,590,469 | 78,033 | 6,505,078 |
| **Todd Kahn** *Chief Executive Officer and Brand President, Coach* | 990,385 | - | 1,896,988 | 1,199,925 | 1,875,000 | 62,467 | 6,024,765 |
| **Liz Fraser**[1] *Chief Executive Officer and Brand President, Kate Spade* | 850,000 | - | 822,036 | 519,963 | 797,300 | 26,900 | 3,016,199 |
| **David Howard** *General Counsel and Secretary* | 595,192 | - | 1,040,456 | 499,967 | 548,100 | 34,188 | 2,717,903 |

(1)  Ms. Fraser left the Company on September 2, 2024.

## 2024 Proxy Voting Roadmap

| | THE BOARD RECOMMENDS VOTING: | PAGE REFERENCE (for more detail) |
|---|---|---|
| **PROPOSAL 1**: Election of Eleven Directors | **FOR EACH NOMINEE** | 22 |
| **PROPOSAL 2**: Ratification of appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending June 28, 2025 | **FOR** | 31 |
| **PROPOSAL 3**: Advisory vote to approve the Company's executive compensation, as discussed and described in this proxy statement | **FOR** | 36 |

TABLE OF CONTENTS

 # *CORPORATE GOVERNANCE*

## *Meetings and Committees of the Board*

The Board held eight (8) meetings during fiscal year 2024. In addition to meetings of the full Board, Directors also attended meetings of Committees of the Board (the "Committees" and each a "Committee"). Each of the incumbent Directors attended at least 75% of the meetings held by the Board and Board Committees on which he or she served during the fiscal year.

The Board has an Audit Committee (the "Audit Committee"), a Human Resources Committee (the "HR Committee"), which performs the functions of a compensation committee and a Governance and Nominations Committee (the "GN Committee"). Each Committee operates pursuant to a charter, which can be found for each Committee on Tapestry's website at www.tapestry.com/investors/ under the Committees section. We will provide to any person without charge, upon request, copies of any of the Committee charters. You may obtain such copies by sending a written request to Tapestry, 10 Hudson Yards, New York, New York 10001, Attention: Secretary. Each Committee has implemented procedures to

ensure that during the course of each fiscal year it devotes the attention that it deems necessary or appropriate to each of the matters assigned to it under its charter.

All regular quarterly meetings of the Board and Board Committees include an executive session of our non-employee Directors, all of whom are independent ("Independent Directors") without members of management present. In fiscal year 2024, Anne Gates presided over executive sessions of the Board as Independent Chair of the Board. Our Independent Directors and Board Committees have authority to retain outside advisors as they deem necessary.

Tapestry encourages each member of the Board to attend each Annual Meeting of Stockholders, but has not adopted a formal policy with respect to such attendance.

All of the Company's Directors then-standing for re-election attended the Annual Meeting of Stockholders held in 2023.

### Board Membership and Committee Roster

| Name of Director | Audit | Human Resources | Governance and Nominations |
|---|---|---|---|
| John P. Bilbrey | | ● (Chair) | ● |
| Darrell Cavens | | ● | |
| Joanne Crevoiserat | | | |
| David Elkins[1] | ● | | |
| Hanneke Faber | ● | | |
| Anne Gates | ● | | ● (Chair) |
| Thomas Greco | ● (Chair) | | ● |
| Kevin Hourican[2] | | ● | |
| Alan Lau | ● | | |
| Pamela Lifford | | ● | |
| Annabelle Yu Long | | | |

● Committee Chair   ● Member

(1) Mr. Elkins joined the Board and was appointed to the Audit Committee on February 29, 2024.
(2) Mr. Hourican joined the Board and was appointed to the Human Resources Committee on February 29, 2024.

tapestry

TABLE OF CONTENTS

## Audit Committee

The Audit Committee is comprised solely of Independent Directors and met four (4) times during fiscal year 2024. The Audit Committee reviews Tapestry's auditing, accounting, financial reporting and internal control functions and has sole responsibility for the selection of independent accountants. The Audit Committee is required to pre-approve all services provided by the independent accountants to assure that these services do not impair the auditor's independence. Services that have not received pre-approval will require specific review and approval by the Audit Committee. In addition, when the scope of services being provided (and the related fees) meaningfully change, Tapestry and the independent accountants will provide an update to the Audit Committee. The Audit Committee reviews Tapestry's accounting principles and financial reporting, as well as the independence of Tapestry's independent accountants. In discharging its duties, the Audit Committee:

- is directly responsible for the appointment, compensation determination and oversight of Tapestry's independent accountants;

- is directly responsible for pre-approving the audit and non-audit services rendered by the independent accountants;

- provides oversight of, and has authority for the selection and evaluation of Tapestry's internal auditors;

- meets independently with Tapestry's internal auditors, its independent accountants and senior management;

- reviews the general scope of matters relating to Tapestry's accounting, financial reporting, internal control systems, annual audit and internal audit program as well as matters relating to Tapestry's information system architecture and cybersecurity, and the results of the annual audit; and

- reviews with Tapestry's Chief Executive Officer and Chief Financial Officer the matters required to be personally certified by such officers in Tapestry's public filings and the procedures followed to prepare for such certifications.

Tapestry's Board determined that all members of the Audit Committee during fiscal year 2024 were "independent" as defined in the NYSE listing standards and Rule 10A-3 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and that all were "financially literate" under the rules of the NYSE. The Board has determined that Mr. Greco, the Chair of the Audit Committee, Messrs. Elkins and Lau and Mses. Gates and Faber each qualify as an "Audit Committee financial expert" under federal securities laws.

## Human Resources Committee

The HR Committee is comprised solely of Independent Directors and met five (5) times during fiscal year 2024. Pursuant to the HR Committee Charter, the HR Committee:

- determines, approves and reports to the Board on all elements of compensation for Tapestry's executive officers and other key executives, including targeted total cash compensation and long-term equity-based incentives and oversees the administration of various employee benefit and retirement plans, except as otherwise delegated by the Board or the Committee;

- reviews non-employee director compensation and benefits and recommends changes to the Board as necessary;

- reviews Tapestry's overall human capital strategy, including EI&D;

- performs, or assists the Board in performing, the duties of the Board relating to the annual performance evaluations of the Company's executive officers;

- monitors performance, talent development and succession planning for key executives; and

- consults, as needed, with third-party compensation consultants.

In fiscal year 2024, the HR Committee retained the services of Compensation Advisory Partners, LLC ("CAP"); a description of the services provided to the HR Committee by CAP during fiscal year 2024 appears under *Compensation Discussion and Analysis-Compensation Decision Making Process-Roles and Responsibilities*.

Tapestry's Board determined that all members of the HR Committee during fiscal year 2024 were "independent" under the NYSE heightened independence standards for members of compensation committees and that each member of the HR Committee qualifies as a "non-employee director," as defined in Rule 16b-3 promulgated under the Exchange Act.

**tapestry**

TABLE OF CONTENTS

CORPORATE GOVERNANCE

## Governance and Nominations Committee

The GN Committee is comprised solely of Independent Directors and met four (4) times during fiscal year 2024.

The GN Committee performs a leadership role in shaping the corporate governance of the Company, and reports to the Board on matters relating to corporate governance and the identification and nomination of new directors. The GN Committee also performs succession planning for the Chief Executive Officer and conducts annual performance evaluations of the Board and its several Committees, and each individual Director. The GN Committee also has primary oversight of the Company's corporate responsibility strategy, Board succession planning and Board refreshment processes. These responsibilities are described in more detail in *Board, Committee and Director Evaluations* and *Board Refreshment and Succession Planning Processes* below.

Tapestry's Board determined that all members of the GN Committee during fiscal year 2024 were "independent" as defined in the NYSE listing standards.

## Ongoing Director Education

The Board believes that ongoing Director education is essential for both new and long-serving Directors to successfully fulfill their duties. All incoming Directors participate in the Company's Director onboarding and education program, which involves meetings with members of management to review Company strategy, Tapestry and brand business and operational performance, corporate governance, human capital management and corporate responsibility matters. Throughout the course of their service on the Board, all Directors are polled on which topics and programs they think will support them in their roles and the Company incorporates this feedback into future programming. Directors are given access to relevant educational materials and information on training programs through an online portal, as well as external memberships to corporate governance organizations. The Company reimburses Directors for all reasonable fees and expenses associated with attending outside training programs. In addition, outside experts are frequently invited to Board and Committee meetings throughout the year to present on specific topics (such as artificial intelligence, corporate governance, innovation, and geopolitical risk in fiscal year 2024).

## Board, Committee and Director Evaluations

The Board believes that a regular, robust Board evaluation process is a critical tool in ensuring Board effectiveness and strong corporate governance. The GN Committee has primary oversight of the process, which consists of annual evaluations by each Director of the full Board, the Board Committees, and each individual Director. Additionally, members of the Company's management team are periodically asked for their feedback and perspective on Board process and effectiveness. These collective evaluations are intended to determine whether the Board and its Committees are functioning effectively, to assess Director performance, and to identify opportunities for overall improvement.

Evaluations are conducted annually through confidential questionnaires, which solicit quantitative and textual feedback. On a periodic basis (most recently for the fiscal year 2021 review cycle), the process also includes one-on-one interviews with Board members and certain members of management conducted by an independent third-party facilitator.

Evaluations consider a number of topics, including:

• board structure, composition and performance;

• board and Committee roles, and meeting agendas and materials;

• access to management, outside advisors and other information and resources necessary for the Board to fulfill its duties;

• the overall function of the Board and its Committees; and

• assessment of individual and peer contributions, including solicitation of feedback to ensure each director's skills are being utilized most effectively.

The Independent Directors also evaluate the performance of Tapestry's Chief Executive Officer annually. The results of the evaluations are discussed with the Chair of the Board, the GN Committee, each Committee Chair, and with the full Board in executive session. The Chair provides anonymous feedback to each Director on an individual basis.

While this formal evaluation process is conducted on an annual basis, Directors are encouraged to continuously share their perspectives, feedback and suggestions throughout the year. Items requiring follow-up and execution from the annual evaluation process and other engagements are monitored throughout the year by the Board, the applicable Committees and management.

tapestry

TABLE OF CONTENTS

## Board Refreshment and Succession Planning Processes

The Board is committed to active and ongoing Board refreshment practices and succession planning, working to continuously align Board composition and leadership with the Company's strategic needs. Building and maintaining an effective Board is a critical responsibility of our GN Committee, designed to ensure that the Board and each Committee is operating effectively and comprised of highly qualified directors, with the appropriate skills, experience, perspective and independence to provide effective oversight and serve the best interests of our stockholders. The GN Committee conducts a year-round process, which includes (i) regular review and discussion of the existing Board composition, utilizing a matrix of certain director skills and experience as a discussion tool; (ii) consideration of disclosures by each Director in their Annual Director and Officer Questionnaire, including with respect to external commitments, with semi-annual abridged questionnaires for interim updates; (iii) review of the annual Board, Committee and individual Director evaluations; and (iv) regular GN Committee agenda items devoted specifically to Board refreshment and succession planning, reporting out to the full Board.

### Refreshment Practices

In identifying and recommending Director candidates, the GN Committee places emphasis on the Company's Corporate Governance Principles, as approved by the Board and posted on our website, which set forth qualifications and criteria for director selection, including the following minimum qualifications: the highest personal and professional ethics, integrity and values; commitment to representing the long-term interests of our stockholders; an inquisitive and objective perspective, practical wisdom and mature judgment; freedom from significant conflicts of interest; the willingness and ability to devote the time necessary to perform the duties and responsibilities of a director; and a commitment to serve on the Board for an extended period of time. The GN Committee's selection process also provides for engagement of third-party search firms, interviews with various members of the GN Committee, the Board and management, and an evaluation of each individual in the context of the Board as a whole, applying criteria that it deems appropriate. The final selection of nominees is made by the Board.

During fiscal year 2024, the Board appointed two new Directors: Kevin Hourican and David Elkins. They bring significant strategic and financial expertise to Tapestry's Board, highlighted by successful track records of driving global growth and transformation at scale, including deep M&A experience.

The Corporate Governance Principles also provide that unless the Board determines that the carrying out of a Director's responsibilities to the Company will not be adversely affected by the Director's other directorships, Directors who serve as the CEO of a public company should not serve on more than two other public company boards, and other Directors should not serve on more than four other public company boards.

The GN Committee will consider all candidates recommended by stockholders in accordance with the same timing and other procedures established in Tapestry's Bylaws for stockholder nominations. See *Other Information-Stockholder Proposals for the 2025 Annual Meeting* for more information. The GN Committee evaluates all candidates in the same manner, regardless of the source of such recommendation, and, subject to provisions in our Bylaws concerning proper notice by stockholders of proposed nominees, will consider all candidates recommended by stockholders. Such recommendations should include the name and address and other pertinent information about the candidate as is required by Tapestry's Bylaws. Recommendations should be submitted in writing to Tapestry, 10 Hudson Yards, New York, New York 10001, Attention: Secretary. The policy and procedures for considering candidates recommended by stockholders were formally adopted by our Board in May 2004.

### Board Succession Planning

Led by the GN Committee, our Board reviews the composition, skills and dynamics of the full Board and each Committee no less than annually to ensure appropriate Board succession plans are in place.

Based on these reviews, the GN Committee determines optimal utilization of each Director's skills and experience and confirms or modifies succession plans for the Board Chair and Committee Chairs and members. The full Board appoints the Board and Committee Chairs and Committee members annually, following the Company's Annual Meeting.

TABLE OF CONTENTS

CORPORATE GOVERNANCE

## Board Diversity

While the Company does not have a formal policy regarding the diversity of the Board, we believe the Board is diverse based on gender, ethnicity, national origin, and age, as reflected in the charts below. The GN Committee considers the Board's overall composition when considering Director candidates, including whether the Board has an appropriate combination of professional experience, skills, knowledge and variety of viewpoints and backgrounds in light of the Company's current and expected future needs.

In addition, the GN Committee also believes that it is desirable for new candidates to contribute to the variety of viewpoints on the Board, which may be enhanced by a mix of different professional and personal backgrounds and experiences.



**Ethnicity**
2 | 2 | 7
- Black / African American
- Asian
- White / Caucasion

**Geographic Location**
5 | 6
- Born / Work Abroad
- Born / Work in the U.S.

**Gender**
5 | 6
- Female
- Male

**Orientation**
1 | 10
- LGBTQ+
- Heterosexual

**Age**
5 | 4 | 2
- 45 - 55
- 56 - 65
- 66 - 70

AVERAGE AGE
57.5 Yrs

**14 | 2024 PROXY STATEMENT**

tapestry

TABLE OF CONTENTS

## *Board Oversight Structure*

The Board is elected annually by our stockholders to provide ultimate oversight of the management of Tapestry's business strategy and risks and to ensure that the long-term interests of the stockholders are being served.

### Separation of Chair and Chief Executive Officer; Strong Independent Board

Under Tapestry's Bylaws and Corporate Governance Principles, the positions of Chair of the Board and Chief Executive Officer may be held by one person or separately. Our policy as to whether the role of the Chair and the Chief Executive Officer should be separate is to adopt the practice that best serves the stockholders' interests and the Company's needs at any particular time. The positions of Chair of the Board and Chief Executive Officer have been held separately since July 2020, with Ms. Gates currently serving as Chair of the Board and Ms. Crevoiserat serving as Chief Executive Officer.

The Board believes that the current governance structure - Ms. Gates as the independent Chair of the Board and Ms. Crevoiserat as the Company's Chief Executive Officer - allows Ms. Crevoiserat to focus her time and energy on managing the Company and Ms. Gates to lead the Board in its fundamental role of providing guidance, advice and counsel regarding the business, operations and strategy of the Company, as well as oversight of the Company's risk management policies and processes. We believe this structure will allow the Company to continue to execute its strategy and business plans to maximize stockholder value.

The Company has also adopted various policies to provide for a strong and independent Board. The Board and the GN Committee have assembled a Board comprised of capable and experienced Directors who are currently or have been leaders of major companies or institutions, are independent thinkers, and have a wide range of expertise and skills. The Board annually examines the relationships between the Company and each of its Directors. After this examination, the Board has determined that each of the Directors who are nominated for election at the Annual Meeting (other than Ms. Crevoiserat) have no material relationship with the Company (either directly or as a partner, stockholder or officer of an organization that has a relationship with the Company) and is independent as defined in the NYSE listing standards. In addition, all standing Committees of the Board are made up entirely of Independent Directors. The Board and these Committees are empowered to retain their own counsel or advisors as they deem necessary.

### Board's Role in the Oversight of Strategy

Our Board has active oversight responsibility for our corporate strategy and planning, including through: formal dedicated meetings to review our long-range strategic plans, including risks and opportunities facing our business; quarterly engagement at Board and Committee meetings, and during executive sessions; store visits and travel to key global markets; and regular discussions with our Chief Executive Officer and members of management throughout the year. With this strong Board oversight, our management team is responsible for executing our strategy and providing the Board with regular updates on key strategic initiatives, market and macro-environmental trends and other developments with respect to our strategic initiatives.

During fiscal year 2024, the Board was highly engaged in oversight of the Company's business and operational priorities, including development and implementation of long range plans for each of the Company's brands, approval and oversight of the Company's proposed acquisition of Capri, continued progress on corporate responsibility and human capital management activities, and oversight of the Company's innovation priorities, including artificial intelligence.

### Board's Role in the Oversight of Risk

The Board provides critical oversight of the risks facing the Company and the risk management programs the Company has put into place. The Board views effective risk management as a key priority and approaches this work as an integrated part of our strategic planning process. In compliance with its duties under Tapestry's charter, Bylaws and Corporate Governance Principles and, pursuant to Maryland law, the Board and its Committees consider whether the Company's risk management programs adequately:

• identify and assess material and emerging risks facing the Company in a timely fashion;

• allocate ownership for risk management amongst members of management, with appropriate visibility to the Board and its Committees;

• implement appropriate responsive risk management strategies;

• facilitate open communication between management and the Board;

TABLE OF CONTENTS

**CORPORATE GOVERNANCE**

- transmit necessary information with respect to material risks within the Company; and
- foster an appropriate culture of ethics, integrity, and risk management.

The Company believes that the Board's structure provides appropriate risk oversight of the Company's activities.

### Board Risk Oversight

The Board reviews the Company's enterprise risk management ("ERM") program to ensure risk management is consistent with the Company's corporate strategy and effective in fostering a culture of risk-aware and risk-based decision making throughout the organization. The Board's review of the ERM program and other risk management processes includes strategic, operational, financial, reputational and external risks. The Board works with senior management and Tapestry's independent internal auditors, to ensure that enterprise-wide risk management is incorporated into corporate strategy and business operations.

As set forth below, the Board delegates to its Committees primary responsibility to evaluate elements of the Company's risk management program based on the Committee's expertise and applicable regulatory requirements. Each Committee, through its chairperson, reports out to the full Board at its quarterly meeting on the Committee's activities, including agenda items relating to risk; the full Board engages in discussion on these delegated activities at that time.

| Audit Committee Risk Oversight | HR Committee Risk Oversight | GN Committee Risk Oversight |
|---|---|---|
| Responsible for oversight of risks relating to the Company's: | Responsible for oversight of risks relating to the Company's: | Responsible for oversight of risks relating to the Company's: |
| Accounting and financial reporting | Human capital management programs and strategies, including talent development, EI&D, management succession planning (other than CEO), and updates on corporate responsibility program goals under the "Power of Our People" program pillar | Corporate Governance policies and practices, including related party policies and disclosures |
| System of internal controls | | Board refreshment and succession planning, including for Board Committee chair and membership positions |
| Annual financial audit, including meeting privately on a regular basis with the Company's external auditors | Annual performance evaluations of the Company's executive officers and other key executives | CEO succession planning, as presented and approved by the full Board |
| Internal audit program, including oversight and quarterly reports on the ERM program | Compensation programs and policies, including conducting a risk assessment of the Company's compensation programs annually to determine whether any aspects encourage excessive or inappropriate risk taking | Quarterly updates on corporate responsibility program risks (with updates on corporate responsibility programs to the Board at least annually) |
| Business Continuity Program governance | | |
| Litigation and ethics and compliance | | |
| Information system architecture, privacy and cybersecurity | | |

### Role of Management

Management has day-to-day responsibility for the identification and assessment of the various risks facing the Company, and the implementation of effective risk management programs and policies.

tapestry

TABLE OF CONTENTS

**CORPORATE GOVERNANCE**

| ERM Program |
| --- |
| The ERM program provides a framework whereby management conducts comprehensive annual enterprise risk assessments to identify and prioritize the most critical risks facing the Company, as well as emerging risks, and the development and reporting of risk mitigation strategies. Those critical and emerging enterprise level risks are reported and discussed quarterly with internal management committees focused on these enterprise risks, including a Legal, Risk, Compliance & Safety Committee and an Information Governance, Privacy & Security Committee. Additionally, management regularly reports to the full Board and/or its Committees, as applicable on risk assessment and mitigation strategies, to enable the Board to successfully oversee the Company's risk management activities. |

## Corporate Responsibility Risk Management

Corporate responsibility and climate-related risk management is a key priority for management and the Board and is approached as an integrated part of ERM and our strategic planning process. Management and the Board evaluate sustainability and climate-related risks and opportunities that have the potential to impact Tapestry's operations, products and services, supply chain, adaptation and mitigation activities and investment in innovation.











*Our GN Committee* receives quarterly updates on matters of corporate responsibility strategy, compliance and risk, with updates to the full Board at least annually and Audit and HR Committees as appropriate.

*Our ESG Steering Committee*, comprised of Tapestry Executive Committee members, meets quarterly and is responsible for strategy recommendations and supporting execution and final decision-making of corporate responsibility-related opportunities.

*Our ESG Task Force*, comprised of senior leaders and cross-functional members from major business functions at Tapestry, meets quarterly to set and drive company-wide corporate responsibility strategy.

*Our Global ESG Team*, led by our Vice President, ESG & Sustainability, has direct day-to-day responsibility for managing our program, including leadership of the ESG Task Force.

*Our Corporate Responsibility Program* is supported by additional working groups including several Employee Business Resource Groups (EBRGs) and our Tapestry and brand foundations.

TABLE OF CONTENTS

CORPORATE GOVERNANCE

## Cybersecurity Risk Management

The Company has a comprehensive cybersecurity risk assessment program that systematically identifies, analyzes and evaluates potential threats and vulnerabilities that may impact the confidentiality, integrity, and availability of the Company's information systems and data. This program includes governance structure, risk identification, risk analysis, risk management, and risk communication and reporting.

| | | | | |
|---|---|---|---|---|
| *Our Audit Committee* receives quarterly updates from the Company's Chief Information Officer (CIO) and Chief Information Security Officer (CISO) on information security, privacy risk and compliance, with updates to the full Board at least annually. | *Information Governance, Privacy & Security Committee*, which was formed in fiscal year 2023 and includes the CISO and key members of management, meets quarterly and is responsible for management oversight of risk in these areas. | *Our CISO manages our day-to-day* cybersecurity compliance program, including training, prevention, mitigation, detection and remediation of cybersecurity incidents. | *Cybersecurity controls also include periodic internal and third party assessments* to test our cybersecurity controls, perform cyber simulations and annual tabletop exercises, and continually evaluate our privacy notices, policies and procedures surrounding our handling and control of personal data and the systems we have in place to help protect us from cybersecurity or personal data breaches. | *The Company also surveyed its Directors* on their skills and experience relating to cybersecurity to ensure effective oversight of the Company's programs, as reflected in *Director Qualifications, Skills and Experience* on page 22. |

## Compensation Committee Interlocks and Insider Participation

The HR Committee is currently comprised of the following Independent Directors: John P. Bilbrey, Chair, Darrell Cavens, Kevin Hourican and Pamela Lifford. No Director who served as a member of the HR Committee during any portion of fiscal year 2024 was an employee of the Company during their service on the HR Committee or a former officer of the Company. None of Tapestry's executive officers serve on the compensation committee (or other committee serving an equivalent function) or the board of directors of any other company of which any member of the HR Committee or the Board is an executive officer. The HR Committee makes all compensation decisions regarding the Company's executive officers.

## Code of Conduct and Other Policies

Tapestry has adopted a Code of Conduct (the "Code"). The purpose of the Code is to convey the basic principles of business conduct expected of all Tapestry employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer, Principal Accounting Officer and Controller and other senior financial personnel performing similar functions. We require officers and corporate employees (and selected retail employees) to attend training on the Code and other matters of business ethics. We require all employees to review and certify the Code annually. In support of the Code, we have provided our employees with numerous avenues for the reporting of ethics violations or other similar concerns, including a toll-free telephone hotline and a reporting website, both allowing for anonymity. The Code meets the definition of "code of ethics" under the rules and regulations of the SEC and the NYSE and is posted on our website at www.tapestry.com/investors/ under the Global Business

tapestry

TABLE OF CONTENTS

Integrity Program section. In addition, we intend to post on our website all legally required disclosures regarding amendments to, or waivers of, our Code.

We will provide to any person without charge, upon request, a copy of the Code. You may obtain a copy of the Code by sending a written request to Tapestry, 10 Hudson Yards, New York, New York 10001, Attention: Secretary.

Tapestry has also adopted a Political Activities and Contributions Policy. Tapestry does not make political contributions and prohibits all employees from using any Company funds or assets for direct or in-kind political contributions, including contributions to any ballot initiative, referendum or other question, Political Action Committee (PAC), political party or candidate, whether federal, state or local, in the United States or abroad, subject to certain pre-approved specific foreign country exclusions. Employees are permitted to make personal contributions that do not involve any funds or resources of the Company, including Company time, facilities, office supplies, letterhead, phones and other Company devices.

