IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FNY PARTNERS FUND LP, on behalf
of itself and all others similarly
situated, and DAVID R. HURWITZ, in-
dividually and on behalf of all others
similarly situated,

        *Plaintiffs,*

        v.

CAPRI HOLDINGS LTD., JOHN D.
IDOL, THOMAS J. EDWARDS, JR.,
TAPESTRY, INC., JOANNE C.
CREVOISERAT, and SCOTT A. ROE,

        *Defendants.*

No. 24-1410

---

Christopher Hamp Lyons, David A. Knotts, Jake Kalphat-Losego, Michaela D. Park, Tayler D. Bolton, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, DE; Brian E. Farnan, FARNAN LLP, Wilmington, DE,

        *Counsel for Plaintiffs.*

Jacob Michael Perrone, John Patrick DiTomo, William M. Lafferty, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Thomas A. Uebler, Terisa Shoremount, McCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, DE; Timothy Perla, Sonia Sujanani, WILMER CUTLER PICKERING HALE & DORR L.L.P., Boston MA; Jessica Lewis, WILMER CUTLER PICKERING HALE & DORR L.L.P., Palo Alto, CA; Jonathan M. Moses, Elaine P. Golin, Adam L. Goodman, Beatrice R. Pollard, WACHTELL, LIPTON, ROSEN & KATZ, New York, NY,

        *Counsel for Defendants.*

---

**MEMORANDUM OPINION**

March 31, 2026

BIBAS, *Circuit Judge*, sitting by designation.

Mergers and acquisitions are thorny. The target and acquirer have lots of work to do: They must agree on terms, make a plan to integrate, and get their shareholders' approval. But that is not all—they must also get approval from antitrust authorities in every jurisdiction where they operate. That can be troublesome, especially when the two companies compete. All the while, each party must maintain an air of confidence, lest the other party or the shareholders get antsy. So complete silence, even in the face of merger-clearance challenges, is seldom a good option.

Capri Holdings (owner of Michael Kors and Versace) and Tapestry, Inc. (owner of Kate Spade and Coach) faced this dilemma when they tried to combine. The two accessible-luxury handbag companies made a long list of public statements about the merger while the Federal Trade Commission reviewed it. Ultimately, the FTC thought the merger posed a serious risk to competition and so sued to block it. The antitrust watchdog won and the merger fell apart, meaning that many of defendants' optimistic statements about the deal fell flat. Several investors in Capri now sue, alleging that these public statements were fraudulent. But not everything is securities fraud. For a variety of reasons, defendants' statements were not fraudulent, so I dismiss the complaint without prejudice.

## I.  THE FTC BLOCKS THE CAPRI-TAPESTRY MERGER

Capri Holdings Ltd. is a public company that owns several fashion brands, including Michael Kors, Jimmy Choo, and Versace. Consol. Compl., D.I. 32, ¶ 17. John Idol was the CEO and Chairman of Capri's board, and Thomas Edwards was its Executive Vice President, CFO, and COO. *Id*. ¶¶ 18–19. Tapestry, Inc. is also a public company

that markets fashion brands, including Coach, Kate Spade, and Stuart Weitzman. *Id.* ¶ 21. Joanne Crevoiserat was Tapestry's President and CEO, plus a director. ¶ 22. Scott Roe was Tapestry's CFO and COO. *Id.* ¶ 23.

In spring of 2023, Crevoiserat and Idol met to discuss possible "strategic opportunities" for their companies. *Id.* ¶¶ 27–28. They tentatively agreed that Tapestry would buy Capri for cash. *Id.* ¶ 28. Soon after, Capri's shareholders approved the preliminary deal at a price of $57 per share of Capri stock. *Id.* ¶¶ 29–30.

But trouble began in November 2023, when the FTC made a "second request" for materials related to the competitive effects of the proposed merger. *Id.* ¶ 35. It suspected the proposed merger might be anticompetitive. *Id.* And the Second Request materials confirmed those suspicions: After review, the FTC sued in the Southern District of New York to enjoin the merger because it violated antitrust laws. *Id.* ¶ 36. The FTC alleged that combining Kate Spade, Coach, and Michael Kors would eliminate market competition, since together they held a dominant share of the "accessible luxury handbag market." *Id.* A federal district court granted the injunction, finding that the "accessible luxury handbag market" was a relevant market for antitrust purposes, and that the merger would unlawfully harm competition in that market. *Id.* ¶ 37; *see also FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 404, 464 (S.D.N.Y. 2024). (I may take judicial notice of that court's decision. *See McPherson v. United States*, 392 F. App'x 938, 940 (3d Cir. 2010).)

Right after the court announced the injunction on October 24, 2024, Capri's stock price tanked from $41.60 to $21.26 per share. Consol. Compl. ¶ 173. By mid-

November, Capri and Tapestry announced that they were calling off their deal because they could not get antitrust approval. *Id.* ¶ 9.

FNY Partners Fund LP bought Capri stock between August 2023 and October 2024. *Id.* ¶ 15. David Hurwitz also bought Capri stock and sold "put options" on it. *Id.* ¶ 16. Both would profit if Capri's stock price went up but would suffer if it went down. As Capri's stock plummeted, both lost money. So they sued for securities fraud: one count under Section 10(b) of the Exchange Act and Rule 10b-5, which make it unlawful to manipulate or deceive in a securities sale or purchase, and one under Section 20(a), which imposes liability on any person who controls another person that violates Section 10(b). *Id.* ¶¶ 206–15. FNY and Hurwitz allege that Capri, Tapestry, and its officers and employees made many misleading statements while the merger review was pending. These statements fall into several buckets (with a full list available in the appendix):

*A. Timeline statements.* Some statements spoke generally about the merger's timeline:

- "[W]e think that the timeline that we've laid out reflects just what we see in the market today and we think that's a realistic timeline to closing." *Id.* ¶ 103.
- "[W]e expect the deal to close in calendar year 2024, subject to customary closing conditions, approval by Capri shareholders and receipt of the required regulatory approvals." *Id.* ¶ 105; *accord, e.g., id.* ¶¶ 104, 119–23, 128, 131–33, 136, 142, 155–56, 166, 170
- "[W]e're confident in our ability to complete this transaction." *Id.* ¶ 112; *see also id.* ¶ 115.
- "On November 3, 2023, Capri and Tapestry each received a request for additional information and documentary materials (the "Second Request") from the Federal Trade Commission (the "FTC") in connection with the FTC's review of

the Transaction…. Capri continues to expect that the Transaction will be completed in calendar year 2024 ….” *Id.* ¶ 119. Tapestry issued a similar statement after the second request. *Id.* ¶ 120.

B. *Market-structure statements.* Other statements centered on the brands themselves and the relevant market:

- “We [Tapestry and Capri] play in a resilient $200 billion luxury market that includes handbags, footwear, and apparel.” *Id.* ¶ 109

- “Tapestry and Capri operate in the fiercely competitive and highly fragmented global luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low. Capri intends to vigorously defend this case in court alongside Tapestry and complete the pending acquisition.” *Id.* ¶ 149; *accord, e.g., id.* ¶¶ 115, 128, 150, 160, 163.

- “[S]he told me she is ‘disappointed but quite surprised with the way the FTC is thinking about the market.’ She said: ‘They fundamentally misunderstand the market and the way consumers shop.’ She said: ‘We spend time in the market and we have data and it is intensely competitive.’ Crevoiserat following up by saying ‘duopoly?’ Because we mentioned this idea that the FTC referred to as Kors-Coach duopoly. She said: ‘I wish our job was that easy, I wish we had to worry about one competitor.’” *Id.* ¶ 152.

C. *Competitive-impact statements.* Finally, several statements emphasized that defendants viewed the proposed merger as pro-consumer, pro-competitive, or both:

- “But we continue to be confident because we know that this is a transaction that is pro-consumer ….” *Id.* ¶ 142; *accord, e.g., id.* ¶¶ 146, 149, 150, 156, 157, 163, 166, 170. “Defendant Crevoiserat added that Tapestry had no intention of divesting brands to complete the Capri Acquisition, claiming, ‘We don't think that it's necessary.’” *Id.* ¶ 143.

- “The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition.” *Id.* ¶ 149. “There is no question that this is a pro-competitive, pro-consumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop.” *Id.* ¶ 150.