## Other Corporate Governance Matters

### Stockholder Engagement

We communicate with our stockholders throughout the year and are committed to fostering effective and transparent communication. We engage regularly through quarterly earnings calls, our investor relations website, and group as well as one-on-one meetings and calls to ensure we have a strong understanding of their perspectives, including potential concerns with respect to our Company and business.

In advance of our Annual Meeting of Stockholders each year, we reach out to many of our investors to discuss topics of corporate governance, executive compensation and any other items of interest or concern. Our engagements typically involve representatives from Investor Relations, Legal, Human Resources, ESG and other business areas, including our senior management team and Board of Directors when appropriate.

In advance of our prior year Annual Meeting of Stockholders, we reached out to approximately 40 stockholders, representing approximately 70% of shares outstanding. Although our investors did not have concerns requiring engagement in advance of the meeting, we engaged with our stockholders on a number of issues throughout fiscal year 2024.

Key topics of discussion during our fiscal year 2024 engagements included:

- our business strategies and financial performance;
- the Company's proposed acquisition of Capri;
- topics related to corporate responsibility, including sustainability and climate change, as well as *The Fabric of Change* initiatives and corporate responsibility goals;
- our strategies around EI&D, and other matters of human capital management, including the inclusion of EI&D metrics in our Annual Incentive Plan ("AIP"); and
- topics around general Board oversight and corporate governance.

### Corporate Governance Principles

Tapestry's Corporate Governance Principles provide the framework for the governance of Tapestry. These guidelines reflect the governance rules for NYSE-listed companies and those contained in the Sarbanes-Oxley Act of 2002. The Board reviews these principles and other aspects of governance periodically. The guidelines, together with other corporate governance documents of Tapestry, are posted on our website at www.tapestry.com/investors/ under the Governance Documents section. We will provide to any person without charge, upon request, a copy of the Corporate Governance Principles. You may obtain a copy by sending a written request to Tapestry, 10 Hudson Yards, New York, New York 10001, Attention: Secretary.

### Sarbanes-Oxley Certifications

Tapestry has filed with the SEC, as exhibits to its most recently filed Form 10-K, the certifications required by the Sarbanes-Oxley Act of 2002 regarding the quality of the Company's public disclosure.

TABLE OF CONTENTS

CORPORATE GOVERNANCE

## Director Compensation

Directors who are Tapestry employees receive no additional compensation for their services as Directors. Compensation for Independent Directors is recommended by the HR Committee and approved by the Board. Compensation for Independent Directors consists of an annual cash retainer for Board service and additional cash retainers for service as the Independent Chair of the Board or Lead Outside Director, as applicable, and as the chairperson of Board Committees. Annual grants of stock options and restricted stock units ("RSUs") are made to each elected Independent Director on the date of Tapestry's Annual Meeting. Upon joining the Board, a new Independent Director receives a grant of stock options and RSUs with approximately the same value as this annual

grant. The Second Amended and Restated Tapestry, Inc. 2018 Stock Incentive Plan (the "2018 Stock Incentive Plan") includes an overall limit on annual Independent Director compensation of $800,000 per director.

Due to complex regulatory requirements related to equity compensation in China, in lieu of an annual equity award of stock options and RSUs, Ms. Long receives a cash payment equal to $170,000, representing the targeted fair market value of equity awards granted to the other Independent Directors, paid one year after the date of each Annual Meeting of Stockholders at which she is elected, or re-elected, to the Board.

Tapestry's Outside Director retainers in effect during fiscal year 2024 were as follows:

| Compensation Element | Annual Amount* ($) |
|---|---|
| Basic annual retainer | 100,000 |
| Annual equity grant value[1] | 170,000 |
| Audit Committee Chair annual retainer | 35,000 |
| HR Committee Chair annual retainer | 30,000 |
| GN Committee Chair annual retainer | 25,000 |
| Independent Chair of the Board retainer | 200,000 |
| Lead Outside Director (not applicable in fiscal year 2024) | 30,000 |
| Cash payment in lieu of annual equity grant for Annabelle Long | 170,000 |

*\* Amounts shown reflect the full target value of the retainers for fiscal year 2024.*

*(1) The annual equity grant to our Independent Directors is fixed at a fair market value of approximately $170,000, with 50% of the target value of the award made in the form of stock options and 50% made in the form of RSUs. These awards vest in full one year from the date of grant, subject to the Director's continued service until that time.*

From time to time, most recently in August 2024, the HR Committee's consultant, CAP, evaluates the Independent Director compensation program and, as appropriate, the HR Committee may recommend changes to the Independent Director compensation program. The 2024 study compared Tapestry's Independent Director compensation program to:

• the same peer group used for executive compensation benchmarking, described in the *Compensation Discussion & Analysis* section; and

• as a secondary reference point, general industry survey data (companies across industries with revenues between $2.5 billion and $10 billion), from the 2023-24 Director Compensation Report from the National Association of Corporate Directors.

The study found that current Independent Director total compensation was positioned below median of Tapestry's peer group. The study also confirmed that Tapestry's use of stock options was unusual relative to the peer group and the broader market. The HR Committee recommended an increase to the target annual equity grant value to $200,000, to bring total Independent Director compensation to approximately the median of the peer group. The HR Committee also recommended to eliminate stock options and grant 100% of board equity compensation in RSUs. The Board approved these changes, which will be effective in November 2024 and will be reflected in next year's annual proxy statement.

tapestry

TABLE OF CONTENTS

## Director Stock Ownership Policy

Tapestry has a stock ownership policy for Independent Directors. Under the policy, each Independent Director is expected to accumulate Tapestry shares valued at five times the basic annual retainer ($100,000 during fiscal year 2024). The Board expects the minimum level of ownership to be achieved within five years of the date an Independent Director is appointed to the Board. Until the requirement is met, each Director is required to retain 50% of the net after-tax shares obtained from RSUs that vest and stock options that are exercised. Ownership for this calculation includes shares owned outright and shares equivalent to the after-tax value of unvested RSUs and the after-tax value of vested, unexercised, in-the-money stock options.

The Board has waived the Director Stock Ownership Policy for Ms. Long due to the complex regulatory framework for equity compensation in China.

As of the last measurement date (December 31, 2023):

- All Independent Directors were in compliance with the stock ownership policy;

- Messrs. Bilbrey and Cavens and Ms. Gates had achieved five times the basic annual retainer level of ownership; and

- Messrs. Greco and Lau and Mses. Faber and Lifford were making appropriate progress toward achieving the desired level of ownership (all have been Independent Directors for less than five years).

- Messrs. Elkins and Hourican were not yet members of the Board as of the measurement date.

## 2024 Director Compensation

Compensation paid in fiscal year 2024 for each Independent Director is detailed below:

| Name | Fees Earned or Paid in Cash ($) | Stock Awards[1] ($) | Option Awards[1] ($) | All Other Compensation[2] ($) | Total ($) |
|---|---|---|---|---|---|
| John P. Bilbrey | 112,391 | 84,996 | 84,992 | - | 282,380 |
| Darrell Cavens | 100,000 | 84,996 | 84,992 | 10,000 | 279,988 |
| David Denton[3] | 76,658 | - | - | - | 76,658 |
| David Elkins[3] | 8,791 | 84,984 | 85,008 | - | 178,783 |
| Hanneke Faber | 100,000 | 84,996 | 84,992 | - | 269,988 |
| Anne Gates | 325,000 | 84,996 | 84,992 | 12,000 | 506,988 |
| Thomas Greco | 135,000 | 84,996 | 84,992 | - | 304,988 |
| Kevin Hourican[3] | 8,791 | 84,984 | 85,008 | - | 178,783 |
| Alan Lau | 97,431 | 84,996 | 84,992 | - | 267,419 |
| Pamela Lifford | 100,000 | 84,996 | 84,992 | - | 269,988 |
| Annabelle Yu Long[4] | 270,000 | - | - | - | 270,000 |

*(1) Reflects the aggregate grant date fair value of all RSU awards and stock options, calculated according to FASB ASC Topic 718. The assumptions used in calculating the grant-date fair value of these awards are described in footnote 4 to the Summary Compensation Table. As of June 29, 2024, the last day of fiscal year 2024, each Independent Director held 3,189 unvested RSUs, except Messrs. Elkins and Hourican who held 1,816 unvested RSUs due to their joining grant upon appointment and Ms. Long, who does not hold RSUs. The outstanding stock options held by each Independent Director were: Mr. Bilbrey 42,905; Mr. Cavens 58,282; Mr. Denton 84,085; Mr. Elkins 5,280; Ms. Faber 28,346; Ms. Gates, 59,624; Mr. Greco, 28,764; Mr. Hourican 5,280; Mr. Lau 16,313 and Ms. Lifford, 28,764.*

*(2) Amounts shown in "All Other Compensation" are matching charitable contributions under the Company's Matching Gift Program.*

*(3) Mr. Denton did not stand for re-election to the Tapestry Board of Directors in November 2023; Messrs. Elkins and Hourican were appointed to the Tapestry Board of Directors in February 2024.*

*(4) In addition to the basic annual retainer, Ms. Long received a cash payment in lieu of stock options and RSUs considering regulatory requirements related to equity compensation in China.*

TABLE OF CONTENTS

 # *PROPOSAL 1: ELECTION OF DIRECTORS*

All of Tapestry's Directors are elected each year at the Annual Meeting by the stockholders. We do not have staggered elections of our Board members. Eleven Directors will be elected at this year's Annual Meeting. Each Director's term lasts until the 2025 Annual Meeting of Stockholders and until his or her successor has been duly elected and qualifies. All of the nominees are currently members of Tapestry's Board. Directors will be elected by a majority of the total votes cast "FOR" and "AGAINST" each nominee. The Board recommends that you vote FOR each of the Director nominees below.

If a nominee is unable to serve or for good cause will not serve as a Director, the proxy holders may vote for another nominee proposed by the Board, or the Board may reduce the number of Directors to be elected at the Annual Meeting. The following information is furnished with respect to each nominee for election as a Director. The ages of the nominees are as of September 27, 2024.

> THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "**FOR**" EACH OF THE BELOW NOMINEES FOR DIRECTOR.

## *Director Nominees*

| Name | Age | Position with Tapestry |
| --- | --- | --- |
| Anne Gates | 64 | Independent Chair of the Board of Directors |
| John P. Bilbrey | 68 | Director |
| Darrell Cavens | 51 | Director |
| Joanne Crevoiserat | 60 | Director and Chief Executive Officer |
| David Elkins | 56 | Director |
| Johanna (Hanneke) Faber | 55 | Director |
| Thomas Greco | 66 | Director |
| Kevin Hourican | 51 | Director |
| Alan Lau | 49 | Director |
| Pamela Lifford | 61 | Director |
| Annabelle Yu Long | 51 | Director |

### Director Qualifications, Skills and Experience

The Company does not set specific criteria for Directors, except to the extent required to meet applicable legal, regulatory and stock exchange requirements, including the independence requirements of the SEC and the NYSE. Nominees for Director will be selected on the basis of outstanding achievement in their personal careers, board experience, wisdom, integrity, ability to make independent, analytical inquiries, understanding of the business environment and willingness to devote adequate time to Board duties.

While the selection of qualified Directors is a complex and subjective process that requires consideration of many intangible factors, the GN Committee of the Board believes that each Director should have a basic understanding of (a) the principal operational and financial objectives, plans and strategies of the Company, (b) the results of operations and financial condition of the Company and its business, and (c) the relative standing of the Company and its business in relation to its competitors. The Board believes that each of its current Directors meet all of these qualifications, as well as the individual qualifications presented in each of their biographies.

tapestry

TABLE OF CONTENTS

**PROPOSAL 1: ELECTION OF DIRECTORS**

As reflected in the following chart, we believe our Director nominees offer a diverse range of key skills and experience to provide effective oversight of the Company and create long-term sustainable growth through successful execution of the Company's strategic initiatives

| Experience | John P. Bilbrey | Darrell Cavens | Joanne Crevoiserat | David Elkins | Hanneke Faber | Anne Gates | Thomas Greco | Kevin Hourican | Alan Lau | Pamela Lifford | Annabelle Yu Long | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Experience** | | | | | | | | | | | | |
| Prior Public Company Experience (directorships or executive officer) | • | • | • | • | • | • | • | • | | | • | 9 |
| **Executive Leadership** | | | | | | | | | | | | |
| Current Public Company CEO | | | • | | • | | | • | | | | 11 |
| Former Public Company CEO | • | • | | | | | • | | | | | |
| Other Senior Executive | | | | • | | • | | | • | • | • | |
| **Financial / Accounting Experience** | | | | | | | | | | | | |
| Financial Background (CFO, Treasurer, Accounting) | | | • | • | | • | | | | | | 11 |
| Oversight Financial Functions | • | • | • | • | • | • | • | | • | • | • | |
| Other Significant Experience | • | • | • | • | • | • | • | • | • | • | • | |
| Investment Experience | | • | | • | | | | | | | • | |
| **Industry Experience** | | | | | | | | | | | | |
| Artificial Intelligence (A.I.) | ❖ | ❖ | | | ❖ | ○ | ❖ | | | ○ | | 8 |
| Cyber / Information Security | ❖ | | | ❖ | ❖ | ○ | ❖ | ❖ | | | | 9 |
| Entrepreneurial / Innovation | | | ❖ | | ❖ | ❖ | ❖ | | ❖ | | ❖ | 9 |
| Global / International | | ❖ | ❖ | | | ❖ | ❖ | ❖ | ❖ | | ❖ | 11 |
| Human Capital Management | ❖ | ❖ | ❖ | ❖ | ❖ | ❖ | ❖ | ❖ | | ❖ | | 10 |
| Industry (Retail / Consumer Products) | | | | | | ❖ | ❖ | ❖ | | | ❖ | 11 |
| Marketing & Branding | ❖ | ❖ | ❖ | ❖ | | ❖ | | ❖ | ❖ | | | 10 |
| Mergers & Acquisitions | ❖ | | | | ❖ | | ❖ | | ❖ | | ❖ | 9 |
| Supply Chain / Manufacturing | ❖ | ❖ | ❖ | | ❖ | ❖ | ❖ | ❖ | | | | 8 |
| Technology / Digital / E-commerce | ❖ | | ❖ | ❖ | | ❖ | ❖ | ❖ | ❖ | ❖ | ❖ | 11 |
| Corporate Responsibility | | | | | | | | | | | | |
| Environmental | | | ❖ | | ❖ | ○ | ❖ | ❖ | | ❖ | | 7 |
| Social | | | ❖ | | ❖ | ❖ | ❖ | ❖ | | ❖ | | 8 |
| Governance | ❖ | ❖ | ❖ | | ❖ | ❖ | ❖ | ❖ | | ❖ | ❖ | 11 |

❖ Direct Experience    ❖ Managing / Overseeing    ○ Continuing Education

tapestry

TABLE OF CONTENTS

**PROPOSAL 1: ELECTION OF DIRECTORS**



# JOHN P. BILBREY (J.P.)

**Age:** 68 • **Director since** 2020 • **Independent**
**Committees:** Human Resources, Governance and Nominations

**Business Experience:**

》 Executive Chairman of Olaplex Holdings, Inc. (July 2023 - Current)

》 The Hershey Company (2003 - 2017)

President and Chief Executive Officer (2011 - 2017); Executive Vice President and Chief Operating Officer (2010 - 2011); Senior Vice President, President Hersey North America (2007 - 2010); Senior Vice President, President Hershey International (2003 - 2007)

**U.S. Public Board Memberships:**

*Current*

Colgate-Palmolive

Elanco Animal Health

Olaplex

*Previous (past five years)*

Campbell Soup Company

Mr. Bilbrey is qualified to serve as a Director based on his experience as the chief executive officer of a large, publicly-traded company as well as his strong operational and financial background in consumer facing industries.

Mr. Bilbrey holds a Bachelor of Science in Psychology from Kansas State University.



# DARRELL CAVENS

**Age:** 51 • **Director since** 2018 • **Independent**
**Committees:** Human Resources

**Business Experience:**

》 President of New Ventures, Qurate Retail Group (2017 - 2018)

》 President and Chief Executive Officer, Zulily, Inc., (2009 - 2017)

》 Director, SQL Server / BizTalk Server Microsoft (2008 - 2009)

》 Chief Technology Officer and Senior Vice President, Marketing, Blue Nile (1999 - 2008)

| **U.S. Public Board Memberships:** | **Other Experience and Community Involvement:** |
|---|---|
| *Previous (past five years)* | Rad Power Bikes |
| Big Sky Growth Partners | Vouched |
| | Brooks Running |

Mr. Cavens is qualified to serve as a Director based on his experience as the chief executive officer and co-founder of a large, publicly-traded company, his strong background in online retailing, technology and data analytics and his understanding of the retail industry.

Mr. Cavens attended the University of Victoria.

TABLE OF CONTENTS

PROPOSAL 1: ELECTION OF DIRECTORS



# JOANNE CREVOISERAT

**Age:** 60  •  **Director since** 2020  •  **Chief Executive Officer and Director**

**Business Experience:**

» Tapestry, Inc. (2019 - Current)

  » Chief Executive Officer (2020 - Current); Chief Financial Officer (2019 - 2020)

» Abercrombie & Fitch Co. (2014 - 2019)

  » Executive Vice President and Chief Operating Officer (2017 - 2019); Chief Financial Officer (2014 - 2017)

» Prior to 2014, Senior level finance positions at Kohl's, Wal-mart Stores and May Department Stores, including Chief Financial Officer, Filene's, Foley's and Famous-Barr.

| **U.S. Public Board Memberships:** | **Other Experience and Community Involvement:** |
| --- | --- |
| **Current** | Partnership for New York |
| General Motors | The Fashion Pact |
| **Previous** (*past five years*) | |
| At Home Group | |

Ms. Crevoiserat is uniquely qualified to serve as a Director based on her experience in the management of the Company and oversight of strategic planning and operations, as well as her significant financial expertise and experience in the retail industry.

Ms. Crevoiserat holds a Bachelor of Science in Finance from the University of Connecticut.



# DAVID ELKINS

**Age:** 56  •  **Director since** 2024  •  **Independent**
**Committees:** Audit

**Business Experience:**

» Executive Vice President and Chief Financial Officer, Bristol Myers Squibb (2019 - Current)

» Executive Vice President and Chief Financial Officer, Celgene Corporation (2018 - 2019)

» Chief Financial Officer, Johnson & Johnson's (J&J) Consumer Products (2014 - 2017)

» Chief Financial Officer, Round Rock Research LLC (2012 - 2014)

» Executive Vice President and Chief Financial Officer, Becton Dickinson & Company (2008 - 2012)

» Vice President and Chief Financial Officer, North America & Global Marketing, AstraZeneca (2001 - 2008)

Mr. Elkins is qualified to serve as a Director based on his experience as an executive officer of a large, publicly-traded consumer-facing company, his extensive financial background and M&A experience.

Mr. Elkins holds a Bachelor's degree in Economics from the University of Delaware, an M.S. degree from the University of Pennsylvania, and an M.B.A. from Drexel University.

TABLE OF CONTENTS

**PROPOSAL 1: ELECTION OF DIRECTORS**



# HANNEKE FABER

**Age:** 55  •  **Director since** 2021  •  **Independent**
**Committees:** Audit

**Business Experience:**

» Chief Executive Officer, Logitech International S.A. (2023 - Current)

» Unilever PLC (2018 - 2023)

» President Global Nutrition (2022 - 2023); President Global Foods & Refreshment (2019 - 2022); President Europe (2018 - 2019)

» Royal Ahold Delhaize (2013 - 2017)

» Chief Innovation & eCommerce Officer (2016 -2017); Chief Commercial Officer (2013 - 2016)

» Prior to 2013, Vice President and Global Leader, The Procter and Gamble Company

**U.S. Public Board Memberships:**

**Current**

Logitech

**Previous (*past five years*)**

Bayer AG

Ms. Faber is qualified to serve as a Director based on her experience as a senior executive of large global publicly-traded companies and her nearly 30 years of experience in technology, consumer goods and retail.

Ms. Faber holds a Bachelor of Journalism and Master of Business Administration from the University of Houston.

tapestry

TABLE OF CONTENTS

**PROPOSAL 1: ELECTION OF DIRECTORS**

# ANNE GATES



**Age:** 64    •    **Director since** 2017    •    **Independent Chair**
**Committees:** Audit, Governance and Nominations

**Business Experience:**

》 President, MGA Entertainment (2014 - 2017)

》 The Walt Disney Company (1991 - 2012)

Executive Vice President and Chief Financial Officer for Disney Consumer Products; Managing Director for Disney Consumer Products Europe and Emerging Markets; Senior Vice President of Operations, Planning, and Analysis

| **U.S. Public Board Memberships:** | **Other Experience and Community Involvement:** |
|---|---|
| **Current** | Packard Foundation |
| The Kroger Company | Save the Children |
| Raymond James Financial, Inc. | Salzburg Global Seminar |
| | Public Media Group of Southern California |

Ms. Gates is qualified to serve as a Director and Board Chair based on her business acumen, financial literacy and her broad background in finance, marketing, strategy and business development, including growing international business, and her understanding of the retail and consumer products industries.

Ms. Gates holds a Bachelor of Arts in Mathematics from the University of California, Berkeley, and an M.Sc. in Operations Research from Columbia University.

TABLE OF CONTENTS

**PROPOSAL 1: ELECTION OF DIRECTORS**

## THOMAS GRECO



**Age:** 66  •  **Director since** 2020  •  **Independent**
**Committees:** Audit, Governance and Nominations

**Business Experience:**

》 Advance Auto Parts (2016 - 2024)

  》 Strategic Advisor at Advance Auto Parts (2023 - 2024); Chief Executive Officer (2016 - 2023)

》 Chief Executive Officer of Frito-Lay North America unit of PepsiCo (2011 - 2016)

》 Various leadership positions at The Procter & Gamble Company (1986 - 2011)

| **U.S. Public Board Memberships:** | **Other Experience and Community Involvement:** |
|---|---|
| Current | Sabra Dipping Company |
| Centene Corporation | |
| Previous (*past five years*) | |
| Advance Auto Parts | |

Mr. Greco is qualified to serve as a Director based on his extensive leadership experience, including his role as CEO of a large public company, and his background in strategy, supply chain and logistics.

Mr. Greco holds a Bachelor of Commerce degree form Laurentian University in Sudbury, Ontario and a Master of Business Administration from the Richard Ivey School of Business in London, Ontario.

## KEVIN HOURICAN



**Age:** 51  •  **Director since** 2024  •  **Independent**
**Committees:** Human Resources

**Business Experience:**

》 Chair of the Board and Chief Executive Officer, Sysco (February 2020 - Current)

》 Executive Vice President, CVS Health and President, CVS Pharmacy (2012 - 2020)

》 Senior Vice President and Regional Director of Stores, Macy's (2006 - 2012)

**U.S. Public Board Memberships:**

Current

Sysco Corporation

Mr. Hourican is qualified to serve as a Director based on his experience as the chief executive officer of a large, publicly-traded company as well as his strong operational and supply chain experience.

Mr. Hourican holds an undergraduate degree in Economics and a master's degree in Supply Chain Management from The Pennsylvania State University.

tapestry

TABLE OF CONTENTS

**PROPOSAL 1: ELECTION OF DIRECTORS**

## ALAN LAU



**Age:** 49  •  **Director since** 2023  •  **Independent**
**Committees:** Audit

**Business Experience:**

» Chief Business Officer for Animoca Brands (2022 - Current)

» Chairman and CEO of Tencent WeSure (2016 - 2022)

» Various roles, most recent, Senior Partner; Asia head for McKinsey Digital (1997 - 2016)

**Other Experience and Community Involvement:**
Vice-chair of M+ in Hong Kong
Co-chair of the Asia committees at both the Tate and
the Guggenheim

Mr. Lau is qualified to serve as a Director based on his broad experience in engaging consumers across digital channels and leveraging technology and data analytics, as well as his deep knowledge of the important China market.

Mr. Lau holds a master's degree in Engineering from Oxford University.

## PAMELA LIFFORD

**Age:** 61  •  **Director since** 2020  •  **Independent**
**Committees:** Human Resources

**Business Experience:**

» President, Global Brands, Franchises, and Experiences, Warner Bros. Discovery (2016 - 2023)

» Executive Vice President, Global Licensing, Quicksilver (2013 - 2015)

» Executive Vice President, General Manager Global Fashion/Home/Infant - Disney Consumer Products, The Walt Disney Company (2000 - 2012)

Ms. Lifford is qualified to serve as a Director based on her unique and proven abilities to create global lifestyle brands through successful collaborations andher extensive experience in retail and licensing.

TABLE OF CONTENTS

**PROPOSAL 1: ELECTION OF DIRECTORS**

## ANNABELLE YU LONG



**Age:** 51  •  **Director since** 2016  •  **Independent**

**Business Experience:**

》 Founding and Managing Partner of BAI Capital (2021 - Current)

》 Bertelsmann (2008 - Current)

Bertelsmann Group Management Committee (2011 - Current); Chief Executive Officer of Bertelsmann China Corporate Center (2008 - 2020); Managing partner of Bertelsmann Asia Investments (2008 - 2020); Founding and Managing partner of Bertelsmann Asia Investments (2008 - 2020); Bertelsmann Digital Media Investments & Bertelsmann Asia Media Development (2007); Bertelsmann Entrepreneur Program (2005 - 2006)

| U.S. Public Board Memberships: | Other Experience and Community Involvement: |
|---|---|
| **Current** | The Hongkong and Shanghai Banking Corporation Limited, Independent Director |
| Nio Inc. | Limon Media Limited, Independent Director |
| LexinFintech Holdings Ltd. | Governor of China Venture Capital and Private Equity Association |

Ms. Long is qualified to serve as a Director based on her insight about the Chinese consumer and knowledge of and experience with the media landscape in China, along with her track record of investing in digital and lifestyle companies.