Plaintiffs allege that these statements were false because defendants knew, or were reckless in not knowing, several things. First, defendants allegedly knew (or

5

were reckless in not knowing) that that the market for accessible-luxury handbags would be treated as a submarket under U.S. antitrust law. *Id.* ¶¶ 31, 55–57, 110(a). For support, Plaintiffs use internal documents showing that Capri and Tapestry understood their handbags to fall in the "accessible luxury" market. They cite troves of internal documents showing that the two companies did not believe that their bags competed with higher-level luxury or lower-level mass-market handbags. *Id.* ¶¶ 58–63, 74. Instead, defendants called their bags "accessible luxury" items as far back as 2018. *Id.* ¶ 90. The label suggests a middle-tier product.

Other internal processes confirm this. Both companies practiced "benchmarking," where they compared their brands' performance to the performance of other accessory brands—especially each other. *Id.* ¶ 58. The graphic below, from a slide deck presented to Capri's board, shows that at least some at Capri recognized high, middle, and low categories or product differentiation in the handbag market:



*Id.* ¶ 59.

Defendants also allegedly knew that the merger would substantially reduce competition in the accessible-luxury handbag market. Tapestry estimated that it and Capri combined held more than 80% of the market for accessible-luxury handbags through the Kate Spade, Coach, and Michael Kors brands. *Id.* ¶¶ 27, 33, 37. Capri considered Coach (owned by Tapestry) the "biggest competitor" to its own Michael Kors brand. *Id.* ¶¶ 38–39, 66. Capri and Tapestry closely monitored each other's marketing, visited each other's stores, investigated each other's handbag designs, and tracked each other's pricing. *Id.* ¶¶ 41, 44–53, 77–78. Tapestry's financial advisor, Morgan Stanley, flagged that Tapestry's proposed acquisition of the Michael Kors brand would pose anti-competitive risks. *Id.* ¶ 69. Several internal documents suggested that one of Tapestry's motivations to buy Capri was to raise prices for Michael Kors handbags. *Id.* ¶ 106.

But, plaintiffs continue, Tapestry and Capri took steps to minimize public perception of their competition in the accessible-luxury handbag submarket after the FTC sued to enjoin the merger. This included conspicuously omitting references to "accessible luxury" in public communications after the FTC filed its complaint. *Id.* ¶¶ 86–87. Executives at both companies also testified during the preliminary injunction hearing that the accessible-luxury market was not a distinct submarket, which contradicted their internal strategy and communications. *Id.* ¶ 88. At least some of the investing public believed that the handbag market was fragmented (which would make the deal possible) because of defendants' statements. *Id.* ¶ 108.

All the while, plaintiffs allege, defendants knew that the merger was likely to be stopped. As the New York federal court put it, "Tapestry perceived the acquisition of Michael Kors to be an opportunity to decrease Michael Kors's discounting and increase Michael Kors's prices – a recognized form of anticompetitive effects." *Id.* ¶ 68 (quoting *Tapestry, Inc.*, 755 F. Supp. 3d at 484).

Capri's stock price fell precipitously after the injunction issued. *Id.* ¶¶ 186–96. So plaintiffs conclude that defendants' statements were artificially inflating Capri's stock price. Specifically, they allege that the misinformation-driven stock-price inflation happened across five moments: (1) when the FTC issued a Second Request; (2) when FTC Director Liu made comments about the merger on April 11, 2024; (3) when the New York Times published that the FTC was preparing to sue to enjoin the merger; (4) when the FTC filed suit; and (5) when the court enjoined the merger. *Id.* ¶¶ 191, 193.

To show that they were deceived by defendants' statements, plaintiffs rely on the fraud-on-the-market theory. They allege that Capri stock traded in an efficient market that rapidly reflected news material to Capri's value. *Id.* ¶ 203.

Plaintiffs further allege that the statutory safe-harbor for forward-looking statements does not apply to any of the challenged statements because (1) the statements were not forward looking; (2) they were not accompanied by cautionary language; or (3) even if accompanied by cautionary language, each speaker knew that each statement was false when made. *Id.* ¶ 205.

Plaintiffs admit that many of defendants' statements included warnings that the

8

merger still needed to be cleared. *Id.* ¶ 101. But the identified statements were none-theless misleading, they argue, because defendants never "warn[ed] that the entire purpose of the Capri Acquisition was to stifle competition, that Tapestry and Capri were each other's top competitors, that they collectively controlled four-fifths of the accessible-luxury handbag market, or that all of this put the Capri Acquisition at severe risk of failing to obtain antitrust approval from its inception." *Id.*

But plaintiffs' efforts fall short. Some statements are not actionable because they are forward-looking statements—predictions about the future—alongside language warning investors of the risks to the merger. Others are not actionable because they are expressions of opinion. And finally, some statements are not actionable because defendants lacked scienter for them—the most likely inference is not that defendants knew (or were reckless in not knowing) the statements might mislead investors. In the end, each allegedly misleading statement is not actionable for one or more rea-sons.

This Court has jurisdiction over these Exchange-Act claims. See 15 U.S.C. § 78aa; 28 U.S.C. § 1331. Defendants moved to dismiss on several grounds. I discuss each in turn and dismiss the whole complaint without prejudice.

## II. NONE OF THE STATEMENTS IS ACTIONABLE UNDER SECTION 10(B)

First I discuss the structure of a securities fraud claim. Then I explain, category by category, why each statement is not actionable—some because they are forward-looking, some because they are protected opinion, and some because defendants did not make those statements with scienter.

9

## A. To sue for securities fraud, injured investors must clear a high bar

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 create a private cause of action arising from fraud in the buying or selling of securities. *See Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 267 (2014); *see also* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975). To recover, private plaintiffs must show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 573 U.S. at 267 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013)).

Usually, a complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). But not here. The Private Securities Litigation Reform Act (PSLRA) imposes heightened pleading standards for securities-fraud claims brought by private plaintiffs like FNY and Hurwitz. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017).

Three PSLRA rules are important here. *First*, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

*Second*, for Section 10(b) claims and other actions that require scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u-4(b)(2)(A). It is not enough

10

that a defendant makes a false or misleading statement; to be liable under Section 10(b), he must also have a guilty mind. But the misstatement need not be intentional: Every court of appeals, including the Third Circuit, agrees that recklessness is enough. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 319 n.3 (2007); *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000). Here, most of the challenged market-structure statements are based on defendants' view that the relevant market was broader than "accessible-luxury" handbags. If defendants recklessly ignored the possibility that they were misleading investors into accepting that characterization of the market, that would show scienter. It is not enough that a defendant misspeaks: His conduct must "present[] a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Infinity Grp.*, 212 F.3d at 192.

The normal motion-to-dismiss standard does not apply to scienter allegations in a Section 10(b) claim. Rather, "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Plaintiffs must plead facts demonstrating that "it is at least as likely as not that defendants acted with scienter." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). The proper question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323.

Some other ground rules direct my analysis of scienter. Courts can separately

11

consider whether defendants had scienter about different batches of statements. *See Avaya*, 564 F.3d at 268, 273 (discussing "pricing-pressure statements" separately from "earlier statements"). Mere involvement is not enough to show scienter for individual defendants. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006). Finally, courts must review scienter holistically, based on all allegations. "The pertinent question is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya*, 564 F.3d at 267–68 (internal quotations omitted).

*Third*, (because, as physicist Niels Bohr supposedly quipped, "it's hard to make predictions, especially about the future"), forward-looking statements are usually protected: Any suit based on an "omission of a material fact necessary to make the statement not misleading" cannot rest on forward-looking statements. 15 U.S.C. § 78u-5. Forward-looking statements include any "statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." *Id.* § 78u-5(i)(1)(B). To qualify for the safe-harbor, a statement must first be forward-looking and "identified as such." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (cleaned up). After passing this threshold requirement, a statement is protected if either of the following is met: (1) the statement includes meaningful cautionary language, or (2) a plaintiff cannot show that the speaker knew the statement was misleading or false. *Id.* (quoting 15 U.S.C. § 78u–5(c)(1)).

But the PSLRA is not the end of the inquiry—the securities laws also distinguish facts from opinions. "A fact is 'a thing done or existing' or '[a]n actual happening.'" *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (quoting *Webster's New International Dictionary* 782 (1927)) (alterations in original). An opinion, in contrast, is a person's subjective "belief," "view," or "sentiment." *Id.* What separates fact from opinion is certainty. Facts are "verifiable" at the time they are stated; opinions are not. *Id.* at 184; *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018); *see also In re Maiden Holdings, Ltd. Sec. Litig.*, 153 F.4th 354, 362 (3d Cir. 2025) (applying *Omnicare* to a 10b-5 action).