Ms. Long holds a bachelor's degree in electrical engineering from the University of Electronic Science and Technology in China and an MBA from Stanford Graduate School of Business.

**TABLE OF CONTENTS**



# *PROPOSAL 2: RATIFICATION OF APPOINTMENT OF OUR INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM*

This section should be read in conjunction with the *Audit Committee Report* presented below.

## Ratification of Appointment of Auditors; Attendance at Meetings

The Audit Committee of Tapestry's Board has appointed Deloitte & Touche LLP ("D&T") as our independent registered public accounting firm for fiscal year 2025. We are asking stockholders to ratify the appointment of D&T as our independent registered public accounting firm at the Annual Meeting. Representatives of D&T are expected to be present at the virtual Annual Meeting. They will have the opportunity to make a statement if they desire to do so and are expected to be available to respond to appropriate questions.

Our Bylaws do not require that the stockholders ratify the appointment of D&T as our independent auditors. However, we are submitting the appointment of D&T to the stockholders for ratification as a matter of good corporate practice. If the stockholders do not ratify the appointment, the Board and the Audit Committee will consider this fact when it appoints the independent auditors for the fiscal year ending June 27, 2026

("fiscal year 2026"). Even if the appointment of D&T is ratified, the Audit Committee retains the discretion to appoint a different independent auditor at any time if it determines that such a change is in the best interests of the Company. At this time, the Board and the Audit Committee believe that the continued retention of D&T to serve as our independent auditors is in the best interest of the Company.

Ratification of the appointment of D&T requires "FOR" votes from a majority of the votes cast on the matter at the Annual Meeting.

> THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "**FOR**" THE RATIFICATION OF D&T AS OUR INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR FISCAL YEAR 2025.

## Fees for Audit and Other Services

The aggregate fees for professional services rendered by D&T for the fiscal years ended July 1, 2023 and June 29, 2024 were approximately as follows:

| | Fiscal Year 2023 | Fiscal Year 2024 |
|---|---|---|
| Audit Fees[1] | $5,833,000 | $5,842,000 |
| Audit-Related Fees[2] | 124,000 | 384,000 |
| Tax Fees[3] | 666,000 | 1,328,000 |
| All Other Fees[4] | 8,000 | 4,000 |

*(1) Includes the audit of the Company's annual consolidated financial statements and internal control over financial reporting, reviews of quarterly financial statements and audits of statutory filings.*

*(2) Includes registration statement procedures, other accounting consultations and an audit of the employee benefit plan.*

*(3) Includes fees for professional services related to national tax consulting services.*

*(4) Includes fees for professional services related to HR advisory services.*

## Audit Committee Pre-Approval Policy

The Audit Committee is responsible for approving audit fees and is required to pre-approve all services provided by the independent auditors to assure that these services do not impair the auditor's independence. Under the Audit Committee pre-approval policy for external auditors (the "Policy"), updated in 2016, the Audit Committee must pre-approve all audit and non-audit services provided by the independent auditor. The Policy sets forth the procedures and conditions for such pre-approval of services to be performed by the independent auditor. The Policy utilizes both a framework of general pre-approval for certain specified services and specific pre-approval for all other

services. Services that do not meet the Policy will require specific review and approval by the Audit Committee. In addition, when the scope of services being provided (and the related fees) meaningfully change, Tapestry and the independent auditors will provide an update to the Audit Committee. All services described in the table above have been approved by the Audit Committee or the Audit Committee Chair through the Policy or on an engagement-by-engagement basis.

The Audit Committee considered the services listed above to be compatible with maintaining D&T's independence.

TABLE OF CONTENTS

 # *AUDIT COMMITTEE REPORT*

The Audit Committee (the "Audit Committee") of the Board of Directors of Tapestry, Inc. ("Tapestry") is responsible for overseeing Tapestry's accounting and financial reporting principles and policies, financial statements and the independent audit thereof and Tapestry's internal audit controls and procedures. The Audit Committee is also responsible for selecting and evaluating the independence of Tapestry's independent auditors and for pre-approving the audit and non-audit services rendered by the independent auditors. Management has the primary responsibility for the financial statements and the reporting process, including Tapestry's systems of internal controls. The independent auditors are responsible for auditing the annual consolidated financial statements prepared by management and expressing an opinion as to whether those financial statements conform with accounting principles generally accepted in the United States of America as well as expressing an opinion on the effectiveness of internal control over financial reporting.

The Audit Committee reviewed and discussed the audited consolidated financial statements for the fiscal year ended June 29, 2024 with management and Tapestry's independent auditors. These discussions included a review of the reasonableness of significant judgments, the quality, not just acceptability, of Tapestry's accounting principles and such other matters as are required to be discussed with the Audit Committee. Tapestry's independent auditors discussed their independence and also provided to the Audit Committee the written disclosures required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent auditor's communications with the Audit Committee concerning independence. The Audit Committee has discussed with the independent auditors the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the Securities and Exchange Commission ("SEC").

Based upon the review and discussions described in this report, the Audit Committee recommended to the Board of Directors of Tapestry that the audited financial statements be included in Tapestry's Annual Report on Form 10-K for the fiscal year ended June 29, 2024 that has been filed with the SEC.

**Audit Committee**
Thomas Greco, Chair
David Elkins*
Hanneke Faber
Anne Gates
Alan Lau

*\* Mr. Elkins joined the Audit Committee effective February 29, 2024.*

**tapestry**

**TABLE OF CONTENTS**

# *EXECUTIVE OFFICERS*

The following table sets forth information regarding each of Tapestry's executive officers as of September 27, 2024:

| Name | Age | Position |
|------|-----|----------|
| Joanne Crevoiserat[1] | 60 | Chief Executive Officer |
| David Howard | 49 | General Counsel and Secretary |
| Todd Kahn | 60 | Chief Executive Officer and Brand President, Coach |
| Denise Kulikowsky | 56 | Chief People Officer |
| Scott Roe | 59 | Chief Financial Officer and Chief Operating Officer |

*(1) Information regarding Ms. Crevoiserat is listed under Proposal 1: Election of Directors.*

***David Howard*** has served as General Counsel since June 2020, and Secretary since August 2020. He previously served as Senior Vice President, Deputy General Counsel and Assistant Secretary from August 2018 through May 2020 and held several key roles in the Law Department since joining the Company in January 2011. Prior to joining the Company, from June 2008 to January 2011, Mr. Howard served as Associate General Counsel and Assistant Corporate Secretary at Mirant Corporation. From 2002 to 2008, Mr. Howard was a corporate attorney at Arnall Golden Gregory, LLP, and from 1997 to 1999, Mr. Howard practiced public accounting with Arthur Andersen LLP. Mr. Howard holds a Bachelor and Master of Science degrees in Accounting from Wake Forest University and a Juris Doctor from the University of Georgia School of Law. Mr. Howard is also a Certified Public Accountant.

***Todd Kahn*** has served as Chief Executive Officer and Brand President, Coach since April 2021 after having served as the Interim Chief Executive Officer and Brand President since July 2020 and having led the revenue generating business units of the brand since March 2020. He joined the Company as Senior Vice President, General Counsel and Secretary in January 2008 and held a number of successively senior roles, including Chief Legal Officer until March 2020, Company Secretary until August 2020, and President and Chief Administrative Officer from May 2016 until April 2021. Prior to joining the Company, Mr. Kahn held leadership positions at several public and private companies. Mr. Kahn holds a Bachelor of Science degree from Touro College and a Juris Doctor from Boston University Law School.

***Denise Kulikowsky*** has served as Chief People Officer since joining the Company in October 2023. She previously worked at Party City Holdings Inc. from 2018 to 2023, serving first as the Chief Human Resources Officer and then as the Chief People and Administrative Officer. From 2015 to 2018, Ms. Kulikowsky was the Vice President, Global Human Resources for The Estee Lauder Companies, Inc. Prior to joining The Estee Lauder Companies, she held several senior human resources positions at Gap Inc. Ms. Kulikowsky holds a Bachelor of Science degree in Psychology from Fordham University and a Master's degree in Counseling from The University of Pennsylvania.

***Scott Roe*** has served as Chief Financial Officer since joining the Company in June 2021, and as Chief Financial Officer and Chief Operating Officer since August 2022. He also served as Head of Strategy from June 2021 until August 2022. Mr. Roe joined the Company from VF Corporation, where he served as Chief Financial Officer since April 2015, and as Executive Vice President since March 2019. Prior to his appointment as CFO in 2015, Mr. Roe served in a number of senior management positions since joining VF Corporation in 1996. Before joining VF Corporation, Mr. Roe worked in the OEM Automotive and Basic Materials industries after beginning his career at Ernst & Young. Mr. Roe holds a Bachelor of Science degree in Accounting from the University of Tennessee.

TABLE OF CONTENTS

 *TAPESTRY STOCK OWNERSHIP BY CERTAIN BENEFICIAL OWNERS AND MANAGEMENT*

The table below presents information, as of August 31, 2024, except as otherwise noted below, with respect to the beneficial ownership of Tapestry's common stock by each stockholder known to us to be the beneficial owner of more than 5% of our common stock, each Director and Director nominee, our NEOs, and all Directors, NEOs and all executive officers as a group. Except as otherwise noted, the persons named in the table below have sole voting and investment power with respect to all shares shown as beneficially owned by them. The beneficial ownership percentages set forth in the table below are based on 232,603,020 shares of Tapestry common stock outstanding as of August 31, 2024. Unless otherwise indicated, the address of each individual listed below is c/o Tapestry, Inc., 10 Hudson Yards, New York, New York 10001.

In general, "beneficial ownership" by an individual or entity includes those shares an individual or entity has the power to vote, or the power to transfer, and stock options or other derivative securities that are exercisable currently or will become exercisable within 60 days; however, shares exercisable within 60 days are not considered outstanding for purposes of computing the percentage of ownership of any other individual or entity. Where indicated, the beneficial ownership described below includes share unit balances held under Tapestry's stock incentive plans and Non-Qualified Deferred Compensation Plan for Outside Directors. The value of share units and share equivalents mirrors the value of Tapestry's common stock. The amounts ultimately realized by the Directors will reflect all changes in the market value of Tapestry common stock from the date of deferral or accrual until the date of payout. The share equivalents do not have voting rights but are credited with dividend equivalents, if any, which will be forfeited if the underlying award forfeits.

| Beneficial Owner | Shares owned | Percent of Class (%) |
|---|---|---|
| Vanguard[1] | 31,495,231 | 13.54 |
| Blackrock[2] | 15,383,458 | 6.62 |
| FMR[3] | 13,272,133 | 5.71 |
| Joanne Crevoiserat[4] | 1,216,106 | * |
| Scott Roe[5] | 165,852 | * |
| Liz Fraser[6] | 174,769 | * |
| David Howard[7] | 91,452 | * |
| Todd Kahn[8] | 823,187 | * |
| John P. Bilbrey[9] | 73,775 | * |
| Darrell Cavens[10] | 69,159 | * |
| David Elkins[11] | - | * |
| Hanneke Faber[12] | 23,404 | * |
| Anne Gates[13] | 63,287 | * |
| Thomas Greco[14] | 31,036 | * |
| Kevin Hourican[15] | - | * |
| Alan Lau[16] | 7,871 | * |
| Pamela Lifford[17] | 25,386 | * |
| Annabelle Yu Long [18] | - | * |
| All Directors and Executive Officers as a Group (16 people)[19] | 2,765,284 | 1.18 |

*Less than 1%.*

*(1) The Vanguard Group ("Vanguard"), as of December 31, 2023, possessed shared voting power with respect to 233,758 securities, sole dispositive power with respect to 30,689,950 securities and shared dispositive power with respect to 805,281 securities, based on a Schedule 13G/A filed with the SEC on February 13, 2024. Vanguard is located at 100 Vanguard Boulevard, Malvern, PA 19355.*

**tapestry**

TABLE OF CONTENTS

**TAPESTRY STOCK OWNERSHIP BY CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

*(2) Blackrock, Inc. ("Blackrock"), as of December 31, 2023, possessed sole voting power with respect to 14,704,452 securities and sole dispositive power with respect to 15,383,458 securities, respectively, based on a Schedule 13G/A filed with the SEC on January 26, 2024. Blackrock is located at 50 Hudson Yards, New York, New York 10001.*

*(3) FMR LLC ("FMR") as of December 31, 2023, possessed sole voting power with respect to 12,865,630 securities and sole dispositive power with respect to 13,272,133 securities, respectively, based on a Schedule 13G/A filed with the SEC on February 9, 2024. FMR is located at 245 Summer Street, Boston, Massachusetts 02210.*

*(4) Includes 885,158 shares of common stock that may be purchased within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(5) Includes 133,033 shares of common stock that may be purchased within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(6) Includes 125,177 shares of common stock that may be purchased within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(7) Includes 44,682 shares of common stock that may be purchased within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(8) Includes 648,803 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(9) Includes 32,603 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(10) Includes 47,980 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(11) Mr. Elkins joined the Board in February 2024.*

*(12) Includes 18,044 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(13) Includes 49,322 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(14) Includes 18,462 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(15) Mr. Hourican joined the Board in February 2024.*

*(16) Includes 6,011 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(17) Includes 18,462 shares of common stock that may be acquired within 60 days of August 31, 2024 pursuant to the exercise of options.*

*(18) Ms. Long receives cash payments, in lieu of equity awards, due to complex regulatory requirements related to equity compensation in China.*

*(19) Reflects ownership of all Directors, NEOs, and the Company's other executive officers not listed individually in the table above as a group. Includes 2,027,737 shares subject to options exercisable within 60 days of August 31, 2024.*

TABLE OF CONTENTS



# *PROPOSAL 3: ADVISORY VOTE TO APPROVE THE COMPANY'S EXECUTIVE COMPENSATION*

The Board is committed to sound compensation governance and recognizes the interest of stockholders in executive compensation matters. On an annual basis, we provide our stockholders with an opportunity to cast an advisory vote to approve the compensation of our Named Executive Officers, or NEOs, as described in the *Compensation Discussion and Analysis* section beginning on page 37 and the *Executive Compensation* section beginning on page 61 in this proxy statement.

As this is an advisory vote, the result will not be binding on the Company, the Board or the HR Committee. However, the Board and HR Committee value the opinions expressed by our stockholders through their vote on this proposal, and the HR Committee will take into account the outcome of the advisory vote when evaluating the effectiveness of our compensation policies and practices and when making future compensation decisions for NEOs.

At our 2023 Annual Meeting of Stockholders, approximately 94% of the votes cast were in favor of our advisory vote on executive compensation. The HR Committee believes this result reflected strong stockholder support for our executive compensation programs and decisions.

We believe our people are our greatest differentiator and our executive compensation programs are designed to attract, motivate and retain individuals who are critical to our success. Tapestry's pay-for-performance philosophy regarding executive compensation is straightforward: reward our executives for their contributions to the Company's annual and long-term performance by tying a significant portion of their total compensation to key business drivers and stockholder value. Reflecting this philosophy, a significant portion of executive compensation is subject to increase when results exceed target, reduction when results fall below target and elimination if results do not achieve a threshold level of performance.

The variable short-term and long-term incentive plans are designed to incentivize and reward management for delivering results that prioritize sustainable brand health and maximize stockholder value creation.

We believe the Tapestry compensation programs are deserving of stockholder support. Stockholders are urged to read the *Executive Compensation* and *Compensation Discussion and Analysis* sections of this proxy statement, which describes our executive compensation philosophy and programs in greater detail, as well as compensation decisions made by the HR Committee for our NEOs with respect to fiscal year ended 2024.

## Say on Pay Proposal

The Board recommends that stockholders vote FOR the following resolution:

"RESOLVED, that the stockholders approve, on an advisory non-binding vote basis, the compensation of the Company's Named Executive Officers, as discussed and described in the proxy statement for the 2024 Annual Meeting of Stockholders pursuant to the compensation disclosure rules of the SEC, set forth in Item 402 of Regulation S-K, including the Compensation Discussion and Analysis and the accompanying executive compensation tables and narrative discussion."

Adoption of the above resolution requires "FOR" votes from a majority of the votes cast on the matter at the Annual Meeting.

> THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "**FOR**" THE RESOLUTION APPROVING THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS.

tapestry

TABLE OF CONTENTS

 *COMPENSATION DISCUSSION AND ANALYSIS*

This *Compensation Discussion and Analysis* describes the compensation program for our NEOs for fiscal year 2024:

| Name | Title |
|------|-------|
| Joanne Crevoiserat | Chief Executive Officer |
| Scott Roe | Chief Financial Officer and Chief Operating Officer |
| Todd Kahn | Chief Executive Officer and Brand President, Coach |
| Liz Fraser [1] | Chief Executive Officer and Brand President, Kate Spade |
| David Howard | General Counsel and Secretary |

*(1) Ms. Fraser left the Company on September 2, 2024.*

This *Compensation Discussion and Analysis* is divided into the following sections:

| | Page |
|------|------|
| Executive Summary | 38 |
| What We Pay and Why | 42 |
| Fiscal Year 2024 Compensation | 46 |
| Other Compensation and Benefit Elements | 54 |
| Compensation Decision Making Process | 55 |
| Additional Information | 57 |

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

## *Executive Summary*

### Fiscal Year 2024 Performance

Through our unwavering focus on powering innovation and consumer connections, Tapestry meaningfully advanced its strategic agenda during fiscal year 2024, delivering strong financial results highlighted by constant currency topline gains, significant gross margin expansion, double-digit adjusted EPS growth, and robust cash flow generation.

This success has been driven by Tapestry's passionate global teams whose creativity and exceptional execution continue to fuel Tapestry's brands and business.

Tapestry also remained committed to creating value for stockholders, returning $321 million in fiscal year 2024 through a quarterly cash dividend of $0.35 per common share, for an annual dividend rate of $1.40 per share. Looking ahead to fiscal year 2025, Tapestry's Board approved a quarterly cash dividend of $0.35 per common share in August 2024 and expects to maintain an annual dividend rate of $1.40 per common share.

### Financial Results

Select Tapestry, Inc. fiscal year 2024 financial results include:

| Measure | Fiscal Year 2024 Results[1] ($ in millions, except per share amounts) | | | |
| | GAAP | Non-GAAP [2] | Change Versus Fiscal Year 2023 on a GAAP Basis | Change Versus Fiscal Year 2023 on a Non-GAAP Basis [2] |
| --- | --- | --- | --- | --- |
| Net sales | $6,671.2 | $6,748.5 | 0.2% | 1.3% |
| Diluted earnings per share | $ 3.50 | $ 4.29 | (9.8)% | 10.6% |
| Annual cash dividend | $1.40 per share as of fiscal year 2024 | | +$0.20 per share since fiscal year 2023 | |
| Total Shareholder Return[3] | 1-year: 3.74% | | 3-year cumulative: 10.13% | |

*(1) See Appendix A for a reconciliation of non-GAAP financial measures to our results as reported under Generally Accepted Accounting Principles ("GAAP"). See page 37 of the Company's Annual Form 10-K for a reconciliation of non-GAAP Diluted earnings per share to GAAP.*

*(2) Non-GAAP revenue / growth vs. fiscal year 2023 presented on a constant currency basis.*

*(3) Total Shareholder Return ("TSR") includes dividends reinvested.*

tapestry

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

## Fiscal Year 2024 Compensation Actions and Organizational Changes

We believe our people are our greatest competitive differentiator. In fiscal year 2023 we instituted significant changes to our annual and long term incentive plans to further support sustainable brand health and maximize TSR.

Therefore, as we entered fiscal year 2024, we did not implement significant changes in our executive compensation plan design or philosophy (for detail, see the "Fiscal 2024 Compensation Program Highlights" table on page 45). Consistent with our practice since fiscal year 2023, we did not

provide annual cyclical merit increases for our key leadership positions, including our NEOs. Rather, we continued to only provide targeted merit increases if warranted considering annual market benchmarking analysis.

Denise Kulikowsky joined the Company in October 2023 as Tapestry's Chief People Officer. Additionally, on September 2, 2024, Liz Fraser, CEO and Brand President of Kate Spade left the Company.

## Performance-Based Compensation

Our financial results in fiscal year 2024 were strong despite a challenging macroeconomic environment and softened consumer demand in certain regions.

- At the enterprise level, Tapestry performance was above targets established by the HR Committee, and therefore our NEOs earned 132% of target payout under the plan for the Tapestry portion of their 2024 AIP results.

- Results for the Coach brand were above the target levels, and the results for the kate spade new york brand were between threshold and target performance levels. Therefore, Mr. Kahn (the NEO tied to Coach segment) earned 165% of target payout for Coach brand portion of his 2024 AIP results, and Ms. Fraser (the NEO tied to kate spade segment) earned 70% of target payout for kate spade new york brand portion of her 2024 AIP results.

- The Company also made strong progress against advancing EI&D objectives that could modify AIP payout from 0% to -10%. For our NEOs, the fiscal 2024 result was a -1% modifier to the calculated AIP result based on the financial performance goals, based on the HR Committee evaluation of success versus pre-defined objectives.

Although there were no Annual PRSU (the "Annual PRSU") performance periods completed during fiscal year 2024 (due to legacy two-year performance periods prior to fiscal year 2023), there are currently two outstanding Annual PRSU awards tied to Sales, Average Return on Invested Capital ("ROIC") and relative TSR for fiscal years 2023-2025 and fiscal years 2024-2026 awarded to approximately 50 corporate leaders, including our NEOs.

tapestry

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

The following table summarizes the status of NEO incentive plan awards as of the end of fiscal year 2024:

| Grant/Pay Date | Award Type | Performance Period (Fiscal Years) | Named Executive Officers | Performance Targets ☐ = In progress ☒ = Not Achieved ☑ = Achieved | Payout as a % of Target |
|---|---|---|---|---|---|
| August 2024 | Annual Incentive Plan | 2024 | Joanne Crevoiserat, Scott Roe, David Howard | ☑ Tapestry Net Sales<br>☑ Tapestry Operating Income<br>☑ Tapestry Gross Margin<br>☑ Equity, Inclusion & Diversity | Performance Period Complete: 130.5% Payout |
| August 2024 | Annual Incentive Plan | 2024 | Todd Kahn | ☑ Tapestry Net Sales<br>☑ Tapestry Operating Income<br>☑ Tapestry Gross Margin<br>☑ Coach Net Sales<br>☑ Coach Operating Income<br>☑ Coach Gross Margin<br>☑ Equity, Inclusion & Diversity | Performance Period Complete: 150% Payout |
| August 2024 | Annual Incentive Plan | 2024 | Liz Fraser | ☑ Tapestry Net Sales<br>☑ Tapestry Operating Income<br>☑ Tapestry Gross Margin<br>☒ Kate Spade Net Sales<br>☒ Kate Spade Operating Income<br>☑ Kate Spade Gross Margin<br>☑ Equity, Inclusion & Diversity | Performance Period Complete: 93.8% Payout |
| August 2022 | Annual PRSU | 2023 - 2025 | Joanne Crevoiserat, Scott Roe, Todd Kahn, Liz Fraser, David Howard | ☐ Cumulative Sales<br>☐ Average Return on Invested Capital (ROIC)<br>☐ Relative TSR | Performance Period In Progress |
| August 2023 | Annual PRSU | 2024 - 2026 | Joanne Crevoiserat, Scott Roe, Todd Kahn, Liz Fraser, David Howard | ☐ Cumulative Sales<br>☐ Average Return on Invested Capital (ROIC)<br>☐ Relative TSR | Performance Period In Progress |

## Results of Stockholder Advisory Vote to Approve Executive Compensation and the HR Committee's Response to Stockholder Feedback

At our 2023 Annual Meeting of Stockholders, approximately 94% of the votes cast were in favor of our advisory vote on executive compensation. Management and the HR Committee reviewed our stockholders' affirmative 2023 Say on Pay vote and believe it indicates strong support for our current executive compensation program and practices.

Ahead of the 2023 Annual Meeting of Stockholders, we reached out to approximately 40 stockholders, representing approximately 70% of shares outstanding. Although our investors did not express concerns in advance of our 2023 Annual Meeting of Stockholders, we continued engagement with our stockholders on a number of issues throughout fiscal year 2024 to understand their perspectives on the Company's executive compensation program and other items of interest or concern. Our stockholders expressed support for our overall executive compensation program and for our continued use of EI&D goals under our AIP that we believe support our targeted business results.

After the close of fiscal year 2020, several investors provided feedback regarding our historical and forward-looking burn rate under the 2018 Stock Incentive Plan. Based on these conversations and consistent with the feedback received from stockholders, the Company and the HR Committee, which serves as administrator of the 2018 Stock Incentive Plan, committed to maintain an unadjusted burn rate at or below 2.0% annually for its fiscal years 2022 through 2024. In fiscal year 2024 our burn rate (calculated as full value shares and stock options granted during the fiscal year divided by weighted average common shares outstanding excluding share repurchases) was 1.7%.

Our engagement with stockholders is valuable and informative and we intend to continue discussions to further understand our investors' perspective on our executive compensation program and other governance matters.

**40 | 2024 PROXY STATEMENT**

tapestry

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

## Executive Compensation Practices

Tapestry's executive compensation philosophy is focused on pay for performance and reflects governance practices that align with the needs of our business.