Usually, one cannot be liable for expressing his opinion even if he turns out to be wrong. But in three scenarios, even opinion statements run afoul of securities laws. *See Omnicare*, 575 U.S. at 184. First, if one does not believe what he says, his expression of opinion is an actionable misstatement of fact. *See id.* at 184–85. Expressing an opinion implies that the speaker sincerely holds that opinion. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023).

Second, some opinion statements contain embedded false statements of fact. *Omnicare*, 575 U.S. at 185. If a CEO says "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access," his opinion about the TVs' quality is actionable if the company does not actually use a "patented technology," since the supporting fact is untrue. *Id.* at 185–86.

Finally, if a speaker fails to include "material facts about [his] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a

13

reasonable investor would take from the statement itself," the opinion is actionable. *Id.* at 189. If a speaker says, "We believe our conduct is lawful," it implies that he consulted a lawyer. But if he did not, the reasonable implication is untrue and his statement becomes actionable. *Id.* at 188.

Defendants cite an older case from this circuit, *City of Edinburgh Council v. Pfizer, Inc.*, to limit the scope of actionable opinions. 754 F.3d 159, 170 (3d Cir. 2014) ("Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis.") But *Pfizer* pre-dates *Omnicare*, which lays out these three exceptions. *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 502 (3d Cir. 2016); *see Maiden Holdings*, 153 F.4th at 363.

## B. The timeline statements are protected opinion and forward-looking, and defendants lacked scienter

*1. The timeline statements are all non-actionable opinions.* Defendants repeatedly reiterated their belief that the acquisition would close by the end of 2024. *See, e.g.*, Consol. Compl. ¶¶ 104 ("The transaction is anticipated to close in calendar year 2024."), 142 ("We had set a calendar 2024 expectation, and we're still confident that we can complete the deal."). But those statements express the speakers' subjective expectations for the future, not objective statements about "thing[s] done or existing." *Omnicare,* 575 U.S. at 183 (quoting *Webster's New International Dictionary* 782 (1927)). What is more, they are not verifiable, again because they express the speakers' expectations.

And none of these opinion statements fits in any of the three exceptions, so they are not actionable. First, the complaint does not plausibly allege that defendants did

14

not actually expect the deal to close in 2024. True, internal company documents show that some Capri and Tapestry employees knew the two companies were direct competitors. That posed a substantial—ultimately insurmountable—obstacle to merger clearance because combining competitors might give the companies too much market power. But not all anticompetitive effects are fatal in fact. It was not obvious that the FTC and courts would adopt the narrow market definition they ultimately did, isolating the "accessible luxury" handbag market from the larger one. And plaintiffs have not alleged anything suggesting why defendants would proceed with the merger if they truly believed it was doomed from the get-go.

Second, the challenged timeline statements also have no false factual assertions. Some do contain factual statements, like that the companies are "working expeditiously" to close the deal and were "responding to" the FTC's requests, but nothing in the complaint suggests that was untrue. Consol. Compl. ¶¶ 122, 156.

And the timeline statements did not lack a reasonable basis: Before *FTC v. Tapestry*, no court had held that accessible-luxury handbags constitute a market distinct from the market for handbags generally. *See generally* 755 F. Supp. 3d 386 (citing no cases that had held that). Defendants' forecasts were wrong—the deal never closed. But they did due diligence, retained counsel (who represented them in the FTC litigation), and hired several experts to help argue against the FTC's blocking attempt. Consol. Compl. ¶¶ 28–29; *Tapestry, Inc.*, 755 F. Supp. at 439–40. The amount of ink spilled over the correct market definition alone shows that defendants did "some meaningful legal [and financial] inquiry." *Omnicare*, 575 U.S. at 188.

15

Plaintiffs rely on *Hering v. Rite Aid Corp.* to show that timeline statements might qualify as actionable opinions. But the reliance is misplaced. *See* Tapestry Answering Br., D.I. 55, at 17 (citing 331 F. Supp. 3d 412, 425 (M.D. Pa. 2018)). True, that court found some timeline-related statements actionable. 331 F. Supp. 3d at 426. But they were so only because they "alluded to [the speaker's] secret knowledge" about the FTC's timetable. *Id.* at 427. Not so here.

Finally, plaintiffs argue that defendants knew the deal "faced major antitrust hurdles" from its inception. Capri Answering Br., D.I. 56, at 12. Thus, the timeline statements falsely imply that the merger "was not anticompetitive and was likely to swiftly obtain regulatory approval." *Id.* They point to internal documents showing that "Coach and Michael Kors were each other's closest competitors," with the companies together holding 77% of the accessible-luxury market. *Id.* But even if defendants were aware of clearance hurdles, this does not show that defendants did not believe the timeline they expressed was realistic, or that they did not believe the deal would close. Even if the companies dominated the "accessible luxury" space, they did not hold so much of the entire handbag market. Nothing suggests that defendants knew that the *accessible-luxury* submarket was the relevant antitrust one. Without that vital link, defendants' unexpressed knowledge about Tapestry and Capri is not a "material fact[] about [their] inquiry." *Omnicare*, 575 U.S. at 188–89.

*2. Most timeline statements fit in the safe-harbor for forward-looking statements.* Defendants argue that all their statements fall within the forward-looking statements safe-harbor. I partially agree.

16

*i. All of the written timeline statements are forward-looking and have adequate cautionary language.* The timeline statements were forward-looking. The expectation of closing a merger fits comfortably within the category of "statement[s] of the plans and objectives of management for future operations." § 78u-5(i)(1)(B). And the word "expected" identifies a statement as forward-looking. *Cooper Tire*, 834 F.3d at 501.

Almost all of the timeline statements describe expectations. *See* Consol. Compl. ¶¶ 128 ("[W]e still expect to close the deal in fiscal '24."), 131 ("[The] Capri Acquisition is expected to close during calendar year 2024."), 155 (same).

And I need extend *Cooper Tire*'s reasoning only a bit to cover the rest of them. These statements may not use the word "expect," but they do use similar language that makes clear the statement is a forecast, not a present description. *See id.* ¶¶ 115 ("Management remains highly confident in its ability to complete the acquisition."), 156 (Tapestry is "working expeditiously to close the transaction in calendar year 2024."), 142 ("We had set a calendar 2024 expectation, and we're still confident that we can complete the deal.").

Still, forward-looking statements are immunized only if the statements adequately warn the listener that the statements are forward-looking. Not just any warning will do. "[V]ague or blanket (boilerplate) disclaimer[s]" are not enough; the warnings "must be substantive and tailored to the specific future projections, estimates or opinions in the [documents] which the plaintiffs challenge." *Cooper Tire*, 834 F.3d at 491 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). Cautionary statements need not be in the same document as the forward-

17

looking statements. *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005).

All of the SEC filing statements—the 8-Ks and 10-Qs—contain enough cautionary language because they specifically address the risk of legal obstacles to the merger. *See, e.g.*, D.I. 50-3 Ex. 17 at 114 (the 8-K referenced in Paragraph 104 of the complaint, identifying "the outcome of any legal proceedings related to the merger" as a potential risk to "the price of Tapestry, Inc. or Capri stock").

Plaintiffs argue that the timeline statements lack appropriate cautionary language because defendants' cautionary language is boilerplate and did not change over time to incorporate new information. Capri Answering Br. 30. But disclosures that list specific risks and uncertainties are enough. *See Avaya*, 564 F.3d at 257.

Plaintiffs also object that the timeline statements are misleading because they omit important facts. Capri Answering Br. 24. But the text of the safe-harbor forecloses this theory since they are forward-looking. *See* 15 U.S.C. § 78u-5.

*ii. Defendants did not know that the oral timeline statements were false.* Special rules apply to oral statements. An issuer is not liable for an oral forward-looking statement if: (1) the issuer explains "that the statement is forward-looking and that actual results may differ materially from the predictions"; (2) the issuer "directs the audience to other 'readily available' written documents that contain the additional information about important factors relating to the forward-looking statement; and (3) the identified documents set forth satisfactory cautionary statements." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 873 n.3 (3d Cir. 2000).