Below is a summary of compensation practices we have adopted to drive performance and to align with stockholder interests, alongside those practices we do not employ.

| WHAT WE DO | WHAT WE DON'T DO |
|---|---|
| ✓ *Pay for Performance, with 10% of AIP tied to EI&D goals that support business performance.* | ✗ *No Excise Tax Gross-Ups Upon Change in Control.* |
| ✓ *Stock Ownership Policy for NEOs.* | ✗ *No Excessive Executive Perquisites.* |
| ✓ *Double Trigger Equity Acceleration Upon a Change-in-Control.* | ✗ *No Tax Gross-Ups on Perquisites or Benefits, other than standard relocation costs.* |
| ✓ *Independent Compensation Consultant Retained by HR Committee.* | ✗ *No Payment of Dividends on Unvested Long-term Incentives.* |
| ✓ *Regular Review of Share Utilization.* | ✗ *No Repricing of Underwater Stock Options Without Stockholder Approval.* |
| ✓ *Maintain a Clawback Policy in compliance with new SEC rules.* | ✗ *No Inclusion of Long-term Incentive Awards in Severance or Retirement Benefit Calculations.* |
| ✓ *Minimum Required Notice Period for voluntary resignations of NEOs.* | ✗ *No Permitted Hedging, Short Sales or Derivative Transactions in Company stock.* |
| ✓ *Balance of short and long-term performance metrics.* | ✗ *No guaranteed or automatic annual salary increases for NEOs.* |
| ✓ *Annual Say on Pay vote.* | ✗ *No Fixed Term or Evergreen NEO Employment Agreements.* |
| ✓ *Regular stockholder outreach.* | |

tapestry

**TABLE OF CONTENTS**

**COMPENSATION DISCUSSION AND ANALYSIS**

## *What We Pay and Why*

### Compensation Program Objectives

Over the long-term, the Company is focused on driving innovation across our brands and adopting strategies that promote long-term brand health and sustained increases in stockholder value through accelerating growth and enhanced profitability across the portfolio.

Our compensation programs are aligned with this objective: we deliver a market-competitive level of fixed compensation with the opportunity for above-average rewards when the Company and the executive exceed our performance objectives. The compensation program for Tapestry's NEOs is designed to serve the following goals:

• reward performance, with performance-based pay constituting a majority of total compensation;

• support the attainment of the Company's short- and long-term strategic and financial objectives;

• align NEOs' interests with those of our stockholders and encourage ownership of Company stock by our NEOs;

• reward NEOs for achieving the challenging financial and strategic targets that we believe ultimately will drive stockholder value;

• enable us to attract, retain and reward the best talent in the luxury retail industry, which is necessary to profitably grow our business and drive stockholder value; and

• be competitive with our peer companies.

In implementing our compensation programs, we are also committed to taking actions that embrace our responsibility as a global fashion company to affect positive change for our people, our industry and the world at large. Since fiscal year 2022, we have included a dashboard of EI&D measures as a modifier of up to 10% of AIP compensation for leadership, which includes Vice President level and above ("Leadership"), on a global level. This action is intended to further incentivize leaders to advance the Company's EI&D initiatives, which are tied to overall company strategy, and to hold leaders accountable for creating a diverse and inclusive culture and supporting inclusive behaviors. We believe that our commitment to diversity supports and enhances our relationship with our diverse customer base.

### Elements of Compensation

Compensation for our NEOs includes both fixed and performance-based components, with an emphasis on performance-based elements to support the objectives listed above. We consider a component to be performance-based if the amount eventually earned or paid varies based on one or more elements of the Company's financial performance (e.g., sales, operating income, gross margin, etc.), operational measures (e.g., EI&D dashboard) or stock price appreciation. Performance-based components are designed so that above-plan performance is rewarded with above-target payouts and vice versa. The fixed components of compensation are

designed to be competitive and are typically a minority portion of the total mix of each executive's compensation package. We do not attempt to align each element of compensation to specific peer company percentiles or ratios; rather peer company data is one of several factors considered by the HR Committee when determining executive compensation. See *Compensation Decision Making Process* for details.

The following table briefly describes each element of compensation. A detailed explanation of each component for fiscal year 2024 is provided in the next section, *Fiscal Year 2024 Compensation*.

tapestry

TABLE OF CONTENTS

COMPENSATION DISCUSSION AND ANALYSIS

| Compensation Component | Reason to Provide | Performance Based | Not-Performance Based | Value Linked to Stock Price | Value Linked to Operating Results |
|---|---|---|---|---|---|
| **Annual Incentive: AIP** | Rewards for achieving the annual financial performance goals established by the HR Committee early in each fiscal year. A portion of AIP compensation for the Company's Leadership team is tied to performance under dashboard of EI&D measures. | ✓ | | | ✓ |
| **Long-term Incentive: PRSUs** | Granted to drive focus on Tapestry's long-term performance, align executive rewards with stockholders and link explicitly to achievement of long-term value creation. To maximize TSR growth, a portion of the PRSU is tied to relative TSR. | ✓ | | ✓ | ✓ |
| **Long-term Incentive: RSUs** | Granted to encourage retention. Although the number of shares earned is fixed, provided the executive is still employed, their value rises and falls with the price of our common stock, adding a performance element. | | ✓ | ✓ | |
| **Long-term Incentive: Stock Options** | Granted to drive focus on Tapestry's long-term performance and align executive rewards with stockholders on an absolute basis. Stock options have value only when our stock price increases from the price on the date of grant so they are a tool to support Tapestry's success and growth; we utilize stock options because of this strong pay for performance relationship. | ✓ | | ✓ | |
| **Base salary** | Competitive base salaries are necessary to attract and retain qualified, high-performing executives. Prior experience, scope of responsibility and performance are key elements considered in setting base salaries. | | ✓ | | |
| **Benefits & Limited Perquisites** | Competitive benefits and modest perquisites are necessary to attract and retain qualified, high-performing executives. | | ✓ | | |

**tapestry**

**TABLE OF CONTENTS**

**COMPENSATION DISCUSSION AND ANALYSIS**

## Fiscal Year 2024 Compensation Summary----Target Pay Mix

The following charts depict the relationship between the primary elements of the Company's target annual total direct compensation mix for fiscal year 2024 for each NEO. For Ms. Crevoiserat during fiscal year 2024, 76% of her target total compensation was performance-based. For the other NEOs, 66% of target total compensation was performance-based. These charts illustrate target total compensation for fiscal year 2024 as described in the *Fiscal Year 2024 Compensation* section in this proxy statement.



*(1) Charts represent regular, ongoing annual target compensation for the full fiscal year 2024.*

**44 | 2024 PROXY STATEMENT**

tapestry

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

The HR Committee routinely discusses the Company's strategy and programs with CAP, its executive compensation consultant. CAP advises the HR Committee on market trends and best practices, which the HR Committee considered in setting fiscal year 2024 executive compensation.

Significant actions for our fiscal year 2024 executive pay program are summarized in the table below:

| Fiscal Year 2024 Compensation Program Highlights | Rationale |
| --- | --- |
| Awarded salary increases to Ms. Crevoiserat and Messrs. Roe, Kahn and Howard as part of the annual review cycle. | To align more closely with competitive total cash compensation for similar positions in our executive compensation peer group. |
| Increased annual equity values for Messrs. Roe, Kahn and Howard. | To align more closely with competitive total compensation for similar positions in our executive compensation peer group. |
| For the AIP, allocated higher weighting to Gross Margin measure. | To increase focus on metric(s) that we believe drive P/E multiple expansion and TSR growth. |
| For AIP and for PRSU awards, continued to tighten our performance curves. | To recognize economic recovery trends in our industry despite continued uncertainty related to softening consumer demand and general economic conditions. |

tapestry

**2024 PROXY STATEMENT | 45**

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

## *Fiscal Year 2024 Compensation*

### Base Salary

Tapestry employees, including our NEOs, are paid a salary based on the responsibilities of their position, the skills and experience required for the position, their individual performance, business performance, labor market conditions and with consideration of salary levels for similar positions in our peer companies. For our NEOs, in addition to these factors, it is Tapestry's practice to recommend salary increases for HR Committee consideration only if there is clear evidence (based on benchmarking) that their salary lags the market. During fiscal year 2024, the HR Committee approved the base salary rate increases for Ms. Crevoiserat and Messrs. Roe, Kahn and Howard. The salary rates in effect during fiscal year 2024 for each NEO were as follows:

| Named Executive Officer | FY24 Base Salary Rate[1] | FY24 Salary Increase |
|---|---|---|
| Joanne Crevoiserat | $1,400,000 | 4% |
| Scott Roe | $  975,000 | 5% |
| Todd Kahn | $1,000,000 | 5% |
| Liz Fraser | $  850,000 | -% |
| David Howard | $  600,000 | 4% |

*(1) Amounts shown are as of the close of fiscal year 2024.*

### Annual Incentive Plan

The Tapestry AIP rewards eligible employees, including NEOs, for achievement of financial performance targets and EI&D measures, established by the HR Committee.

In setting the financial performance measures, targets and incentive payout schedule for the AIP, the HR Committee considered prior fiscal year performance, desired financial and operational performance levels in line with our annual operating plan, long-term strategic plan and general economic conditions. We tightened the performance curves in fiscal year 2024 to continue to incentivize a top line growth and operational efficiency mindset, and also considering peer group practices and trends. We also recognized economic recovery trends in our industry while still accounting for continued uncertainty related to the general macroeconomic environment and softening consumer demand. The HR Committee certified the results after the end of the fiscal year. Payouts for Tapestry and Coach brand results were above target, while payouts for kate spade new york brand results were between threshold and target.

The fiscal year 2024 target award levels for each NEO were determined by the HR Committee based on the role and responsibility of each position and on peer company target award levels for similar positions.

The fiscal year 2024 financial measures were intended to incentivize and reward management for delivering results that prioritize sustainable brand health and TSR performance. For fiscal year 2024 we modified the metric weights to allocate the strongest focus on Sales and Gross Margin goals, aligned with key business priorities and which we believe are top drivers of TSR growth. We also felt comfortable lowering the weight on Operating Income given the Gross Margin metric also provides profit exposure.

| Fiscal Year 2024 Measure | Reason for Measure | Fiscal Year 2023 Weight | Fiscal Year 2024 Weight | Performance / Payout Curve |
|---|---|---|---|---|
| Net Sales | Top drivers of P/E multiple expansion, leading to long-term TSR growth | 40% | 35% | For maximum performance, 200% of the target award can be earned, and for threshold performance, 30% of the target award can be earned. |
| Gross Margin | | 20% | 35% | |
| Operating Income | Core profitability measure driving increases in operating cash flow and a measure of brand health | 40% | 30% | |

tapestry

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

The company's operating plans were the basis used by the HR Committee for setting target AIP metric goals for fiscal year 2024, and required growth in Net Sales, Operating Income and Gross Margin on a non-GAAP, constant currency basis versus fiscal year 2023 for Tapestry overall. These values were aligned with the Company's strategic objective to drive long-term profitability, making necessary investments to support the health of its brands, while also drawing focus to the agility and discipline required to increase gross margin. Initial AIP funding was determined based on performance versus predefined financial goals. The HR Committee also set individual brand-level targets based on operating plans for each brand. For NEOs leading a brand, corporate financial goals were weighted 40% and brand goals were weighted 60%.

In setting the fiscal year 2024 threshold and maximum performance and payout values, the HR Committee considered several factors including the degree of difficulty in achieving each metric while balancing the uncertainty driven by global macro-economic conditions. The HR Committee deemed these targets would be sufficiently challenging to merit payout of the target AIP awards. The maximum performance levels were set such that maximum payout would be achieved for truly outstanding results versus fiscal year 2023.

The EI&D AIP component applied to all Leadership in fiscal year 2024, including NEOs and functions as a potential negative modifier on financial performance, based on the HR Committee's assessment of performance versus a predefined, quantitative and qualitative dashboard of EI&D goals.

Total potential payout for our AIP remained 0% to 200% of target incentive. Ten percent of the initial performance payout, based on results versus the predefined financial goals, was then adjusted through the EI&D modifier within a multiplier range of 90% to 100%. In this structure, we multiply the initial performance payout by 100% if we achieve our EI&D goals in full, resulting in no change to the initial performance payout. If we fail to achieve our EI&D goals, we multiply our initial performance payout by 90%, resulting in a 10% reduction in the initial performance payout. Partial achievement of our goals would result in a modifier between 90% and 100%.

The EI&D modifier was designed as a dashboard with shared goals focused on fostering behaviors in our sourcing, recruitment and talent mobility practices and policies, and rewarding progress against our goals to further shape and support a culture that is equitable, inclusive and diverse, which we believe is aligned with and supports long-term business objectives.

Actual AIP payments are made in cash, based on the degree to which the objectives have been achieved, as certified and approved by the HR Committee. No executive may receive an annual incentive payment exceeding $6.0 million under the AIP for any fiscal year.

The fiscal year 2024 AIP components for each NEO are displayed below.

| Named Executive Officer | Business Segment | Target Annual Incentive as a % of Salary | Component and its Weight as a Percent of Each NEOs Target Annual Incentive | | |
| | | | [90% of AIP] | | [10% of AIP] |
| | | | Tapestry, Inc. Component | Brand Component | Equity, Inclusion & Diversity Modifier[1] |
|---|---|---|---|---|---|
| Joanne Crevoiserat | Tapestry, Inc. | 200% | 100% | | ✓ |
| Scott Roe | Tapestry, Inc. | 125% | 100% | | ✓ |
| Todd Kahn | Coach | 125% | 40% | 60% | ✓ |
| Liz Fraser | Kate Spade | 100% | 40% | 60% | ✓ |
| David Howard | Tapestry, Inc. | 70% | 100% | | ✓ |

(1) The EI&D Modifier is a potential negative modifier on initial AIP funding based on financial results versus pre-defined goals. A full financial payout can only be achieved if the HR Committee certifies that all EI&D goals are achieved.

**tapestry**

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

The financial performance measures, target values established by the HR Committee, and the certified financial results for the fiscal year 2024 AIP appear below.

## Tapestry, Inc.

**Applied to all Named Executive Officers**

| ($ in millions) | Weight | Fiscal Year 2023 Results [1] | Fiscal Year 2024 Award Targets[2][3] | | | Fiscal Year 2024 Results[3] | Payout as a % of Target Incentive[2] |
|---|---|---|---|---|---|---|---|
| | | | Threshold | Target | Maximum | | |
| Net sales | 35% | $6,660.9 | $6,411.7 | $6,969.3 | $7,178.3 | $6,748.5 | 72.0% |
| vs. prior year | | | | 5% | | 1% | |
| Operating income (excluding AIP $) | 30% | $1,251.3 | $1,156.4 | $1,360.5 | $1,537.4 | $1,398.9 | 122.0% |
| vs. prior year | | | | 9% | | 12% | |
| Gross Margin | 35% | 70.8% | 70.5% | 71.5% | 72.5% | 73.1% | 200.0% |
| vs. prior year | | | | 1% | | 3% | |
| **Weighted average payout as a % of Target:** | | | | | | | **131.8%** |

## Coach

**Applied to Mr. Kahn**

| ($ in millions) | Weight | Fiscal Year 2023 Results [1] | Fiscal Year 2024 Award Targets[2][3] | | | Fiscal Year 2024 Results[3] | Payout as a % of Target Incentive[2] |
|---|---|---|---|---|---|---|---|
| | | | Threshold | Target | Maximum | | |
| Net sales | 35% | $4,960.4 | $4,796.7 | $5,157.7 | $5,312.5 | $5,162.8 | 103.0% |
| vs. prior year | | | | 4% | | 4% | |
| Operating income (excluding AIP $) | 30% | $1,561.9 | $1,446.9 | $1,607.7 | $1,736.3 | $1,730.1 | 195.0% |
| vs. prior year | | | | 3% | | 11% | |
| Gross Margin | 35% | 73.5% | 73.2% | 74.2% | 75.2% | 76.1% | 200.0% |
| vs. prior year | | | | 1% | | 4% | |
| **Weighted average payout as a % of Target:** | | | | | | **Coach:** | **164.7%** |
| | | | | | | *Combined with Tapestry:* | 151.5% |

## Kate Spade

**Applied to Ms. Fraser**

| ($ in millions) | Weight | Fiscal Year 2023 Results [1] | Fiscal Year 2024 Award Targets[2][3] | | | Fiscal Year 2024 Results[3] | Payout as a % of Target Incentive[2] |
|---|---|---|---|---|---|---|---|
| | | | Threshold | Target | Maximum | | |
| Net sales | 35% | $1,418.9 | $1,378.3 | $1,498.2 | $1,543.1 | $1,341.9 | -% |
| vs. prior year | | | | 6% | | (5)% | |
| Operating income (excluding AIP $) | 30% | $ 122.3 | $ 155.1 | $ 182.4 | $ 209.8 | $ 145.2 | -% |
| vs. prior year | | | | 49% | | 19% | |
| Gross Margin | 35% | 63.4% | 63.5% | 64.4% | 65.3% | 65.3% | 200.0% |
| vs. prior year | | | | 2% | | 3% | |
| **Weighted average payout as a % of Target:** | | | | | | ***Kate Spade*** | **70.0%** |
| | | | | | | *Combined with Tapestry:* | 94.7% |

*(1) Fiscal year 2023 results reflect Non-GAAP financial figures in nominal currency. See Appendix A for a reconciliation to results as reported under GAAP.*

*(2) For all metrics, actual payout is 0% if performance is below threshold, 30% of target for performance at threshold, 100% of target for target performance and 200% of target for maximum performance, with interpolation for performance levels between the amounts above.*

*(3) Fiscal year 2024 targets and actual results reflect the impact of currency adjustments. See Appendix A for a reconciliation to results as reported under GAAP.*

*tapestry*

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

The EI&D measures established by the HR Committee for the fiscal year 2024 AIP component (where we believe success supports achievement of our business objectives) are described below:

- Representation in the US at the Sr. Director and Leadership team levels.
- Expectations related to internal job postings for new roles and/or vacancy opportunities.
- Expectations related to diverse candidate slates.
- Differences in measures of engagement based on ethnicity and gender in our employee survey.
- Active Leadership participation in certain EI&D related events

Final payout for this AIP component was determined by the HR Committee through its evaluation of a dashboard with the predefined criteria and related results; no component of the scorecard had a pre-assigned weighting.

Progress was made through diversifying our employee sourcing and recruitment process, transparent job posting policies, leadership participation in EI&D events, and listening to our employees by collecting their feedback throughout the year on their perception of inclusion.

Considering that a significant portion of objectives were achieved, but not all, and that meaningful results were observed, the HR Committee determined to apply a modest negative modifier for the EI&D component of the AIP, resulting in a reduction of 1% out of a possible 10%. The initial performance payouts were therefore multiplied by 99% (instead of 100%) to reflect majority achievement of our EI&D dashboard.

## Calculation of Fiscal Year 2024 Annual Incentive Awards:

The following table shows the fiscal year 2024 target awards as a percent of the salary as of the end of the fiscal year for each NEO, applies the results described above to each target award, and shows the actual award earned. The resulting payouts are also displayed in the *Summary Compensation Table* in the column "Non-Equity Incentive Plan Compensation".

| Named Executive Officer | Target Annual Incentive[2] (a) | Financial Performance[1] Tapestry[2] (0% - 200%) (b) | Financial Performance[1] Brand[2] (0% - 200%) (c) | Financial Performance[1] [Tapestry Weight * b] + [Brand Weight * c] Total Tapestry & Brand (0% - 200%) (d) | EI&D Performance EI&D Scorecard (90% - 100%) (e) | Total Performance and Payout[1] [d * e] Total Financial and EI&D performance (f) | Total Performance and Payout[1] [a * f] Annual Incentive Award[3] (g) |
|---|---|---|---|---|---|---|---|
| Joanne Crevoiserat | $2,800,000 | 131.8% | | 131.8% | 99% | 130.5% | $3,654,000 |
| Scott Roe | $1,218,750 | 131.8% | | 131.8% | 99% | 130.5% | $1,590,469 |
| Todd Kahn | $1,250,000 | 131.8% | 164.7% | 151.5% | 99% | 150.0% | $1,875,000 |
| Liz Fraser | $850,000 | 131.8% | 70.0% | 94.7% | 99% | 93.8% | $797,300 |
| David Howard | $420,000 | 131.8% | | 131.8% | 99% | 130.5% | $548,100 |

*(1) Percentages as shown are rounded to the nearest decimal.*

*(2) The target AIP as a percent of annual salary for each NEO and the weights associated with Tapestry and Brand performance are shown in the fiscal year 2024 AIP components table in the Annual Incentive Plan Section.*

*(3) The AIP Award is calculated using annual salary as of the close of the fiscal year.*

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

### Non-GAAP Measures

As indicated above, the HR Committee used certain non-GAAP measures for the purpose of setting goals and/or to evaluate performance. The adjustments, including for the impact of foreign currency fluctuations, are set out in *Appendix A*. These non-GAAP performance measures were used by management to conduct and evaluate its business during its regular review of operating results. Management and the Company's Board utilized these non-GAAP measures to make decisions about the uses of Company resources, analyze performance between periods, develop internal projections and measure management performance. The Company's primary internal financial reporting excluded these items affecting comparability. We believe these non-GAAP measures are useful to investors and others in evaluating the Company's

ongoing operating and financial results in a manner that is consistent with management's evaluation of the business and understanding how such results compare with the Company's historical performance. We also believe excluding the items affecting comparability assists investors in developing expectations of future performance.

The HR Committee believes it is appropriate to use constant currency performance measures for setting AIP goals and/or evaluating performance because it will incentivize management to make business decisions that drive the long-term sustainable performance of the Company rather than reacting to short-term currency fluctuations, which are largely outside of their control.

tapestry

TABLE OF CONTENTS

COMPENSATION DISCUSSION AND ANALYSIS

## Long-Term Incentive Plan

Long-term incentives ("LTI") represent a significant proportion of compensation for our Chief Executive Officer and other NEOs. They are designed to align employee interests with those of our stockholders, reward employees for enhancing stockholder value and support retention of key employees. NEO's awards are typically a set mix of stock options, PRSUs and RSUs. In addition, approximately 2,400 of our employees, including nearly all of our store managers, received an annual long term equity award in fiscal year 2024. We offer an "Equity Choice" program, under which eligible employees may elect to receive their annual LTI in the form of stock options, RSUs or a combination of the two. Under this program, the ratio of stock options to RSUs is set so that the grant date fair market value of stock options and RSUs is approximately equal. Equity Choice is not available to our Chief Executive Officer or our other NEOs.

The number of PRSUs, stock options and/or RSUs granted to a NEO each year is based on a target grant value. The values granted are converted to shares based on the closing price of Tapestry common stock on the date of grant, and, in the case of stock options, on the estimated Black-Scholes value of the stock option. The exercise price for stock options is the closing price of Tapestry common stock on the grant date. Adjustments to the target grant value for each NEO may be made based on changes in the executive's responsibilities and performance, changes in the competitive marketplace, or other factors determined by the HR Committee. From time to time, we also grant special PRSU and/or RSU awards as part

of new hire agreements or other special circumstances. In fiscal year 2024 our burn rate (calculated as full value shares and stock options granted during the fiscal year divided by weighted average common shares outstanding excluding share repurchases) was 1.7%.

All awards are made under the terms and conditions of the 2018 Stock Incentive Plan. The majority of the awards are granted during or around the Board and HR Committee's regularly scheduled August meetings, at approximately the same time that salary increases and AIP award payments are approved. Off-cycle grants for new hires and other special events may be made on the first business day of the month following such event.

*Fiscal Year 2024 Long-Term Incentive Awards:* In August 2023, the HR Committee granted the LTI awards shown in the table below to the NEOs with consideration given to median total compensation for NEOs in our industry, the competitive landscape for NEO talent, each executive's performance and the Company's guidelines for executive compensation.

The fiscal year 2024 PRSU measures were intended to incentivize and reward management for delivering results that prioritize sustainable brand health and maximize TSR growth over a longer time horizon. These metrics support focus on effective achievement of our long-term strategy to build a global house of brands.

| Fiscal Year 2024 Measure | Reason for Measure | Fiscal Year 2024 Weight | Performance / Payout Curve |
|---|---|---|---|
| Sales | While Sales is also part of AIP, it is an essential measure to incentivize not only short-term, but long-term stable top line expansion in-line with our externally stated ambitions | 33% | For maximum performance, 200% of the target award can be earned, and for threshold performance, 30% of the target award can be earned. |
| ROIC | Designed to measure how efficiently the Company manages its deployed capital. ROIC aligns closely with how investment community views Tapestry | 33% | |
| Relative TSR | Supports alignment of executive compensation and stockholder return outcomes | 33% | See below |

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

For 33% of the PRSU award, potential payout is based on Company TSR over a three year performance period relative to a predefined PRSU Peer Group. Objective criteria was used to select the PRSU Peer Group, which represents companies from the *S&P 1500 Composite and Euronext Indexes in Apparel, Accessories and Luxury Goods* which we believe is most relevant to Tapestry as far as their global reach, the products and services offered, the talent landscape we compete with, and are viewed as alternative investment choices by capital markets. Given the size of Tapestry, companies with a market cap over $100 billion were removed. The below charts outline the PRSU Peer Group companies and describe the PRSU payout levels tied to relative performance.

| Performance Peer Group for FY24-FY26 Relative TSR Measurement | | |
|---|---|---|
| Criteria: S&P 1500 Composite and Euronext Indexes in Apparel, Accessories and Luxury Goods with less than $100 billion in Market cap | adidas AG | Kontoor |
| | Burberry | Moncler |
| | Capri | Movado |
| | Carter's, Inc. | Oxford |
| | Columbia | Pandora A/S |
| | Richemont | PVH Corp. |
| | Luxottica | Ralph Lauren |
| | Fossil Group, Inc. | Swatch |
| | G-III Apparel Group, Ltd. | Under Armour |
| | Hanesbrands Inc. | VF |
| | Hugo Boss AG | Vera Bradley |
| | Kering SA | |

| FY24 - FY26 Relative TSR Performance / Payout Curve | | | | |
|---|---|---|---|---|
| PRSU Payout: | No Payout | 30% | 100% | 200% |
| rTSR: | Bottom Quartile | Threshold | Median | Top Quartile |
| | 0 - 24% | 25% | 50% | 75 - 100% |

Linear interpolation between quartiles

The Company's long-term strategic plan was a basis for the HR Committee setting the financial performance targets for each measure, and the maximum and threshold performance goals and payout levels to establish a clear performance standard. For maximum performance, 200% of the target number of stock units can be earned, and for threshold performance, 30% of the target number of stock units can be earned.