18

Some of defendants' oral statements about the merger timeline meet these requirements. The conference call referenced in Paragraph 105 of the complaint includes this cautionary language: "Before we begin, I would like to note that today's discussion contains forward-looking statements that are subject to the risks identified in both Company's [sic] SEC filings and other written communications related to the announcement. Please refer to the information on Slide 2 of the presentation posted to our website as well as the additional information contained in the SEC filing of both Tapestry, Inc. and Capri Holdings Limited …." D.I. 50-3 at 118. This disclaimer meets the three requirements for oral statements. First, it explains that the conference call will include forward-looking statements. Second, it directs investors to Tapestry and Capri's SEC filings. And third, the SEC filings contain adequate cautionary statements about the legal risks to the merger, as discussed above. Several other oral timeline statements included a similar adequate warning. *See* Consol. Compl. ¶¶ 112, 123, 128, 133; D.I. 50-2 at 399; D.I. 50-6 at 3; D.I. 50-9 at 3.

But several of the oral statements lack the necessary cautionary language. The interview in Paragraph 103 of the complaint had a warning: An employee said the company expected "to go through the normal closing conditions that are required including regulatory and we think that the timeline that we've laid out reflects just what we see in the market today …." Tapestry Opening Br., D.I. 49, at 46. But that was not enough. It does not identify any statement as forward-looking. And it does not "direct[] the audience to other 'readily available' written documents" that contain cautionary language. *EP Medsystems*, 235 F.3d at 873 n.3.

19

Likewise, the supposed warning from the investor meeting at Paragraph 136—"[r]isks . . . include . . . unfavorable government regulations"—is threadbare; I cannot accept the suggestion that this is enough to invoke the safe-harbor. Tapestry Opening Br. 60. And the statements reported in analyst notes do not show what, if any, cautionary language the speaker included. *See, e.g.*, D.I. 50-7 at 2; *see also* Consol. Compl. ¶ 142 ("We had set a calendar 2024 expectation, and we're still confident that we can complete the deal."); D.I. 50-3 at 162–65 (no adequate warning language).

Even without cautionary language, forward-looking statements fit in the safe-harbor if "the plaintiff fails to prove that the forward-looking statement—if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(B). As I explain more fully below, defendants were not reckless about the truth of any of the timeline statements. So these oral timeline statements are still covered by the safe-harbor—even if they lack cautionary language.

Plaintiffs argue that the timeline statements are not forward-looking because they "imply a present state of affairs justifying an expectation of swift regulatory approval and prompt closing." Capri Answering Br. 22. But that cannot be the rule—any statement about a future event can be recharacterized as a statement about the present likelihood (of that future event). To the extent these statements implied anything about the present, they did so only in relation to a projection about the future. *Cf. In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 281 (3d Cir. 2010). Such statements are still forward-looking. *Id.*

*3. Defendants lacked scienter about the timeline statements.* I start with what plaintiffs do not allege. First, nothing in the complaint suggests that defendants had a motive to defraud. Plaintiffs allege no inside stock sales. *See Suprema Specialties,* 438 F.3d at 277. Plaintiffs assert that defendants were motivated to misrepresent the facts to investors because they were keen on sealing the deal. *See* Capri Answering Br. 31. They rely principally on *Chabot* for this idea. *See* Tapestry Answering Br. 36 (citing *Chabot v. Walgreens Boots All., Inc.,* 2023 WL 2908827, at *18 (M.D. Pa. Mar. 31, 2023)). But that case involved an allegation that the speaker "had a major pecuniary stake" in the merger. *Chabot,* 2023 WL 2908827, at *18. This complaint has no similar allegation. In any event, desire to complete the deal alone is not a motive to defraud, especially because a more compelling inference is that defendants genuinely believed the FTC would approve the merger and the deal would close. *See Emps. Ret. Sys. of R.I. v. Williams Cos., Inc.,* 889 F.3d 1153, 1173 (10th Cir. 2013).

The lack of motive or confidential witnesses leaves only defendants' conscious misbehavior or recklessness as a basis for scienter. *See GSC Partners CDO Fund,* 368 F.3d at 236 (quoting *Oran v. Stafford,* 226 F.3d 275, 288–89 (3d Cir. 2000)). A plaintiff who pleads conscious misbehavior or recklessness must allege that the defendant engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001).

The plaintiffs' core theory is that "the Tapestry Defendants fraudulently maintained confidence that the Capri Acquisition would close despite their knowledge of

21

the true level of regulatory risk faced by the transaction." Tapestry Answering Br. 32; *see also* Capri Answering Br. 26. Defendants retort that "[e]ven if the documents reflected an awareness that Tapestry and Capri competed, that alone does not support scienter" and that "Plaintiffs cannot explain why Capri would enter a transaction it knew was destined to fail[]." Tapestry Opening Br. 34; Capri Opening Br., D.I. 41, at 25. But plaintiffs make a more nuanced point—that defendants overstated the likelihood of successful merger clearance. Nonetheless, defendants get the better of the argument. Again, the more compelling inference is that defendants genuinely believed the deal would close. *See Williams*, 889 F.3d at 1173; *cf. Queen*, 503 F.3d at 328; *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 544.

It is not enough to allege that the risks of FTC litigation were higher than publicly admitted. This scienter theory would foreclose any litigation advocacy because such speech is necessarily intended to downplay the strengths of the opposing argument and hence the risks of the litigation. Unsurprisingly, even courts cited by plaintiffs have not adopted it. The more compelling inference is that defendants believed the deal would close.

Plaintiffs' other cases do not save their theory. *Utesch v. Lannett Co.* noted that it is "significant when a high-ranking officer 'evin[ces] certitude' as to a matter, particularly where the underlying substance is being publicly questioned." 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (quoting *Avaya*, 564 F.3d at 270). But defendants here did not "evince certitude." They used anticipatory—and less confident—language, such as "expected." And even if "steps to cover-up a misdeed" can be "strong proof of

scienter," here, that argument assumes the conclusion. Capri Answering Br. 29 (quoting *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005)); Tapestry Answering Br. 34. Defendants' statements expressing confidence that the merger will close and describing the market as "fragmented" do not show scienter without evidence that defendants *actually thought those statements were false*, which plaintiffs have not plausibly alleged.

Plaintiffs argue that they adequately allege scienter for the individual Tapestry defendants because "[t]he Complaint alleges facts showing that Crevoiserat and Roe had direct roles in and knowledge of the nature of competition between Michael Kors and Coach." Tapestry Answering Br. 33. But as explained, it does not follow from this knowledge that the merger was doomed. I cannot conclude that the risk of misleading buyers is as likely as the innocent alternative.

## C. The competitive-impact statements are protected opinion, forward-looking, or lack scienter

*1. Most of the statements about the acquisition's competitive impact are non-actionable opinion.* Like the timeline statements, the competitive-impact statements express subjective beliefs. *See, e.g.*, Consol. Compl. ¶¶ 157 ("Tapestry remains confident …." (internal quotation marks omitted)), 146 (Tapestry "strongly believe[s] this is a deal that deserves to clear as it is pro-consumer and pro-competitive"), 166 ("The Company is confident …."). These are statements about the future impact of the deal. Without time travel, they are not verifiable. No one could be sure whether divestiture would be necessary until after the FTC finished its review. *Id.* ¶ 143. Nor could anyone know for certain whether the deal would harm consumers until after the deal

23

happened—the proof of the pudding is in the eating. *Id.* ¶¶ 146, 150, 156, 163, 170. And these statements generally do not convey verifiable facts or lack a reasonable basis, for substantially the same reasons as those justifying the timeline statements.

*2. Most competitive-impact statements fit the safe-harbor.* Unlike the timeline statements, many of the competitive-impact statements lack words, like "expected," that often identify a statement as forward-looking. *Cooper Tire*, 834 F.3d at 501. Defendants contend they are still forward-looking because they discuss the future effects of the merger, specifically, "the impact on consumers and competition in the future if the Transaction closes." Tapestry Opening Br. 18; *see, e.g.*, Consol. Compl. ¶¶ 142 ("But we continue to be confident because we know that this is a transaction that is pro-consumer."), 146 ("Tapestry claimed to 'strongly believe this is a deal that deserves to clear as it is pro-consumer and pro-competitive' and that '[w]e have full confidence in the merits of this transaction and in our legal arguments, should we need to make them.'"), 150 ("There is no question that this is a pro-competitive, proconsumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop."), 156 ("Tapestry is 'confident in the merits and pro-competitive, pro-consumer nature of this transaction and looks forward to presenting its strong legal arguments in court.'"), 157 ("Tapestry remains 'confident in the merits and pro-competitive, pro-consumer nature of this transaction and look[s] forward to presenting our strong legal arguments in court.'").