The following table presents the HR Committee's decisions for the NEO target value for equity grants and corresponding shares granted in fiscal year 2024:

| | FY24 Long-Term Incentive Awards | | | | | | |
|---|---|---|---|---|---|---|---|
| | Stock Options | | Target PRSUs | | RSUs | | Total |
| Named Executive Officer | Shares | Grant Value ($) | Shares | Grant Value ($) | Shares | Grant Value ($) | Grant Value ($) |
| Joanne Crevoiserat | 380,657 | 4,000,000 | 118,308 | 4,000,000 | 59,154 | 2,000,000 | 10,000,000 |
| Scott Roe | 142,746 | 1,500,000 | 44,366 | 1,500,000 | 22,183 | 750,000 | 3,750,000 |
| Todd Kahn | 114,197 | 1,200,000 | 35,492 | 1,200,000 | 17,746 | 600,000 | 3,000,000 |
| Liz Fraser | 49,485 | 520,000 | 15,380 | 520,000 | 7,690 | 260,000 | 1,300,000 |
| David Howard | 47,582 | 500,000 | 14,789 | 500,000 | 14,789 | 500,000 | 1,500,000 |

While the table above summarizes how the HR Committee viewed its annual target equity decisions for the NEOs, it is not a substitute for the Summary Compensation Table which represents the accounting value of each award at grant, calculated in accordance with FASB ASC Topic 718, which includes the incremental expense (versus what is shown above) associated with incorporation of a relative TSR metric.

There are currently two outstanding Annual PRSU awards for fiscal years 2023-2025 and fiscal years 2024-2026 awarded to approximately 50 corporate leaders, including our NEOs. There are no Annual PRSU performance periods completed as of the end of fiscal year 2024. At the close of fiscal year 2023, the HR Committee certified the results for the performance-based LTI awards for the FY22-23 Annual PRSUs as described in the *Long-Term Incentive Section* of the *Fiscal Year 2023 Proxy Statement*. This award was subject to an additional one-year vesting requirement and the shares were distributed in August 2024.

tapestry

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

Shares Earned: The following table displays the number of shares each NEO earned from the FY22-23 Annual PRSUs in August 2023 that were distributed in August 2024.

| Name | Shares Granted at Target[1] | Shares Earned[2] |
|---|---|---|
| Joanne Crevoiserat | 84,272 | 94,406 |
| Scott Roe | 28,969 | 32,453 |
| Todd Kahn | 21,068 | 23,602 |
| Liz Fraser | 12,641 | 14,161 |
| David Howard | 7,901 | 8,851 |
| **TOTAL:** | | **173,473** |

*(1) Includes dividend equivalent shares accumulated through June 29, 2024.*

*(2) This award is subject to an additional one-year vesting requirement and the shares were distributed in August 2024.*

**tapestry**

**2024 PROXY STATEMENT | 53**

TABLE OF CONTENTS

**COMPENSATION DISCUSSION AND ANALYSIS**

### Developments for Fiscal Year 2025

For fiscal year 2025, the HR Committee approved pay actions for select NEOs, and slight plan design modifications as summarized below. More detail on these changes to our compensation program will be provided in the fiscal year 2025 proxy statement.

| Fiscal Year 2025 Compensation Highlights | Rationale |
|---|---|
| Did not award salary increases to NEOs. | Currently aligned with competitive salaries for similar positions in our executive compensation peer group. |
| Increased target AIP as a percent of salary for Mr. Kahn. | To align more closely with competitive total cash compensation for similar positions in our executive compensation peer group. |
| For the AIP, enhanced EI&D modifier design to create up to +10% upside modifier for above target results and up to -10% negative modifier for below target results. Maximum payout remains 200% of target. | Align pay with performance and encourage outperformance versus communicated objectives to continue to educate, equip and empower the business to leverage our EI&D program as a strategic differentiator in our workforce and marketplace. |
| For the AIP and PRSUs, further tightened our performance curves. | To incentivize a top line growth mindset, a focus on operational efficiencies, and to stay in line with executive compensation peer group trends. |

## *Other Compensation and Benefit Elements*

NEOs are eligible to participate in the same benefit programs as all of our full-time employees in the United States. These include:

- health, life and disability insurance;

- retirement savings plans;

- the Company's Matching Gift Programs, under which the Company's foundation matches eligible employee donations to qualified charitable organizations;

- a qualified employee stock purchase plan (the Amended and Restated Tapestry, Inc. 2001 Employee Stock Purchase Plan (the "Employee Stock Purchase Plan")); and

- relocation payments and reimbursements under the Company's policies covering moving expenses for employees who must relocate as part of their employment at Tapestry.

The Company's retirement plans consist of a qualified 401(k) plan (the "401(k) Savings Plan") and a voluntary, non-qualified defined contribution plan (the "Executive Deferred Compensation Plan" or "EDCP"). Employees, including our NEOs, are eligible to participate in the 401(k) Savings Plan after completing one month of service; the Company matches 100% of employee contributions, up to 3% of compensation contributed and 50% of the next 2% of compensation contributed. These matching contributions are immediately vested.

Highly compensated employees whose annual target cash compensation exceeds the IRS 401(a)(17) compensation limit, are also eligible to participate in the EDCP. Under this plan, eligible employees, including our NEOs, may elect to defer a portion of their salary and/or annual incentive into the plan and invest the assets in substantially similar mutual funds as those offered under the qualified 401(k) Savings Plan. The Company matches 100% of employee contributions up to 3%, less the maximum company match available in the 401(k) Savings Plan. Deferral and distribution elections are made annually in accordance with IRS rules under Section 409A. Certain of our NEOs also maintain balances in the Supplemental Retirement Plan (the "SRP"), a non-qualified defined contribution plan frozen to new contributions as of December 31, 2015. Company contributions to the various retirement plans are included in the "All Other Compensation" column of the *Summary Compensation Table* and in the related footnote. Contributions, earnings and account balances for the EDCP and SRP are detailed in the *Non-Qualified Deferred Compensation Table*.

None of these benefits or perquisites are included in the base compensation on which annual incentives and retirement plan contributions are calculated.

tapestry

TABLE OF CONTENTS

## Compensation Decision Making Process

### Roles and Responsibilities

The HR Committee has overall responsibility for executive compensation at Tapestry, including the approval and oversight of compensation and benefit program administration for Tapestry's NEOs, as well as other key executives at Tapestry. The HR Committee reviews and approves Tapestry's annual and LTI compensation programs, including performance goals, as well as significant changes in the design of employee benefits programs. In fiscal year 2024, the HR Committee retained and utilized the services of the independent firm, CAP, to provide advice and recommendations on the amount and form of executive compensation. CAP reported to and took direction from the HR Committee, and management provided information and input to CAP's consultants at the HR Committee's direction. CAP did not provide additional services to Tapestry or its affiliates in fiscal year 2024. The HR Committee, after taking into consideration all factors relevant to such independence, including, but not limited to factors specified in NYSE listing standards and Rule 10C-1(b)(4) of the Exchange Act, confirmed that CAP was independent and determined that no conflicts of interest existed between CAP and Tapestry.

During fiscal year 2024, CAP attended HR Committee meetings and met with the members of the HR Committee without management present, and advised the HR Committee on various compensation matters such as executive compensation levels and practices among our peer group, amounts and structure of compensation for new hires, and investor policies on executive compensation. CAP also advised the HR Committee on considerations with respect to including EI&D measures as a portion of the Company's AIP for Leadership starting in fiscal year 2022. CAP reviews and comments on materials prepared by management and also presents the HR Committee with its own analyses and recommendations. The HR Committee considered CAP's advice in its decision making on the compensation actions described in the sections *Executive Summary* and *Fiscal Year 2024 Compensation*. Typically, the CEO and other members of management work with the HR Committee Chair and CAP to set meeting agendas and prepare materials for HR Committee meetings.

Certain members of management typically attend HR Committee meetings to present information on the Company and the competitive environment for talent, discuss compensation and benefits policies and provide technical advice. The CEO is responsible for reviewing the performance of certain key executives, including the NEOs (other than herself), and recommending changes in their compensation to the HR Committee for approval. The HR Committee consults with CAP and determines and approves changes in the CEO's compensation based on its own review of the CEO's performance and other factors in its discretion. The HR Committee considers information on all elements of compensation over a period of years, as well as the impact of various termination scenarios in evaluating the appropriateness of executive compensation. Actual pay earned by our NEOs in prior years from AIP and LTI compensation is reviewed but is not specifically taken into account by the HR Committee in making the current year's compensation decisions.

Decisions to change a NEO's (other than the CEO) base salary, AIP opportunity and/or LTI award are based on various factors, including the judgment of our CEO and the HR Committee. They consider the scope of their positions and any changes to those responsibilities, the skills and experience required for the job, their individual performance, business performance, labor market conditions and peer company compensation levels based on public disclosure and purchased industry compensation surveys. Salary increases, AIP opportunity and/or LTI award changes are considered annually and upon significant role changes, and are based on both financial and non-financial results achieved by the Company and the NEO during the preceding fiscal year. All changes are subject to HR Committee approval.

tapestry

TABLE OF CONTENTS

COMPENSATION DISCUSSION AND ANALYSIS

## Peer Group and Competitive Assessment of Compensation

Compensation at a defined group of companies is one reference point considered by the HR Committee and management in setting NEO compensation levels, although we do not attempt to link any single element of compensation to specific peer company percentiles or ratios. Pay practices at this group of companies are also reviewed by the HR Committee. The composition of the peer group is reviewed periodically and is determined by the HR Committee, considering input from its independent compensation consultant. The most recent review was completed in February 2023 and will be revisited in fiscal year 2025.

The peer group used during fiscal year 2024 is shown below. It includes 15 companies whose aggregate profile was comparable to Tapestry in terms of size, industry, operating characteristics and/or competition for executive talent. As a secondary reference point, the HR Committee considers publicly available data from the following foreign-listed and private companies with whom Tapestry competes for certain executive talent: Burberry Group plc, Hermes International, J. Crew Group, Inc., Kering S.A., and LVMH, as well as industry compensation surveys.

| Company Name | Sub-Industry (as defined by GICS codes) | Revenue[1] | Market Valuation as of 6/29/2024[2] |
|---|---|---|---|
| Compagnie Financière Richemont SA[3] | Apparel, Accessories and Luxury Goods | $22,242 | $92,140 |
| The Estée Lauder Companies Inc. | Personal Care Products | $15,608 | $38,151 |
| The Gap, Inc. | Apparel Retail | $14,889 | $ 8,960 |
| V.F. Corporation | Apparel, Accessories and Luxury Goods | $10,455 | $ 5,252 |
| Lululemon Athletica Inc. | Apparel, Accessories and Luxury Goods | $ 9,619 | $37,338 |
| PVH Corp. | Apparel, Accessories and Luxury Goods | $ 9,218 | $ 5,914 |
| Williams-Sonoma, Inc. | Homefurnishing Retail | $ 7,751 | $18,159 |
| **Tapestry, Inc.** | **Apparel, Accessories and Luxury Goods** | **$ 6,671** | **$ 9,832** |
| Ralph Lauren Corporation | Apparel, Accessories and Luxury Goods | $ 6,631 | $10,968 |
| Victoria's Secret & Co. | Apparel Retail | $ 6,182 | $ 1,384 |
| Levi Strauss & Co. | Apparel, Accessories and Luxury Goods | $ 6,179 | $ 7,664 |
| Under Armour, Inc. | Apparel, Accessories and Luxury Goods | $ 5,702 | $ 2,882 |
| Coty Inc. | Personal Care Products | $ 6,118 | $ 8,650 |
| American Eagle Outfitters, Inc. | Apparel Retail | $ 5,262 | $ 3,921 |
| Capri Holdings Limited | Apparel, Accessories and Luxury Goods | $ 5,170 | $ 3,859 |
| Urban Outfitters, Inc. | Apparel Retail | $ 5,153 | $ 3,834 |
| **Tapestry, Inc. Percentile Rank** | | **50th** | **67th** |

*(1) As reported in the Form 10-K for the most recent fiscal year (in millions).*

*(2) As reported by S&P Capital IQ (in millions).*

*(3) Revenue was converted to U.S. dollars (US$) based on the exchange rate at the end of the fiscal year (3/31/2024). Market valuation was converted to US$ based on the exchange rate as of 6/29/2024.*

tapestry

## *Additional Information*

### Clawback Policy: Adjustment or Recovery of Awards

In accordance with SEC rules and NYSE listing standards, in October 2023 the Board adopted a clawback policy that requires (subject to limited exceptions) that any incentive compensation (including both cash and equity compensation that is granted, earned or vested wholly or in part upon the attainment of a financial reporting measure) paid to any current or former covered officer, including our NEOs, is subject to recoupment if:

- the incentive compensation was calculated based on financial statements that were required to be restated due to material noncompliance with financial reporting requirements (including both "big R" and "little r" restatements), without regard to any fault or misconduct; and

- that noncompliance resulted in overpayment of the incentive compensation within the three fiscal years preceding the date the restatement was required.

In addition, Tapestry has a long-standing separate clawback policy that applies to any performance-based annual or LTIs awarded to a broader group of key executives. Under this policy, in the event of a material restatement of Tapestry's financial results, the HR Committee will review the circumstances that caused the restatement and consider accountability to determine whether a covered employee was negligent or engaged in misconduct. If so, and if the amount paid in an annual incentive award or the shares vesting in a performance-based LTI award would have been less had the financial statements been correct, the HR Committee will recover compensation from the covered employee as it deems appropriate.

Our LTI award agreements also include a repayment provision in the event an award holder is terminated for cause (as defined in those agreements) or violates various non-compete or non-solicitation provisions, or other restrictive covenants included in those agreements.

### Stock Ownership, Insider Trading Policy and Anti-Hedging Trading Policies

We believe that our NEOs should have a meaningful ownership stake in Tapestry in order to further align the interests of management and stockholders. Under our Stock Ownership Policy, each NEO is required to hold Company stock with a value at least equal to the multiple of his or her base salary set forth below.

| Title | Multiple of Salary |
|---|---|
| Chief Executive Officer | 5 |
| Tapestry Chief Financial Officer & Chief Operating Officer; CEO and Brand President, Coach | 3 |
| CEO and Brand President, Kate Spade; General Counsel and Secretary | 2 |

Until the required ownership level is met, NEOs are required to retain 50% of net shares vested and options exercised until they reach such level, which is expected to happen within five years of the date a NEO is appointed to his or her position.

Ownership includes the equivalent of after-tax shares owned and shares equivalent of vested, unexercised, in-the-money

stock options and unvested RSUs. PRSUs with incomplete performance periods do not count towards ownership. The HR Committee evaluates compliance with this policy annually, as of December 31.

As of the last measurement date (December 31, 2023):

- Mses. Crevoiserat and Fraser, and Messrs. Kahn and Howard owned the required number of shares; and

- Mr. Roe was making appropriate progress towards achieving his ownership requirement (Mr. Roe had less than five years with the Company at the time of measurement).

Under Tapestry's Insider Trading Policy, Tapestry employees and directors are prohibited from trading in Tapestry shares at any time that they are in possession of material non-public information and during certain prescribed blackout periods, typically beginning two weeks prior to the end of each fiscal quarter and ending two days after the public release of our quarterly earnings announcement. Tapestry employees and directors are prohibited from engaging in short sales, buying or selling derivative securities and other similar hedging activities related to Tapestry stock at all times.

### Impact of Accounting and Tax Treatment

In designing our compensation and benefits programs, the HR Committee reviews and considers the accounting implications of its decisions, including the accounting treatment of amounts awarded or paid to our executives.

Section 162(m) of the Internal Revenue Code (the "IRC") limits the income tax deduction by Tapestry for compensation paid to certain executive officers to $1 million per year. As a result of amendments to Section 162(m) as part of the Tax Cuts and Jobs

**TABLE OF CONTENTS**

**COMPENSATION DISCUSSION AND ANALYSIS**

Acts of 2017, Tapestry is generally no longer able to take a deduction for any compensation paid to its current or former NEOs in excess of $1 million, with the exception of compensation pursuant to a binding written agreement in place on November 2, 2017, which can be exempt from the deduction limit if applicable requirements are met.

Other provisions of the IRC can also affect compensation decisions. Section 409A of the IRC, which governs the form and timing of payment of deferred compensation, imposes a 20% additional tax and an interest penalty on the recipient of deferred compensation that does not comply with Section 409A. The HR Committee takes into account the potential implications of Section 409A in determining the form and timing of compensation awarded to our executives and intends to structure any non-qualified deferred compensation plans or arrangements to be exempt from or to comply with the requirements of Section 409A.

tapestry

TABLE OF CONTENTS

 *HUMAN RESOURCES COMMITTEE REPORT*

The Human Resources Committee of the Board of Directors of Tapestry, Inc. (the "Human Resources Committee"), which performs the functions of a compensation committee, reviewed and discussed the *Compensation Discussion and Analysis* set forth above with management. Based on our reviews and discussion with management, the Human Resources Committee recommended to the Board of Directors that the *Compensation Discussion and Analysis* be included in the proxy statement for the Annual Meeting and incorporated by reference into our Annual Report on Form 10-K.

**Human Resources Committee**

John P. Bilbrey, Chair
Darrell Cavens
Kevin Hourican*
Pamela Lifford

*Mr. Hourican joined the Human Resources Committee effective February 29, 2024.*

**tapestry**

**2024 PROXY STATEMENT | 59**

TABLE OF CONTENTS

 *COMPENSATION RISK ASSESSMENT*

Management periodically reviews and shares with the HR Committee our compensation policies and practices and evaluates the degree to which they may motivate any employee, including our NEOs, to take on inappropriate or excessive risk. We believe that our various compensation programs are aligned to our strategy and objectives, and that they encourage prudent risk-taking to drive performance. As a result of its review and evaluation of our fiscal year 2024 compensation programs, the HR Committee, together with its independent compensation consultant, CAP, determined that our compensation policies and practices for our employees are not reasonably likely to have a material adverse effect on Tapestry.

Factors evaluated by management and the HR Committee include the overall mix of pay between base salary, annual and long-term incentives, the performance metrics used in each program, the range of performance required to earn a payout under each program and incentive plan components such as maximum payouts, vesting, stock ownership requirements and clawbacks.

Some of the key factors supporting the HR Committee's conclusion that our programs do not drive inappropriate or excessive risk include capped payouts on all of our incentive plans, use of multiple, counter-balancing financial performance criteria in our AIP and Long-Term Incentive Plan, executive and Independent Director stock ownership and anti-hedging policies, a market competitive weight on each component of pay, multiple year vesting for LTI, a variety of performance metrics for PRSUs and an incentive compensation clawback policy.

When the HR Committee and management are developing new or modified compensation programs and selecting performance measures for annual and long-term incentives, risk taking is considered and affects decisions accordingly.

tapestry

TABLE OF CONTENTS

 # *EXECUTIVE COMPENSATION*

## *Summary Compensation Table*

| Name & Principal Position | Fiscal Year | Salary[1] ($) | Bonus[2] ($) | Stock Awards[3] ($) | Option Awards[4] ($) | Non-Equity Incentive Plan Compensation[5] ($) | All Other Compensation[6] ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| **Joanne Crevoiserat** *Chief Executive Officer* | 2024 | 1,390,385 | - | 6,323,364 | 3,999,753 | 3,654,000 | 62,711 | 15,430,213 |
| | 2023 | 1,350,000 | - | 6,694,692 | 4,002,498 | 2,381,400 | 60,913 | 14,489,503 |
| | 2022 | 1,340,385 | - | 4,799,985 | 3,199,996 | 4,337,550 | 61,510 | 13,739,426 |
| **Scott Roe[7]** *Chief Financial Officer and Chief Operating Officer* | 2024 | 965,385 | - | 2,371,288 | 1,499,903 | 1,590,469 | 78,033 | 6,505,078 |
| | 2023 | 925,000 | - | 2,175,777 | 1,300,807 | 1,019,813 | 98,542 | 5,519,939 |
| | 2022 | 925,000 | 250,000 | 1,100,018 | 0 | 2,122,875 | 47,066 | 4,444,959 |
| **Todd Kahn** *Chief Executive Officer and Brand President, Coach* | 2024 | 990,385 | - | 1,896,988 | 1,199,925 | 1,875,000 | 62,467 | 6,024,765 |
| | 2023 | 950,000 | - | 1,673,684 | 1,000,624 | 1,240,938 | 75,913 | 4,941,159 |
| | 2022 | 950,000 | - | 1,199,996 | 799,998 | 2,106,625 | 68,110 | 5,124,729 |
| **Liz Fraser** *Chief Executive Officer and Brand President, Kate Spade* | 2024 | 850,000 | - | 822,036 | 519,963 | 797,300 | 26,900 | 3,016,199 |
| | 2023 | 850,000 | - | 870,325 | 520,320 | 449,650 | 68,913 | 2,759,208 |
| | 2022 | 840,385 | - | 719,989 | 480,005 | 1,619,250 | 66,560 | 3,726,189 |
| **David Howard[8]** *General Counsel and Secretary* | 2024 | 595,192 | - | 1,040,456 | 499,967 | 548,100 | 34,188 | 2,717,903 |
| | 2023 | 575,000 | - | 869,454 | 400,246 | 355,005 | 49,791 | 2,249,496 |

*(1) Salary amounts reflect the actual base salary payments made in fiscal years 2024, 2023 and 2022.*

*(2) The fiscal year 2022 amount reflect cash sign-on bonus pursuant to the terms of Mr. Roe's offer letter and is described in the applicable section of our fiscal year 2022 proxy statement.*

*(3) Reflects the aggregate grant date fair value of all stock awards granted in the years shown. The aggregate grant date fair value is the amount that the Company expects to expense for accounting purposes over the award's vesting schedule as of the grant date and does not correspond to the actual value that the NEOs will realize from the award.*

*To determine the aggregate grant date value of the fiscal year 2024 PRSU under FASB ASC Topic 17, given the relative TSR performance metric, the market value on the grant date is adjusted to reflect the probable outcome of the relative TSR component based on monte carlo simulation, determined as of the grant date, which results in a fair value per PRSU under FASB ASC Topic 718 that is 108% of the market value of the underlying shares on the grant date.*

*The grant date fair values for awards granted during fiscal year 2024 were as follows:*

- *For Ms. Crevoiserat, annual RSUs and PRSUs (assuming target performance for the PRSUs). The Annual PRSUs have a grant date fair value of $4,323,368; at the maximum achievement level, the total fair value would be $8,646,736.*
- *For Mr. Roe, annual RSUs and PRSUs (assuming target performance for the PRSUs). The Annual PRSUs have a grant date fair value of $1,621,282; at the maximum achievement level, the total fair value would be $3,242,564.*
- *For Mr. Kahn, annual RSUs and PRSUs (assuming target performance for the PRSUs). The Annual PRSUs have a grant date fair value of $1,296,996; at the maximum achievement level, the total fair value would be $2,593,992*
- *For Ms. Fraser, annual RSUs and PRSUs (assuming target performance for the PRSUs). The Annual PRSUs have a grant date fair value of $562,036; at the maximum achievement level, the total fair value would be $1,124,072.*
- *For Mr. Howard, annual RSUs and PRSUs (assuming target performance for the PRSUs). The Annual PRSUs have a grant date fair value of $540,439; at the maximum achievement level, the total fair value would be $1,080,878.*

*The amounts for fiscal years 2023 and 2022 are described in the applicable sections of our fiscal year 2023 and 2022 proxy statements.*

TABLE OF CONTENTS

EXECUTIVE COMPENSATION

*(4) Reflects the aggregate grant date fair value of all stock options granted in fiscal year 2024. The weighted-average assumptions used in calculating the grant date fair value of option awards are shown in the table below. The applicable weighted average assumptions for fiscal years 2023 and 2022 are described in* Note 7, "Share-Based Compensation" of Tapestry's Annual Report on Form 10-K for fiscal year ended June 29, 2024.

| | Stock Option |
|---|---|
| Expected Term (years) | 5.0 |
| Expected Volatility | 44.8% |
| Risk-free Interest Rate | 4.5% |
| Dividend Yield | 4.2% |

*(5) Amounts in this column reflect compensation earned under the AIP for the years shown. The amounts for fiscal year 2024 are described in detail in the section titled* Compensation Discussion and Analysis-Fiscal Year 2024 Compensation-Annual Incentive Plan. *The AIP and the amounts for fiscal years 2023 and 2022 are described in the applicable sections of our 2023 and 2022 proxy statements.*

*(6) "All Other Compensation" includes the following amounts for the years shown:*

| Name & Principal Position | Fiscal Year | Company Contributions to Qualified Defined Contribution Plans ($) | Company Contributions to Non-Qualified Defined Contribution Plans ($) | Life Insurance Premiums ($) | Other[a] ($) |
|---|---|---|---|---|---|
| Joanne Crevoiserat *Chief Executive Officer* | 2024 | 14,800 | 46,800 | 396 | 715 |
| | 2023 | 12,200 | 47,800 | 396 | 517 |
| | 2022 | 12,200 | 48,400 | 396 | 514 |
| Scott Roe *Chief Financial Officer and Chief Operating Officer* | 2024 | 14,800 | 43,842 | 396 | 18,995 |
| | 2023 | 12,200 | 46,561 | 396 | 39,385 |
| | 2022 | 12,200 | 13,875 | 396 | 20,595 |
| Todd Kahn *Chief Executive Officer and Brand President, Coach* | 2024 | 14,556 | 46,800 | 396 | 715 |
| | 2023 | 12,200 | 47,800 | 396 | 15,517 |
| | 2022 | 12,200 | 48,400 | 396 | 7,114 |
| Liz Fraser *Chief Executive Officer and Brand President, Kate Spade* | 2024 | 13,789 | - | 396 | 12,715 |
| | 2023 | 12,200 | 47,800 | 396 | 8,517 |
| | 2022 | 12,200 | 13,875 | 396 | 20,595 |
| David Howard *General Counsel and Secretary* | 2024 | 13,400 | 14,087 | 396 | 6,305 |
| | 2023 | 13,000 | 26,037 | 396 | 10,358 |