Defendants are right that statements describing the future effects of the transaction are forward-looking. Like the description of a strike as "temporary" that the

Third Circuit found to be forward-looking in *Cooper Tire*, the truth of these statements was not verifiable when they were uttered. 834 F.3d at 502; *see also Hadian v. Fate Therapeutics, Inc.*, 2024 WL 4246083, at *22 (S.D. Cal. Sept. 19, 2024) ("Forward-looking language also includes statements that a company expects, believes, or is confident that certain projections will be realized in the future." (cleaned up)).

Some of the competitive-impact statements use the future tense and refer to future events. *See* Consol. Compl. ¶¶ 149 ("The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition."), 163 (same). Given their tense and the fact that they discuss events in the future, they are forward-looking statements.

Plaintiffs resist this conclusion: They argue that the statements are not forward-looking because they are about "what the existing market realities demonstrated at the time." Capri Answering Br. 20 n.5. They refer me to *In re Stone & Webster, Inc. Securities Litigation*, a First Circuit decision. *See id.* (citing 414 F.3d 187, 213 (1st Cir. 2005)). But the Third Circuit has cabined *Stone & Webster*'s reasoning. *See Avaya*, 564 F.3d at 255–56. If the present aspect of a mixed present-and-future statement "does not advert to a particular current fact such as cash on hand, but expresses only defendants' continuing comfort with" a future projection, the whole statement is forward-looking. *Id.* at 256. That describes the statements in Paragraphs 149 and 163. Even though these two statements refer obliquely to the present "market realities," that is not "particular" enough to make the present component of the mixed statement actionable. Consol. Compl. ¶ 149 (first quotation); *Avaya*, 564 F.3d at 256 (second one).

25

But one of the competitive-impact statements is not forward-looking. Paragraph 143 alleges that Crevoiserat suggested that "Tapestry had no intention of divesting brands to complete the Capri Acquisition." Consol. Compl. ¶ 143. That is an expression of the company's present intention, not a future projection, so it is not forward-looking.

Because most of the competitive-impact statements are forward-looking, I next need to determine whether they have adequate warning language. Most do. Consider, for instance, the statement in Paragraph 150. The forward-looking statement in the 8-K checks all the boxes. It specifically identified that the press release contained forward-looking statements and identified specific risk factors that could affect those statements, including the results of "legal proceedings related to the merger[,] the ability of the parties to consummate the proposed transaction on a timely basis or at all[, and] the satisfaction of the conditions precedent …, including the ability to secure regulatory approvals on the terms expected, at all or in a timely manner." D.I. 50-11 at 19; *see also* Consol. Compl. ¶¶ 149, 163.

But some of the statements lack adequate cautionary language. The statement in Paragraph 142 was oral. So, again, it is insulated only if (1) it is identified as forward-looking and warns that actual results may vary, (2) the speaker references written material with more details disclosures, and (3) the written material has cautionary language. *See EP Med systems*, 235 F.3d at 873 n.3. The language that defendants cite does not use the term "forward-looking," nor does it refer investors to written documents with more information, so it obviously does not meet those requirements.

Tapestry Opening Br. 60. Same for Paragraphs 143 and 146. *See id.* (regarding Paragraph 143: "[T]he market is pricing in a roughly 50% probability that the deal will be completed …. Some market participants see the odds closer to 40% ...."; regarding Paragraph 146: "We cannot speculate on the FTC's intentions …. [T]he Biden Administration has taken a tougher stance on mergers and acquisitions recently.")

In summary, all the competitive-impact statements are covered by the safe-harbor except for Paragraphs 142, 143, and 146. I do not address whether the bespeaks-caution doctrine would cover more. That doctrine "is analogous to" the statutory safe-harbor. *In re Aetna*, 617 F.3d at 282. I do not discuss it because, in the end, none of the statements is actionable. I also need not address whether the defendants knew that the competitive-impact statements (other than those in Paragraphs 142, 143, and 146) were false because adequate warning language is an independent basis for dismissal. I need not address whether defendants knew the statement in Paragraph 143 was false because it was not forward-looking, so the safe-harbor cannot apply. And I cannot conclude that Paragraphs 142 and 146 are not actionable because defendants did not know the statements were false—as I discuss next, defendants did not explain why they lacked scienter (be it recklessness or knowledge) about these statements.

*3. Plaintiffs adequately alleged scienter about at least one (and maybe more) of the competitive-impact statements.* Defendants do not explain, in their opening briefs, why they lacked scienter for the competitive-impact statements. The most extensive discussion consists of a single sentence: "Other presentations … suggest that

27

Tapestry intended to increase Michael Kors's value proposition to consumers, which would be pro-consumer." Tapestry Opening Br. 34. But that sentence still does not explain why defendants were not reckless about the truth of the statements. So I cannot dismiss plaintiffs' claim as to the competitive-impact statements for lack of scienter. *See* Consol. Compl. ¶ 142 ("But we continue to be confident because we know that this is a transaction that is pro-consumer.")

In fact, one of the competitive-impact statements gives rise to a strong inference of scienter: Capri's statement that "[t]he market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition." *Id.* ¶ 149; *see also id.* ¶ 163. That is a strikingly broad assertion. Taken literally, it implies that the deal would not reduce competition at all. That, of course, is likely false, since Capri and Tapestry both sold handbags and indeed were each other's closest competitor. And while sometimes a merger of competitors can increase competition by allowing the merged entity to compete better with other participants, that is by no means uniformly true. *Compare FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 175 (3d Cir. 2022) ("[A] merger can enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products.") (cleaned up)*, with United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017) ("Mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition.") (internal quotations omitted).

Internal communications suggested that executives at each company recognized

28

that the "two brands [were] in the same group[,] showing the same stuff [and] vying for the same customer." Consol. Compl. ¶ 80. It was common knowledge within Tapestry and Capri that each was the other's "key competitor." *Id.* ¶ 39. Other, even more on-point documents, suggest that some at Tapestry viewed the Capri deal as a chance to raise prices. *See id.* ¶ 66 (internal slide deck discussing "room to increase M[ichael] K[ors] AUR," or average unit retail price). The most plausible inference from those statements is that defendants were at the very least reckless about whether the merger would reduce competition. So defendants' statement was plausibly misleading, and plaintiffs adequately pleaded scienter as to the competitive-impact statements in Paragraphs 149 and 163.

Tapestry objects that plaintiffs are trying to make Capri liable for a corporate statement "without alleging facts showing scienter by any individual." Though the Third Circuit has never passed on the issue, some courts require securities-fraud plaintiffs to "identify a[n] … official responsible for the challenged [corporate] statement who also possessed scienter," and others "look[] to the state(s) of minds of certain employees to determine whether to impute scienter to the corporation." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 631 (D.N.J. 2023) (collecting cases). Only two circuits "allow[] a plaintiff to establish scienter against a corporation without specifically identifying an individual in a pleading." *Id.* at 632 (collecting cases). Ultimately, I need not pass on this issue because the statement described in Paragraphs 149 and 163 is unactionable for the distinct reason that it is forward-looking. *See supra* section II.C.2.

29

**D. The market-structure statements protected opinions or lack scien-
ter**

*1. Many of the market-structure statements are facts or protected opinions.* Many
of the challenged statements express a view about the market or industry in which
Capri and Tapestry operate. *See* Consol. Compl. ¶¶ 109 ("We [Tapestry and Capri]
play in a resilient $200 billion luxury market that includes handbags, footwear, and
apparel."), 149 ("Tapestry and Capri operate in the fiercely competitive and highly
fragmented global luxury industry. Consumers have hundreds of handbag choices at
every price point across all channels, and barriers to entry are low."), 151 ("We see
the FTC as fundamentally misunderstanding the marketplace and the way consum-
ers shop today as well as the impact of this deal on employees and workers in our
industry."). Those market-structure statements are different from the timeline and
competitive-impact statements because they describe present affairs, not subjective
views about future events.