*(a) Fiscal year 2024 amounts shown include:*

- *Long-term disability insurance premium of $715 for Mses. Crevoiserat and Fraser and Messrs. Roe, Kahn and Howard.*
- *Company matching charitable contributions under the Company's Matching Gift program of $10,000 for Mr. Roe, $12,000 for Ms. Fraser and $5,590 for Mr. Howard.*
- *Relocation expenses, pursuant to the Company's Relocation Policy for Vice Presidents and Above for Mr. Roe: $8,280 of associated income taxes paid by the Company.*
- *The amounts for fiscal years 2023 and 2022 are described in the applicable sections of our 2023 and 2022 proxy statements.*

*(7) In accordance with his offer letter, the stock option and RSU portions of Mr. Roe's initial equity awards were granted during fiscal year 2021 upon hire in June 2021. Details of the award is reported in the 2021 Proxy Statement. The PRSU portion of Mr. Roe's annual award was granted on the annual grant date in fiscal year 2022.*

*(8) Mr. Howard was not a Named Executive Officer in fiscal year 2022.*

tapestry

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

## *Grants of Plan-based Awards*

| Name & Principal Position | Award Type | Grant Date | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards[1] | | | Estimated Possible Payouts Under Equity Incentive Plan Awards[2] | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards[3] ($/Share) | Closing Market Price on Grant Date ($/share) | Grant Date Fair Value of Stock and Option Awards[4] ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | | |
| **Joanne Crevoiserat** *Chief Executive Officer* | Annual incentive | | 840,000 | 2,800,000 | 5,600,000 | | | | | | | | |
| | Annual stock option grant | 8/21/2023 | | | | | | | | 380,657 | 33.81 | 33.81 | 3,999,753 |
| | Annual RSU grant | 8/21/2023 | | | | | | | 59,154 | | | 33.81 | 1,999,996 |
| | Annual Performance RSU grant | 8/21/2023 | | | | 35,492 | 118,308 | 236,616 | | | | 33.81 | 4,323,368 |
| **Scott Roe** *Chief Financial Officer and Chief Operating Officer* | Annual incentive | | 365,625 | 1,218,750 | 2,437,500 | | | | | | | | |
| | Annual stock option grant | 8/21/2023 | | | | | | | | 142,746 | 33.81 | 33.81 | 1,499,903 |
| | Annual RSU grant | 8/21/2023 | | | | | | | 22,183 | | | 33.81 | 750,006 |
| | Annual Performance RSU grant | 8/21/2023 | | | | 13,310 | 44,366 | 88,732 | | | | 33.81 | 1,621,282 |
| **Todd Kahn** *Chief Executive Officer and Brand President, Coach* | Annual incentive | | 375,000 | 1,250,000 | 2,500,000 | | | | | | | | |
| | Annual stock option grant | 8/21/2023 | | | | | | | | 114,197 | 33.81 | 33.81 | 1,199,925 |
| | Annual RSU grant | 8/21/2023 | | | | | | | 17,746 | | | 33.81 | 599,992 |
| | Annual Performance RSU grant | 8/21/2023 | | | | 10,648 | 35,492 | 70,984 | | | | 33.81 | 1,296,996 |
| **Liz Fraser** *Chief Executive Officer and Brand President, Kate Spade* | Annual incentive | | 255,000 | 850,000 | 1,700,000 | | | | | | | | |
| | Annual stock option grant | 8/21/2023 | | | | | | | | 49,485 | 33.81 | 33.81 | 519,963 |
| | Annual RSU grant | 8/21/2023 | | | | | | | 7,690 | | | 33.81 | 260,000 |
| | Annual Performance RSU grant | 8/21/2023 | | | | 4,614 | 15,380 | 30,760 | | | | 33.81 | 562,036 |
| **David Howard** *General Counsel and Secretary* | Annual incentive | | 126,000 | 420,000 | 840,000 | | | | | | | | |
| | Annual stock option grant | 8/21/2023 | | | | | | | | 47,582 | 33.81 | 33.81 | 499,967 |
| | Annual RSU grant | 8/21/2023 | | | | | | | 14,789 | | | 33.81 | 500,017 |
| | Annual Performance RSU grant | 8/21/2023 | | | | 4,437 | 14,789 | 29,578 | | | | 33.81 | 540,439 |

*(1) These columns represent the range of possible cash payouts for fiscal year 2024 associated with established levels of performance under the AIP. If performance falls below the pre-established thresholds, the payout is $0. Amounts actually earned are displayed in the Summary Compensation Table. For details please see the section titled Compensation Discussion and Analysis-Fiscal Year 2024 Compensation-Annual Incentive Plan.*

*(2) These columns represent the range of possible share payouts associated with pre-established levels of performance for PRSUs granted in fiscal year 2024. If performance falls below the pre-established thresholds, no shares will be earned or distributed. These awards are described in the section titled Compensation Discussion and Analysis-Fiscal Year 2024 Compensation-Long Term Incentive Plan.*

*(3) The exercise price for stock option grants is the closing stock price on the date of grant.*

*(4) The amounts reported represent the grant date fair value of all stock and option awards granted to NEOs in fiscal year 2024. For RSU grants, the grant date fair value is calculated using the closing price of Tapestry common stock on the grant date, for stock options, the grant date fair value is calculated using the Black-Scholes value as of the grant date, and for the PRSU grants, under FASB ASC Topic 17 and given the relative TSR performance metric, the market value on the grant date is adjusted to reflect the probable outcome of the relative TSR component based on monte carlo simulation, determined as of the grant date, which results in a fair value per PRSU under FASB ASC Topic 718 that is 108% of the market value of the underlying shares on the grant date. The weighted average assumptions used in calculating the grant date fair value of these stock option awards are described in a footnote 4 to the Summary Compensation Table. Annual stock options and annual RSUs vest 25% per year over four years; Annual PRSUs vest 100% after completion of the three-year performance period.*

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

## *Outstanding Equity Awards at Fiscal Year-end 2024*

| | Option Awards | | | | | Stock Awards | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name & Principal Position | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Grant Date | Option Exercise Price ($/share) | Option Expiration Date | Number of Shares or Units of Stock that Have Not Vested (#) | Restricted Stock Unit Grant Date | Market Value of Shares or Units of Stock that Have Not Vested[a] ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units, or Other Rights that Have Not Vested[b] (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units, or Other Rights that Have Not Vested[a] ($) |
| **Joanne Crevoiserat** *Chief Executive Officer* | 224,081 [1] | - | 8/19/2019 | 20.97 | 8/19/2029 | | | | | |
| | 90,875[1] | 30,291[1] | 8/17/2020 | 15.83 | 8/17/2030 | | | | | |
| | 106,152[1] | 35,383[1] | 11/2/2020 | 23.63 | 11/2/2030 | | | | | |
| | 114,572[1] | 114,572[1] | 8/23/2021 | 42.31 | 8/23/2031 | | | | | |
| | 83,368[1] | 250,104[1] | 8/22/2022 | 35.41 | 8/22/2032 | | | | | |
| | - | 380,657[1] | 8/21/2023 | 33.81 | 8/21/2033 | | | | | |
| | | | | | | 6,954[d] | 8/17/2020 | 297,568 | | |
| | | | | | | 20,813[d] | 8/23/2021 | 890,587 | | |
| | | | | | | 45,416[d] | 8/22/2022 | 1,943,344 | | |
| | | | | | | 61,399[d] | 8/21/2023 | 2,627,256 | | |
| | | | | | | | 8/23/2021 | | 94,406[e] | 4,039,653 |
| | | | | | | | 8/22/2022 | | 121,109[f] | 5,182,240 |
| | | | | | | | 8/21/2023 | | 122,798[f] | 5,254,511 |
| **Scott Roe** *Chief Financial Officer and Chief Operating Officer* | 43,156[1] | 14,385[1] | 6/1/2021 | 44.97 | 6/1/2031 | | | | | |
| | 27,095[1] | 81,283[1] | 8/22/2022 | 35.41 | 8/22/2032 | | | | | |
| | - | 142,746[1] | 8/21/2023 | 33.81 | 8/21/2033 | | | | | |
| | | | | | | 3,366[c] | 6/1/2021 | 144,027 | | |
| | | | | | | 14,760[d] | 8/22/2022 | 631,578 | | |
| | | | | | | 23,025[d] | 8/21/2023 | 985,232 | | |
| | | | | | | | 8/23/2021 | | 32,453[e] | 1,388,657 |
| | | | | | | | 8/22/2022 | | 39,361[f] | 1,684,244 |
| | | | | | | | 8/21/2023 | | 46,050[f] | 1,970,464 |
| **Todd Kahn** *Chief Executive Officer and Brand President, Coach* | 47,970[2] | - | 8/13/2015 | 31.46 | 8/13/2025 | | | | | |
| | 83,605[2] | - | 8/11/2016 | 39.87 | 8/11/2026 | | | | | |
| | 78,467[1] | - | 8/17/2017 | 41.00 | 8/17/2027 | | | | | |
| | 55,423[1] | - | 8/16/2018 | 51.38 | 8/16/2028 | | | | | |
| | 179,265[1] | - | 8/19/2019 | 20.97 | 8/19/2029 | | | | | |
| | 60,583[1] | 30,291[1] | 8/17/2020 | 15.83 | 8/17/2030 | | | | | |
| | 28,644[1] | 28,642[1] | 8/23/2021 | 42.31 | 8/23/2031 | | | | | |
| | 20,842[1] | 62,526[1] | 8/22/2022 | 35.41 | 8/22/2032 | | | | | |
| | - | 114,197[1] | 8/21/2023 | 33.81 | 8/21/2033 | | | | | |
| | | | | | | 6,954[d] | 8/17/2020 | 297,568 | | |
| | | | | | | 5,202[d] | 8/23/2021 | 222,602 | | |
| | | | | | | 11,354[d] | 8/22/2022 | 485,836 | | |
| | | | | | | 18,419[d] | 8/21/2023 | 788,168 | | |
| | | | | | | | 8/23/2021 | | 23,602[e] | 1,009,913 |
| | | | | | | | 8/22/2022 | | 30,278[f] | 1,295,583 |
| | | | | | | | 8/21/2023 | | 36,839[f] | 1,576,336 |

tapestry

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

| Name & Principal Position | Option Awards | | | | | Stock Awards | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Grant Date | Option Exercise Price ($/share) | Option Expiration Date | Number of Shares or Units of Stock that Have Not Vested (#) | Restricted Stock Unit Grant Date | Market Value of Shares or Units of Stock that Have Not Vested[a] ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units, or Other Rights that Have Not Vested[b] (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units, or Other Rights that Have Not Vested[a] ($) |
| **Liz Fraser** *Chief Executive Officer and Brand President, Kate Spade* | 65,350[1] | - | 3/2/2020 | 23.69 | 3/2/2030 | | | | | |
| | 17,186[1] | 17,186[1] | 8/23/2021 | 42.31 | 8/23/2031 | | | | | |
| | 10,838[1] | 32,513[1] | 8/22/2022 | 35.41 | 8/22/2032 | | | | | |
| | - | 49,485[1] | 8/21/2023 | 33.81 | 8/21/2033 | | | | | |
| | | | | | | 3,122[d] | 8/23/2021 | 133,606 | | |
| | | | | | | 5,905[d] | 8/22/2022 | 252,659 | | |
| | | | | | | 7,982[d] | 8/21/2023 | 341,542 | | |
| | | | | | | | 8/23/2021 | | 14,161[e] | 605,959 |
| | | | | | | | 8/22/2022 | | 15,744[f] | 673,688 |
| | | | | | | | 8/21/2023 | | 15,964[f] | 683,085 |
| **David Howard** *General Counsel and Secretary* | 10,742[1] | 10,740[1] | 8/23/2021 | 42.31 | 8/23/2031 | | | | | |
| | 8,337[1] | 25,010[1] | 8/22/2022 | 35.41 | 8/22/2032 | | | | | |
| | - | 47,582[1] | 8/21/2023 | 33.81 | 8/21/2033 | | | | | |
| | | | | | | 8,692[d] | 8/17/2020 | 371,926 | | |
| | | | | | | 3,903[d] | 8/23/2021 | 166,997 | | |
| | | | | | | 9,084[d] | 8/22/2022 | 388,704 | | |
| | | | | | | 15,350[d] | 8/21/2023 | 656,836 | | |
| | | | | | | | 8/23/2021 | | 8,851[e] | 378,744 |
| | | | | | | | 8/22/2022 | | 12,111[f] | 518,215 |
| | | | | | | | 8/21/2023 | | 15,350[f] | 656,836 |

(1) Annual Stock Option Grant: vests 25% each year beginning one year from date of grant.

(2) Annual Stock Option Grant: vested 33.3% each year beginning one year from date of grant.

(a) The market value of stock awards is the number of shares shown in the table multiplied by $42.79, the closing price per share of our common stock on June 28, 2024.

(b) This column displays the number of shares that may be earned subject to expected performance conditions at the end of the relevant performance period. Please see Compensation Discussion and Analysis-Fiscal Year 2024 Compensation-Long Term Incentive Plan for details.

(c) Represents annual RSU grant awarded upon hire for Mr. Roe and vests 25% each year beginning one year from date of grant.

(d) Annual RSU grant: vests 25% each year beginning one year from date of grant.

(e) Annual PRSU grant: subject to a two year performance period, may vest 100% three years from date of grant. As of June 29, 2024, performance period was complete and 113.4% of target shares vested on August 23, 2024. Shares and market values shown are tied to actual performance.

(f) Annual PRSU grant: subject to a three year performance period, may vest 100% three years from date of grant. As of June 29, 2024, performance period was incomplete. Shares and market values shown assume target performance.

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

## *2024 Option Exercises and Stock Vested*

| Name & Principal Position | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting[1] (#) | Value Realized on Vesting[2] ($) |
| **Joanne Crevoiserat** *Chief Executive Officer* | - | - | 106,242 | 3,762,917 |
| **Scott Roe** *Chief Financial Officer and Chief Operating Officer* | - | - | 8,077 | 302,305 |
| **Todd Kahn** *Chief Executive Officer and Brand President, Coach* | - | - | 70,702 | 2,438,038 |
| **Liz Fraser** *Chief Executive Officer and Brand President, Kate Spade* | - | - | 24,392 | 878,908 |
| **David Howard** *General Counsel and Secretary* | - | - | 32,756 | 1,126,912 |

*(1) 52,458 shares were withheld to cover the taxes related to the vesting of Ms. Crevoiserat's RSUs; 3,635 shares were withheld to cover the taxes related to Mr. Roe's RSUs; 36,096 shares were withheld to cover the taxes related to the vesting of Mr. Kahn's RSUs; 9,867 shares were withheld to cover the taxes related to the vesting of Ms. Fraser RSUs; 16,090 shares were withheld to cover the taxes related to the vesting of Mr. Howard RSUs.*

*(2) Represents the product of the number of shares vested and the market value of Tapestry, Inc.'s common stock on the vesting date.*

tapestry

## *2024 Non-Qualified Deferred Compensation*

| Name & Principal Position | Non-Qualified Plan | Executive Contributions in Last FY[1] ($) | Registrant Contributions in Last FY[2] ($) | Aggregate Earnings in Last FY[3] ($) | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FYE[4] ($) |
|---|---|---|---|---|---|---|
| **Joanne Crevoiserat** | EDCP | 504,439 | 46,800 | 242,096 | - | 2,351,821 |
| *Chief Executive Officer* | SRP | - | - | - | - | - |
| **Scott Roe** | EDCP | 188,008 | 43,842 | 188,150 | - | 1,919,822 |
| *Chief Financial Officer and Chief Operating Officer* | SRP | - | - | - | - | - |
| **Todd Kahn** | EDCP | 85,962 | 46,800 | 149,863 | - | 1,191,026 |
| *Chief Executive Officer and Brand President, Coach* | SRP | - | - | 6,154 | - | 121,368 |
| **Liz Fraser** | EDCP | 42,500 | - | 31,989 | - | 337,922 |
| *Chief Executive Officer and Brand President, Kate Spade* | SRP | - | - | - | - | - |
| **David Howard** | EDCP | 34,299 | 14,087 | 25,553 | - | 233,724 |
| *General Counsel and Secretary* | SRP | - | - | 2,239 | - | 17,431 |

*(1) Amounts shown represent elective salary and AIP deferrals made by NEOs into the Tapestry, Inc. Executive Deferred Compensation Plan ("EDCP") in fiscal year 2024.*

*(2) In fiscal year 2024, Tapestry made matching contributions to the accounts of employees who participated in the EDCP (including our NEOs) during the 2023 plan year. The matching formula is 100% of up to 3% of up to $2 million in salary and AIP deferred in the previous plan year, less the maximum match available in the qualified 401(k) Savings Plan, as described in the Other Compensation and Benefits Elements section. All contributions shown are also reported as compensation for fiscal year 2024 in the Summary Compensation Table.*

*(3) Amounts shown represent total investment earnings (losses) under the EDCP and the Supplemental Retirement Plan ("SRP"). Both plans are funded non-tax qualified plans in which participants select investment options based on substantially similar mutual funds available to participants in the 401(k) Savings Plan. The value of each mutual fund varies daily based on stock market conditions. The SRP is frozen and there have been no contributions to the plan since December 31, 2015.*

*(4) Includes Executive Contributions, Registrant Contributions and Aggregate Earnings earned in the last fiscal year for each plan as applicable. Vested account balances are distributed six months after a participant's termination. Under the EDCP, the deferred amounts and company match reported as compensation in the Summary Compensation Table were:*

- *For Ms. Crevoiserat, $616,194 for fiscal year 2022 ($48,400 of which represented company match), $420,940 for fiscal year 2023 ($47,800 of which represented company match) and $551,239 for fiscal year 2024 ($46,800 of which represented company match).*

- *For Mr. Roe, $1,089,188 for fiscal year 2022 ($13,875 of which represented company match), $329,264 for fiscal year 2023 ($46,561 of which represented company match) and $231,850 for fiscal year 2024 ($43,842 of which represented company match).*

- *For Mr. Kahn, $224,364 for fiscal year 2022 ($48,400 of which represented company match) and $150,756 for fiscal year 2023 ($47,800 of which represented company match) and $132,762 for fiscal year 2024 ($46,800 of which represented company match).*

- *For Ms. Fraser, $132,438 for fiscal year 2022 ($48,400 of which represented company match) and $90,300 for fiscal year 2023 ($47,800 of which represented company match) and $42,500 for fiscal year 2024 (there was no company match).*

- *For Mr. Howard, $53,937 for fiscal year 2023 ($26,037 of which represented company match) and $48,386 for fiscal year 2024 ($14,087 of which represented company match).*

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

## *Employment Agreements and Compensatory Arrangements*

### Messrs. Howard, Kahn and Roe and Mses. Crevoiserat and Fraser

Messrs. Howard, Kahn and Roe and Mses. Crevoiserat and Fraser are not subject to fixed term employment contracts. However, each agreed to employment offer letters with the Company upon the commencement of their employment and various supplemental letter agreements entered into, as applicable.

Each of Messrs. Howard, Kahn and Roe and Mses. Crevoiserat and Fraser are required to provide the Company with six-months' advance written notice of his or her intent to terminate employment with Tapestry. Under the terms of each letter agreement, failure of the executive to comply with this notice provision results in the Company being entitled to an immediate injunction prohibiting him or her from commencing employment elsewhere for the length of the required notice and being entitled to claw back any cash incentive paid within 180 days of his or her last day of employment, the forfeiture of any unpaid cash incentive or unvested RSU or stock option or vested stock option as of his or her last day of employment and the ability to claw back any Financial Gain (as defined in each equity award grant agreement) realized from the vesting of any equity award within the 12 months preceding his or her last day of employment with Tapestry.

Ms. Crevoiserat and Mr. Roe's letter agreements each provide that upon their voluntary resignation from the Company after attaining age 62 with not less than five (5) completed years of service with the Company, they will receive retirement treatment under their equity award agreements. All other executives are subject to the standard retirement requirements discussed below under *Treatment of Long-Term Incentives Upon Termination or Change in Control*. Mr. Kahn is currently eligible for retirement treatment. See *Treatment of Long-Term Incentives Upon Termination or Change in Control* for a summary of such treatment.

Each of Ms. Fraser and Messrs. Roe and Kahn's letter agreements provide for 12-months of base salary and health benefits continuation under the Severance Pay Plan for Vice Presidents and Above (the "Severance Pay Plan") in the event he or she is terminated without "Cause" or, for Ms. Fraser and Mr. Roe, if they resign for "Good Reason." Mr. Howard's agreement provides for severance for the greater of 10 months or the amount he is eligible to receive under the Severance Pay Plan. Ms. Crevoiserat's agreement provides for 24-months of base salary and benefits continuation, as well as pro-rated AIP payment based on actual performance in the event she is terminated without "Cause" or resigns for "Good Reason."

Under each of the executive's letter agreements, "Cause" is defined as (i) violation of Tapestry's employee guide or written policies and procedures, (ii) violation of any of the Company's policies regarding sexual harassment and misconduct, (iii) indictment, conviction of, or plea of guilty or no contest to a felony or crime of moral turpitude, (iv) willful or grossly negligent breach of duties, (v) any act of fraud, embezzlement or other similar dishonest conduct, (vi) any act or omission that Tapestry determines could have a material adverse effect on Tapestry, (vii) failure to follow the lawful directives of his or her supervisor, (viii) breach of his or her letter agreement or other written agreement between with Tapestry or any of its affiliates; or (ix) for breach of certain representations.

Under Mses. Crevoiserat and Fraser's letter agreements, "Good Reason" is defined as (i) material diminution of respective position and title, or comparable role; or (ii) relocation of Tapestry's executive offices more than 50 miles outside of New York City; or, for Ms. Crevoiserat, (iii) a reduction in her base salary of more than 20%, other than a reduction that is also applied to members of the Company's Executive Committee or equivalent body or (iv) the Company's material breach of the terms of her letter agreement, subject to certain notice and cure periods described in each letter agreement. Under Mr. Roe's letter agreement, "Good Reason" is defined as Mr. Roe ceasing to be the Company's Chief Financial Officer (principal financial officer) without his consent, subject to certain notice and cure periods described in the letter agreement.

The Company has also adopted the Tapestry, Inc. Special Severance Plan (the "Special Severance Plan"), which is intended to provide benefits to designated employees of the Company who are members of a select group of management or highly compensated employees (as determined in accordance with Sections 201(2), 301(a)(3) and 401(a)(1) of ERISA) in the event their employment is terminated by the Company without cause or by the participant for good reason, each as set forth in the plan upon or within 24 months following a Change in Control (a "Qualifying Termination"). In the event of a Qualifying Termination, the Company shall provide the participants under the Special Severance Plan with severance payment amounts equal to the sum of such participant's Base Salary plus Bonus (each as defined in the Special Severance Plan) multiplied by a certain severance multiple applicable to each participant depending on position, pro-rated bonus based on actual performance, in addition to COBRA and accelerated vesting of unvested awards granted on or after the adoption of the

**tapestry**

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

plan. Under the Special Severance Plan, Ms. Crevoiserat is entitled to a multiple of 2.5 times; all other NEOs are entitled to severance multiples of 1.5 times.

Please refer to *Treatment of Long-Term Incentives Upon Termination or Change in Control* below for a discussion of the impact of a termination on annual stock options, PRSUs and RSUs.