But they are nonetheless opinions. Market definition is hard and involves "a
deeply fact-intensive inquiry." *Tapestry, Inc.,* 755 F. Supp. 3d at 415 (quoting *Todd v.
Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.)). Reasonable minds can
and often do differ about elasticities of demand, fragmentation, barriers to entry, and
the like. "Interpretations of clinical trial data are considered opinions." *Pfizer*, 754
F.3d at 170. Interpretations of microeconomic data are, too. *See* Consol. Compl. ¶ 152
("We spend time in the market and we have data and it is intensely competitive.");
*see also In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023) ("We
have rejected the proposition that a mere dispute about the proper interpretation of

30

data can form a basis for liability under section 10(b) and Rule 10b-5." (cleaned up)). Further bolstering that conclusion, some statements even use clearly subjective language. *See*, *e.g.*, Consol. Compl. ¶ 151 ("We see the FTC as fundamentally misunderstanding the marketplace ….").

Most of the market-structure statements do not fit into any of the exceptions that make opinions actionable. Plaintiffs' documents do not plausibly allege that defendants did not actually believe that the better market definition included all handbags or other luxury goods. Nor, generally, do they show that the implied factual assertions, such as that the barriers to entry are not high, are false. And for most—though not all—of the statements, "Plaintiff[s] do[] not allege particular facts suggesting that the Defendants knew these opinions to be baseless" or otherwise misleading. *Hering*, 331 F. Supp. 3d at 426. So for the most part, the market-structure statements are not actionable because they express opinions.

But some market-structure statements are not protected opinions because they misleadingly omit important information. Defendants repeatedly emphasized that they compete in a "fiercely competitive" and "highly fragmented" market. Consol. Compl. ¶¶ 115, 149, 150, 163; *see also id.* ¶ 128 ("fragmented"). And they maintained that the deal would not harm competition. *Id.* ¶¶ 149, 163. Yet plaintiffs' complaint is full of allegations that defendants had a more nuanced view of their industry. While defendants may have viewed their market as highly competitive, each also viewed the other as its biggest or main competitor. Plus, plaintiffs plausibly allege that defendants did not think that they were meaningfully competing with higher-end

31

luxury bags. Coach's CEO is quoted as saying "Gucci bags at $2000 is just not our customer in NA [North America]." *Id.* ¶ 61. Likewise, a Kate Spade executive allegedly commented, "Nobody says 'should I buy a LV [Louis Vuitton] bag or a Coach bag?'" *Id.* ¶ 62.

To be sure, "disclosure is not a rite of confession." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (cleaned up). Just as "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," they do not need to share their subjective views about the market(s) in which they operate. *Id.* (cleaned up). And pure omissions are not prohibited by Section 10(b). *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). So a company, even one under investigation by the FTC, is not required by the securities laws to publicly discuss its market outside the courtroom.

But once a company chooses to discuss its market, it cannot selectively disclose its opinions as both a sword (to garner public support and assuage its investors' fears) and a shield (by omitting directly relevant information that cuts against the disclosure). That is what plaintiffs allege Tapestry and Capri did with the market-structure statements. Once defendants commented on the specifics of the FTC's theory—by discussing fragmentation, barriers to entry, and the like—they also had to disclose other views that plaintiffs allege that they held: specifically, that Capri and Tapestry were each other's strongest competitors and that they did not see brands (like Louis Vuitton) significantly up-market from their own as real competitors. Consol. Compl. ¶ 149; *cf. SEB Inv. Mgmt. AB v. Endo Int'l, PLC,* 351 F. Supp. 3d 874, 911 (E.D. Pa. 2018)

(omitting facts in investor communications to overstate likelihood of FDA approval). To be clear, generally disputing the FTC's allegations was not enough to trigger this duty. Nor was disagreeing with the FTC's alleged market definition. Rather, defendants opened the door to the increased disclosure by commenting on market specifics when there were relevant and important facts and opinions undermining their stated views.

A final point on the market-structure statements' status as fact or opinion: One statement by Tapestry about the FTC litigation is not opinion at all. In disputing the FTC's allegations, Tapestry told investors that Tapestry and Capri "compete for consumers who are cross-shopping a wide range of channels and brands along a vast pricing spectrum when considering what to purchase." Consol. Compl. ¶ 150. That is a verifiable statement about the companies' customers, a present state of affairs. Under *Omnicare*, this is a statement of fact, not opinion. *Omnicare*, 575 U.S. at 183.

*2. None of the market-structure statements is forward-looking.* As I have explained, many of the challenged market-structure statements express a view about the market or industry in which Capri and Tapestry operate. *See supra* section II.D.1; *see, e.g.*, Consol. Compl. ¶¶ 109 ("We [Tapestry and Capri] play in a resilient $200 billion luxury market that includes handbags, footwear, and apparel."), 149 ("Tapestry and Capri operate in the fiercely competitive and highly fragmented global luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low.").

Even though those statements are about the merger, they (unlike the timeline

33

statements) also explicitly discuss present conditions. "A mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255 (cleaned up). Unlike *Avaya*'s statements that the defendants were "on track" to meet projections, the market-structure statements each "advert to a particular current fact," such as whether the market is "fragmented," whether there are meaningful "barriers to entry," and whether "consumers … cross-shop[] a wide range of channels and brands along a vast pricing spectrum" when purchasing handbags. *Id.* at 256 (first and second quotations); Consol. Compl. ¶¶ 149 (third and fourth quotations), 150 (fifth quotation). Those factual statements "c[an] be distinguished" from the future-looking aspects of the merger commentary. *Avaya*, 564 F.3d at 256. So none of the market-structure statements (that is, the statements in Paragraphs 109, 115, 128, 149, 150, 151, 152, 160, and 163) fit in the forward-looking safe-harbor.

Defendants resist that conclusion, insisting that litigation posturing is forward-looking. Tapestry Opening Br. 25–26; Capri Opening Br. 22. There are two problems with that objection. First, only some of these statements occurred after the FTC litigation began. Those predating the FTC's complaint do not fit into the litigation exception. But more importantly, all these statements are meaningfully different from the litigation-related statements held by other district courts to be forward-looking. For example, one court concluded that the defendant's litigation posturing was forward-looking—but the challenged statements were merely general objections to the litigation. *See, e.g.*, *In re GlaxoSmithkline*, 2006 WL 2871968, at *9–10 (S.D.N.Y. Oct.

34

6, 2006) ("We are very confident we can defend our patents."). The same goes for *Dang v. Amarin Corp.*: Most of those statements were general statements of optimism about the litigation or intent to appeal. *See* 750 F. Supp. 3d 431, 449 (D.N.J. 2024) ("[W]e believe that we have numerous arguments that will contribute to a strong substantive appeal …."). The market-structure statements are much more specific than those.

Defendants also assert that the market-structure statements are not actionable because defendants never guaranteed that the FTC would bless the merger. *See* Capri Reply Br., D.I. 60, at 15 (*citing In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 131 (3d Cir. 2017)). That reasoning supports my conclusion that the *timeline* statements fall within the forward-looking safe-harbor. *See supra* section II.B.2. But the market-structure statements are more present-oriented and more concrete than either the timeline statements or the statements in the Third Circuit's unpublished *Amarin* decision, which centered on whether a "long-term outcome trial" was necessary for a future FDA approval of a new drug. *Amarin*, 689 F. App'x at 130. So that decision is inapplicable.

*3. The market-structure statements are a close call, but plaintiffs do not adequately allege scienter.* Even though many of the market-structure statements are actionable opinions (or facts), and even though those statements do not qualify for the forward-looking safe harbor, plaintiffs' allegations as to those statements founder on scienter. In securities law, scienter does not mean merely an intent to do bad things. It refers to a specific mental state: "conduct designed to deceive or defraud investors by

controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). So a defendant does not have scienter merely because he intends to do something uncouth, fraudulent, or even illegal. Rather, a defendant has scienter when he is at least reckless about affecting the price of the security or misleading investors. *See Kalnit*, 264 F.3d at 141 ("[I]ntent to defraud [the acquirer corporation in a merger] cannot be conflated with an intent to defraud the shareholders."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 623 (S.D.N.Y. 2005) (applying *Kalnit*).