## Ms. Fraser Severance Arrangements

Ms. Fraser's employment with the Company ceased involuntarily on September 2, 2024, at which time the Company and Ms. Fraser entered into a separation agreement and mutual release that sets forth the payments and benefits, summarized below, that Ms. Fraser is receiving in connection with her termination.

| Compensation and Benefits owed to Ms. Fraser due to Involuntary Termination Event | |
|---|---|
| Salary Continuation[1] | $ 850,000 |
| Non Qualified Retirement Plan Distribution | $ 232,567 |
| Executive Deferred Compensation Plan Distribution | $ 364,285 |
| **Intrinsic Value of unvested long-term incentive awards that will pro-rata vest upon termination[2]** | |
| Stock Options: intrinsic value of the pro-rata portion of awards expected to vest | $ 4,932 |
| RSUs: intrinsic value of the pro-rata portion of awards expected to vest | $ 9,675 |
| PRSUs: intrinsic value of unvested awards expected to vest, assuming performance at target. Awards may vest subject to satisfaction of performance criteria. | $ 670,710 |
| **Total** | **$2,132,169** |

*(1) Payments will be made over 12 months.*

*(2) Values are based on the closing price of Tapestry, Inc. common stock on September 3, 2024 of $41.57. Pro-rata awards will vest on future vest dates.*

**tapestry**

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

## Treatment of Long-Term Incentives Upon Termination or Change in Control

In general, the annual stock option, PRSU and RSU grants made to our NEOs and outstanding as of the end of fiscal year 2024 are treated as indicated below in the event of termination or change-in-control. The HR Committee retains discretion to modify the terms of any agreement in certain situations.

| Reason for Termination | Treatment of Unvested Awards |
|---|---|
| Voluntary (including a resignation without "Good Reason," as defined above under *Employment Agreements and Compensatory Arrangements*) | Unvested awards forfeit.<br><br>Vested stock options remain exercisable for 90 days. |
| Retirement (departure from the Company, other than for cause, if employee has attained age 65 and five years of service or age 55 and ten years of service with the Company) | Unvested awards remain outstanding and become vested according to their original schedule, subject to compliance with the restrictive covenants through the last vesting date. The number of PRSUs that vest is based on actual company performance.<br><br>Vested options continue to be exercisable for the remainder of the ten-year term. |
| Severance Event (including resignation with "Good Reason" or termination without "Cause," as defined above under *Employment Agreements and Compensatory Arrangements*) | Unvested awards vest pro-rata as of the employee's termination date.<br><br>The number of PRSUs that ultimately vest will be based on actual performance relative to the pre-established targets.<br><br>Exercisability of vested stock options continues for the 90 days following termination date. |
| Death or Long-Term Disability | Vesting of unvested awards and target PRSUs is accelerated.<br><br>The estate (or the executive) may exercise stock options for five years. |
| Termination upon a Change-in-Control | Vesting of unvested awards is accelerated (at target performance for PRSUs if prior to completion of performance period). |
| Cause (as defined above under *Employment Agreements and Compensatory Arrangements*) | Vested and unvested stock options and unvested RSUs and PRSUs forfeit, and financial gains realized in the twelve months prior to termination must be repaid. |
| Change-in-Control without termination | Outstanding awards shall continue vesting as scheduled assuming continued employment, or an equivalent award shall be substituted by the successor corporation. PRSUs shall be deemed earned at target performance if Change-in-Control is prior to end of performance period. |

tapestry

TABLE OF CONTENTS

## *Potential Payments Upon Termination or Change in Control*

The tables below reflect the amount of compensation that would have been owed to each of our NEOs in the event of employment termination, including due to a change in control, on June 29, 2024. The tables include amounts earned through June 29, 2024, as well as estimates of the amounts which would have been paid to such NEOs following that date. The actual amounts to be paid out can only be determined at the time of a NEO's termination.

Regardless of the reason for a NEO's termination of employment, a NEO may be entitled to receive amounts earned during the term of employment. Such amounts include:

- any vested balance in our qualified and non-qualified retirement plans;

- the ability to convert life insurance at the NEO's own expense;

- the ability to exercise vested stock options for a defined period of time.

In the event a NEO dies or is terminated due to disability, such NEO or beneficiary would receive benefits under our broad-based life insurance or long-term disability plan, as appropriate.

The amounts of compensation due upon various termination situations reflect the specific employment terms and conditions for each executive as described under *Employment Agreements and Compensatory Arrangements*, and were calculated using the following assumptions:

- LTI amounts reflect the intrinsic value of unvested stock options, RSUs and PRSUs whose vesting would be pro-rated, accelerated or continued due to the termination, assuming a closing price of our common stock on June 28, 2024 of $42.79 the last trading day before the assumed termination date. For termination reasons in which the value of PRSUs earned depends on satisfaction of the performance criteria, FY22-23 PRSUs reflect actual performance of 113.4% of target, as certified by the HR Committee in August 2022.

- The HR Committee does not exercise its discretion to pro-rata vest, increase or decrease any equity awards.

- The values shown for continuation of benefits and perquisites reflect our cost for each program as of June 29, 2024. These costs may change annually.

- The "Total" row represents the sum of all estimated payments in the column.

tapestry

TABLE OF CONTENTS

**EXECUTIVE COMPENSATION**

**JOANNE CREVOISERAT**

| Incremental Benefits Due to Termination Event | Termination with Cause ($) | Resignation by the Executive without Good Reason[1] ($) | Termination without Cause ($) | Resignation by the Executive with Good Reason ($) | Termination due to Change-in-Control ($) | Termination due to Executive's Death or Disability ($) | Termination due to Executive's Retirement[2] ($) |
|---|---|---|---|---|---|---|---|
| **TOTAL** | **2,601,607** | **2,601,607** | **23,057,799** | **23,057,799** | **43,857,576** | **33,304,412** | **-** |
| Salary Continuation | - | - | 2,800,000 | 2,800,000 | 3,500,000 | - | - |
| Benefit and Perquisite Continuation | - | - | 42,531 | 42,531 | 53,164 | - | - |
| Short Term Incentive | - | - | 3,654,000 | 3,654,000 | 10,654,000 | 3,654,000 | - |
| Annual Long Term Incentives: | | | | | | | |
| Unvested Stock Options | - | - | 3,035,532 | 3,035,532 | 6,813,646 | 6,813,646 | - |
| Unvested Restricted Stock Units | - | - | 2,385,518 | 2,385,518 | 5,758,755 | 5,758,755 | - |
| Unvested Performance Restricted Stock Units | - | - | 8,538,611 | 8,538,611 | 14,476,404 | 14,476,404 | - |
| Retirement Plan Distribution | 2,601,607 | 2,601,607 | 2,601,607 | 2,601,607 | 2,601,607 | 2,601,607 | - |

(1) Pursuant to Ms. Crevoiserat's employment offer letter with the Company, Ms. Crevoiserat may receive, based on the sole discretion of the Company, total compensation of up to $2,800,000, equal to 24 months' salary, in exchange for enforcement of the non-competition provisions of such offer letter for up to the 24-month period following her separation from the Company.

(2) Ms. Crevoiserat was not eligible to retire as of June 29, 2024.

**SCOTT ROE**

| Incremental Benefits Due to Termination Event | Termination with Cause ($) | Resignation by the Executive without Good Reason[1] ($) | Termination without Cause ($) | Resignation by the Executive with Good Reason ($) | Termination due to Change-in-Control ($) | Termination due to Executive's Death or Disability ($) | Termination due to Executive's Retirement[2] ($) |
|---|---|---|---|---|---|---|---|
| **TOTAL** | **2,061,482** | **2,061,482** | **7,153,441** | **7,153,441** | **15,670,158** | **12,337,881** | **-** |
| Salary Continuation | - | - | 975,000 | 975,000 | 1,462,500 | - | - |
| Benefit and Perquisite Continuation | - | - | 27,768 | 27,768 | 41,652 | - | - |
| Short Term Incentive | - | - | - | - | 3,418,594 | 1,590,469 | - |
| Annual Long Term Incentives: | | | | | | | |
| Unvested Stock Options | - | - | 552,589 | 552,589 | 1,881,728 | 1,881,728 | - |
| Unvested Restricted Stock Units | - | - | 614,540 | 614,540 | 1,760,837 | 1,760,837 | - |
| Unvested Performance Restricted Stock Units | - | - | 2,922,062 | 2,922,062 | 5,043,365 | 5,043,365 | - |
| Retirement Plan Distribution | 2,061,482 | 2,061,482 | 2,061,482 | 2,061,482 | 2,061,482 | 2,061,482 | - |

(1) Pursuant to Mr. Roe's employment offer letter with the Company, Mr. Roe may receive, based on the sole discretion of the Company, total compensation of up to $975,000, equal to 12 months' salary, in exchange for enforcement of the non-competition provisions of such offer letter for up to the 12-month period following his separation from the Company.

(2) Mr. Roe was not eligible to retire as of June 29, 2024.

**TODD KAHN**

| Incremental Benefits Due to Termination Event | Termination with Cause ($) | Resignation by the Executive without Good Reason[1] ($) | Termination without Cause ($) | Resignation by the Executive with Good Reason [2] ($) | Termination due to Change-in-Control ($) | Termination due to Executive's Death or Disability ($) | Termination due to Executive's Retirement[3] ($) |
|---|---|---|---|---|---|---|---|
| **TOTAL** | **2,190,378** | **2,190,378** | **11,201,309** | **-** | **15,460,110** | **12,058,707** | **12,058,707** |
| Salary Continuation | - | - | 1,000,000 | - | 1,500,000 | - | - |
| Benefit and Perquisite Continuation | - | - | 17,602 | - | 26,403 | - | - |
| Short Term Incentive | - | - | - | - | 3,750,000 | 1,875,000 | 1,875,000 |
| Annual Long Term Incentives: | | | | | | | |
| Unvested Stock Options | - | - | 2,317,324 | - | 2,317,324 | 2,317,324 | 2,317,324 |
| Unvested Restricted Stock Units | - | - | 1,794,173 | - | 1,794,173 | 1,794,173 | 1,794,173 |
| Unvested Performance Restricted Stock Units | - | - | 3,881,832 | - | 3,881,832 | 3,881,832 | 3,881,832 |
| Retirement Plan Distribution | 2,190,378 | 2,190,378 | 2,190,378 | - | 2,190,378 | 2,190,378 | 2,190,378 |

tapestry

TABLE OF CONTENTS

(1) Pursuant to Mr. Kahn's employment offer letter with the Company, Mr. Kahn may receive, based on the sole discretion of the Company, total compensation of up to $1,000,000, equal to 12 months' salary, in exchange for enforcement of the non-competition provisions of such offer letter for up to the 12-month period following his separation from the Company.

(2) Mr. Kahn is not able to resign for Good Reason under the terms of his offer letter.

(3) Mr. Kahn was eligible to retire as of June 29, 2024.

**LIZ FRASER**

| Incremental Benefits Due to Termination Event | Termination with Cause ($) | Resignation by the Executive without Good Reason[1] ($) | Termination without Cause ($) | Resignation by the Executive with Good Reason ($) | Termination due to Change-in-Control ($) | Termination due to Executive's Death or Disability ($) | Termination due to Executive's Retirement[2] ($) |
|---|---|---|---|---|---|---|---|
| TOTAL | 563,701 | 563,701 | 3,895,479 | 3,895,479 | 7,294,111 | 4,744,111 | - |
| Salary Continuation | - | - | 850,000 | 850,000 | 1,275,000 | - | - |
| Benefit and Perquisite Continuation | - | - | - | - | - | - | - |
| Short Term Incentive | - | - | 797,300 | 797,300 | 2,072,300 | 797,300 | - |
| Annual Long Term Incentives: | | | | | | | |
| Unvested Stock Options | - | - | 212,266 | 212,266 | 692,571 | 692,571 | - |
| Unvested Restricted Stock Units | - | - | 285,446 | 285,446 | 727,807 | 727,807 | - |
| Unvested Performance Restricted Stock Units | - | - | 1,186,766 | 1,186,766 | 1,962,732 | 1,962,732 | - |
| Retirement Plan Distribution | 563,701 | 563,701 | 563,701 | 563,701 | 563,701 | 563,701 | - |

(1) Pursuant to Ms. Fraser's employment offer letter with the Company, Ms. Fraser may receive, based on the sole discretion of the Company, total compensation of up to $850,000, equal to 12 months' salary, in exchange for enforcement of the non-competition provisions of such offer letter for up to the 12-month period following her separation from the Company.

(2) Ms. Fraser was not eligible to retire as of June 29, 2024.

(3) Ms. Fraser's employment with the Company ceased involuntarily on September 2, 2024. Please see Employment Agreements and Compensatory Arrangements-Ms. Fraser Severance Arrangements for a schedule of actual payments.

**DAVID HOWARD**

| Incremental Benefits Due to Termination Event | Termination with Cause ($) | Resignation by the Executive without Good Reason[1] ($) | Termination without Cause ($) | Resignation by the Executive with Good Reason [2] ($) | Termination due to Change-in-Control ($) | Termination due to Executive's Death or Disability ($) | Termination due to Executive's Retirement[3] ($) |
|---|---|---|---|---|---|---|---|
| TOTAL | 768,074 | 768,074 | 3,784,268 | - | 6,632,425 | 5,071,447 | - |
| Salary Continuation | - | - | 600,000 | - | 900,000 | - | - |
| Benefit and Perquisite Continuation | - | - | 20,652 | - | 30,978 | - | - |
| Short Term Incentive | - | - | 548,100 | - | 1,178,100 | 548,100 | - |
| Annual Long Term Incentives: | | | | | | | |
| Unvested Stock Options | - | - | 180,742 | - | 617,015 | 617,015 | - |
| Unvested Restricted Stock Units | - | - | 799,278 | - | 1,584,463 | 1,584,463 | - |
| Unvested Performance Restricted Stock Units | - | - | 867,421 | - | 1,553,795 | 1,553,795 | - |
| Retirement Plan Distribution | 768,074 | 768,074 | 768,074 | - | 768,074 | 768,074 | - |

(1) Pursuant to Mr. Howard's employment offer letter with the Company, Mr. Howard may receive, based on the sole discretion of the Company, total compensation of up to $600,000, equal to 12 months' salary, in exchange for enforcement of the non-competition provisions of such offer letter for up to the 12-month period following his separation from the Company.

(2) Mr. Howard is not able to resign for Good Reason under the terms of his offer letter.

(3) Mr. Howard was not eligible to retire as of June 29, 2024.

tapestry

**TABLE OF CONTENTS**

**EXECUTIVE COMPENSATION**

## *CEO Pay Ratio*

As required by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), the following information explains the relationship of the annual total compensation of our median employee to the annualized total compensation of Ms. Crevoiserat, our CEO at the end of fiscal year 2024.

For fiscal year 2024, as required under the applicable rules we identified a new median employee.

We determined the following in compliance with the requirements set forth in Item 402(u) of SEC Regulation S-K:

- The total compensation of our median employee was $26,657;

- The total annualized compensation of Ms. Crevoiserat was $15,430,213; and

- The ratio of the median employee's pay to that of Ms. Crevoiserat was 1 to 579.

Ms. Crevoiserat's compensation as reported in the *Summary Compensation Table* was used for purposes of calculating the ratio. For purposes of the pay ratio, both the CEO's and median employee's annual total compensation were calculated in accordance with the requirements of Item 402(c)(2)(x) of SEC Regulation S-K.

Our median employee is a full time sales associate working in a retail store in Asia. To identify the median employee and determine his or her annual total compensation, we used the following methodology in fiscal year 2024, consistent with SEC regulations:

- We selected June 1, 2024 as the determination date, one month before the end of our fiscal year 2024. In 2021 we selected May 3, 2021 as the date on which to determine our median employee. We changed the determination date in fiscal year 2024 for internal administrative reasons.

- At June 1, 2024, we prepared a file of our consolidated global payroll records. As of the determination date, our analysis included approximately 20,100 employees working in 27 countries. This figure represented all our employees globally.

- We utilized actual base salary paid in fiscal year 2024 from our payroll records as our consistently applied compensation measure to identify the median employee. We converted compensation for employees paid in currencies other than the U.S. dollar into U.S. dollars based on exchange rates as of the end of fiscal year 2024.

- We examined a small group of employees for whom actual base salary was clustered within a few dollars around the median. From this group we selected an individual we determined to be reasonably representative of our median employee.

tapestry

TABLE OF CONTENTS

## Pay versus Performance

The following table sets forth the relationship between executive compensation actually paid and the financial performance of the Company in accordance with SEC rules. It includes compensation for our Chief Executive Officer, or PEO (Ms. Crevoiserat), our former Chief Executive Officer, or PEO (Jide Zeitlin) for fiscal year 2021, and average compensation for our NEOs other than our PEOs, or the non-PEO NEOs.

| Fiscal Year | Summary Compensation Table Total for Ms. Crevoiserat ($)[1] | Summary Compensation Table Total for Mr. Zeitlin ($)[1] | Compensation Actually Paid to Ms. Crevoiserat[1] (2) | Compensation Actually Paid to Mr. Zeitlin[1][2] | Average Summary Compensation Table Total for Non-PEO NEOs[1] | Average Compensation Actually Paid to Non-PEO NEOs[1][2] | Total Shareholder Return[3] | Peer Group Total Shareholder Return[3] | Net Income (millions) | Net Sales (millions) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Value of Initial Fixed $100 Investment Based on: | | | |
| 2024 | $15,430,213 | NA | $16,312,370 | NA | $4,565,986 | $4,968,207 | $375 | $101 | $816 | $6,671 |
| 2023 | $14,489,503 | NA | $21,941,536 | NA | $3,867,451 | $5,632,476 | $361 | $115 | $936 | $6,661 |
| 2022 | $13,739,426 | NA | $ 8,274,188 | NA | $4,287,976 | $2,782,806 | $252 | $123 | $856 | $6,685 |
| 2021 | $12,548,591 | $90,078 | $32,598,067 | $4,088,619 | $3,713,352 | $9,037,986 | $340 | $200 | $834 | $5,746 |

*(1) The following individuals are our Named Executive Officers for each fiscal year:*

| Fiscal Year | PEO(s) | Non-PEO NEOs |
|---|---|---|
| 2024 | Joanne Crevoiserat | Scott Roe, Todd Kahn, Liz Fraser, and David Howard |
| 2023 | Joanne Crevoiserat | Scott Roe, Todd Kahn, Liz Fraser, and David Howard |
| 2022 | Joanne Crevoiserat | Scott Roe, Todd Kahn, Tom Glaser, and Liz Fraser |
| 2021 | Joanne Crevoiserat, Jide Zeitlin | Scott Roe, Todd Kahn, Tom Glaser, Liz Fraser, and Andrea Resnick |

*(2) Compensation actually paid to our NEOs represents the "Total" compensation reported in the Summary Compensation Table for the applicable fiscal year, adjusted as follows for FY 2024. For all prior year adjustments, refer to the 2023 Proxy Statement.*

| | FY 2024 | |
|---|---|---|
| | PEO - Ms. Crevoiserat | Avg. non-PEO NEO |
| Summary Compensation table total for applicable year. | 15,430,213 | 4,565,986 |
| Deduction for amounts reported under the "Stock Awards" and "Option Awards" columns in the Summary Compensation table for the applicable year. | (10,323,117) | (2,462,632) |
| Increase based on ASC Topic 718 fair value of Awards granted during applicable year that remain unvested as of applicable year end, determined as of applicable year end. RSU values include RSUs attributable to reinvested dividend equivalents. | 15,312,306 | 3,642,222 |
| Increase based on ASC 718 Fair Value of Awards granted during Applicable FY that Vested during Applicable FY, determined as of Vesting Date. | - | - |

**tapestry**

TABLE OF CONTENTS

| | FY 2024 | |
| --- | --- | --- |
| | PEO - Ms. Crevoiserat | Avg. non-PEO NEO |
| Increase/deduction for Awards granted in prior years that were outstanding and unvested as of applicable year end, determined based on change in ASC Topic 718 fair value from the prior year end to the applicable year end. | (1,003,786) | (151,847) |
| Increase/deduction for Awards granted in prior years that vested during the applicable year, determined based on change in ASC Topic 718 fair value from the prior year end to the vesting date. | (3,103,246) | (625,522) |
| Fair Value at the End of the Prior Year of Equity Awards that Failed to Meet Vesting Conditions in the Year. | - | - |
| Compensation Actually Paid | 16,312,370 | 4,968,207 |

(3) TSR is cumulative for the measurement periods beginning on June 27, 2020 and ending on July 3, 2021, July 2, 2022, July 1, 2023, and June 29, 2024, calculated in accordance with Item 201(e) of Regulation S-K. The Peer Group TSR column represents the S&P Composite 1500 Apparel, Accessories & Luxury Goods Index, which is the industry specific index included in Part II, Item 5 of our Annual Report on Form 10-K for the fiscal year ended June 29, 2024.

tapestry

TABLE OF CONTENTS

# Pay versus Performance Relationship

See the *Compensation Discussion & Analysis* for a description of how the HR Committee assesses the relationship between executive compensation and performance.

The chart below provides a comparison between (i) the TSR of Tapestry and of the S&P Composite 1500 Apparel, Accessories & Luxury Goods Index assuming a fixed $100 initial investment on June 27, 2020 and reinvestment of dividends, and (ii) the compensation actually paid to our PEOs and the average compensation actually paid to our non-PEO NEOs for the fiscal years 2021, 2022, 2023, and 2024.

Because our TSR significantly outperformed the TSR of our industry index, and because LTI are the most significant element of pay for our PEO and our other NEOs, compensation actually paid is substantially higher than amounts reported in the Summary Compensation Table on a cumulative basis for fiscal years 2021, 2022, 2023, and 2024. While we are extremely pleased with our strong absolute and relative TSR performance over the last four years, we realize that there is no guarantee that our executives will actually realize the amounts reported below as compensation actually paid.



|  | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Tapestry TSR | $100 | $ 339.92 | $ 252.06 | $ 361.01 | $ 374.51 |
| S&P Composite 1500 Apparel, Accessories & Luxury Goods Index | $100 | $ 200.09 | $ 122.52 | $ 115.41 | 101.22 |
| PEO Compensation Actually Paid - Zeitlin |  | $ 4,088,619 | NA | NA | NA |
| PEO Compensation Actually Paid - Crevoiserat |  | $32,598,067 | $8,274,188 | $21,941,536 | $16,312,370 |
| Avg non-PEO NEO Compensation Actually Paid |  | $ 9,037,986 | $2,782,806 | $ 5,632,476 | $ 4,968,207 |

tapestry

TABLE OF CONTENTS

The chart below provides a comparison between (i) Tapestry's Net Income and (ii) compensation actually paid to our PEOs and average compensation actually paid to our non-PEO NEOs for the fiscal years 2021, 2022, 2023 and 2024.



|  | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|
| Net Income (in millions) | $ 834 | $ 856 | $ 936 | $ 816 |
| PEO Compensation Actually Paid - Zeitlin | $ 4,088,619 | NA | NA | NA |
| PEO Compensation Actually Paid - Crevoiserat | $32,598,067 | $8,274,188 | $21,941,536 | $16,312,370 |
| Avg non-PEO NEO Compensation Actually Paid | $ 9,037,986 | $2,782,806 | $ 5,632,476 | $ 4,968,207 |

tapestry

TABLE OF CONTENTS

The chart below provides a comparison between (i) Tapestry's Net Sales and (ii) compensation actually paid to our PEOs and average compensation actually paid to our non-PEO NEOs for the fiscal years 2021, 2022, 2023, and 2024.



|  | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|
| Net Sales (in millions) | $ 5,746 | $ 6,685 | $ 6,661 | $ 6,671 |
| PEO Compensation Actually Paid - Zeitlin | $ 4,088,619 | NA | NA | N/A |
| PEO Compensation Actually Paid - Crevoiserat | $32,598,067 | $8,274,188 | $21,941,536 | $16,312,370 |
| Avg non-PEO NEO Compensation Actually Paid | $ 9,037,986 | $2,782,806 | $ 5,632,476 | $ 4,968,207 |

## Performance Measures

The following performance measures are the most important used by the Company to link executive compensation actually paid to the NEOs to company performance during fiscal year 2024.

| Company-selected performance measures |
|---|
| Net Sales |
| Operating Income |
| Gross Margin |
| Return on Invested Capital |
| Relative Total Shareholder Return |
| Equity, Inclusion and Diversity |

TABLE OF CONTENTS

 *SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS*

The following table summarizes information as of June 29, 2024, with respect to the shares of Tapestry common stock that may be issued under our equity compensation plans:

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants or rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity comp plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 14,925,691[1] | 32.59[2] | 19,114,325[3] |
| **Total** | **14,925,691** | | **19,114,325** |

*(1) Includes 5,526,036 RSUs and 1,150,207 PRSUs, which do not have an exercise price. PRSUs with incomplete performance periods assume maximum performance conditions will be satisfied.*

*(2) Includes weighted average exercise price for stock options only.*

*(3) Includes securities remaining available for future issuance for each of the following plans:*

- *2018 Stock Incentive Plan: 18,729,589*
- *Employee Stock Purchase Plan: 384,736*

TABLE OF CONTENTS

# CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

## Transactions with Related Persons

The Company has not identified any direct or indirect material interests of its directors or executive officers in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K for fiscal year 2024.

## Policies and Procedures for Related Person Transactions

Tapestry has instituted written policies and procedures for the review, approval and ratification of "related person" transactions as defined in Item 404 of SEC Regulation S-K under the Exchange Act between the Company and its directors, director nominees, executive officers, greater than 5% beneficial owners and each of their immediate family members, in which any "related person" had, has or will have a "direct or indirect material interest," and which is potentially required to be disclosed pursuant to the Exchange Act.

The policy provides that the GN Committee is responsible for the review and approval or disapproval of related party transactions proposed to be entered into or the ratification of any such transaction which continues on a year after year basis. Under the policy, no GN Committee member may participate in any review, consideration or approval of a transaction involving such member or their immediate family or any entity with which such GN Committee member is affiliated.

In reviewing transactions subject to the policy, the GN Committee considers any factors it deems relevant, including (i) whether the transaction is in the ordinary course of business of the Company, (ii) whether the transaction is on terms no less favorable than terms available to an unaffiliated third party, (iii) the related person's interest in the transaction, (iv) the approximate dollar value of the transaction and the related person's interest, (v) the purpose of the transaction, (vi) the disclosure obligations of the Company, (vii) the conflict of interest provisions of the Code and (viii) any other information that may be considered material.

**tapestry**

TABLE OF CONTENTS

# ▶ OTHER INFORMATION

## Communicating with the Board

Tapestry has adopted a policy which permits stockholders and interested parties to contact the Board, with the option to do so anonymously. To report complaints or concerns about Tapestry's accounting, internal accounting controls, auditing or legal matters directly to Tapestry's Board and/or Audit Committee, stockholders may submit a report on Tapestry's Ethics and Compliance Reporting System (https://www.tapestry.ethicspoint.com/) or call 1-800-396-1807, which is manned by an independent service taking confidential messages on behalf of Tapestry. Complaints or concerns relating to Tapestry's accounting, internal accounting controls or auditing matters will be referred to Tapestry's Independent Chair and the Audit Committee Chair. Other relevant legal or ethical concerns will be referred to the Independent Chair of Tapestry's Board, who is also currently the Chair of the GN Committee. The status of all outstanding concerns addressed to the Independent Chair or the Audit Committee Chair will be reported to the Board on at least a quarterly basis. Further information on this policy is available to security holders on Tapestry's website through the Corporate Governance page.