Recklessness is not the most likely inference here. Rather, the most likely inference from the market-structure statements is that the speakers genuinely thought they competed in a market that encompassed more than just accessible-luxury handbags. *See Williams*, 889 F.3d at 1173. Just as "it is improbable that a company would stake its existence on a drug and a clinical trial that the company thought was doomed to failure," so too it is improbable that a company would risk the dire consequences—not least, a precipitous fall in stock price—of a merger that it recklessly pursued. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) (cleaned up). Plaintiffs line up a long list of defendants' statements and internal documents that prove that Capri and Tapestry each regarded the other as its "key competitor." Consol. Compl. ¶ 39; *see also id.* ("biggest competitor"). The extensive allegations in the complaint about the companies' strategic pricing provide additional support for Capri and Tapestry's close competitive relationship. *See, e.g., id.* ¶¶ 46, 48, 52. And several internal documents show that Capri and Tapestry viewed "accessible luxury" as a

36

meaningfully different market segment, separate from true or European luxury, on the one hand, and mass-market bags, on the other. *See, e.g., id.* ¶ 59.

But the most compelling inference from those factual allegations is not that Capri and Tapestry thought that "accessible-luxury" handbags were a distinct *antitrust market*, or that their merger would monopolize that market. Rather, the most compelling inference is that Capri and Tapestry knew that theirs was a merger of close competitors but thought that it could nevertheless be lawful, especially because no court had recognized "accessible-luxury" handbags as a relevant antitrust market (yet). *See id.* ¶ 154 ("We spend time in the market and we have data and it is intensely competitive.").

Note what the complaint lacks. It never alleges that Capri and Tapestry hawked false data to investors. That critical fact distinguishes this case from *Alaska Electric Pension Fund v. Pharmacia Corp*, where defendants allegedly manipulated data to "trick" an academic journal into publishing an article complementary of a drug that defendants produced. 554 F.3d 342, 351 (3d Cir. 2009). The complaint here, in contrast, alleges that defendants publicly advocated their reading of data—that accessible-luxury handbags do not compose a freestanding market under antitrust law, such that the merger would have been unlawful.

Nor did defendants say that the FTC had, or would, approve the transaction. So this case is distinguishable from *Skiadas v. Acer Therapeutics Inc.*, where the defendants falsely told investors that "the FDA had agreed to approve [a drug] when the FDA had not so agreed." 2020 WL 4208442, at *8 (S.D.N.Y. July 21, 2020). Nor, again,

does this complaint feature allegations about insider stock sales that would motivate defendants to inflate stock prices during the merger-review period. *See Suprema Specialties*, 438 F.3d at 277; section II.B.3, *supra*.

One last thing cuts against any inference of recklessness about the market-structure statements: These statements were most likely not directed at investors. Rather, they were litigation advocacy targeted towards the *FTC* in an effort to convince the antitrust regulator to back off. To the extent that defendants must be at least reckless with regard to *investors*, the inference that defendants were advocating to the FTC also cuts against the inference that they consciously disregarded a substantial risk that investors would be misled. *See Kalnit*, 264 F.3d at 143.

### E. Plaintiffs' other objections do not sway me

Plaintiffs object that none of the challenged statements are opinions because defendants misrepresented objective facts, did not actually hold the opinions that they expressed, and omitted key information. But I am not persuaded.

Begin with misrepresentation. Plaintiffs are right that misrepresentation of true facts is actionable. *Cf. Alaska Elec. Pens. Fund*, 554 F.3d at 352 ("While it is true that a legitimate disagreement over scientific data does not give rise to a securities fraud claim, plaintiffs alleged something quite different: a bad-faith misrepresentation of scientific data. Those allegations are sufficient to withstand the '[e]xacting pleading requirements' of the PSLRA …."). But the timeline statements are not bad-faith misrepresentations of objective facts. They express defendants' view about inherently uncertain future events. *Cf. Pfizer*, 754 F.3d at 170 ("Interpretations of clinical trial data are considered opinions."). The same goes for the competitive-impact and

38

market-structure statements listed above as opinions—they are analyses based on data, not misrepresentations of the underlying facts.

Next, consider the sincerity of defendants' beliefs. Plaintiffs have not alleged facts making it plausible that defendants did not sincerely believe the timeline statements. Plaintiffs again cite *Chabot*, which held that misrepresenting the timeline for a deal closing was actionable. *See* Capri Answering Br. 16 (citing *Chabot*, 2023 WL 2908827, at *15). But the statements at issue in *Chabot* "implied [that the speaker] had inside information contradicting negative media reports about the approval process." *Chabot*, 2023 WL 2908827, at *13. Defendants' statements here never implied that.

Finally, consider the allegation that defendants' statements omitted material facts. Neither the timeline statements nor the competitive-impact statements were specific enough to require disclosure about defendants' views on the close relationship between Tapestry and Capri. "An opinion statement … is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189. The timeline and competitive-impact statements involved "a weighing of competing facts" about a litany of things, ranging from the competitive relationship between Capri and Tapestry, to the pro-competitive justifications for the merger, to (critically) the proper market definition. *Id.* at 190; *see also supra*, Sections II.B–C. "Reasonable investors understand that opinions sometimes" involve weighing competing facts, and reasonable investors would have understood the timeline and competitive-impact statements to involve such weighing. *Id.* at 189–90. These statements are like the optimistic statements about a pending FDA application that the

Second Circuit found unactionable in *Tingue v. Sanofi*. 816 F.3d 199 (2d Cir. 2016). That court rejected a Rule 10b-5 claim based on an alleged "failure to include a fact that would have potentially undermined defendants' optimistic projections." *Id.* at 212. The court reasoned that "*Omnicare* imposes no such disclosure requirements on issuers" so long as the optimism is "fairly aligned with the information in the issuer's possession." *Id.* (cleaned up). That alignment is present here too. So the timeline and competitive-impact statements are protected opinion.

But, as I explained, several of the market-structure statements are different because they are more specific and hence more directly contradicted by defendants' knowledge about the closeness of the competition between Capri and Tapestry. Those statements, though opinion, are actionable because they misleadingly omit important facts. Even so, they still fail because plaintiffs did not adequately plead scienter. *See supra*, Section II.D.3.

### F.  Plaintiffs do not plausibly allege a scheme

Plaintiffs argue that they "allege[] scheme liability under Rule 10b-5(a) and (c)," even though the complaint never even cites those provisions. Capri Answering Br. 34. Not so. Scheme liability "must entail a defendant's undertaking of a deceptive scheme or course of conduct that went beyond misrepresentations." *In re Royal Dutch/Shell Transport*, 2006 WL 2355402, at *8 (D.N.J. Aug. 14, 2006). Plaintiffs do not explain what, other than the misrepresentations, was fraudulent or deceptive about defendants' conduct. And though plaintiffs suggest that defendants forfeited any challenge to scheme liability by failing to brief it in their motions to dismiss, there was no forfeiture because the "the claims were not actually pled." Capri Reply Br. 19; *see Nash*

40

*v. Qualtrics Int'l Inc.*, 2024 WL 231870, at *6–7 (D. Del. Jan. 22, 2024).

### G. I need not address loss causation or the purchaser-seller rule

Defendants argue that when a known risk materializes, that cannot support loss causation—one of the elements of a successful Rule 10b-5 claim. The Tapestry defendants also raise some issues related to the purchaser-seller rule, which restricts standing in Rule 10b-5 cases to "actual purchasers and sellers" of securities. *Blue Chip Stamps*, 421 U.S. at 731. But I have already concluded that all of the allegedly actionable statements are not actionable for one reason or another. *See infra*, Appendix Summary Table. So I need not address loss causation or the purchaser-seller rule.

### III.    THE § 20(A) CLAIM FOLLOWS THE § 10(B) CLAIM

"If the § 10(b) claim is inadequate, then so is the § 20(a) claim." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 429 (5th Cir. 2019). Because plaintiffs' § 10(b) claim cannot proceed, I dismiss their § 20(a) claim too.

\* \* \* \* \*

Making predictions about antitrust law is treacherous. But the securities laws immunize all of defendants' statements since some are opinions, some are forward-looking, some were probably not made with scienter, and others are all three. I dismiss the complaint without prejudice.