## Stockholder Proposals for the 2025 Annual Meeting

Tapestry's Bylaws currently provide that in order for a stockholder or eligible group of stockholders to nominate a candidate for election as a Director at an Annual Meeting of Stockholders or for a stockholder to propose business for consideration at such meeting, written notice complying with the requirements set forth in our Bylaws generally must be delivered to the Secretary of Tapestry, at Tapestry's principal executive office, not later than 5:00 p.m., Eastern Time, on the 120th day, and not earlier than the 150th day, prior to the first anniversary of the date of the proxy statement for the preceding year's Annual Meeting of Stockholders. Accordingly, a notice of stockholder nomination or proposal intended to be considered at the 2025 Annual Meeting of Stockholders must contain all the information and certifications required by our Bylaws and be received by the Secretary no earlier than April 30, 2025, and no later than 5:00 p.m. Eastern Time on May 30, 2025. Nominations or proposals should be mailed to Tapestry, Inc., to the attention of Tapestry's Secretary, David Howard, 10 Hudson Yards, New York, New York 10001. Our proxy access Bylaw also currently permit a stockholder (or a group of up to 20 stockholders) owning 3% or more of our outstanding common stock continuously for at least three years to nominate and include in the Company's proxy materials candidates for election as directors constituting up to the greater of two individuals or 20% of the Board, if the nominating stockholder(s) and the nominee(s) satisfy the requirements specified in Tapestry's Bylaws. For the 2025 Annual Meeting of Stockholders, notice of a proxy access nomination must be delivered to our Secretary not before April 30, 2025, and no later than 5:00 p.m. Eastern Time on May 30, 2025. A copy of the Bylaws may be obtained from David Howard, Tapestry's Secretary, by written request to the same address.

In addition, if you wish to have your proposal considered for inclusion in Tapestry's 2025 proxy statement, pursuant to Rule 14a-8 of the Exchange Act, we must receive such proposal no later than May 30, 2025.

Tapestry will consider only proposals and nominations meeting the requirements of the applicable federal securities laws, the Commission rules promulgated thereunder and Tapestry's Bylaws.

## Other Business

Tapestry's Board does not presently intend to bring any other business before the Annual Meeting and, so far as is known to the Board, no matters are to be brought before the Annual Meeting except as specified in the Notice of the Annual Meeting. As to any business other than as specified in the Notice of the Annual Meeting that may properly come before the Annual Meeting, however, it is intended that proxies will be voted in respect thereof in accordance with the discretion of the persons exercising such proxies.

tapestry

TABLE OF CONTENTS

**OTHER INFORMATION**

## *Tapestry's Form 10-K and Other Matters*

A copy of Tapestry's Annual Report on Form 10-K for the fiscal year ended June 29, 2024, as filed with the SEC, will be sent to any stockholder, without charge, by regular mail or by e-mail upon written request addressed to Tapestry, to the attention of the Investor Relations Department, 10 Hudson Yards, New York, New York 10001. You also may obtain our Annual Report on Form 10-K over the Internet at the SEC's website, *www.sec.gov*, or on the investor relations section of our website.

To the extent that this proxy statement is incorporated by reference into any of our other filings under the Securities Act or the Exchange Act, the sections of this proxy statement titled *Human Resources Committee Report*, and *Audit Committee Report* (to the extent permitted by the rules of the SEC) will not be deemed incorporated, unless specifically provided otherwise in such filing. No information contained on our website, www.tapestry.com, is intended to be included as part of, or incorporated by reference into, this proxy statement.

## *Expenses of Solicitation*

This solicitation is being made by mail, but may also be made by e-mail, telephone or in person by Tapestry's officers and employees (without additional compensation). Tapestry will pay the cost of soliciting proxies for the Annual Meeting, including the cost of mailing. Tapestry will reimburse brokerage firms, nominees, custodians and fiduciaries for

their out-of-pocket expenses for forwarding proxy materials to beneficial owners and seeking instruction with respect thereto. The Company has engaged Alliance Advisors LLC to assist in the solicitation of proxies for the Annual Meeting for a fee of $13,500 plus reasonable out-of-pocket expenses.

## *Householding*

Pursuant to rules of the SEC, the Company is delivering to multiple stockholders sharing the same address one copy of the Notice of Internet Availability (or, for those who request it, one hard copy of our annual report, proxy statement and proxy card) in a single envelope unless the Company has received prior instructions to the contrary. This procedure is referred to as householding. Upon written or oral request, we will promptly mail a separate copy of our Notice of Internet Availability in separate envelopes (or our annual report, proxy statement and proxy card) to any stockholder at a shared address to which a single copy of our Notice of Internet Availability (or our annual report, proxy statement and proxy card) was delivered in a single envelope. Conversely, upon written or oral request, we will cease delivering separate copies of our Notice of

Internet Availability (or our annual report, proxy statement and proxy card) in separate envelopes to any stockholder at a shared address to which multiple copies of either document were delivered in the past. Please contact Broadridge Householding Department with your request, by calling their toll free number, 1-866-540-7095 or by writing to: Broadridge, Householding Department, 51 Mercedes Way, Edgewood NY 11717. We will mail the materials that you request at no cost to you. Stockholders who hold their shares in "Street name," that is, through a broker, bank, financial institution or other nominee or intermediary as holder of record, and who wish to change their householding instructions or obtain copies of these documents, should follow the instructions on their voting instruction card or contact the holders of record.

tapestry

TABLE OF CONTENTS

 *APPENDIX A*

## RECONCILIATION OF GAAP AND NON-GAAP FINANCIAL MEASURES

The Company's reported results are presented in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"). The reported Net Sales, Operating Income and Gross Margin in fiscal years 2024 and 2023 reflect certain items which affect the comparability of our results.

In addition, the reported Net Sales, Operating Income and Gross Margin in fiscal years 2024 and 2023 were adjusted,

when applicable, for AIP evaluation purposes. The following tables reconcile the "as reported" results to "adjusted" results excluding these items. Numbers shown in millions have been rounded to one decimal.

| ADJUSTMENTS FOR FISCAL YEAR 2024 FINANCIAL HIGHLIGHTS AND FISCAL YEAR 2024 ANNUAL INCENTIVE PLAN | Tapestry, Inc. | | | Coach | | | Kate Spade | | |
|---|---|---|---|---|---|---|---|---|---|
| | Net Sales (in millions) | Operating Income (in millions) | Gross Margin | Net Sales (in millions) | Operating Income (in millions) | Gross Margin | Net Sales (in millions) | Operating Income (in millions) | Gross Margin |
| As Reported: (GAAP Basis) | $6,671.2 | $1,140.1 | 73.3% | $5,095.3 | $1,651.1 | 76.1% | $1,334.4 | $132.6 | 65.2% |
| Acquisition Costs | N/A | $ 109.9 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Adjusted: (Non-GAAP basis as reported in Form 10-K)[1] | $6,671.2 | $1,250.0 | 73.3% | $5,095.3 | $1,651.1 | 76.1% | $1,334.4 | $132.6 | 65.2% |
| Foreign Currency Adjustments | 77.3 | 33.5 | 0.1% | 67.5 | 33.2 | -% | 7.5 | 1.7 | 0.1% |
| Exclude AIP from Operating Income Adjustment | N/A | 115.4 | N/A | N/A | 45.8 | N/A | N/A | 10.9 | N/A |
| Brand Mix Impact from Gross Margin | N/A | N/A | -0.3% | N/A | N/A | N/A | N/A | N/A | N/A |
| Adjusted: (Non-GAAP Basis for AIP results measurement) | $6,748.5 | $1,398.9 | 73.1% | $5,162.8 | $1,730.1 | 76.1% | $1,341.9 | $145.2 | 65.3% |

| ADJUSTMENTS FOR FISCAL YEAR 2023 FINANCIAL HIGHLIGHTS AND FISCAL YEAR 2023 ANNUAL INCENTIVE PLAN | Tapestry, Inc. | | | Coach | | | Kate Spade | | |
|---|---|---|---|---|---|---|---|---|---|
| | Net Sales (in millions) | Operating Income (in millions) | Gross Margin | Net Sales (in millions) | Operating Income (in millions) | Gross Margin | Net Sales (in millions) | Operating Income (in millions) | Gross Margin |
| As Reported: (GAAP Basis) | $6,660.9 | $1,172.4 | 70.8% | $4,960.4 | $1,529.9 | 73.5% | $1,418.9 | $115.0 | 63.4% |
| Adjusted: (Non-GAAP basis as reported in Form 10-K)[1] | $6,660.9 | $1,172.4 | 70.8% | $4,960.4 | $1,529.9 | 73.5% | $1,418.9 | $115.0 | 63.4% |
| Exclude AIP from Operating Income Adjustment | N/A | 78.9 | N/A | N/A | 32.0 | N/A | N/A | 7.3 | N/A |
| Adjusted: (Non-GAAP Basis for AIP results measurement) | $6,660.9 | $1,251.3 | 70.8% | $4,960.4 | $1,561.9 | 73.5% | $1,418.9 | $122.3 | 63.4% |

*(1) See page 41 of the Company's Form 10-K for fiscal year 2024 for a detailed description of certain items excluded from the non-GAAP financial measures presented in the 10-K for fiscal year 2024. There were no items affecting comparability in fiscal year 2023.*

TABLE OF CONTENTS

**APPENDIX A**

These non-GAAP performance measures were used by management to conduct and evaluate its business during its regular review of operating results for the periods affected. Management and the Company's Board utilized these non-GAAP measures to make decisions about the uses of Company resources, analyze performance between periods, develop internal projections and measure management performance. The Company's primary internal financial reporting excluded these items affecting comparability. In addition, the HR Committee of the Company's Board used these non-GAAP measures when setting and assessing achievement of incentive compensation goals.

We believe these non-GAAP measures are useful to investors in evaluating the Company's ongoing operating and financial results in a manner that is consistent with management's evaluation of business performance and understanding how such results compare with the Company's historical performance.

Additionally, we believe presenting certain increases and decreases in constant currency provides a framework for assessing the performance of the Company's business outside the United States and helps investors and analysts understand the effect of significant year-over-year currency fluctuations. We believe non-GAAP measures assist investors in developing expectations of future performance. By providing the non-GAAP measures, as a supplement to GAAP information, we believe we are enhancing investors' understanding of our business and our results of operations. The non-GAAP financial measures are limited in their usefulness and should be considered in addition to, and not in lieu of, U.S. GAAP financial measures. Further, these non-GAAP measures may be unique to the Company, as they may be different from non-GAAP measures used by other companies.

**TABLE OF CONTENTS**

 *APPENDIX B*

## *QUESTIONS YOU MAY HAVE REGARDING THIS PROXY STATEMENT*

**1. WHAT IS THE PURPOSE OF THESE MATERIALS?**

The accompanying proxy is solicited on behalf of our Board. We provide these proxy materials to you in connection with our Annual Meeting. Our Annual Meeting will be held virtually via live webcast on Thursday, November 14, 2024, at 9:00 a.m. Eastern Time at www.virtualshareholdermeeting.com/TPR2024.

As a holder of our common stock as of the close of business on the Record Date, you are invited to join the Annual Meeting and are entitled and requested to vote on the proposals described in this proxy statement.

**2. WHAT INFORMATION IS CONTAINED IN THESE MATERIALS?**

The information included in this proxy statement relates to the proposals to be considered and voted on at the Annual Meeting, the voting process, the compensation of the Directors and our NEOs and other required information. Our Form 10-K for fiscal year 2024 is available to review with this proxy statement.

We are delivering the Notice of 2024 Annual Meeting of Stockholders and instructions on how to access the proxy statement (or, for those who request it, a hard copy of this proxy statement and the enclosed proxy card) to our stockholders on or about September 27, 2024.

**3. WHAT PROPOSALS WILL BE VOTED ON AT THE MEETING?**

At the Annual Meeting, our stockholders will be asked:

1. To consider and vote upon the election of eleven Directors;

2. To consider and vote upon the ratification of the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending June 28, 2025;

3. To consider and vote upon the approval of, on a non-binding advisory basis, the Company's executive compensation as described in this proxy statement; and

4. To transact such other business as may properly come before the Annual Meeting or any postponement or adjournment of the Annual Meeting.

Our Board is not aware of any other matter that will be presented at the Annual Meeting. If any other matter is properly presented at the Annual Meeting, the persons named on your proxy will vote in accordance with their discretion on the matter.

**4. DOES THE BOARD OF DIRECTORS RECOMMEND VOTING IN FAVOR OF THE PROPOSALS?**

Yes, our Board unanimously recommends that you vote your shares "**FOR**" each of the Director nominees in proposal 1, **"FOR"** proposals 2 and 3.

**5. WHAT SHARES CAN I VOTE?**

You may vote all of the shares of our common stock that you owned at the close of business on The Record Date.

**6. WHAT CLASSES OF SHARES ARE ENTITLED TO BE VOTED?**

Holders of our common stock are entitled to one vote for each share of stock held by them as of the close of business on the Record Date. On the Record Date, the Company had

232,781,326 shares of common stock outstanding and entitled to be voted at the Annual Meeting, and no other stock of any series issued or outstanding.

tapestry

TABLE OF CONTENTS

**7. WHAT DO I NEED TO DO NOW?**

Please carefully consider the information contained in this proxy statement and respond as soon as possible so that your shares will be represented at the Annual Meeting. You can respond by following the instructions for granting a proxy to vote presented in the Notice of Annual Meeting and Internet Availability of Proxy Materials you received; if you received paper copies of the Company's proxy materials, you can respond by completing, signing and dating your proxy card and returning it in the enclosed envelope. Alternatively, you may attend the Annual Meeting virtually via live webcast and vote your shares at the meeting. If you grant a proxy to vote online, by telephone or mail in a proxy card, you may still participate in the online meeting, and should you choose do to so, you may revoke the proxy by voting your shares during our Annual Meeting.

**8. DO I NEED TO ATTEND THE ANNUAL MEETING?**

No. You may authorize a proxy to vote your shares by following the instructions presented in the notice of the Annual Meeting and Internet Availability of Proxy Materials or if you received or requested a paper proxy card, by completing, signing and dating your proxy card and returning it in the envelope provided to you.

**9. HOW DO I ATTEND THE ANNUAL MEETING THIS YEAR?**

Tapestry's Annual Meeting will be conducted via a live webcast, simultaneously allowing for greater participation and the opportunity to participate in the live, online meeting from any location convenient for you. We are committed to ensuring that our stockholders have substantially the same opportunities to participate in the virtual Annual Meeting as they would at an in-person meeting. Stockholders may attend the Annual Meeting, vote and submit a question during the Annual Meeting by visiting www.virtualshareholdermeeting.com/TPR2024. Questions may also be submitted prior to the Annual Meeting at www.proxyvote.com. Stockholders will be able to review the rules of conduct and other meeting materials on www.virtualshareholdermeeting.com/TPR2024. We will answer questions that comply with the meeting rules of conduct during the Annual Meeting, subject to time constraints. If we receive substantially similar questions, we will group such questions together. The webcast replay of the Annual Meeting, including the question and answer portion, will be available soon after the Annual Meeting on our Investor Relations website for at least 30 days. Please note that stockholders will need their control number which appears on their Notice of Internet Availability of Proxy Materials, the proxy card (printed in the box and marked by the arrow), and the instructions that accompanied the proxy materials in order to access these sites and vote shares or ask questions prior to or at the Annual Meeting. If you hold your shares as a beneficial owner in street name and do not have a control number, please contact your bank or brokerage firm for voting instructions. If you access the Annual Meeting but do not enter your control number you will be able to listen to the proceedings, but you will not be able to vote or otherwise participate.

We will have technicians ready to assist you with any technical difficulties you may have accessing the Annual Meeting. If you encounter any technical difficulties during check-in or during the Annual Meeting, please call the technical support number that will be posted on www.virtualshareholdermeeting.com/TPR2024.

**10. WHAT CONSTITUTES A QUORUM, AND WHY IS A QUORUM REQUIRED?**

A quorum is required for the Tapestry stockholders to conduct business at the Annual Meeting. The presence at the Annual Meeting, in person via the webcast or by proxy, of stockholders entitled to cast a majority of all the votes entitled to be cast at the Annual Meeting on any matter will constitute a quorum, permitting us to conduct the business of the Annual Meeting. Proxies received but marked as abstentions, if any, and broker non-votes described below, will be included in the calculation of the number of shares considered to be present at the Annual Meeting for purposes of obtaining a quorum.

**11. WHAT IS THE VOTING REQUIREMENT TO APPROVE THE PROPOSALS?**

With respect to election of Directors (Proposal No. 1), our Bylaws provide that Directors will be elected by a majority of the total votes cast "FOR" and "AGAINST" each nominee in the election of Directors at the Annual Meeting, either in person or by properly completed or authorized proxy. This means that the number of shares voted "FOR" a nominee must exceed the number of shares voted "AGAINST" that nominee. There are no cumulative voting rights. Abstentions and broker non-votes

TABLE OF CONTENTS

**APPENDIX B**

will not have any effect on the election of Directors. See "What happens if a Director nominee does not receive a majority of the votes cast?" below for information concerning our Director resignation policy.

Approval of Proposals No. 2 and 3 requires, in each case, "FOR" votes from a majority of the votes cast on the matter at the Annual Meeting, either in person or by properly completed or authorized proxy.

Abstentions and broker non-votes will not have any effect on Proposals No. 2 and 3. Additionally, as discussed below, we do not expect that there will be any broker non-votes with regard to Proposal No. 2 as it is a routine matter.

#### 12. WHAT IF I DON'T VOTE? WHAT IF I ABSTAIN? HOW ARE BROKER NON-VOTES COUNTED?

If you hold your shares in street name, based on current NYSE rules, your broker will NOT be able to vote your shares with respect to the election of Directors or the non-binding advisory approval of executive compensation. If you have not provided directions to your broker, we strongly encourage you to do so and exercise your right to vote as a stockholder. However, the NYSE considers Proposal No. 2, regarding the ratification of the appointment of D&T, a routine matter. Thus, your broker or nominee may vote on your behalf with regard to

Proposal No. 2, whether or not you provide voting instructions. When a proposal is not a routine matter and a brokerage firm has not received voting instructions from a beneficial owner of the shares with respect to that proposal, the brokerage firm cannot vote the shares on that proposal. This is called a broker non-vote. Abstentions and broker non-votes are generally not considered votes cast and will have no effect on the proposals

#### 13. WHAT HAPPENS IF A DIRECTOR NOMINEE DOES NOT RECEIVE A MAJORITY OF THE VOTES CAST?

Under our Corporate Governance Principles, a Director nominee, running uncontested, who does not receive a majority of the votes cast, is required to tender his or her resignation for consideration by the GN Committee. The GN Committee will recommend to the Board whether to accept or reject the resignation.

The Board will act on the tendered resignation and publicly disclose its decision within 90 days following certification of the election results. Unless all Directors have tendered their resignation, any Director who tenders his or her resignation will not participate in the Board's decision with respect to his or her resignation.

#### 14. CAN I CHANGE MY VOTE AFTER I HAVE DELIVERED MY PROXY?

Yes. You may change your vote at any time before your proxy is exercised at the meeting. You can do this in one of three ways. First, you can revoke your proxy by sending written notice to the Secretary of Tapestry before the Annual Meeting. Second, you can authorize online or send the Secretary of Tapestry a later-dated, signed proxy before the meeting. Third, if you are

a holder of record, you can attend the meeting through our live online webcast and submit your vote electronically. If your shares are held in an account at a brokerage firm or bank and you do not have your control number, you must contact your brokerage firm or bank for instructions on how to change your vote.

#### 15. IF MY SHARES ARE HELD IN "STREET NAME" BY MY BROKER, WILL MY BROKER VOTE MY SHARES FOR ME?

Your broker will vote your shares only if the proposal is a matter on which your broker has discretion to vote (which is limited to the ratification of the appointment of the Company's

independent registered public accounting firm) or if you provide directions on how to vote by following the instructions provided to you by your broker.

#### 16. WHO WILL COUNT THE VOTES?

All votes will be tabulated by Broadridge Financial Solutions, the inspector of elections appointed for the meeting.

#### 17. WHERE CAN I FIND VOTING RESULTS OF THE ANNUAL MEETING?

We will announce preliminary voting results at the meeting and publish final results in a Form 8-K filed with the SEC within four business days after the end of the Annual Meeting.

**tapestry**

TABLE OF CONTENTS

APPENDIX B

**18. WHO WILL BEAR THE COSTS OF SOLICITING VOTES FOR THE MEETING?**

The expenses of soliciting proxies to be voted at the meeting will be paid by the Company. Following the original mailing of soliciting materials, we may also solicit proxies by mail, telephone, fax or e-mail. Following the original mailing of soliciting materials, we will request that brokers, custodians, nominees and other record holders of common stock forward copies of the proxy statement and other soliciting materials to persons for whom they hold shares of common stock and request authority for the exercise of proxies. In such cases, the Company, upon the request of the record holders, will reimburse these holders for their reasonable expenses. The Company has engaged Alliance Advisors LLC to solicit proxies for a fee of $13,500 plus reasonable out-of-pocket expenses.

**19. WHOM SHOULD I CALL WITH OTHER QUESTIONS?**

If you have additional questions about this proxy statement or the meeting or would like additional copies of this document, please contact: Tapestry, 10 Hudson Yards, New York, New York 10001, Attention: Investor Relations Department, Telephone: (212) 946-7252.

tapestry

TABLE OF CONTENTS



TABLE OF CONTENTS

TABLE OF CONTENTS

## tapestry

COACH | kate spade | STUART WEITZMAN

TAPESTRY, INC.
C/O BROADRIDGE
P.O. BOX 1342
BRENTWOOD, NY 11717



**SCAN TO VIEW MATERIALS & VOTE**

**VOTE BY INTERNET**
Before The Meeting - Go to www.proxyvote.com or scan the QR Barcode above

Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by 11:59 P.M. Eastern Time on November 13, 2024. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

During The Meeting - Go to www.virtualshareholdermeeting.com/TPR2024

Have the information that is printed in the box marked by the arrow available and follow the instructions.

**ELECTRONIC DELIVERY OF FUTURE PROXY MATERIALS**
If you would like to reduce the costs incurred by our Company in mailing proxy materials, you can consent to receiving all future proxy statements, proxy cards and annual reports electronically via e-mail or the Internet. To sign up for electronic delivery, please follow the instructions above to vote using the Internet and, when prompted, indicate that you agree to receive or access proxy materials electronically in future years.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by 11:59 P.M. Eastern Time on November 13, 2024. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

---

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

V56278-P17002    KEEP THIS PORTION FOR YOUR RECORDS

THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.    DETACH AND RETURN THIS PORTION ONLY

---

**TAPESTRY, INC.**

The Board of Directors recommends you vote FOR the following:

1. To elect eleven Directors of Tapestry, Inc.;

Nominees:

|  |  | For | Against | Abstain |
|---|---|---|---|---|
| 1a. | John P. Bilbrey | ☐ | ☐ | ☐ |
| 1b. | Darrell Cavens | ☐ | ☐ | ☐ |
| 1c. | Joanne Crevoiserat | ☐ | ☐ | ☐ |
| 1d. | David Elkins | ☐ | ☐ | ☐ |
| 1e. | Johanna (Hanneke) Faber | ☐ | ☐ | ☐ |
| 1f. | Anne Gates | ☐ | ☐ | ☐ |
| 1g. | Thomas Greco | ☐ | ☐ | ☐ |
| 1h. | Kevin Hourican | ☐ | ☐ | ☐ |
| 1i. | Alan Lau | ☐ | ☐ | ☐ |
| 1j. | Pamela Lifford | ☐ | ☐ | ☐ |
| 1k. | Annabelle Yu Long | ☐ | ☐ | ☐ |

The Board of Directors recommends you vote FOR proposals 2 and 3.

|  |  | For | Against | Abstain |
|---|---|---|---|---|
| 2. | Ratification of the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending June 28, 2025; and | ☐ | ☐ | ☐ |
| 3. | Advisory vote to approve the Company's executive compensation, as discussed and described in the proxy statement. | ☐ | ☐ | ☐ |

**NOTE:** To transact such other business as may properly come before the Annual Meeting or any postponement or adjournment of the Annual Meeting.

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

|  |  |  |  |
|---|---|---|---|
| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |

TABLE OF CONTENTS

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting:**
The Notice and Proxy Statement and Form 10-K are available at www.proxyvote.com.

V56279-P17002

## TAPESTRY, INC.
### Annual Meeting of Stockholders
### November 14, 2024 9:00 AM
### This proxy is solicited on behalf of the Board of Directors

The undersigned hereby appoints Joanne Crevoiserat and David Howard, or either of them, with full power of substitution in each of them as proxies and attorneys-in-fact and hereby authorizes them to represent and vote, as provided on the other side, all the shares of Tapestry, Inc. Common Stock which the undersigned is entitled to vote, and, in their discretion, to vote upon such other business as may properly come before the 2024 Annual Meeting of Stockholders of the Company (the "Meeting") to be held November 14, 2024 or any adjournment or postponement thereof, with all powers which the undersigned would possess if present at the Meeting. The Meeting will be held virtually via live webcast www.virtualshareholdermeeting.com/TPR2024 at 9:00 AM Eastern Time on November 14, 2024. The undersigned hereby acknowledges receipt of the notice of the Meeting and of the accompanying proxy statement and hereby revokes any proxies submitted previously with respect to the Meeting.

If this proxy is properly executed, the shares represented by this proxy will be voted in the manner directed herein, or if no such direction is made, will be voted on each proposal in accordance with the Board of Directors' recommendations.

The votes entitled to be cast by the undersigned will be cast in the direction of the proxy holder on any other matter that may properly come before the Meeting or any adjournment or postponement thereof.

Continued and to be signed on reverse side