41

**Appendix: Summary Table**

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 103 | "[W]e think that the timeline that we've laid out reflects just what we see in the market today and we think that's a realistic timeline to closing." | Oral | Timeline | Yes | Yes | No | Yes |
| 103 | "We're confident that this deal brings tremendous value to consumers as well as to our brand." | Oral | Timeline | Yes | Yes | No | Yes |
| 104 | "The transaction is anticipated to close in calendar year 2024." | Written | Timeline | Yes | Yes | Yes | Yes |
| 105 | "[W]e expect the deal to close in calendar year 2024." | Oral | Timeline | Yes | Yes | Yes | Yes |
| 109 | "We [Tapestry and Capri] play in a resilient $200 billion luxury market that includes handbags, footwear, and apparel." | Oral | Market structure | Yes | No | n/a | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 112 | "[W]e're confident in our ability to complete this transaction." | Oral | Timeline | Yes | Yes | Yes | Yes |
| 115 | "Management remains highly confident in its ability to complete the acquisition." | Written | Timeline | Yes | Yes | Yes | Yes |
| 115 | "The companies operate in an attractive, growing, global, highly fragmented market." | Written | Market structure | No | No | n/a | Yes |
| 119 | "Capri continues to expect that the Transaction will be completed in calendar year 2024, subject to the expiration or termination of the waiting period under the HSR Act and the satisfaction or waiver of the other closing conditions specified in the Merger Agreement." | Written | Timeline | Yes | Yes | Yes | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 120 | "The Company continues to expect that the Transaction will be completed in calendar year 2024, subject to the expiration or termination of the waiting period under the HSR Act and the satisfaction or waiver of the other closing conditions specified in the Merger Agreement." | Written | Timeline | Yes | Yes | Yes | Yes |
| 121 | "[T]he Capri Acquisition 'is expected to close during calendar year 2024.'" | Written | Timeline | Yes | Yes | Yes | Yes |
| 122 | "Tapestry assured investors that it 'is working to receive all required regulatory approvals, including responding to [the Second Request],' and that Tapestry 'remains confident in the ability to complete this transaction, with a close expected in calendar 2024, consistent with prior expectations.'" | Written | Timeline | Yes | Yes | Yes | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 123 | "We remain confident in our ability to complete the transaction with a close anticipated in calendar 2024, consistent with our prior outlook …." | Oral | Timeline | Yes | Yes | Yes | Yes |
| 128 | "[W]e still expect to close the deal in fiscal '24." | Oral | Timeline | Yes | Yes | Yes | Yes |
| 128 | "[W]e operate in a large market, as I talked about, it's the $200 billion market. It's fragmented. There are low barriers to entry and the transaction is pro-consumer." | Oral | Market structure | No | No | n/a | Yes |
| 128 | "So we remain confident in our ability to complete the transaction, again, closing expected in calendar '24, consistent with our prior expectations." | Oral | Timeline | Yes | Yes | Yes | Yes |
| 131 | "[T]he Capri Acquisition 'is expected to close during calendar year 2024.'" | Written | Timeline | Yes | Yes | Yes | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 132 | "Tapestry remains confident in the ability to complete the transaction, with a close expected in calendar 2024, consistent with prior expectations." | Written | Timeline | Yes | Yes | Yes | Yes |
| 132 | "[T]he Capri Acquisition 'is expected to close in calendar 2024.'" | Written | Timeline | Yes | Yes | Yes | Yes |
| 133 | "[I]n terms of timing, we remain confident in our ability to complete the transaction with a close expected in calendar 2024, consistent with our original expectations." | Oral | Timeline | Yes | Yes | Yes | Yes |
| 133 | "We're making progress as we expected towards the close in this calendar year that's unchanged from our prior outlook." | Oral | Timeline | Yes | Yes | Yes | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 136 | "The company remains confident in completing the CPRI acquisition, and the process remains on the expected timeline to close in calendar 2024 … Management reiterated that it remains confident in closing the deal, and that it is exactly where it thought it would be at this point, noting that it expected a somewhat drawn out process as reflected in the expected closing timeline of calendar 2024…" | Oral | Timeline | Yes | Yes | No | Yes |
| 142 | "But we continue to be confident because we know that this is a transaction that is pro-consumer." | Oral | Competitive impact | No | Yes | No | No |
| 142 | "We had set a calendar 2024 expectation, and we're still confident that we can complete the deal." | Oral | Timeline | Yes | Yes | No | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 143 | "Defendant Crevoiserat added that Tapestry had no intention of divesting brands to complete the Capri Acquisition, claiming, 'We don't think that it's necessary.'" | Oral | Competitive impact | Yes | No | No | No |
| 146 | "Tapestry claimed to 'strongly believe this is a deal that deserves to clear as it is pro-consumer and pro-competitive' and that '[w]e have full confidence in the merits of this transaction and in our legal arguments, should we need to make them.'" | Oral | Competitive impact | Yes | Yes | No | No |
| 149 | "The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition." | Written | Competitive impact | No | Yes | Yes | No |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 149 | "Tapestry and Capri operate in the fiercely competitive and highly fragmented global luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low. Capri intends to vigorously defend this case in court alongside Tapestry and complete the pending acquisition." | Written | Market structure | No | No | n/a | Yes |
| 150 | "There is no question that this is a pro-competitive, pro-consumer deal and that the FTC fundamentally misunderstands both the marketplace and the way in which consumers shop." | Written | Competitive impact | Yes | Yes | Yes | No |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 150 | "Tapestry and Capri operate in an intensely competitive and highly fragmented industry alongside hundreds of rival brands, including both established players and new entrants. We also compete for consumers who are cross-shopping a wide range of channels and brands along a vast pricing spectrum when considering what to purchase. The reality is that consumers have a host of choices …. The bottom line is that Tapestry and Capri face competitive pressures from both lower- and higher-priced products. In bringing this case, the FTC has chosen to ignore the reality of today's dynamic and expanding $200 billion global luxury industry." | Written | Market structure | No | No | n/a | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 150 | "We have full confidence in the merits and pro-competitive nature of this transaction." | Written | Competitive impact | Yes | Yes | Yes | No |
| 151 | "We see the FTC as fundamentally misunderstanding the marketplace and the way consumers shop today as well as the impact of this deal on employees and workers in our industry." | Oral | Market structure | Yes | No | n/a | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 152 | "[S]he told me she is 'disappointed but quite surprised with the way the FTC is thinking about the market.' She said: 'They fundamentally misunderstand the market and the way consumers shop.' She said: 'We spend time in the market and we have data and it is intensely competitive.' Crevoiserat following up by saying 'duopoly?' Because we mentioned this idea that the FTC referred to as Kors-Coach duopoly. She said: 'I wish our job was that easy, I wish we had to worry about one competitor.'" | Oral | Market structure | Yes | No | n/a | Yes |
| 155 | "Tapestry stated that the Capri Acquisition 'is expected to close during calendar year 2024.'" | Written | Timeline | Yes | Yes | Yes | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 156 | "Tapestry is 'confident in the merits and pro-competitive, pro-consumer nature of this transaction and looks forward to presenting its strong legal arguments in court.'" | Written | Competitive impact | Yes | Yes | Yes | No |
| 156 | "Tapestry is '… working expeditiously to close the transaction in calendar year 2024.'" | Written | Timeline | Yes | Yes | Yes | Yes |
| 157 | "Tapestry remains 'confident in the merits and pro-competitive, pro-consumer nature of this transaction and look[s] forward to presenting our strong legal arguments in court.'" | Oral | Competitive impact | Yes | Yes | Yes | No |
| 160 | The company is "working to help the FTC understand key industry dynamics (such as high fragmentation & low barriers to entry, among others)." | Oral | Market structure | Yes | No | n/a | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 163 | "The market realities, which the government's challenge ignores, overwhelmingly demonstrate that this transaction will not limit, reduce, or constrain competition." | Written | Competitive impact | No | Yes | Yes | No |
| 163 | "Tapestry and Capri operate in the fiercely competitive and highly fragmented global fashion luxury industry. Consumers have hundreds of handbag choices at every price point across all channels, and barriers to entry are low." | Written | Market structure | No | No | n/a | Yes |
| 166 | "The Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction …." | Written | Competitive impact | Yes | Yes | Yes | No |
| 166 | "The Company is … working expeditiously to close the transaction in calendar year 2024." | Written | Timeline | Yes | Yes | Yes | Yes |

| Complaint Paragraph | Statement | Oral or Written | Category | Non-Actionable Opinion | Forward-Looking | Adequate Warning Language | Failure to Plead Scienter |
|---|---|---|---|---|---|---|---|
| 170 | "The Company is confident in the merits and pro-competitive, pro-consumer nature of this transaction …." | Written | Competitive Impact | Yes | Yes | Yes | No |
| 170 | "The Company is … working expeditiously to close the transaction in calendar year 2024." | Written | Timeline | Yes | Yes | Yes | Yes |